**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF MISSISSIPPI**
**JACKSON DIVISION**

| | |
|---|---|
| PHI THETA KAPPA HONOR SOCIETY, | Civil Action No. 3:22-cv-00208-CWR-RPM |
|     Plaintiff/Counter-Defendant, | |
| v. | |
| HONORSOCIETY.ORG INC., | |
|     Defendant/Counter-Plaintiff | |
| HONOR SOCIETY FOUNDATION, INC., | |
|     Defendant. | |
| HONORSOCIETY.ORG INC., | |
|     Defendant/Counter-Plaintiff/Third-Party Plaintiff | |
| v. | |
| LYNN TINCHER-LADNER, | |
|     Third-Party Defendant. | |

**HONORSOCIETY.ORG, INC.'S SECOND-AMENDED COUNTERCLAIMS AND**
**SECOND-AMENDED THIRD-PARTY COMPLAINT**

Defendant, Counter-Claimant, and Third-Party Plaintiff HonorSociety.org Inc. brings this Second Amended Counterclaims against Counter-Defendant Phi Theta Kappa Honor Society ("PTK"), and Second Amended Third-Party Complaint against Third-Party Defendant Lynn Tincher-Ladner, on personal knowledge as to HonorSociety's own activities and on information and belief as to the activities of others as follows:

### Nature of the Case

1.     This is a case under the Sherman Antitrust Act to recover damages that HonorSociety suffered from counterclaim-defendant PTK's attempted monopolization of the market for general honors societies for community-college students in the United States, which are membership clubs that provide a package of services consisting of general resources, scholarships, membership recognition, academic recognition, and networking resources and opportunities.

2.     HonorSociety also seeks to recover damages that it suffered from false advertising, cybersquatting, defamation, and tortious interference caused by counterclaim-defendant PTK and third-party defendant Tincher-Ladner.

3.     HonorSociety and PTK operate competing membership-based academic and professional societies providing a range of services and benefits to their respective members.

4.     PTK has long been the dominant provider of academic and professional focused membership services to community-college students. It is over 100 years old and has members at hundreds of community colleges in the United States.

5.     PTK has long marketed itself as an elite society consisting of only the top-performing community-college students.

6.     HonorSociety is a new entrant to the market, launched just over a decade ago. In contrast with PTK's focus on exclusivity, HonorSociety markets itself both to students that have achieved academic success as well as those who aspire to do so. By focusing its services around more modern values of inclusivity, HonorSociety has quickly become the second-largest competitor in the relevant market for community-college honors societies.

7.     Faced with meaningful competition after decades of uncontested market dominance, PTK engaged in a series of anticompetitive actions intended to harm HonorSociety and drive it from the market. For example, PTK has repeatedly contacted community colleges urging them—based on false accusations about HonorSociety—to warn community-college students about joining HonorSociety. It has also sought to have schools block HonorSociety's communications from reaching current and potential customers.

8.     This is not the first time that PTK has attempted to eliminate competition and maintain its market dominance. PTK has actively engaged in a course of anticompetitive conduct designed to prevent other potential market entrants from providing services to community-college students.

9.     PTK's anticompetitive efforts to maintain or retain dominance in the relevant market also include its use of a combination of false or misleading marketing claims designed to eliminate any competition. PTK can only convince schools to blackball new entrants and block HonorSociety's communications by leveraging its already dominant market position to gain even more market power and exclude competition.

10.     First, relying solely on a recognition in 1929 by an industry association that PTK was **an** official honor society for community colleges—PTK now markets itself as the "**only** official" honor society for community colleges. This implies that all community colleges exclusively recognize PTK as legitimate to the exclusion of all others. PTK's claim is false. The 1929 recognition was never intended to be exclusive. It expressly acknowledged that the policy would allow for the approval of other honors societies in addition to PTK. Also, not all community colleges participate in the industry association that PTK claims made it the "only official" honor society for all community colleges.

11.     PTK's claims about being the only official honor society have caused consumers in the relevant market to purchase PTK's membership services to the exclusion of competition. Those consumers would have otherwise purchased services from one of PTK's competitors in the relevant market had PTK not repeatedly published that false claim.

- 3 -

12.   PTK also consistently represents to community-college students that its benefits include access to hundreds of millions of dollars in "exclusive" transfer scholarships awarded to students transferring to a four-year college or university. This claim implies that students cannot obtain these transfer scholarships unless they are members of PTK. This claim is false, as transfer scholarships are widely and readily available from four-year colleges and universities to all qualifying students, and not exclusively limited to PTK members.

13.   Finally, PTK invites students to join its membership, and induces their purchase based on a representation that the students are in the top 10% of their community college by grades. PTK further represents that if those students join PTK they will be part of a society limited to the top 10% of community-college students. These claims are false. In truth, PTK has no information as to which students are in the top 10%. The only information available to PTK is students' cumulative GPA. PTK generally invites only students with a 3.5 or higher GPA. But a 3.5 GPA at community colleges does not correspond to being in the top 10%. Rather, a 3.5 GPA ranges from approximately the top 20–40% depending on the school.

14.   PTK's false claims had several effects. First, PTK's false claims caused consumers in the relevant market to purchase PTK's membership services to the exclusion of competition—including but not limited to HonorSociety—believing they could access transfer scholarships and be part of a top-10% club by joining PTK. Those consumers would have otherwise purchased services from one of PTK's competitors in the relevant market had PTK not repeatedly published those false claims. Second, PTK's claims constitute false advertising causing HonorSociety in particular to lose sales that it would have otherwise enjoyed had PTK not published those false claims.

15.   PTK's web of misrepresentations is one component of its efforts to create significant barriers to entry to potential competitors.

16.   PTK's exploitation of its market dominance isn't limited to extracting membership fees from community-college students with no ability to obtain services from a competitor. In addition to generating revenue from student memberships, PTK also sells its student's private

- 4 -

and personal information to third parties—businesses and universities—that want to market to the students. PTK does not obtain informed consent from its members to selling their personal information. Instead, it transfers their information first to another entity which has no relationship with the student members and then that entity enters agreements to sell personal information, generating millions of dollars of annual revenue. PTK makes those sales under false pretenses, misrepresenting to purchasers of its students' information that they are paying for access to the top 10% of community college students in the U.S., which is false and yet another claim that PTK has no basis for making.

17.    PTK and Tincher-Ladner have engaged in other bad-faith tactics designed to harm HonorSociety's business and goodwill in particular. Just before filing this lawsuit, ███████ ████████████████████ to register at least five internet domain names confusingly similar to HonorSociety's federally registered HONOR SOCIETY® trademark, U.S. Reg. No. 4,662,343.

18.    PTK surreptitiously registered those domain names using proxy registration information to conceal their registration that HonorSociety would not be alerted to the cybersquatting. Tincher-Ladner then directed PTK to █████████████████████████ ██████████████████████████████████████████.

19.    HonorSociety has filed this Second Amended Counterclaims and Second Amended Third-Party Complaint to assert claims for attempted monopolization in violation of Section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2, false advertising under the Lanham Act, 15 U.S.C. § 1125(a), violations of the Anticybersquatting Consumer Protection Act, 15 U.S.C. § 1125(d), and defamation and tortious interference under Mississippi common law.

20.    Through these counterclaims and third-party claims, HonorSociety seeks to recover the damages it has suffered on account of PTK and Tincher-Ladner's intentional misconduct, as well as recover punitive damages sufficient to deter similar future misconduct.

## Parties

21.    HonorSociety is a corporation incorporated under the laws of Nevada with its principal place of business in Las Vegas, Nevada.

22.     PTK is a corporation organized and incorporated under the laws of the State of Mississippi with its principal place of business in Jackson, Mississippi.

23.     Lynn Tincher-Ladner is a citizen of Mississippi. She is the President and CEO of PTK.

## Jurisdiction and Venue

24.     This Court has subject-matter jurisdiction over this action under 28 U.S.C. §§ 1331, 1337, and 1338(a) and (b) because this action arises under the laws of the United States, namely the Sherman Antitrust Act, Lanham Act, and Anticybersquatting Consumer Protection Act. This Court has supplemental jurisdiction under 28 U.S.C. § 1367(a) of the related state-law claims that are factually interdependent with the federal-law claims, and that arise from the same case or controversy.

25.     This Court also has original jurisdiction under 28 U.S.C. § 1332, as HonorSociety is a citizen of a different state than both PTK and Tincher-Ladner, and the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs.

26.     This Court has personal jurisdiction over PTK and Tincher-Ladner because they reside in, and are citizens of, Mississippi.

27.     Venue is proper under 28 U.S.C. § 1391(b)(1) because both PTK and Tincher-Ladner reside in this judicial district, and they are both residents of the State of Mississippi.

28.     Venue is also proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims for relief occurred in Mississippi.

29.     Venue is also proper under 28 U.S.C. §§ 1391(b)(3) and 1391(c)(2) because PTK and Tincher-Ladner are individuals and business entities that are subject to this Court's personal jurisdiction.

## Relevant Market

30.     The relevant product market for HonorSociety's antitrust claim is the market for general honors societies for community-college students, which are membership clubs that

provide a package of services consisting of general resources, scholarships, membership recognition, academic recognition, and networking resources and opportunities.

31.    The relevant geographic market is the United States.

32.    Participants in the relevant market offer unique benefits tailored to the needs and aspirations of community-college students. These membership clubs focus on providing community-college students with general networking opportunities, scholarships, and leadership development specific to two-year college environments.

33.    For example, participants in the relevant market all offer:

a.    information about transfer scholarships, which are scholarships that four-year universities and colleges offer students who transfer from community colleges to those schools;

b.    scholarship databases, showing scholarships available to community-college students;

c.    information to their members about transferring to four-year universities, such as profiles about every four-year university in the United States, and university-transfer opportunities;

d.    academic recognition in the form of certificates and profiles of students who achieve certain grade-point averages;

e.    general resources, such as savings and discounts on products and services;

f.    events where members convene together to network;

g.    educational content about how best to get a job, get ready for a member's first professional employment, and excel professionally once employed; and

h.    perhaps most importantly, a sense of belonging to a community of community-college students who are focused on leadership and academic success.

34.    PTK is the dominant provider of services in the relevant market. HonorSociety surveys have indicated that PTK enjoys about a 55% market share in the relevant market.

35.     HonorSociety has the second-largest market share in the relevant market behind PTK. HonorSociety surveys have indicated that HonorSociety enjoys about a 20% market share in the relevant market.

36.     Other participants in the relevant market include National Society of Leadership & Success (about a 15% market share), National Society of Collegiate Scholars (about a 3% market share), Phi Sigma Pi (about a 2% market share), and Alpha Beta Kappa (less than 1% market share).

37.     Community-college students cannot substitute honors societies that provide resources, scholarships, and networks directed to four-year-college students or graduate students for those directed to community-college students because two-year-college students do not qualify to join. So those honors societies are outside the relevant market.

38.     The relevant market consists of general honors societies—that is honors societies that accept students regardless of their chosen fields of study or personal demographics.

39.     Community-college students cannot substitute membership clubs with limited fields of studies—such as those specific to business, nursing, psychology, communication, or English studies—for general honors societies.

40.     For example, Alpha Beta Gamma (ABG) is an international business honors society for students enrolled in business and professional programs at two-year colleges. But most students are not enrolled in business and professional programs, and so they do not qualify for ABG.

41.     Psi Beta is the national honors society in psychology for community colleges. Students who are not psychology students do not qualify for it.

42.     Sigma Chi Eta is the national communication association's honors society at two-year colleges. It recognizes students who excel in communication studies and promotes their career development. But students who are not enrolled in communications degrees do not qualify for Sigma Chi Eta.

43.     Sigma Kappa Delta is the national English honors society for two-year colleges. Its central purpose is to confer distinction upon students of the English language and literature in undergraduate studies. But most students are not English students, and so they do not qualify for membership.

44.     Community-college students cannot substitute membership clubs accepting only members of limited demographics—such as disabled persons—for general honors societies.

45.     For example, Delta Alpha Pi is an academic honors society founded to recognize high-achieving students with disabilities who are attending colleges. But to qualify, students must present with a documented disability, which most students cannot satisfy.

46.     While ABG, Psi Beta, Sigma Chi Eta, Sigma Kappa Delta, and Delta Alpha Pi might each be a complementary membership club for students who study business, psychology, communications, or English, or for students with disabilities, none is a substitute for membership clubs that provide a package of services to community-college students in the United States which consist of general resources, scholarships, membership recognition, academic recognition, and networking resources and opportunities. ABG, Psi Beta, Sigma Chi Eta, Sigma Kappa Delta, and Delta Alpha Pi do not provide the general networking and resources that participants in the relevant market provide, but instead provide resources limited to their niche field-of-study focuses.

47.     Nor can community-college students substitute honors societies available to students in other countries for those available in the United States. Rather, students at community colleges in the United States require services that can support their academic and professional needs in the United States.

## Factual Allegations

**A.    HonorSociety offers an academic and professional membership society to students including those at community colleges.**

48.     HonorSociety is an inclusive academic and professional achievement society. HonorSociety's membership base includes approximately 1.5 million individuals, comprised of

professionals, alumni, as well as active students. HonorSociety has members in all 50 states and from dozens of countries worldwide.

49.     HonorSociety's mission is to create a platform to give all students and interested members of the general public a place to recognize their achievements, to empower them, and to maximize their individual success.

50.     HonorSociety's mission has always included a focus on developing opportunities for those who may be overlooked or underserved, whether in traditional higher education or elsewhere.

51.     HonorSociety is available to, and has members in, each of the distinctive higher-education markets including students in four-year universities and those in two-year community colleges, as well as alumni and others associated with higher education.

52.     Because HonorSociety is inclusive, welcoming students who have accomplished academic success as well as those who aspire to do so, it does not claim to limit its membership based on arbitrary criteria such as GPA. Everyone who cares about academic success is welcome to join HonorSociety and has equal access to HonorSociety's scholarship platform, benefits, and other services.

53.     Yet traditional measures of success based on GPA are still recognized at HonorSociety. Its members who achieve specified GPA thresholds qualify for recognition as follows: "Honors" for 3.2 and above, "High Honors" for 3.5 and above, and "Highest Honors" for 3.8 and above.

54.     Because many different honors societies exist with different focuses and purposes, HonorSociety does not hold itself out as being the only one. Students can choose which organization they would prefer to belong to.

55.     HonorSociety offers members a wide range of benefits and value, depending on their membership tier, including access to its scholarship platform, career-networking opportunities, and education programs.

56.     Benefits include access to a range of scholarships via the HonorSociety platform to connect with potential scholarship opportunities, including approximately $500,000 in scholarships funded through Defendant Honor Society Foundation.

57.     HonorSociety members also have access to a range of career-related tools, including a job board on the HonorSociety website and access to Vault Career Guides. HonorSociety pays a third party for access to Vault Career Guides but makes it available without additional charge to certain tiers of HonorSociety membership classes. Vault Career Guides is also used by schools, including some Ivy League schools, and other institutions, making the tool particularly valuable to HonorSociety members. It provides students with access to information about what it's like to really work within an industry, company, or profession and advises students on how to position themselves to launch and build their career.

58.     HonorSociety members also have access to a mentorship platform connecting them with mentors for feedback on professional and personal development, including offering feedback on resumes, conducting mock job interviews, as well as providing insight based on experience in particular job roles and particular industries.

59.     HonorSociety also runs networking events across the country for members, which have recently included, for example, events in Seattle, New Orleans, here in Jackson, Mississippi, and attending NBA and NHL games with other members.

60.     Those include member nights and member trips where students and other members can come together and network. Trips offered to members have included a banquet with distinguished speakers, including Antonio Villaraigosa, the former mayor of Los Angeles.

61.     HonorSociety proudly provides its members with graduation stoles bearing the HonorSociety crest. Stoles are traditional graduation decorations students wear as part of their personal expression for a variety of reasons, including their commitment to a particular faith, a particular ethnic heritage, Greek fraternity or sorority, specific organization on campus, and many other similar interests.

62.     Graduation stoles frequently represent membership in an honors society for students for whom that has personal significance. Because gold is the traditional color for academic success, students expect stoles—including HonorSociety's stoles—to feature gold. The majority of honors societies use gold regalia.

63.     In addition to stoles, HonorSociety offers members options for other graduation regalia, including obtaining honor cords and medallions. These choices allow individual HonorSociety members to select their preferred means of expression during graduation.

64.     HonorSociety's regalia uses wreath imagery to denote academic success, which higher-education students expect as a famous symbol of academic excellence, as first made famous by Socrates and other ancient Greeks.

65.     In addition, members of HonorSociety have access to dining discounts, and discount dental, vision, and hearing health plans.

**B.     PTK is the dominant provider of honors-societies services to community-college students.**

66.     PTK has long been the dominant provider of honors-societies services in the relevant market. It is over 100 years old and has members at hundreds of community colleges in the United States.

67.     PTK has long marketed itself as an elite society consisting of only the top-performing community college students.

68.     Faced with meaningful competition after decades of uncontested market dominance, PTK engaged in a series of anticompetitive actions intended to harm HonorSociety and drive it from the relevant market.

69.     For example, PTK has repeatedly contacted community colleges urging them—based on false accusations about HonorSociety and other would-be competitors—to warn community-college students about joining HonorSociety and the others.

70.     PTK employees have also, on multiple occasions, ███████████████████ ███████████████████████████████████ .

71.     This is not the first time PTK has sought to eliminate competition and maintain its dominance in the relevant market. PTK has engaged in an ongoing course of anticompetitive conduct designed to prevent other potential entrants in the relevant market from providing services to community-college students. PTK does so by leveraging its existing dominance and relationships with community colleges to gain even more market power and exclude competition.

72.     For example, in 2011, the National Society of Collegiate Scholars ("NSCS")—which already provided services to students in four-year schools—took initial steps to enter the relevant market. But to hinder competition, PTK's then executive director, Dr. Rod Risley, contacted community-college leaders to accuse NCSC of "misrepresent[ing] facts" to college decision-makers and of "present[ing] misinformation in an attempt to gain a foothold on several large community college campuses." Risley's statements to the community-college leaders were false.

73.     Risley, on behalf of PTK, also warned community colleges against allowing the establishment of chapters of NSCS. He indicated that doing so would put at "risk… unwitting hard working students, particularly our first-generation low-income students, who aspire to be recognized for academic achievement and desire access to programs that will help them succeed, but who have little context by which to measure the credibility or value of a recognition organization and its purported benefits." Risley's statements were false.

74.     Similarly in 2017, a potential competitor in the relevant market sought to establish a chapter at the campuses of ███████████████. But to hinder competition, ██████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████ which was a false claim ██████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████

C.   **PTK falsely represents to community-college students that they are invited to join because they are in the top 10% of their class and that they will be joining a society consisting of the top 10% of students.**

75.    PTK membership eligibility requires students to complete a certain number of hours of coursework and achievement of, generally, a cumulative 3.5 GPA, although the PTK Bylaws only require a 3.0 GPA and individual PTK chapters may impose higher GPA requirements.

76.    PTK receives information from each participating community college identifying those students who have satisfied both eligibility requirements. In other words, it has information about which students have achieved a 3.5 GPA or greater, or possibly in some cases as low as 3.0 or greater, as is allowed in PTK's Bylaws.

77.    PTK does not receive information from community colleges about students' class rank.

78.    Community colleges generally do not make class-rank determinations, and if they do, they do not make that information available to students or to third parties like PTK.

79.    PTK has no means of determining a student's class rank based on the information available to it, including before inviting that student to join PTK.

80.    Thus, based solely on information about a student's GPA and completion of the required amount of coursework, PTK invites the student to pay for a PTK membership.

81.    PTK's typically sends its invitations by email.

82.    PTK sends its membership invitations to all students at all community colleges with PTK chapters that the school identifies to PTK as meeting both the GPA and coursework requirements.

83.    PTK claims that it has over 1,200 chapters. Given that there are around 4.5 million students enrolled in community colleges in the United States, PTK's membership invitations are sent each year to at least hundreds of thousands of students.

84.    PTK's membership solicitation emails include the representation and claim that the student earned an invitation by being in the top 10% of students at her or his school.

85. An example of this is shown in the PTK invitation with redacted recipient and college information that appears nearby as **Figure 1**.



**Figure 1**

86. Another example of PTK's representation that a student is being invited to join PTK because the student is in the "top 10% of students" at their community college, accompanied by a personal endorsement featuring Tincher-Ladner, appears nearby as **Figure 2**.





████, high achieving students like you are at the heart of Phi Theta Kappa Honor Society (PTK). As one of the top 10% of students at Black Hawk College, you have earned your place in our community of student scholars and leaders. Our team creates these info sessions to give you the skills you need to navigate college and successfully enter the workforce.

Join our President and CEO Dr. Lynn Tincher-Ladner to learn helpful writing tips you can use to amp up your resume. Academic and career guidance is just one of the benefits of being a PTK member. You'll also have access to scholarships, networking, and recognition. With PTK, you can create the future you want.

Register

**Figure 2**

87.    PTK's representation in membership-solicitation advertisements and promotions that the recipient is in the top 10% of students at their school is false.

88.    PTK does not limit invitations to students in the top 10%. Rather, it generally invites those with a GPA of 3.5 or above. At all or almost all two-year colleges, a 3.5 GPA corresponds with a much-lower class rank than top 10%.

89.     Typically, a 3.5 GPA at a community college corresponds to a student being in the top 20–40%.

90.     Thus, PTK's representation is false in several ways.

91.     First, PTK's representation to students that they are being invited because they are in the top 10% is literally false. The students are being invited because they generally have a GPA of 3.5 or higher, and most students with that GPA are not in the top 10%.

92.     Second, PTK's representation to students that they are being invited to join an exclusive group of students who were all in the top 10% is also false. In truth, because PTK invites anyone who has at least a 3.5 GPA (or lower in some cases), its members are at best in the top 20–40% at their community college by class rank.

93.     And because two-year schools generally do not publish class rank, students who receive PTK's invitation do not have the ability to evaluate PTK's false representation that they are in the top 10%. They have no choice but to rely on PTK's false representation.

94.     PTK only knows which students have a GPA of 3.5 of greater. PTK does not know any student's overall class rank. So, PTK has no factual basis for its representation to students that they are in the top 10%.

95.     As just one of many examples, Mississippi Gulf Coast Community College students that are invited to join PTK are also told that they are in the "top 10% of students on your campus".

96.     Prior to her position at PTK, Tincher-Ladner was employed at Mississippi Gulf Coast for over 20 years.

97.     A redacted screenshot of an invitation PTK sent to a Mississippi Gulf Coast student on January 19, 2024 appears nearby as **Figure 3**. And **Figure 4** shows a screenshot by that student indicating that their GPA is 3.29.



**Figure 3**



**Figure 4**

98.     According to materials on the Mississippi Gulf Coast website, its PTK chapter imposes a 3.25 minimum GPA eligibility requirement. *See* Mississippi Gulf Coast Emerging Scholars Guide at p. 10 (available at https://mgccc.edu/wp-content/uploads/2023/04/ Mississippi-Gulf-Coast-Emerging-Scholars-Guide-2023-2024.pdf).

99.     Yet, other publicly available information on the Mississippi Gulf Coast website shows that of the 4,721 current fulltime students, 1,878 have a GPA of 3.3 or higher. See Mississippi Gulf Coast Fall 2023 President's and Vice President's Lists (available at https://mgccc.edu/2024/01/fall-2023-presidents-and-vice-presidents-lists/). That means that at Mississippi Gulf Coast, a 3.3 GPA puts a student just barely in the top 40% of students.

100.   Therefore, with an even lower GPA of 3.29, this Mississippi Gulf Coast student is not in the top 10% of students at their campus—not even close. PTK's representation to this prospective member is false, as it is with so many others.

**D.     PTK falsely represents to community-college students that a benefit of membership is that the average PTK member gets $2,500 a year in scholarships and that there are hundreds of millions in transfer scholarships exclusively available to PTK members.**

101.   PTK has repeatedly represented in promotion and advertising, including to students, that the "average [PTK] member gets $2,500 a year" in scholarships.

102.   This representation is literally false, or at best misleading.

103.   The average PTK member does not receive $2,500 in scholarships per year.

104.   PTK makes this representation in solicitation emails sent to prospective members, as shown in **Figure 1**. PTK also instructs its chapter advisors to make this claim to students at their school.

105.   PTK also represents in its promotion and advertising that there are hundreds of millions of dollars in transfer scholarships available exclusively to PTK members.

106.   For example, in the example shown in **Figure 1**, PTK represented to that prospective student that the "unmatched" benefits of PTK membership included that "You'll have access to $246 million in member-only scholarships".

107.   The representation that the $246 million (or similar amount) in transfer scholarships are an "exclusive" PTK member benefit is false. In truth, those scholarships are not "exclusive" to PTK.

108.   Rather, those scholarships are generally available to all community-college students seeking to transfer to four-year schools. The scholarships are equally available to PTK members, HonorSociety members, and students who choose not to join any membership society.

**E.      PTK and Tincher-Ladner provide members with a letter of recommendation for use with applications for employment or admission to four-year schools signed by Tincher-Ladner that falsely represents that the member is in the top 10% of their class.**

109.   PTK's member benefits also include a fraudulent letter of recommendation personally signed by Tincher-Ladner.

110.   PTK's template Standard Letter of Recommendation offered to all its paid members—which currently number about 230,000—is reproduced nearby as **Figure 5**.

111.   Among other representations, PTK's form letter of recommendation claims that "To be invited to membership in Phi Theta Kappa, [member] earned high academic standing with a class rank in the top 10 percent."

112.   PTK's form letter of recommendation, that is signed by Tincher-Ladner and available to all members, also claims that "Phi Theta Kappa requires members to maintain high academic standing for the duration of enrollment at the college."



**Figure 5**

113.   Neither of these representations are true.

114.   First, as detailed above, PTK's members are not limited to the top 10% of their class.

In truth, because PTK's standard 3.5 GPA cutoff generally corresponds to a top 20–40% class

rank, the claim that a particular PTK member is in the "top 10%" of their class is false with respect to 50–75% of PTK members.

115.   Additionally, the letter makes an implied representation that PTK has the ability to determine that a particular student is in the top 10% of their class. This is also false. For the reasons detailed above, PTK has no information about class rank and has no factual basis upon which it can represent that any particular student is or is not in the top 10% at their school.

116.   Second, it is absolutely false that PTK requires members to "maintain high academic standing for the duration of enrollment" at their community college.

117.   In truth, after a student first joins, PTK does not track the student's GPA, does not have any ability to do so, and does not receive further GPA information about the student from the student or from their community college. It is literally false that PTK has any such requirement for its members and, at best, misleading to represent that about any particular student.

118.   Yet PTK offers these fraudulent form letters of recommendation—each of which is signed by Tincher-Ladner—to all its members. There is no limit on the number of recipients that a PTK member may send these letters to.

119.   Because PTK encourages members to widely use these form recommendation letters in connection with applications for employment and for admission to four-year schools, presumably this fraudulent form recommendation letter bearing Tincher-Ladner's signature has been sent to many millions of potential employers and four-year schools.

120.   That Tincher-Ladner and PTK send these fraudulent letters has reduced competition in the market for two reasons. First, students have joined PTK to get these letters rather than joining services offered by PTK's competition. PTK was only able to block competition based on the fraud contained in the letters. Second, Tincher-Ladner and PTK sent these fraudulent letters to millions of business leaders and college executives with influence over community-college students' purchasing decisions. Based on Tincher-Ladner's false claim of students being in the top 10%, competition has been thwarted as students exposed to those

millions of letters have chosen to join PTK's service rather than join services offered by PTK's competition in the relevant market.

**F.     PTK fails to disclose to students that they will sell the students' personal information through an affiliated for-profit entity.**

121.   When students register for membership with PTK, they are required to agree to PTK's Membership Terms & Conditions.

122.   PTK's Membership Terms & Conditions (available at https://www.ptk.org/policies/membership-terms-conditions/), state, among other things, that PTK and its "university and business partners" are allowed to "provide promotion of our chapter activities, store merchandise, advertising and other information to you":

> **5 Rights you Grant Us**
>
> In consideration of the rights granted to you under the Agreement, you grant us the right (1) to process your membership and provide access to your member benefits, (2) to provide promotion of our chapter activities, store merchandise, advertising and other information to you, and (3) to allow our university and business partners to do the same.

123.   Similarly, PTK's Privacy Policy (available at https://www.ptk.org/privacy-policy/) states, among other things:

> **Data Usage**
>
> PTK Members grant us the right to
>
> - process your membership and provide access to your member benefits,
>
> - to provide promotion of our chapter activities, store merchandise, advertising and other information to you,
>
> - and to allow our university and business partners to do the same.
>
> Members who do not wish to see our communications or those of our partners can log into the Member account profile and adjust communication options within.

124.   But PTK fails to disclose to students that it transfers their personal information to a completely different entity not disclosed in its terms or privacy policy—the Phi Theta Kappa

Foundation—which in turn sells the students' information to universities and businesses, generating millions of dollars in annual revenue.

125.   These programs are referred to as PTK Connect (for private student data sold to universities) and PTK Connect for Business (for private student data sold to businesses).

126.   PTK markets its members' contact information through these programs based on the same misrepresentation that its members are in the "top 10%". For example, as shown in nearby **Figure 6**, the PTK Connect for Business program's website (https://ptkbusiness.org) falsely offers to sell access to the "top 10% of community college students in America."



**Figure 6**

127.   Because PTK fails to disclose that it will sell its members' personal information to a potentially unlimited number of schools and businesses, PTK members frequently come to realize

that they have been sold out. As one disappointed student reported after joining PTK, "It was a bit of a scam. They sold my information and I have been spammed by colleges and other things ever since I joined."

**G.   PTK published false statements about HonorSociety and sought to interfere with HonorSociety's ability to communicate with community-college students.**

128.   PTK has published defamatory statements about HonorSociety, either stating outright or insinuating that HonorSociety is a "scam," or other similar types of statements, that HonorSociety is not a legitimate honor society. Its false statements have caused further substantial damages to HonorSociety and its reputation and have deterred prospective members of HonorSociety from becoming members or caused HonorSociety's actual members to cancel their memberships and seek refunds.

129.   PTK's statements include emails from . This would effectively prevent HonorSociety from contacting students at these schools who used school-provided email addresses, whether they were prospective HonorSociety members or even existing members.

130.   Similarly, on at least one occasion, a

131.   PTK's statements asserting or insinuating that HonorSociety is a scam or that it intentionally seeks to deceive students constitute defamation per se, for which damages need not be proven. The statements are so obviously hurtful and unambiguously suggest behavior that is incompatible with the proper conduct of a business, trade, or profession.

132.   PTK's statements were false. HonorSociety has never intentionally or knowingly confused or misled students. HonorSociety is also not a scam but is a legitimate honor society.

133.   PTK had no factual basis to assert that HonorSociety intentionally or knowingly confused or misled students or is a scam. It had no basis to insinuate that HonorSociety is not a legitimate honor society or has engaged in deceptive or other unlawful conduct.

134.   PTK made those defamatory statements with actual malice—with knowledge of their falsity or alternatively, with a reckless disregard for their falsity.

135.   PTK made those defamatory statements without privilege or justification.

136.   Those defamatory statements concerning HonorSociety directly injured it by diminishing its reputation, which has a natural tendency to decrease HonorSociety's paid membership and thus its financial bottom line.

137.   Those statements were defamatory on their face insofar as they falsely disparaged HonorSociety and tarnished its reputation.

138.   PTK expected and intended that the defamatory statements would injure HonorSociety economically.

139.   PTK's defamatory statements are not likely to be perceived by third parties as mere opinion or non-actionable innuendo, speculation, conjecture, or rhetorical hyperbole. They are instead likely to be perceived as literal and material statements of fact affecting consumer decisions to transact with HonorSociety.

140.   PTK also intentionally and willfully engaged in other tortious acts that they calculated to cause damage to HonorSociety's lawful business. Specifically, it attempted to delegitimize HonorSociety to numerous third parties. It also falsely and maliciously referred to HonorSociety as a "scam" and accused HonorSociety of other fraudulent conduct, insinuating that HonorSociety is not a legitimate honor society. These false statements have caused further substantial damages to HonorSociety and its reputation and have deterred prospective members of HonorSociety from becoming members and driven them instead to join PTK.

141.   PTK made its accusations concerning HonorSociety to various third parties with the intention that these third parties would repeat the accusations to their constituents, including community-college students that were prospective or current HonorSociety members.

142.   Many of HonorSociety's actual customers have cancelled their memberships and sought refunds from HonorSociety as a result of PTK's misconduct, as confirmed by statements those former members have made to HonorSociety as part of their refund requests. Some examples include but are not limited to the following:

a.   A student at Ivy-Tech Community College stated in their refund request: "This is not the real honor society chapter affiliated with ivy tech or purdue. The school sent out warnings to all students that they are in no way affiliated with this organization."

b.   A student at Motlow College stated in their refund request the content of a message received from their college: "Dear Motlow Students: I just learned that this organization has been soliciting Motlow students to join. Just so that you know, this is not a Motlow College Honors Society and we don't know anything about this organization. The only honors society for two year colleges is Phi Theta Kappa (PTK) PTK.org and if you are eligible to join you will receive an invitation through the United States Postal Service (aka. snail mail) a couple of weeks into the semester. Let me know if you have any questions about PTK at Motlow College. [Named Redacted.] Research Technician II & Phi Theta Kappa Coordinator."

c.   A student at St. Louis Community College stated in their refund request: "I have been inducted into the Phi Theta Kappa honor society and do not need duplicate benefits. My school has instructed me to cancel HonorSociety.org. Thank you for your services offered, but at this time, I choose to cancel this membership due to PTK."

d.   A Student at Walla Walla Community College stated in their refund request: "My school only recognizes PTK."

e.  A student at Westmoreland Community College stated in their refund request: "My college has alerted me that they are not affiliated with HonorSociety and that this is likely a scam. As their honor society is through Phi Theta Kappa."

f.  A student at the University of Toledo stated in their refund request: "Have read multiple news posts that this is a scam and although I find it hard to believe, I don't want to be a part of this."

g.  A student at Kentucky Community Technical College System stated in their refund request: "My school is reporting this site as Spam/Scam I thought the site was a direct affiliate."

h.  A student at Bergen Community College stated in their refund request: "Got email from my school telling me that the email you sent out was not real and basically a scam."

i.  A student at North Idaho College stated in their refund request: "I was told by officials at NIC that this was a scam and to get a refund."

j.  A student at St. Louis Community College stated in their refund request: "Was told by the school this is a scam."

143.   The refund requests from HonorSociety's former members parrot PTK's statements and/or insinuations that HonorSociety is a scam.

144.   The harm to HonorSociety represented by those statements were a direct result of false and/or misleading statements, or other misconduct, of PTK that were specifically designed to encourage these misperceptions about HonorSociety throughout the community-college market, and to be repeated by those who hear or read them, including by colleges to their students.

145.   PTK has specifically reached out to colleges, students, and other third parties—including but not limited to those mentioned above—to wrongfully encourage them to spread false information to their students about HonorSociety being a "scam," or engaging in otherwise unlawful behavior, and encouraging students to cancel their memberships with HonorSociety.

146.   In a further attempt to wrongfully and unfairly stifle HonorSociety's lawful business, and increase PTK's business, PTK has claimed to third parties, including to students and schools, that PTK is the "only official" honor society for two-year colleges, which is false and/or misleading, and which has caused further damages to HonorSociety.

147.   PTK and Tincher-Ladner's instances of misconduct against HonorSociety were not right or justified, and were instead motivated, at least in part, by anticompetitive reasons.

148.   PTK and Tincher-Ladner's instances of misconduct against HonorSociety were made with an element of aggression, or some coloring of insult, malice, oppression, fraud, or gross negligence, evincing ruthless disregard for the rights of others, such that punitive damages are warranted.

149.   Discovery will reveal additional instances in which PTK, as well Tincher-Ladner, made other defamatory statements about HonorSociety directly to community colleges and students/potential members of HonorSociety, as well as engaged in other acts of tortious interference with business relations, and other acts of false advertising that have caused damages to HonorSociety.

150.   As a result, HonorSociety has experienced a very significant decrease in its membership and product sales.

151.   HonorSociety received approximately 880 requests from its student members to cancel their memberships and receive refunds, before this lawsuit was filed, on the urging of PTK and/or their affiliated colleges, as confirmed by statements made by these students to HonorSociety. These cancelations resulted in significant and ongoing loss to HonorSociety. HonorSociety believes that all these damages are attributable to the misconduct of Tincher-Ladner and PTK.

**H.   PTK and Tincher-Ladner registered in bad faith domain names confusingly similar to the HONOR SOCIETY® trademark.**

152.   In March 2022, immediately before PTK's filing of this lawsuit, without HonorSociety's knowledge or consent, ██████████████████████████████ ████████████████████████████.

153.   Specifically, in early March 2022, ████████████████████████ █████████████████████████████████████████████████ ████████████████.

154.   A few weeks later, ███████████████████████████████ ██████████████████████████████████████████████████████ █████████████████████████████████████████████ ███████████████.

155.   PTK surreptitiously registered these domain names using hidden public-registration information to conceal its involvement and responsibility. Thus, it is likely that PTK, Tincher-Ladner, or their agents have registered additional domain names confusingly similar to the HONOR SOCIETY® trademark which HonorSociety has not yet discovered because of PTK and Tincher-Ladner's concealment. Collectively, the five domain names listed in Paragraph 154 and any other domain names that PTK and Tincher-Ladner registered that are confusingly similar to HONOR SOCIETY® are referred to as the "Infringing Domains".

156.   PTK and Tincher-Ladner have never had a bona fide noncommercial or fair use of the HONOR SOCIETY® trademark in a site accessible at any of the Infringing Domains.

157.   PTK and Tincher-Ladner intentionally caused the Infringing Domains to redirect visitors to PTK's own website located at ptk.org.

158.   By registering domain names that consumers would likely attempt to access in searching for online information about HonorSociety's services, PTK and Tincher-Ladner intended to divert consumers from HonorSociety's online location to sites controlled by PTK, which offers competing services. For example, consumers seeking to visit the Honor Society

Foundation (at ▮▮▮▮▮▮▮▮▮▮▮▮), to shop at HonorSociety's online store (at ▮▮▮▮▮▮▮▮▮▮), or even to join HonorSociety (at ▮▮▮▮▮▮▮▮▮▮, ▮▮▮▮▮▮▮▮▮▮▮▮, or ▮▮▮▮▮▮▮▮▮), are diverted from doing business with HonorSociety as a result of the confusingly similar Infringing Domains.

## COUNT I
### Attempted Monopolization
### Against PTK
### Under Section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2.

159.   HonorSociety realleges and hereby incorporates by reference all paragraphs above.

160.   PTK has engaged in illegal attempted monopolization of the market for general honors societies for community-college students in the United States, which are membership clubs that provide a package of services consisting of general resources, scholarships, membership recognition, academic recognition, and networking resources and opportunities.

161.   PTK had and still has a specific intent to monopolize the relevant market.

162.   PTK engaged in unjustified efforts to eliminate competition by engaging in a course of conduct of urging community colleges to warn students against joining HonorSociety and other potential competitors in the relevant market based on false accusations. PTK also engaged in unjustified false advertising as to its own services that were intended to, and actually did, exclude competition by causing consumers in the relevant market to believe that PTK is the only legitimate honors society for community-college students. PTK does so by leveraging its current dominant market position to gain even more market power and exclude competition.

163.   Although direct evidence of specific intent to monopolize is rarely available, specific intent may be inferred from a defendant's anticompetitive conduct.

164.   PTK's intent is evident from its campaign to monopolize the relevant market.

165.   Specifically, PTK engages in deceptive and malicious conduct designed to eliminate competition in the relevant market, including without limitation PTK's years-long efforts to make false accusations to community colleges about HonorSociety and other potential competitors in the relevant market. PTK also engaged in deceptive and malicious false advertising as to the

supposed exclusive benefits of PTK's services for the purpose of excluding competition, and specifically causing consumers in the relevant market to believe that PTK is the only legitimate honors society in the relevant market. In addition, PTK maliciously and deceptively urged community colleges to prevent the establishment of chapters by potential competitors in the relevant market and to warn students about joining HonorSociety or other potential competitors. In some cases, PTK caused community colleges to implement technical blocking of HonorSociety emails to completely prohibit it from communicating with students who use school-provided email addresses, regardless of whether they are already HonorSociety members or prospective members.

166.   The result of PTK's conduct is to increase barriers to entry in the relevant market including by enlisting colleges to proactively warn potential customers of prospective competitors, including HonorSociety, from even considering doing business with anyone other than PTK and by engaging in the widespread dissemination of false advertising which falsely conveys the impression that only PTK is able to provide certain material benefits or that its competitors in the relevant market are somehow not legitimate.

167.   If PTK has not already monopolized the relevant market, there is a dangerously high probability that it will.

168.   Through the exclusionary conduct alleged here, PTK has achieved a dangerous probability of achieving monopoly power.

169.   PTK's conduct is likely to restrain competition and, if undeterred, will result in actual monopolization if it has not already resulted in monopolization.

170.   As a result of PTK's attempted monopolization of the relevant market, consumers have been denied the benefits of competition.

171.   As a result of PTK's attempted monopolization of the relevant market, participants have lost the economic freedom to select from among competing providers of those goods and services because, with respect both to HonorSociety and other would-be competitors, PTK's conduct has resulted in them being excluded from offering services to community-college

students, prohibited from forming on-campus chapters, or even in some cases from engaging in email communications with students at particular schools.

172.    PTK's illegal attempt to monopolize the relevant market inflicted antitrust injury on HonorSociety in that current and potential customers—community-college students—have received communications at PTK's direction falsely accusing HonorSociety of being a scam or having engaged in other misconduct, been subjected to PTK's false advertising about PTK's supposed unique ability to provide certain benefits designed to exclude competitors, including HonorSociety, from competing, and in some cases resulted in HonorSociety being able to communicate by email with any students—regardless of whether they are a prospective member or have already joined.

173.    HonorSociety has suffered an injury proximately caused by PTK's conduct in attempting to monopolize the relevant market.

174.    For example, HonorSociety has lost members that would have joined HonorSociety had PTK not engaged in predatory and deceptive conduct designed to interfere with competition.

175.    HonorSociety's injury is attributable to the anticompetitive aspect of the PTK's practice of predatory and deceptive conduct designed to interfere with competition.

176.    HonorSociety's injury is the type that antitrust laws were intended to prevent, namely injury to competition and not merely injury to HonorSociety as a competitor.

177.    PTK's practices have imposed an unreasonable restraint on competition because PTK sent a series of false communications to community colleges that were designed to, and actually did, reduce competition in the relevant market. As a result of PTK's false and predatory communications, consumers in the relevant market falsely believe that PTK is the only legitimate honors society in the relevant market. And because of that, PTK thwarted competition and was able to maintain its dominant market position without a competitive threat.

178.    HonorSociety's injury flows from and was caused by PTK's unlawful practice of predatory and deceptive conduct designed to interfere with competition.

179.    PTK's attempted monopolization has inflicted substantial antitrust injury on HonorSociety in violation of Section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2.

180.    HonorSociety's injury was caused by PTK eliminating competition through its predatory conduct and monopoly, including PTK's efforts to spread false accusations to students about HonorSociety being a scam or being otherwise engaged in deceitful or unlawful conduct, PTK's efforts to convince colleges that only PTK can provide certain benefits and that students would be harmed by competition, coupled with PTK's false advertising designed to convey that PTK—and no other provider—is able to provide many key benefits to community-college students.

181.    Other competitors and would-be competitors in the relevant market suffered injuries similar to HonorSociety's injuries because PTK caused injury to competition and not just injury to any one competitor.

182.    PTK's practices as alleged in this claim for relief have injured competition in the relevant market by driving out a series of would-be competitors, including its current attempts to exclude HonorSociety.

183.    PTK has engaged in illegal attempted monopolization of the relevant market in violation of Section 2 of the Sherman Antitrust Act and is liable to HonorSociety for damages in an amount to be determined at trial. HonorSociety is also entitled to three times its actual damages plus attorney fees.

### COUNT II
### False Advertising
### Against PTK and Tincher-Ladner
### Under 15 U.S.C. § 1125(a)

184.    HonorSociety realleges and hereby incorporates by reference all paragraphs above.

185.    Tincher-Ladner and PTK have used, and continue to use, in interstate commerce, false or misleading representations of fact concerning PTK's services, that are likely to cause confusion, cause mistake, and/or deceive as to the affiliation, connection, or association of PTK with other organizations, all of which have caused damages to HonorSociety.

186.    Specifically, Tincher-Ladner and PTK have claimed, and continue to claim, to third parties, including to students and schools, that PTK is the "only official" honor society for two-year colleges, which is false and/or misleading. These statements are false because PTK is not the only honor society for two-year junior colleges. Rather, HonorSociety and other participants in the relevant market also serve students at two-year colleges. These statements are misleading because there is no one organization that has the right or ability to declare or recognize the existence, legitimacy, or validity of all honor societies.

187.    PTK and Tincher-Ladner have made additional false and/or misleading statements of fact in commercial advertising and promotion as described above, including with respect to statements about PTK only inviting, and PTK membership consisting of, the top 10% of community-college students, about allegedly exclusive scholarship benefits for PTK members, among other false and/or misleading statements alleged herein.

188.    The statements published by these colleges are directly attributable to PTK advisors, and PTK chapter leadership, including but not limited to Tincher-Ladner. In many cases, PTK advisors and chapter leadership placed the content at issue directly onto the college websites, or third-party college website pages, directly writing the false statements on those websites, including the colleges' respective official websites, giving credence to and furthering the misperceptions complained of herein.

189.    These statements from colleges to their students are attributable to the false and/or misleading statements of Tincher-Ladner and PTK, and discovery will confirm Tincher-Ladner and PTK as the source of these mistaken perceptions among colleges and their constituents.

190.    PTK and Tincher-Ladner's false and/or misleading statements concerning PTK's services have deceived, or have the potential to deceive, a substantial segment of actual and potential customers of HonorSociety.

191.    PTK and Tincher-Ladner's false and/or misleading statements concerning PTK's services were material in that they tended to influence the purchasing decisions of actual and potential customers of both PTK and HonorSociety.

192.   Indeed, HonorSociety has received many requests from its student members requesting to cancel their memberships and receive refunds due to their mistaken belief that PTK is the "only official" honor society for two-year colleges and/or their schools, which statements are attributable to the false and/or misleading statements of Tincher-Ladner and PTK.

193.   Tincher-Ladner and PTK caused their false claims to enter interstate commerce.

194.   PTK and Tincher-Ladner's false and/or misleading claims about PTK's services constitute commercial advertising, as they were acts of commercial speech, made by Tincher-Ladner and PTK in competition with HonorSociety, for the purpose of influencing customers to purchase PTK's services, or to cancel their memberships with HonorSociety.

195.   PTK and Tincher-Ladner's false and/or misleading claims about PTK's services do not constitute non-actionable mere puffery. Nor are they likely to be perceived by reasonable purchasers of PTK's and HonorSociety's respective services as (a) exaggerated, blustering or boasting statements, or (b) general or vague claims of superiority over comparable services, or ones expressing mere opinions, but are instead likely to be perceived as literal and material statements of fact.

196.   As a result of PTK and Tincher-Ladner's false claims, HonorSociety has suffered damages, and is likely to suffer further damages to its reputation and sales.

197.   HonorSociety's reputation has been harmed, and is likely to continue to be harmed, as a result of the false and/or misleading claims of Tincher-Ladner and PTK because HonorSociety's current, former, and potential customers are likely to incorrectly believe that HonorSociety is not a legitimate honor society, which is false.

198.   HonorSociety's sales have also been harmed, and are likely to continue to be harmed, because the false and/or misleading claims of Tincher-Ladner and PTK have caused HonorSociety's members to cancel their memberships and seek refunds and have likely deterred HonorSociety's potential customers from joining as members or making purchases of HonorSociety's goods and services.

199.   HonorSociety received approximately 880 requests from its student members to cancel their memberships and receive refunds before this lawsuit was filed. The student members requested those refunds because they relied on the false claims that PTK and Tincher-Ladner placed into commerce, and which were repeated by colleges relying on PTK and Tincher-Ladner's false claims, as confirmed by statements made by these students to HonorSociety. These cancelations arose directly from students believing PTK and Tincher-Ladner's false claims.

### COUNT III
### Cybersquatting
### Against PTK and Tincher-Ladner
### Under Anticybersquatting Consumer Protection Act, 15 U.S.C. § 1125(d).

200.   HonorSociety realleges and hereby incorporates by reference all paragraphs above.

201.   PTK registered and is currently the registrant of the Infringing Domains.

202.   The Infringing Domains are each confusingly similar to HonorSociety's registered HONOR SOCIETY® trademark, which HonorSociety has continuously used in commerce since at least May 1, 2013.

203.   PTK registered, trafficked in, or used the Infringing Domain Names in bad faith and with a bad-faith intent to profit from the HONOR SOCIETY® trademark.

204.   Tincher-Ladner actively and knowingly caused the cybersquatting of the Infringing Domains, and was the moving, active, and conscious force behind the cybersquatting.

205.   Neither PTK nor Tincher-Ladner have trademark or intellectual-property rights in any of the Infringing Domains.

206.   Neither PTK nor Tincher-Ladner made any prior use of the Infringing Domain Names in connection with the bona-fide offering of goods or services.

207.   Neither PTK nor Tincher-Ladner have made any bona-fide noncommercial or fair use of the HONOR SOCIETY® trademark in a site accessible under the Infringing Domains.

208.   PTK and Tincher-Ladner have diverted consumers from HonorSociety's online location to a site accessible under the Infringing Domains. These acts have harmed the goodwill

represented by the HONOR SOCIETY® trademark, for commercial gain or with intent to tarnish or disparage the HONOR SOCIETY® trademark, by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site.

209.   PTK and Tincher-Ladner provided material and misleading false contact information when applying for the registration of the Infringing Domains or intentionally failed to maintain accurate contact information.

210.   PTK and Tincher-Ladner registered multiple domain names which they know are identical or confusingly similar to marks of others that were distinctive at the time of registration of such domain names, without regard to the goods or services of the parties.

211.   PTK and Tincher-Ladner's registration and use of the Infringing Domains constitutes cybersquatting in violation of 15 U.S.C. § 1125(d).

212.   PTK and Tincher-Ladner's conduct has irreparably harmed and—if not enjoined— will continue to irreparably harm the general public who has an inherent interest in being free from confusion, mistake, and deception.

213.   As a proximate result of PTK and Tincher-Ladner's conduct, HonorSociety has suffered—and unless PTK and Tincher-Ladner are enjoined—will continue to suffer damage to its reputation and goodwill, and injury to the current and potential customer base of its businesses which offer services under the HONOR SOCIETY® trademark.

214.   Alternatively, at HonorSociety's election under 15 U.S.C. § 1125(d), instead of actual damages and profits, HonorSociety is entitled to an award of statutory damages in the amount of $100,000 for each of the Infringing Domains.

215.   PTK and Tincher-Ladner committed their wrongful acts willfully and with notice of HonorSociety's rights.

216.   This is an exceptional case under 15 U.S.C. § 1117(1)(3), entitling HonorSociety to an award of its reasonable attorney's fees.

**COUNT IV**
**Defamation**
**Against PTK**
**Under the Common Law of Mississippi**

217.  HonorSociety realleges and hereby incorporates by reference all paragraphs above.

218.  PTK published or were responsible for publishing the false statements about HonorSociety described above.

219.  All the false statements PTK published, or were responsible for publishing, were and are defamatory. The statements were clearly directed towards HonorSociety and were designed to and did indeed injure HonorSociety's reputation, expose HonorSociety to public hatred, contempt or ridicule, degrade HonorSociety in society, lessen HonorSociety in public esteem, and lower HonorSociety in the confidence of the community. That the statements were defamatory is clear and unmistakable from the words themselves.

220.  PTK published or was responsible for publishing the statements to third parties and had no privilege or justification to publish such false and defamatory statements about HonorSociety. Instead, PTK published or were responsible for publishing the false statements with actual malice; that is, with knowledge of their falsity or a reckless disregard of whether the statements were true or false.

221.  PTK's statements falsely accused HonorSociety of actions incompatible with proper conduct in the academic and professional achievement industry. Such statements were designed to, did, continue to, and are presumed to have injured HonorSociety's reputation and business, thus causing HonorSociety monetary damages. PTK is liable to HonorSociety for all damages proximately caused by such defamatory statements.

222.  Among other damages that HonorSociety suffered from PTK's false statements, numerous HonorSociety student members canceled their memberships and demanded refunds after being exposed to the defamatory statements by PTK.

223.  HonorSociety is entitled to punitive damages because PTK's acts of defamation against HonorSociety were made with an element of element of aggression, or some coloring of

insult, malice, oppression, fraud, or gross negligence, evincing ruthless disregard for the rights of others.

## COUNT V
## Tortious Interference With Business Relations
## Against PTK
## Under the Common Law of Mississippi

224.   HonorSociety realleges and hereby incorporates by reference all paragraphs above.

225.   HonorSociety had contracts with students for membership.

226.   But PTK engaged in unlawful intentional and willful tortious acts that were calculated to cause damage to HonorSociety's lawful business.

227.   For example, PTK published defamatory statements that were designed to delegitimize HonorSociety by falsely and maliciously referring to HonorSociety as a "scam," or other similar accusations.

228.   PTK also urged community colleges to block delivery of HonorSociety's emails to students, which would prevent HonorSociety from communicating with current members.

229.   HonorSociety members were exposed to PTK's defamatory statements.

230.   HonorSociety members believed PTK's defamatory statements even though the statements were false.

231.   As a result of PTK's false statements and/or HonorSociety being technically blocked from sending emails to members, HonorSociety members refused to honor their contracts, and instead sought refunds.

232.   If not for PTK's defamatory statements and/or interference with HonorSociety's ability to communicate with its members by email, those HonorSociety members would have performed their agreements and not sought refunds.

233.   PTK's tortious acts were done with the unlawful purpose of causing damage and loss to HonorSociety and were done without right or justification.

234.   As a result of PTK's unlawful conduct, HonorSociety has been damaged, including losing customers that otherwise would have performed their obligations and maintained their HonorSociety memberships.

235.   HonorSociety has lost substantial members and product sales directly attributable to PTK interfering with HonorSociety's contracts by making false and defamatory statements and/or by causing HonorSociety to not be able to communicate with its members by email, to cause HonorSociety members to either cancel memberships or not engage in memberships that they would have purchased if PTK had not interfered with those relationships.

236.   HonorSociety is entitled to punitive damages because PTK's instances of tortious interference against HonorSociety were made with an element of aggression, or some coloring of insult, malice, oppression, fraud, or gross negligence, evincing ruthless disregard for the rights of others.

**COUNT VI**
**Interfering With a Prospective Business Advantage**
**Against PTK**
**Under the Common Law of Mississippi**

237.   HonorSociety realleges and hereby incorporates by reference all paragraphs above.

238.   HonorSociety has lost customers that it would have otherwise entered into agreements with had PTK not engaged in wrongful acts to interfere with HonorSociety's prospective business advantage.

239.   PTK engaged in unlawful intentional and willful tortious acts that were calculated to cause damage to HonorSociety's lawful business.

240.   For example, PTK published defamatory statements that were designed to delegitimize HonorSociety by falsely and maliciously referring to HonorSociety as a "scam," or other similar accusations.

241.   PTK also urged community colleges to block delivery of HonorSociety's emails to students, which would prevent HonorSociety from communicating with prospective members.

242.   HonorSociety members were exposed to PTK's defamatory statements.

243.   Prospective HonorSociety members believed PTK's defamatory statements even though the statements were false.

244.   As a result of PTK's false statements  and/or HonorSociety being technically blocked from sending emails to prospective members, students that would have become HonorSociety members instead either joined PTK's membership society or did not join any membership society.

245.   The acts of PTK were intentional and willful.

246.   The acts of PTK were calculated to cause damage to HonorSociety in its lawful business.

247.   PTK undertook their tortious acts of defamation with the unlawful purpose of causing damage and loss, without right or justifiable cause, and so those acts constitute malice on the part of PTK.

248.   HonorSociety suffered actual damage and loss resulting from the wrongful acts of PTK. Specifically, HonorSociety lost business that it would have otherwise enjoyed had students not been exposed to the defamation that PTK published.

249.   HonorSociety is entitled to punitive damages because PTK's instances of interference with a prospective business advantage against HonorSociety were made with an element of aggression, or some coloring of insult, malice, oppression, fraud, or gross negligence, evincing ruthless disregard for the rights of others.

## Prayer for Relief

HonorSociety respectfully requests that this Court enter judgment against PTK and Tincher-Ladner granting the following relief:

1.   A judgment or order declaring PTK's conduct, as alleged, unlawful under Section 2 of the Sherman Antitrust Act;

2.   A judgment, order, or award of damages adequate to compensate HonorSociety for PTK's illegal attempted monopolization of the alleged relevant market, based on lost sales, lost profits, price erosion, loss of market share, or any other applicable theory,

in an amount to be proven at trial, together with prejudgment interest from the date
the illegal attempted monopolization began;

3.   A permanent injunction prohibiting PTK and its subsidiaries, affiliates, agents,
servants, employees, and all persons in active concert or participation with them
from monopolization or further attempted monopolization of the alleged relevant
market;

4.   Treble damages for PTK's illegal attempted monopolization under 15 U.S.C. § 15;

5.   An award of actual damages and disgorgement of profits against PTK and Tincher-
Ladner, jointly and severally, for their false advertising under 15 U.S.C. § 1117(a), in
an amount to be proven at trial;

6.   Treble the amount of actual damages awarded for PTK and Tincher-Ladner's false
advertising under 15 U.S.C. § 1117(a);

7.   Injunctive relief under 15 U.S.C. § 1116(a) requiring PTK and Tincher-Ladner to
make and pay for substantial corrective advertising that addresses their false and/or
misleading statements affecting HonorSociety, and prohibiting PTK and Tincher-
Ladner and their respective subsidiaries, affiliates, agents, servants, employees, and
all persons in active concert or participation with them from making further false
and/or misleading statements affecting HonorSociety;

8.   An award of statutory damages against PTK and Tincher-Ladner, jointly and
severally, under 15 U.S.C. § 1117(d) in the amount of $100,000 for each of the
Infringing Domains;

9.   In the alternative to statutory damages, at HonorSociety's election, a judgment,
order, or award of actual general and compensatory damages against PTK and
Tincher-Ladner, jointly and severally, adequate to compensate HonorSociety for
their unlawful violations of 15 U.S.C. § 1125(d) in an amount to be proven at trial;

10.  Preliminary and permanent injunctive relief restraining and enjoining PTK and
Tincher-Ladner, and their respective agents, representatives, employees, attorneys,

successors and assigns, and all persons acting for, with, by, through or under them, and each of them, from registering, using, or trafficking in in any manner, any internet domain name that incorporates, in whole or in part, the HONOR SOCIETY® trademark or any name, mark, or designation confusingly similar thereto;

11.    A judgment, order, or injunction under 15 U.S.C. § 1125(d)(2)(C) directing PTK and Tincher-Ladner to transfer to HonorSociety every internet domain name that either of them own which is identical or confusingly similar to the HONOR SOCIETY® trademark;

12.    Punitive, special, or exemplary damages as allowed by law against PTK and Tincher-Ladner, jointly and severally, for their violations 15 U.S.C. § 1125(d), including an award of treble damages under 15 U.S.C. § 1117(a), and an award of attorney fees because this is an exceptional case;

13.    Restitution and disgorgement of PTK's and/or Tincher-Ladner's profits from infringement or obtained by PTK or Tincher-Ladner as the result of unjust enrichment arising from their violations of 15 U.S.C. § 1125(d), and an order directing PTK and Tincher-Ladner to account to HonorSociety for all profits they have derived from their unlawful conduct as described herein;

14.    Injunctive relief, requiring PTK to make and pay for substantial corrective advertising wherein it publicly retracts its false and malicious statements against HonorSociety, and prohibiting PTK and its subsidiaries, affiliates, agents, servants, employees, and all persons in active concert or participation with them from publishing further false and malicious statements about HonorSociety;

15.    An award of actual damages adequate to compensate HonorSociety for PTK's defamation and tortious interference as alleged herein in an amount to be proven at trial;

16.   An award of punitive damages arising from PTK's defamation and tortious interference as alleged herein;

17.   An award to HonorSociety of its reasonable attorneys' fees and costs to the extent permitted by law including, without limitation, under 15 U.S.C. § 15, 15 U.S.C. § 1117(a), and any other applicable grounds; and

18.   Such other and further relief as this Court or a jury may deem proper and just under the circumstances.

## Demand for Jury Trial

Defendant, Counter-Claimant, and Third-Party Plaintiff HonorSociety.org, Inc. demands a trial by jury on all issues so triable.

Dated: April 10, 2024                    Respectfully Submitted,

                                         s/ Derek Linke
                                         Derek A. Newman (pro hac vice)
                                         Derek Linke (pro hac vice)
                                         NEWMAN LLP
                                         100 Wilshire Blvd, Suite 700
                                         Santa Monica, CA 90401
                                         Tel: (310) 359-8200
                                         dn@newmanlaw.com
                                         linke@newmanlaw.com

                                         s/ Daniel A. Rozansky
                                         Daniel A. Rozansky (pro hac vice)
                                         Michael A. Bernet (pro hac vice)
                                         STUBBS ALDERTON & MARKILES, LLP
                                         15260 Ventura Blvd., 20th Floor
                                         Sherman Oaks, California 91403
                                         Tel: (818) 444-4500
                                         drozansky@stubbsalderton.com
                                         mbernet@stubbsalderton.com

                                         s/ W. Whitaker Rayner
                                         W. Whitaker Rayner
                                         JONES WALKER LLP
                                         190 E. Capitol St., Suite 800
                                         Jackson, Mississippi 39201

Tel: (601) 949-4724
wrayner@joneswalker.com

Attorneys for Defendant, Counter-Claimant,
and Third-Party Plaintiff HonorSociety.org, Inc.

**Certificate of Service**

I hereby certify that on April 10, 2024, I electronically filed the foregoing with the Clerk of the Court by using the appellate CM/ECF system. Participants in the case are registered CM/ECF users and service will be accomplished by the appellate CM/ECF system.

Executed this 10th day of April, 2024.            s/ Derek Linke
                                                  Derek Linke