### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF MISSISSIPPI
### NORTHERN DIVISION

| | | |
|---|---|---|
| PHI THETA KAPPA HONOR SOCIETY, | ) | |
| | ) | |
| Plaintiff/Counter-Defendant | ) | Civil Action No. 3:22-cv-00208-CWR-RPM |
| | ) | |
| v. | ) | |
| | ) | |
| HONORSOCIETY.ORG, INC., | ) | **URGENT AND NECESSITOUS** |
| | ) | |
| Defendant/Counter-Plaintiff | ) | **ORAL ARGUMENT REQUESTED** |
| /Third-Party-Plaintiff | ) | |
| | ) | |
| HONOR SOCIETY FOUNDATION, INC., | ) | |
| | ) | |
| Defendant | ) | |
| ----------------------------------------------------- | ) | |
| HONORSOCIETY.ORG, INC., | ) | |
| | ) | |
| Defendant/Counter-Plaintiff | ) | |
| /Third-Party-Plaintiff | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| DR. LYNN TINCHER-LADNER, | ) | |
| | ) | |
| Third-Party Defendant | ) | |

### PHI THETA KAPPA HONOR SOCIETY'S MEMORANDUM IN
### SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER,
### PRELIMINARY INJUNCTION AND/OR GAG ORDER

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ................................................................................. 1

II.  STATEMENT OF FACTS ................................................................... 2

    A.   Defendants AI-Generated and Published 5,000+ Malicious Articles
        Attacking PTK. ...................................................................................... 3

    B.   Defendants' Other Published Articles Malign PTK and Dr. Tincher-
        Ladner. .................................................................................................. 5

    C.   The Misleading Statements on Defendants' Websites Disparage PTK. ............... 6

    D.   Falsities on Defendants' Twitter Account Harm PTK. .......................................... 8

    E.   The Harm to PTK is Substantial. ........................................................ 9

III. DEFENDANTS' NEW CONDUCT WARRANTS A TEMPORARY
     RESTRAINING ORDER AND PRELIMINARY INJUNCTION................................. 11

    A.   Legal Standard. .................................................................................. 11

    B.   All Considerations Warrant Grant of Injunctive Relief. ..................................... 12

        1.   Defendants' conduct is intentional, willful and intended to harm
            PTK. ......................................................................................... 12

        2.   Defendants' conduct has no legitimate purpose. ................................... 13

        3.   Defendants' conduct has and continues to irreparably harm PTK. ......... 14

        4.   PTK's Harm Outweighs Any Alleged Harm to Defendants.................... 16

        5.   Injunctive Relief Serves the Public Interest. ......................................... 17

IV.  GRANT OF A GAG ORDER IS ALSO WARRANTED. ............................................. 18

    A.   Legal Standard. .................................................................................. 18

    B.   All Considerations Warrant Grant of a Gag Order. ........................................... 20

        1.   Defendants' publications create substantial (certainly reasonable)
            likelihood of prejudice to PTK. ........................................................ 20

        2.   The Proposed Gag Order is sufficiently narrow. .................................... 26

        3.   The Proposed Gag Order is the proper and least restrictive means
            of ensuring PTK's right to a fair trial..................................................... 27

V.   REQUEST FOR ATTORNEYS' FEES ................................................... 28

VI.  CONCLUSION................................................................................... 30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bridges v. Cal.*,
  314 U.S. 252 (1941) ............................................................................18

*Campaign for S. Equality v. Bryant*,
  64 F.Supp.3d 906 (S.D. Miss. 2014) (J. Reeves) ...................................17

*Carter v. Marshall Durbin Food Corp.*,
  No. 2:08cv164–KS–MTP, 2009 WL 161829 (S.D. Miss. Jan. 22, 2009) ..............................19

*Chambers v. NASCO, Inc.*,
  501 U.S. 32 (1991) ..............................................................................29

*Cranford v. Stringer*,
  2007 WL 541657 (S.D. Miss. Feb. 16, 2007) ..............................................11, 12, 13

*Crowe v. Smith*,
  261 F.3d 558 (5th Cir. 2001) ...............................................................29

*Gentile v. State Bar of Nev.*,
  501 U.S. 1030 (1991) ....................................................................18, 28

*Greene v. Demoss*,
  2021 WL 3609300 (W.D. La. Aug. 13, 2021) ..........................................19, 22, 28

*Multiplan, Inc. v. Holland*,
  NO. 1:14CV315-LG-RHW, 2014 WL 12575800 (S.D. Miss. Aug. 19, 2014) ..........14, 16, 17

*Natural Gas Pipeline Co. of Am. v. Energy Gathering, Inc.*,
  86 F.3d 464 (5th Cir. 1996) ...............................................................29

*Neider v. Franklin*,
  844 So. 2d 433 (Miss. 2003) ...............................................................11

*Nelson-Ricks Cheese Co. v. Lakeview Cheese Co., LLC*,
  331 F. Supp. 3d 1131 (D. Idaho July 12, 2018) .......................................7, 21

*Par Indus., Inc. v. Target Container Co.*,
  708 So.2d 44 (Miss.1998) ...................................................................12

*U.S. ex rel. Stewart v. La. Clinic*,
  No. Civ.A.99–1767, 2002 WL 32850 (E.D. La. Jan. 10, 2002) ............................24

*U.S. v. Brown*,
    218 F.3d 415 (5th Cir. 2000) ............................................................................ *passim*

*U.S. v. Scrushy*,
    No. CR–03–BE–0530–S, 2004 WL 848221 (N.D. Ala. Apr. 13, 2004) ...............................28

*Union Nat. Life Ins. Co. v. Tillman*,
    143 F. Supp. 2d 638 (N.D. Miss. 2000)..............................................................................14

**Other Authorities**

Mississippi Rules of Prof'l Conduct R. 3.6(a)...............................................................................24

Rule 65(D)(2)....................................................................................................................................26

## I. INTRODUCTION

Despite this Court's March 28th Preliminary Injunction Order, Defendants' malicious conduct has not stopped. It has become much more aggressive and far-reaching. Defendants are trying their case in the court-of-public-opinion, flooding the Internet with deceptive publications and attacks on PTK and Dr. Tincher-Ladner that mirror their enjoined March 2024 survey questions. The damage to PTK is tangible, irreparable, and mounting – and the jury pool is being tainted and biased against PTK each day. Once again, PTK must ask this Court to intervene.

From June 18 to 24, Defendants used Artificial Intelligence (AI) to create approximately 5,000 new webpages, associated with nearly all PTK's partner colleges, so that when college students and parents search for information on PTK during enrollment season, they will be directed to Defendants' misleading, fantastical articles. The articles deceive readers regarding the claims and nature of the lawsuit, directly attack PTK and Dr. Tincher-Ladner's reputations, and urge colleges and students to terminate their relationships with PTK. Through widespread use of the Internet and AI, Defendants are ushering in a new era of tortious interference and jury tainting.

The publications wrongfully associate Defendants' counterclaims with Defendants' own prior allegations of sexual harassment and embezzlement against PTK – topics the Court previously enjoined as part of the "malicious" survey. They deceptively caricaturize Dr. Tincher-Ladner, misleadingly photoshop her into images with the PTK ex-CEO, and make unsupported and malicious allegations of financial mismanagement. Defendants use their "high-traffic" websites and social media expertise to maximize the reach of their tortious interference and jury manipulation. Rather than heeding the Court's March 28 warning, Defendants have intensified and darkened their malicious conduct.

This is far more than a standard "press release" stating the claims filed in a complaint or alleging innocence/non-liability. If that were all that were issued, this motion would never have

been filed. This a calculated, relentless and malicious campaign intended to destroy PTK.

The damage to PTK is clear. Many students have recently terminated their PTK memberships, stating they would not like to be associated with the organization. *See infra* at 16. New membership revenues are down over $80,000 compared to this time last year. PTK webstore sales have similarly declined. And several colleges have elected not to renew their PTK Connect agreements. Separately, the reputational harm grows by the day. Come enrollment season, if Defendants' propaganda continues to flood the Internet, the harm to PTK will be irreparable and the jury pool will be permanently tainted. Thus, Defendants conduct detail below must be enjoined.

## II. STATEMENT OF FACTS

PTK originally sued Honor Society to cease Honor Society's infringement of PTK's intellectual property, which caused significant confusion and damaged PTK's reputation among community college students. *See* ECF No. 1 ¶¶ 1-4. PTK's claims are well-founded, buttressed by hundreds of instances of actual confusion by students thinking they joined PTK, but actually joined Honor Society. *Id.* ¶¶ 16-17. The parties engaged in settlement discussions, which collapsed ahead of Judge Ball's retirement on February 29, 2024. Ex. A, Decl. of Jonathan Polak ("Polak Decl.") ¶ 3. Since then, Defendants retained new counsel and began a campaign of scorched earth conduct, including egregious behavior outside the courtroom.

Defendants: (i) harassed PTK's partner colleges with 240+ records requests originating from a disguised email address appearing to associate with PTK, and (ii) tarnished PTK's reputation by sending malicious, misleading, PTK-related survey questions to +450,000 students, many of whom are considering PTK membership. As this Court acknowledged, "[t]he survey questions and public records requests were intentional and willful… and the content of …the survey show[s] malicious intent to harm PTK's lawful business." ECF No. 130, Prelim. Inj. Order at 4. Consistent with this Court's findings, the survey has wreaked havoc on PTK's reputation and

deceived recipients as to its origin. *See* Polak Decl. Ex. A-1 (showing PTK's Trustpilot rating has dropped to 2.4 stars based on Defendants' March 2024 survey, which directs recipients to the site).[1]

With complete disdain for the Court's March 28 Preliminary Injunction Order, Defendants have intensified their wrongful conduct and publicized on a grand scale the same type of sordid allegations that the Court just found to be malicious, intentional, and willful. *Id.*

**A. Defendants AI-Generated and Published 5,000+ Malicious Articles Attacking PTK.**

Just over a week ago, Defendants published approximately 5,000 online articles that include malicious, misleading content to bias students, colleges, and the general public against PTK.[2] *See also* Declaration of Dr. Lynn Tincher-Ladner ("Tincher-Ladner Decl.") ¶ 7. The articles feature misguided, apocalyptic and horror-movie-like representations of college campuses, PTK chapters, PTK members, and PTK donors – all to rebrand PTK as villains. *Id.* ¶ 28; *see also* A-2.







Phi Theta Kappa at Sheridan College, Main Campus: Iota Theta Chapter of PTK

Phi Theta Kappa at Northeast Wisconsin Technical College, Green Bay Campus: Beta Nu Theta Chapter of PTK

Phi Theta Kappa at Southwest Technical College, Fennimore Campus: Beta Rho Beta Chapter of PTK

---

[1] *See also* Polak Decl. Ex. A-1 (1-star reviews) at 5 ("[W]hy would you have the survey direct me to this atrociously reviewed Trustpilot page immediately after finishing? . . . This page makes you look horrible, why in the world would you send me here automatically after your survey? Braindead organization."); *id.* at 11 ("why was i sent a survey about something i've literally never heard of?? who are you people?"); *id.* at 12 ("Why did you make me do this survey?!?!?!").

[2] *See* https://honorsocietyfoundation.org/?s=lynn+tincher+ladner. A URL citation is provided because the AI-generated articles total 50,000+ pages and therefore are not provided in-full as an exhibit. Defendants or the AI appear to revise and republish the articles on occasion.

The publications were discussed at a June 26 discovery hearing with Judge Myers, and just hours later, apparently recognizing the folly of their ways, Defendants edited the images and content of several (but certainly not all) of the articles, the content of which still appears to remain cached in Google search results. *See* Tincher-Ladner Decl. ¶ 27. These AI articles are particularly deceptive because many are written in the voice of the colleges. *See id.* ¶¶ 20-21; *see also,* Polak Decl. Ex. 2 at 36.

The table below shows Defendants' malicious statements that were enjoined in the March 28 Order relative to statements in their new publications. Unfortunately, not much has changed.

| Statements Enjoined By This Court's TRO (ECF No. 130 at 2) | Statements By Defendants' in May/June 2024 |
|---|---|
| - If PTK falsely claimed you were in the *Top 10% of students*, would that make you skeptical/wary of PTK? | "Phi Theta Kappa often advertises itself as an exclusive honor society, inviting students who supposedly fall within the '**Top 10%**' of their class. However, this claim is misleading." *See* Polak Decl. Ex. A-3 at 3 (emphasis added). |
| - If PTK falsely claimed the average member gets *$2,500 in scholarships*, would that make you skeptical/wary of PTK? | "PTK allegedly claims that its 'average member gets *$2,500 a year*' in transfer scholarships, which is false. These misleading statements deceive students about the benefits of PTK membership." *See e.g.,* Polak Decl. Ex. A-4 at 4 (emphasis added). |
| - If PTK falsely claimed it was the OFFICIAL honor society for community colleges, would that make you skeptical/wary of PTK? | "This includes falsely claiming to be the **'only official' honor society** and selling members' personal information with their consent. *See* Polak Decl. Ex. A-5 at 4 (emphasis added). |
| - Does it hurt the reputation of Phi Theta Kappa (PTK) that a chapter advisor was arrested in February 2024 for *allegedly embezzling funds*?<br><br>- Does it hurt the reputation of Phi Theta Kappa (PTK) that their last executive director took a $3 million *golden parachute of non-profit student dues* while resigning? | "These deceptive tactics, the lawsuit claims, have enable PTK to **misappropriate significant funds** from students exploiting their trust and aspirations." Polak Decl. Ex. A-4 at 4 (emphasis added).<br>"PTK has **misappropriate[d] significant sums** from students, by exploiting their trust and aspirations." *See, e.g.,* Polak Decl. Ex. A-6 at 4. |

The new publications (like the old) show Defendants' clear intent to drive a wedge between PTK and its membership base and colleges. Tincher-Ladner Decl. ¶ 23. For example, they spin

false tales of "potential liability for schools hosting PTK chapters." *Id.* ¶¶ 6, 19, 23; *see also* Polak Decl. Ex. A-2 at 30, 33, 36. And as demonstrated by the language above, Defendants' repeatedly portray their counterclaim allegations as facts, to deceive readers about PTK's integrity. The articles often end with a misguided "Call for Action" to rally students, colleges, and other readers against PTK. *See* Polak Decl. Ex. A-2 at 31, 34, 36.

**B. Defendants' Other Published Articles Malign PTK and Dr. Tincher-Ladner.**

Defendants' articles wrongfully attack Dr. Tincher-Ladner, saying she "masterminded these deceptive practices against community college students and institutions . . ." *Id.* at 30, 33, 66. To disparage and intimidate her further, Defendants portray Dr. Tincher-Ladner as a masked, money-hungry villain. *See* Polak Decl. Exs. A19, A20. *See also* Tincher-Ladner Decl. ¶¶ 24, 31.



Photoshopped images (above at right) and the text of Defendants' articles inappropriately entangle Dr. Tincher-Ladner and Defendants' pending counterclaims (e.g., false advertising, monopolization) with Defendants' own prior allegations of sexual harassment and embezzlement. *See* Polak Decl. Ex. A-8, A-17. Indeed, these articles are tagged as "abuse" on Honor Society Foundation's website. *See id.* 31. Yet, these malicious allegations are completely unrelated to Dr. Tincher-Ladner or this lawsuit – **and are the very basis of the March 28th Injunction Order**. To this end, the publications state, "Alongside the embezzlement charges, PTK has faced criticism for

its deceptive advertising practices" (Polak Decl. Ex. A-8 at 2) and "serious allegations of sexual harassment . . . have surfaced alongside ongoing concerns about the organization's deceptive advertising practices." *Id.* Ex. A-17 at 3. These are blatant attempts to recycle the substance of Defendants' enjoined survey questions and falsely associate Honor Society's counterclaims with misleading, stale, and unrelated accusations of sexual harassment and embezzlement, which have nothing to do with this case.

In fact, nearly all of Defendants' 5,000+ publications parrot the malicious language enjoined by this Court's March 28th Preliminary Injunction Order. *See, e.g.,* Polak Decl. Ex. A-7, (reproduced below) (demonstrating Defendants' restatements of their enjoined propaganda, such as: PTK's alleged Top 10% criteria, average $2,500 scholarship amounts, and "official" honor society designation by the AACC); *see also, id.* Ex. A-2 (generally). Only now, Defendants are disseminating these same misleading statements across the Internet on a grander scale.

1. **Misleading "Top 10%" Claims**: The lawsuit claims PTK falsely asserts that students invited to join are in the "Top 10%" of their class. In reality, PTK's criteria allow a much larger percentage of students to qualify, misleading them about the exclusivity of the honor society. For example, at Oakton Community College, 44% of students meet PTK's GPA standard, far exceeding the top 10%.

2. **Questionable Letters of Recommendation**: PTK is accused of issuing letters of recommendation signed by CEO Lynn Tincher-Ladner, claiming the member is in the top 10% at their school without any factual basis. This practice allegedly deceives students, colleges, and employers about the merit of PTK membership.

3. **Dubious Scholarship Promotions**: The lawsuit alleges PTK promotes access to $246 million in exclusive scholarships, which are actually broadly available transfer scholarships. This misrepresentation allegedly leads students to pay for PTK membership under false pretenses. PTK also claims its "average member gets $2,500 a year" in scholarships, which is disputed in the lawsuit.

4. **Anticompetitive Tactics**: The lawsuit highlights PTK's alleged attempts to monopolize the community college honor society market through aggressive and deceptive practices. This includes falsely claiming to be the "only official" honor society and selling members' personal information without their consent.

### C.  <u>The Misleading Statements on Defendants' Websites Disparage PTK.</u>

Defendants tout their website as so highly trafficked that, they are, by some measures, the largest academic and professional society in the nation. *See* Polak Decl. Ex. A-9 at 3. Further,

Defendants' LinkedIn and Twitter accounts, collectively, have tens of thousands of followers, with their public commentary on these platforms receiving correspondingly vast attention. *See e.g.,* Polak Decl. Exs. A-10, A-41, A-42. Each of these facts highlights the nationwide reach of Defendants' publications. Moreover, where Defendants' publications target PTK, the reach is even more widespread, as PTK has a massive membership base (4.2 million) and significant following worldwide. *See* Tincher-Ladner Decl. ¶ 32. Through Defendants' massive online presence, their AI-article dump, and their Search Term Optimization (SEO)[3] techniques, Defendants have made every attempt to recharacterize PTK as a bad actor that is misleading and stealing from students. Yet this could not be further from the truth.

Defendants have also created a URL titled "**PTKLawsuit.com**", which directs users to Defendants own website. *See* Polak Decl. Ex. A-6 at 4. The website states, "[i]f you have insights or information about PTK's deceptive practices, please email **PTKLawsuit@gmail.com**." *Id* at 5. (emphasis added). Even the homepage is misleading, suggesting that Defendants sued PTK, not the other way around. *Id*. Defendants have created their own "JUSTICE CENTER" on their website, which is based solely on the so-called "**Phi Theta Kappa Lawsuit**." *See* Tincher-Ladner Decl. ¶ 4. Defendants' 5,000+ misleading publications link back to their websites where they present those publications as a "**Phi Theta Kappa Chapter Directory**" and "**PTK Alerts by Community College**," misleading and luring students to malicious articles specific to their colleges. *See* Polak Decl. Ex. A-12, A-13. This is a grandiose attempt to stifle PTK enrollment.

---

[3] "[S]earch engine optimization (SEO) is a marketing discipline focused of the visibility of search engine results. [It] is the study and application of what appears when an individual searches for something on a search engine (on Google for example), the order in which the results appear, and why." *Nelson-Ricks Cheese Co. v. Lakeview Cheese Co., LLC*, 331 F. Supp. 3d 1131, 1146 (D. Idaho July 12, 2018). Defendants' 5,000+ AI articles make thoughtful use of SEO to ensure that any person "Googling" PTK or its CEO immediately sees many disparaging, maligning articles (created by Defendants) at the top of their search results. *See* Ex. A-46; Ladner Decl. ¶ 33-34, 58.

Defendants' websites host a vast collection other false, malicious, and hyperbolic attacks on PTK. The so-called "FAQ" Section of their website misrepresents the nature of the lawsuit and overtly attacks PTK's reputation. *See* Polak Decl. Ex. A-14 at 61, 63, 72, 85, 87, 95, 98, 101, 104, 116-17, 119 (reproduced below); *see also* Tincher-Ladner Decl. ¶ 14.

**What are the potential long-term effects of the lawsuit on PTK's reputation?**

The long-term effects of the lawsuit on PTK's reputation could be significant, especially if the allegations are substantiated. PTK might face a loss of trust and credibility among students, educational institutions, and the broader community. Restoring its reputation would require substantial efforts to improve transparency, accountability, and the accuracy of its claims. This could lead to systemic changes within the organization to rebuild trust.

**What is the acceptance rate for Phi Theta Kappa honor society?**

**Top 10% Claims:** PTK advertises that it only accepts the top 10% of students. However, school records often show that the admission standards are much broader, including a significant portion of the student body, sometimes up to 60%. This discrepancy between the claim and the reality can mislead students about the exclusivity and prestige of PTK.

**Do Employers Care About Phi Theta Kappa?**

No, employers generally do not care about Phi Theta Kappa in general, and further due to its alleged questionable practices and misleading claims.

These issues make Phi Theta Kappa less impressive to employers who value honesty, integrity, and transparency. For students seeking to enhance their resumes, it's advisable to seek out honor societies and organizations with clear ethical standards.

**Is Phi Theta Kappa a legitimate honor society?**

No, Phi Theta Kappa's legitimacy as an honor society is highly questionable due to their alleged deceptive practices and misleading claims.

These actions highlight a pattern of unethical behavior and deception that calls into question the legitimacy of PTK as an honor society. For students seeking genuine recognition and opportunities, it's crucial to be aware of these issues and consider alternatives that uphold higher ethical standards and transparency.

**Is Phi Theta Kappa Respected?**

**Perceived Value by Employers:** Employers who are familiar with PTK may recognize that its membership is not as exclusive or prestigious as advertised. This can lead to skepticism about the authenticity of the achievements listed on a resume, and PTK membership may not carry the weight or respect that other honors or accomplishments might.

**Is Phi Theta Kappa a real honor society?**

**Deceptive Advertising:** PTK's promotional materials often exaggerate the exclusivity and benefits of membership. They claim that being a member places you among an elite group, but the actual requirements for joining are relatively easy to meet. This discrepancy diminishes the true value and respect associated with PTK membership.

**Can I Put Phi Theta Kappa on a Resume?**

**Misleading Scholarship Claims:** PTK advertises access to exclusive scholarships as a significant benefit. However, many of these scholarships are available to all students, not just PTK members. Additionally, PTK often exaggerates the average scholarship amounts received by members, creating a false impression of financial benefits.

**How Prestigious Is Phi Theta Kappa?**

**General Misrepresentation:** PTK's portrayal of itself as a highly prestigious and selective honor society is misleading. The organization uses marketing strategies that exaggerate its exclusivity and the benefits of membership, leading many students to believe that membership is more prestigious than it truly is.

**How does the lawsuit impact educational institutions?**

Educational institutions that may knowingly or unknowingly endorse or support PTK might need to reconsider their relationships with the society if the allegations are proven. Institutions should evaluate the claims and their own practices to ensure they are not inadvertently endorsing misleading information. This might involve reviewing their own promotional materials and communications about PTK to ensure they are accurate and transparent.

**How do the allegations against Phi Theta Kappa affect current and prospective students?**

The allegations against Phi Theta Kappa (PTK) could have significant implications for current and prospective students. If the claims of deceptive advertising, false exclusivity, and misleading scholarship information are proven true, students may need to reassess the value and benefits of PTK membership. It's crucial for students to stay informed about the lawsuit's progress and its potential outcomes to make educated decisions about joining or remaining in the society.

**Can I participate in any awareness campaigns about PTK's alleged deception?**

Absolutely. Awareness campaigns are crucial for educating the public about the issues within Phi Theta Kappa. You can participate by sharing articles, graphics, and videos that highlight the lawsuit and the need for ethical reforms in PTK. Join online forums and groups dedicated to this cause, and consider organizing or attending events that focus on these issues.

**How can I support the lawsuit against Phi Theta Kappa?**

You can support the lawsuit against Phi Theta Kappa by staying informed and spreading awareness about the issues. Share information on social media, talk to fellow students, and participate in discussions about honor societies' transparency and ethics. You can also contribute to awareness campaigns that aim to support promote accountability in honor societies.

**D.**  **Falsities on Defendants' Twitter Account Harm PTK.**

Defendants' campaign to disparage PTK and taint the jury pool is reinforced by their Twitter account – called **@PTKLawsuit** – which is dedicated to editorializing the lawsuit and

besmirching PTK to Defendants' benefit. *See* Polak Decl. Ex. A-15 at 3-7, 12 (and below, left).



Separately, Defendants each have their own Twitter accounts, where they post misleading and disparaging statements about PTK and Dr. Tincher-Ladner. In an effort to reach maximum viewers, Defendants even started re-Tweeting on their CampusBuddy Twitter account, without acknowledging that it is another arm of their own propaganda campaign. *See e.g.,* Polak Decl. Ex. A-16. Deception as to who is behind their malicious publications is common for Defendants – and it was a pitfall of their early March conduct as well. *See id.* Ex. A-35 (maligning PTK under the guise of a "CollegeBudget.com" article – another alias of Defendants – and encouraging readers to "use the hashtag #PTKlawsuit on social media."); *see also* ECF No. 130 at 4-5. Defendants' social media postings direct their nearly 20,000 Twitter followers to Defendants' misleading, malicious articles and the PTKLawsuit.com webpage, which in fact a URL that redirects to Honor Society's own website. Thus, Defendants have created a vast web of public commentary, built on their misleading portrayal of PTK, Dr. Lynn-Tincher Ladner and this lawsuit.

### E.   **The Harm to PTK is Substantial.**

From March-June, compared to last year, PTK's membership revenues are down over $80,000. *See* Tincher-Ladner Decl. ¶ 54. PTK's existing student members and college partners are

also leaving the organization in droves. In unprecedented fashion, since Defendants' March survey, dozens of students have contacted PTK to terminate their lifetime memberships. *See id.* ¶ 53. Never before has this happened. *Id.* And why would it? With a one-time payment, PTK membership is good for life. *Id.* Only exceptional circumstances would cause students cancel a lifelong, paid-up membership. Further, because it is far easier to simply not enroll in an organization than it is to actively terminate one's membership, PTK expects that recent terminations represent only a fraction of 2025 prospective members who will choose to ignore PTK in enrollment season due to Defendants' smear campaign. *Id.* ¶ 53.

PTK's college partners are also deserting, with approximately 15% of PTK's prior college and corporate partners declining to renew their PTK Connect memberships. *See id.* ¶ 55. Further, PTK's webstore sales, which include PTK-branded regalia, apparel, jewelry, and other accessories, are also down over $100,000 in March-June of 2024 versus that time last year, prior to Defendants' conduct. *See id.* ¶ 56.

Separately, PTK's and Dr. Tincher-Ladner's reputations have been severely damaged, which Defendants perceive as a success. *See id.* ¶ 57-58. *See, e.g.,* Polak Decl. Ex. A-14 at 61 ("PTK might face a loss of trust and credibility among students, educational institutions, and the broader community. **Restoring its reputation would require substantial efforts** . . . .") (emphasis added). Defendants are correct. For Dr. Tincher-Ladner alone, corrective Search Engine Optimization (SEO) efforts will cost approximately $10,000 in the first three months alone. *See* Tincher-Ladner Decl. ¶ 59. Efforts for PTK would likely be even more costly. *Id.* Even if corrective SEO techniques are productive in "burying" the misleading and malicious publications, PTK cannot undo the permanent denigration of its reputation in the minds of students and colleges as a result of Defendants' publications. *Id.* ¶¶ 57-59.

## III.    DEFENDANTS' NEW CONDUCT WARRANTS A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION.

Defendants were recently enjoined from attacking PTK with malicious, deceptive statements, but they now revive that same content. Once again, the Court should enjoin Defendants for what is essentially the same conduct, albeit in a different medium and on a much grander scale.

Defendants' will likely claim that their acts are protected speech, as "press releases" regarding the lawsuit. However 5,000+ malicious AI-generated websites, countless other misleading articles, 40+ disparaging "FAQ" webpages, deceptive "PTKLawsuit" branded webpages, endless social media postings furthering the messaging above, caricaturizing and photoshopping of PTK's CEO, and deceiving and intentional entanglement of sexual harassment and embezzlement allegations with unrelated, baseless counterclaims **are not protectable** under any theory. That is egregious tortious interference having no justification.

### A.    <u>Legal Standard.</u>

The Court should enter a preliminary injunction when the plaintiff has established four elements: (1) a substantial likelihood that plaintiff will prevail on the merits; (2) a substantial threat that plaintiff will suffer irreparable injury if the injunction is not granted; (3) the threat and injury to plaintiff outweighs the threat and harm the injunction may do to defendants; and (4) granting the injunction will not disserve the public interest. *Cranford v. Stringer*, 2007 WL 541657, at *1 (S.D. Miss. Feb. 16, 2007) (citing C*anal Auth. of State of Fla. v. Callaway*, 489 F.2d 567, 572 (5th Cir. 1974)). For tortious interference with contractual relations, a plaintiff must prove:

> (1) that the acts were intentional and willful; (2) that they were calculated to cause damage to the plaintiffs in their lawful business; (3) that they were done with the unlawful purpose of causing damage and loss, without right or justifiable cause on the part of the defendant (which constitutes malice); and (4) that actual damage and loss resulted."

*Neider v. Franklin*, 844 So. 2d 433, 437 (Miss. 2003) (citing *Par Indus., Inc. v. Target Container*

*Co.*, 708 So.2d 44, 48 (Miss.1998)). Based on these same elements, "[t]ortious interference with business relations occurs when a person unlawfully diverts prospective customers away from one's business." *Par Indus.*, 708 So. 2d at 48. As described below, PTK is entitled to injunction relief because each necessary element of tortious interference is satisfied by Defendants' conduct.

**B.**  **All Considerations Warrant Grant of Injunctive Relief.**

**1.**  **Defendants' conduct is intentional, willful and intended to harm PTK.**

The intentionality and willfulness of Defendants' conduct is undeniable. They have deployed over 5,000 online articles (four associated with each PTK chapter) to drive students and colleges away from PTK's organization. Defendants articles include several misleadingly statements, such as, "[t]hese allegations raise serious questions about the integrity of PTK and the potential liability for schools hosting PTK chapters" (*see* Polak Decl. A-2 at 36) and "[e]ducational institutions . . . might need to reconsider their relationships with the society . . ." (*id.* Ex. A-14 at 63). These are fear-mongering, malicious statements intended to drive a wedge between PTK and college partners. Defendants' articles also tell students to "reassess the benefits and value of their membership," which is intended to harm PTK at its core. *See id.* 72.

Further, Defendants' use of AI and photoshop to caricaturize and villainize Dr. Tincher-Ladner (*id.* at A-19, A-20) and to erroneously entangle their own past accusations of sexual harassment and embezzlement with their new, unrelated counterclaims (*id.* at A-17, A-8) is clearly marked by willfulness and purposed to harm PTK. Similarly purposed are Defendants' new websites and social media accounts, which are deceivingly branded as "PTKLawsuit.com", @PTKLawsuit, and PTKLawsuit@gmail.com. *See, e.g., id.* Exs. A-15, A6 at 5. Their clear intention is to mischaracterize the lawsuit as one in which PTK is the bad actor that was sued by Defendants, which is a backwards recharacterization of this litigation. The intentionality and harmful purpose is further marked by Defendants' so-called "FAQs" (all answered negatively by

Defendants), which ask ridiculous questions such as, "Is [PTK] a real Honor Society?", "Can I Put [PTK] on a Resume?", "Do Employers Care" About [PTK]?". Polak Decl. Exs. A-14 at 98, 104, 115. Moreover, these publications are overtly aimed at PTK's existing and prospective business with its student members and partner colleges – a hallmark of tortious interference. *See e.g., id.* at 72 ("How do the allegations against PTK affect current and prospective students [and] educational institutions?" – again met with disparaging, misleading answers). Thus, the willfulness and purpose to harm PTK is self-evident from Defendants' publications.

### 2.    Defendants' conduct has no legitimate purpose.

Defendants have no legitimate purpose for 5,000+ publications that attack PTK's reputation, mislead students as to PTK's merit, and lie to colleges about alleged risks of doing business with PTK. Like the enjoined survey questions, these new attacks have no legitimate purpose. For example, they suggest to college students that "employers generally do not care about Phi Theta Kappa", "[e]mployers who are familiar with PTK may recognize that its membership is not as exclusive or prestigious as advertised", and there is a question as to whether students "Can [] Put Phi Theta Kappa on a Resume". *See* Polak Decl. Ex. A-14 at 104-05. Likewise, there is no legitimate reason to misinform colleges that they face "potential liability [as] schools hosting PTK chapters." *See e.g.,* Polak Decl. Ex. A-2 at 30, 33, 36. In fact, these instances of fear mongering likely rise to the level of false advertising, defamation, and unfair competition.

While Defendants frame their actions as "a public service announcement in the interest of protecting students and community colleges" (*see id.*), caricatures of Dr. Tincher-Ladner, apocalyptic imagery, sham FAQs, deception as to authorship of the articles, and encouragement to "reassess the value and benefits of PTK membership" tell a different story. *See, e.g.,* Polak Decl. Ex. A-14 at 72. Defendants' deceptive naming conventions throughout their publications also

underscore their ill-intent. *See* Polak Decl. Ex. A-6 (coining the terms "PTKLawsuit.com," "#PTKLawsuit," "PTKLawsuit@gmail.com," among others, to disparage PTK); *see id.* at A-12, A-13 (creating a "Phi Theta Kappa Chapter Directory" and "PTK Alerts By Community College", which are really repositories of webpages on Defendants' own site that mischaracterizes the lawsuit and disparage PTK); *see id.* at 19-29 (using the phrase "alleged misleading mastermind" as a distasteful nickname for Dr. Tincher-Ladner). Worse yet, Defendants' AI articles are written in the first person voice of the colleges to deceive students into thinking the colleges themselves are publishing anti-PTK rhetoric. *See, e.g.,* Polak Decl. Ex. A-2 at 36 ("Southwest Technical College, Fennimore Campus, is dedicated to protecting its students from deceptive advertising practices."). Defendants' publications generally cite allegations of their counterclaims against PTK yet fail to mention that these allegations have been levied by Defendants themselves, not a disinterested third-party with the best interest of students in mind. *Id.* (generally). This outright deception shows the Defendants' illegitimate purpose – and does so 5,000 times over.

Defendants' propaganda pieces serve no legitimate purposes and instead seek to terrorize Dr. Tincher-Ladner and wrongfully disparage her and PTK.

**3.    Defendants' conduct has and continues to irreparably harm PTK.**

Defendants' actions have and will continue to cause PTK substantial reputational and financial harm. As stated in the March briefing and oral argument to this Court, "[a] loss of a business' customers and damage to its goodwill are widely recognized as injuries incapable of ascertainment in monetary terms and may thus be irreparable." *Union Nat. Life Ins. Co. v. Tillman*, 143 F. Supp. 2d 638, 645 (N.D. Miss. 2000) (citing *Allied Mktg. Group, Inc. v. CDL Mktg., Inc*., 878 F.2d 806, 810 (5th Cir. 1989)); *see also Multiplan, Inc. v. Holland*, NO. 1:14CV315-LG-RHW, 2014 WL 12575800, at *3 (S.D. Miss. Aug. 19, 2014) (citing *Better Bus. Bureau of Metro.*

*Houston, Inc. v. Med. Dirs., Inc.*, 681 F.2d 397, 403 (5th Cir. 1982) ("[T]he Fifth Circuit has held that damage to a business's reputation can constitute irreparable harm.")).

Defendants aim to sully PTK's reputation, and they have hit the mark. *See* Tincher-Ladner Decl. ¶¶ 57-58; *see also* Polak Decl. Ex. A-18, ("This article examines whether PTK truly lives up to its <u>reputation</u>, scrutinizing its leadership and the misleading practices that have <u>tarnished its image</u>.") (emphasis added). But it is not PTK's practices that have tarnished its reputation and image – it is Defendants' 5,000+ wrongful publications, which deceptively present their own baseless allegations and editorializations as facts. *See* Tincher-Ladner Decl. ¶¶ 3, 6, 17. Moreover, Defendants' entanglement of their counterclaims with their (already enjoined) suggestions of embezzlement and sexual harassment work to damage PTK's reputation even further.[4] Portraying such awful accusations of sexual harassment and embezzlement as being "alongside" Defendants' counterclaims is likely in contempt of the Court's Preliminary Injunction Order, and at minimum, it tarnishes PTK's reputation in the same malicious manner as Defendants' March 2024 survey.

Defendants have all but admitted that their publications target PTK's "reputation," and with their self-proclaimed expertise in social media and websites that boast the most web traffic of any honor society in the nation (*see* Polak Decl. Ex. A-9), there is no doubt Defendants' campaign is successfully dismantling PTK's reputation. *See* Tincher-Ladner Decl. ¶¶ 57-58. While the March 2024 survey was disseminated to Defendants' list-serve of 450,000, their new, more aggressive publications are distributed across the Internet and likely to be accessed by every student, parent, potential donor, and other interested reader who searches "PTK" in connection

---

[4] *See* Polak Decl. Ex. A-8 ("embezzlement, a serious offense that has cast a shadow over PTK's reputation . . . . <u>Alongside</u> the embezzlement charges, PTK has faced criticism for its deceptive advertising practices.") (emphasis added); *see id.* at Ex. A-17 ("[S]erious allegations of sexual harassment . . . still affect the society today [and] have surfaced <u>alongside</u> ongoing concerns about the organization's deceptive advertising practices."); *see* also Tincher-Ladner Decl. ¶¶ 24-31.

with any PTK chapter in the nation – potentially millions of people, including donors, sponsors, and community colleges. In practical terms, in 2024, nearly all college-aged students "Google" organizations before deciding whether to enroll. *See* Tincher-Ladner Decl. ¶ 33-35. Knowing this, Defendants rely on SEO to ensure each of those students (at any one of PTK's 1,244 chapters) reads numerous publications that besmirch PTK's reputation before making their decision as to enrollment. *Id*. After reading those misrepresentations how many students will still enroll? Defendants count on a reduced number come Spring 2025. Thus, using AI, Defendants have ushered in a new era of pervasive, reputational harm and tortious interference.

Beyond that, just three months into Defendants' malicious campaign, PTK is now experiencing other damage to its business as well. Colleges and corporate partners are passing on PTK Connect. *See* Tincher-Ladner Decl. ¶ 55 (PTK Connect enrollment is down approximately 15% compared to March-June of 2023). Fewer students are enrolling in PTK. *See id.* ¶ 54 (PTK's membership revenue is down over $80,000 compared to March-June of last year). And students are terminating their existing PTK memberships, which has never happened before. *See id.* ¶ 52 (Approximately 20 students have called PTK to "immediately" terminate their membership). Monetary damage may be able to address PTK's loss of college partnerships and student members in individual instances, but it cannot fix the avalanche of business loss that is sure to follow, and it cannot remedy the substantial, lasting reputational harm that Defendants have worked so hard to cause. These most recent efforts by Honor Society have the serious potential for being existential for PTK. For these reasons, PTK has suffered clear harm, and that harm is no doubt irreparable.

### 4. PTK's Harm Outweighs Any Alleged Harm to Defendants.

As with the prior Preliminary Injunction, any harm to Defendants is entirely of their own making. *See Multiplan*, 2014 WL 12575800, at *4 (concluding injury to plaintiff "certainly

outweighs any harm to the defendants because the defendants are using improper and frivolous threats, as well as harassment of third party customers" and "they will merely be forced to utilize judicially-recognized means"). Here, like in *Multiplan*, with an injunction, Defendants would merely be forced to litigate <u>fairly</u>, in the courtroom, rather than in the "court of public opinion."

PTK has already suffered significant reputational damage at the hands of Defendants, and if not enjoined, their conduct will continue to become more aggressive and more damaging. In March, Defendants' malicious survey questions seemed to be egregious, unthinkable conduct. Yet that pales in comparison to their more recent behavior. Just three months post-injunction, they have generated numerous websites and Twitter accounts dedicated solely to mischaracterizing and rebranding this lawsuit, created demeaning caricatures of PTK's CEO, generated 5,000+ AI articles to mislead students considering membership at any PTK college, and publicly entangled their own embezzlement and sexual harassment allegations with their unrelated pending counterclaims. *See* Tincher-Ladner Decl. (generally).

Their conduct has steadily grown in maliciousness and numerosity, each act more surprising and harmful than the last. Trial is nearly a year away. If Defendants are not enjoined now, then by trial, the damage to PTK will be unimaginable in the most literal sense of the word. The conduct must be stopped before PTK's name and business are broken beyond all repair.

### 5.    <u>Injunctive Relief Serves the Public Interest.</u>

Parties seeking a preliminary injunction "must show that [it] will not disserve the public interest." *Campaign for S. Equality v. Bryant*, 64 F.Supp.3d 906, 951 (S.D. Miss. 2014) (J. Reeves). Here, in the case of a non-profit that exists solely for the betterment of the community college students, the public interest is of paramount concern and could not be better served than by enjoining Defendants' conduct. Students across the nation are being deceived into believing

that PTK – an organization long-dedicated to providing them with college transfer scholarships and significant employment opportunities – is "misappropriat[ing] significant sums from students, by exploiting their trust and aspirations." *See* Polak Decl. Ex. A-6 (quoting Defendants' "Phi Theta Kappa Lawsuit" publication); *see also* Tincher-Ladner Decl. ¶ 50. This could not be further from the truth. Meanwhile Defendants' conduct, driving students away from PTK, has the potential to deprive community college students of thousands of dollars in scholarships. *Id.* ¶ 60.

Defendants' attempts to destroy PTK's reputation, stifle its student enrollment, break its bonds with partner colleges, and convince the public that PTK is a bad actor have gone too far. For the public interest, Defendants' conduct should be immediately enjoined.

## IV.    GRANT OF A GAG ORDER IS ALSO WARRANTED.

### A.    <u>Legal Standard.</u>

The Supreme Court has long recognized that "'trial by newspaper' poses significant and well-known dangers to a fair trial." *U.S. v. Brown*, 218 F.3d 415, 423 (5th Cir. 2000) (quoting *Pennekamp v. Fla.*, 328 U.S. 331 (1946)). The Court has stated, "[l]egal trials are not like elections, to be won through the use of the meeting-hall, the radio, and the newspaper" – i.e., the analogs of the today's Internet articles and social media posts. *See Bridges v. Cal.*, 314 U.S. 252 (1941). "Paramount among these dangers is the potential that pretrial publicity may taint the jury venire, resulting in a jury that is biased toward one party or another." *Brown*, 218 F.3d at 423. The Court has been clear that "[f]ew, if any, interests under the Constitution are more fundamental than the right to a fair trial by 'impartial' jurors, and an outcome affected by extrajudicial statements would violate that fundamental right." *Gentile v. State Bar of Nev.*, 501 U.S. 1030 (1991).

While a gag order is a prior restraint affecting First Amendment rights, "those rights may be subordinated to other interests that arise in the context of both civil and criminal trials." *Id.* at 424 (quoting *Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 104 S. Ct. 2199, 2207–08 n. 18 (1984))

(internal quotation marks omitted); *see also Greene v. Demoss*, 2021 WL 3609300 (W.D. La. Aug. 13, 2021) ("First Amendment rights may be subordinated to other interests in the context of a civil trial, which in this case, is the Seventh Amendment right to a trial by jury in a civil case."). Thus, the right to a fair trial, including an unbiased jury pool, is a sufficient competing interest to justify a gag order. *See, e.g.*, *Carter v. Marshall Durbin Food Corp.*, No. 2:08cv164–KS–MTP, 2009 WL 161829, at *2 (S.D. Miss. Jan. 22, 2009) ("If [] counsel's speech could have the adverse [e]ffect of prejudicing [opposing party's] right to a fair trial by creating bias among potential jurors[, the] Court assumes that this concern would constitute a sufficiently serious protected competing interest . . .").

In *Brown*, the Fifth Circuit established that a "gag order [is] constitutionally permissible [where] it is based on a reasonably found substantial likelihood that comments from the lawyers and parties might well taint the jury pool . . . , [it] is the least restrictive corrective measure available to ensure a fair trial, and [it] is sufficiently narrowly drawn." 218 F.3d at 423.

The Fifth Circuit took care to clarify that only a "substantial likelihood" (and perhaps even a "reasonable likelihood") of tainting the jury pool is needed to justify a gag order. *See Brown*, 218 F.3d at 427 (finding that a gag order appropriate where "extrajudicial commentary . . . would present a 'substantial likelihood' of prejudicing the court's ability to conduct a fair trial [and declining to] address whether a trial court may also impose a similar gag order based on a 'reasonable likelihood' of prejudice."); *see also Carter*, 2009 WL 161829, at *2 (recognizing the need to establish that a "reasonable likelihood that the risk is present"). *Brown's* standard represents a relatively low burden of proof. *See Brown*, 218 F.3d at 427 (rejecting the "Sixth, Seventh, and Ninth Circuits . . . ***more stringent tests***, requiring either a showing of 'clear and

19

present danger' or 'serious and imminent threat' of prejudicing a fair trial, in favor of the lower "substantial likelihood" or "reasonable likelihood" standard) (emphasis added).

In view of these authorities, a gag order is warranted as described below.

**B.  All Considerations Warrant Grant of a Gag Order.**

Defendants' misleading publications regarding the lawsuit are exceedingly frequent, widespread, and reach a vast audience. This, coupled with the narrow language of the Proposed Gag Order and impracticality of other means of cleansing the jury pool, strongly favor granting a gag order to enjoin Defendants' malicious conduct. Moreover, Dr. Tincher-Ladner is the target of a substantial portion of the unfounded, harmful publications, and while she has suffered reputational harm as a party, Defendants' conduct is also aimed to intimidate her into silence, as she is a key witness in this litigation. Tincher-Ladner Decl. ¶¶ 7, 24-26, 42-46.

**1.  Defendants' publications create substantial (certainly reasonable) likelihood of prejudice to PTK.**

All precedential considerations suggest a substantial likelihood of prejudice to PTK's right to a fair trial. Defendants' publications have attracted increased national publicity to a lawsuit already of great significance, especially in Mississippi; the frequency and quantity of the publications shows Defendants' propensity to "try this case in the press" if permitted; their publications discuss evidence that would not be admissible at trial; and Defendants' give only their versions of the facts, which threatens to undermine the basic tenet that a trial must be decided by impartial jurors. *See Brown*, 218 F.3d at 429 (citing *Gentile*, 111 S. Ct. at 2743). Each issue underscores the substantial likelihood of prejudice to PTK if Defendants' conduct is not enjoined.

**a.  *The lawsuit is widely publicized.***

Mississippians especially, tend to recognize and take interest in PTK, as community colleges and the honor society chapters that support them are woven into the fabric of the

Mississippi education system. *See* Tincher-Ladner Decl. ¶ 40. However, the Mississippians are not alone in this regard. With more than 4.2 million members and nearly 1,300 chapters across the United States and in 11 countries, PTK and its undertakings are known on a global scale. *Id.* ¶ 32. It is no surprise that this lawsuit has attracted significant media attention, which is being further fueled by Defendants' relentless, extrajudicial commentary. Undoubtedly, 5,000+ articles with apocalyptic imagery, numerous "PTK Lawsuit" and "PTK Chapter Directory" websites, and a vast social media presence across several different accounts do not go unnoticed. Defendants proclaim they are the largest academic and professional society in the nation based on web traffic (*see* Polak Decl. Ex. A-9), and they acknowledge themselves as social media experts, which is, in fact, demonstrated by their enormous following (e.g., 20,000+ followers across multiple platforms accumulating countless views). *See* Tincher-Ladner Decl. ¶ 32. Thus, each time Defendants publish online articles, post on Twitter or LinkedIn, and publish new webpages on their high-traffic sites, this generates significant publicity around what they call the "PTK Lawsuit." Defendants' Search Engine Optimization (SEO) techniques further ensure that their malicious publications flood the zone of interest. *See Nelson-Ricks*, 331 F. Supp. 3d at 1146.

In public-facing cases such as these, courts recognize that "[u]nrestricted statements by the participants in [the] trial would only serve to increase the volume of pre-trial publicity" and "have a responsibility to avoid the creation of a 'carnival atmosphere'" threatening the integrity of the preceding. *Brown*, 218 F.3d at 428-29 (quoting *Sheppard v. Maxwell*, 384 U.S. 333 (1966)). Yet here, a "carnival atmosphere" with continuous public chatter and inquiries about "PTK Lawsuit" (e.g., via @PTKLawsuit, with #PTKLawsuit, and on PTKLawsuit.com and elsewhere) is exactly what Defendants hope to achieve. *See, e.g.,* Ex. A-14 at 85, 87 (reproduced below) (encouraging the public to join the campaign to spread misleading information about PTK and the lawsuit).

**Can I participate in any awareness campaigns about PTK's alleged deception?**

Absolutely. Awareness campaigns are crucial for educating the public about the issues within Phi Theta Kappa. You can participate by sharing articles, graphics, and videos that highlight the lawsuit and the need for ethical reforms in PTK. Join online forums and groups dedicated to this cause, and consider organizing or attending events that focus on these issues.

**How can I support the lawsuit against Phi Theta Kappa?**

You can support the lawsuit against Phi Theta Kappa by staying informed and spreading awareness about the issues. Share information on social media, talk to fellow students, and participate in discussions about honor societies' transparency and ethics. You can also contribute to awareness campaigns that aim to support promote accountability in honor societies.

Thus, this factor strongly suggests that Defendants' conduct should be enjoined, as it causes a substantial likelihood of prejudice to PTK's right to a fair trial.

> ### b. _Defendants have and will continue to try this case in the press._

There can be no doubt that Defendants' parade of publications "have already demonstrated a desire to manipulate media coverage to gain favorable attention," which is another factor supporting the substantial likelihood of prejudice to PTK. _Brown_, 218 F.3d 429. For example, Defendants have published thousands of articles, created a website and social media accounts specifically for the lawsuit, and generated 40+ "FAQ" webpages dedicated to editorializing the lawsuit for their benefit. _See e.g.,_ Polak Decl. (generally). The frequency with which Defendants are generating improper commentary on the lawsuit is astounding, and it is likely to increase. _See Greene_, 2021 WL 3609300, at *9 ("Extrajudicial statements would likely increase the closer this case gets to trial, which would also increase the chances of tainting the jury venire"). Thus, Defendants have made clear that they are "prepared to 'try this case in the press' and would attempt to use the media to influence the potential jury pool and create a prejudicial media atmosphere, if permitted." _Id_. For this reason too, Defendants' prejudicial conduct must be ceased.

> ### c. _Defendants' publications discuss inadmissible evidence._

Defendants' publications include evidence that likely would not be permitted at trial, which poses a significant threat to PTK's right to a fair trial. For example, they state "at many institutions, more than 10% of students meet the 3.5 GPA requirement. At Oakton Community College, 44% of students qualify under this standard . . ." Polak Decl. Ex. A-14, at 107, 110. In fact, Defendants have published their version of the PTK enrollment rates for numerous institutions across the

country.[5] It is unclear how Defendants obtained this data or reached such a conclusion, but it is certainly conceivable that such evidence would not be permitted at trial. Other examples of likely inadmissible evidence and statements include the following: "often between 40-60% [of students] are eligible for [PTK] membership" (*id*. at 95); "The perceived value of PTK membership can vary significantly . . . the less stringent criteria and misleading claims can make it seem less valuable" (*id*. at 98); "most of the claimed value PTK claims to offer is tied to the initial act of joining" (*id*. at 113); "employers generally do not care about Phi Theta Kappa in general, and further due to its alleged questionable practices and misleading claims" (*id*. at 116); "Including PTK on a resume . . . could lead to questions about the authenticity of the achievements listed on your resume" (*id.* at 104). Thus, Defendants are tainting the jury pool with unsubstantiated data and misleading statements that would not be admissible trial evidence – a factor that indicates a substantial likelihood of prejudice to PTK's right to a fair trial.

### d. *Defendants' publications are biased, one-sided, and misleading.*

Defendants' commentary on the case, gives only "their version of the facts [which] obviously threaten[s] to undermine [the] basic tenet that the outcome of a trial must be decided by impartial jurors." *Brown*, 218 F.3d at 423 (quoting *Gentile*, 501 U.S. 1030) (internal quotation marks omitted). Stating their opinions as facts, Defendants have published uncountable prejudicial remarks, for example:

> PTK's "misleading endorsements deceived colleges and employers about the true academic standing of PTK members, undermining trust in the society's credibility." (Polak Decl. Ex. A-14 at 40.)

---

[5] PTK expects that, to the extent these calculations were performed with the required inputs to achieve accurate results, confidential and AEO information provided to Defendants in formal discovery would have been used in such calculations. PTK intends to further investigate this potential violation of the Protective Order and will seek appropriate relief as necessary.

"[T]he criteria used by PTK often allow a much larger percentage of students to qualify, misleading students about the true exclusivity of their membership." (*Id.* at 48.)

"The acceptance rate for Phi Theta Kappa (PTK) honor society is much higher than advertised, with 40% of the school invited, . . . [t]his discrepancy between the claim and reality can mislead students about the exclusivity and prestige of PTK." (*Id.* at 95.)

PTK's "promotional materials often exaggerate the exclusivity and benefits of membership . . . but the actual requirements are relatively easy to meet . . . diminish[ing] the true value and respect associated with PTK membership." (*Id.* at 98.)

"PTK frequently overstates the average scholarship amounts received by its members, creating a false impression of financial advantages." (*Id.*)

"PTK has engaged in behaviors intended to stifle competition, calling into question its commitment to fair and ethical practices. . . . These issues make Phi Theta Kappa less impressive to employers who value honesty, integrity, and transparency. For students seeking to enhance their resumes, it's advisable to seek out honor society and organizations with clear ethical standards." (*Id.* at 116.)

"These deceptive tactics, the lawsuit claims, have enable PTK to misappropriate significant funds from students exploiting their trust and aspirations." (Polak Decl. Ex. A-4 at 4.)

These statements are completely out of bounds, misleading, and made to degrade PTK's reputation and bias the jury pool.

As noted in Comment 5 to ABA Model Rule 3.6, there are "certain subjects that are more likely than not to have a material prejudicial effect on a proceeding [in] a civil matter triable to a jury," which includes **character, credibility, and reputation**, of a party – as well as information "likely to be inadmissible as evidence in a trial." Model Rules of Prof'l. Conduct R. 3.6, Comment 5 (accessed July 2, 2024); *see also U.S. ex rel. Stewart v. La. Clinic*, No. Civ.A.99–1767, 2002 WL 32850 at *2 (E.D. La. Jan. 10, 2002) (citing the same).[6] Here, Defendants' comments absolutely degrade the "character, credibility, [and] reputation" of PTK and Dr. Tincher-Ladner.

---

[6] *See also* Mississippi Rules of Prof'l Conduct R. 3.6(a) (prohibiting any "extrajudicial statement . . . disseminated by means of public communication if . . . it will have a substantial likelihood of materially prejudicing an adjudicative proceeding).

*See, e.g.,* Polak Decl. Ex. A-14 at 61 (stating on Defendants' website, "PTK might face a loss of **trust and credibility** among students, educational institutions, and the **broader community**.[7] Restoring its **reputation** would require substantial efforts.") (emphasis added). *See also* Tincher-Lander Decl. ¶¶ 57-59 (confirming damage to PTK's and Tincher-Ladner's reputations). This is but one example of thousands of statements with such sentiment, aimed at impeaching PTK's credibility and reputation.

Relatedly, while PTK initiated this lawsuit in April 2022 by suing Honor Society for trademark infringement, Defendants are working to rebranding the lawsuit as one they initiated against PTK, further misleading and biasing the jury pool into believing that PTK is the bad actor. Defendants have expressly stated:

> The lawsuit was filed by HonorSociety.org. . . . The suit targets Phi Theta Kappa and its CEO, Lynn Tincher-Ladner . . . (Polak Decl. Ex. A-14 at 26).

> The lawsuit was filed to address systemic issues with Phi Theta Kappa, including alleged false claims about exclusivity, deceptive scholarship promises, and anticompetitive actions intended to monopolize the community college honor society market. (*Id.* at 28).

Defendants website also boasts an online "JUSTICE CENTER" directly solely to PTK, which is complete with a "Phi Theta Kappa Lawsuit Center" that further editorializes these proceedings in manner intended to confuse readers as to the origin, nature, and outcomes of the lawsuit.[8] *See* Tincher-Ladner Decl. ¶¶ 4, 12-15. Defendants' AI articles are the most deceptive of all. They are written in the first person voice of colleges to deceive students into thinking colleges themselves are publishing anti-PTK rhetoric. *Id.* ¶ 20. The articles, 5,000 times over, severely prejudice PTK.

---

[7] Defendants intend their statements as attacks on PTK's character, credibility and reputation not only with students and colleges, but with the "broader community" at large – e.g., the jury pool.

[8] Defendants even advertise their misguided and confusing use of the Gmail account: PTKLawsuit@gmail.com. This too confuses the public as to the nature of the lawsuit, not to mention as to the owner of the email account.

Thus, Defendants' repeatedly publications of their own commentary on the lawsuit as undisputed facts, mischaracterizations of the very nature of lawsuit, and deception as to the origin of the already misleading publications further creates a substantial likelihood of prejudice to PTK.

### 2. The Proposed Gag Order is sufficiently narrow.

The Proposed Gag Order, like that which was upheld in *Brown*, "is sufficiently narrow [because it] eliminate[s] substantially only that speech having a meaningful likelihood of materially impairing the court's ability to conduct a fair trial." *Brown*, 218 F.3d at 429. The table below shows the language of *Brown's* gag order compared that of the Proposed Gag Order. If anything, the Proposed Gag Order is narrower and provides clearer "guidance regarding the nature of the prohibited comments" (an attribute praised by the Fifth Circuit). *Id.* at 430.

| Gag Order Affirmed in *Brown* | Proposed Gag Order |
|---|---|
| "[A]ttorneys, parties, and witnesses [are prohibited] from discussing with 'any public communications media' anything about the case 'which could interfere with a fair trial,' including statements 'intended to influence public opinion regarding the merits of this case,' with exceptions for matters of public record and matters such as assertions of innocence." *Brown*, 218 F.3d at 418. | Defendants and their extensions and affiliates, as defined by Rule 65(d)(2), including without limitation CollegeBudget.com and Campusbuddy.com, are prohibited from publishing or causing to be published editorializations of this lawsuit that would influence public opinion regarding the merits of the parties' claims or defenses, with the exception of quoting the public record and making assertions of non-liability, and this includes: (a) no such online articles; (b) no such webpages; (c) no such social media postings; and (d) no such communications to community colleges, their students and prospective students, or others in the community college sphere. |

First, following precedent, PTK does not ask the Court to impose a "no comment" rule, "but instead leaves available to the parties various avenues of expression, including assertions of innocence, general statements about the nature of an allegation or defense, and statements of matters of public record." *Brown*, 218 F.3d at 429–30. In fact, the Proposed Gag Order expressly

permits "quoting the public record and assertions of non-liability." Only statements that jeopardize the parties' constitutional right to a fair trial are be prohibited by this Proposed Gag Order.

Second, as the law requires, "the [proposed] order provides sufficient guidance regarding the nature of the prohibited comments." *Id*. at 430. In particular, the Fifth Circuit has blessed the type of gag order that specifically prohibits "[s]tatements or information intended to influence public opinion regarding the merits of [the] case." *Id*. (quoting *Levine v. U.S. District Court*, 764 F.2d 590, 598-99 (9th Cir.1985) (finding that an order barring trial participants from making any statement[] . . . that bears "upon the merits to be resolved by the jury" not vague)). Here, PTK asks the Court to enjoin only those statements and publications that would influence public opinion regarding the merits of the parties' claims or defenses. For it is those very statements that prejudice PTK's right to a fair trial and should thus be prohibited.

For these reasons, the Proposed Gag Order is sufficiently narrow.

### 3.    The Proposed Gag Order is the proper and least restrictive means of ensuring PTK's right to a fair trial.

The Proposed Gag Order is the appropriate remedy for Defendants' relentless mischaracterizations of the lawsuit because it will work to cure the prejudice to PTK on the front end, saving judicial resources and mitigating the risk that voir dire, change of venue, or some other jury-rehabilitating device are ultimately insufficient. As the Supreme Court has noted:

> Even if a fair trial can ultimately be ensured through voir dire, change of venue, or some other devise, these measures entail serious costs to the system. Extensive voir dire may not be able to filter out all of the effects of pretrial publicity, and with increasingly widespread media coverage of [] trials, a change of venue may not suffice to undo the effects of statements [by trial participants]. The State has a substantial interest in preventing officers of the court, such as lawyers, from imposing such costs on the judicial system and on the litigants.

*Gentile*, 501 U.S. at 1075–76. The Fifth Circuit has also recognized the limited efficiency and high

costs associated with gag order alternatives in the context of conduct like Defendants':

> Like voir dire, "emphatic" jury instructions may be at best an imperfect
> filter, and would also fail to address the threat of a "carnival atmosphere"
> around the trial . . . In short, all of these options carry with them significant
> costs without addressing the root cause of the district court's concern . . . .

*Brown*, 218 F.3d at 431 (citations omitted). For these reasons, the best approach to "curing" the

effect of pretrial publicity often involves "those remedial measures that will prevent the prejudice

at its inception." *U.S. v. Scrushy*, No. CR–03–BE–0530–S, 2004 WL 848221, at *5–6 (N.D. Ala.

Apr. 13, 2004) (quoting *Sheppard*, 384 U.S. at 362–63) (emphasis added).

Given the rampant nature of Defendants' commentary and the fact that trial is nearly a year

away, Defendants' statements and the prejudice to PTK and Dr. Tincher-Ladner are likely to

increase ***exponentially*** by the time jury members are considered. *See Greene,* 2021 WL 3609300

at *9 ("There is a substantial likelihood that extrajudicial comments will be more numerous closer

to trial and will, therefore, undermine the Defendants' right to a fair trial. [Thus], alternative

measures will not adequately protect the Defendants right to a fair trial.").

Defendants began with a malicious survey, graduated to limited publications and websites

mimicking their survey allegations, blasted the allegations on social media, and now publish

5,000+ articles seeking to destroy PTK's reputation with the same content. Per this pattern, their

behavior will only intensify if not enjoined at the front end. For these reasons, a gag order taking

immediate effect is the proper and least restrictive means of ensuring PTK's right to a fair trial.

## V.    REQUEST FOR ATTORNEYS' FEES

PTK's seeks its attorneys' fees and costs in connection with this motion, the gathering of

the evidence used therein, and the anticipated fees to be incurred in connection with monitoring

compliance with any order issued by this Court. The Court has inherent power to sanction parties

that engage in conduct that constitutes fraud on the Court or an abuse of the judicial process. *Chambers v. NASCO, Inc.*, 501 U.S. 32, 50-51 (1991); *Crowe v. Smith*, 261 F.3d 558, 563 (5th Cir. 2001). A court's inherent powers to sanction "may be exercised only if essential to preserve the authority of the court . . . ." *Natural Gas Pipeline Co. of Am. v. Energy Gathering, Inc.*, 86 F.3d 464, 467 (5th Cir. 1996). While the bar is high, Defendants' conduct has risen to the occasion. In disregard for the Court's March 28th Preliminary Injunction Order issued just three months ago, Defendants' have intensified their malicious campaign to destroy PTK and Dr. Tincher-Ladner's reputations among colleges and students nationwide.

Defendants conduct is no doubt intentional and willful and ushers in a new era of jury pool tainting, witness intimidation, and tortious interference through the use of AI to mass-disseminate disparaging publications, which target the character of the PTK and Dr. Tincher-Ladner and the merits of the lawsuit. For Dr. Tincher-Ladner, corrective Search Engine Optimization (SEO) efforts will cost thousands of dollars, potentially tens of thousands of dollars, with no guarantee of success. *See* Tincher-Ladner Decl. ¶ 59. Efforts for PTK are likely to be even more costly. *Id.* Even if corrective SEO techniques are productive in "burying" misleading and malicious publications, PTK and Dr. Tincher-Ladner cannot undo the permanent denigration of their reputations in the minds of students and colleges as a result of Defendants' publications. These injuries should be considered in the Court's assessment of any sanctions appropriate for Defendants' conduct.

Defendants have shown that the Court's Preliminary Injunction is of no concern. The Court, at Defendants' request and over PTK's objection, extended further the discovery schedule and trial date in this matter. *See* ECF No. 164. Defendants have used that extended time only to flood social media and the Internet with more malicious and deceptive statements about PTK and Dr. Tincher-Ladner. With trial nearly a year away, Defendants' conduct will continue to intensify

if not tamed by the Court in a manner aligned with their disdain. The numerosity, obsessiveness, and sheer "bad faith" of Defendants' conduct more than justifies the Court's use of its inherent power to issues sanctions. Thus, PTK so requests this relief and any other that the Court deems just and proper.

## VI.    CONCLUSION

For the foregoing reasons, PTK respectfully requests the proposed relief. [9]

Dated: August 14, 2024                    Respectfully submitted,

*/s/ Jonathan G. Polak*
Jonathan G. Polak (*Pro Hac Vice*)
W. Michael Etienne (*Pro Hac Vice*)
TAFT STETTINIUS & HOLLISTER LLP
One Indiana Square, Suite 3500
Indianapolis, IN 46204-2023
(317) 713-3500 – phone
(317) 713-3699 – fax
jpolak@taftlaw.com
metienne@taftlaw@taftlaw.com

Rachel Smoot (*Pro Hac Vice*)
TAFT STETTINIUS & HOLLISTER LLP
41 S. High Street, Suite 1800
Columbus, OH 43215
(614) 221-2838 – phone
(614) 221-2007 – fax
rsmoot@taftlaw.com

*/s/ Michael B. Wallace*
Michael B. Wallace, MSB # 6904
Charles E. Cowan, MSB #104478
WISE CARTER CHILD & CARAWAY, P.A.
Post Office Box 651
Jackson, Mississippi 39205
Phone 601-968-5500
*Counsel for Plaintiff*

---

[9] PTK appreciates the limit for all briefing is 35 pages; however, due to the volume of evidence generated by Defendants and the separate bases for enjoining their conduct, PTK provides notice that it may request no more than 7 additional pages to address Defendants' forthcoming Response.

## <u>CERTIFICATE OF SERVICE</u>

I, Jonathan G. Polak, do hereby certify that I have this day electronically served the foregoing pleading or other paper with the Clerk of the Court via hand delivery and separately served the foregoing pleading or other paper via electronic mail to all counsel of record.

Dated: August 14, 2024

*/s/ Jonathan G. Polak*
Jonathan G. Polak
