IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

PHI THETA KAPPA HONOR SOCIETY,

    *Plaintiff / Counter-Defendant*,

*v.*

HONORSOCIETY.ORG, INC.,

    *Defendant/ Counter-Plaintiff*,

*v.*

DR. LYNN TINCHER-LADNER,

    *Third-Party Defendant.*

CAUSE NO. 3:22-CV-208-CWR-RPM

## ORDER ON SECOND MOTION FOR PRELIMINARY INJUNCTION

On July 12 and 17, 2024 the Court heard arguments and held an evidentiary hearing on plaintiff Phi Theta Kappa[1] Honor Society's *Motion for Temporary Restraining Order, Preliminary Injunction, and/or Gag Order*. The Court deferred ruling.

As the *Motion* was under consideration, the plaintiffs submitted supplemental exhibits. Docket No. 200. Defendant/counter-plaintiff HonorSociety.Org, Inc. ("Honor Society") responded with a *Motion to Strike* the supplemental exhibits. Docket No. 203.

After reviewing the arguments, evidence, and applicable law, the Court finds that the plaintiffs' *Motion for a Temporary Restraining Order, Preliminary Injunction and/or Gag Order*

---

[1] Dr. Lynn Tincher-Ladner joined the *Motion* and added her request for a Gag Order. Because Phi Theta Kappa and Dr. Tincher-Ladner are aligned parties, the Court will call this "the plaintiffs' *Motion*."

should be **granted in part and denied in part**. The *Motion to Strike* should be **denied**. Rule 52(a) findings and conclusions follow.

## I.   FACTS

This Court previously issued a narrow Preliminary Injunction against Honor Society[2] on March 28, 2024. Docket No. 130. The Preliminary Injunction found that Honor Society was directly engaging with Phi Theta Kappa's ("PTK") members and collegiate partners in misleading ways. The Preliminary Injunction, therefore, enjoined Honor Society from sending six specific survey questions to PTK's members and from submitting public records requests to PTK's college partners that appeared as if they were coming from PTK.

Fewer than four months after entry of that Preliminary Injunction, the Court is tasked yet again with determining if emergency relief is warranted for what can only be described as Honor Society's "trolling."[3]

This time, Honor Society has turned much of the content of the six previously-enjoined survey questions into thousands of webpages. Instead of sending them to PTK members and partners, Honor Society changed the questions into statements and published them on the Internet for all to see. This electronic version of "I'm not touching you,"[4]

---

[2] Honor Society includes several other entities, including 501(c)(3) organizations Honor Society Foundation and Honor Society Museum. Founder Michael Moradian also owns CampusBuddy.com and CollegeBudget.com, among other companies.

[3] *Trolling*, MERRIAM-WEBSTER.COM, http://merriam-webster.com/dictionary/trolling (defining "trolling" as, among other things, "to antagonize (others) online by deliberately posting inflammatory, irrelevant, or offensive comments or other disruptive content.").

[4] Referring to the common activity or game of small children, particularly siblings, where one child places their finger or hand near the face or body of the other after instruction specifically not to touch the other child. *See* Linda Holmes, *Remembering Back Seat Kids' Games Other Than 'I'm Not Touching You'*, NPR (Aug. 31, 2010).

approaches a violation of the Preliminary Injunction, but PTK does not contend that it is an actual violation of that narrow Order. The question is whether it merits its own relief.

The webpages with "articles" about PTK began appearing in May. The first was a press release on May 14, 2024. The majority of the webpages appeared in mid-June.

Honor Society admits to creating the pages. Its Founder and Executive Director, Michael Moradian, testified that he used artificial intelligence ("AI") to make approximately 5,000 webpages with allegations about PTK and its current Executive Director, Dr. Lynn Tincher-Ladner. Many are framed as articles detailing the claims in the litigation, but the posts often go further. For example, images accompanying several articles style Dr. Tincher-Ladner as a cartoon villain.[5] The articles have appeared on four Honor Society-affiliated websites, plus the websites of Moradian's other businesses, CampusBuddy Inc. and CollegeBudget.com.

Honor Society characterizes the pages as "includ[ing] reports on: sexual-harassment allegations against PTK; allegations that a PTK chapter advisor allegedly embezzled funds; allegations that PTK is misleading in its descriptions of available scholarship benefits; contentions that PTK does not restrict invitations to students in the 'Top 10%' of their classes; and other allegations in this lawsuit." Honor Society Response at 15. Other allegations also include claims that PTK is a monopoly, that past PTK Executive Director Rod Risley was allowed to take a "golden parachute" retirement payment following accusations of sexual harassment, and that PTK sells student data without their consent. Many posts label PTK's

---

[5] Moradian answered  that "an image of a woman holding money" was removed from the webpages between June 25 and July 3. Hr'g Tr. 2 at 163. He further stated "the images that looked like a movie scene were removed, and they were replaced with generic messaging[.]" *Id.* The Court finds that some of these images are still publicly available.

current Executive Director, Dr. Tincher-Ladner, as the "misleading mastermind" behind PTK's alleged conduct. *See* Ex. A-19; Ex. A-21; *Lynn Tincher-Ladner: Alleged Misleading Mastermind*, https://honorsocietyfoundation.org/lynn-tincher-ladner-alleged-misleading-mastermind/ (last accessed Aug. 16, 2024).

Honor Society has created social media accounts to share the anti-PTK webpages and articles. Social media accounts on Twitter and Instagram have emerged using the handle @PTKlawsuit. They link to Honor Society's websites and encourage people to post with the hashtag #PTKlawsuit. Honor Society has also shared these articles on its LinkedIn account. It created a "PTKlawsuit@gmail.com" account and invites people to email any information they may have of PTK wrongdoing to that account. Honor Society's webpages often include language that encourages colleges and students to reconsider their relationships with PTK.

Throughout these webpages and posts, Honor Society frames itself as the wronged party that initiated the litigation as a public service on behalf of all those misled by PTK. The posts do not explain that Honor Society is the defendant who was sued first by PTK, and it only later asserted counterclaims.

Honor Society claims that all the information it has posted online is true, and that truth gives it protection from further injunctive relief. The Court, however, sees multiple instances where Honor Society takes liberties with the truth. They are described in detail later in this Order.

Dr. Tincher-Ladner arguably receives the most online venom from Honor Society. Many of Honor Society's articles frame her as a villain responsible for PTK's alleged wrongdoing. Honor Society even has an entire webpage utilizing her name in its URL. *See Lynn Tincher-Ladner Lawsuit*, https://www.honorsociety.org/Lynn-Tincher-Ladner.

4

In one instance, discussed *infra,* a caricature of her has been racialized to make her appear of East Asian descent. To this Court's knowledge, Dr. Tincher-Ladner is not of East Asian descent.

PTK alerted the Court to its pending *Motion* on July 3. The Court held a status conference virtually, then conducted two days of in-person evidentiary hearings. At those hearings, PTK and Honor Society presented evidence. Dr. Tincher-Ladner and Moradian testified. Because a related *Motion for Leave to File Under Seal*, Docket No. 171, was opposed by Honor Society, the parties submitted their briefs on the plaintiffs' *Motion* via email. The Court later instructed the parties to upload their filings to ECF so the Court could enter this Order and make a clean record for appellate review.

In short, PTK's *Motion* seeks an injunction enjoining Honor Society from posting these webpages online, and a Gag Order. It says Honor Society's recent Internet actions give rise to a claim for tortious interference with contractual relations under Mississippi law. Honor Society responds with a First Amendment defense, arguing that all the information is truthful and denying PTK can show how it has suffered any harm from the online postings.

Days after the conclusion of the evidentiary hearing, the Court received notice detailing further online behavior that occurred post-hearing. It turns to that conduct now.

On July 24, PTK filed a supplemental declaration by Dr. Tincher-Ladner with accompanying exhibits. Docket No. 200-5. The declaration says someone has been editing PTK's Wikipedia page to add Honor Society's online smears. Added in June were sections entitled "lawsuit" and "leadership misconduct." These sections again frame PTK as the defendant in the lawsuit against Honor Society. Other changes remove 19 accomplished

persons from the "Notable Members" section of PTK's Wikipedia page, including astronaut Fred Haise and Maryland Governor Wes Moore, and replace them with attempted assassin of Donald Trump, Thomas Matthew Crooks. Currently the Wikipedia page has a new section entitled "Controversies, local chapter or member misconduct," which did not exist several months ago.

PTK's supporting exhibits show the Wikipedia page's "Revision history." The most suspicious edits came during the dates of July 20-24 by a username "WikiObjectivity." Docket No. 200-7. PTK suspects that this user is Moradian or another person affiliated with Honor Society making the edits at Moradian's direction. Docket No. 200-5 at 7.

Honor Society responded with a *Motion to Strike* the supplemental declaration by Dr. Tincher-Ladner and exhibits. Docket No. 203. It argues that the supplemental declaration and exhibits are procedurally improper, constitute new evidence submitted after the parties rested, and are an attempt to circumvent the Court's page limits. *Id*. Honor Society does not confirm whether it is behind the Wikipedia edits. It then says that if the Court considers the supplemental materials, it seeks leave to file its own declaration to "address the history of the Wikipedia article and its edits as well as allegations of Mr. Moradian's involvement." Docket No. 213 at 3-4.

## II.  LAW

It is well-established that a preliminary injunction is "an extraordinary and drastic remedy." *Black Fire Fighters Ass'n of Dall. v. City of Dall., Tex.*, 905 F.2d 63, 65 (5th Cir. 1990). Before one may issue, the movant must demonstrate:

(1) a substantial likelihood of prevailing on the merits; (2) a substantial threat of irreparable harm if the injunction is not granted; (3) that the threatened

injury outweighs any harm that may result from an injunction; and (4) that the injunction will not undermine the interest of the public.

*Bluefield Water Ass'n Inc. v. City of Starkville, Miss.*, 577 F.3d 250, 252-53 (5th Cir. 2009).

To prevail on the merits of a tortious interference with contractual relations claim in Mississippi, a party must show:

> (1) that the acts were intentional and willful; (2) that they were calculated to cause damage to the plaintiffs in their lawful business; (3) that they were done with the unlawful purpose of causing damage and loss, without right or justifiable cause on the part of the defendant (which constitutes malice); and (4) that actual damage and loss resulted.

*Neider v. Franklin*, 844 So. 2d 433, 437 (Miss. 2003).

### III.   ANALYSIS

#### A.   *Honor Society's Motion to Strike*

Honor Society makes three arguments for striking the supplemental filings at Docket Nos. 200-5 to 200-12. It first argues that the supplemental exhibits are procedurally improper as PTK did not show good cause or offer any reason for submitting them late, and claims that the exhibits were available to PTK before the hearing. Docket No. 204 at 3. Honor Society's second argument simply is that PTK cannot submit new evidence after a hearing. *Id.* at 3-4. Lastly, it claims that Dr. Tincher-Ladner's declaration is an attempt to circumvent the page limits under Local Rule 7(b)(5). *Id.* at 4. Honor Society argues in the alternative that if the Court considers the supplemental declaration and exhibits, it should be given leave to address the contents – its motion is quiet as to the merits of the exhibits – before ruling on the preliminary injunction.

While Honor Society doesn't cite to the Federal Rules of Civil Procedure, Rule 6(b)(1)(B) provides that "[w]hen an act may or must be done within a specified time, the court

may, for good cause, extend the time . . . after the time has expired if the party failed to act because of excusable neglect." "The determination of what is excusable is at bottom an equitable one, taking account of all relevant circumstances surrounding the party's omission." *McCarty v. Thaler*, 376 F. App'x 442, 444 (5th Cir. 2010) (citations omitted). These circumstances include "the danger of prejudice to the [movant], the length of the delay and its potential impact on judicial proceedings, the reason for the delay, including whether it was within the reasonable control of the movant, and whether the movant acted in good faith." *Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380, 395 (1993). "Even if good cause and excusable neglect are shown, it nonetheless remains a question of the court's discretion whether to grant any motion to extend time under Rule 6(b)." *McCarty*, 376 F. App'x at 443; *see also Henderson v. Jones Cnty. Sch. Dist.*, No. 2:18-CV-188-KS-MTP, 2021 WL 53174, at *3 (S.D. Miss. Jan. 6, 2021).

The Court is not sure that the excusable neglect standard is applicable here, because the plaintiffs' *Motion* was already fully submitted for the Court's review before PTK learned about the suspicious Wikipedia edits. PTK has acted in good faith in bringing these matters to the Court's attention, and the supplemental exhibits are relevant to the pending *Motion*. Considering them now, compared to later – in what likely would be the third request for a TRO or preliminary injunction – serves judicial economy and prevents duplicative future motions.

The Court will nevertheless address Honor Society's arguments. For its first argument of procedural defect, Honor Society relies on *Rashid v. Delta State Univ.*, 306 F.R.D. 530 (N.D. Miss. 2015). In *Rashid* the Court declined to consider new evidence because the plaintiff "had nearly four-weeks to create this affidavit" and offered "no explanation for her delay in doing

so." 306 F.R.D. at 534. That is nothing like the situation here. PTK learned of the edits shortly after the Court concluded its hearing. It submitted the evidence only two days later.

Honor Society's second argument also fails to persuade. The most critical revisions to the Wikipedia page occurred between July 20 and 24. *See* Docket No. 200-7; *see also* Phi Theta Kappa: Revision History, Wikipedia.org, https://en.wikipedia.org/w/index.php?title=Phi_Theta_Kappa&action=history (last accessed Aug. 16, 2024). The evidence was not known at the time of the briefing or the hearings.[6] PTK had good cause to supplement the record.

Honor Society's argument about PTK exceeding the page limits, meanwhile, is frivolous. "Extra pages in this instance is beyond appropriate." *Hester v. Jackson Pub. Sch. Dist.*, No. 3:16-CV-936-CWR-FKB, 2019 WL 8751951, at n.6 (S.D. Miss. Jan. 28, 2019). But for post-hearing edits to PTK's Wikipedia page there wouldn't be a need for additional pages.

Honor Society's request for leave to file a supplemental response is denied as well. Honor Society could have responded to PTK's filing and addressed the contents. It chose not to. The Court declines to countenance further delay tactics.

Honor Society says in rebuttal that if the Court considers the supplemental materials "it should not rely on PTK's limited submission but instead take judicial notice of the fact that the information appears on Wikipedia and is therefore available to the public." Docket No. 213 at 2-3. It is not clear what that would achieve, though. They show the same thing.

---

[6] The magnitude of the revisions suggests that Honor Society was concocting them during the hearing and only unleashed them after the close of the hearing on July 17, after the Court announced it was taking the matter under advisement.

Honor Society also complains that PTK's exhibit showing the Wikipedia revision log "conveniently excludes portions where Wikipedia found the complained-of revisions to be well sourced." *Id.* at 3. But that argument, which is essentially a "truth" defense, doesn't warrant the striking of the evidence either.

Wikipedia is "based on an openly editable model." *United States v. Lawson*, 677 F.3d 629, 650 (4th Cir. 2012) (cleaned up). Some of its edits are factual; others are not. Care must be taken in reviewing a website such as this—one that "is more easily vandalized" than other sites. *Id.* And here, there might be a factual basis for adding the attempted assassin's name to Wikipedia—the Court does not know if he was or was not a member of PTK. But what is the rationale for deleting an astronaut and Governor from PTK's Wikipedia page? When the edits are considered together, they suggest an intentional scheme to delete favorable content about PTK and introduce unfavorable content about PTK, rather than speak the truth.

The *Motion to Strike* is denied. The Court will consider the supplemental declaration and exhibits in its analysis for what they're worth.

### B. The Plaintiffs' Motion for Preliminary Injunction and Gag Order

#### 1. Substantial Likelihood of Success on the Merits

A plaintiff need not show actual success to prove substantial likelihood of success on the merits when seeking a preliminary injunction. *See Bynum v. Landreth*, 566 F.3d 442, 446 (5th Cir. 2009) (citing *Icee Distribs., Inc. v. J&J Snack Foods Corp.*, 325 F.3d 586, 596 n.34 (5th Cir. 2003)).

As to the first element of tortious interference, it is undisputed that the webpages and Internet posts in question were intentional and willful. Moradian testified that he knowingly made the web content.

As with the first Preliminary Injunction, the Court finds that the acts here were likewise calculated to cause damage to PTK's lawful business.

Honor Society's posts expressly encourage PTK's customer base "to reconsider their relationships with the society if the allegations are proven." Ex. A-14 at 63; *see also* Ex.A-20 at 4. Honor Society wants "students . . . to reassess the value and benefits of PTK membership." Ex. A-14 at 72. It advises them to "consider alternative societies that may offer more transparent and genuine benefits." Ex. A-32 at 4. Other posts describe the "Cons of Joining Phi Theta Kappa," which encourages students to "take caution and make an informed decision, and **consider substantial criticisms of the organization.**" Ex. A-36 at 4 (emphasis in original). This language is meant to dissuade students from joining PTK and dissuade colleges from partnering with PTK.

There's ordinarily nothing wrong with that. In seeking to inform students and colleges about its competitor, though, Honor Society has made numerous false representations about PTK. And just like the "content of and hyperlinks within the survey" discussed in the last injunction, Docket No. 130 at 4, this shows malicious intent to harm PTK's lawful business. *See Gulf Pub. Co. v. Lee*, 434 So. 2d 687, 696 (Miss. 1983) (holding that a party "acts with actual malice when he prints a story with knowledge that it is false or with reckless disregard for the truth."). Similarly, if Honor Society is behind the edits to PTK's Wikipedia page reproducing false claims, that too could show malice.

Honor Society conducted some of these activities without right or justifiable cause. Some posts do report or restate claims contained in the pleadings – which Honor Society has

the right to publish.[7] This does not, however, justify Honor Society's posts framing the facts in misleading or untruthful ways, or the editing of Wikipedia to cast PTK in a damming light (if the evidence ultimately sustains that).

One post created without right or justifiable cause was Honor Society's article about Robin Lowe, a PTK chapter advisor at Itawamba Community College who was arrested for allegedly embezzling funds. *See* Ex. A-8. Honor Society's post makes Lowe appear as a PTK employee, when in fact PTK campus advisors are employees of community colleges. The advisor role is an unpaid volunteer. Dr. Tincher-Ladner testified to this in her February deposition. Moradian was present when she explained it. There is no factual basis for Honor Society's claim.

Honor Society's webpage about Lowe then states that "WLBT reported that the funds were meant for scholarships, events, and other educational purposes, underscoring the betrayal of trust." *Id*. It includes a link to the WLBT article, which says no such thing. *See Honor society advisor at Mississippi community college arrested for embezzlement,* WLBT (Feb. 12, 2024). Honor Society attributed words to WLBT that are not present in the actual story. There is no right or justifiable cause for this.

Honor Society's webpage repeatedly attributes Lowe's alleged[8] conduct to PTK's leadership and internal controls. Ex. A-8 at 4. But the Mississippi Office of the State Auditor stated that Lowe is "accused of converting public funds meant to benefit the PTK chapter for her own personal use." *Former Itawamba Community College Honor Society Advisor Arrested*

---

[7] As this Court detailed in a previous Order, public commenting about the contents of litigation or a party's claims is privileged. *See* Docket No. 131 at 5-8. Honor Society's posts about an alleged monopoly, false advertising, and cybersquatting relate to or restate the counts pled in its counter-complaint.

[8] To this Court's knowledge, Lowe has only been accused of this conduct and has not been found guilty. She, of course, is innocent until proven guilty.

*for Embezzlement*, Miss. Office of the State Auditor (Feb. 12, 2024). Public funds are taxpayer funds, not PTK membership dues or other money students paid to PTK.  Honor Society's claim is a lie. Honor Society knows it is a lie.  How do we know?  It refers to the State Auditor's website in Moradian's Declaration. *See* Moradian Decl. at ¶¶81-82. This was done without right or justifiable cause.

The conclusion is simple. Honor Society chose to describe an Itawamba Community College employee who allegedly took public funds, and made it look as though a PTK employee took money from PTK members, all to further Honor Society's scheme to injure PTK.[9] Throughout his testimony, Moradian claims he created the webpages for the sake of transparency to students. Transparent they are not. At best, they are there to deceive those who read them.

Honor Society misleads again when it frames itself as the plaintiff in this litigation. *See* Ex. A-4 ("In a bold move to defend students, parents, and the educational community, a lawsuit was filed against Phi Theta Kappa (PTK) and its CEO, Lynn Tincher-Ladner."). This lawsuit was, of course, filed by PTK. Honor Society knows this. There is no justification for this conduct.

Honor Society's PTK "Chapter Directory" and "Alerts by Community College" pages also mislead without any justification. Ex. A-12; Ex. A-13. These pages purport to provide a link to PTK chapters across the country. *Community College Honor Societies Directory*, https://honorsocietyfoundation.org/community-college-honor-societies-directory/ (last accessed

---

[9] Honor Society's brief to this Court repeats this misrepresentation of Lowe as a PTK employee. *See* Honor Society Memorandum at 5 ("PTK has been credibly accused of sexual harassment multiple times, and its employee arrested for embezzling student funds.").

Aug. 18, 2024).   But when one clicks on the link, there is no contact information—just a page parroting the claims against PTK and inviting students to email the Gmail account with information about PTK's "alleged deceptive practices." An example is shown here:



This is misleading to students and PTK's partners because it is not an actual "Chapter Directory." Rather, it is an attempt to direct persons interested in PTK to a page "informing potential members about why they should not select PTK[.]" Honor Society Response at 22.

The Court would be remiss to omit the most offensive content in Honor Society's campaign. On its website and in its tweets, Honor Society has generated a so-called "parody" cartoon that depicts Dr. Tincher-Ladner as East Asian. The image is reproduced here:



https://x.com/HonorSociety/status/1803520879722373259; *see also* Ex. A-3 at 3; Ex. A-26 at 3. To this Court's knowledge, the images are still online, despite Moradian's testimony that many such caricatures were removed or since edited.

Honor Society says "[t]he images are parodies, represent HonorSociety's opinions, and serve as metaphors for concerns about PTK's operations." Honor Society Response at 20. But unexplained is why Honor Society's "concerns" about PTK were represented in this way.

The cartoon Asian woman presents as a vendor wearing a crown and a robe; she appears to be untrustworthy as she is selling fake medals or certificates.[10] This image leans into anti-Asian, specifically anti-East Asian, tropes. It doesn't make sense as anything other than an appeal to racism.[11] This behavior is without right or justifiable cause. It is despicable.

---

[10] For background on the racist narrative of Asian-American women as untrustworthy, *see generally* Yen Le Espiritu, *Asian American Women and Men: Labor, Laws, and Love* (2008).

[11] For that matter, Honor Society's use of racist caricatures is incompatible with its public statements expressing a commitment to racial justice. *See Phi Theta Kappa Lawsuit*, Honor Society®,

To summarize the elements analyzed so far, PTK is substantially likely to prevail on the first three elements of a tortious interference with contractual relations claim. This Court also finds that it is substantially likely to prove actual loss and damage resulting from Honor Society's actions.

Honor Society argues that PTK "cannot identify a single actual or potential customer that it lost." Honor Society Memorandum at 11. It relies primarily on *Ronaldo Designer Jewelry, Inc. v. Cox*, No. 1:17-CV-2-DMB-DAS, 2019 WL 1245787 (N.D. Miss. Mar. 18, 2019), for the proposition that parties claiming tortious interference must "identify a specific relationship (prospective or actual) which was allegedly harmed." *Id*. at *4. Here, however, PTK has provided the Court with a list of students who have cancelled their memberships since Honor Society began sending surveys and posting online content disparaging PTK. *See* Ex. B to Tincher-Ladner Dec. at ¶52. PTK says that at least 20 students have left PTK's lifetime membership since March 28, 2024. *Id*. These students cancelled between March 2, 2024 and June 7, 2024. *Id*. Many of them occurred after Honor Society's posts.

As an example, one canceling student (that the Court will identify as F.G.) stated in their May 25, 2024 request to PTK, that their personal information was being "disclosed." The language parrots Honor's Society's claims, made in early May 2024, that PTK is "selling members' personal information without consent." *See Phi Theta Kappa Alert At Des Moines Area Community College, West Campus: Caution Advised Regarding the PTK BETA MU TAU Chapter*, HONOR SOCIETY FOUNDATION (May 1, 2024),

---

https://www.honorsociety.org/phi-theta-kappa-lawsuit ("For over a decade, Honor Society® has been at the forefront of promoting inclusivity and dismantling systemic bias and structural racism, providing a platform that encourages achievement at all levels.").

https://honorsocietyfoundation.org/ptk-des-moines-area-community-college-west-campus/; *Phi Theta Kappa Alert At Rowan College of South Jersey, Cumberland Campus: Caution Advised Regarding the PTK RHO GAMMA Chapter*, HONOR SOCIETY FOUNDATION (May 2, 2024), https://honorsocietyfoundation.org/ptk-rowan-college-of-south-jersey-cumberland-campus/. This is not akin to the situation in *Ronaldo Designer Jewelry*.

In terms of tangible dollars and cents, PTK says it has lost $81,595 in membership revenue for the period of March 1, 2024 to June 30, 2024. *See* Tincher-Ladner Decl. at ¶54. PTK also says that 15% of its college and corporate partners have decided not to renew their PTK Connect memberships. *Id*. at ¶55. It attributes this to Honor Society's websites.

While the causal connection for the lost profits can be more fully developed during discovery, "[a] defendant who seeks to promote his own interest by telling a known falsehood to or about the plaintiff or his product may be said to have proximately caused the plaintiff's harm." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 138 (2014) (cleaned up). As discussed above, there are multiple places where Honor Society tells falsehoods about PTK. For these reasons, it is substantially likely that PTK has suffered actual loss or damage due to Honor Society's actions.[12]

Thus, this Court finds PTK substantially likely to prevail on the merits of its tortious interference with contractual relations claim.

---

[12] For what they're worth, Honor Society's own posts suggest that PTK's reputation has been harmed. *See* Tincher-Ladner Decl. at ¶58; *see also What are the potential long-term effects of the lawsuit on PTK's reputation?*, Honor Society.org Support (June 11, 2024), https://support.honorsociety.org/hc/en-us/articles/27494043046669-What-are-the-potential-long-term-effects-of-the-lawsuit-on-PTK-s-reputation.

## 2. Substantial Threat of Irreparable Harm

"In general, a harm is irreparable where there is no adequate remedy at law, such as monetary damages. However, the availability of monetary damages does not automatically mean that a remedy at law is always adequate." *SO Apartments, L.L.C. v. City of San Antonio, Texas,* 109 F.4th 343, 353 (5th Cir. 2024) (cleaned up).

While money damages would be available after a trial on the merits, a substantial threat of reputational harm exists for PTK. This is not seriously disputed. As discussed above, Honor Society's own posts admit that PTK has suffered reputational harm. Dr. Tincher-Ladner, meanwhile, has been made into a caricature and personally vilified as the "mastermind" of all alleged PTK wrongdoing.[13] *See* Ex. A-21; *Unmasking Lynn Tincher-Ladner: The Allegations of False Advertising at PTK,* Honor Society (Jun. 16, 2024), https://www.honorsociety.org/articles/unmasking-lynn-tincher-ladner-allegations-false-advertising-ptk; *see also* Ex. A-19; *Who is Lynn Tincher-Ladner, and what is her role in the allegations?,* Honor Society Help Center (Jun 11, 2024), https://support.honorsociety.org/hc/en-us/articles/27493187971213-Who-is-Lynn-Tincher-Ladner-and-what-is-her-role-in-the-allegations (stating that she "is alleged to have masterminded the deceptive practices and anticompetitive behaviors detailed in the lawsuit.").

As mentioned in the prior injunction, Docket No. 130, a threat of irreparable injury exists when a business's "carefully cultivated reputation" is damaged. *Better Bus. Bureau of*

---

[13] Honor Society's online "Community College Honor Society Directory," Ex. A-12, has a link to each PTK chapter. The vast majority of those links direct persons to a page which includes the statement: "The PTK CEO, Tincher-Ladner, allegedly masterminded these deceptive practices against community college students and institutions and should be held accountable."

*Metro. Hous., Inc. v. Med. Directors, Inc.*, 681 F.2d 397, 403 (5th Cir. 1982). And here, just as this Court held in *Multiplan, Inc. v. Holland,* "[b]ecause the harm to the plaintiffs' reputation and business in this case will probably be difficult to quantify, they have demonstrated irreparable harm." No. 1:14-CV-315, 2014 WL 12575800, at *3 (S.D. Miss. Aug. 19, 2014). It will be difficult for PTK or Dr. Tincher-Ladner to precisely quantify the reputational damage they have suffered from Honor Society's conduct.

The Court does not believe that "monetary damages would be an adequate remedy to [PTK's harm] at the end of a trial on the merits." *Mississippi Power & Light Co. v. United Gas Pipe Line Co.*, 760 F.2d 618, 623 (5th Cir. 1985). A substantial threat of irreparable harm exists.

### 3. The Threatened Injury Outweighs the Harm of the Injunction

The Court finds that the injury to PTK and Dr. Tincher-Ladner from Honor Society's cyberbullying outweighs any harm that an injunction would cause Honor Society. An appropriately-tailored injunction would mean Honor Society would have to stop posting the false content the Court instructs it to.

Honor Society, via Moradian, presses that PTK's motions are financially burdensome to him. "PTK's scorch-earthed litigation tactics have taken a toll financially on HonorSociety and on me personally," he says. "Due to the constant engagement with this case, and PTK's meritless motions, for example, I have been unable to spend quality time with my two infant children." Moradian Declaration at ¶24. The Court finds the notion that *PTK* is the party engaging in "scorched-earth litigation tactics" to be gaslighting. Moradian will reduce his litigation costs and have more time for his family if he doesn't create 5,000 webpages with false information about his opponents.

Nor would an injunction prevent Honor Society from getting its version of events out to the public. Honor Society could have, and did, issue a press release countering PTK's narrative about this case. But that was not enough. It escalated. It cannot throw a rock and now hide its hand.

The Court is persuaded that the harm to PTK far surpasses the potential harm to Honor Society.

### 4.   Whether the Injunction will Serve the Public Interest

The Court has no stake in whether consumers—which here are junior colleges and their students—ultimately choose to believe PTK or Honor Society's characterizations of the value of their organizations. The two sides of this litigation are competitors in a marketplace. But the Court does recognize a significant public interest in consumers having the truth. And here, a preliminary injunction that prohibits one side from making false statements about their opponent during the pendency of this litigation serves the public interest.

The Court finds that Honor Society misrepresents the truth online in multiple posts. These misrepresentations do not benefit the public interest. Honor Society's online behavior prevents the public from considering both businesses objectively.

For these reasons, the Court finds that a Preliminary Injunction should be granted.

### 5.   First Amendment Concerns

Beyond the high standard for a preliminary injunction, this Court proceeds with an added degree of caution because PTK seeks to enjoin Honor Society's speech.

Although this dispute does not involve political speech that is at the core of the First Amendment, "[a]ny system of prior restraints of expression . . . bear[s] a heavy presumption against its constitutional validity." *New York Times Co. v. United States*, 403 U.S. 713, 714 (1971)

(quoting *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70 (1963)). The party seeking imposition of a prior restraint "carries a heavy burden of showing justification . . . ." *Org. for a Better Austin v. Keefe*, 402 U.S. 415, 419 (1971). And there is no doubt that an order prohibiting an attorney or party from commenting on the subject matter before the Court constitutes a prior restraint on speech. *See Carter v. Marshall Durbin Food Corp.*, 2009 WL 161829, at *2 (S.D. Miss. Jan. 22, 2009).

The first step in assessing the constitutionality of a prior restraint requires considering whether the harm the Court seeks to prevent justifies the restraint on speech. *Marceaux*, 731 F.3d at 493 (citing *United States v. Brown*, 218 F.3d 415, 425 (5th Cir. 2000)). And as discussed *supra*, the risk of long-term reputational harm to these movants justifies a restraint on speech.

The Constitution "accords a lesser protection to commercial speech than to other constitutionally guaranteed expression." *Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York*, 447 U.S. 557, 563 (1980). To determine if the speech is commercial, the court must consider (i) whether the communication is an advertisement, (ii) whether the communication refers to a specific product or service, and (iii) whether the speaker has an economic motivation for the speech. *Procter & Gamble Co. v. Amway Corp.*, 242 F.3d 539, 552 (5th Cir. 2001), *abrogated on other grounds by Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014) (citing *Bolger v. Youngs Drug Prod. Corp.*, 463 U.S. 60, 67 (1983)). "If all three factors are present, there is strong support for the conclusion that the speech is commercial." *Id.* (quotations omitted).

Honor Society makes a few fleeting arguments that its speech is not commercial. It claims the posts are the subject of interest and concern to the public. This is not the shield that Honor Society believes it is. "The Supreme Court has 'made clear that advertising which links

21

a product to a current public debate is not thereby entitled to the constitutional protection afforded noncommercial speech.'" *Eastman Chem. Co. v. Plastipure, Inc.*, 775 F.3d 230, 236 (5th Cir. 2014) (quoting *Bolger*, 463 U.S. at 68).

Honor Society then relies on *Matter of Nat'l Serv. Corp.*, 742 F.2d 859 (5th Cir. 1984) for the proposition that speech is protected if it has public value. It likens its conduct to that of Turner Advertising Company billboards announcing that National Service Corporation was "bankrupt" and "cannot pay its bills." The Fifth Circuit found that this was not commercial speech. "Rather, the message more closely resembles a public service message, and one for which TAC is not being remunerated. TAC's message simply states two unassailable facts, that NSC is in bankruptcy and that NSC cannot pay its bills." *Id.* at 862.

This is not the case here. Some of Honor Society's online statements are false. Other claims comprising the allegations in its countersuit are disputed. After two days of hearing arguments regarding PTK's invitation process, namely whether invited students constitute the top 10% of students at their colleges or the top 10% nationally, the Court is no clearer as to which side has the accurate claim. The same goes for the dispute over the average dollar amount that PTK members receive in scholarships. None of the discussion of numerators, denominators, and percentages made either side's calculations so clear that the Court could declare them to be "unassailable facts." *Id.*

Returning to the *Bolger* factors, the economic motivation of Honor Society is plain. Honor Society admits it in response that it "is PTK's competitor. If HonorSociety is prevented from comparative advertising and informing potential members about why they should not select PTK, HonorSociety will lose business." Honor Society Response at 22. Honor Society's

own words classify its actions as economically motivated, confirming the first and third factors of the relevant legal standard.

This leaves the second *Bolger* factor: whether the communication refers to a specific product or service. That element is obvious here, since Honor Society refers to PTK's products and services with each post, encouraging students to consider "alternative societies that may offer more transparent and genuine benefits." *See* Ex. A-32 at 4; *Is PTK Worth It? A Look Into Phi Theta Kappa*, HONOR SOCIETY®, https://www.honorsociety.org/ptk-worth-it-look-phi-theta-kappa. These statements suggest students forego PTK and consider paying for Honor Society's services.

Because the three *Bolger* elements are present, the Court finds that Honor Society's online postings are commercial speech. Honor Society and Honor Society alone connects its efforts to its profits, confirming that its webpages are commercial speech.

The Fifth Circuit in *Marceaux* determined that the "substantial likelihood of prejudice test" applies when determining if a prior restraint is justified. *Id*. Based on the Court's findings *supra* of the substantial likelihood of reputational harm, the Court believes there is substantial likelihood of prejudice to PTK by this commercial speech. A preliminary injunction will be entered.

## C.  Gag Order

PTK has requested an Order prohibiting Honor Society from making future public statements about the case. Such orders are used to avoid "the potential that pretrial publicity may taint the jury venire, resulting in a jury that is biased toward one party or another, and preventing the creation of a carnival atmosphere, which threatens the integrity of the proceeding." *Marceaux*, 731 F.3d at 494 (cleaned up).

This Court does not find that a gag order is necessary at this juncture. As discussed at the hearing, there are avenues to ensure that jurors are not prejudiced by pretrial publicity. The main avenue is *voir dire*, and this Court believes through *voir dire* it will be able to find the six to eight people required to hear this case. If some jurors were exposed to the online posts, the Court could also draw jurors from another Division within the Southern District of Mississippi. The request for a gag order is denied without prejudice.

### D. Attorney's Fees

PTK requests the Court awards attorney's fees as a sanction.

The Supreme Court has expressed three categories where "federal courts have inherent power to assess attorney's fees." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 45 (1991) (citing *Roadway Express., Inc. v. Piper*, 447 U.S. 752, 765 (1980))). The first category is the "common fund exception," the second is "for the willful disobedience of a court order," and the third is "when a party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons." *Id.* at 45-46. (cleaned up).

The first category is patently inapplicable. As for the second, PTK does not believe Honor Society has violated the terms of the previous injunction, so attorney's fees for the "willful disobedience of a court order" would not be proper. The remaining question is whether Honor Society has acted in bad faith, vexatiously, wantonly, or for oppressive reasons.

The Court believes that standard has been met as to certain online posts. A full ruling on fees may need to be issued. Because the Court has not confirmed whether PTK's Wikipedia page was in-fact edited by Honor Society, though, that determination today might

be incomplete.[14] The Court will, therefore, deny the request for attorney's fees without prejudice.

After the parties discover who edited the Wikipedia page, PTK is welcome to renew its fees motion describing with specificity which posts (and if necessary, which Wikipedia edits) it believes meet the applicable standard. Honor Society can respond in the usual course of business.

## IV.   THE PRELIMINARY INJUNCTION

"The district court must narrowly tailor an injunction to remedy the specific action which gives rise to the order." *John Doe #1 v. Veneman*, 380 F.3d 807, 818 (5th Cir. 2004).

In *Marceaux*, the Fifth Circuit overturned the "wholesale banning" of a website, but said it "recognize[s] that there may be bases upon which to order removal of some of the content." 731 F.3d at 495. This is the case here. A limited injunction will be "narrowly tailored and represent the least restrictive means." *Id*. (cleaned up).

It is therefore ordered that Honor Society, and all its affiliates and agents encompassed by Rule 65(d)(2), including but not limited to Honor Society Foundation, Inc., CampusBuddy.Org, CollegeBudget.com, Moradian, and any other company owned or controlled by Moradian, shall:

---

[14] Misrepresentations to the Court may also be relevant to any renewed Motion for Attorney's Fees. Moradian and Honor Society, through counsel, informed the Court at the March 27 hearing that "Honor Society sends out public records requests not for discovery in this case, but for competitive reasons." Docket No. 135 at 89. Yet, Honor Society has attached the public records responses as exhibits, Moradian Decl. Ex. 8 at 7-10, and relies on them as proof that PTK misrepresents that it takes "the top 10%" of community college students. Moradian Decl. at ¶40-57. It is not clear how Honor Society can use these records for litigation purposes after it's counsel represented that it would not. *See* ABA Model Rule 3.3(a) ("A lawyer shall not knowingly . . . make a false statement of fact or law to a tribunal or fail to correct a false statement of material fact or law previously made to the tribunal by the lawyer."); *see also* ABA Model Rule 4.1(a). The Court is also troubled by Honor Society's brief's continued assertion that Lowe was PTK's employee, after the evidence was known. *See* Honor Society Response at 5.

1) Immediately cease edits to PTK's Wikipedia page, and subject itself to discovery on Wikipedia edits it may have made or caused during this litigation.

2) Remove all images of the cartoon East Asian woman vendor from its webpages and social media posts.

3) Remove all false subject matter from its webpages and social media posts regarding the Itawamba Community College chapter advisor's arrest.

4) Limit its reporting on the sexual harassment allegations against Risley to existing media articles only, rather than articles of its own creation.[15]

5) Add the actual contact information for every PTK chapter into the "Directory," or delete the "Directory."

6) Add the following disclaimer, in 12 point or larger size font, to the top of all remaining webpages and social media posts that concern or reference this litigation:

> Disclaimer: The author of this article is not a neutral party in the referenced litigation. HonorSociety.org Inc., Honor Society Foundation Inc., and its president Michael Moradian were sued in federal court by PTK on April 20, 2022 for False Designation of Origin, Trade Dress Infringement, and Unfair Competition. Honor Society and Michael Moradian countersued and are presently defendants/counter-plaintiffs in this litigation. Litigation is still ongoing and all claims made regarding this case are just allegations against the parties.

Honor Society, of course, may elect to take down prior content if adding this disclaimer to every page or post would be too burdensome.

---

[15] Honor Society provided the Court with a declaration by the alleged victim of Risley's sexual harassment. The declaration lists eight news articles from 2015 detailing the allegations. Because these articles present more objective factual narratives about the alleged harassment than articles created by Honor Society, Honor Society may share or repost any of those eight articles should it decide to discuss the alleged sexual harassment.

Lastly, Honor Society requested a bond of "at least $1 million to cover damages[.]" Honor Society Response at 22. Yet, it cited no caselaw, nor provided any evidence to support such an amount. "The amount of security required is a matter for the discretion of the trial court; it may elect to require no security at all." *Corrigan Dispatch Co. v. Casa Guzman, S.A.*, 569 F.2d 300, 303 (5th Cir. 1978). Courts have upheld bond amounts as low as $10,000 for security in similar injunctions. *See Whirlpool Corp. v. Shenzhen Sanlida Elec. Tech. Co., Ltd.*, 80 F.4th 536, 542 (5th Cir. 2023). Thus, pursuant to Rule 65(c), PTK shall post a bond in the amount of $100,000. The Court considers this amount to be "proper to pay the costs and damages sustained" by Honor Society should it be determined it was wrongfully enjoined.

## V.   CONCLUSION

Mike Tyson once said "[e]veryone has a plan until they get punched in the mouth." Robert K. Rasmussen & Michael Simkovic, *Bounties for Errors: Market Testing Contracts*, 10 Harv. Bus. L. Rev. 117, 118 (2020). It appears that Honor Society wants to punch PTK in the mouth at every opportunity. But the totality of its online behavior paints a picture of a petulant cyberbully fixated on destroying a competitor, rather than a boxer abiding by the rules of his sport. Unfortunately, then, the parameters described above are necessary to render this a good, clean fight.

The *Motion for Temporary Restraining Order and Preliminary Injunction* is **GRANTED in part and DENIED in part**. The *Motion to Strike* is **DENIED**.

**SO ORDERED**, this the 22nd day of August, 2024.

s/ Carlton W. Reeves
UNITED STATES DISTRICT JUDGE