# EXHIBIT A

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION**

| | | |
|---|---|---|
| PHI THETA KAPPA HONOR SOCIETY, | ) | |
| | ) | |
| Plaintiff/Counter-Defendant | ) | Civil Action No.  3:22-cv-00208-CWR- |
| | ) | RPM |
| v. | ) | |
| | ) | |
| HONORSOCIETY.ORG, INC., | ) | |
| | ) | |
| Defendant/Counter-Plaintiff | ) | |
| /Third-Party-Plaintiff | ) | |
| | ) | |
| HONOR SOCIETY FOUNDATION, INC., | ) | |
| | ) | |
| Defendant | ) | |
| | ) | |
| ----------------------------------------------------- | ) | |
| | ) | |
| HONORSOCIETY.ORG, INC., | ) | |
| | ) | |
| Defendant/Counter-Plaintiff | ) | |
| /Third-Party-Plaintiff | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| DR. LYNN TINCHER-LADNER, | ) | |
| | ) | |
| Third-Party Defendant | ) | |

## DECLARATION OF JONATHAN G. POLAK

I, Jonathan G. Polak, declare as follows:

1.      I am over the age of eighteen and competent to testify to the matters in this declaration. I have personal knowledge and access to information on the matters discussed in this declaration, as counsel of record for the Plaintiff/Counter-Defendant Phi Theta Kappa Honor Society ("PTK") and Third-Party Defendant Dr. Lynn Tincher-Ladner in this lawsuit. My

declaration is based on my personal knowledge and investigation into the information and documents discussed in this declaration.

**A. The Procedural History Demonstrates Honor Society's Bad Faith.**

2.      In early March 2024, Honor Society launched a malicious campaign against PTK. Honor Society harassed PTK's partner colleges with 280+ records requests originating from a disguised email address and subject line appearing to associate with PTK. Honor Society also sent malicious, misleading, PTK-related survey questions to 450,000+ recipients, including community college students in PTK's market, to tarnish PTK's reputation.

3.      PTK investigated Honor Society's conduct related to the surveys and the records request. PTK's counsel then contacted Honor Society's counsel seeking to have Honor Society cease sending the surveys and records requests to avoid the need for Court intervention. After failed discussions, PTK was forced to prepare and file a motion seeking injunctive relief from the deceptive records requests and malicious survey along with an amended complaint, and a motion for expedited discovery into the conduct, with each having supporting briefs, declarations, replies, and numerous exhibits. *See, e.g.,* ECF Nos. 112, 112-4, 114, 113, 115, 116, 117, 124, 125, 126 and 126-1. PTK's attorney's fees in connection with this legal work detailed in Ex. A-1 attached hereto, the contents of which are described in more detail below.

4.      On March 27, 2024, the Court held an in-person evidentiary hearing on PTK's motion for injunctive relief and related filings. Ex. A-2 attached hereto is a true and accurate copy of the Evidentiary Hearing Transcript dated March 27, 2024. As shown in the transcript, in the first injunction hearing, Honor Society's out-of-state counsel stated, "Honor Society sent a onetime survey out . . . It doesn't need to send the survey again" and "the survey was a onetime deal . . . They received the results from that survey; they are done." Ex. A-2 at 98:22-100:22. Michael

Moradian, Honor Society's Executive Director, sat at his counsel's table when that representation was made and offered no objection or correction.

5.      On March 28, 2024, the Court issued an Order granting PTK injunctive relief and admonishing Honor Society's malicious and deceptive conduct. ECF No. 130. The Order also permitted PTK to file an amended complaint to add its claims of tortious interference. *Id*. The Order also permitted PTK to conduct discovery in accordance with the existing discovery schedule. *Id*. As a part of that discovery, PTK deposed Moradian, who testified he disagreed with the Order and that Judge Reeves was "misinformed" and did not have "the chance to have a truly objective analysis." *See* Ex. A-3, 5/3/2024 Moradian Dep. Tr. at 47:1-63:22 and 212:18-22, a true and accurate copy of which is attached hereto.

6.      As part of that discovery, PTK also deposed David Asari, the same individual who laundered the records requests through a personal email account. Asari testified that the voluminous March records requests were issued to "get an idea of if PTK's claims of 10 percent were – being in the top 10 percent were correct" and "if those claims were correct." Ex. A-14, 5/2/24 Asari Dep. Tr. at 227:19-228:14. In other words, the records requests were used to collect information as evidence in this litigation.

7.      In May 2024, Honor Society expanded its malicious attack on PTK. This time Honor Society reframed the allegations of its now-enjoined survey questions as alleged facts and published the maligning, misleading material across the Internet for all to see. Specifically, Moradian created approximately 5,000 AI-generated webpages and related publications maligning PTK by publishing false, misleading, deceptive, malicious material intended to destroy the reputations of PTK and its CEO, Dr. Tincher-Ladner. While the webpages parroted Honor Society's counterclaims in the litigation, they did so in misleading ways. For example, they failed

to state that author was a not neutral party, and was in fact the counterclaimant in the litigation, used racist tropes in the illustrations and otherwise falsely suggested PTK's and Dr. Tincher-Ladner's association with embezzlement and sexual harassment allegations. Honor Society linked the maligning webpages to its websites, social media accounts, and other websites owned by Moradian.

8.    PTK was forced to spend extensive time and effort investigating both the vast volumes of material published by Honor Society and the damage to PTK. The investigation was complex because Honor Society cross-linked its 5,000 webpages to its website and the websites and social media accounts of Moradian's other companies as well. Not to mention, throughout the rapid investigation, Honor Society edited the webpages and constantly created new ones. The number of pages grew in just days from hundreds to thousands and at its height totaled approximately 5,000 malicious webpages. Again, PTK contacted Honor Society's counsel seeking to have Honor Society take down the malicious publications to avoid the need for Court intervention. And again, after failed discussions, PTK was forced to prepare and file a second motion seeking injunctive relief from the 5,000 maligning, bad-faith publications with a supporting, brief, declarations, and reply, each having many exhibits. *See, e.g.,* ECF Nos. 220, 221, 221-1, 221-48, 231-1, 231. PTK and its counsel moved at a grueling pace to investigate Honor Society's mass-publications and prepare its motion and supporting papers. Its goal was to obtain relief as fast as possible to stop the harm that 5,000 malicious webpages tied to each of its community colleges had already caused it. PTK's attorney's fees incurred in connection with this legal work are detailed in Ex. A-4 attached hereto, the contents of which are described in more detail below.

9.     PTK was confident that its papers (including Dr. Tincher-Ladner's declarations and 60+ exhibits detailing Honor Society's conduct and PTK's damages) would provide the Court the information it needed to reach its decision. That said, over PTK's objection, Honor Society requested a full in-person evidentiary hearing with live witness testimony from Mr. Moradian and Dr. Tincher-Ladner. The in-person hearing lasted two-full days. Ex. A-5 attached hereto is a true and accurate copy of the Evidentiary Hearing Transcript (Volumes 1 and 2) dated July 12, 2024 and July 17, 2024.

10.    While waiting for the Court to rule on the pending (second) motion for injunctive relief, on August 19, 2024, PTK brought to Honor Society's attention that Honor Society's survey, which was the subject of the first preliminary injunction proceedings, was still in use, albeit without the six questions called out in the Court's First Preliminary Injunction Order.  PTK asked for an explanation for why the Court was told in March that the survey was no longer being used, but it was still in use months later. Ex. A-6 attached hereto is a true and accurate copy of PTK's correspondence to Honor Society dated August 19, 2024.

11.    Honor Society's out-of-state counsel responded that it was some "other survey" that was now in use. Honor Society's out-of-state counsel also stated, "At no point did either HonorSociety or I represent to the Court that HonorSociety would not send other surveys or other survey questions." This response avoided the question, but the clear intent was to state the survey at issue was "new" and thus different from the old survey. But in a deposition taken of Moradian on October 1, 2024, he clearly stated that this survey referenced in his out-of-state counsel's letter was the "same" survey as was the subject of the injunction (just without the six questions at issue). Ex. A-7 attached hereto is a true and accurate copy of Honor Society's response to PTK dated August 30, 2024. This is important not only for the misrepresentations of out-of-state counsel but

also to show that survey language still had negative questions about PTK intended to elicit only negative responses, or to suggest that only negative responses would be true. (For example, one question continuing to be fielded read: "Please elaborate on why you are dissatisfied with PTK. The truth is important and your opinion matters!").

12.     On August 22, 2024, the Court issued an Order granting PTK injunctive relief and strongly admonished Honor Society for its bad-faith conduct. *See* ECF No. 230. The Order expressly identifies Honor Society's conduct, which it found to be misleading. Honor Society was ordered to subject itself to discovery to determine whether it was responsible for edits to PTK's Wikipedia page that the Court said "suggest an intentional scheme to delete favorable content about PTK and introduce unfavorable content about PTK, rather than speak the truth." *See* ECF No. 230 at 10. In the Order, the Court invited PTK to seek its fees after its Wikipedia discovery. Specifically, the Court recognized its "inherent power to assess attorney's fees," for example "when a party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons," and it "believes that standard has been met as to certain online posts." *See* ECF No. 230 at 24.

13.     Even still, Honor Society failed to comply with the Second Preliminary Injunction Order. PTK spent extensive time and effort investigating the thousands of publications that failed to comply with the Order. In some cases, Honor Society made no attempt at to comply with the Order. For example, its PTK Lawsuit support webpages lacked disclaimers entirely. In other instances, Honor Society complied with the express language of the Order but deliberately violated its spirit. For example, most of Honor Society's disclaimers were smaller than required 12-point font. Most egregiously, Honor Society also enlarged the surrounding text to further the very confusion the disclaimer was intended to dispel. Where Honor Society did comply with the Order, it did so only because of PTK's efforts to force compliance.

14. PTK wrote Honor Society's counsel demanding Honor Society comply with Order. Honor Society's out-of-state counsel wrote back denying any wrongdoing. Through that correspondence and Moradian's declaration after-the-fact, it became clear that Honor Society and its out-of-state counsel believed it was PTK's job to identify any failures of Honor Society to comply with the Court's Order, and that Honor Society's role in compliance with the Order was reactive, not proactive. PTK offered Honor Society the ability to avoid litigating the contempt issues by complying with the Order, but Honor Society rejected the offer, and PTK was forced to file its motion and supporting papers. *See* ECF Nos. 242, 242-1, 261-1, 243, 261. PTK's attorney's fees in connection with this legal work are detailed in Ex. A-8 attached hereto, the contents of which are described in more detail below.

15. PTK was forced to spend significant resources to defend itself and preserve its reputation in the face of Honor Society's smear campaign. Every aspect of this side-show, satellite litigation was Honor Society's doing, and at every turn Honor Society could have stood down, removed the offensive content, and avoided the costs incurred to date. At the relevant points, out-of-state counsel could have been truthful as to their intentions and the facts, but for whatever reason did not do so. As a result, PTK now moves for fees. PTK's attorney's fees in connection with this legal work are detailed in Ex. A-9 attached hereto, the contents of which are described in more detail below. PTK anticipates filing a reply in support of its motion for fees, for which it reserves the right to seek its fees.

**B.  The Rule 30(b)(6) Deposition Demonstrates Honor Society's Bad Faith.**

16. After the Court's entry of its Second Preliminary Injunction Order, on August 22, the day of Order, and pursuant to the Court's instruction that it do so, PTK issued a Rule 30(b)(6) Deposition Notice to Honor Society. The Notice listed three discrete topics, each of which was

related to the revisions to PTK's Wikipedia entry. A true and accurate copy of the 30(b)(6) Deposition Notice served on Honor Society on August 22, 2024, is attached hereto as Ex. A-10.

17.    Honor Society only produced objections and declined to produce a witness at that time. Honor Society contended that PTK was only entitled to a single Rule 30(b)(6) deposition in the case, and so any deposition on the Wikipedia revisions must be addressed in that context and within the total time limitations of the rule. This was despite the Court's Order for Honor Society to "subject itself to discovery" on the matter so that PTK may report back quickly on the facts related to the Wikipedia revisions. *See* ECF No. 230 at 26. As a result, PTK raised this issue, among many others, in a discovery conference with Magistrate Judge Myers on September 28th. During this conference, Magistrate Judge Myers ordered Honor Society to produce a witness in response to PTK's Rule 30(b)(6) deposition notice, without prejudice to issuing a second notice on other issues in the case at a later time. Magistrate Judge Myers also expressly refused to limit the time for the deposition to anything less than the seven (7) hour limit, despite Honor Society's request to limit the deposition to only a few hours. PTK's objection to any reduced time limit was based on prior experience in deposing Moradian, his repeated non-responsiveness during those depositions, and his likely use of the "clock" to avoid answering all relevant questions. These concerns turned out to be well founded because during the October 1 Rule 30(b)(6) deposition, it became clear that had the deposition been limited to only a few hours, Moradian would have run out the clock without providing PTK with any substantive information.

18.    Of course, PTK's intention was not to depose Mr. Moradian for the full time. In fact, it was expected the deposition (assuming a cooperative and responsive witness) would only take around two (2) hours. On October 1st, I deposed Honor Society via Zoom for approximately seven (7) hours. For this deposition, Honor Society designated Michael Moradian, its Executive

Director and Founder, as its corporate witness. A true and accurate copy of the 30(b)(6) Deposition

Transcript of Honor Society conducted on October 1, 2024 is attached hereto as Ex. A-11.

19.     PTK needed to use the entire seven hours due to Moradian's evasiveness,

inconsistent testimony, and unwillingness to answer questions asked. This was Moradian's fourth

deposition in this matter. In my opinion, Moradian's goal throughout the deposition was to

intentionally not answer the questions being asked. To demonstrate this, I would point to his

testimony, which was sometimes absurd and sometimes personal attacks towards me, but rarely

responsive:

- "Well, the implication is mischaracterization, which is a perpetual habit of your legal style or maybe some would say chicanery . . ." Ex. A-11 at 9:4-6.

- "So I'm very familiar with the way you operate.  And you know, the way I answer that question will be -- set up to be used against me either way and, you know, this is just the way that you frame your arguments." *Id*. at 51:17-21.

- "And I would say to Judge Reeves or any interested party that leaders can come from anywhere. Heros [sic] can come from anywhere.  Just because you're litigated does not mean you cannot stand up for the rights of students and for the general public. Facts are facts and Wikipedia arbitrates and determines that and these are their determinations, not mine." *Id*. at 77:2-83:4

- "I'm sorry, I'm just trying my best to help you here, but what I would say is, like a broken record, you're bending the space time continuum." *Id*. at 158:23-25

- "I don't know if I'm qualified to answer that. I'm just one person contributing to Wikipedia. I'm not a Wikipediaian." *Id*. at 191:16-18.

20.     In my decades of experience as a litigator, I have never been a part of a deposition

where the witness was so abusive of the deposition process. Over *thirty* questions had to be

repeated to Moradian, either by myself or the court reporter, based on his unwillingness to answer

the question. For example, I had to ask Moradian *nine* times if he was the one responsible for

removing Fred Haise's name from the PTK Wikipedia page, despite his obligation to prepare for

this deposition, before he confirmed he was. *Id*. at 10:10-13:14. I also had to ask Moradian *eight*

times if he ever disclosed to any Wikipedia moderator that he was the executive director for Honor Society, before he confirmed he had not. Ex. A-11 at 69:15-72:15. Further, I had to ask Moradian *ten* times if he recalled the Court found Honor Society's enjoined survey questions to be malicious before Moradian confirmed that he did. *Id.* at 77:9-80:8. It took *eleven* times for Moradian to respond as to whether he agreed with the Court's ruling that there is no factual basis for referring to Robin Lowe as a PTK employee. *Id.* at 216:13-222:21. Including these questions and dozens of others, I noted over fifty instances when Moradian's answers were non-responsive to my questions.

21.    Despite claiming to be a great fan of Wikipedia for nearly twenty years, Moradian only recalled creating one account: WikiObjectivity. *Id.* at 38:5-11, 39:4-12, 74:21-75:22. This account was created on April 16th, mere weeks after the Court entered its First Preliminary Injunction Order and days after Honor Society filed its Second Amended Counterclaims. *Id.* And despite Moradian's position that the account was meant to bring objectivity to the honor society space, he made more edits to PTK's Wikipedia page than any other. He attempted to justify his edits because PTK's account was "advertorial" in nature, which Moradian alleges is improper. *Id.* at 108:4-22, 113:5-117:4. For example, Moradian claimed that the history section on the page and PTK's claim of an affiliation to Phi Beta Kappa were unfounded and advertorial, despite PTK producing a licensing agreement between the two honor societies in this case months ago. *Id.* at 73:19-24, 117:22-118:18, 119:3-22; *see also* Ex. A-12, PTK0132046, a true and accurate copy of which is attached hereto. He also claimed that the words "Phi Theta Kappa was born" is "advertorial" and somehow improper. Ex. A-11 at 116:2-20. He stated, "You know, the tone there is not an objective encyclopedic tone and somebody could, you know, take exception to an encyclopedia, you know, claiming, you know, this is the birth of Venus here. This is just -- this is not an appropriate tone for Wikipedia." *Id.* at 117:9-16.

22.     Moradian claimed that he was making these changes as the curator of the Honor Society museum, a function of the Honor Society Foundation. Ex. A-11 at 29:19-29:25.

23.     Moradian confirmed he removed the majority of the "Notable members" from the article because he claimed he was unable to verify their membership. He said there was no corresponding reference footnote nor was he able to find any information online (i.e., PTK's website). Ex. A-11 at 13:22-14:21, 122:8-16, 122:25-123:16, 124:2-126:24; 131:8-21. 132:12-133:4. Of course, this did not stop Moradian from including his own additions to PTK's Wikipedia page without any footnote references. *Id.* at 166:7-167:12 (revising PTK's Founder's day description, and testifying: "No, there is not a footnote to any of this changes, and no, it's not necessary [to include a footnote]."). Moradian did not feel he needed to confirm the members were in fact members; he felt his only obligation were to delete them – and hypocritically, he did not feel that the footnote "rule" applied to him, only PTK because there was text he added that contained no cited authority in any footnote. *Id.* at 125:8 ("The lack of a footnote is really all that's required [to delete notable members].").

24.     When questioned as to whether he had looked for any other notable members of PTK, Moradian responded incredulously that he had spent "Probably between a hundred to a thousand hours . . . Closer to a thousand" searching for other notable members and was essentially unable to locate anyone else besides two prior PTK presidents and Thomas Matthew Crooks. Ex. A-11 at 127:4-130:8, 134:4-137:2. Specifically when asked what was notable about Thomas Matthew Crooks, Moradian responded that he was famous for "being a PTK member." *Id.* at 131:25-132:3. According to Moradian, Crooks' association with PTK "was viewed notable, reliable and relevant by media sources." *Id.* at 132:12-133:4. But only a single media outlet (TMZ)

reported said affiliation. Moradian also testified that when PTK attempted to revert this change and add the Notable members back, he caused that change to be reversed. *Id*. at 143:5-17.

25.    Moradian also testified that he revised PTK's article in compliance with Wikipedia's policies and without "bias" – but obviously that is not the case. Ex. A-11 at 49:5-50:1. Three minutes later, he revised his testimony to admit he did act with bias, it was just  "lesser" than PTK's "bias." *Id*. at 50:20-51:25. But Wikipedia's Conflict of Interest ("COI") page notes that editors should disclose "*any* COI," including in instances where an editor is in a legal dispute with the page's subject or when an editor is a competitor. *See* Ex. A-13, Wikipedia Conflict of Interest Policy. An editor can note the conflict at the top of the affected "talk page," in the "edit summary" of any of his contribution, or on his user page. *Id*. Yet Moradian made no note of his conflict on any page or comment, nor did he tell any other Wikipedia user that he had a conflict of interest or was the adverse party to PTK in the lawsuit noted in PTK's article. Ex. A-11 at 69:15-72:15. Nor did Moradian have any reasonable response for why he included Honor Society's litigation contentions but not PTK's in his revisions. *Id*. at 170:25-180:3.

26.    I also asked Moradian about Wikipedia's Universal Code of Conduct on "content vandalism and abuse of the projects," which is defined as "[d]eliberately introducing biased, false, inaccurate or inappropriate content, or hindering, impeding **or** otherwise hampering the creation (and/or maintenance) of content." Ex. A-11 at 97:19-100:6, 100:21-101:12 (emphasis added). In response, Moradian claimed that **all** of the descriptors must be met, regardless of the "or" connective. *Id*. In other words, Moradian testified that because his revisions did not deliberately introduce biased **and** false **and** inaccurate **and** inappropriate content that did not hinder **and** impede **and** hamper the creation and maintenance of PTK's page, he had not violated Wikipedia's

Code of Conduct. *Id*. This tortured reading of the provision reinforces the lengths to which Moradian will go to defend his otherwise bad-faith behavior in this case.

27.     Moradian also confirmed that, despite the Court's prior findings of malice and its finding that there is "no factual basis" for Honor Society's claim of embezzlement by PTK, he saw no problem repeating the unfounded allegations in his Wikipedia edits. Ex. A-11 at 215:2-216:2. And indeed, he still maintains that these allegations are true. *Id*. Moradian also acknowledged he was aware of the sexual harassment allegations against Risley as early as 2015 but made no revisions to PTK's Wikipedia page until 2024, when he was in active litigation with PTK. Ex. A-11 at 83:25-89:21. He had no reasonable explanation for his delay and deflected with misguided personal attacks against me. *See, e.g., id*. ("It's a broad-based coverup and you are the main proponent of that."). Yet he also testified that "but once I became aware of it, it is our duty, once you're aware, to add context, add information to help make the page more objective." *Id*. at 75:19-22.

28.     Moradian also maintained that his Wikipedia edits that present Honor Society as the party that began the "lawsuit" are accurate, alleging that each time an amended complaint or counterclaim is filed, those pleadings "can be interpreted as a new lawsuit." Ex. A-11 at 155:7-163:10. Obviously, Moradian is not a lawyer. Yet because the Court made clear in its Second Preliminary Injunction Order that Honor Society misleads the public when it presents itself as the plaintiff or the initiator of the lawsuit. Moradian has no excuse for continuing to argue that he believes it is permissible to repeat this legally incorrect mischaracterization.

29.     Most telling of Moradian's disdain for this Court was his multiple implications that he views Wikipedia as the trier of fact, not the Court or a jury. Ex. A-11 at 81:19-82:1; 83:22-24 ("Facts are facts and Wikipedia arbitrates and determines that and these are their determinations,

not mine."). Namely, Moradian alleges that because Wikipedia permitted his revisions to remain (and removed those of PTK), these edits are not misleading and instead speak the truth, despite the Court's findings to the contrary. *See, e.g.*, *id.* at 202:3-21. In context, Moradian admits that he never told any Wikipedia contributor of his own bias – as President of Honor Society, PTK's competitor and opposing party in this litigation – so Wikipedia (while certainly not the trier of fact) had no reasonable basis for assessing the credibility of Moradian's edits.

### C. PTK's Fees Are Reasonable.

30.     I have been lead counsel in this lawsuit since PTK filed its complaint on April 20, 2022. I am submitting this Declaration in support of PTK's Motion for Attorney's Fees (the "Motion").

31.     I am a member of the Indiana Bar and am admitted to the Bars of the Indiana Supreme Court, the Texas Supreme Court, the United States District Court for the Southern District of Indiana, the Northern District Court of Indiana, the Northern District of Texas, the Eastern District of Texas, the Eastern District of Michigan, the United States Court of Appeals for the Fifth Circuit, the Sixth Circuit, and the Federal Circuit. I have been practicing law for more than 30 years.

32.     I am a 1991 graduate of Southern Methodist University and a 1994 graduate of Southern Methodist University School of Law.

33.     I have been an attorney in the Indianapolis office of Taft Stettinius & Hollister LLP ("Taft") since 2008 by way of merger and a Partner that entire time. Taft is an AmLaw 100 firm, with over nearly 1,000 lawyers in offices located throughout Indiana, Illinois, Ohio, Kentucky, Minnesota, Michigan and Washington D.C. Also, at Taft, I am the Practice Group Leader for the

intellectual property practice, presently overseeing the activities of over 100 attorneys and other professionals at the firm. I have served in that capacity for approximately seven (7) years.

34.    I have been the recipient of a number of recognitions in my legal career, including: Indiana Super Lawyers, for Intellectual Property Litigation (from 2014 to the present); Honoree for Best Lawyers in America (2012 to the present); Honoree, World Trademark Review, WRT 1000 (2021 to the present); Honoree, IP Stars (2023); and Honoree, Chambers USA, for Intellectual Property (2019 to the present), as well others included in my biography on Taft's website: https://www.taftlaw.com/people/jonathan-g-polak/.

35.    I have represented clients in over one-hundred different intellectual property-related lawsuits and proceedings in federal and state courts around the country and before the United States Patent and Trademark Office, and countless more that never made it that far. I have monitored litigation matters in the European Union and Australia. In addition to my litigation work, I also assist clients with business-side intellectual property matters, including advising on trademark portfolios, protecting and licensing intellectual property, and intellectual property issues relating to merger or acquisition transactions. I have litigated matters in over 20 states.

36.    My areas of practice primarily relate to litigation involving copyrights, patents, trademarks, and software and technology, although I have also litigated insurance disputes, shareholder disputes, construction, engineering, and general commercial matters, among other subject matter. I have a unique specialization in trademark litigation, which forms the basis for several of the recognitions and awards recognized, for example, on Taft's website. I was approached by PTK to represent it in this litigation based on that specialty and my, and my team's, depth of experience with trademark litigation matters. I understand that PTK connected with Taft in part because PTK was unable to identify a law firm in Mississippi that met all its needs for this

litigation. I understand Mississippi is not a hotbed for trademark litigation. For example, since 2022, when this lawsuit was filed, it appears (per PACER statistics) that there have only been 8 trademark cases filed in the Southern District of Mississippi. By comparison, the North District of Illinois has had 3,600 trademark cases in that time, and the Central District of California, where the Newman firm practices locally, has had around 1,600 such cases in that time.

37.    In 2024, my hourly rate charged to PTK is $825. This rate is discounted from my strategic hourly rate for new clients, for complex litigation matters, or for disputes involving a national scope, which is $910. I am billing PTK at this discounted rate in-part because it a non-profit organization. This is approximately a 10% discount. I have applied that same discount to all members of my team that have worked on PTK-related matters. Even without this discount, my rate is reasonable in the community of intellectual property litigators with comparable skills, reputation, and experience. I base this opinion on my experience in the legal community, my communications with similarly experienced attorneys about fees being charged, and my knowledge of my law firm's hundreds of clients.

38.    The volume of work associated with this litigation, and in particular with Honor Society's tortious, malicious, and contemptuous conduct, has been usually high – even relative to other complex cases with a national scope. Certainly, even where the work in complex cases has been substantial, my experience has been that it was at least "on the issues," and not on satellite issues that are unrelated to the core claims in the case. Undoubtedly, each time keeper who has worked on PTK's First Motion for Temporary Restraining Order and Preliminary Injunction ("First Preliminary Injunction Motion"), PTK's Second Motion for Temporary Restraining Order and Preliminary Injunction and/or Gag Order ("Second Preliminary Injunction Motion"), PTK's Motion for Contempt and Sanctions ("Contempt Motion"), and PTK's Motion for Attorney's Fees

("Fee Motion") has done so the exclusion of their ability to work on other matters, as is common with rapid, involved proceedings such as these (e.g., injunctions, instance of contempt, and seeking of associated fees).

39.    That said, Taft is well-suited to handle this exceptionally high volume of work based on the significant number of attorneys in its ranks and its support staff, whose time has not been billed to PTK. To be clear, PTK has not requested compensatory fees here for non-billing support staff in its Motion, despite the significant amount of time these people have spent preparing exhibits, intaking Honor Society's document productions (including the results of its records requests and surveys), assisting with filings, and collecting information used by the billing timekeepers. If PTK ultimately prevails in this litigation, PTK reserves the right to seek reimbursement from Honor Society for all fees incurred. This accommodation is solely for purposes of the pending motion.

40.    I am familiar with the timekeeping records kept and maintained by Taft on client matters. Taft keeps those records in the course of its regularly conducted business activities, and it is the regular practice of our law firm to keep such records. All time entries are made at or near the time of the act or events described in them, based on information transmitted by a person with knowledge of those time entries – i.e., timekeepers and/or their assistants. I personally review the bills sent to PTK every month and am aware of all activities of all professionals working on behalf of PTK.

41.    Taft's work in connection with First Preliminary Injunction Motion, Second Preliminary Injunction Motion, Contempt Motion, and Fee Motion has been handled by several timekeepers in addition to me including: Rachel Smoot, Mike Etienne, Hannah Fereshtenkhou, Christine Walsh, Alex Matthews, Haley Sears, Neil Peluchette (all of whom are associates) and

Alexis Rose (who is a paralegal). Like me, each of these timekeepers has a preferred hourly rate, which is higher than the rate at which their time was billed to PTK. In each case, the rate billed to PTK is an approximate 10% discount.

42.     Ms. Smoot's hourly rate for PTK has been $470 throughout this litigation (compared to $515 strategic). Mr. Etienne's hourly rate for PTK has been $465 (compared to $510 strategic). Mr. Peluchette's hourly rate for PTK has been $420 (compared to $460 strategic). Ms. Fereshtenkhou's hourly rate for PTK has been $375, as has Ms. Sears's, Mr. Matthew's, and Ms. Walsh's (compared to $415 strategic). Ms. Rose's hourly rate for PTK has been $100. Again, I believe these fees to be reasonable in the field of intellectual property litigation attorneys and paralegals with comparable skills, reputation, and experience, based on my extensive experience in this field. Based on my body of experience working with each of these attorneys, they no doubt have the abilities and competencies to provide excellent services to PTK – as do the attorneys at Wise-Carter. This does not appear to be challenged by out-of-state counsel, who said in a discovery conference with Judge Myers that someone told him Mike Wallace is the best lawyer in Mississippi. (That has been PTK's and Taft's experience as well.) As to Taft, based on my experience, I also can confirm the reasonableness of the Taft associates' and paralegal's hourly rates.

43.     As demonstrated, I staffed the First Preliminary Injunction Motion, Second Preliminary Injunction Motion, Contempt Motion, and Fee Motion with associates and a paralegal, which is a cost saving measure and justifies the reasonableness of the aggregate fees.

44.     I made a conscientious effort to assign suitable legal work to associates whenever possible to further reduce PTK's attorney's fees. For example, when preparing the motions, either

Ms. Smoot or Mr. Etienne typically handled the primary drafting responsibilities. Taft made a conscientious effort not to duplicate legal work.

45.     Attached as Exhibits A-1, A-4, A-8, A-9 to this Declaration are true and correct copies of accounting records summarizing billing data of Taft for representation of PTK in connection with PTK's First Preliminary Injunction Motion, PTK's Second Preliminary Injunction Motion, PTK's Contempt Motion, and PTK's Fee Motion. It should be appreciated that the legal work in connection with each motion includes investigation into Honor Society's conduct prior to the motion, the motion and supporting papers (e.g., briefs, declarations, exhibits) replies and their supporting papers, hearing preparation, travel required for the hearing, and the hearing itself. The legal work also includes responding to Honor Society's motions and responses filed in response to PTK's Motions, including Honor Society's Motion to Strike. These documents have been redacted or edited to protect the privilege that may be contained in some entries but have not been so edited that it is impossible to understand at least the general nature of the work.

46.     As explained in more detail below, Exhibits A-1, A-4, A-8, A-9 (each a "Time Report"), summarizes the total amount of fees Taft billed to PTK in connection with each motion based on hours worked by Taft timekeepers and their respective hourly rates. The total fees billed to PTK by Taft for each motion are:

- Ex. A-1: First Preliminary Injunction Motion: $172,293.00.

- Ex. A-4: Second Preliminary Injunction Motion: $229,451.00.

- Ex. A-8: Contempt Motion: $63,810.00.

- Ex. A-9: Fees Motion: $18,324.00 (through September 30).

47.     In each Time Report, the "Invoice" column identifies the unique invoice number for each invoice that Taft provided to PTK. The "Orig Hours" column describes the number of

hours that each timekeeper worked in providing a particular service, recorded in tenths of an hour. The "Orig Amount" is the amount of fees generated (but not necessarily billed) for a service provided by a timekeeper. The Orig Amount is calculated by multiplying the Orig Hours by a timekeeper's hourly rate for PTK, which is reflected in the "Rate" column.

48.    The "Rev Hours" column describes the actual number of hours that PTK was invoiced for a service provided by a timekeeper. This is often less than the Orig Hours. The "Rev Amount" column is the amount actually billed to PTK for a service provided by a timekeeper. The Rev Amount is calculated by multiplying the Rev Hours by the Rate for each timekeeper.

49.    To further ensure the reasonableness of Taft's attorney's fees, I made discretionary write-offs of hours recorded by timekeepers. The write-offs are reflected in the Rev Amount and Rev Hours columns. The total discount resulting from the write-offs is $61,294.00. This is an additional 11.2% reduction from the amount of fees generated by the timekeepers, including myself, on top of our already discounted rates.

50.    Similar to the Time Reports, Exhibit A-15 summarizes the total costs Taft billed to PTK in connection with each motion. In total, through September 30, 2024, Taft billed $17,602.77 in costs to PTK. As with the Exhibits A-1, A-4, A-8, and A-9, the Cost Report identifies the unique invoice number for each invoice that Taft provided to PTK. The "Orig Amt" column describes the costs incurred (but not necessarily billed) in connection with a particular service. The "Rev Amt" columns describes the actual costs that PTK was invoiced for a service, which is often less than "Orig Amt."

51.    PTK also incurred $4,613.57 in court reporter costs associated with the Rule 30(b)(6) deposition taken on October 1, 2024. *See* Exhibit A-16. We do not yet have the videographer costs for that deposition but expect to receive them soon. PTK will supplement its

evidence with that invoice once it is received. Because this 30(b)(6) deposition took place on October 1, 2024, the court reporter costs associated with the deposition are not included in the costs shown in Ex. A-15, which are current only through September 30.

52.     Like I did with the Time Reports, I made discretionary write-offs of costs, which are reflected in the Rev Amt column. The total discount from the write-offs of costs is $5,430.54. This is a 23.6% reduction in costs from the original costs of $23,033.31, to arrive at only $17,602.77 in costs billed to PTK, which speaks to the reasonableness of the costs PTK seeks.

53.     For each Invoice dated through August 31, PTK has paid its fees in full. Each time, PTK has paid its fees promptly without dispute, further demonstrating the reasonableness of the fees. I do not anticipate any issue with the September invoice, which has not yet been issued.

54.     In my experience and training, as described above, as well as my personal observations from my involvement in the work, it is my opinion that the fees incurred in connection with these described activities are reasonable. They were also necessarily incurred. Because of the maliciousness of Honor Society's activities described in the underlying motions, PTK had to seek the relief it did. At every turn, we offered Honor Society an "off ramp" to avoid motion practice on the issues. At no time did Honor Society accept our offers or otherwise withdraw from their conduct. Making matters worse, we have found out-of-state counsel for Honor Society to garble the truth from time to time, whether it be outright falsities or shaded offers of partial truths.  And even in where we have obtained explicit relief from this Court, Honor Society has taken what appear to be intentional acts to avoid compliance with those orders. All of this demonstrates a pattern of conduct that required immediate action by PTK. Unfortunately, the repeated nature and high volume of this misconduct has led to the incurrence of substantial attorney's fees and costs

that would not have been incurred but for Honor Society's bad faith. The fees incurred were, in my view, absolutely necessary to avoid further damage to PTK.

55.     PTK also anticipates seeking fees based on issues not fully ripe before this Court and reserves the right to do so along with seeking its fees in connection with the appellate proceedings.


I declare under penalty of perjury that the foregoing is true and correct. 28 U.S.C. § 1746.


Executed on: October 14, 2024

*/s/ Jonathan G. Polak*
Jonathan G. Polak

# EXHIBIT A-1

| Date | Name | Description | Orig Hrs | Orig Amt | Orig Rate | Rev Hrs | Rev Amt | Invoice | Narrative |
|------|------|-------------|----------|----------|-----------|---------|---------|---------|-----------|
| 03/04/2024 | Smoot, Rachel A. | Associate | 0.50 | 235.00 | 470.00 | 0.50 | 235.00 | 6304101 | Call with client regarding FOIA requests. |
| 03/05/2024 | Polak, Jonathan G. | Partner | 0.50 | 412.50 | 825.00 | 0.50 | 412.50 | 6304101 | Review message from L. Tincher-Ladner regarding FOIA-type requests made by HS.org to colleges; consider strategy on same; conference with L. Tincher-Ladner regarding same; conference with R. Smoot regarding same. |
| 03/06/2024 | Polak, Jonathan G. | Partner | 0.90 | 742.50 | 825.00 | 0.90 | 742.50 | 6304101 | Exchange multiple emails with client regarding recent emails to college presidents by HS.org.; consider strategy on same; review draft email from L. Tincher-Ladner regarding same; prepare revisions to same. |
| 03/06/2024 | Polak, Jonathan G. | Partner | 1.50 | 1,237.50 | 825.00 | 1.50 | 1,237.50 | 6304101 | Prepare for and attend conference with M. Bernet and D. Linke regarding status of various discovery issues and concerns over recent FOIA requests; prepare email to M. Bernet and D. Linke confirming conversation and depositions; address various issues raised in conference requested by M. Bernet. |
| 03/06/2024 | Polak, Jonathan G. | Partner | 0.90 | 742.50 | 825.00 | 0.90 | 742.50 | 6304101 | Prepare for and attend conference with client and B. Mansfield to discuss situation with FOIA requests and related other issues. |
| 03/06/2024 | Smoot, Rachel A. | Associate | 1.00 | 470.00 | 470.00 | 1.00 | 470.00 | 6304101 | Call with client regarding FOIA requests and ongoing email security issue. |
| 03/06/2024 | Smoot, Rachel A. | Associate | 0.20 | 94.00 | 470.00 | 0.20 | 94.00 | 6304101 | Attention to email from client regarding PTK email systems. |
| 03/06/2024 | Smoot, Rachel A. | Associate | 0.20 | 94.00 | 470.00 | 0.20 | 94.00 | 6304101 | Call and email to Mailchimp's counsel. |
| 03/07/2024 | Smoot, Rachel A. | Associate | 0.40 | 188.00 | 470.00 | 0.40 | 188.00 | 6304101 | Confer with IT and co-counsel regarding email security issues. |
| 03/07/2024 | Smoot, Rachel A. | Associate | 0.30 | 141.00 | 470.00 | 0.30 | 141.00 | 6304101 | Call and email to Mailchimp counsel. |
| 03/07/2024 | Etienne, William M. | Associate | 3.60 | 1,674.00 | 465.00 | 3.60 | 1,674.00 | 6304101 | Research case law preventing vexatious use of FOIA requests to seek information; prepare written explanation of same. |
| 03/07/2024 | Etienne, William M. | Associate | 3.20 | 1,488.00 | 465.00 | 3.20 | 1,488.00 | 6304101 | Research case law regarding improper use of third party discovery devices generally to harass customer of party to litigation; prepare written explanation of same. |
| 03/07/2024 | Polak, Jonathan G. | Partner | 2.50 | 2,062.50 | 825.00 | 0.00 | 0.00 | 6304101 | Continue work on issues related to HS.org's communications to colleges; consider strategy on same; prepare email to counsel for HS.org regarding intent to seek a hearing and protective order; conference with M. Wallace regarding same; conference with M. Etienne regarding scope of legal research; review email from Z. Linke regarding same; multiple communications with client regarding emails to colleges. |
| 03/08/2024 | Etienne, William M. | Associate | 0.80 | 372.00 | 465.00 | 0.80 | 372.00 | 6304101 | Continue to assess case law regarding FOIA requests in pending district court litigation; discuss strategy for PO, TRO, and/or state law claims in view of same. |

| Date | Name | Title | Hours | Amount | Rate | Hours | Amount | Code | Description |
|---|---|---|---|---|---|---|---|---|---|
| 03/08/2024 | Polak, Jonathan G. | Partner | 0.50 | 412.50 | 825.00 | 0.50 | 412.50 | 6304101 | Continue work on strategy for addressing FOIA requests; conference with M. Etienne regarding same; conference with B. Mansfield regarding same. |
| 03/08/2024 | Smoot, Rachel A. | Associate | 1.40 | 658.00 | 470.00 | 1.40 | 658.00 | 6304101 | Multiple calls with co-counsel and local counsel related to pending FOIA requests; review and analyze research and case law related to same. |
| 03/08/2024 | Smoot, Rachel A. | Associate | 0.60 | 282.00 | 470.00 | 0.60 | 282.00 | 6304101 | Multiple calls with client related to pending email security issues and FOIA requests. |
| 03/08/2024 | Smoot, Rachel A. | Associate | 0.10 | 47.00 | 470.00 | 0.10 | 47.00 | 6304101 | Follow up call to Mailchimp counsel. |
| 03/11/2024 | Etienne, William M. | Associate | 0.30 | 139.50 | 465.00 | 0.30 | 139.50 | 6304101 | Review survey monkey emails, records request emails, and related correspondence. |
| 03/11/2024 | Etienne, William M. | Associate | 2.70 | 1,255.50 | 465.00 | 2.70 | 1,255.50 | 6304101 | Research MS case law regarding tortious interference. |
| 03/11/2024 | Etienne, William M. | Associate | 0.80 | 372.00 | 465.00 | 0.80 | 372.00 | 6304101 | Identify template for PTK's motion for leave to file supplemental complaint and memorandum in support of same. |
| 03/11/2024 | Polak, Jonathan G. | Partner | 2.50 | 2,062.50 | 825.00 | 2.50 | 2,062.50 | 6304101 | Attention to issues related to FOIA, email hack and consumer survey related to HS.org; multiple conferences with client to discuss same; consider issues related to possible supplemental claims on same; multiple communications and conferences with local counsel regarding same. |
| 03/11/2024 | Smoot, Rachel A. | Associate | 0.90 | 423.00 | 470.00 | 0.90 | 423.00 | 6304101 | Call with client and co-counsel related to honor society survey; multiple emails regarding same. |
| 03/11/2024 | Smoot, Rachel A. | Associate | 0.70 | 329.00 | 470.00 | 0.70 | 329.00 | 6304101 | Amend Exhibit A to Mailchimp subpoena; send same to client for review. |
| 03/11/2024 | Smoot, Rachel A. | Associate | 0.40 | 188.00 | 470.00 | 0.40 | 188.00 | 6304101 | Confer with co-counsel regarding records requests. |
| 03/11/2024 | Smoot, Rachel A. | Associate | 0.60 | 282.00 | 470.00 | 0.60 | 282.00 | 6304101 | Review Honor Society production for gmail addresses. |
| 03/11/2024 | Fereshtenkhou, Hannah S. | Associate | 0.70 | 262.50 | 375.00 | 0.00 | 0.00 | 6304101 | Strategize regarding filing supplemental pleading, temporary restraining order, motion for expedited discovery, and response to motion to amend scheduling order. |
| 03/11/2024 | Fereshtenkhou, Hannah S. | Associate | 3.20 | 1,200.00 | 375.00 | 3.20 | 1,200.00 | 6304101 | Analyze Federal Rule of Civil Procedure 15(d) regarding process for filing supplemental pleading; draft supplemental amended complaint to include claims for tortious interference with contracts and prospective business advantage; research and analyze case law regarding sufficiency of allegations for same. |
| 03/12/2024 | Smoot, Rachel A. | Associate | 0.80 | 376.00 | 470.00 | 0.80 | 376.00 | 6304101 | Confer with co-counsel regarding Motion for Leave to File Supplemental First Amended Complaint and David Asari's agency; compile documents in support of same. |
| 03/12/2024 | Smoot, Rachel A. | Associate | 0.10 | 47.00 | 470.00 | 0.10 | 47.00 | 6304101 | Attention to email from client regarding survey. |
| 03/12/2024 | Smoot, Rachel A. | Associate | 0.30 | 141.00 | 470.00 | 0.30 | 141.00 | 6304101 | Call with Mailchimp counsel regarding direct complaint. |
| 03/12/2024 | Etienne, William M. | Associate | 2.10 | 976.50 | 465.00 | 2.10 | 976.50 | 6304101 | Prepare supplemental complaint. |

| Date | Name | Title | Hours | Amount | Rate | Hours | Amount | Code | Description |
|------|------|-------|-------|--------|------|-------|--------|------|-------------|
| 03/12/2024 | Etienne, William M. | Associate | 4.90 | 2,278.50 | 465.00 | 4.90 | 2,278.50 | 6304101 | Review comments and edits to supplemental complaint; prepare revisions in view of same. |
| 03/12/2024 | Etienne, William M. | Associate | 5.90 | 2,743.50 | 465.00 | 5.90 | 2,743.50 | 6304101 | Revise memorandum in support of motion to amend scheduling order based on comments and edits; prepare additional section of same. |
| 03/12/2024 | Polak, Jonathan G. | Partner | 0.70 | 577.50 | 825.00 | 0.70 | 577.50 | 6304101 | Review emails forwarded from L. Tincher-Ladner regarding open records requests and communications with colleges; continue work on strategy for same. |
| 03/12/2024 | Fereshtenkhou, Hannah S. | Associate | 2.20 | 825.00 | 375.00 | 2.20 | 825.00 | 6304101 | Draft declaration of L.Tincher-Ladner in support of motion for temporary restraining order. |
| 03/12/2024 | Fereshtenkhou, Hannah S. | Associate | 1.00 | 375.00 | 375.00 | 0.00 | 0.00 | 6304101 | Strategize regarding supplemental amended complaint and elements of tortious interference with contract; revise supplemental amended complaint based on same. |
| 03/12/2024 | Fereshtenkhou, Hannah S. | Associate | 1.60 | 600.00 | 375.00 | 1.60 | 600.00 | 6304101 | Draft memorandum of law in support of motion for leave to supplement amended complaint; research and analyze case law regarding factors supporting supplementation for same. |
| 03/13/2024 | Etienne, William M. | Associate | 2.20 | 1,023.00 | 465.00 | 2.20 | 1,023.00 | 6304101 | Review additional comments to supplemental complaint; provide additional revisions based on same. |
| 03/13/2024 | Etienne, William M. | Associate | 11.40 | 5,301.00 | 465.00 | 11.40 | 5,301.00 | 6304101 | Prepare portions of memorandum in support of motion for TRO and PI. |
| 03/13/2024 | Polak, Jonathan G. | Partner | 1.20 | 990.00 | 825.00 | 1.20 | 990.00 | 6304101 | Continue work on Supplemental Complaint; conference with M. Etienne; work on related documents for TRO and related relief. |
| 03/13/2024 | Smoot, Rachel A. | Associate | 0.70 | 329.00 | 470.00 | 0.70 | 329.00 | 6304101 | Confer with co-counsel regarding next steps related to Motion to Supplement Complaint, Motion for Temporary Restraining Order, and all related documentation. |
| 03/13/2024 | Smoot, Rachel A. | Associate | 1.10 | 517.00 | 470.00 | 1.10 | 517.00 | 6304101 | Revise and edit First Amended Supplemental Complaint; confer with co-counsel regarding same. |
| 03/13/2024 | Fereshtenkhou, Hannah S. | Associate | 1.00 | 375.00 | 375.00 | 1.00 | 375.00 | 6304101 | Proofread and revise supplemental amended complaint; strategize regarding temporary restraining order and motion for leave to supplement amended complaint. |
| 03/13/2024 | Fereshtenkhou, Hannah S. | Associate | 5.20 | 1,950.00 | 375.00 | 5.20 | 1,950.00 | 6304101 | Continue drafting memorandum of law in support of motion for leave to supplement amended complaint; research and analyze case law regarding Federal Rule of Civil Procedure 15(d) as support for supplementing pleading with new claims and parties for same. |
| 03/14/2024 | Etienne, William M. | Associate | 8.80 | 4,092.00 | 465.00 | 8.80 | 4,092.00 | 6304101 | Research additional case law; revise memorandum in support of motion for leave to file supplemental complaint based on same. |
| 03/14/2024 | Etienne, William M. | Associate | 2.10 | 976.50 | 465.00 | 2.10 | 976.50 | 6304101 | Review further comments and edits to supplemental complaint; prepare additional revisions in view of same. |
| 03/14/2024 | Etienne, William M. | Associate | 0.50 | 232.50 | 465.00 | 0.50 | 232.50 | 6304101 | Prepare motion for supplemental complaint. |

| Date | Name | Title | Hours | Amount | Rate | Hours | Amount | Code | Description |
|---|---|---|---|---|---|---|---|---|---|
| 03/14/2024 | Etienne, William M. | Associate | 6.20 | 2,883.00 | 465.00 | 6.20 | 2,883.00 | 6304101 | Revise Tincher-Ladner declaration and circulate for comments. |
| 03/14/2024 | Polak, Jonathan G. | Partner | 0.90 | 742.50 | 825.00 | 0.90 | 742.50 | 6304101 | Continue work on Supplemental Complaint, TRO and related papers and strategy; multiple email communications regarding same. |
| 03/14/2024 | Smoot, Rachel A. | Associate | 6.10 | 2,867.00 | 470.00 | 0.00 | 0.00 | 6304101 | Draft Motion for Leave to Conduct Expedited Discovery and memo in support of same, expedited discovery requests, and Rule 26 Notice for HonorSociety.org. |
| 03/14/2024 | Smoot, Rachel A. | Associate | 5.10 | 2,397.00 | 470.00 | 0.00 | 0.00 | 6304101 | Draft Memorandum in Support of Motion for Temporary Restraining Order and Preliminary Injunction. |
| 03/14/2024 | Smoot, Rachel A. | Associate | 0.50 | 235.00 | 470.00 | 0.50 | 235.00 | 6304101 | Revise and edit Declaration of Lynn Tincher-Ladner. |
| 03/14/2024 | Fereshtenkhou, Hannah S. | Associate | 1.50 | 562.50 | 375.00 | 0.00 | 0.00 | 6304101 | Continue drafting fact section for memorandum of law in support of motion for leave to supplement amended complaint; revise declaration for L. Tincher-Ladner. |
| 03/14/2024 | Fereshtenkhou, Hannah S. | Associate | 2.10 | 787.50 | 375.00 | 0.00 | 0.00 | 6304101 | Research and analyze case law regarding temporary restraining order factors; draft argument regarding temporary restraining order factors for memorandum in support of motion for temporary restraining order based on same. |
| 03/15/2024 | Etienne, William M. | Associate | 2.20 | 1,023.00 | 465.00 | 2.20 | 1,023.00 | 6304101 | Continue to prepare memorandum in support of motion for leave to supplement amended complaint. |
| 03/15/2024 | Etienne, William M. | Associate | 6.30 | 2,929.50 | 465.00 | 6.30 | 2,929.50 | 6304101 | Review and provide comments on memorandum in support of motion for TRO and PI. |
| 03/15/2024 | Etienne, William M. | Associate | 1.20 | 558.00 | 465.00 | 1.20 | 558.00 | 6304101 | Provide edits to Tincher-Ladner declaration in support of PTK's motions. |
| 03/15/2024 | Polak, Jonathan G. | Partner | 1.40 | 1,155.00 | 825.00 | 1.40 | 1,155.00 | 6304101 | Continue work on TRO, supplemental complaint and related documents; exchange emails with team regarding same. |
| 03/15/2024 | Smoot, Rachel A. | Associate | 0.10 | 47.00 | 470.00 | 0.10 | 47.00 | 6304101 | Attention to SurveyMonkey Support email received from client; respond to client regarding same. |
| 03/15/2024 | Smoot, Rachel A. | Associate | 6.10 | 2,867.00 | 470.00 | 0.00 | 0.00 | 6304101 | Continue to draft Memorandum in Support of Motion for Temporary Restraining Order and Preliminary Injunction; revise and edit same. |
| 03/15/2024 | Smoot, Rachel A. | Associate | 0.50 | 235.00 | 470.00 | 0.50 | 235.00 | 6304101 | Revise and edit Declaration of Lynn Tincher-Ladner; send same to client for review. |
| 03/15/2024 | Fereshtenkhou, Hannah S. | Associate | 1.50 | 562.50 | 375.00 | 0.00 | 0.00 | 6304101 | Research and analyze case law regarding public interest in privacy and public interest factor for motion for temporary restraining order. |
| 03/16/2024 | Etienne, William M. | Associate | 0.80 | 372.00 | 465.00 | 0.80 | 372.00 | 6304101 | Revise Tincher-Ladner declaration; related information to supplement pleadings. |
| 03/16/2024 | Polak, Jonathan G. | Partner | 3.20 | 2,640.00 | 825.00 | 3.20 | 2,640.00 | 6304101 | Continue work on TRO and related papers and discovery. |

| Date | Name | Title | Hours | Amount | Rate | Hours | Amount | Code | Description |
|---|---|---|---|---|---|---|---|---|---|
| 03/16/2024 | Smoot, Rachel A. | Associate | 0.40 | 188.00 | 470.00 | 0.40 | 188.00 | 6304101 | Confer with co-counsel regarding preparation of remaining documents to be filed (i.e., Motion for Temporary Restraining Order and Preliminary Injunction, Motion for Leave to Conduct Expedited Discovery, Motion for Leave to file Supplemental First Amended Complaint). |
| 03/16/2024 | Smoot, Rachel A. | Associate | 2.00 | 940.00 | 470.00 | 2.00 | 940.00 | 6304101 | Revise and edit Motion for Leave to Conduct Expedited Discovery and Memorandum in Support of Same; draft Rule 30(b)(6) Notice to HonorSociety.org. |
| 03/17/2024 | Etienne, William M. | Associate | 1.80 | 837.00 | 465.00 | 1.80 | 837.00 | 6304101 | Revise PTK's memo in support of motion for leave to file supplemental complaint based on comments. |
| 03/17/2024 | Etienne, William M. | Associate | 0.60 | 279.00 | 465.00 | 0.60 | 279.00 | 6304101 | Revise Tincher-Ladner declaration to align with revised motions. |
| 03/17/2024 | Etienne, William M. | Associate | 1.70 | 790.50 | 465.00 | 1.70 | 790.50 | 6304101 | Revise supplemental amended complaint based on comments. |
| 03/17/2024 | Etienne, William M. | Associate | 3.50 | 1,627.50 | 465.00 | 3.50 | 1,627.50 | 6304101 | Review and prepare edits to memo in support of motion for expedited discovery. |
| 03/17/2024 | Etienne, William M. | Associate | 3.90 | 1,813.50 | 465.00 | 3.90 | 1,813.50 | 6304101 | Review and provide additional edits to motion and memo in support of motion for TRO and PI. |
| 03/17/2024 | Etienne, William M. | Associate | 0.70 | 325.50 | 465.00 | 0.70 | 325.50 | 6304101 | Prepare correspondence to local counsel regarding filing of PTK's three motions, memoranda in support, and exhibits. |
| 03/17/2024 | Polak, Jonathan G. | Partner | 7.90 | 6,517.50 | 825.00 | 7.90 | 6,517.50 | 6304101 | Continue work on TRO and supplemental complaint documents; exchange emails with litigation team on same; exchange emails with L. Tincher-Ladner on same; prepare draft email to counsel regarding intentions on filing and need for conference. |
| 03/17/2024 | Smoot, Rachel A. | Associate | 7.50 | 3,525.00 | 470.00 | 7.50 | 3,525.00 | 6304101 | Revise and edit Motion for Temporary Restraining Order and Memorandum in Support of same; multiple calls with co-counsel regarding same; revise and edit Motion for Leave to Conduct Expedited Discovery and Memorandum in Support of same as well as limited discovery requests and Notices of Rule 30(b)(6) depositions; revise and edit Declaration of Lynn Tincher-Ladner. |
| 03/18/2024 | Etienne, William M. | Associate | 0.60 | 279.00 | 465.00 | 0.60 | 279.00 | 6304101 | Prepare revised version of motion for supplemental complaint based on comments. |
| 03/18/2024 | Etienne, William M. | Associate | 2.60 | 1,209.00 | 465.00 | 2.60 | 1,209.00 | 6304101 | Prepare revised version of memorandum in support of motion for expedited discovery based on comments. |
| 03/18/2024 | Etienne, William M. | Associate | 4.60 | 2,139.00 | 465.00 | 4.60 | 2,139.00 | 6304101 | Prepare revised version of memorandum in support of motion for TRO and PI based on comments. |
| 03/18/2024 | Etienne, William M. | Associate | 0.80 | 372.00 | 465.00 | 0.80 | 372.00 | 6304101 | Prepare revised version of Tincher-Ladner declarartion based on comments. |
| 03/18/2024 | Etienne, William M. | Associate | 1.40 | 651.00 | 465.00 | 1.40 | 651.00 | 6304101 | Prepare instructions for exhibits; review finalized versions of same. |
| 03/18/2024 | Etienne, William M. | Associate | 0.60 | 279.00 | 465.00 | 0.60 | 279.00 | 6304101 | Participate in meet and confer with local counsel regarding PTK's forthcoming motions. |

| Date | Name | Title | | | | | | | Description |
|---|---|---|---|---|---|---|---|---|---|
| 03/18/2024 | Polak, Jonathan G. | Partner | 3.50 | 2,887.50 | 825.00 | 3.50 | 2,887.50 | 6304101 | Continue work on Supplemental Pleading and TRO-related documents; numerous emails exchanged with team regarding same; finalize same for filing. |
| 03/18/2024 | Polak, Jonathan G. | Partner | 0.50 | 412.50 | 825.00 | 0.50 | 412.50 | 6304101 | Hold conference with counsel for Honor Society and Honor Society Foundation to discuss supplemental pleading and TRO papers; consider next steps in light of same. |
| 03/18/2024 | Polak, Jonathan G. | Partner | 0.30 | 247.50 | 825.00 | 0.30 | 247.50 | 6304101 | Conference with M. Wynne (Grayson College) regarding public records request; prepare email to L. Tincher-Ladner regarding same. |
| 03/18/2024 | Polak, Jonathan G. | Partner | 1.40 | 1,155.00 | 825.00 | 1.40 | 1,155.00 | 6304101 | Prepare for hearing on TRO and motion for leave to file supplemental pleading; review file materials for same. |
| 03/18/2024 | Smoot, Rachel A. | Associate | 1.20 | 564.00 | 470.00 | 1.20 | 564.00 | 6304101 | Revise and edit Memorandum in Support of Motion for Leave to Conduct Expedited Discovery. |
| 03/18/2024 | Smoot, Rachel A. | Associate | 0.40 | 188.00 | 470.00 | 0.40 | 188.00 | 6304101 | Revise and edit Declaration Lynn Tincher-Ladner. |
| 03/18/2024 | Rose, Alexis | Staff | 2.50 | 250.00 | 100.00 | 2.50 | 250.00 | 6304101 | Finalize motions and exhibits for TRO filing, prepare and organize documents for telephonic conference scheduled on 3/19. |
| 03/19/2024 | Etienne, William M. | Associate | 1.70 | 790.50 | 465.00 | 1.70 | 790.50 | 6304101 | Prepare case law summary and comments regarding TRO briefing for use during conference with Court. |
| 03/19/2024 | Etienne, William M. | Associate | 1.60 | 744.00 | 465.00 | 1.60 | 744.00 | 6304101 | Participate in conference with Court. |
| 03/19/2024 | Etienne, William M. | Associate | 0.30 | 139.50 | 465.00 | 0.30 | 139.50 | 6304101 | Discuss exhibits and strategy regarding TRO and PI hearing for Wednesday, 3/27. |
| 03/19/2024 | Polak, Jonathan G. | Partner | 2.30 | 1,897.50 | 825.00 | 2.30 | 1,897.50 | 6304101 | Prepare for and attend conference with court to discuss scheduling of TRO and related issues; post-hearing conference with local counsel; prepare email updating client on events; conference with B. Mansfield regarding status. |
| 03/19/2024 | Polak, Jonathan G. | Partner | 1.30 | 1,072.50 | 825.00 | 1.30 | 1,072.50 | 6304101 | Begin preparation for TRO hearing; identify exhibits to be used at hearing; conference with L. Tincher-Ladner regarding hearing agenda and preparation. |
| 03/19/2024 | Smoot, Rachel A. | Associate | 1.60 | 752.00 | 470.00 | 1.60 | 752.00 | 6304101 | Attend status conference with Court related to Motions for Leave to File Supplemental First Amended Complaint, Temporary Restraining Order/Preliminary Injunction, and Conduct Expedited Discovery; confer with co-counsel regarding same. |
| 03/19/2024 | Smoot, Rachel A. | Associate | 1.00 | 470.00 | 470.00 | 1.00 | 470.00 | 6304101 | Prepare for hearing presentation. |
| 03/20/2024 | Etienne, William M. | Associate | 0.40 | 186.00 | 465.00 | 0.40 | 186.00 | 6304101 | Prepare exhibit list for TRO hearing. |
| 03/20/2024 | Polak, Jonathan G. | Partner | 0.50 | 412.50 | 825.00 | 0.50 | 412.50 | 6304101 | Exchange multiple emails with client on public records requests; review emails from colleges regarding same. |
| 03/20/2024 | Polak, Jonathan G. | Partner | 0.50 | 412.50 | 825.00 | 0.50 | 412.50 | 6304101 | Continue preparation for hearing on TRO; exchange emails with M. Wallace regarding same. |
| 03/20/2024 | Polak, Jonathan G. | Partner | 0.50 | 412.50 | 825.00 | 0.50 | 412.50 | 6304101 | Conference with M. Etienne regarding: exhibit list preparation and strategy on same. |

| Date | Name | Title | Hours | Amount | Rate | Hours | Amount | Code | Description |
|---|---|---|---|---|---|---|---|---|---|
| 03/20/2024 | Polak, Jonathan G. | Partner | 0.40 | 330.00 | 825.00 | 0.40 | 330.00 | 6304101 | Conference with D. Newman and D. Linke regarding approach to TRO hearing and related issues; prepare email to client regarding same. |
| 03/20/2024 | Smoot, Rachel A. | Associate | 1.20 | 564.00 | 470.00 | 1.20 | 564.00 | 6304101 | Draft outline for Hearing on Temporary Restraining Order; confer with co-counsel regarding same. |
| 03/21/2024 | Etienne, William M. | Associate | 3.40 | 1,581.00 | 465.00 | 3.40 | 1,581.00 | 6304101 | Review LTL Declaration; continue to identify and prepare exhibits for hearing. |
| 03/21/2024 | Polak, Jonathan G. | Partner | 0.50 | 412.50 | 825.00 | 0.50 | 412.50 | 6304101 | Exchange multiple emails with client on public records requests; review emails from colleges regarding same. |
| 03/21/2024 | Polak, Jonathan G. | Partner | 0.50 | 412.50 | 825.00 | 0.50 | 412.50 | 6304101 | Continue preparation for hearing on TRO; exchange emails with M. Wallace regarding same. |
| 03/21/2024 | Smoot, Rachel A. | Associate | 5.10 | 2,397.00 | 470.00 | 5.10 | 2,397.00 | 6304101 | Continue to draft outline for Hearing on Temporary Restraining Order; compile exhibits in support of same. |
| 03/21/2024 | Smoot, Rachel A. | Associate | 0.20 | 94.00 | 470.00 | 0.20 | 94.00 | 6304101 | Request additional information from client related to records requests and survey. |
| 03/21/2024 | Smoot, Rachel A. | Associate | 0.20 | 94.00 | 470.00 | 0.20 | 94.00 | 6304101 | Follow up email to Natasha Gill regarding Mailchimp direct complaint. |
| 03/22/2024 | Polak, Jonathan G. | Partner | 0.30 | 247.50 | 825.00 | 0.30 | 247.50 | 6304101 | Exchange emails w/ D. Newman regarding: TRO hearing. |
| 03/22/2024 | Polak, Jonathan G. | Partner | 0.90 | 742.50 | 825.00 | 0.90 | 742.50 | 6304101 | Continue work on TRO hearing preparation. |
| 03/22/2024 | Polak, Jonathan G. | Partner | 0.40 | 330.00 | 825.00 | 0.40 | 330.00 | 6304101 | communications with schools on public records requests. |
| 03/22/2024 | Polak, Jonathan G. | Partner | 0.40 | 330.00 | 825.00 | 0.40 | 330.00 | 6304101 | Receive and review email with proposed objections to PTK evidence; consider same. |
| 03/22/2024 | Fereshtenkhou, Hannah S. | Associate | 0.10 | 37.50 | 375.00 | 0.00 | 0.00 | 6304101 | Strategize regarding research for reply in support of motion for temporary restraining order, including case law regarding public records requests in the context of protective orders or temporary restraining orders. |
| 03/22/2024 | Fereshtenkhou, Hannah S. | Associate | 1.30 | 487.50 | 375.00 | 1.30 | 487.50 | 6304101 | Research and analyze case law regarding protective orders or temporary restraining orders for party making public records requests to third-parties. |
| 03/23/2024 | Etienne, William M. | Associate | 1.10 | 511.50 | 465.00 | 1.10 | 511.50 | 6304101 | Review HS's motion to exclude evidence of Tincher-Lader declaration; prepare notes regarding same. |
| 03/23/2024 | Etienne, William M. | Associate | 2.20 | 1,023.00 | 465.00 | 2.20 | 1,023.00 | 6304101 | Research case law for memorandum in opposition to HS's motion to exclude evidence. |
| 03/23/2024 | Etienne, William M. | Associate | 5.70 | 2,650.50 | 465.00 | 5.70 | 2,650.50 | 6304101 | Prepare memorandum in support of PTK's opposition to HS's motion to exclude evidence. |
| 03/23/2024 | Etienne, William M. | Associate | 1.80 | 837.00 | 465.00 | 1.80 | 837.00 | 6304101 | Review HS's response to PTK's motion for TRO and PI; prepare notes regarding same. |
| 03/23/2024 | Etienne, William M. | Associate | 3.30 | 1,534.50 | 465.00 | 3.30 | 1,534.50 | 6304101 | Prepare reply in support of PTK's motion for TRO. |
| 03/23/2024 | Polak, Jonathan G. | Partner | 6.50 | 5,362.50 | 825.00 | 6.50 | 5,362.50 | 6304101 | Review filings made by HS.org in response to TRO and related motions; work on strategy for responding to same; work on reply briefs; multiple communications with M. Etienne regarding same. |

| 03/23/2024 | Smoot, Rachel A. | Associate | 4.60 | 2,162.00 | 470.00 | 4.60 | 2,162.00 | 6304101 | Attention to Defendants' Response to Motion for Leave to Conduct Expedited Discovery; draft Reply Brief in Support of PTK's Motion for Leave to Conduct Expedited Discovery. |
| 03/23/2024 | Smoot, Rachel A. | Associate | 0.70 | 329.00 | 470.00 | 0.70 | 329.00 | 6304101 | Draft rebuttal facts section related to survey questions for Motion for Temporary Restraining Order and Preliminary Injunction. |
| 03/23/2024 | Rose, Alexis | Staff | 1.00 | 100.00 | 100.00 | 1.00 | 100.00 | 6304101 | Prepare binders of 3/23/2024 filings for TRO hearing. |
| 03/24/2024 | Etienne, William M. | Associate | 8.50 | 3,952.50 | 465.00 | 8.50 | 3,952.50 | 6304101 | Continue to prepare reply brief in support of motion for TRO and PI. |
| 03/24/2024 | Polak, Jonathan G. | Partner | 8.60 | 7,095.00 | 825.00 | 8.60 | 7,095.00 | 6304101 | Continue working on replies to Honor Society's Responses and motion to exclude; internal communications regarding same. |
| 03/24/2024 | Smoot, Rachel A. | Associate | 2.10 | 987.00 | 470.00 | 2.10 | 987.00 | 6304101 | Attention to Michael Moradian Declaration; draft Supplemental Declaration of Lynn Tincher-Ladner. |
| 03/24/2024 | Smoot, Rachel A. | Associate | 2.10 | 987.00 | 470.00 | 2.10 | 987.00 | 6304101 | Draft Reply Brief in Support of Motion for Temporary Restraining Order and Preliminary Injunction. |
| 03/24/2024 | Smoot, Rachel A. | Associate | 1.90 | 893.00 | 470.00 | 1.90 | 893.00 | 6304101 | Continue to draft Reply in Support of Motion for Expedited Discovery; revise and edit same. |
| 03/24/2024 | Smoot, Rachel A. | Associate | 0.20 | 94.00 | 470.00 | 0.20 | 94.00 | 6304101 | Attention to draft email to opposing counsel. |
| 03/24/2024 | Smoot, Rachel A. | Associate | 0.40 | 188.00 | 470.00 | 0.40 | 188.00 | 6304101 | Revise and edit Response to Motion to Exclude Evidence. |
| 03/24/2024 | Walsh, Christine | Associate | 2.60 | 975.00 | 375.00 | 2.60 | 975.00 | 6304101 | Review and respond to email correspondence from M. Etienne and J. Polak; Research precedent cited by Defendants in opposition to our TRO; Research precedent in support of our alleged harm. |
| 03/25/2024 | Etienne, William M. | Associate | 7.70 | 3,580.50 | 465.00 | 0.00 | 0.00 | 6304101 | Travel from IND to JAN for hearing on temporary restraining order and preliminary injunction. |
| 03/25/2024 | Etienne, William M. | Associate | 6.20 | 2,883.00 | 465.00 | 6.20 | 2,883.00 | 6304101 | Revise reply briefing in support of motion for TRO and PI based on comments. |
| 03/25/2024 | Etienne, William M. | Associate | 1.50 | 697.50 | 465.00 | 1.50 | 697.50 | 6304101 | Research relevant case law in furtherance of motion for TRO and PI. |
| 03/25/2024 | Etienne, William M. | Associate | 2.30 | 1,069.50 | 465.00 | 2.30 | 1,069.50 | 6304101 | Revise response in memorandum in support of opposition to HS's motion to exclude evidence based on comments. |
| 03/25/2024 | Etienne, William M. | Associate | 0.40 | 186.00 | 465.00 | 0.40 | 186.00 | 6304101 | Prepare opposition to HS motion to exclude evidence. |
| 03/25/2024 | Etienne, William M. | Associate | 2.00 | 930.00 | 465.00 | 2.00 | 930.00 | 6304101 | Identify additional case law regarding tortious interference with contracts in preparation for TRO and PI hearing. |
| 03/25/2024 | Polak, Jonathan G. | Partner | 5.40 | 4,455.00 | 825.00 | 5.40 | 4,455.00 | 6304101 | Continue work on TRO-related papers and finalize same for filing. |
| 03/25/2024 | Polak, Jonathan G. | Partner | 6.00 | 4,950.00 | 825.00 | 6.00 | 4,950.00 | 6304101 | Travel to Jackson for hearings. |
| 03/25/2024 | Smoot, Rachel A. | Associate | 7.00 | 3,290.00 | 470.00 | 7.00 | 3,290.00 | 6304101 | Travel to Jackson from Columbus. |
| 03/25/2024 | Smoot, Rachel A. | Associate | 1.00 | 470.00 | 470.00 | 1.00 | 470.00 | 6304101 | Revise and edit Reply Brief in Support of Motion for Expedited Discovery; finalize same, including exhibit. |
| 03/25/2024 | Smoot, Rachel A. | Associate | 0.80 | 376.00 | 470.00 | 0.80 | 376.00 | 6304101 | Revise and edit Response in Opposition to Objections to portions to Tincher-Ladner Declaration. |

| Date | Name | Role | Hours | Amount | Rate | Hours | Amount | Code | Description |
|------|------|------|-------|--------|------|-------|--------|------|-------------|
| 03/25/2024 | Smoot, Rachel A. | Associate | 1.30 | 611.00 | 470.00 | 1.30 | 611.00 | 6304101 | Revise and edit Reply Brief in Support of Motion for Leave to File First Amended Supplemental Complaint. |
| 03/25/2024 | Smoot, Rachel A. | Associate | 0.10 | 47.00 | 470.00 | 0.10 | 47.00 | 6304101 | Attention to response received from SurveyMonkey. |
| 03/25/2024 | Smoot, Rachel A. | Associate | 2.20 | 1,034.00 | 470.00 | 2.20 | 1,034.00 | 6304101 | Prepare for hearing in Jackson, including reviewing additional case law related to interference with contract. |
| 03/25/2024 | Smoot, Rachel A. | Associate | 0.90 | 423.00 | 470.00 | 0.90 | 423.00 | 6304101 | Revise and edit Supplemental Declaration of Lynn Tincher-Ladner. |
| 03/25/2024 | Smoot, Rachel A. | Associate | 0.10 | 47.00 | 470.00 | 0.10 | 47.00 | 6304101 | Call to Natasha Gill regarding Mailchimp subpoena. |
| 03/25/2024 | Walsh, Christine | Associate | 0.50 | 187.50 | 375.00 | 0.50 | 187.50 | 6304101 | Review and respond to email correspondence from J. Polak; Research case relied on by opposing counsel, and potential counter-cases. |
| 03/26/2024 | Etienne, William M. | Associate | 0.80 | 372.00 | 465.00 | 0.80 | 372.00 | 6304101 | Prepare case law outline for TRO hearing. |
| 03/26/2024 | Etienne, William M. | Associate | 1.20 | 558.00 | 465.00 | 1.20 | 558.00 | 6304101 | Review outlined arguments and discuss overall strategy and case law for TRO hearing. |
| 03/26/2024 | Etienne, William M. | Associate | 2.20 | 1,023.00 | 465.00 | 2.20 | 1,023.00 | 6304101 | Conduct review of image files of survey responses produced to PTK ahead of hearing. |
| 03/26/2024 | Polak, Jonathan G. | Partner | 3.50 | 2,887.50 | 825.00 | 3.50 | 2,887.50 | 6304101 | Prepare for TRO hearing; conference with M. Wallace and team to discuss and strategize on same; respond to various client communications on same. |
| 03/26/2024 | Polak, Jonathan G. | Partner | 0.40 | 330.00 | 825.00 | 0.40 | 330.00 | 6304101 | Conference with community college representative regarding recent consumer survey requests. |
| 03/26/2024 | Smoot, Rachel A. | Associate | 0.10 | 47.00 | 470.00 | 0.10 | 47.00 | 6304101 | Call to Natasha Gill regarding Mailchimp subpoena. |
| 03/26/2024 | Smoot, Rachel A. | Associate | 3.00 | 1,410.00 | 470.00 | 3.00 | 1,410.00 | 6304101 | Prepare for hearing on all pending PTK Motions, including drafting table of inconsistencies in Moradian deposition; attend Temporary Restraining Order preparation session; attention to emails from President of Colby Community College related to multiple records requests. |
| 03/27/2024 | Etienne, William M. | Associate | 3.80 | 1,767.00 | 465.00 | 3.80 | 1,767.00 | 6304101 | Review additional documents of 17,000 produced to PTK ahead of TRO hearing. |
| 03/27/2024 | Etienne, William M. | Associate | 5.10 | 2,371.50 | 465.00 | 0.00 | 0.00 | 6304101 | Continue pre-hearing preparation; participate in same. |
| 03/27/2024 | Polak, Jonathan G. | Partner | 1.20 | 990.00 | 825.00 | 1.20 | 990.00 | 6304101 | Review documents produced by HS.org related to TRO hearing; conference with R. Smoot and M. Etienne regarding same; prepare for hearing based on same. |
| 03/27/2024 | Polak, Jonathan G. | Partner | 5.00 | 4,125.00 | 825.00 | 5.00 | 4,125.00 | 6304101 | Continue preparation generally for hearing on TRO and related motions; attend same. |
| 03/27/2024 | Polak, Jonathan G. | Partner | 0.90 | 742.50 | 825.00 | 0.90 | 742.50 | 6304101 | Post-hearing evaluation of presentation and evidence and consider related discovery issues in connection with larger part of the case. |
| 03/27/2024 | Smoot, Rachel A. | Associate | 6.30 | 2,961.00 | 470.00 | 6.30 | 2,961.00 | 6304101 | Attend hearing on pending motions for temporary restraining order/preliminary injunction, leave to file supplemental first amended complaint, and expedited discovery; attend post-hearing meeting regarding same. |
| 03/28/2024 | Etienne, William M. | Associate | 8.10 | 3,766.50 | 465.00 | 0.00 | 0.00 | 6304101 | Travel JAN to IND subsequent to TRO hearing. |
| 03/28/2024 | Polak, Jonathan G. | Partner | 6.00 | 4,950.00 | 825.00 | 6.00 | 4,950.00 | 6304101 | Travel back to Indianapolis. |

| 03/28/2024 | Smoot, Rachel A. | Associate | 7.00 | 3,290.00 | 470.00 | 7.00 | 3,290.00 | 6304101 | Travel from Jackson to Columbus. |
| **Totals** | | | **361.70** | **194,792.50** | | **314.10** | **172,293.00** | | |

# EXHIBIT A-2

<pre>
 1              IN THE UNITED STATES DISTRICT COURT
            FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
 2                       NORTHERN DIVISION

 3

 4   PHI THETA KAPPA HONOR SOCIETY                    PLAINTIFF

 5   VERSUS              CIVIL ACTION NO. 3:22-CV-00208-CWR-RPM

 6   HONORSOCIETY.ORG, INC., ET AL.                  DEFENDANTS

 7

 8

                          EVIDENTIARY HEARING
 9           BEFORE THE HONORABLE CARLTON W. REEVES,
              UNITED STATES DISTRICT COURT JUDGE,
10                     MARCH 27, 2024,
                      JACKSON, MISSISSIPPI
11

12

13

14   APPEARANCES:

15   FOR THE PLAINTIFF:    MICHAEL B. WALLACE, ESQ.
                           JONATHAN G. POLAK, ESQ.
16
     FOR THE DEFENDANTS:   W. WHITAKER RAYNER, ESQ.
17                         DEREK NEWMAN, ESQ.

18

19

20

21
     REPORTED BY:
22
         CANDICE S. CRANE, RPR, RCR, CCR #1781
23       OFFICIAL COURT REPORTER
         501 E. Court Street, Suite 2.500
24       Jackson, Mississippi  39201
         Telephone:  (601)608-4187
25       E-mail:  Candice_Crane@mssd.uscourts.gov
</pre>

1                          **TABLE OF CONTENTS**

2   Style and appearances.....................................  1

3   ORAL ARGUMENTS:

4       By Mr. Wallace........................................  6

5       By Mr. Polak.........................................  48

6       By Mr. Newman........................................  77

7       By Mr. Wallace.......................................138

8   The Court's Ruling.......................................147

9   Certificate of Court Reporter...........................155

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**IN OPEN COURT, MARCH 27, 2024**

1

2

3          THE COURT:  You may be seated.

4          Good morning.  I apologize for the delay.  Who's

5     here for the plaintiff?

6          MR. WALLACE:  Your Honor, I'm Mike Wallace --

7          THE COURT:  Make sure your microphone is on,

8     Mr. Wallace.

9          MR. WALLACE:  Thank you.  I'm Mike Wallace from the

10    Wise Carter firm.  With me at counsel table is Jonathan

11    Polak of the Taft, Stettinius & Hollister firm.  Also is

12    Dr. Lynn Tincher-Ladner who is a counter defendant in her

13    own right, and she is president of Phi Theta Kappa.  With

14    us but not at counsel table from the Taft firm are Rachel

15    Smoot and Mike Etienne.

16         THE COURT:  Okay.  Thank you, Mr. Wallace.

17         MR. WALLACE:  Thank you, Judge.

18         THE COURT:  And who's here for the defendant?

19         MR. RAYNER:  Good morning, Your Honor.  Whit Rayner

20    from the Jones Walker law firm on behalf of

21    HonorSociety.Org, Inc.  With me is Mr. Michael Moradian who

22    is the executive director of Honor Society, and also Derek

23    Newman of the Newman Law Firm, and behind the table is

24    Mr. Nadir Moradian.

25         THE COURT:  All right.  Thank you.

```
 1          All right.  Counsel, we have several motions before

 2   the Court, and we'll figure out how we're going to proceed

 3   with them.  Let me hear from the plaintiff.

 4          MR. WALLACE:  On how we're going to proceed?

 5          THE COURT:  Yeah.

 6          MR. WALLACE:  Is that the question?

 7          THE COURT:  Yeah.  Yeah.  Well, I know we have a TRO

 8   pending.

 9          MR. WALLACE:  Yes, sir.

10          THE COURT:  But we also have these other motions for

11   expedited discovery.  I think the expedited discovery is --

12   well, the motion to supplement --

13          MR. WALLACE:  Yeah.

14          THE COURT:  -- the complaint, if the Court grants

15   that, grants the motion to supplement, I'm just trying to

16   think about these things, how that might affect any TRO,

17   for example, that the Court might grant.  And I know the

18   parties are awaiting from the Court rulings on these

19   earlier motions, that if the Court grants or denies those

20   earlier motions, how that might impact the current motion

21   for a TRO and otherwise.

22          MR. WALLACE:  Let me respond this way, Judge.  We

23   are prepared, and we believe the most efficient way to

24   proceed is to argue -- excuse me -- is to argue all three

25   motions together.  They were filed together.  They were
```

1    briefed together.  They relate to each other.

2        The motion to supplement the complaint I think is

3    logically the first thing.  If Your Honor decides we cannot

4    present these claims, it seems to me that you're probably

5    not going to be able to grant a TRO on claims you're not

6    going to let us pursue in this court.

7        So I think the way I intend to address it is to

8    begin with our right to supplement, to move quickly to

9    whether or not we're now entitled to emergency relief on

10   the claims that we want to bring, and to close with a few

11   words about discovery.  Because if we're allowed to

12   proceed, then we're going to get more discovery somewhere

13   somehow, and we need to talk about that.  So I think it

14   makes sense to argue all three together, and I think that's

15   the logical progression of how the Court would consider

16   them.

17       THE COURT:  Okay.  Thank you.  What do the

18   defendants say about that?

19       MR. NEWMAN:  Thank you.  Good morning, Your Honor.

20   My name is Derek Newman.  I represent HonorSociety.Org,

21   Inc., and I agree with Mr. Wallace.  I think that the

22   approach that would be most efficient is to allow the

23   plaintiff to argue all three motions, and then we would

24   argue all three motions.  Perhaps there would be a

25   rebuttal, perhaps there would be a surrebuttal, but I think

1    that's more efficient than stand up, sit down, stand up,

2    sit down for lots of motions.

3          THE COURT:  Okay.  Thank you.  You may proceed,

4    Mr. Wallace.

5          MR. WALLACE:  Thank you, Your Honor.

6          THE COURT:  And we'll do it like that, I think, take

7    up all of these motions, because I do think the questions

8    that I sort of mapped out might go from motion to motion.

9          MR. WALLACE:  Thank you, Your Honor.

10          As I say, I'm Mike Wallace for the plaintiff and

11    counter defendants.  I am going to address the motions.  I

12    am going to deal with the law on the motions, and I think

13    I've got enough to get us through this morning.

14          The Court may have questions about facts and what

15    has happened in discovery.  And Mr. Polak may need to

16    address those, because he's been on top of this case.  As

17    you know, I've been in this courthouse on a fairly lengthy

18    trial lately.  I've missed some depositions.

19          So I'm here to deal with it.  If there are things I

20    can't deal with, we can ask Mr. Polak, and I think he's

21    going to want to say something about the discovery we got

22    last night from them about the time I went to bed, about

23    62,000 pages of documents.  And what's in there and what's

24    not in there will probably have some effect on how much

25    discovery we still need to do.

 1          So let me begin, as I said I would, with the
 2    supplemental complaint.  I know Your Honor is disappointed
 3    that I didn't bring a poster board with me this morning,
 4    but you know what Rule 15(d) says, and the most important
 5    words are "may" and "any."  It says the Court may permit
 6    the filing of the supplemental complaint; that means it may
 7    or may not.  You've got discretion.  But if it chooses to
 8    do so, we may assert any claim that we have against the
 9    other side.  There is no substantive restriction on the
10    kinds of claims you may allow us to permit.
11          It is certainly true that in the exercise of
12    discretion courts often look at the extent to which the
13    supplemental claims are related to the already existing
14    claims.  They rely on the *Becnel* case from Louisiana, in
15    which a pro se plaintiff wanted to hire -- wanted to bring
16    in new parties and new complaints that had no relation to
17    anything that had gone before, and the court said, no,
18    we're not going to do that.  And that's certainly a
19    reasonable exercise of discretion.
20          But the claims here are clearly connected.  On the
21    very first page of their brief on the TRO, Honor Society
22    admits that they're in competition with us, and they claim,
23    again on the first page, to be doing it fairly and
24    lawfully.  Well, that's the issue, we think they're
25    competing with us unfairly and unlawfully.  The first

 1    amended complaint sets out four ways in which they are

 2    competing with us unfairly and unlawfully.  The

 3    supplemental complaint sets forth two new ways that they've

 4    just started doing within the last couple of weeks that we

 5    say are unfair and unlawful.

 6          The claims are clearly related, and I think the best

 7    evidence that the claims are related is that Mr. Moradian's

 8    affidavit submits into evidence materials that they've

 9    gotten from their records requests and surveys.  Of course

10    what they're doing is related to this case, they're using

11    it in this case.

12          Indeed, the first page of their brief on the TRO

13    says they used this to investigate frivolous lawsuits.  I

14    suppose they're talking about this one unless they've got a

15    whole supply of lawsuits we don't know about.  So by their

16    own admission, what they're doing is related to what we've

17    been doing in this Court for the last couple of years.

18          THE COURT:  Let me ask this question here,

19    Mr. Wallace.

20          MR. WALLACE:  Yes, sir.

21          THE COURT:  You know, we have gavels on our docket

22    sheet with respect to motions that have not been ruled upon

23    yet, and I notice that there is a motion that you all

24    filed, motion for leave to file second amended complaint,

25    back in September.  And I know the parties have met and

 1    conferred and have been to Judge Ball at certain times.

 2    But with respect to the request -- with respect to the

 3    relief requested in that motion, the leave to file that

 4    second amended complaint, since that time have the parties

 5    been operating as if those issues were ripe for discovery

 6    and all that?

 7        Because I know since Judge Ball is now absent and

 8    gone, Judge Myers recently extended discovery on the

 9    underlying -- on these operative -- what I believe is the

10    operative complaint.

11        MR. WALLACE:  Yes, sir.

12        THE COURT:  And that discovery deadline is sometime

13    in August, I think, of this year.  Does that deadline allow

14    the parties to pursue those issues that's in your motion at

15    docket number 79?

16        MR. WALLACE:  Uh-huh.

17        THE COURT:  The reason I was asking, I'm trying to

18    figure out -- because you know this case was filed sometime

19    ago.  Leave was -- I guess there was a first amended

20    complaint.

21        MR. WALLACE:  Right.

22        THE COURT:  There was a request for a second amended

23    complaint, and there's been a lot of discovery since the

24    filing of 79 and today.  There's been a lot of discovery.

25    That discovery that has occurred, has it taken into account

1    the proposed second amended complaint and the grounds that

2    the plaintiffs want to pursue in that second amended

3    complaint?  Do you understand what I'm asking?

4        MR. WALLACE:  Yes, I do understand, and I think I

5    know the answer.  Although Mr. Polak may correct me.

6        The first amended complaint has a claim that is

7    titled false advertising.  They believe we didn't plead it.

8    When that came up, we filed the second amended complaint to

9    say, well, if we didn't do it right the first time, here it

10    is; we want to do it.  I think all of our discovery has

11    proceeded on the assumption that we have a false

12    advertising claim in this case.  There's been the -- I

13    think you know there's been a lot of discovery, and I may

14    have missed a detail.  But I don't think anybody has

15    withheld discovery on the theory that the second amended

16    complaint has not yet been granted.  I think we're going

17    forward as if it has been, and if you don't, then that's

18    just a bunch of stuff we won't need.

19        Have I got that more or less right?

20        MR. POLAK:  One hundred percent.

21        THE COURT:  Okay.  So assuming then as you said,

22    this docket entry number 113, I believe your motion for

23    leave to file a supplemental first amended complaint, you

24    say that these claims in the proposed supplemental

25    complaint are like and related to or, you know, arise out

1  of all of this common nexus-type language.  And even if it

2  did not -- even if it did not meet that, this Court has the

3  discretion under Rule 15 or other rules to allow it?

4      MR. WALLACE:  I think that's right.  You have the

5  discretion even if it's not related.  But I believe as we

6  said in our brief, the key question is as they laid out in

7  the first page of their brief.  We are competitors; are

8  they competing fairly and lawfully?

9      We think there are some things they've been doing

10  for a long time that are unfair and unlawful.  These are

11  new, and we think they are unfair and unlawful.  I do

12  think -- so I think they're related, and I don't think that

13  it is likely to -- I don't think it's likely to delay

14  discovery.

15      We are already looking at each other's finances to a

16  certain extent.  There are damages claims in the case.

17  These new intentional interference claims are damage

18  claims, so we're already looking at each other's money.

19  We've been looking at each other's paper, and they gave us

20  62,000 new pages of paper last night.  So they're related.

21      And as best I can tell now, we will be able to keep

22  going on these new claims without having to push back the

23  deadlines.  What caused us to push back the deadlines is we

24  worked very hard with Judge Ball to try to get this

25  settled, and while we were trying to get it settled, we

1    were not getting discovery done.  So that's what pushed us

2    back.  I don't think this is going to push it back anymore.

3         I do think, as Your Honor said in the *Dobbs* case, we

4    have one dispute, and the defendant may keep doing new

5    things, but it's still one dispute.  And it makes sense to

6    have it resolved here.

7         As Judge Starrett said in the *Ennis* case, you could

8    go file these claims someplace else, but you're going to

9    have to -- they're going to have to be tried somewhere, and

10   judicial economy suggests they should be tried together in

11   the court that already knows what's going on in this case.

12   So I think based on *Dobbs* and *Ennis* and the discretion that

13   you have, you ought to allow us to assert these claims

14   here.

15        They do have one detail, they acknowledge that Honor

16   Society Foundation, which is I believe a charitable

17   organization that is affiliated with Honor Society, will be

18   brought in as a defendant on the supplemental claims

19   because they are using -- Honor Society Foundation is using

20   its website to send out all these surveys to students.  So

21   Honor Society Foundation comes in on the new claims.

22        We think we are entitled, based on the new

23   information and the new activity, to bring them in on the

24   old claims.  We now have direct evidence that they are

25   assisting Honor Society in this endeavor.  Whether or not

```
 1   they've been doing it all along, I don't know, but the fact
 2   that they're doing it on the new claims gives us reason to
 3   believe they're doing it on the old claims.  We think Honor
 4   Society Foundation ought to be in on all claims.
 5        THE COURT:  With respect to those old claims, when
 6   did PTK or Phi Theta Kappa first learn that Honor Society
 7   might have had a role in any of this?  I know there was
 8   discovery taken.  I presume you learned of at some point in
 9   time.  The directors or persons involved in Honor Society
10   Foundation were the same as those involved in Honor
11   Society.
12        So with respect to the old claims, did you just
13   learn this after you -- after March or so when you got this
14   information about the records requests that were made by
15   the foundation, or did the parties learn anything about the
16   foundation's, Honor Society Foundation's role in any of
17   this at some point earlier?
18        MR. WALLACE:  We have been trying to learn about the
19   foundation.  We have learned -- you know, we know it's out
20   there.  We have issued -- in the original suit, we issued a
21   subpoena to Honor Society Foundation to try to find out
22   what it was doing and what connection it may have with the
23   activities we are complaining about.
24        So we have known about Honor Society Foundation.  I
25   don't think we have known with the clarity that we found
```

1   out two weeks ago when we see these emails from Honor

2   Society Foundation being sent to students who are members

3   of Phi Theta Kappa.  So, yes, we knew something, Judge.

4   Whether we knew enough to sue them earlier is not a

5   question I think I can answer.  We know we have enough to

6   sue them now, because we're complaining about the surveys

7   and it's on their email.

8         THE COURT:  And with respect to those old claims, if

9   the Court were to allow you to bring those what we're

10  calling "old claims" and "new claims" --

11        MR. WALLACE:  Yep.

12        THE COURT:  -- against the foundation, will the

13  parties be able to complete discovery under the Myers

14  existing discovery order?

15        MR. WALLACE:  I think we can, Judge.  Discovery

16  about the Honor Society Foundation has been going on.  They

17  are not strangers to this dispute, whether or not they've

18  been parties to it.  So we are able, and we should be able

19  to gear up and complete discovery with Honor Society

20  Foundation in time to get ready to try this case.

21        As I say, we've had to deal with them under

22  subpoenas and not under document requests to this point,

23  but we've got some information.  And I think when they come

24  into this case, they should be in the position -- I mean,

25  they sent out the emails.  They know what they're getting

1    back, so they ought to be able to get it to us pretty

2    quickly I would think.  So I don't think adding Honor

3    Society Foundation to all the claims will materially delay

4    the case.

5         I will say lawyers on both sides have been working

6    hard to do discovery.  There's an immense amount of stuff

7    out there.  Adding these new claims is going to add some

8    new stuff, but we just got 62,000 pieces of it last night.

9    So I think we're on track to get busy.  That is why I think

10   we ought to be allowed to assert the new claims, and if you

11   do allow us to assert the new claims, we are here asking

12   for emergency relief in the form of a temporary restraining

13   order.

14        I want to begin by making clear what we're asking

15   for and what we're not asking for.  When we filed our

16   complaint, we knew we didn't know everything.  We thought

17   we might know more by the time we got here.  We know a

18   little bit more, and we'll know a lot more before we try

19   it.  But our rebuttal brief I think shaves down what we are

20   asking for now based on what we know in the evidence we are

21   present with today, in the form of Dr. Tincher-Ladner's

22   declaration, presenting to the Court.

23        We do not want to stop all record requests.  Until

24   we got this litigation going, we didn't even know they had

25   a records requests about GPA.  We don't want to enjoin

1    that.  If they want to send record requests about general

2    subjects, that's fine.  We do want to stop record requests

3    about Phi Theta Kappa and about Dr. Lynn Tincher-Ladner,

4    that's the sort of record requests we're trying to stop.

5        We don't want to stop them from doing legitimate

6    consumer surveys, if there is such a thing, but we do want

7    them to stop using surveys to make assertions about Phi

8    Theta Kappa and Dr. Tincher-Ladner.  You know, would it

9    hurt -- would it hurt their reputation if you knew they had

10   paid somebody $3 million with student dues?  That kind of

11   assertion we don't think is a valid survey.  We think it's

12   harassing.  We think it ought to stop.  But if they want to

13   send surveys that look for the kinds of things that a

14   commercial survey ordinarily would, we're not asking you to

15   stop it.  When it happens, we may see it, and we may think

16   there's something wrong with it.  But we're not asking you

17   to craft an injunction today that would prevent every

18   survey or prevent every record request.

19        THE COURT:  Are the surveys going to -- do we know

20   who the surveys are going to?  Are they going to the

21   schools and/or students, or the schools and no students, or

22   just students and no schools?

23        MR. WALLACE:  As best we can tell, they're going to

24   students.  And of course we've asked who you sent this to,

25   and we don't know yet.  That's part of the expedited

 1    discovery we're asking for.  But they are going directly to
 2    students.  We know that because we've heard that from Phi
 3    Theta Kappa members who are asking us what is this and who
 4    wants to know this and what's going on?  And apparently
 5    there have been a lot of them.
 6         In their brief, they give you responses they've
 7    received from students.  One of them -- I think the highest
 8    number they gave was respondent number 3,091, so they're
 9    sending out a lot of surveys to a lot of students.  How
10    many we just don't know; that's part of the discovery we'll
11    be asking for.  So that's what we're asking for.
12         We are not asking for an injunction against hacking
13    into our computers or any of this electronic stuff that you
14    know I can't possibly explain.  We think it is suspicious
15    that the computer problems started happening at the very
16    same time the surveys and the record requests started.
17         We don't think suspicion is enough for you to give
18    us a TRO.  We think it's enough for you to let us amend the
19    complaint and we'll do the discovery, and by the time we
20    try the case, maybe we'll know whether it's connected or
21    it's not.  But I'm not here today to argue that you ought
22    to enjoin them from messing with our computers, because we
23    don't know whether it's them or somebody else.  We're going
24    to look and try to find out.  So that's what we want:
25    surveys about us and records requests about us.

1           THE COURT:  Let me ask you specifically about the

2    surveys about quote/unquote competitor entities that do

3    product research and sort of surveys on their competitors.

4    Tide probably sends something out to people who typically

5    use Gain, you know, so I'm just trying to figure out, you

6    say there were -- we suspect there were at least 3,000

7    survey respondents, number 3,000-something responded.

8    Obviously we know from -- we know that people -- everybody

9    that receives a survey does not respond to it.

10          MR. WALLACE:  Correct.

11          THE COURT:  So we can reasonably assume I guess that

12   others have received the survey, but what is wrong with

13   respect to putting surveys out there to persons who you

14   either have a relationship or that you don't have a

15   relationship with about what -- you know, the benefits of

16   what they have with their existing organization, for

17   example.  What's wrong with Honor Society asking people

18   about, well, you have a relationship with PTK.  What do you

19   think about them?

20          MR. WALLACE:  Here's what I would say, and I'll use

21   Your Honor's own example.  If Tide sent out a survey to

22   consumers that says would it hurt Gain's reputation if you

23   knew their laundry soap turned your clothes green?  You

24   know that -- that would do damage.  You're not looking --

25   the very formulation of the question is not looking to

```
1    obtain information.  It is to assert information in a
2    deceptive sort of way, and that is the sort of things that
3    they have done here.
4         Would it hurt your opinion of Phi Theta Kappa if you
5    knew these series of five things, and at some point, I'll
6    get to why I think all of those are misleading.  We have
7    not alleged them to be defamatory.  As the Court knows,
8    defamation is not an easy thing to prove in Mississippi,
9    and you know you're not entitled to say any reasonable
10   person would infer the following from this.  If you have to
11   infer it, it's not defamation.  It has got to be right on
12   the face.  We haven't alleged defamation.
13        We have alleged that what they're doing is
14   misleading, and misleading is part of the tort of
15   intentional -- is one way to commit the tort of intentional
16   interference with business advantage or business
17   relationships.
18        THE COURT:  Let me ask you about that, the word
19   "misleading," you know in product liability cases, warnings
20   cases, there are competing persons who talk about what that
21   particular warning says, how it might affect the reasonable
22   consumer, and there are generally disputes about that.
23   People hire experts to talk about whether or not that
24   warning itself is misleading, whether that warning itself
25   does provide the requisite information.  Do the -- you
```

1    know, yes, it's misleading in the words of PTK.  I assume

2    when I hear from the Honor Society, they're going to say

3    that's really not misleading.  And is that a question of

4    law for the Court, or would that be a question of fact?

5         And if it is a question of fact, can the parties,

6    you know, dissect and reconstruct that particular question

7    and put it before the jury?  The competing testimony about

8    whether or not that particular question is or is not

9    misleading in each of the questions that PTK contends are

10   misleading.

11        MR. WALLACE:  I don't know that we're going to need

12   an expert.  I'm here today to tell you that common sense

13   would suggest that these are misleading.

14        And two things about Mr. Moradian's declaration.  He

15   says he stopped using these questions, but he never said

16   why he started.  He's never attempted to defend why this

17   would be a legitimate form of consumer protection or

18   consumer inquiry.  He just says we don't do it anymore,

19   never explained why he did.  And their brief doesn't

20   address whether or not it's misleading.

21        The brief keeps saying, well, it's not false.  And

22   for defamation purposes, that might be important if we were

23   bringing a defamation claim, but we're not.  It's a

24   question of attacking our customer base, if you would call

25   or say that about these students, with material that is

1    going to mislead them, and that they may have trouble

2    verifying or challenging.

3        I mean, I'm looking at one right here:  Does it hurt

4    the reputation of Phi Theta Kappa that a chapter advisor

5    was arrested in February 2024 for allegedly embezzling

6    funds?

7        Now, there are a couple of things about that.  If

8    you -- if you look at it from a defamation point of view,

9    that's true, that happened.  If you look at it from a

10   misleading point of view, it overlooks things that they

11   learned in Dr. Tincher-Ladner's deposition when I was over

12   here trying that case.  We don't pick -- Phi Theta Kappa

13   doesn't pick chapter advisors.  These are part of the

14   college's business.  If the college is going to allow a

15   chapter on its campus, they pick the advisor, so they have

16   a finger on what's going on.  And the funds that she

17   embezzled were not student dues, they were state money.

18   That's why Shad White had her arrested.  It was not

19   students' dues, but it was state money.

20       So I didn't sue them for defamation, because there's

21   truth in there.  But it's very misleading to suggest to

22   students all over the country that Phi Theta Kappa is

23   careless in selecting faculty advisors, and that those

24   faculty advisors steal members' money; that's not true.

25       I don't know that I need an expert when we try the

1    case to tell you that's misleading, but I think for

2    purposes of a TRO today you can see there is a pretty

3    reasonable chance that we're going to be able to show that

4    students would have and were misled by that.

5        THE COURT:  And the TRO would -- because I think the

6    other side says we're not sending that question out

7    anymore.  We've stopped sending that question out.  The TRO

8    would be one that would affirmatively tell them not to send

9    out anymore.

10       MR. WALLACE:  And I can go straight to what I was

11   going to end with on this point, and that's the mootness.

12   The mootness situation, the Fifth Circuit case in *Speech*

13   *First* says the fact that a defendant voluntarily quits

14   doing what he was doing doesn't necessarily mean the case

15   is moot.  You have to be absolutely clear that it's never

16   going to come back.

17       And the Fifth Circuit had three tests on that:

18   Whether there's a controlling statement of future

19   intention.  Now, all Mr. Moradian says in paragraph 56 is

20   he's not doing it anymore.  But he makes no promise never

21   to do it again, and there's certainly no court order on it.

22       The second point in *Speech First* is suspicious

23   timing.  Mr. Moradian stopped doing this after we

24   complained to his lawyers.  He didn't just wake up one

25   morning and say, you know, that's a bad idea.  I shouldn't

1    have done it.  I'm going to quit.  It happened immediately

2    after the lawyers were complained to and maybe it will

3    start again when nobody's looking.

4         And the third point is whether or not the defendant

5    is continuing to defend its conduct.  If a defendant comes

6    in here and says, well, we won't do this anymore, but we

7    were 100 percent right.  We had every right to do it.

8    We've never done anything wrong.  That's in their brief,

9    they say we're not going to do it, but we have every right

10   to do it.  We didn't do anything wrong.  And if that's

11   their attitude, we can't rest with any confidence that they

12   will never do it again.  It's not absolutely clear.  We

13   think the *Speech First* case answers Your Honor's question

14   about, you know, will they do it again.

15        Let me tell you -- and I was going to start this by

16   telling you what I think they're up -- why they're doing

17   this from facts we know and facts we don't know.  These

18   surveys, according to Mr. Moradian's declaration, started

19   on March 4th.  We don't know when they started doing record

20   requests.  We started hearing about it at that time.  His

21   declaration doesn't tell us when he started doing those

22   requests.

23        We don't think it's an accident that they started

24   this four days after Judge Ball retired.  Judge Ball had

25   tried to settle this case.  It didn't work.  We didn't

 1    agree with them, so we're back litigating again.  But Judge

 2    Ball had restricted the scope of the discovery.  They sent

 3    a Rule 45 subpoena to an outfit called NAVEX that we used

 4    to investigate and keep track of any allegations about us

 5    that we ought to know about.  Judge Ball says don't bother

 6    the other people.  You can get that from Phi Theta Kappa;

 7    leave them alone.

 8         And more importantly for purposes here, because this

 9    is a reputation case, we are alleging their unfair and

10    unlawful competition is damaging our reputation.  Judge

11    Ball says you're entitled to see what their reputation is

12    that is out there in public, because what people say about

13    them in public effects whether their reputation has been

14    damaged.  But what you're not entitled to do is turn over

15    rocks on the inside and look for things that the public

16    doesn't know yet; that's got nothing to do with their

17    reputation.

18         THE COURT:  Let me ask you about the NAVEX.  PTK,

19    Phi Theta Kappa I guess I should say, hired NAVEX to do

20    some sort of internal research?

21         MR. WALLACE:  It's not a research outfit.  But if

22    anybody's got -- if anybody wants to file complaints with

23    us -- let me ask Mr. Polak.

24         THE COURT:  That's fine.  That's fine.  I just want

25    to make sure I'm clear about it, and I appreciate you

1    bringing that to my attention with respect to what the

2    parties knew prior to March 4th.  And apparently the

3    subpoena was sent to NAVEX --

4         MR. WALLACE:  Sometime ago.

5         THE COURT:  -- and Judge Ball quashed the subpoena,

6    I guess?

7         MR. WALLACE:  And I'm not telling you I know

8    everything NAVEX does.  They may do a lot of things for us.

9    But what they wanted to see is did we have any record --

10   did NAVEX have any records of people, of students

11   complaining about us or anybody complaining about us.  And

12   we said we know about that; they keep those records for us.

13   You ask us, and we'll give them to you if Judge Ball says

14   so.

15        THE COURT:  Thank you.  All right.  You may proceed

16   then.

17        MR. WALLACE:  So now Judge Ball's gone, and this

18   starts immediately.  And when we tell their lawyers, when

19   we tell Honor Society's lawyers about it, some of it at

20   least stops immediately.

21        Now, why are these two things connected?  The

22   records requests are going to the colleges, and they're

23   asking for everything that has to do with Phi Theta Kappa.

24   But, specifically, they specifically include lists that are

25   going to Phi Theta Kappa.  Now, the lists we get from the

1    colleges that we have, as our complaint says, enforceable

2    agreements with, the lists we get from them are kids who

3    had good grades last semester.  When the grades come out,

4    the college looks at it, and says these are the kids who

5    qualify to be Phi Theta Kappa, and they send us the lists.

6         Now, presumably those lists would be produced under

7    the records request, at least by some people, and when they

8    get those lists, then they know where to send the surveys.

9    We know from discovery that they purchased lists of young

10   folks' emails.  They send out millions of invitations to

11   join Honor Society.  But if what you want to do is compete

12   with Phi Theta Kappa, as their brief says and as

13   Mr. Moradian's declaration says, it really helps you to

14   have lists of people who have been invited to join Phi

15   Theta Kappa.  So the records requests helps them to target

16   the surveys; that's how these two things fit together.

17        And indeed in paragraph 52 of Mr. Moradian's

18   declaration, he says we send these surveys to people who

19   have been confirmed as junior college students.  Well, he

20   doesn't say how he's confirmed it, but if he's got the

21   lists he's asking for, that's a pretty good confirmation.

22        Now, here's why it's a problem particularly now.

23   Most places ended the fall semester just before Christmas.

24   It takes a while to get the grades together.  Sometime

25   early in the new year, maybe February, we're going to get

1    lists from colleges that says here are the kids who are

2    eligible to join.  And some colleges notify the kids

3    directly.  Some colleges send us the lists, and we send out

4    invitations to the kids.  And that has been going on during

5    February and March.

6          March is the time of year, because of this process,

7    that we pick up the greatest number of new members.  And as

8    we say when we get to the damages point, membership is down

9    15 percent this March.  One reason it's big in March is we

10   have the national convention in April.  This week -- this

11   week it's the first -- it's the first week in April down in

12   Orlando.  We need to -- these kids, if they want to take

13   advantage of the college fair and the other things we

14   provide at the national convention, they need to make up

15   their minds and decide to get in.

16         Now, if you're a kid down the road at Utica or back

17   in my neck of the woods in Perkinston or over here at

18   Scooba and you're trying to make up your mind, because

19   you've got limited resources and limited time, is Phi Theta

20   Kappa something that can do me some good?  It's very

21   important for them to be looking at that right now, and

22   it's very important for them to be able to look at that

23   right now without any misleading information that is being

24   sent out in these surveys by -- by Honor Society.

25         They claim they have a First Amendment defense with

1   regard to the surveys.  They don't say there's a First

2   Amendment defense with regard to the records requests.

3   They say there's one with regard to the surveys.

4       You've dealt with that before is the *Bond Pharmacy*

5   case, and you know that commercial speech is not protected

6   when it's misleading.  I've already talked to you about how

7   some of these surveys are -- some of these survey questions

8   are misleading.  They talk -- one of them says, "Would it

9   hurt your reputation if the last director got a $3 million

10  golden parachute when he left?"

11      I don't know how the federal government worked when

12  you left the U.S. Attorney's Office.  I know how it worked

13  when I left congressional staff.  They take money out while

14  you're working.  You've earned the money.  They put it

15  towards your retirement, and when you leave, when you're

16  not going to get any retirement, they give you the money

17  back.

18      In my case, I wouldn't have called it "a golden

19  parachute."  But I had earned it, and I was happy to have

20  it.  And that is what was happening here.  And they know

21  that because they were told that during the deposition, and

22  there's nothing to the contrary.  We don't pick the chapter

23  advisors --

24      THE COURT:  That deposition occurred when?  Do we

25  know?

1          MR. WALLACE:  During the -- the last week of

2     February, I think.  Yeah, because I was -- I was over here

3     doing the redistricting trial, so I wasn't there.  But all

4     of these things in the -- in their questions were --

5          THE COURT:  So they learned about it.  Presumably

6     Dr. Tincher-Ladner was questioned about it during the

7     course of this case in the discovery in the deposition, --

8          MR. WALLACE:  Yep.

9          THE COURT:  -- and information taken from that was

10    used, in part I guess, to construct a survey?

11         MR. WALLACE:  I think that's right.  I'm not

12    accusing them of taking anything in discovery to -- that

13    would have violated any orders.  Some of this -- some of

14    what they asked about was in newspapers, could have been

15    gotten legitimately.  But newspapers, as Your Honor may

16    have noticed, are not always complete and clear about all

17    the facts.  So they had a deposition where they had the

18    opportunity to and did get complete clarity on the facts,

19    and then they went out and did it anyway.

20         They say we're lying about being the official junior

21    college honor society.  We've given them the minutes from

22    1929 when the Junior College Association made us official.

23    If they don't think the minutes are any good, we know

24    they've got subpoenas.  They can ask the Junior College

25    Association whether we're official or not.

1       So this is all commercial.  They admit in their
2   complaint in paragraph -- not their complaint,
3   Mr. Moradian's declaration, paragraph 50 and paragraph 83,
4   they say this is commercial.  This is a key part of our
5   commercial business.  Because it's commercial, their First
6   Amendment protection is limited, and it doesn't protect the
7   sort of misleading things they're sending out to our
8   students.
9       For that matter, malice gets no First Amendment
10  protection.  The torts we've alleged under Mississippi law
11  require malice.  They define malice perhaps differently
12  from what the Supreme Court has done in the defamation
13  cases, but this isn't a defamation case.  Mississippi
14  understands that you just can't go around punishing people
15  for what they say.  You have to have a high degree of
16  fault.  That's what we've alleged; that's what we think we
17  can prove.
18      And I was surprised that one of their cases, a Fifth
19  Circuit case, *Test Masters* vacated a -- vacated an
20  injunction -- and this is the part they like -- that told
21  the defendant you can't contact the -- I'm sorry.  Told the
22  plaintiff I think in that case.  But in any event, they got
23  an injunction that said you can't contact the other party,
24  you can't contact their employees, you can't contact
25  anybody associated with them ever about anything.  And the

 1    Fifth Circuit said, no, that's way too broad.  We're not

 2    asking you to do anything that broad.

 3         The Fifth Circuit didn't throw out the injunction.

 4    They narrowed the injunction, and they said that you can --

 5    First Amendment notwithstanding, you can enjoin harassing

 6    communications, and we're going to revise the injunction to

 7    say -- not to say you can't talk to anybody at any time,

 8    but to say you can't use it for harassment.

 9         We certainly think -- we think that what's going on

10    in this case is sort of a bank-shot harassment of us, among

11    other things.  They ask questions to the colleges, the

12    colleges complain to us.  They send surveys to our members,

13    the members complain to us.  There's a lot of it out there,

14    and I think that's the sort of harassment that *Test Masters*

15    says receives no First Amendment protection.

16         THE COURT:  Let me ask you that we believe -- I

17    mean, I think you've asserted that the information went out

18    on or about March 4th.  And it probably takes one hit of a

19    button after all this stuff has been put in some sort of --

20         MR. WALLACE:  Yeah.

21         THE COURT:  I think there was specific requests from

22    these institutions to put it in an Excel spreadsheet, for

23    example, and I assume, you know, with one hit of the

24    button, the letters could go out, the surveys could go out

25    to hundreds of thousands of individuals.

1          And I presume the surveys are not being responded to

2     all at the same time.  So if I got one in Perkinston and if

3     I got one over in Raymond, I'm just now getting it, or I'm

4     just now turning my attention to it.  I'm back from spring

5     break.  I look at the survey, and I respond.

6          I guess my question would be, basically, the horse

7     is out of the barn; right?  So all of this information is

8     already out there to presumably at least 3,000 people.  We

9     suspect more; right?

10         MR. WALLACE:  We do.

11         THE COURT:  Okay.  So it's already out there, and

12    now we're waiting on results or responses to those surveys.

13    I mean, what could the -- as I said, the horse is out of

14    the barn.  What is it this Court could do at this point?

15         MR. WALLACE:  There are more horses all the time.

16    There are some community colleges out on the west coast

17    that are on the quarter system.  They are finishing up the

18    quarter in March.  We'll get lists from those colleges in

19    April, and we will send things out to them.  And unless you

20    stop them, they will be pushing another button and sending

21    more information, more assertions out to more horses.

22         And there will be a lot more people before this case

23    is tried because when the -- with most places under the

24    semester system, you're going to get the grades -- they

25    will finish in May.  You'll get the grades in June.  We'll

```
1    get emails out to people in July.  And when they get those

2    lists, they're going to have those same questions or

3    questions like them out there to all those new horses.

4         So, no, I'm not -- certainly a TRO isn't going to

5    fix everything.  That's why we're going to have a damage

6    trial.  But the TRO can stop the bleeding.

7         THE COURT:  Well, will the damage trial -- at the

8    end of the day with the damage trial, I assume you won't be

9    requesting sort of injunctive relief or equitable relief.

10   You'll be asking for some amount of money.

11        MR. WALLACE:  We are asking for some amount of

12   money, but I suspect we'll be asking for a permanent

13   injunction at the same time.

14        And that's one of the differences between this and

15   the Bond Pharmacy case that Your Honor had.  Your Honor

16   said, well, if you've lost business, you can contact the

17   doctors who don't do business with you anymore.  You can

18   find out whether the letter had anything to do with that,

19   and you can look at the kind of money you used to make from

20   them.  And we can add it all up, and you can get a nice big

21   check.

22        Where damages will provide a full remedy, then

23   ordinarily that's what the Court does.  The difference

24   between us and the pharmacy in that case is we're not in

25   the business of cashing checks.  We are a nonprofit
```

1    institution.  We are in the business of helping kids in

2    junior college, and if these kids are driven away or

3    deterred from joining Phi Theta Kappa, we can't help them.

4    More importantly, they can't get the help that we've been

5    providing to their parents and grandparents for 100 years.

6    I don't know how you fix that.  I don't think you can fix

7    that.  So I think that's a huge reason why damages are not

8    going to be sufficient in this case.

9        I'll get to irreparable injury in a minute; although

10   I think I've just talked about irreparable injury.  But I

11   do want to talk about these public records requests, which

12   they quite reasonably don't claim to be a constitutional

13   right, because it's not.  There's no First Amendment right

14   to get into the government's filing cabinets.  If they did,

15   you'd be hearing from people all the time, but you're not

16   under FOIA.

17       But the Government can open the filing cabinets on

18   certain conditions, and so there are statutory rights that

19   get you into the government's papers.  And they differ in

20   every case.  Every state has a different way of doing

21   things.  The only one they cite to you is the Mississippi

22   Code, which, again, is interesting because as far as we

23   know, they haven't sent any -- they haven't sent any

24   document -- any records requests to Mississippi.

25       I don't think that's a coincidence either.  The

 1    first order you entered in this case decided we didn't have

 2    personal jurisdiction over Mr. Moradian.  I think he's

 3    being very careful not to do anything in Mississippi if it

 4    would bring him back in.  But he's got free rein in the

 5    other 49 states, and he is sending these all kinds of

 6    places.

 7         But Mississippi is a good example of why nobody has

 8    an unrestricted fundamental right to get anything that

 9    happens to be in a government filing cabinet.  Our statute,

10    25-61-9, says that the materials and information that the

11    government gets from private parties on the outside is not

12    necessarily public.

13         When a government agency in Mississippi gets the

14    request:  Give me everything you've got from Phi Theta

15    Kappa.  The agency is supposed to call Phi Theta Kappa.

16    We've got 21 days to go to court and to establish, which we

17    would do very easily if they were just asking for it in

18    this case.  We would just go see Judge Myers, and we'd talk

19    about what they're entitled to and what they're not.  But

20    if you use records requests, we at least have the

21    opportunity to go to court and stop them, so there's not an

22    unqualified right to get any records request at any time.

23         I don't know what the law is in the other 49 states.

24    And presumably they don't know either, because they haven't

25    said anything about it in the brief.  By the time we try

1    this case or by the time we've come back for a preliminary

2    injunction, maybe they will do it.  Maybe they'll find some

3    places in this country where the people who provide private

4    information have no right to protect themselves once the

5    Government gets it, but I doubt it.  I don't think there's

6    anybody out there.

7         They keep calling it public information.  If it

8    comes from us, it's private information that happens to be

9    in the hands of the government.  They don't have an

10   absolute right to go get that from anybody.

11        THE COURT:  So presumably, I assume the public

12   entity which receives the request, they look at it to

13   determine whether or not they can turn over the stuff.

14        So wouldn't the burden be on the public institution

15   to make sure it doesn't give out stuff that it is not

16   required to give out under that state's public records

17   thing?

18        MR. WALLACE:  You would hope so, Your Honor.  I

19   intend no disrespect to anybody to say that most junior

20   colleges, community colleges are small institutions in the

21   business of teaching kids.  They don't have full-time

22   lawyers on staff.

23        In Mississippi I suppose if they had a problem, they

24   would call up the Attorney General, and say what do I do

25   with this?  But all of that depends on who gets the

1    request, and it depends on who gets the request identifying

2    a problem on which they do need legal advice and then

3    figuring out how and where to go get it.

4         And it seems, based very quickly on what they sent

5    us after I went to bed last night, some of the things

6    they've gotten back are emails between the college and the

7    students with students' names, students' emails.

8         I don't claim to know a lot about FERPA, but I think

9    I know that's protected.  You are not supposed to be -- I

10   mean, my heavens, the trouble I had getting my kid's grades

11   from the schools was pretty strong.  I hope they're not

12   sending out the email communications.  I think that's

13   illegal under federal law, but apparently somebody did it.

14        So I don't think you can ask for stuff, ask for all

15   of this stuff, including lists that you know they shouldn't

16   be giving it to you, and say, well, it's not my fault they

17   don't know the law.

18        Now that's -- again, once we've gone through these

19   62,000 pieces of paper we got last night, we're going to

20   know more about that.  But I don't think it's fair right

21   now to say they can ask for things they know they're not

22   entitled to, that Judge Ball has told them they're not

23   entitled to, just because, well, the burden is on the back

24   of the junior colleges to figure out the law.  I hope

25   that's not the case.

1          Going the long way around the barn, I've finally

2     gotten to the *Canal Authority* factors.  I do think we have

3     a likelihood of success on the merits of our interference

4     with business advantage claim.

5          At this point, we're not entitled to a TRO on our

6     tortious interference with contract.  The law in

7     Mississippi seems to be you need to prove that you've lost

8     a contract.  There may be colleges out there that have

9     already said we don't want to fool with Phi Theta Kappa

10    anymore, but they haven't told us.

11         When the colleges on the west coast start deciding

12    whether or not to send us their winter grades, you know,

13    then maybe we'll know whether we've lost a contract.  We

14    don't know it yet.  I'm not asking you to grant a TRO on

15    something where we're not in a position to prove it to you.

16         But I think we have offered plenty of proof on the

17    question of malicious interference -- of interference with

18    business advantage.  These communications, they were

19    intentional.  They're proud of them.  They're here telling

20    you they were intentional; we did them on purpose.  And

21    both the records requests and the survey targets Phi Theta

22    Kappa on the face.  The key question in Mississippi -- and

23    it's the definition of malice in Mississippi -- are you

24    intending to damage somebody without justifiable cause?

25         And it's not justifiable cause enough to say, well,

1    we're competitors.  We want market share, we'll take it

2    from them.  Okay.  That's fine when you do it fairly.  But

3    under the Mississippi Supreme Court's MBF case, it's not

4    fine when you go beyond the realm of legitimate

5    competition.

6          They took their -- aside from the timing we've

7    already talked about, on the document requests, the records

8    requests, they took pains to make sure nobody would know

9    they were coming for Honor Society.  They were sent by one

10   of their employees, Mr. Asari.  He did it on his own email.

11   He's got an Honor Society email; we've seen that in

12   discovery.  But the document requests do not purport to be

13   from Honor Society.  They don't say anything about Honor

14   Society.  It's this unexplained guy out there somewhere

15   that wants to know about Phi Theta Kappa.  And if you

16   thought you were doing right, you wouldn't go to the effort

17   to hide who you are.

18          And if they really wanted this stuff, the easy way

19   to do it is to file one request with us:  Give us all your

20   communications with all of the junior colleges in the

21   country.  They didn't do that.  The only imaginable reason

22   for not filing one request instead of hundreds and

23   thousands is that we would have an opportunity to defend

24   ourselves before Judge Myers.  So they've decided to take

25   that off the table by going straight to the colleges.

1          And, again, they did the survey at the same time as

2     the record requests.  They don't even suggest -- what is

3     it? -- a legitimate competition purpose for the surveys.

4     Why would you say, you know, would it hurt the reputation

5     of Phi Theta Kappa if so and so -- they're not trying to

6     find out about the market.  They're trying to poison the

7     market.

8          The irreparable injury, I've already told you why

9     damages won't work.  The *Daniels* and *Spiegel* case from the

10    Fifth Circuit say that reputational harm may be -- may be

11    irreparable.  That's a good basis for issuing injunctive

12    relief.

13         Also, the *Multiplan* case says it's irreparable when

14    damages are hard to quantify.  It's not *Bond Pharmacy* where

15    you've got to contact 50 doctors and say why aren't you

16    doing business with us anymore.  We've got thousands of

17    kids who never -- hundreds of thousands who may never

18    choose to do business with us, because they've been scared

19    off by this survey.

20         The third test is comparative injury, how is this

21    going to hurt them?  We're being hurt if only by the time

22    we have to spend to explain to our colleges what's going on

23    and to explain to the members who contact us what's going

24    on.  The TRO is not going to hurt them in any way.

25         If they want to file a record request about the

```
1   junior college market, we're not stopping them from doing

2   that.  We just say don't talk about Phi Theta Kappa.

3        If they want to do a survey for legitimate

4   competitive reasons, you know, we're not asking you to

5   enjoin it.  When its out there, we may look at it, and we

6   may have a problem with it, and we'll come see you.  But

7   that's not what today is about.

8        So we're being injured.  Where is the injury in

9   telling them for the next 14 days they need to stop?  And

10  they say, you know, public interest.  They say these are

11  public documents.  The public is helped when we get public

12  documents.  Well, the key is they're private documents.

13  They're private communications with a private party, and if

14  they get those before we know about them and before we've

15  had a chance to be heard, then we've been really injured.

16  I've told you --

17       THE COURT:  Let me ask you about this, because the

18  other side is certainly going to have an opportunity to

19  respond.

20       MR. WALLACE:  Oh, yeah.

21       THE COURT:  But, again, those surveys have already

22  been sent out.  If the Court were to grant you the relief

23  you want today, that would stop I guess for the next

24  14 days, or broadly throughout the course of this

25  litigation, the Court says no more surveys can be sent out
```

```
1    in the form in which they currently are.

2         MR. WALLACE:  Right.

3         THE COURT:  Would that -- does that satisfy the sort

4    of irreparable harm or the injunctive relief that Phi Theta

5    Kappa would need to stop the bleeding as you might have

6    said?

7         MR. WALLACE:  I think that's the best you can do

8    based on what we know now.  When we get the discovery that

9    I'm just about to ask for, we may be back here either at a

10   preliminary injunction or at trial and tell you how to

11   stitch up the bleeding.  But we just don't know how bad the

12   wound is right now.

13        We may get to the point where the Court ought to

14   tell them to contact other people and to say we're sorry we

15   sent you this; pay no attention to it.  That's something

16   the Court could do.  I'm not asking you to do that today.

17   I'm asking you to tell them not to make it any worse, and

18   then to let us have our discovery.

19        But I want to say one thing before discovery.  If

20   you -- I think this is best treated as a matter of

21   substantive law.  We have a valid claim under Mississippi

22   law, and you have authority under federal procedure to

23   grant us emergency relief subject to changing your mind

24   when you see what comes down the road.  But we also think

25   that we could be -- if Your Honor has doubts about any of
```

1  those questions, we could be entitled to a Rule 26

2  protective order.

3       It is not often that courts are asked to issue a

4  Rule 26 protective order about things that are going on

5  outside of discovery.  It is not unprecedented.  It has

6  happened in cases where the court decides you're avoiding

7  the decisions that have already been made by this court,

8  and we're not going to let you do that.

9       We have cited the *Heinrich* case where the party --

10  where the plaintiff had asked the magistrate to reopen

11  discovery, the magistrate had said no, so they sent out a

12  Colorado Records Act Request.  And the Court says I'm

13  sorry; I'm not going to say you're never entitled to do a

14  records request, but when the judge has told you discovery

15  is over, then I'm going to tell you discovery is over.  And

16  I'm not going to let you evade that by using other legal

17  mechanisms to get evidence.

18       Arkansas did the same case -- the same thing in the

19  *Hartman* case we've cited.  And the judge says, again in

20  *Heinrich*, says I don't have anything that explicitly tells

21  me I can do this, but I don't have anything that tells me I

22  can't.  And the rule tells me to protect people from being

23  harassed, and I see these people are being harassed, and I

24  want it to stop.  So I think you've got that authority, or

25  at least there are a couple of District Courts that think

 1    you've got that authority whether or not you ever get to

 2    that TRO.

 3        THE COURT:  You mentioned you got 62,000 pages

 4    yesterday.  If the Court were to grant Phi Theta Kappa's

 5    request today and say at least for the next 14 days or

 6    until we get a complete handle on this, which may extend

 7    through the current discovery deadline --

 8        MR. WALLACE:  Right.

 9        THE COURT:  -- that any -- if the Court were to say

10    that no more future surveys to be sent out in the form in

11    which they've been sent out.  But any responses received by

12    Honor Society in response to those requests, they're a part

13    of discovery in this case, and they will have to be given

14    to Phi Theta Kappa.

15        I mean, is that reasonable?

16        MR. WALLACE:  I think that's right, Judge, and that

17    gets us to our request for expedited discovery.  The

18    lawyers have provided us some of the information we've

19    asked for, not enough for us to evaluate it now.

20        Their only objection to expedited discovery is they

21    say we don't have a right to a TRO.  Well, we've pled a

22    case.  If we're entitled to amend our complaint, we're

23    entitled to some discovery about that complaint sometime.

24    It's only a question of how fast.  And you can set a

25    preliminary injunction in two weeks, and we can get

1    discovery between now and then.  If they're willing to have

2    a TRO remain in place longer, we can do -- do discovery a

3    little more leisurely.

4         They have not objected to the substance of

5    discovery.  We've attached to our motion this is what we

6    want to know, and their only argument is you can't get it

7    because you can't get this TRO.  We think we have pled a

8    claim.  We're entitled to discovery at some point, and if

9    the Court is going to allow us to go forward on a

10   preliminary injunction, then we need it before we get to

11   that point.

12        THE COURT:  If the Court allows you to do your

13   supplemental amended complaint and move forward, will there

14   be a need for any TRO?  Other than the TRO which says

15   change the survey or don't send out those specific

16   questions anymore.

17        And under the existing discovery order that Judge

18   Myers has in place, the parties have until August to do all

19   the discovery that they need to do based on any claims that

20   the Court -- any claims or counter claims that are part of

21   the thing.  And obviously the parties know that when August

22   rolls around, if the discovery has not been completed,

23   they're probably going to ask Judge Myers, and say, look,

24   it's August now.  We believe we can get it done by October

25   and that might effect the trial date.  Judge Myers, please

1    let us out of that trial date.  And you know I'm just

2    asking, if the Court allows you to file your supplemental

3    amended -- what was called a supplemental amended complaint

4    to bring in all these issues here, if it were to allow the

5    Honor Society to bring whatever claims that they thought

6    were necessary, you discover all of this stuff, you tee

7    everything up for trial.  Short of trial, you tee

8    everything up for summary judgment.

9        Does that not cure, but isn't that the logical

10   progression?

11       MR. WALLACE:  I mean, I think that's the logical

12   progression.  I think we need some kind of restraint from

13   the Court at this point whether it's a TRO, whether it's a

14   Rule 26 protective order to say that these surveys that are

15   targeting Phi Theta Kappa and Dr. Tincher-Ladner need to

16   stop.

17       It's a marketing case.  There may be a marketing

18   expert that needs to do a real survey, and we're not

19   telling them -- we don't want you to tell them they can't

20   do what they need to do to get ready to try the case.

21       But they don't need to tell kids all over the

22   country, would it hurt the reputation of Phi Theta Kappa if

23   you knew X, Y, and Z?  Of course it would, that's why

24   you're telling them, so I think that needs to stop.  I

25   think the records requests at this point need to stop.  All

1  of that can be funneled through Judge Myers, and we can get

2  ready to try this case.  So I don't think we need as broad

3  a TRO as we thought when we filed it, but I think we need

4  these things that target us to stop.

5        You know, at some point, and I don't know whether

6  this is in the TRO or whether this is down the road, but I

7  talked to you about the nature to bind up the wound.  You

8  may not be ready to do this today.  You may want to do it

9  if and when we get to the preliminary injunction stage.

10 But we would very much like them to tell these colleges

11 that are getting these requests and are calling us on the

12 phone:  Dear college, we're sorry.  You can stop work.  You

13 don't need to respond to this.

14       We'd love to have that today.  If Your Honor doesn't

15 feel comfortable with that today, we can talk about it, and

16 probably will, between now and the trial.  But the key

17 thing is don't make it any worse.

18       What I want to do, if I may, is sit down.

19 Mr. Polak, I'm not going to tell you he's been through

20 62,000 pieces of paper, but he knows more about it than I

21 do and knows more about what we need to do to get ready for

22 trial.  And I'd like to hand that over to him for just a

23 minute and then --

24       THE COURT:  And then we'll take a break for the

25 court reporter, and then we'll return and hear from the

 1    other side.  Thank you, Mr. Wallace.

 2          MR. WALLACE:  Thank you.

 3          MR. POLAK:  Good morning, Judge.

 4          THE COURT:  Good morning.

 5          MR. POLAK:  Jonathan Polak for the Plaintiff PTK and

 6    Counter Defendant Dr. Tincher-Ladner.  I'll be quick about

 7    the documents.  62,000 seems like a big number.  It's one

 8    of these situations where we got a lot, but we didn't get

 9    very much; that's the problem.

10          I think from the papers you'll recall a person by

11    the name of David Asari.  He was the primary I think sender

12    of the records requests, these public records requests.

13    Out of 62,000 pieces of paper, there are four -- we have

14    the ability to search this stuff online.  There are four

15    emails that reference his name.  So out of all of this they

16    gave us only four match it, so what does that mean?

17          They did not give us two of the things that we've

18    been asking for since the beginning, since all the way back

19    to I think March 6th or 7th:  Tell us the number of

20    colleges you sent this stuff to.  In other words, how many

21    of these emails did you send, and what are the colleges you

22    sent them to?  So we can understand the scope and volume.

23          There are a little less than 1,500 community

24    colleges in the United States.  We know that as late as

25    yesterday, because I had a conversation with somebody at a

 1    small community college, they have received not one, not

 2    two, not three, not four, but five records requests, many

 3    of them overlapping.  That means that there could be as

 4    many as -- because you're right, it's not hard to do the

 5    email send; right?  You have your spreadsheet, you pop it

 6    into the email server, boom, you can send out 1500 of these

 7    real quickly.

 8         And so what do we know?  We could have literally a

 9    disaster on our hands in terms of the high volume of

10    documents.  We don't have that stuff.

11         So I want to make it clear that in terms of what it

12    is we've been asking for since the beginning, from the very

13    first conversation that I had with Mr. Newman's colleague,

14    Mr. Linke, and I said tell us -- we just found out about

15    these records requests.  Tell us who it is you've sent this

16    stuff to.  We don't even -- and their response was we don't

17    even know that that happened.  Their own lawyers didn't

18    know.  But that's why we've been asking for this.

19         And why is it they gave us these documents last

20    night?  It wasn't because of the fear of the expedited

21    discovery that we've asked for, because they might come up

22    here and say we don't need to do the expedited discovery.

23    We're giving these things already.  Well, they're not.

24         These are all because we asked them to give us, a

25    long time ago, all documents referencing Phi Theta Kappa.

1    We asked for that back in 2022.  Those records requests

2    have been or Rule 34 requests have been outstanding.

3           So what do we know?  We know that they started this

4    apparently at some point in early March.  They've had all

5    this time.  They had an obligation to timely supplement

6    their discovery; they did not.

7           I'm going to give the lawyers credit here.  They

8    didn't know, because their own client didn't tell them they

9    were going through this process.  But they had an

10   obligation to give it to us, and I think they've hustled to

11   get everything.  But it's not everything.  We still don't

12   have copies of the records requests.  We don't know how

13   many were sent to each one.

14          A huge category of documents that are still

15   responsive to our Rule 34 request are going to be the

16   planning documents for the survey.  What was Mr. Moradian

17   talking about with Mr. Asari when they're sitting there

18   scheming and plotting to send literally possibly tens of

19   thousands of public records requests and potentially

20   millions, potentially millions of emails for these surveys,

21   what were their motivations for doing so?  We don't have

22   that.

23          That is topics I believe -- well, I don't know the

24   exact numbers, but you have the requests for production we

25   are asking for.  We also have 30(b)(6) notices that we

1    attached.  That is what we're after, Your Honor.  We want

2    to know what happened, but we also want to know why.  And

3    it's the answer to the why question that I think is super

4    important.

5        My colleague, Mr. Wallace, was explaining to you all

6    of the reasons why we think this was not ordinary course of

7    business FOIA requests.  These were maliciously designed to

8    cause colleges out there, who are our lifeblood for emails,

9    to reconsider whether it is really worth it to have a

10   relationship with Phi Theta Kappa.  And for the students

11   who received those surveys, we have no information, from

12   what I can tell, that will tell us the number of surveys

13   that were sent.  We have survey responses, but we don't

14   know the total number of surveys that were done.

15       Now, they will tell you that they terminated it;

16   it's gone.  But as Mr. Wallace was telling you, there's no

17   representation it's not going to happen again, and we do

18   see a connection between the emails they're getting on the

19   one side from the public records requests and the emails

20   that go out with the survey on the other side.  They're

21   inextricably intertwined.  So that's what we're asking for.

22       THE COURT:  Let me ask you this, Mr. Polak.  You

23   said there were four documents as far as you could tell

24   that link Mr. Asari with somebody else.  What do the other

25   62,000 pages look like?  What type of information is that?

 1          MR. POLAK:  We have not been able to chew through

 2     those as much as we would have liked.  I don't know if my

 3     colleagues on the bench back there have nodded off, but

 4     they were up all night looking at this stuff.  And we can

 5     only chew through so much of it.

 6          But I believe that it has -- there are some

 7     spreadsheets.  I think there was some number of

 8     spreadsheets.  Thirty or 40 is the number that comes to

 9     mind from an email I read this morning, but it's in that

10     range.  Those spreadsheets are going to include the email

11     addresses from some of the schools that have responded.

12     Mr. Wallace was referring to that.  There are probably

13     going to be emails back from the colleges where there is

14     this exchange.

15          But what's curious about it is that if Mr. Asari is

16     only mentioned four times, I doubt that there's a whole lot

17     of communications that they've produced there, and that's

18     what we want to see.

19          THE COURT:  Okay.  Now, let me ask you this.  Of

20     course Phi Theta Kappa has relationships with junior

21     colleges and community colleges.  Am I correct then, and

22     should I assume that those are the only persons Phi Theta

23     Kappa has relationships with, junior and community

24     colleges?

25          Because I think Honor Society's affidavit suggests

1    that persons are eligible to be members of the Honor
2    Society who might be in four-year colleges and
3    universities, and there may have been information sent to
4    the four-year colleges and universities, which would not be
5    a community college.
6         In discovery, I know Rule 26 is broad, anything that
7    might lead to discoverable -- I guess that's still -- the
8    magistrate judges deal with --
9         MR. POLAK:  Yeah.
10        THE COURT:  -- discovery issues.
11        MR. POLAK:  Right.  It's a good question.
12        THE COURT:  But tend to get to matters that are
13    material or discoverable.  Is Phi Theta Kappa taking the
14    position that it would not be entitled to whatever
15    information that Honor Society might have sent to students
16    enrolled in public or private four-year colleges and
17    universities?
18        MR. POLAK:  I think the answer is we very much would
19    have an interest in that, and the reason why is those are
20    alumni of ours.  And I don't know that there actually is --
21    if "alumni" is a good word to identify --
22        THE COURT:  For persons who have graduated --
23        MR. POLAK:  Correct.
24        THE COURT:  -- from the community colleges who would
25    have --

```
1          MR. POLAK:  Correct.

2          THE COURT:  Some of whom might have received

3     scholarships or would receive scholarships in the future.

4          MR. POLAK:  Once in Phi Theta Kappa, always in Phi

5     Theta Kappa, because there's only a onetime fee to join.

6     Unlike Honor Society which charges credit cards every

7     other -- every six months.

8          Once you're in Phi Theta Kappa, you're in and so --

9     and many of those students, not all, but many come to the

10    convention.

11         Many of those students proselytize the virtues and

12    value of their own membership in Phi Theta Kappa.  Some of

13    our best PR comes from people who once were in our

14    organization as an active member as opposed to someone who

15    has graduated and been successful transferring from

16    community college to do that.

17         So I just got a note here.  There are -- it's going

18    back to your question that you asked about what else is in

19    those documents.  There are communications that include

20    confidential student communications.  Student

21    communications that were produced, I think, by the

22    colleges.  So as a part of these records requests, right,

23    they're saying give me all the communications that speak in

24    any way to PTK or Dr. Tincher-Ladner, including but not

25    limited to email addresses.
```

1          So I don't want the Court to have the understanding

2     that the only focus of these records requests were email

3     addresses.  It's a big part of it, a big reason why they're

4     asking for it.

5          But they also were asking for this other bit where

6     let's say, for example, this is an issue we dealt with in

7     the NAVEX situation.  A student who's a chapter member and

8     a member of Phi Theta Kappa on Campus X has a disagreement

9     with their chapter advisor.  A disagreement with something

10    that happened in class that day, whatever it might be, and

11    they contact their Phi Theta Kappa chapter advisor about

12    it.  Totally private, totally anonymous -- well, not

13    totally anonymous, but totally private.

14         There's an expectation of confidentiality I'm sure

15    with that student because sometimes they act -- these are

16    kids, and they're going to be vulnerable sometimes in ways

17    that adults are not going to be.  And that was kind of what

18    we dealt with with NAVEX, because in the NAVEX situation,

19    we had a bunch of complaints -- well, not a bunch, that

20    overstates it.  We had a number of complaints that they

21    were wanting to get that were totally private.  Many of

22    which were anonymously submitted, and there's a reason why

23    they were anonymously submitted.

24         Judge Ball was like, look, you could get these.  You

25    don't have to go to NAVEX to get them.  You can go to PTK

 1    to get this stuff.  But on top of it, these students have

 2    privacy interests, and I don't see any relevancy here to

 3    these private communications, these private situations,

 4    these confidential communications to whether or not these

 5    guys are infringing our trademark.

 6          THE COURT:  Well, with respect to NAVEX, though, did

 7    NAVEX's counsel or somebody representing NAVEX file a

 8    motion to squash and that was teed up?

 9          Because the subpoena went out, and I assume there

10    was some meet and confer or otherwise.  You got before

11    Judge Ball.  He said, no, it can't happen.  Did NAVEX --

12    were you representing NAVEX or was --

13          MR. POLAK:  We were not.  They demurred to us to

14    take care of that for them.

15          THE COURT:  Okay.

16          MR. POLAK:  And their position was whatever Judge

17    Ball happens to do, we're going to comply with it.  They

18    weren't going to go hire lawyers to represent them out in

19    Seattle, which is where they were located, and I don't

20    think anybody wanted to go out to Seattle to go litigate

21    it.  But they were willing to comply with whatever the

22    Court did.

23          But of course in that instance, the reason why we

24    were able to do that is because we had advanced notice.  We

25    had the due process that's allowed under the federal rules

1  to speak up and protect not only Phi Theta Kappa's

2  interest, but the interests of these students that Phi

3  Theta Kappa works with every day.  So I see that as a big

4  distinction between these two situations.

5      You know the schools in this instance have --

6  Dr. Tincher-Ladner is trying to get ready for this

7  convention that's next week.  It's the pinnacle of the

8  year.  At the same time, she is fielding many, many

9  communications, mainly phone calls from these colleges

10 saying, wait a minute, we're a 2,500-student campus.  We're

11 a 500-student campus.  We don't have the staff to deal with

12 this.  We don't have the money to go hire a lawyer to go

13 fight this.  What are you doing about this?

14     THE COURT:  Well, the public college system here in

15 Mississippi, they do have lawyers.  So I'm just curious why

16 is that burden not on that institution not to disclose

17 material that is FERPA?  I mean, you know you cannot -- I

18 mean, everybody knows that you cannot --

19     MR. POLAK:  Well, apparently they did, because

20 that's in the documents they produced to us.  Some of these

21 schools went ahead and just said it's not worth it to us to

22 go through that process.  Here ya go, and they produced

23 those communications.

24     And it's a little difficult for us to tell which

25 ones they marked as confidential and which ones they marked

1  as AEO unless we go by a document-by-document basis.  We

2  haven't had time to do that.  But I can tell you this.  Our

3  initial review shows that they produced -- "they" being

4  Honor Society -- produced spreadsheets with email addresses

5  of these students not marked confidential under the

6  protective order.

7      Why is that interesting?  Because counsel to date in

8  this case have bent over backwards together collaboratively

9  to protect student information.  There are documents that

10 have been produced in this case that contain student

11 emails.  Those have been produced in this case.

12     There have been depositions taken where student

13 emails have been presented to witnesses, and they had to

14 testify with them.  How did we deal with that?  We either

15 marked it confidential, or in many instances we treated it

16 not just confidential, attorneys eyes only, documents that

17 were exchanged between the parties in discovery.

18     Honor Society's own counsel has acknowledged that

19 that information is so confidential that it needs to be

20 protected under attorneys eyes only, or in other

21 instances -- I think in some select instances, it was

22 produced confidentially or marked confidential.  But you

23 can see the disconnect here; right?

24     But getting back to your initial question around,

25 isn't this the burden of the schools?  I get your point

1  about that, and I don't think that we necessarily dispute

2  at some level the schools need to do what the schools need

3  to do.  But that's not really the basis of our claim.

4      The basis of our claim is they have engaged in an

5  orchestrated campaign, not to go collect information that

6  these schools have because they're interested in it.  They

7  have instituted an orchestrated campaign to maliciously,

8  and in many instances with respect to the survey

9  misleadingly, engaged in an effort to drive wedges between

10 Phi Theta Kappa and its constituents, students, its

11 members, as well as its college partners.

12     If Phi Theta Kappa loses the support of the

13 colleges, Phi Theta Kappa will be over.  And the reason why

14 is because where does it get its membership?

15     It doesn't get its membership because it advertises

16 online the way Honor Society does.  It doesn't get its

17 membership because it blasts literally millions of emails

18 every month to anybody and everybody who might have an

19 email as saying, hey, come join an Honor Society when

20 they're not.

21     Phi Theta Kappa has enjoined the trust and respect

22 of its college partners for a hundred years.  The identity

23 of the prospective members of Phi Theta Kappa come from

24 those colleges.  That's what this upload is that

25 Mr. Wallace was talking about.  The colleges are the ones

```
 1    who identify who is eligible to join Phi Theta Kappa.  And
 2    in about 50, 60 percent of those instances, Phi Theta Kappa
 3    sends emails to those students saying you've been invited;
 4    you've made it; you've achieved.  Welcome to the club.
 5    Welcome to the Honor Society; you've earned it.  In some
 6    other instances, the colleges choose to do it themselves.
 7         But the focal point there in terms of the delivery
 8    of those email addresses are the colleges.  They're the
 9    ones who make those decisions.  So if the colleges start to
10    figure out because of what it is Honor Society has done and
11    Honor Society Foundation knowing they're going to get --
12    because it doesn't seem like it's stopping, because the
13    college I talked to yesterday said not only did I get these
14    three weeks ago, four weeks ago, I got one on Sunday asking
15    them for pretty much the same information that they'd
16    already been requested three weeks ago.  It's going to
17    continue.  They're going to continue doing it.
18         It's not that the colleges have the burden to
19    respond, yes, they do.  What we're here about today is the
20    malicious intent of Honor Society and its affiliate Honor
21    Society Foundation to use these, what they would say
22    otherwise legitimate records requests, to disrupt Phi Theta
23    Kappa's business right before the pinnacle of its year.
24    That's what's going on.
25         THE COURT:  You're basically suggesting they're --
```

1    aside from these surveys that may be misleading, the mere

2    fact that they're doing records requests --

3         MR. POLAK:  To make it burdensome for these schools

4    to do business with the plaintiff in this case.  It is

5    purely retaliatory, because we didn't settle with them.

6    It's retaliatory because we had the audacity to sue them

7    for violating our intellectual property.

8         We didn't have this situation before Judge Ball left

9    the bench.  We have it now.  And they've decided that what

10   they're going to do -- and the phrase I used on the phone

11   the other day with you I think is very appropriate --

12   scorched earth litigation.  If PTK is going to take us

13   down, we're taking PTK down with us.  And that's what

14   they're doing, and that's why we're here.

15        If this was just about a bunch of GPA-request

16   emails, we wouldn't be here.  We wouldn't be here, because

17   PTK is not referenced in those GPA emails, right, those

18   records requested.  We didn't do that.

19        What do we see on the other ones, the ones we're

20   here about?  The subject line on those emails says "PTK

21   document requests," and you'll see in the briefing and

22   Dr. Tincher-Ladner's declaration, colleges have called her

23   up and said why are you asking me for this stuff?

24        There's no reference to Honor Society on those

25   requests, that Honor Society; right?  It says "PTK

1    request," and it comes from a Mr. Asari.  And so the

2    colleges --

3          THE COURT:  Mr. Asari at what email address?

4          MR. POLAK:  David Yoshea --

5          THE COURT:  I mean, does it --

6          MR. POLAK:  I'm sorry.  It's a Gmail.

7          THE COURT:  Is it not Asari@HonorSociety.com?

8          MR. POLAK:  I believe some of the surveys came from

9    HonorSocietyFoundation@gmail.com.  I believe that the

10   public records requests -- I could be wrong on this, but I

11   think the ones that I have seen come from Mr. Asari's

12   personal Gmail account, which I believe Mr. Moradian has

13   already claimed owner- -- well, control over, if you will,

14   because he's like, yeah, I knew these things were going

15   out.  I knew that we were going to be sending out these

16   requests.  And I'm entitled to do it, and I'm going to keep

17   doing it.

18         And that's our point is that it would be one thing

19   if he was interested in knowing what Kilgore College down

20   in Texas, happened to say, what was your GPA?  And they

21   send one of them, okay, fine.  They could even send 50 or

22   100, whatever.

23         But if you're going to send what might have been

24   10,000-plus emails to our community colleges with the

25   intent, the stated intent in their briefing, and you know

```
 1   what?  I think I'm totally okay with doing it.  I think the
 2   courts are going to be okay with me doing it, and I'm going
 3   to continue doing it.  They've even done it since we filed
 4   our papers.
 5          THE COURT:  Do we know if the same request was sent
 6   to each community college or each public entity which
 7   received the request?  Do we know if it was the same
 8   request?
 9          MR. POLAK:  I've been asking that question since
10   March 6th.  I still do not have an answer to that question.
11   It is not in the documents they've produced or the
12   documents we've seen.
13          THE COURT:  In the documents they've produced, does
14   it appear it was the same --
15          MR. POLAK:  I don't --
16          THE COURT:  I mean, you have 62,000 of them, so does
17   it --
18          MR. POLAK:  I can't answer your question based on
19   the documents they've produced.  I can answer that question
20   based on the communications that Phi Theta Kappa has
21   received from the schools.  And it does appear that these
22   public records requests have taken probably four or five I
23   guess different forms, and they've evolved over time.  My
24   suspicion is that -- well, let me back up.  They've evolved
25   over time.  We have received complaints from colleges
```

1    around these, and in all of those complaints, they have

2    identified what effectively are the same requests that all

3    the other colleges are complaining about.

4         We also have a suspicion based on that that they are

5    sending out not only requests to the -- let's call them

6    requests one, two, three, four, and five, because I know

7    about five different forms.  Two of those are GPA requests,

8    so we take those out.  Let's call it one, two, and three,

9    so these are public records request that say -- that make

10   reference in some way to either Dr. Tincher-Ladner or Phi

11   Theta Kappa or both.

12        The first one was that one I've already described,

13   and this does seem to be the one that we have received the

14   most communication around.  And that is the one that's

15   identified in the briefing, and it says "PTK records

16   request" in the subject line.  And it says again "PTK

17   records request" I think in the body, and it says -- I'm

18   paraphrasing -- request is made for all communications

19   between PTK and Lynn Tincher-Ladner and the school or

20   concerning them, as well as any student emails that you,

21   the school, gave to Phi Theta Kappa for membership.  I'm

22   butchering the language, but that's generally what it says.

23   And so we have that one.

24        We also have the one that I just learned about

25   yesterday for the first time that says -- and this is the

1    one sent out on Sunday.  It might have gone to one school.

2    I'm sure it did not.  They didn't hit send just to one

3    school.  It's a small school in the middle of the Midwest.

4    They sent it to a bunch.  We just haven't heard about it

5    yet.

6        But this one says we're asking for all records of

7    communications concerning HonorSociety.Org from Phi Theta

8    Kappa.  So that is already included in the first records

9    request.  We now have -- in other words, there's overlap

10    between them.  There's no reason to have sent this last

11    one, not at all.  They already got the first one.

12        They sent another one, and so what they're going to

13    do -- what they're doing is, they're asking for, I think,

14    the same information over and over and over again,

15    peppering these schools not with legitimate requests for

16    information.  On their face, it might look legitimate.

17        But in the bigger context of what we know now, which

18    is it's very likely they have sent out literally thousands

19    of emails -- thousands of emails, maybe potentially more

20    than 10,000 emails for public records requests, that

21    doesn't sound to me like a legitimate information gathering

22    thing.  That sounds to me like a campaign to tortiously

23    interfere in our relationships and prospective

24    relationships, and so that's why we're here.  That's what

25    our concern is.

1           And that's why we need the expedited discovery,

2    because in order for us to be able to stitch up the wound,

3    as Mr. Wallace said, we've got to know how big this wound

4    is.  I've got to know how much -- how much thread I'm going

5    to need, and we're only going to know that if they tell us

6    how many emails they sent.  Still don't have that.

7           How many public records requests did they send and

8    to whom?  Still don't have that.

9           And it's -- it's baffling to me why we don't have

10   it.  They spent all this time to produce literally 60,000

11   pieces of paper to us digitally, and they can't give us the

12   thing I've been asking for since March 6th?

13          They've known about this for a long time.  It tells

14   me the reason why they didn't want to give it probably was

15   intentional, and I'm going to go ahead and go there.  The

16   reason why it would be intentional is because they didn't

17   want us sitting up here and standing up here today to tell

18   you that we now know for sure that they sent 10,000 emails

19   for public records requests that overlap with each other to

20   the people that are our lifeblood.  That's why we didn't

21   get it, at least that's my suspicion.  And so that's why we

22   need it, and that's why we're so concerned about it, Your

23   Honor.  We wouldn't be here if it was about GPA requests.

24          THE COURT:  One final question.  You talk about the

25   burden on Dr. Tincher-Ladner and the burden on PTK.  I

1    think in your papers and otherwise in her affidavit or

2    declaration, I think she talks about the burden on those

3    colleges with respect to responding, but she probably is

4    not the best person to talk about what burdens the colleges

5    might be facing in responding to these requests.

6         It's basically the burden of PTK in responding to

7    the questions or the calls and communications from those

8    colleges --

9         MR. POLAK:  If we're --

10        THE COURT:  -- because she has to take them aside

11   from whatever duties she's doing or whatever those of her

12   staff and team are doing.  Literally all she has to say is

13   I think that document did not come from us.  We believe it

14   came from somebody else.  Talk to your counsel or deal with

15   it in that way.

16        MR. POLAK:  I absolutely believe that is a burden on

17   PTK.  Whether that is a relevant burden to your decision

18   here today is going to be up to the Court.

19        But it's not the only burden we're talking about,

20   because what has been a part of those communications to

21   Dr. Tincher-Ladner has been communications that this is

22   really burdensome.  We don't have the staff to deal with

23   this.  Why are we being drawn into your lawsuit?  Why do we

24   have to deal with this?  That lawsuit is your problem, not

25   our problem.  How many more records requests are we going

1    to get?  Why do we have to continue doing this?  Are you

2    going to help us prepare the responses?  Can you give us a

3    legal opinion around it?

4         Those are the types of things, and so what are they

5    really communicating to us?  Sure, they've got burden that

6    they have to deal with.  But you're right, Judge; in a

7    harsh world, that's their problem; right?

8         But that's not the point of the records requests.

9    The point of the records requests is exactly the burden

10   that those people are talking about, which is to

11   maliciously and tortiously interfere with our relationships

12   and our prospective relationships and the possibility

13   that -- and these colleges that are -- not the possibility,

14   but the colleges that are going to be giving us, hopefully,

15   downloaded information in the future, and what is this

16   campaign designed to do?

17        It's to do exactly what you've identified:  To

18   overburden those colleges in such a way that it no longer

19   benefits them from a pure cost-benefit standpoint to engage

20   with Phi Theta Kappa.  Because, again, Honor Society's

21   position is if you're taking us down, we're taking you

22   down.  That's what is going on here.  At least we believe

23   it; we strongly believe it.

24        There is no reason for them to have sent out -- I

25   mean, I guess put another way, let's talk about Rule 26.

1    There's 1,500 colleges out there, give or take.  If they

2    issued -- if they gave us notice they were going to send

3    out even 1,000 or let's say 500 subpoenas to those

4    colleges, we'd probably be having a conversation with you

5    or Judge Myers about it; right?  Because we would have

6    notice.  We would have all of those things, and my guess is

7    the Court would not countenance that.

8        They would say, well, what's the scope of this?

9        And they would have to say, well, we want the

10   communications that exist between Phi Theta Kappa and these

11   colleges.

12       Well, doesn't Phi Theta Kappa already have that?

13       Yes.

14       Well, why aren't you asking Phi Theta Kappa for that

15   first?

16       Which is exactly what happened with NAVEX, because

17   that was part of what Judge Ball said.  Why aren't you

18   asking Phi Theta Kappa for this first?  Why are you going

19   to this third-party entity?  And Judge Ball said that's not

20   right.  If you want it, go ask them, but I'm going to put

21   some guardrails around it.  It's only public complaints,

22   not private complaints, we're not going to deal with that.

23       So what is it that they turn around and do?  They go

24   and they do a complete end run around it, no due process,

25   no notice, none of that kind of stuff.

1          And that's what's so I think evidentiary of the

2     malice behind what it is they're doing.  There's a host of

3     other reasons that go to show it, too.

4          THE COURT:  I mean, that was one of the questions I

5     just wrote down here.

6          MR. POLAK:  Okay.

7          THE COURT:  They could have submitted an

8     interrogatory or request for production of documents to Phi

9     Theta Kappa asking them to tell us what community colleges

10    you've dealt with, and give us copies of all the

11    correspondence.  And I know they might be broad and

12    objections to them, but then there will be an opportunity

13    to meet and confer --

14         MR. POLAK:  Not only could they have done it, they

15    did.  We tendered for the Court examples of our Rule 34

16    requests -- I'm sorry -- their Rule 34 request to us.  And,

17    yeah, there were objections, but they've never pursued

18    them.  They've never said you didn't give us enough of the

19    communications with the community colleges.  They've never

20    pursued that, and that's what's I would say baffling.  I

21    would say instead what makes all this so much more

22    suspicious is that they knew there was a process.

23          There's an existing lawsuit in place, but what did

24    they do?  They got stymied on the NAVEX subpoena.  Judge

25    Ball set out some very clear rules.  Judge Ball leaves the

1    bench.  Executives, not lawyers, executives at Honor

2    Society then make the decision, you know what, we're not

3    going to tell our lawyers, because they might tell us no.

4    We know that's what happened.

5        So what do they do?  They go ahead and they do it

6    anyway.  They do it anyway, and then apparently once they

7    talked with their lawyers -- I'm not going to assume what

8    those conversations were, but we do know this.  After we

9    complained to their lawyers, the survey got terminated.

10   The survey, or the offending part of the survey, was

11   terminated fairly quickly.

12       And so, you know, I guess when you go back and look

13   at that in the bigger context of things, none of this looks

14   right.  There is something inherently wrong about a company

15   going and sending out that volume of communications

16   repeatedly to the people who matter most to our

17   organization, not because there's a legitimate competitive

18   interest in doing so, but because what they want to do is

19   use the records requests for two purposes:  To drive wedges

20   between us and our most trusted partners and most needed

21   partners; as well as to gain information that they could

22   then use for step two, which is this offensive, misleading,

23   and in some ways false survey they have issued.

24       The two things work hand in hand, but what is the

25   goal?  The goal is to attack our relationships with our

1  colleges and to attack our reputation with our student

2  members, and just because we had the audacity of suing them

3  for creating confusion in the marketplace.  There are

4  literally hundreds of examples in our documents and their

5  own documents showing that because of what they were doing,

6  students were confused.  Students were joining their

7  organization thinking that they were joining ours.  That is

8  basic trademark 101 when that happens, and they don't want

9  to stop.

10       They don't want to stop what they're doing.  And

11  that's what we were trying to get the thing settled for,

12  was to get them to stop doing it, but we couldn't get it

13  over the hump.  Fine.

14       But the next thing you don't do is then start trying

15  to tear down your opponent's business in litigation and

16  outside of litigation.  That's what tortious interference

17  claims are there for, Judge, and you know that.  I don't

18  have to tell you things that I know you already know.

19       THE COURT:  Thank you, Mr. Polak.  We're going to

20  take a 15-minute break, and then I'll hear from the other

21  side.

22       MR. POLAK:  Thank you, Judge.

23       MS. SUMMERS:  All rise.

24            (A brief recess was taken.)

25       MS. SUMMERS:  All rise.

1          THE COURT:  You may be seated.

2          Before I hear from you, Mr. -- I know you're not

3    Linke, but you've got the same name.  First name, Daniel --

4          MR. NEWMAN:  My name is Derek Newman.

5          THE COURT:  Derek Newman.

6          Let me ask, Mr. Polak, this question here --

7          MR. POLAK:  Yes, sir.

8          THE COURT:  Huh-huh, you can stand there as long as

9    you talk into the mike.

10          You mentioned these 62,000 pages that you've

11   received so far, and I had intended to ask the question

12   with those documents and the others that may come in, with

13   the existing discovery order that's in place by Judge

14   Myers, the August deadline, do you think that that -- will

15   that deadline -- knowing what you know about what you've

16   received and what you might receive, would that deadline --

17   would that give you adequate time to complete discovery?

18          MR. POLAK:  No question.  We weren't really in

19   support of the last extension.  We thought we had plenty of

20   time under the order.  The reason why the extension was

21   given had less to do with discovery time, had more to do

22   with the expert deadline that was then scheduled for

23   March 15th.  We were ready to go with our experts, but I

24   think the defendants were not.

25          And so but the answer to your question is, yes, we

1    can get it done.  I might just put a little side note on

2    that.  If we get what we've asked for on the expedited

3    discovery, whether we get it in a week, two weeks,

4    whenever, and it's a complete set, I don't know that we're

5    going to need anything else.

6         Now, I know the other side has asked for reciprocal

7    discovery.  You might remember in our papers we said, look,

8    we get the whole goose-gander thing.  But this goose, Phi

9    Theta Kappa, we laid it out for the Court exactly what it

10   is that we wanted.  It was very narrowly tailored to these

11   issues, and we don't have the benefit of that.

12        So while it is that -- I think certainly for the

13   expedited procedures, I don't know that that reciprocity or

14   that mutualness exists here, because we don't know what it

15   is that they're asking for.  But even if they were to ask

16   us for it, we'll give them whatever it is the Court is

17   inclined to order that we produce.  But I don't see under

18   any circumstance that we would not be able to get this done

19   under the current schedule.

20        THE COURT:  Okay.  And one final question since you

21   mentioned the extension of time on the experts.  Are these

22   experts on -- I haven't looked at the designations -- well,

23   and they're not filed, anyway.

24        MR. POLAK:  Right.

25        THE COURT:  What type of experts are we talking

1    about?  Persons who are in trademark or what other types of

2    experts are there?  What experts do we have that you all

3    have designated so far?

4        MR. POLAK:  Sure.  We haven't designated any yet.

5    We were ready to go.  But generally speaking, I don't want

6    to give too much away since we're not there yet.  But you

7    typically in these cases have liability experts and you

8    have damages experts.

9        THE COURT:  Okay.

10        MR. POLAK:  And liability experts are the kind of

11    people that you've already referred to, which are those

12    people who go and do consumer surveys to test out, you

13    know, do you have secondary meaning in your trademarks?  Is

14    there a likelihood of confusion based on a bigger survey?

15        We already have instances, plenty of instances, of

16    actual confusion.  But it's not uncommon in these cases to

17    have an expert who comes in and says, well, I'm going to go

18    ahead and survey the market to see if there is consumer

19    confusion in that survey laboratory that they do.

20        And then we also have damages claims that are

21    disgorged profit.  We also have a damages claim that

22    their -- their activities even before here were --

23    basically created a damage across the entire market for

24    honor societies.  And that we felt that, because our

25    membership numbers have been going down, anyway.  Because

1    of a survey we did of people who were not joining us, and

2    we did the same survey, like, back in 2005.  But the survey

3    that we did here in 2022 or 2021, we asked these people,

4    why are you not joining Phi Theta Kappa?  Thirty percent of

5    the people who responded said, well, because we think it's

6    a scam.  We think the honor societies are scams.

7         We did this same poll back in 2005 before these guys

8    were in the market, not a single word about Phi Theta Kappa

9    being a scam.  And so we think that the activities -- just

10   the mere existence of Honor Society doing what they do has

11   caused damage, so that is an expert damage -- that's

12   probably an expert that we're going to have as well.

13        THE COURT:  Okay.

14        MR. POLAK:  But it might be that we have to go and

15   do some additional expert work here, but based on what

16   we're talking about here, like Mr. Wallace was saying, that

17   may not be necessary.  And even if it is necessary, I'm

18   pretty sure we can get it done by the deadline we currently

19   have.

20        THE COURT:  Okay.  Thank you.  And when is your

21   existing expert deadline?

22        MR. WALLACE:  June.

23        MR. POLAK:  It was 60 days, so it was March, April,

24   May.  It's supposed to be May 15th.

25        THE COURT:  Okay.  All right.  Thank you.

```
 1            I'll now hear from you.  I know you've been waiting.
 2            MR. NEWMAN:  I have, Your Honor.  Thank you.
 3            So I'll start with the motion to supplement the
 4   pleading; the Court should deny that for two reasons.
 5   First, because a motion to supplement requires that the
 6   plaintiff show that the claims are related to the initial
 7   claims filed in their original complaint, and here they are
 8   not.
 9            And I listened carefully when PTK spoke to Your
10   Honor and indicated that they're at issue, because the
11   parties are competitors.  And he focused on our papers
12   where we say the parties are competitors; that's certainly
13   not in dispute.  But the tortious interference claim is not
14   an unfair competition claim.  If it were an unfair
15   competition claim, it may or may not relate to the original
16   complaint.  But tortious interference has nothing to do
17   with trademark infringement.  It's a completely separate
18   type of claim that is alleging that somebody -- in this
19   case, Honor Society -- interfered with the contract.  So
20   whether the parties are competitors or not, it's irrelevant
21   to the analysis.  Specifically, the tortious interference
22   claim does not relate to the intellectual property claims.
23   The Court should deny it on that basis.
24            THE COURT:  Let me ask you this question.  If the
25   Court denied it and told them you need to bring your
```

1    separate action in a separate complaint.  They do that; it

2    is filed.  They pay whatever the filing fee is, they file

3    it.  It is filed here in the Southern District of

4    Mississippi.  They will have to put on the civil cover

5    sheet that there is a like or related case in some way.

6         Our local rules, internal or otherwise, sort of

7    suggest that a like or related case ought to be handled by

8    the judge who has the related case.  And I suspect the

9    parties being the same and all of that, I don't think

10   there's a broad leap to us determining on the inside here

11   it's like or related, and if that's the case, it comes back

12   here.

13        Then I think there might be a motion filed by the

14   parties.  Judge, you ought to consolidate that case with

15   this one, because we don't want to have to try these issues

16   separately, to be before you for another three years or two

17   years or one year even, in dealing with the intentional

18   interference case.

19        So why does -- why shouldn't the Court yield to

20   efficiency in that instance?

21        MR. NEWMAN:  Your Honor, I don't think that claim

22   would be filed in this court.  It's a claim under state

23   law.  And in order to qualify for federal court under

24   diversity, the plaintiff has to show that there's $75,000

25   worth of damages, but here --

1          THE COURT:  They have to claim more than 75,000.  I

2    mean, they'll have to claim it.  They don't have to prove

3    it in the initial complaint; right?

4          MR. NEWMAN:  Your Honor's correct, but it needs to

5    be plausible.  And here the plaintiff hasn't identified any

6    contract that's been breached, any customer that's been

7    lost, so I don't know that it could, in good faith, claim

8    $75,000 or more in controversy.  So I think that claim

9    would be in state court.  It would not be before Your

10   Honor.

11         THE COURT:  But that would be on a motion to dismiss

12   or a motion to remand, wouldn't it?  That would be a motion

13   to dismiss, because presumably they will file it here.

14   They will claim they have more than $75,000 in damages.

15   They will say our complaint survives Rule 8 at least.  It

16   may not -- you will say it doesn't survive Rule 12, and the

17   Court will have to deal with that.

18         But as long as they claim $75,000, they don't have

19   to prove anything; correct?  All they have to do is claim

20   $75,000 or more, and that gives them -- assuming all

21   diversity things are there, people of different states, and

22   I don't think there's a disagreement with respect to that.

23         Then that's enough to at least keep it here in this

24   Court; right?

25         MR. NEWMAN:  Well, Your Honor, under *Iqbal* and

1    *Twombly*, the plaintiff is required to plead more than mere

2    conclusions, and there are no facts that indicate that the

3    plaintiff suffered $75,000 or more in damages.  And so if

4    the plaintiff is complying with its pleading obligation, I

5    don't think that it can properly plead $75,000 or more in

6    damages, and it will be filed in state court.

7         THE COURT:  If they're working on an expert right

8    now that's going to be talking about damages, and if they

9    were to wait until after May 15th to file that suit, that

10   would be plausible at least; right?

11        Would you disagree that that would be -- we deal

12   with *Iqbal* and *Twombly* issues all the time, and we don't

13   grant them around here, the motions to dismiss.

14        MR. NEWMAN:  I understood, Your Honor, that the

15   plaintiff was referring to an expert with respect to their

16   trademark claims, not their tortious interference claims.

17        THE COURT:  Okay.  Okay.

18        MR. NEWMAN:  But that's the answer to the Court's

19   question.

20        THE COURT:  Okay.  All right.

21        MR. NEWMAN:  The second reason that the Court should

22   deny the motion to supplement is because it is futile.  The

23   plaintiff does not properly plead a claim for tortious

24   interference with business or interference with business

25   advantage.

1          In fact, PTK here today conceded that it lacks a

2    claim for tortious interference.  Counsel conceded that

3    there haven't been any contracts that have been terminated,

4    and so the third claim that they propose to add, counsel

5    concedes lacks merit.  It should be dismissed.

6          The second claim, the fourth claim for relief, is

7    with interference of business advantage.  And the

8    difference between tortious interference with contract and

9    interference with business advantage is pretty simple.

10   Tortious interference with a contract involves parties that

11   actually have a contract.  So, for example, if Honor

12   Society has a contract with a college and PTK has a

13   contract with a college, and Honor Society causes a breach

14   and that contract is actually breached, that would be

15   tortious interference with a contract.

16         Interference with business advantage is one step

17   removed.  In that case you have, for example, PTK

18   negotiating a contract with a community college, and then

19   Honor Society swoops in and through wrongful action causes

20   that community colleges never to enter into the contract.

21   Thus, PTK loses a customer.

22         But even under interference with business advantage,

23   the plaintiff is required to show a lost customer.  Here

24   the plaintiff hasn't shown any lost customers.  I don't

25   believe they've pleaded that, and so PTK concedes that its

1    proposed third claim for relief lacks merit.

2        And under the fourth claim for relief, because they

3    don't plead a lost customer that, too, lacks merit, and the

4    amendment would be futile.

5        THE COURT:  Is their customer base only limited to

6    the community colleges, or can they argue that a customer

7    base is a potential student or a current alumni or either a

8    person who is a member?

9        And, again, they're getting these documents now.

10   And if they were to reach out to a specific student, and

11   that student says, yeah, I did not apply for PTK because I

12   had gotten this specific stuff from Honor Society.

13       And PTK says, well, what are your relevant

14   qualifications?  This person says, well, I'm -- the records

15   show and they have those records now, because the college

16   has submitted the records in response to the Freedom of

17   Information records request.  It shows that the student is

18   4.0 student at that college, and based on that, Phi Theta

19   Kappa says, well, you would have been eligible to be a

20   member, compete for our scholarships.  And now you're not,

21   because you've missed the deadline or whatever.

22       So who is the customer here?  Is the customer only

23   the community colleges, or can the customer, the lost

24   customer, be the individual students as well?

25       MR. NEWMAN:  Your Honor, the customer could

1    certainly be a student.  But PTK can't merely speculate

2    that a student is unlikely to join PTK because of Honor

3    Society's actions.  They actually have to have facts to

4    support their Rule 11 obligation under the pleading.

5          THE COURT:  Do they have to have facts to do Rule 8?

6          MR. NEWMAN:  Absolutely.  In order to plead a claim

7    for interference with business advantage, the plaintiff has

8    to show a lost customer.  Just one perhaps, but they have

9    to show a lost customer.  And speculation that they may

10   have a lost customer in the future is insufficient.

11   Without pleading a lost customer, the pleading fails.  And

12   the Court should not grant the motion to amend, because

13   it's futile.

14         THE COURT:  Okay.

15         MR. NEWMAN:  I'll speak for a minute about Honor

16   Society Foundation.  The claim against Honor Society

17   Foundation likewise is made without factual basis.  So PTK

18   suggests that because Honor Society sent an email from an

19   email address that is HonorSocietyFoundation@Gmail.com,

20   that that means Honor Society Foundation has liability in

21   this case.  It does not.  They're referring to merely an

22   email address, not any actions or activities by the

23   foundation.  And because the only basis for naming the

24   foundation is an email address, there is no claim against

25   Honor Society Foundation, and a pleading against it would

1  be futile as well.

2      THE COURT:  Isn't the tie between Honor Foundation

3  and Honor Society Mr. Asari himself?  Isn't Mr. Asari

4  involved in both entities?

5      MR. NEWMAN:  I don't know, Your Honor.  I know that

6  Mr. Asari is an employee of a business that Mr. Moradian

7  owns.  I'm not sure whether he has involvement in the

8  foundation.  I know he has involvement in HonorSociety.Org,

9  Inc.

10      THE COURT:  But, again, sometimes persons file

11  complaints that might be on the line and discover -- this

12  Court generally allows discovery.  I mean, you know,

13  motions to dismiss are not, you know, ruled on favorably.

14      So if I give you an opportunity to file your motion

15  to dismiss, I'll give the other side -- give me your best

16  pleading.  This is your one last chance to plead your best

17  case if I agree with the defendants here that that case

18  ought to be dismissed.  And then they come back with

19  information that ties it to discovery that they would have

20  received in the underlying action, then would the Court be

21  permitted to allow the case to go forward?

22      MR. NEWMAN:  Based upon what I heard today from

23  PTK's argument, its only basis for a complaint against the

24  foundation is an email address, and I would submit under

25  Rule 11 that's insufficient to name that party.

1        If in discovery they learn that the foundation had

2   something to do with the acts they complain are wrongful,

3   at that point, they can make a motion to amend.  But at

4   this stage, they don't have those facts.  And they never

5   will, because I understand that Honor Society Foundation

6   did not have anything to do with what they're alleging.  So

7   without a basis to name the foundation, the pleading would

8   be futile.

9        THE COURT:  Would they be permitted to ask the

10  question of why Honor Society Foundation sent the email?

11       MR. NEWMAN:  Absolutely.  That's relevant to the

12  claim against HonorSociety.Org, Inc., and in deposition,

13  that's a perfectly fine question.  Why was the email

14  address HonorSocietyFoundation@Gmail.com?  And there would

15  be no objection, and an answer would be given.

16       I'll turn next to the TRO.  In our papers, we laid

17  out several independent reasons why the TRO should be

18  denied.  Let me focus on the three most compelling.  I'll

19  summarize them:

20       First, I've already began this discussion, PTK does

21  not identify a lost contract or a lost customer.

22       Second, Honor Society had the absolute right to send

23  out surveys and public records requests.

24       And, third, no irreparable harm was suffered.

25       I'll start with the first point.  I think the most

1    striking thing that I've found from PTK's papers, in both

2    its opening brief and especially its reply to us and even

3    today in oral argument is that PTK has not identified a

4    single customer that it lost.  It concedes that no contract

5    was terminated.  Okay.  But it claims it still would like

6    to allege interference with business advantage, and that

7    under Fifth Circuit precedent, and I'll cite a couple of

8    them.

9         *Par Industries versus Target Container* and *Cenac*

10   *versus Murray*, that claim requires that there is actually a

11   lost customer, not speculation, but a lost customer.

12   Because speculation wouldn't be an interference with

13   business advantage claim.  That would be perhaps an

14   anticipatory claim, and there is no Mississippi law for

15   anticipatory interference with business advantage.

16        And if there was, it wouldn't be allowed in this

17   court, because this is a federal court where there has to

18   be a case in controversy to give rise to standing.  There

19   has to be an actual injury, and without a lost customer,

20   there is no actual injury.  The initial threshold element

21   that PTK must show is a lost customer.  If it doesn't have

22   one, it's not allowed into the courthouse doors, and if it

23   is not allowed in the courthouse doors, it can't make a

24   motion for TRO.

25        Its motion for TRO today is made on the idea that

 1    this complaint is going to be allowed, and that it can then

 2    make a motion.  But with respect to likelihood of success

 3    on the merits, if it can't show a lost customer that is

 4    already lost -- it's not just merely speculating, it's not

 5    mere conjecture, but that it has actually lost a customer.

 6    If it can't show that, then it has no likelihood of success

 7    on the merits.

 8         We point this out in our papers.  I expected in

 9    reply that there would be some customer that they identify.

10    Really I was thinking that they might make something up,

11    some argument; yeah, we lost a customer.  But PTK doesn't

12    even make that attempt, and by not making that attempt, it

13    cannot succeed on the merits.

14         Its claim is not ripe.  It suggests that students

15    are not going to do business with it, and that colleges are

16    going to terminate contracts, speculation and conjecture.

17    But that claim is not ripe until somebody actually

18    terminates a contract, so a customer actually doesn't do

19    business with it.

20         Now, PTK notes that it received calls from 25

21    different colleges.  Their declaration indicates that those

22    colleges were resentful of public records requests.  The

23    reason why PTK received those calls is because under all

24    applicable public records statutes, the Federal Freedom of

25    Information Act also known as FOIA, the state records

1    requests, the public entities that receive the request are

2    required to give notice to any party whose communications

3    would be subject to the request.

4         So these 25 colleges contacted PTK not to express

5    resentment or that they were upset, but rather because

6    they're under a statutory duty to notify PTK.  And I would

7    suggest that the Court shouldn't find credibility in that

8    testimony about the schools being resentful, because if a

9    school was resentful, then the declaration would have

10   stated I heard from this college and this person, and this

11   person expressed that they're resentful and here's what

12   they said.  That would be hearsay not normally admissible,

13   sometimes considered in the context of a TRO or preliminary

14   injunction, but here there is no such testimony.  It's

15   merely conjecture that the schools are resentful.

16        And I would also suggest no school is resentful.

17   The public institutions throughout the country receive

18   public records request on a daily basis.  Most of them have

19   entire departments devoted to dealing with them.  They have

20   lawyers on staff that analyze these things.  Colleges have

21   compliance officers familiar with FERPA.  They get these

22   requests all the time.  It's a part of doing business.

23   It's nothing they would resent.  But what's most

24   noticeable --

25        THE COURT:  Let me ask you this.  When was the first

1    public records request sent in this litigation?

2        MR. NEWMAN:  Honor Society has been sending public

3    records requests since its first day in business years ago,

4    ten years ago.  Regularly sends public records requests and

5    is very familiar with the way of doing that.

6        THE COURT:  Did you find that the responses

7    received -- because presumably then since it does it all

8    the time, during this litigation, then, they were doing it

9    for the last two years.  Was the -- did you find that the

10   responses received from the various institutions were

11   responsive to existing discovery that had been propounded

12   by Phi Theta Kappa?

13       MR. NEWMAN:  Your Honor, two responses.  First, I

14   would like to take a step back and note that Honor Society

15   sends out public records requests not for discovery in this

16   case, but for competitive reasons.  And so those would not

17   all relate to discovery in this matter.

18       And then the second response to Your Honor's

19   question about whether they overlap with discovery

20   responses is just frankly I don't know.  And the reason I

21   don't know is because my client is engaging in what it has

22   a right to do, send out public records requests, as it has

23   done for 12 years for competitive purposes.  I'm not

24   involved in that process, and I don't expect my client to

25   report to me about everything they do in their business.

1          THE COURT:  So what if Phi Theta -- trust me, I

2    haven't seen the discovery requests, and I don't

3    necessarily want to because I leave that to the magistrate

4    judge side of things.  But if there were a discovery --

5    discovery had been propounded or request for production of

6    documents saying please provide to me any documents you've

7    received from any community colleges during the course of

8    this litigation.  I presume there may be an objection to

9    that by the other side.

10         MR. NEWMAN:  I would expect.

11         THE COURT:  Right.  I would expect that there might

12   be an objection that says it's overbroad, da, da, da, da.

13   The parties have a duty under Rule 26 to meet and confer,

14   and to the extent they couldn't agree on it, they turned to

15   the magistrate judge.  The other side says, you know, a

16   motion to compel.  They meet and confer before that motion

17   is heard by the magistrate judge.  That would give Honor

18   Society the opportunity to tell why any previous response

19   that it might have received to any of its requests for

20   records during the course of litigation would not be

21   responsive to the request for production or otherwise

22   should not be turned over.

23         So that would all involve the discovery issues in

24   these cases.  So, you know, again, I guess the question is

25   the fact that you say that Honor Society engages in this

```
 1   all the time and I -- again, I haven't seen the discovery
 2   requests, but it's your suggestion that anything that might
 3   have been responsive to the records requests would not be
 4   responsive to the discovery that's been propounded in this
 5   case?
 6         MR. NEWMAN:  Two answers, Your Honor.  First, I
 7   don't know.  I haven't seen all the records requests.  My
 8   understanding is that Honor Society has sent records
 9   requests for 12 years and does so on a weekly basis.  Long
10   before this lawsuit ever began, and so I don't know.
11         THE COURT:  And throughout this lawsuit apparently?
12         MR. NEWMAN:  Of course.  That's part of the way they
13   do business.  It's a competitive advantage they have is
14   they're very familiar with the public records statutes and
15   how to get information to help them in their business.
16   They did it long before this lawsuit.  They did it during
17   this lawsuit.  They'll do it after this lawsuit.
18         THE COURT:  And presumably they are very in tune to
19   what the rules of discovery say during the course of
20   litigation?
21         MR. NEWMAN:  That's a good point, Your Honor,
22   because the records that our client is seeking aren't for
23   the purposes of this litigation --
24         THE COURT:  Well, but that would be a matter to take
25   up --
```

1          MR. NEWMAN:  And because of that, they would never

2     serve -- we would never serve a subpoena on PTK asking for

3     this information, because it's not relevant to this

4     litigation.

5          THE COURT:  No, you would not have to serve a

6     subpoena.  All you'd have to do is serve discovery on PTK;

7     right?

8          MR. NEWMAN:  Correct, Your Honor.  So we would never

9     serve a request for production of documents on PTK asking

10    for information that's overbroad for purposes of the

11    litigation.  That's not why Honor Society sends out public

12    records requests.  They've been doing it forever, and it's

13    to gain a competitive advantage freely under their right

14    under the law.

15         And so it just strikes me as disingenuous for PTK to

16    say we could have gotten it in discovery.  We could not

17    have gotten it in discovery.  When I say "we," I shouldn't

18    say "we," I should say my client, because I'm not involved

19    in that.  My client is not entitled to information in

20    discovery for competitive purposes that don't relate to the

21    lawsuit.  For that, my client turns to public records

22    requests, which it has every right to send.

23         THE COURT:  But your client is entitled to certain

24    information under the rules of discovery.

25         MR. NEWMAN:  Yes, Your Honor.

```
 1          THE COURT:  And that may or may not be the same

 2   information that you would get from a public records

 3   request for your purposes.  I think I hear you saying we

 4   did the public records requests for the purpose of helping

 5   us with our client survey results or whatever else, our

 6   marketing or whatever.

 7          But you were not -- they were not foreclosed in

 8   trying to get that same information from Phi Theta Kappa

 9   through a discovery request; right?

10          MR. NEWMAN:  If the Court is asking whether records

11   requests and discovery may or may not overlap, my answer is

12   I don't know; it's possible.

13          PTK also objects to the records requests, because

14   they say they don't get advanced notice like they would in

15   discovery.  Two responses to that.  First, it's irrelevant

16   because the records request is a different procedure than a

17   discovery device.  But they do get advanced notice, because

18   the records request requires the public institutions to

19   give the notice and the opportunity to object, which is why

20   PTK received the calls from the 25 colleges.

21          THE COURT:  But what if the college does not comply

22   with the rule?  I mean, it's on the college.  I mean, you

23   know, what if the college does not comply with what the law

24   requires?

25          The law in some states, because we're talking about
```

 1    community colleges in all 50 states.  Are we talking about

 2    any community colleges outside of the country?  I don't

 3    know; are we?  Are we?  I'm asking.

 4         MR. NEWMAN:  I don't know, Your Honor.  I don't

 5    think so.

 6         THE COURT:  Okay.

 7         MR. NEWMAN:  But to the extent that the colleges do

 8    not comply with their obligations under the law, I'm sure

 9    there's a remedy, but that's far outside the scope of what

10    we're discussing here.  And I don't see any basis for the

11    claim that the colleges are just going to disregard their

12    obligation to provide notice.  In fact, the testimony --

13         THE COURT:  What if the state law in that state does

14    not require notice?

15         MR. NEWMAN:  From what we've seen, they all do.  And

16    based upon the testimony of PTK's witness, notice has been

17    given.  She's receiving calls from the colleges.

18         Now, counsel spoke here and had a colloquy about

19    schools asking the PTK witness, how many more records are

20    we going to receive and all these type of hypotheticals.

21    Nowhere in the record do we see those statements.  Counsel

22    made that up.  The Court should not consider that argument,

23    because that's not in the declaration and never happened.

24         THE COURT:  And even if it were in Ms. Tincher's

25    declaration, I mean, it would still be an out-of-court

1    statement; right?  You contend that it's --

2        MR. NEWMAN:  Yes, Your Honor.

3        THE COURT:  -- still hearsay; right?

4        MR. NEWMAN:  Yes.  And then I want to make a final

5    point about the fact that PTK has failed to identify a lost

6    customer and hasn't met the elements of tortious

7    interference.  Counsel spoke about misleading speech, and

8    there was a lot of talk about misleading speech and cite to

9    a case about how misleading speech is not protected.

10        Misleading speech is not an element for tortious

11    interference, and I haven't seen any cases indicating that

12    it's a basis for tortious interference.  Misleading speech

13    is relevant to false advertising and some other claims for

14    relief.  This motion for TRO is not based on a false

15    advertising claim for relief, so the argument about how

16    misleading speech is not lawful is irrelevant to the

17    analysis here.

18        THE COURT:  Does it go toward malice?

19        MR. NEWMAN:  Excuse me?

20        THE COURT:  Would misleading go toward malice to

21    prove the either intentional interference of contract or

22    the intentional interference of induce -- whatever the

23    other count might be, would it go to sort of infer malice

24    on the part of Honor Society?

25        MR. NEWMAN:  I don't think it would.  So when

1  looking at malice, you're looking at whether the defendant

2  had an unlawful purpose, and if they did, whether there was

3  malice associated with it.  And so if they can show an

4  unlawful purpose, then they have to prove that the

5  defendant intended to cause harm.

6        The fact that speech is misleading or not doesn't

7  relate to what their intent is.  It might go to another

8  claim they have for relief like false advertising, but

9  that's not what they're suing on here.

10        THE COURT:  Why would it not go to show their

11  malicious intent?

12        MR. NEWMAN:  Because whether a statement is

13  misleading --

14        THE COURT:  Suppose it's --

15        MR. NEWMAN:  -- a lot of times --

16        THE COURT:  -- suppose it's intentionally

17  misleading, doesn't that go to show that -- couldn't, not

18  does it.  But couldn't it go to show?

19        I mean, I'm thinking about your Rule 8 and your

20  Rule 12.  Again, it might state a claim, and you're allowed

21  at the end of the day discovery on those particular points.

22  And if it doesn't meet it at that point, motion for summary

23  judgment.  But even then if it's a close question, this

24  Court generally allows that to be decided by the fact

25  finder, whoever that might be.

1          So couldn't malice at least -- couldn't misleading

2     statements be used to help a party prove malice?

3          MR. NEWMAN:  I don't think so, Your Honor, and

4     here's why.  We had less than three days to get our papers

5     together, and then when we finished, we did other legal

6     research because we ran out of time.  And we searched to

7     see whether misleading speech was involved in any tortious

8     interference cases.  We found none, which is why I suggest

9     that the citations to misleading speech is not a violation

10    of the First Amendment.

11         I suggest that it's irrelevant because in no other

12    cases is misleading speech involved in tortious

13    interference cases.  And so I don't think it goes towards

14    malice, because if so, you'd see in jurisprudence --

15         THE COURT:  Is misleading speech protected by the

16    First Amendment?

17         MR. NEWMAN:  It depends in which context.  So to the

18    extent that there's a false advertising claim and it

19    alleges that there's misleading advertising, and that the

20    plaintiff suffered harm, then the plaintiff can recover

21    damages at trial.  And the misleading speech isn't

22    protected by the Constitution.

23         But in the context of a TRO, the misleading speech

24    is protected, because a court is not authorized to issue a

25    prior restraint on that speech.  It can award damages

1    later, but it can't stop the speech midway through

2    litigation because that would be an unlawful prior

3    restraint.  So it would be protected at this stage, but it

4    certainly would not be protected if they proved the false

5    advertisement based on misleading speech and that the

6    plaintiff suffered harm.  At trial, they would recover for

7    that.

8         THE COURT:  Now, if I understand what I've been told

9    through the papers, Honor Society has agreed to stop those

10   questions that are -- I don't know if it's what the parties

11   believe is misleading or what one side, but Honor Society

12   said, okay, I'm going to put a pause in it.  We're not

13   sending out anymore of these questions; is that right?

14        MR. NEWMAN:  Yes, Your Honor, and the Court could

15   find that in Mike Moradian's declaration.

16        Counsel today has suggested the language in the

17   declaration isn't strong enough.  To the extent the Court

18   believes that, the Court could swear in Mike Moradian right

19   now and ask.  But that survey that was sent out with the

20   five objectionable statements, which are not misleading

21   but --

22        THE COURT:  But you've agreed to not send out

23   anymore --

24        MR. NEWMAN:  And the reason why is because Honor

25   Society sent a onetime survey out.  It sends lots of

1    surveys out, has for its entire business.  Sends a onetime

2    survey to a lot of people, gets responses, and then is

3    done.  It doesn't need to send the survey again.

4         So by the time we contacted Honor Society and asked

5    about that survey, because we learned about it from

6    counsel, we were told, like, yeah, we sent that survey out.

7    And we're not going to send out another one, because we

8    have all the information that we need.  So in the

9    declaration of Mike Moradian, he indicates that those

10   survey questions will not be sent out again.

11        I think the declaration is strong enough on that

12   point, and the Fifth Circuit has found that if the conduct

13   has ceased that a TRO or preliminary injunction is

14   inappropriate.  I think the declaration is clear about

15   that.  But if Your Honor thinks it's not, Your Honor could

16   swear in Mike Moradian right now and ask the question

17   directly.

18        THE COURT:  The date of those survey questions, what

19   date were those survey questions sent out; do you know?

20        MR. NEWMAN:  Your Honor, I think early March.

21        THE COURT:  Early March, which would have been

22   sometime during the litigation in this case; correct?

23        MR. NEWMAN:  Of course.  The case has been pending

24   for two years.

25        THE COURT:  Right.  Right.  It was not sent out

1    before March?

2         MR. NEWMAN:  Those particular questions were not,

3    but lots of other surveys were.

4         THE COURT:  But those questions -- information about

5    those questions were available to Honor Society before

6    March 6th, right, or March 4th?

7         MR. NEWMAN:  I don't know the answer to that

8    question.

9         THE COURT:  Okay.

10        MR. NEWMAN:  I think it is entirely possible that

11   Honor Society sent those questions after learning

12   information in depositions that weren't protected as

13   confidential or attorneys eyes only, so that might have

14   spurred that survey.  But the survey was a onetime deal as

15   many of their surveys are.  They received the results from

16   that survey; they are done.

17        THE COURT:  Right.  Some of the information there,

18   it appears to me from reading the papers, probably came at

19   the time that Dr. Tincher-Ladner's deposition was taken,

20   and I think we've already agreed or been told that

21   deposition was sometime in February.

22        MR. NEWMAN:  Yes, Your Honor.

23        THE COURT:  So, theoretically, the survey questions,

24   at least on the points that she was questioned on in her

25   deposition, could have gone out before March 4th?

1         MR. NEWMAN:  Yes, Your Honor.

2         THE COURT:  So the survey questions with respect to

3    these issues went out on or about March 4th.  Again, these

4    survey questions could have never been submitted during all

5    the times at which Honor Society was previously sending out

6    other requests as it does on its usual basis then?

7         MR. NEWMAN:  Assuming that Honor Society didn't have

8    the information that formed the basis of those surveys,

9    then I suppose it could not have sent the surveys before

10   that date.

11        THE COURT:  Okay.  All right.

12        MR. NEWMAN:  So, Your Honor, I just spoke about why

13   the plaintiff isn't going to show a likelihood of success.

14   The most glaring is they haven't identified a single lost

15   customer, so they cannot state a claim for relief, and

16   they're not entitled to a --

17        THE REPORTER:  Slow down a little, please.

18        MR. NEWMAN:  Excuse me?

19        THE COURT:  She said, "slow down."

20        MR. NEWMAN:  I'm so sorry.

21        THE COURT:  No, that's fine.  I'm sorry.

22        MR. NEWMAN:  They're not entitled to a TRO, because

23   they cannot show a likelihood of success on the merits.  So

24   I'd like to move to my second point that I find --

25        THE COURT:  Well, let me ask --

1          MR. NEWMAN:  Yeah.

2          THE COURT:  -- you, if they're not entitled to the

3     TRO --

4          MR. NEWMAN:  Yeah.

5          THE COURT:  -- and part of the reason why they're

6     not entitled to the TRO is because you contend Mr. Moradian

7     has said we've already collected all the information we

8     need to.  There's no need for us to send out this survey

9     request again.  That's no concession I guess on Honor

10    Society's part that what you submitted, what went out

11    should never have gone out; right?

12         MR. NEWMAN:  Your Honor, we believe -- and I'll

13    speak to it in a moment -- that Honor Society was perfectly

14    entitled to send that survey, and there was nothing

15    misleading about it.

16         THE COURT:  Okay.  And so now that you've decided

17    not to send it out anymore, is there anything wrong with

18    the Court, either through TRO language or protective order

19    language, require that you not --

20         MR. NEWMAN:  Yes, Your Honor.

21         THE COURT:  -- send it out again?

22         MR. NEWMAN:  Two things wrong.  First, the Fifth

23    Circuit has been clear that when a party stops conduct that

24    is concerning that it becomes moot, and a TRO should not

25    issue.  So that would be wrong.

1          And then with respect to the protective order, the

2     Fifth Circuit's clear that a protective order governs

3     discovery devices.  It does not govern what happens outside

4     of discovery, and issuing that order, Your Honor, would

5     constitute an unconstitutional prior restraint.  So even

6     though Honor Society commits and will recommit that it's

7     not going to send those questions again, that doesn't mean

8     that the Court can violate law on prior restraint and issue

9     an injunction against it.

10          THE COURT:  Could the Court order you to turn over

11     all the information that are responses, that you received

12     that are responses to what you've already sent out, those

13     particular questions?

14          MR. NEWMAN:  I haven't analyzed that, but that would

15     come in the course of a discovery request being sent out,

16     documents being produced or not, a meet and confer, and a

17     motion to compel.  And we're not here today on a motion to

18     compel, so I don't know what discovery request those would

19     relate to.  I don't know whether the plaintiff would be

20     entitled to it.

21          But I will tell the Court this:  We have nothing to

22     hide.  We've been very transparent.  PTK requested several

23     documents from us that we believe are not within the scope

24     of any prior discovery request, but yet we produced the

25     documents.  We produced the documents because we want to

1    move this litigation forward, and we're transparent.

2          So last night after a lot of time gathering and

3    reviewing documents over the past week, we produced 17,000

4    documents, 62,000 pages.  Many of which are not responsive

5    to discovery requests, but which counsel informally asked

6    us to produce, and so we did.

7          So with respect to what the Court is asking me now,

8    are they entitled to certain documents, my honest answer as

9    I sit here now is I don't know.  Because we're not in the

10   context of a motion to compel, and I haven't analyzed it.

11         So I would guess that because we're transparent,

12   we'd probably produce it, but I'd have to confer with my

13   client and do the analysis to really know the answer to

14   that.

15         THE COURT:  Now, generally during this litigation,

16   the parties have had many opportunities to meet and confer,

17   which I think -- and I think you all have done it.  Meet,

18   confer, then went to the magistrate judge if you needed to,

19   that suggests to me that the parties knew about the rules

20   of discovery, Rule 26, and their obligation under the local

21   rules.  So the parties acted as if this case were

22   proceeding under the umbrella of the Rules of Civil

23   Procedure.

24         Is that a correct statement?

25         MR. NEWMAN:  This case is certainly operating under

1    the Federal Rules of Civil Procedure.  The records requests

2    and surveys are not discovery devices.  They're done for

3    competitive reasons, to gain intelligence, to provide

4    better services, to understand the market, and so they

5    don't relate to Rule 26 or the federal rules.

6         But to the extent that there's a discovery request

7    and it's valid, Honor Society will comply.  To the extent

8    we get an informal request, we may comply, as we did last

9    night, and PTK will get all the information that it needs.

10        So I'd like to move to my next point, which is

11   another compelling reason why this Court should deny the

12   motion for TRO, and that is Honor Society had the absolute

13   right to conduct public records requests and send surveys.

14        Now, what was striking to me is that the federal

15   government in every state has these public records request

16   laws, and we cite four -- four Fifth Circuit Court of

17   Appeals binding cases that held that a party has the

18   absolute right to send public records requests even when

19   it's in litigation.

20        So that's the issue before the Court, one of many,

21   but does Honor Society have the right to send these records

22   requests?  If so, PTK can't succeed on the merits of its

23   claims.

24        And then the other side is, is it appropriate to

25   issue a TRO?  And I'll cite the Fifth Circuit cases.

1    There's four of them.  They're all precedential.  It's

2    binding law that decides this matter.

3          In *Mississippi Department of Wildlife versus*

4    *Mississippi Wildlife Enforcement*, the Fifth Circuit held

5    that sending a public records request does not require a

6    legitimate purpose.  And even an intent to cause harm to an

7    opposing party in litigation still allows the party to send

8    the public records request, and that a court can't stop

9    that.

10          In *Hoover versus U.S. Department of Interior*, the

11    Fifth Circuit held that litigation is not an exception to

12    the right to send public records requests, and a party to

13    litigation may request records while litigation is pending.

14          In *Halloran versus* --

15          THE COURT:  In those cases -- I hear you.

16          In those cases, were those parties required to turn

17    over the information they received in response to those

18    records requests?  Were they required to turn it over to

19    the other party involved in the litigation?

20          MR. NEWMAN:  From my recollection of those cases,

21    that was never an issue.  The question wasn't whether they

22    were required to turn over those documents.  The question

23    was whether a party had the right to seek public records

24    requests or whether it had to send subpoenas and requests

25    for production of documents.  And the Fifth Circuit said

1  four different times a party in litigation can proceed on

2  parallel tracks: public records requests, discovery.  And

3  the public records requests aren't part of the discovery

4  process.

5      In *Halloran versus Veterans Association*, (sic) the

6  Fifth Circuit Court of Appeals said that, "Even if a party

7  is sending public records requests for less than lofty

8  purposes" -- that's a direct quote from the case; that's

9  what the Fifth Circuit said -- "Party is sending public

10  records requests for less than lofty purposes, the party

11  nonetheless has the right to send the public records

12  requests, and the court doesn't have the right to issue a

13  protective order or other order stopping the public records

14  requests."

15      In *U.S. v. Murdock*, the Fifth Circuit held that

16  "Formal discovery" -- which is what Your Honor has asked me

17  about a lot this morning -- "and public records requests

18  are independent avenues that parties have a right to take

19  in litigation."

20      So those are four cases, usually we only have one,

21  four precedents from the Fifth Circuit Court of Appeals

22  that decides this issue.  Honor Society has the absolute

23  right to send public records requests, and the Court, under

24  that precedent, is not authorized to issue a protective

25  order or a TRO.

1          There's other Fifth Circuit cases that help us.  For

2     example, in *Cooper Cameron versus U.S.*, the Fifth Circuit

3     held that when looking at the legitimacy of a public

4     records request, the motive of the party seeking the public

5     records are irrelevant.

6          So to the extent that Honor Society has a malicious

7     intent, which it does not, but to the extent that it did,

8     its motive is irrelevant.  It is still entitled to send

9     public records requests, and the Court can't bar it from

10    doing so based on a protective order or a TRO.

11         So I just cited to the Court five precedential

12    binding Fifth Circuit Court of Appeals cases.  How many

13    Fifth Circuit cases does PTK cite on this point?  Zero.

14         PTK doesn't even cite a single District Court within

15    the Fifth Circuit, because obviously the District Courts

16    have to follow the Fifth Circuit.  And since the Fifth

17    Circuit has spoken five times, no District Court has done

18    what PTK requests this Court to do:  Namely, issue an order

19    restraining Honor Society against its fundamental right to

20    send public records requests.

21         Now, I'd like to address a quick point that PTK

22    made, but I think it's outside the scope of the analysis.

23         THE COURT:  Well, let me ask you this.  You concede

24    that it was Honor Society who made the requests?

25         MR. NEWMAN:  Yes.  It wasn't David Asari acting

1    ultra vires.  It was Honor Society, and David Asari is

2    associated with Honor Society.  So, yes, Your Honor, it

3    was.

4         THE COURT:  Is Mr. Asari also associated with Honor

5    Society Foundation?

6         MR. NEWMAN:  I don't know the answer to that

7    question, Your Honor.  And I suppose that is discoverable,

8    but I don't know that as I sit here right now.

9         THE COURT:  And the only way it would be

10   discoverable is if -- I guess if Honor Society were asked

11   the question or if Honor Society Foundation were made a

12   party to the litigation; right?

13        MR. NEWMAN:  Your Honor, I don't see how the

14   foundation should be made a party, because there aren't any

15   facts that indicate it did anything.

16        But absolutely with respect to HonorSociety.Org,

17   Inc., the party I represent here today, it's a fair

18   question to ask them.  Did the foundation have anything to

19   do with this?  Why were you using that email address?

20        THE COURT:  And if they were told that the

21   foundation had something to do with it, then plausibly

22   under *Iqbal* and *Twombly* the foundation could be made a

23   party; right?

24        MR. NEWMAN:  Yes, Your Honor, after they have those

25   facts but not before that.

1          Another point that I wanted to address, and there's

2    two more points I wanted to address on this point that

3    Honor Society has the absolute right to send public records

4    requests.  Since PTK claims that there was a violation of

5    this law FERPA, and I can cite cases now, but, again, I

6    think it's outside the scope of what we're trying to

7    resolve.

8          That under FERPA, Honor Society is entitled to

9    student directories, including name and email address.

10   They are not confidential.  Any member of the public can

11   request them, and any member of the public get them.  To

12   the extent they do violate FERPA or any similar law, the

13   colleges would object and wouldn't produce the documents.

14         I don't think this is a FERPA case, but I just

15   wanted to point out that we respectfully disagree with PTK.

16   And I've read the law, and it's clear that with respect to

17   directories, some steps have to be made, but any member of

18   the public is entitled to them.

19         THE COURT:  But if there is a violation, the

20   institution itself has a right to protect the students'

21   information; right?

22         MR. NEWMAN:  The institutions have compliance

23   counsel familiar with FERPA.  They are familiar with the

24   law, they make the objection, and they don't produce

25   documents.  And then if a party requesting records has an

1    issue with that, the party requesting records can file an

2    action against the institution, but the colleges make that

3    determination based upon competent counsel who they have

4    responding to records requests.

5          It's outside the scope of what we're trying to

6    achieve here, because even if it did violate FERPA, which

7    it does not, it doesn't impact Honor Society's right to

8    send the request.  It might impact their right to receive

9    responses, but that's between Honor Society and the

10   colleges, not between Honor Society and PTK.

11         There's been a lot of repeating that Honor Society

12   didn't tell its lawyers it was sending out public records

13   requests, and it's almost been presented as a gotcha.  The

14   lawyers didn't know, so it must have been bad; and I feel

15   compelled to address that.

16         Honor Society has been sending public records

17   requests for 12 years.  They are experts at it.  They gain

18   a lot of competitive intelligence by that.  Their service

19   offerings are based a lot on what they get from records

20   requests and surveys, and they don't tell their lawyers

21   what they're doing to generate competitive information.

22   That's just -- that's not normal, and so it doesn't

23   surprise me that Honor Society didn't call us to tell us

24   they were sending these out.

25         Now, these public records requests do mention PTK; I

1    can see why they would tell us, but I'm not surprised they

2    didn't.  And I don't think the fact that I didn't know

3    about it until it was called to my attention by opposing

4    counsel, I don't think that that relates to the analysis.

5         THE COURT:  But if there were discovery requests out

6    there, again, generally the parties have about -- and I

7    know what's in the standard order, a right to do 30

8    interrogatories or so and so many requests for production

9    of documents.  I think I saw where there was an opportunity

10   for persons to do as many as 100 requests for production of

11   documents in this case I think.  I may be wrong.

12        But if there was an interrogatory out there or a

13   request for production of documents out there that would

14   have required the same information that was received

15   through the records requests to have been turned over to

16   the other side -- or, I mean, the lawyers may not have

17   known of it.  Now they do.

18        Again, doesn't it -- I understand Mr. Moradian does

19   this all the time, because that's how he does things.  But

20   under the umbrella of the court filing in this case and the

21   rules that govern this case, would not -- well, what should

22   the Court do?  Wait until the other side files a motion to

23   compel or a motion to do something, because they may

24   believe that the information -- and it may already be -- I

25   don't know if the parties have met and conferred about it.

 1          They may believe that what was sent out might be

 2     responsive to some earlier interrogatory or request for

 3     production of documents, and should I just stay back and

 4     wait for the magistrate judge to tend to any future filing

 5     on that issue?

 6          MR. NEWMAN:  Your Honor, as I stand here, I'm not

 7     prepared to respond to a motion to compel that has never

 8     been filed.

 9          It strikes me the information the Court is asking

10     about PTK might be entitled to, but I really need to think

11     through that.  I haven't analyzed it.  And if they are

12     entitled to it, they get it.

13          And as I noted, we are very transparent, and we've

14     provided a lot of documents that we do not believe fell

15     within the scope of prior document requests.  But we've

16     provided them, because they were requested.  And I think we

17     might provide them here under that circumstance, but I

18     can't commit to that as I stand here.

19          THE COURT:  Separate and apart from their duty to

20     file a motion to compel, what obligation does a party have

21     to seasonably supplement any discovery?

22          MR. NEWMAN:  So the rules are clear about a duty to

23     supplement discovery.  So if there's a request for certain

24     documents, for example that were received between

25     January 1st and January 31st, and there's a production in

1    February, and then more January documents are discovered in

2    March, the parties are obligated to produce that.  There's

3    a continuing duty under the rules.

4         Your Honor, I'd like to address the surveys.  PTK

5    requests that this Court issue an injunction banning Honor

6    Society from sending surveys, at least with respect to the

7    five questions.  I'm not totally clear, because their

8    papers indicate that it's more than just the five questions

9    they're looking to ban.  They talk about anything that's

10   false or misleading that could relate to any prospective

11   customers.  It's extremely broad.

12        And we note in our response that any order that

13   would stop Honor Society from sending a survey would

14   constitute an unconstitutional prior restraint.  And

15   there's a whole body of law on prior restraints, and we

16   cite a lot of it.

17        And what really surprised me about PTK's reply in

18   support of its motion is it did not address prior

19   restraint.  The Court can't issue a prior restraint; we

20   note that.  We expected some argument like there's an

21   exception to the prior restraint rule, but PTK didn't even

22   use the words "prior restraint" in its reply in support of

23   its motion.  And even today during argument, there was no

24   discussion about an exception to the law on prior

25   restraint.

1          The Court may not issue an order stopping the

2     surveys because of the prior restraint jurisprudence.  And

3     I would suggest, Your Honor, that is undisputed, because if

4     it were disputed, PTK would have responded to it.  And PTK

5     has not, because it is clear that the relief they seek

6     stopping Honor Society from sending any surveys at all, the

7     five questions or otherwise, would constitute an unlawful

8     prior restraint, and the Court may not issue that order.

9          THE COURT:  What about an order that tracks what

10    Mr. Moradian says he will do, not send out these five

11    questions anymore, so would that be a prior restraint?

12         MR. NEWMAN:  Absolutely, Your Honor.

13         THE COURT:  If I grant an order consistent with what

14    he says he will not do?

15         MR. NEWMAN:  Absolutely.  There's no exception to

16    the prior restraint jurisprudence that indicates that if a

17    party is willing to do what the Court is ordering, that the

18    Court therefore has --

19         THE COURT:  No.  No.  No.  The Court is willing to

20    put in an order what he said he is willing to do.  He said

21    that in his papers.  This Court has not directed anything

22    yet.

23          But if I say, okay, because you've said I won't go

24    out there and march on the street anymore; then okay.  I

25    say, well, I'll put that in an order, because you said you

1    won't do it.

2         So if I do what Mr. Moradian -- I understand you --

3    I thought the disagreement you had was that the protective

4    order says "what Mr. Moradian says and otherwise."  If I

5    scratch out the otherwise portion and put in the form of an

6    order what Mr. Moradian said he will not do, I will not --

7    he -- that Honor Society cannot send out these five

8    questions in their current form.

9         Now, whether or not those questions are later

10    reconfigured and figured out a different way to say it and

11    all of that, you know, because I thought about different

12    ways they can say it to get the same information, for

13    example.  But if I narrowly say he said he won't send out

14    these specific five questions, then that would be what he

15    said, not what the Court dictated; right?

16         MR. NEWMAN:  No, Your Honor.  That would be an

17    unconstitutional prior restraint, because there's an order

18    that a party may not engage in speech.  So the fact that

19    Mr. Moradian swore he wouldn't do that is a separate basis

20    to deny the motion for TRO, because the relief sought is

21    moot.  And the Fifth Circuit has noted that when there's

22    voluntary compliance, a TRO is always inappropriate.

23         But even more important than that, the Court is not

24    allowed to issue a prior restraint of speech, whether a

25    party agrees to it or not.

1          I'd like to talk about those five statements,

2    because there seems to be an assumption those five

3    statements were wrongful, and they were not.  So the first

4    one was a question about PTK having an average $2,500

5    scholarship value.  When reading the declaration of PTK's

6    witness, she talks about how those are transfer

7    scholarships.

8          Now, let me tell the Court what a transfer

9    scholarship is.  A transfer scholarship is where -- when a

10   for-profit institution wants to incentivize a community

11   college student to pay it even more money to attend the

12   four-year institution, the four-year institution gives it

13   money on the front end; that's called a transfer

14   scholarship.  And that transfer scholarship is provided

15   whether the student is enrolled with PTK, enrolled with

16   Honor Society, or not enrolled with any institution -- or I

17   should say any membership club or honor society.

18         PTK did not give a student any advantage to

19   achieving the $2,500 scholarship that they say is an

20   average, because any student would otherwise be entitled to

21   it.  That advertisement to students that there's help with

22   $2,500 average worth of scholarships, that statement is

23   false and misleading, so the survey question noting that is

24   not misleading and is entirely appropriate.

25         The top ten percent claim; PTK claims in

1    advertisements that its enrollees are in the top ten

2    percent of schools.  We know that's false.  There's

3    evidence in the record, because Honor Society did a survey.

4    It does lots of surveys.  And the colleges have come back

5    and said that the students are far outside of the top ten

6    percent.  Some are in the bottom half.  So PTK representing

7    that all students are in the top ten percent, that is

8    false, which means that Honor Society's survey is not

9    misleading.

10        The golden parachute; Honor Society had an employee

11    named Rod Risely.  He was investigated for sexual

12    harassment in the company.  When he left, they paid

13    Mr. Risely $3 million.  Paying somebody accused of sexual

14    harassment $3 million is a golden parachute.

15        THE COURT:  According to whom?

16        MR. NEWMAN:  Well, according to the common --

17        THE COURT:  According to whom?  You've cited a tweet

18    by Senator Elizabeth Warren.  I mean, is she the person or

19    any person to explain what a golden parachute is?

20        MR. NEWMAN:  So the way we would present that

21    evidence at trial if we had to, we would take a consumer

22    survey, and we would ask, what is a golden parachute?

23    Like, a survey expert would come in and do that.

24        What we did for purposes of this motion is we

25    searched the internet.  We searched Google, we searched

1    ChatGPT, and it was clear that what we're describing as a

2    golden parachute:  Paying somebody a lot of money when

3    they're accused of something on their way out the door;

4    that is a classic golden parachute.

5        THE COURT:  What about paying them what they're

6    entitled to?  What about paying them with stuff that they

7    had earned?  What about paying them for the benefit of not

8    being sued by that person?  That's done all the time.

9        Persons leave employment under suspicion, and rather

10   than fight off a future lawsuit, you sort of lay it out and

11   you let them go.  It's just good that we cut our ties;

12   here's your money.  That does not make that a golden

13   parachute, does it?

14       MR. NEWMAN:  Yes, Your Honor, that's entirely a

15   golden parachute.  The whole idea is the "golden" is money,

16   and the "parachute" is we're not going to have to worry

17   about future litigation.  That is a golden parachute, what

18   the Court just described.  So Honor --

19       THE COURT:  Who says that they're not -- I mean, we

20   haven't gotten to that issue, that there will not be future

21   litigation based on --

22       MR. NEWMAN:  I was responding to Your Honor's

23   hypothetical.

24       THE COURT:  Oh, okay.

25       MR. NEWMAN:  But my review of what "golden

 1    parachute" means indicates that what Your Honor just

 2    described is a golden parachute, and what was done with Rod

 3    Risely was a golden parachute.

 4         But if this is really an issue for trial, experts

 5    will come in and state what the common meaning is, and the

 6    Court will find that Honor Society was not misleading in

 7    calling it a golden parachute.

 8         I'll move to the next --

 9         THE COURT:  Okay.  So that issue is one that would

10    be subject -- or any of these things, subject to some trial

11    on the merits?

12         MR. NEWMAN:  No, Your Honor.  Because it's being

13    made in the context of a tortious interference with

14    business advantage claim, and without the loss of a

15    customer, it doesn't matter whether that survey was

16    misleading or even entirely false.  Because if you want to

17    show that that was a false statement and that it violated

18    the rights of PTK, then PTK needs to sue for something else

19    like defamation.

20         What they're suggesting, it was misleading and hurt

21    them, that's not a tortious interference claim.  That's a

22    defamation claim.  It may be a false advertising claim.  I

23    don't think so, because I don't think the surveys were

24    advertising.  But it's not tortious interference -- it's

25    not a tortious interference claim, and so it would never be

1    at issue at trial.

2          The next issue was whether a chapter advisor

3    embezzled funds.  Robin Lowe embezzled funds as a PTK

4    chapter advisor, thus it wasn't misleading.

5          Next is whether Honor Society -- strike that --

6    whether PTK is the official honor society.  We understand

7    that 95 years ago, PTK received a paper saying it is an

8    official honor society, not the official honor society.

9    And I don't think we can rely on a document that's over

10    100 years old when sending out advertisements to students

11    today, and so it's not misleading suggesting they're not

12    the official honor society.  So those five statements --

13          THE COURT:  Well, we do rely on old documents all

14    the time.

15          MR. NEWMAN:  From an evidentiary standpoint, Your

16    Honor, it would be admitted.  But from a weight of evidence

17    standpoint, I think a jury would disregard that as --

18          THE COURT:  Does the document say that -- does the

19    document -- and, again, I don't know if I've seen it.  Does

20    the document say whether it is a or an official or the?  Do

21    we know what the document says?

22          MR. NEWMAN:  My understanding is it says it's "an

23    official honor society," not the official honor society.

24          THE COURT:  Okay.  And nothing precludes Honor

25    Society from -- if it doesn't say "only official," then

1    that means that there could be other honor societies?

2         MR. NEWMAN:  Yes, Your Honor.

3         THE COURT:  Okay.

4         MR. NEWMAN:  So Honor Society having the absolute

5    right to send out public records requests and surveys means

6    that a tortious interference claim, whether with contract

7    or business advantage, fails as a matter of law.

8         If Honor Society does something it has the right to

9    do and PTK suffers a loss, that's not tortious

10   interference.  And there isn't a likelihood of success on

11   the merits, because Honor Society had the absolute right to

12   do what it did.

13        I'd like to move to irreparable harm --

14        THE COURT:  Let me go back one step to the person --

15   the advisor issue, because I know PTK says, well, we had

16   nothing to do with that particular person.  She was an

17   advisor; she didn't steal PTK money, but she stole money.

18        So what was the specific language of the survey

19   question?

20        MR. NEWMAN:  The survey asked whether it would

21   impact PTK's reputation if it had hired a chapter advisor

22   that embezzled funds.  And a chapter advisor did embezzle

23   funds, so that question is not misleading.

24        I'd like to move on to --

25        THE COURT:  Did it hire the chapter advisor before

1    or after she embezzled the funds?  I presume it was before.

2         MR. NEWMAN:  The advisor?

3         THE COURT:  Was the advisor hired --

4         MR. NEWMAN:  Advisor for PTK and embezzled funds

5    relating to PTK.

6         THE COURT:  Okay.  All right.

7         MR. NEWMAN:  So that's not misleading, and even if

8    it is misleading, that doesn't qualify as tortious

9    interference with contract, because no customer was lost.

10   It might be defamation, but that's not a claim that's

11   before the Court.

12        I'm going to talk a bit about irreparable harm.

13   I've already talked about how there's no likelihood of

14   success, because there wasn't a customer lost.  Therefore,

15   there's no likelihood of success on the merits, and the

16   case should be dismissed.

17        I've talked about how Honor Society has the absolute

18   right to send public records requests.  The Fifth Circuit

19   repeated that four different times.  It has the right to

20   send surveys, and the court may not issue an unlawful prior

21   restraint.

22        But, also, PTK must show irreparable harm in order

23   to get a TRO, and this is another area where if we had more

24   than two and a half days to prepare our papers, we would

25   have done a lot more.  Because we did a survey -- and I'm

1    happy to file this with the court if the Court wants to see

2    it, but we did a survey of tortious interference claims

3    where a motion for TRO was brought all across the country.

4    We found 27 cases, and all but a handful were denied

5    because there is rarely irreparable harm with a tortious

6    interference case.

7         Why?  Because you're losing a customer or you're

8    losing a contract, and contracts have value.  If customers

9    aren't signing up and they're $60 a customer, you multiply

10   60 by the number of customers you lost, and that's the

11   harm.  If there's compensation by money damages, there's no

12   irreparable harm.  And so in tortious interference cases,

13   there's almost always money damages.  There are in this

14   case as well.

15        Now, I said that all but a handful were denied, so

16   what about that handful?  In that handful, there were

17   motions for TRO, but it wasn't limited to tortious

18   interference.  There was stolen trade secrets, one was a

19   copyright case, and there was one outlier case that PTK

20   relies on heavily for obvious reasons.  That case is called

21   *Multiplan*, and in *Multiplan*, there's thin analysis by the

22   District Court.  There are egregious facts.

23        And the *Multiplan* court makes a huge mistake that

24   the parties also made in briefing, and so I want to correct

25   that mistake today.  The *Multiplan* court said that

1  reputational injury can be harm in a tortious interference

2  case; that is not true.  And *Multiplan*, in support of that,

3  cites two other cases, one is a trademark case, one is a

4  false advertising case.  Neither are tortious interference

5  cases.  Other than Multiplan, we haven't found a single

6  case all across the country where reputational injury is a

7  damage that's recognized for tortious interference.

8       Again, why?  Because tortious interference is with a

9  contract, and reputational injury is not a contract-type

10  injury, and so it cannot be recovered under a tortious

11  interference case.

12       I made a mistake that I wanted to note.  In

13  *Multiplan*, it's cited for reputational damages.  It's a

14  false advertising case and an FCC case, a Federal

15  Communications Commission case, about incumbent telephone

16  carriers.  But it wasn't about tortious interference, and

17  neither of those cases were tortious interference cases,

18  and so reputational injury being a damage allowed is not

19  applicable to tortious interference cases.

20       I also want to point out another mistake PTK made in

21  its opening brief.  I wish we would have done this in our

22  response.  But I think it's important to do it here,

23  because it's a glaring mistake.  In its opening brief, PTK

24  cited *Better Business Bureau of Metro Houston versus*

25  *Medical Directors*, 681 F.2d 397, and PTK writes that in

1    that case, the court granted TRO seeking injunctive relief

2    for tortious interference with business relations where

3    defendant harassed plaintiff's customers and caused

4    plaintiff to lose customers and harmed plaintiff's

5    reputation; that is just not true.

6         In *Better Business Bureau of Metro Houston versus*

7    *Medical Directors*, there's no mention of a contract.  There

8    was no mention of tortious interference.  It was not a

9    tortious interference case.  It was a false designation of

10   origin case; that's a Lanham Act trademark-related case,

11   not a tortious interference case.  So the statement that

12   PTK made that it was a tortious interference case was a

13   huge mistake.  They were probably racing to get their

14   papers done, too, so I understand it.  But it is glaring,

15   and I thought I'd call it to the Court's attention.

16        And then finally, I'd like to note that in order to

17   suffer irreparable harm, there has to be a harm they can

18   prove, and here there is no harm they can prove.

19        They indicate that during a two-week period sales

20   dropped by 15 percent.  But at the same time that sales

21   dropped by 15 percent, they lost mail services, because

22   Mailchimp shut them off for violating Mailchimp's terms of

23   services against unsolicited bulk email and Microsoft

24   flagged them for phishing.

25        Honor Society is not responsible for that, but the

1    fact that PTK only lost 15 percent in light of these two

2    major events seems low to me.  I would have expected it to

3    lose a lot more than that.  But that explains any loss in

4    revenue is not due to Honor Society's surveys, and even if

5    it was, Honor Society had the absolute right to send those

6    surveys so it wouldn't qualify as tortious interference.

7        I'll quickly address a couple of the other elements.

8    Balance of the equities; Honor Society, as we discussed,

9    has a right under statute to send public records requests.

10   PTK notes that we cited Mississippi law, and they asked,

11   like, why didn't you cite other laws?  And the answer is

12   because we're racing to get things done, and I don't think

13   the Court would appreciate a 50-state analysis.

14       But from what we've seen, public records requests

15   statutes are very similar from state to state, and

16   interestingly, PTK says that we omitted that.  But PTK does

17   not dispute that.  PTK does not point to a single state

18   that has a different public records-type analysis.

19       And in fact, several states -- like, PTK says, what

20   about New Hampshire?  In New Hampshire, it's a

21   constitutional right that a party has to send public

22   records requests.  It's under the Bill of Rights in New

23   Hampshire.

24       So if there's an injunction against public records

25   requests, Honor Society would lose its fundamental right to

1    send public records requests.  It would be subject to a

2    prior restraint against speech for surveys.  It wouldn't be

3    able to generate competitive researching data that it uses

4    to improve services and market to students and better

5    compete, and that loss is substantial.

6        THE COURT:  Going back to those five questions,

7    though.  Do they have the unmitigated right to ask a

8    specific question?

9        Can they go back and rephrase the question and

10   solicit the same information?  I'm not a marketer; I don't

11   know.

12       But if they were to send the same question about the

13   golden parachute, I'm not suggesting that this would pass

14   the test.  But if they were to use the word golden

15   parachute, and say golden parachute as described by Senator

16   Elizabeth Warren because that's what you rely on in your

17   tweet.

18       MR. NEWMAN:  It was an example.  It wasn't a

19   complete -- we were quickly putting together papers, and it

20   was an example.

21       THE COURT:  Okay.  So if the question were modified

22   in that way, do you think the response from the persons

23   would be any different?

24       Because what they've complained about now -- now, it

25   may be there are some other complaints once the questions

1    are -- once Honor Society decides to sort of recalibrate

2    these five -- because right now, Mr. Moradian says I'm not

3    going to send these out, and I'm going to take him at his

4    word.  I might take him at his word he's not going to send

5    these out.  That does not necessarily mean that he cannot

6    go back and recalibrate the questions.

7         And if he recalibrates the questions and they have

8    an issue with those questions, then they come back I guess.

9    But maybe the parties will meet and confer to figure out

10   what those questions might be.  I don't know if that would

11   sort of interfere with persons' competitive instincts to

12   sort of work it out.  But would that -- I mean, the

13   violation of constitutional rights in New Hampshire or

14   statutory rights in other states, they don't have the

15   unlimited right to a specific question, do they?

16        MR. NEWMAN:  I think that's a question for a

17   different day.  The question here is whether the Court can

18   issue a prior restraint, and the jurisprudence is clear

19   that the Court cannot.

20        But the question for the different day is, yeah, I

21   think Honor Society has the absolute right to ask those

22   questions.  And if they recalibrate it, I'm sure PTK would

23   take issue with it, because we believe this case is not

24   really to vindicate rights but to try and shutdown Honor

25   Society.  And by bringing an emergency motion for a TRO, it

1    inflicts a lot of harm on Honor Society.  I think it would

2    do so regardless of how the question was framed.

3         THE COURT:  Thank you.

4         MR. NEWMAN:  Which leads me to the next issue, the

5    request for a protective order.  The Fifth Circuit Court of

6    Appeals in a binding and precedential decision called *June*

7    *Med versus Phillips* held that protective orders apply only

8    to discovery, not to activities that occur outside of

9    discovery.  And this is in line with the Fifth Circuit's

10   other cases about how public records requests is an

11   independent avenue from discovery requests.

12        And because of that case, the Court can't issue a

13   protective order for activities that don't occur in the

14   discovery process.  The Court can't issue a protective

15   order against a party's own independent investigation, and

16   the Court can't issue a protective order certainly against

17   a party engaging in competitive strategies like sending

18   surveys and records requests that aren't necessarily going

19   to be used for the case.

20        THE COURT:  Aren't necessarily, but can be; right?

21        MR. NEWMAN:  Of course they can be.

22        THE COURT:  They can be so --

23        MR. NEWMAN:  But the Fifth Circuit says they can't

24   be.

25        THE COURT:  But they will be subject to the rules of

1   discovery in that instance; right?  I'm just asking.  I

2   mean, you've told me what the Fifth Circuit has said.

3          MR. NEWMAN:  They would not --

4          THE COURT:  *June Medical* dealt with abortion, I

5   think; right?

6          MR. NEWMAN:  They would not be subject to the rules

7   of discovery.  The Fifth Circuit has made that clear.

8   Public records requests, one set of rules.  Discovery,

9   another set of rules.  When a party exercises its FOIA

10  rights or state public request statutory rights to get

11  public records, it's not subject to the discovery process.

12  Perhaps those records --

13         THE COURT:  Even though the request may touch on

14  both?

15         MR. NEWMAN:  Absolutely not subject to the discovery

16  process.  A protective order would be inappropriate under

17  those circumstances, because the Fifth Circuit has found

18  they are independent avenues.

19         There was discussion of NAVEX and the subpoena

20  served on NAVEX that Judge Ball found wasn't appropriate,

21  because it didn't relate to this case.  That an order

22  issued considering NAVEX is not germane to the public

23  records requests on schools.  It was a subpoena in the

24  discovery process, and the discovery process has to be

25  tight, and discovery imposes burdens on third parties, a

1 subpoena does in any event, and requires them to do stuff

2 they're not otherwise required to do by law.

3   Whereas, a public records request only asks a party

4 to do what they must do under law.  So the fact that a

5 subpoena was rejected under NAVEX --

6   THE COURT:  A subpoena, you're required to do that

7 by law, right, Rule 45; right?  You said by law you must

8 turn over stuff.  You must respond to a subpoena.

9   MR. NEWMAN:  Right.  There's a lot of burden on a

10 party when they receive a subpoena, and that's why the

11 Court is there to govern the discovery process and not

12 allow subpoenas that are inappropriate.  But the standards

13 are different with public records requests.

14   THE COURT:  And let me ask you this.  So I assume

15 Honor Society agrees that the subpoena that was issued to

16 NAVEX was inappropriate because Judge Ball -- I don't know

17 if there was a formal motion to quash that was filed, but

18 he told y'all to back away.  I guess that ruling was never

19 appealed to this Court, so shall I assume that you agree

20 that it was inappropriate?

21   MR. NEWMAN:  It's the law of the case, Your Honor,

22 but that's with respect to NAVEX.  It doesn't relate at all

23 to public records request.

24   So I'd like to take a step back and talk about what

25 this case is really about.  This case is about competition.

1   So PTK, for over 100 years, has been the undisputed leader

2   in community college honor societies.  Its market share was

3   bordering on being a monopoly.  And then Honor Society,

4   this small upstart, came out of nowhere and started

5   competing.

6        Honor Society is an inclusive membership club where

7   any matriculating student into a community college can join

8   immediately upon matriculation, and there's lots of great

9   benefits that Honor Society offers.  So it has generated

10   significant membership from new students.

11        PTK does not offer membership until after the first

12   semester.  By the time PTK invites students to join, many

13   of them have already joined Honor Society, and as a result,

14   PTK has lost significant market share.  Based upon the

15   surveys that Honor Society has done, it appears that PTK

16   has lost over a third of its membership to Honor Society

17   through lawful and competitive measures.

18        So of course PTK is troubled by Honor Society.  PTK

19   is losing a business that it had for over a hundred years,

20   and this lawsuit wasn't filed to vindicate rights, but

21   because it's attempting to shutdown Honor Society.

22        Now, Honor Society is run by Mike Moradian.  He is a

23   UCLA-trained economist who's a specialist in data.  He has

24   operated his business through use of surveys and public

25   records requests to gather competitive data, learn about

1    the market, so he could constantly improve services for

2    student and offer what PTK, the incumbent, has been unable

3    to offer.

4        And PTK filed this lawsuit for trademark

5    infringement alleging that, for example, a gold stole is

6    trademark infringement, even though every honor society has

7    a gold stole.  Alleging that the colors blue and gold on a

8    website are infringement, even though they don't have a

9    registered trademark for blue and gold.  They don't own

10   blue and gold.  The case lacks merit.  It's a transparent

11   attempt to shutdown Honor Society, and this motion is more

12   of that.

13       There is no urgency here.  There is no emergency

14   that required our staff to be pulled off of all their other

15   cases, to stay up all night long, to research and analyze

16   the papers that PTK spent weeks preparing, and to respond

17   to it.

18       In fact, I would suggest that after we filed our

19   opposition that PTK should have withdrawn its motion,

20   because the Fifth Circuit is clear.  Records requests are

21   allowed regardless of intent, even if there was malicious

22   intent.  Survey response is allowed, and an order against

23   it would be an unconstitutional prior restraint.  And

24   without identifying a lost customer, PTK fails to state a

25   claim for which relief can be granted and cannot succeed on

1    the merits; so Your Honor should deny the motion for TRO.

2         I'll speak for probably no more than two minutes

3    about the motion for expedited discovery.  The standard

4    there is good cause.  For the reasons I stated, PTK does

5    not have good cause.  Expedited discovery would require the

6    parties to fly around the country doing deposition.  It

7    would require insane response times to discovery requests

8    that aren't necessary or appropriate.

9         Those discovery requests can be asked during regular

10   discovery.  They don't need to be done on an expedited

11   basis.  I would like to start getting seven hours of sleep

12   again.  I don't want to have to now race into this

13   discovery process that is totally unnecessary.  So the

14   Court should deny that motion as well.

15        THE COURT:  I want to get seven hours of sleep, too,

16   but y'all won't allow me to do that.  So if the Court

17   allows the supplemental complaint, which would -- I think

18   is there a counterclaim or something that Honor Society

19   wished to proceed with?

20        MR. NEWMAN:  Yes, Your Honor.  We have actually

21   prepared a complaint, but I don't think it's ready to

22   distribute to PTK's counsel.  But I would expect that to

23   happen within the next couple of days.  We're going to ask

24   that PTK stipulate to it.  If PTK does not, we may file a

25   motion to supplement here, or we may file a separate

1    lawsuit in California.  But there is that complaint, and

2    Honor Society does intend to file it.

3        THE COURT:  Okay.  And if you file it in California,

4    I assume there may be a motion possibly to transfer out

5    here, because there's this existing litigation.

6        All right.  That's fine.  But if the Court were to

7    allow them to amend their complaint and allow you to amend

8    yours, they have said that they suspect that the current

9    discovery deadline could still be met.  That is for the

10   next five months, four months now, the discovery could be

11   done.

12       With respect to the potential claims that you expect

13   to bring, could discovery be done on your claims during

14   that same period?

15       MR. NEWMAN:  I don't know.  But if we anticipate

16   discovery cannot be done in that timeframe, we'd bring a

17   motion before Judge Myers to extend the case schedule.

18       THE COURT:  Okay.  So if the Court denies the motion

19   for TRO for the reasons that you've expressed or for other

20   reasons, because I do know that there are damages

21   involved -- that there are damages.  And to the extent Phi

22   Theta Kappa proves whatever claims it says they can prove,

23   those damages, those injuries could be cured by -- they

24   will be asking for monetary damages.  Maybe they will ask

25   for other stuff, too.

1            But to the extent it could be -- monetary damages

2      could be awarded against Honor Society, isn't that a

3      sufficient basis to deny the TRO?

4            Or assuming there's a preliminary injunction going

5      forward, would that be a sufficient basis if they can show

6      that they've been hurt, harmed, and that money will be --

7      that money damages are a sufficient remedy?

8            MR. NEWMAN:  Yes, Your Honor.  From our review of

9      tortious interference cases across the country, we only

10     found one case, *Multiplan*, where there was irreparable harm

11     or injunctive relief is appropriate.

12            In the rest of the cases, it's clear that money

13     damages can compensate the plaintiff.  Because they have to

14     be contract-type damages, and contract-type damages

15     generally don't lead to irreparable injury.

16            Thank you.

17            THE COURT:  Thank you.  We're going to take another

18     break for about ten minutes, Mr. Wallace, and then I'll

19     come back for your rebuttal.

20            MR. WALLACE:  Thank you, Judge.

21            THE COURT:  Ten or 15 minutes for the court

22     reporter.

23            MS. SUMMERS:  All rise.

24                 (A brief recess was taken.)

25            MS. SUMMERS:  All rise.

```
 1          THE COURT:  You may be seated.

 2          All right, Mr. Wallace.

 3          MR. WALLACE:  May it please the Court?  You have

 4    been patient with us, and I'm going to do the best I can to

 5    get everybody to lunch.

 6          I want to begin with the proposed supplemental

 7    complaint.  The only understanding I have of why he thinks

 8    it would be futile is that we have not identified a

 9    contract that has been broken or a customer, potential

10    member that we have lost.

11          In saying that, he's relying on appellate cases

12    where the Court looks at the end of the day, and says you

13    didn't prove a broken contract; you lose.  You didn't prove

14    you lost a customer; you lose.  He doesn't have a case

15    where a court on the front end has said you didn't give me

16    the name of the customer you lost, you didn't give me the

17    name of the party that broke the contract; therefore, you

18    can't even go forward.  No such case exists.

19          We know we have to identify somebody down the road,

20    but we think they exist now in the evidence you have before

21    you now is Dr. Tincher-Ladner's declaration.  They filed a

22    motion to say that it shouldn't be considered.

23          Your Honor has the pleasure of trying cases all the

24    time.  Most of us never get to do it anymore, but you know

25    how Rule 701 works, which is that people are allowed to
```

1    give their opinion if their experience tells you that the

2    opinion might be pretty good.

3         Dr. Tincher-Ladner has worked for years -- they call

4    Perkinston Mississippi Gulf Coast Community College these

5    days.  I'll never get used to that.  But that's where she

6    was.  She's worked at Southern Mississippi for years.  She

7    has now spent years at Phi Theta Kappa.  She knows how

8    institutions of higher learning think.  She knows how they

9    work, and she knows there's not a single one of them

10   anywhere in the world that wants to get a document request

11   and have to deal with lawyers.

12        He's suggested the reason those people are calling

13   her up is to give them the notice they are entitled to

14   under the law of their home state.  She was on the other

15   end of the phone calls.  It's in the declaration.  Nothing

16   in there about the law requires me to tell you that they've

17   made this request.

18        Those people are calling to say why are we getting

19   these requests, and what are we supposed to do about it?

20   What can you tell us?  That's what's in the record before

21   this Court.  Her opinion that she is losing customers right

22   now is backed up by the fact that our joinders this year

23   are down 15 percent.

24        Now, she can't tell you how much of that is caused

25   by the economy, how much of that is caused by what they've

1    been doing to us for the last eight or ten years, and how

2    much is caused by what they're doing to us this March.  But

3    she knows she's bleeding, and she reasonably believes we

4    are damaged right now.

5         We don't know where the injury is, but we're going

6    to find it.  So you have testimony from an experienced

7    witness that you can believe when she tells you that we are

8    damaged.  There are people we're losing, and if you don't

9    stop it not only are we going to lose these people, but

10   these kids who have to join Phi Theta Kappa before they

11   graduate or they never get the chance, are never going to

12   get that chance and never get the benefits that I know from

13   living in this state all my life it's been providing to

14   junior college kids forever and ever.

15        So, yes, there's damage.  Yes, we're entitled to

16   amend our complaint.

17        Oh, one other thing.  He closed by saying, you know,

18   we're in a competition.  It is our job to take market share

19   away from Phi Theta Kappa; that's what we're trying to do

20   every day.  Why in the world would you not believe that's

21   what these surveys are trying to do, and in fact, they're

22   accomplishing it.

23        They brag that they take business away from us.

24   Well, they probably do.  And if they're taking business

25   away from us under these surveys, it is unfair competition.

1    It is actionable under the two Mississippi counts we've put

2    before you, and we think we are entitled to go forward and

3    find where there damage is and present it to you in this

4    courtroom.

5        THE COURT:  Let me ask you specifically about that

6    particular issue, and, again, you might have to look to

7    Mr. Polak.

8        MR. WALLACE:  I might.

9        THE COURT:  But the discovery requests that have

10    been propounded in this case, are there any discovery

11    requests, interrogatories, or requests for production of

12    documents that Phi Theta Kappa believes should be responded

13    to based on what you've seen in the survey requests or

14    either the records requests?

15        MR. WALLACE:  I'll give you one example that I know

16    of, and we don't want to ask you to do Judge Myers' work.

17    If we find out they haven't done what they should have been

18    doing, we'll take it up with him.

19        But, yes, we've been asking them from the beginning

20    for surveys they've taken in the course of their business,

21    and their answer was we don't have any.  And we're finding

22    out here that, like, they do surveys and they do records

23    requests all the time.  Now, look, they may have an

24    explanation for that, and we're going to give them a chance

25    to give that explanation to Judge Myers.

1          But, yes, Your Honor, we have asked for a lot of

2    things that should have been disclosed.  Records requests,

3    some of these records requests do relate to us.  They've

4    produced one in discovery that they took in 19 -- in 2021.

5    I don't know what the subject was, but it was within the

6    scope of something we asked for, so they gave it to us.

7          The interesting thing about that is David Asari sent

8    the records requests out, but he used his Honor Society

9    email to do it.  These records requests Asari sends it out,

10   and he sends his Gmail.  He doesn't want to have Honor

11   Society's fingerprints on it, anyway.  When we get to the

12   point of malice and intent, I think that's going to turn

13   out to be a very big fact.

14         So the answer to your question is yes.  But I don't

15   know enough, and I don't think you want to know enough to

16   do Judge Myers' work for him.  We'll see what's in those

17   62,000 pages, and we'll see what we need to do about it.

18         So I do want to say -- I do want to say something

19   about the First Amendment.  Prior restraint is a part of

20   First Amendment law, but it applies where the First

21   Amendment applies.  And Your Honor has said in *Bond*

22   *Pharmacy*, and its right, that there is no protection, First

23   Amendment protection, for misleading commercial speech.

24         There's no protection for harassment either, and as

25   I have explained, I think we're getting harassed on the

 1   rebound.  They send these surveys to our kids, they send

 2   the records requests to our partners, and the harassment

 3   comes from them to us.  That's what's going on here.

 4        What the Fifth Circuit said in discussing the First

 5   Amendment and prior restraint in the *Test Masters* case,

 6   "The courts do have the power to enjoin harassing

 7   communications."  That's not a prior restraint, because

 8   it's commercial.  I'm not even sure harassing communication

 9   is commercial speech, but it's not protected.

10        There is enough evidence protected in the -- enough

11   evidence in the record to justify an injunction order

12   prohibiting Singh from threatening or harassing TES.  So if

13   you find what they're doing is not protected by the First

14   Amendment, then they -- then you have the authority to do

15   something about it.

16        I do want to say something about irreparable injury.

17   Judge Guirola -- they mentioned the *Multiplan* case; they

18   say it's an outlier, but it doesn't outlie very far.  It's

19   in Gulfport.  This is Judge Guirola's opinion.  It's Judge

20   Guirola's opinion in an intentional interference with

21   business advantage lawsuit.  He grants the TRO, and he

22   says, "The Fifth Circuit has held that damages to a

23   business reputation can constitute irreparable harm."

24   Damage to Phi Theta Kappa's business reputation is the

25   whole point of this case.

1          Your Honor, you asked, I think, about the actual

2     survey question on the chapter advisor.  You know I don't

3     do screens.  I have it printed out, and I think I read it

4     to you the first time I was up.  "Does it hurt the

5     reputation of Phi Theta Kappa that a chapter advisor was

6     arrested in February 2024 for allegedly embezzling funds?"

7          And if I may bring it to you, I know they've got it.

8          It's what you sent.

9          Does it hurt the reputation of Phi Theta Kappa?  You

10    bet it does.  You absolutely bet it does.  That's the whole

11    point.  That's the point of the survey:  Tell us what we

12    ought to use to damage the reputation of Phi Theta Kappa.

13    That's what he says he's trying to do to deprive of our

14    kids of the opportunities that we can give them and have

15    been giving them for almost 100 years.

16          Judge Guirola says that's irreparable injury and I'm

17    going to issue a TRO, and we think you ought to do exactly

18    what Judge Guirola did.

19          I'll say one thing about Rule 26, and then I'll sit

20    down.  As I'm sure you know, the *Mississippi Department of

21    Wildlife* case is not a Fifth Circuit case at all.  It's a

22    Mississippi Supreme Court case, and it doesn't say anything

23    about interactions between -- between discovery.  It tells

24    generally that if you're entitled to get something, you

25    ought to be able to get it.  We don't dispute that.  If

 1    they're entitled to get it, Judge Myers will give it to

 2    them.

 3         The Fifth Circuit cases they've cited are all about

 4    the interaction between FOIA and ongoing litigation.  This

 5    isn't FOIA.  This is about the interaction between this

 6    litigation and the laws of 49 other states that they have

 7    not laid before you, but that's where they're going after

 8    our information.  None of those are binding.

 9         I do think that you should look very carefully at

10    the *Heinrich* and the *Hartman* cases.  That's a case where

11    the district judge says, my magistrate already told you

12    what to do and you're doing something else; and I'm telling

13    you to stop it.  Your former magistrate told them what to

14    do:  Bring their requests to us, have them reviewed in this

15    court, and have the discovery done limited to the real

16    issues before this Court.

17         They didn't like that, and Mr. Moradian, as soon as

18    Judge Ball was gone, decided he was going to take matters

19    into his own hands.  I don't like -- I generally try not to

20    look into the hearts of people to see why they do what they

21    do, but the calendar just screams out to me on that one.

22         I think you've got the same authority to back up

23    your magistrates as the judge did in *Heinrich* and *Hartman*,

24    and say as long as you're in this Court, you're going to

25    play by our rules.

1          At the very least, we think we ought to have a

2    temporary restraining order.  They haven't even tried to

3    justify that survey.  It's harassment, it's improper

4    commercial speech, we ought to have a TRO on that in a

5    heartbeat.

6          And at the very least on these records requests, you

7    can issue an order that says before you send a record

8    request out to somebody, you tell Phi Theta Kappa that

9    you've done it, so they don't have to wait for people to

10   complain.  We can get busy and defend our own rights.

11         We'd like you to give us that opportunity.  We think

12   we can get all of this discovery done and try this case,

13   and when you do, you will see from beginning to end this is

14   not a case of fair and lawful competition.  It is a case of

15   unfair and unlawful competition.  It needs to stop, not

16   only for the protection of my client, but for the

17   protection of kids that they exist to serve.

18         We thank you for your patience.  I told you I'd let

19   everybody go get lunch.  I'm going to sit down unless

20   you've got some questions.

21         THE COURT:  Under Judge Myers' existing order, it

22   said that the plaintiffs' expert designation might be due

23   around May 15th.  I presume the defendants will have their

24   designation due either June or July?

25         MR. WALLACE:  One correction on that, Judge.

 1          THE COURT:  Okay.

 2          MR. WALLACE:  We're plaintiffs, they're

 3   counter-plaintiffs.  Our plaintiff expert and their

 4   counter-plaintiff's experts are all due on May 15th, and

 5   then, yes, we've got 30 days to -- everybody's got 30 days

 6   to respond to that.  Is that right?

 7          MR. POLAK:  That is correct.

 8          THE COURT:  Okay.

 9          MR. WALLACE:  That's my understanding, Judge.

10          THE COURT:  Okay.

11          MR. WALLACE:  Thank you, Judge.  We appreciate your

12   patience.

13          THE COURT:  Thank you.  I may or may not write

14   something on this, because I don't want to run into -- I

15   don't want to put a pause on what people can be doing.  I'm

16   just telling y'all off the cuff right now what I'm inclined

17   to do.

18          I think the supplemental complaint, it just makes

19   complete sense to the Court to allow the supplemental

20   complaint.  I guess you don't need any formal -- I mean,

21   you know, you don't need any analysis on that.

22          I hereby find that I have the discretion to allow

23   the parties to file their supplemental -- PTK to file their

24   supplemental pleading.  They've identified what that

25   pleading is.  They've shown it; I think it's a part of the

```
 1   exhibits to the motion, so nobody's going to be surprised
 2   about what the issue is.
 3        And I know I haven't ruled on the earlier complaint,
 4   but we are drafting something on the docket number 79, I
 5   think it is, and whatever else has happened from now until
 6   then.  But I am inclined to allow their supplemental
 7   pleading.
 8        Now, I do know the other side suggested that they're
 9   either working on it or -- and they should have a right to,
10   and, yes, if you all decide that you're pursuing some other
11   claim, whether you file it here or in California, if it
12   gets filed in California and gets sent back here, it's
13   going to be subject to this same -- I mean, it will come
14   back to Mississippi.  It will be a new civil action number
15   here.  It's likely that the clerk's office would see that
16   it's a like or related case, and it will come back here.
17        So think long and hard about where you might want to
18   bring that case.  I will give you seven days.  Is that
19   enough time, or do you want 14 days?
20        I mean, what I don't want to do is slow down or
21   interrupt Judge Myers' order at this point in time.
22        MR. NEWMAN:  Your Honor, I'd be grateful for
23   14 days, and we do want to bring it here.
24        THE COURT:  Okay.  I'll give you 14 days.
25        MR. NEWMAN:  Thank you.
```

1          THE COURT:  All right.  So with respect to the

2    supplemental complaint, I do think under the existing --

3    and the parties can correct me, but I think under the

4    existing scheduling order, obviously the parties will be

5    allowed to submit, propound discovery to one another on

6    those issues, whether it needs to be expedited now or not.

7    Because we know when discovery concludes, I think should be

8    left up to y'all.

9          So, you know, whether it's expedited -- and I'm not

10   going to require people to have to respond in less than the

11   30 days there normally would be.  Because there's ongoing

12   discovery now as I appreciate it, because the discovery

13   deadline now is in August.  So if -- you know, I think

14   there would still be one discovery deadline.  The operative

15   discovery deadline for these new cases, for these new

16   complaints and counter-complaints is still going to be

17   August, whatever date that is that Judge Myers has set;

18   that's the operative discovery deadline.

19         Now, of course -- of course as the parties move

20   forward in their litigation, and, you know, parties could

21   raise issues with Judge Myers about whether or not that is

22   the appropriate deadline.  I'm not going step in -- I'm not

23   going to wade in that right now.

24         So with respect to the TRO, I'm going to reserve

25   ruling on that for right now and preliminary -- well, for

 1    the TRO for right now.  There's a couple of things I want

 2    to look at.

 3          But I'm strongly inclined to do what Mr. Moradian

 4    said he would do, but, of course, it looks like that might

 5    be the minimum.  It might not be the maximum that I could

 6    do.  It's not even the minimum I could do, I don't think.

 7          But the surveys -- it's my understanding based on

 8    everything that I've heard so far that those specific

 9    questions are not being asked, but there more than likely

10    will be some further guidance from this Court.

11          I do think discovery allows Phi Theta Kappa to get

12    the responses to all of that stuff that they have -- that

13    Honor Society has received, and of course proper objections

14    can be made.  But I think my -- we'll see what my final

15    ruling is on that, but I'm inclined to say any documents

16    that were received in response to the records requests and

17    surveys should be turned over to the other side.

18          Again, the rules of discovery are quite broad under

19    26.  It may not be admissible in evidence at the end of the

20    day, but I generally think information like that is

21    discoverable.  These are the calls that the magistrate

22    judges make all the time, but I want to keep this case

23    going.

24          To the extent Phi Theta Kappa believes that their

25    new claims -- I find that those new claims are part and

1    parcel.  I have the discretion under Rule 15, under Rule

2    16, under Rule 26 to allow the filing of those new claims

3    to have them all in this case.  I think it helps the Court

4    with the underlying rules of civil procedure.  Rule 1 leads

5    to the just, speedy resolution of all issues.  We just need

6    to make sure all issues are here, so that we can have all

7    issues decided.

8        But this Court can properly decide as soon as

9    possible, so to the extent anybody has anything to bring, I

10   think this is the appropriate place to bring it.  I so find

11   that you can bring it; that the discovery based on any of

12   these new claims can be done under the existing scheduling

13   order Judge Myers just entered with the discovery deadline

14   being sometime in August of 2024.

15       And I hope to give you a very short written order on

16   the TRO, very short, and it may be so short in fact that I

17   might call you all and tell you what it is.  And do it that

18   way because I don't want anything to slow down this case,

19   and I certainly don't want me to slow it down.

20       You'll be getting rulings on the other pending

21   motions that I mentioned earlier.  I think you'll be

22   getting that really soon in the next few days or so, and so

23   that's my interim ruling for now.  I have not ruled on the

24   TRO request.

25       MR. NEWMAN:  Your Honor, we have 14 days to file an

1    amended complaint or a motion for leave to file an amended

2    complaint?

3              THE COURT:  No.  You have 14 days to file it.

4              MR. NEWMAN:  Thank you.

5              THE COURT:  You can file it, and of course any

6    response to those motions will be filed.  No, I don't want

7    to do anything that slows down the process, because leave

8    to file it would mean that you're responding saying you're

9    disagreeing about whether or not it should be filed.

10             Yeah, we'll be ready to tee up these issues of

11   whether the complaints survive Rule 8, Rule 12.  We'll be

12   ready for all that, so let's keep this case rolling.

13             And as I tell all the parties, and I may have

14   mentioned it to you when we were on the phone the other

15   day, as I tell all parties in every case, criminal or

16   civil:  Every step of the process is another opportunity

17   for the parties to seek resolution.  Every step of the

18   process is another opportunity.

19             Yes, Judge Ball was on the case; he's no longer on

20   the case, that was an opportunity.  Judge Myers is on the

21   case; he's submitted a new order.  We have had this hearing

22   now; this is another opportunity for the parties to figure

23   out whether or not this case can be resolved.  I'm one of

24   the ones who -- and all of our judges are pretty adamant

25   about parties taking the case out of the hands of the court

1    and juries and whatnot, giving you the full opportunity to

2    see if you can seek some resolution.  Because we know if

3    this case continues to go, parties are going to be

4    expending money and resources, and, you know, you've got

5    the discovery deadline, the experts.  After that you'll

6    have a trial.  After that you'll have a bunch of motions I

7    imagine post discovery.  You'll have a trial.  And at the

8    end of the day, the trial does not even, in many cases,

9    resolve a case, because parties have the right to appeal.

10        This case has been -- was filed in 2022.  By the

11    time we have the trial, February 2025 or later, it will be

12    three years.  The parties will have spent a lot of money on

13    defending the case and prosecuting the case.

14        And, yes, it's going to be new claims raised now on

15    both sides now, so all of that should be a factor.  And as

16    we go forward, every time there is something that happens

17    in the case or even if it doesn't happen, that's the

18    opportunity for the parties to be talking about how we get

19    this matter resolved.  And I encourage you all to continue

20    to do that.  I'm not suggesting that you have not done it.

21    Nobody can make anyone settle a case.  I just encourage you

22    all to continue to try.

23        Is there anything else we need to take up at this

24    moment?

25        MR. WALLACE:  I don't think so from our side, Your

1    Honor.

2          MR. NEWMAN:  Not from Honor Society, Your Honor.

3          THE COURT:  Okay.  Thank you, Counsel and parties,

4    for making yourselves available on this expedited basis.  I

5    appreciate you.  This concludes all that the Court has

6    before it today.  This matter -- do you need this back,

7    Mr. Wallace?

8          MR. WALLACE:  You can keep it, Judge.  We've got

9    copies.

10          THE COURT:  Okay.  All right.  The Court is now

11    adjourned.  Thank you so much.

12          MS. SUMMERS:  All rise.

13    ************************************************************

14

15

16

17

18

19

20

21

22

23

24

25

1            **CERTIFICATE OF COURT REPORTER**

2

3        I, Candice S. Crane, Official Court Reporter for

4 the United States District Court for the Southern District

5 of Mississippi, do hereby certify that the above and

6 foregoing pages contain a full, true, and correct

7 transcript of the proceedings had in the forenamed case at

8 the time and place indicated, which proceedings were

9 stenographically recorded by me to the best of my skill and

10 ability.

11        I further certify that the transcript fees and

12 format comply with those prescribed by the Court and

13 Judicial Conference of the United States.

14        THIS, the 2nd day of April, 2024.

15

16                /s/ Candice S. Crane, RPR, RCR, CCR

17                Candice S. Crane, RPR, RCR, CCR #1781
                        Official Court Reporter
18                United States District Court
                        Candice_Crane@mssd.uscourts.gov

19

20

21

22

23

24

25

# EXHIBIT A-3

Page 1

```
 1              UNITED STATES DISTRICT COURT
 2             SOUTHERN DISTRICT OF MISSISSIPPI
 3                    NORTHERN DIVISION
 4    _____
    PHI THETA KAPPA HONOR SOCIETY,)
 5                               )
       Plaintiff/Counter-Defendant,)
 6                               )
            vs                   ) No. 3:22-cv-00208-
 7                               )      CWR-RPM
    HONORSOCIETY.ORG, INC.,      )
 8                               )      CONFIDENTIAL
      Defendant/Counter-Plaintiff )
 9      /Third-Party-Plaintiff   )
                                 )
10    HONOR SOCIETY FOUNDATION,  )
      INC.,                      )
11                               )
       Defendant                 )
12    _____)
                                 )
13    AND RELATED ACTIONS.       )
      _____)
14
15
16          VIDEOTAPED DEPOSITION TRANSCRIPT
17               OF MICHAEL MORADIAN
18              Sherman Oaks, California
19               Friday, May 3, 2024
20                  Volume III
21
22    Reported by:
      LYNN GEARHART, RPR
23    CSR No. 9466
24    JOB No. 6679300
25    PAGES 1 - 297
```

Page 2

```
 1                UNITED STATES DISTRICT COURT
 2               SOUTHERN DISTRICT OF MISSISSIPPI
 3                     NORTHERN DIVISION
 4    _____
      PHI THETA KAPPA HONOR SOCIETY,)
 5                                  )
         Plaintiff/Counter-Defendant,)
 6                                  )
      v.                            ) No. 3:22-cv-00208-
 7                                  )      CWR-RPM
      HONORSOCIETY.ORG, INC.,       )
 8                                  )   CONFIDENTIAL
         Defendant/Counter-Plaintiff )
 9        /Third-Party-Plaintiff    )
                                    )
10    HONOR SOCIETY FOUNDATION,     )
      INC.,                         )
11                                  )
         Defendant                  )
12    _____)
      HONORSOCIETY.ORG, INC.,       )
13                                  )
         Defendant/Counter-Plaintiff )
14        /Third-Party-Plaintiff    )
                                    )
15    v.                            )
                                    )
16    DR. LYNN TINCHER-LADNER,      )
                                    )
17          Third-Party Defendant.  )
      _____)
18
19          Videotaped Deposition Transcript of MICHAEL
20    MORADIAN, Volume III, taken on behalf of Plaintiff/
21    Counter-Defendant, at 15260 Ventura Boulevard, 21st
22    Floor, Sherman Oaks, California, beginning at 9:21
23    a.m. and ending at 6:14 p.m. on Friday, May 3, 2024,
24    before LYNN GEARHART, Certified Shorthand Reporter
25    No. 9466.
```

Page 47

1    Q   Has your organization used public records

2    requests in the past?

3    A   I would say yes.

4    Q   Why would an organization like yours use

5    public records requests?

6        MR. LINKE:  Objection.  Vague, calls for

7    speculation.

8    BY MR. POLAK:

9    Q   You can answer.

10   A   There are many reasons to do public records

11   requests.

12   Q   What are those reasons?

13   A   Well --

14   Q   It would be good if you just list them out

15   for me, and I can ask you questions about each one.

16   A   I will do my best.  Freedom of Information

17   Act requests can be used for transparency, for

18   intelligence, for competitive intelligence, for

19   business strategy, for identifying people, for

20   directory information and many other reasons which I

21   can't think of sitting here right now.

22   Q   Are all of those the reasons why Honor

23   Society has at one point or another issued public

24   records requests?

25       MR. LINKE:  Objection.  Overbroad.

```
                                        Page 48

1          THE WITNESS:  What do you mean by all of

2     those?

3     BY MR. POLAK:

4       Q    The ones you just listed.

5       A    Would you mind rereading them to me?

6       Q    Transparency, intelligence, competitive

7     intelligence, business strategy, identifying people,

8     directory information.

9       A    Thank you.  Now, would you mind repeating the

10    question?

11      Q    Are all of those reasons why it is that Honor

12    Society from time to time has issued public records

13    requests?

14      A    I believe to some extent, yes.

15      Q    Do you know what type of -- well, you were

16    here with Mr. Asari.  I'll just kind of cut to it.

17    You were here with Mr. Asari, and he was deposed

18    yesterday, and I showed him the public records

19    request examples that had been sent historically

20    since 2019.  And you've got them there in front of

21    you if you want to take a look at them.  These would

22    be Exhibits 250 through 255.

23          MR. LINKE:  Mr. Polak, are you referring to

24    the stack of papers --

25          MR. POLAK:  Correct.
```

Page 49

1          MR. LINKE:  -- on the right of the table?

2          MR. POLAK:  Correct.

3     Q    And you should feel free to look at those, if

4    you would like, but let me just set the table while

5    you're looking at them.

6          MR. LINKE:  Mr. Polak, do you know if that

7    stack was just left here overnight tonight?

8          MR. POLAK:  It was.

9     Q    But if you want to pull 250 to 255.  But my

10   point to you is that Mr. Asari said that the only

11   public records requests that were sent from 2019

12   prior to March of 2024 were basically these

13   directory requests that are shown in those

14   documents.  Do you have any reason to believe that

15   other types of records requests were done in that

16   time period than just the directory requests?

17          If you hand those to me, I can pull them out.

18   I've given you 250 to 255.  Those are the documents

19   that Mr. Asari yesterday identified as so-called

20   directory public records requests.  My question to

21   you is whether you recall during that 2019 to 20 --

22   early -- well, to pre-March, 2024 period, whether

23   any other types of public records requests were made

24   by your organization.

25          MR. LINKE:  Objection.  Lacks foundation.

Page 50

1           THE WITNESS:  Thank you.

2           Can you repeat the question?

3     BY MR. POLAK:

4       Q    Those look to you to be those so-called

5     directory requests you identified, asking for

6     directory information?

7           MR. LINKE:  Objection.  Misstates the

8     witness's prior testimony, assumes facts not in

9     evidence.

10    BY MR. POLAK:

11      Q    Mr. Asari told us that those are directory

12    requests, Mr. Moradian.  Do those look like the

13    directory requests that you referred to when you

14    listed out the various different reasons why Honor

15    Society had done records requests in the past?

16          Okay.  You identified a number of different

17    reasons.  One of those was directory information.

18    Are those directory requests?  I'd note for you in

19    the first paragraph it has all in capitals letters

20    the word directory.  Maybe that'll help you answer

21    my question a little more quickly.

22      A    Based on your statement and based on my

23    review of this document to the best of my ability, I

24    would assume that these are directory requests.

25      Q    Okay.  So were any other types of requests

Page 51

1    for public records sent by your company in 2019,

2    2020, 2021, 2022, 2023 or January, February of 2024,

3    than these directory requests?

4         MR. LINKE:  Objection.  Vague, overbroad,

5    compound.

6         THE WITNESS:  I'm not sure what you're

7    referring to.

8    BY MR. POLAK:

9    Q    You listed out for me several other ones,

10   Mr. Moradian.  You said that you -- asking for

11   transparency, asking for intelligence, asking for

12   competitive intelligence, asking for business

13   strategy information.  Did you send any other types

14   of records requests that met those categories?

15   A    Sitting here right now, I can't definitively

16   speak to all of the extensive possibilities of

17   records requests that may or may not have been sent.

18   Q    You understand that you are under court order

19   from Judge Meyers to produce to us every single type

20   of public records request that was sent by you in

21   the past.  You understand that; right?

22   A    I believe so.

23   Q    So telling me that you don't know is not an

24   answer.  I need to know definitively.  You're the

25   president of this organization, and your company was

Page 52

1    under court order to produce these to us.  I need to

2    know whether there were any other public records

3    requests issued by you than just these types of

4    directory requests during the time period I

5    referenced, 2019 to the first two months of 2024.

6        A    To the best --

7            MR. LINKE:  Go ahead.

8    BY MR. POLAK:

9        Q    Not to the best of my knowledge.  Yes or no?

10       A    To the best of my knowledge, sitting here

11   today right now, I believe a month removed from such

12   a request, I believe we did produce everything

13   responsive to that request.

14       Q    But what would cause you to think that that

15   might not be an unqualified yes?

16           MR. LINKE:  Are you asking about the exhibits

17   or about the court order?

18           MR. POLAK:  He knows what I'm talking about.

19       Q    Mr. Moradian.  You're saying -- you're

20   qualifying your answer, to the best of my knowledge.

21   That's not what I'm asking you.  You're under a

22   court order to state definitively whether all of

23   those records requests were gathered and produced to

24   me.  I need to know definitively.  Are these the

25   only requests that were used by your organization,

Page 53

1   these so-called directory requests, or was there

2   something else?

3      A    The reason the term to the best of my

4   knowledge was used and is used is because that

5   happened a month ago, and we took all the steps to

6   do that a month ago.  But I'm sitting here as an

7   individual today to give you the best of my

8   knowledge.

9      Q    Did you not put in a declaration, submitted

10  to the court, that you've been doing these public

11  records requests since the beginning of your

12  company?

13     A    Again, to the best of my knowledge.

14     Q    Did you qualify that declaration as to the

15  best of your knowledge, or did you state more

16  definitively what the answer was?

17     A    To the best of my knowledge.

18     Q    Okay.  We'll take a look at your declaration.

19  We'll see if that, "to the best the your knowledge"

20  qualifier was in that statement that was sworn under

21  oath.  But you can't sit here right now and tell me

22  definitively whether there were other public records

23  requests issued by your organization from 2019 to

24  the first two months of 2024.

25         MR. LINKE:  Are you asking about these

Page 54

1   exhibits in front of him?  These files.

2        MR. POLAK:  No, Derek.  I'm not asking you

3   these questions.  I'm asking Mr. Moradian, and he

4   knows what I'm talking about.

5     Q    This is -- these -- these examples, 250 to

6   255, are so-called directory requests.  I'm asking

7   you whether definitively, as a matter of yes or no,

8   do you -- did your organization send out any other

9   types of public record requests during that time

10  period than these directory requests?

11    A    I'm sorry.  Maybe in a more calm and

12  objective tone, do you think you could just --

13    Q    Could you just answer my question,

14  Mr. Moradian?  That's what I would like.

15    A    I mean you're yelling at me.

16    Q    I'm not yelling at you.

17    A    It's makes it really hard to concentrate.

18    Q    It would make it very nice if you would just

19  answer my question.

20    A    I'm doing my best, and I would like to help

21  you.

22    Q    Well, please answer my question 'cause I've

23  asked it now, I think, six times.  I need a

24  definitive yes or no.  Did your company send any

25  other types of public records requests from 2019 to

Page 55

1   the first two months of 2024 than these

2   directory-type requests that you see in 250 through

3   256?  I'm sorry, 255.

4       A    To the best of my knowledge, everything

5   responsive was produced.

6       Q    So you can't state definitively one way or

7   the other.  You have to qualify it with this to the

8   best of your knowledge.

9       A    Again, you're sitting here yelling at me --

10      Q    Not yelling.

11      A    -- in a raised tone, forcefully asking me to

12  testify of something that I already have.  And I'm

13  not in a position to, just sitting here as an

14  individual, comment past what I've already provided.

15      Q    All right.  What is -- well, historically,

16  what has been your role with regard to public

17  records requests made by your organization?

18          MR. LINKE:  Objection.  Vague.

19          THE WITNESS:  Can you be a little more

20  specific?

21  BY MR. POLAK:

22      Q    No, I can't.  It's a very simple question,

23  and I'd ask a very simple answer.  What has been

24  your role historically in connection with public

25  records requests by your organization?

Page 56

1          MR. LINKE:  Objection.  Vague.

2          THE WITNESS:  I think about them and

3    strategize about them.

4    BY MR. POLAK:

5       Q   Do you review them before they go out?

6          MR. LINKE:  Objection.  Overbroad.

7          THE WITNESS:  Not usually.

8    BY MR. POLAK:

9       Q   Do you communicate with people internally

10   about them?

11         MR. LINKE:  Objection.  Overbroad.

12         THE WITNESS:  I've been involved with public

13   records and Freedom of Information for at least 17

14   years.  So it's not something that we commonly talk

15   about at this point.

16   BY MR. POLAK:

17      Q   Have you personally issued public records

18   requests on behalf of Honor Society?

19      A   I'm not sure.

20      Q   Who all at Honor Society are you aware of

21   that has issued public records requests in the past,

22   for Honor Society?

23      A   Can you repeat that?

24         MR. POLAK:  Could you read it back, please.

25         (Record read.)

Page 57

1          THE WITNESS:  I believe that would be David

2     Asari.

3     BY MR. POLAK:

4          Q    Anybody else?

5          A    And I believe to some extent I have.

6          Q    What records -- types of records requests

7     have you issued in the past?  And let me be clear

8     for you.  We identified 250 through 255 as a

9     directory type of request.  Have you issued

10    directory type requests for Honor Society in the

11    past?

12         MR. LINKE:  Objection.  Ambiguous, misstates

13    the witness's prior testimony, assumes facts not in

14    evidence.

15         THE WITNESS:  Can you repeat that?

16    BY MR. POLAK:

17         Q    250 through 255 we identified as a

18    directory-type of records request.

19         A    Uh-huh.

20         Q    Is that the type of -- is that a type of

21    records request that you personally have issued in

22    the past for Honor Society?

23         MR. LINKE:  Objection.  Assumes facts not in

24    evidence.

25         THE WITNESS:  I'm not sure.

Page 58

1    BY MR. POLAK:

2      Q   You referenced before that Mr. Asari has sent

3    records requests and that you have.  What types of

4    records request do you recall issuing in the past?

5          MR. LINKE:  Objection.  Assume facts not in

6    evidence, ambiguous.

7          THE WITNESS:  Well, our organization has been

8    doing records requests from inception, and I don't

9    remember what records requests I've done in the

10   history.  You know, I'm the CEO, executive director

11   of this organization, and this is not really at the

12   top of my mind, Freedom of Information requests.

13   It's not something today.

14   BY MR. POLAK:

15     Q   Well, it was at the top of Judge Meyers's

16   mind when he ordered you guys to produce them to us.

17   I will tell you I haven't seen any records requests

18   produced by your company that were issued by you.

19         So you're telling me here today that you have

20   issued them in the past, and so I'm concerned.  And

21   I would like to know what you remember about sending

22   those requests.  What was the subject matter?  When

23   did you do it?

24         MR. LINKE:  Objection.  Misstates the

25   witness's prior testimony.

Page 59

1          THE WITNESS:  I'm happy you're concerned

2     because I also share some concerns.  And I think

3     that it's important -- maybe you can remind me.

4     What was the date of the -- cutoff dates for this

5     request?

6     BY MR. POLAK:

7        Q   This is not this time for us to have that

8     dialogue, Mr. Moradian.  I'm simply asking you --

9     you apparently remembered issuing some public

10    records requests in the past that Mr. Asari did not

11    issue.  And I'm asking you, what ae you thinking of

12    when that answer was given?  What was the subject

13    matter?  When was it made?

14       A   Can you repeat that --

15       Q   No.

16       A   -- more succinctly?

17       Q   You've heard me.  I've now asked you this

18    three times.  What were the public records requests

19    subject matters that were involved in the emails

20    that you sent and when were they sent?

21          MR. LINKE:  Mr. Polak, as of yesterday, I

22    would ask that you not yell at the witness --

23          MR. POLAK:  Not yelling.

24          MR. LINKE:  -- throughout the day yesterday.

25    You've already been asked by the witness today not

Page 60

1  to do it, and he mentioned it made it hard for him

2  to answer the questions.  We can have a civil

3  deposition without you raising your voice when

4  you're trying to force him to give you answers under

5  pressure.  There's no need for it.

6       MR. POLAK:  Not -- first of all, not yelling;

7  second of all, not raising my voice either.

8    Q    But I am being direct with you, Mr. Moradian,

9  because you are not answering my questions.  And I

10  think you are intentionally being evasive about

11  answering my questions, just like Mr. Asari was

12  intentionally evasive about answering my questions

13  yesterday.

14       So I'm going to ask you this one more time,

15  and this is your chance to answer the question.  I

16  would like you to describe for me the subject matter

17  of the public records requests that you were

18  thinking of when you answered my question a few

19  short moments ago that you thought you had sent

20  public records requests in the past.  What was the

21  subject matter?

22    A    Firstly, I am trying my best to answer every

23  question as quickly and succinctly as possible.  I

24  think you're intentionally yelling at me and

25  intentionally putting pressure on me.  So I again,

1    I'm trying my best here, and I would please ask that

2    you respect this civil dialogue.

3        Q    Would you just answer my question,

4    Mr. Moradian?

5        A    I'm sorry.  Can you quickly just --

6        Q    No.  You know what I asked you for.  I'm not

7    going to ask it again.  Tell me what the subject

8    matter was of these emails of the public records

9    requests that you think you sent in the past.  I

10   think this is the eighth time I've asked you this

11   question.

12       A    I think I sent a number of them around the

13   foundational time of Honor Society to understand

14   what's possible and the directory information around

15   inception time.

16       Q    So they were directory-type requests.  Do you

17   recall any other types of subject matter that you

18   sent public records requests for Honor Society?

19       A    I'm not sure.

20       Q    You said that you think about public records

21   requests.  What do you mean by that?  As a part of

22   your role in connection with the public records

23   requests issued by Honor Society, you said that you

24   think about them.  What do you mean by that?

25       A    Sure.  So public institutions, such as the

1    institutions that many honor societies work with,

2    that Dr. Tincher-Ladner emails and corresponds with,

3    in fact in her case they're almost exclusively

4    public institutions.  And, you know, as

5    Dr. Tincher-Ladner refers to them as sunshine --

6    sunshine laws, they are exactly that.  They are

7    meant to bring sunshine or illuminate to the public

8    discrepancies, issues, violations.  And Freedom of

9    Information Act has been used accordingly many

10   times, from Sandusky and researching Sandusky's

11   actions at Penn State University, Larry Nassar --

12       Q   Do you ask for -- do you ask for this stuff

13   for Honor Society business?  'Cause none of that is

14   responsive to my question.  I'm just asking you what

15   you think about in your role in connection with your

16   role with the Honor Society.

17           MR. LINKE:  Mr. Moradian, were you finished

18   with your answer before he interrupted you?

19           THE WITNESS:  No, I wasn't.

20   BY MR. POLAK:

21       Q   Okay.  You keep -- you keep wasting my time

22   --

23       A   No, I'm not --

24       Q   -- with information that I did not ask for.

25   But if you want to keep taking up time on this

Page 63

1   record, telling me about Larry Nassar and the swim

2   team, you go right ahead.  But that's not at all

3   what I asked about.

4       A    Can you please repeat what you asked?

5           Ms. Reporter?

6           MR. LINKE:  Mr. Polak, the rule provides that

7   your remedy is to object as nonresponsive at the

8   conclusion of the answer.

9           MR. POLAK:  Okay.  So you're endorsing him

10  wasting our time today, Derek.

11          MR. LINKE:  I'm addressing your conduct

12  during deposition, which is an ongoing problem we've

13  had through many --

14          MR. POLAK:  There's a problem with the

15  conduct in the deposition, Derek.  There's no

16  question about that, but it's not on me.

17          THE WITNESS:  Can I finish my response?

18          MR. POLAK:  No.  I'll withdraw the question.

19  I'm tired of hearing it.

20          THE WITNESS:  No, I'm -- I need to --

21          MR. POLAK:  No.  I withdraw the question, and

22  I'll strike your answer.

23      Q    With respect to strategizing about these at

24  Honor Society, that was also a role that you said

25  that you had.  Why don't you tell me how -- who it

Page 212

```
 1     Q   Did you read Judge Reeves's preliminary
 2   injunction order concerning the survey?
 3     A   I believe -- I believe so.
 4     Q   Do you -- do you recall that Judge Reeves
 5   called this survey malicious?
 6     A   I'm not sure.
 7     Q   You're not sure?  You don't recall.  That's a
 8   pretty big word and a pretty important word where a
 9   federal judge calls this survey malicious, and you
10   don't recall that?
11     A   I recall reading the statement.
12     Q   Okay.  So you recall reading the statement in
13   the injunction where he called it malicious.  Do you
14   agree with Judge Reeves that this survey was
15   maliciously intended?
16         MR. LINKE:  Objection.  Misstates the
17   witness's prior testimony.
18         THE WITNESS:  While I admire Judge Reeves and
19   I view him as venerable and respect him, I believe
20   that, you know, in that TRO hearing he was very
21   misinformed, and I don't think that he has had the
22   chance to have a truly objective analysis.
23         So, you know, to that extent -- and you're
24   asking -- you're asking me.  I mean to that extent,
25   I think that I don't think he had a fair chance to
```

Page 296

1          I, the undersigned, a Certified Shorthand

2     Reporter of the State of California, do hereby

3     certify:

4          That the foregoing proceedings were taken

5     before me at the time and place herein set forth;

6     that any witnesses in the foregoing proceedings,

7     prior to testifying, were placed under oath; that a

8     verbatim record of the proceedings was made by me

9     using machine shorthand which was thereafter

10    transcribed under my direction; further, that the

11    foregoing is an accurate transcription thereof.

12         Further, that if the foregoing pertains to

13    the original transcript of a deposition in a Federal

14    Case, before completion of the proceedings, review

15    of the transcript [ ] was [ ] was not requested.

16         I further certify that I am neither

17    financially interested in the action nor a relative

18    or employee of any attorney or any of the parties.

19         IN WITNESS WHEREOF, I have this date

20    subscribed my name.

21

22    Dated: May 3, 2024

23

24    _____

      LYNN GEARHART, RPR

25    CSR No. 9466

# EXHIBIT A-4

| Date | Name | Description | Orig Hrs | Orig Amt | Orig Rate | Rev Hrs | Rev Amt | Invoice | Status | Narrative |
|------|------|-------------|----------|----------|-----------|---------|---------|---------|--------|-----------|
| 05/09/2024 | Polak, Jonathan G. | Partner | 1.10 | 907.50 | 825.00 | 1.10 | 907.50 | 6349699 | Billed | Attention to social media posts by Honor Society concerning counterclaims; evaluate strategy on same; conference with Lynn Tincher-Ladner regarding same; prepare email to counsel on same. |
| 05/09/2024 | Smoot, Rachel A. | Associate | 1.50 | 705.00 | 470.00 | 1.50 | 705.00 | 6349699 | Billed | Call with client regarding false advertising issues. |
| 05/09/2024 | Smoot, Rachel A. | Associate | 0.70 | 329.00 | 470.00 | 0.70 | 329.00 | 6349699 | Billed | Call with co-counsel regarding latest social media posts and press release by Defendants. |
| 05/10/2024 | Smoot, Rachel A. | Associate | 0.30 | 141.00 | 470.00 | 0.30 | 141.00 | 6349699 | Billed | Call with co-counsel regarding latest developments as it relates to false advertising claim. |
| 05/13/2024 | Smoot, Rachel A. | Associate | 0.40 | 188.00 | 470.00 | 0.40 | 188.00 | 6349699 | Billed | Call with client regarding latest social media posts by Defendants. |
| 05/14/2024 | Polak, Jonathan G. | Partner | 0.50 | 412.50 | 825.00 | 0.50 | 412.50 | 6349699 | Billed | Conference with Dr. Tincher-Ladner regarding status of case and recent public communications by HS.org; review and exchange emails regarding same with client. |
| 05/19/2024 | Polak, Jonathan G. | Partner | 0.50 | 412.50 | 825.00 | 0.50 | 412.50 | 6349699 | Billed | Review issues related to mailing of press release; consider legal strategy on same; exchange emails with client and Rachel Smoot regarding same. |
| 06/06/2024 | Polak, Jonathan G. | Partner | 0.30 | 247.50 | 825.00 | 0.30 | 247.50 | 6376040 | Billed | Review emails from client regarding recent records requests made by Honor Society; review preliminary injunction to determine compliance; respond to emails from client. |
| 06/06/2024 | Polak, Jonathan G. | Partner | 0.30 | 247.50 | 825.00 | 0.30 | 247.50 | 6376040 | Billed | Review emails from client regarding recent advertisements and solicitations by Honor Society; evaluate strategy on same; respond to emails from client. |
| 06/10/2024 | Smoot, Rachel A. | Associate | 0.40 | 188.00 | 470.00 | 0.40 | 188.00 | 6376040 | Billed | Review and analyze latest posts and press releases by Honor Society; confer with co-counsel regarding same. |
| 06/11/2024 | Polak, Jonathan G. | Partner | 0.30 | 247.50 | 825.00 | 0.30 | 247.50 | 6376040 | Billed | Review recent records requests brought to attention of client by community colleges; review injunction order; prepare email to client with evaluation of same. |
| 06/12/2024 | Polak, Jonathan G. | Partner | 1.80 | 1,485.00 | 825.00 | 1.80 | 1,485.00 | 6376040 | Billed | Review recent social media posts by Honor Society; consider strategies for addressing same, including injunctive relief; conference with C. Cowan regarding same; conference with Rachel Smoot regarding same; conference with Mike Etienne regarding same; conference with Lynn Tincher-Ladner regarding same |
| 06/12/2024 | Etienne, William M. | Associate | 3.90 | 1,813.50 | 465.00 | 3.90 | 1,813.50 | 6376040 | Billed | Research case law regarding PTK motion to cause HS to cease publications characterizing the lawsuit. |
| 06/12/2024 | Etienne, William M. | Associate | 1.90 | 883.50 | 465.00 | 1.90 | 883.50 | 6376040 | Billed | Prepare outline including case law on Motion for Gag Order. |
| 06/12/2024 | Etienne, William M. | Associate | 2.40 | 1,116.00 | 465.00 | 2.40 | 1,116.00 | 6376040 | Billed | Continue to outline Memo in support of Motion for Gag Order; prepare Introduction and portion of Statement of Facts. |
| 06/12/2024 | Kendall, Kristina | Paralegal | 0.10 | 43.50 | 435.00 | 0.00 | 0.00 | 6376040 | Billed | Perform PageVault capture for Rachel Smoot. |
| 06/12/2024 | Sears, Hayley A. | Associate | 1.20 | 450.00 | 375.00 | 1.20 | 450.00 | 6376040 | Billed | Discuss with preliminary injunction and gag order with Mike Etienne and partake in call on document review. |
| 06/12/2024 | Smoot, Rachel A. | Associate | 1.00 | 470.00 | 470.00 | 1.00 | 470.00 | 6376040 | Billed | Confer with co-counsel regarding preparation of Motion for Gag Order; review and analyze case law regarding same. |
| 06/13/2024 | Matthews, Alex M. | Associate | 8.70 | 3,262.50 | 375.00 | 8.70 | 3,262.50 | 6376040 | Billed | Drafting and revising motion for preliminary injunction regarding Honor Society press releases and social media posts; reviewing and analyzing Honor Society publicly released materials; reviewing and analyzing motion for PI briefing and ruling |
| 06/13/2024 | Polak, Jonathan G. | Partner | 3.20 | 2,640.00 | 825.00 | 3.20 | 2,640.00 | 6376040 | Billed | Continue work on preliminary injunction/gag order strategy and related papers; conference with Mike Etienne regarding same; review cases and other relevant authorities for same; review file materials for same; review and exchange communications with client regarding same. |
| 06/13/2024 | Etienne, William M. | Associate | 8.20 | 3,813.00 | 465.00 | 8.20 | 3,813.00 | 6376040 | Billed | Continue to prepare Memo in Support of Motion for Gag Order. |
| 06/13/2024 | Sears, Hayley A. | Associate | 5.20 | 1,950.00 | 375.00 | 5.20 | 1,950.00 | 6376040 | Billed | Review exhibits containing twitter accounts, article, independent sources, and HS website and draft statement of facts. |
| 06/13/2024 | Smoot, Rachel A. | Associate | 0.70 | 329.00 | 470.00 | 0.70 | 329.00 | 6376040 | Billed | Confer with co-counsel regarding additional evidence in support of emergency motion to stop Defendants' publications. |
| 06/14/2024 | Matthews, Alex M. | Associate | 9.30 | 3,487.50 | 375.00 | 9.30 | 3,487.50 | 6376040 | Billed | Drafting and revising motion for PI regarding HS' website & social media postings; reviewing and analyzing docket, exhibits, and transcripts for same; internal team conference regarding same |
| 06/14/2024 | Polak, Jonathan G. | Partner | 0.90 | 742.50 | 825.00 | 0.90 | 742.50 | 6376040 | Billed | Continue work on TRO papers and strategy; conference with Mike Etienne regarding same. |
| 06/14/2024 | Etienne, William M. | Associate | 8.40 | 3,906.00 | 465.00 | 8.40 | 3,906.00 | 6376040 | Billed | Continue to prepare Memorandum in support of Gag Order and Preliminary Injunction based on Defendants misleading publications. |
| 06/14/2024 | Sears, Hayley A. | Associate | 5.30 | 1,987.50 | 375.00 | 5.30 | 1,987.50 | 6376040 | Billed | Read draft motion for preliminary injunction and gag order, draft Jonathan Polak declaration, review new exhibits, and research case law on gag order. |
| 06/14/2024 | Sears, Hayley A. | Associate | 0.30 | 112.50 | 375.00 | 0.30 | 112.50 | 6376040 | Billed | Call with Mike Etienne to get update on next steps for briefing. |
| 06/15/2024 | Sears, Hayley A. | Associate | 4.00 | 1,500.00 | 375.00 | 4.00 | 1,500.00 | 6376040 | Billed | Review new twitter accounts, Facebook posts, and instagram posts and send to Mike and draft Lynn's declaration. |
| 06/15/2024 | Sears, Hayley A. | Associate | 0.80 | 300.00 | 375.00 | 0.80 | 300.00 | 6376040 | Billed | Edit statement of facts to incorporate new information and caricatures of Lynn. |
| 06/16/2024 | Polak, Jonathan G. | Partner | 0.30 | 247.50 | 825.00 | 0.30 | 247.50 | 6376040 | Billed | Review emails from client on social media postings by Honor Society; prepare email to Mike Etienne regarding inclusion of same in moving papers. |
| 06/16/2024 | Etienne, William M. | Associate | 0.40 | 186.00 | 465.00 | 0.40 | 186.00 | 6376040 | Billed | Discuss Statement of Facts and Declaration in support of Motion for Preliminary Injunction and Gag Order. |
| 06/17/2024 | Matthews, Alex M. | Associate | 13.20 | 4,950.00 | 375.00 | 13.20 | 4,950.00 | 6376040 | Billed | Editing and revising motion for PI & gag order; reviewing and analyzing HS discovery requests and associated pleadings; reviewing and coding documents for production |
| 06/17/2024 | Polak, Jonathan G. | Partner | 1.80 | 1,485.00 | 825.00 | 1.80 | 1,485.00 | 6376040 | Billed | Continue work on memo and related papers in support of Motion for Preliminary Injunction; internal conferences regarding same; exchange emails with local counsel regarding same. |
| 06/17/2024 | Etienne, William M. | Associate | 4.70 | 2,185.50 | 465.00 | 4.70 | 2,185.50 | 6376040 | Billed | Revise Statement of Facts for Motion for Preliminary Injunction and Gag Order. |
| 06/17/2024 | Etienne, William M. | Associate | 5.20 | 2,418.00 | 465.00 | 5.20 | 2,418.00 | 6376040 | Billed | Prepare additional portions of Gag Order Argument for brief in support of same; provide comments regarding Tortious Interference claims for same. |
| 06/17/2024 | Smoot, Rachel A. | Associate | 6.30 | 2,961.00 | 470.00 | 6.30 | 2,961.00 | 6376040 | Billed | Revise and edit Memorandum in Support of Motion for Preliminary Injunction and Gag Order and documents in support of same; review and analyze latest public statements by Defendant for the purpose of including into Memorandum. |
| 06/17/2024 | Sears, Hayley A. | Associate | 0.20 | 75.00 | 375.00 | 0.20 | 75.00 | 6376040 | Billed | Check in with Mike Etienne about preliminary injunction statement of facts and document review. |
| 06/18/2024 | Etienne, William M. | Associate | 0.50 | 232.50 | 465.00 | 0.50 | 232.50 | 6376040 | Billed | Review additional publications by Defendants in last two days and review HS and HS Foundation Twitter and Instagram accounts in connection with preparation of additional exhibits. |
| 06/18/2024 | Etienne, William M. | Associate | 6.20 | 2,883.00 | 465.00 | 6.20 | 2,883.00 | 6376040 | Billed | Discuss comments and revise brief in support of motion for gag order and preliminary injunction in view of comments and new offending conduct. |
| 06/18/2024 | Smoot, Rachel A. | Associate | 2.10 | 987.00 | 470.00 | 2.10 | 987.00 | 6376040 | Billed | Revise and edit Memorandum in Support of Motion for Preliminary Injunction and Gag Order; revise and edit Lynn Tincher-Ladner Declaration in support of same. |
| 06/18/2024 | Sears, Hayley A. | Associate | 2.20 | 825.00 | 375.00 | 2.20 | 825.00 | 6376040 | Billed | Research case law on witness intimidation for gag order brief, look for new material on twitter, facebook, linkedin, and instagram, and communicate with mike about next steps to finalize brief and declarations. |
| 06/19/2024 | Etienne, William M. | Associate | 4.70 | 2,185.50 | 465.00 | 4.70 | 2,185.50 | 6376040 | Billed | Review examples of Defendants' 1,244 AI-generated college-specific articles; incorporate facts regarding same in preliminary injunction and gag order facts. |
| 06/19/2024 | Etienne, William M. | Associate | 2.40 | 1,116.00 | 465.00 | 2.40 | 1,116.00 | 6376040 | Billed | Prepare Motion for Preliminary Injunction and Gag Order including Prayer for Relief and request for attorneys' fees; identify case law in support of same. |

| Date | Name | Description | Orig Hrs | Orig Amt | Orig Rate | Rev Hrs | Rev Amt | Invoice | Status | Narrative |
|---|---|---|---|---|---|---|---|---|---|---|
| 06/19/2024 | Etienne, William M. | Associate | 0.40 | 186.00 | 465.00 | 0.40 | 186.00 | 6376040 | Billed | Review correspondence and provide suggested edits to same regarding Defendants' alleged motion to compel discovery. |
| 06/19/2024 | Etienne, William M. | Associate | 0.60 | 279.00 | 465.00 | 0.60 | 279.00 | 6376040 | Billed | Revise Introduction of preliminary injunction briefing based on discovery of AI-generated articles. |
| 06/19/2024 | Smoot, Rachel A. | Associate | 6.40 | 3,008.00 | 470.00 | 6.40 | 3,008.00 | 6376040 | Billed | Revise and edit Memorandum in Support of Motion for TRO/PI/Gag Order and supporting documents; confer with co-counsel regarding same. |
| 06/19/2024 | Sears, Hayley A. | Associate | 3.00 | 1,125.00 | 375.00 | 3.00 | 1,125.00 | 6376040 | Billed | Research case law about tortious interference preliminary injunction where social media was enjoined |
| 06/19/2024 | Polak, Jonathan G. | Partner | 3.40 | 2,805.00 | 825.00 | 3.40 | 2,805.00 | 6376040 | Billed | Continue work on motion to TRO and related papers; exchange emails with local counsel regarding same; exchange emails with client regarding same; review new evidence. |
| 06/19/2024 | Polak, Jonathan G. | Partner | 0.80 | 660.00 | 825.00 | 0.80 | 660.00 | 6376040 | Billed | Conference with Lynn Tincher-Ladner regarding status of TRO papers and other recent activities related to social media postings by Honor Society. |
| 06/19/2024 | Peluchette, Neil R. | Associate | 8.20 | 3,444.00 | 420.00 | 8.20 | 3,444.00 | 6376040 | Billed | PageVault website captures of hundreds of articles on Honor Society's website. |
| 06/20/2024 | Nienhouse, Hillary | Clerk | 4.50 | 1,170.00 | 260.00 | 4.50 | 1,170.00 | 6376040 | Billed | Meet with Neil Peluchette; Take Page Vault captures of web articles about client Phi Theta Kappa |
| 06/20/2024 | Polak, Jonathan G. | Partner | 0.50 | 412.50 | 825.00 | 0.50 | 412.50 | 6376040 | Billed | Conference with local counsel on strategy for TRO. |
| 06/20/2024 | Polak, Jonathan G. | Partner | 1.80 | 1,485.00 | 825.00 | 1.80 | 1,485.00 | 6376040 | Billed | Continue work on TRO and related paperwork and strategy. |
| 06/20/2024 | Etienne, William M. | Associate | 1.80 | 837.00 | 465.00 | 1.80 | 837.00 | 6376040 | Billed | Prepare slides for hearing on preliminary injunction and board presentation demonstrating HS's wrongful publications. |
| 06/20/2024 | Etienne, William M. | Associate | 0.90 | 418.50 | 465.00 | 0.90 | 418.50 | 6376040 | Billed | Review additional AI-generated articles created by HS to disparage PTK, which now total nearly 5,000. |
| 06/20/2024 | Etienne, William M. | Associate | 0.50 | 232.50 | 465.00 | 0.50 | 232.50 | 6376040 | Billed | Meet with local counsel to discuss strategy for preliminary injunction and gag order briefing. |
| 06/20/2024 | Peluchette, Neil R. | Associate | 8.90 | 3,738.00 | 420.00 | 8.90 | 3,738.00 | 6376040 | Billed | PageVault website captures of hundreds of articles on Honor Society's website. |
| 06/21/2024 | Etienne, William M. | Associate | 0.70 | 325.50 | 465.00 | 0.70 | 325.50 | 6376040 | Billed | Attend meeting with PTK board regarding HS's malicious conduct. |
| 06/21/2024 | Peluchette, Neil R. | Associate | 3.80 | 1,596.00 | 420.00 | 3.80 | 1,596.00 | 6376040 | Billed | PageVault website captures of hundreds of articles on Honor Society's website; correspondence with PageVault regarding the mass capture of the Honor Society's website; call with PageVault regarding same; collection of prior captured content for production. |
| 06/24/2024 | Polak, Jonathan G. | Partner | 0.50 | 412.50 | 825.00 | 0.50 | 412.50 | 6376040 | Billed | Review newly published social media websites; consider issues related to motion for TRO; exchange communications with client regarding same. |
| 06/24/2024 | Peluchette, Neil R. | Associate | 1.20 | 504.00 | 420.00 | 1.20 | 504.00 | 6376040 | Billed | Receipt of PageVault downloads from PageVault; collection of same and providing to litigation support for processing and production. |
| 06/24/2024 | Peluchette, Neil R. | Associate | 0.70 | 294.00 | 420.00 | 0.70 | 294.00 | 6376040 | Billed | PageVault capture of two newly published articles. |
| 06/24/2024 | Smoot, Rachel A. | Associate | 0.80 | 376.00 | 470.00 | 0.80 | 376.00 | 6376040 | Billed | Confer with co-counsel regarding Motion for Temporary Restraining Order and additional evidence in support of same. |
| 06/25/2024 | Etienne, William M. | Associate | 1.50 | 697.50 | 465.00 | 1.50 | 697.50 | 6376040 | Billed | Review new Honor Society publications disparaging PTK; print and prepare publications and related correspondence as demonstratives for discovery hearing. |
| 06/25/2024 | Sears, Hayley A. | Associate | 3.00 | 1,125.00 | 375.00 | 3.00 | 1,125.00 | 6376040 | Billed | Search for new articles, tweets, and news sources; compare new ones to original documents; and converse with Mike Etienne about next steps. |
| 06/26/2024 | Polak, Jonathan G. | Partner | 0.40 | 330.00 | 825.00 | 0.40 | 330.00 | 6376040 | Billed | Review recent changes to social media sites; conference with Rachel Smoot regarding same. |
| 06/26/2024 | Peluchette, Neil R. | Associate | 0.40 | 168.00 | 420.00 | 0.40 | 168.00 | 6376040 | Billed | PageVault capture of newly published web article. |
| 06/26/2024 | Sears, Hayley A. | Associate | 2.10 | 787.50 | 375.00 | 2.10 | 787.50 | 6376040 | Billed | Search for additional articles and create exhibit table outlining all of the exhibits and their content. |
| 06/27/2024 | Etienne, William M. | Associate | 0.80 | 372.00 | 465.00 | 0.80 | 372.00 | 6376040 | Billed | Meet to discuss TRO briefing regarding Defendants' malicious publications, PTK's interrogatory responses, Defendants' protective order violations, and document productions. |
| 06/27/2024 | Etienne, William M. | Associate | 12.80 | 5,952.00 | 465.00 | 12.80 | 5,952.00 | 6376040 | Billed | Revise brief in support of Motion for TRO and Gag Order including sections on tortious interference, gag order, and introduction, conclusion, and statement of facts. |
| 06/27/2024 | Smoot, Rachel A. | Associate | 1.60 | 752.00 | 470.00 | 1.60 | 752.00 | 6376040 | Billed | Call with co-counsel regarding Motion for Temporary Restraining Order/ Gag Order. |
| 06/28/2024 | Smoot, Rachel A. | Associate | 3.20 | 1,488.00 | 465.00 | 3.20 | 1,488.00 | 6376040 | Billed | Revise brief to include additional examples of injury to PTK; prepare demonstrative chart in furtherance of same. |
| 06/28/2024 | Smoot, Rachel A. | Associate | 0.50 | 235.00 | 470.00 | 0.50 | 235.00 | 6376040 | Billed | Confer with co-counsel regarding evidence for Motion for Temporary Restraining Order. |
| 06/28/2024 | Etienne, William M. | Associate | 0.40 | 186.00 | 465.00 | 0.40 | 186.00 | 6376040 | Billed | Revise Motion for PI based on newly discovered evidence; circulate same with comments in conjunction with brief to local counsel for further review. |
| 06/28/2024 | Smoot, Rachel A. | Associate | 0.50 | 235.00 | 470.00 | 0.50 | 235.00 | 6376040 | Billed | Review legal research related to unauthorized access of PTK information; confer with co-counsel regarding same. |
| 06/29/2024 | Smoot, Rachel A. | Associate | 2.50 | 1,175.00 | 470.00 | 2.50 | 1,175.00 | 6376040 | Billed | Revise and edit Tincher-Ladner Declaration in Support of Motion for Temporary Restraining Order/Gag Order. |
| 06/30/2024 | Polak, Jonathan G. | Partner | 1.20 | 990.00 | 825.00 | 1.20 | 990.00 | 6376040 | Billed | Continue work on TRO and injunction papers. |
| 06/30/2024 | Etienne, William M. | Associate | 3.30 | 1,534.50 | 465.00 | 3.30 | 1,534.50 | 6376040 | Billed | Revise brief to include proper exhibit citations; address further comments regarding same. |
| 06/30/2024 | Matthews, Alex M. | Associate | 9.40 | 3,525.00 | 375.00 | 9.40 | 3,525.00 | 6376040 | Billed | Editing and revising motion for PI; gathering exhibits and cited materials; editing and revising declarations; internal team conference regarding finalizing brief and exhibits |
| 07/01/2024 | Etienne, William M. | Associate | 0.80 | 372.00 | 465.00 | 0.80 | 372.00 | 6402281 | Billed | Revise motion for preliminary injunction based on comments regarding gag order. |
| 07/01/2024 | Etienne, William M. | Associate | 0.80 | 372.00 | 465.00 | 0.80 | 372.00 | 6402281 | Billed | Coordinate exhibits for LTL declaration and brief in support of motion for preliminary injunction; review citations in brief in furtherance of same. |
| 07/01/2024 | Matthews, Alex M. | Associate | 8.20 | 3,075.00 | 375.00 | 8.20 | 3,075.00 | 6402281 | Billed | Revising and editing brief for PI motion; drafting and revising Polak decl; reviewing and coding documents for production |
| 07/01/2024 | Smoot, Rachel A. | Associate | 4.40 | 2,068.00 | 470.00 | 4.40 | 2,068.00 | 6402281 | Billed | Revise and edit Memorandum in Support of Motion for Temporary Restraining Order and Gag Order; revise and edit Tincher-Ladner Declaration in Support of same; multiple calls and emails with co-counsel regarding same; messages with client |
| 07/01/2024 | Polak, Jonathan G. | Partner | 1.40 | 1,155.00 | 825.00 | 1.40 | 1,155.00 | 6402281 | Billed | Continue work on TRO and related papers; internal communications regarding same. |
| 07/02/2024 | Matthews, Alex M. | Associate | 7.70 | 2,887.50 | 375.00 | 7.70 | 2,887.50 | 6402281 | Billed | Revising and editing exhibits for motion for PI; reviewing and coding documents for production |
| 07/02/2024 | Balthazor Jr., O.J. | Associate | 0.60 | 288.00 | 480.00 | 0.60 | 288.00 | 6402281 | Billed | Review and analyze emails from Rachel Smoot and Mike Etienne regarding screenshots for motion; phone call with Rachel Smoot regarding the same; pull screenshots of Google search results pages for purposes of attaching to motion; email Rachel Smoot and Mike Etienne regarding the same. |
| 07/02/2024 | Smoot, Rachel A. | Associate | 4.10 | 1,927.00 | 470.00 | 4.10 | 1,927.00 | 6402281 | Billed | Revise and edit Memorandum in of Support of Motion for Preliminary Injunction, Temporary Restraining Order and/or Gag Order; revise and edit Tincher-Ladner Declaration in Support of the same; revise and edit Polak Declaration in Support of the same; multiple emails and calls with client and co-counsel regarding same. |
| 07/02/2024 | Polak, Jonathan G. | Partner | 2.70 | 2,227.50 | 825.00 | 2.70 | 2,227.50 | 6402281 | Billed | Continue work on motion for TRO and related papers; internal conferences regarding same; exchange of emails with local counsel regarding same. |
| 07/02/2024 | Etienne, William M. | Associate | 1.20 | 558.00 | 465.00 | 1.20 | 558.00 | 6402281 | Billed | Revise PTK brief in support of TRO and Gag Order to align requested relief with that of Motion and to highlight PTK's need for right to a fair trial. |

| Date | Name | Description | Orig Hrs | Orig Amt | Orig Rate | Rev Hrs | Rev Amt | Invoice | Status | Narrative |
|------|------|-------------|----------|----------|-----------|---------|---------|---------|--------|-----------|
| 07/02/2024 | Etienne, William M. | Associate | 0.80 | 372.00 | 465.00 | 0.80 | 372.00 | 6402281 | Billed | Review Search Engine Optimization case law and revise PTK brief in support of TRO / GO to include discussion of same. |
| 07/02/2024 | Etienne, William M. | Associate | 2.20 | 1,023.00 | 465.00 | 2.20 | 1,023.00 | 6402281 | Billed | Revise PTK brief in support of TRO and Gag Order to include discussion of additional, quantified harm. |
| 07/02/2024 | Etienne, William M. | Associate | 1.10 | 511.50 | 465.00 | 1.10 | 511.50 | 6402281 | Billed | Revise PTK brief in support of TRO and Gag Order to include discussion of Defendants' conduct being far more than a protectable press-release . |
| 07/02/2024 | Etienne, William M. | Associate | 0.80 | 372.00 | 465.00 | 0.80 | 372.00 | 6402281 | Billed | Revise PTK brief in support of TRO and Gag Order to include updated exhibit reference; prepare additional material for exhibits in furtherance of same. |
| 07/02/2024 | Etienne, William M. | Associate | 8.60 | 3,999.00 | 465.00 | 8.60 | 3,999.00 | 6402281 | Billed | Revise all portions of PTK brief in support of TRO and Gag Order to reduce length and provide more persuasive requests for relief; revise Motion to achieve same. |
| 07/03/2024 | Smoot, Rachel A. | Associate | 7.00 | 3,290.00 | 470.00 | 7.00 | 3,290.00 | 6402281 | Billed | Review and edit Memorandum in Support of Motion for Temporary Restraining Order, Preliminary Injunction, and/or Gag Order; revise and edit supporting documents in support of same; draft, revise, and edit Motion to Seal and Proposed Order granting same. |
| 07/03/2024 | Smoot, Rachel A. | Associate | 0.30 | 141.00 | 470.00 | 0.30 | 141.00 | 6402281 | Billed | Confer with local counsel regarding scheduled hearing; draft Notice of Hearing. |
| 07/03/2024 | Polak, Jonathan G. | Partner | 4.30 | 3,547.50 | 825.00 | 4.30 | 3,547.50 | 6402281 | Billed | Continue work on TRO and related papers; internal conferences regarding same. |
| 07/03/2024 | Etienne, William M. | Associate | 9.60 | 4,464.00 | 465.00 | 9.60 | 4,464.00 | 6402281 | Billed | Revise brief in support of motion for TRO/PI and GO based on comments from local counsel; revise same to include pin citations for exhibits A1-46; revision motion and declaration in view of same; coordinate filing of same. |
| 07/04/2024 | Smoot, Rachel A. | Associate | 0.30 | 141.00 | 470.00 | 0.30 | 141.00 | 6402281 | Billed | Attention to multiple emails from opposing counsel. |
| 07/04/2024 | Polak, Jonathan G. | Partner | 0.20 | 165.00 | 825.00 | 0.20 | 165.00 | 6402281 | Billed | Receive and review email from D. Linke regarding confidentiality designations under motion to seal; consider response to same; prepare response. |
| 07/05/2024 | Smoot, Rachel A. | Associate | 0.20 | 94.00 | 470.00 | 0.20 | 94.00 | 6402281 | Billed | Finalize and file Notice of Hearing. |
| 07/05/2024 | Smoot, Rachel A. | Associate | 0.60 | 282.00 | 470.00 | 0.60 | 282.00 | 6402281 | Billed | Attention to multiple emails from opposing counsel; confer with co-counsel regarding same; redact Tincher-Ladner Declaration and send same to opposing counsel. |
| 07/05/2024 | Polak, Jonathan G. | Partner | 0.30 | 247.50 | 825.00 | 0.30 | 247.50 | 6402281 | Billed | Prepare status email to Lynn Tincher-Ladner on pending motions and anticipated schedule for next week. |
| 07/07/2024 | Smoot, Rachel A. | Associate | 0.30 | 141.00 | 470.00 | 0.30 | 141.00 | 6402281 | Billed | Attention to Response in Opposition to Motion to Seal. |
| 07/07/2024 | Etienne, William M. | Associate | 0.40 | 186.00 | 465.00 | 0.40 | 186.00 | 6402281 | Billed | Review Defendants' Response to PTK's Motion to Seal. |
| 07/08/2024 | Polak, Jonathan G. | Partner | 1.50 | 1,237.50 | 825.00 | 1.50 | 1,237.50 | 6402281 | Billed | Prepare for court hearing; review file materials for same; attend court hearing; post-hearing conference with co-counsel to discuss status and strategy. |
| 07/08/2024 | Polak, Jonathan G. | Partner | 0.80 | 660.00 | 825.00 | 0.80 | 660.00 | 6402281 | Billed | Exchange emails with client regarding hearing status and strategy; conference with client regarding same. |
| 07/08/2024 | Polak, Jonathan G. | Partner | 1.60 | 1,320.00 | 825.00 | 1.60 | 1,320.00 | 6402281 | Billed | Begin preparation for hearing on July 12th; review file materials for same; identify exhibits to be used at hearing; begin work on exhibit list for same; conference with client to discuss hearing strategy. |
| 07/08/2024 | Etienne, William M. | Associate | 1.30 | 604.50 | 465.00 | 1.30 | 604.50 | 6402281 | Billed | Research and review case law regarding Reply in support of motion to seal in 5th Circuit. |
| 07/08/2024 | Etienne, William M. | Associate | 1.80 | 837.00 | 465.00 | 1.80 | 837.00 | 6402281 | Billed | Participate in scheduling hearing for TRO hearing and motion to seal. |
| 07/08/2024 | Etienne, William M. | Associate | 1.10 | 511.50 | 465.00 | 1.10 | 511.50 | 6402281 | Billed | Review and provide comments regarding initial draft of Reply to motion to seal; provide comments on additional case needs in support of same. |
| 07/08/2024 | Matthews, Alex M. | Associate | 7.70 | 2,887.50 | 375.00 | 7.70 | 2,887.50 | 6402281 | Billed | Reviewing and analyzing case law regarding motion to seal; drafting and revising reply to motion to seal |
| 07/08/2024 | Smoot, Rachel A. | Associate | 2.00 | 940.00 | 470.00 | 2.00 | 940.00 | 6402281 | Billed | Prepare for and attend status conference; coordinate delivery to Court of Motion for Temporary Restraining Order, Preliminary Injunction and/or Gag Order and supporting papers; coordinate drafting of Reply. |
| 07/09/2024 | Etienne, William M. | Associate | 5.20 | 2,418.00 | 465.00 | 5.20 | 2,418.00 | 6402281 | Billed | Prepare PTK reply brief in support of motion to seal; research case law in furtherance of same. |
| 07/09/2024 | Polak, Jonathan G. | Partner | 8.50 | 7,012.50 | 825.00 | 8.50 | 7,012.50 | 6402281 | Billed | Continue preparation for TRO and injunction hearing; review file materials for same; begin preparation of examination outline of Dr. Tincher-Ladner. |
| 07/09/2024 | Polak, Jonathan G. | Partner | 0.90 | 742.50 | 825.00 | 0.90 | 742.50 | 6402281 | Billed | Work on identifying exhibits for use at injunction hearing; work with administrative team on same. |
| 07/10/2024 | Polak, Jonathan G. | Partner | 6.00 | 4,950.00 | 825.00 | 0.00 | 0.00 | 6402281 | Billed | Travel to Jackson for injunction hearing. |
| 07/10/2024 | Polak, Jonathan G. | Partner | 4.00 | 3,300.00 | 825.00 | 4.00 | 3,300.00 | 6402281 | Billed | Continue work on preparation for injunction hearing; continue work on Lynn Tincher-Ladner direct examination; work on M. Moradian cross- examination. |
| 07/10/2024 | Polak, Jonathan G. | Partner | 0.50 | 412.50 | 825.00 | 0.50 | 412.50 | 6402281 | Billed | Continue work on reply to motion to seal; provide comments and revisions to Mike Etienne. |
| 07/10/2024 | Polak, Jonathan G. | Partner | 0.80 | 660.00 | 825.00 | 0.80 | 660.00 | 6402281 | Billed | Review response brief; consider reply brief arguments and strategy. |
| 07/10/2024 | Etienne, William M. | Associate | 2.90 | 1,348.50 | 465.00 | 2.90 | 1,348.50 | 6402281 | Billed | Revise Reply brief in support of motion to seal based on comments and additional case law and exhibit citations. |
| 07/10/2024 | Etienne, William M. | Associate | 2.80 | 1,302.00 | 465.00 | 2.80 | 1,302.00 | 6402281 | Billed | Review brief in opposition to PTK's motion for injunction relief; review case law and compose arguments to rebut same. |
| 07/10/2024 | Etienne, William M. | Associate | 1.80 | 837.00 | 465.00 | 1.80 | 837.00 | 6402281 | Billed | Review Defendants' Opposition to PTK's Motion seeking injunctive relief; research case law and provide notes regarding Rebuttal to same. |
| 07/10/2024 | Etienne, William M. | Associate | 1.70 | 790.50 | 465.00 | 1.70 | 790.50 | 6402281 | Billed | Review declarations of Marek, Linke, and Moradian; review exhibits in support of same to identify potential issues/objections. |
| 07/10/2024 | Matthews, Alex M. | Associate | 9.80 | 3,675.00 | 375.00 | 9.80 | 3,675.00 | 6402281 | Billed | Editing and revising motion to seal; reviewing and analyzing case law |
| 07/10/2024 | Smoot, Rachel A. | Associate | 6.40 | 3,008.00 | 470.00 | 6.40 | 3,008.00 | 6402281 | Billed | Review and analyze Response in Opposition to Motion for Temporary Restraining Order, Preliminary Injunction and/or Gag Order and supporting documents; confer with co-counsel regarding same; confer with client regarding same; draft Rebuttal Facts section; review and analyze outline of direct examination of Lynn Tincher-Ladner. |
| 07/11/2024 | Polak, Jonathan G. | Partner | 14.50 | 11,962.50 | 825.00 | 9.50 | 7,837.50 | 6402281 | Billed | Continue work on reply brief; internal communications regarding same, including with local counsel; conference with D. Newman regarding exhibits and protocol; work on related papers including motions to seal and supplemental declarations; conference with client to prepare for hearing; continue work on examination outlines for hearing. |
| 07/11/2024 | Etienne, William M. | Associate | 7.50 | 3,487.50 | 465.00 | 0.00 | 0.00 | 6402281 | Billed | Travel to Jackson, MS for hearing on PTK's Motion seeking injunctive relief. |
| 07/11/2024 | Etienne, William M. | Associate | 2.30 | 1,069.50 | 465.00 | 2.30 | 1,069.50 | 6402281 | Billed | Prepare motion to seal reply in support of motion to seal motion seeking injunctive relief. |
| 07/11/2024 | Etienne, William M. | Associate | 4.30 | 1,999.50 | 465.00 | 4.30 | 1,999.50 | 6402281 | Billed | Revise reply in support of motion to seal motion seeking injunctive relief based on comments and decision seeking open courtroom with prohibition on publication of witness testimony; identify and incorporate case law in support of same. |
| 07/11/2024 | Etienne, William M. | Associate | 2.40 | 1,116.00 | 465.00 | 2.40 | 1,116.00 | 6402281 | Billed | Evaluate Defendants' exhibits in support of Opposition to PTK's Motion seeking injunction relief; prepare objections (e.g., hearsay, authentication) regarding same. |
| 07/11/2024 | Etienne, William M. | Associate | 0.90 | 418.50 | 465.00 | 0.90 | 418.50 | 6402281 | Billed | Review supplemental declaration of Dr. Tincher-Ladner; provide suggested edits to rebuttal in support of Motion seeking injunctive relief. |
| 07/11/2024 | Etienne, William M. | Associate | 1.20 | 558.00 | 465.00 | 1.20 | 558.00 | 6402281 | Billed | Review direct examination outline of Dr. Tincher-Ladner. |

| Date | Name | Description | Orig Hrs | Orig Amt | Orig Rate | Rev Hrs | Rev Amt | Invoice | Status | Narrative |
|---|---|---|---|---|---|---|---|---|---|---|
| 07/11/2024 | Smoot, Rachel A. | Associate | 10.20 | 4,794.00 | 470.00 | 10.20 | 4,794.00 | 6402281 | Billed | Draft Supplemental Tincher-Ladner Declaration; draft Motion to Seal Rebuttal Brief in Support of Motion for Temporary Restraining Order, Preliminary Injunction and/or Gag Order; revise and edit Declaration and Rebuttal Briefs; compile and finalize exhibits for Supplemental Tincher-Ladner Declaration; confer with co-counsel regarding Defendants' exhibits and preparation of objections to same; revise and edit objections to Defendants' exhibits; attention to response to PTK's objections to Defendants' exhibits and Defendants' objections to PTK's exhibits; review and analyze case law related to self-authentication of Page Vault documents; draft timeline of most recent productions in advance of hearing. |
| 07/11/2024 | Sears, Hayley A. | Associate | 6.70 | 2,512.50 | 375.00 | 6.70 | 2,512.50 | 6402281 | Billed | Participate in call with Mike regarding exhibits, draft objections to Defendants 50 exhibits used in response to PI/gag order motion, discuss various objections with Mike Etienne, incorporate Jonathan Polak's edits into draft, and email DeAnn to get filed. |
| 07/12/2024 | Polak, Jonathan G. | Partner | 9.00 | 7,425.00 | 825.00 | 9.00 | 7,425.00 | 6402281 | Billed | Continue preparation for hearing; attend hearing. |
| 07/12/2024 | Polak, Jonathan G. | Partner | 6.00 | 4,950.00 | 825.00 | 0.00 | 0.00 | 6402281 | Billed | Travel back to Indianapolis. |
| 07/12/2024 | Etienne, William M. | Associate | 1.30 | 604.50 | 465.00 | 1.30 | 604.50 | 6402281 | Billed | Organize all documents related to PTK's briefing in support of TRO and Defendants briefing opposing same to offer as exhibits during hearing. |
| 07/12/2024 | Etienne, William M. | Associate | 0.80 | 372.00 | 465.00 | 0.80 | 372.00 | 6402281 | Billed | Review Fifth Circuit case law regarding "editorialization" of claims in connection with PTK's proposed language for injunction; provide argument for hearing regarding same. |
| 07/12/2024 | Etienne, William M. | Associate | 0.40 | 186.00 | 465.00 | 0.40 | 186.00 | 6402281 | Billed | Obtain and organize cases cited in PTK's briefing in support of injunctive relief and in Defendants' briefing in opposition. |
| 07/12/2024 | Etienne, William M. | Associate | 7.80 | 3,627.00 | 465.00 | 7.80 | 3,627.00 | 6402281 | Billed | Participate in hearing regarding PTK's Motion seeking injunctive relief, including supporting direct examination of Dr. Tincher-Ladner and objections to Defendants' cross examination of same; discuss strategy regarding same. |
| 07/12/2024 | Etienne, William M. | Associate | 7.40 | 3,441.00 | 465.00 | 0.00 | 0.00 | 6402281 | Billed | Travel from Jackson, Mississippi to Indianapolis, IN after first portion of hearing on PTK's Motion seeking injunctive relief. |
| 07/12/2024 | Smoot, Rachel A. | Associate | 7.50 | 3,525.00 | 470.00 | 0.00 | 0.00 | 6402281 | Billed | Prepare for and attend hearing on Motion for Temporary Restraining Order, Preliminary Injunction, and/or Gag Order. |
| 07/12/2024 | Peluchette, Neil R. | Associate | 0.60 | 252.00 | 420.00 | 0.60 | 252.00 | 6402281 | Billed | Researching affidavit process for PageVault if needed for hearing; email correspondence regarding same. |
| 07/15/2024 | Polak, Jonathan G. | Partner | 1.20 | 990.00 | 825.00 | 1.20 | 990.00 | 6402281 | Billed | Receive and review motion to de-designate AEO materials; consider response; exchange emails with D. Newman regarding resolution of same; conference with Lynn Tincher-Ladner regarding same; prepare draft order and circulate same to D. Newman; finalize and file same. |
| 07/15/2024 | Smoot, Rachel A. | Associate | 0.30 | 141.00 | 470.00 | 0.30 | 141.00 | 6402281 | Billed | Attention to Emergency Motion to De-Designate AEO Documents. |
| 07/16/2024 | Polak, Jonathan G. | Partner | 6.00 | 4,950.00 | 825.00 | 0.00 | 0.00 | 6402281 | Billed | Travel to Jackson for TRO hearing. |
| 07/16/2024 | Polak, Jonathan G. | Partner | 1.20 | 990.00 | 825.00 | 1.20 | 990.00 | 6402281 | Billed | Continue work on M. Moradian cross-examination for TRO hearing. |
| 07/16/2024 | Smoot, Rachel A. | Associate | 0.10 | 47.00 | 470.00 | 0.10 | 47.00 | 6402281 | Billed | Email Court regarding Zoom link for upcoming hearing. |
| 07/17/2024 | Polak, Jonathan G. | Partner | 10.50 | 8,662.50 | 825.00 | 10.50 | 8,662.50 | 6402281 | Billed | TRO hearing and client conferences. |
| 07/17/2024 | Smoot, Rachel A. | Associate | 6.50 | 3,055.00 | 470.00 | 6.50 | 3,055.00 | 6402281 | Billed | Prepare for and attend hearing on motion for temporary restraining order, preliminary injunction, and/or gag order. |
| 07/17/2024 | Etienne, William M. | Associate | 9.20 | 4,278.00 | 465.00 | 9.20 | 4,278.00 | 6402281 | Billed | Prepare for and participate in injunctive relief hearing. |
| 07/18/2024 | Polak, Jonathan G. | Partner | 6.00 | 4,950.00 | 825.00 | 0.00 | 0.00 | 6402281 | Billed | Travel back to Indianapolis. |
| 07/19/2024 | Etienne, William M. | Associate | 6.50 | 3,022.50 | 465.00 | 0.00 | 0.00 | 6402281 | Billed | Travel from Jackson, Mississippi to Indianapolis. |
| 07/23/2024 | Smoot, Rachel A. | Associate | 3.40 | 1,598.00 | 470.00 | 3.40 | 1,598.00 | 6402281 | Billed | Confer with client and co-counsel regarding latest Honor Society online attacks; review and analyze latest publicly available information; draft Supplemental Declaration of Lynn Tincher-Ladner; draft Notice of Filing Supplemental Exhibits. |
| 07/23/2024 | Peluchette, Neil R. | Associate | 2.70 | 1,134.00 | 420.00 | 2.70 | 1,134.00 | 6402281 | Billed | Review of PTK Wikipedia page; Edits to same; Correspondence with Wikipedia regarding security access to page. |
| 07/24/2024 | Polak, Jonathan G. | Partner | 0.80 | 660.00 | 825.00 | 0.80 | 660.00 | 6402281 | Billed | Continue attention to Wikipedia changes; exchange multiple communications with client; review and revise draft Declaration from Tincher-Ladner on same. |
| 07/24/2024 | Polak, Jonathan G. | Partner | 0.50 | 412.50 | 825.00 | 0.50 | 412.50 | 6402281 | Billed | Continue work on notice of supplemental evidence. |
| 07/24/2024 | Smoot, Rachel A. | Associate | 1.70 | 799.00 | 470.00 | 1.70 | 799.00 | 6402281 | Billed | Revise and edit Supplemental Tincher-Ladner Declaration; multiple emails with client and co-counsel regarding same; compile Exhibits for same. |
| 07/24/2024 | Peluchette, Neil R. | Associate | 2.90 | 1,218.00 | 420.00 | 2.90 | 1,218.00 | 6402281 | Billed | Additional review of PTK Wikipedia page; Edits to same; Correspondence with Wikipedia regarding security access to page. |
| 07/26/2024 | Smoot, Rachel A. | Associate | 3.40 | 1,598.00 | 470.00 | 3.40 | 1,598.00 | 6402281 | Billed | Review and analyze Motion to Strike; confer with co-counsel regarding same; draft Response to Motion to Strike, including reviewing and analyzing case law in support of Response. |
| 07/27/2024 | Smoot, Rachel A. | Associate | 1.00 | 470.00 | 470.00 | 1.00 | 470.00 | 6402281 | Billed | Revise and edit Response in Opposition to Motion to Strike; confer with co-counsel regarding same. |
| 07/27/2024 | Polak, Jonathan G. | Partner | 0.50 | 412.50 | 825.00 | 0.50 | 412.50 | 6402281 | Billed | Continue work on response to motion to strike; exchange emails with Rachel Smoot regarding same. |
| 07/28/2024 | Smoot, Rachel A. | Associate | 0.60 | 282.00 | 470.00 | 0.60 | 282.00 | 6402281 | Billed | Attention to email from co-counsel regarding Opposition to Motion to Strike; revise and edit same. |
| 07/29/2024 | Polak, Jonathan G. | Partner | 0.90 | 742.50 | 825.00 | 0.90 | 742.50 | 6402281 | Billed | Continue work on response to motion to strike; circulate draft on same. |
| 07/29/2024 | Smoot, Rachel A. | Associate | 0.80 | 376.00 | 470.00 | 0.80 | 376.00 | 6402281 | Billed | Revise and edit Response to Motion to Strike; confer with co-counsel regarding same. |
| 07/30/2024 | Smoot, Rachel A. | Associate | 0.60 | 282.00 | 470.00 | 0.60 | 282.00 | 6402281 | Billed | Confer with co-counsel regarding Response to Motion to Strike; revise and edit Memorandum in Support of Motion to Strike; draft Response to Motion to Strike; revise and edit same. |
| 08/07/2024 | Polak, Jonathan G. | Partner | 0.30 | 247.50 | 825.00 | 0.30 | 247.50 | 0 | Unbilled | Receive and review reply in support of motion to strike; prepare email to client regarding same. |
| **Totals:** | | | **513.20** | **266,895.50** | | **455.20** | **229,451.00** | | | |

# EXHIBIT A-5

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION


PHI THETA KAPPA HONOR SOCIETY      PLAINTIFF/COUNTER-DEFENDANT

VS.                    CIVIL CASE NO. 3:22CV208-CWR-RPM

HONORSOCIETY.ORG., INC.,       DEFENDANTS/COUNTER-PLAINTIFFS
MICHAEL MORADIAN,
HONOR SOCIETY FOUNDATION, INC.


VS.

DR. LYNN TINCHER-LADNER          THIRD-PARTY DEFENDANT


**TRANSCRIPT OF EVIDENTIARY HEARING**

**VOLUME 1 OF 2**


BEFORE THE HONORABLE CARLTON W. REEVES
UNITED STATES DISTRICT JUDGE


JULY 12, 2024
JACKSON, MISSISSIPPI


REPORTED BY:  TERI B. NORTON, RMR, FCRR, RDR
              Mississippi CSR #1906
_____

501 E. COURT ST., STE. 2.500
JACKSON, MISSISSIPPI  39208
(601)608-4186

```
 1    APPEARANCES:

 2    FOR THE PLAINTIFF/COUNTER-DEFENDANT:
           MICHAEL B. WALLACE, ESQUIRE
 3         CHARLES E. COWAN, ESQUIRE
           WISE, CARTER, CHILD & CARRAWAY, PA
 4         401 EAST CAPITOL STREET, SUITE 600
           JACKSON, MISSISSIPPI  39201
 5

 6         JONATHAN G. POLAK, ESQUIRE
           WILLIAM MICHAEL ETIENNE, ESQUIRE
 7         TAFT, STETTINIUS & HOLLISTER, LLP
           ONE INDIANA SQUARE, SUITE 3500
 8         INDIANAPOLIS, INDIANA  46204

 9         RACHEL A. SMOOT, ESQUIRE  (VIA ZOOM)
           TAFT, STETTINIUS & HOLLISTER, LLP
10         41 S. HIGH STREET, SUITE 1800
           COLUMBUS, OHIO  43215
11
      FOR THE DEFENDANTS/COUNTER-PLAINTIFFS:
12         W. WHITAKER RAYNER, ESQUIRE
           JONES WALKER, LLP
13         190 EAST CAPITOL ST., SUITE 800
           JACKSON, MISSISSIPPI  39201
14
           DEREK NEWMAN, ESQUIRE
15         NEWMAN, LLP
           1201 SECOND AVENUE, SUITE 900
16         SEATTLE, WASHINGTON  98101

17

18    ALSO PRESENT:  DR. LYNN TINCHER-LADNER
                      MR. MICHAEL MORADIAN
19

20

21

22

23

24

25
```

1                          TABLE OF CONTENTS

2

3                              VOLUME 1

4     WITNESSES FOR THE PLAINTIFF:

5     DR. LYNN TINCHER-LADNER

6         Direct Examination By Mr. Polak   .......................23

7         Cross-Examination By Mr. Newman   .....................133

8         Redirect Examination By Mr. Polak   ...................186

9         Recross-Examination By Mr. Newman   ...................195

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          **THE COURT:**  Good morning.  You may call the case,

2     Twana.

3          **THE CLERK:**  The Court calls Phi Theta Kappa Honor

4     Society versus HonorSociety.Org., Inc. et al, Civil Docket No.

5     3:22cv208-CWR-RPM.

6          **THE COURT:**  All right.  Good morning.  I know we are

7     here this morning for the hearing on the temporary restraining

8     order and preliminary injunction.  I take it the parties have

9     not resolved their differences, so they are here this morning,

10    so I know you didn't come here to announce that you had

11    resolved it.

12         I think the first thing we need to take up are the motions

13    or the requests to seal -- to restrict the filings in this case

14    and the related motions with respect to that issue so that we

15    can proceed in a way that we have to in case the Court were to

16    grant the particular motion.  I think that's where we should

17    start first, because those motions -- the motions have not been

18    officially filed on the record yet, I don't think.  Right?  I

19    know the parties have submitted them to the Court, and there

20    are motions to -- for leave to file restricted access and

21    sealed documents and things of that sort, so I don't think the

22    preliminary injunction motion has actually been filed on the

23    record yet along with the related exhibits.  That's my

24    appreciation.  Nor have the responses.  Right?  I mean, do the

25    parties agree that that's where we should start?

1          **MR. WALLACE:**  Fine.

2          **THE COURT:**  If that's not where we should start, then

3     we can go straight into the merits.

4          **MR. POLAK:**  Jonathan Polak.  We talked about this the

5     other day on our scheduling conference, right?

6          **THE COURT:**  Right.

7          **MR. POLAK:**  And I think there are two issues.  One is

8     on the paper, a matter of what is on file with the Court.  And

9     then the second issue, which I think was probably the more

10    salient issue, is are we going to lock the doors.

11         Let me address the second one first because it may clarify

12    how we handle the first one.  With respect to locking doors, we

13    don't see any reason for that.  There's nobody here in the

14    courtroom other than parties.  We think that when you hear the

15    evidence, you will be sufficiently persuaded that certainly

16    people should not talk about what happened today in this

17    courtroom because we are here because of the publication of

18    things in this case to -- over the internet, over social media,

19    all of those things.

20         So we think that you are going to be persuaded at the end

21    to admonish the parties at minimum to not broadcast what was

22    said today.  Dr. Tincher-Ladner has some very deeply personal

23    things she is going to talk about here today.  We don't need

24    Mr. Moradian to be publicizing that across the internet.  She

25    is also going to be talking about things that are deeply

1   meaningful to the nonprofit that she runs.  We don't want that

2   publicized around the internet.  And that is why we filed it

3   initially under seal because we did not want to do more damage

4   by bringing this motion than what they have already done to the

5   company and to Dr. Tincher-Ladner.

6       So to answer the question that you asked us during the

7   scheduling conference, which I did not provide an answer to at

8   the time, I asked for some ability to think about it, the

9   answer is, no, you do not need to close out the courtroom.

10  Dr. Tincher-Ladner is going to testify openly about it.  And we

11  trust that the Court will enter appropriate admonitions and

12  instructions to the parties to not take information here and

13  use it to their competitive advantage.

14      With respect to the documents that are filed, I think what

15  we can do is proceed with that information under seal.  The

16  information that's there is the very same stuff that we are

17  worried about them publicizing over the internet because of why

18  we are here.  It only makes sense for us to keep that under

19  seal.  And we cited a bunch of cases for you that spoke to it.

20  My colleague, Mr. Etienne, can speak more specifically to those

21  cases since he handled the briefing on it, if you have

22  questions about specific cases.

23      I know they have First Amendment concerns, open court

24  concerns, but they themselves have filed a lot of documents

25  under seal, as have we in connection with different filings.

1    These are documents that have been exchanged in discovery that

2    are marked AEO or confidential.  There is nothing extraordinary

3    about that, and I don't think it impedes the interest of

4    justice, which really is what we are talking about here.  Does

5    it impede the interest of justice to keep, at least for right

6    now so we can get about the business of presenting evidence, to

7    keep all of that under seal, and then the Court can figure out

8    at the end of this what it wants to do?  If it hears things

9    that it goes, yeah, okay, I get it, I don't think that ought to

10   be a matter of public record, then the Court can enter an

11   appropriate order or series of orders around that.  If the

12   Court hears the testimony and goes, I'm not convinced, I'm not

13   persuaded, I think it's okay, then the Court can enter the

14   orders that it deems appropriate around that, including on the

15   motions to seal.

16        That is how I think we ought to proceed.  That way we can

17   get to the business of the day, which is the testimony that you

18   need to hear about the underlying harm that has happened to PTK

19   and Dr. Tincher-Ladner personally.

20              **THE COURT:**  Okay.  Thank you.

21          **MR. NEWMAN:**  Good morning, Your Honor.

22              **THE COURT:**  Good morning.

23          **MR. NEWMAN:**  Derek Newman.  The United States Supreme

24   Court and the Fifth Circuit Court of Appeals have been clear

25   that public proceedings are open to the public with very few

1    exceptions, such as trade secrets, national secrets.  PTK's

2    counsel just indicated that the reason why they would like

3    these documents to be sealed is because the Court is going to

4    hear stuff that is very personal.  There's no argument that the

5    materials fall within the scope of the protective order or any

6    of the exceptions that the Supreme Court or the Fifth Circuit

7    have laid out.

8        I'm going to spare the Court of additional argument.  I

9    think our papers are clear, but I just wanted to be clear about

10   our position, which is we believe that nothing should be

11   sealed, that the public should have a right to access, that the

12   relief sought here today is extreme and the public has a right

13   to see how the proceedings lay out and the Court comes to its

14   conclusion.  Thank you.

15        **THE COURT:**  All right.  I will hear from the parties.

16   I will hear the evidence.  Absent from the briefing on this, I

17   believe, at least I could have overlooked it, but the Fifth

18   Circuit has been fairly clear recently on sealing and unsealing

19   and closed proceedings.  The *Binh Hoa Le* case, 990 F.3d 410,

20   Fifth Circuit 2021, they have admonished trial courts.  They

21   say repeatedly -- well, maybe they didn't use that word, but

22   Judge Willett sort of expressed real frustration with parties

23   and Courts closing proceedings.  So that will guide how I look

24   at this and hear the evidence and all of that.

25        The *June Medical Services, LLC versus Phillips* 22 F.4th

1    512, Fifth Circuit 2022, is another case since the *Binh Hoa Le*

2    case.  And just for guidance purposes only, I know several

3    District Courts and others and the Fifth Circuit have cited

4    *Binh Hoa Le* a number of times since then as well, but there's a

5    *Sharjin versus Sharjin*.  It's a case out of the Eastern

6    District of Louisiana, 2024 Westlaw 493443, Eastern District of

7    Louisiana, 2024.

8        So, basically, the *Binh Hoa Le* case, at pages 417 through

9    421, lays out several different things about the Court should

10   be ungenerous, for example, with their discretion to seal

11   judicial records.  "The public's right of access to judicial

12   proceedings is fundamental," according to the Court.  "Judges

13   must protect public accessibility for three mutually

14   reinforcing reasons:  The public has the right to monitor the

15   exercise of judicial authority; judges are the primary

16   representatives of the public interest in the judicial process;

17   and, third, the judiciary's institutional legitimacy depends on

18   public trust.  Public trust cannot co-exist with a system

19   wherein important judicial decisions are made behind closed

20   doors and where its private litigants do the closing."

21       Now, there are occasions where you are talking about trade

22   secrets or the identities of confidential informants and things

23   of that sort, but the Court should take a very measured and

24   document-by-document analysis.  In other words, we just can't

25   be too broad, I don't think in doing it.  But *Binh Hoa Le* makes

```
 1    the point that "At the discovery stage," and they emphasize
 2    discovery stage -- "discovery, rather, when parties are
 3    exchanging information, a stipulated protective order under
 4    Rule 26(c) may well be proper.  Party-agreed secrecy has its
 5    place, for example, in honoring legitimate privacy interests
 6    and facilitating the efficient exchange of information.  But at
 7    the adjudicative stage," and they highlight adjudicative stage,
 8    "when materials enter the court record, the standard for
 9    shielding records from public view is far more arduous.  The
10    secrecy of judicial records, including stipulated secrecy, must
11    be justified and weighed against presumption of openness that
12    can be rebutted only by a compelling countervailing interest
13    favoring nondisclosure.  All too often judicial records are
14    sealed without any showing that secrecy is warranted or why the
15    public's presumptive right of access is subordinated.  This
16    mistake harms the public interest, however interested the
17    public is likely to be.  Sealings are no less rampant in low
18    profile cases than in high profile cases featured at the front
19    page or the Oscar stage," and so forth and so on.
20         So I'm sort of guided by that notion, and I will hear the
21    parties out.  But at this point in time, I don't think the
22    standard has been met for sealing what has been -- or placing
23    under seal what potentially might be filed or to close the
24    courtroom for these purposes.  So I'm guided by that.  I will
25    hear the parties.  You know, if there's a point or two that you
```

 1  want the Court to consider that ought to be closed from the

 2  public in some way, we will take it up at that point in time.

 3      **MR. POLAK:**  Thank you, Your Honor, for the guidance

 4  and the instructions.  To follow on on your point, I think

 5  that -- I got a sense as to where the Court is going with this.

 6  We would like the ability to at least, after this hearing is

 7  completed, to tender a redacted version so you can see exactly

 8  what -- like, with Dr. Tincher-Ladner's declaration, the

 9  original one, I think there are probably only four or five

10  paragraphs that we actually truly care about, out of a

11  65-paragraph declaration.

12      So taking the guidance that you've given us that you want

13  us to be more rifle shot on this as opposed to whole cloth, we

14  would just like the ability to submit that, after the hearing

15  is concluded, next week so that the Court may review that to

16  determine whether that is sufficient to meet that narrower

17  approach that you are talking about.

18      **THE COURT:**  Okay.  I will grant that request.

19      **MR. POLAK:**  Thank you.  Now, are we ready to proceed,

20  and are the parties ready to tell me how they wish to proceed?

21      **MR. WALLACE:**  Your Honor, I told you on Monday the

22  law hadn't changed since the last time we were here, and I

23  stand by that.  If you have questions about the briefs that we

24  have submitted, we would be happy to address them, but

25  otherwise, I'm happy to have Mr. Polak tell you what he has

          1    discussed with the other side about how to present evidence

          2    today.

          3              **THE COURT:**  Okay.  All right.

          4              **MR. POLAK:**  I think we have good news for you, that

          5    Mr. Newman and I met on Wednesday evening, and we discussed the

          6    issue of witnesses, which was a topic that you asked us to talk

          7    about.  There are multiple declarations that have been

          8    submitted, but in terms of live testimony, the only live

          9    testimony is going to be from Dr. Tincher-Ladner and

         10    Mr. Michael Moradian.

         11         That doesn't mean that we won't be relying on the

         12    declarations that have been submitted, but that is -- for

         13    example, you have a declaration from me proving up some

         14    documents.  You have a declaration from Mr. Derek Linke, who is

         15    not here, but he is a colleague of Mr. Newman's, that also

         16    attempted to prove up some documents.  You also have

         17    declarations from two women concerning some events that

         18    happened about ten years ago.  I understand that they are not

         19    going to be called live.  I had a conversation with Mr. Newman

         20    about that, and that's not going to happen.  In terms of the

         21    witnesses, we are one hundred percent agreed on what is going

         22    to happen.

         23         Now, there is the issue of exhibits, and the Court

         24    probably is aware that the parties both filed objections to

         25    each other's evidence yesterday, and we objected to most of

1    their evidence on the basis that it was either not

2    authenticated properly or was hearsay, knowing full well that

3    in an injunction proceeding, the standards for admissibility

4    are relaxed a little bit, not a lot but a little bit.  It is

5    different.  But we do have some concerns as to the authenticity

6    of those documents and the -- and some other issues regarding

7    hearsay.

8         Mr. Newman, in that conversation I had with him, he asked

9    me whether we were going to stipulate to the admissibility of

10   exhibits, and I told him, well, I have some concerns about your

11   exhibits.  He then said, Okay, well, if that's the way we are

12   going to do it, then I need to file my own objections, which he

13   did, and he objected to some of the authenticity of some of our

14   documents, and I believe there are also some hearsay objections

15   in there.

16        Because this is a bench trial as opposed to a jury trial,

17   my suggestion is that we go ahead and proceed with the

18   testimony subject to the objections that have been asserted.

19   You are well-versed on the rules of evidence.  As you hear it,

20   you can make determinations as to what is admissible and what

21   is not.  You have our objections.  To give you an example of

22   the type of objection that we have made, counsel for Honor

23   Society has submitted a series of exhibits, I think there are

24   about 20 of them, that are documents that they received through

25   the FOIA requests that we were here about last time that have

1    now, even though they were not made for the purposes of

2    litigation, was what they told you, they now are very much a

3    part of the litigation, curiously.  So we now have these

4    exhibits.

5         So what does that mean?  You have an affidavit or a

6    declaration from Mr. Linke or Mr. Moradian, I think it's Mr.

7    Moradian, that says, Attached to my declaration are true and

8    correct copies of documents I received from University X,

9    College X.  That's not authentication of a document.  That's

10   authentication that you received the document, but that's not

11   authentication of the underlying document.  Right?  Only the

12   school can authenticate that document.

13        Same thing goes with a hearsay declaration.  There's no

14   business record predicate built up.  I don't even know that

15   these documents are business records.  They aren't documents

16   that were kept in the ordinary course of business for sure.

17   These are documents that were created to, in chart form, to

18   give to them for the purpose of how many people are within a

19   certain GPA, how many students are full-time enrolled, that

20   type of thing.  So this is all hearsay.

21        I flag that for you not to argue the point, but I flag it

22   for you because I know they are going to be trying to present

23   this evidence, and I think we can handle the objections two

24   ways.  I can either, as they attempt to use the document, I can

25   just step up and say, Judge, this is a document we object to,

1  these are the reasons why, so you then understand what our

2  objection is, and you can take the testimony for what it is.

3  Or we could argue it out now in advance.  My preference would

4  be not to argue it out in advance because that would take

5  probably about an hour and a half to go through all of our

6  exhibits and all their exhibits.  I think it probably makes

7  more sense to do it the other way.

8       **THE COURT:**  Okay.  Let me ask you this.  Again, I

9  know the parties are in the throes of discovery right now,

10  still, I think, in the underlying -- or in this action, and I

11  presume that there's FOIA information and other information

12  that the parties are getting from third parties, and everything

13  else is being produced to each other.  And obviously before any

14  of that material is to be used in any trial as an exhibit at

15  the trial at the end of the day, the parties will have another

16  opportunity at least to object or at least -- well, to either

17  make sure that the objections are avoided by making sure that

18  documents come within the rules of evidence in some way or

19  either the objections and stuff are preserved at the pretrial

20  order.  But I assume that these documents that each party has

21  now are subject or at least discoverable in some way under Rule

22  26, and the parties are, you know -- they are responsive to

23  some document request or some other way where the parties are

24  exchanging this information.

25       **MR. POLAK:**  With a small subset of their documents, I

 1   would completely agree with you, Your Honor.  The evidentiary

 2   defects ultimately probably are overcomable.  For example, they

 3   just attached printouts of websites.  They don't give the date,

 4   the time, the place.

 5       I have a case for you.  I think it's the *Perfect 10* case.

 6   I believe the citation is 213 F.Supp.2d 1146, and this was a

 7   case where, on an injunction hearing actually, the Court

 8   allowed -- the parties basically, one of the parties stapled a

 9   printout of a website to a declaration and said, this is a true

10   and correct copy of the website.  They didn't provide the date,

11   didn't provide the time, didn't provide the web address, didn't

12   provide any of that information that would ordinarily

13   authenticate something.  But in that case, the party did

14   provide that information, and the Court found that because they

15   provided date, time and place, it was okay.  That is the

16   opposite of what we have here, of course.  But could they

17   ultimately overcome that at trial?  Could they cure that up

18   with the proper authentication?  Sure, absolutely.  But for

19   purposes of this injunction proceeding, they did not, and the

20   *Perfect 10* case would seem to suggest that it would be

21   perfectly within your province to reject that testimony because

22   it is fatally defective.  But perhaps Mr. Moradian can, on the

23   stand, clean that up, and I look at that as a minor issue, and

24   it's only a few documents.

25       The bulk of the documents, though, like the FOIA requests,

1    are uncurable, and the reason why they are uncurable is that it

2    is highly unlikely that any community college is going to

3    provide a business records affidavit, not going to do it.  They

4    don't even probably care for them because of the amount of

5    trouble they have put them through, sending three, four, five

6    records requests over the last several months to the same

7    colleges asking the same information.  So I doubt seriously

8    that those schools are going to be wanting to cooperate on it,

9    and they don't have to.  They would have to go to the AG's

10   office anyway in order to get that type of declaration.  And

11   again, my guess is the AG's office has better things to do than

12   provide those types of documents.

13       But anyway, there's predicate issues, there's

14   authentication issues and those things, and I don't know that

15   they will ever be able to achieve it.  Maybe in some universe

16   they can for some, but certainly not for all.  So I don't want

17   this Court to be of the belief that that is something that is

18   like the prove-up of the website printouts.  It is entirely

19   different.

20       I don't think they will ever be able to get those

21   documents into evidence.  And that's the problem when you try

22   to prove your case through a FOIA request, through

23   extrajudicial discovery that they told this Court back in March

24   had nothing to do with this case.  They told you, Judge,

25   multiple occasions, that was not for purposes of discovery in

 1  this case, they weren't going to use these documents in this

 2  case, it was for other reasons.  And I will leave it to you to

 3  decide whether those representations were true.  We don't think

 4  they were, but still, that's the danger of going and doing

 5  that.

 6      We don't have any of these documents.  They can't get

 7  those documents from us.  We don't have the GPA or other types

 8  of information.  We do have information that shows the truth of

 9  our ten-percent claim --

10          **THE COURT:**  But you do have the -- the parties have

11  exchanged the information that anybody has received through a

12  FOIA request or otherwise?

13          **MR. POLAK:**  They have given all of it to us, as we

14  understand.  Correct.

15          **THE COURT:**  All right.  All right.

16          **MR. NEWMAN:**  Your Honor, PTK cites that *Perfect 10*

17  case.  It comes from the Ninth Circuit.  We think it resolves

18  in our favor, but we think the Court should disregard it

19  because the Court should follow the Fifth Circuit, which has

20  held numerous times that preliminary injunction procedures are

21  informal, and presentation of otherwise inadmissible evidence

22  is allowed.  The Court can rely on inadmissible evidence,

23  including hearsay.  And the reason for that to me is obvious.

24  We were served with an emergency motion just a week ago.  We

25  had a week to respond.  We don't have time to do a year's worth

1  of discovery and get documents authenticated and the like.  So

2  in a preliminary injunction, the evidentiary rules are relaxed

3  so that parties can present their case through what would be

4  inadmissible at trial.

5      And another rationale for it is we are presenting to the

6  Court, not a jury, so the Court can look at the evidence and

7  make whatever conclusions Your Honor wishes and shouldn't have

8  to follow the rules of evidence like a jury would where there

9  would be substantial prejudice.

10     So I would suggest that Your Honor allow everything to be

11 admitted, and if the Court declines that, then this is going to

12 be a very long day where, do you recognize this document, how

13 do you recognize it, objection, and I don't think that that

14 serves the purposes of today, which is to take testimony to

15 augment the declarations, evaluate credibility of witnesses.

16 But it shouldn't be a full evidentiary hearing like you have at

17 trial because, as the Fifth Circuit has held several times,

18 hearsay evidence is admissible.  Inadmissible evidence is

19 admissible for purposes of today's hearing.

20     **THE COURT:**  Well, I will hear the parties out further

21 on this as we hear the testimony, but I assume there's an abuse

22 of discretion sort of standard along with the proposition you

23 have raised, I mean, that I don't think it will be appropriate

24 for the Court to simply rely on just anything that comes in for

25 purposes of any hearing.  And I did -- and, of course, I do

1    understand that this motion was filed about a week or so ago,

2    but from reading the papers -- and I'm going to give the

3    parties the full opportunity, because I've only had this before

4    me for a week, so I'm not stepping on anyone's toes about how

5    they intend to get the information before me.

6        Do not assume that I have read every line in every one of

7    these documents, but I will say, yes, it was filed about ten

8    days ago, but from my reading of some of the papers, the full

9    scope of all of this was not apparent until about June 24th or

10   so, which it -- which means that they filed everything about

11   ten days after, seven or eight days after the full scope of

12   what they believe justified this filing.  So I don't think they

13   should be faulted for that.  When I say "they," I'm talking

14   about PTK should not be faulted for that, you know.

15       So we will all proceed from that point.  But I will listen

16   closely to the evidence and the arguments about what evidence

17   ought to be considered and all of that.  And I've seen somewhat

18   the debate between who is in the top ten and who is not and all

19   of that and how that is figured out, so I'm listening.  I'm

20   listening.  I'm reading.

21       Again, do not sit back and rest on the fact that you

22   believe that I've read -- I'm telling you that on the front

23   end -- read every one of these lines, but I've done my best.

24   We have done our best.

25       Okay.  So I will -- we don't want to prolong anything.

1    But I will caution the parties that if you believe that, you

2    know, that the Court should hear or should not hear certain

3    evidence, I will give you the opportunity to raise the

4    objection.  And if I don't rule today, I will consider all of

5    this stuff in crafting a ruling that I think might be

6    appropriate based on what I've heard.

7         So are we ready to proceed in any way?

8              **MR. POLAK:**  We are, Your Honor.

9              **THE COURT:**  All right.  Defense ready?

10             **MR. NEWMAN:**  Yes, Your Honor.

11             **THE COURT:**  You may call your first witness, then, or

12   however you intend to proceed.

13             **MR. POLAK:**  Thank you, Your Honor.  PTK calls

14   Dr. Lynn Tincher-Ladner to the stand.

15             **THE COURT:**  Okay.

16             **MR. POLAK:**  Judge, while she is walking up there, we

17   are going to do the documents the old fashioned way.  I have

18   notebooks for -- we have all of the exhibits, 1 through 50, or

19   1 through 48 for us, that PTK would be using.

20             **THE COURT:**  Remaining standing.  Please.  I'm sorry.

21             **MR. POLAK:**  My colleague here is going to provide the

22   Court one, the witness one, the opposing counsel with one.  We

23   are not going to be messing with the electronic side of things.

24   I might use the Elmo on one or two, but I want the Court to

25   know that's the way we are going to proceed with the exhibits.

```
 1              THE COURT:  Thank you so much.  I appreciate that.
 2              THE CLERK:  Place your left hand on the Bible but
 3    raise your right hand.
 4         (OATH ADMINISTERED.)
 5              THE COURT:  Dr. Tincher-Ladner, before you is the
 6    microphone.  I think you were here the last time, I think.  You
 7    were here before.  Just speak loudly and clearly into the mic
 8    so that everyone can hear you.  Please speak at a pace at which
 9    the court reporter can keep up with you, and allow the lawyers
10    to finish their questions before you begin to speak so that the
11    two of you will not speaking at the same time.  And try to make
12    sure all of your responses are -- all your responses are
13    verbal.  If you are going to nod or shake the head, please give
14    me a yes or no.  I will be monitoring that.
15         To start us off, though, will you state and spell your
16    name for the record.
17              THE WITNESS:  Yes.  Lynn Tincher-Ladner.
18              THE COURT:  Could you bring that microphone just a
19    little bit closer to you.
20              THE WITNESS:  Lynn Tincher-Ladner, L-Y-N-N
21    T-I-N-C-H-E-R - L-A-D-N-E-R.
22              THE COURT:  Thank you.  You may proceed, sir.
23                    DR. LYNN TINCHER-LADNER,
24    having first been duly sworn, testified as follows:
25                       DIRECT EXAMINATION
```

1   **BY MR. POLAK:**

2   Q.  Good morning, Dr. Tincher-Ladner.

3   A.  Good morning.

4   Q.  I know you've already given us your name, but could you

5   just introduce yourself to the Court.

6   A.  Yes, my name is Dr. Lynn Tincher-Ladner, and I am

7   president and CEO of Phi Theta Kappa Honor Society.

8   Q.  How long have you been the CEO or president of PTK?  And

9   is it okay if I call it PTK?  We all know what we are talking

10  about that there.  How long have you been the CEO or president

11  of PTK?

12  A.  I was officially named by the board of directors in

13  January of 2016.

14  Q.  Before that, did you have a position at PTK?

15  A.  Approximately ten months before that, I was serving as the

16  interim CEO from about April of 2015 to January of 2016, but

17  also during that time and from July 1st of 2012, I was the

18  chief information and research officer for Phi Theta Kappa.

19  Q.  Now, you introduced yourself as Dr. Tincher-Ladner.  Do

20  you have a Ph.D.?

21  A.  Yes, I do.

22  Q.  What is that in?

23  A.  It is a Doctorate of Leadership in Community College

24  Education from the Mississippi State University.

25  Q.  Can you describe your academic background in relation to

1    community colleges?

2    A.   I don't know if I was born first or started working for

3    community college first.   I started in December of 1990 as an

4    instructor.   I think one year prior to that, I was a high

5    school teacher.   But I've worked in community colleges.   But by

6    and large, the last several decades of my life, I have been in

7    a data science type position as a researcher for community

8    colleges here in Mississippi for the Southern Association of

9    Colleges and Schools for the accreditation of two and four-year

10   colleges, just a lot of really different positions that evolve

11   around analyzing data for community college students prior to

12   my CEO role.

13   Q.   So is that why you became chief information officer for

14   PTK?

15   A.   Well, I didn't apply to come to PTK.   They wanted a

16   researcher.   They also wanted someone who knew about computer

17   science.   So they recruited me pretty heavily for probably

18   about a year before I felt like my children were old enough for

19   me to make a move to Jackson to work for someone other than

20   where I was working.

21   Q.   So was it your reputation that caused them to hire you?

22   A.   Yes.   I was pretty well known and probably still am as an

23   institutional researcher, data science person, not just in

24   Mississippi but probably the United States.

25   Q.   What is PTK?

1    A.   Well, Phi Theta Kappa is a -- we don't like to say we are

2    the oldest.  We like to say we were the first honor society for

3    students seeking credentials that are two years or less.  So we

4    were established in 1918 in Missouri, but we moved to

5    Mississippi I believe in the 1930s, and we have been

6    headquartered in the state of Mississippi since that time.

7         Our mission is to -- it's a two-fold mission.  One is to

8    honor the academic achievement of community college students

9    and students in those types of programs across other

10   institutions, but where we spend probably most of our time and

11   energy and resources is developing programming and ways for

12   these students to become stronger leaders and scholars.

13   Q.   So are you organized for the colleges or is your mission

14   about the students?

15   A.   The mission is about the students and providing their

16   recognition and also working with them to get to that next

17   level, whether that is transfer or going into employment.

18   Q.   How many employees does PTK have?

19   A.   Right now we have about 60.  We probably have about ten

20   student interns too.  We have another ten student success

21   coaches that work directly with coaching and one-on-one with

22   students, but as far as full-time employees, around 60.

23   Q.   Are most of those here in Jackson?

24   A.   I would say about 42 of them are here in Jackson, though

25   the rest of the key employees are spread out in the United

```
 1    States.  And I probably have employees in about 12 other states
 2    other than Mississippi.
 3    Q.  Are there academic requirements to join Phi Theta Kappa?
 4    A.  Yes.  Generally, you have to have -- the average is 3.5
 5    GPA to join the honor society, and you also have to have
 6    accumulated up to that point at least 12 hours of semester
 7    credit, and that's when you are talking about a two-year
 8    program.  If a student is in a one-year program, then it's 6
 9    hours of credit, but generally it is 3.5 and 12 hours of
10    credit.
11    Q.  Can you describe for the Court how students are selected
12    for membership or prospective membership in Phi Theta Kappa?
13    A.  Well, we leave that to the institutions to do the
14    selection and nomination of the students.  We are not allowed
15    to ask students to be a part of our organization unless there
16    is a chapter at their institution.  So a college first
17    petitions us for a chapter, and that may or may not be granted
18    by the board of directors, depending on the type of
19    institution.  But once they receive a chapter, then they create
20    their charter, and then they put their rules of membership in
21    the charter, and then at that point they decide which students
22    are eligible, based on their rules, and they either invite
23    those students themselves, or they have us do it, or we might
24    both do it.  It's not always the same at every college.
25    Q.  I want to make sure we are all clear because this is
```

1    important for some other things we are going to talk about

2    here.  PTK does not actively go out and identify students for

3    membership, does it?

4    A.  No.

5    Q.  The recommendations -- well, students have to be

6    recommended in order to join, right?

7    A.  Correct.  It is an invitation-only organization.  The

8    college is the one that decides who is invited.

9    Q.  Okay.  So the college is the one that gives you names?

10   A.  Yes.  The college, if they want us to do their recruitment

11   or inviting students, they will upload the student information

12   to a secure system, and then from there we start inviting them

13   primarily by e-mail.  Sometimes they may include the student's

14   home address, and they may also ask us to send a letter, and if

15   they do that, then we do that.  But sometimes the college is

16   sending their own invitations and we are sending them too, so

17   it is primarily by e-mail, as far as the first time you would

18   hear from us.

19   Q.  You mentioned you have chapters at these schools.  Can you

20   tell the Court a little bit about what it means to have a

21   chapter at a community college?

22   A.  Yes.  They petition us.  They fill out information.  They

23   have to be accredited by a regional accreditor.  We can't just

24   give a chapter to every institution just because they want one.

25   They have to have a minimum of being accredited, or sometimes

1    in the process of accreditation, we might do that.  And once

2    they ask for a chapter, they must also appoint an advisor to

3    that chapter.  So the chapter can't just sit there without

4    someone on campus who is in charge of the programming and the

5    activities of that chapter.

6    Q.  You said they need to appoint an advisor.  Who is the

7    "they" you are talking about?

8    A.  The college president.  They have to actually appoint an

9    advisor at their college.  It might be a faculty member.

10   Generally, it is.  But there are a lot of staff members.  There

11   are administrators.  We also have a couple of college

12   presidents that serve as the advisor of their own chapters.

13   Q.  Does PTK pay those chapter advisors?

14   A.  No, they are completely in a voluntary role.  The chapter

15   itself, because the college has all of these policies that

16   drive their student activities, the chapters themselves are

17   under the administrative authority of the institution that they

18   are at.  So the chapter, after it is established and while it

19   is being established, they have to follow the rules in our

20   constitution.  But after that, the chapter and, like, anything

21   that happens with the chapter would need the attention of the

22   college and not really us.

23   Q.  If there is a disciplinary issue with respect to an

24   advisor, a PTK advisor, does that come from PTK or does that

25   come from the college itself?

1    A.  If there's an advisor that is in a disciplinary situation,

2    we would not do any of that.  If we do receive sort of a

3    complaint or something, we might -- depending on the nature of

4    the complaint, we would automatically pass it to the college to

5    deal with whatever the situation is.

6    Q.  Is that because that is an employee of the college, not an

7    employee --

8    A.  Yes, they are an employees of the college.  Our employees

9    are not working in the colleges.

10   Q.  What is the American Association of Community Colleges?

11   A.  The American Association of Community Colleges is the

12   AACC.  It's also a membership, nonprofit organization.  They

13   are based in Washington, D.C.  Generally, all of the community

14   colleges or almost all of them are members of AACC, and the

15   mission of AACC is to be the advocacy arms for community

16   colleges, particularly with Congress in passing legislation

17   that would be beneficial to those colleges.  They also do

18   leadership training.  I'm sure they do other things, but that's

19   what kind of stands out in my mind about what their primary

20   function is.

21   Q.  But in terms of who makes up the AACC, who is that?  Is

22   that the community colleges themselves?

23   A.  Well, the college presidents and probably their upper

24   administration go to their meetings.  So they are usually

25   represented by the college president.  But as far as the

1    membership, it's the college that is the member, not

2    individuals.

3    Q.  So the colleges, the community colleges in the United

4    States are the ones that drive the decisions of the AACC?

5    A.  Correct.

6    Q.  So has the AACC given PTK any distinctions or

7    recognitions?

8    A.  Yes, and it was probably the most important thing that

9    happened to Phi Theta Kappa and why we are as large as we are

10   today, that the AACC, in 1929, they were actually called the

11   AAJC, the American Association of Junior Colleges at that time,

12   and they recognized Phi Theta Kappa as the official honor

13   society for, at that time, junior colleges.  So yes, we are

14   very proud of that recognition.

15   Q.  Has the AACC ever withdrawn or retracted that

16   distinction --

17   A.  No.

18   Q.  -- of PTK being recognized as the official honor society

19   for community colleges?

20   A.  No, they have not.

21   Q.  So, in your mind, did that distinction come from the AACC

22   or from the community colleges themselves?

23   A.  I guess it would have been both.  But, yes, the AACC, at

24   their board meeting -- if you look at historical documents, it

25   happened during one of their board meetings.

1    Q.  So that was 1929.  We are sitting here in 2024.  That is

2    almost a hundred years ago.  Would it be accurate to say, well,

3    that was a hundred years ago, but that recognition no longer

4    applies today?

5    A.  I think it very much does.  Phi Theta Kappa, we are an

6    affiliate member of the AACC.  They only have about -- I don't

7    know how many, but less than 25 nonprofit affiliates across the

8    United States that they have as affiliate members.  Every year

9    Phi Theta Kappa recognizes scholars at their annual convention

10   at a president's breakfast.  That happens every year for the

11   last fifty plus -- 54 years.  I think we are on our 54th

12   anniversary of that.

13        I also serve on the board of the American Association of

14   Community Colleges, and so that's a very prominent role.  It

15   was the first time in our history we were serving actually as a

16   board member.  I just recently, last week, was appointed the

17   co-chair of the Student Success Commission in the United

18   States, so I will be serving alongside 20 or 30 other college

19   presidents as we work through initiatives that will increase

20   student success for community colleges students.

21   Q.  So you have been present recently, recently being the last

22   five to eight years, where people from the AACC have recognized

23   PTK as the official honor society for community colleges?

24   A.  Yes, and I mean, it's often something that we talk about

25   at that breakfast.  I don't know if we say it every time, but

1    we always let the new presidents know that we were named that.

2    Q.  And when you talk about it, nobody jumps up and raises

3    their hand and says, "That's not true."  That doesn't happen,

4    does it?

5    A.  No.

6              MR. NEWMAN:  Objection, hearsay.  I would rather not

7    be making objections throughout the day.  I would like to know

8    if the Court would like the objections or whether we should

9    save them perhaps for post hearing brief so as to streamline

10   the hearing.

11             THE COURT:  You should make any objections you think

12   are necessary.  But is that an objection to that statement?

13             MR. NEWMAN:  Yes, Your Honor.

14             THE COURT:  It's overruled.

15   BY MR. POLAK:

16   Q.  So with respect to these individual community colleges,

17   you are aware that some of those have websites that talk about

18   the PTK chapter?

19   A.  Yeah, I think most often the community colleges in this

20   country are very proud of having Phi Theta Kappa on their

21   campuses.  They use it to recruit high school students to come

22   there so that they will have student organizations that really

23   provide a lot of activity for those students that maybe are

24   used to that.  But yeah, you will often -- I don't know if it

25   is on every community college website, but you will often see a

1    couple of pages dedicated to what the chapter is doing and who

2    the advisor is and elements like that.

3    Q.  Do those websites that are created by the colleges refer

4    to PTK as the official honor society for their school?

5    A.  I guess sometimes they do.  Sometimes they just say, this

6    is our official honor society.  In their minds, like, we are

7    their honor society, so they might have some permutation of

8    that language available to students to let them know that this

9    is our honor society that we've established, you know, whenever

10   it was established.

11   Q.  Do you understand why we are in court today?

12   A.  Yes, I do.

13   Q.  What is that understanding?

14   A.  We are here because of the online attacks from Honor

15   Society against Phi Theta Kappa and me personally.

16   Q.  When did you first become aware of Honor Society speaking

17   publicly about Phi Theta Kappa?

18   A.  I think it was the end of April.  When they filed their

19   counterclaims, they had a press release about their lawsuit

20   against us, and that would have been the first time I saw a

21   public notification about them come out.

22   Q.  So this press release was issued.  Was that a problem for

23   you?

24   A.  No.  It was a press release, and we had released our own

25   press release, so it didn't bother me at all.

1   Q.  You understood that since you had done a press release

2   when this lawsuit was filed in 2022, it wasn't inherently

3   offensive to you when you saw the press release in April of

4   this year about their counterclaims?

5   A.  It didn't bother me.

6   Q.  Did you see that press release immerge itself into local

7   media?

8   A.  I did.  I saw the press release published here in Jackson

9   in a newspaper called the *Jackson Jambalaya*.

10  Q.  It is a local newspaper?

11  A.  It's a community newspaper.  It has a fairly large

12  readership in this community.

13  Q.  And you attached --

14          **MR. POLAK:**  Actually, I attached as Exhibit 43,

15  Judge -- we aren't going to spend a lot of time looking at it,

16  but just so you know, it's in your evidence packet.  Exhibit 43

17  is the *Jackson Jambalaya* article, and we would move for

18  admission of that into evidence.

19          So -- actually, I guess, according to Mr. Linke's

20  statements -- I'm sorry, Mr. Newman's statements before, I

21  don't know that we are actually moving for admission of our

22  documents into evidence.  Is that correct, or do you want me to

23  move for admission?

24          **THE COURT:**  They have been all attached to her

25  declaration, right?

1          **MR. POLAK:**  My declaration, yes, but referenced, I

2     think, in hers.

3          **THE COURT:**  I mean --

4          **MR. POLAK:**  They are in the record.

5          **THE COURT:**  -- I will take it for what it is worth,

6     so no need to object, I mean, unless you have a specific

7     objection.  I'm going to -- since it is here with me, I'm going

8     to look at it.  I've seen it.

9          **MR. POLAK:**  Thank you, Your Honor.

10    BY MR. POLAK:

11    Q.  Has anyone mentioned this article to you?

12    A.  Yes.  When the article was published, I think the very

13    next morning I had a communication with Jim McHale, who is the

14    CEO of the largest nonprofit here in Mississippi, the Woodward

15    Hines Foundation.  He contacted me around 6:30 in the morning,

16    and so in his communication to me, his board chair on the

17    Woodward Hines Foundation -- not board chair, board member, I

18    don't remember that gentleman's name, but he had read it in the

19    *Jackson Jambalaya*, and he had let Jim know that it was there

20    and he was concerned, and he wanted Jim to explain it.  And Jim

21    called me to get some more information.

22         And that was unfortunate because the Woodward Hines

23    Foundation is a strong grant supporter of Phi Theta Kappa here

24    in the state of Mississippi.  They have provided about $500,000

25    in moneys to help low income students in Mississippi over the

1    years, and so they had a very strong interest in anything

2    written about us that was negative.

3    Q.  Did you witness any other actions of Honor Society to

4    publish that press release?

5    A.  After that, as far as the press release portion of what

6    they have done, I did receive word from Dr. Dan Phalen, who is

7    a member of the Phi Theta Kappa board.  He is president of

8    Jackson College in Michigan -- not this Jackson, Jackson,

9    Michigan.  And apparently, he received an envelope -- not him.

10   His college received an envelope, and it just said "To Jackson

11   College."  It didn't have a return address.  It was just a

12   letter.  And when they opened it, it was a copy of the press

13   release.  And someone who opened that letter sent it to his

14   office, and he sent it to me and said, "We received this by

15   mail.  I hope no one else is getting these by mail."

16   Q.  You are experienced in issuing press releases, right?

17   A.  Yes.

18   Q.  Your organization has done that on multiple, multiple

19   occasions over the last ten years probably, right?

20   A.  Yes.

21   Q.  Did it seem strange to you that they would be mailing a

22   press release to people in hard copy?

23   A.  Yes.  I've never, in my years of doing any type of public

24   relations work for Phi Theta Kappa or otherwise, known someone

25   to mail a press release to someone.

1    Q.  Do you have concerns over whether other people received

2    those by mail?

3    A.  I do have concerns.

4    Q.  Do you know the full scope of how many of those were

5    mailed?

6    A.  I do not.  And with this being a legal proceeding, I don't

7    know if people would reach out to me.  And he did because he's

8    on the board.

9    Q.  So we have talked about the press release and sort of this

10   strange mailing of hard-copy copies to colleges.  Since that

11   time, have you seen an escalation of other efforts by Honor

12   Society to publicize this lawsuit?

13   A.  Yes.  After the press release, there was several weeks

14   later, I think it was sort of mid-July -- no, probably around

15   the July 11th time frame, there began -- we began seeing

16   articles written --

17   Q.  Was it July 11th or June 11th?

18   A.  I mean June 11th.  Sorry.  June 11th, we started seeing --

19              **THE COURT:**  Is it 2024 --

20              **THE WITNESS:**  Yes, sir.

21              **THE COURT:**  -- or 2023?

22              **THE WITNESS:**  Yes, Your Honor.

23              **MR. POLAK:**  Just so the Court is clear on the timing,

24   the press release we were just talking about that was issued by

25   them and that was mailed by them from time to time was in --

1          **THE COURT:**  There's no evidence that they mailed it.

2          **MR. POLAK:**  -- 2024.

3          **THE COURT:**  I mean, so far.  I don't know what you

4    all have learned in discovery.

5          **MR. POLAK:**  Well, you have her testimony that that's

6    what happened.

7          **THE COURT:**  We have her testimony that somebody

8    received --

9          **MR. POLAK:**  Correct.

10          **THE COURT:**  -- an envelope that was unaddressed.

11          **MR. POLAK:**  Correct, that contained the press

12    release.

13          **THE COURT:**  The press release.  But there's still a

14    gap there that says that they did it.

15          **MR. POLAK:**  Fair enough.  Absolutely, Your Honor.

16          **MR. NEWMAN:**  Your Honor, I object to counsel making a

17    speech and testifying.  I think all testimony should come from

18    the witnesses until argument.

19          **THE COURT:**  Objection overruled.

20          **MR. POLAK:**  I was merely clarifying for the Court.

21          **THE COURT:**  I was just trying to figure out the press

22    -- what is Dr. Tincher-Ladner's testimony about when she

23    learned that there was a press release.  I know the press

24    release was done after the counterclaim was filed.  I assume

25    the counterclaim was sometime in 20 --

 1          **MR. POLAK:**  It was April of 2024, because we are

 2    talking about the second amended counterclaim, not the

 3    counterclaims that were filed back in 2023, some of which you

 4    dismissed.

 5          **THE COURT:**  Okay.  So this is April '24, the

 6    counterclaim, a press release came out after that, and now we

 7    are up to June of 2024.

 8          **MR. POLAK:**  Right.

 9          **THE COURT:**  And tell me what happened in June of

10    2024.  There was some testimony about June.

11          **MR. POLAK:**  Yes, sir.

12          **THE COURT:**  Have her repeat that.  I don't remember

13    what it was.

14          **MR. POLAK:**  That's okay.  What she was saying was

15    that around that time she started noticing an increase in the

16    distribution of information about this lawsuit and about the

17    claims in the lawsuit and those things.

18          **THE COURT:**  Okay.

19    **BY MR. POLAK:**

20    Q.  I believe, Lynn, that you said those efforts were online?

21    A.  Yeah, after that, I did see them proceed out onto the

22    Instagram channel.  And when they did that, they tagged my

23    personal account and they tagged Phi Theta Kappa with

24    additional information about the lawsuit and their imagery of

25    it or other things about it.  But after that, I saw several

1    websites being involved in posting on their home pages of

2    different things about it.

3         And then the social media campaign moved to Twitter and

4    LinkedIn, so we have both the online publication of stories

5    about the press release and the press release itself, and then

6    we have this online activity around all of this.

7    Q.  Let me break some of this down for the Court so the Court

8    can kind of understand.  What it started with -- I think what

9    you said was it started with you seeing on social media -- can

10   you describe what -- by social media, you are talking about

11   Twitter or Instagram, those types of social media companies?

12   A.  Right.

13   Q.  Platforms.  Just yes or no.  Is that what you are talking

14   about?

15   A.  Yes.

16   Q.  So when you saw those, you saw -- you saw what, references

17   to this lawsuit or articles about you?  What is it that you

18   were seeing?

19   A.  It was numerous things.  I saw articles about me in

20   particular, articles about the lawsuit.  They were all written.

21   They looked like a reporter had written them.  And it really --

22   all of that activity was sort of pointing to a website that had

23   about 5,000 pages of information about chapters and colleges

24   and Phi Theta Kappa and me --

25   Q.  But, Lynn -- I'm sorry, Dr. Tincher-Ladner, those 5,000

1    websites didn't emerge at the same time the social media was

2    there, right?

3    A.  No.

4    Q.  Because as I recall -- well, let me ask it this way.  When

5    the social media accounts, when you first became aware of the

6    social media accounts, did you notice that there were people

7    responding to it, because people can comment on social media,

8    right?

9    A.  Yeah, the first preview of everything was on Instagram,

10   and the reason I knew about that is they tagged me.  So it came

11   up as a notification on my phone that you have been tagged by

12   Honor Society.  And then my phone blew up, and I went to

13   Instagram to look at the post, and at that time I saw --

14   because they are on Instagram, that is where a lot of our

15   current members are, a lot of our most active members, if you

16   think about the age group of our -- the average age of Phi

17   Theta Kappa is 28 years old.  So you have a lot of students

18   that they were very upset about these allegations, so they

19   began commenting about how false this was.  They began pushing

20   back --

21   Q.  Let's be clear, Dr. Tincher-Ladner.  When you say that

22   they were upset and they were commenting about false -- were

23   they commenting about PTK providing false information or were

24   they commenting about Honor Society's post being false?

25   A.  Yeah, they were pushing back on them and making strong

```
 1   cases for Phi Theta Kappa.  And I don't have it in front of me,
 2   but they were pro Phi Theta Kappa and anti whatever this was.
 3   It went on for about 30 minutes, and all of a sudden, they took
 4   that post down.
 5   Q.  So what you saw was, they posted the information on the
 6   social media accounts, people started commenting positively
 7   about PTK --
 8   A.  Um-hm.
 9   Q.  -- and then all of a sudden you saw those documents taken
10   down?
11   A.  Yes.  Then it went away.
12   Q.  Okay.  So what was your reaction when they took it down?
13   A.  I thought, okay, that's good, you know.  They -- maybe
14   they won't try that again, because of what happened.  It didn't
15   really benefit them.  In fact, it was bad for them.  And
16   then --
17   Q.  We will talk about then.  I know you want to tell the
18   Court what has happened, but just follow my questions, if you
19   would.
20   A.  Yes.
21   Q.  So the social media posts, the comments and those things
22   were taken down off of Instagram, but Twitter remained, right?
23   A.  I think Twitter -- I didn't know when the Twitter started,
24   but once I saw that, I started looking around, and I found all
25   of this stuff come out on Twitter as well.
```

1    Q.   Now, you had mentioned that there were 5,000 websites.

2    Did the 5,000 websites emerge overnight or was there a

3    progression?

4    A.   No, there was the Instagram attack, then there was

5    Twitter, and then there was some information on LinkedIn.  But

6    while they were pushing those out, they kept pointing to an

7    ever-growing amount of information that was published on the

8    Honor Society Foundation's website.  So it didn't start out

9    with 5,000 websites.  It started out with several articles

10   about me and PTK, and then it grew to about a thousand pages.

11   And then within, like, a week or five days, it went from a few

12   articles to 5,000 pages of information for students to look at

13   and articles to see.

14   Q.   We are going to look at those documents about the 5,000

15   pages, but the first thousand were all, for the most part,

16   related to specific pages about PTK and chapters for PTK,

17   right?

18   A.   The first ones were about me personally that I saw.  They

19   were --

20   Q.   They were about you personally?  They mentioned you by

21   name?

22   A.   Yes.

23   Q.   Okay.  But then when it really got big, and it got to be

24   the first thousand websites, not just four or five or ten, but

25   the thousand websites, that first traunch of sites that you

1    saw, those related to individual pages for each of the

2    chapters, right?

3    A.   Right.   They had reference to the college name, the

4    chapter name, Phi Theta Kappa, and the word PTK abbreviated.

5    So they had --

6    Q.   How many chapters do you have?

7    A.   We have about 1250 chapters.

8    Q.   So if you are going to create a separate web page for

9    every chapter, you would have to create around 1200 websites,

10   right?

11   A.   Yes.

12   Q.   And then if you are going to create more than that, let's

13   say you create four websites for every PTK chapter, that's

14   going to get you to around five thousand, right?

15   A.   Right.

16   Q.   Is that what you saw?

17   A.   Right.   When you went to them, and I didn't go to every

18   one of them, I went to dozens of them, but there appeared to be

19   this four different pages dedicated to each chapter at Phi

20   Theta Kappa at a certain college, and it was information on

21   different pages about -- it wasn't the press release at that

22   point.   It was story-telling, one-sided inflammatory

23   story-telling about these efforts.

24   Q.   Let's look at some of these documents that are in the

25   record.   Open up your notebook, and if you can go to exhibit --

1    it is identified as A2 to my declaration, but I'm just going to

2    call these Exhibits 2, 3, 4.  And because the defendant has

3    also identified documents using a numerical system, as well as

4    an alphabetical system, I'm just going to call it Plaintiff's

5    Exhibit 2.  That way we can be clear that it is a document that

6    came from us.

7          **MR. POLAK:**  And, Your Honor, if you will open to

8    Exhibit 2, and if you will turn to the second page there where

9    the actual graphic images are.

10   **BY MR. POLAK:**

11   Q.  Okay.  So we see here an image that was captured on

12   June 19th, 2024, by my firm.  And it is at the Honor Society

13   Foundation.org website, correct?

14   A.  Yes.

15   Q.  So this is not Honor Society.  This is Honor Society

16   Foundation published material?

17   A.  Yes.

18   Q.  So is this image at the top one of those things that you

19   were mentioning where they came after you personally?

20   A.  Yes.  I searched -- when I searched my name, I found

21   these --

22   Q.  It says your name right there, right, in the title?

23   A.  Yeah.

24   Q.  It says, "Lynn Tincher-Ladner, alleged misleading

25   mastermind."  Now, is that a picture of you?

1   A.  I don't think I'm on the right thing here.  I'm sorry.

2   Q.  Are you on Exhibit A2, or Exhibit 2?

3   A.  Okay.

4   Q.  Is that a picture of you?

5   A.  No, it's a picture of like me.

6   Q.  You wear glasses?

7   A.  I have glasses.

8   Q.  She is wearing glasses, right?

9   A.  Yeah.

10  Q.  And this picture depicts someone in a cap and gown?

11  A.  Yes, blue and gold regalia.

12  Q.  The blue and gold is significant why?

13  A.  That's our colors.

14  Q.  That's Phi Theta Kappa's colors, right?  And this lawsuit

15  is about confusion in part over the use of those colors by

16  Honor Society, right?

17  A.  Yes.

18  Q.  So what is that that this imaged woman is holding?

19  A.  She is clutching a bag of money in a greedy way.

20  Q.  So your name is there, and you have this photograph.

21  Actually, I'm sorry.  It's not a photograph.  Have you looked

22  for that image online?

23  A.  I did try to, but I couldn't find it.  I mean, when I

24  looked at this, I could tell it was probably generated through

25  AI, the way it looks.

1    Q.  AI being artificial intelligence?

2    A.  Yes.  I mean, we have stock photography that we use from

3    time to time, and we purchase large -- you know, large

4    libraries of stock photography, and I had never seen anything

5    like this, so --

6    Q.  So this has some dates around it as well, right?  We see

7    that this has a date of June 11, 2024.  What conclusion do you

8    draw from looking at that date?  Was that the date it was

9    published?

10   A.  That this was published on June 11th.  I mean, that would

11   be what someone would assume.

12   Q.  Then it says, "By Honor Society Foundation."

13   A.  Yes.

14   Q.  So that's a representation it is coming from the

15   Foundation, right?

16   A.  Yes.

17   Q.  And it's also on the Foundation website.  Now, the

18   Foundation is a defendant in this case, but it is -- do you

19   know what it is and its relationship to Honor Society?

20   A.  To my knowledge, Honor Society Foundation is a nonprofit

21   arm of Honor Society, and so I find it very curious that it

22   would be within the scope of a mission of a nonprofit to be

23   publishing things that are related to its for-profit arm.

24   Q.  Let's look at the text here.  There's text that's captured

25   on this feed underneath the image.  It says, "In recent years,

1    the community college honor society landscape has been

2    scrutinized due to allegations of deceptive practices and

3    monopolistic behavior centered around Phi Theta Kappa and its

4    CEO, Lynn Tincher-Ladner."  Has your organization been under

5    scrutiny?

6    A.  No.

7    Q.  In recent years?

8    A.  No.

9    Q.  Has anyone other than Honor Society and Mr. Moradian made

10   allegations concerning deceptive practices?

11   A.  Not a single person, just Honor Society.

12   Q.  And these alleged deceptive practices that are identified

13   in here were never identified by Honor Society prior to April

14   of 2024?

15   A.  No.

16   Q.  So is it a true statement that your organization has come

17   under scrutiny in recent years?

18   A.  No.

19   Q.  Is that misleading to anyone who reads it?

20   A.  Very misleading.  And when you read this article, this one

21   in particular, it says "some people," and "critics believe,"

22   plural.  And it gives the reader this idea that there are

23   critics, as in lots of critics, and some people, and it's not

24   some, and it's not critic.  And it also never mentions that the

25   critic singular is Honor Society.  It tries to drive you into

1   this sort of psychologically, this nebulous idea that there are

2   all of these other things happening, and they are absolutely

3   not.

4   Q.   And it is really only coming from one source?

5   A.   Yes.

6   Q.   And that person is sitting right there in that chair in

7   the courtroom?

8   A.   Yes.

9          **THE COURT:**  Hold on one second.  When you say this

10  article, I presume, where it says "Read more," the article is

11  behind --

12         **MR. POLAK:**  Right.  It is not in this exhibit, but we

13  are going to go to that exhibit in a second.  Because you are

14  correct, if you connect on that "Read more" button, it will

15  take you to an article on the internet separate, one of the

16  other 5,000 articles.

17         **THE COURT:**  Okay.  All right.

18  **BY MR. POLAK:**

19  Q.   Going on, it says, "PTK's image has faced challenges due

20  to their alleged actions."  Is that a true statement?

21  A.   We have faced challenges since things like this got

22  published, but prior to that, we haven't faced any challenges.

23  Q.   It goes on to say, "At the heart of this controversy is

24  Tincher-Ladner."  Are you at the heart, or are you just trying

25  to do your job as an executive director of a nonprofit here in

1    Jackson?

2    A.   Yeah, I'm not a misleading mastermind, and I'm not at the

3    heart of anything like what's being said in this article.

4    Q.   So let's scroll through this document.   There are other

5    images that are here that are linked to other articles, namely

6    these red alert images.   What is your reaction when you see

7    these?   What is the emotional reaction that you get when you

8    see these images of students running, of lightning in the

9    background, of a college administrator looking over her

10   shoulder there on page 6, "Red alert, Phi Theta Kappa," and

11   students standing around looking at a lightning bolt.   These

12   apocalyptic-type images, what is your reaction to those?

13   A.   They are so fake-looking and they are just so

14   inflammatory, and they are done this way so people will want to

15   look at them, and pictures of students being scared and

16   running.   And just the one with our regalia is particularly

17   disturbing to me because this blue --

18   Q.   That's on page 2 that has --

19   A.   The second one.

20   Q.   -- the students sitting in rows, and you are saying they

21   have the gold regalia?

22   A.   Yes, the gold stole at a community college graduation is

23   our single-most outward facing identifier of who we are, and

24   that is what the public knows us as when they see those gold

25   stoles at a community college graduation.   So for them to use

1    that in here is particularly just so identifying to us, you

2    don't even really have to read that it's about Phi Theta Kappa

3    in the title.

4    Q.  Let me show you here.  When we look at that particular

5    article with the students sitting in the rows, it is dated

6    June 19, 2024, "Phi Theta Kappa at Edmonds College, Lynnwood

7    campus, Alpha Alpha Lambda chapter of PTK."  And we look at the

8    other title names.  They are all the same, right?  It says Phi

9    Theta Kappa at a particular college, and then it has the Greek

10   name associated with that chapter, right?

11   A.  Yes.  I mean --

12   Q.  Just yes or no.

13   A.  Yes.

14   Q.  That's what you see, right?

15   A.  Yes.

16   Q.  So you told me before that there were, like, 5,000

17   websites created that were dedicated to each of these chapters,

18   that you have sometimes three or four websites for these.  Is

19   that what you are talking about?  These are the articles that

20   there were over a thousand of, maybe five thousand of, that you

21   were referencing in your testimony earlier, all with this

22   apocalyptic-type imagery?

23   A.  Yes.

24   Q.  So do you have a sense as to how people search for

25   information about Phi Theta Kappa?

1    A.  Yes.  I think these are so --

2    Q.  My question for you is do you have a sense --

3    A.  Yes, I have a sense.

4    Q.  How would someone typically go and search for information

5    about PTK at a particular college?

6    A.  Well, a student who has been invited at a particular

7    college, if they want to -- you know, a lot of our students are

8    first generation.  Their parents never went to college.  So

9    they are going to research what this is, and they are going to

10   go to a search engine, and they are going to type Phi Theta

11   Kappa, and they are going to type the name of their college.

12   They may not know the name of the chapter yet, but they will

13   definitely, I think, type those few things.

14   Q.  So do you draw a conclusion about the use of those names

15   in these titles as far as what the intention is here with

16   respect to the way in which these articles are laid out and

17   titled?

18   A.  Yes.  The title contains any type of information the

19   student would be using to search.  But further, the most

20   important part of a web page is its title.  When you tag a

21   title, that's what the search engines, like Google, like Bing,

22   that's what it goes out and looks at to bring back information

23   to you.  So using those keywords in a title is extremely

24   damaging as far as the students seeing this just when they want

25   to learn something about their chapter.

1    Q.  Okay.  I just -- I would like you to stay in Exhibit A2
2    but go to the third blue sheet that's inside Exhibit A2.
3         **MR. POLAK:**  And, Judge, you've got in your notebook,
4    in Exhibit 2, there are a number of documents in it that are
5    separated by blue sheets.  The one that we are looking for is
6    the third one, and it is titled, "Phi Theta Kappa at Sheridan
7    College, main campus, Iota Theta chapter of PTK."
8         **MR. NEWMAN:**  May I ask a question about the exhibit?
9         **THE COURT:**  Yes.
10        **MR. NEWMAN:**  I have the book, and I can see
11   everything, thank you, but I just want to know, are these the
12   same exhibits you already filed?
13        **MR. POLAK:**  They are.
14        **MR. NEWMAN:**  So 2 here is A2 filed?
15        **MR. POLAK:**  Right.
16        **MR. NEWMAN:**  So the blue sheets are separating it,
17   but it's not different exhibit numbers?
18        **MR. POLAK:**  Right.  It was really just for ease of
19   testimony orientation.
20        **MR. NEWMAN:**  I just wanted to understand.  Thank you.
21   **BY MR. POLAK:**
22   Q.  Okay.  So when you clicked, there were different title
23   names, and then read more.  One of those we looked at was for
24   Sheridan College.  So when you clicked on that, is this the
25   website that comes up?

1   A.   Yes.

2   Q.   So let's take a look at this.  First note that this is

3   also an Honor Society Foundation website, right?

4   A.   Right.

5   Q.   And we've already talked about why you would find that

6   curious.  The second title is "Understanding the allegations

7   against Phi Theta Kappa and their impact on Sheridan College's

8   main campus."  And below that we again see this language about

9   PTK coming under scrutiny that you have already identified as

10  false, right?

11  A.   Yes.

12  Q.   Let's go down to the section, "Impact on Sheridan

13  College's main campus."  And we see here -- I will quote this

14  for the record.  "While Sheridan College's main campus is not a

15  part of the lawsuit, it is essential to consider the potential

16  implications for its PTK chapter.  The allegations against PTK

17  could affect the reputation of the honor society and, by

18  extension, the students associated with it."

19       What is your reaction when you see that in this article

20  prepared by The Foundation about the impact of these

21  allegations on students and on colleges?

22  A.   I think right at the -- people don't read a lot of an

23  article, but the first point they are getting across is about

24  students.  So they are letting students know, if students are

25  reading this, this is bad for students.  So this is a direct

1  attack on potential, current, and future members of Phi Theta

2  Kappa.  This is about students.

3  Q.  So when you go up above that, it talks about allegations

4  against Phi Theta Kappa, and it says that "PTK is accused of

5  falsely claiming that its members represent the top ten percent

6  of their class."  We are going to get into the details of that

7  here in a second, but is it true or false that PTK's membership

8  is in the top ten percent of their campuses?

9  A.  Phi Theta Kappa's membership is in the top ten percent of

10  students on the campus.

11  Q.  They also claim that it is false that you promise

12  significant scholarship opportunities.  Does PTK offer

13  significant scholarship opportunities?

14  A.  Yes, we do.

15  Q.  How many dollars of scholarships -- just dedicated just

16  for PTK-only members, you have a foundation, how much in

17  scholarships do you give out a year on that?

18  A.  Well, we have three types of scholarships, but the

19  foundation-type scholarships, I call those the competitive

20  scholarships, you apply for them through our foundation, they

21  have over a million dollars in funds that have been donated,

22  people who have left endowments.  There are just a lot of

23  different opportunities in the foundation scholarships.

24  Q.  And then they go on to say that it is false that you offer

25  an average of $2,500 per member annually in scholarships.  Is

1    it true or false that you offer more than $2,500 in

2    scholarships on average to students?

3    A.   It is true that the average scholarship -- this is

4    referencing another pot of scholarships.  They are not

5    competitive.  They are for members.  So that is why we publish

6    it in this way.  But the average scholarship is way above

7    2,500, but this is a true statement.

8    Q.   Okay.  So they go on to tell, then, but they warn

9    everybody in this article, beware, PTK lies, and the school

10   ought to do something about it, right?  And they are also

11   saying here, students, you ought to reconsider whether you want

12   to join PTK because of what the allegations are that they claim

13   here?

14   A.   Yes.

15   Q.   And, you know, if we were to go and look at the other

16   4,999 or so websites that they created that are specific to

17   each college, would we see the exact same stuff?

18   A.   Yes.

19   Q.   So they don't say it just once in a press release.  They

20   have said it five thousand times on line; is that right,

21   Dr. Tincher-Ladner?

22   A.   Yes.

23   Q.   So let's go to Exhibit 13.  And this is also on the Honor

24   Society Foundation website, and it is a page that is titled,

25   "PTK alerts by community college."  And they have here at the

1    top "Unveiling the truth about PTK," and then they list three

2    things:  Deceptive advertising and false claims, misleading

3    scholarship information, leadership accountability.  They have

4    those three things there.

5         But I think the point that I want you to note for the

6    Court is that if you were to flip through the remaining I think

7    23 pages, you see a link for every single PTK chapter that

8    exists, right?

9    A.   Yes.  Even the ones outside of the country.  Yes.

10   Q.   And you see above that a title that says, "Explore the PTK

11   alerts directory."  Do you see that in the middle of the first

12   page, "Explore the PTK alerts directory"?

13   A.   Yes.

14   Q.   "This directory offers comprehensive information on PTK

15   chapters at various community colleges, providing critical

16   insights and transparency."  Do these articles that you have

17   seen for each of these chapters provide your side of the story?

18   A.   None of them.

19   Q.   Now, Mr. Moradian sat in your deposition in February,

20   didn't he?

21   A.   Yes.

22   Q.   You told him about the falsity of their claim about the

23   top ten percent, didn't you?

24   A.   We went through it.

25   Q.   You told him about the falsity of the $2,500 claim that he

1   is making here?

2   A.  Yes.

3   Q.  You told him about the falsity of all of what it is that

4   they are arguing in their complaint, right?

5   A.  I did.

6   Q.  And that was before the second amended complaint was even

7   filed?

8   A.  I did, yes.

9   Q.  So when he created these, or Honor Society Foundation

10  created these, it was done with knowledge that you have a

11  different story to tell, but they don't tell that here, do

12  they?

13  A.  No.

14  Q.  You've talked about these individual web pages for --

15  actually, let's make one more note here, staying on Exhibit 13.

16  Do you see the section there that says "Impact on Students and

17  Institutions," and it talks about here the misleading practices

18  of PTK.  They don't even bother to use the word "alleged"

19  there, do they?

20  A.  No, they --

21  Q.  They just conclude that it is misleading, right?

22  A.  Yes.

23  Q.  And when you look at the -- the various comments at the

24  top about unveiling the truth about PTK, those are stated as if

25  they are facts, right?  That it is a fact that PTK is engaged

 1    in deceptive claims, right?

 2    A.  Yes, when they numerically bullet things like this and put

 3    bold, that's where the eye goes, and there's no indication that

 4    they are alleged.

 5    Q.  Right.  And would it even matter if they said alleged?

 6    A.  No.

 7    Q.  Students aren't going to pick up on that, are they?

 8    A.  No, they are not.

 9    Q.  So you have -- what it is, you have these deceptive and

10    misleading claims in the first section that don't provide any

11    counter story, right?  Is that right?

12    A.  Yes.

13    Q.  And then in the middle section, there's a statement about

14    "Impact on Students and Institutions" where we see the same

15    stuff we were looking at before where there is this big warning

16    to students, don't join PTK because of this, right?

17    A.  Yes, impact on students.

18    Q.  And the same thing with the colleges.  They are

19    threatening the colleges, saying, if you continue to do

20    business with PTK, you are going to have an issue?

21    A.  Yes.  In each of the articles, there is information for

22    students, information for the colleges and their

23    administration, and then there is also information for faculty

24    and staff.  So every single important constituent person

25    connected to us, there is a message for them in these articles.

1    Q.  And let's look at Exhibit 12.  This is just more of the

2    same, but this is Phi Theta Kappa Chapter Directory, it says at

3    the top.  And it says, "Welcome to our comprehensive directory

4    of Phi Theta Kappa chapters.  This page serves as a resource

5    for students, educators, and researchers to explore and

6    understand the numerous PTK chapters across the country,"

7    right?

8    A.  Right.

9    Q.  So it is pretty neutral when you read that first

10    paragraph, right?

11         MR. NEWMAN:  Objection.  Counsel has been leading the

12    witness through almost every question.

13         MR. POLAK:  I will withdraw the question, Your Honor.

14         THE WITNESS:  This is --

15         THE COURT:  Hold on.

16         THE WITNESS:  I would like to make a statement.

17         THE COURT:  Hold on.  Hold on, Dr. Tincher.

18         THE WITNESS:  Sorry.

19         THE COURT:  Let me rule.  Objection is sustained.  He

20    says he is going to withdraw.  Rephrase your question.

21         MR. POLAK:  Absolutely, Your Honor.  Thank you.

22    BY MR. POLAK:

23    Q.  Is this worded neutrally or some other way?

24    A.  Some other way.

25    Q.  Well, the first couple of sentences, is it worded

1    neutrally or some other way?

2    A.   Some other way.  But on this exhibit, they have hijacked

3    the Phi Theta Kappa Chapter Directory, and when people are

4    looking for a chapter directory, they are going to go here

5    instead of Phi Theta Kappa's website, or could.

6    Q.   And then what we see is the same list of 23 or so pages of

7    additional -- of links to each of those other pages that they

8    have created about these things, right?

9    A.   Yes.

10   Q.   Okay.  Now, we've talked about these web pages that were

11   created in relation to specific colleges.  Let's look at

12   Exhibit 3 in your binder as well.  And this is not an article

13   about the specific college.  This is an article about just Phi

14   Theta Kappa.  So is this on the Honor Society Foundation

15   website?

16   A.   Yes.

17   Q.   And the title is, "Is Phi Theta Kappa a big deal?  No,

18   it's not."  This one is dated June 11, 2024.

19        When you -- this content goes to the same issues we have

20   been talking about about alleged deceptive conduct by Phi Theta

21   Kappa, right?

22   A.   Yes.

23   Q.   Let's look at "Misleading exclusivity."

24        "Phi Theta Kappa often advertises itself as an exclusive

25   honor society, inviting students who supposedly fall within the

1    top ten percent of their class.  However, this claim is

2    misleading."  Is that neutrally written?

3    A.  No.

4              **THE COURT:**  What exhibit are you looking at?

5              **MR. POLAK:**  I'm looking at Exhibit 3, Your Honor.

6    A.  This image is so offensive to Asian students that it's

7    just incredulous.

8    **BY MR. POLAK:**

9    Q.  Do you have any -- well, we will let Mr. Moradian answer

10   for that.  There's a section down here about data privacy.  We

11   haven't talked about that yet.  The claim is, "PTK has also

12   been accused of selling and sharing member data under

13   misleading circumstances."  Has anyone, other than Honor

14   Society, made that accusation?

15   A.  No one.

16   Q.  In the second amended complaint, they contend that you did

17   this in connection with PTK Connect.  Can you explain for the

18   Court what PTK Connect is?

19   A.  Yes.  PTK Connect is a proprietary database that we

20   created with a grant from the Dell Foundation.  And what it

21   does is it allows four-year colleges to enter into the portal

22   and create profiles with scholarships, with other information

23   for students to learn about their four-year college.  But it

24   also is for the students too.  The students go into the portal,

25   they can search for colleges, they can search for scholarships,

1   they can learn -- a lot of our students can't afford to travel

2   to campuses, so if they want to attend a four-year college,

3   sometimes they have to just research it.  This provides

4   everything in one place for a transfer student, not for all

5   students but for a students wanting to go from a community

6   college to that particular four-year.

7   Q.   In connection with PTK Connect, do the four-year colleges

8   have the ability to communicate inside that portal with

9   students that are members of PTK?

10  A.   They do.  They have access to their data as part of their

11  sponsorship and membership in PTK Connect.  The students have

12  more of an ability to communicate to them.  They can hit the

13  love button, and that sends a message to that recruiter, hey,

14  this student is interested in your college.  You need to reach

15  out.

16       But yeah, we didn't reinvent the social media experience

17  in there.  They do have to e-mail each other.  But they can get

18  the contact information of each person that they need.

19  Q.   But, Dr. Tincher-Ladner, it is interactive in that the

20  students can contact these four-year institutions in one place

21  at one time to communicate their interest in that school?

22  A.   And that is important, yes, and when you look at a

23  four-year university, only certain recruiters are dedicated to

24  the transfer students.  So it is important that it gives them

25  just the right person they need to contact to get the

1    information they want to have.

2    Q.  So they accuse -- Honor Society accuses you of selling

3    student data to these schools without the students' consent.

4    First of all, are you selling their data to them?

5    A.  We are not selling student data.  We have membership data.

6    When the student becomes a member, they release that data to

7    give to those colleges for their participation in Connect.  And

8    we don't sell student data.  We're a membership organization.

9    Colleges have students.  We have members.

10   Q.  Do students value this program?

11   A.  They do very much.

12   Q.  Do they use this program?

13   A.  Yes, thousands and thousands of students log into Connect

14   every month.

15   Q.  Has any student ever complained about having access to

16   this program?

17   A.  No.

18   Q.  So this concept of selling the data, do these four-year

19   schools pay money, in what form, maybe, to PTK for access?

20   A.  The four-year colleges, if they want to partner with us,

21   they do pay a subscription fee to be able to communicate with

22   the students.

23   Q.  Okay.  But you are not selling the data to them?

24   A.  No, we don't sell data.

25   Q.  So -- and even if it was a sale, which it is not, but even

 1   if it were, like they have alleged, do the students consent to

 2   participation in the program when they join PTK?

 3   A.  Yes.  It is such an important part of what we do.  The

 4   transfer function is really -- we have a lot more than this.

 5   We teach them courses on how to transfer.  This is just a part

 6   of their experience with learning how to transfer from a

 7   two-year to a four-year.

 8        What was your question?  I'm sorry.

 9   Q.  No, you answered it.  With respect to this web page we are

10   looking at here, Exhibit 3, over on the right-hand side and

11   continued on the next page are it looks like little blue

12   banners or blue tabs.  Do you know what those are?

13   A.  It says at the top that they are tags for this page.

14   Q.  Are you -- do you have knowledge in your job as to what

15   tags are in connection with websites?

16   A.  Yes.  I mean, I have worked with websites throughout my

17   career.  I mean, the most important tag is the title.  As I

18   mentioned previously, these additional tags help users find

19   information on your website about a particular topic.

20   Q.  So that -- just so I'm understanding correctly, these tags

21   work with Google and the search algorithm?

22   A.  Potentially they could.  And when it is published, they

23   can see the first few tags.  Like, it would say, here is the

24   title, it's "Under abuse," that being the first tag here.

25   Q.  These colleges that are out to the right, are they, for

1    the most part, four-year institutions or two-year institutions?

2    A.  Most of these colleges listed are four-year colleges.

3    Q.  And those are the colleges that would be interacting

4    potentially or actually on the PTK Connect program?

5    A.  Absolutely, yes.

6    Q.  So is it significant to you that this web page that talks

7    about data privacy and allege deceptive activities by PTK, that

8    that page is being tagged with those four-year colleges?

9    A.  It bothers me a lot.

10   Q.  And can you tell what the intent is there with respect to

11   that?

12   A.  I think the intent is to make sure that the internet knows

13   that if you want to learn anything about California -- sorry,

14   my eyesight --

15   Q.  California Lutheran University or Arizona State

16   University --

17   A.  Yes, and if you want to learn about them, you are going to

18   end up having to read this.

19   Q.  It is going to come up in a search result?

20   A.  Yes.

21   Q.  So when you look at the bottom of the page, there are two

22   related articles.  Do you see that?  One is, "Is Phi Theta

23   Kappa Worth It," and the other one is "Phi Theta Kappa lawsuit,

24   PTK deceptive practices and attempted monopoly."  Do you see

25   those two?

1    A.   Yes.

2    Q.   So is that the way these websites work is that they offer

3    other links so people, when they get done reading this article,

4    can go look at other websites?

5    A.   At the bottom of each one of these experiences on their

6    website, you have this ability to move to the next article, the

7    previous and the next above that, but it also published other

8    articles below that that -- so they can advertise the reader to

9    even explore further their inflammatory work here.

10   Q.   So if we were to click on "Phi Theta Kappa lawsuit, PTK

11   deceptive practices and attempted monopoly" link, you would go

12   to Exhibit 4.

13        **MR. POLAK:**   Judge, I would turn your attention to

14   Exhibit 4, as well as you, Dr. Tincher-Ladner.

15   **BY MR. POLAK:**

16   Q.   And we see another article that is talking about -- this

17   one is dated May 17, 2024, "Phi Theta Kappa lawsuit, PTK

18   deceptive practices and attempted monopoly."  And it says at

19   the beginning of the article, "In a bold move to defend

20   students, parents, and the educational community, a lawsuit was

21   filed against Phi Theta Kappa and its CEO, Lynn

22   Tincher-Ladner."  Is that true, that they filed a lawsuit

23   against you?

24   A.   No, we filed a lawsuit against them in April of 2022,

25   and --

1    Q.  Did they mention that lawsuit that you filed against them?

2    A.  No.

3    Q.  The Honor Society Foundation and a lot of its articles

4    claims that it is doing a public service, right?

5    A.  Yeah.

6    Q.  Do they make any reference at all in the voice of public

7    service to the claims that PTK has alleged against Honor

8    Society?

9    A.  No.

10   Q.  That is completely absent from any of these five thousand

11   articles, isn't it?

12   A.  You don't see it in any of them.

13   Q.  It goes on to say -- it talks about the allegations in the

14   lawsuit.  You go on to the next page, you see again statements

15   about the allegations against Phi Theta Kappa, again, talking

16   about this false top ten percent claim, misleading scholarship

17   claims.  It goes on to talk about monopolistic conduct and

18   suppression of competition.  Do you see all of that here?

19   A.  Yes.

20   Q.  Is any of that worded in a voice that is anything other

21   than one-sided?

22   A.  It is completely one-sided and false.

23   Q.  So let's look at, underneath the --

24       **MR. POLAK:**  This is on page 2, Your Honor, the

25   allegations against Phi Theta Kappa.

1  **BY MR. POLAK:**

2  Q.  Let's go down after the bolded three claims that are

3  there.  We see a sentence that starts with, "These deceptive

4  tactics."  Do you see that?

5  A.  Yes.

6  Q.  I will read it for the Court.  "These deceptive tactics,

7  the lawsuit claims, have enabled PTK to misappropriate

8  significant funds from students by exploiting their trust and

9  aspirations."  Has PTK misappropriated any funds?

10  A.  No.

11  Q.  Does anyone audit PTK's financials?

12  A.  Yes, we have a firm that audits Phi Theta Kappa every

13  year.  And to my knowledge, and I've looked through all of the

14  audits that are available to me, we have never had an audit

15  that was -- had any kind of question.  They were all clean

16  audits.  And it is their job to find anything like that, and

17  it's absolutely not true.

18  Q.  Has anyone in any one of these audits ever found a

19  misappropriation of funds that you're aware of?

20  A.  Never.

21  Q.  Do you audit chapter financials?

22  A.  No.  The chapters themselves fall within the college's

23  student activities budgets, and all of that happens at the

24  college.  We do not audit chapter financials.  We audit Phi

25  Theta Kappa, the foundation, but we also audit our 28 regions,

1   so we have -- we have regional accounts, and they come under

2   our audit.  So we do audit everything but the chapters.

3   Q.  So the chapter funds really are state funds?

4   A.  Yeah, the chapter funds, because they are held at the

5   institution, they are not PTK funds.  They are college funds.

6   Q.  Okay.  When we go down into the section about monopolistic

7   conduct and suppression of competition, we see here a quote

8   from a person named Michael Calvert.  Do you know who Michael

9   Calvert is?

10  A.  I do.

11  Q.  Does he work for Honor Society?

12  A.  He is the vice-president of marketing for Honor Society.

13  Q.  But this is a quote given for the Honor Society

14  Foundation, right?

15  A.  Yes, I just don't really -- I can't really tell who works

16  for who over there, but he is listed on his LinkedIn as the VP

17  for marketing for Honor Society.

18  Q.  Have you recently learned anything about Mr. Calvert?

19  A.  Yes, I have.

20  Q.  What is it that you have learned?

21  A.  In the last few weeks, we learned that we have a member

22  who goes to college in New Jersey, but his address is Michael

23  Calvert's home address.  And when the student joined Phi Theta

24  Kappa, a credit card with Michael Calvert's address was used to

25  join and -- but not his name.  It was the correct name.  So I

1    don't know what's going on, but Michael Calvert appears to be a
2    member or has somehow acquired some student information.
3    Q.  Let's break that down for the Court so the Court
4    understands.  Someone in a student name -- let's back up.  You
5    first learned about this because of what?
6    A.  So, about two weeks ago, they produced several thousand
7    pages of discovery to Phi Theta Kappa, and the lawyers on your
8    team were going through it, and they happened to notice that a
9    student had produced a lot of different screen shots and some
10   information --
11   Q.  Screen shots of what?
12   A.  I haven't been able to see the actual -- I'm not allowed
13   to look at the discovery, so I don't know.  But this is just
14   what Rachel told me on the phone.
15   Q.  Okay.  So there were screen shots of PTK's website?
16   A.  Right, or different things.
17   Q.  That's what you understand?
18   A.  That's what I understand, information about us.
19   Q.  And the screen shots were taken by someone who was not
20   named Michael Calvert?
21   A.  Right.  So she asked me --
22   Q.  It was an actual student?
23   A.  Yeah, it was a student's name, and she said, tell me about
24   the student.  So I pulled up the student's record in the
25   database, and nothing looked out of the ordinary.  The student

1    had joined in March of this year, but what did look like out of

2    the ordinary is the student had joined in March, but the

3    address was in Missouri, and the address sits in the middle of

4    the screen.   And so, you know, not that students don't change

5    addresses, but it is just funny to have an address go from New

6    Jersey to Missouri in just a month's time frame.

7              **THE COURT:**   In just a what time frame?

8              **THE WITNESS:**   A month.

9    **BY MR. POLAK:**

10   Q.   So you then went or someone went and compared the address

11   in Missouri to what, to Mr. Calvert's address?

12   A.   So I told Rachel, the lawyer on your team, that this

13   student applied for a scholarship, they bought a piece of

14   regalia, they have gone into PTK Connect.   They seem to be

15   doing all the things we want members to do.   The only thing I

16   think that's weird about the student is the address is in

17   Missouri.   And she is the one that determined this was Michael

18   Calvert's address.   I did not do that.

19   Q.   So what conclusion do you draw from this series of events?

20   Are you telling this Court that Michael Calvert hijacked an

21   actual student's account in order to access your proprietary

22   information?

23   A.   Yes.   To join PTK, you have to have the invitation, but

24   you also have to have a pass code.   So I don't know how Michael

25   Calvert got this information, but it does appear as though

1    Michael Calvert is pretending to be a student from New Jersey.

2    Q.  Let's look at Exhibit 7.  I'm just going to kind of go

3    through some of these websites for the Court.  I know the Court

4    at the outset said it hadn't looked at quite everything yet, so

5    I'm just going to flag some of these quickly for you.

6         This is an article, but this is on the HonorSociety.Org

7    website.  So this is not the Foundation.  This is actually the

8    Honor Society for-profit organization.  And it is titled, "Phi

9    Theta Kappa legal issues.  What students and educators need to

10   know."  Right?  That's the title?

11   A.  Yes.

12   Q.  Again, we see students and educators being targeted in the

13   title, right?

14   A.  Yes.

15   Q.  And then it goes through and talks about the very same

16   thing, the top ten percent claim, the scholarships, the

17   anti-competitive activities we have already talked about.

18        On the second page, there is a special section, and it's

19   called "Impact on students.  If these allegations are true,

20   PTK's practices could have misled many students."  See that?

21   A.  Yes.

22   Q.  And then underneath that, "Educational institutions'

23   perspective."  It writes, "Educational institutions that

24   partner with PTK might need to reassess their affiliations and

25   ensure they are not inadvertently supporting misleading

1    practices."  Do you see that?

2    A.   Yes.

3    Q.   Then "Broader educational implications:  This lawsuit

4    against PTK serves as a wake-up call for all honor societies

5    and organizations."  Let's look at Exhibit 8.

6            **MR. POLAK:**  Are we looking to take a break, Your

7    Honor?

8            **THE COURT:**  Yes.  This would be an appropriate time.

9    I was about to let you do this exhibit, but we are going to go

10   through a few of them.  So we will take a 15-minute break.

11   Dr. Ladner, you may step down.  We will recess for 15 minutes.

12         **(RECESS TAKEN AT 10:31 A.M. UNTIL 10:50 A.M.)**

13           **MR. NEWMAN:**  Your Honor, should the Court impose any

14   time limits so we can make sure we finish today?

15           **THE COURT:**  Oh, I hope -- I hope we finish today.  If

16   not, we will pick up wherever we don't, but I hope we finish

17   today.  When I say today, I don't mean beyond 6:00 either.

18           **MR. POLAK:**  It's a lot of material to go through,

19   Your Honor, and I appreciate your patience.  It's a lot of

20   websites that we have to go through.

21           **THE COURT:**  Okay.  I understand.  But as I explained

22   to the parties the other day, if we -- I do hope we will finish

23   today.  And I think I told the parties, you know, about my

24   schedule for the future.  And, you know, if things change in

25   that regard, I will let the parties know.

1    In the three-defendant criminal case that I have, one of

2  the defendants has announced that he will plead guilty, so that

3  probably means that that trial, assuming it goes forward, will

4  not last a whole month now.

5    **(OFF-RECORD)**

6    **THE COURT:**  You may proceed at any point, Mr. Polak.

7  **BY MR. POLAK:**

8  Q.  We were talking about Exhibit 8.  Do you have that open,

9  Dr. Tincher-Ladner?

10  A.  Yes.

11  Q.  And this is a little different than the articles we were

12  looking at before because this one is from the Honor Society

13  website, right?

14  A.  Yes.

15  Q.  This is not the Honor Society Foundation.  And this one is

16  titled, "Phi Theta Kappa embezzlement:  A deep dive into the

17  allegations."  Do you recall whether this embezzlement issue

18  was also a part of the survey that the Court enjoined back in

19  March?

20  A.  Yes.

21  Q.  And we see it here again.  Is this article only about the

22  claimed embezzlement or something else?

23  A.  It's about more.

24  Q.  What are the other issues that it attempts to -- just

25  state very generally.  We see there "deceptive advertising

1    practices" at the bottom.  Is that what you are referring to?

2    A.  Yes.

3    Q.  So we see underneath that, "Key issues."  It's the same

4    issues we have been talking about already related to the

5    scholarships and those things.  But then we go on and we see

6    the same other types of language, "Impact on PTK and its

7    members."  Do you see that?

8    A.  Yes.

9    Q.  And they wrote on this website, "The combined impact of

10    the embezzlement and deceptive advertising allegations has

11    significant implications for PTK's reputation and its members."

12    Right?

13    A.  Yes.

14    Q.  So they are trying to marry the embezzlement with these

15    other deceptive allegations?

16    A.  Yes.

17    Q.  Let's look at the first paragraph back on the first page.

18    It reads, "Phi Theta Kappa, the 'prestigious' honor society for

19    community college students, finds itself embroiled in

20    controversy following the arrest of a former advisor on charges

21    of embezzlement."

22        Now, first of all -- well, it goes on to say, "This

23    incident, coupled with longstanding allegations of deceptive

24    advertising practices, raises serious concerns about the

25    integrity and oversight within PTK."

1        First of all, have these allegations been longstanding?

2  A.   No.

3  Q.   They have only been alleged since April, right?

4  A.   Right.

5  Q.   They go on to discuss the impact on the members.  We

6  talked about that.  But let's talk about this PTK advisor

7  issue.  You told the Court earlier that you don't control the

8  PTK advisors, right?

9  A.   Right.

10 Q.   These are faculty or staff from the colleges that are

11 hired by the colleges?

12 A.   Yes.

13 Q.   You also told the Court about how the money in the

14 chapters is not controlled or audited by PTK.

15 A.   Correct.

16 Q.   It is controlled and audited by the state?

17 A.   Yes.

18 Q.   Now, you were asked questions at your deposition back in

19 February about those very same issues, weren't you?

20 A.   I was.

21 Q.   Was Mr. Moradian sitting in the deposition room when you

22 were deposed?

23 A.   Yes.

24 Q.   And did he hear you talk truthfully about the relationship

25 between the advisors and PTK?

1    A.  He did.

2    Q.  So --

3           **THE COURT:**  Hold on for a second.  I presume the

4    deposition was February of 2024?

5           **MR. POLAK:**  Correct.  Thank you, Your Honor.

6    **BY MR. POLAK:**

7    Q.  So just a few months before this website comes out making

8    these allegations, suggesting a connection between this advisor

9    embezzling funds and some lack of oversight by PTK, you had

10   previously told him that none of that was connected?

11   A.  I did.

12   Q.  So they just ignored your testimony?

13   A.  They did.

14   Q.  Was this former advisor even a PTK advisor when she got

15   arrested?

16   A.  She was not.

17   Q.  Were student funds actually taken by her?

18   A.  No.

19   Q.  So the association in this article that the advisor was

20   the responsibility of PTK, is that true or false?

21   A.  That is false.

22   Q.  That the money was PTK's student member funds, was that

23   true or false?

24   A.  False.

25   Q.  You can put that document to the side.  Are you familiar

1    with Honor Society's, quote/unquote, justice center?

2    A.  I am.

3    Q.  Turn your attention to Exhibit 9.  This is the home page

4    for Honor Society's website as it existed on June 14th of this

5    month.

6            **MR. POLAK:**  And, Judge, we know that it was

7    June 14th, just so you know, because on the very first -- well,

8    the first real substantive page, you will see a document that

9    says Page Vault at the top, and this is a software that our law

10   firm uses to capture on-screen data from websites.  And it

11   will, in essence, time and date stamp the collection of that so

12   that it is authenticated.  This is a software that has been

13   regularly accepted by courts.  That way you know what this --

14   because websites change.  Right?  They are constantly being

15   updated.  They are constantly changing.  This allows us to know

16   when and how that website was captured.

17           **THE COURT:**  By a particular date and time?

18           **MR. POLAK:**  By a particular date and time.  That is

19   correct, Your Honor.

20   **BY MR. POLAK:**

21   Q.  Before we get to the point that I want to ask you about,

22   the justice center, if we were to look on the very first page

23   of the website capture, over to the left it says, "Honor

24   Society is built for everyone with a goal."  Do you see that?

25   And then underneath that it has some text, but it says here,

1    "We are also the largest based on web traffic."  Are they

2    claiming they are the largest honor society based on the number

3    of people that come and visit their website?

4    A.  Yes.

5            MR. NEWMAN:  Objection, question calls for

6    speculation.

7            THE COURT:  Objection sustained.  Let me -- well,

8    where is it?

9            MR. POLAK:  Sure.  Your Honor, if you were to look at

10   this page right here --

11           THE COURT:  I'm looking.

12           MR. POLAK:  It's right here inside the smaller text,

13   and it says, "We are also the largest based on web traffic."

14           MR. NEWMAN:  The document speaks for itself.  It is

15   speculation, and that question can be asked to Mr. Moradian --

16           THE COURT:  No, that's fine.  Your objection is

17   sustained.  But it is here.

18           MR. POLAK:  It says what it says.  And I guess if

19   they want to dispute that they are the largest based on web

20   traffic from their own advertisement, they can do that with Mr.

21   Moradian.

22   BY MR. POLAK:

23   Q.  So we see that there.  Do you draw a conclusion about --

24   you have got 5,000 websites, you have got the social media, all

25   of these things.  When you read that on there, what conclusion

 1    do you personally draw about the significance of their claim

 2    that they are the largest by web traffic?

 3    A.  With the information about the lawsuit and links to

 4    various articles on their home page, it really worries me that

 5    they send invitations to every four-year college student, every

 6    two-year college student, every high school student, from what

 7    I understand.  So everyone in higher education and in post

 8    secondary education possibly is going to this website, or is

 9    being invited at some point to go here, and they can see this

10    information.  So it's worrisome.

11    Q.  Let's go to the very last page.  If you were to be

12    scrolling on a website and you were to scroll all the way to

13    the bottom, this is where you would come to, right?

14    A.  Yes.

15    Q.  And we see here a number of different links or sections,

16    and the upper left-hand corner talks about scholarships and

17    grants, with a number of different links.  But I want to turn

18    your attention to the bottom row, second from the left.  It's

19    called Justice Center.  I asked you before if you were aware of

20    Justice Center.  Is that what you were referring to?

21    A.  Yes, this is the Justice Center.

22    Q.  Okay.  And underneath that, there are some links.  One is

23    titled, "Phi Theta Kappa Lawsuit Center."  Another is called

24    "PTK lawsuit claim."  And then another one is the "PTK news

25    release."  Do you see those?

1    A.  Yes.

2    Q.  Let's go to Exhibit 14.  This is a fairly thick exhibit.

3    It's got a number of different Page Vault captures here, but is

4    it your understanding that if you click on those links there in

5    the Justice Center, that it will take you to these pages?

6    A.  Yes.

7    Q.  So this one is entitled, if you look in the upper

8    left-hand corner of this page, it says, "Honor Society Help

9    Center."  This is from -- we are still on the Honor Society

10   website, right?

11   A.  Yes.

12   Q.  And this says, "Phi Theta Kappa lawsuit.  Welcome to the

13   FAQ section dedicated to the Phi Theta Kappa lawsuit."  And it

14   has some other language there, but do you see where I'm talking

15   about?

16   A.  Yes.

17   Q.  Do you know what the term FAQ means?

18   A.  Frequently asked question.

19   Q.  So when you see an FAQ page, frequently asked questions,

20   do you draw a conclusion about whether those are questions that

21   are actually frequently asked?

22   A.  Yes, that's what it means.  These questions have been

23   asked numerous times.

24   Q.  Okay.  And we see here a number of links at the bottom,

25   starting with "Overview of the lawsuit, specific allegations."

1    Down at the bottom of the first page, we see, "Impact on

2    community college students, faculty, staff."  Do you see that?

3    A.   Yes.

4    Q.   And then on the second page, you see even more categories

5    of links.  So let's look at some of these.  Under "Overview of

6    the lawsuit," we see a web link, that's a web page you can go

7    to that titled, "What impact could the lawsuit have on Phi

8    Theta Kappa members?"  So they are telling -- do you draw a

9    conclusion about this being a FAQ, a frequently asked question

10   in that question?

11   A.   Yes.

12   Q.   What is your conclusion?

13   A.   They are making certain that members, potential members,

14   students in particular, are aware of things that might impact

15   them, and they have a lot of students probably being drawn to

16   this information because it is their high traffic area.

17   Q.   So let's look at the second column there, still under

18   "Overview of the lawsuit."  The very first one says, "What

19   steps should students take if they feel misled by Phi Theta

20   Kappa?"  Right?

21   A.   Yes.

22   Q.   Is that a frequently asked question of your organization

23   prior to this distribution of 5,000 websites and material that

24   they put online?

25   A.   No.

1    Q.  Then there are some other ones under "Specific

2    allegations."  Let's look at a couple of those.  On the

3    right-hand side of the column, the first two, "What impact

4    could these allegations have on current and prospective

5    members?"  And you click on that and there will be a whole

6    other article, right?

7    A.  Yes.

8    Q.  Answering that question.  Underneath it, "Who is Lynn

9    Tincher-Ladner, and what is her role in the allegations?"

10   Right?

11   A.  Yes.

12   Q.  In your press release that your organization issued, did

13   you specifically call out the CEO, Michael Moradian?

14   A.  No, we never listed his name.

15   Q.  Have you ever issued any formal public statements on

16   websites or whatever that went after Mr. Moradian?

17   A.  Never.

18   Q.  Yet he is doing that to you?

19   A.  A lot.

20   Q.  We have a whole section below that called "Impact on

21   Community College Students, Faculty, and Staff."  You look on

22   the very first one:  "What can educational institutions do to

23   support affected students during this lawsuit?"  And you can

24   click on that link, and it will take you to a page that answers

25   that question.  Right?

1    A.  Yes.

2    Q.  Has any educational institution come to you and said, how

3    am I supposed to support students about this prior to this

4    online avalanche of information?

5    A.  No.

6    Q.  Look over to the right.  There are some other links there,

7    like, "How does the lawsuit impact educational institutions?"

8    Do you see that?

9    A.  Yes.

10   Q.  Then on the next page, there's more call to action

11   questions.  "Impact on community college students, faculty, and

12   staff."  You look at the upper right-hand column, there's a web

13   page you can go visit that answers the question.  "What role do

14   faculty and staff have in addressing the allegations against

15   PTK?"

16        We have seen multiple links on this page that all get at

17   the issue of your relationship with your students, right?

18   A.  Yes.

19   Q.  And we have seen multiple web links here that get at the

20   issue of your relationship with colleges?

21   A.  Yes.

22   Q.  And if we were to add up all of these links, there's how

23   many?  What, 35, 36?

24   A.  36.

25   Q.  So when we looked at the Justice Center links at the

1    bottom of the page, and there were only three, does that really

2    give a full representation of the number of web pages that they

3    have dedicated to attacking your organization?

4    A.  No.  It's a lot.

5    Q.  It's a lot more than that, isn't it?

6    A.  Yes.

7    Q.  And behind that, we see all of the links -- we printed for

8    the Court all of the data that goes through -- if you were to

9    hit these links, I've printed for the Court in these other

10   pages in Exhibit 14 the content of each of those pages.  And

11   I'm not going to go through all of those for the Court.  I will

12   leave those to the Court to review on its own.  But I wanted to

13   flag that for you so you know that information is there.  And

14   I'll tell you that if you were to review it, you would find a

15   lot of the same, we think, deceptive and misleading

16   characterizations in there.  You can put that one to the side

17   now.

18        There is an entire other website that was created by Honor

19   Society that is called PTKlawsuit.com.  Is that right?

20   A.  Yes.

21   Q.  Have you visited that website?

22   A.  I have.

23   Q.  Does it contain the same information that we have been

24   discussing?

25   A.  Yes.

```
 1   Q.  Do you find it to be true or untrue in terms of the
 2   information it contains?
 3   A.  Untrue.
 4   Q.  There is a companion lawsuit that they also created called
 5   PTKlawsuit.org.  Have you gone to that one?
 6   A.  Yes.
 7   Q.  Does it contain the same information as PTKlawsuit.com?
 8   A.  It does.
 9   Q.  Does the .org, is it commonly used for certain types of
10   companies?
11   A.  The general public I think sees .org and they think
12   nonprofit.
13          MR. NEWMAN:  Objection.  The question calls for
14   speculation.
15          THE COURT:  Objection overruled.
16          MR. NEWMAN:  The witness lacks foundation to answer
17   that question.
18          THE COURT:  Rephrase your question.  Objection
19   sustained.
20   BY MR. POLAK:
21   Q.  So your PTK is a nonprofit?
22   A.  Um-hm.
23   Q.  Is that right?
24   A.  Right.
25   Q.  Do you have a .org?
```

1    A.   Yes.

2    Q.   And are you aware of other nonprofits using .org?

3    A.   Yes.

4    Q.   You have talked with other people in your industry about

5    the use of .org?

6    A.   Correct.

7    Q.   You have gained an understanding of what the general

8    understanding and acceptance of the use of .org is?

9    A.   Yes.

10   Q.   So I will go back to my original question, then.  Do you

11   draw any conclusions about their use of .org in connection with

12   PTKlawsuit.org?

13   A.   I have never seen a nonprofit use a .com, so -- you know,

14   I've seen for profits use .org, but it's just another way for

15   them to find it if they are putting in the .org.  And it also

16   is very close to our web URL, which is just PTK.org.

17   Q.   And it uses the same colors that you have, blue and gold,

18   on those websites too, right?

19   A.   Yes.

20   Q.   So, again, the confusion you were originally worried about

21   with Honor Society, somebody could go on these websites and

22   think that you were actually the promoter of these websites?

23   A.   Yes, that is one of the worries.

24   Q.   You mentioned previously that you were aware of not only

25   these websites but also the use of social media by Honor

1    Society to make these statements, so I want to show you some of

2    these documents and show the Court some of these documents.  So

3    let's look at Exhibit 15.  This is a screen --

4        **THE COURT:**  I'm sorry.  Let me ask a question.  The

5    PTK.org, is that in one of these documents, or is it behind --

6    if you click on something --

7        **MR. POLAK:**  I think you have to click on it.

8        **THE COURT:**  Okay.  It's not written here on this

9    page.

10        **MR. POLAK:**  I don't believe it is in one of the

11    exhibits, is that right, the PTKlawsuit.org, or is it?

12        **MR. ETIENNE:**  Not .org but .com.

13        **MR. POLAK:**  Which exhibit is that?

14        **THE COURT:**  That's fine.

15        **MR. POLAK:**  It is in the record, but we do not have

16    the PTKlawsuit.org in the record, but we have referred to it on

17    the stand.  And I think she said that the content was basically

18    the same as the PTKlawsuit.com.  The PTKlawsuit.com website is

19    captured, I'm told, in Exhibit 6.

20        **THE COURT:**  But if I were to click on some of this

21    stuff that's in Exhibit 14, it would take me to a PTK.org?  Is

22    that the testimony?

23        **MR. POLAK:**  That is correct.

24        **THE COURT:**  Okay.  All right.

25        **MR. POLAK:**  Well, on 15 -- not necessarily, no.  But

 1    if you go to -- if you look at Exhibit 6, this is where it goes

 2    to -- if you type into your, let's say, Explorer or Safari,

 3    browser, whatever it is, and if you type in www.PTKlawsuit.com,

 4    it will take you to, I believe, a web page maintained by Honor

 5    Society that is at HonorSociety.org.  So it is a jump site, if

 6    you will.  That's what they call it.  But that's the thing is

 7    that you type in there, they advertise that link, and it takes

 8    you to the Honor Society website, which is found at Exhibit 6.

 9    And we have the content there, and it's got a copy of the

10    lawsuit on there in full text, but it also has a bunch of

11    language editorializing about their efforts.

12            **THE COURT:**  Okay.  That is fine.  Thank you.

13    **BY MR. POLAK:**

14    Q.  So we are looking at Exhibit 15.  Do you have it there in

15    front of you?

16    A.  Yes.

17    Q.  Okay.  So is this an example of the social media efforts

18    of Honor Society that you saw?

19    A.  Yes.

20    Q.  What is this?

21    A.  This is the PTK lawsuit created as an account on Twitter,

22    which is X now.  But this is their Twitter account for just

23    that part.

24    Q.  So Twitter is also known as X these days?

25    A.  Yes.

1    Q.   And this is -- is this a popular social media platform?

2    A.   I think Twitter has probably got more users than any other

3    social media platform in the world.  X.

4    Q.   And we can't see it on this page, but if we were to look

5    at it, it has in red "lawsuit," and underneath it, it makes

6    reference to Strayer University and this top 10 percent issue.

7    and then you see a logo that says "lawsuit" on it.  Right?

8    A.   Yes.

9    Q.   And underneath, it says "PTK lawsuit."  Can you tell from

10   this who is behind this page?

11   A.   I'm assuming Honor Society is behind the page because --

12   Q.   You are assuming, but would someone who isn't familiar

13   with these guys know that?

14   A.   No.

15   Q.   Okay.  Because it doesn't make reference to that at the

16   top, right?  Instead, it says, "Phi Theta Kappa sued for

17   alleged predatory conduct and deceptive advertising."  And

18   above it it has a hashtag.  Now, it does say, "This page is

19   proudly by @HonorSociety, not affiliated with PTK," but that is

20   in small print there, isn't it?

21   A.   Yes.

22   Q.   And when you look at what they have -- let's look at the

23   first posting that they made on -- because these are dated,

24   right?  You can see the date out to the right of each post.  So

25   it says, "PTK lawsuit, June 11th."  And the very first post

```
 1   says, "What impact" -- I'm sorry.  Actually, this is the most
 2   recent post.  "What impact could the #PTKlawsuit have on
 3   #PhiThetaKappa members?"
 4        Now, the Court may not be familiar with the hashtag, so
 5   let's talk about that here for a second.  Can you explain to
 6   the Court how Twitter uses hashtags and what those hashtags
 7   represent?
 8   A.  Yes.  A #PhiThetaKappa is something that we -- you can
 9   follow Phi Theta Kappa channels on --
10   Q.  When you say a Phi Theta Kappa channel, you mean that have
11   -- you guys are on Twitter, right?
12   A.  Right.
13   Q.  So you have a page that is on Twitter that is dedicated
14   just to PTK content?
15   A.  Correct.
16   Q.  And you have a hashtag there that is used to direct
17   traffic to yours and that other users can use that says
18   #PhiThetaKappa?
19   A.  Yes.  We use the @ symbol, @PhiThetaKappa, to send them
20   directly to our Twitter account, but #PhiThetaKappa is used by
21   people that are posting about Phi Theta Kappa because the
22   people following that hashtag, like myself, like 14,000 other
23   people, see that post because they are following the hashtag.
24            THE COURT:  Right.  I understand.
25            MR. POLAK:  Thank you, Your Honor.
```

1   **BY MR. POLAK:**

2   Q.  So is it significant to you that they have chosen to use

3   your trademarked name in the hashtag for this article that

4   says, "What impact could the lawsuit have on PTK members"?

5   A.  Yes.

6   Q.  Why is that significant to you?

7   A.  Because the people following our channel will see this,

8   and they are just tricking you to go here by using our hashtag,

9   and it's our trademark name in the hashtag.

10  Q.  And if they were to go and see that post and click on the

11  article that is linked to it, they would go and see one of

12  those articles that we have been talking about that contains

13  what you have identified as containing false, deceptive, and

14  misleading information?

15  A.  Correct.

16  Q.  How many followers does PTK have on social media and the

17  internet?

18  A.  Probably about 30,000 across the channels.  Twitter is 14,

19  I think, 14,000.

20  Q.  So this one post using that one hashtag has the ability to

21  do what?

22  A.  It has the potential for our 14,000 followers to see it.

23  Q.  Have you seen other companies associated with Michael

24  Moradian use their social media on these topics that attack

25  PTK?

1    A.   I have.

2    Q.   Let's look at Exhibit 16.   This is a web capture dated

3    July 1st of 2024 of an entity called CollegeBuddies feed.   And

4    here it says CampusBuddy -- this is at the very top, to

5    describe the business of CampusBuddy.   It says, "CampusBuddy

6    connects you with your campus, your classes, and your

7    classmates."

8    A.   Yes.

9    Q.   And then when we go to the last page here, we see the most

10   recent non-PTK related submission, and it's dated August 30,

11   2017.   Do you see that?

12   A.   Yes.

13   Q.   It's an article with a reference to Michael Johnson, the

14   runner.   Do you see that there on the last page?

15   A.   Yes.

16   Q.   So the next post above that is an article related to this

17   lawsuit, and it's dated May 8th of 2024.   Do you see that?

18   A.   Yes.

19   Q.   So this CampusBuddy --

20        **THE COURT:**   March 8th.   Oh, I'm sorry.   Is it

21   March 8th or May --

22        **MR. POLAK:**   It is dark and it's hard to read, but I

23   believe it says May 8th.   Yeah, it's -- well, regardless, it's

24   in May of 2024, March of 2024.   I believe it is May, Your

25   Honor.

1              **THE COURT:**  Okay.

2    **BY MR. POLAK:**

3    Q.   But the point here, though, is, Dr. Tincher-Ladner, do you

4    see any posts made by the CampusBuddy company from August of

5    2017 to mid-2024?

6    A.   No.

7    Q.   And then suddenly it gets resurrected, and you see around

8    10 to 12 posts all about what it is that we are talking about

9    today?

10   A.   Yes.

11   Q.   Do these posts have anything to do with connecting

12   students with their campus, their classes or their classmates?

13   A.   No.

14   Q.   Who is it that you know or understand owns CampusBuddy?

15   A.   Michael Moradian.

16   Q.   When you see the other references to -- in the other

17   articles that we were looking at, we saw some references,

18   didn't we, that were, like, scrutiny has come upon PTK, or

19   there's widespread recognition of the deceptive advertising.

20   Do you remember those types of things we looked at?

21   A.   Yes.

22   Q.   So one of the points I think you made to the Court was

23   that those things made it seem like there were a lot of people

24   out there doing this, right?

25   A.   Yes.

1    Q.  But you said that the only person who's actually doing

2    this is that man sitting right there in that chair, Michael

3    Moradian?

4    A.  Yes.

5    Q.  Now, is this an example of what you were talking about as

6    well?

7    A.  This is one example, yes.

8    Q.  And he activated CampusBuddy, a company that is unrelated

9    to Honor Society, supposedly, to attack your organization, to

10   make it seem like there is this widespread attack?

11   A.  Yes.

12   Q.  Is there anything on this CampusBuddy website that makes

13   it seem or gives notice to anyone that CampusBuddy is owned by

14   Mr. Moradian?

15   A.  No.

16   Q.  Is there anything on this Twitter feed that gives notice

17   to anyone that this company is connected to Honor Society?

18   A.  No.

19   Q.  It only says -- well, this one doesn't even say it's not

20   connected with PTK, like the other one, right?

21   A.  Right.

22   Q.  So someone looking at this could draw whatever conclusion

23   they wanted to about the source?

24   A.  Yes.

25   Q.  But they wouldn't know that it's connected to the person

1   who is personally attacking you?

2   A.  They wouldn't.

3   Q.  Do you recall the part of the survey content that was

4   enjoined related to claims of sexual harassment?

5   A.  Yes.

6   Q.  Let's turn to Exhibit 17.  So this is an article on Honor

7   Society's website entitled "Phi Theta Kappa, sexual harassment,

8   the stunning allegations revisited."  And there's an image on

9   the top of this.  Have you ever seen this photograph before?

10  A.  Not until it was published on their website.

11  Q.  So this looks like a photograph, doesn't it?

12  A.  It looks like it.

13  Q.  Are you aware of that photograph ever existing as you see

14  it there?

15  A.  I'm not aware.

16  Q.  Do you have a suspicion about this photograph?

17  A.  I think it looks photoshopped.

18  Q.  So the title is -- well, I'm sorry.  Who is it that's in

19  that photoshopped -- well, allegedly photoshopped photograph?

20  A.  I'm in it and Dr. Rod Risley is in it.  R-I-S-L-E-Y.

21  Q.  Was he the subject of these harassment allegations?

22  A.  He was.

23  Q.  Is there anything strange about this potentially

24  manipulated photo in your view?

25  A.  I just -- he is behind me in an awkward position, and it

1    looks sexually suggestive, to me.

2    Q.   He is in your personal space right there as this thing has

3    been created, isn't he?

4    A.   Yes, we are sitting practically -- I'm in his lap almost.

5    Q.   And the article, it is about sexual harassment.

6    A.   Yes.

7    Q.   Do you find this photograph, as it is being presented, to

8    be deceptive?

9    A.   I do.

10   Q.   When did these allegations of harassment arise?

11   A.   Over ten years ago.

12   Q.   Prior to these social media and website postings by Honor

13   Society, was the sexual harassment issue as pertaining to Dr.

14   Risley a matter of current concern?  In other words, was it

15   currently a concern in 2021?

16   A.   No.

17   Q.   2022?

18   A.   No.

19   Q.   2023?

20   A.   No.

21   Q.   When the Court enjoined the use of the sexual harassment

22   allegations in the survey, did you think that issue was

23   resolved for this lawsuit?

24   A.   I did.

25   Q.   We also see references to things wholly unrelated to the

1    issue of sexual harassment here, right?

2    A.  Yes.

3    Q.  We see at the very bottom of this page, but continuing

4    onto the next page, a whole section on alleged deceptive

5    advertising practices.  Do you see that?

6    A.  Yes.

7    Q.  Going back to Dr. Risley, were you even CEO when any of

8    this happened?

9    A.  I was not.

10   Q.  So if you were standing in front of Dr. Risley, you would

11   have been the chief information officer at the time, right?

12   A.  Yes.

13   Q.  Because you were the chief information officer for PTK,

14   not CEO, but the chief information officer when these

15   allegations first surfaced?

16   A.  Yes.

17   Q.  So going back to the deceptive advertising practices, we

18   go underneath this, "Questioning PTK's leadership."  So this is

19   on a web page that they created with potentially a photoshopped

20   image and a section here talking about your leadership for an

21   event that occurred when you were not even an executive with

22   PTK, right?

23   A.  Not the CEO, yes.

24   Q.  So let's look at what it is that they wrote here.  "The

25   leadership of PTK, including both the current and former CEOs

1    and the board of directors, must be held accountability for the

2    organization's culture and practice.  The failure to address

3    these serious allegations adequately raises concerns about the

4    leadership's commitment to ethical standards and member

5    welfare."  Now, again, this happened over ten years ago?

6    A.  Yes.

7    Q.  Who is the leadership that this article is questioning?

8    A.  Mine.

9    Q.  Is that an image of you on the photograph?

10   A.  It is.

11   Q.  Is your name all over this?

12   A.  All over it.

13   Q.  Let's look at Exhibit 21.  So here on Exhibit 21 we see

14   yet another article that contains this potentially photoshopped

15   image.  Do you see that?

16   A.  Yes.

17   Q.  This one actually uses your name in the title.  "Unmasking

18   Lynn Tincher-Ladner.  The allegations of false advertising at

19   PTK."  Do you see that?

20   A.  Yes, in the title.

21   Q.  Have you seen the term "unmasking" on some of these other

22   articles as well?

23   A.  Many times.

24   Q.  In fact, I think there is one image of an article that was

25   AI generated, and it's a woman, you can't see her face, but it

1    is called "Unmasking the Truth," and it's a woman taking --

2    holding a mask in front of her face, right?

3    A.   Yes.

4    Q.   Did you take it to be a woman that looks kind of like you?

5    A.   I do.

6    Q.   So when we see here -- this is on the Honor Society

7    website, right?  This is not The Foundation.  This is Honor

8    Society's website.  Let's look at the text here and let's go to

9    the second sentence.  "Recent allegations have surfaced

10   accusing PTK of false advertising and deceptive practices."

11        Not to beat a dead horse, but has anyone other than

12   Michael Moradian or Honor Society made these allegations of

13   deceptive activity?

14   A.   No one.

15   Q.   So do they say here in this article that they are the

16   source of the allegations?

17   A.   No.

18   Q.   There are other articles that were written about you as

19   well.  Let's look at Exhibit 28.

20        **MR. POLAK:**  We are not able to look at all of them,

21   Judge, and I don't intend to go look at -- we don't have that

22   amount of time.  We would be here all next week looking at all

23   5,000 websites, but I do want to highlight a couple for you.

24   Exhibit 21 -- I'm sorry, Exhibit 28, this one is about -- we

25   see the image again, right, that we have been talking about,

1    this allegedly photoshopped image, and then above it, the title

2    is, "Lynn Tincher-Ladner's PTK compensation and salary review."

3    A.  Yes.

4    Q.  So this one is about your salary, and they provide

5    information below.  What is your understanding of the gist of

6    what they are arguing here?

7    A.  They are communicating to whomever, well, look at this,

8    what my salary is.

9    Q.  And not just what your salary is, but they're making the

10   argument that you are overpaid, right?

11   A.  Oh, yeah.

12   Q.  And they compare you to one person or two people who are

13   with the ACHS, American College of Honor Societies, or

14   Association of Collegiate Honor Societies.

15   A.  Right.

16   Q.  So I'm going to ask you some questions about that.  First

17   of all, can you tell the Court how your salary is determined?

18   A.  Yes.  Every January, I am evaluated by the Phi Theta Kappa

19   board of directors.  I do a self-evaluation.  They do an

20   evaluation.  I leave the room.  And the chief financial officer

21   works with the board to compare my salary to the appropriate

22   people that they wanted her to compare it to, and that's how

23   they determine my salary.

24   Q.  You have been deposed.  They had the opportunity to ask

25   you that question, how your salary was -- right?

1    A.   Yes.

2    Q.   All they did at that deposition was ask you what your

3    salary was?

4    A.   Right.

5    Q.   So they don't care, I guess, how it is that your salary is

6    calculated, but here in this article they are making

7    allegations that you don't earn the money that you are paid?

8    A.   Right.

9    Q.   That you are misappropriated -- well, that PTK is misusing

10   student funds because they overpay you?

11   A.   That is what they are trying to say, yeah.

12   Q.   Now, is ACHS a good comparison?

13   A.   No.

14   Q.   Why not?

15   A.   ACHS, first of all, the president is really just a

16   volunteer from another organization.  ACHS doesn't have a

17   convention with -- I mean, I could go on, but no, these are

18   improper comparisons.

19   Q.   I want you to go on.  I want you to explain to the Court

20   what it is that you do to earn the salary that you do.

21   A.   Well --

22   Q.   Do you travel a lot?

23   A.   I travel about 120 days a year, and I'm away from my

24   family 120 days a year.

25        The board does several comparisons.  If you notice, my

1    title is president and CEO.  That was communicating out to the

2    world of community colleges that my salary would be calculated

3    in line with what college presidents are paid.

4        So we have a computer program called Payscale, and we go

5    into Payscale, and we pull the average reports of what college

6    presidents, community college presidents are paid, and that is

7    just one of the comparisons.

8    Q.  You said that there was a convention that you put on?

9    A.  Yes.

10   Q.  How many students come to that convention every year?

11   A.  They look at people who have events.  Our event has

12   4,000 -- you know, after COVID, it went down a little bit.  It

13   had its most, 5,000 people.  So we are talking about an event

14   that you have thousands of students coming to.  It's a lot of

15   work.  And that is one of the metrics.  They only look at

16   organizations that have -- as far as the nonprofit side, they

17   look at comparable organizations that are doing the level of

18   activity that Phi Theta Kappa is doing.

19   Q.  Does ACHS put on an annual convention?

20   A.  I don't know.  They probably put on a meeting, but they

21   definitely don't have --

22   Q.  Four thousand people?

23   A.  -- four thousand trying to stay in different hotels, and

24   it's a crazy amount of work.

25   Q.  And you are personally involved in the presentations at

1  that --

2  A.   Absolutely.  I am a keynote speaker.  Plus, the safety and

3  security of 5,000 students in any city in this country is a lot

4  of stress for a little 60-member staff.

5  Q.   How does the budget of PTK compare against ACHS, if you

6  know?

7  A.   I don't know.  That's another way they calculate it.  They

8  do compare my salary to other nonprofit leaders, but they put

9  in the same budget we have.  So I really seriously doubt ACHS

10  and the Tau Beta and the Alpha Chi and any executive director

11  in the city of Jackson has a budget that is the size of Phi

12  Theta Kappa's, and that's one of the things they look at when

13  they capture the ones that -- and we also compare my salary

14  nationally, not just here in Jackson, because most of my work

15  is not right here in Jackson just because we are headquartered

16  here.

17  Q.   Is what you are saying that comparing PTK's salary for you

18  against other organizations that are local only to Jackson is

19  apples and oranges?

20  A.   It's like apples and cucumbers.

21  Q.   Exactly.  So is it deceptive, what you are seeing here?

22  A.   It is.

23  Q.   Is it misleading?

24  A.   It is.

25  Q.   Let's look at Exhibit 29.  Here again we see, yet again,

 1   that allegedly photoshopped image.  This one now is titled more

 2   aggressively, "Lynn Tincher-Ladner, alleged, alleged,

 3   misleading mastermind."

 4       Do you get the sense that somebody may have told them that

 5   so long as you put the word "alleged" in front of all of this,

 6   that suddenly it is okay to defame you?

 7   A.  Well, they are not consistent about it, but they think

 8   that that is helpful.  I don't know.

 9   Q.  Does it change your view?

10   A.  No, not at all.

11   Q.  Because not everything we have looked at says alleged,

12   does it?

13   A.  No.

14   Q.  And even if it did say alleged, does it matter?

15   A.  Not to the psychological way that people look at

16   information, no.

17   Q.  So this contains a lot of the same information we have

18   already gone through, but it does have those same tags out to

19   the right-hand side, right, of all of those colleges?

20   A.  Oh, yeah.

21   Q.  And we haven't looked at those tags, but the Court will be

22   able to see that on all the other Honor Society web pages,

23   those tags exist.  When we look at the bottom of that page,

24   there are two other articles, one of which we have already

25   looked at.  The other one says, "Rod Risley's PTK CEO tenure

1   shadows over Phi Theta Kappa."  If you were to click that link,

2   you could go to that page about Rod Risley as well, right?

3   A.  Right.

4   Q.  Let's go to Exhibit 33.  Here we see again the

5   photoshopped image, or allegedly photoshopped image.  The title

6   is, "Is Phi Theta Kappa ethical?"  And we see a photo of you

7   with Rod Risley standing close.

8   A.  Yes.

9   Q.  So we are up to I think five or six websites that use the

10  same image and are talking only about you and personal things

11  to you?

12  A.  Yes.

13  Q.  And that also, I take it, contained false information?

14  A.  All of it.

15  Q.  Let's look at Exhibit 35.  Now, we talked before about

16  College Budget, but we looked at the social media.  Now when we

17  look here, we have an exhibit that was captured on June 13th of

18  2024.  The article has a date of May 21st, 2024.  But here

19  PTK -- I'm sorry, College Budget has an article called "Lynn

20  Tincher-Ladner and Phi Theta Kappa are sued for false

21  advertising.  What you need to know."

22      And it goes on to say in the text, "In a significant

23  development to protect community college students, Honor

24  Society has filed a federal lawsuit against Lynn

25  Tincher-Ladner, CEO of Phi Theta Kappa.  The lawsuit, initiated

1    in the Southern District of Mississippi, brings forward serious

2    allegations of deceptive practices and monopolistic behavior

3    under Tincher-Ladner's leadership.  For students, parents and

4    educators, these claims warrant close attention."

5         Now, is there anything in this article, because I know you

6    have looked at it, that says anything about how College Budget

7    is owned by Michael Moradian?

8    A.  It does not.

9    Q.  Does it disclose at all the connection between College

10   Budget and Mr. Moradian?

11   A.  No.

12   Q.  What about the relationship between College Budget's

13   employees -- wasn't Mr. Asari, David Asari, we learned his name

14   last time, isn't he associated with College Budget?

15   A.  In his deposition, he said he worked for College Budget --

16   no, CampusBuddy.  Anyway, I don't know what he said.

17   Q.  Does this thing, this article, disclose at all about the

18   relationship of co-employees between these organizations?

19   A.  It does not.

20   Q.  So, again, just to reinforce so everybody remembers, your

21   testimony before was that you were concerned that by having

22   articles like this and the other social media from these fake

23   third parties gave the impression that all of these people are

24   concerned about it?

25   A.  Yes, it's not just impression.  It's -- it's the way

1    search engines work when -- it's called back-linking.  When you

2    start putting these articles on these various channels, it

3    tricks Google into thinking, wow, everyone is talking about

4    this, it must be super important.  And that's how it navigates

5    the searches on PTK, on Lynn Tincher-Ladner, on our chapters

6    and two-year college partners.  It pushes it way up in the

7    search engine because it's tricking the internet that these are

8    other people.  It's not just one person.

9    Q.  So we turn to the second page.  It says, "Key allegations

10   against Lynn Tincher-Ladner," and it talks about false top ten

11   percent claims, questionable letters of recommendation,

12   misleading scholarship information, the same top ten percent

13   claims.  We have already talked about whether those are true or

14   false.  We don't need to go back over that.  But they claim

15   that these are key allegations against you.  So this article is

16   coming after you.  How does that make you feel?

17   A.  Not very good.

18   Q.  Why?

19   A.  Because I've been working in higher education for 35

20   years.  I started out as a high school teacher at Gulfport High

21   School.  And I've been working in public education and

22   nonprofits, and all of a sudden one person is saying that I'm

23   some criminal mastermind or something, and it's just not even

24   within the scope of the mission of Phi Theta Kappa for me to be

25   this person that they are portraying me as.

1    Q.  I'm going to turn your attention to Exhibit 20.  This is

2    another social media site called LinkedIn.  Can you describe

3    for the Court what LinkedIn is as a platform?  Generally, what

4    is the market that it tries to serve?

5    A.  LinkedIn is for professionals.  It's a professional

6    networking site.  It's not supposed to have your opinions or

7    nonsense on it, but --

8    Q.  Do you have a profile?

9    A.  I do.

10   Q.  And that's the way it works is people can put a personal

11   profile?

12   A.  Yes.

13   Q.  Now, companies can have profiles too, right?

14   A.  Yes.

15   Q.  Do PTK students, members, have profiles, even though they

16   are not yet professionals?

17   A.  Yes.  I mean, LinkedIn, according to the research, is one

18   of the fastest growing platforms for young people.  They are

19   navigating to it because it can help them find jobs.

20   Q.  Does PTK use LinkedIn to communicate its messaging?

21   A.  Oh, yes.

22   Q.  Is it a significant part of what you guys do?

23   A.  Yes.

24   Q.  I didn't ask this before, but is Twitter something that's

25   significant?

1    A.  Yes, they all are.  We use all the channels.

2    Q.  Instagram, Twitter, LinkedIn, you use all of that social

3    media to get your message out?

4    A.  We even use TikTok, yes.

5    Q.  So at the same time they are putting all of this content

6    out that's negative about you, you are out there also trying to

7    do the mission of the nonprofit over those channels?

8    A.  We are trying, yes.

9    Q.  Let's look at this.  This article that was put out was

10   captured on June 14th, 2024.  It was posted on LinkedIn, and

11   it's titled, "Phi Theta Kappa, shocking allegations and

12   unmasking the truth."  We had talked before about an image that

13   was AI generated of a woman holding a mask over it.  Is this

14   the one you were referring to?

15   A.  Yes.

16   Q.  Do you have a view as to whether that was intended to look

17   like you?

18   A.  It's an AI version of me, I guess.

19   Q.  Maybe not a very complimentary photo or image, but still

20   it's --

21   A.  I do dress like that, but yes.

22   Q.  Now, you see the first line here is, "Phi Theta Kappa, the

23   self-proclaimed world's largest honor society for community

24   college students, is facing a firestorm of allegations that

25   could forever alter its reputation."  What is your reaction

1    when you read that?

2    A.  Just the 8,033 people that saw this above there is more

3    concerning, but it is just more of the same inflammatory

4    one-sided lies.

5    Q.  Okay.  Then it goes on to talk about the recent lawsuit

6    and the accusations, and it talks about the allegations.  We

7    have already talked about those.  But there are some blue words

8    here.  Are those links that are embedded in the article that

9    you can click to and it will take you to more information

10   related to this article?

11   A.  Yes.

12   Q.  And those are not links that LinkedIn creates.  Those guys

13   over at Honor Society --

14   A.  Yeah, they back-link to his articles to make them more

15   valid.

16   Q.  These are some of the 5,000 plus websites we have been

17   discussing, right?

18   A.  Yes.

19   Q.  So you turn the page and you look at the second page, and

20   we see more content directed towards driving fear in students

21   and colleges.  One is titled, "The student impact:  Misled and

22   disillusioned."  Do you see that?

23   A.  Yes.

24   Q.  Have you seen any evidence of students being misled and

25   disillusioned about these allegations prior to the time that

1    they were being made?

2    A.   No.

3    Q.   So, in other words, prior to the second amended complaint

4    in April, did any students complain to you and say, I've been

5    misled, I'm disillusioned with PTK?

6    A.   No.

7    Q.   They go on to say here at the bottom of this, and this is

8    important, quote, the implications for their academic and

9    professional futures could be significant.  What impact do you

10   think that is going to have on a 20-year-old kid?

11   A.   A negative one.

12   Q.   What impact do you think that is going to have on a parent

13   that's a professional that is researching PTK and comes across

14   this?

15   A.   They are not going to join.

16   Q.   There's another one here.  "Educational institutions

17   reevaluating PTK."  And it says, "Colleges and universities

18   that host PTK chapters" --

19          **THE COURT:**  Slow down.

20          **MR. POLAK:**  Thank you, Judge.  I'm sorry.  My tummy

21   is growling, so I'm trying to keep this thing moving.

22   **BY MR. POLAK:**

23   Q.   "Colleges and universities that host PTK chapters may need

24   to reconsider."

25   A.   Wow.

1    Q.  So that's more of the same.  So you may put that one to

2    the side.

3         You made reference before on how all of these articles

4    posted online can have an effect on Google.  Did you conduct an

5    investigation into that?

6    A.  Yes.

7    Q.  What was it?

8    A.  Well, I just tried Googling different things, not just Phi

9    Theta Kappa but my name, and then combining the searches with

10   Phi Theta Kappa and a college name, and every one of those

11   searches, Google thinks that this information is more important

12   than even the most current information about those places,

13   people and things.

14   Q.  So let's look at Exhibit 46.  And 46 is a search result of

15   the type that you are talking about, right?

16   A.  Yes.

17   Q.  And this is a search result that was populated on

18   July 2nd, 2024, and was captured using a screen shot, that same

19   software that we did.  Can you describe for the Court what you

20   see -- well, first of all, what it is that you did in order

21   to -- well, what it is that was done in order to get this

22   search result?

23   A.  Just put Southwest Mississippi Community College and Phi

24   Theta Kappa in the same Google search.

25   Q.  Do you see that, that search from the top, at the very

1    top?

2            **MR. POLAK:**  This is Exhibit 46, Your Honor.

3    **BY MR. POLAK:**

4    Q.  You go to the very top of that, and there's a Google

5    search bar, and you can see the actual search terms that were

6    used, Phi Theta Kappa, Southwest Mississippi Community College,

7    right?

8    A.  Right.

9    Q.  So what else do you see here, Dr. Tincher-Ladner?

10   A.  You get the website of the organization on the college,

11   and then you pick up their Facebook feed, but then after that,

12   boom, boom, boom, you are getting everything about the lawsuit

13   and their interpretation and editorial version of it, and then

14   below that is the Phi Theta Kappa things on our website.

15   Q.  Okay.  So let's break that down.  These are a listing that

16   is created as a result of the Google algorithm when you type in

17   search terms, and the third, fourth, and fifth highest ranking

18   search results is Honor Society's website?

19   A.  Yes.

20   Q.  And not just their website but these pages that we are

21   talking about?

22   A.  Warning, yes.

23   Q.  So you have to go through all of that on the search

24   results before you actually come to PTK's website?

25   A.  Right.

1    Q.   So, first of all, why is that important to you?

2    A.   It is very important that parents and students are able to

3    use the internet to research Phi Theta Kappa at their college.

4    And this takes that away from them.  And when you've got Honor

5    Society's propaganda on CampusBuddy, you've got it on a

6    foundation, you've got it all throughout social media, you've

7    got the Honor Society page lawsuit center, you've got College

8    Budget -- and keep in mind, I'm on the home page, which makes

9    Google go, wow, this is so important that I need to show those

10   results.

11        So this is a search engine optimization technique that you

12   can use to try to get information out ahead of other things,

13   and competitors use it all the time for marketing strategies.

14   We don't, but he knows very much what he is doing, he knows

15   what he has done, and he has essentially hijacked the SEO for

16   Phi Theta Kappa, for our chapters at colleges, and my name, all

17   doing this same technique.

18   Q.   Now, behind that in the next blue tabbed sheet, we see the

19   same search that you ran for Phi Theta Kappa, Hinds Utica

20   campus.  Do you see the same results there that the websites

21   they created around -- that we are talking about, these 5,000

22   or so websites that are dedicated directly to campuses, where

23   that deceptive and misleading information you described before

24   is posted, you get to that before you ever get to PTK?

25   A.   Yes.

1    Q.  In fact, this one it is a little worse because you have to

2    scroll down to around the very last one on the search result.

3    You have to go all the way to the second page at the bottom

4    before you get to Phi Theta Kappa.

5    A.  And this is particularly confusing for the members that --

6    we have a grant at Hinds Utica to pay for all the members' dues

7    and bring them to convention.  And if the parents of those

8    students are seeing this at this particular college, which is

9    so important to us right now in working and coaching these

10   students, this is terrible.

11   Q.  Okay.  You can put that to the side.  Thank you.

12        So we have discussed these various publications on the

13   internet.  We have gone through not all of the 5,000 web pages,

14   but I think you have touched on quite a few of them.  I would

15   now like to start to talk with you about what effect all of

16   this has had on you and PTK, and I want to start with you.

17   What effect has this had on you?

18   A.  I hope no one has to ever go through this online attack on

19   your reputation, but, you know, normally this time of year,

20   over the last few months, I would have been invited to speak at

21   several graduation commencements in the United States at very

22   different places, and I've gotten invited to one, and by now, I

23   would have been invited to speak at faculty convocations in the

24   fall, and I've not been invited to do any of that.

25        And so between this activity and the FOIA and everything,

 1    I'm very much being taken out of my role that I had previously

 2    in working and doing my job outside of Jackson.  And so it has

 3    been difficult psychologically, but my daughter is, you know, a

 4    school teacher here in the Jackson Public School District, and

 5    I didn't say anything that's about them, but she comes to me

 6    and she goes, "Mom, you're a criminal mastermind.  What is

 7    going on?"  I'm just thankful my son hasn't found it.  But at

 8    work, I'm just really -- it's very difficult to do the work for

 9    the students, and it's just been horrific on me psychologically

10    and professionally and personally.  I'm just glad my

11    85-year-old parents haven't been able to use the internet to

12    find this stuff, but you can bet everyone that I know

13    professionally knows about it.

14    Q.  So is it difficult for you to talk about that in front of

15    Michael Moradian when he is sitting right here and you know

16    he's the one that did this to you?

17    A.  Yeah, I'm just -- you know, every day it's something new,

18    and I don't know what he is going to do next, if I can't get

19    some relief from my career, my 35-year career in higher

20    education.

21    Q.  Do you have a fear that him sitting here listening to what

22    you said is somehow going to populate itself on another 5,000

23    websites?

24    A.  Yes, I think he is probably thinking that he knows what

25    gets to me the most, based on my testimony, and I don't know

1  what he is going to do next.

2  Q.  Are you concerned about how this is affecting PTK and its

3  reputation?

4  A.  That's the most concerning part.

5  Q.  What is your concern vis-a-vis the way in which PTK gets

6  its members?

7  A.  Our members are first generation students, and they use

8  the internet.  They don't all -- especially after the pandemic,

9  not everyone is really in classes on campus and can talk to

10  students, but the internet is being used more than ever to

11  research Phi Theta Kappa, I believe.  And I feel like all of

12  this activity definitely is keeping students from joining, it's

13  taking away the opportunities that they have when they do join

14  and the great and amazing student success that our organization

15  provides.

16      And for the 4.3 million members that are already part of

17  Phi Theta Kappa, this completely invalidates them.  Their

18  academic achievement means nothing now because of just one

19  person's online crusade to invalidate the work of those

20  students.  And the colleges are just getting beaten up left and

21  right and getting pulled into this thing.  With so many FOIA

22  requests, it is just glazing inappropriate.

23  Q.  But in terms of the students, let's talk about what that

24  looks like for a student.  If a student comes across these

25  5,000 websites that contains, as you've put it, false or

1    deceptive information, not the whole story, and they don't join

2    PTK because of that, what happens to that kid?  What are they

3    losing out on?

4    A.   They are losing out on the ability to have a community

5    around them.  We have a 91-percent student success rate.

6    Q.   Is that higher than everyone else?

7    A.   I have never seen a study, and I've looked at them all, of

8    any group of students in four-year colleges, two-year colleges,

9    for profit, nonprofit, whatever you want to look at, we have

10   the absolute highest student success rates of students that are

11   members.

12   Q.   So the harm that you are talking about is not just to you

13   personally, it's not just to PTK, but are you worried about the

14   harm to these students?

15   A.   I am.  If they don't join, they will never know if they

16   will get a scholarship to Mississippi State, Millsaps.  I mean,

17   Jackson State has a full ride for our members.  They might not

18   ever even know that if they don't join.

19   Q.   Where are you presently in your membership cycle?

20   A.   We're in our summer recruitment cycle.  We are currently

21   recruiting about 120,000 different students across the United

22   States.

23   Q.   What's going to happen in August, though?

24   A.   In August --

25   Q.   How does that change?

1    A.   We start in the fall cycle with about 450,000 students.

2    That's who we were recruiting last fall.  So in the fall, just

3    in a few weeks here, we are going to be trying to recruit

4    450,000 students.

5    Q.   So if this Court is disinclined to grant the relief that

6    we are asking here, to have all of this stuff taken down, what

7    do you think is going to happen during your fall recruitment

8    cycle?

9    A.   It will be ineffective.  It will definitely fall, as it

10   has fallen this summer since this came out, all of it.

11   Q.   Do colleges use PTK membership for their own recruitment?

12   A.   Yeah, that is like -- aside from PTK and me personally and

13   the students, the two-year colleges in this state, they use PTK

14   to help recruit high school students to come.  A lot of high

15   school students don't like to go to a community college because

16   they feel like they are not going to have friends, and so the

17   colleges, they go out there into the community and they say,

18   your kid is going to have good friends.  They are going to be

19   with a group of students, especially a high-achieving high

20   school student.

21        So this has the potential to lower enrollments in the

22   state of Mississippi, because I know personally that these

23   colleges are using Phi Theta Kappa as a recruitment tool.  You

24   can go to their websites and you can see that they are.  And I

25   know they are because I know the presidents in this state, and

1    I was a part of one of the colleges here for a very long time.

2    This is a very harmful thing for a parent to Google Phi Theta

3    Kappa and see this, and they're like, My kid is not going

4    there.  Well, if they can't afford to go to Mississippi State

5    or Ole Miss or Jackson State, or wherever they wanted to go,

6    they might not go to college at all.

7    Q.  You have talked about your concerns.  Have you seen any

8    indications that Honor Society is actually harming PTK's

9    business with what it is they have done?

10   A.  Yes.  I mean, from -- we have had students that are

11   calling up randomly since this started, I don't want to be a

12   member, I don't want any questions asked, I don't want to be a

13   member.  And we have never had a volume of students rescinding

14   their -- they are not asking for their money back.  They are

15   just saying, I don't want to be a member.  They have been

16   members for years.

17   Q.  And you have identified these people specifically in

18   your declaration --

19   A.  I did.  I listed the ones.

20   Q.  And that was part of what it is that you asked the Court

21   to keep quiet?

22   A.  Yes.

23   Q.  And why is that?

24   A.  Students don't like to have their name published anywhere,

25   especially in litigation.  And it could just be more

1    inflammatory for everybody.

2    Q.   But there were about two dozen students that have

3    contacted you in the last couple of months, here in the summer.

4    What conclusions do you draw about that in the fall?

5    A.   I don't know what is going to happen.   I think membership

6    will go down.   Membership has been down about -- in January and

7    February, it was fine, and then come March, with the surveys

8    and now this, we are down in revenue, that I know of, about

9    $80,000 in revenue.

10   Q.   We talked before about PTK Connect, and how that's -- the

11   PTK Connect program is sponsored by a number of different

12   sources.   Right?   One of those are the colleges, the four-year

13   colleges that we talked about.   There are also sponsorships of

14   that program by corporate sponsors, right?

15   A.   Right.

16   Q.   Now, do you track the four-year institutions, sponsorships

17   of that organization?

18   A.   Yes.

19   Q.   What have you seen?

20   A.   We have had a decline, around 15-percent decline in

21   cancellations of participation in Connect, and we have never

22   had that.   We have always grown that program.   Four-year

23   colleges want our students.

24   Q.   So that's suspicious to you?

25   A.   Very suspicious.   Especially -- you know, these are very

1    large institutions with plenty of reasons to be recruiting the

2    top students in the country.

3    Q.   Has PTK experienced any decline in sales through its web

4    store in the last several months?

5    A.   In the web store, we have had another decline since --

6    from March until now, at least a hundred thousand dollars in

7    less sales.  And it's not that the sales of the store create

8    that much revenue for us, but what happens is a student doesn't

9    even buy a PTK T-shirt because they don't want to wear that.  I

10    mean, the reason we sell things in the store is so our brand

11    will be out there.

12    Q.   So if there is all this negative, false, deceptive

13    information floating around, are you saying that students

14    aren't going to feel proud to be PTK members anymore?

15    A.   Not proud, they are canceling, they are not proud, and

16    they probably will not join.  And I've never, in the years I've

17    been the CEO, had all three main revenue streams down at the

18    same time.  And more importantly, what is going to happen in

19    the fall?

20    Q.   Have you seen any increase in negative online reviews of

21    PTK?

22    A.   Absolutely.  It has been suspicious that since March,

23    April, and then really more in the last few weeks that I have

24    seen and had to deal with so many complaints on the internet.

25    Q.   And are you aware that the community college survey that

1    the Court enjoined had a link in it to Trustpilot to leave a

2    review of PTK?

3    A.  Yes.

4    Q.  Do you see a connection there between these negative

5    reviews and that survey?

6    A.  There was an escalation in visits to Trustpilot.  We never

7    used Trustpilot as a way to evaluate ourselves, but they have

8    sent students to Trustpilot after putting them through their

9    survey, and if you look at the dates on their submission, you

10   can definitely see the decline in their assessment of us.

11   Q.  And it's not like the survey and these articles are

12   completely separate.  Right?  The same subjects that were a

13   part of the survey, the alleged sexual harassment, the

14   misappropriation of funds, the embezzlement, this top ten

15   percent issue, the only official honor society for community

16   college, those were all part of the survey.

17   A.  Right.

18   Q.  And you also see those all being a part of this 5,000-page

19   online campaign?

20   A.  That and much more.

21   Q.  So is it a stretch for you to conclude that if people were

22   influenced by the survey, 5,000 articles of this is going to

23   also have a similar effect?

24   A.  Now that every single Google search around anything that

25   has to do with our company has been impacted by their

1    activities, I don't have any idea what is going to happen.  If

2    it's anything like what has happened in the last few months,

3    it's going to be pretty terrible.

4    Q.  What about the Better Business Bureau?  People can go on

5    the BBB and leave reviews, right?

6    A.  They can leave both complaints and reviews, yes.

7    Q.  Have you seen an uptick in complaints about PTK on --

8    A.  They do not --

9            **COURT REPORTER:**  Wait, wait.  I'm not getting the end

10   of his questions.

11           **THE WITNESS:**  I'm sorry.

12           **MR. POLAK:**  That's okay. Let me finish the question

13   and then she can answer.

14   **BY MR. POLAK:**

15   Q.  Have you seen an uptick of the negative reviews that were

16   complaints on the BBB website?

17   A.  Yes.  We had never had any activity whatsoever on the BBB

18   website, and then after March, we have had I don't know how

19   many, but we have had several negative reviews on that website.

20   Q.  People can leave those anonymously, right?

21   A.  Well, they are not anonymous to the BBB, but they are

22   anonymous to us.

23   Q.  Have you been able to determine -- so, in other words,

24   anybody posing as somebody else could go and post a publicly

25   anonymous complaint, right?

1    A.   They can.

2    Q.   Have you been able to determine whether any of those

3    uptick in negative complaints have been false?

4    A.   Yes, well --

5    Q.   Let me use the word "fake."

6    A.   The complaint -- the student on the other end of the

7    complaint, I can't speak to that, but when the student writes

8    what they write about us, the BBB allows us to send them

9    documentation.  Like, for example, we had a very negative

10   complaint.  We couldn't find the student, the database, so we

11   sent that and they took it down.  We had a student say that

12   they didn't receive a scholarship, so we sent them the

13   documentation that showed them that they did receive one.

14        And then we had a student say they didn't get a

15   scholarship, and we sent them the documentation that they never

16   filled out the scholarship application.  So it's been someone's

17   full-time job to monitor the strange activity on the BBB that

18   never existed, not a single complaint or anything before March.

19   Q.   Now, did you --

20             **THE COURT:**  I'm sorry.  You said someone full-time.

21   Someone employed by PTK as of --

22             **THE WITNESS:**  Yes, sir, Your Honor.

23             **THE COURT:**  Hold on.  Someone employed by PTK?

24             **THE WITNESS:**  Yes.

25             **THE COURT:**  Their job responsibility is to monitor

 1   that website now?

 2             **THE WITNESS:**  Yes.

 3             **THE COURT:**  Okay.

 4   **BY MR. POLAK:**

 5   Q.  Did you see a Better Business Bureau complaint by

 6   Ms. Malek?

 7   A.  I did.

 8   Q.  And Ms. Malek is someone who tendered a declaration --

 9   A.  Marek.

10   Q.  Marek.  I'm sorry.  Ms. Marek tendered a declaration, and

11   she is one of the accusers of Rod Risley?

12   A.  Yes.

13   Q.  But the Better Business Bureau complaint related to, what,

14   a scholarship?

15   A.  Yes, she was complaining that she didn't receive

16   scholarships.

17   Q.  How recent was that complaint?

18   A.  She filed a complaint within the last month.

19   Q.  Okay.  And how did you respond to that?

20   A.  We went into the computer system and found the canceled

21   checks that she had received from her scholarship, and we sent

22   those to the BBB and they took down her complaint.

23   Q.  So she complained publicly on the BBB that she had never

24   received a scholarship, but the truth was that she actually had

25   received scholarships and received multiple checks?

1   A.  Right, two checks.

2   Q.  So if it is all this bad, you have all of this negative

3   energy out there and negative information, why haven't you

4   taken any steps to publish your own response to these

5   allegations, in other words, solve the deception with your

6   truth?

7   A.  It's bad enough that my Chief Operating Officer, Fredrica,

8   has to monitor the BBB.  I do not have the resources to sit

9   there and publish out 5,000 pages of anything.  We are busy

10  working with students.  We are coaching students, training the

11  new advisors that came on this summer, and we don't have enough

12  people to do all the work that we are supposed to be doing.  I

13  don't have any way or desire to stoop to the level of dealing

14  with this in that negative way.  I'm here instead --

15  Q.  Is there a bond issue too --

16          **THE COURT:**  Wait.  Hold on.  Please allow her to

17  finish her statement.

18  A.  I'm here instead, instead of doing something like that.  I

19  would never do that.

20  **BY MR. POLAK:**

21  Q.  Thank you.  Is it also a volume issue?  I mean, how would

22  you ever start to combat 5,000 websites that are each

23  integrated with each other, that have had two months to get the

24  synergies going, combined with all of the social media sites,

25  all of which use artificial intelligence to create these fake

1    images and photoshopped pictures?  Do you even know where to

2    start to compete with that?

3    A.  No, not -- I would have to hire someone to deal with it,

4    and even then, to try to push down these things, they would

5    still be there, but it would cost thousands of dollars, and I

6    don't know what it would cost to deal with the chapters and the

7    colleges.  It would be ten thousand dollars just to deal with

8    me.

9    Q.  You have looked at it just for your own purposes, but

10   there was no guarantee that that ten thousand dollars was going

11   to eliminate the problem?

12   A.  Right.  It will cost you about $3,500 a month to start to

13   try to push this stuff down.  There's no guarantee it will

14   work.  And after that, we need to do this for at least three

15   months.  And after that, we are probably going to have to keep

16   doing it.  If they publish something and it gets up -- it would

17   just be an ongoing cost bleeding away from the work.

18   Q.  What effect has this online negative campaign against you

19   and the company, the nonprofit organization, had on your staff

20   and its morale?

21   A.  I'm trying to go in every day and tell them it is going to

22   be okay, but my employees come to me and they're, like, Should

23   I get another job?  Should I leave?  And I'm scared.  I'm so

24   scared.  And we have 45 families right here in Jackson that

25   depend on their income.  And it's not just that.  We are a

 1    nonprofit.  We are a nonprofit.

 2    Q.  The people who work for you believe in the mission?

 3    A.  They are all -- they are all student success

 4    professionals.  You can't come to work for us unless you

 5    already know how to help students.  They all have degrees.

 6    These are professionals.

 7    Q.  Can you repair morale with money?

 8    A.  I cannot.  I cannot.  It will take years for us to come

 9    out of this funk, if we can come out of it at all.

10    Q.  PTK and you have requested this Court award you fees in

11    this motion.  Why?

12    A.  Because it's just more expense to get this case and this

13    notebook, and everything in here today is so much money.  And I

14    thought after the surveys we wouldn't be here again.  We would

15    just have to go to trial, and then everyone would present their

16    case and respect the process in between.  But we are here again

17    because we are in bad shape, as far as what they have done on

18    their way to trial.

19    Q.  You were here in the courtroom when the Court was

20    questioning Mr. Moradian and his counsel about whether they

21    ever intended to ask those questions again on those topics, and

22    they promised, no, they wouldn't.  Here you are having to

23    relive it all over again, not just in a survey that was sent

24    but in 5,000 websites and articles that contained the same --

25    A.  Not just web pages and articles but social media that can

1    just interact every single day and keep tripping it out there.

2    Q.  Is there anything you think is going to stop Michael

3    Moradian from his online campaign against you personally and

4    against PTK?

5    A.  I think the Court can.  That's the only relief I think

6    that we would be able to get.

7    Q.  Is that why you are here?

8    A.  Yes.

9            **MR. POLAK:**  Thank you, Your Honor.  Pass the witness.

10           **THE COURT:**  We are going to break for lunch now.

11   Let's be back at 1:45.  It's 12:15 now.  We will be back at

12   1:45, and we will start with the cross-examination, I presume,

13   of Dr. Tincher-Ladner -- is it Tichner or Tincher?

14   A.  Tincher, just like it is spelled.  But I'm used to

15   students mispronouncing it.

16           **THE COURT:**  Tincher.  I want to make sure I'm correct

17   in pronouncing your name.  I do owe the parties an apology too.

18   I know we were supposed to start at 8:30, and I think we

19   started about 8:40, and typically when I'm late coming in -- I

20   know it was 8:30 when I came in because I said it was 8:30,

21   right?  But I do owe you an apology.  I think we started about

22   8:40.  I did want to do that.  We will be back at 1:45.  Thank

23   you.

24           **(RECESS TAKEN AT 12:16 P.M. UNTIL 1:45 P.M.)**

25           **THE COURT:**  Ms. Ladner, you may return to the stand.

1    I failed to ask, is there anything we need to take up before we

2    start?

3              **MR. WALLACE:**  No, Your Honor.

4              **THE COURT:**  You may proceed.

5                          **CROSS-EXAMINATION**

6    BY MR. NEWMAN:

7    Q.  Good afternoon, Ms. Tincher-Ladner.  My name is Derek

8    Newman.  I have a few questions for you.

9    A.  Okay.

10   Q.  First, PTK advertises that all of its members are in the

11   top ten percent of their class; is that right?

12   A.  Yes.

13   Q.  And PTK gets some information from colleges about

14   membership; is that correct?

15   A.  Like what kind of information?

16   Q.  PTK gets information about members' GPAs, for example; is

17   that right?

18   A.  We don't -- we get lists of people who qualify for

19   membership.

20   Q.  And with respect to those lists of people who qualify for

21   membership, is it disclosed to PTK what their GPAs are, the

22   members?

23   A.  They are allowed to upload that if they want to.

24   Q.  And college chapters put rules in the charter about who

25   gets invited; is that right?

1    A.  What now?  What charter?

2    Q.  So PTK invites students to join.  Yes?

3    A.  No, the colleges decide who is going to be invited.  If

4    they want us to invite them, then they send us their

5    information.

6    Q.  All right.  So colleges decide who gets invited to join

7    PTK, correct?

8    A.  Correct.

9    Q.  And then once they do that, they will advise PTK, and PTK

10   sends a membership invitation to students to join; is that

11   right?

12   A.  Not always.

13   Q.  Sometimes?

14   A.  Right.

15   Q.  And the college chapters, are you aware of criteria that

16   college chapters place on who receives a membership invitation?

17   A.  Yes.  They -- we put in our database their minimum GPA and

18   the -- whatever the criteria is, we try to keep track of it.

19   Q.  GPA is one of them?

20   A.  Yes.

21   Q.  Some schools have a minimum GPA of 3.0; is that right?

22   A.  Not that I'm aware of.

23   Q.  Some schools have a minimum GPA of 3.5; is that right?

24   A.  Right.  Most of them.

25   Q.  And the schools, when advising you of the minimum GPA, the

1  schools don't advise you about class rank, in other words, what

2  percent of students fall within a certain GPA; is that right?

3  A.  No.

4  Q.  Because the college decides who gets invited, and the GPA,

5  the colleges can invite students who are outside the top ten

6  percent of their class based on class rank, right?

7  A.  No.

8  Q.  So PTK has no way of knowing whether students with a 3.5

9  GPA constitute 10 percent of their class, 20 percent of their

10  class, 30 percent of their class, or 40 percent of their class,

11  correct?

12  A.  No.  We study this, and I think in discovery you should

13  have our studies of their -- what percent of students we are

14  inviting at each one of these colleges, every single one of

15  them.

16  Q.  So PTK doesn't have access from the colleges to what

17  percent the students fall within a 3.5 GPA, correct?

18  A.  No, we have access to their enrollments through the

19  federal government, and we use -- and it's by college, so we

20  have access to how many students are on those campuses.

21  Q.  Community colleges don't rank students the way law

22  schools, for example, rank students, number one, number two,

23  number three, correct, to your knowledge?

24  A.  I don't know.  They might do whatever they want.  You

25  would have to interview all 1250 of them.

1    Q.  You have a lot of experience in the community college

2    industry, correct?

3    A.  Yes.

4    Q.  Are you aware of any community college that ranks

5    students?

6    A.  Yes, they have valedictorians.  They have their -- it is

7    different everywhere.

8    Q.  To your knowledge, community colleges generally don't

9    place class rank on students.  That's unusual at the community

10   college --

11   A.  I don't know.  I'm not a -- you know, I don't know what

12   they do.  I know they have here's our valedictorian, so

13   obviously that was number one.  So I think they do whenever

14   they do that.

15   Q.  But that is never disclosed to PTK, is it?

16   A.  If that valedictorian was up there, you can bet they were

17   asked to be a member.

18   Q.  But class rank is never disclosed to PTK, other than maybe

19   valedictorian, the number one person?

20            **COURT REPORTER:**  Slow down, please.

21            **MR. NEWMAN:**  Thank you.

22   **BY MR. NEWMAN:**

23   Q.  Class rank is never disclosed by colleges to PTK, except

24   perhaps who the valedictorian is, correct?

25   A.  They don't have to disclose class rank.  We have a way to

1    determine if they fall in the top ten percent without asking

2    the colleges and getting them to do more work than they are

3    already doing.

4    Q.   That's fair.  And you testified that colleges don't have

5    to advise PTK, but my question was whether they ever advise

6    PTK.

7    A.   They give us lists of students.

8    Q.   And the list of students are never by class rank, correct?

9    A.   I don't know what's in their databases.

10   Q.   You don't know what's in PTK's database?

11   A.   I said I don't know what's in a college's database.  I

12   only know what's in PTK's database.

13   Q.   Exactly.  And in PTK's database, PTK does not know class

14   rank of any of its members, other than maybe a valedictorian,

15   correct?

16   A.   We know what percent of members we have based on how many

17   students are at that college.  So if the criteria is whatever

18   it is and above and we are getting those students, then I would

19   say, yes, we know they are in the top ten percent.

20   Q.   Because you've done the math yourself?

21   A.   Right, every year.

22   Q.   For which school have you done the math yourself?

23   A.   Every school.  Every chapter.

24   Q.   Every year for every chapter, you do math?

25   A.   For the schools, we do the math -- well, we haven't done

 1    it in a while, and because you guys wanted it, we went back and

 2    did it as much as -- you know, every year.

 3    Q.  Is that the materials that's presented in the supplemental

 4    declaration that you filed in your rebuttal brief?

 5    A.  I don't know what's in my supplemental.  I know it was in

 6    your discovery.

 7    Q.  Have you reviewed the public records responses that Honor

 8    Society has produced in this lawsuit?

 9    A.  No, not in detail.

10    Q.  And do you have any reason to believe that any public

11    records request that Honor Society produced are false or

12    fabricated?

13    A.  On giving the Michael Calvert incident, probably, yes.

14              **MR. NEWMAN:**  Ms. Wharton, can we pull up Exhibit LL.

15              **MR. POLAK:**  Can I see it?

16              **MR. NEWMAN:**  Of course, you can.

17              **MR. POLAK:**  Usually we get it before it goes up.

18              **THE COURT:**  Let them see it before I see it.  Let the

19    other side see it before I see it.

20              **MR. NEWMAN:**  Okay.  I don't have a -- we can have

21    them available on iPad.

22              **MR. POLAK:**  Is it demonstrative?

23              **MR. NEWMAN:**  Yes.

24              **MR. POLAK:**  This is an actual e-mail from someone --

25    from a school -- that you claim you got from a school on a

1    Freedom of Information Act request?

2            **MR. NEWMAN:**  I'm not claiming anything.  I'm just

3    going to ask the witness about it.

4            **MR. POLAK:**  It's not a demonstrative document.  Okay.

5    We object, and I can explain my reasons why, but we object.  I

6    can explain here in a second if you would like me to.

7            **THE COURT:**  Okay.  I heard him say -- well, what is

8    it?

9            **MR. NEWMAN:**  It is a response to a public records

10   request that Honor Society served that indicates that students

11   who have a 3.5 percent GPA are 54 percent of the school, not

12   10 percent of the school.

13           **THE COURT:**  What is the basis for the objection?

14           **MR. POLAK:**  Thank you, Your Honor.

15       First of all, I believe it was proffered as a

16   demonstrative.  Actual real evidence is not a demonstrative

17   aid.  Usually a demonstrative aid is used to assist the

18   witness, as the Court knows.  So it doesn't qualify as a

19   demonstrative document.  Assuming that they actually want to

20   introduce it, it goes to the issues that I have forecasted for

21   the Court earlier.  These FOIA request documents are not

22   authenticated and they contain hearsay.  So we would object to

23   consideration of it for both of those reasons.  So it is not a

24   demonstrative.  That is objection number one.  Objection number

25   two is it is not authenticated.  And objection number 3 is it

1    is hearsay and might even contain hearsay within hearsay.

2            **MR. NEWMAN:**  Your Honor, it is a response to a public

3    records request.  We had a week to prepare a response to the

4    preliminary injunction.  We didn't have time to serve a

5    subpoena or take a deposition in that amount of time.

6        I think that when the Court sees the document, the Court

7    will know that it is something that we are likely to prove at

8    trial because our -- their burden is to show likelihood of

9    success on the merits, and so we are showing the Court that we

10   have documents that in the end we will present at trial that

11   indicates the facts that schools are admitting PTK members --

12           **THE COURT:**  Well, what is concerning about it is that

13   it's a document that is not authenticated.  It's your

14   representation that you received it from a school in response

15   to your request, your FOIA request.  And that's you making a

16   representation that that was actually sent to you.  So I will

17   take it for what it's worth, but I'll allow you to -- she can't

18   identify it.

19           **MR. NEWMAN:**  No.

20           **THE COURT:**  You know, and she's the witness.

21           **MR. NEWMAN:**  That is correct.

22           **THE COURT:**  So I will take it for what it's worth.

23   And I think I forecasted about what I think it is worth.

24           **MR. POLAK:**  Judge, if I might also add, this is a

25   document that was not on their exhibit list.  It's not attached

 1   to any declaration.  This is Exhibit LL.  There is no such LL

 2   attached to any declarations that were filed by your deadline

 3   of Wednesday at noon.  There might be other documents like this

 4   in this, but there is no "this document" in there.

 5              **THE COURT:**  Do you have another one like that that

 6   was part of -- that everybody has seen at least.

 7              **MR. NEWMAN:**  I will skip this one for now.  Thank

 8   you.

 9              **THE COURT:**  Okay.

10   **BY MR. NEWMAN:**

11   Q.  Are you familiar with Holyoke Community College?

12   A.  Holyoke Community College?  Not exactly, but the name

13   sounds familiar.

14   Q.  Do you know whether you have done math to determine

15   whether the students that are invited at Holyoke Community

16   College constitute 10 percent, 20 percent, or 30 percent of

17   their class?

18   A.  I have done the math at Holyoke.  I'd have to look at the

19   documents that I produced, but I'm fairly certain it is less

20   than 10 percent.

21   Q.  Are you familiar with Wor-Wic Community College?

22   A.  Yes.

23   Q.  Have you done the math on Wor-Wic?

24   A.  I've done the math on every community college for so many

25   years and gave that to you as discovery.

1    Q.  You made that available for your lawyers to provide in

2    discovery?

3    A.  Yes.

4    Q.  I haven't received that.

5          **MR. POLAK:**  Judge, it's --

6    A.  You did.

7          **MR. POLAK:**  That is untrue.  They have gotten them.

8    **BY MR. NEWMAN:**

9    Q.  Is it your testimony that some PTK chapters do not have

10   GPA requirements below 3.5?

11   A.  Yes.  Well, I mean, below 3.0.  Yes.  Sorry.

12   Q.  Some colleges have a GPA requirement of only 3.0, not 3.5,

13   correct?

14   A.  I would have to look at the list.  The average is 3.5.  I

15   know there's just a handful at 3.25.  There's some at 3.75.  So

16   the average is 3.5.  I gave you a document with everyone's

17   thresholds on there.  I don't have it memorized how many are at

18   3.0, but I'm sure it is less than -- if it's any at all, it's a

19   very small number.  So I don't know.  Without my work in front

20   of me or the computer at Phi Theta Kappa, you are asking me

21   about over a thousand institutions right now.  And I'm sorry, I

22   can't definitively answer your questions.  I know the average

23   is 3.5.

24   Q.  As you sit here today, you don't know whether any colleges

25   invite students to join PTK with only a 3.0 GPA?

1  A.   I don't really know.  I'd have to look at the document.

2  You have it in discovery, that document as well.  We provided a

3  document to you that has every single GPA threshold for every

4  college.  Do you have that document?

5          **THE COURT:**  No need -- I mean, just answer the

6  question that is asked.

7          **THE WITNESS:**  Okay.  Sorry, Your Honor.

8  **BY MR. NEWMAN:**

9  Q.   PTK will issue a letter of recommendation for any student

10  who requests it.  Is that right?

11  A.   Yes, there is a portal where a student can request a

12  letter of recommendation from the system.

13          **MR. NEWMAN:**  May I see Moradian 7.

14          **MR. POLAK:**  Your Honor, we do have an objection to

15  this that was stated on our objections.  Would you like me to

16  present that objection now?

17          **THE COURT:**  What's the basis for the objection?

18          **MR. POLAK:**  The objection does not have anything to

19  do with the first page, but the pages after that do not seem

20  related to the first page.  There is no evidence in the

21  declarations as to the source of these, whether these social

22  media posts that are here have been snipped and repasted onto a

23  Word document, or whether they are actually from the internet.

24  There is no ability to tell the date or time or place or manner

25  in which they were secured.  There also is a page at the end of

```
 1    Exhibit 7 about a "Do not recommend" -- you have this --
 2            THE COURT:  Well, let's deal with the page that I see
 3    first.  It's fine.  Right?
 4            MR. POLAK:  If that is all that counsel is going to
 5    use is page 1 of Exhibit 7, then we would have no objection to
 6    that, but if he is seeking to use and introduce the remainder
 7    of Exhibit 7, yes, we would have a problem with it.
 8            THE COURT:  Okay.  Is Exhibit 7 something that you
 9    received or that -- you received --
10            MR. POLAK:  We did receive Exhibit 7, and we
11    specifically provided objections to Exhibit 7 on the objections
12    that we filed last evening I think at about 6:05.
13            THE COURT:  When I should have been gone home.
14            MR. POLAK:  Yeah.  Maybe we could answer -- if
15    counsel does not intend to look at those other documents in
16    Exhibit 7, and he is only going to look at the letter of
17    recommendation that's on the first page, then we have no
18    objection to the use of that document.  It is clearly coming
19    from PTK.
20            MR. NEWMAN:  I'm only asking about the first page.
21            THE COURT:  Okay.  All right.  Thank you.
22    BY MR. NEWMAN:
23    Q.  Do you recognize the form of this document?
24    A.  I have a problem with this document because the symbol on
25    the bottom left-hand corner here should look like Phi Theta
```

1    Kappa in Greek letters.  It also has a lot of words pushed

2    together.  So I have a problem with this document.

3    Q.  Do you recognize the form of the document?

4    A.  I don't recognize this document because our markings

5    wouldn't have this weird symbol here.  The address is, like,

6    gone.  Phi Theta Kappa is pushed together.  There are words in

7    paragraphs that are pushed together.

8    Q.  Do you recognize the words in the paragraphs from a form

9    that you do have?

10   A.  I would have to go into our computer system.  This is our

11   -- it looks to be the one that is automated, and so I don't

12   hand write these every day.  So I would have to compare this

13   document to what we have in our system, and I would have been

14   happy to provide that as some sort of document you needed, but

15   this document, I don't know if this student is a student.  But

16   I know the symbols are wrong.  So I'm worried about this

17   document being messed with, because I can tell it has been.

18   Q.  But as you sit here today, do you agree that PTK has an

19   automated letter that's similar to the words in this form?

20   A.  Again, I would have to read the actual automated letter to

21   verify that that is what this is.

22   Q.  Are you familiar with the letter that is automated today?

23   A.  Yeah, I wrote it several years ago, and I apologize for

24   not memorizing every word that I wrote, but I can tell

25   something is wrong with this document.

1    Q.   And looking at the words of the document, not necessarily

2    the Phi Theta Kappa symbol or the like, is there anything in it

3    that you think doesn't appear in the form letters of

4    recommendation that PTK regularly sends?

5    A.   Again, I would have to look at the form letter and compare

6    it.  I have no way to do that.

7            **THE COURT:**  Do we have the form letter?  You don't

8    remember -- were there any questions about this form letter at

9    her deposition?

10           **MR. NEWMAN:**  I don't know.  I wasn't -- it was before

11   my time.

12           **THE COURT:**  Okay.  Do we have a copy of the form

13   letter?

14           **MR. POLAK:**  We do not.

15           **MR. NEWMAN:**  First, Your Honor, it was before my

16   time.  Second, this issue only arose recently, so I don't think

17   that question would have been asked.  It is a new issue.

18           **THE COURT:**  I will give you an opportunity to read

19   this letter, Dr. Tincher.  First, I will give you an

20   opportunity to read it.

21           **MR. POLAK:**  Your Honor, the document that counsel is

22   using on this screen is different than the document they gave

23   us as Exhibit 7.  Mr. Wallace just pointed that out to me.  The

24   document they gave us -- if I might approach, Your Honor.

25           **THE COURT:**  Let me ask this question.  The signature

 1  on that document, is that your -- sort of the signature that

 2  you use?

 3          **THE WITNESS:**  Yes, Your Honor.

 4          **THE COURT:**  I see -- I know you questioned whether or

 5  not the Greek letters were the same.

 6          **MR. POLAK:**  The point, though, Your Honor, if I might

 7  approach --

 8          **THE COURT:**  Okay.

 9          **MR. POLAK:**  This is the document that they gave us on

10  Wednesday at noon.  If you look on the bottom left-hand corner,

11  you see on the document they gave us, it says in Greek, Phi

12  Theta Kappa, those Greek letters.  If you look at your screen,

13  there's something entirely different on that document, and I

14  think that's what the witnessed is talking about it being

15  adulterated.  The document that counsel is using is not the

16  document they gave us earlier in the week.

17          **MR. NEWMAN:**  Thank you for pointing that out.  I'm

18  happy to use the paper copy.

19          **MR. POLAK:**  I think the bigger concern is that you

20  are using a document that appears adulterated, and it is

21  represented as something you actually gave the Court.

22          **MR. NEWMAN:**  It is exactly what we gave the Court.

23  It might have been rendered differently in an electronic form,

24  but it is exactly what we gave the Court.

25          **MR. POLAK:**  How it is rendered differently than what

1    you gave to us?

2            **THE COURT:**  Hold on.  Okay.  I've -- well, I do --

3    for the record, I will just tell you for the record, Phi Theta

4    Kappa does appear on this document.  The Greek letters Phi

5    Theta Kappa, it looks like, at least from the screen that I'm

6    reviewing, the Phi Theta Kappa Honor Society, which appears on

7    the screen -- what appears -- what it looks to the Court like

8    is that there may be a different font in type in these two,

9    might be.  I don't know.  But the Phi Theta Kappa down in the

10   bottom is definitely -- there is no space between Phi and

11   Theta, and Kappa appears to be in a different font than Kappa

12   on the original page.  And honor society appears to be in a

13   different font.

14           **MR. POLAK:**  I understand what you are saying.  I

15   don't know that I would necessarily disagree that it's a

16   different font.  The problem I'm having, when documents are

17   filed, they are filed as PDFs with the Court.  A PDF should not

18   change after it is created unless you go into the PDF and

19   change it.  What doesn't make sense to me is that the document

20   that I have as Exhibit 7 is very different from the -- like, in

21   a significant way, like, it's a different document -- it has

22   changes to it, than what it is that counsel is using here

23   today.  It tells me that either they have a glitch in their

24   system or there is -- regardless of whether it was intentional

25   or unintentional glitch, I'm going to assume unintentional, it

1    still has modified the document that they gave you that they

2    attached to a declaration that they said this is the true and

3    correct copy.

4         So what it is that counsel is using right now is not what

5    they gave you, and it definitely is not what they gave us.  We

6    can argue about materiality, I get that, but documents are

7    supposed to be what it is that they say they are.  That is the

8    essence of authentication.  And if the document that is

9    attached to Mr. Linke's or Mr. Moradian's declarations that

10   were filed with the Court on Wednesday or what I gave you that

11   you are holding in your hand are different from the one he is

12   now proffering as, oh, yeah, this is what I filed with the

13   Court, because it's not, ipso facto --

14        **THE COURT:**  They may have the document, but clearly,

15   this is not a copy of the document, because the Greek letters

16   Phi Theta Kappa is on this one, and it's not on the other one.

17   That's the most glaring thing.  But I do believe, as I was

18   saying, that the typed Phi Theta Kappa Honor Society --

19        **MR. NEWMAN:**  Your Honor, I have a theory as to what

20   happened.  We prepare PDFs and attach them, like counsel said.

21   And then for purposes of making the display easier, we

22   converted them to a PowerPoint presentation.  We are pulling

23   the original PDF.  Let me see how that looks.

24        So this is -- what you are looking at now is the same as

25   what you are holding in your hand.  I think, Your Honor, what

1   it is is that we shouldn't use the PowerPoint documents.  We

2   should use the original PDFs.  Is that okay?

3           **THE COURT:**  All right.  That would satisfy at least

4   on this document.  But we are only asking questions about this

5   particular document that is on the screen right now.

6           **MR. NEWMAN:**  So in the conversion from the PDF to the

7   PowerPoint, the rendering was jumbled.

8   **BY MR. NEWMAN:**

9   Q.  All right.  No problem.  You have testified that you have

10  done the math for every college to determine what percent of

11  students have a 3.5 GPA; is that right?

12  A.  Yes.

13  Q.  But in connection with this motion and the evidence you

14  submitted, you didn't submit any documents substantiating the

15  math, correct?

16  A.  I did.

17  Q.  Can you identify the document?

18  A.  There is several spreadsheets, one for each year.  The

19  spreadsheet has the raw data from the number of students that

20  were invited from Phi Theta Kappa for each year.  And then

21  there was another spreadsheet, you know -- not spreadsheet but

22  tab to the spreadsheet that gave you the enrollments at that

23  college, the unduplicated head count enrollments for that

24  college, and it also had, based on the AACC's report, an

25  estimate of the other types of students that were at that

1    college.

2         So at the end of the day, there was a numerator that was

3    developed that has the number of students invited to PTK for

4    the year, and in the denominator are all the students on that

5    campus or at that college -- not campus but college.  And those

6    two numbers were divided, and they are presented in that

7    spreadsheet for every school, for as many years as we could

8    pull out of our system with the information that we had.  But

9    yes, I think those were given to you guys in discovery, I'm

10   assuming.

11   Q.  Neither the numerator nor the denominator was based on

12   what percent of the class falls within a 3.5 GPA, correct?

13   A.  Yes, the numerator was the number of students invited.  So

14   let's say a college is only inviting students with a 3.5 and

15   above -- okay?  So that would have been in the numerator, the

16   number of students that have a 3.5 and above that were invited.

17   In the denominator are all the students.  So when I divide

18   those two numbers and I get something less than ten percent,

19   then that is saying that you are at the top of the class

20   because you are over -- you're in the top part of the GPAs that

21   can be evaluated.  So that's our logic for doing the math.  And

22   we provided as many -- we provided you five years, I believe,

23   worth of data.

24   Q.  And the math that you did is based on who gets invited,

25   correct?

```
1    A.  Not all of it.  There are three pieces.  There are the
2    federal government's head counts that they use for PELL grants
3    and other information.  The only thing that came from our
4    database was the numerator, which is the number of students
5    that got invited, because we know who got invited.
6    Q.  The numerator is the number of students who were invited?
7    A.  Right, and those came from the college list of students
8    that say these are the students that are eligible to be
9    invited.
10   Q.  And the students who are eligible have criteria beyond
11   just GPA, correct?
12   A.  Yes, the students that are eligible have to do with their
13   charter, and, you know, the GPAs of those students could vary,
14   but they have to follow the rules in their charter.  So if a
15   student is in a two-year program, they need to be at least 12
16   hours of credit because we have to have something to base that
17   GPA on.  If a student is in a one-year program, like a welding
18   program that's only one year, they only have to have 6 hours.
19   Q.  Is it limited to GPA or there's other factors?
20   A.  There's one other factor.  We can't count the GPA based on
21   one class, so we have to have some sort of amount of
22   information to determine if you've been at that school long
23   enough to have a GPA that is substantive.
24   Q.  But the schools don't inform you whether students who fall
25   within a 3.5 GPA, for example, are in the top 10 percent or
```

1    20 percent or 30 percent of the school?

2    A.   The schools provide us with the students.  We know the

3    count of students that had the highest GPAs, and then the

4    denominator is all the other students.  That's how we do it.

5    Q.   And students who are invited, you just testified there is

6    criteria beyond just GPA, correct?

7    A.   Yes, there is GPA, and then there is at least one semester

8    of being at that college, which is, on average, 12 hours.

9    Q.   I'd like to turn your attention to Exhibit 7 that's in

10   front of you.  Do you now recognize the form of this letter or

11   no?

12   A.   No, because these are automated letters.  This letter is

13   for a student --

14   Q.   I'm asking you about the form of this letter, not about

15   the particular student.

16   A.   Without going and looking in our database at the form

17   letter and comparing it to this, unless this student

18   authenticated this letter is belonging to him, I can't tell you

19   if this is a letter that is in the database.  It's an automated

20   letter of recommendation.  Students typically use it to prove

21   they are a member so they can get their scholarship.  That is

22   what it is used for.

23   Q.   So you are unfamiliar with the form of the letter as you

24   sit here today?

25   A.   I am not unfamiliar with its existence.  I wrote it

 1   several years ago, so I can't tell you word for word -- if we

 2   are going to go through this letter word for word, then I can't

 3   confirm this is the letter that sits in the PTK database

 4   because this went to a student, not you and not your client.

 5          **THE COURT:**  Hold on for a second.  All that he has

 6   asked at this point was if you recognize this as the form, and

 7   if you don't recognize it as the form, then you don't recognize

 8   it.  But I've given you an opportunity to read it to see if it

 9   sounds like the form letter that you all drafted or it was

10   sent.  Because this is a letter that PTK sends out to others.

11   Right?  To whom it may concern.

12          **MR. POLAK:**  You will notice that there is no Bates

13   number on this document.  They have asked us for discovery.  We

14   have produced letters of recommendation to them in discovery.

15   They come from our records.  They chose not to use a document

16   that came from our records.  I don't even know if this document

17   has been produced to us in the case.  And I think that's where

18   the disconnect is happening is that this witness knows what it

19   is that has gone out the door, and she understands Bates

20   numbers, and she understands litigation very well now.  And

21   that's the problem.  They have chosen to use a document that

22   has a curious origin.

23          **MR. NEWMAN:**  We had a week to present documents.

24          **THE COURT:**  I'm sorry?

25          **MR. NEWMAN:**  We had one week to prepare.  It was

 1    difficult to compile it all.

 2            **THE COURT:**  I will continue the hearing, then, if you

 3    need more time to assemble records that were produced in

 4    discovery.

 5            **MR. NEWMAN:**  I'm not asking for that right now, Your

 6    Honor.

 7            **THE COURT:**  Okay.

 8    **BY MR. NEWMAN:**

 9     Q.  Do you know whether the form of letter that you send says

10    that the student has achieved and maintained academic

11    excellence at a college standing among the top ten percent of

12    the class?

13     A.  Where does it say that in here?

14     Q.  The third paragraph, last sentence.

15     A.  Like I said, I would have to look at the form letter.  I

16    just would like to compare to what is in the database, and we

17    could have given that to you.

18     Q.  So you don't know as you sit here today?

19     A.  I don't know if we used the exact words.  I mean, there's

20    no date on this letter.

21            **THE COURT:**  It's been asked and answered.  You don't

22    know.

23    **BY MR. NEWMAN:**

24     Q.  PTK's membership is offered at a single moment in time

25    when there aren't any renewals; is that right?

196

1    A.  We send -- the students join -- the maintenance part is

2    typically something that happens on the campus end.  So when

3    the students get ready to graduate, they're typically

4    recognized in the program, and at that point they do a

5    reconciliation if they are still in, and it is all done really

6    at the campus level.

7    Q.  Are students ever kicked out of PTK?

8    A.  I assume they are.  You would have to interview the

9    colleges.  We do not on our end because we don't have access to

10   their academic records after they join.  We allow the colleges

11   to decide who they are going to honor in their graduation, who

12   gets to wear the stole.  You know, as I testified earlier, the

13   college chapter after the point that they become a member, they

14   really try to manage the records on their own.

15        Now, occasionally an advisor will go into the system and

16   they will move someone off the active roster, I would imagine,

17   but, you know, there's a lot of different ways that they,

18   quote, get kicked out or whatever you want to call it, but it's

19   not about getting kicked out as much as not getting to be

20   recognized at graduation.

21   Q.  PTK has done nothing to confirm that students who are

22   initially invited maintain a certain percentile rank in the

23   class, does it?

24   A.  The advisors do.  They have access to the records that

25   would constitute that.

 1   Q.   Is it your testimony that every single student who becomes

 2   a member always maintains a certain class rank?

 3   A.   You are talking about 4.3 million people, so, okay.

 4   That's a really hard question to answer definitively.   I

 5   believe I've done my best job to explain to you how it works.

 6   And so it's hard to answer that question.

 7           **THE COURT:**   Is the answer yes or no, though?   You

 8   injected 4.3 million, and you can't speak to 4.3 million,

 9   right?

10           **THE WITNESS:**   I mean --

11           **THE COURT:**   I mean, I understand the going back and

12   forth between the two, but I know we are trying to get to a

13   point to help the Court figure out what information is

14   necessary.

15           **THE WITNESS:**   Right.

16           **THE COURT:**   Just answer the question that is asked,

17   and if you need some explanation, you can let him know.   And if

18   he needs further clarification, then he can follow up with his

19   specific question.

20   A.   Okay.   What is your question?

21           **THE COURT:**   Rephrase your question.   I'm sorry.   I

22   mean, not rephrase.   Restate your question.

23   **BY MR. NEWMAN:**

24   Q.   Let me just start with PTK itself has done nothing to

25   confirm that students who are admitted to PTK maintain a

1    certain GPA requirement or class rank throughout their tenure

2    as a member, correct?

3    A.   The chapters do.  The PTK chapters do.  So I would say not

4    correct.

5    Q.   PTK doesn't.  The chapters do but PTK does not?

6    A.   They are PTK chapters.

7    Q.   Okay.  Fair.  And does PTK have these records of

8    verification of students maintaining a certain GPA?

9    A.   No, not typically.  Like I said, the advisor will go into

10   the system and move the students off the active roster role.

11   We don't charge more than one time, so there's not this reason

12   for us to be notified in such -- to answer your question, there

13   is no reason for it.

14   Q.   That is fair.  So when you sit here today, you don't know

15   if any one student has maintained a certain GPA or class rank?

16   A.   I do know that colleges rescind their membership.  I don't

17   know how they do it.  They all do it very differently.  But I

18   do know they rescind the membership, and they do not get

19   recognized at graduation if their GPA doesn't stay where it is

20   supposed to be.

21   Q.   But as a PTK member, any member qualifies for the letter

22   of recommendation that your system will send out, correct?

23   A.   If they are a member, they can go request this letter of

24   recommendation, correct, as one of the benefits to being a

25   member.

1    Q.   And the letters are issued based on an automated system?

2    A.   Yeah, they can log into their portal and simply request

3    that this be sent to them.

4    Q.   And when a member requests a letter, there is no research

5    done on the member to confirm that they still have maintained

6    the class rank or GPA, correct?

7    A.   With 60 full-time employees, no, it's not possible for us

8    to do that.

9    Q.   Are PTK members members for life?

10   A.   If they pay their dues and they are called PTK, and we

11   don't charge them again, they can refer to themselves as they

12   were Phi Theta Kappa, yeah.

13   Q.   How office do PTK members pay dues?

14   A.   When they join, they pay dues.  They are not dues.  It's a

15   membership fee.

16   Q.   They pay a membership fee once?

17   A.   As far as I'm aware, yes.  That's the way it is supposed

18   to work.

19   Q.   And thereafter, a student who pays membership fees is a

20   member, correct?

21   A.   What?

22   Q.   After paying fees --

23   A.   They pay the fee one time when they join.

24   Q.   And then the student is a PTK member for life, correct?

25   A.   Yes.

1    Q.   And any student member can request a letter of

2    recommendation, yes?

3    A.   Yes, if they have access to the system.   They have to log

4    in.

5    Q.   Are you familiar with the reasons why students join PTK?

6    A.   Yes.

7    Q.   Do students join PTK because they view it as exclusive?

8    A.   The reasons that students join Phi Theta Kappa are as

9    diverse as the students themselves.   Everybody has their own

10   reason for joining.   I can give you the top two or three

11   reasons, but I can't give you an exhaustive list and answer

12   that question definitively for all students or for any one

13   particular student.

14   Q.   Do you agree that many students join PTK because they view

15   it as exclusive?

16   A.   I've never heard the word "exclusive" used until Honor

17   Society started using it.   It's not a word that is anywhere in

18   any of our publications.   So I would say, no, students don't

19   join PTK in general because it is exclusive.

20   Q.   Do students join PTK because they believe they are at the

21   top of their class?

22   A.   Students join PTK because they want their academic

23   achievements recognized.   And so they join because they got

24   invited to join, and the college is saying, you are the top,

25   you are in the top of the top.   And so I've never, you know --

1    I don't know where in that percent they might fall.  I just

2    know, based on our math, that 99 percent of the time they are

3    in the top ten percent, and it's in the records that I prepared

4    for you.

5    Q.  Let's talk a minute about Honor Society.  Did you first

6    learn of Honor Society's entry into the two-year honor society

7    market in 2017?

8    A.  I can't tell the exact day that I knew Honor Society

9    existed.  I learned more of how their business worked in

10   mid-2019.  Around that time is when I started to realize they

11   had no academic criteria.  Before that, I thought, you know,

12   they were a real honor society.

13   Q.  In 2017, did you refer to them as the competition?

14   A.  I thought of them as a competitor.  Now I think of them as

15   an unfair competitor.  But I've answered these questions in my

16   deposition about how I feel about them.

17   Q.  Are you aware that in 2018, PTK's staff referred to Honor

18   Society as the enemy?

19   A.  I'm not particularly aware, but when I'm looking through

20   the evidence in this case, I've seen an e-mail at that time,

21   but I don't, like, remember that in that time period.  I

22   remember it as part of the case discovery.

23   Q.  At one point PTK accused Honor Society of running a

24   phishing scam; is that right?

25   A.  I don't know what you are talking about.  Please just give

1    me some more information.

2    Q.  Has PTK referred to Honor Society as running a scam?

3    A.  No.

4    Q.  You testified earlier about the AACC, the American

5    Association of Community Colleges?

6    A.  Yes.

7    Q.  And you testified that the AACC recognized PTK as an

8    official honor society in 1929?

9    A.  Yes.

10   Q.  And when the AACC did, PTK was recognized as an official

11   honor society, not the official honor society; is that right?

12   A.  We were, at the time of that recognition, the only general

13   honor society that was available for all students.  I would

14   have to look at the document that was produced by AACC on that

15   to see if it was a "the" or an "an."  But, yes, we are the

16   official honor society for community colleges.

17   Q.  And not since 1929 has the AACC or its predecessor ever

18   put into writing that PTK is the official honor society?

19   A.  I don't know.  You would have to check with the AACC.

20   Q.  You are not aware of any documents where AACC has, since

21   1929, written that PTK is an official or the official honor

22   society?

23   A.  We may or may not have put it in the program at their

24   convention.  I don't know.  I would have to look at all of the

25   convention programs where we present ourselves at their

1   convention and our scholars, so I can't sit here and say yes or

2   no, it's not written down, just because I don't know exactly

3   where it is.

4   Q.  You sit on the board of directors of the AACC?

5   A.  Yes.

6   Q.  And as a board member, as you sit here today, you can't

7   recall any document over than the 1929 communication indicating

8   that PTK was the official honor society?

9   A.  I was named to the board of directors last year, and we

10  meet four times a year, so I haven't always been on the board

11  of directors.  So I'm not aware, during the last two years, of

12  it being in a board meeting, if that's your question.

13  Q.  Let's talk a moment about scholarships.

14  A.  Okay.

15  Q.  When PTK advertises -- strike that.  Does PTK advertise

16  that it offers an average of $2,500 in scholarships per

17  student?

18  A.  We advertise that the transfer scholarships average at a

19  $2,500 rate, but it's a little higher than that actually, but

20  yeah.

21  Q.  Does PTK advertise that those scholarships are exclusive

22  to PTK members?

23  A.  Yes.

24  Q.  So a transfer scholarship is a scholarship that a

25  four-year university gives to a transferring two-year community

1   college student; is that right?

2    A.   A transfer scholarship is typically for a community

3   college student, yes, but -- yes.

4    Q.   And do you agree that four-year universities offer

5   transfer scholarships and the opportunity to obtain them to

6   students, whether students are members of PTK or not?

7    A.   Yes.   I mean, most four-year colleges offer a couple of

8   different kinds of transfer scholarships.   Depending on what

9   your GPA is, what happens is a PTK member may qualify for one

10  of those general scholarships because their GPA is correct, and

11  then because they are PTK, they get an extra scholarship called

12  a PTK scholarship.

13       So I know it is confusing, but there are lots of

14  scholarships for every kind of student, for a lot of different

15  reasons, but there are PTK exclusive scholarships that are

16  transfer scholarships, and there are also transfer scholarships

17  for other students too.

18   Q.   Does PTK advertise that members have access to

19  $246 million in member-only scholarships?

20   A.   I don't know if it is 239 or -- it is somewhere around

21  there.   That sounds about right.

22   Q.   And do you have documents that you have produced in

23  connection with this lawsuit that shows that amount?   You said

24  it might be 239 million in exclusive PTK scholarships

25  unavailable to non-PTK members.

1   A.   Yes, I produced all of the calculations that we used to

2   arrive at that statistic for numerous years in the discovery.

3   Q.   Have any been submitted in connection with this motion, if

4   you know?

5   A.   They were submitted before this.

6   Q.   So you don't know, as you sit here now, whether they have

7   been submitted in connection with this particular motion?

8   A.   I didn't look at every document.  But you have them.

9   Q.   Thank you.

10  A.   You're welcome.

11  Q.   There was reference earlier to an embezzlement allegation.

12  You agree that a chapter advisor was arrested for embezzling

13  funds.  The embezzlement took place while the person arrested

14  was a PTK chapter advisor, correct?

15  A.   The embezzlement?  Well, I don't know anything about the

16  embezzlement.  I know that those were not PTK funds.  I called

17  the college president when that happened.  His name is Dr. Jay

18  Allen.  He's the president of Itawamba Community College.  And

19  I asked him to tell me what happened.  He said, Lynn, those

20  funds were not PTK funds, they were college funds, and that PTK

21  did nothing wrong.

22  Q.   But a chapter advisor, while as a chapter advisor for PTK,

23  embezzled funds, correct?

24  A.   I don't know.  That case hasn't gone to trial.  I have no

25  idea.

1    Q.   Fair.  But the person was arrested for embezzling funds?

2    A.   The person was arrested.  At the time, they weren't a PTK

3    member.  She is not a PTK employee.  And we have no control

4    over the chapter accounts.  And that's all I know about it.

5    Q.   Shortly after PTK filed its claims against Honor Society,

6    PTK issued a press release; is that right?

7    A.   We put a press release on our website, and we issued it to

8    three or four higher education news outlets.  And that's how we

9    announced this lawsuit.

10   Q.   And you authorized the press release?

11   A.   Yes.

12   Q.   And the same day that the press release was released,

13   Bloomberg published about your press release; is that right?

14   A.   I have no idea if Bloomberg -- I don't even know what

15   Bloomberg is.

16   Q.   Are you aware of any media sources that wrote an article

17   or republished your press release --

18   A.   No one republished our press release that I'm aware of.

19   It is sitting on our website, and that's where it started, and

20   I think that's where it ended.

21   Q.   Are you aware of any press that wrote an article after

22   that press release was written about the lawsuit?

23   A.   Only the stuff that has been going on recently with Honor

24   Society have I seen their press release written about, but to

25   my knowledge, I have not seen our press release anywhere except

1    our website.

2    Q.   Let's talk a moment about PTK Connect.

3    A.   Okay.

4    Q.   PTK Connect, does it have two sets of customers, one for

5    businesses and one for colleges?

6    A.   There's PTK Connect and there's PTK Connect for business.

7    Q.   In order to gain access to PTK for business or PTK Connect

8    for colleges, does a business or college have to pay a fee?

9    A.   They have to sponsor the work that goes into creating that

10   platform.  And that sponsorship is in the form of money.

11   Q.   So money is paid to PTK in exchange for the benefits that

12   the college or business gets from PTK for business or PTK for

13   colleges, correct?

14   A.   Yes.

15   Q.   And did you testify that with PTK for business or PTK for

16   colleges, the college or the business that pays the fee gets a

17   verified database of more than 425,000 candidates?

18   A.   That is estimated based on the number of students that

19   have signed a release of information to be recruited for job

20   purposes or for scholarship purposes.

21   Q.   And when the college or business gains access to the

22   database of more than 425,000 top candidates, the college or

23   business gets access to information like e-mail addresses for

24   each member in the database, correct?

25   A.   Yes, so they can contact them and recruit them.

1    Q.  So would you agree that PTK is selling that personal

2    information to the business or colleges?

3    A.  No, I would not.

4    Q.  PTK takes a fee, colleges and businesses get the database,

5    but there's no sale there?

6    A.  We don't refer to it as sales.  It's called a sponsorship.

7    And you said personal information, and that's wrong.  It's the

8    information that the student said that they could have so that

9    they could get a job offer opportunity or a scholarship

10   opportunity.

11   Q.  A student's name is personal information, correct?

12   A.  It is, I guess, a form of personal information.

13   Q.  E-mail address is personal information, yes?

14   A.  It's directory information.

15   Q.  E-mail address is personal information, yes?

16   A.  It is directory information.

17   Q.  Is directory information comprised of personal

18   information?

19   A.  It depends on what you define personal information as.

20   Q.  Fair.  PTK does provide e-mail address and students' names

21   and addresses to the colleges and businesses that pay for it,

22   yes?

23   A.  Not always.  Students don't like to give their address.

24   We don't have it.

25   Q.  Most you do, correct?

1    A.   I don't know.   I would have to look.   People are funny
2    about what they give you these days, so I can't tell you the
3    percentage of students that give us their address.   I would
4    imagine it is pretty high.   But yes, that is part of being able
5    to contact the student is to receive mail at their home from
6    the college or the business.
7    Q.   Do you agree that the 425,000 candidates listed in the
8    database constitutes data?
9    A.   It's data in a database.
10   Q.   And PTK makes that data available to colleges and
11   businesses for a fee, correct?
12   A.   PTK makes the information that students release available
13   to the colleges and businesses that -- that -- if they want to.
14   I mean --
15   Q.   PTK's terms and conditions talk about providing
16   information to business and college partners, correct?
17   A.   Yes.   In the terms and conditions, we tell the student,
18   when you join, your information will be shared with our
19   partners.
20   Q.   But PTK doesn't disclose to any student member that they
21   are going to receive e-mails soliciting them from businesses,
22   correct?
23   A.   They don't solicit.   They are job offers.   The partners
24   that we have on Connect are only for the purposes of offering
25   them jobs.   They don't sell them things.

1    Q.  And PTK doesn't disclose to any members that data is sold

2    to businesses or colleges, correct?

3    A.  We don't call it selling, but in the terms and conditions,

4    it is very clear that it is going to be shared.  That's the

5    word.

6    Q.  But PTK doesn't disclose it's shared --

7    A.  It does disclose.  It's in the terms and conditions.

8    Q.  But PTK doesn't disclose that it's sold in exchange for a

9    fee, correct?

10   A.  It's not sold.  It is shared.

11   Q.  PTK doesn't disclose that the database is shared in

12   exchange for a fee, correct?

13   A.  We don't tell the students what the sponsorship agreement

14   is because it is different for every college.

15   Q.  You testified earlier that you want the colleges to have

16   access to the database so the students have more exposure; is

17   that right?

18   A.  Yes, I think when a student joins, the number one reason

19   they join is to get their hands on those scholarships.  If the

20   colleges are not allowed to communicate with them and tell them

21   how much it is, then the whole system doesn't work.  That's

22   what it's for.

23   Q.  But despite that PTK wants colleges to have access, the

24   students have exposure, PTK does not offer that data for free?

25   A.  No, we don't offer -- we don't hand over data to colleges

 1   without sponsorship for the students.

 2   Q.   You testified earlier that *Jackson Jambalaya* wrote an

 3   article about this lawsuit; is that right?

 4   A.   No, they just published a release.  I don't think there

 5   was an article associated with it.  They just published the

 6   press release, just the flat press release.

 7   Q.   Do you know what a blog is?

 8   A.   Yeah.  A blog is a news outlet.

 9   Q.   It's not a personal web blog?

10   A.   What's your -- what are you talking about?  Are you

11   talking about *Jackson Jambalaya*?

12   Q.   I'm asking whether you understand a blog to be a personal

13   web log of information.

14   A.   It depends on who is blogging.  I don't know if it is

15   personal.  If it's community -- I don't know what your question

16   is.  I'm so sorry.

17   Q.   And other than the *Jackson Jambalaya*, are you aware of any

18   media outlet that has published an article or done a story

19   about this lawsuit?

20   A.   Yes, there are tons of them.  CampusBuddy.  I mean, we

21   went ad nauseum about people that have done stories on this

22   article.

23   Q.   News sources?

24   A.   News sources?  I don't know if students consider --

25   CollegeBudget.com has a news article.  I consider that news.

1   Q.   The *Clarion Ledger* didn't cover this lawsuit ever, did it?

2   A.   The *Clarion Ledger* here in Jackson?  No, they did not.

3   Q.   And you are not aware that any cable news network has

4   covered this --

5   A.   No, but Jackson Jambalaya has more readers than the

6   *Clarion Ledger* does.

7   Q.   You don't know that to be true?

8   A.   Pretty sure.

9   Q.   Upon what basis do you believe that the *Jackson Jambalaya*

10  blog has more viewers than the *Clarion Ledger*?

11  A.   I don't know.  I just assume it does because it is free.

12  *Jackson Jambalaya* is free, and the *Clarion Ledger* costs money,

13  so I just assume.

14  Q.   You aren't aware of any local T.V. stations that have

15  covered this, are you?

16  A.   No local T.V. stations I'm aware of, no.

17  Q.   You submitted a declaration in connection with this

18  motion, correct?

19  A.   Yes.

20  Q.   And you signed that declaration on July 3rd?

21  A.   I don't know what day I signed it.  I'm so sorry.

22  Whatever date is at the top is probably when I signed it.

23  Q.   I'm going to ask if this is a true and correct copy of

24  your declaration.  I see that you are reviewing the first page.

25  Do you want to review the whole thing or can you answer that

1  question?

2  A.  Can you just scroll through it, please.  You don't have to

3  go that slow.  Just help me.  It should be 25 or so pages, if I

4  remember correctly.  Yes, that looks right.  Yes.

5  Q.  It says it was executed on July 3rd.

6  A.  July 3rd, then.

7  Q.  Do you believe everything in the declaration was true and

8  correct as of July 3rd?

9  A.  I would have not signed it.

10  Q.  So on July 3rd, you verified everything in that

11  declaration?

12  A.  Yes, I think so.  I mean, it could have been -- I could

13  have signed it July 4th, I guess, or 5th or something.  I don't

14  know, but I signed it.

15  Q.  In the declaration, you discussed one of Honor Society's

16  articles that has the "Voice Of A College."  Do you remember

17  that?

18  A.  No.  You will have to -- sorry.  It's very -- a lot of

19  information there.  Can you just put the page up that has that

20  on there?

21  Q.  Fair request.  Do you see paragraph 20?

22  A.  Yes.

23  Q.  And do you see you wrote "The AR articles are particularly

24  deceptive because many are written in the Voice of the

25  College"?

1    A.   Yes.

2    Q.   Did you verify that on the day you signed this

3    declaration?

4    A.   Yes.

5    Q.   Have you since reviewed any of the articles that are

6    discussed in this declaration to confirm that they still are

7    posted on the internet?

8    A.   I have Googled myself a few times and the same stuff comes

9    up.  I mean, it is five thousand pages.  The Bible is 25 -- you

10   know, 1200 pages.  So it's a lot to sit there and verify all of

11   this every single day.

12   Q.   Have you seen any of the articles in the Voice of the

13   College since you signed the declaration?

14   A.   I cannot sit here and tell you I've gone back through all

15   of this stuff.  I would have to take another week to go back

16   through it.

17   Q.   You testified earlier that you would normally be invited

18   to speak at graduations, but this year you weren't; is that

19   right?

20   A.   No, I was invited to speak at one several months ago

21   before all of this stuff started.  I was invited to speak at

22   one, which is unusual.

23   Q.   Were you invited to speak at more?

24   A.   I usually speak at a few more if I can.  I can't -- they

25   all happen at the same time, so I can't always speak at every

1   one I am invited to, but I'm usually invited to more than one.

2   Q.  Did you indicate earlier that you attribute the fact that

3   you weren't invited to more to Honor Society's articles?

4   A.  I was just lamenting that my inbox from colleges is very

5   slow, if not nonexistent, after the FOIA request and after all

6   of this.  They are afraid to talk to me.

7   Q.  When invited to speak at colleges, the invitation would

8   come before June.  Yes?

9   A.  Not always.  Not always.  But the FOIA requests have been

10  going on for quite some time, but they would have come around

11  all of that time.

12  Q.  So when speaking at a graduation, when do you generally

13  receive an invitation?

14  A.  I don't know.  I would have to look at my e-mail.

15  Q.  The Honor Society articles were published in June, yes?

16  A.  The FOIA requests, everything started months before that.

17  So all of it sort of spooked the colleges, I think, lots of

18  FOIA, tons.

19  Q.  Not one college has contacted you to cancel a contract and

20  indicated it's because of Honor Society's articles, correct?

21  A.  What contract?

22  Q.  Any contract.

23  A.  Canceling contracts that are in place?  Are you talking

24  about -- I have had nonrenewals.  Those are contracts for PTK

25  Connect.  They have been nonrenewed at this time, many.

1   Q.  You have had nonrenewals for PTK Connect?

2   A.  Yes.

3   Q.  And the customers on those, none of them have indicated

4   it's because of what Honor Society posted, correct?

5   A.  I provided 20 names.  I have provided a lot of information

6   of people who have turned their back on PTK in my declaration.

7   Q.  Of those 20 names, none of them told you that they were

8   canceling because of Honor Society's statements on the

9   internet, correct?

10  A.  I gave you 20 names, and that's just the tip of the

11  iceberg as to how many people probably know about all of this

12  stuff.

13  Q.  I'm going to ask the question again.

14  A.  My phone number is not available on the internet for these

15  students to, you know, let me just tell you.

16  Q.  You are not aware of any student who canceled a membership

17  because of Honor Society's posts?

18  A.  They call and say, No questions asked.

19  Q.  So no questions were asked?

20  A.  Look, you have plenty of names, of weird things that have

21  happened to Phi Theta Kappa since all of this mess has started.

22  We have lost revenue and all of that stuff.

23  Q.  And of those names --

24  A.  So you are going to sit here and say that this had no

25  impact?  I will give you one more name --

1    Q.   That's not the answer to my question.   I'm asking whether

2    any of those names, any of the people who have canceled have

3    indicated to you in any --

4    A.   They have not indicated to me that they didn't believe

5    because of that.

6    Q.   They have no --

7    A.   They haven't told me.

8    Q.   No party who has canceled a membership has told you that

9    it was because of Honor Society's articles or other

10   communications, correct?

11   A.   I'll give you one more name.   Casey Holcomb, two days ago,

12   received a text message from Michael Moradian saying, I need to

13   talk to you about Lynn.

14        And she's a former employee, an honorary member of Phi

15   Theta Kappa, and she said she didn't want to talk to him.   And

16   then he said, Why don't you Google Lynn and then get back with

17   me.

18        And so if you don't think "Googling Lynn" or Phi Theta

19   Kappa has been damaging just because --

20   Q.   That's not my question.   What is Casey's last name?

21   A.   Holcomb.

22   Q.   And Ms. Holcomb didn't cancel a contract with you,

23   correct?

24   A.   Ms. Holcomb is a very prominent realtor in this community,

25   and her opinion of me matters.

1    Q.  The question is whether she canceled a contract with you.

2    A.  She didn't cancel a contract.  She was a former employee.

3    Q.  And Ms. Holcomb didn't indicate she was going to decline

4    to purchase any services --

5    A.  She's not a student.

6    Q.  My question isn't whether she was a student.  It's whether

7    she indicated that she was going to decline to purchase a

8    service from PTK.

9    A.  I have lost FOIA --

10   Q.  That's not my question.

11   A.  Casey Holcomb --

12           **THE COURT:**  Listen to his question.

13   A.  Casey Holcomb did not say that she was upset.  She was

14   upset that we gave her personal information to Michael

15   Moradian.  That's what she was upset about.

16   **BY MR. NEWMAN:**

17   Q.  And as you sit here now, you can't think of a single

18   person or company that has communicated to you that it was

19   canceling a contract for not entering into a sale with PTK due

20   to Honor Society's articles or other communications, correct?

21   A.  We haven't received a grant from the Woodward Hines

22   Foundation since the *Jackson Jambalaya* thing happen.

23   Q.  That's not my question.  Woodward Hines didn't indicate to

24   you that it was canceling a contract or not providing a grant

25   because of Honor Society, correct?

1          **COURT REPORTER:**  I need you to slow down, please.

2          **MR. NEWMAN:**  Thank you.  I apologize.

3     A.  I don't know why these people are pulling out.  I'm

4     assuming it's because of this, but I'm not going to sit here

5     and tell you anything that I don't know.  So they haven't told

6     me why they have left.  But they are leaving in droves, and

7     they are leaving.

8     **BY MR. NEWMAN:**

9     Q.  You testified it is an assumption.

10    A.  I am testifying that it is logical, and that any normal

11    person, when you Google Phi Theta Kappa and get all of this

12    stuff, you are not going to join, you are not going to complete

13    your contract --

14    Q.  That's not my question.  You are testifying it's an

15    assumption.  Yes?  That's what you said?

16    A.  I'm testifying --

17         **MR. POLAK:**  Mischaracterizes prior testimony.

18         **THE COURT:**  She said she assumed.  Assumption is the

19    same as assume, at least from this point.  If -- I understand

20    we both want to tell our stories, but if you will answer his

21    question, we can move on.

22    A.  My answer to your question is that they have not told me

23    that's why they are leaving.

24    **BY MR. NEWMAN:**

25    Q.  Thank you.  You testified a volume of students have

1  canceled memberships?

2  A.  I have listed names in my declaration of people that have

3  canceled memberships that have been members for years.

4  Q.  And PTK didn't lose any money from those cancellations

5  because no money was due from those students, correct?

6  A.  We lost $80,000 in revenue from new members since this hit

7  the internet.

8  Q.  But again, none of those losses, no one has indicated to

9  you it is from Honor Society's articles --

10  A.  There is no way for them to indicate.  There is no way for

11  them to indicate.

12  Q.  You could ask.

13  A.  Really?  And they are going to answer the e-mail?  Well,

14  maybe we need to do that, and we certainly will.  But I don't

15  want to sit here and say no one has left because of whatever,

16  when --

17  Q.  And a lot of the volume of students that canceled

18  memberships canceled before the June articles that Honor

19  Society posted, correct?

20  A.  It has been ongoing.

21  Q.  So if the cancellation occurred before June, it couldn't

22  have been due to the articles here, correct?

23  A.  I don't know when the dates came in.  They are listed in

24  here, and it was after all of this happened.

25  Q.  You testified earlier that employees have asked if they

1    should quit their jobs; is that right?

2    A.   Yes.

3    Q.   Which employees?

4    A.   Fredrica Tyes.

5              **THE COURT:**  Do you know how to spell her name?

6              **THE WITNESS:**  F-R-E-D-R-I-C-K-A -- Fredrica -- no,

7    C-A, not K.  Tyes, T-Y-E-S.

8    **BY MR. NEWMAN:**

9    Q.   T-Y-E-S?

10   A.   Yes.

11   Q.   Did Fredrica Tyes quit her job?

12   A.   No, I told her not to.

13   Q.   Any other employees ask if they should quit their job?

14   A.   No, not me directly but their supervisors, so I will have

15   to collect names for you.  I supervise Fredrica.  That's the

16   person that came to me because I'm her supervisor.

17   Q.   Rod Risley is the previous CEO of PTK; is that right?

18   A.   Yes.

19   Q.   And at one point, you reported to Rod Risley?

20   A.   I did.

21   Q.   And he was accused of sexually harassing a chapter

22   advisor; is that right?

23   A.   No, he was not.

24   Q.   Rod Risley was not accused of sexually harassing anybody?

25   A.   You said chapter advisor, and he was not accused of

1    harassing a chapter advisor.

2    Q.  Thank you for the clarification.  He was accused of

3    harassing PTK employees or chapter employees, correct?

4    A.  Chapter employees, no.

5    Q.  Was he accused of harassing Toni Marek?

6    A.  He was accused by Toni Marek and Rachel Reeck of sexual

7    harassment from them.

8    Q.  What was Toni Marek's relation to PTK at the time?

9    A.  At the time of the harassment, she had been removed from

10   office and was not a member -- not a member of the chapter that

11   she was in.  She was with her chapter, but she wasn't an

12   officer anymore.

13   Q.  Do you know how Rod Risley had the opportunity to engage

14   in conduct that was alleged as sexual harassment if she was no

15   longer a member?

16   A.  What?  I was not around.  I have never met Toni Marek in

17   her capacity as a member.  I haven't ever spoken directly with

18   Toni Marek, and I wasn't around Toni Marek.  I have met Rachel

19   Reeck face to face but not Toni Marek.

20   Q.  And Rachel Reeck accused Rod Risley of sexual harassment,

21   correct?

22   A.  The two of them together, I think.  I think -- I don't

23   know if they did it at the same time.  I would have to go back

24   and look.

25   Q.  And Rachel Reeck complained to you?

 1    A.  No.

 2    Q.  You spoke to Rachel Reeck --

 3    A.  I spoke to Rachel Reeck a couple of years ago.  This

 4    happened ten years ago.  I have met her.

 5    Q.  And she asked for an apology from PTK; is that correct?

 6    A.  I don't remember the conversation of her asking for an

 7    apology.

 8    Q.  PTK has never apologized to Toni Marek or Rachel Reeck?

 9    A.  For what?  Listen, I know where you are going with this.

10    I am a woman, I have a daughter, and if you think for one

11    minute that if we were able to get to the bottom of the "he

12    said/she said," we would have done something about it.  So if

13    you could please move on from that.  It happened ten years ago.

14    But I have absolutely no information for you about it except

15    for we couldn't figure it out, or we would have done something.

16    Q.  That's not my question.

17         **THE COURT:**  Hold on.  He is entitled to ask his

18    question.  Again, allow him to ask his question and you can

19    answer that question.

20    **BY MR. NEWMAN:**

21    Q.  I would like to turn your attention to the Exhibit 17 that

22    PTK filed.  It is Exhibit 17 to PTK.  You discussed this

23    exhibit with your lawyer earlier today; is that right?

24    A.  Yes.

25    Q.  And you testified that the image of you with Rod Risley is

1    not accurate?

2    A.   I've never seen it before.

3    Q.   You believe it is photoshopped?

4    A.   I believe it is strange and it's awkward and I've never

5    seen it before.

6    Q.   But you've appeared with Mr. Risley at various PTK events

7    when he was president, correct?

8    A.   I don't remember.  It's been ten years.  Very seldom.

9              **MR. NEWMAN:**  Can we show the YouTube clip.

10             **MR. POLAK:**  Excuse me.

11             **THE WITNESS:**  YouTube clip?

12             **MR. POLAK:**  Have we seen a YouTube clip?

13             **MR. NEWMAN:**  This is for impeachment purposes, which

14   I can do for any purpose.

15             **MR. POLAK:**  Has it been produced in discovery?

16             **MR. NEWMAN:**  It has not because the testimony just

17   came out today.

18             **THE COURT:**  What is this you --

19             **MR. NEWMAN:**  This is a YouTube video showing

20   Dr. Tincher-Ladner with Rod Risley, and it shows that there was

21   no photoshopping.  This is a real photo taken from a video that

22   PTK created with Dr. Tincher-Ladner and Rod Risley.  We don't

23   want the record to reflect an allegation of photoshopping and

24   fraud when that didn't occur.

25             **MR. POLAK:**  If that's the case, Your Honor, then I

1    think it really just becomes then a matter of whether they

2    selected the one frame out of a very long one to make it

3    look --

4             **THE COURT:**  I'll look at the video.

5             **MR. POLAK:**  I don't know that we need to sit here and

6    watch it.

7             **THE COURT:**  How long is it?

8             **MR. NEWMAN:**  Thirty-five seconds.

9             **THE COURT:**  Okay.

10            **THE WITNESS:**  Who published this video?

11        **(VIDEO PLAYED)**

12   A.   This is a dream.

13   **BY MR. NEWMAN:**

14   Q.   Do you remember that event?

15   A.   I remember us presenting our 91-percent student success

16   rates at a number of conferences.  I think this is the one we

17   did do it together.

18   Q.   And you saw in that video --

19   A.   What year is this video?  2015?  Okay.

20   Q.   And you saw in that video that Mr. Risley was standing in

21   one place and you were moving around?

22   A.   That video is a video.  What you have is a photo.

23   Q.   I'm just asking did you see that.  Did you see that?

24   A.   I saw it, yeah.

25   Q.   And you saw that you moved close to Rod Risley and stood

1    there for a moment?

2    A.  No, I think I was in motion the whole time.

3    Q.  Okay.  And I would like to turn your attention back to

4    PTK's Exhibit 17.  The image that you see in Exhibit 17, can

5    you tell now that that comes from the video that you just

6    watched?

7    A.  It looks like it does, yeah.  It comes from the video from

8    2015 with a 2024 publication.

9    Q.  So it probably wasn't photoshopped?

10   A.  I don't know.  Like I said, I had never seen the photo

11   before.

12          **MR. NEWMAN:**  I have no further questions at this

13   time.  Thank you.

14          **MR. POLAK:**  I have just four quick hits, Your Honor.

15          **THE COURT:**  Okay.

16                      **REDIRECT EXAMINATION**

17   **BY MR. POLAK:**

18   Q.  Dr. Tincher-Ladner, the first thing I would like to show

19   you -- and I will go ahead and use the Elmo here.

20          **THE COURT:**  You can lay it down, I think.  It's going

21   to take a second.  We are loading it up here.  We are

22   transferring it.  She is.

23          **MR. POLAK:**  Yes.

24   **BY MR. POLAK:**

25   Q.  You were asked before about a declaration that you gave

1   that was signed July 3rd.  You tendered a supplemental

2   declaration as well, right?

3   A.  Okay.  Yes, I did, just yesterday.

4   Q.  It was yesterday, and it was filed yesterday, and it was

5   filed in connection with our reply brief to what they filed on

6   Wednesday, right?

7   A.  Yes.

8   Q.  And in it you provided a number of different facts,

9   correct?

10  A.  Yes.

11  Q.  And I'm not going to go through the whole thing, but you

12  were asked at length by counsel about -- I'm looking at page 4

13  of your declaration, of your supplemental declaration, and

14  paragraph 13.  Isn't it true in the supplemental declaration

15  that you provided your math about how the top ten percent was

16  calculated?

17  A.  Yes, for many years.

18  Q.  We are not going to rehash all of that.  It's in the

19  declaration.  But counsel had also suggested that you had not

20  produced documents -- well, Phi Theta Kappa had not produced

21  documents proving the math.  And here we have a table in

22  paragraph 13.  Does this table set out the math that you did

23  for -- for your membership?

24  A.  Yes.

25  Q.  And we see out to the right -- I'm sorry, on this column

1    here, "Document," there are PTK Bates numbers.

2    A.   Yes.

3    Q.   And I'll represent to the Court that it was suggested that

4    those documents had not been produced.  Those were produced on

5    June 25th.

6         We also see this is for 2015, 2016, 2017.  And the

7    percentages out to the right are 4.3, 4.6, 4.4.  Are those

8    percentages more or less than 10 percent?

9    A.   They are very much less.

10   Q.   That table continues on on the next page, continuing on in

11   paragraph 13, for the years 2018 all the way to 2022?

12   A.   Yes.

13   Q.   That was all information you were able to calculate doing

14   your math?

15   A.   Yes.  The federal government takes a year and a half to

16   get the numbers published on their website that I use for these

17   calculations, so they had to end at 2022 because that's the

18   latest publication I have out there to work with.

19   Q.   Again, I don't want to belabor the point.  The Court has

20   the declarations.  But isn't it true in your declaration, you

21   provide not just those tables, but you provide an explanation

22   as to why their math has some fundamental calculation errors?

23   A.   It does.

24   Q.   And you have already identified, I think, some.  There

25   were things like the denominator problem?

```
 1   A.   Right.   They were not -- from what little bit I saw in the
 2   exhibit book, when they asked for the FOIA request of the
 3   colleges, they were not asking for all the students.   They were
 4   only asking in some of them I think for full-time students, and
 5   then for students that only had 12 hours, and they did not take
 6   into account the large numbers of students that unfortunately
 7   drop out of community colleges in the first year.   They did not
 8   account for the number of students taking developmental ed
 9   remediation classes.   They did not account for students that
10   are in short-term work force development problems that are
11   noncredit.
12        The community college mission serves so many more
13   students.   So when we say you are in the top ten percent on
14   your campus, you are in the top ten percent on your campus,
15   because there are so many students that unfortunately -- at the
16   end of the spring semester when you're doing FOIA requests, a
17   lot of them have unfortunately dropped out, and you need to
18   take more time in your FOIA to explain what "all students"
19   means to a community college.
20   Q.   Thank you.
21              THE COURT:   I mean, what does all students mean?
22              THE WITNESS:   All students means --
23              THE COURT:   Anybody who is enrolled?
24              THE WITNESS:   Yeah, anyone who is going to this
25   college.
```

1          **THE COURT:**  Okay.

2     **BY MR. POLAK:**

3     Q.  And at any time in any of your advertising or public

4     statements about this top ten percent number, as you can

5     remember it, was it limited to full-time students?

6     A.  Never.  We have lots of part-time students.  The president

7     of Phi Theta Kappa today, the student president, is a part-time

8     student.  I mean, we have part-time students.

9          We invite anyone who has the right GPA, but I can only

10    wish that 55 percent of community college students had a 3.5 or

11    higher.  A lot more people would go to community colleges if

12    that were true.  It just can't be true or they would be filled

13    with students, and they are not.  They drop out, unfortunately.

14    They have jobs.  They are a very challenged part of society

15    because they are low income, typically.  And to sit there and

16    say 55 percent of students have above 3.5 is absolutely -- it

17    doesn't agree with the nightly news or any of the news on

18    community colleges.

19    Q.  So when you see all of these statements and accusations

20    that are in these five thousand or so websites and their social

21    media saying, PTK lies when it says top ten percent, when you

22    look at that, are their statements based on correct math?

23    A.  No, their math is so bad because they know nothing about

24    community college students and the type of institutions they

25    are.  I spent 35 years study -- I have a Ph.D. in the way these

1   colleges work.  And it's just when you don't account for all

2   the students, then you are inflating your percentages, and your

3   math is so bad that you need to say, how many students do have

4   coming to your college for any reason, because we say students

5   on campus.  We don't say students in a program.  They may be in

6   developmental ed classes, and maybe their PELL grant will help

7   them with those classes, but they don't count toward their

8   enrollment numbers in Phi Theta Kappa.  It is just a smaller

9   segment of students than they are trying to study in their

10  FOIA.

11  Q.  This is Defendant's Exhibit 7, first page of that exhibit

12  that we were talking about before.  Based on your testimony, I

13  may have erred in agreeing to its use, but I want to show a

14  couple of things to you.  When we scroll in here and we look at

15  the bottom of this document, we see a couple of things.  One is

16  a phone number.  Is Phi Theta Kappa's phone number

17  (601)000-0000?

18  A.  No, it's not.

19  Q.  We see also -- let me see if I can focus this a little

20  better.  There we go.  Do you see an e-mail address there?  It

21  says, Inquires@PTK.org.  Do you have an e-mail address like

22  that that you use for PTK?

23  A.  I don't know.  I mean, the only one I know of that we

24  typically have on these types of things is called Help@PTK.org.

25  That's kind of the one we see most often.

1    Q.  But even if it was supposed to be something about an

2    inquiry or an inquirization, you wouldn't use inquires.  It

3    would be inquiries@PTK.org.

4    A.  I mean, I don't know.  I would have to look in the

5    database.

6    Q.  And I get that, and you have said that, but I point these

7    two things out to ask you this question.  You already told me

8    and you had told the Court that you have some serious questions

9    about the authenticity of this document, but we have now looked

10   at a couple of other things here.  Does that add to your

11   suspicion about this document?

12   A.  Yeah.  It just makes me want to verify what is coming out

13   of the system and why would Honor Society have a student's

14   document without authentication from the student.

15   Q.  Defendant's Exhibit 37 is also a document I want to show

16   you, and this is page number 3 from theirs.  I'm just going to

17   use the Elmo here.  You are asked on cross-examination about

18   whether or not you are selling data without the student's

19   knowledge or permission.  You have already talked a lot about

20   whether it was a sale or not, but I want to ask you a question

21   about whether PTK obtained student consent.

22       This Exhibit 37 is -- are the terms and conditions on your

23   website, right?

24   A.  Right.

25   Q.  Are these also the terms and conditions for membership in

1    the organization?

2    A.   Yeah.   When they join, that same document that's linked at

3    the bottom of our website, they have to agree to it or they

4    can't be a member.

5    Q.   So one of the things that you ask them to agree to are the

6    terms that are contained in paragraph number 5 on page 3, "Five

7    Rights You Grant Us."   Actually, I think it is paragraph 5,

8    "Rights That You Grant Us."

9         Let's look at the first paragraph.   "In consideration of

10   the rights granted to you under the agreement, you grant us the

11   right to:   One, process your membership and provide access to

12   your member benefits; two, to provide promotion of our chapter

13   activities, store merchandise, advertising, and other

14   information to you; and three" -- and this is the one that is

15   important -- "three, to allow our university and business

16   partners to do the same."

17   A.   Yes.

18   Q.   Is this the provision that you were talking about during

19   your cross-examination where you told Mr. Newman and this Court

20   that you actually do get their consent --

21   A.   Yes.

22   Q.   -- to use their name and e-mail address for the PTK

23   Connect program, for example?

24   A.   Yes.

25   Q.   So should there be any question as to whether or not

1    students, when they sign up for PTK, give consent for

2    participation in PTK Connect?

3    A.  No question whatsoever, because once they agree to this,

4    they have to go in -- it will not even let them pass this point

5    if they don't agree to this.  But they can, once they agree to

6    it, they can go into their profile and they can say no, no, no,

7    and it will leave them out, but that's the only way.

8    Q.  But it's an agreement in the beginning, and then later on,

9    if they choose to, if they aren't getting the benefit they like

10   or whatever, they can go ahead and turn that off?

11   A.  Yes.  And we leave it on the website too because they can

12   refer to it, because once they go through the accept mem

13   process, they can't see it anymore.  So we publish it front and

14   center on the website so they always know what it is.

15   Q.  Are these terms and conditions secret behind some

16   firewall?

17   A.  No, no, they are on the front home page.  Everybody can

18   get to this document.

19   Q.  So Mr. Moradian or his team, when they were preparing

20   these five thousand pages of websites, accusing you of selling,

21   without consent, student data, they had access to that.

22   A.  Everybody can see this.  It is very important that

23   students know that they are releasing their data.

24            **THE COURT:**  You said that is Defendant's Exhibit 37?

25            **MR. POLAK:**  Defendant's Exhibit 37, Your Honor.  That

1   is a part --

2           **THE COURT:**  Is that part of a declaration or

3   something?

4           **MR. POLAK:**  It is attached to either Mr. Linke's --

5   I'm sorry.  It is attached to Mr. Moradian's declaration as

6   Exhibit 37.  We did not proffer that, but they did and we are

7   talking about it.

8           **THE COURT:**  Oh, okay.

9           **MR. NEWMAN:**  We don't dispute it, if that's the

10  question.

11          **MR. POLAK:**  Thank you, Your Honor.  Pass the witness.

12  Actually, I think that is it.

13          **MR. NEWMAN:**  A couple of points.

14          **THE COURT:**  On recross?

15          **MR. NEWMAN:**  Yes, Your Honor.

16                      **RECROSS-EXAMINATION**

17  **BY MR. NEWMAN:**

18   Q.  I would like to turn your attention --

19          **THE COURT:**  Hold on.  You know this is unusual,

20  right?

21          **MR. NEWMAN:**  May I?

22          **THE COURT:**  Unusual, right?

23          **MR. NEWMAN:**  Yes, Your Honor.  May I ask a couple of

24  questions about two points?

25          **THE COURT:**  You may.

1          **MR. NEWMAN:**  Thank you, Your Honor.

2     **BY MR. NEWMAN:**

3     Q.   Turning your attention to the declaration, what you

4     testified about top ten percent -- do you remember or do you

5     want to read it?

6     A.   I'm pretty familiar with it.

7     Q.   So you testified about the percent of students at the

8     school who are invited to membership; is that right?

9     A.   That is correct.

10    Q.   But not the number of students who fall within a certain

11    GPA, correct?

12    A.   The GPA criteria are already looked at when they provide

13    us the members.

14    Q.   One of few criteria.  Yes?

15    A.   Yes.

16    Q.   And you testified that there's other criteria other than

17    grade, correct?

18    A.   There is you've been in college a hot minute, yes.

19    Q.   And you testified the number of students shown in response

20    to the FOIA requests doesn't include all of the students; is

21    that right?

22    A.   I have not reviewed the hundreds and hundreds of FOIA

23    requests.  I don't even know if we have all of them.  I would

24    be so happy to go through each one, or whatever, but again, I

25    don't know once --

1    Q.   I'm asking about the testimony you just provided a few

2    minutes ago.

3    A.   To just the cross or to you?

4    Q.   To Mr. Polak.

5    A.   Oh, okay.

6    Q.   And I'm asking whether your testimony was that the number

7    of students is larger than the community colleges reported in

8    response to FOIA requests?

9    A.   I don't know.

10   Q.   So that wasn't your testimony?

11   A.   I mean, it would have to be because what he asked them was

12   for full-time students.  He asked them only for students who

13   all had above 12 hours of credit.  He left out anyone in a

14   developmental education program.  I mean, I tried to tell you

15   the kinds of students you are leaving off your calculation.

16   Q.   So more students would be invited to PTK than are shown?

17   A.   No, more students are not invited.  Your denominator is

18   wrong.  I don't know about your numerator.

19        Another thing that you need to think about with these FOIA

20   requests is we are going to invite a student several semesters.

21   So you have got all kinds of students coming and going and

22   dropping out during those semesters.  So when you look at it

23   for just one semester, we look at it all year long, because

24   it's -- you are counting my student differently than I'm

25   counting them from an annual basis.

1    Q.  Okay.  So can we look at Exhibit 37, the terms and

2    conditions, please?

3            **THE COURT:**  You need to show it to her because he put

4    it on the Elmo.  Y'all need to put it on the screen.

5    A.  It's Exhibit 37.

6            **THE COURT:**  You'll have to come back over.

7            **MR. POLAK:**  I can just give you my copy if you want

8    to use the Elmo, to keep things moving.

9    **BY MR. NEWMAN:**

10   Q.  You were looking at paragraph 5, yes?

11   A.  Number 5, yes.

12   Q.  Section 5, "Rights You Grant Us."  And members grant the

13   right to provide promotion of chapter activities, store

14   merchandise, advertising, and other information, and to allow

15   university and business partners to do the same, correct?

16   A.  Right.

17   Q.  And the same is providing chapter activities?

18   A.  No, the same meaning give them ability to contact you,

19   like we're -- the second one is about us e-mailing them things,

20   and the third one is about our partners being able to e-mail

21   them things.

22   Q.  But it doesn't say that in the terms and conditions.  You

23   agree with that?

24   A.  Well, pretty much, unless you know of a student that

25   doesn't understand what this means, this is what it means to us

1   when we wrote it and sent it through legal.

2   Q.  And there is no disclosure in these terms and conditions

3   or otherwise to students that PTK accepts a fee for the

4   transfer of the student data to businesses, correct?

5   A.  Why would I tell a student about a fee that's not coming

6   from them?

7   Q.  That's not the question.

8   A.  We don't have it in here because it doesn't need to be in

9   here.

10          **MR. NEWMAN:**  Thank you.

11          **THE COURT:**  I need you to stay there for a second

12  because I do have a couple of questions, and I know it's going

13  to call for some sort of follow-up questions.  So I just have a

14  couple of questions.

15          **THE WITNESS:**  It doesn't matter.  However long you

16  need me.

17          **THE COURT:**  I'm still trying to get a clear

18  understanding of when do you -- when does PTK determine the

19  number of students to base the denominator -- I mean, because

20  you have been talking about a numerator and a denominator.  The

21  denominator is all students, and all students is everybody who

22  either touches the campus or is enrolled in the school, period.

23          **THE WITNESS:**  Period.  It is everybody is in the

24  denominator, because we say students on campus in the

25  publications.

1      **THE COURT:**  Is it limited to on campus or students

2   who are enrolled?

3      **THE WITNESS:**  Students that are enrolled in the

4   college.  You know, they might be all online or -- yeah, online

5   campus is a campus too.

6      **THE COURT:**  Okay.  So if I'm at Hinds Community

7   College in Raymond, if I'm enrolled in Hinds, I may be enrolled

8   in the welding program or I may be some other type of student.

9   I'm just trying to figure out, when do you get your number,

10  because it seems to me that one of the disconnects is, maybe,

11  when you get your number and when the FOIA request was made,

12  and what was the response to the FOIA request.  I don't know --

13  I don't know what the FOIA request looks like.  I don't know

14  what numbers it asked for.  But what I'm trying to figure out

15  is, I think you said there's a lapse in time sometimes before

16  the federal government sort of provides the number of students

17  that were in Hinds Community College, for example.  So if

18  you -- does PTK -- school will start in August of 2024.

19      **THE WITNESS:**  Um-hm.

20      **THE COURT:**  When does PTK reach out to the -- I guess

21  because you might have a contract with -- you might have an

22  agreement with the college already, but I'm just trying to

23  figure out when do you get your numbers, or when do you request

24  your numbers?  What is that denominator?  You know, how is that

25  denominator -- at what point in the school semester is that

1    denominator determined, because I know it can change because --

2        **THE WITNESS:**  It does.

3        **THE COURT:**  -- because people enroll in school in

4    August, and some drop out in October for a whole lot of

5    reasons.

6        **THE WITNESS:**  Yes.

7        **THE COURT:**  Some graduate in December.  I'm just

8    trying to figure out when PTK gets its numbers.

9        **THE WITNESS:**  What we do is we try not to bother the

10   colleges.  They have a lot to do.  But the colleges are

11   required to file their numbers with the federal government to

12   maintain their status of Pell grants.  There are two kinds of

13   numbers they give the feds.  One is an unduplicated fall

14   enrollment, and another is an unduplicated annual enrollment.

15   So we are talking about fall, spring and summer.

16       At the end of summer, every single community college in

17   the country is required to tell the federal government the

18   unduplicated numbers of students that were enrolled at that

19   college in credit programs.  Now, the AACC keeps a database of

20   the noncredit students.  So I have to use two sources to add

21   together to get the denominator.

22       **THE COURT:**  And then when does PTK make that decision

23   about, of this denominator, this is the top ten percent?

24       **THE WITNESS:**  Yes, the numerator is the students we

25   invited.  So we divide the numbers and get a percentage.  And

 1    you saw an aggregate of the whole year on that declaration
 2    supplemental.  But we are saying they are in the top ten
 3    percent because the numerator is less than ten percent.
 4            **THE COURT:**  Okay.
 5            **THE WITNESS:**  That's the way we do it.
 6            **THE COURT:**  Okay.  Now, I want to turn your
 7    attention -- I just have a couple more questions.  You have
 8    before you the book of exhibits, and I want to just ask you
 9    about Exhibit 35.  You've got the book in front of you.  And I
10    think everybody else has it.
11            **MR. POLAK:**  Plaintiffs or defendants, Your Honor?
12            **THE COURT:**  Plaintiffs.  I'm sorry.
13            **THE WITNESS:**  Okay.  I've got it.
14            **THE COURT:**  This was a document, "College Budget
15    Articles and Reviews for Students."  I just want to make sure
16    you are looking at the same one I'm looking at.
17            **THE WITNESS:**  Yes, Your Honor.
18            **THE COURT:**  There were several questions that were
19    asked about that particular document.  And I think Mr. Polak
20    talked about the false advertising and the attempt at
21    monopolization highlight the alleged claims against
22    Tincher-Ladner.  On the right-hand side of that document are
23    Greek -- I assume these are -- do you know from that document
24    what these are?  I was assuming it might be Greek -- I guess
25    the school -- do you know what that is?  I'm just asking.

1          **THE WITNESS:**  I'm thinking, based on visiting this

2     website, those are all the other honor societies in the

3     country, I believe.

4          **THE COURT:**  Oh, the other honor societies in the

5     country?

6          **THE WITNESS:**  I believe.  That would be a --

7          **THE COURT:**  Okay.  I recognize Alpha Kappa Mu.

8          **THE WITNESS:**  I hope that is not our chapters.  Let's

9     just pray.

10          **THE COURT:**  Okay.  It's not your chapters.

11          **THE WITNESS:**  Praying.

12          **THE COURT:**  Okay.  Well, good.  That's what I needed

13     to know.  These are not the chapters but may be other honor

14     societies.

15          **THE WITNESS:**  I think so, yes.

16          **THE COURT:**  Yeah, Alpha Lambda Delta is definitely an

17     honor society.

18          **THE WITNESS:**  We do have an Alpha Lambda Delta, but

19     that's a different one.

20          **THE COURT:**  Okay.  Starting with the plaintiff, any

21     follow-up based on the two questions I asked?

22          **MR. POLAK:**  No, Your Honor.  Thank you.

23          **THE COURT:**  Turning to the other side, any follow-up?

24          **MR. NEWMAN:**  No, Your Honor.  Thank you.

25          **THE COURT:**  Dr. Tincher-Ladner, you may step down.

```
 1    We are going to take a 15-minute break and find out where we
 2    are from this point.
 3            (RECESS TAKEN AT 3:34 P.M. UNTIL 3:43 P.M.)
 4            THE COURT:  The parties may have expected
 5    Dr. Tincher-Ladner to be on the stand as long as she was, but I
 6    did not think so originally.  I know we have Mr. Moradian, who
 7    is slated to testify, and I suspect his testimony will be about
 8    that long as well.  I don't know.  I mean, I suspect it will
 9    be.  But I don't want to ruin your Friday or your Saturday in
10    this way, so we need to figure out what's the stopping off
11    point today and figuring out when we may pick back up on this.
12    I realize the parties and some of the lawyers are from out of
13    state, but let's talk about when we try to resume this.
14            MR. NEWMAN:  Your Honor just indicated graciously
15    that the Court doesn't wish to ruin or Friday or Saturday, but
16    I'm wondering, because we traveled all of this way, whether
17    Saturday might be an option.
18            THE COURT:  No.
19            MR. NEWMAN:  Thank you.  Just wanted to confirm.
20            THE COURT:  Saturday is not an option, and the Court
21    has other -- I'm out of town -- I've got stuff -- I'll be in
22    Washington Monday, and I'm leaving before Monday to be there.
23            MR. POLAK:  I think certainly we can complete the
24    cross-examination by 5:00, 5:10, I hope, but I think the bigger
25    question isn't what we get done today, it is when it is that we
```

 1    are going to get back together again.  And I think it would

 2    help us to know when it is that you have clearance on your

 3    schedule next.

 4            **THE COURT:**  And that I don't know yet.  The trial

 5    that I had to start begins on the 29th, but I have another

 6    matter the week of the 22nd.  The big trial that I was talking

 7    about starts on the 29th.  But I could not do it the week of

 8    the 22nd because I have another hearing scheduled to begin on

 9    the 22nd.  The 29th is becoming -- the length of that trial

10    is -- I won't know until after -- again, I know one defendant

11    is going away next week, possibly, but I don't know how that

12    affects the entire case.  Until we close out that proceeding on

13    Tuesday, we might not have a better idea because we are

14    supposed to follow up later in the day with a pretrial

15    conference with the remaining parties.

16            **MR. POLAK:**  I don't know if this would be acceptable

17    to Mr. Newman, but I am going to suggest it anyway and see if

18    it has any legs.

19            You got to hear from Dr. Tincher-Ladner today.  While I

20    think my cross will be informative and persuasive, I also think

21    that there is sufficient information in the record for you to

22    rule.  This is of extreme immediate importance to PTK.  And I

23    would suggest that maybe what we could do is rely on the record

24    as it exists right now, objections are what objections are, and

25    we could schedule on next week at your convenience a zoom call,

 1    two hours, however long it is that you have in your schedule.
 2    We will work out the time limits between ourselves, and the
 3    parties could make the arguments that they need to make.

 4         And my guess is, inherent in those arguments are going to
 5    be probably the very same things that we would be pointing out
 6    to you on cross-examination and on direct examination.  You
 7    have a very long declaration from Mr. Moradian.  I feel
 8    confident -- Mr. Wallace is going to be doing most of the
 9    arguing -- he will be able to make the points that need to be
10    made on that.

11         I think you will recall we are not the ones that asked for
12    the evidentiary hearing.  We were ready to move on the papers.

13         I have an argument just about that.  I don't know whether
14    that is going to be acceptable to Mr. Newman.  I'm going to
15    stop talking and let him respond, but I do think that under the
16    circumstances, it is a very reasonable way for us to approach
17    it, unless what they are willing to do is to take down
18    everything while it is that we wait to have our next hearing.
19    And that would be the alternative, that some sort of TRO, based
20    on the evidence you have heard, would be in place by agreement
21    to take the stuff down.  They are not admitting anything in
22    taking it down.  It is just a way for us to get through the
23    process without blowing up the process.

24         **THE COURT:**  Will taking it down, Mr. Polak, do
25    anything about what is out there now or how it could be

1   retrieved?  When you say take it down, if they took whatever

2   down you are talking about taking down, what will that do with

3   persons who put in their Bing or Google or Yahoo search Phi

4   Theta Kappa or Lynn Tincher-Ladner?  I mean, when you say take

5   it down, what effect does that have with -- if they agree to

6   take whatever you are talking about, take it down, what does

7   that do with the --

8           **MR. POLAK:**  With the search engine?

9           **THE COURT:**  -- with the search engine.

10          **MR. POLAK:**  That's an excellent question.  And I'm

11  going to -- unless one of my techy people here tells me I'm

12  wrong -- if they shut down all five thousand websites -- in

13  other words, the websites that we are talking about, they put

14  these things on the internet in what appears to us to have been

15  within a matter of days.  They can take them down just as

16  easily.  I think if you turn the off switch of the site so it

17  is no longer viewable on the internet, it is literally that

18  easy, then no one is going to see it.  Am I right on that?

19          **DR. TINCHER-LADNER:**  It would take a few weeks for

20  the cache to --

21          **MR. POLAK:**  Yeah, but if the cache would be unique to

22  each of the personal users, so only if they searched for

23  that would it pop up again --

24          **MR. NEWMAN:**  Your Honor, may I be heard?

25          **THE COURT:**  You will be heard.  Trust me, I'm very

1   sensitive to the First Amendment stuff and all of that kind of

2   stuff you argued in your brief.  You will be heard.  You will

3   be heard.

4          **MR. POLAK:**  What I'm hearing is that if they flip --

5   there is literally an off button that you can press.  It is

6   probably more technical than that.  But you can flick the

7   switch.  Just like we turned the lights on and off earlier, you

8   can turn off the switch for those websites.  It is going to

9   take a little bit of effort for Mr. Moradian, but that would

10  allow us to, I think, to have comfort while it is that we try

11  to continue the hearing, whenever it might be.

12         Alternatively, I'm fine with the other way as well, so

13  long as we can have an argument with you next week.  And I

14  fully appreciate your schedule, Your Honor, and I don't want to

15  impose on that with this, but I think you also can tell from

16  the testimony of Dr. Tincher-Ladner, this is not only important

17  to PTK, but it is important to her personally.  And we are

18  inching very closely to no longer being in summer invitation

19  season but getting into real invitation season.  And the risk

20  of harm here is significant.  And if we go -- I mean, literally

21  there is a point in our future, and I don't know that we have

22  crossed it already, but there is a point in the future that is

23  the point in overturn.

24         **THE COURT:**  The one question I failed to ask

25  Dr. Tincher-Ladner, but the parties know this too, does -- has

1  Dr. Ladner made any claims against -- excuse me, against Honor

2  Society in her personal capacity in this matter, no defamation,

3  no any misappropriation of likeness in image?  I'm just asking.

4         **MR. POLAK:**  Not yet, but as you know, the history in

5  this case procedurally has had kind of a tortured past.  We

6  were thinking we were going straight to trial and that we would

7  be trying the case this year.  We have all of these new claims.

8  They were asking for an extension of time just last week.  What

9  we have tried to do here is to avoid adding new claims into the

10  mix and instead relying on the existing claims asserted by PTK

11  for the relief that we are asking for here, as well as the

12  inherent power of the Court to sanction and control parties

13  that are within its jurisdiction.

14      Now, we could go assert claims, and I'm not telling you

15  that those claims won't be asserted in the future, but I

16  remember we had a conversation similar to this at the last

17  hearing, and you were asking the parties about when they were

18  going to -- because they had indicated they were going to be

19  amending their claims.  You admonished Honor Society, Don't go

20  filing those claims in California.  I don't want it all tried

21  in this action.

22      I don't want to jeopardize the June date that we have next

23  year.  It seems like an eternity from now, but it's a year from

24  now.  But with what's going on and we see here in the

25  ever-escalating efforts by them, we have got to get some

 1   relief.

 2        But the answer to your question is, do we have present

 3   claims?  The answer is, not directly from Dr. Tincher-Ladner,

 4   but I can't tell you that that is off the table eventually, but

 5   we are very mindful of this Court's order, and we don't want --

 6   well, scheduling order, and we don't want to mess that up.

 7             **THE COURT:**  All right.  I will hear from you.

 8             **MR. NEWMAN:**  Your Honor, it would be fundamentally

 9   unfair to allow PTK to present its witness and then leave the

10   record without us presenting our witness.  And this was

11   supposed to be an evidentiary hearing.  I suggested a time

12   limit this morning because I want to avoid that unfairness.

13   But we should have the right to examine our witness just like

14   they did before the Court comes to any conclusions.

15             **THE COURT:**  Yeah, I mean, you would have your right.

16   I mean -- right.  I mean, that --

17             **MR. NEWMAN:**  I would suggest the Court shouldn't be

18   entering any interim orders based upon testimony from one side

19   and not the other.

20             **THE COURT:**  Can everybody be back here on the 17th?

21   I apologize.  It is next Wednesday.

22             **MR. WALLACE:**  We're clear over here, Judge.

23             **MR. NEWMAN:**  Yes, Your Honor.

24             **THE COURT:**  All right.  I'm going to have to step

25   down.  I have got to check on a scheduling issue about the

 1    17th.  I know it will be the 17th.  I'm just trying to figure

 2    out what time we will be able to start.  On that day, we will

 3    go until we end.  And I know that persons who have -- well, I

 4    know there's these fundamental arguments, and hopefully you

 5    will have that opportunity too, although the briefs are well

 6    done.  Just stand down for a minute.

 7         **(RECESS TAKEN AT 4:15 P.M. UNTIL 4:30 P.M.)**

 8              **THE COURT:**  We've reached out -- I had another matter

 9    set for the 17th.  We have reached out to those lawyers.  They

10    respect the summer Fridays, so we just reached out to them.

11    They are gone.  But they have a hearing that's currently set at

12    9:30, and I'm trying to get them to agree to continue it.

13         First of all, I've already changed the time of their

14    hearing to 8:30.  I suspect it to be done by 10:30, possibly.

15    So I'm going to give you all a 10:30 time, but you need to be

16    open to start earlier because you may get an e-mail from our

17    chambers over the weekend or Monday about starting as early as

18    we started today, 8:30 or 9, and then we will be able to --

19    that's the only hearing I have, I think, on that day.  So

20    hopefully we will be able to get all the testimony in that we

21    need and even all the arguments that the parties might need,

22    and I apologize to you all, but I appreciate you accommodating

23    my schedule.  I know it is taxing on everybody, but I do want

24    everybody to be heard and to be considered.  Well, you were

25    going to be considered whether you were heard or not, but I

1    want everybody to be heard.  So we will pick back up then on

2    that date.  Is there anything else we need to take care of

3    before then?

4         **MR. NEWMAN:**  Your Honor, I'm very grateful that the

5    Court is accommodating us.  And because of travel, I just want

6    to note, not that it really matters, that we really appreciate

7    it if we could start at 8:30, because it allows us to get out

8    earlier.  But, of course, the Court's schedule is what matters,

9    and we will accommodate --

10        **THE COURT:**  Oh, I'm trying to get you that earlier

11   time too.  I am.  Trust me, I am.  And we will do what we can

12   do in that regard.  Is there any -- anything else?  All right.

13   Thank you all so much.  Mr. Wallace, could I see you for a

14   second on a totally -- on a whole different matter?

15        **MR. WALLACE:**  Always, Your Honor.

16        **THE COURT:**  Thank you.  We are gone.  Court is

17   adjourned.

18             (HEARING CONTINUED TO JULY 17, 2024, 8:45 A.M.)

19

20

21

22

23

24

25

1

2

3                    CERTIFICATE OF COURT REPORTER

4

5        I, Teri B. Norton, RMR, FCRR, RDR, Official Court

6   Reporter for the United States District Court for the Southern

7   District of Mississippi, appointed pursuant to the provisions

8   of Title 28, United States Code, Section 753, do hereby certify

9   that the foregoing is a correct transcript of the proceedings

10  reported by me using the stenotype reporting method in

11  conjunction with computer-aided transcription, and that same is

12  a true and correct transcript to the best of my ability and

13  understanding.

14       I further certify that the transcript fees and format

15  comply with those prescribed by the Court and the Judicial

16  Conference of the United States.

17

18

19

20       s/ *Teri B. Norton*
         TERI B. NORTON, RMR, FCRR, RDR
21       OFFICIAL COURT REPORTER

22

23

24

25

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION


PHI THETA KAPPA HONOR SOCIETY      PLAINTIFF/COUNTER-DEFENDANT

VS.                          CIVIL CASE NO. 3:22CV208-CWR-RPM

HONORSOCIETY.ORG, INC.,          DEFENDANTS/COUNTER-PLAINTIFFS
MICHAEL MORADIAN,
HONOR SOCIETY FOUNDATION, INC.


VS.

DR. LYNN TINCHER-LADNER              THIRD-PARTY DEFENDANT



**TRANSCRIPT OF EVIDENTIARY HEARING**

**VOLUME 2 OF 2**




BEFORE THE HONORABLE CARLTON W. REEVES
UNITED STATES DISTRICT JUDGE




JULY 17, 2024
JACKSON, MISSISSIPPI




REPORTED BY:  TERI B. NORTON, RMR, FCRR, RDR
              Mississippi CSR #1906
_____

501 E. COURT ST., STE. 2.500
JACKSON, MISSISSIPPI  39208
(601)608-4186

1    APPEARANCES:

2    FOR THE PLAINTIFF/COUNTER-DEFENDANT:
          MICHAEL B. WALLACE, ESQUIRE
3         CHARLES E. COWAN, ESQUIRE
          WISE, CARTER, CHILD & CARRAWAY, PA
4         401 EAST CAPITOL STREET, SUITE 600
          JACKSON, MISSISSIPPI  39201
5

6         JONATHAN G. POLAK, ESQUIRE
          WILLIAM MICHAEL ETIENNE, ESQUIRE
7         TAFT, STETTINIUS & HOLLISTER, LLP
          ONE INDIANA SQUARE, SUITE 3500
8         INDIANAPOLIS, INDIANA  46204

9         RACHEL A. SMOOT, ESQUIRE   (VIA ZOOM)
          TAFT, STETTINIUS & HOLLISTER, LLP
10        41 S. HIGH STREET, SUITE 1800
          COLUMBUS, OHIO  43215
11

12   FOR THE DEFENDANTS/COUNTER-PLAINTIFFS:
          W. WHITAKER RAYNER, ESQUIRE
13        JONES WALKER, LLP
          190 EAST CAPITOL ST., SUITE 800
14        JACKSON, MISSISSIPPI  39201

15        DEREK NEWMAN, ESQUIRE
          NEWMAN, LLP
16        1201 SECOND AVENUE, SUITE 900
          SEATTLE, WASHINGTON  98101

17

18   ALSO PRESENT:  DR. LYNN TINCHER-LADNER
                    MR. MICHAEL MORADIAN
19

20

21

22

23

24

25

1                         TABLE OF CONTENTS

2

3                             VOLUME 2

4   WITNESSES CALLED BY THE PLAINTIFF:

5   MICHAEL MORADIAN

6       Cross-Examination By Mr. Polak  .........................5

7       Direct Examination By Mr. Newman  ......................77

8   DR. LYNN TINCHER-LADNER

9       Direct Examination By Mr. Polak  ......................168

10      Cross-Examination By Mr. Newman  ......................181

11  Argument by Plaintiff  ....................................193

12  Argument by Defendant  ....................................208

13  Rebuttal Argument by Plaintiff  ...........................232

14

15

16

17

18

19

20

21

22

23

24

25

1              **THE COURT:**  Good morning.  This is Phi Theta Kappa

2     Honor Society versus HonorSociety.Org, Inc., 3:22cv208.

3          Is there anything we need to take up before we -- we are

4     here today to continue the hearing on the temporary restraining

5     order/preliminary injunction.  Is there anything we need to

6     take up before we call the next witness?

7              **COURT REPORTER:**  Please turn your mic on.

8              **MR. WALLACE:**  I think we are ready for them to

9     proceed, as far as we are concerned.

10             **THE COURT:**  All right.  Thank you.  Mr. Wallace

11    typically doesn't need a mic.

12             **MR. NEWMAN:**  Your Honor, I just want to point out

13    that counsel has agreed that to streamline the proceedings, Mr.

14    Polak is going to call Mr. Moradian as his witness, and then

15    rather than ask questions within the scope of that examination,

16    I will do my direct examination.  And then Mr. Polak is going

17    to want to cross, and I'm going to want to redirect, and he has

18    objected to that, but I think I'm entitled to redirect because

19    I'm not going to call him separately in my case, but I will

20    allow the Court to consider that as the proceedings roll out.

21    Thank you.

22             **THE COURT:**  Okay.  All right.  No problem.  Mr.

23    Polak, then, you wish to call your witness?

24             **MR. POLAK:**  Michael Moradian.

25             **THE COURT:**  All right.  I appreciate the parties for

1    wanting to streamline things.  I do appreciate that immensely.

2            **THE CLERK:**  Place your left hand on the Bible and

3    raise your right hand.

4        **(OATH ADMINISTERED.)**

5            **THE COURT:**  Mr. Moradian, you were in the courtroom

6    the other day and you have been here I think every time that

7    we've testified or taken testimony during this hearing, and I

8    know you've heard my instructions.  You've testified before, I

9    think.  I will just ask you to please follow the instructions

10   that I've given you and the other witnesses in this case.  But

11   for the record, just to start us off, could you state and spell

12   your name for the record.

13           **THE WITNESS:**  Sure.  My name is Michael Moradian,

14   spelled M-I-C-H-A-E-L, Moradian, M-O-R-A-D-I-A-N.

15           **THE COURT:**  Thank you, sir.  Mr. Polak, you may

16   proceed when you are ready.

17                        **MICHAEL MORADIAN,**

18   **having first been duly sworn, was called as an adverse witness**

19   **and testified as follows:**

20                        **CROSS-EXAMINATION**

21   BY MR. POLAK:

22   Q.  Mr. Moradian, do you recall the survey questions that you

23   used in the community college survey that this Court enjoined?

24   A.  Yes, I do.

25           **MR. POLAK:**  Could you turn on the Elmo, please.

 1          Your Honor, what I'm showing the witness is already on the

 2     Court's docket.  This is your order on the preliminary

 3     injunction, and we are going to use this for a second here with

 4     this witness.  If you would like a copy, I have extra copies.

 5          **THE COURT:**  I have a copy.  Thank you.

 6     **BY MR. POLAK:**

 7     Q.  So in the Court's injunction order, the Court listed out

 8     the questions that PTK was concerned about, and that formed the

 9     basis of its motion for a temporary restraining order.  Do you

10     recall that?

11     A.  Yes, I do.

12     Q.  You've read this order before, haven't you?

13     A.  Yes, I have.

14     Q.  Did you read it the day that it was issued?

15     A.  I don't know that it was the day it was issued, but within

16     a day or two, a couple of days.

17     Q.  You had an opportunity to read it from beginning to end,

18     didn't you?

19     A.  Yes.

20     Q.  So let's look at these questions, just so we can remind

21     ourselves about what the topics of those questions were.  The

22     first question said, "Does it hurt the reputation of Phi Theta

23     Kappa that a chapter advisor was arrested in February of 2024

24     for allegedly embezzling funds?"  Do you see that?

25     A.  Yes.

1    Q.  And that was in the survey, wasn't it?

2    A.  Yes.

3    Q.  Next one, "Does it hurt the reputation of PTK that their

4    last executive director resigned after alleged sexual

5    harassment of multiple members of the society?"  Do you see

6    that?

7    A.  Yes, I do.

8    Q.  That was in the survey, right?

9    A.  Yes.

10   Q.  Next question, "Does it hurt the reputation of PTK that

11   their last executive director took a 3-million-dollar golden

12   parachute of non-profit student funds while resigning?"  That

13   was in the survey, wasn't it?

14   A.  Yes.

15           **THE COURT:**  For the record, you said student funds.

16   I think that reads student dues.

17           **MR. POLAK:**  Thank you, Your Honor.  That is correct,

18   student dues.

19   A.  Thank you.

20   **BY MR. POLAK:**

21   Q.  Next question, "If PTK falsely claimed it was the official

22   honor society for community colleges, would that make you

23   skeptical or wary of PTK?"  That question was in the survey,

24   wasn't it?

25   A.  Yes.

1    Q.  "If PTK falsely claimed the average member gets $2,500 in

2    scholarships, would that make you skeptical or wary of PTK?"

3    That question was also in the survey?

4    A.  Yes.

5    Q.  "If PTK falsely claimed that you were in the top ten

6    percent of students, would that make you skeptical or wary of

7    PTK?"  That question also was in the survey, right?

8    A.  Yes.

9    Q.  So there was a total of six questions that were at issue

10   at that hearing and in connection with the Court's order,

11   right?

12   A.  Yes.

13   Q.  Now, in particular, these questions the Court found to be

14   both intentionally made and malicious, right?

15   A.  I don't believe that was the exact characterization.

16   Q.  You don't recall the Court using the word "malicious" in

17   this description of these questions and the survey itself?

18   A.  I do recall the word, yes.

19   Q.  But do you recall the Court using that word in connection

20   with those questions?

21   A.  Yes.

22   Q.  And do you acknowledge that the Court found those

23   questions to have -- to be intentionally malicious, to harm

24   PTK?

25   A.  I do acknowledge that that was what was said, and I hope

1  to disprove that today.

2  Q.  Do you agree or disagree that in your 5,000 websites and

3  social media posts that we are here about today, that you make

4  reference to the claim that PTK falsely advertised its

5  membership as in the top ten percent?  Is the claim that PTK

6  falsely advertised its membership is in the top ten percent

7  part of the content of the 5,000 websites that you created?  A

8  simple yes or no.

9  A.  The allegations that are in the lawsuit which that is a

10  part of, yes, I agree.

11  Q.  That's not what I asked you.  I didn't ask you whether it

12  was part of the lawsuit.  I asked you whether or not Honor

13  Society's claim that PTK falsely advertised its membership in

14  the top ten percent is contained in the websites, the 5,000

15  websites that you published?

16  A.  Yes, the allegations are listed.

17  Q.  Same question as to this allegation that it is false that

18  the average member of PTK gets $2,500 in scholarships.  That

19  also is in your 5,000 websites?

20  A.  Yes, that allegation is listed.

21  Q.  The allegation that it is false that PTK is the, quote,

22  official honor society of community colleges is also in your

23  5,000 websites?

24  A.  Yes, I believe that allegation is listed.

25  Q.  Your allegation that the former PTK advisor was arrested

1  for embezzlement of funds is also contained in the 5,000

2  websites that you created, right?

3  A.  No, I never mentioned that the executive director was

4  arrested.

5  Q.  You never mentioned that she was arrested?  Do you not

6  recall the photograph of the -- of that former PTK advisor

7  standing in front of what looked to be an arrest picture, like

8  a mugshot with the lines on top?  You don't recall that?

9  A.  I believe you are asking about the executive director.

10  Q.  The former PTK advisor that was arrested for embezzlement

11  of funds, that is contained in your 5,000 websites, isn't it?

12  A.  Yes, that allegation or statement of fact is in the

13  articles.

14  Q.  Is your allegation that PTK has misappropriated chapter

15  funds or moneys or dues contained in the 5,000 websites?

16  A.  I'm sorry.  Where are you referencing?

17  Q.  I'm just asking you.  Is that allegation contained in the

18  5,000 websites that you published?

19  A.  I believe it is, yes.

20  Q.  And this allegation that a former executive director

21  engaged in sexual harassment, that too is included in the 5,000

22  websites that you published, isn't it?

23  A.  Yes.

24  Q.  Are you the one that created the 5,000 websites?

25  A.  I have not created 5,000 websites.  That's a

1    mischaracterization.  They are just pages on a website.  And,

2    yes, I did create those pages.

3    Q.  You are the one that created the content that is found on

4    the internet that Dr. Tincher-Ladner testified to this Court

5    about last week?

6    A.  Yes.

7    Q.  You're the one that created those AI images as well?

8    A.  Well, the AI created it, but, yes --

9    Q.  Well, Mr. Moradian, somebody had to tell the AI to create

10   it.  You're the one who told the AI to create it, right?

11   A.  Yes.

12   Q.  So we just went through the Court's order here that

13   identified all the questions that were at issue, and we went

14   through, also, the categories of documents -- or the categories

15   of information that are contained on those 5,000 websites.  So

16   you don't disagree that you merely took all the things that

17   Judge Reeves ordered you to not send students and repackaged

18   them into 5,000 websites and countless social media posts?

19   A.  All that, Your Honor, Mr. Reeves -- how do I refer --

20   Q.  Judge.

21   A.  Judge Reeves, Your Honor, all that he asked was that I do

22   not use the exact survey questions in that exact form and to

23   consult you if I do do similar questions to a survey.  So he

24   did not enjoin -- it was just that narrow word usage.

25   Q.  So you took a real narrow understanding of what Judge

1    Reeves' order was?

2     A.   Well, a preliminary injunction is a narrow focused

3    document.

4     Q.   I've got a demonstrative exhibit that I'm using.  I've

5    already given it to opposing counsel.  I understand there are

6    no objections to it.

7          **MR. NEWMAN:**  I don't think you are going to confuse

8    the Court, so go ahead.

9          **MR. POLAK:**  What this is, Your Honor, is a comparison

10   of the enjoined conduct in your order with the content of the

11   online campaign, so we can see the similarity of those two

12   things.

13         **MR. NEWMAN:**  I object to the characterization because

14   it says "statements enjoined by this Court's TRO," but the

15   statements were not enjoined.  It was survey questions.

16         **THE COURT:**  All right.  Thank you.  Objection

17   overruled.

18   **BY MR. POLAK:**

19    Q.   So down the left-hand column, we see a repeat verbatim of

20   what we found.  We were just looking at in the Court's order

21   where the questions that were contained in the survey were

22   listed.  Do you see that?

23    A.   I see that.

24    Q.   Okay.  So, for example, the very first top cell, "If PTK

25   falsely claimed you were in the top ten percent of students,

1  would that make you skeptical or wary of PTK?"  That was in

2  your survey, correct?

3   A.  I believe so, if this is the exact quote.

4   Q.  Okay.  Now, comparing that against Exhibit A3 at page 3,

5  you wrote in one of your 5,000 websites, "Phi Theta Kappa often

6  advertises itself as an exclusive honor society inviting

7  students who supposedly fall within the top ten percent of

8  their class.  However, this claim is misleading."  Do you see

9  that?

10   A.  I see that.

11   Q.  Okay.  So in the question that was enjoined that the Court

12  found to be intentionally malicious, you wrote, "If PTK falsely

13  claimed," but in the statements on the website, you just

14  dropped the "if" and you went full on saying "this is

15  misleading," right?

16   A.  The statement is about the lawsuit and is different and

17  different wording, and it's not a survey question, and it was

18  not enjoined.

19   Q.  So that's your defense here.  The judge didn't enjoin you

20  from repackaging the very same information that he told you was

21  malicious so you could go ahead and not publish it just once,

22  twice, five times, ten times; you could use AI and republish it

23  5,000 times.  That's what you want this Court to believe?

24   A.  I believe the Court understands the truth in the

25  preliminary injunction.

1    Q.  Okay.  We could go through this in more detail, Your

2    Honor, but we also see in the next cell here, if PTK -- this

3    one relates to the 2500 scholarships.  If we were to look at

4    Exhibit 4 at page 4, it says -- this is a quote from the

5    website, Mr. Moradian -- "PTK allegedly claims that its average

6    member gets $2,500 a year in transfer scholarships, which is

7    false.  This misleading statement" -- I'm sorry, "These

8    misleading statements deceive students about the benefits of

9    PTK membership."

10       So again, you drop the "if" that is in the question, and

11   you move on to just claiming definitively that it is misleading

12   and deceptive, right?

13   A.  Mr. Polak, this statement says allegedly in here.  It's

14   talking about the lawsuit.  And how else are we supposed to

15   communicate?  This is a freedom of speech and talking about

16   litigation.

17   Q.  Right, but you issued a press release, you did that, but

18   we are not talking about the press release, are we, Mr.

19   Moradian?  We are talking about the fact that you did far more

20   than that.  You created 5,000 websites dedicated to stating

21   definitively that PTK's advertising is not just allegedly

22   misleading, that it is misleading.  You wrote, "These

23   misleading statements deceive students about the benefits of

24   PTK membership."  Right?  That is from your websites, right?

25   A.  May I ask that we please not mischaracterize?  They are

1    web pages.  These are not launched websites.

2    Q.  Website content.  I believe there are 5,000 different

3    websites.  You believe differently.  It doesn't matter.  There

4    are 5,000 different places on the internet to go look for this.

5    That's not the point.  The point is that you created 5,000

6    different pieces of internet content that contain statements

7    like this where it is definitively said that PTK's advertising

8    is misleading and deceptive.  Isn't that right, Mr. Moradian?

9    A.  I think it is important for characterization's sake that

10   for the rest of the day we refer correctly to what pages

11   because --

12   Q.  Is that correct, Mr. Moradian?

13   A.  -- it's mischaracterization.

14          **THE COURT:**  Hold on.  Finish your answer.

15   A.  Thank you, sir.  So there were 5,000 web pages on just a

16   couple of websites, and that's an important thing to

17   distinguish, and these are essentially, broadly speaking,

18   talking narrowly about the litigation claims.

19   **BY MR. POLAK:**

20   Q.  Let's go on to the next cell.  This one talks about

21   whether or not it is true or false that PTK is the official

22   honor society for community colleges.  On your website content,

23   republished 5,000 or more times, this includes falsely claiming

24   to be the only official honor society and selling members'

25   personal information with their consent.  That is on your

 1    website too, isn't it?

 2     A.   Yes, it is speech discussing the claims in this

 3    litigation.

 4     Q.   You go on here where there's -- part of the questions

 5    spoke to the issue of does it hurt the reputation related to

 6    the allegedly embezzling funds.  That was in your survey

 7    questions.  It also talks about the use of $3 million as a

 8    golden parachute of student dues.

 9         On your 5,000 pages of website content, you wrote, "These

10    deceptive tactics, the lawsuit claims, have enabled PTK to

11    misappropriate significant funds from students, exploiting

12    their trust and aspirations."  That is from Exhibit 4 at page

13    4.

14         You also wrote in a different website, "PTK has

15    misappropriated significant sums from students by exploiting

16    their trust and aspirations."

17         So it's the same stuff, the same stuff the Court told you

18    not to be out there publishing in the form of questions, and

19    you just repackaged it in the form of these 5,000 websites or

20    web pages or web content or however you want to characterize

21    it.

22     A.   This one is actually a mischaracterization.  Please leave

23    that there.  We look at the left and we are talking about a

24    chapter advisor allegedly embezzling funds, and we are talking

25    about a previous executive director here.  On the right, we are

1    looking at deceptive tactics that the lawsuit talks about and

2    the misappropriating significant funds, and misappropriating

3    significant funds is speaking directly to what's going on in

4    this lawsuit where PTK is taking greater than $15 million a

5    year from students with a statement based on a lie.

6    Q.  Let's go back and look at the order that Judge Reeves

7    entered, and we are looking at page 4, at the very bottom.  The

8    Court wrote "The survey questions and public records requests

9    were intentional and willful.  Honor society does not contest

10   this.  The content of and hyperlinks within the survey show

11   malicious intent to harm PTK's lawful business."  Did I read

12   that correctly?

13   A.  Yes, I believe you did read it correctly.

14   Q.  So the judge here is not telling you that it's the format

15   of it in question form that is the problem.  He doesn't say,

16   the questions and hyperlinks within the survey show malicious

17   intent.  He is telling you that the content of and hyperlinks

18   within the survey are malicious.  Did you miss that word when

19   you read it?

20   A.  I think when this was issued, I had my new counsel for

21   only two weeks, and we didn't have a chance to contest that in

22   the previous TRO hearing.  And I do read this to say that, but

23   I hope to show today why they were not in that way.

24   Q.  You didn't agree with Judge Reeves' order, did you?

25   A.  That's not correct.  I read it very closely and stuck to

 1    it letter by letter.

 2    Q.  Let's take a look at the deposition I took of you back on

 3    May 3rd of this year.  And let's go to page 212, lines 12

 4    through 22.

 5         "Did you read Judge Reeves' preliminary injunction order

 6    concerning the survey?"

 7         "Answer:  I believe -- I believe so."

 8         "Question:  Do you -- do you recall that Judge Reeves

 9    called this survey malicious?"

10         "Answer:  I'm not sure."

11         "Question:  You are not sure?  You don't recall?  That's a

12    pretty big word and a pretty important word where a federal

13    judge calls this survey malicious and you don't recall that."

14         "Answer:  I recall reading the statement."

15         "Question:  Okay.  So you recall reading the statement in

16    the injunction where he called it malicious.  Do you agree with

17    Judge Reeves that this survey was maliciously intended?"

18         "Answer:  While I admire Judge Reeves and I view him as

19    venerable and respect him, I believe that, you know, in that

20    TRO hearing, he was very misinformed, and I don't think that he

21    had a chance to have a truly objective analysis."

22         You didn't like his order, and you had no intention of

23    complying with it, did you, Mr. Moradian?

24    A.  That is not true.  I did --

25    Q.  You thought it was misinformed.

1  A.  I didn't say -- what I said here is simply that due to the

2  fact that we didn't have a chance to present everything, and

3  you guys also spoke at great lengths, we didn't have a

4  chance -- I do respect, as I said, and view him very venerably,

5  and I respected his word and I followed it to the word exactly.

6  Q.  Are you blaming your lawyers for this?  Is it their fault

7  that you lost that hearing?  Sorry.  Let me withdraw that

8  question.  Is it their fault that Judge Reeves was misinformed,

9  to use your word?

10  A.  I don't believe that speaking about my counsel is

11  appropriate here.  I'm just simply giving some analysis of my

12  feedback of what we saw when I had a counsel that was two weeks

13  into the case, and you've been here for three years just

14  propounding these narratives, and, you know, how could he have

15  a chance?

16  Q.  So just so we are clear, Judge Reeves' order concerned the

17  content of that survey, and you found his order to be

18  misinformed?

19  A.  No, sir.

20  Q.  So you created that survey the night of

21  Dr. Tincher-Ladner's deposition, right?  That's what you told

22  me at your deposition.

23  A.  I don't believe it was the night of her deposition.  I was

24  here in Mississippi.  I wasn't sitting on a computer.

25  Q.  Well, the point is, you're the one that drafted those

1    questions and that survey and sent it to the students, right?

2    A.  I believe so.

3    Q.  So you knew exactly what was in that survey because you're

4    the one who drafted it?

5    A.  Yes, that's correct.

6    Q.  And you sat here throughout the entire TRO hearing that we

7    had back in March and you heard the evidence then as well,

8    right?

9    A.  Yes.

10    Q.  Now, isn't it true that you promised the Court that you

11    wouldn't send out questions like these again?

12    A.  Yes, and I have not.

13    Q.  Let's look at exactly what you said.  You were present at

14    the hearing.  To refresh your memory, let's look at the

15    exchange between your counsel and the Court that you were

16    sitting in open court listening to, in the exchange between the

17    Court and counsel.  Let's go to page 98.

18        This is lines 8 through 23.

19        "The Court:  Now, if I understand what I've been told

20    through the papers, Honor Society has agreed to stop those

21    questions that are -- I don't know if it's what the parties

22    believe is misleading or what one side, but Honor Society said,

23    okay, I'm going to put a pause in it.  We're not sending out

24    any more of these questions.  Is that right?"

25        Mr. Newman said, "Yes, Your Honor, and the Court could

1    find that in Mike Moradian's declaration.  Counsel today has

2    suggested the language in the declaration isn't strong enough.

3    To the extent the Court believes that, the Court could swear in

4    Mike Moradian right now and ask, but the survey that was sent

5    out with the five objectionable statements which are not

6    misleading, but" --

7         "The Court:  But you've agreed not to send out anymore."

8         And Mr. Newman says:  "And the reason why is because Honor

9    Society sent a one-time survey out."

10        So here, in that instance, the Court is asking you, are

11   you going to send out these questions again.  I take it you

12   understood that you just couldn't ask those specific questions

13   ever again, but the content of the questions was just fine.  Is

14   that your position here today?

15   A.   Those narrow specific questions were enjoined.  I honored

16   that to the word.  And it was stated that we could ask similar

17   questions and to run it by you to ask for, you know, clearance.

18   And to that effect, that shows that we are allowed to use

19   similar statements.  We did not publish any new surveys using

20   such content, and so we followed to the word exactly what Your

21   Honor asked.

22   Q.   Do you think that position is in line with the spirit of

23   what it is that Judge Reeves was telling you, that the content,

24   quote, content of those survey questions was intentional and

25   malicious?

1    A.  Sorry.  Can you repeat that?

2    Q.  Do you think that position is in the spirit of what Judge

3    Reeves told you in his order, that he was upset with the

4    content of the survey questions because he found them to be

5    malicious and intentionally designed to harm PTK?

6    A.  Yes, of course, I believe that they were okay because we

7    followed it to the exact word.  And what you are asking is a

8    freedom of speech issue.  It's not about the surveys anymore.

9    You are talking about public statements.

10   Q.  But this hearing --

11          **THE COURT:**  Hold on for a second.  We are going to

12   talk about the law.  No need for you to testify about it.  I'm

13   pretty sure we are going to have a very candid discussion on

14   what did -- what I said here and how it affects what the duties

15   and responsibilities of the parties are with respect to this

16   and whether there are any First Amendment concerns.  I don't

17   think we need to elaborate here on that.  I'm pretty sure the

18   parties are ready to talk about that.

19   **BY MR. POLAK:**

20   Q.  Now, you said some other things in your declaration which

21   were parroted to the Court at the hearing that we had back in

22   March.  You also represented to the Court during that

23   proceeding that the records requests that were the subject of

24   that -- remember, your organization had been sending out

25   hundreds of FOIA requests to various different community

 1    colleges.  Do you recall that?

 2    A.  Yes.

 3    Q.  And you represented to the Court in your declaration and

 4    through your counsel that those records requests are not for

 5    discovery in this case but for, quote, competitive reasons.  Do

 6    you recall that?

 7    A.  We've done FOIA requests within our business from before

 8    we even launched.  It's an integral part of our organization.

 9    Q.  And your lawyer, Mr. Newman -- if I could have the Elmo

10    back up, thank you -- on page 89, lines 13 through 16, in

11    response to a question from the Court concerning that issue,

12    Mr. Newman said, "Your Honor, two responses.  First, I would

13    like to take a step back and note that Honor Society sends out

14    public records requests not for discovery in this case but for

15    competitive reasons, and so those would not all relate to

16    discovery in this matter."

17         He also said --

18              **THE COURT:**  If you are reading, just slow down just a

19    tad.  I think you are slow enough, but --

20              **MR. POLAK:**  Thank you, Your Honor.  I will slow down.

21    **BY MR. POLAK:**

22    Q.  He goes on to say, "And in the second response to Your

23    Honor's questions is whether they overlap to discovery

24    responses is just, frankly, I don't know."

25         I don't have the page cite for this, but your lawyer also

```
 1    went on to say -- the Court asked this question, "And
 2    presumably they are very in tune to what the rules of discovery
 3    say during the course of litigation."
 4        And Mr. Newman said, "That's a good point, Your Honor,
 5    because the records that our client is seeking aren't for
 6    purposes of this litigation."
 7        Now, you sat there while your lawyer was making those
 8    representations.  You never raised your hand up and said, Whoa,
 9    that's not right.  That's not true.  Right?
10    A.  This is a mischaracterization both of the statements but
11    also the essence of freedom of information requests.  Freedom
12    of information requests are for transparency, they are for
13    sunshine, and there is no track where it is just for law or
14    just for information.  I mean, some of the biggest scandals in
15    both higher education and outside have come through the use of
16    freedom of information.  Operation Varsity Blues, which was a
17    huge scandal within higher education, was exposed from freedom
18    of information.  And that's a right that the people have to
19    know what is going on within their public institutions.
20            THE COURT:  I'm sure we are going to hear more about
21    that.
22            THE WITNESS:  Yes, sir.
23            THE COURT:  But it is going to come from your lawyer,
24    though.  We are going to hear more about these arguments.
25            THE WITNESS:  Yes, sir.
```

1    BY MR. POLAK:

2    Q.   The FOIA requests that we were dealing with back in March,

3    those asked the hundred or so community colleges to disclose

4    class ranks, right?  Some of those requests did?

5    A.   I believe so.

6    Q.   Some of those requests also asked for disclosure of GPAs

7    of students in community college?

8    A.   Yes.

9    Q.   And we see all sorts of that data in your 5,000 or so web

10   pages of content about community college GPAs and comparing

11   that against PTK's GPAs, right?

12   A.   The web pages are speaking about litigation, and we are

13   talking about litigation, and we also pull in some public facts

14   to support --

15   Q.   Right.

16   A.   -- our statements.

17   Q.   And the litigation you are talking about is because you

18   took the FOIA information that you obtained through those, and

19   you relied on that in order to make your allegations in the

20   second amended complaint that was filed on April 10th, didn't

21   you?

22   A.   Well, we relied on public information.

23   Q.   You relied on the FOIA requests specifically, didn't you?

24   A.   Which are public information, alongside a whole host of

25   other public information.

1   Q.  So is the answer yes, Mr. Moradian, you did use the

2   information for the FOIA requests to draft your second amended

3   counterclaims?

4   A.  To an extent.

5   Q.  Okay.  So you used the information obtained in the FOIA

6   requests not for competitive purposes, as you told the Court,

7   but for purposes of this litigation, right?

8   A.  That's not true.

9   Q.  I don't see how it could be anything other than that, Mr.

10  Moradian.  You asked for the FOIA requests in February and

11  March, and you see the information from those FOIA requests in

12  the second amended complaint.  How could those two things not

13  be connected?

14  A.  Well, of course, information can overlap, but it's not the

15  only reason, and we've done FOIA requests from the beginning of

16  time within Honor Society, and it's not a one-to-one process.

17  These requests are not narrowly done just for information.  We

18  do freedom of information requests all the time.

19  Q.  Do you think this is a game, Mr. Moradian?

20  A.  No, sir.

21  Q.  Do you think it's a game when you read the judge's order

22  about the TRO telling you not to use this content, and you go

23  and you republish it 5,000 times, or when you tell the Court

24  that you are using it for, quote, neutral competitive reasons,

25  and then suddenly it shows up in your second amended

1  counterclaims?  Is this a game where you try to parse words,

2  find loopholes?  Is that what you are aiming at here?

3  A.  Not at all, and I'm just curious why there is such a fight

4  against speech and freedom of speech and truth.

5  Q.  You claim that Honor Society is the largest honor society

6  by web traffic, right?

7  A.  Yes.

8  Q.  And your business is nearly entirely e-Commerce based,

9  right?

10  A.  It's internet based.  I wouldn't characterize --

11  Q.  I will take that answer.  It is internet based.  And your

12  primary source of advertising is either on the internet or

13  through e-mail solicitations to members or nonmembers, driving

14  traffic back to your website, right?

15  A.  We are a website, yes.  We do that.

16  Q.  All of these -- well, most of these articles that we

17  found -- I'm sorry.  Let me rephrase this.  All of the articles

18  that we showed the Court during Dr. Tincher-Ladner's

19  declaration and that otherwise are in the record through her

20  declaration that was filed with the Court, from

21  HonorSociety.Org, those articles are found on the same website

22  that you claim is the largest by web traffic?

23  A.  Yes.

24  Q.  Yes.  Okay.  It wasn't a great question.  Let me ask it

25  probably a different way.  Isn't it true that what you are

1    doing with these websites that are at issue here today is you

2    are driving much of the traffic to your website,

3    HonorSociety.Org?

4    A.   Can you rephrase that?

5    Q.   The websites that we are looking at that were from the

6    HonorSociety.Org website are on this very same website that you

7    claim makes you the largest honor society because of web

8    traffic to that site?

9    A.   Your claims allege that that was a false statement, and

10   now that we have used our website, now you are trying to say

11   that we are using the largest website by web traffic.  And yes,

12   they are hosted on our website, and yes, we are the largest

13   honor society website by traffic.

14   Q.   It's true that you have hundreds of thousands of visitors

15   to your website every month?

16   A.   Yes, I believe so.

17   Q.   How many followers does Honor Society have on social

18   media?

19   A.   Well, given that we are a very well received brand, we

20   have been around for over a decade, and we built one of the

21   largest followings in the academic space, we have over a

22   million followers throughout social media, most of those being

23   on Facebook, but we have a tremendously engaged audience, and

24   we have followers on every platform.

25   Q.   And you use Instagram?

1    A.  Yes.

2    Q.  Facebook?

3    A.  Yes.

4    Q.  Twitter?

5    A.  Yes.

6    Q.  LinkedIn?

7    A.  Yes.

8    Q.  The way in which Honor Society drives membership primarily

9    is through the use of e-mail solicitations, unsolicited e-mail

10   solicitations to e-mail addresses, right?

11   A.  I wouldn't characterize it that way, but we do receive

12   membership through -- in the same vein as PTK or other honor

13   societies, through e-mail.

14   Q.  Okay.  So as I understand the way it works, you have a

15   database that is sourced from various different locations, and

16   you use that database to push out e-mail content to people who

17   are members or nonmembers, right?

18   A.  In the same way that PTK and every other honor society

19   does, yes.

20   Q.  You just can answer the question yes or no.  That's the

21   way you do that, right?

22        **THE COURT:**  Hold on.  Restate your question.  I

23   didn't catch it.

24   **BY MR. POLAK:**

25   Q.  You don't need to add on what PTK does.  I just need you

1    to answer yes or no as to how you do it.  Okay, Mr. Moradian?

2    A.  Yes.

3    Q.  So your organization sends e-mails soliciting people for

4    membership, and in those e-mails are embedded links, right?

5    A.  I believe so, yes.

6    Q.  And those links go back to your website?

7    A.  I believe so, yes.

8    Q.  And you are encouraging recipients of those e-mails to

9    open those links and go back to your website?

10   A.  I believe so, yes.

11   Q.  And you send out, I believe, a million to 3 million

12   e-mails every month.  Is that right?

13   A.  I believe, yes, potentially more.

14   Q.  And all of those are -- that is going to include student

15   e-mails that you obtain from FOIA requests to community

16   colleges, right?

17   A.  To the limited extent that we get that data, which is a

18   very small subset of our data, I believe so.

19   Q.  Okay.  So -- and you understand that part of the claims

20   that PTK is making here is that students receive your e-mails

21   for membership and they click the links, and they go join your

22   organization mistakenly believing they are joining PTK.  That's

23   the allegation, right?

24   A.  I believe I have read that amongst a host of allegations.

25   Q.  And you have seen the documents that PTK has produced

1    showing that evidence, such as it is.  I know you disagree with

2    it, but you have seen that evidence; is that right?

3    A.  I actually haven't seen that.

4    Q.  Well, we did get a chance to look at your own business

5    records at your deposition where we identified a number of

6    people who had mistakenly joined your organization thinking

7    that they joined PTK, right?

8    A.  To the limited extent that I haven't seen that, we have a

9    no questions asked refund policy.  And it was usually in

10   connection with issuing a refund so that members could do as

11   they wished, including join PTK or otherwise.

12   Q.  But the answer to my question, Mr. Moradian, is yes, that

13   happens at your organization.  People joined your organization

14   thinking they were joining PTK.  The answer to that question is

15   yes?

16   A.  I believe the answer would be to the extent, the limited

17   extent that that has happened, yes.

18   Q.  We talked about social media accounts.  Honor Society

19   Foundation has those as well, right?

20   A.  I believe so, yes.

21   Q.  And you personally have social media accounts?

22   A.  Yes.

23   Q.  And from those, you will post information about -- I'm

24   sorry, about HonorSociety.Org, right?

25   A.  For clarity, I don't believe I've ever posted about PTK,

1    but I have from time to time posted about the business of which

2    I'm the founder and executive director of, yes.

3    Q.   College Budget is a company that you also own?

4    A.   Yes, I founded that as well.

5    Q.   College Budget has websites?

6    A.   Yes.

7    Q.   It is found at CollegeBudget.com?

8    A.   Yes.

9    Q.   And it has social media accounts?

10   A.   Yes.

11   Q.   On those same platforms we talked about before?

12   A.   I'm not sure about every platform, but broadly, yes.

13   Q.   You have activated College Budget's website and social

14   media to publish the same information that we find in the 5,000

15   websites, right?

16   A.   To a limited extent, we have posted and reposted, yes.

17   Q.   And taking a look at Exhibit 35 -- is the witness notebook

18   up there now?  I don't think it is.

19           **MR. POLAK:**  While he is looking for that, Your Honor,

20   I will just use the Elmo on this.

21   **BY MR. POLAK:**

22   Q.   This is the first page from Exhibit 35.  This is taken

23   from College Budget.com.  This is an example of an article that

24   you had published concerning Dr. Tincher-Ladner and Phi Theta

25   Kappa's alleged false advertising, right?

```
 1    A.  Yes, this is a document or an article about the lawsuit.

 2    Q.  And you instructed -- are you the one that wrote this?

 3    A.  I believe so, yes.

 4    Q.  Okay.  So you didn't have to instruct anybody else to do

 5    it.  You did it.  Is that right, Mr. Moradian?

 6    A.  I believe so, yes.

 7    Q.  And there's another article, Exhibit 39 --

 8            THE COURT:  If you need to take him the notebook, you

 9    can.

10            MR. POLAK:  Go ahead and give it to him, but we will

11    stay with the Elmo.  I think it is a little more efficient this

12    way.  But just keep it there, and we are on Exhibit 39.

13    BY MR. POLAK:

14    Q.  If you will just turn your attention to the screen, Mr.

15    Moradian, and I think we will be more efficient here.

16        So here's another article on the CollegeBudget.com

17    website.  "Phi Theta Kappa lawsuit, what you need to know."

18    And this one is dated May 21, 2024.  It is roughly the same

19    date as the other article that we saw.  Is this an article that

20    you also wrote?

21    A.  I believe so, yes.

22    Q.  Did you think that one article about it wasn't enough?

23    A.  It's simply a discussion about the lawsuit.

24    Q.  Well, so is the other one, right?  You told us before the

25    other one was about the lawsuit, but you wrote not one, but
```

1   two.

2   A.   Well, they are nuanced and different articles.   Of course,

3   we are going to speak about it.

4         MR. POLAK:   If you could turn on the computer screen.

5   So we are going live, Your Honor, on the internet here.   I

6   wanted to get the most recent example of the CollegeBudget.com

7   website.   I'm going to show it to the witness.   Let me move

8   this over here.

9   **BY MR. POLAK:**

10   Q.   So when we look at this, Mr. Moradian, this is the

11   website.   We see CollegeBudget.com up here at the upper

12   left-hand corner.   When you go to the home page, the very first

13   article that comes up is the one that we looked at before,

14   which was Exhibit 35.   Do you recall that?

15   A.   I believe there are five or six articles above this in a

16   rotating carousel.

17   Q.   Well, you have your banner up top, but the first posted

18   one is the one we are looking at here.   Underneath that

19   banner is -- and it says PTK lawsuit.   Do you see that?

20   A.   These are in chronological order.

21   Q.   So we look at the first two, and I told you those were

22   from May 21, 2024.   The next most recent article on this

23   website is dated March 8th, 2023, about some Greek organization

24   called Kappa Mu Epsilon, right?

25   A.   This is about another honor society, yes.

1    Q.   The point is less about the content of the article and

2    more about the date range.   There was nothing posted on your

3    CollegeBudget.com website for over a year until you decided to

4    post these two articles about Dr. Tincher-Ladner and the

5    lawsuit, right?

6    A.   Yes.

7    Q.   There's no other new content that was over -- well over a

8    year.

9    A.   I don't believe there's any requirement to write content.

10   We run this website, and that's how we run it.

11   Q.   The point is, Mr. Moradian, you reactivated this website

12   that you own, that you can control, for purposes of this online

13   campaign against Phi Theta Kappa?

14   A.   This website has been active for over ten years.   It will

15   be active.   And there's nothing about this -- College Budget is

16   meant to inform students.   Historically, it was meant to help

17   save students money.   And to that extent, this lawsuit aims to

18   do the same thing, save students money and increase

19   transparency.

20        So, yes, we did publish two articles about it.   I don't

21   think these are the last articles we are going to publish.

22   They are just two along the line of many.

23   Q.   So you intend to do more than just 5,000 websites, don't

24   you?

25   A.   Again, we have never launched 5,000 websites.   Websites

1    implies it's a domain that I would be paying $20 a year to run.

2    These are just simply web pages, and the characterization is

3    wrong, and that's important.  But the point is, of course

4    CollegeBudget.com will continue doing what it does.

5    Q.  Well, whatever it did, it didn't do it for about a year

6    and a half until you posted these new articles, right, Mr.

7    Moradian?

8    A.  Well, I have been very busy.  I don't think that reflects

9    on the future of CollegeBudget.com.

10    Q.  Let's look at this.  This article here is written

11    supposedly by College Budget.  Is there anything referencing

12    here on this article or on this website CollegeBudget.com's

13    relationship to you or to HonorSociety.Org?

14    A.  It is widely known throughout --

15    Q.  Widely known?  How do you know that?

16    A.  Google it.

17    Q.  Okay.  Is there any words that are on these pages -- if

18    the Court were to look at the web articles or if the Court were

19    to look at the website and it were to look for a statement on

20    there that College Budget is an affiliate of Honor Society,

21    would that be found?

22    A.  This website is not owned by HonorSociety.Org.  It is very

23    clear and transparent that I work with CollegeBudget.com as

24    well as Honor Society.Org.  One simple Google search of both

25    reveals who operates both of them.  And it is exceedingly clear

1    that I'm involved with both of them.

2    Q.  You also own a company called CampusBuddy, right?

3    A.  That's right.

4    Q.  It has a website as well, right?

5    A.  That's correct.

6    Q.  It has social media, doesn't it?

7    A.  That is correct.

8    Q.  And it has also sat largely dormant for years, right?

9    A.  I believe so.

10   Q.  But you activated it recently to post social media for you

11   on this campaign against PTK.  Isn't that true?

12   A.  I wouldn't call this a campaign against PTK, but, you

13   know, to the extent that we are putting -- broadcasting

14   knowledge and about the litigation, yes, we did feel that it

15   was something that, you know, would be correct for CampusBuddy

16   to cover.

17   Q.  And those social media posts -- I will withdraw that

18   question.  You can go ahead and take that down.  Let's go back

19   to the Elmo.  Let's look at Exhibit 40.  This is a website

20   called -- I'm sorry.  This is a screen capture from a website

21   called HonorSocietyMuseum.com or .org.  Are you familiar with

22   that website?

23   A.  Yes, I am.

24   Q.  It's owned and operated by you or your organization, Honor

25   Society, isn't it?

1    A.   It is owned and operated by Honor Society Foundation.

2    Q.   And Honor Society Foundation is a non-profit that you

3    created to be an affiliate of Honor Society, to provide

4    scholarships for Honor Society, and so on and so forth, right?

5    A.   It's an organization to provide scholarships, preserve the

6    history of honor societies, and to provide educational content

7    for students.

8    Q.   Are you the one that created the content here on this

9    May 17, 2020 article?

10   A.   Yes, I am.

11   Q.   And this is not just a republication of the press release,

12   is it?

13   A.   It discusses the litigation and the allegations.

14   Q.   So the answer is no, Mr. Moradian?  This document and the

15   content in it is not merely a verbatim recitation of the press

16   release that you had issued in April, is it?

17   A.   It is not meant to be nor is it a verbatim press release.

18   Q.   So it's got other information on it, and it's written

19   differently than a press release.  And the title of it is "Phi

20   Theta Kappa is sued:  Disturbing deceptive practices and

21   monopolistic tactics."  Do you see that title?

22   A.   Yes, I see the title.

23   Q.   And you have this image here.  Did you create this image?

24   A.   I believe this image was created, yes, with the help of

25   AI.

1    Q.   So you were the one that used AI to create this image?

2    A.   That is correct.

3    Q.   If you were to go on the Honor Society Museum website,

4    would you be able to tell that it is an affiliate of your

5    organization?

6    A.   I believe it is widely disseminated, that it is --

7    Q.   Is their text on the website that says that Honor Society

8    or Honor Society Foundation owns the Honor Society Museum?

9    A.   We do not own the Honor Society Museum.  It's owned by a

10   public benefit charity, so we don't own it.

11   Q.   So if someone went to the Honor Society Museum, they would

12   think it was associated with a public charity?

13   A.   Yes.

14   Q.   That is your intent?

15   A.   It is owned by the Honor Society Foundation, which is a

16   501(c)(3).  Yes.

17   Q.   So it is your intent that when someone goes to the Honor

18   Society Museum website, that they perceive it to be sponsored

19   by a charity, right?

20   A.   It is creating public awareness, and yes, that is what it

21   is for.

22   Q.   Let's add this up.  You activated the following things to

23   engage in this online campaign against Phi Theta Kappa:  The

24   HonorSociety.Org websites, right?  Just yes or no.  You used

25   The HonorSociety.Org websites to publish these 5,000 websites,

1    right?

2    A.   Yes, we used our platform to publish pages discussing it.

3    Q.   You used HonorSociety.Org's social media accounts, of

4    which there were several?

5    A.   To a very limited extent.

6    Q.   You used the Honor Society Foundation website?

7    A.   Yes.

8    Q.   You used the Honor Society Foundation social media

9    accounts, of which there are several?

10   A.   To a limited extent.

11   Q.   You used the Honor Society Museum website?

12   A.   Yes.

13   Q.   Also the Honor Society Museum's social media accounts?

14   A.   I don't believe so.

15   Q.   You used the College Budget's websites, or website?

16   A.   Website.

17   Q.   Right?  You used that.  We looked at that.

18   A.   Two articles, yes.

19   Q.   You also used College Budget's social media accounts, of

20   which there were several?

21   A.   To a limited extent.

22   Q.   You used College Buddy websites?

23   A.   There's no College Buddy websites.

24   Q.   I'm sorry.  CampusBuddy's websites.

25   A.   There is only one website.

1    Q.   You used that website?

2    A.   To a limited extent.

3    Q.   And you also used the social media accounts of

4    CampusBuddy, didn't you, of which there were several?

5    A.   To a very limited extent.

6    Q.   So you activated nine different locations on the internet

7    to populate out this messaging about PTK and

8    Dr. Tincher-Ladner, right?

9    A.   Well, we --

10   Q.   Is that a yes or no?  Did you use the nine that we just

11   described, Mr. Moradian?

12   A.   We published our content on our websites and our platform,

13   yes.

14   Q.   Let's look at Exhibit 12.  This one is entitled Phi Theta

15   Kappa chapter directory.  That's a pretty neutral title, isn't

16   it?

17   A.   I'm not sure what you mean by that.

18   Q.   You don't think that's a neutral title?

19   A.   It's just a statement of what it is.

20   Q.   Okay.  And up in the upper left-hand corner, we see that

21   this is from the Honor Society Foundation, that public charity

22   that you were talking about.

23   A.   Yes.

24   Q.   So here we have a web page that's on the Honor Society

25   Foundation web page that you claim is for public charitable

1  purposes, and this is a Phi Theta Kappa chapter directory.  But

2  then immediately underneath it, we see "Exposing PTK's

3  practices."  Well, that doesn't have anything to do with a

4  directory, does it?

5  A.  I believe this is just a description of the page.

6  Q.  Well, no.  The title is "Phi Theta Kappa chapter

7  directory."  The subtitle is "Exposing PTK's practices."  A

8  chapter directory should just be listing the actual chapter

9  names, right?

10  A.  I think any web page can do anything that it wants in the

11  sense that -- of course, a chapter directory can have a

12  paragraph or an informational portion, of course.

13  Q.  You don't think it is misleading to title this document,

14  "Phi Theta Kappa chapter directory" and then go straight into a

15  bunch of statements about alleged activities of PTK that you

16  found objectionable?

17  A.  Sir, it is a directory.  It has links to chapters.  It

18  does discuss broadly why we are here, which is this litigation

19  and the practices that are so troubling that the public has a

20  need to know and a right to know.

21  Q.  So you've got to go all the way -- after you read "Phi

22  Theta Kappa chapter directory," you have to go and read through

23  "Exposing PTK's practices."  These are all links to other

24  articles, right?

25  A.  Yes, that's right.

1    Q.   Those are some of the 5,000 web pages, web content, that

2    you created designed to attack PTK?

3    A.   I wouldn't characterize it that way, again --

4    Q.   Well, let's look at the first title.  "The hidden truth

5    behind Phi Theta Kappa's top ten percent claims."  You don't

6    think that is an attack on PTK?

7    A.   I intend to prove and show the merits to that today.

8    Q.   I understand you intend to prove things, Mr. Moradian.

9    The question is not what you intend to do today.  The question

10   is about the title.  That title is an attack on PTK, isn't it?

11   A.   No.

12   Q.   "Are Phi Theta Kappa scholarships truly exclusive.  A

13   deeper look."  You don't think that's an attack on PTK?

14   A.   It's just speech.  It's just talking about it.

15   Q.   We go on here.  There's another section that they have to

16   go through, "How PTK's practices affect chapters."  You go on

17   to say in that section, "The deceptive advertising and

18   misleading claims not only tarnish the reputation of PTK but

19   also impact the individual chapters and their members."  What

20   does that statement have to do with a directory of chapters on

21   a public charity website?

22   A.   Well, we are going to discuss that extensively.

23   Q.   I understand you are going to get your chance.  Your

24   chance is right now, Mr. Moradian.  What does that statement

25   have to do with a chapter directory on what you claim is a

1    public charity website?

2    A.   I think it has a lot to do with it because, as we are

3    going to discuss today, when we look at the practices and the

4    troublesome work of PTK, that we will see that that is

5    meritful.   And, you know, this directory is simply a directory

6    that links to web pages.   It's not, you know, meant for -- I

7    don't even know that this page has been seen by anybody.   It is

8    just, you know, a hierarchy for the website to be able to

9    categorize all the pages.

10   Q.   So it is your testimony when you click on these links, and

11   they go on for page and page and page, listing all -- these are

12   links to every single web page that you created about these

13   campuses, the person clicking on that link is going to go find

14   a neutral description of that chapter and PTK?   Is it going to

15   find the contact information of the advisor?   It's not, is it?

16   It's not, is it?

17   A.   These pages are not meant for that.

18   Q.   Right.   You are not going to find the address of the

19   chapter, are you?

20   A.   If --

21   Q.   It's just a yes or no question.   Are you going to find the

22   address on there, Mr. Moradian?

23   A.   If we were to do --

24   Q.   It's a yes or no question.

25              **THE COURT:**   Hold on.   Answer his question, and you

1    may explain your answer if you need to, but don't talk over one

2    another.  So ask your question, sir.

3    **BY MR. POLAK:**

4    Q.  If you go on any of these web pages, will you find the

5    address of the chapter?

6    A.  You would not, because if we were to do that -- you know,

7    we specifically went through links to make sure that this page

8    is clear that's not affiliated with PTK, because if we did say

9    that, you would say that we were posing to be PTK.

10   Q.  But you called it a chapter directory.

11   A.  Of course.  It is a chapter directory.

12   Q.  Instead, when you click on these I believe 23 pages of

13   links and you were to click on, you know, the very first one

14   here, the Beta Nu Alpha chapter, you would go to a web page,

15   and we looked at it or something similar during

16   Dr. Tincher-Ladner's testimony.  It doesn't provide any of that

17   directory information, and it is solely more publication of

18   your claims against PTK, right?

19   A.  Again, a directory has -- it means --

20   Q.  It's a yes or no question, Mr. Moradian.  That's what you

21   would find if you go to that link, right?

22   A.  You would find -- yes, you would find information about

23   our claim that involves this school and chapter.

24   Q.  And those pages contain allegations that students should

25   be concerned if they join PTK and should reconsider their

1    membership, right?

2    A.   I don't believe it has those statements today.   I believe

3    those statements were up for 2 to 3 days on a Friday, Saturday

4    when they were created.

5    Q.   Why did you take them down?   Did you realize that those

6    were malicious against PTK?

7    A.   No, of course not.   The reason that they were taken down

8    is because I know how voraciously you are against speech and

9    the fact that you are looking for really anything to bring us

10   here and occupy the Court's time, our time, and really to just

11   keep this going.

12          **MR. POLAK:**   Can we go to the computer?

13   **BY MR. POLAK:**

14   Q.   My colleague just provided me a computer that I relinked

15   that goes to that page.   I guess this is what you've changed it

16   to.   Is this -- what you are looking at there, is that what you

17   see now for all of these links?

18   A.   Yeah, I believe so.

19   Q.   So you removed all the content that Dr. Tincher-Ladner was

20   complaining about before?   You have taken all of that down?

21   A.   Well, again, this was within days of publishing over the

22   weekend, and they have been this way, and this is all that is

23   on these pages since --

24   Q.   When was it taken down?

25   A.   I believe approximately June 23rd -- yeah, the 23rd, I

 1    believe.

 2    Q.  So it's your position it was taken down before we had the

 3    conference with Magistrate Judge Myers?

 4    A.  This page was like this before that, yes.

 5    Q.  Okay.  So you still say in here, "The PTK CEO,

 6    Tincher-Ladner, allegedly masterminded these deceptive

 7    practices against community college students at institutions

 8    and should be held accountable."  What does that have to do

 9    with directory information for PTK?

10    A.  Well, that has specifically to do with this lawsuit, which

11    I intend to show today how true that is.  And this is just a

12    web page.  It's nothing more than that.

13    Q.  But there's no directory information here, Mr. Moradian.

14    There's not a single address, not a -- the only e-mail address

15    that is on here is titled PTKlawsuit@gmail.com in the call for

16    action section, right?

17    A.  I'm not sure what your question is.

18    Q.  So if we are to look at Exhibit 2 -- you can take that

19    down.  Thank you.

20        We used this in Dr. Tincher-Ladner's direct examination.

21    Is it your testimony, then, that what we find here at the

22    Sheridan College link that she looked at is no longer on the

23    internet?

24    A.  I can't speak to the specific exact page.

25    Q.  So it might be.  It might be still up.  You might have

 1    missed some.

 2    A.   I don't believe so.   There's nothing that --

 3    Q.   So we first raised this situation with your counsel during

 4    the June 26th hearing with Magistrate Judge Myers.   Did you do

 5    anything to remove content off the internet on the 26th, 27th,

 6    28th of June, that time frame sort of immediately following

 7    that hearing where your lawyers were first told about this?

 8    A.   I believe, and my understanding is that everything was

 9    updated or changed in the days before that, there may have been

10    one or two modifications.   I can't say specifically, but I

11    believe it was mostly, if not all, done by -- days before this

12    meeting.

13    Q.   This comes from Exhibit 48.   This is the first page of

14    Exhibit 48.   This is not Plaintiff's Exhibit 48.   This is

15    Defendant's Exhibit 48, and it's a very thick document, and I

16    believe it goes on for a couple of notebooks, but you testified

17    before you used --

18              **THE COURT:**   Exhibit 48 of what?

19              **MR. POLAK:**   Defendant's 48.

20              **THE COURT:**   Do I have it?

21              **MR. POLAK:**   You do have it.

22              **THE COURT:**   Is it in the record?

23              **MR. POLAK:**   It is in the record.   It is attached to

24    Mr. Moradian's declaration, as I recall.   So it's Exhibit 48

25    attached to his exhibit -- I'm sorry, his declaration.

**BY MR. POLAK:**

1    Q.   What is not on your exhibit is my highlighted stuff here.

2    That highlighting is from my hand, not yours, Mr. Moradian, but

3    I did that for ease of testimony.   So with respect to this, I

4    believe your declaration said that you used an artificial

5    intelligence platform called ChatGPT to create some of this

6    content; is that right?

7    A.   I'm not sure my declaration said that, but I believe that

8    is right.

9    Q.   Okay.   So -- and ChatGPT is an artificial intelligence

10   that allows you to tell the AI what it is you want it to write

11   for you, you give it some instructions, and then it spits out

12   some data after that, right?

13   A.   Broadly speaking, yes.

14   Q.   And is that what you used to create the content for these

15   websites?

16   A.   So in the first two to three days, we -- I experimented

17   with ChatGPT because of how quickly it is evolving and

18   reshaping the internet.   We published those pages on -- we

19   being I -- on the Thursday and Friday, going into the weekend

20   of June 23rd.   Before the end of the weekend, I changed it to a

21   templated approach to not give the AI a chance to write

22   because -- precisely for these reasons:   I didn't want to

23   create any confusion or allow any chance that any article could

24   speak in a voice that I'm not comfortable with.

1    Q.   Was that done before or after we filed this motion?

2    A.   Much before.

3    Q.   Okay.  So you realized that the content that it was

4    creating that you had posted looked as if it spoke in the voice

5    of the college and you needed to make a change?

6    A.   I don't think so.  I think that we were being proactive,

7    and we made it clear with our restrictions here in order to

8    make sure that this tool knows our goal is to be clear,

9    transparent, not name any other person or party, and to write

10   it from our voice.  And, of course, universities, colleges, are

11   going to be referred to in third person.  That's just the

12   nature of it.  It's a third person object, and that's how

13   everybody writes about it, including AI.  And I think, you

14   know, I didn't have a problem with it, but again, because I

15   didn't read every single page, and I wanted to, you know, very

16   narrowly control it's output, I actually removed it within a

17   day or two and, you know, put in these templated articles,

18   where we were able to control every word.

19   Q.   How quickly were you able to create 5,000 websites using

20   ChatGPT?

21   A.   Well, the internet expands, like, 4 billion pages a day,

22   so we are talking about billions of pages every single day.

23   Q.   I didn't ask about the rest of the internet.  I asked

24   about you.  How long did it take you?

25              **THE COURT:**  Hold on.  The specific question was how

1    quickly were you able to create 5,000 websites using ChatGPT?

2    Is that the question?

3         **MR. POLAK:**  That's the question, Your Honor.

4         **THE COURT:**  Answer that specific question.  You may

5    explain your answer, if you wish.

6         **THE WITNESS:**  Thank you, Your Honor.

7    A.   I'm not an expert with ChatGPT.  I was merely, you know,

8    learning it.  This is a learning tool.  And I was able to

9    publish it fairly quickly within a matter of a day or two.

10   **BY MR. POLAK:**

11   Q.   And I see here at the bottom that you asked the ChatGPT to

12   make an XML output.  That's a website language, right?  Or

13   actually, to put it a better way, that's a website format that

14   is consistent with your websites, like HonorSociety.Org or

15   Honor Society Foundation or College Buddy or College Budget?

16   A.   Well, I think every website operates with that, yes.

17   Q.   Okay.  So, in other words, what you were asking the

18   ChatGPT function to do is to write this not only as content you

19   would otherwise cut and paste, but it actually is the creation

20   of the website itself, and that's why you were able to do it so

21   quickly?

22   A.   It's a web page, and yes, I'm ensuring that it matches the

23   conventions of web pages.

24   Q.   And I think you told the Court just a few seconds ago that

25   you did not review all 5,000 pages before they got published?

1    A.  I reviewed many of the pages.

2    Q.  But you did not review all of them?

3    A.  For the limited duration of about 48 hours that they were

4    up on a weekend, that is correct that I didn't review every

5    single one.

6    Q.  And for the other websites that remained after that

7    weekend, you didn't review them either.

8    A.  I believe I have reviewed --

9    Q.  So when we looked at that chapter directory and there were

10   23 pages of links, of just chapter-related links, you are

11   telling me that when those were posted, you looked at every

12   single one of those?

13   A.  Well, the post is the exact same on every single page.  It

14   was that short blurb.

15   Q.  Did you have to hand do that or did you use AI to do that?

16   A.  We didn't use AI to put that small blurb up, no.

17   Q.  Let's look at the original prompt here.  This came from

18   your fingers.  You wrote this prompt, right?

19   A.  I believe so.

20   Q.  And the words that we see here came from your head?

21   A.  I believe so.

22   Q.  You instructed the prompt to, quote, explain the potential

23   liability for schools hosting PTK chapters, right?

24   A.  Is there more to this that's cut off?

25   Q.  Based on -- I'm just asking you about this prompt right

1    here that we can see.

2    A.   There are words missing to the right of it that I can't --

3    I can't really tell the exact sentence.

4    Q.   The Court has the full one.  This is printed off from what

5    you guys gave us.  "Explain the potential liability for schools

6    hosting PTK chapters."  That is in your prompt, right?

7    A.   Again, I can't see the whole sentence.

8    Q.   I'm just asking you whether those words are there.

9    A.   To the extent of what I see of this, yes, I read those

10   words.

11   Q.   Next line, "Emphasize the need for schools to protect

12   their students from deceptive advertising practices."  That is

13   written there as well, isn't it?

14   A.   Again, yes, I do see that written there.  I believe -- I

15   mean, there are full words missing here.  I believe it says,

16   "Make sure it is not defamatory," and I would assume there are

17   more words than that, so -- I can't even see the full sentence

18   here.  It is hard for me to confirm this.

19   Q.   You don't dispute that the pages that were generated using

20   this prompt attempted to explain the potential liability for

21   schools hosting PTK chapters, right?  We saw that on the

22   websites that Dr. Tincher-Ladner talked about during her

23   examination?

24   A.   This web page or web pages were up for a limited amount of

25   time.  They were down before any motion or hearing, but there

1    are many type of issues that, you know, have, you know,

2    reputational issues that are a liability.  I mean, there are

3    many things to discuss.  There's not --

4    Q.  Barring a Court order instructing you never to republish

5    those websites and that website content that you took down,

6    again, there is nothing preventing you from going and taking

7    all of that content that you claimed to have taken down and

8    putting it right back up there, right?

9    A.  I think your aggressive bullying and manipulation of the

10    Court system serves as a deterrent.

11    Q.  So are you telling the Court you've learned your lesson?

12    A.  I don't believe that there is a lesson to be learned in

13    this sense of speaking.  I believe that it's a lesson that if

14    you try to speak your mind, we are not going to allow that.  We

15    are going to hire five to ten attorneys to prosecute you, to

16    malign you, and to make sure you stay silent.  But that's the

17    message that I received.

18    Q.  So it's your view that the creation of 5,000 websites and

19    the activation of all of these social media accounts to

20    personally attack Dr. Tincher-Ladner is not bullying?

21    A.  I would vehemently disagree with that statement.  And I

22    believe that we have been sitting idly for two and a half years

23    since PTK took these same measures.  You know, they launched a

24    press release on the day they launched this lawsuit, calling

25    it, I believe, willfully misleading, to contact the State

 1    Attorney General, the BBB, and they sent this to chapters,

 2    their own chapters and advisors, and we didn't even really know

 3    who PTK was at the time.  I certainly didn't know who

 4    Dr. Tincher-Ladner was.

 5         So I think that we are doing everything but bullying.  We

 6    are now defending ourselves after two and a half years of being

 7    quiet and waiting for a chance to speak.  For two and a half

 8    years, we haven't had the chance to even have a conversation

 9    together.  Apple and Microsoft, they discuss their differences.

10    But we have just been channeled through this pipeline, and it

11    is really sad because this money could have been going to

12    students.  Both what this charity of PTK is spending on five to

13    ten lawyers at a time, as well as our organization, this is a

14    gross mismanagement and misuse of public funds, and as well as

15    our own funds.

16         So to answer your question more directly, we have never

17    looked to malign PTK nor Dr. Lynn Tincher-Ladner.  We have

18    learned stuff that has taught us the hugely impactful issues

19    that PTK is having.  And so, of course, once -- we didn't know

20    these issues because we had never looked at PTK before, but now

21    that we see the issues, we certainly believe that we should be

22    able to share with the 130,000 students per year that are

23    essentially misled by PTK.

24              **THE COURT:**  All right.  At this time, I'm going to

25    take a 15-minute break for the court reporter.  And, I mean,

```
 1   that's a good place to stop for now.  We are going to take
 2   about a 15 or 20-minute break for the court reporter and the
 3   parties.  How much longer, Mr. Polak, do you believe you have?
 4          MR. POLAK:  That's always a dangerous question to ask
 5   a lawyer.  Let's see --
 6          THE COURT:  I don't want to put you in danger, but I
 7   ask --
 8          MR. POLAK:  I would say we are probably about half
 9   done.  I'm going to do everything I can to get done by noon.
10          THE COURT:  This is my point.  I think I know where
11   we are at this point.  Well, and we can come back and talk
12   about it, but I see at this point what we are talking about is
13   whether -- basically whether the Honor Society has violated the
14   Court's prior injunction either blatantly, in spirit, or
15   otherwise.  And if they have, whether what they have done is
16   protected by the First Amendment.
17          And so I think -- I think that's -- you know, I think
18   that's what we ought to be talking about, First Amendment
19   issues and whether, you know, dropping out allegedly, and
20   whether -- talking about whether speaking of the lawsuit itself
21   is separate and apart from violating the spirit of the
22   injunction.  Does talking about the lawsuit implicate the
23   survey questions, for example, that the Court has?  So I think
24   I'm fully versed -- no, no, I think I'll have the parties fully
25   verse me on what the arguments might be in that regard.  I'm
```

```
 1    not sure if it's worth everybody's time to go -- honestly, I
 2    don't want to stop anybody from making the record that they
 3    need to make.
 4            MR. POLAK:  I understand, Your Honor.
 5            THE COURT:  So I say that.
 6            MR. POLAK:  I fully appreciate what you are saying.
 7    You might recall that we were not the ones asking for the
 8    evidentiary hearing.  We were fine just arguing it on the
 9    papers.  I think you may recall at the conclusion of the
10    proceedings, or near the conclusion of the proceedings on
11    Friday, when we were talking about what to do, I was perfectly
12    willing to not even go through the cross-examination and we
13    just move straight to argument.  And if that is what -- if the
14    Court has heard enough to make a decision on this and
15    understands the facts, understands the issues that we've got
16    here, then -- from PTK's standpoint, we are ready to proceed to
17    argument, and we could do that immediately.
18            THE COURT:  No, I don't -- I don't want to step on
19    anybody's toes from making the record that they need to make
20    because this may not be the final decision, for example.  This
21    may not be the final decision.  So I'm not going to step on
22    anybody's toes about making the record they need to make, and I
23    know the other side will want to make its record.  But I --
24            MR. POLAK:  I think what you are asking me to do is
25    to move it along, and I understand that.
```

 1           **THE COURT:**  No -- and the thing is, the arguments

 2    will come from counsel.  And that's to you, Mr. Moradian.  The

 3    arguments will come to the Court through the mouths of the

 4    lawyers, how they are tied together, the First Amendment rights

 5    or frailties of whatever is going on.  I'm going to leave that

 6    to the lawyers to talk to me about and to argue those specific

 7    points and to argue the merits of the request that is before

 8    the Court.  All right.  Mr. Wallace?

 9           **MR. WALLACE:**  Your Honor, may I say something?

10    Because I'm going to be in charge of the law.  The first thing

11    you said is the real question is has he followed your order.

12    And just so you know, I don't think there's anything in our

13    motions, and there won't be anything in my argument that says

14    he didn't follow the order.  We have not moved for contempt.

15       What he has told you this morning is it's a narrow order,

16    and he followed it to the word.  And what we are going to tell

17    you is, you need more words in your order.  It needs to be

18    broader.  I don't know if you need any more evidence, but

19    that's the legal issue we intend to present.

20           **THE COURT:**  That you intend to ask for more words?

21           **MR. WALLACE:**  More words.

22           **THE COURT:**  All right.  Thank you all.  Twenty-minute

23    break.

24       **(RECESS TAKEN AT 10:26 A.M. UNTIL 10:49 A.M.)**

25           **THE COURT:**  Mr. Moradian, you can return to the

```
 1    stand.  And I said Moradian.  Is it Moradian or Moradian
 2    (pronouncing)?
 3                  THE WITNESS:  It's Moradian, similar to Meridian,
 4    Mississippi, with an O.
 5                  THE COURT:  All right.  You are ready to proceed, Mr.
 6    Polak?
 7                  MR. POLAK:  We are, Your Honor.
 8                  THE COURT:  You may.
 9                  MR. POLAK:  If you could turn on the computer screen.
10    What I'm going to have my colleague, Mr. Etienne, do is type
11    into -- we have a Google search -- well, we have Google, the
12    website up, and we are going to run a Google search.  Can you
13    type in Phi Theta Kappa Gulf Coast Campus?
14         Here we see the search returns, and if you scroll down to
15    the second one, this is an Honor Society Foundation link.
16    Let's click on that one.  This one is -- this is dated June 19,
17    2024.  It is on the Honor Society Foundation website.  It's
18    titled "Phi Theta Kappa Alert at Mississippi Gulf Coast
19    Community College, Jackson County Campus.  Caution advised
20    regarding the PTK Pi Epsilon chapter."  Is that a website that
21    you yourself created using AI?
22    A.  This is a web page, and this is not created using AI.
23    Q.  You manually wrote this out yourself?
24    A.  As I've testified, they are a template.  So it is a
25    templated approach where variables such as the name of the
```

1   college would be added.  But other than that, no, this is not

2   AI-generated.

3   Q.  Who wrote the words that are on this page?

4   A.  I did.

5   Q.  Thank you.  So you testified before that those links

6   related to the college campuses and the specific PTK chapters

7   were modified.  But when we search for the chapter itself on

8   the internet, organically this comes up.  You haven't taken

9   this one down, have you?

10  A.  This is a different web page.  I did not say I have taken

11  this down.  Could we please scroll to the bottom.  All the way,

12  please.  Thank you.  Up here.  Thank you.

13  Q.  Do you have anything to add to your answer or did you just

14  need to look at it?

15  A.  I wanted to see the whole article and also look at the

16  fact that it talks about our litigation, it talks about the

17  site is not by Phi Theta Kappa, and it makes it very clear it

18  is by Honor Society Foundation.

19  Q.  Okay.  But the point here, though, is that you testified

20  earlier that you modified and removed all of the content from

21  those other links, but it's true, isn't it, that there are

22  articles just like this one for all 1300 PTK chapters still

23  existing on the internet containing this content?

24  A.  These pages are different than the other pages you showed

25  me earlier.  They have a different title, and they talk about

1    different content.  I never said that this specific page was

2    taken off the internet.  In fact, if you read the article, it

3    talks about the lawsuit, the allegations, and making it clear

4    to the public about what we've learned, you know, what we've

5    learned in the past months.

6    Q.  Let's go back to the Google search return.

7    A.  I think it's important to note that these Google search

8    results both, depending on what you've searched before, as well

9    as the location where you are searching, drive those factors to

10   your results.  So I don't control that, and there are a lot of

11   inputs within your control that could potentially push these

12   up.

13   Q.  The next one on this list says, "Phi Theta Kappa Warning!

14   Caution at Mississippi Gulf."  Let's look at that article.

15        Now, this is on Honor Society's website, not Honor Society

16   Foundation.  And this is about the same community college, Gulf

17   Coast Community College, talking about the Pi Epsilon chapter.

18   So this is the second article, separate article, about just

19   that chapter that can still be found on the internet, right?

20   A.  I believe so.  Can I see the whole article?

21   Q.  Sure.  Let's scroll down.  It's on your website, and you

22   wrote it?

23   A.  To me, it looks very clear this is published by us, where

24   we believe that an informed community is a strong community.

25   It talks about our lawsuit, and it makes it exceedingly clear

 1  that this is published by us.

 2   Q.  Let's go back.  Now let's look at the third one.  This is

 3  again from the Honor Society Foundation.  "Caution advised

 4  regarding the PTK Omicron Alpha chapter."

 5                **MR. NEWMAN:**  Your Honor --

 6                **THE COURT:**  We have, apparently, an objection.

 7                **MR. NEWMAN:**  Your Honor, I'm concerned about these

 8  live images on the internet because they can't be preserved for

 9  appeal.  So, on appeal, we may want to cite to these documents

10  that counsel is asking the witness about, but we cannot because

11  these are live on the internet without any copies.  So I'm not

12  objecting to the content, but I would like a copy of it for the

13  record so that we can cite to it if this goes up.

14                **MR. POLAK:**  He already has a copy.  We produced this

15  already.

16                **THE COURT:**  It's live.  It might be different.  It

17  might be different.  I don't know.  If you have something --

18                **MR. POLAK:**  I don't have it with me, but we can

19  certainly supplement the record with it if it's necessary.  But

20  the testimony that is being provided is we are reading directly

21  from it, and the testimony that matters here is what has been

22  read into the record that this witness has acknowledged is

23  contained on these documents, and I think the Court is also

24  free to go on the internet itself to look at these things in

25  deciding a thing like an injunction.

1          **THE COURT:**  I understand all of that, but he's made a

2    valid preservation of the record sort of objection.  I think

3    that's valid.

4          **MR. POLAK:**  My colleague, Mr. Cowan, is apparently

5    creating PDFs of these images right now, and he will e-mail

6    them to counsel here shortly.

7          **THE COURT:**  That may preserve it.  Objection

8    overruled if they can get the copies of what we are looking at,

9    if they can get hard copies of what is being discussed.

10         **MR. NEWMAN:**  Thank you, Your Honor.

11   **BY MR. POLAK:**

12   Q.  Mr. Moradian, down at the bottom, we see the images that

13   Dr. Tincher-Ladner -- you said that was from -- counsel

14   indicated that was from a video.  Are you the one that selected

15   the specific frame from that video that was used on those other

16   websites?

17   A.  These are a live video --

18   Q.  They are not live video.  These are still images taken

19   from a video, right?

20   A.  Yes, sir.

21   Q.  And you were the one that selected the specific frame on

22   the video that showed Dr. Tincher-Ladner very close to

23   Dr. Risley, but you had other frames you could choose from,

24   right?

25   A.  Of course.

1    Q.   And you were the one that chose that specific frame, isn't

2    that right?

3    A.   Yes, I did choose the frame.

4    Q.   When we looked at that other -- you can take this down

5    now.   Thank you.   When we looked at the website before that you

6    claim replaced those chapter directory websites, you remember

7    we looked at a sentence that you wrote on there saying that

8    Dr. Tincher-Ladner should be held accountable.   Do you recall

9    that?

10   A.   I do.

11   Q.   Do you want Dr. Tincher-Ladner fired?

12   A.   That is not my intention.   It's never been my intention.

13   And I didn't even know who Dr. Tincher-Ladner was prior to this

14   lawsuit, so --

15   Q.   You knew who she was when you created the 5,000 websites,

16   didn't you?

17   A.   Again, they are not websites.   They are simple pages.   I

18   think you are making statements that are misleading.   But to

19   the extent that we created these articles, you know, I will

20   show today that they are not only true, but they are shocking

21   and alarmingly true.   And we have learned this in the past

22   couple of months, because we didn't ever investigate PTK

23   before.   We didn't know -- we didn't follow PTK.   So to the

24   extent we have learned things that the public needs to know,

25   these are, you know, critical pieces of information that you

 1   are attempting to silence, and the public has a right to know.

 2   So speaking about, you know --

 3              **THE COURT:**  Hold on.  Hold on now.  We are getting

 4   far astray.  I think the question is, or was, one of the

 5   questions was if you wanted her fired, and you said you didn't

 6   know her, and then it went back to -- but you created these

 7   websites.  Ask your specific question.  Answer that question.

 8              **THE WITNESS:**  Yes, sir.

 9   **BY MR. POLAK:**

10   Q.  Do you know how many community college students are

11   currently enrolled in school?

12   A.  Yes, I believe I do.

13   Q.  What is that number?

14   A.  Well, according to NCES, the National Center of

15   Educational Statistics run by the government, it is

16   approximately 4.4 million.  According to the National Student

17   Clearinghouse, which processes all of the transcripts in

18   America and has record of virtually all of the students, the

19   number is between 4.5 to 4.6 million community college

20   students.  So that's my knowledge.

21   Q.  And that's not just full-time students.  That's anybody at

22   all enrolled for any purpose, correct?

23   A.  That is correct.

24   Q.  You heard Dr. Tincher-Ladner's testimony that she is

25   anticipating that there will be approximately 450,000

 1  invitations issued to academically qualified students in the

 2  fall to join PTK.  Do you recall that?

 3  A.  I have not heard that because it was redacted from the

 4  copy that I'm supposed to defend myself --

 5  Q.  She said it in open court.  Do you recall her testifying

 6  to that fact?

 7  A.  I don't remember the specifics.

 8  Q.  Okay.  If, if she were to have said that, what is -- well,

 9  regardless of whether she said it, what is 10 percent of

10  4.6 million?

11  A.  In a vacuum --

12  Q.  What is ten percent of 4.6 million people?

13  A.  That question's response --

14  Q.  Is what?

15  A.  -- is 450,000.

16  Q.  The same number that Dr. Tincher-Ladner said is being

17  invited next fall to join PTK.

18       When did you become aware that the total number of

19  students currently enrolled in community colleges in the United

20  States is roughly 4.6 million people?

21  A.  I would like a chance to address the previous question.

22  Q.  No.  Your lawyer can ask you questions.  I'm asking you

23  now, when did you become aware of that number, 4.6 million?

24  Today, yesterday, the day before, ten months ago?

25  A.  I would say that I remember learning it during probably

1    the first week of this lawsuit.

2    Q.   Okay.  So that number, 4.6 million, has not changed since

3    2022?

4    A.   Well, the number that just -- and this is important -- the

5    number that Dr. Tincher-Ladner just stated was 17.5 million,

6    which is a clear fabrication.  So the numbers that we are

7    seeing here, I mean, they are unharmonious.  And yeah, I

8    believe the number is 4.5 million, and we will discuss that

9    extensively.

10   Q.   So if PTK is inviting 450,000 people to join PTK and the

11   total population of the community college students is 4.5 or

12   4.6 million, it is true, then, isn't it, that PTK is inviting

13   the top ten percent of the class to become a member?

14   A.   That is completely and blatantly false.

15   Q.   My math must be off.

16   A.   It's not a math issue.  It's a deception issue.

17   Q.   Your websites also accuse PTK of engaging in an attempted

18   monopolization, and that means that PTK is trying to take over

19   the community college honor society market to your detriment,

20   right?

21   A.   That is correct.

22   Q.   You told the Court through your lawyer and also through

23   your declaration back in March that you actually had taken a

24   third of the business away from PTK.  Isn't that right?

25   A.   I think that's a misstatement.  I believe --

1    Q.  That's what you said in your declaration, Mr. Moradian.

2    A.  I believe -- well, I would like to see the declaration so

3    we can discuss it.

4    Q.  And your lawyer also told the Court verbatim that the

5    motivation for filing this lawsuit to begin with was in

6    retaliation for you taking a third of the business away from

7    PTK.  Do you not recall that?  I have the transcript right

8    here.  We can go look at it.

9    A.  Would you please show it.

10   Q.  Would you agree with me that if a company such as yours --

11   actually, if a company such as PTK is losing a third of its

12   business to an upstart like your company, that's not very

13   effective monopolization, is it?

14   A.  To be clear, PTK's numbers have not gone down since this

15   period you are talking.  They have not lost one-third of market

16   share.

17   Q.  Then why did you say it in your declaration --

18   A.  I didn't say --

19   Q.  Mr. Moradian --

20            **THE COURT:**  No, no, no, Mr. Polak.

21            **MR. POLAK:**  I just need to get my answer to my

22   question out, but I will wait.

23            **THE COURT:**  Okay.  Ask your specific question.  I

24   know if you have it in the declaration, you can show him in the

25   declaration -- you can tell him what he said.

 1              **MR. POLAK:**  I don't want to slow things back --

 2              **THE COURT:**  We are not going to argue back and forth

 3    here.  The lawyers will have an opportunity to make any

 4    arguments, and the other side will get a chance to redirect the

 5    witness.

 6    BY MR. POLAK:

 7    Q.   The truth is that you will do anything to hurt Phi Theta

 8    Kappa and Dr. Tincher-Ladner.  Isn't that true?

 9    A.   That couldn't be further from the truth.

10    Q.   You heard Dr. Tincher-Ladner describe what she believes

11    happened with Michael Calvert and the unauthorized access into

12    PTK's computer system?

13    A.   I heard that, yes.

14    Q.   Is it true that Michael Calvert accessed PTK's computer

15    system with someone else's credentials?

16    A.   I don't know the details about that.  I just heard about

17    it about a week ago.  I had been flying to and from

18    Mississippi.  What I do know is true is that PTK accessed our

19    site, our internal workings, against our terms of service and

20    reverse engineered our website.  They looked at our social

21    platforms.  They complimented our store and bundling, one

22    directly was cited as complimenting our internal workings, and

23    so I know that there's an extensive record of PTK doing this.

24         I believe that two years later there seems to be a record

25    of us doing a similar investigation.  I haven't looked into it

1    or heard more since I heard this just days before our last

2    hearing.

3    Q.  So you do not have any information to dispute what

4    Dr. Tincher-Ladner described where Michael Calvert used

5    credentials of someone else and acted as if he was that person

6    and accessed PTK's server?  You don't have any information to

7    dispute that, do you?

8    A.  I haven't had a chance to even sit and look at anything

9    other than this hearing for the past week.

10   Q.  You were at the deposition of PTK's board chair, George

11   Boggs, weren't you?

12   A.  Yes.

13   Q.  And Dr. Boggs is 80 years old?  Do you recall him

14   testifying that he is 80 years old?

15   A.  I don't recall his exact age.

16   Q.  You sat through his entire deposition, and at the end,

17   while everyone was packing their stuff away, you went up to him

18   and threatened him that you would file an IRS complaint about

19   PTK, alleging that PTK had fraudulently filed a PPP2

20   application.  Isn't that true?

21   A.  That is, again, as far from the truth as you can get.  Mr.

22   Polak, you were standing within a foot to two feet of the

23   discussion.  It was very friendly, amicable.  We shook hands

24   and we discussed.  I don't see that you're testifying to that

25   happening, and it's because it didn't happen.

1    Q.  Well, if he remembers it differently, so be it.  But you

2    don't deny bringing up the PPP2 issue to him in that side bar

3    conversation while everyone else was packing their stuff up and

4    you were talking to this 80-year-old man?  You don't deny

5    bringing it up?

6              **THE WITNESS:**  Your Honor, PPP2 fraud is a big issue.

7              **THE COURT:**  Answer the question.  Did you bring it

8    up?

9    A.  So in the course of that conversation, the only context I

10    brought it up in is that I'm not here to bring awareness to the

11    issue.  I don't care about -- it's not my issue about PPP2, but

12    it doesn't seem like he's informed about his own organization.

13    And so to the extent I brought it up, it was just an awareness

14    that you should be aware of this, and nothing more was said

15    than that.

16    **BY MR. POLAK:**

17    Q.  Let's look at what you told me at your deposition when I

18    asked you about this.

19    A.  Sure.

20    Q.  Look at page 11.  I'll just read it into the record.

21              **THE COURT:**  Do you have a hard copy to show him?  I'm

22    sorry.  Ms. Summers had to run out.

23              **MR. POLAK:**  I do have a hard copy of it.  Actually,

24    I've got -- this is the transcript.

25              **THE COURT:**  Give it to him because he will need it.

1  **BY MR. POLAK:**

2  Q.  Let's go to page 11, lines 9 through 15.  This is

3  describing the conversation that you had with Dr. Boggs.

4      "Well, we discussed the lack of knowledge about the

5  lawsuit" --

6          **THE COURT:**  Slow down.

7  **BY MR. POLAK:**

8  Q.  We are on page 11, line 9.

9  A.  What subpage?

10  Q.  Page 11.

11  A.  There are four pages.

12  Q.  It's the transcript page 11, which is up in the right-hand

13  corner.

14  A.  Thank you.

15          **THE COURT:**  And this is the deposition of whom?

16          **MR. POLAK:**  Of Mr. Moradian, dated May 3, 2024.

17  **BY MR. POLAK:**

18  Q.  This is the answer:  "Well, we discussed the lack of

19  knowledge about the lawsuit, with him being the board member.

20  We discussed their known issues, one of them being, you know,

21  PPP2, and, you know, the issues around that, and, you know, not

22  really complying with the laws there, and that, you know, as

23  the chair member, board, he should, you know, be aware of

24  that."

25          And we go on to page 12, line 9 through 12.  "And he

 1   should be aware.  I mean, the fact of the matter is, if there

 2   is a PPP2 violation, we all have a fiduciary duty.  He has a

 3   fiduciary duty to be aware of and to make adjustments as

 4   needed."

 5       And your testimony is that's not a threat to this

 6   80-year-old man, who's the board chair, that you're going to

 7   drop a dime to the IRS about this PPP2 issue?

 8   A.  Of course not.

 9   Q.  And if Dr. Boggs remembers it differently, that's just a

10   disagreement between you two?

11   A.  I haven't heard anything that Dr. Boggs remembers it

12   otherwise, and I don't believe that to be the case.

13   Q.  You go on to talk on page 14.  You gave me this following

14   explanation as to why you even brought it up to Dr. Boggs.

15       Line 14, line 5 through 25.  "Well, I think it's front and

16   center in a case like this.  You know, when you are talking

17   about trademark and trade dress, you're also talking about

18   reputation and reputational issues."

19           **THE COURT:**  Slow down.  Slow down.

20           **MR. POLAK:**  Thank you.

21   **BY MR. POLAK:**

22   Q.  "And this ties directly into that.  If an organization is

23   committing fraud against the government, that's a reputational

24   issue.  I mean, that is an issue.  And this is an issue out

25   there."

1      So you accused -- you accused PTK, in front of Dr. Boggs,

2   in this conversation of committing fraud.

3   A.   Firstly --

4   Q.   That's what you told me at the deposition, Mr. Moradian.

5   A.   This is a deposition transcript, and Dr. Boggs was not

6   here, so you are mischaracterizing the statement.

7   Q.   I'm using your words, Mr. Moradian.  You told me that you

8   used the fraud word in your conversation with Dr. Boggs.  That

9   is what motivated you to bring it up to him.

10  A.   What we are seeing here is another in the track record of

11  silencing voices.  You know, if there is an issue, which there

12  has been nothing to disprove this issue, then Dr. Boggs does

13  have a fiduciary duty.  He is the chairman of the board.  We

14  all have a fiduciary duty.  And setting the record straight,

15  you know, we have had months to look at this --

16         THE COURT:  We are going to hear arguments on all

17  this.  I just want answers to questions and questions that can

18  be answered.  And it's okay to say yes or no to any question,

19  or I don't know.

20         THE WITNESS:  Yes, Your Honor.

21  BY MR. POLAK:

22  Q.   Going back to the websites, if the Court orders you to

23  take all of this down, the social media posts, the websites,

24  including the ones that you claim that don't exist that we just

25  looked at, what is going to stop you from finding some other

1   medium to put it in?  Hard copy letters.  It's hard for me to

2   imagine what else there is you could come up with, but I never

3   thought in a million years you would go publish 5,000 websites

4   of this either.

5       If the Court orders you specifically, take down those

6   websites, what is it that's going to prevent you from going and

7   putting it in another form?

8   A.  This sounds like a limit on speech, but I won't discuss

9   that.  You know, I will honor the word of the Court devoutly

10  and closely.  I am -- really, that is my intention.

11  Q.  I get that, Mr. Moradian, but the Court told you before

12  that the content, the content of the survey was what was

13  malicious.  And he said don't use it again.  And yeah, it was

14  in the context of the surveys, but you used the same content

15  again here today in these 5,000 websites in a worse way.  So

16  why should we believe you now that you're not going to do it

17  again?

18          **MR. NEWMAN:**  Objection.  Counsel is arguing --

19          **THE COURT:**  Objection sustained.

20  **BY MR. POLAK:**

21  Q.  You've asked for a bond here.  How does taking down all of

22  these websites and social media posts hurt your organization?

23  A.  Can you provide more clarity to what you are talking

24  about?

25  Q.  You're moving -- your paper is responding to this request.

1    It says that taking down all of these websites and social media

2    posts will hurt your company.

3    A.   Can you please show me that?

4    Q.   Did you not make that statement?  Do you not have any

5    evidence to show that you've been hurt?

6    A.   I'm not sure what you are referencing, and I would like to

7    see that.

8    Q.   Okay.  Regardless of the reference, will taking down all

9    of these websites and social media posts hurt your company in

10   some way?

11   A.   It will hurt the general public most of all.

12   Q.   Not asking about the general public.  I'm asking about

13   your company.

14   A.   Of course the time and effort is a barrier.  It's part of

15   the tactic you are utilizing here.  So to the effect that we

16   have to sit and manually deal with this as opposed to creating

17   value for students, you know, working on this litigation, yes,

18   that would be burdensome.

19          **MR. POLAK:**  We are going to look at the transcript.

20   If we can put this up on the Elmo.  To go back to the point I

21   was making before.

22   **BY MR. POLAK:**

23   Q.   This is Mr. Newman's argument to you, Your Honor.  Halfway

24   through the paragraph on page 133, line 14, based upon --

25          **THE COURT:**  That's the transcript from which hearing?

 1          **MR. POLAK:**  Evidentiary hearing on March 27, 2024.

 2    This is the injunction hearing.

 3          **THE COURT:**  Okay.

 4    **BY MR. POLAK:**

 5     Q.  I'm quoting.  "Based upon the surveys that Honor Society

 6    has done, it appears that PTK has lost over a third of its

 7    membership to Honor Society through unlawful and competitive

 8    measures."

 9          **MR. POLAK:**  I will also ask the Court to take notice

10    of Mr. Moradian's declaration that was tendered in connection

11    with that where he said something roughly to that same effect.

12    And that would be page 4, I believe it's starting at 25.  It's

13    document number 120-1, starting at paragraph 25, and I think it

14    goes on through paragraph 27, 28.

15          **THE COURT:**  And that's paragraph 25 of his

16    declaration?

17          **MR. POLAK:**  Of his declaration that's a part of the

18    Court's docket and record.  I pass the witness, Your Honor.

19          **THE WITNESS:**  Can I complete a statement to that,

20    what he was asking me?

21          **THE COURT:**  I guess he has no more questions.

22          **THE WITNESS:**  Okay.  Thank you.

23                    **DIRECT EXAMINATION**

24    **BY MR. NEWMAN:**

25     Q.  Good morning, Mr. Moradian.

1    A.  Good morning.

2    Q.  Did you attend college?

3    A.  Yes, I did.

4    Q.  Where?

5    A.  I attended the University of California, Los Angeles.

6    Q.  What was your major and minor?

7    A.  I studied business economics and a minor in accounting.

8    Q.  And after you obtained the economics and accounting

9    degrees from UCLA, did you take employment?

10   A.  Yes, I did.

11   Q.  What was that?

12   A.  I joined KPMG, which is one of the big four public

13   accounting firms.

14   Q.  And then sometime after KPMG, did you start a company?

15   A.  Yes, I did.

16   Q.  What was that?

17   A.  I started CampusBuddy.com.

18   Q.  What is CampusBuddy.com?

19   A.  CampusBuddy was one of the original Facebook apps that was

20   meant to connect people with their school and their courses.

21   We used public records in an innovative way to bring

22   transparency to the process of selecting your courses, for the

23   first time being able to see how professors grade, and what

24   classes are easy or hard.  This was a groundbreaking tool that

25   millions of college students used.  They saw their courses and

1    their classmates in their courses, and it was well received,

2    published in Techcrunch, Mashable, as well as many other tech

3    and educational resources.

4    Q.   And why was it important to you to provide that level of

5    transparency through CampusBuddy that had never been available

6    before?

7    A.   I think it was crucial at the time, and transparency is

8    even more crucial now, and that's because consumers don't have

9    full information, it's an opaque industry, to know how

10   educational operates, what operates in the space, and being

11   able to truly understand what course can help you advance to

12   pursue your goals.  You know, if a course is going to derail

13   your GPA, you may not get into that Harvard or Yale that you

14   dreamed of.  And to me, it was very important to help create

15   that level of transparency.  As consumers, students have a

16   right to know what they are paying for.

17   Q.   What year did you form CampusBuddy?

18   A.   That was in 2007.

19   Q.   Sometime after that, did you form CollegeBudget.com?

20   A.   Yes.

21   Q.   What year was that?

22   A.   I believe CollegeBudget.com was launched in 2010.

23   Q.   What is College Budget?

24   A.   It was a very innovative tool that used group buying and

25   collective power to help students save money on educational and

1    discretional purchases.  And it basically collected a million

2    plus consumers and let them negotiate with people from textbook

3    companies, to student loan, to American Apparel and Skype, some

4    of the largest national companies, to help them save dramatic

5    amounts of money, and we saved students millions of dollars in

6    the process.

7    Q.  And while you were running CollegeBudget.com, did you

8    apply to and were you accepted to the Harvard Business School?

9    A.  Well, while I was running these websites, they were very

10   well regarded.  The U.S. Department of State profiled me in an

11   article about "Why did you become an entrepreneur," which they

12   disseminated worldwide, in order to show the merits of

13   entrepreneurship, and we were in the Entrepreneur's

14   Businessweek's 25 best entrepreneurs.  And that type of

15   attention to the services that we were providing I think really

16   helped catapult me and the attention of what I'm capable of

17   doing and the change that we can create to business schools

18   that I applied to.

19   Q.  Were you accepted into the Harvard Business School?

20   A.  Yes, I was.

21   Q.  And after that acceptance, what did you do to decide

22   whether or not to attend?

23   A.  When I was admitted to Harvard Business School and

24   because, you know, my websites were really well received and in

25   the public sphere, we actually asked our consumers and the

1    general public to vote on whether they believed it would be

2    best for me to pursue Harvard Business School or to continue

3    down the path of entrepreneurship and innovation.

4    Q.  Did you do that through a survey?

5    A.  Yes, I did.

6    Q.  Was that survey ultimately published in the *Washington*

7    *Post*?

8    A.  Yes, it was.

9    Q.  Have you been doing surveys in connection with your

10   business ever since that time?

11   A.  Yes.

12   Q.  In or around 2012, did you start Honor Society?

13   A.  I started researching and building towards Honor Society

14   at that time, yes.

15   Q.  And what is Honor Society?

16   A.  Honor Society is an inclusive academic and professional

17   platform that's meant to help people achieve their goals and

18   their dreams.  It's not meant to be an exclusive network.  It's

19   meant to be inclusive and to streamline the process to leave

20   nobody behind, to make sure that the people who aren't

21   necessarily reaching a level such as Phi Beta Kappa, which is

22   the highest and most prestigious honor society, to give them

23   the tools to have hope and to believe and to work towards their

24   goals.  That was the real driver behind creating our honor

25   society.

1    Q.   Is Honor Society a membership club?

2    A.   Yes, it is.

3    Q.   And what do members get under that membership?

4    A.   They get a tremendous amount of goods.  So they get

5    benefits, a scholarship platform to apply for scholarships,

6    community, member events and trips, recognition, and a host of

7    career tools, namely our Career Edge tool, and broadly a type

8    of lifetime support to help them go further.

9    Q.   Is it a membership club kind of like the American

10   Automobile Association or American Association of Retired

11   Persons?

12   A.   I believe that is right, yes, because we are an affinity

13   group meant to help a whole cohort of people.

14   Q.   Like those, does Honor Society offer health care benefits?

15   A.   We offer health care discounts, yes, we do.

16   Q.   Does Honor Society offer restaurant discounts?

17   A.   At over 18,000 restaurants in America, yes, we do.

18   Q.   And Honor Society has a benefit hub?

19   A.   That is correct.  It's a tool that allows people to get

20   discounts across the nation at things like events, amusement

21   parks, and discretionary purchases, which is very well

22   received.

23   Q.   Does Honor Society have a service called Career Edge?

24   A.   Yes, we do.

25   Q.   When did Career Edge begin?

1    A.   Career Edge began I believe in 2014 or 2015.  By 2016, we

2    were using it so much that we appended the common law trademark

3    to the usage of that term on our cite to make it clear that the

4    Career Edge tool is something that we offer for our consumers,

5    and we believe we are building a brand on that.

6    Q.   What is the Career Edge tool?

7    A.   The Career Edge tool, it starts with access to Vault

8    Career Guides.  It's a tool that has over 8,000 company

9    profiles, industry profiles, interviewing tips and tricks, and

10    it was really, I believe, the tool that helped me get my first

11    job at KPMG.  So I believe in it so much that we actually

12    bought an expensive license to be able to offer it to all of

13    our membership.

14    Q.   In addition to being a membership club, is Honor Society

15    also an honor society?

16    A.   I believe it is.

17    Q.   What is an honor society?

18    A.   So an honor society is a group, an academic group that

19    helps recognize students and provide them the tools for

20    leadership and going further.  It's commonly understood that

21    they can offer things like scholarships and tools and resources

22    to their group.

23    Q.   And how does Honor Society function not as a membership

24    club but as an honor society?

25    A.   Sure.  I think there are many ways.  I think the first one

1    is that we created a GPA tier system that was created in order

2    to leave nobody behind.  So if you have a 3.2 GPA, you are a

3    honor student, at 3.5, you are a high honors, and at 3.8, you

4    are at highest honors.  But crucially, importantly, we state

5    that this is an inclusive society meant for everybody to join.

6    And the reason is because that while we believe in the merits

7    of academic recognition, we also know that this leaves people

8    behind.  The people that can't qualify, it perpetuates a

9    systemic inequity, because if you can't --

10                **THE COURT:**  Slow down.

11                **THE WITNESS:**  I'm sorry.  I'm just passionate about

12    this.

13    **BY MR. NEWMAN:**

14    Q.  You are going a mile a minute, so if you could slow down,

15    I think that the court reporter --

16    A.  I'm sorry.

17    Q.  -- would be really grateful.  I think you were testifying

18    about how honor functions as an honor society.  Would you like

19    to finish that testimony?

20    A.  Yes, sir.  By giving access to everybody, not just those

21    who receive an arbitrary GPA, we are making sure that there's

22    access.  We are making sure that students don't get left

23    behind, because there is known systemic inequity in higher

24    education and education.  The second that you take a group and

25    say, hey, you've achieved, so we are going to give you the

1    tools to achieve more, then, by definition, those people that

2    don't receive these tools are left behind.

3         And so this is exacerbating the way honor societies are

4    set up.  It is an exacerbating systemic inequity, because you

5    can't, with a straight face, sit and say by giving

6    scholarships, transfer scholarships, tools to people doesn't

7    leave behind the people who don't have access.

8         So in building our Honor Society, our main goal, our

9    prerogative, and something that distinguishes us from societies

10   like Phi Beta Kappa, Phi Kappa Phi, the original honor

11   societies, and even the ones that have come along, like Phi

12   Beta Kappa, is that our reason for existence is to help

13   everybody, to push people ahead, and to maximize their

14   leadership and give them hope.  This is a known -- widely known

15   practice in honor society space, and it is one that I deeply

16   believe in.

17   Q.  Does Honor Society compete in multiple markets in the

18   honor society space?

19   A.  Yes, we do.

20   Q.  What are those?

21   A.  So predominantly, we sought to be a four-year honor

22   society, but when we launched, we knew that this was meant to

23   be a resource for all.  And so we also operate in the high

24   school space.  We operate in the graduate school space.  We

25   operate in the professional and alumni space.  And we operate

1   in the community college and technical college spaces.

2   Q.   Why do you believe each of those spaces are separate

3   markets?

4   A.   Well, they are crucially separated because a student at

5   UCLA can't join Phi Theta Kappa.  Alternatively, a student at

6   Hinds Community College can't attend Phi Beta Kappa at Harvard

7   or any chapter of Phi Beta Kappa.  They only serve their

8   addressable market, and it's important that there's an

9   opportunity for people to have selection and choice in

10  competition within each of these marketplaces.

11  Q.   Do you know what percent of your business is limited to

12  that two-year community college market?

13  A.   Roughly, yes.

14  Q.   What is that percent?

15  A.   It is approximately ten percent.

16  Q.   So 90 percent of your business is for markets outside of

17  the community college base and only ten percent is for the

18  community college base?

19  A.   That's right.  We only have about ten percent of our

20  members that come in the whole community college space,

21  including those that may not qualify for other memberships,

22  such as Phi Theta Kappa.

23  Q.   Is there a GPA requirement to join Honor Society?

24  A.   No.

25  Q.   Why not?

1   A.   Because we believe that it perpetuates systemic inequities

2   and is a structural bias, and that we believe and our model is

3   to make sure that that doesn't punish people who need the tools

4   to go further.   And this is a practice that is well established

5   in our space.

6        And I'm not here to say that other honor societies

7   shouldn't exist.   I'm just here to say that there should be an

8   option for everybody.

9   Q.   Do you have an understanding whether any traditional honor

10  societies lacked a GPA requirement?

11  A.   Yes, I do.

12  Q.   And what were those?

13  A.   Well, Phi Beta Kappa, which is considered the oldest and

14  the most prestigious honor society, which has no relationship

15  to Phi Theta Kappa, and it is widely known they are separate

16  organizations.   So I just want to clarify that.   Phi Beta Kappa

17  didn't have a GPA restriction for over 150 years, from 1776 to

18  approximately the 1920s, and there was a debate, a literary

19  debate and scholarly club.

20  Q.   And are you aware of other reputable honor societies today

21  that lack a GPA requirement?

22  A.   Yes, I am.

23  Q.   What are a couple of examples of those?

24  A.   Well, I believe there are many, but I would like to start

25  with the National Adult Education Honor Society, which deals in

1  the community college space primarily.  They have been around

2  since 1990, I believe, and make it exceedingly clear that there

3  is no GPA restriction.

4  Q.  Does Honor Society provide a scholarship platform?

5  A.  We do offer a scholarships platform.  And there are more

6  honor societies which I would like to discuss.  In terms of our

7  scholarship platform, we offer students the opportunity to

8  access hundreds of scholarships throughout our platform, and

9  it's open to everybody without payment.  It's a tool that we've

10  had since the beginning, and so we are actually bringing

11  scholarships in front of students.

12       But we also have funded scholarships, and we funded the

13  Honor Society Foundation which gives scholarships.  So to that

14  effect, we have given over a half a million dollars directly to

15  students to help them further their -- to hundreds of students

16  to help them further their educational opportunities.

17  Q.  Does Honor Society assist in job placement?

18  A.  Yes, we have our Career Edge tool, and the Career Edge

19  tool has a job board, it has a resumé uploader and helps people

20  both find jobs and connect them again with our Vault Career

21  Guide where they can research jobs.

22  Q.  Does Honor Society help students find mentors?

23  A.  Yes, we have a mentorship platform within our site that

24  connects people both with mentors and even allows them to

25  become a mentor.  So it's a tool that helps our society

```
1    essentially help and be helped by others in their shoes.
2    Q.  Are you familiar with the term "regalia"?
3    A.  Yes, I am.
4    Q.  What is regalia?
5    A.  So regalia is -- actually, there are many definitions of
6    what a regalia is.  It starts with a -- it's an honorary piece
7    of accessory originally used in royal hierarchies, militaries,
8    but it is also in the educational space.  So when you graduate,
9    people wear regalia of their school, their fraternity,
10   sorority, honor societies, clubs, many things.
11   Q.  Does Honor Society's regalia have any colors?
12   A.  Yes.
13   Q.  What are the colors?
14   A.  The stole is gold, and we also use blue in the cord, so
15   gold and blue.
16   Q.  Why did Honor Society choose blue and gold?
17   A.  Well, Honor Society blue and gold is used because, first,
18   they are the most common colors in honor societies by far.  Phi
19   Beta Kappa, the original honor society, uses blue and gold, as
20   does Phi Kappa Phi, as does Golden Key, which I was a member
21   of.  UCLA is blue and gold.  But I think that blue and gold are
22   used because gold is the color of success.
23        Our Olympic medals, the first place is gold.  And blue,
24   like a blue ribbon at a carnival, is also a symbol for success.
25   So for those reasons, my and many alma maters, like UCLA and
```

1    Michigan, also adorn themselves with blue and gold.  And that

2    is just a very common academic color, and it's, if not the

3    majority, many of the most influential honor societies dating

4    back to 1776 use blue and gold.

5    Q.  What other honor societies use blue and gold regalia?

6    A.  The honor societies that use blue and gold are Phi Beta

7    Kappa, from 1776, Phi Kappa Phi, from the 1800s, which I

8    believe Dr. Tincher-Ladner is a member of, based on her

9    LinkedIn.  Golden Key Honor Society, which has been around for

10   about 50 or 60 years, Blue Key Honor Society, Omicron Delta

11   Kappa, which has been around since the 1800s, uses blue and

12   gold.  Sigma Xi, which has been around since the 1800s used

13   blue and gold.  The Salute Veterans Honor Society as well uses

14   blue and gold.  Then many of the specialized honor societies,

15   such as Psi Chi, which is in the community college space, uses

16   blue and gold and gold regalia, Psi Beta Mu -- sorry, Mu Alpha

17   Theta, which is a mathematics honor society, uses blue and

18   gold.  And Mortar Board uses gold stoles.  There are many honor

19   societies.  I would say I'm about a quarter through the list.

20   Q.  Does Honor Society conduct events for its members?

21   A.  Yes, we do.

22   Q.  What type of events?

23   A.  We host member trips, member banquets, and more commonly

24   lately, we partner with MBA and NHL teams to give our members

25   exclusive experiences with the teams, and they find it to be a

1    great camaraderie within the community and also to do exclusive

2    things with these teams.

3    Q.   What types of events have you done with the professional

4    teams?

5    A.   Sure.  So with the Vegas Golden Eggs, for example, our

6    group was able to hold the flag and be on the ice for the

7    Pledge of Allegiance, and that was a very special member

8    benefit for that group.  We did the same thing in Los Angeles

9    with the Kings, where members were able to go up on there, and

10   many others.

11   Q.   Have you ever held an event here in Jackson?

12   A.   Yes, we have.

13   Q.   What was that event?

14   A.   We held an event at the Highball Bowling Lanes in the

15   Fondren area.  It was attended by several members, and we had a

16   bowling night, and we catered food, and we were able to connect

17   with the members here in Jackson.

18   Q.   And you have had events in other cities?

19   A.   Yes, that's right.

20   Q.   Los Angeles?

21   A.   Yes.

22   Q.   Houston?

23   A.   With the Houston Rockets, yes.

24   Q.   And New Orleans?

25   A.   With the Pelicans, with exclusive content, yes.

1    Q.  Atlanta?

2    A.  Yes, with the Atlanta Hawks.

3    Q.  Chicago?

4    A.  That was a great event where the Bulls started taking our

5    members behind the scenes to get a tour of working for the

6    Chicago Bulls and to understand how sports management works.

7    That was one of my personal favorites.

8    Q.  Philadelphia?

9    A.  Yes.  We were honored on the court during the game, our

10   members from Philadelphia, and that was a special experience

11   for many of our members.  I believe that footage is on YouTube

12   today.

13   Q.  Indiana?

14   A.  Yes, with the Indiana Pacers.

15   Q.  When a member signs up with Honor Society, Honor Society

16   sometimes charges a fee; is that correct?

17   A.  There are options to have membership dues, yes.

18   Q.  But not everything requires a fee; is that right?

19   A.  That is right.

20   Q.  When consumers pay fees to Honor Society, does Honor

21   Society have a refund policy?

22   A.  Yes, we do.

23   Q.  What is the refund policy?

24   A.  So anybody can get a refund from our organization for any

25   reason or for no reason.  This is really to ensure that members

1    are satisfied because we want to make sure that people want to

2    be here for the right reasons and that they want to engage with

3    our platform.  If they don't feel like it is worth it, we don't

4    want to waste their time or money.  This is in contrast to many

5    other honor societies, such as Phi Theta Kappa, that don't have

6    a refund policy at all.

7    Q.  In connection with the honor society business, I think we

8    have heard testimony that honor societies use public records

9    requests; is that right?

10   A.  That's right.

11   Q.  When did Honor Society start utilizing public records

12   requests in connection with its business?

13   A.  We started using public records from before we even

14   launched publicly.

15   Q.  Has Honor Society used public records like the FOIA

16   requests consistently since the beginning of its business?

17   A.  Yes, we use them every year.

18   Q.  What for?

19   A.  For learning about our market, identifying high achievers,

20   such as through the dean's list, chancellor's list, president's

21   list, any awards they may receive, and also by gaining general

22   knowledge of the institutions that we work with and the

23   students that go there.

24   Q.  How frequently has Honor Society sent out public records

25   requests since it began?

1   A.   So we send out requests every single year.  I would say

2   generally about one to three times per year, but without

3   exception, every year we do public records.

4   Q.   What was Honor Society's first exposure to PTK?

5   A.   The first exposure that I can recall, and it was really

6   the only exposure that I know of prior to the lawsuit, was

7   being at the National Association of College Admissions

8   Counselors where we were walking around and connecting with

9   others in the higher education space.

10       Amongst the tables, I noticed there was a table for Phi

11  Theta Kappa.  I wasn't really sure what that was, so I used

12  Instagram to confirm with me that this is an honor society, to

13  confirm who they are and what they do, and I was surprised to

14  even learn that -- I didn't understand at all at that time why

15  would a community college honor society be at a four-year

16  college fair.  So that piqued by interest, and I went over and

17  I confidently and amicably introduced myself, I talked about

18  who we are and what we do.  I thought we had a great

19  conversation, and I handed my business card over and said,

20  Please feel free to contact me at any time.

21  Q.   What year was that?

22  A.   That was in 2018.

23  Q.   Before 2018, had you ever heard of PTK?

24  A.   To the only extent that we've heard about it, and the

25  discovery shows this, we have only heard or talked about them

 1    in a group setting, usually when discussing five to 50 to 60

 2    honor societies.  We've never really talked about PTK

 3    individually at all.  It's never been a conversation within our

 4    team, which diametrically contrasts with how PTK has viewed us.

 5    Q.  And before this lawsuit, did Honor Society ever conduct

 6    competitive research on PTK?

 7    A.  No, not on PTK.

 8    Q.  Why not?

 9    A.  We didn't view them as somebody that merited a competitive

10    study.  In honesty, we view the honor society space as an

11    accreditive accretion area, where societies can help one

12    another, they can grow, there are tools and resources that you

13    can provide one another.  We never viewed this as a kill or be

14    killed competition which PTK, to our knowledge now, has taken

15    from even before the discovery period of 2016.  So we never

16    felt a need to study them.

17    Q.  Do you have an understanding whether PTK conducted

18    competitive research against honor society?

19    A.  Yes, we know a lot.

20    Q.  What is your understanding of that?

21    A.  Well, it starts in discovery in 2016, when an employee of

22    PTK says, HonorSociety.Org, Inc. is really gaining momentum.

23    So, in 2016, they are saying that and they're discussing the

24    momentum we are building.

25         And then from there, it snowballs into them asking schools

1    and telling schools we are a scam, echoing and reinforcing that

2    they should block our domains and not allow us to even have the

3    freedom of communicating with students.  They, you know,

4    supported articles that went out that called us a scam, put Xs

5    through our e-mails, and have been essentially degrading and

6    maliciously aligning us -- maligning us within the honor

7    society space the whole way.

8    Q.  Did you testify earlier that a PTK employee had

9    surreptitiously accessed Honor Society's systems?

10   A.  That's right.

11   Q.  What was the nature of that?

12   A.  In 2018, a PTK employee took the liberty to joining our

13   website where they screenshot every single page of the sign-up

14   flow, which is against our terms of service for reverse

15   engineering, and our site is explicitly for noncommercial

16   personal use.  They then screenshotted the inner workings of

17   our site, including our social platform that is members only,

18   and our graduation regalia section, which were reported back to

19   Dr. Lynn Tincher-Ladner, and she remarked in the discovery that

20   she loves what we are doing with our regalia and asked for it

21   to be --

22            **MR. POLAK:**  Objection your Honor, testifying from

23   documents that are not in evidence is just not appropriate.  I

24   let the former answer go because it was general enough.  That

25   answer there --

1          **THE COURT:**  Objection sustained.  What issue is

2     before the Court today that we started out on Friday, what's

3     the issue?  What's the issue?

4          **MR. NEWMAN:**  The issue is malicious intent, and I

5     will point out that PTK spent hours with Dr. Lynn

6     Tincher-Ladner and Michael Moradian, and I can assure the Court

7     that our examination will be a fraction in time, but I think we

8     should be able to explore the same types of areas, and there

9     are allegations of improper conduct and malicious intent, and

10    this goes to that.  And I think the record should reflect

11    testimony accordingly.

12         There were hours of testimony that I heard having nothing

13    to do with the issues before the Court.  The Court allowed it,

14    and I think the Court should allow this testimony which I think

15    does go to the issues.

16         **MR. POLAK:**  The alleged malicious intent of PTK is

17    not at issue here.  The only issue before the Court is the

18    malicious intent of the man on the stand and Honor Society.

19         **THE COURT:**  And I suppose -- okay.  Yeah.  I mean,

20    the motion that's been filed by PTK for preliminary injunction,

21    I think, or temporary restraining order, in order to restrain

22    the conduct of Honor Society.  I mean, I'm giving you some

23    leeway, but if he is talking about -- is this a justification

24    for why they say he did something, is he testifying that I'm

25    justified in doing whatever I did because of what happened in

 1    2016 and 2018, and I've learned in discovery that PTK never

 2    liked us in the beginning?  I mean, it sounds like that's where

 3    we are going.  And I don't know if we want to go there.

 4         **MR. NEWMAN:**  He's testifying that PTK did a certain

 5    type of competitive research.  Honor Society had never done

 6    that, but after PTK did, it responded accordingly.  And to the

 7    extent --

 8         **THE COURT:**  Okay.  So what justifies -- if the Court

 9    believes the testimony so far, what justifies the continuing --

10    if he were to do a survey question along the line of what the

11    Court has said don't do, regardless of what PTK has done, does

12    that matter, I guess is the question.  You know, if he's here

13    to testify that I did all of what they've said that they did,

14    but it was because they started research on my company first,

15    does that justify what he might have done after the date of the

16    Court's injunction?

17         **MR. NEWMAN:**  I think it goes to PTK's implication

18    that what Honor Society did was improper, when PTK engaged in

19    the same conduct and wasn't improper from their vantage point.

20         **THE COURT:**  I will give you some leeway, but the

21    lawyers are going to have an opportunity to argue what it is

22    that the Court ought to be focused on in ruling on the merits

23    before it -- on the merits of this particular motion.

24         The parties do understand that you all are still in the

25    throes of discovery in this case.  You have still got stuff

1  pending before Judge Myers, I think.  You are still going to be

2  litigating this case.  And, you know, you have still got a

3  trial setting scheduled, I think, before a jury at some time

4  next year.  And I just want to make sure the parties understand

5  what's before the Court on this emergency motion that the Court

6  stopped all that it had to do to take this up.

7        **MR. NEWMAN:**  So what's before the Court is PTK

8  engaged in a series of malicious attacks against Honor Society.

9  Honor Society stayed silent, and at some point it needed to

10  defend its reputation and point to the fact that PTK is the one

11  who is engaged in deceptive practices.  So this testimony goes

12  to the fact that there is free speech on both sides, and they

13  want to shut down free speech only on one side.

14        **THE COURT:**  I understand that.  We are going to argue

15  about what free speech is and what rights people have if this

16  Court violates someone's free speech rights.

17        So, again, I don't want to step on you from trying to put

18  your proof up, but this -- you know, I'm sort of trying to keep

19  things focused on what it is, the motion that's before the

20  Court right now.

21        **MR. NEWMAN:**  Thank you.

22        **THE COURT:**  All right.  You may proceed.

23  **BY MR. NEWMAN:**

24  Q.  Do you know whether PTK considered Honor Society a threat

25  to its business?

1    A.  Yes, I do.

2    Q.  And what is your understanding of that?

3    A.  Yes, they highly did.  They viewed us as the enemy, the

4    competitor, that they need market share, that they have no

5    problems stealing from competitors, and that, you know,

6    essentially they were going to protect their market share.

7              **MR. POLAK:**  Your Honor, same objection I said before.

8    He is testifying about documents and statements that are out of

9    court and are not in the record.

10             **THE COURT:**  The Court overrules the objection.  I

11   will be able to decipher between the two.  I'm the finder of

12   fact today and for Friday's purposes.

13   **BY MR. NEWMAN:**

14   Q.  And do you know whether PTK made public statements about

15   Honor Society?

16   A.  Yes, they have.

17   Q.  And when did that occur?

18   A.  Well, that occurred through chapters since the beginning.

19   But most narrowly, the day they filed their lawsuit, which we

20   were totally unaware of and had no communication whatsoever,

21   they filed a press release that called us a lot of maligning

22   things, including, I believe, willfully deceiving or to that

23   effect, and that they should contact the Attorney Generals and

24   the BBB.

25             You know, we didn't even know who these people were when

 1    they filed this.  Nevertheless, we sat on our hands for two and

 2    a half years.  We didn't respond because we didn't believe this

 3    to be a substantial case.  What they filed was about blue and

 4    gold, which we know many honor societies use, including in

 5    community colleges.  The stoles --

 6         **THE COURT:**  That issue, though -- again, this issue

 7    is being litigated, right?  This is what your trademark case is

 8    about and all of that.  I mean, there is a lawsuit.

 9         Now, I think the issue before this Court, I think -- now,

10    please help me out if I'm wrong, if I'm wrong.  PTK says, look,

11    Judge, he has violated your order that you entered -- not he,

12    but Honor Society has violated the order that you entered on

13    March 28, 2024, the preliminary injunction order.

14         **MR. NEWMAN:**  That's not the issue.  Mr. Wallace said

15    that they are not alleging a violation of that order.

16         **THE COURT:**  Okay.  They attempted to prove that that

17    order was not expansive enough?

18         **MR. NEWMAN:**  I think what Mr. Wallace said --

19         **THE COURT:**  That your order, Judge, is not expansive

20    enough.  It doesn't have the right words in it, it doesn't have

21    enough words in it because Honor Society has found a way to get

22    around the -- what we believe, I assume what they believe, is

23    not only the wording but the spirit of the order.

24         I presume that's what I'm going to hear, and I'm going to

25    take in all of the arguments.  So I want to get to the facts of

1    this.  What happened leading up to the lawsuit, as to why PTK

2    filed the original lawsuit, people can file lawsuits.  People

3    can counterclaim, as you all have done.  And that lawsuit is

4    being heard.  In the midst of that lawsuit, this Court had a

5    preliminary injunction hearing and specifically stated about

6    some survey questions, I think.

7         So I think we need to try to be focused on that.  And, you

8    know, to the extent there is ill will between the parties and

9    how long it has been going on, I just -- I don't know how well

10    that resonates with me at this point.

11              **MR. NEWMAN:**  Understood, Your Honor.  Thank you for

12    that.

13    **BY MR. NEWMAN:**

14    Q.  During the course of this lawsuit, before Honor Society

15    filed its counterclaims, did PTK make public statements in

16    addition to the press release about Honor Society?

17    A.  Yes.

18    Q.  And what was the nature of those communications to the

19    public?

20    A.  They communicated to newspapers and other press about our

21    lawsuit.  They communicated to all of their chapters and

22    chapter advisors.  And I think it's important to know how this

23    ties back is that every single thing that is alleged by PTK at

24    this moment, they have done.  They have -- this is a one-sided

25    justice what they are seeking.

```
 1    Q.  Let's just stick to the question.  I think the Court might
 2   be growing impatient.  What was the nature of those
 3   communications to the public that PTK said?
 4    A.  So the nature to the public was to take statements and
 5   malign us and ask us to be reported to officials.  They
 6   referenced us as a scam.  They've communicated to chapters and
 7   school officials of the like, and they've perpetuated their
 8   narrative for two years.
 9    Q.  Did PTK and its chapters post on social media?
10    A.  Yes.
11    Q.  Do you remember the nature of those posts?
12    A.  Yes.
13    Q.  What were they?
14    A.  They posted "scam alert" with big Xs through our content.
15   As recently as March 1st --
16         MR. POLAK:  Your Honor, I have to object to this one
17   because I don't know what document he is talking about.  I
18   don't know what social media posting he is talking about.
19   There is no document in evidence.  If it's something we said,
20   it won't be hearsay, but I've got to know that it actually
21   exists, and I don't have any way to cross-examine this witness
22   about a document that they claim is in existence that we don't
23   have.
24         THE COURT:  Is there a document?
25         MR. NEWMAN:  We could present documents, but I'm not
```

1    presenting them right now.

2            **THE COURT:**  He can't testify about what is not in

3    evidence.

4            **MR. NEWMAN:**  Okay.

5            **MR. POLAK:**  I would move to strike that testimony,

6    Your Honor.

7            **MR. NEWMAN:**  I would like to show the witness

8    Exhibit 5 to Moradian.

9            **MR. POLAK:**  Is that Defendant's Exhibit 5?

10           **THE COURT:**  Is that part of the declaration of Mr.

11   Moradian?

12           **MR. NEWMAN:**  Yes, it is Exhibit 5 to the declaration

13   of Mr. Moradian.

14           **THE COURT:**  Okay.

15   **BY MR. NEWMAN:**

16    Q.  Do you recognize Exhibit 5?

17    A.  Yes, I do.

18    Q.  What is it?

19           **MR. POLAK:**  Your Honor, we objected to this document

20   in the objections that we tendered to the Court, in that it is

21   hearsay.  It has been suggested and represented in the prior

22   answers that this is a statement by PTK.  It is not.  It is

23   made by some poster called Phi Theta Kappa Alumni of Washburn.

24   That's what the document says.

25           **MR. NEWMAN:**  He can cross-examine the witness about

```
 1   this.
 2            MR. POLAK:  It hasn't been authenticated either.
 3   There are hearsay issues.  There are authentication issues,
 4   because this is not a business record.  It's not an admission
 5   by Phi Theta Kappa.  It is not even a statement of Phi Theta
 6   Kappa.  It is not evidence.
 7            THE COURT:  What is your question?
 8   BY MR. NEWMAN:
 9   Q.  Do you recognize this document?
10   A.  Yes, I do.
11   Q.  Where did you first see it?
12   A.  On Facebook.com.
13   Q.  And did you download it?
14   A.  Yes.
15   Q.  And who do you understand published it?
16   A.  I understand it to be the Phi Theta Kappa chapter and
17   alumni of Washburn.
18            MR. POLAK:  Objection.
19            THE COURT:  Hold on.
20   BY MR. NEWMAN:
21   Q.  What's the nature of the statement?
22   A.  Well, it's taking our trademarked content and our
23   registered trademark and putting a scam alert on it, and, you
24   know, repeatedly referring to us as a scam, to be on alert,
25   scam alert, beware, and it calls us a fake group.  We are not a
```

1    fake group.  As we've discussed, we have been doing all of

2    these things since 2014.

3              **THE COURT:**  Objection sustained.  I mean, do we know

4    who posted this?  Are you saying that PTK posted this?

5              **MR. NEWMAN:**  Your Honor, we are in the midst of

6    discovery.  So we had to prepare for this within a week.  This

7    was posted by a PTK chapter that gets their information from

8    PTK.

9              **THE COURT:**  So what is good for the goose is good for

10   the gander then.  I mean, that's why -- I mean, because -- even

11   if this is true, even if PTK did this, even if

12   Ms. Tincher-Ladner did this, what does that have to do with the

13   issue before the Court today?

14             **MR. NEWMAN:**  Thank you.  PTK engaged in a malicious

15   campaign of speech against our client, who didn't respond until

16   recently.  And because there are all of these public statements

17   maligning Honor Society, Honor Society at some point had to

18   respond, had to respond and say, We are not a scam.  They are

19   the scam.

20             **THE COURT:**  There is this Court's order.  I'm looking

21   back at the March 28th order.  I know it said refrain from

22   sending the above six survey questions.  "Turn over to PTK all

23   responses to surveys distributed."  I don't know if that has

24   been done.  We will hear about that.

25             **MR. NEWMAN:**  It has.

```
 1              THE COURT:  "Provide PTK with reasonable advance
 2   notice should Honor Society desire to use similar but reworded
 3   questions in future surveys."  I realize we say "in future
 4   surveys."
 5              MR. NEWMAN:  In surveys.
 6              THE COURT:  I understand that.  I know what the
 7   argument is going to be about, but I'm focused on the merits of
 8   the motion before me.  What's good for the goose may or may not
 9   be good for the gander, may, but talking about PTK's bad
10   behavior that's in the midst of being discovered during this
11   lawsuit does little to me, I think, to justify what might have
12   been done after March 28th.
13              MR. NEWMAN:  It's responding to a campaign.
14              THE COURT:  So -- okay --
15              MR. NEWMAN:  Which shows --
16              THE COURT:  You will be able to argue that he was
17   aware of that after March 28th then.
18              MR. NEWMAN:  Which shows good faith intent.
19              THE COURT:  You will be able to argue that.  Do you
20   want me to -- okay.  You will be able to argue that.
21              MR. NEWMAN:  Thank you.
22              THE COURT:  All right.
23              MR. POLAK:  Just so the record is clear, is this
24   document in evidence or --
25              THE COURT:  No, this document is not in evidence.  I
```

 1    think the objection is rightfully sustained, but he's heard

 2    about it, so --

 3            **MR. NEWMAN:**  So, Your Honor, if we present a whole

 4    series of other documents from PTK chapters maligning Honor

 5    Society, is the Court going to order that they are hearsay and

 6    inadmissible, even though we only had a week to prepare for

 7    this and we didn't have a chance to take their depositions to

 8    ask questions whether that flowed from the top?  Because I have

 9    other exhibits like this, several.  Should I skip those?

10        **MR. POLAK:**  Your Honor, we don't even have this

11    document.  It has no Bates number.  We have never seen it

12    before.  They have pulled it out of thin air, yet this document

13    would have been responsive to document requests that we sent

14    back in April of 2023.

15            **MR. NEWMAN:**  That is just false.  You had the

16    document in discovery.

17            **MR. POLAK:**  I don't see the Bates number on it, Mr.

18    Newman.

19            **THE COURT:**  I tell you what.  Y'all review what

20    documents you have over the lunch break.  We are going to take

21    the lunch break now.  We will be back in an hour and 15

22    minutes.

23        I never want to step on a party for making their record

24    and proving whatever case that needs to be proven, but I'd like

25    the parties to think about -- and I will think about it over

 1    this lunch break -- I mean, what is the issue before the Court

 2    that the parties want me to take care of in light of the motion

 3    for preliminary -- temporary restraining order and preliminary

 4    injunction that I've been hearing since Friday.

 5        And again, all the free speech and all of that stuff will

 6    be argued by the lawyers, what handcuffs -- how far does the

 7    First Amendment handcuff this Court from doing anything,

 8    because I do believe that's Honor Society's argument, the First

 9    Amendment does not allow this Court to do anything, no prior

10    restraint and all of that.

11        And I heard some testimony earlier about, you know, not

12    having the opportunity to have corrected the record of the

13    other hearing and not having, you know, quick -- maybe there

14    was some things wrong in the first preliminary injunction, but

15    there has been no motion for reconsideration, there's been

16    nothing to ask the Court to correct anything.  There's been no

17    appeal of it, if there could have been an appeal.

18        **MR. NEWMAN:**  I think the reason for that, Your Honor,

19    is because it was limited to survey questions, and Honor

20    Society at the time never intended to send that again.

21        **THE COURT:**  I've heard from the witness today,

22    though, that there were some things wrong with it, there was

23    some error, there was something wrong with it, but I never

24    heard any motion for reconsideration or anything.

25        **MR. NEWMAN:**  That's because the order didn't impact

1   Honor Society's speech because it didn't intend to send those

2   survey questions again, so the order not to didn't impact it,

3   didn't feel a need to appeal.  But here there's a request for a

4   much broader injunction, and the Court should understand that

5   Honor Society didn't act maliciously and didn't violate the

6   law.

7        **THE COURT:**  And -- but whether the Court can do

8   something is a legal question.  And I understand all the

9   testimony one might want to put there, but that's a legal issue

10  at the end of the day.  I can assume that everything Honor

11  Society wants to put in is the truth.  Right?

12       **MR. NEWMAN:**  Yes, Your Honor.

13       **THE COURT:**  And from there, I could figure out what

14  it is that -- what it is that might limit this Court's

15  authority under the First Amendment.  So assuming everything

16  you say is true, everything, what can the Court do?

17       **MR. NEWMAN:**  Or can't just issue an injunction.

18       **THE COURT:**  Right.  I know that.  That's your

19  argument, and that's an argument that's reserved for the

20  lawyers to make.

21       And again, I don't want to step on your toes about trying

22  to prove your case and giving you the sufficient time, to have

23  the same amount of time that the other side has had.  But let's

24  focus on what the legal issue will be at the end of the day,

25  you know, because I do see First Amendment blasting throughout

```
 1   the response to PTK's thing.  Well, even if PTK wins on
 2   everything, Judge, you still can't do anything because they
 3   actually didn't win because the First Amendment says that you
 4   can't do anything because, you know -- so I will be ready to
 5   hear your arguments, and I don't want to make them for you.
 6   But I do want the parties to think about what -- what has
 7   caused the Court to set aside this time for this hearing on
 8   Friday and today with hopefully trying to conclude it today,
 9   because if it is not concluded today, you know, I just don't
10   know when it might be.
11          MR. NEWMAN:  Your Honor, as I noted, PTK got six
12   hours.  I'm going to take a fraction of that.  I think you will
13   find that a lot of the questions are honed more closely to the
14   issues, but I would like the opportunity to present a case.
15          THE COURT:  Make sure that the witness answers the
16   questions in a more honed way, then.
17          MR. NEWMAN:  That's important too.  Thank you.
18          THE COURT:  We will be in recess until 1:30.
19      (RECESS TAKEN AT 12:11 P.M. UNTIL 1:41 P.M.)
20          THE COURT:  Mr. Moradian, you may return to the
21   stand.  I always ask is there anything to take up before we
22   resume?  No resolution of the matter?  Okay.  All right.
23          MR. POLAK:  The only thing we might add, you had
24   asked us to send to counsel those screenshots from the live
25   websites, and Mr. Cowan did that 45 minutes ago, probably.  So
```

```
 1   counsel now has them.  I don't know if you need those filed
 2   with the Court, but we could do that if you need us to.
 3             THE COURT:  Okay.  Yeah, at some point, they should
 4   be made a part of this record.
 5             MR. POLAK:  Made a part of this record?
 6             THE COURT:  Uh-huh.  Ready?
 7             MR. NEWMAN:  Thank you.
 8   BY MR. NEWMAN:
 9   Q.  Mr. Moradian, did you listen to Dr. Tincher-Ladner's
10   testimony yesterday?
11   A.  Yes, I did.
12   Q.  And she testified about why she believes that PTK members
13   are in the top ten percent of their class.  Did you hear that
14   testimony?
15   A.  Yes, I did.
16   Q.  And what did you understand her methodology to be?  I just
17   want to make clear that you understood what she was saying.
18   Actually, strike that.  Did you understand that there was a
19   numerator and a denominator?
20   A.  Yes, I did.
21   Q.  And the numerator is the number of invitees that PTK has
22   per year?
23   A.  Yes, I did.
24   Q.  And the denominator is the total number of students at the
25   schools where PTK sends invites?  Is that your understanding?
```

1    A.   Yes.

2    Q.   And doing simple math, top ten percent.  Was that your

3    understanding?

4    A.   That's what they presented, yes.

5    Q.   And Dr. Tincher-Ladner cited an Excel spreadsheet,

6    correct?

7    A.   Yes.

8         **MR. POLAK:**  Objection.  I know we are trying to keep

9    things moving along, but he is leading the witness, and I would

10   object to leading.

11        **THE COURT:**  Okay.

12        **MR. NEWMAN:**  Your Honor, I am admittedly leading.  I

13   could take the witness through --

14        **THE COURT:**  Don't lead the witness.

15        **MR. NEWMAN:**  Okay.  I won't lead the witness.  Thank

16   you.

17        **THE COURT:**  That's fine.  I'm refreshed now.  I have

18   candy, I have water.  I'm refreshed.  So we are good for the

19   next several hours right now.

20        **MR. NEWMAN:**  All right.  We are good.

21   **BY MR. NEWMAN:**

22   Q.   Did you hear Dr. Tincher-Ladner testify about a

23   spreadsheet?

24   A.   Yes, I did.

25   Q.   And did you understand that spreadsheet to support her

1    calculations?

2    A.    I understand that it was intended to support them.

3    However, I refute the calculations.

4    Q.    Have you had a chance to review that spreadsheet?

5    A.    Not until about 36 hours ago.

6    Q.    Why not until 36 hours ago?

7    A.    These documents that I needed to defend myself were

8    withheld from me as AEO.    I just simply couldn't see them, and

9    I had no idea what I'm defending myself against until 36 hours

10    ago.

11            MR. POLAK:    Objection.    For the record, those were on

12    file last week, and counsel had the opportunity to ask us to

13    allow Mr. Moradian to review those last week.    I got an e-mail

14    and a request yesterday for that, or maybe a day and a half ago

15    for that.    I just want the record to be clear that we are not

16    withholding anything.

17            MR. NEWMAN:    That is not true.    Would the Court like

18    me to respond, or should I just continue with the questioning?

19            THE COURT:    You can respond, since it's not true.

20            MR. NEWMAN:    Okay.    Thank you.

21        So there was reference to those materials in a reply brief

22    filed the night before the hearing that we had last week.    The

23    actual materials we didn't have a chance to review until after

24    the hearing, and then the very next morning I asked whether I

25    could show those materials to Mr. Moradian, and PTK declined

1    without providing any reason at all.  And I kept pressing in a

2    very friendly tone.  They didn't respond to my e-mails, so we

3    filed an emergency motion on Monday, and then when we filed the

4    motion, they called and said, okay, we will let you see the

5    materials.

6         So it wasn't as simple as we didn't ask.  We did ask time

7    and again.  We had to file a motion before they were allowed.

8         **THE COURT:**  I do take it from all the testimony that

9    I've heard so far, the parties disagree about how to get to the

10   proper -- the parties use different methodology, I guess, to

11   get to how to calculate the top ten percent.  Right?

12        There's a dispute as to whether the top ten percent has

13   been reached by these people or whether it is some other

14   number.  Right?

15        **MR. NEWMAN:**  There should not be a dispute --

16        **THE COURT:**  By "these people," I'm talking about PTK.

17        **MR. NEWMAN:**  There should not be a dispute.

18        **THE COURT:**  I mean, apparently there is.  Some people

19   look at numerator and denominator and do calculations of

20   4.5 million people.  I've heard the number 4.6 million.  So if

21   450,000 letters went out, there is a dispute whether those

22   letters actually went out to, quote, unquote, the top ten

23   percent.  Right?

24        **MR. NEWMAN:**  There should not be a dispute.

25        **THE COURT:**  But there is, right?  There is.

1           **MR. NEWMAN:**  Yes, Your Honor.

2           **THE COURT:**  There's a real disagreement about that,

3    right?

4           **MR. NEWMAN:**  I suppose.  I think that PTK knows that

5    it's students are not in the top ten percent.

6           **THE COURT:**  That's a matter that's in the big case,

7    right?

8           **MR. NEWMAN:**  No, it goes to this little case.

9           **THE COURT:**  Okay.  All right.

10           **MR. NEWMAN:**  Because to the extent that the

11   statements that Honor Society publishes are true, they are

12   protected by the First Amendment.

13           **THE COURT:**  Okay.

14           **MR. NEWMAN:**  If PTK is going to stipulate that the

15   statements that Honor Society has made are true, then we don't

16   need to go through testimony to establish that they are, but I

17   don't think there's that stipulation.

18           **THE COURT:**  Okay.  Again, we are going to get a

19   chance to flesh out the argument, but part of the argument is

20   that what you have been doing is defending your -- what Honor

21   Society has been doing is defending its allegations in the

22   lawsuit, right?

23           **MR. NEWMAN:**  That is part of it, Your Honor.

24           **THE COURT:**  And that's their allegation, right?

25           **MR. NEWMAN:**  That's not --

1      **THE COURT:**  That's Honor Society's assertion that

2   their ten percent number is the wrong number.

3      **MR. NEWMAN:**  Yes.

4      **THE COURT:**  Right?  And Honor Society, I believe,

5   claims that it has a right to say that because that is a matter

6   of the subject of the litigation.

7      **MR. NEWMAN:**  In part, but separately, even if it

8   wasn't a part of the litigation, the fact that PTK is making

9   these false statements that impact the public, Honor Society

10  and every other member of the public has the right to publish

11  material to alert the public to this concern, regardless of

12  whether there's litigation.

13     **THE COURT:**  Okay.  Make your record.  You can ask

14  your question.

15     **MR. NEWMAN:**  Thank you.

16  BY MR. NEWMAN:

17   Q.  Why don't we pull up that spreadsheet, the first page, the

18  analysis tab.  And while we are doing that, I'm going to ask

19  you a couple of questions.  You testified earlier that you're

20  familiar with the number of students who attend community

21  colleges; is that right?

22   A.  Yes, that's right.

23   Q.  And where did you get that information?

24   A.  National Center of Education Studies and National Student

25  Clearinghouse.

1    Q.   And how many students attend community colleges?

2    A.   4.4 in one and 4.5 to 4.6 in another.

3    Q.   And PTK has said that they send out 450,000 invites?

4    A.   They are saying -- what I heard is that they are going to

5    do that this fall, for only the fall.

6    Q.   So that would be ten percent of all students?

7    A.   That's what they're saying.

8    Q.   Does PTK have a chapter at every school in the country?

9    A.   No, they don't.

10   Q.   So PTK's chapter is a subset of those?

11   A.   That's right.

12   Q.   Okay.

13              **MR. NEWMAN:**  May we please have the display on the

14   computer.

15   **BY MR. NEWMAN:**

16   Q.   Is this a true and correct copy of the spreadsheet that

17   you reviewed?

18   A.   Yes.

19   Q.   And there's a series of spreadsheets like this?

20   A.   Yes.

21   Q.   Is this calendar year 2021 to 2022?

22   A.   It says so, yes.

23   Q.   Okay.  And you see on this first page, the analysis tab,

24   the number of students on campus is 15,110,225?

25   A.   Yes, that's what I see.

1    Q.  Is that -- is it possible that there are 15 million

2    students on campus at PTK chapters?

3    A.  No, that is impossible.

4    Q.  Why is that impossible?

5    A.  Because PTK only serves the community college space, which

6    we established at 4.4 to 4.6 million students, and they are a

7    subset of that.

8    Q.  Can we look at the college data tab.  Do you see there's

9    columns A, B, C, D?

10   A.  Yes.

11   Q.  What do you understand column C to be?

12   A.  Column C is -- I have not had a chance to fact check the

13   numbers due to the shortness of time I've seen this -- is the

14   number of students enrolled at each of these colleges.

15   Q.  What do you understand column D to be?

16   A.  Well, if we scroll over column D, which we have in the

17   line here, every college's number is --

18           **THE COURT:**  Hold on for a second.  Is your question

19   about column B as in boy or D as in David?

20           **MR. NEWMAN:**  Thank you for asking for the

21   clarification.  It is D as in Derrick.

22           **THE COURT:**  Not even David.  Okay.  Diddly-squat.

23   Okay.

24   **BY MR. NEWMAN:**

25   Q.  So you are looking at column D?

1    A.  Yes, I am.

2    Q.  Continue.

3    A.  So I believe --

4    Q.  The question is, what does column D show?

5    A.  Column D represents an arbitrary load factor that PTK

6    added to their schools.  So in B and C, 22,807 is multiplied by

7    67.2 to add an additional 15,000 students plus to Orange Coast

8    College.  And it's the same for every university or community

9    college down column D.

10   Q.  Has PTK arbitrarily added 67 percent more students in

11   column D?

12   A.  Yes, that is correct.

13   Q.  And column E as in Edward?

14   A.  Can you repeat that?

15   Q.  Can you look at column E as in Edward?

16   A.  Yes.

17   Q.  What do you understand column E to be?

18   A.  I understand that to be the PTK invites sent by PTK

19   national headquarters.

20   Q.  Do you see several schools where there are zero invites?

21   A.  Yes, I do.

22   Q.  And did you count the number of schools where there are

23   zero invites?

24   A.  Yes, I did.

25   Q.  How many are there?

1    A.   I believe they was 115.

2    Q.   How many students does that represent?

3    A.   It represents about 880,000 students, real students,

4    actual students.

5    Q.   So schools that have 880,000 students, the spreadsheet

6    shows zero invites; is that your understanding?

7    A.   That is right.

8    Q.   And what is your understanding as to why there are zero

9    invites when there are all those students?

10        MR. POLAK:  Objection, calls for speculation.  This

11   is a document she prepared.  He wouldn't know the answer to

12   that question.

13        THE COURT:  Objection sustained.

14        MR. NEWMAN:  I'm asking about his understanding.  He

15   has had one day to analyze it.  He should have the right to

16   testify about his analysis and why it is incorrect.

17        THE COURT:  He can't testify why it's incorrect if

18   she prepared it.  I mean, does he know it is incorrect?

19        MR. NEWMAN:  Do they know it is incorrect?

20        THE COURT:  I mean, he can testify about what he

21   believes his data shows.

22        MR. NEWMAN:  Right.

23        MR. POLAK:  I think the question was, what is his

24   understanding of that, which is inherently calling for

25   speculation.  Just because he happens to have an opinion, it

 1    doesn't mean it is a valid opinion.  He has to have some basis

 2    to do it.

 3              **THE COURT:**  Objection sustained.

 4    **BY MR. NEWMAN:**

 5    Q.  And did you see other schools in column E where there is

 6    only between 1 and 100 invites?

 7    A.  Yes, I did.

 8    Q.  And assuming that those columns in E, where there are zero

 9    invites are between 1 and 100, are schools where PTK does not

10    invite students directly, would that deflate the numerator?

11    A.  Yes, because they are also inviting outside of that

12    channel.

13    Q.  We heard Dr. Tincher-Ladner testify that schools sometimes

14    invite students on their own?

15    A.  That's right, from the chapter.

16    Q.  And your understanding is that when the chapter invites,

17    that wouldn't be in the numerator because PTK doesn't have

18    those numbers?

19    A.  That's right.

20              **MR. POLAK:**  Objection, leading.

21              **THE COURT:**  Objection overruled.

22    **BY MR. NEWMAN:**

23    Q.  You testified, when Mr. Polak asked you questions, that

24    there's about 4.5 million students at community colleges.

25    A.  Yes, that's right.

1    Q.  And PTK, according to the spreadsheet, did it send out
2    979,000 invitations?
3    A.  Yes, I believe that's what it said.
4    Q.  So when doing the math on 979,000 invitations and
5    4.5 million college students, what percent of college students
6    are being invited to PTK?
7    A.  Off the top of my head, I believe that number would be
8    close to 18 percent.
9    Q.  But not every school has a PTK chapter?
10   A.  That is right.
11   Q.  Do you know how many chapters PTK has?
12   A.  I believe it is around 1240.
13   Q.  And do you know how many total community colleges there
14   are?
15   A.  Yes, I believe it is 1461.
16   Q.  So PTK has chapters at about 85 percent of the schools?
17   A.  Yes.
18   Q.  So if we reduce the number of students in the denominator
19   by 85 percent, then what percent of students at community
20   colleges did PTK invite?
21   A.  That would be close to 21 to 22 percent.
22   Q.  And the numerator includes invitees who Dr. Tincher-Ladner
23   testified have a 3.5 GPA or a 3.25 GPA and 12 credit units?
24   A.  That is right.
25   Q.  Are there students who don't have 12 credit units but have

1  higher than a 3.5 GPA?

2  A.  Yes, and I was one of them.

3  **MR. POLAK:**  Objection, calls for speculation.  Lack

4  of foundation.

5  **THE COURT:**  Objection overruled.

6  A.  Yes, I was a student who took only two community college

7  courses, got As in both of them, and I wouldn't have been

8  included.

9  **BY MR. NEWMAN:**

10  Q.  So you had a 4.0 in community college?

11  A.  That's right.

12  Q.  So you would have a higher GPA than someone with a 3.5 and

13  12 credit units?

14  A.  That is correct.

15  Q.  But students like you are included in the numerator?

16  A.  That's right.

17  Q.  Did you prepare a document to aid your testimony in

18  explaining why Dr. Tincher-Ladner's calculations are incorrect?

19  A.  Yes, I did.

20  Q.  Is it in a PowerPoint presentation?

21  A.  Yes, it is.

22  Q.  So I'm going to show you that and we can walk through it

23  to help aid your testimony.

24  **MR. POLAK:**  We have objections as to the use of that

25  document, Your Honor.

1          **THE COURT:**  What's the basis of your objection?

2          **MR. POLAK:**  It contains more unauthenticated

3    documents.  So authentication is an objection.  Two, it

4    contains hearsay.  Three, it contains speculation and

5    speculative opinions.  And four, it contains what I think could

6    only be identified as inflammatory types of language.  I

7    appreciate that as regularly more of a jury issue, and the

8    Court can distinguish between those things, but for the record,

9    we would oppose it under I believe Rule 403.

10         So it's lack of authentication, contains hearsay, contains

11   speculation, and it's -- while it might contain relevant

12   information, it's prejudicial.  And I can point to the Court

13   what it is, but you don't have the benefit of the document

14   right now.

15         **THE COURT:**  Right.  It's for demonstrative purposes

16   only for right now, at least.

17         **MR. NEWMAN:**  We are not offering any portion as

18   evidence.  We are allowing the witness to explain these complex

19   calculations, and the presentation that he prepared makes it

20   easier, we believe, for the Court to understand.  But we don't

21   think it is going to confuse the Court or be prejudicial.  We

22   think the Court understands what's going on and can evaluate it

23   accordingly.

24         **MR. POLAK:**  It does contain information -- it

25   contains an actual screenshot of documents or information from

1    a document this Court has already determined is inadmissible

2    because it wasn't properly authenticated.  It was a FOIA

3    document.  They are trying to get it in the back door through a

4    demonstrative, when they wouldn't be able to get it in the

5    front door as an actual document.

6         **THE COURT:**  Put up the document and let me see what

7    it is.

8         **MR. POLAK:**  The page that is specific to that is your

9    -- page 6 related to Triton College.

10        **MR. NEWMAN:**  Your Honor, the Triton College --

11        **MR. POLAK:**  Can we just show that document so the

12   judge can see it?

13        **MR. NEWMAN:**  Your Honor, the Triton College

14   exhibit --

15        **MR. POLAK:**  Exhibit 6.

16        **MR. NEWMAN:**  -- was not attached to our papers

17   because we consider it a response in rebuttal to

18   Dr. Tincher-Ladner's testimony.  It was produced in discovery.

19   So before I show the illustrative exhibit, may I ask questions

20   to this witness about this document to authenticate it and ask

21   whether we can admit it?

22        **THE COURT:**  What is the document that is the subject

23   of this -- I take it this whole demonstrative is the subject of

24   an objection.  Is that right?

25        **MR. POLAK:**  That is correct, Your Honor.  But

1    specific to this issue of the FOIA and the inclusion of

2    evidence you have already said shouldn't be admitted, that

3    would be, I believe, page 6 of this exhibit, and I don't

4    know -- he is displaying the particular document, which is this

5    Triton College, River Grove, Illinois, a community college.

6         Now, the document that you see there in front of you is a

7    document that was not created by Honor Society.  It was a

8    document that was created by that community college and

9    provided, supposedly, in response to a FOIA request.

10           **MR. NEWMAN:**  May I ask the witness questions to try

11   and authenticate it and the Court can rule?

12              **THE COURT:**  Let him --

13           **MR. POLAK:**  For all the reasons that we've talked

14   about before, being that while this witness can say, yeah,

15   that's where I got it from, as the Court has already instructed

16   the parties, that does not meet the authentication test.  They

17   need someone from that school to be here to authenticate it or

18   to have had an affidavit around it.

19         And I think the Court asked the question before of, okay,

20   it's an injunction hearing.  What is the likelihood of being

21   able to get that actually into evidence down the road?  And the

22   answer is, I don't see them ever getting any type of prove-up

23   document for this document.

24           **MR. NEWMAN:**  Of course, at trial we would have

25   testimony to authenticate the document, but we have had one

 1  week, so it's not --

 2          **THE COURT:**  Wait, wait, wait.  This whole one-week

 3  stuff, I mean, y'all were taking depositions in May, and people

 4  learned of stuff in May.  I think his deposition was taken

 5  May 3rd of 2024.  That's my daughter's birthday.

 6          **MR. NEWMAN:**  This document just arrived last month.

 7  It's a third party --

 8          **THE COURT:**  Well, wait.  There was testimony going on

 9  as late as -- there was some evidence going on between the

10  parties as late as June 24th.  This motion was filed ten days

11  later.  We got the call on July 3rd.  So that's why we are

12  here -- that's why we were here last week, that's why we are

13  here now.

14      I mean, so this whole notion of we only had a week,

15  everybody knows what this litigation has been about since 2022,

16  at least, what this litigation has been about, and people have

17  been in place to move the litigation forward.  You have had

18  time before the former magistrate judge, you have had time

19  before the current magistrate judge.  You are litigating it.

20  You have motions to compel pending.  Some have been resolved, I

21  think.  You have had objections.  So, yes, people knew that

22  there were questions about some of the discovery as it was

23  coming in, as it was being exchanged.

24      Now, I think at the beginning I did talk about these

25  FOIA -- the information that was produced by the colleges in

```
 1   response to the FOIA requests.  There is no one here from any
 2   of those colleges, correct?  No one is here from any of those
 3   colleges who submitted a response to a FOIA request.  Is that
 4   right?
 5           MR. NEWMAN:  That is right, Your Honor.
 6           THE COURT:  Okay.
 7           MR. NEWMAN:  But this document was only received in
 8   June, a few weeks ago.  It's not like we could take a
 9   third-party deposition within weeks after receiving the
10   document.  That's for a later date, and that's when it gets
11   authenticated and admitted at trial.
12           THE COURT:  So what is it -- what is special about
13   this exhibit that this witness ought to be able to testify that
14   would help the Court inform its decision on the current issue?
15           MR. NEWMAN:  This response to a public records
16   requests is representative of several others where, under PTK's
17   criteria, colleges have provided information that no -- that
18   3.5 does not mean top ten percent.  It means top 35 percent,
19   top 40 percent.
20           THE COURT:  What was your FOIA request, because this
21   was your FOIA request, and people responded to your FOIA
22   request to the information you wanted.
23           MR. NEWMAN:  The witness will testify that this
24   document was created by Triton -- was sent by Triton College,
25   and the criteria Triton College summarized in the table at the
```

1    top, "Be currently enrolled at Triton College.  Degree-seeking

2    students must have included" --

3              **COURT REPORTER:**  Wait.  Slow down when you're

4    reading.

5     A.  "Be currently enrolled at Triton College part-time or

6    full-time; degree-seeking students must have completed 12

7    college-level credit hours prior to the current semester;

8    certificate-seeking students must have completed 6

9    college-level credit hours prior to the current semester; and

10   have a minimum cumulative GPA of 3.5 grade point average across

11   all your semesters at Triton College."

12             **MR. POLAK:**  Your Honor, I have some additional

13   information for you.  You will note that there's no Bates

14   number on this.  The reason why is we don't believe we have

15   ever even been given this document in document production.  If

16   they've had this since June and we are sitting here in mid July

17   and have not received it, that's very concerning.

18             **MR. NEWMAN:**  Your Honor, there is a Bates label on

19   it.

20             **MR. POLAK:**  Secondly, Mr. Newman, secondly, what Mr.

21   Newman just described for you for the reason why it is he wants

22   this Court to consider it is the very reason that, regardless

23   of authentication, the Court can't consider it.  He is telling

24   you that the information in this document that was not created

25   in the ordinary course of business but was created to respond

1    to their FOIA is being offered for the truth of what it says.

2    That is, by definition, hearsay.  There is no business record

3    predicate -- there's no exception to the hearsay rule that he

4    could possibly identify that would make this admissible in

5    Court.

6        So it's not only not authenticated.  It is a highly

7    questionable fact of whether we've even received it and been

8    produced.  And then, thirdly, it is being offered for the truth

9    of the matter, which is hearsay.  It cannot be considered by

10   the Court.

11           **THE COURT:**  What was the FOIA request itself?

12   Because apparently there was information produced to you in

13   response to the FOIA request.  What was the FOIA request, and

14   where is that?

15           **MR. NEWMAN:**  You can ask the witness or I can ask the

16   witness.

17           **THE COURT:**  No.  I mean, there is a written FOIA

18   request that was sent to the school by Honor Society.  There

19   was a request.  And they attempted to respond to that request

20   based on the information they received.  So where is that?

21   Where is that document?  And then at least let me know what it

22   is you were requesting and to see if, I guess, the information

23   was responsive to the request.  I mean, don't I need to know

24   what was the request?

25           **MR. NEWMAN:**  No, because what the request was isn't

1    really relevant to what the response is.  The response,

2    regardless of the request, provides the criteria that the

3    college looked at to determine whether a student with a 3.5 GPA

4    is in a certain percentile, and that criteria the college

5    listed at the top.  So whether Honor Society requested that or

6    not, that's what the college reports.

7           **THE COURT:**  Well, I don't know what the college

8    reported.  I see that you have prepared a document here with

9    numbers on it saying that that's what the college did.  Is this

10   the document that the college turned in to you in response to

11   the request?

12          **MR. NEWMAN:**  Yes.

13          **THE COURT:**  This is the document?

14          **MR. NEWMAN:**  This is the document the college sent to

15   Mr. Moradian in response to the request.

16          **THE COURT:**  Okay.  I still need to see the request.

17          **MR. POLAK:**  For the record, Your Honor, I stand

18   corrected.  There is a Bates number on this document.  We just

19   found it.

20          **THE COURT:**  I understand.  I need to see the request.

21          **MR. NEWMAN:**  I don't have the request here today,

22   Your Honor, but I don't think it relates because whether the

23   school is responding to the questions in the request or

24   otherwise providing information that's not in the request, what

25   matters, what is relevant is what the school reports, and there

1   is certain criteria --

2         **THE COURT:**  What I hear you saying is this is what

3   the school responded, this is the school's response to our

4   request.  The school is not here to testify, though, about,

5   yes, this is what we sent them in response to their request.

6   You want me to say that from the receiver, this is what I

7   received from the school, and everything that's in that

8   document is true and correct.  There's a gap there, right?

9         **MR. NEWMAN:**  There is, Your Honor, because on a

10  preliminary injunction, there are relaxed evidentiary standards

11  because it is difficult to gather the type of evidence you

12  present at trial.

13        **THE COURT:**  I will give it the weight it deserves.

14  That's what I will do.  I will give it the weight it deserves.

15        **MR. POLAK:**  With respect to the objection, then, Your

16  Honor, to the demonstrative -- I don't think we are to that

17  exhibits, but maybe we are -- is the Court's view that the

18  demonstrative can be used with the witness, but the Court will

19  receive the information subject to the objections that we've

20  made?

21        **THE COURT:**  Yes.  If it will help -- if it will help

22  him describe his case, yes, subject to the objections, I do --

23  I mean, it's a demonstrative.  It will not be admitted.  I am

24  giving it the weight, I think -- I think I've been pretty

25  clear, I'm giving it the weight it deserves.

```
 1          MR. POLAK:  So I do not need to interrupt the
 2   testimony, do I have a running objection as to --
 3          THE COURT:  You do.  And again, the parties will have
 4   an opportunity to argue the law and the issues and keep the
 5   Court focused on what the Court needs to be doing.
 6          MR. POLAK:  Thank you, Your Honor.
 7          THE COURT:  All right.
 8   BY MR. NEWMAN:
 9   Q.  The document on the screen --
10          THE COURT:  You may proceed.
11          MR. NEWMAN:  Thank you.
12   BY MR. NEWMAN:
13   Q.  The document on the screen, which I will refer to as the
14   Triton exhibit, do you recognize it?
15   A.  Yes, I do.
16   Q.  What is it?
17   A.  It's a FOIA response from Triton College, River Grove,
18   Illinois.
19   Q.  How do you know it's a FOIA response from Triton College
20   in Illinois?
21   A.  Because I asked for a FOIA request to be placed there, and
22   we received the e-mail back from the records official at Triton
23   College.
24   Q.  Did you receive this document?
25   A.  David Asari under my command.
```

1    Q.  Is it kept in the regular course of business?

2    A.  Yes, it is.

3    Q.  The document that you received, what does it indicate?

4    A.  Well, in the top portion, it talks about the specific

5    eligibility GPA criteria at Triton College, which we have gone

6    through.

7    Q.  Slow down.

8    A.  Yes.

9    Q.  Go ahead.

10   A.  The PTK eligibility is to be enrolled part-time or

11   full-time; to be a degree-seeking student that has completed 12

12   college credit hours prior to the current semester;

13   certificate-seeking students that have completed 6

14   college-level credit hours prior to the current semester; and

15   have a minimum GPA of 3.5 cumulative across all of the

16   semesters at Triton College.

17   Q.  Based on that criteria, what is your understanding of what

18   Triton College provided for the percentile the students are in

19   with a 3.5 GPA?

20   A.  So the Triton College records official directly produced

21   this to us, and it has the GPA criterion threshold, and for the

22   sake of clarification, the 3.5 plus and 3.0 plus.  And we see

23   that the percentage eligible reaches up to 43 percent and as

24   low as 26 percent, but clearly above top ten percent.

25   Q.  And did you receive responses to public records requests

1    from other colleges?

2    A.  Yes, I have.

3    Q.  And were any of those -- did any of those responses

4    indicate that students with a 3.5 GPA were in any less than the

5    top 30 percent?

6    A.  Some did show less than top 30 percent.

7    Q.  How low?

8    A.  All of them, about 40 or 50 that I can recollect, showed,

9    at the minimum, 18 percent, top 18 percent or higher.

10   Q.  And what was the maximum?

11   A.  63 percent, I believe.

12   Q.  I would like to show the presentation to help aid in your

13   testimony about Dr. Tincher-Ladner's calculations?

14   A.  Thank you.

15   Q.  Just so the Court understands, did you prepare this?

16   A.  I simply screenshotted this from Dr. Tincher-Ladner's

17   presentation.

18   Q.  But this presentation that we are showing, six slides or

19   so, you prepared this?

20   A.  Yes, I did.

21   Q.  And you did this to help illustrate your point so you can

22   better explain?

23   A.  Yes.

24   Q.  Okay.  And so this is the first page.  What does this

25   represent?

 1    A.   So this represents the first page of the cover sheet

 2    provided by Dr. Lynn Tincher-Ladner.   From the get-go, it shows

 3    15 million college students, which Mr. Polak has made clear

 4    that there's actually 4.5 million to 4.6.

 5         So the first thing that screams is that that number is

 6    false, and we have established that through Mr. Polak himself

 7    and through the NCES and National Student Clearinghouse.

 8    Q.   Anything else on this slide that you want to tell the

 9    Court that you see about Dr. Tincher-Ladner's testimony?

10    A.   Yes.   So we see here that PTK is admitting to sending

11    979,000 invites to an audience of 4.5 million, which they are a

12    subset of.   It also shows the count of colleges by top ten

13    percent, but that statement, which we will go through, is

14    highly misleading and inaccurate.   And further, it's about the

15    number of students who are told that they are in the top ten

16    percent or not, not just simply a number of colleges,

17    especially when 116 of them show zero invitations to those

18    schools.

19    Q.   I'm going to turn to the next page on your slide.   Can you

20    explain to the Court what this slide represents and how it

21    impacts your understanding of the calculations that

22    Dr. Tincher-Ladner testified about?

23    A.   Yes.   This is a screenshot directly from the worksheet

24    that we were looking at earlier.   And if you look in the

25    equation, it is showing that the column is multiplied by 4.1

1    divided by 6.1, and that happens at every single community

2    college on this sheet, representing an increase in their

3    denominator for no reason, an increase of 62.7 percent.

4    Q.  You said 62.7 percent?

5    A.  That's right.

6    Q.  Is it not 67.2 percent?

7    A.  Yes.  Sorry.  That is correct.  I meant 67.2 percent.  I'm

8    looking at that.

9    Q.  Okay.  And then looking at the next slide, would you

10    explain to the Court how this impacts your review of

11    Dr. Tincher-Ladner's testimony?

12    A.  Yes.  So when you look at invitations, say, on an annual

13    basis, students are invited to join every semester.  And when

14    you look at new invitations, by definition, that doesn't

15    include the students that were already identified and already

16    paid their membership dues to be a part of PTK.  They wouldn't

17    be invited again.

18        So based on their reported number of 12 percent acceptance

19    rate of their invitation, we are already looking at numerator

20    should be increased by 12 percent, just on this one point.  So

21    that was not factored into the number of students that they

22    tell are in the top ten percent.

23    Q.  Is it your understanding that the numerator is only new

24    invitees but doesn't include everybody with a 3.5 GPA because

25    some have already joined?

1    A.  That is right.

2    Q.  So the numerator should be increased by people who have

3    already joined PTK because they too have a 3.5 GPA?

4           **MR. POLAK:**  Objection, leading.

5           **THE COURT:**  Objection overruled.

6    **BY MR. NEWMAN:**

7    Q.  So is it your understanding that the numerator includes

8    only students who are currently invited but not students who

9    had already joined?

10    A.  That is correct.

11    Q.  And do you understand that students who have already

12    joined also have a 3.5 GPA?

13    A.  By definition, that is correct.

14    Q.  Do you understand that they are not included in the

15    numerator?

16    A.  That is correct.

17    Q.  And so how does that impact the results of the analysis?

18    A.  Well, first, we would have to remove the imaginary

19    students, the 67.2, or the increase of 67 for every hundred

20    students, but then on top of that, we would have to multiply

21    the numerator by 1.12 or an additional 12 percent to reflect

22    the adjustment required for this point.

23    Q.  In other words, the students who had already joined PTK

24    who are not included in the numerator of students with a 3.5

25    GPA or above?

1    A.   That is correct.

2    Q.   Let's look at the next page of your presentation.  Will

3    you explain to the Court what this page represents and how it

4    impacts your analysis of Dr. Tincher-Ladner's calculations?

5    A.   Sure.  So by my understanding of invitations, if somebody

6    opts out to an invitation, by CAN-SPAM law, there is a

7    requirement that they do not receive a new invitation.

8    Q.   What is an opt out?

9    A.   An opt out is when somebody says, no, I don't want to

10   receive the invitation.

11   Q.   So PTK sends out invitations?

12   A.   Yes.

13   Q.   And PTK allows people who receive it to agree -- request

14   never to receive another invitation?

15   A.   Yes.

16   Q.   That's an opt out?

17   A.   Yes.

18   Q.   So how do opt outs impacts the analysis?

19   A.   So opt outs impact the analysis because these are people

20   that would not be included in the new invitations, which

21   Dr. Tincher-Ladner is holding out to be the only people in the

22   top ten percent.

23        From my experience, being in the honor society space, I

24   can tell you that the multiplier would be much higher than

25   12 percent, but for the sake of conservatism, I took the

1    12 percent that were accepted and assumed that 12 percent would

2    also opt out of receiving any more communications.

3    Q.   People who don't want to receive PTK's offers are not

4    included in the numerator because they don't receive another

5    offer?

6    A.   That's right.

7    Q.   So the numerator is deflated?

8    A.   Very much so, yes.

9    Q.   Let's look at the next slide in your presentation.  Will

10   you explain to the Court how this slide informs your testimony

11   and analysis of Dr. Tincher-Ladner's calculations?

12   A.   Sure.  So as we've discovered, there are many part-time

13   students in community college.  And the fact that, you know,

14   like myself, I took two courses which were 6 to 8 units, that

15   wouldn't have been included in PTK's invites because they

16   weren't eligible by PTK standards.  However, they did achieve a

17   GPA that would be considered in the top ten percent.  And so

18   when you preclude this space on PTK's eligibility, it is

19   precluding people who are in the top ten percent, and that,

20   again, significantly deflates the numerator.

21   Q.   So PTK only allows people to join who receive invitations

22   that have 12 credit units?

23   A.   That is correct.

24   Q.   It is your understanding from your experience that certain

25   students have less than 12 credit units but a 4.0?

1    A.   That is right.

2    Q.   Do you believe those students are ahead of students who

3    have a lower GPA?

4    A.   They have a higher GPA and, therefore, a higher class

5    rank.

6    Q.   But they are not included in the numerator?

7    A.   That's right.

8    Q.   So the numerator is deflated accordingly?

9    A.   That's right.

10   Q.   The next slide looks at the Triton College data.  I think

11   we already discussed that, but if you want to explain to the

12   Court how this impacts the analysis.

13   A.   Sure.  So, just quickly, I looked at this one university,

14   which we have outside data to confirm, and what we are seeing

15   on their sheet is that they say there's a 7 percent invite rate

16   to that college.

17         Now, the college itself, for that same criteria, that same

18   period below, represented to us that there's a 33 to 43-percent

19   rate.  And what that means is that if they are representing

20   7 percent here as below the top ten percent, the university

21   itself is saying that there's a 33 to 43 percent.  If you apply

22   that multiplier to the whole sheet, you are going to see a

23   drastically different equation, and we believe this is to be

24   correct.

25   Q.   Let's look at the next slide.  How does this slide --

1    strike that.  Is it your understanding based on

2    Dr. Tincher-Ladner's testimony that some students are invited

3    to join PTK by the chapters themselves?

4    A.   Yes, that's right.

5    Q.   So they are not invited by PTK?

6    A.   That's right.

7    Q.   So they wouldn't be included in PTK's invitees?

8    A.   That's right.

9    Q.   And that number of students deflates the numerator?

10   A.   Significantly.  That's right.

11   Q.   And there's a quote on this page.  Will you read the quote

12   and tell us where it comes from.

13   A.   Yes.  This comes from the spreadsheet itself that Dr. Lynn

14   Tincher-Ladner produced.  And it says, "Colleges submitting

15   very low or zero invitations are most likely doing PTK

16   recruitment locally."

17   Q.   And how many students are represented by those, low number

18   that you just testified to?

19   A.   Well, a lot.  We are seeing colleges that say they only

20   had one invitee.  There's 116 colleges -- or I believe 130

21   colleges that had between 1 and 100 invitees on the

22   spreadsheet.  However, there were schools of 20- to 30,000

23   students commonly.  And that's not reflective that it was the

24   top 1 student or the top 100 but rather just the ones that

25   received invitations through this mechanism.

1    Q.   And you base that based upon the quote that you see there

2    from the document?

3    A.   That is correct.

4    Q.   So that numerator is deflated by the number of students

5    that the school invites and PTK doesn't invite directly?

6    A.   That is right, and from our survey, we see that a

7    significant number of students do receive local recruitment.

8    Q.   Then looking at the next slide, is this the same idea?

9    A.   That is right.  This slide shows the zero invites that PTK

10   is showing at these schools.  What that means is that they are

11   including all of the numbers to the row C, the middle one, and

12   about a hundred more to the denominator, which represents

13   880,000 real students.

14        And then when they include their 67-percent load factor,

15   it increases their denominator, which there is no justification

16   because those students don't exist.  It increases the

17   denominator by 1.5 million, 1.48 million students in the

18   denominator.  So it's highly misleading.

19   Q.   I'm going to skip two slides ahead.  This talks about how

20   Dr. Tincher-Ladner's testimony measures colleges.  It should be

21   students.  Would you explain to the Court what is meant by

22   that?

23   A.   Sure.  So Dr. Tincher-Ladner is taking a look at the

24   colleges and saying, oh, we have about a thousand chapters, and

25   you see here about a hundred -- about 600 or so don't have a

1  top ten percent issue.  But what they are failing to look at is

2  the fact that College of Western Idaho, for example, has about

3  17,000 invitees out of about 20,000 students.  So you are

4  looking at an 85-percent acceptance rate at that college, and

5  that skews the results.  And then they are taking a school that

6  has one invitee or zero, as we just saw, with 20,000 students

7  and say, oh, well, that balances out, one has and one doesn't

8  have a below ten-percent issue.  But when you look at the

9  students --

10          **COURT REPORTER:**  Slow down, please.

11  A.   -- in this case, 17,000 in one example and, one, we know

12  that 17,000 are then being lied to and misled, and further,

13  that one may be lied to and misled as well because they're the

14  only one that received the invite.  We don't know if they were

15  the valedictorian of their school or anywhere near the top ten

16  percent.  We just know that their invite was due to the fact

17  they reached their eligibility standards, which at every school

18  we have seen is lower than the top ten percent at your college.

19  Q.   And then when you take all of these factors into

20  consideration that you just testified about, what percent of

21  PTK invitees have a 3.5 GPA?

22  A.   So this is a conservative method --

23  Q.   Strike that.  When PTK invites students, what class rank

24  do those students generally have based upon the analysis of

25  Dr. Tincher-Ladner's calculations, do you conclude?

1    A.   Well, the class rank that we have seen is about 30 percent

2    on average being in the top ten percent, and what this sheet

3    here shows is that under conservative -- and I studied

4    statistics and econometrics in college, but on a conservative

5    methodology, 89 percent of students are at colleges where the

6    top ten percent of your college claim is literally false.  But

7    I also believe, due to my conservative methodology, that that

8    is substantially underestimated, and I could briefly list the

9    factors that would increase that.

10        As we went through, there was the fact that you could

11   previously accept your invitation, and that's 12 percent more

12   at that school.  The fact that you could opt out, and more

13   people opt out than accept your invitation, so you are looking

14   at another 12 percent would be included in the numerator.  I

15   haven't factored that into the 89 percent.

16        Then you are looking at students who had lower than 12

17   units, like myself, that had a 4.0, and that is a substantial

18   subset of students, as the most common grade in community

19   colleges is now an A.

20        And then when you factor in local recruitment, which takes

21   place independent of this whole process, you then see that

22   their recruitment numerator would be substantially larger.

23        And lastly, to the fact that there is local recruitment, I

24   would like to discuss adverse selection, because that's when

25   they have one or ten students who accept their invitation.

 1   They actually are not representative of the top ten percent in

 2   their college per se because the odds are, if a 20th or 30th

 3   percentile student receives that invitation, they are more

 4   likely to accept.  And, therefore, even the schools that have a

 5   below top ten percent are not necessarily in that.

 6        And what I'm getting at is it is a close to 100-percent

 7   deception rate of that claim of top ten percent of your

 8   college.  I have corroborated this through freedom of

 9   information and through our consumer surveys.  I wish it wasn't

10   true, but it is a truthful allegation and a very sad and dismal

11   reality of what they are doing over there.

12   Q.  Did Honor Society send surveys to students asking whether

13   students had been invited by PTK?

14   A.  Yes, we have.

15   Q.  How many responses did Honor Society receive?

16   A.  We received close to 13,000 responses.

17   Q.  Of those 13,000 responses, what percent of students

18   indicate that they were invited to join PTK?

19        **MR. POLAK:**  Objection.  That document is not in

20   evidence.  It's not here today.  It's not attached to any

21   evidence in the record.  It's not attached to Mr. Moradian's

22   declaration.  And it's not contained, I don't believe, in any

23   of the exhibits.  He is testifying about things that are not in

24   court.

25        **THE COURT:**  How is it relevant?

1            **MR. NEWMAN:**  He's testifying about business records

2       that show that over 40 percent of students who are asked are

3       invited to join PTK.

4            **THE COURT:**  He has testified that he sent out a

5       survey, and he testified that this is a response to the survey,

6       and it just sounds like it is just numbers out of thin air.  Do

7       we have a document that reflects the number of surveys he sent

8       out?  Do we have documents of the responses that came back?

9            **MR. NEWMAN:**  He is testifying about those documents.

10           **THE COURT:**  He cannot just testify -- just because he

11      is sitting there under oath does not mean he can say anything,

12      does it?

13           **MR. NEWMAN:**  No.  But he can testify about records he

14      is familiar with in his business.

15           **THE COURT:**  Please show the records to the other

16      side.  Do you have the records?

17           **MR. NEWMAN:**  They are not in this record.

18           **THE COURT:**  Well, you will be able to develop that

19      before the trial, presumably.

20           **MR. NEWMAN:**  Right.

21           **THE COURT:**  This is not the trial.

22           **MR. NEWMAN:**  Can we do Moradian Exhibit 7, please.

23      **BY MR. NEWMAN:**

24      Q.  Do you recognize this document?

25      A.  Yes, I do.

1    Q.   What is it?

2    A.   It's a screenshot that I took of Twitter.

3            **MR. POLAK:**  Objection, Your Honor.  This document

4    is -- you will recall that on Friday, this exhibit, if we will

5    scroll to the first page of this exhibit, this is the exhibit

6    that had the messed up stuff because of the PowerPoint

7    conversion, according to Mr. Newman.  And it didn't have the

8    right phone number on the bottom, didn't have the right logo.

9    There are some questions as to authenticity.

10           But what he is showing you right now is the rest of

11   Exhibit 7 that does not have any relationship to the first page

12   of Exhibit 7, and we had also objected to the rest of it, and I

13   believe that the way it was resolved was that you would look at

14   the first page and take it for what it is, understanding the

15   objections and the authenticity issues.  But we never got to

16   the rest of the exhibit, and I don't believe they moved for

17   entry of the rest of the exhibit, and we had objected to it,

18   and the only document we used was the first page.

19           So in that context, we have several objections to this,

20   which we stated on the record.  These are not authenticated as

21   to time and place.  There's nothing on these that would

22   indicate that these are anything other than random screenshots.

23   I think Mr. Moradian just attempted to say that he was the one

24   that did it.  Okay.  That's not in the record, but fine.  These

25   are things -- he just said it.  But we don't -- there's no

1    Bates stamp on these.  We don't know whether these were

2    produced or not produced.  And then it's combined with some

3    others things that are contained from what appears to be an

4    entirely different website at the very end of this.

5        So it's not authenticated, it's hearsay, it is -- yeah,

6    it's not authenticated and it's hearsay.

7              **MR. NEWMAN:**  Your Honor, what we submitted as

8    Exhibit 7 contains several unrelated documents, and I'm not

9    asking about all of Exhibit 7.  I'm asking about the admitted

10   portions.

11             **THE COURT:**  I assume you are about to ask about

12   February 2, 2022.

13             **MR. NEWMAN:**  Well, it's not hearsay because --

14             **THE COURT:**  Because that's what's on the screen.

15             **MR. NEWMAN:**  Yes, Your Honor.

16             **THE COURT:**  You are about to ask him what?  Ask him

17   the question you want answered about this particular document.

18   **BY MR. NEWMAN:**

19   Q.  Do you recognize this?

20   A.  Yes, I do.

21   Q.  How do you recognize it?

22   A.  I screenshotted this from Twitter, now called X.

23   Q.  Does it appear to be a post by PTK?

24   A.  Yes.  It appears to be a direct reply to Shy Girl Grayson.

25   Q.  And it says, by PTK, "It means your college told us you

1    are at the top ten percent of students at your college"?

2          **THE COURT:**  Do we know what PTK is responding to?  It

3    is responding to Shy, whoever that is, Shy Girl.

4          **MR. NEWMAN:**  Yes.

5          **THE COURT:**  What is it that precipitated PT -- the

6    honor society's -- PTK Honor Society -- what question is the

7    honor society responding to?

8    **BY MR. NEWMAN:**

9    Q.  Did you see the question that PTK is responding to?

10    A.  I don't remember the content of the question on the top of

11    my head.

12          **MR. POLAK:**  I think what he did is he literally just

13    snipped out a bunch of different posts he wanted to talk to the

14    Court about today and threw them on a document.

15          **THE COURT:**  I'm just trying to figure out what it is

16    about this document you want him to testify about because

17    there's nothing that authenticates it.

18          **MR. NEWMAN:**  Looking at a representation that appears

19    to come from PTK where PTK states, "It means your college told

20    us you're at the top ten percent of students at your college."

21          **THE COURT:**  "Your college told us."  So how is the

22    Court supposed to deal with that evidence?  "Your college told

23    us."

24          **MR. NEWMAN:**  We are not offering it for the truth

25    because we don't believe their college did tell them at the top

1    ten percent.

2            **THE COURT:**  Why offer it if it's not for the truth?

3            **MR. NEWMAN:**  We are offering it to show why, in good

4    faith, Honor Society posted articles about this.

5            **THE COURT:**  Objection sustained.

6    **BY MR. NEWMAN:**

7    Q.  Before Honor Society posted articles, did Honor Society

8    see a series of posts on the internet by PTK representing that

9    students were in the top ten percent?

10           **MR. POLAK:**  Objection, leading, and it's the same

11   issue we just talked about.

12           **THE COURT:**  Rephrase your question.

13   **BY MR. NEWMAN:**

14   Q.  Before Honor Society posted articles on the internet, did

15   Honor Society see anything that prompted it to post those

16   articles about the top ten percent claim?

17   A.  Yes, we saw many, and we've heard Dr. Tincher-Ladner's

18   testimony, and we just learned out about this from March until

19   now.  We didn't know about this before.  This was never on our

20   radar.

21   Q.  Can you summarize for the Court some of what you saw that

22   prompted Honor Society to post those articles?

23   A.  Sure.  So we are looking at students who are, in the first

24   sentence of their admission, invitation, they are being told

25   they are in the top ten percent.

1          **MR. POLAK:**  Objection.

2     A.  We students crying about --

3          **THE COURT:**  There's an objection.  Stop speaking when

4     there is an objection.

5          **MR. POLAK:**  Once again, the witness is testifying

6     about documents, in this instance an alleged invitation that he

7     claims contains certain things.  That document is not in the

8     record.

9          **MR. NEWMAN:**  The witness is testifying about what led

10    Honor Society to post the articles.

11         **MR. POLAK:**  But he is still talking about a document

12    that is not in evidence.

13         **THE COURT:**  He is talking about a specific document.

14    Be as general as you can.

15         **THE WITNESS:**  Sure.

16         **THE COURT:**  I mean, you are saying things that they

17    did caused you to go out and do what?  Create these, well,

18    pages -- because I've heard you testify that it was, in part,

19    in response to some of Dr. Tincher-Ladner's testimony.  Was

20    that the testimony from her deposition months ago or was that

21    from her testimony the other day?

22         **THE WITNESS:**  That was from her testimony at the

23    deposition which occurred I believe February 28th, and that's

24    when we first, you know, caught our radar that this could be a

25    large widespread issue that's reaching 130,000 students a year.

```
 1   We had no reason to investigate prior.  You know, we had not

 2   been keeping track.

 3              THE COURT:  This is stuff I will ask the lawyers, I

 4   mean, because we were talking about survey questions back in

 5   March, and I'm assuming the Honor Society was aware of PTK's

 6   misrepresentations back then.  Right?

 7              MR. NEWMAN:  Yes.

 8              THE COURT:  Okay.  And as a part of the surveys that

 9   you were sending out, it was to solicit information about PTK's

10   representations at that point, right, I assume?  Is that right?

11              MR. NEWMAN:  I assume.

12              THE COURT:  You assume?

13              MR. NEWMAN:  Well, I don't know the answer to that

14   question.

15              THE COURT:  You were not the lawyer then?

16              MR. NEWMAN:  What's that?

17              THE COURT:  You were not the lawyer then?

18              MR. NEWMAN:  I don't know if I understand the

19   question, Your Honor.  I'm sorry.

20              THE COURT:  Okay.  Survey questions were going out

21   from Honor Society way back when, at some point in time.

22              MR. NEWMAN:  In March.

23              THE COURT:  In March.  Were the survey questions sent

24   out in response to the depositions and the information that

25   Honor Society learned through this lawsuit?
```

```
 1              MR. NEWMAN:  That's not my understanding.

 2              THE COURT:  Oh, okay.  Survey questions are just done

 3    all the time as a part of business practices?

 4              MR. NEWMAN:  That's my understanding, yes.

 5              THE COURT:  The websites, web pages, though, were not

 6    created until after March 28th, 2024.

 7              MR. NEWMAN:  They were created in June, Your Honor.

 8              THE COURT:  All right.  What's your basis for the

 9    objection?

10              MR. POLAK:  I'm trying to remember the question, Your

11    Honor, but I believe that what I -- I believe we were talking

12    about this document -- no, I know what it was now.  The

13    question was asked, and the answer that was given included

14    reference to documents that are not in the record.  I believe

15    it was specific to this invitation.  And so the objection that

16    I had was he's testifying from documents that are not in the

17    record and that we don't even know what it is he is talking

18    about.

19              MR. NEWMAN:  He's not testifying from documents.

20    He's testifying about what led Honor Society to post articles.

21              MR. POLAK:  He was quoting specifically, in his

22    answer, documents.

23              THE COURT:  Let me hear from him what it is that

24    prompted him to do what he did.

25    BY MR. NEWMAN:
```

1    Q.   What led Honor Society to post articles about the top ten
2    percent claim?
3    A.   It was the awareness that a systematic large-scale fraud
4    was going on and that we are alleging in our lawsuit, and this
5    is the equivalent of an academic stolen valor, Your Honor.  We
6    are looking at a society misleading 130,000 students every
7    year, including this coming year.  And that's just morally
8    wrong.  You know, we know that it is untrue.  Not only have we
9    alleged it but we have also proven it is untrue here.  So the
10   claim is truthful, and we are simply disseminating it because
11   130,000 students are relying on hearing a counter opinion that
12   is truthful.
13              **THE COURT:**  Okay.  I've heard it.  All right.
14   **BY MR. NEWMAN:**
15   Q.   Let's talk about scholarship.  What is a transfer
16   scholarships?
17   A.   A transfer scholarship is a scholarship that's given to a
18   student upon transfer to a university.
19   Q.   And what students have access to transfer scholarships?
20   A.   Well, any students who transfers to a four-year university
21   has access to a transfer scholarship.
22   Q.   Do Honor Society members have access to transfer
23   scholarships?
24   A.   To the extent that they transfer to a four-year
25   university, I believe they do.

1    Q.  And do students who aren't a member of Honor Society or

2    PTK or any other honor society have access to transfer

3    scholarships?

4    A.  To the extent that there are transfer scholarships, yes, I

5    know they are.

6    Q.  Is it your understanding that PTK represents that its

7    average member receives $2,500 in scholarships?

8    A.  Yes, I've seen that time and time again.

9    Q.  Do you have a basis to have an understanding as to whether

10   that understanding is true or false?

11   A.  Yes.

12   Q.  And do you believe it is true or false?

13   A.  I believe it is false.

14   Q.  Why do you believe it's false?

15   A.  It is false because even in the wording, it talks about

16   $2,500 a year, and the average member gets $2,500 a year in

17   scholarships from PTK.  If we run the math of an average

18   member, which is 130,000 receiving 2,500 a year, and applying

19   two years or more, at a two-year rate, I believe that number

20   would come out to 600 million or more, and that number just

21   simply doesn't add up, even compared to the number that they

22   present, which was originally 39 million, 90 million, and now

23   246 million.  So even within their own marketing, they

24   constantly deflect and, you know, are wrong when you compare

25   their own numbers.

1    Q.  Is it your understanding that PTK has exclusive

2    scholarships that are substantial for students?

3    A.  Well, Dr. Tincher-Ladner testified that, yes to some and

4    no to some.  So I believe they may have some, but they don't

5    have them all.

6    Q.  How long have you been seeing PTK promote that the average

7    student gets $2,500 in scholarships?

8    A.  I've been seeing it for a couple of years.

9    Q.  And have you also seen PTK talk about the total amount of

10   scholarships that are offered?

11   A.  Yes, I have.

12   Q.  Has that number varied?

13   A.  Yes.

14   Q.  What have you seen it vary by?

15   A.  So I saw it start in the 30-million range just a few years

16   ago.  Their member base has been constant roughly throughout

17   this period.  And then as I said, we saw it balloon to in the

18   90-million range, the 100-million range, and now the

19   246-million range, despite no change in the 2,500 per year per

20   student and no change in the base of students, no substantial

21   change.

22       It's important to note that they are also not -- PTK says

23   that they are exclusive to PTK members.  However, they are not

24   exclusive to PTK members, and Dr. Tincher-Ladner testified to

25   that.  So that's misleading.

1    Q.   Why did Honor Society post the articles?

2    A.   We posted the articles simply to get the word out about

3    what we are seeing.

4    Q.   And what in particular are you seeing?

5    A.   Well, what we are seeing and the reason why we are suing

6    about this now is that we are seeing a large-scale issue

7    involving the things that we alleged in our lawsuit, which are

8    then spoken about almost to the T within all of the articles.

9    And they are all truthful, and we intend to prove them true.

10   Q.   Why do you believe it is important to have these articles

11   on the internet?

12   A.   Well, as I stated, 130,000 students actually rely and pay

13   based on these claims.   But a million students, which

14   Tincher-Ladner just showed, actually received these statements,

15   and potentially many more per year.

16   Q.   And why 5,000 articles?   Why not three, for example?

17   A.   That's a good question.   So I think that when you are

18   looking at something affecting communities, in this case

19   chapters and schools, it's important to get the message out,

20   you know, to the people searching.   You know, if they are

21   searching the internet for information, we are just seeking out

22   a counterbalance.   We are not seeking to say that this is the

23   end-all be-all, because PTK certainly tells their story.   They

24   tell it in the invitations, they tell it to the chapters,

25   whether true or untrue.   We just seek to tell a narrative of

1    what the allegations are and why the public needs to know, that

2    they are affected by it and they are harmed by it.

3    Q.  Are you aware of any other websites that have republished

4    any of the Honor Society articles at issue today?

5    A.  Not at all.

6    Q.  Are you aware of any websites that have discussed the

7    articles that Honor Society has posted that are at issue today?

8    A.  Not at all.

9    Q.  Are you aware of any press or media that have covered the

10   subject matter of those articles?

11   A.  No, not at all.

12   Q.  Do any of those articles call for any type of commercial

13   transaction?

14   A.  No, not at all.

15   Q.  And what do you mean when you testify that the articles do

16   not call for a commercial transaction?

17   A.  So the articles are put up on the internet, and we -- they

18   are not looking for people to join Honor Society.  We are not

19   asking people to consider our society.  We are standing to lose

20   by posting these articles because it is directly our industry,

21   and we are calling out a bad act that, frankly, hurts us.  It

22   hurts us competitively, but it also -- the consumer who reads

23   these messages are not just magically drawn to us.  It actually

24   ruins their trust, and I wish, I sincerely wish this wasn't the

25   case.  I don't want to be here telling people that the top ten

1    percent isn't true, but it is not.  It is factually incorrect,

2    and that's all I seek to let students know.

3    Q.  Do any of the articles that are at issue today have links

4    to a sign-up page for Honor Society?

5    A.  No.

6    Q.  Do any have links to any other page within Honor Society

7    that calls for a member to join?

8    A.  No.

9    Q.  Has Honor Society advertised these articles at all?

10   A.  Not at all.

11   Q.  When internet users arrive at a sign-up page for Honor

12   Society, are there links to these articles on that sign-up

13   page?

14   A.  No, not at all.

15   Q.  So is there any connection between signing up for Honor

16   Society and these articles anywhere on the websites?

17   A.  No, not at all.

18   Q.  When did Honor Society create these articles?

19   A.  These articles were by and large created June 18th to

20   24th.

21   Q.  And did you edit them after they were first created?

22   A.  Within that time frame, yes.

23   Q.  When did you edit them?

24   A.  I believe they were edited during the weekend, which I

25   believe was around the 22nd or 23rd.

1    Q.   And that was before the hearing with Judge Myers where

2    PTK's counsel told us about these articles?

3    A.   Yes, that is correct.

4    Q.   Do you remember seeing, in Dr. Tincher-Ladner's

5    declaration, reference to an article that Honor Society posted

6    that she alleged spoke in the voice of the college?

7    A.   Yes, I do.

8    Q.   And were those articles that she believed spoke in the

9    voice of the college removed by June 25 from the internet?

10   A.   Yes, well before that.

11   Q.   And that was before the hearing with Judge Myers?

12   A.   That is correct.

13   Q.   Was that at least a week before the motion here was filed?

14   A.   That is correct.

15   Q.   And why did you remove those articles?

16   A.   I removed portions of the article precisely because I was

17   afraid of being silenced.  You know, I'm afraid of speaking.

18   You know, what's happening is a chilling effect.  We are not

19   allowed to talk about the wrongdoings, significant wrongdoing

20   that we found to be true.  And, you know, if I'm afraid to

21   speak up, many are afraid to speak up.  We have X employees

22   that are afraid to speak up.  We have members and chapter

23   advisors that are afraid to speak up.  And if not me, who?  And

24   if not now, when?

25   Q.   In connection with any of the articles at any time before

1    or after they were edited, did Honor Society ever use photoshop

2    to photoshop an image of Dr. Tincher-Ladner?

3    A.  Never.

4    Q.  We saw images on Friday that said "Red Alert."  Do you

5    remember those images?

6    A.  Yes, I do.

7    Q.  Were those removed from the internet before June 25?

8    A.  The images that looked like a movie scene were removed,

9    and they were replaced with generic messaging, such as a red

10   alert, a siren, or just generic symbols.

11   Q.  We saw an image of a woman holding money.  Was that image

12   removed before June 25?

13   A.  Yes, it was.  That one may have been removed between

14   June 25 -- but I know before July 3rd.

15   Q.  Is it your belief that PTK has misappropriated funds from

16   students?

17   A.  Based on what I've been seeing from Freedom of Information

18   requests, from the students themselves, from the 990s, the

19   public filings of the non-profit, I certainly do.

20   Q.  What's the basis for that understanding?

21   A.  Well, the basis is that their first and most impactful

22   statement of their organization to a consumer is a large-scale

23   lie, that we have found examples, about 40 from community

24   colleges, which I believe would be happy to testify to that.

25   They are a compliance officer who are neutral, and they just

1   report the facts, and what they did is produce the facts and

2   gave them to us as a right to know.

3   Q.  Have you searched for press about this lawsuit?

4   A.  Yes.

5   Q.  What have you seen in response to your searches?

6   A.  The only press that I have seen stem from the press

7   release two years ago, which, you know, was featured in

8   Bloomberg and other legal outlets.  There has been no press, to

9   my knowledge, since.

10  Q.  When you refer to the press release, what press release

11  are you referring to?

12  A.  I'm referring to the press release that PTK put out on the

13  day of this lawsuit on April, in April 2022, which we didn't

14  respond to until recently.

15  Q.  Does Honor Society have a website up, PTKlawsuit.com?

16  A.  Yes, we do.

17  Q.  What's the purpose of that website?

18  A.  The purpose is to inform the public of the lawsuit, the

19  allegations, and just general knowledge about really our

20  perspective of the case, because we've been silent for two and

21  a half years, and it has been a one-sided system here, and we

22  are just seeking to tell our story.  And that's something that

23  apparently is not okay.  They are trying to enforce a one-sided

24  justice system here.

25  Q.  Did you post any of the articles to cause harm to PTK?

1    A.  No, definitely not.

2    Q.  And do you understand why there's a concern that that

3    might have been the intent?

4    A.  I can understand that, yes.

5    Q.  What's your understanding about that concern?

6    A.  I can understand that it could look like it's -- an

7    article is coming out to potentially hurt an organization, but

8    when you look at the actual facts surrounding it, you are

9    looking at a person, me, who spent years waiting and studying,

10   doing freedom of information, surveying, filing a lawsuit and

11   alleging it, and then discussing to the very most the truthful

12   allegations, to the best of our knowledge, to impart it onto an

13   audience that otherwise would not know, they have no way of

14   knowing this otherwise, and it is impactful to their

15   decision-making.

16   Q.  So, if not to harm PTK, why did Honor Society publish

17   these articles?

18   A.  Well, as I stated, we have just found out.  This is, in

19   many ways, breaking news.  You know, we didn't know about this

20   to this extent in March.  The March events, you know, to a

21   large part, were done for education purposes.  How can you

22   understand something if you don't research it?  And research

23   involves freedom of information.  It involves going to sources

24   that would have information and asking them respectfully, could

25   you provide us with this information.  It involves doing

1    surveys and inquiries into what is going on.

2        So those were all good faith efforts to learn about what's

3    going on.  As we learned what is going on, a dark pattern

4    emerged, and that's our allegation.  And unfortunately, it is

5    true.  And, you know, we seek to prove that in the court, and

6    we seek to let the audience know what we found to be true thus

7    far, from our perspective.

8    Q.  Can you summarize in one sentence why you posted those

9    articles?

10   A.  To inform the audience that are impacted of the potential

11   misstatements and deception that is occurring without any

12   counterweight knowledge to what is happening.

13           **MR. NEWMAN:**  Based on the Court's desire to move this

14   along, I'm going to skip a lot of questions I would have

15   otherwise asked.  But to the extent the Court allows Recross, I

16   would ask for Redirect because, again, I would otherwise be

17   able to direct in PTK's case and then be able to ask questions

18   again in my own case.  Here, I only had one chance.  So to the

19   extent there are going to be more questions, I would like to

20   follow up, if necessary.  I might not elect to, but if

21   necessary.

22           **THE COURT:**  I don't want to be faulted for you not

23   asking the questions you need to ask.  They are having to carry

24   the burden of, you know, you not having enough time to get the

25   documents and proof in order because it was only filed a few

1    days ago and all of that.  So I don't -- I want to give you

2    every opportunity to ask whatever questions you think you need

3    to ask.

4          **MR. NEWMAN:**  Thank you, Your Honor.  I think I'm

5    going to allow the hearing to proceed so that we can move to

6    argument, but to the extent that there are more questions of

7    this witness, I may ask for Redirect.

8          **THE COURT:**  Okay.  All right.  We are going to take a

9    15-minute recess for the court reporter.  And then if there are

10   just a few questions, I don't know -- I do have a question.  I

11   do have a question.  Well, I will wait for my question.  We are

12   going to take a 15-minute recess.

13         **(RECESS TAKEN AT 3:00 P.M. UNTIL 3:28 P.M.)**

14         **THE COURT:**  Any Redirect or Cross, or whatever we are

15   calling it, of Mr. Moradian?

16         **MR. POLAK:**  We have no further questions of Mr.

17   Moradian, but we will have a rebuttal witness.

18         **THE COURT:**  Who is the rebuttal witness?

19         **MR. WALLACE:**  Dr. Tincher-Ladner, to unfortunately

20   contest the things we heard on the stand that were not a part

21   of his declaration, or is otherwise a part of the record, other

22   than his testimony.  I don't expect it to go long.

23         **THE COURT:**  Okay.  You may call her.  Do you have an

24   objection?

25         **MR. NEWMAN:**  I do.  I mean, it's a preliminary

1    injunction hearing.

2            **THE COURT:**  Make sure you are speaking into the

3    microphone for the benefit of the court reporter.

4            **MR. NEWMAN:**  Your Honor, we have heard hours and

5    hours of testimony from PTK.  I understand they have the burden

6    of persuasion, but this is a preliminary injunction hearing.

7        I think the Court wants to get to arguments, and when

8    PTK's counsel gets going, it goes for a while.  I think that

9    the Court should stand on the testimony that is before the

10   record and the declaration and the document, and PTK's counsel

11   has already volunteered to move on to argument and said that

12   the evidentiary hearing is unnecessary.

13           **MR. POLAK:**  That was before I --

14           **THE COURT:**  You may call your witness.

15           **MR. POLAK:**  Thank you, Your Honor.

16           **THE COURT:**  You pay proceed.  You are still under

17   oath, Dr. Ladner.

18           **MR. POLAK:**  I will need the Elmo turned on, please.

19                    **DR. LYNN TINCHER-LADNER,**

20   **having been previously duly sworn, testified as follows:**

21                       **DIRECT EXAMINATION**

22   **BY MR. POLAK:**

23   Q.  Dr. Tincher-Ladner, you heard Mr. Moradian inform the

24   Court that I think there were some 1400 some odd community

25   colleges in the United States.  Do you have a different

1    understanding than that?

2    A.  Yes, there are not 1400 community colleges.  There is just

3    a little over a thousand.

4    Q.  You have been in the community college business your whole

5    life, haven't you?

6    A.  Yes.

7    Q.  How many years is that professionally?

8    A.  This will be my 34th year.

9    Q.  Let's go through this document here.  The first number

10   that Mr. Moradian talked about was this 15 million number.

11   That is your number.  You put it on the page.  How was that

12   calculated?

13   A.  That is -- a lot of the numbers I've heard today are just

14   fall numbers.  That is the sum of every student that's on a

15   community college campus at all the campuses.

16   Q.  For an entire year?

17   A.  That PTK serves.

18   Q.  For an entire year?

19   A.  For an entire year.  So it's fall, spring, and it's an

20   unduplicated head count.  So no one is counted twice.  They are

21   all counted one time.

22   Q.  Did you just make that number up?

23   A.  No.

24   Q.  Where did you get it from?

25   A.  Well I got it from two sources:  One, the credit, you

1    know, program students, most of what I've heard about today, I

2    would have received that from the IPEDS database where the

3    colleges report to the federal government.  They do report

4    their fall numbers, which I've heard a lot today, but they also

5    are required to produce an annual unduplicated enrollment

6    number, and they produced that as well.

7         So you have two different data points that you can access

8    for each -- every single college that gets PELL grants.

9              **COURT REPORTER:**  Could you spell IPEDS?

10             **THE WITNESS:**  I-P-E-D-S.  It's the Integrated Post

11   Secondary Education -- let me see.  Anyway, it's just called

12   IPEDS, but it would be under the NCES, the national -- the

13   website for all of the statistics for higher ed.

14   **BY MR. POLAK:**

15   Q.  This number of 4.6 million has been thrown about here in

16   the courtroom.  Let's just assume, for the sake of argument,

17   that 4.6 million is the number.  Is that 4.6 million number the

18   entire year, so that means it's the total number of students

19   that happen to show up on a community college campus for an

20   entire year, or is that a snapshot for one semester?

21   A.  I don't know where that number comes from, because if you

22   look at AACC, the American Association of Community Colleges,

23   they publish a very high level fast facts document every year,

24   and this year alone, this year's document has, in the fall

25   alone, 6.1 million credit students and another 4.2 or 1 --

1    anyway, there is a little over 10 million students just in the

2    fall, according to the American Association of Community

3    Colleges.  And they have an entire department of researchers

4    I'm all familiar with that that I highly respect where their

5    numbers come from.

6    Q.  So community college, students are generally in school for

7    one to two years, right?

8    A.  Correct.

9    Q.  So you talked about the fall.  Let's talk about the spring

10   semester.  There might be another -- I mean, there might be

11   10 million students enrolled in school that semester, right?

12   A.  In the spring, it's a little smaller because, you know --

13        **MR. NEWMAN:**  I'm going to object, lack of foundation.

14        **THE COURT:**  Objection overruled.

15   A.  You know, I've never seen the spring completely isolated.

16   All I've seen is the fall and then the whole year, so I don't

17   really want to --

18   **BY MR. POLAK:**

19   Q.  Right.  But I guess the point is, though, Lynn -- I'm

20   sorry, Dr. Tincher-Ladner, is that you can look at the fall

21   isolated and compare that against the number of invitations

22   that you offer, right?

23   A.  Oh, yeah.

24   Q.  And you feel very confident that it is 10 percent or less

25   on average, right?

1    A.   Yes.   I mean, there are a few colleges.   It looks like we
2    are a little over ten percent, but we are far under ten percent
3    of the students on campus.
4    Q.   By a little over, you mean instead it is 11 percent or
5    12 percent?
6    A.   Right.
7    Q.   And then with respect to the next semester, you start all
8    over again.   And some of those students might have been there
9    the semester before or they might be brand new, but at the end
10   of the day, you go issue another roughly ten percent of that
11   population invitations, right?
12   A.   Yeah, and if you are invited to join PTK, you are not
13   invited at all usually the first semester.   You have to
14   complete at least 12 hours.   It is generally 12 hours.   If you
15   are in a one-year program, that reduces to six hours.   But we
16   can't assess your grade point average at all until you have
17   been in college at least one semester.
18        So our students are in college for almost -- for a year,
19   because they have to reenroll the next semester to even be
20   invited.   So just during a fall/spring, there are different
21   studies out there, but I've seen the dropout rate anywhere from
22   30 to 50 percent of the students drop out during that time.
23   Q.   So let's look at the FOIA request document here
24   separately, and this is one that Mr. Moradian also testified
25   from.   Here, supposedly on the document, there is a report here

1    of who is in the group that they reported out statistics for

2    down here.  One is, they have to be currently enrolled, either

3    part-time or full-time.  Are there other types of students

4    other than full-time or part-time?

5     A.  Yeah, there are lots of different types of students.  I

6    mean, Hinds Community College right here in Mississippi is not

7    only the largest community college in Mississippi, they are

8    also the largest high school because they produce more GEDs

9    than probably any of the high schools around here.

10        So you look at students that are going to Hinds, and they

11   are there for a lot of different reasons.  A lot of students

12   are unprepared and they cannot even take a college-level

13   course.

14             **THE COURT:**  Would they be included in a part-time

15   number or a full-time number, though?

16             **THE WITNESS:**  They might be included in a part-time

17   number, but if they are in a noncredit in status, because a lot

18   of times they don't want to put them in credit classes because

19   then their PELL grant starts, and they want to do their

20   developmental education with those students in a noncredit

21   status in most schools.

22   **BY MR. POLAK:**

23    Q.  I think the point, though, Dr. Tincher-Ladner, is looking

24   at this document, you can't tell whether or not Triton included

25   those other students or not, can you?

1      A.   I really can't.  I would have to, you know, look at this,

2      but again, this is done by semester by semester.  So PTK

3      members have a 91-percent success rate.  So they are there

4      every semester, and you have all of these other students coming

5      and going this whole time.  So we back up and we do our

6      calculations on an annual basis.

7              THE COURT:  I guess my next question, and I'm sorry

8      to cut across you, is every community college the same?

9              THE WITNESS:  Pretty much.

10             THE COURT:  Do all the community colleges offer the

11     GED courses and offer the stuff that Hinds might do that might

12     increase their numbers or decrease their numbers?

13             THE WITNESS:  Yeah, I would say that according to the

14     AACC, out of all the community college students, 60 percent of

15     them are in a credit, and 40 percent are in a noncredit.  And

16     that number really hasn't changed much in the last 5 or 6

17     years.

18             THE COURT:  Okay.

19             THE WITNESS:  You know, there's a lot going on in the

20     mission of a community college, and those students are just not

21     eligible for PTK, and we don't consider noncredit students as a

22     top because they don't have any criteria for us to even look

23     at.  But they are there, and our advertisements don't say top

24     ten percent of a certain kind of students.  They just say top

25     ten percent of students on campus.  And so these students are

1    on campus, and they are doing things.

2        And a lot of times the work that they do may be -- I think

3    I'm overanswering your question, but there's a lot that

4    colleges do to get their noncredit work transferred to credit.

5    So there's entire offices that do a noncredit to credit -- to

6    get those students on the other side.  But anyway, I think I

7    overanswered it.

8    **BY MR. POLAK:**

9     Q.  I appreciate it, Dr. Tincher-Ladner.  Let's look at the

10    demonstrative aid.  I want to go through very quickly these

11    slides that they used with Mr. Moradian and just get your

12    response to them.

13        Here Mr. Moradian claimed that it was a false narrative

14    about the top ten percent because of his conclusion that you

15    had unreasonably inflated the denominator by 67.2 percent, for

16    the reasons that he described.  Do you have a criticism of that

17    analysis?

18    A.  I do, because, you know, a university has a mission to do

19    credit work and graduate level work, but community colleges

20    have a dual mission to do undergraduate credit and work force

21    development, and also community work, which is all their

22    noncredit.  And, in fact, here in Mississippi, I would say a

23    lot of these colleges might have even more noncredit students

24    than credit students.  I mean, I've heard that, but I don't

25    know exactly what they have.  But according to the AACC, if

1   40 percent of the colleges on campus are noncredit, what I have

2   done in this column here to estimate the unduplicated noncredit

3   is to take their statement about how many noncredit students we

4   have and push it across these institutions.  And essentially,

5   that number -- these are all in, like, that 60 to 40

6   relationship that they claim is true across community colleges.

7        And the reason the AACC would know that is they have their

8   own database call the VFA, the Voluntary Framework of

9   Accountability, and community colleges upload their head counts

10  to that system, and that's how they are able to tell what

11  noncredit -- what the noncredit work is, because you won't find

12  it published in the public websites under the NCES.  But I have

13  done economic impact studies for a lot of different colleges,

14  and we always include the noncredit work because that's what

15  the taxpayers are paying for.  They are paying for the GED.

16  They are paying for all of this stuff.

17       So those students are there, and when we talk about how

18  many students we serve, we add them all together when we are

19  presenting to the public the work of that institution.

20  Q.   Dr. Tincher-Ladner, with respect to this false narrative

21  number one, is it your view that Mr. Moradian's testimony

22  suffers from just a lack of understanding of the unique aspects

23  of the community college market?

24  A.   Yeah, I think that, you know, he mentioned some honor

25  societies for adult ed.  I would have to investigate those

1     honor societies, but I think they are for the teachers of adult

2     ed that he mentioned, not the students.  But adult education,

3     work force development, remediation, is such a huge part of

4     what colleges do, and he is leaving out that part of their

5     mission.

6     Q.   False narrative number two he claims is that your

7     numerator was improperly inflated -- or, I'm sorry, deflated by

8     12 percent because you were including, I believe, people that

9     had already joined.  So do you have a response to that?

10    A.   I do.  Community colleges, when they join Phi Theta Kappa,

11    about 45 percent of our members are joining right there at

12    graduation to get the scholarship, the transfer scholarships,

13    and they are joining so they can wear the regalia.  So when I'm

14    doing these numbers on an annual basis, half the chapter is

15    gone the next year.

16         Now, there is -- there are members that are still there,

17    but when I look at the numbers and you look at chapter sizes, I

18    wish they were bigger than they are, it was immaterial to

19    account for that percentage of students, because a lot of them

20    will also graduate the next day.

21         I mean, our membership completely flips over within two

22    years, all of it, but I just wanted the analysis to have those

23    two columns to keep it easy to understand, but it's immaterial.

24    If I were to account for those students, it would still be way

25    under ten percent on all of those colleges.

1    Q.  He also claims in this alleged false narrative three that

2    your number was incorrect by around 12 -- your numerator was

3    incorrect by around 12 percent because you should not have

4    included opt-outs from previous invitation rounds.  Is that a

5    true -- sorry.  Is that a valid observation on his part?

6    A.  I don't know how Mr. Moradian would know anything about

7    how I handled opt-outs in my analysis, because when I'm

8    counting the invitations, I'm not counting what's going on over

9    here in Mailchimp.  So if a student has opted out, Mailchimp

10   handles that.

11   Q.  Opted out to you?

12   A.  Yes, opted out from receiving communications from

13   Mailchimp.  When I do my analysis, I pull the students off of

14   the upload areas where colleges go into our system and they

15   upload the potential members for that year.  I'm doing my

16   analysis based on the uploads of those students and not

17   based -- this is not even part of the analysis at all.

18   Q.  He also claims false narrative number four, and he claims

19   that you did not factor in top ten percent of GPA of

20   individuals taking 1 to 11 units.

21   A.  Well, in this instance, they are not eligible for PTK

22   until they hit 12 hours.  Fortunately, we are seeing a lot of

23   high school -- I mean, dual enrollment and dual credit is

24   really in expansion, and so many high school students are

25   getting to the 12 percent threshold where they will eventually

 1    get invited.  But, you know, if you come to community college

 2    and take one class, or whatever, and you have a good grade, we

 3    don't invite you, and we don't consider you in that calculation

 4    for the numerator because you are not receiving anything from

 5    us at that point that even says you are in the top any percent.

 6        Now, we do count them in the denominator because they are

 7    a student at the school.  And the way we have the methodology

 8    set up is we just look at the number of invitations versus the

 9    number of students.  That's the way we have always done it.  We

10    have been saying we are the top ten percent for I know 20 years

11    at least that I've been associated with knowing more about

12    this.  And after this lawsuit, I went back, and we have been

13    saying the top ten percent -- for as long as I have anything

14    that's written about PTK, that's what it says.

15    Q.  False narrative number five on his demonstrative claims

16    that you did not count local recruitment.  Therefore, you

17    affected the numbers.  Do you have an observation about that?

18    A.  Well, you know, the aggregate numbers that we showed in my

19    statement shows at 4.5 percent.  So if a college is doing their

20    own invitations, the reason they are doing that is because they

21    have policies that they cannot give us the data.  They will not

22    give us the data because they have a FERPA situation where they

23    have to do the invitations on their own.  Now, whether or not

24    those invitations say you are in the top ten percent, I would

25    have no clue what those invitations have in them.  But if they

1    are on my report as a zero or low, it means they are doing

2    their recruitment.  And if I could account for them, there

3    would be still absolutely no way we would push over the

4    ten-percent mark either in aggregate or at those institutions.

5    Q.  There were some zeroes on your spreadsheet which he called

6    zero invite colleges.  Did that really affect your calculation

7    to cause it to be incorrect?

8    A.  No.  I mean, like I said, our aggregate showed us at like

9    four and a half or five and a half percent, six percent.  So

10   even if we were able to include these colleges, which we can't,

11   because I'm not going to send a FOIA request and ask colleges

12   what they are doing.  You know, Hinds Community College does

13   not work for me.  I work for Hinds.  So I do the best

14   methodology that we can possibly do with using public data

15   sources, and that's the way we do it.

16   Q.  But even if we are looking at it -- if we take a step

17   back, and we go back to the question I was asking you at the

18   very beginning, if you take a step back and you look at the

19   total number of students that are enrolled in community

20   college, and you look at the percentage of those students that

21   you are sending invitations to, is it at or below ten percent?

22   A.  That's where we got the ten percent.  Our invitations have

23   always been about ten percent of the enrollments, and that's

24   just what we have always looked at.  And I studied this when I

25   came to PTK in 2012, as their institutional researcher, I

1    verified it, and in my deposition to Honor Society, I explained

2    how we do the calculation, and that's all I can tell you.  This

3    is our methodology, and it's solid.

4            **MR. POLAK:**  Thank you, Dr. Tincher-Ladner.

5                          **CROSS-EXAMINATION**

6    **BY MR. NEWMAN:**

7    Q.  Did you testify that you include students in your

8    denominator that aren't enrolled full-time or part-time?

9    A.  We include full-time and part-time students, and we invite

10   part-time students too.

11   Q.  Did you testify that you include students who aren't

12   enrolled full-time or part-time?

13   A.  We include students that are noncredit students.  Colleges

14   have different classifications for those types of students, so

15   we are just calling them noncredit more generically at a

16   research level when we study these students, but usually -- you

17   know, they actually have different -- they've got more than

18   half-time, they have half-time.  There are so many different

19   calculations.  I know the public knows full-time and part-time,

20   but it is actually way more complex than that.  But a noncredit

21   student is just a student on campus.

22   Q.  You testified the denominator includes every student on

23   campus?

24   A.  Yes.

25   Q.  But "every student on campus" includes nondegree-seeking

1    students who don't receive any GPA at all?

2    A.  That is correct.

3    Q.  And schools have a substantial number of students who do

4    not take classes for credit and don't receive a GPA, correct?

5    A.  Yes, because they are usually in remediation and they are

6    not able to take credit classes yet.

7    Q.  So students who don't receive a GPA can't be ranked

8    against students who do receive a GPA because there's nothing

9    to rank them against, correct?

10   A.  Well, they are still a student on campus.

11   Q.  Exactly.  And students who do not take classes for credit

12   can't be ranked higher or lower than students who do take

13   college classes for credit, because students who don't take

14   classes for credit don't receive any grades at all?

15   A.  We don't rank.  We look at the number of invitations and

16   the number of students and we divide, and that's how we get the

17   percentages.

18   Q.  So students who don't receive any grades and thus can't be

19   compared against students who do receive grades artificially

20   inflate the denominator, because there's no way to determine

21   whether they have a higher or lower GPA than students taking

22   classes for credit, correct?

23   A.  I'm not artificially inflating anything.  You have a

24   problem with our advertisement.  We say you are in the top ten

25   percent of students on campus, and there's a lot of students on

1    campus.  A student taking developmental ed classes is not a top

2    student.

3    Q.  Doesn't PTK also represent you are in the top ten percent

4    of your class?

5          **COURT REPORTER:**  Wait.  Slow down.  Can you repeat

6    your question?

7    A.  I've never seen top ten percent of your class.

8          **THE COURT:**  Hold on.  I think the court reporter

9    wants you to repeat your last question.

10          **MR. NEWMAN:**  I will strike the question.

11   **BY MR. NEWMAN:**

12   Q.  In your analysis, you increase the number of students

13   enrolled by 67 percent to account for noncredit students,

14   correct?

15   A.  I did a 60/40 split, which is what the American

16   Association of Community Colleges says is going on.

17   Q.  And that is 67 percent?

18   A.  Forty -- yeah.  More -- it's an increase of two-thirds, or

19   four divided by six, or whatever the number was for that year.

20   It varied.  Every one of their reports that I gave you had the

21   number that was right for that year.

22   Q.  And in the report we looked at, you used 67 percent for

23   every college in the country, even though that number can vary

24   dramatically from school to school, correct?

25   A.  It can be a lot higher.

1    Q.  And it could be a lot lower, correct?

2    A.  I don't know.

3    Q.  Correct?

4    A.  I don't know.

5    Q.  You know it could be higher, but you don't know if it

6    could be lower?

7    A.  I don't know if it's material.

8    Q.  You testified it could be higher?

9    A.  It could be a little higher or a little lower, but it is

10   40 to 60 ratio of noncredit to credit work in the country.

11   Q.  It could be a lot lower, couldn't it, if you went school

12   by school?

13   A.  I don't know.  I don't do FOIA requests and harass

14   colleges for data.

15   Q.  PTK doesn't have chapters at every school, does it?

16   A.  We have chapters at -- I would probably say about

17   98 percent of them, 97 percent of them, something like that.  I

18   would have to look at that.

19   Q.  The numerator in your calculation does not include

20   students who have already joined PTK, does it?

21   A.  Well, they have graduated out.  Because I'm doing a yearly

22   analysis, I'm counting everybody one time, and most of those

23   students graduate out.  I'm probably not accounting for a

24   handful of students at each chapter, not anything that would

25   materially change and cause -- it would be insignificant.  The

1    chapter sizes are very small compared to the numbers we are

2    talking about on these sheets.

3    Q.  PTK sends invites after one semester if a student has

4    accrued 12 units, correct?

5    A.  No.

6    Q.  When does PTK send an invitation?

7    A.  I don't know when a student gets one because they have to

8    have 12 hours.  If they are part-time and they are only taking

9    3 hours, they've been there two years before they get an

10   invitation --

11   Q.  If a student goes full-time and accrues 15 units its first

12   semester, that student will receive an invitation from PTK,

13   assuming it has a 3.5 GPA and meets other requirements,

14   correct?

15   A.  Correct.

16   Q.  And then the following semester, that same student will

17   not receive another invitation because that student has already

18   joined PTK, correct?

19   A.  Not very many of them, but yeah, they will receive another

20   invitation if they haven't joined, if they are maintaining the

21   criteria.  If they drop below it, they won't be reinvited.

22   Q.  And the students who have already joined PTK likely have a

23   3.5 GPA but are not included in the numerator, correct?

24   A.  But within a year's time, a significant number of those

25   students graduate out off the roles.  And I did look at that to

```
 1    include it, but it was immaterial.
 2         So I tried to make my analysis as easy to understand as
 3    possible, but I can go back and add them in, and I promise you
 4    we would be under ten percent, every one of those.
 5    Q.  You looked at it?
 6    A.  I looked at doing it, and it was immaterial.
 7    Q.  And you realized that there are students who receive
 8    invites after one semester, and they are not included in the
 9    numerator the second semester, correct?
10    A.  I don't think I'm following you at this point about what
11    you are talking about.  I'm saying that if you are already a
12    member, you wouldn't be reinvited, correct, but sometimes --
13    Q.  And not included in the numerator, then?
14    A.  Here's the thing --
15              THE COURT:  Wait.  Hold on.
16    A.  -- sometimes you are.
17              THE COURT:  Hold on.  No talking at the same time.
18    That's all.  It makes it awfully difficult for the court
19    reporter.  That's all.
20    A.  Sometimes colleges will upload the student again because
21    they haven't properly figured out they are a member on their
22    end and marked it in their database, and then before they would
23    receive an invitation, we would take them out of the data set,
24    but this analysis leaves them in.  So I conjecture there are
25    probably just as many students in that situation that are
```

1    sitting in the situation you are saying.

2        I'm just telling you, if you want me to redo the analysis

3    and put them in there, I promise you it will still stay under

4    ten percent for every single one of those colleges.

5    **BY MR. NEWMAN:**

6    Q.   So you agree the numerator excludes students who have a

7    3.5 GPA and who are enrolled at the school full-time?

8    A.   I am looking at a whole year.  So I will concede that

9    there's probably a handful of students that are not in there

10   that are in their chapter, but it is insignificant.  They have

11   graduated.

12   Q.   When sending an invitation, PTK includes a link for

13   students to opt out and never receive another invitation from

14   PTK?  Is that correct?

15   A.   Yes.

16   Q.   And many students click on that link?

17   A.   I don't know how many students click on that link.  But

18   that is all in Mailchimp.

19   Q.   But PTK doesn't send another invitation if a student has

20   requested not to receive an invitation, correct?

21   A.   I don't know.  You know, it just depends on -- we send it.

22   If Mailchimp says it's not going to arrive at its destination,

23   then it won't, but I counted them in my study.

24   Q.   The numerator doesn't include students with 4.0 GPAs that

25   haven't yet achieved 12 credit units, correct?

1    A.   We don't look at them until they achieve the criteria that

2    the college set.   Sometimes it is 15 hours.   It depends.   Like,

3    I've got colleges that won't let them in PTK unless they have

4    like a 3.75 or a 3.9.   You know, it's -- we've talked about

5    this at length at my depositions.

6    Q.   But students who have a high GPA, like a 4.0, are higher

7    in the class than students with a lower GPA, such as a 3.5.

8    You would agree with that, right?

9    A.   I think -- we don't look at it in terms of class ranks.

10   We don't.   No one does.   I mean, at community colleges, like,

11   we don't know what you are talking about.   We look at the

12   percent of invitations.   I mean, it's just the way, the only

13   way we can do the math accurately and respectfully without

14   having all of this information.

15   Q.   You do agree, don't you, that a student with a 4.0 is

16   higher in the class than a student with a 3.5?

17   A.   No.   Usually it has to do with the number of hours you've

18   been there too when you start, quote, ranking people.   If you

19   do rank students at all, you do it at graduation and everybody

20   has 60 hours.   And, you know, if you want to talk about

21   graduation, we have a 91-percent success rate, and community

22   colleges have way less than that.   Like, literally, it is sad,

23   but 25 to 35 percent of community college students graduate

24   within three years, period.

25   Q.   But the invitations don't go out at the time of

 1  graduation, do they?

 2  A.  They will continue to go out until you join if you are

 3  still eligible.

 4  Q.  Invitations go out sometimes after the first semester of

 5  taking credits and receiving, for example, 15 credit units,

 6  correct?

 7  A.  Yes, and we count them one time.  Your study is counting

 8  them over and over and over.

 9  Q.  And when you count them one time and a student might have

10  a 3.5 GPA, that student, you would agree, has a lower GPA than

11  a student with a 4.0 GPA, correct?

12  A.  If a student walks into a community college and takes one

13  really easy class and gets an A, we don't consider them a top

14  student.

15  Q.  So you don't consider students with a 4.0 GPA in your

16  numerator, right?

17  A.  We consider students with a 4.0 GPA that have at least 12

18  hours because they have proven that they can keep their 4.0.

19  Q.  Many colleges send invitations out on their own.  PTK does

20  not send the invitations to students, is that correct?

21  A.  What was your -- how many colleges?

22  Q.  Many.

23  A.  Not many.

24  Q.  How many colleges?

25  A.  It is on the spreadsheet.  All those ones with zero, which

1    is a hundred and some out of 1200 and -- you know, or out of a

2    little over a thousand colleges.

3    Q.   Okay.

4    A.   So I would say less than ten percent or so of colleges

5    send their own invitations.

6    Q.   And those ten percent of colleges that send invitations,

7    those invitations are not reflected in your numerator, correct?

8    A.   Those invitations may not say top ten percent, I guess.  I

9    don't know.  I can't sit here and speak to what other colleges

10   are doing.  I can only tell you what we are doing.

11   Q.   Exactly.  And what you are doing is not including in your

12   numerator invitations that have gone out to students with 3.5

13   GPAs and 12 credits, correct?

14   A.   Not included in -- the numerator is zero for those

15   colleges on that spreadsheet.  The percent is zero.

16   Q.   Even though those colleges have sent invitations on PTK's

17   behalf to students with a 3.5 GPA and 12 credit units, correct?

18   A.   Did they?  I don't know.

19   Q.   Didn't you testify that schools send out their own

20   invitations?

21   A.   We ask them to, but I can't sit here and tell you that --

22   sometimes if there's no advisor -- you might get a zero because

23   they don't have an advisor and they haven't found one, or maybe

24   during COVID someone quit and they haven't gotten someone to

25   fill in the role.  Those zeroes may mean nothing is happening.

1    Q.   So at some colleges, you think no invitations are being

2    sent out?

3    A.   Yes.   At some colleges, no invitations might be not sent

4    out for whatever reasons.

5    Q.   And at those colleges where no invitations are being sent

6    out, you would agree there are students who have a 3.5 GPA and

7    12 credit units, correct?

8    A.   You would agree that no one is receiving any kind of

9    message that you are in the top ten percent of anything if you

10   are not getting an invitation.   So why would you have an issue

11   with colleges that are not doing membership?

12   Q.   Some of those schools on your spreadsheet reflect that,

13   like, three invitations go out, correct?

14   A.   No.   Everyone was counted once.

15   Q.   On the spreadsheet, you have included the number of

16   invitations that go out for each school, correct?

17   A.   Unduplicated for a whole year.

18   Q.   And some of those schools have only sent out three

19   invitations, correct?

20   A.   I don't know.

21   Q.   Some have sent out zero invitations, correct?

22   A.   I don't know.   You are going to have to tell me what

23   school you are talking about, what FOIA request you are talking

24   about, before I can talk about an individual college.

25   Q.   So you don't remember seeing on your spreadsheet that some

1    colleges sent out zero invitations?

2    A.  We just talked about that.

3    Q.  You do remember it?

4    A.  Yes.  If it has a zero, one of two things is happening.

5    One, no one is getting an invitation, or two, they are doing it

6    themselves, and I don't know what that invitation says.

7         A lot of them come out from the college president.  They

8    like to personally sign their invitations.  That's what's going

9    on at some of those schools.

10   Q.  And when the college president sends out invitations, it

11   goes presumably to students that have a 3.5 GPA and 12 credit

12   units, correct?

13   A.  It goes to whatever the criteria that it takes to be in

14   Phi Theta Kappa.

15   Q.  But they aren't included in the numerator, are they?

16   A.  If I don't -- if it's zero, then nothing is in the

17   numerator.

18              **MR. NEWMAN:**  Thank you.

19              **MR. POLAK:**  No questions, Your Honor.

20              **THE COURT:**  All right.  You may step down.

21        All right.  There's no more testimony, I presume.  Are we

22   ready for any arguments on the motion?

23              **MR. WALLACE:**  Yes, Your Honor.

24              **THE COURT:**  Any record preservation thing that anyone

25   needs to do?  I saw y'all consulting.

1          Okay.  All right.  We are ready, then, for the argument.

2    Of course, PTK has the burden and will have an opportunity for

3    rebuttal.

4          **MR. WALLACE:**  May it please the Court.  Michael

5    Wallace for PTK.

6          **THE COURT:**  Make sure you are speaking into the

7    microphone, Mr. Wallace.

8          **MR. WALLACE:**  You already told me everybody can hear

9    me, Judge.

10          **THE COURT:**  The court reporter has the things in her

11    ears.

12          **MR. WALLACE:**  Michael Wallace for PTK and

13    Dr. Tincher-Ladner.

14          I told you last week we had already talked to you about

15    the law.  More importantly, you have talked to us about the

16    law.  You have issued a preliminary injunction in this case and

17    you have told us what the law is.  The preliminary injunction

18    you issued was on preliminary relief on our two state law

19    claims for malicious interference with business.  And based on

20    the communications before the Court, at that time you found

21    that we were substantially likely to succeed on the merits of

22    those state law claims, and you decided that we met the other

23    three *Canal Authority* factors as well.

24          So the only question before you now is not so much about

25    the law, it's about how the new facts you have heard apply to

```
 1    the law that you've already declared.  And we are talking about
 2    new communications.  But the only difference between the new
 3    communications and the old communications is they took away a
 4    question mark and put a period.  The last time they sent these
 5    questions, and Mr. Polak went over the six questions with you,
 6    but in short form, they said, Would you think less of PTK if
 7    you knew they were liars and thieves?  And Your Honor decided
 8    that was an insinuation that we were liars and thieves, and it
 9    was an insinuation that ought to be enjoined.
10         There is no insinuation anymore.  They are sending out
11    direct statements that we are liars and thieves, and we're
12    asking you to enjoin those.  And we think you will find, as you
13    will already have found, that the suggestion that we are liars
14    and thieves is likely to be a violation of our rights under the
15    Mississippi tortious interference with business law.
16         So what you found last time was that they had malicious
17    intent to harm PTK's lawful business.  And you followed Judge
18    Guirola's order in *Multiplan* which says, if somebody is trying
19    to harm your reputation, that is hard to quantify, but it is
20    substantially likely you are going to find damage when you look
21    at it, and, therefore, you decided we had met that part,
22    substantial likelihood of success.
23         We are not just relying on *Multiplan* now.  We have now
24    specified the particular damage that we have suffered since
25    these communications started.  We have given you a list.  It is
```

 1     under seal, but there are about 20 people who have left PTK.

 2     Their names are there.  It is under seal.  We have given you

 3     evidence that the universities and businesses that have been

 4     participating in our PTK Connect program, that's down by about

 5     15 percent since all of this started.  That certainly looks

 6     like proof of damage, certainly as much as we had last time,

 7     and I would say a great deal more.

 8          So what they say in their brief this time is we haven't

 9     proved that their malice caused our damage.  Well, as you've

10     noted several times, it's a preliminary injunction.  We are not

11     going to try the whole case yet.  The question is, do we have

12     substantial likelihood?  I would say when you've already found

13     that they maliciously intend to harm us, and now we have proven

14     that we have been harmed, it is substantially likely that when

15     we get to trial, we are going to be able to close the gap and

16     show that what they intended to do is exactly what they did.

17     It is certainly possible that there are other causes of a

18     downturn in anybody's business, but they haven't suggested what

19     any of them are.  All we know is that they went out to hurt us

20     and that we have been hurt.  I think that is good enough under

21     *Multiplan* and good enough under any preliminary analysis of a

22     tortious interference claim.

23          So we think the new communications are even more damaging

24     than the old communications.  We think we have already met all

25     of the four *Canal Authority* issues.  And the only real question

1      is whether they have got some kind of an affirmative defense to

2      the proof we are likely to be able to establish at trial.

3          You've mentioned several times their First Amendment

4      defense, which I'm prepared to talk about.  I was a little

5      surprised before lunch to hear there recrimination defense.

6      Your Honor, when I was doing divorces back in Biloxi back in

7      another century, we had a defense called recrimination.  It

8      meant that if your spouse had done something to you and you had

9      done the same thing to your spouse, you couldn't get a divorce.

10         And that's the defense they have issued here this morning,

11     well, we lie about you, but you lie about us.  It's not in

12     their brief.  It's not in their pleadings.  I don't think it is

13     in the law.

14         I don't think that you can excuse tortious and malicious

15     interference with somebody else's business by saying they are

16     just as bad as we are.  It's certainly not something they can

17     rely on here because they've never pled it and they've never

18     briefed it, and they've never showed us anything to suggest it

19     is a law.  If they want to come back and file a malicious

20     interference claim and get a preliminary injunction on it, we

21     can come here and talk all day about what we did to them and

22     what we didn't.

23         But as Your Honor said before lunch, I can assume all of

24     this is true and I can assume all of it really happened.  Does

25     it make any difference to this preliminary injunction?  The

1    answer is no, for a lot of reasons.  But we do have a First

2    Amendment defense.  Of course, they asserted that last time.

3    And the Court issued the order and I think the Court probably

4    considered their First Amendment defense, but we need to

5    consider it a little more carefully today.

6         The fact is that commercial speech does not get protection

7    under the First Amendment when it is false, misleading, and

8    deceptive.  That's the law.  That comes from the *Bolger* case

9    from the Supreme Court, and the *Bolger* case says that if you

10   have got those three things, it is probably commercial speech.

11   The Fifth Circuit analyzed *Bolger* in the *Procter & Gamble* case

12   several years ago.  They said, here are the three things you

13   have got to find:  You have got to find that the speech is an

14   advertisement; you've got to find that the speech refers to a

15   product or service; and you've got to find that there's an

16   economic motivation for the speech.  That's the sequence the

17   Supreme Court listed them in.

18        The Fifth Circuit, in *Procter & Gamble*, says, you know,

19   the first thing you really ought to look at is the economic

20   motivation.  If there is an economic motivation, it's a pretty

21   good idea that what you are talking about is an advertisement

22   of one form or another.

23        So their motivation for talking about us is pretty clearly

24   economic.  They filed an antitrust action which is not before

25   you now except to the relevant factor that they claim to be our

1    competitors.  So they have got an economic reason for telling

2    the world that we are bad people, because if the rest of the

3    world decides not to do business with them -- with us, they

4    might go do business with Honor Society.

5        And if there was any doubt that these communications were

6    commercial, then why in the world would they have asked for a

7    bond?  They are saying this isn't commercial speech, but if you

8    don't let us make this speech, we are going to be commercially

9    damaged, so we want a bond.  I don't think there is any more

10   clear proof that you could have that the communications they

11   are setting out there are commercial speech.  And -- or

12   economically motivated speech.

13       So we have established the third factor of *Procter &*

14   *Gamble*.  That tells us we have probably established the first

15   factor, Is this communication an advertisement?  And what the

16   Fifth Circuit said in *Procter & Gamble* is an advertisement can

17   go either way.  It can be a positive advertisement in our

18   favor.  It can be a negative advertisement against you.  A

19   positive advertisement says we are great.  A negative

20   advertisement says we are terrible.

21       The advertisement in *Procter & Gamble* Your Honor may

22   remember.  There were Amway distributors that were saying that

23   the trademark image *Procter & Gamble* used on its product was

24   satanic.  I don't think you get much more negative than

25   accusing somebody of being satanic.  It was a satanic

 1     accusation.  That was a negative advertisement.  So the Fifth

 2     Circuit says you have an economic motivation, you have a

 3     negative advertisement, and the next question is, does it refer

 4     to a product or service?

 5         And here it certainly refers to a product or service.

 6     What they are telling people is that the service we are

 7     providing, whether it is scholarships or anything else, is not

 8     real, we are not telling the truth about it, do not believe

 9     that the service Phi Theta Kappa says it can provide for you

10     will really happen.  Those touch all three bases.

11         This is clearly commercial speech, and it is clearly the

12     case that there is no First Amendment protection.  The Fifth

13     Circuit says that in *Procter & Gamble*.  It says that falsehood,

14     deception and misleading speech is not protected.  The *Eastman*

15     case cited in the briefs says you can't do deceptive or

16     misleading speech.

17         The *Gibson* case says the same thing.  And the *Gibson* case

18     says one other thing that I think is very interesting.  We have

19     talked about prior restraints.  The *Gibson* case says a prior

20     restraint is the prohibition of saying something you haven't

21     said yet.  You believe something is about to come out and you

22     restrain people and say, you can't say that.

23         That is not this case.  All of this has already been said.

24     We have given you what they have already said.  It is in that

25     big, thick binder.  We went through all of it.  It's not a

1    prior restraint.  It is already out there.  So you can order

2    them today to take it down and quit saying it.

3        The *Eastman* case, the question was, Can you prohibit the

4    use of a sales brochure?  It wasn't a prior restraint.  The

5    sales brochure was already out there.  The Court looked at it

6    and said, it is false, misleading and deceptive, and you can't

7    use it.

8        We are certainly in that position here today, which is

9    that this material is already out there.  I think you can find

10   it's false, misleading and deceptive, and I think you can order

11   them right now to take it down.

12       I will stop and say that poor Mr. Polak has lived with all

13   of the facts in this case, and if you have got any questions

14   about whether anything particular out there on those websites

15   is true, false or otherwise, I will be perfectly happy to have

16   you direct them to him, but I think you've told us you have

17   heard the evidence, and now I just want to talk about the law.

18       **THE COURT:**  Let me ask you this about the law, a

19   couple of questions.  Some of what I've seen and heard is Honor

20   Society's telling the public about the specific lawsuit.  These

21   are the claims that somebody has brought against Phi Theta

22   Kappa.

23       **MR. WALLACE:**  Uh-huh.

24       **THE COURT:**  These are the claims.  People have

25   accused them of X.  And I'm not sure if it's obvious from some

1    of it that they are the accuser.  We filed a counterclaim.  I'm

2    not sure if there was any reference -- I'm not positive if

3    they've owned up to the statements, but even if they did own up

4    or whether they didn't, we do know that those are allegations

5    of this lawsuit.  And I guess, can they stand up to the world

6    and tell people what is in a publicly filed lawsuit?

7         **MR. WALLACE:**  Generally they can.  We have asked in

8    the alternative for a gag order, but the gag order would say

9    you can stand up and tell the world what's in the lawsuit.  I

10   think the *Brown* case, and I will get to the gag order when I

11   get to it, says you do that without elaboration.

12   They have criticized us for talking about editorializing.

13   All right.  Take out editorializing and do elaborating, because

14   that's the language the *Brown* case uses.  Yes, I think they can

15   say that, that we have filed the lawsuit and here are the

16   claims we have made.  But what you see in the articles and

17   notices we've gone over in these two hearings is a lot more

18   than that.  And I think it is false, misleading, certainly

19   misleading, certainly deceptive.

20   Some of them they say Honor Society brought these claims,

21   and a lot of them they don't say Honor Society brought these

22   claims.  I think that is deceptive.  And the factual statements

23   they make are, you know, critics are wondering why -- critics

24   are wondering why Honor Society is doing this.  It reminds me

25   of what President Trump likes to say.  He says, "People are

1    saying this."  And when President Trump says that, he means,

2    I'm saying this.  Nobody ever identifies the people who are

3    saying this.

4        Their websites read like a Donald Trump tweet.  "People

5    are saying Phi Theta Kappa is bad."  What people?  The only

6    people that are saying that are Honor Society, and on most of

7    these websites, they don't fess up and say the only people

8    complaining about Phi Theta Kappa is us.  I think you found

9    that to be deceptive once already in this case, and I think it

10   is still deceptive.

11       Let me say a word about remedy.  One remedy you can and

12   should give is take all of this down.

13       The next question is, what do I say about the stuff they

14   haven't thought of yet?  And as you know, sitting as the

15   Chancellor, you have to be very, very careful about what you

16   put into an injunction.  You have to be clear about what it is

17   you are forbidding so that people have notice of it, because if

18   they disobey your order, they can go to jail, and that is

19   serious business.  So you have to be careful.  And you were

20   careful in your last remedy.

21       You went through everything they had done, you described

22   what they had done, and your order was basically, "Don't do

23   this again."  You didn't go any broader than that to say, "And

24   don't do anything like it again."  You were very narrow, as I

25   think a preliminary injunction generally ought to be.  But the

1    problem with being narrow is a litigant like Mr. Moradian, who

2    sat here this morning and said, You told me I couldn't ask

3    questions.  You didn't tell me I couldn't do -- couldn't do

4    statements.  I have kept the words of the order, and so I

5    haven't done anything wrong.

6        Your Honor may have had other experiences than what I have

7    had with fatherhood.  I can look at my oldest child and say,

8    take the beans out of your right ear, and she would take them

9    out of the right ear and look me straight in the eye and put

10   them in the left ear.  That's what Mr. Moradian did this

11   morning:  You told me not to ask any more questions.  I didn't

12   ask questions.  I'm going to look you straight in the eye and

13   tell you I'm making flat out statements that Phi Theta Kappa

14   are liars and thieves.

15       I don't think you could have anticipated that when you

16   issued your first injunction, but it's certainly happened now,

17   and I think you have to have a broader injunction that will get

18   the message to Mr. Moradian that it is the content that

19   matters, it's not the format that matters, whether it is a

20   question, whether it is a statement, whether it is a press

21   release, whether it is 5,000 web pages.  And you know I don't

22   know the difference between web pages and websites, but there's

23   a lot of stuff out there, and if you are doing this content

24   saying that Phi Theta Kappa are liars and thieves, you need to

25   stop it.  I think you need -- as I told you this morning, you

1    need more words and broader words than you used last time.

2        So we think you have established the need for a

3    preliminary injunction.

4        **THE COURT:**  If the Court were to grant it, if the

5    Court were to grant it, Mr. Wallace, we will have to be careful

6    with the words that we use and how narrow or how broad it is,

7    but if the Court were to grant it, would PTK submit something

8    to the Court in terms of what it ought to look like?

9        **MR. WALLACE:**  It is in our motion.  If you look at

10   the end of our motion --

11       **THE COURT:**  I guess if you just read to the end.

12       **MR. WALLACE:**  -- we have this is what a preliminary

13   injunction ought to look like, and then in the next paragraph,

14   this is what a gag order ought to look like.

15       And a gag order, by the way, which I will address now,

16   goes both ways, and it is about protecting the integrity of the

17   Court and particularly about protecting the right to an

18   unbiased jury.  That's a related but separate issue, and we

19   have asked for it.

20       We think that the gag order here is justified under the

21   *Brown* case and the *Marceaux* case.  The *Marceaux* case is a civil

22   case applying the *Brown* rule, and the *Brown* rule says there can

23   be prior restraint of communications about the trial when there

24   is a substantial likelihood of prejudice to a fair trial.  Will

25   it infect the jury; will it not?  That's the problem we are

 1    facing.

 2         What *Marceaux* approved was a gag order limiting the

 3    parties to talking about what's on the public record, the

 4    identification of the claims and defenses.  That's the question

 5    you asked before:  Can they say we have these claims pending?

 6    Absolutely they can.  And the scheduling of or the result of

 7    any step in the litigation, they would be able to walk out and

 8    talk to people today about what happened in this courtroom

 9    today.  That is what we are asking you to do.

10         The only thing *Marceaux* disapproved was shutting down the

11    entire website that was in question, and we are not asking you

12    to do that.  We are asking you to limit the communications on

13    both sides.

14         Now, they say that this case isn't a circus like the *Brown*

15    case.  And Your Honor is well aware, nobody puts on a better

16    circus than Louisiana elected officials, and the *Brown* case was

17    certainly a circus.  But the *Marceaux* case points out that

18    circuses have changed in the computer age.  It points out you

19    could have an article on the front page of the newspaper and

20    nobody would ever see it.

21         I think that is particularly true of the *Clarion Ledger*,

22    although their press release has been on *Jackson Jambalaya*,

23    where I think it is much more likely to be seen.  But even so,

24    it goes out to thousands of people on the internet.  You can't

25    tell there is a circus going on because it's not all out in

 1    front of the courthouse.  The circus is in hundreds of

 2    thousands of homes all over the country where people are being

 3    subjected to what they say about this lawsuit, and they

 4    testified we have hundreds of thousands of people coming to our

 5    website all the time.

 6         Now, I don't know where all of those people live, but

 7    we've shown you what happens in this judicial district, in the

 8    Jackson division if you Google Phi Theta Kappa and the local

 9    community college, and you get the stuff they are putting up.

10         So I have no doubt in my mind that there are people who

11    are either going to Hinds or they are sending their children to

12    Holmes, or they have something to do with Co-Lin.  Those are

13    all in this district.  And if anybody is looking up those

14    places, what they are seeing is what they have got out there.

15    And in the computer age, hundreds of thousands of people

16    looking at this stuff seems to me to be a circus, and I think

17    it calls for the gag order that was approved in *Marceaux*, which

18    is like the one in *Brown*.

19         One thing we know for sure, Mr. Moradian told you how hard

20    it is to put this stuff out there.  He's not doing this just

21    because he thinks no one will see it.  He thinks people will

22    see it, and he told them what he wants them to do.  He said he

23    wants people to see it, and he wants it to be impactful to

24    their decision-making.  I'm not sure whether impactful is a

25    word, but the decision-making he is talking about is whether

1    they decide to do business with Phi Theta Kappa.  That's why he

2    put it out there.  That's why he is spending this money on it.

3    He thinks it is going to have an effect.  And I think that it

4    may very well have an effect.  And to preserve the integrity of

5    our jury, you need to tell him to stop.

6         I think we are entitled to a preliminary injunction.  I

7    think we are entitled to a gag order.  And one other thing you

8    are saying that we are entitled to is sanctions.

9         I haven't come in here asking for contempt because I know

10   how serious contempt is.  And they say you can't sanction them

11   because you can't prove intentionally they violated the

12   contempt order.

13        Your Honor will remember I was counsel to the Senate

14   majority leader for the Clinton impeachment trial.  I learned

15   there that there are people in this world who will argue all

16   day and night about what the meaning of "is" is.  One of those

17   people sits right over there.  And I don't want to spend the

18   rest of my life arguing about whether he violated your order or

19   whether he didn't, but it is clear he is doing everything he

20   can to get his way around it.

21        And if he is going to do it, if he didn't take the

22   education you gave him last time that this is bad stuff and you

23   ought to stop saying it, every time he finds a new way to say

24   it, we will be happy to bring him back in here and let you tell

25   him again, but he ought to get an education at his expense, not

1    ours.  He ought to be the one to pay for putting us and putting

2    you through everything we have learned over these two days of

3    testimony.

4         Our brief has indicated the cases that allow you to

5    sanction him, whether he technically violated your order or

6    not.  You will read them, you will decide whether or not they

7    apply, and you will decide how far he is off the reservation.

8    My view is he is pretty far gone, and I think Your Honor needs

9    to bring him back by, again, making him pay for the education I

10   think we are all about to get once again from this Court.

11        If you have factual questions, I will turn it over to Mr.

12   Polak.  Unless you've got any legal questions, we have talked

13   about this before, I will sit down.

14        **THE COURT:**  There is just this one question that I

15   had, and it may not even be -- I'm going to ask it before the

16   end of the day because I just feeling a burning to ask it.

17        **MR. WALLACE:**  I will sit down and we'll talk when you

18   are ready.  Thank you, Judge.

19        **THE COURT:**  All right.  You may proceed.

20        **MR. NEWMAN:**  Thank you.  I'm going to start with a

21   brief recitation of the facts that I think are undisputed that

22   we learned during the evidentiary hearing.  I will then talk

23   about the preliminary injunction and the gag order and then the

24   request for fees.

25        I will start with the facts.  PTK doesn't know if any

1    student is in the top ten percent of classes.

2    Dr. Tincher-Ladner admitted colleges never tell PTK whether any

3    student is in the top ten percent, but rather colleges only

4    inform PTK if students have a 3.5 GPA, sometimes as low as a

5    3.25 percent GPA, but we don't know whether that constitutes

6    the top ten percent.

7        PTK never verifies whether any student is in the top ten

8    percent but yet represents that all students are.  PTK sends

9    letters advertising that students maintain their top ten

10   percent, but PTK doesn't verify.  And we have heard testimony

11   that students who join PTK are members for life, so there

12   couldn't be a verification that they continue maintaining a top

13   ten percent requirement.  And, of course, PTK has admitted that

14   it doesn't know that any student is in the top ten percent,

15   only that it had a 3.5 GPA at some time.

16       Dr. Tincher-Ladner's calculations don't make sense.  She

17   uses a 17 million student number in a numerator, when I think

18   it is clear that there are only five million students in the

19   whole country, and many don't have a PTK chapter.  So if

20   there's five million students, considering all the invites that

21   PTK sends, that's only the top 22 percent, assuming that

22   everyone is at the top of their class.

23       And there's an arbitrary increase of 70 percent of

24   students who are enrolled in credit-taking programs, which

25   doesn't make sense, because if a student isn't enrolled until a

1    credit-taking program, then it can't be compared against

2    students who do.  It's not ahead or behind because there aren't

3    any grades to judge it against, which means that PTK's numbers

4    are artificially inflated because it is including students who

5    are not seeking a degree, and thus they wouldn't be ranked

6    against students who are seeking a degree.

7         PTK's invitation number also doesn't include students who

8    have already joined PTK.  So if a student joins PTK after the

9    first semester, when invitations go out the second semester,

10   that student who joined first semester is not included, but yet

11   they have a 3.5 GPA as well, and so they should be included in

12   the numerator, and it artificially depresses the numerator.

13        **THE COURT:**  If the Court agrees with you on that

14   issue, that PTK has somehow misled the students or somehow --

15   when the numbers all are dissected and looked at, it's not the

16   top ten percent, admittedly, or it's not -- there's a question

17   of whether it's the top ten percent, it might be top 12 or top

18   15 percent -- if the Court says that that's correct, that

19   there's a dispute about that, that what you say may be true,

20   what they say might not be true, what about the other steps

21   that Honor Society has taken to encourage -- to encourage

22   persons to not trust or not -- to what they contend is

23   interfering with the business relationship?

24        So that is one aspect of it.  You are saying what we are

25   saying is true on that.  What about all the other stuff, or any

1   of the other stuff, like the Honor Society website,

2   HonorSociety.Org.  It says here your PTK chapters, and then you

3   drop down and you look at every chapter and what comes up is

4   the stuff about the lawsuit, the other stuff.

5       So, again, assuming that based on what I've heard the last

6   couple of days, there is some confusion about whether or not it

7   is the top -- everyone who receives the invitation is actually

8   in the top ten percent of their class, because the question I

9   wanted to ask, you know, it might be possible, I would think,

10  for the persons who are invited locally by the schools to have

11  also received an invitation from PTK.  So that number might be

12  messed up in that way.  The number might be messed up in a way

13  where somebody has said, Please don't send this to me again,

14  exclude me from your list, unsubscribe me, but PTK, like

15  anybody else, we have unsubscribed, unsolicited text messages

16  and e-mails that we get all the time, and we say, Please take

17  me off your list, and then you get them.

18      So if I accept your proposition that they are wrong with

19  respect to the top ten percent, is it over at that point for

20  them?  I mean, does that close the door for any relief that

21  they might get, if I agree with you on that, notwithstanding

22  some of the other stuff?

23          **MR. NEWMAN:**  The relief that they seek is foreclosed

24  for several reasons, but if the Court is asking whether other

25  statements that Honor Society makes are untrue, the answer is

1  no.  The list of directories, for example, a directory is just

2  a list of something, and there is a directory of schools there.

3  Click on the school and true statements appear.  There aren't

4  any false statements.  It is true what Honor Society publishes

5  on the page in response to the directory link.

6      We can look at other things that Honor Society published.

7  For instance, Honor Society notices that PTK sells student data

8  without consent.  And Tincher-Ladner admitted PTK receives a

9  fee for access to student data, that to me is selling student

10 data, but PTK never discloses to students that it sells data.

11 Rather it informs students that it and its partners were sent

12 marketing.  It doesn't say who those partners are.  There's not

13 a link to see who the partners there.  It is buried in fine

14 print.  It violates advertising laws to bury something in fine

15 print that might be confusing.

16      **THE COURT:**  The law hasn't been determined on that.

17 And I guess me or somebody else would figure out what the law

18 is, but they -- they have informed students, I thought I saw an

19 exhibit, that you have given us your information, and we have

20 the right to share the information with our partners.

21      **MR. NEWMAN:**  They don't say who the partners are.

22      **THE COURT:**  Do they have to?

23      **MR. NEWMAN:**  Yes, because false --

24      **THE COURT:**  What law tells me or them that they have

25 to tell the student who they give the information to.

1          **MR. NEWMAN:**  Sure.  False advertising law requires

2     that anything that would be material to a purchasing decision

3     must be clear and conspicuous.  Here we saw the terms and

4     conditions buried in fine print.  It says, "transfers to our

5     partners."  Partners, to me, says, like, you know, legitimate

6     business partners, like a subsidiary and the like.  It doesn't

7     mean sell data to the highest bidder.  Perhaps thousands, tens

8     of thousands of buyers so that students will be bombarded with

9     spam and other messages that have nothing to do with PTK.

10          It is false advertising, and Honor Society has a right to

11    publish about that.  And if there is a disagreement as to

12    whether that is false advertising, and I don't think there

13    should be because it's material and it's not clear and

14    conspicuous, then PTK's remedy is to post its own information

15    explaining why that's not false advertising.  But the reality

16    is, if PTK advised students that they are selling student data,

17    PTK would get less student sign-ups.  And that's something of

18    public concern that the public should know, and PTK should have

19    the right to advise the public about.

20          Those other posts up that were discussed today, for

21    example, that the former executive director was accused of

22    sexual harassment, Tincher-Ladner admitted PTK's former

23    executive director was accused of sexual harassment of at least

24    two women, so that is true.

25          There was discussion of embezzlement.  Tincher-Ladner

1    admitted a PTK chapter advisor was indeed arrested for

2    embezzlement, so that is true.  In talking about the press,

3    Tincher-Ladner admitted there has been no meaningful press

4    coverage.  There is a Bloomberg article or two in response to

5    PTK's own press release.  There is a blog post at *Jackson*

6    *Jambalaya*, but nothing more than that.

7        And importantly, Dr. Tincher-Ladner admitted that she

8    knows not of a single contract or sale that was lost from Honor

9    Society's articles.  She says that she assumes that they were

10   lost.  I said, "Assumes?"  And her counsel objected, and the

11   Court said she testified assumes.  An assumption is just mere

12   speculation.  The record is clear that she is unaware of a

13   single lost contract or sale from Honor Society's articles.

14       So I'm going to move to the law.  I did want to summarize

15   the facts, but I'm going to talk about the preliminary

16   injunction first.  The Court should deny the preliminary

17   injunction for three reasons.  The first the Court is well

18   aware of.  We have talked about it.  It's perhaps the biggest

19   issue of the case.  That is the First Amendment.  The second

20   reason is the litigation privilege.  And the third is that PTK

21   cannot meet two elements of its claim, so it's not

22   substantially likely to succeed on the merits.

23       I'm going to start with the First Amendment.  So the First

24   Amendment protects all speech except for a limited category.

25   We cite all of this in our brief.  I'm happy to provide the

 1   case names.  I hope the Court will spend quality time analyzing

 2   the briefs.  But lewd speech, obscene speech, profane speech,

 3   fraudulent speech, speech that incites immediate lawlessness,

 4   that speech isn't protected.  And defamatory speech is not

 5   protected, and perhaps that's what PTK is relying on.

 6        Something being false, that's not an exception.  False

 7   speech is protected unless it is defamatory.  And for something

 8   to be defamatory, there are a couple of elements that have to

 9   be met:  First, there's got to be a false statement.  But

10   second, the speaker has to commit negligence, or, in the case

11   of a public figure, actual malice.

12        And I think that we have reviewed enough to know that none

13   of Honor Society's articles contain false statements.  I think

14   there are arguments that they are misleading, but I don't think

15   there are any valid arguments that they contain false

16   statements.

17        But in any event, we heard Mr. Moradian testify why he

18   believes each statement is true.  I think that testimony was

19   authentic, compelling, real.  I think the Court should believe

20   him.  And to the extent the Court believes him, even if the

21   Court thinks a statement is false, and I don't think any were

22   false, but to the extent Mr. Moradian believed they were true,

23   he did not commit negligence, thus cannot meet the element for

24   defamation.  So even if it is false, it is still protected.

25        I should also point out that PTK's papers make it sound

1    like it is a public figure, in which case he would have to have

2    actual malice.  And what that is under the law is that he knows

3    for certain that the statement was false.  It's not just a

4    disregard.  And I don't believe that Mr. Moradian considers any

5    of those statements false.  He explained why.  And the fact

6    that he has a good faith belief in them means they are not

7    defamatory.  And if they are not defamatory, even if false,

8    still protected under the law.

9         I could cite a series of cases for that, but it is all in

10   our brief, so I hope the Court will spend time on that.

11        I think the substantial majority of the statements that

12   PTK complains about is not any false statement but rather PTK

13   argues statements are misleading.  Misleading speech is

14   protected under the First Amendment, with one exception, and

15   that is commercial speech can lose protection.  And if

16   something is misleading and it's commercial speech, it doesn't

17   automatically lose protection.  There are other elements

18   involved.  There has to be materiality and deception and

19   impacts a purchasing decision.  And the reason why is because

20   misleading speech is not an exception to the First Amendment.

21   Fraud is an exception to the First Amendment.  So if it is

22   misleading and it's material and causes deception and impacts a

23   purchasing decision, and if it is commercial speech, it might

24   be unlawful.

25             **THE COURT:**  Suppose the Court finds that it's

1    commercial speech that is misleading.  Then we go down to the

2    other things that you say must have to prove, whether it

3    discourages one to, you know, lose customers, for example.  I

4    think Mr. Moradian testified he's trying to get this word out

5    to as many people as possible because the community needs to

6    know about this fraud.  I think he used the word "fraud" a few

7    times out of his mouth, defrauding people or they are doing

8    this.  And as a citizen, he didn't use the word "citizen," but

9    we all have an obligation and a duty, something, words to that

10   effect is what he said.  So the idea of putting it out there, I

11   think the question was about 5,000 -- why 5,000 pages or why

12   5,000 web pages as opposed to just 10?  Why not -- and the

13   thing that I thought about, why not 10,000?  I don't know what

14   was the magic with 5,000.  Maybe 5,000 did put the notice --

15   gave everybody the notice that Mr. Moradian thought that they

16   should have.  It reached to everybody who he thought it should

17   reach.

18        So what if the Court believes it is commercial speech,

19   that it is misleading?  Have they proved the rest of the

20   elements that you said that they have to prove after that

21   point?

22             **MR. NEWMAN:**  So to answer that question, I think I

23   first have to address what is commercial speech?  Commercial

24   speech, according to *Central Hudson Gas and Electric Corp.*

25   *versus Public Service Commission*, it must propose a commercial

 1   transaction.  In other words, it's an advertisement.  And the
 2   Fifth Circuit, in the case *In Re: National Services Corp.*, held
 3   that commercial speech is expression related solely to the
 4   economic interest of the speaker and its audiences.  It has to
 5   be related solely to the economic interest of the speaker.
 6         **THE COURT:**  So because someone is doing it out of the
 7   good of their heart and making money, the Fifth Circuit would
 8   say, because they are doing it out of the good of their heart,
 9   because they are doing something else other than just making
10   money, it's not commercial speech.
11         **MR. NEWMAN:**  Yes, and the reason why is because the
12   United States Supreme Court has held that speech that's a
13   matter of public concern is always protected, even if it's in
14   an advertisement.  So if the expression is not related solely
15   to the economic interest, if it's a matter of public concern,
16   it's protected.
17         **THE COURT:**  And the matter of public concern here
18   would be education of people who are thinking about education
19   in the community college or education period, presumably.
20   That's a matter of public concern.
21         **MR. NEWMAN:**  The colleges and students are being
22   misled, and Honor Society believes that that's a matter of
23   public concern and that they should know that they are being
24   misled.  In *In Re: National Service Corp*., the defendant put up
25   a big billboard that said, "Beware this company does not pay

 1   its bills, and beware this company is in bankruptcy."  And the

 2   plaintiff alleged those billboards were false.  And the

 3   District Court agreed and issued a temporary restraining order

 4   and a preliminary injunction.  But the Fifth Circuit reversed

 5   and held that because they weren't a solicitation for the sale

 6   or purchase of a product or service, they don't qualify as

 7   commercial speech.

 8        And here, Honor Society's articles are not a solicitation

 9   for the purchase of a product, so they are not commercial

10   speech under the Fifth Circuit standard in *In Re: National*

11   *Service Corp*.

12        And I should also note, Your Honor, that none of the

13   articles are misleading in any event.  They editorialize the

14   lawsuit.  They provide opinions.  They directly relate to the

15   lawsuit and summarize allegations, but they aren't misleading.

16   Images of a woman with money and red alert images, that's art

17   not capable of being proven true or false at all.  It is

18   farcical parody.  And if it can't be proven true or false, then

19   their message can't be misleading.  It is a type of artwork

20   that's traditionally protected by the First Amendment.

21        The page that PTK claims is the voice of the colleges, I

22   think if the Court reads it carefully, it's not in the voice of

23   the college, it is on a page that's obviously by Honor Society,

24   because it has Honor Society's logo, it's on Honor Society's

25   web page.  And I should note it was removed a week before this

1    motion was ever filed, not in response to this motion but

2    before it was ever filed, which should indicate that the plan

3    wasn't to keep it up in any event.  Mr. Moradian saw it, he

4    didn't like it, he wanted to edit it, he removed it, and it

5    wasn't because this motion was brought.  It was done before

6    this motion and before counsel brought to my attention that

7    these articles were on the internet.

8        So the Court should deny the preliminary injunction

9    because the First Amendment protects Honor Society's speech in

10   any event, even if it is false, unless it is defamatory, but we

11   have heard that Mr. Moradian had a good faith basis.  And it's

12   not commercial speech, and if it is commercial speech, it is

13   not misleading.

14       The Court should also deny the preliminary injunction

15   because of the litigation privilege.  This Court has already

16   issued an order about the litigation privilege when PTK was

17   sending letters to colleges stating that Honor Society was

18   committing a scam, and the Court found that it was related

19   enough to PTK's allegations that it fell within the litigation

20   privilege.  And the difference between sending letters directly

21   to colleges and putting up pages on its website is what PTK did

22   is reach the audience directly because PTK has that

23   relationship and ability, whereas Honor Society doesn't have

24   the relationship and ability and so it is less likely to reach

25   its desired audience.

1       So I would suggest that under the litigation privilege --

2   it has even a stronger interest in stating what its allegations

3   are.  And for the reasons that the Court said that PTK is

4   allowed to continuing telling colleges that Honor Society is a

5   scam, the Court should also agree that Honor Society has a

6   right to publish on the internet that PTK is misleading

7   colleges and students by making false statements, which I don't

8   think there should be a dispute about.

9       I'm going to move on to my next reason why the Court

10  should deny the preliminary injunction, and that is, PTK is not

11  substantially likely to succeed on the merits of its claim.

12  And that's the standard, substantially likely to succeed on the

13  merits of its claim.

14      I'm going to repeat arguments that I made last time that I

15  think the Court rejected, but this is a new motion, and I think

16  it is fair that I make those arguments again, especially

17  because if the Court issues an injunction, the case will go up,

18  and I want to preserve the record.  So I'm going to make the

19  record.

20      The first argument is that the case law is clear that a

21  plaintiff cannot succeed on the merits of a case for tortious

22  interference without showing a specific lost contract or lost

23  sale.  The standard is not likelihood of a breach of a contract

24  or a lost sale.  The standard is there must be an actual breach

25  or lost sale.  Why?  Because we are in federal court.  And in

 1    federal court there has to be a case in controversy, which

 2    means there has to be an actual injury, not mere speculation.

 3         And what we cited in our brief, and again, I hope the

 4    Court reviews it, is the overwhelming weight of authority shows

 5    that PTK must show a lost contract or lost sale.  And here,

 6    Dr. Tincher-Ladner testified she is not aware of one, not one.

 7         In fact, the plaintiff must show that lost contract or

 8    lost sale with particularity specifically in its complaint.

 9    And we cited a series of cases where judges dismiss the

10    complaint at the pleading stage for failure to identify a

11    specific lost customer sale.  For example, Judge Wingate, in

12    *Pie Dev versus Pie Insurance Holdings* dismissed a complaint

13    where a defendant did not identify a particular lost customer

14    sale.  Instead, the alleged defendants had unlawfully diverted

15    customers based on their actions.  The plaintiff showed lots of

16    lost revenue that coincided with the defendant's actions.  And

17    Judge Wingate said, if you can't identify a specific lost sale

18    or lost contract, case dismissed, at the pleading stage.

19         Similarly, in *Ronaldo Designer Jewelry versus Cox*, which

20    is a 2019 case from this district, the Court collected cases

21    and noted that Courts, quote, regularly, unquote, dismiss

22    tortious interference claims when a claimant fails to identify

23    a specific lost contract or sale in its complaint.

24         And we have reviewed cases from across the country in

25    federal courts, and we've only found two where a Court has

1    issued a preliminary injunction in a tortious interference case

2    where the plaintiff failed to identify a specific lost contract

3    or sale.  The first was *MultiPlan*, and when I argued last time,

4    I said, *MultiPlan* is an outlier.  And my friend, Mr. Wallace,

5    said, It's not much of an outlier.  It came from this very

6    court.  But what I meant by outlier is it came to a decision

7    that no other Court has come to, because it isn't based in the

8    law.

9        And the second injunction that was issued without a

10   particular lost contract or sale was this Court's decision.

11   And I would suggest, respectfully, because I'm grateful for the

12   Court's time and attention, and I know the Court is fair, and I

13   appreciate that I'm allowed to make this argument, but I would

14   suggest that the Court and the *MultiPlan* judge erred, because

15   the law is clear that the complaint must identify a specific

16   lost customer or sale.  But here we are at preliminary

17   injunction.  You would think that after all of this time, PTK

18   could identify just one lost contract or sale.  I have a list

19   of 20 students who didn't renew.  Just ask a student, Why

20   didn't you renew?  I'm suspicious that they did ask, and no

21   student has said it was because of Honor Society's articles,

22   because if that was the case, it would be in the record.  And

23   without a lost contract or sale, PTK is merely speculating, and

24   speculation is not allowed in federal court because there has

25   to be a case or controversy.  There has to be an actual injury.

 1    The standard isn't likelihood that there's a breached contract

 2    or sale.  The standard is there is a lost contract or sale.

 3    And here, Dr. Tincher-Ladner admitted clearly that she can't

 4    think of a single one because none exists.

 5              **THE COURT:**  Is the standard that there is a lost sale

 6    or the standard is that they -- there's a substantial

 7    likelihood to succeed that there will be -- that they will be

 8    able to prove a lost --

 9              **MR. NEWMAN:**  That's not the standard.

10              **THE COURT:**  That's not the standard?

11              **MR. NEWMAN:**  No.  The standard is substantial

12    likelihood of success on the merits.  How do you succeed on the

13    merits?  You must show a lost contract or sale.  It's not a

14    substantial likelihood that there will be a lost contract or

15    sale.  It's not a likelihood of lost contract or sale.  The

16    standard is actual lost contract or sale, not a likelihood of a

17    lost contract or sale.

18         PTK relies on correlation, namely it lost money during the

19    course of this litigation, and that coincided with the time

20    that Honor Society published material.  But the Fifth Circuit

21    has repeatedly noted in case after case, one is *Huss v. Gayden*,

22    one is *U.S. versus Valencia*.  Again, we cited them on our

23    papers, so if the Court spends quality time with our papers, he

24    doesn't need to write them down.  But the Fifth Circuit held,

25    noted several times, correlation is not causation.  Evidence of

 1    lost sales that coincide with allegedly wrongful conduct is not

 2    enough.  Why?  Because, again, in federal court there has to be

 3    a case in controversy, and you can't have one without an actual

 4    lost sale.  Speculation doesn't suffice.  And that there is

 5    correlation is mere speculation.

 6        Dr. Tincher-Ladner admitted speculation.  She said she was

 7    assuming.  She can't identify a single lost contract or lost

 8    sale.  The Fifth Circuit said that correlation is not

 9    causation, and so PTK is not substantially likely to succeed on

10    the merits of its claim.

11        Then another element that they have to prove is that what

12    Honor Society did was wrongful.  But Honor Society didn't act

13    wrongfully because it believed in good faith that everything it

14    was publishing was true.  And it also has done so under the

15    First Amendment, so it didn't act wrongfully.  And unless it

16    acts wrongfully, it can't commit tortious interference.

17        **THE COURT:**  So the idea of maliciously doing

18    something is not wrongful?  If the Court were to find that the

19    intent to -- the intent to harm PTK is there, you would still

20    say that that's fine, because it's not misleading or because I

21    should believe that they were doing the public good?

22        **MR. NEWMAN:**  In part.  In order for it to be

23    malicious under the law, it can't be for a legitimate purpose.

24    So if it is --

25        **THE COURT:**  And that's the legitimate purpose here,

1     if it's not to drive people away from PTK or to drive people

2     toward Honor Society.  That's the reason, right?  Or is it

3     totally public good, like Mr. Moradian said?  You know, when

4     there's a fraud out there, as a member of the public, we have a

5     duty to warn everybody else.

6          **MR. NEWMAN:**  Honor Society has, as I discussed, a

7     First Amendment right to publish what it believes to be true,

8     and therefore it has a legitimate purpose.  And if it has a

9     legitimate purpose, by definition, that cannot be malicious, so

10    the Court can't find that it has a malicious purpose.

11         **THE COURT:**  So you have a right to publish or say

12    anything about someone, because in your mind, you believe it is

13    true?

14         **MR. NEWMAN:**  Unless the defendant acts with reckless

15    disregard for the truth, yes.  So the Court should deny the

16    preliminary injunction motion because of the First Amendment,

17    the litigation privilege, and because PTK is not substantially

18    likely to succeed on the merits of its claim.

19         I'm going to move to the gag order.  The law on gag orders

20    is clear.  The Supreme Court and the Fifth Circuit held that

21    there's a strong presumption against a gag order because of

22    speech concerns and that gag orders qualify as prior restraint.

23    I heard argument from PTK's.  Counsel that a prior restraint

24    doesn't include stopping speech that is in progress.  I've

25    never read that before.  A prior restraint is stopping any

1     speech in the future.  If it exists today and continues, it

2     exists in the future.  That is a prior restraint.  And the

3     Supreme Court has said that prior restraints are presumptively

4     invalid.

5          For a gag order, the standard has to be a substantial

6     likelihood that extrajudicial commentary will undermine a fair

7     trial.  And both sides have cited the *Marceaux* case for that.

8     Substantial likelihood that extrajudicial commentary will

9     undermine a fair trial.  So the question is, is the potential

10    jury going to be so exposed to facts of the case that they will

11    not be partial?

12         But the facts here aren't what PTK's papers claim they

13    are.  The papers say that this case has been, quote, widely

14    publicized, end quote.  We heard testimony, and PTK could only

15    cite a couple of Bloomberg articles that arise out of its own

16    press release and a blog post on *Jackson Jambalaya*.  This case

17    has been going on for two years.  There have been two cites to

18    the press in response to the press release, so once a year

19    there has been a small article that no one has seen.

20         There was discussion by PTK's counsel that a circus now

21    goes online, but the type of circus that Courts refer to is

22    when the public is so exposed because it is in the media and

23    they can't avoid it.  They turn on the T.V., it is there.  They

24    open a newspaper and it is there.  But here, the public who

25    will serve as jury members have no exposure to Honor Society's

1    website.

2        We saw that the only way to see these articles is by doing

3    a search.  So unless the jurors are doing a search, they will

4    not be exposed.  And, of course, when potential jurors arrive

5    for voir dire, the Court instructs them not to do a search, not

6    to do any external research.  So the substantial likelihood is

7    that no juror will have heard anything about this case.  And so

8    it doesn't meet the standard that substantial likelihood that

9    extrajudicial commentary will undermine a fair trial.

10       And also, if there is going to be a gag order, the Court

11   has to exercise the least restrictive means at avoiding it for

12   trial.  So cases have talked about voir dire, and here the

13   Court will have voir dire with the jurors and ask, Has anyone

14   heard of PTK?  Has anyone heard of Honor Society?  Has anyone

15   heard of the facts of this case?  In the unlikely event that

16   jurors have, they will be excluded.  They will not be on the

17   jury.

18       The Courts have also found that a transfer of venue might

19   be appropriate.  I don't think that would be necessary here

20   because I don't think any potential juror is searching for

21   Honor Society on the internet, but that's another thing the

22   Court would need to consider before --

23           **THE COURT:**  I've been thinking about that just a

24   little bit, not the transfer of venue, but the community

25   college system is large in Mississippi.  We've been talking

1    about Hinds Community College.  It has a campus in Raymond and

2    Utica and Ridgeland, and these are just right here, and

3    Jackson.  That's one community college with four campuses, not

4    even -- well, three of which are in the same county.  And then

5    other parts of the county in this district, you have Holmes

6    Community College, which has one in Ridgeland and in Holmes.

7    And they all have campuses -- I mean, they are designed to sort

8    of treat every county.  That's the nature of them, to make sure

9    that people are skilled in whatever their training.

10         Of course, the online -- they all have an online component

11   now.  And I don't know how many people are enrolled in all of

12   the community colleges in the Southern -- in the Northern

13   Division of the Southern District or the entire Southern

14   District, but the chances are that persons are getting ready

15   for college now or back in the spring, are looking at -- and

16   when their friends get stuff from Phi Theta Kappa or Honor

17   Society and I'm not getting something, I might be trying to

18   find out why I didn't get it.

19         So I am -- I'll tell you, I am somewhat concerned about

20   that, but I do think the Court could address that in ways in

21   which we could see if it -- if we would be prevented from

22   getting 7 or 8 people to try -- to sit as jurors in this case.

23   So I am somewhat -- you know, I don't know -- I don't know if

24   you all have thought about how many people in and around here

25   are tied to the community college system.

1      **MR. NEWMAN:** All right.  If the Court has that

2      concern, it is very easy voir dire questions.  Have you ever

3      attended a community college?  Do you attend a community

4      college?  Have you researched community colleges?  And I would

5      suggest that the substantial majority, if not all, of the

6      potential jurors are going to say no, and the one that does

7      would be excluded.  So voir dire would ferret that out.

8          I'm going to move on to the fees request.  At the last

9      motion for preliminary injunction, PTK asked for relief that

10     would have prohibited these articles.  The Court denied that

11     request and issued an order that is limited to very specific

12     survey questions.  And why do I say very specific survey

13     questions?  Because the Court's order says, if Honor Society is

14     going to send out other survey questions with the same subject

15     matter, Honor Society is not barred from doing so but must

16     advise PTK.  It doesn't even give PTK a right to object.  It

17     just says that Honor Society must advise PTK that it is sending

18     out other survey requests.  So the order contemplates that

19     other survey requests might be sent out with the same subject

20     matter.  And if other survey requests might be sent out with

21     the same subject matter, then I think it is fair to assume that

22     the order allows PTK -- excuse me, strike that -- Honor Society

23     to send out other communications that aren't surveys with the

24     same subject matter.

25         The request for fees for an alleged violation of the

1    spirit of the order denies due process.  The spirit of the

2    order, there aren't cases that talk about that.  The spirit of

3    the order is limited to the words of the order because a party

4    has to be put on notice as to what conduct it may and may not

5    engage in.  It can't be left to guess as to what the Court left

6    out.  It has to be specific.

7         I would suggest, based upon the case law that we cited,

8    that the Court can't fine a party for doing something that the

9    order doesn't prohibit, nor does this violate the spirit of the

10   order.

11        The subject matter that Honor Society is speaking about is

12   not in a survey question, and the order is very clear that it

13   is as to survey questions.

14        Fees that Courts issue are reserved for actual violations

15   of a Court order, and here there is no actual violation, not

16   even close.  So I would suggest that a fee award would be

17   inappropriate.

18        Just to conclude, I think PTK is trying to use this

19   process to cover up matters that are legitimately of public

20   concern.  And Honor Society has the legal right to discuss this

21   lawsuit, its allegations, and why it believes that PTK is

22   misleading colleges and students.  And the Court should not

23   issue a prior restraint against Honor Society's speech.  The

24   Court should allow discourse and debate on both sides and let

25   the freedom of speech in the marketplace reach the public.

1   Honor Society has made only true statements, nothing

2   misleading.  And to the extent it is misleading, it's not

3   commercial speech, and it all complies with the First

4   Amendment.  And I'm grateful for the Court's time.  Thank you.

5          **THE COURT:**  We are going to take a ten-minute break.

6   The court reporter needs a break.  We'll come back in ten

7   minutes, and we will let you, Mr. Wallace, wrap up on the

8   rebuttal.

9          **(RECESS TAKEN AT 5:10 P.M. UNTIL 5:26 P.M.)**

10         **THE COURT:**  Mr. Wallace.

11         **MR. WALLACE:**  Your Honor, I know it's late.  I

12  appreciate the Court's patience and effort in fitting this in,

13  and I will try to be brief, but I want to start with your

14  question about the ten percent.  As I understand your question,

15  you were asking isn't it true that there is a factual dispute

16  about whether our ten percent statements are true or they are

17  not true.  I think the answer is, yeah, there is a dispute.

18  But as you've already said, this is a preliminary injunction

19  hearing, and you're the fact-finder.  You're the one who gets

20  to decide, for purposes of the preliminary injunction, whether

21  or not what we have been saying is true.

22      Now, when we get around to trying the case, that doesn't

23  foreclose the jury from reconsidering the same fact.  They can

24  say, We don't owe you any damages because we were telling the

25  truth, that ten percent isn't true.  But for purposes of this

 1   preliminary injunction hearing, you are the finder of fact.
 2   You have to think about the explanation of the numbers which
 3   you heard from a woman who has been doing those numbers as a
 4   college employee and as an employee and now president at Phi
 5   Theta Kappa.  She has been doing those for years, and she has
 6   explained to you why the numbers make sense and why they are
 7   true.

 8        And you've heard about -- you've heard the criticism of
 9   those numbers from somebody who is telling you what he thinks
10   he found out from some junior college in Illinois that he can't
11   authenticate.  You are entitled to decide which one of those is
12   more likely to be true, and I think you ought to find that
13   Dr. Tincher-Ladner is telling the truth when she says that Phi
14   Theta Kappa represents the top ten percent of the junior
15   college community.

16        The other thing they have talked about is sale of data,
17   which is participation in the PTK Connect program, which puts
18   our members in touch with universities and in touch with
19   potential employers.  And they say, for the first time, that
20   that is illegal under the false advertising laws because all
21   material information must be disclosed.

22        I have read the briefs.  I don't think I've heard anything
23   about false advertising laws until he just stood up a minute
24   ago, so I don't know what law he thinks we have violated.  And
25   I don't know how he thinks it would be material to the students

1    because you have read what we tell them.  We tell them we are
2    going to share this information with people, with potential
3    employers and potential universities.  We tell them that.

4        We tell them one other thing too.  After you have signed
5    up, if you don't want to do that, you can opt out.  You can
6    come back to us and say, I don't want you to do that.  Now, if
7    you wanted to show it was material, you would ask a question
8    they have never asked, which is, how many of those people,
9    having been told about it, and having been told they can opt
10   out if they don't like it, how many of them come back and opt
11   out?  But they haven't asked that question.  If they did, I
12   think they would find out that who gets this information is not
13   material, to know their names.  The general category is
14   material.  It's universities and employers, and they are
15   perfectly happy to have us do it.  We're not taking advantage
16   of our members in any way, shape or form.

17       He told you we have embezzled funds.  The uncontradicted
18   evidence in this case is that the former advisor at Itawamba
19   College was appointed by Itawamba, not us, and that the money
20   she embezzled was not Phi Theta Kappa money.  We didn't
21   embezzle anything.  That is just a complete falsehood.  And
22   they have told you that we misappropriated funds.  Mr. Moradian
23   sat there and said his opinion was we had misappropriated
24   student dues.  And I was waiting for him to tell us on what he
25   based that suspicion.  Not a word.  He had nothing to say about

1    it.

2         What he says in his papers, the ones up here -- well, they

3    are not papers.  They are electrons.  They're up there on the

4    internet.  I don't know what you call them.  But what he said

5    there was we paid a golden parachute to Rod Risley with

6    $3 million of student dues.  Now, that would be

7    misappropriation if Rod Risley wasn't entitled to it and if it

8    was all students dues.  But the evidence we have talked about,

9    we had an earlier hearing, we have had it now, Mr. Risley was

10   paid past -- deferred compensation, to which he was entitled

11   for his service to Phi Theta Kappa.  It came from all funds

12   available to Phi Theta Kappa, student dues, contributions,

13   program that we get funds for participating in.

14        The idea that we dipped into our students' pockets and

15   paid $3 million we didn't owe to this man, if it's not a lie,

16   it's misleading.  And indeed, I heard Mr. Newman concede that

17   some of the stuff up on the internet may be misleading.  He

18   says it's not false, and you can't touch it if it's not false.

19   More importantly, that in a defamation action, you can't touch

20   it unless he knows it's false.  That's not the standard for

21   actual malice, but if it were, we could meet it on the basis of

22   the testimony you have heard today.

23        The proof that we are lying about the ten percent is an

24   unauthenticated document that he got from a college in June.

25   He started lying about us on the internet in March.  You have

1    already seen those documents.  He started sending out those

2    questionnaires:  Would you think less of Phi Theta Kappa if you

3    knew they were lying about being the top ten percent?  He

4    literally shot first and asked questions later.

5        The standard for actual malice is not just you know it's

6    wrong.  It's you don't care whether it is wrong or right.

7    That's the definition of actual malice.  And if there is

8    anybody around that's any more actual malice, actually

9    malicious than Mr. Moradian, I don't know how you could find

10   him.

11       He also says that according to the Supreme Court, matters

12   of public interest are always protected, even in commercial

13   speech.  I don't think that is right.  I think you ought to go

14   back and look at the *Zauderer* case, which is in our brief.  And

15   as I remember, *Zauderer* was a disciplinary action concerning a

16   solicitation by a lawyer in Ohio.  And they said that his

17   solicitations were misleading.  He tried to defend it on the

18   notion that in his solicitation, he had statements on matters

19   of public interest.  It was public interest whether you ought

20   to get busy and sue these people, I guess.  And the Supreme

21   Court says, that is all well and good, but you cannot excuse

22   misleading commercial speech just by putting some protected

23   political speech in there.

24       I think that's what Zauderer says, and I think you will

25   find out that his contention that the Supreme Court says all

1    political speech, even in a commercial context, is always

2    protected, I think that is going to turn out to be wrong.

3        He talks about the billboard case in Atlanta, the *National*

4    *Service Corporation* case, which tells you what happens when you

5    don't pay your bills to Ted Turner.  Ted Turner ran -- I don't

6    even know if he is still alive, but among other things, he ran

7    a billboard business in Atlanta, and these people rented

8    billboards from him and they took bankruptcy.  And what he put

9    up on his billboards were an overlay and said, These people

10   don't pay their bills.

11       Now, the Fifth Circuit said, that's not commercial speech.

12   Ted Turner is in the business of selling billboards.  Putting

13   up a notice that these people don't pay their bills doesn't do

14   anything to help him rent billboards.  And anyway, the two

15   things he said are absolutely, completely factually true.  He

16   didn't pay his bills, and he did take bankruptcy.  That case

17   has nothing to do with a case that is real political speech.

18       I will add that when the Fifth Circuit did the Ted Turner

19   case, the Supreme Court hadn't decided the *Bolger* case, and the

20   Fifth Circuit hadn't decided the *Procter & Gamble* case.  So

21   whether Ted Turner would come out differently today, now that

22   we know what the law is, I don't know.  But on the basis of it,

23   he had no commercial because he wasn't making any money on it.

24   He was just mad.  And he told the truth, which even mad people

25   are entitled to do.

1    So I think you will find that this is commercial speech,

2   and I think you will find that if it is misleading or if it is

3   false, and I've gone through the facts with you, that the First

4   Amendment is no barrier.

5    He talks about the litigation privilege, and he says,

6   well, you did a press release and then you sent it to all the

7   colleges.  There's no evidence that we've sent it to all the

8   colleges.  I don't think we did.  I wouldn't sit here and tell

9   you that nobody at Phi Theta Kappa had ever sent the press

10   release to anybody at one of our chapters.  If somebody called

11   up, maybe they very well did.  But we had a press release, and

12   if anybody asked us about it, we could refer them to the press

13   release.  There is no evidence that we went around spreading it

14   so everybody in the world could see it.

15    What you have seen on their website looks very little like

16   our press release.  And not only does it look very little like

17   our press release, they have arranged it in a way that they

18   drive people to find it.  Your Honor knows that I do not

19   understand the internet, and I've never Googled myself and have

20   no desire to, but the evidence I've heard today is that they

21   have arranged it in such a way that if you ask Mr. Google to

22   tell you about Phi Theta Kappa and a junior college, what comes

23   up on the first page are all these cartoons and all these

24   misleading statements and all these lies.  That's not what the

25   litigation privilege is about.  The idea that all they are

1    doing is what you've already said we were justified in doing is

2    simply not true.  The litigation proceeding doesn't happen

3    here.

4         And finally, whether we can prove our case, I'm astounded

5    to find out that I have to argue Article III standing today.

6    It's not in their brief.  You told me on Monday I still don't

7    understand Article III standing, so we are going to go back and

8    look at it again.  But what I understand about Article III

9    standing is to get into federal court, you have to allege, not

10   dump all your proof on the doorstep but allege that I can prove

11   that what I'm claiming about damaged or protected interests

12   that belong to me.  That's the constitutional standard.  And we

13   have alleged that.

14        We have said that at the end of the day, their malicious

15   intent to harm us has in fact harmed us.  I know that

16   correlation is not causation.  But at the preliminary

17   injunction stage, it's a pretty good start.  If we prove they

18   intended to harm us and we prove we got harmed, then we are a

19   long way toward having established a substantial likelihood of

20   success on the merits.  We have identified the students that

21   have quit.  We have told you that our participation in PTK

22   Connect is down, and we told you that it never happened before.

23   Doesn't that at least raise some possibility that we will, at

24   the end of the day, be able to prove that these people have

25   left us because of what they started doing in March?

```
 1         All we have to prove is a substantial likelihood.  We have
 2    given you the names of the people.  I guess in all of this
 3    discovery we are still doing, we will find out more about why
 4    they did what they did.  But for preliminary injunction
 5    purposes, they set out to harm us, we have been harmed, and we
 6    have told you the people that we think are the ones that have
 7    quit doing business with us because of what they have intended
 8    to do.
 9         I think we have got a substantial likelihood of success on
10    the merits.  You thought so in March.  I think you were right.
11    That is why I think you ought to give us an extended
12    preliminary injunction on Counts 5 and 6 and tell them the
13    things they are now saying they have to stop saying.
14         If Your Honor has got any more questions, I will address
15    them, but otherwise, I think I am done.
16         THE COURT:  Okay.  I think one of the responses to
17    what the Court was asking earlier of Mr. Newman, he indicated
18    that speech that is solely based on one thing, or it must be
19    based solely on the -- exclusively or solely to the extent that
20    whatever speech they are doing is for the public good or for
21    some other reason, and it also happens to harm PTK, the Court
22    is restrained from finding that, you know, your claim is
23    meritorious.  You understand the question?
24         MR. WALLACE:  I do understand what you are saying.
25    And my answer to that is, I don't know of any case that says
```

1    commercial speech can't be restricted because some place in the

2    same document is something that would qualify as protected

3    political speech.  My recollection of *Zauderer* is that the law

4    is to the contrary.  You may be able to say the political

5    speech, but that doesn't give you a free ride on the commercial

6    speech.  I think that's the law.

7        And again, I think it looks at the nature of the speech,

8    and it doesn't look all that much at what your intent is.  Even

9    if you believe that somewhere in Mr. Moradian's heart he has

10   the public interest in mind, there's no doubt that the major

11   effort here is commercial.  That's why he wants a bond.  And

12   I -- you know, I think you can tell him, stop doing -- start

13   doing -- stop doing commercial attacks on PTK.  If you want to

14   do the kind of press release that PTK did when they filed the

15   lawsuit, fine, you know.  You can say what your claims are.

16   But going beyond that to do what he said he wanted to do -- he

17   wants to have an impact on people who are making decisions

18   about whether or not to do business with PTK.  I don't think

19   the fact that he thinks that he has public interest at heart

20   gives him a license to go after our customers and potential

21   customers, which is what he admits he's doing.

22        **THE COURT:**  And I guess the claim of PTK is that

23   Honor Society -- I guess it's the claim -- it's tortious

24   interference of contractual relations --

25        **MR. WALLACE:**  That's our claim 5 and 6.  Thank you,

 1    Your Honor.

 2         **THE COURT:**  Thank you, Mr. Wallace.  Counsel, the

 3    Court is going to take this matter under advisement.  I haven't

 4    looked at the scheduling order in this matter.  I know the

 5    trial is set a year -- well, in June, so I'm counting backwards

 6    in my mind.  I presume discovery will be done by the end of

 7    this year.

 8         **MR. POLAK:**  Correct.  The discovery deadline is

 9    December 15th or so.  It's before Christmas.  The next deadline

10    that is in the case is mid-August, which is the plaintiff or

11    counter-plaintiff's experts.  Three days-ish later, the

12    defendant's experts are done, to be disclosed.  But, yes,

13    ultimately the discovery deadline is then.

14         And I think Judge Myers has been very clear that there

15    will be no other extensions on discovery, barring some

16    extraordinary circumstances.

17         **THE COURT:**  Okay.  Well, I'm going to take this under

18    advisement.  I do understand the importance of it and the

19    magnitude of it.  It's a lot of information out there that

20    everybody agrees has been -- has been put out there and will

21    continue to be put out there, I think.  I don't think there's

22    any -- I've not heard anybody say that we are going to stop

23    doing what we are doing, you know.  So I understand the

24    magnitude of whether -- of what the Court does.

25         And we will try to get out something just as soon as we

1    can, just so that the parties will know how they should move

2    forward in this litigation.  It's a hard fought case.  I know

3    y'all have got motions and stuff before Magistrate Judge Myers.

4        Yes, I know the parties are spending a lot of money on

5    this because the parties believe that their respective

6    interests ought to be protected in some way, and people are

7    entitled to do that.  So, you know, we will act as soon as we

8    can.  And as soon as we can may not be as quick for some

9    persons, as quick for some, but hopefully we will able to do it

10   expeditiously.  I'll put it that way.

11       Thank you all for bearing with me, and we will hopefully

12   get something out in due course.  That's all I have.  Thank

13   you.

14       Have a good rest of the day.  We are now adjourned.  And

15   if you want to leave anything here until tomorrow for others to

16   pick up, you may do so.  We just have a hearing -- some

17   criminal hearings tomorrow or something.  But there is

18   plenty -- if you've got to get out and have others to come back

19   and get your stuff, that is fine.

20           **MR. WALLACE:**  We may do that.

21           **THE COURT:**  That is fine.  We will be here all day

22   tomorrow, at least I will.

23                    (HEARING CONCLUDED)

24

25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3                       CERTIFICATE OF COURT REPORTER

4

5         I, Teri B. Norton, RMR, FCRR, RDR, Official Court

6    Reporter for the United States District Court for the Southern

7    District of Mississippi, appointed pursuant to the provisions

8    of Title 28, United States Code, Section 753, do hereby certify

9    that the foregoing is a correct transcript of the proceedings

10   reported by me using the stenotype reporting method in

11   conjunction with computer-aided transcription, and that same is

12   a true and correct transcript to the best of my ability and

13   understanding.

14        I further certify that the transcript fees and format

15   comply with those prescribed by the Court and the Judicial

16   Conference of the United States.

17

18

19

20   s/ *Teri B. Norton*
     TERI B. NORTON, RMR, FCRR, RDR
21   OFFICIAL COURT REPORTER

22

23

24

25

# EXHIBIT A-6



One Indiana Square, Suite 3500 / Indianapolis, IN 46204-4609
Tel: 317.713.3500 / Fax: 317.713.3699
www.taftlaw.com

**JONATHAN G. POLAK**
317.713.3532
JPolak@taftlaw.com

August 19, 2024

**VIA EMAIL**

Derek Linke
Derek Newman
Newman LLP
100 Wilshire Blvd., Ste. 700
Santa Monica, CA  90401
Linke@newmanlaw.com
dn@newmanlaw.com

Whit Rayner
Dakota Stephens
Jones Walker, LLP
3100 N. State Street, Ste. 300
Jackson, MS  39216
wrayner@joneswalker.com
dstephens@joneswalker.com

     Re:  *Phi Theta Kappa Honor Society, et al. v. HonorSociety.Org., et al.*

Dear Counsel:

     We are advised that your client continues to distribute the "Community College Survey" that was the subject of the Preliminary Injunction.  You represented to the Court at the hearing on the injunction motion as follows (Trans. P. 98:22-25; 99:1-10):

The Court:     But you've agreed to not send out anymore –

Mr. Newman:     And the reason why is because Honor Society *sent a onetime survey* out.  It sends lots of surveys out, has for its entire business.  Sends a *onetime survey* to a lot of people, gets responses, and then is done.  It doesn't need to send the survey again. So by the time we contacted Honor Society and asked about the survey, because we learned about it from counsel, we were told, like, yeah, we sent that survey out. *And we're not going to send out another one, because*

Derek Linke
Derek Newman
Whit Rayner
Dakota Stephens
August 19, 2024
Page 2

*we have all the information that we need.*  So in the declaration of Mike Moradian, he indicates *that those survey questions will not be sent out again.*

And you continued later in the argument, when asked whether the information sought in the survey was related to this litigation (Id., p. 100:10-16):

Mr. Newman:   I think it is entirely possible that Honor Society sent those questions after learning information in depositions that weren't protected as confidential or attorneys eyes only, so that might have spurred that survey.  But the survey *was a onetime deal* as many of their surveys are.  They received the results form that survey; *they are done.*

We are concerned that the continued use of the survey by your client is inconsistent with your representations to the Court.  Please advise by no later than Thursday, August 22, 2024, the following:

1. How the continued use of this survey is not inconsistent with your representations to the Court;
2. Why we have not been produced the surveys or their results; and
3. Whether we can have the documents related to these continued surveys (and collected responses) produced to us by Friday, August 23, 2024.

We reserve all rights in connection with these surveys.

Very truly yours,

Jonathan G. Polak

JGP/dac
cc:    Daniel Rozansky (via email)
        Michael Bernet (via email)
        Rachel Smoot (via email)
        Mike Etienne (via email)
        Mike Wallace (via email)
        Beau Bettiga (via email)
        Charles Cowan (via email)
        Jennifer Salva-Cushing (via email)
        Kristine Callahan (via email)
        Hugh Warren (via email)

# EXHIBIT A-7



**Derek A. Newman**
Direct   +1.310.359.8188
Main    +1.310.359.8200
dn@newmanlaw.com

100 Wilshire Blvd, Suite 700
Santa Monica, CA 90401

**SENT BY EMAIL**

August 30, 2024

Jonathan G. Polak
Taft, Stettinius & Hollister, LLP
One Indiana Square, Suite 3500
Indianapolis, IN 46204
*jpolak@taftlaw.com*

> **Re:   *Phi Theta Kappa v. HonorSociety.Org., Inc., No. 22-cv-00208-CWR-RPM***
> **PTK's August 19, 2024 Letter regarding Community College Surveys**

Jonathan:

We received your August 19, 2024 letter questioning whether HonorSociety's recent surveys comport with HonorSociety's representations to the Court and the Court's March 28 preliminary injunction. They do.

On March 18, PTK filed a motion for preliminary-injunctive relief based, in part, on allegations that HonorSociety had distributed a survey with specific questions that PTK believes were misleading.[1] In response, HonorSociety filed a declaration by its executive director stating that the specific survey questions at issue in PTK's motion were only included in HonorSociety's survey from March 6 through March 11.[2] In other words, by the time PTK filed its motion, HonorSociety had already stopped including those questions. Mr. Moradian's declaration also represented that HonorSociety would not use those questions in future surveys.[3]

At the March 27 hearing on PTK's motion, I informed the Court that, although HonorSociety had relied on surveys since its inception, the particular survey at issue in PTK's motion was a one-time event that had already ended and which it had no plans to use again:[4]

> The Court:    Now, if I understand what I've been told through the papers, Honor
>               Society has agreed to stop *those questions* ….
>
> Mr. Newman:   Yes, Your Honor, and the Court could find that in Mike Moradian's
>               declaration ….

---

[1] *See* Dkt. Nos. 116, 117.

[2] Declaration of Michael Moradian, Dkt. No. 120-1, at ¶ 55.

[3] *Id.* ¶ 56.

[4] Hrg. Tr. at 98:8–99:10, Mar. 27, 2024 (emphasis added).

*Phi Theta Kappa v. HonorSociety.Org, Inc.*
*August 30, 2024*
*Page 2 of 3*

| The Court: | But you've agreed to not send out anymore – |
|---|---|
| Mr. Newman: | And the reason why is because Honor Society sent a onetime survey out.  It sends lots of surveys out, has for its entire business.  Sends a onetime survey to a lot of people, gets responses, and then is done.  It doesn't need to send *the* survey again. … |
| | So in the declaration of Mike Moradian, he indicates that *those survey questions* will not be sent out again. |

At no point did either HonorSociety or I represent to the Court that HonorSociety would not send other surveys or other survey questions.

On March 28, the Court issued a preliminary injunction requiring that HonorSociety not send the six specific survey questions at issue in PTK's motion and that it "provide PTK with reasonable advance notice should Honor Society desire to use similar but reworded questions in future surveys."[5] The order did not prevent HonorSociety from sending other surveys. To the contrary, it expressly contemplates that HonorSociety would send "future surveys" for which it HonorSociety is required to "provide PTK with reasonable advance notice should it desire to use similar but reworded questions" again.[6]

Consistent with the order, HonorSociety has not asked those six questions or "similar but reworded questions" in any survey since the March 6–11 survey ended. HonorSociety's representations to the Court that it was done sending those survey questions in that onetime survey were accurate and truthful. If PTK believes that HonorSociety violated the order, please advise which prohibited survey questions HonorSociety has sent since the March 27, 2024 hearing and what evidence PTK has to support that allegation.

The recent surveys HonorSociety produced in discovery are consistent with representations to the Court that HonorSociety sends "lots of surveys out, has for its entire business."[7] The Court understood that "Honor Society has agreed to stop *those questions*…."[8] And I confirmed that HonorSociety's declaration committed that: "*those survey questions* will not be sent out again."[9] PTK's motion did not seek to prevent HonorSociety from sending all surveys. HonorSociety never represented to the Court that it would cease sending all surveys. The Court did not order HonorSociety to do so.

Your letter also demands that HonorSociety advise as to why PTK has "not been produced the surveys or their results." As we advised in our August 28, 2024 letter, if PTK agrees to supplement

---

[5] Dkt. No. 130, at 5–6.

[6] *Id.*

[7] Hrg. Tr. 98:25–96:1, Mar. 27, 2024.

[8] *Id.* at 98:9–10 (emphasis added).

[9] *Id.* at 99:8–10 (emphasis added).

*Phi Theta Kappa v. HonorSociety.Org, Inc.*
*August 30, 2024*
*Page 3 of 3*

its responses to HonorSociety's document requests within 30 days after coming into possession of responsive documents, HonorSociety will make the same commitment moving forward, including with regard to any responsive surveys.

Thank you.

NEWMAN LLP

Derek A. Newman

# EXHIBIT A-8

| Date | Name | Description | Orig Hrs | Orig Amt | Orig Rate | Rev Hrs | Rev Amt | Invoice | Status | Narrative |
|------|------|-------------|----------|----------|-----------|---------|---------|---------|--------|-----------|
| 08/23/2024 | Peluchette, Neil R. | Associate | 0.60 | 252.00 | 420.00 | 0.60 | 252.00 | 6431362 | Billed | Review of Court order; email correspondence with J. Polak regarding same; review of Wikipedia page. |
| 08/23/2024 | Polak, Jonathan G. | Partner | 0.50 | 412.50 | 825.00 | 0.50 | 412.50 | 6431362 | Billed | Review updates to Honor Society website; consider same in context of text of order; exchange emails with Lynn Tincher-Ladner regarding same. |
| 08/23/2024 | Polak, Jonathan G. | Partner | 0.50 | 412.50 | 825.00 | 0.50 | 412.50 | 6431362 | Billed | Conference with Mike Wallace regarding status issues related to TRO and possible need to enforce. |
| 08/23/2024 | Sears, Hayley A. | Associate | 3.20 | 1,200.00 | 375.00 | 1.60 | 600.00 | 6431362 | Billed | Conduct research regarding causal connection and send research to J. Polak and read court's preliminary injunction order. |
| 08/24/2024 | Polak, Jonathan G. | Partner | 1.10 | 907.50 | 825.00 | 1.10 | 907.50 | 6431362 | Billed | Review Honor Society and Honor Society Foundation websites for compliance with injunction; exchange emails with co-counsel regarding same. |
| 08/24/2024 | Smoot, Rachel A. | Associate | 0.40 | 188.00 | 470.00 | 0.40 | 188.00 | 6431362 | Billed | Review and analyze Defendants' publicly available posts referencing PTK in light of injunction order; confer with co-counsel regarding same. |
| 08/26/2024 | Etienne, William M. | Associate | 5.80 | 2,697.00 | 465.00 | 5.80 | 2,697.00 | 6431362 | Billed | Discuss strategy underlying Motion to Show Cause regarding Contempt of Court; gather evidence regarding same and review case law regarding same. |
| 08/26/2024 | Polak, Jonathan G. | Partner | 1.10 | 907.50 | 825.00 | 1.10 | 907.50 | 6431362 | Billed | Attention to injunction compliance; review present status of HS.org and HSF websites; conference with Mike Etienne regarding same; review draft email on contempt from Mike Etienne; exchange communications with client regarding same. |
| 08/26/2024 | Polak, Jonathan G. | Partner | 0.40 | 330.00 | 825.00 | 0.40 | 330.00 | 6431362 | Billed | Receive and review email from D. Newman regarding request for consent to stay injunction; prepare email to D. Newman regarding same; review file materials for same; exchange further communications from D. Newman regarding same. |
| 08/26/2024 | Sears, Hayley A. | Associate | 5.50 | 2,062.50 | 375.00 | 3.50 | 1,312.50 | 6431362 | Billed | Work on motion for contempt and sanctions, call with Mike and Rachel, and research and outline. |
| 08/27/2024 | Etienne, William M. | Associate | 7.60 | 3,534.00 | 465.00 | 7.60 | 3,534.00 | 6431362 | Billed | Prepare initial draft of Memorandum in support of Motion for Contempt and Sanctions. |
| 08/27/2024 | Polak, Jonathan G. | Partner | 0.50 | 412.50 | 825.00 | 0.50 | 412.50 | 6431362 | Billed | Receive and review letter from counsel addressing identified issues of contempt; consider same and provide instructions and guidance in connection with same. |
| 08/27/2024 | Polak, Jonathan G. | Partner | 1.00 | 825.00 | 825.00 | 1.00 | 825.00 | 6431362 | Billed | Review and continue work on motion for contempt; prepare email to Mike Etienne regarding same. |
| 08/27/2024 | Sears, Hayley A. | Associate | 0.10 | 37.50 | 375.00 | 0.10 | 37.50 | 6431362 | Billed | Check-in with Mike and Rachel on motion for contempt and sanctions and discuss recent HS filing. |
| 08/27/2024 | Smoot, Rachel A. | Associate | 4.50 | 2,115.00 | 470.00 | 4.50 | 2,115.00 | 6431362 | Billed | Review and analyze publicly available Honor Society webpages for compliance with Preliminary Injunction; draft Motion for Contempt and Declaration of W. Etienne in support of same; confer with co-counsel regarding same; attention to correspondence from opposing counsel regarding contempt; confer with co-counsel regarding same; multiple emails with client regarding Defendants' compliance with Preliminary Injunction. |
| 08/27/2024 | Smoot, Rachel A. | Associate | 1.30 | 611.00 | 470.00 | 1.30 | 611.00 | 6431362 | Billed | Review and analyze Motion to Stay Preliminary Injunction and supporting documents; confer with co-counsel regarding same. |
| 08/28/2024 | Etienne, William M. | Associate | 8.10 | 3,766.50 | 465.00 | 8.10 | 3,766.50 | 6431362 | Billed | Prepare revised version of Memorandum in support of Motion for Contempt and Sanctions based on comments; review and cite additional case law in furtherance of same; conduct additional investigations in HS conduct in furtherance of same. |
| 08/28/2024 | Polak, Jonathan G. | Partner | 4.10 | 3,382.50 | 825.00 | 4.10 | 3,382.50 | 6431362 | Billed | Attention to injunction enforcement; work on motion for contempt; conference with Mike Etienne to review various HS.org and HSF websites and social media for compliance and issues to raise in contempt motion; review and respond to emails from client on same; continue work on brief in support of motion for contempt; circulate same for comment with revisions. |
| 08/28/2024 | Rose, Alexis | Paralegal | 2.30 | 644.00 | 280.00 | 2.30 | 644.00 | 6431362 | Billed | Discuss motion and exhibits with Mike Etienne, take page vaults and exhibits still needed to prepare for filing. |
| 08/28/2024 | Sears, Hayley A. | Associate | 0.60 | 225.00 | 375.00 | 0.60 | 225.00 | 6431362 | Billed | Review HS motion for stay. |
| 08/28/2024 | Smoot, Rachel A. | Associate | 3.30 | 1,551.00 | 470.00 | 3.30 | 1,551.00 | 6431362 | Billed | Draft Motion for Contempt; revise and edit Memorandum in Support of Same; confer with co-counsel regarding same; revise and edit Declaration of W. Michael Etienne in support of same; revise and edit Memorandum in Support of same. |
| 08/29/2024 | Etienne, William M. | Associate | 11.50 | 5,347.50 | 465.00 | 11.50 | 5,347.50 | 6431362 | Billed | Revise Memorandum in Support of Motion for Contempt and Sanctions in view of additional comments; revise Motion; revise Etienne Declaration in support of same; obtain and review Exhibits 1-55 in support of same; manage filing of same. |
| 08/29/2024 | Polak, Jonathan G. | Partner | 0.80 | 660.00 | 825.00 | 0.80 | 660.00 | 6431362 | Billed | Continue work on motion for contempt; communicate with co-counsel regarding same. |
| 08/29/2024 | Smoot, Rachel A. | Associate | 0.60 | 282.00 | 470.00 | 0.60 | 282.00 | 6431362 | Billed | Multiple emails with co-counsel regarding Motion for Contempt; call with M. Etienne regarding same. |
| 09/04/2024 | Polak, Jonathan G. | Partner | 0.20 | 165.00 | 825.00 | 0.20 | 165.00 | 0 | Unbilled | Exchange emails with C. Cowan regarding status of response to motion to stay. |
| 09/06/2024 | Polak, Jonathan G. | Partner | 1.10 | 907.50 | 825.00 | 1.10 | 907.50 | 0 | Unbilled | Review draft response in Opposition to Motion to Stay; prepare email to C. Cowan regarding same and with comments; prepare email to Lynn Tincher-Ladner regarding same; multiple emails to co-counsel regarding same. |
| 09/06/2024 | Smoot, Rachel A. | Associate | 3.40 | 1,598.00 | 470.00 | 3.40 | 1,598.00 | 0 | Unbilled | Revise and edit Memorandum in support of Response in Opposition to Defendants' Motion to Stay Preliminary Injunction and Appeal; draft Smoot Declaration in support of same; draft Tincher-Ladner Declaration in support of same; email client for potential exhibits and attention to response; finalize exhibits for Declarations; revise and edit Declarations; multiple emails and calls with local counsel regarding finalization. |
| 09/06/2024 | Smoot, Rachel A. | Associate | 1.00 | 470.00 | 470.00 | 1.00 | 470.00 | 0 | Unbilled | Draft Motion to Seal; multiple emails with co-counsel and opposing counsel regarding same. |
| 09/09/2024 | Polak, Jonathan G. | Partner | 0.20 | 165.00 | 825.00 | 0.20 | 165.00 | 0 | Unbilled | Consider need to seek court hearing on contempt motion; exchange emails with co-counsel regarding same. |
| 09/11/2024 | Polak, Jonathan G. | Partner | 0.50 | 412.50 | 825.00 | 0.50 | 412.50 | 0 | Unbilled | Review recent communications over discovery disputes; prepare list of outstanding issues; prepare email to co-counsel regarding same along with strategy for presentation to Magistrate Judge Myers. |
| 09/13/2024 | Polak, Jonathan G. | Partner | 0.50 | 412.50 | 825.00 | 0.50 | 412.50 | 0 | Unbilled | Preliminary review of response to motion for contempt; review email exchanges with co-counsel regarding strategy for responding to same. |
| 09/13/2024 | Smoot, Rachel A. | Associate | 2.80 | 1,316.00 | 470.00 | 2.80 | 1,316.00 | 0 | Unbilled | Review and analyze Response in Opposition to Motion for Contempt; draft Reply Brief. |
| 09/14/2024 | Polak, Jonathan G. | Partner | 1.20 | 990.00 | 825.00 | 1.20 | 990.00 | 0 | Unbilled | Prepare draft email to court on outstanding discovery issues; review file materials for same; circulate for comment with co-counsel; receive same; prepare final email to court. |
| 09/14/2024 | Smoot, Rachel A. | Associate | 3.10 | 1,457.00 | 470.00 | 3.10 | 1,457.00 | 0 | Unbilled | Continue to draft Reply in Support of Motion for Contempt. |
| 09/15/2024 | Smoot, Rachel A. | Associate | 3.50 | 1,645.00 | 470.00 | 3.50 | 1,645.00 | 0 | Unbilled | Continue to draft Reply in Support of Motion for Contempt. |
| 09/16/2024 | Etienne, William M. | Associate | 0.80 | 372.00 | 465.00 | 0.80 | 372.00 | 0 | Unbilled | Review HS Response to PTK's Motion for Contempt. |
| 09/16/2024 | Etienne, William M. | Associate | 5.80 | 2,697.00 | 465.00 | 5.80 | 2,697.00 | 0 | Unbilled | Review HS and HSF websites to determine whether Defendants have now complied with the Court's Second Preliminary Injunction Order; prepare outline and exhibits for Reply brief for Contempt Motion citing failures to comply with same. |
| 09/16/2024 | Etienne, William M. | Associate | 1.60 | 744.00 | 465.00 | 1.60 | 744.00 | 0 | Unbilled | Review case law regarding civil motion for contempt where attorneys fees were granted merely from having to file the motion. |
| 09/16/2024 | Polak, Jonathan G. | Partner | 0.90 | 742.50 | 825.00 | 0.90 | 742.50 | 0 | Unbilled | Review draft reply in support of motion for contempt; review file documents for same; prepare revisions to reply brief; conference with Mike Etienne regarding comments to same. |
| 09/16/2024 | Polak, Jonathan G. | Partner | 0.50 | 412.50 | 825.00 | 0.50 | 412.50 | 0 | Unbilled | Receive communication from court on hearing; receive communication from D. Linke regarding hearing; prepare for court hearing. |
| 09/16/2024 | Rose, Alexis | Paralegal | 0.30 | 84.00 | 280.00 | 0.30 | 84.00 | 0 | Unbilled | Discussion with M. Etienne regarding page vaults and captures needed for Thursday's filing. |
| 09/16/2024 | Rose, Alexis | Paralegal | 0.60 | 168.00 | 280.00 | 0.60 | 168.00 | 0 | Unbilled | Capture page vaults and snap shots for Thursday's filing. |

| Date | Name | Description | Orig Hrs | Orig Amt | Orig Rate | Rev Hrs | Rev Amt | Invoice | Status | Narrative |
|------|------|-------------|----------|----------|-----------|---------|---------|---------|--------|-----------|
| 09/17/2024 | Etienne, William M. | Associate | 1.10 | 511.50 | 465.00 | 1.10 | 511.50 | 0 | Unbilled | Investigate 2500 AI-generated articles revised since Second Preliminary Injunction Order and stored on HS Foundation website; coordinate PageVault evidentiary capture of same. |
| 09/17/2024 | Etienne, William M. | Associate | 8.30 | 3,859.50 | 465.00 | 8.30 | 3,859.50 | 0 | Unbilled | Prepare revised version of Reply brief in support of PTK's Motion to compel; continue to review and incorporate Fifth Circuit case law regarding same. |
| 09/17/2024 | Fereshtenkhou, Hannah S. | Associate | 1.30 | 487.50 | 375.00 | 1.30 | 487.50 | 0 | Unbilled | Research and analyze Fifth Circuit case law regarding motion for contempt, including instances of finding contempt when party complied only after filing of motion for contempt. |
| 09/17/2024 | Polak, Jonathan G. | Partner | 3.40 | 2,805.00 | 825.00 | 3.40 | 2,805.00 | 0 | Unbilled | Receive and review communication from D. Linke to Court on issues raised by PTK with court; consider same in preparation for conference with Magistrate Judge Myers; attend conference. |
| 09/17/2024 | Polak, Jonathan G. | Partner | 0.90 | 742.50 | 825.00 | 0.90 | 742.50 | 0 | Unbilled | Continue work on reply to motion for contempt; conference with Mike Etienne regarding same; prepare email to co-counsel with draft and comments. |
| 09/17/2024 | Rose, Alexis | Paralegal | 3.50 | 980.00 | 280.00 | 3.50 | 980.00 | 0 | Unbilled | Prepare and organize exhibits for reply in support of motion for contempt, review exhibits, finalize for filing. |
| 09/17/2024 | Smoot, Rachel A. | Associate | 1.80 | 846.00 | 470.00 | 1.80 | 846.00 | 0 | Unbilled | Prepare for and attend status conference with Magistrate. |
| 09/18/2024 | Etienne, William M. | Associate | 0.90 | 418.50 | 465.00 | 0.90 | 418.50 | 0 | Unbilled | Prepare motion to file additional pages in connection with Reply in support of Motion for Contempt and Sanctions. |
| 09/18/2024 | Etienne, William M. | Associate | 3.60 | 1,674.00 | 465.00 | 3.60 | 1,674.00 | 0 | Unbilled | Revise Reply in support of Motion for Contempt and Sanctions based on comments and edits. |
| 09/18/2024 | Etienne, William M. | Associate | 4.60 | 2,139.00 | 465.00 | 4.60 | 2,139.00 | 0 | Unbilled | Prepare and revise Etienne Declaration in support of Reply in support of Motion for Contempt and Sanctions. |
| 09/19/2024 | Etienne, William M. | Associate | 3.20 | 1,488.00 | 465.00 | 3.20 | 1,488.00 | 0 | Unbilled | Review proposed edits and revise Reply in support of Motion for Contempt and Sanctions, Declaration and Exhibits, and Motion for Excess Pages; correspond with opposing counsel regarding non-opposition of Motion for Excess Pages. |
| 09/19/2024 | Fereshtenkhou, Hannah S. | Associate | 1.00 | 375.00 | 375.00 | 1.00 | 375.00 | 0 | Unbilled | Research and analyze Fifth Circuit case law regarding hearing requirement for civil contempt. |
| 09/19/2024 | Polak, Jonathan G. | Partner | 0.80 | 660.00 | 825.00 | 0.80 | 660.00 | 0 | Unbilled | Continue work on reply to motion for contempt; review revised declaration from Mike Etienne; exchange emails with Mike Etienne regarding same. |
| 09/19/2024 | Smoot, Rachel A. | Associate | 0.20 | 94.00 | 470.00 | 0.20 | 94.00 | 0 | Unbilled | Attention to Reply Brief in Support of Motion for Sanctions. |
| 09/24/2024 | Etienne, William M. | Associate | 1.20 | 558.00 | 465.00 | 1.20 | 558.00 | 0 | Unbilled | Outline motion and review related caselaw for attorneys' fees related to PTK's first injunction proceeding, second injunction proceeding, motion for contempt. |
| **Totals:** | | | **129.20** | **65,160.00** | | **125.60** | **63,810.00** | | | |

# EXHIBIT A-9

**Time Report**

Phi Theta Kappa Society / Trademark Infringement

| Date | Name | Description | Orig Hrs | Orig Amt | Orig Rate | Rev Hrs | Rev Amt | Narrative |
|------|------|-------------|----------|----------|-----------|---------|---------|-----------|
| 09/14/2024 | Polak, Jonathan G. | Partner | 1.20 | 990.00 | 825.00 | 1.20 | 990.00 | Continue work on fee motion; exchange emails with Rachel Smoot regarding same. |
| 09/14/2024 | Smoot, Rachel A. | Associate | 0.10 | 47.00 | 470.00 | 0.10 | 47.00 | Attention to email from co-counsel regarding motion for fees. |
| 09/23/2024 | Etienne, William M. | Associate | 0.90 | 418.50 | 465.00 | 0.90 | 418.50 | Discuss PTK fee application; review draft and comments regarding same. |
| 09/23/2024 | Smoot, Rachel A. | Associate | 0.30 | 141.00 | 470.00 | 0.30 | 141.00 | Confer with co-counsel regarding Motion for Attorney Fees. |
| 09/24/2024 | Etienne, William M. | Associate | 3.30 | 1,534.50 | 465.00 | 3.30 | 1,534.50 | Outline motion and review related caselaw for attorneys' fees related to PTK's first injunction proceeding, second injunction proceeding, motion for contempt. |
| 09/24/2024 | Etienne, William M. | Associate | 0.20 | 93.00 | 465.00 | 0.20 | 93.00 | Review task list of pending matter in this litigation and update with additional items. |
| 09/25/2024 | Etienne, William M. | Associate | 0.80 | 372.00 | 465.00 | 0.80 | 372.00 | Discuss motion for fees; revise outline regarding same. |
| 09/26/2024 | Fereshtenkhou, Hannah S. | Associate | 3.60 | 1,350.00 | 375.00 | 3.60 | 1,350.00 | Research and analyze case law regarding awarding attorneys' fees based on court's inherent power, contempt, and section 1927. |
| 09/26/2024 | Polak, Jonathan G. | Partner | 0.40 | 330.00 | 825.00 | 0.40 | 330.00 | Continue work on motion for fees; review file documents for same and identify possible exhibits. |
| 09/27/2024 | Etienne, William M. | Associate | 5.80 | 2,697.00 | 465.00 | 5.80 | 2,697.00 | Review Taft's fees March - September 2024 to calculate total attorneys' that Honor Society should pay to PTK based on the first preliminary injunction work; create exhibit for Fee Motion based on same. |
| 09/27/2024 | Fereshtenkhou, Hannah S. | Associate | 3.00 | 1,125.00 | 375.00 | 3.00 | 1,125.00 | Continue researching and analyzing case law regarding awarding attorneys' fees based on courts' inherent power, contempt, and section 1927; review and analyze case law regarding lodestar method for calculating reasonable attorneys' fees. |
| 09/27/2024 | Smoot, Rachel A. | Associate | 5.80 | 2,726.00 | 470.00 | 5.80 | 2,726.00 | Breakdown and calculate fees for Motion for Contempt; confer with co-counsel regarding same. |
| 09/28/2024 | Etienne, William M. | Associate | 1.00 | 465.00 | 465.00 | 1.00 | 465.00 | Review Taft's fees March - September 2024 to calculate total attorneys' that Honor Society should pay to PTK based on the contempt motion work; create exhibit for Fee Motion based on same. |
| 09/28/2024 | Smoot, Rachel A. | Associate | 0.20 | 94.00 | 470.00 | 0.20 | 94.00 | Email to co-counsel regarding Motion for Fees. |
| 09/29/2024 | Fereshtenkhou, Hannah S. | Associate | 2.00 | 750.00 | 375.00 | 2.00 | 750.00 | Continue researching and analyzing Fifth Circuit and Southern District of Mississippi case law regarding calculation of attorneys' fees through the lodestar method and Johnson factors. |
| 09/29/2024 | Polak, Jonathan G. | Partner | 0.40 | 330.00 | 825.00 | 0.40 | 330.00 | Continue work on fee application. |
| 09/29/2024 | Smoot, Rachel A. | Associate | 3.00 | 1,410.00 | 470.00 | 3.00 | 1,410.00 | Confer with co-counsel regarding Motion for Fees; calculate fees in connection with Motion for Contempt and First Motion for Temporary Restraining Order. |
| 09/30/2024 | Etienne, William M. | Associate | 5.40 | 2,511.00 | 465.00 | 5.40 | 2,511.00 | Prepare revised draft of motion for fees based on First Preliminary Injunction Order. |
| 09/30/2024 | Smoot, Rachel A. | Associate | 2.00 | 940.00 | 470.00 | 2.00 | 940.00 | Draft Declaration of Jonathan Polak in Support of Motion for Attorney Fees. |
| | | | **39.40** | **18,324.00** | | **39.40** | **18,324.00** | |

# EXHIBIT A-10

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

| | | |
|---|---|---|
| PHI THETA KAPPA HONOR SOCIETY, | ) | |
| | ) | |
| Plaintiff/Counter-Defendant | ) | Civil Action No. 3:22-cv-00208-CWR-RPM |
| | ) | |
| v. | ) | |
| | ) | |
| HONORSOCIETY.ORG, INC., | ) | |
| | ) | |
| Defendant/Counter-Plaintiff /Third-Party-Plaintiff | ) | |
| | ) | |
| HONOR SOCIETY FOUNDATION, INC., | ) | |
| | ) | |
| Defendant | ) | |
| | ) | |
| ---------------------------------------------------- | ) | |
| | ) | |
| HONORSOCIETY.ORG, INC., | ) | |
| | ) | |
| Defendant/Counter-Plaintiff /Third-Party-Plaintiff | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| DR. LYNN TINCHER-LADNER, | ) | |
| | ) | |
| Third-Party Defendant | ) | |

**PHI THETA KAPPA HONOR SOCIETY'S
NOTICE OF FIRST RULE 30(B)(6) DEPOSITION
TO HONORSOCIETY.ORG, INC.**

Please take notice that under Rule 30(b)(6) of the Federal Rules of Civil Procedure, counsel for Plaintiff/Counter-Defendant, Phi Theta Kappa Honor Society ("PTK") will take the videotaped deposition of Defendant/Counter-Plaintiff HonorSociety.Org, Inc. ("Honor Society") through remote means on August 28, 2024 at 9:00 am Pacific Time. The deposition will take place before a certified shorthand reporter and notary public or other person duly authorized to administer oaths,

and may be recorded by audio, audiovisual, or stenographic means and will continue day-to-day until completed.

Pursuant to Fed. R. Civ. P. 30(b)(6), Honor Society must designate one or more officers, directors, managing agents or other persons who will testify on its behalf as to the matters known or reasonably available to it concerning the subject matters set forth in Schedule B. Please provide that designation no later than two (2) business days prior to the date of the deposition of any designee. The deponent(s) is also required to prepare to testify under the standard set forth in Rule 30(b)(6).

PTK intends to utilize Rule 30(b)(6) for other depositions on other substantive issues in the case. This deposition notice is pursuant to the Court's order that it be taken. (ECF No. 230.) PTK reserves the right to issue further and additional notices for deposition under Rule 30(b)(6) in the future.

Dated this 22nd day of August 2024

Respectfully submitted,

*/s/ Jonathan G. Polak*
Jonathan G. Polak (Pro Hac Vice)
W. Michael Etienne (Pro Hac Vice)
TAFT STETTINIUS & HOLLISTER LLP
One Indiana Square, Suite 3500
Indianapolis, IN 46204-2023
(317) 713-3500 – phone
(317) 713-3699 – fax
jpolak@taftlaw.com
metienne@taftlaw.com

Rachel Smoot (Pro Hac Vice)
TAFT STETTINIUS & HOLLISTER LLP
41 S. High Street, Suite 1800
Columbus, OH 43215
(614) 221-2838 – phone
(614) 221-2007 – fax
rsmoot@taftlaw.com

*/s/ Charles E. Cowan*
Michael B. Wallace, MSB # 6904
Charles E. Cowan, MSB # 104478
Beau M. Bettiga, MSB #105905
WISE CARTER CHILD & CARAWAY, P.A.
Post Office Box 651
Jackson, Mississippi 39205
Phone 601-968-5500

*Counsel for Plaintiff*

## SCHEDULE A

### Definitions and Instructions

1. "Honor Society," "You," and/or "Your" shall mean Defendant HonorSociety.org, Inc. and any of its parents, subsidiaries, divisions, affiliates, attorneys, related companies, predecessors, successors, assigns, officers, directors, employees, agents and representatives, and all other persons acting or purporting to act on their behalf or at their direction or control.

2. "Moradian" shall mean Michael Moradian.

3. "Plaintiff" and "PTK" shall mean Plaintiff Phi Theta Kappa Honor Society and any of its parents, subsidiaries, divisions, affiliates, attorneys, related companies, predecessors, successors, assigns, officers, directors, employees, agents and representatives, and all other persons acting or purporting to act on their behalf or at their direction or control.

4. "Asari" shall mean David Asari, and anyone acting on his behalf or at his direction.

5. "Person" or "Party" means the singular and plural of natural person, corporation, company, proprietorship, partnership, joint venture, association, firm, government entity, or any other entity recognized in law, and shall include the owners, officers, directors, agents, trustees, parents, subsidiaries, affiliates, assignees, predecessors, and successors of each such "Person" or "Party."

6. The connectives "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of these requests all responses that might otherwise be construed as outside of its scope.

7. The use of the singular form of any word includes the plural and vice versa, and the use of the past tense includes the present tense, and vice versa, as necessary to bring within the scope of these requests all responses that might otherwise be construed as outside of its scope.

## **SCHEDULE B**

### **Deposition Topics**

1.      Your knowledge of any additions, deletions, revisions, or any other edits made to PTK's Wikipedia page.

2.      The facts and circumstances of any additions, deletions, revisions, or any other edits made by You, Moradian, Asari, or any affiliate, employee, independent contractor or Person acting on Your behalf to PTK's Wikipedia page.

3.      Whether anyone associated with You is associated with or has otherwise used or accessed the handle "WikiObjectivity."

## **CERTIFICATE OF SERVICE**

I, Rachel Smoot, do hereby certify that a copy of the foregoing was served via electronic

email to the following counsel of record on August 22, 2024:

W. Whitaker Rayner
Dakota J. Stephens
Hugh A. Warren
Kristine Lynn Callahan
JONES WALKER, LLP – Jackson
190 East Capitol Street, Suite 800
Jackson, MS 39205-0427
wrayner@joneswalker.com
dstephens@joneswalker.com
hwarren@joneswalker.com
kcallahan@joneswalker.com

Daniel A. Rozansky
Michael A. Bernet
STUBBS, ALDERTON & MARKILES, LLP
15260 Ventura Blvd., 20th Floor
Sherman Oaks, CA  91403
drozansky@stubbsalderton.com
mbernet@stubbsalderton.com

Derek Newman
Derek Linke
Newman LLP
100 Wilshire Blvd., Suite 700
Santa Monica, CA 90401
dn@newmanlaw.com
linke@newmanlaw.com

*/s/ Rachel Smoot*
Rachel Smoot

# EXHIBIT A-11

Page 1

```
 1              UNITED STATES DISTRICT COURT
 2            SOUTHERN DISTRICT OF MISSISSIPPI
 3                  NORTHERN DIVISION
 4
    PHI THETA KAPPA HONOR              )
 5  SOCIETY,                          )
                                      )
 6                                    )
    Plaintiff/Counter-Defendant,      )
 7                                    ) CASE NO.
    vs.                               ) 3:22-CV-00208-
 8                                    ) CWR-RPM
    HONORSOCIETY.ORG, INC.,           )
 9                                    )
                                      )
10  Defendant/Counter-Plaintiff.     )
    /Third-Party-Plaintiff           )
11                                    )
    HONOR SOCIETY FOUNDATION, INC.,   )
12                                    )
    Defendant.                        )
13                                    )
    ------------------------------- )
14                                    )
    HONORSOCIETY.ORG, INC.,           )
15                                    )
    Defendant/Counter-Plaintiff       )
16  /Third-Party-Plaintiff            )
                                      )
17  v.                                )
                                      )
18  DR. LYNN TINCHER-LADNER,          )
                                      )
19  Third-Party Defendant.            )
    _____)
20
21     VIDEOTAPED REMOTE DEPOSITION OF MICHAEL MORADIAN
22              TUESDAY, OCTOBER 1, 2024
23           Stenographically Reported by:
       Katie L. Langgle, CSR No. 8637, CRR; CCR NO. 993
24
25  Pages 1 through 270
```

Page 2

1    JOB NO. MW 6946296

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 3

```
 1            Deposition of MICHAEL MORADIAN, taken on
 2    behalf of Plaintiff using virtual technology,
 3    commencing at 10:39 a.m., on October 1, 2024, before
 4    Katie L. Langgle, CSR No. 8637; CCR No. 993
 5
 6    A P P E A R A N C E S:
 7
 8    For the Plaintiff/Counter-Defendant:
 9    TAFT STETTINIUS & HOLLISTER LLP
      Jonathan G. Polak, Esq. - Pro Hac Vice
10    Rachel Smoot, Esq.
      One Indiana Square, Suite 3500
11    Indianapolis, Indiana  46204-2023
      jpolak@taftlaw.com
12    317.713.3500
13    WISE CARTER CHILD & CARAWAY, P.A.
14    Charles E. Cowan, Esq.
      Post Office Box 651
15    Jackson, Mississippi 39205
      cec@wisecarter.com
16    601.968.5500
17
18
19    For the Defendant/Counter-Plaintiff/Third-Party
      Plaintiff:
20
      NEWMAN, LLP
21
      Derek Linke, Esq.
22    100 Wilshire Boulevard, Suite 700
      Santa Monica, California  90401-3602
23    linke@newmanlaw.com
      206.274.2800
24
25
```

```
                                            Page 4
 1   JONES WALKER, LLP - JACKSON
 2   Dakota J. Stephens, Esq.
     3100 North State Street, Suite 300
 3   Jackson, Mississippi  39216
     dstephens@joneswalker.com
 4   601.949.4720
 5
 6   ALSO PRESENT: Brandon Miller - Videographer; Lynn
     Tincher-Ladner; Nader Moradian
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
                                              Page 5
 1                    I N D E X
 2              E X A M I N A T I O N S
 3                                              PAGE
    MICHAEL MORADIAN
 4       By Mr. Polak                            8
 5

                    E X H I B I T S
 6
    EXHIBIT           DESCRIPTION             PAGE
 7
    Exhibit 378   Deposition notice              15
 8
    Exhibit 379   Wikimedia Foundation           94
 9                universal code of conduct
                  page
10
    Exhibit 380   Phi Theta Kappa Difference     106
11                Between Revisions
12  Exhibit 381   A capture of an internet       148
                  site on Wednesday, July 24
13
    Exhibit 382   Order on the second            157
14                injunction
15  Exhibit 383   Comparison of revisions        165
16
17
18
19
20
21
22
23
24
25
```

```
                                               Page 6

 1                    VIA VIDEOCONFERENCE;

 2                TUESDAY, OCTOBER 1, 2024;

 3                       10:39 A.M.

 4                        -0o0-

 5        VIDEOGRAPHER:  Good morning.  We're going on

 6   the record at 10:39 a.m. Pacific Daylight Time on

 7   October 1st, 2024.

 8            Please note that this deposition is being

 9   conducted virtually.  Quality of recording depends on

10   the quality of camera, internet connection of

11   participants.  What is seen from the witness and heard

12   on screen is what will be recorded.

13            Audio and video recording will continue to take

14   place unless all parties agree to go off the record.

15            This is Media Unit No. 1 of the video-recorded

16   deposition of Michael Moradian taken by counsel for

17   plaintiff in the matter of Phi Theta Kappa Honor Society

18   versus HonorSociety.org, Incorporated, et al., filed in

19   United States District Court, Southern District of

20   Mississippi Northern Division.

21            Civil Action No. 3:  22-cv-00208-CWR-RPM.

22            This deposition is being conducted remotely

23   using virtual technology.

24            My name is Brandon Miller representing Veritext

25   Legal Solutions, and I'm the videographer.
```

Page 7

1           The court reporter is Katie Langgle from the

2    firm Veritext Legal Solutions.

3           I'm not related to any party in this action,

4    nor am I interested in the outcome.

5           If there are any objections proceeding, please

6    state them at the time of your appearance.

7           Counsel and all present including remotely will

8    now state their appearances and affiliations for the

9    record beginning with noticing attorney and the witness

10   to be sworn in.

11          Thank you.

12          MR. POLAK:  Jonathan Polak, Taft Stettinius &

13   Hollister, represent the plaintiff, Phi Theta Kappa and

14   the counter-defendant, Dr. Lynn Tincher-Ladner.

15          I'm joined with Rachel Smoot, who is also of my

16   office, and Charles Cowan, who is with the Wise Carter

17   Law Firm.

18          And I'm also here joined by Phi Theta Kappa's

19   corporate representative and also Dr. Tincher-Ladner

20   herself, Dr. Tincher-Ladner.

21          MR. LINKE:  Derek Linke with Newman, LLP, and I

22   represent the defendants in this case, HonorSociety.org,

23   Inc., and Honor Society Foundation, Inc.

24          I also represent the witness today,

25   Michael Moradian.

```
                                              Page 8
 1          And we are also joined by Honor Society client
 2   representative Nader Moradian, as well as my co-counsel
 3   in this case, Dakota Stephens, from the firm of
 4   Jones Walker, LLP.
 5          THE COURT REPORTER:  Please raise your right
 6   hand to be sworn in.
 7
 8                    MICHAEL MORADIAN,
 9   having been duly sworn, or affirmed, was examined
10   and testified as follows:
11
12          THE WITNESS:  Yes, I do.
13          THE COURT REPORTER:  Thank you.
14
15                    EXAMINATION
16   BY MR. POLAK:
17      Q.   All right.  Mr. Moradian, we meet again.
18           Why did you mess with PTK's Wikipedia page?
19           MR. LINKE:  Objection as to form.
20           THE WITNESS:  Can you clarify what you mean by
21   "mess"?
22   BY MR. POLAK:
23      Q.   Why did you mess with it?
24      A.   I wouldn't characterize it with the term
25   "mess."
```

1     Q.    What bothers you about the word "mess"?

2     A.    It's a loaded implication.

3     Q.    What's the implication?

4     A.    Well, the implication is mischaracterization,

5     which is a perpetual habit of your legal style or maybe

6     some would say chicanery, but I wouldn't characterize it

7     as mess.

8     Q.    So the implication is an attack on me, but what

9     about the word itself is inaccurate with respect to what

10     it is that you did to the PTK Wikipedia site?

11          MR. LINKE:  Objection as to form.

12          THE WITNESS:  I think the appropriate words

13     would be contribute, enhance, words of that nature.

14     BY MR. POLAK:

15     Q.    Okay.  So you think what you did contributed

16     and enhanced the PTK Wikipedia page; is that right?

17     A.    I believe that objectively it imparted truth,

18     it imparted neutrality, it imparted objectivity, and the

19     objective -- in the sense of balance and, you know,

20     that's what Wikipedia is.

21          Wikipedia is meant to be an open-forum place to

22     convey reliable, verifiable truth, and to that effect,

23     you know, it is important that it be used as such and

24     not a grandstand to perpetuate narratives or agendas.

25     That's against the rules of Wikipedia.

1          It's also against, you know, the FTC Act of

2     1914 of placing advertisements natively, so to that

3     effect, I do know that the page was enhanced by

4     contributions by others.

5          Q.   Was removing Fred Hayes' name from the PTK

6     Wikipedia page an enhancement?

7               MR. LINKE:  Objection as to form.

8               THE WITNESS:  Who is Fred Hayes?

9     BY MR. POLAK:

10         Q.   Did you remove his name from the Wikipedia page

11    for PTK?

12         A.   Well --

13         Q.   It's a simple yes-or-no question.  Did you

14    remove it?

15         A.   Anything on Wikipedia has to be verifiable and

16    reliable.  So to the extent that something is not cited,

17    it is actually not in my control, it's -- or anyone's

18    control.  It is the duty of any editor to remove things

19    that are not verifiable and reliably placed on the

20    internet.  So to -- I'm not even sure who this is, but

21    to the extent that it may have existed, I believe there

22    are no citations and we can both agree to that.  The

23    facts speak for themselves.

24              MR. POLAK:  Objection.  Nonresponsive.

25

Page 11

1    BY MR. POLAK:

2        Q.    Did you remove the name of Fred Hayes from the

3    Wikipedia PTK page?

4            MR. LINKE:    Objection as to form.

5            THE WITNESS:    Can I have a moment to verify

6    this?

7    BY MR. POLAK:

8        Q.    What are you looking at, sir?

9        A.    I'm not looking at anything.    I'm asking if I

10   can.

11       Q.    What are you going to use to verify it?

12       A.    Wikipedia.

13       Q.    You're not supposed to be reviewing any

14   documents here, Mr. Moradian, unless I give them to you

15   or I ask you to.    So please, if you have other things

16   opened on your computer desk, please shut them down now.

17       A.    No, sir, I don't.

18       Q.    Okay.    So my question back to you,

19   Mr. Moradian, and I'll ask it a third time now, did you

20   remove Fred Hayes' name from PTK's Wikipedia page?

21       A.    As per Wikipedia standards, anything that is

22   not verifiable and through third-party sources and

23   notable would be removed.    To that extent, yes, as per

24   Wikipedia standards, it would have been removed.

25           MR. POLAK:    Objection.    Nonresponsive.

```
                                                      Page 12

 1    BY MR. POLAK:

 2        Q.    I'll ask you a fourth time, Mr. Moradian.

 3              Were you the one who removed Fred Hayes' name

 4    from the PTK Wikipedia page?

 5        A.    Asked and answered.

 6        Q.    Okay.  You can answer, please.

 7              Were you the one -- I'll ask a fifth time now,

 8    were you the one who removed Fred Hayes' name from the

 9    PTK Wikipedia page?

10        A.    Per Wikipedia guidelines, yes.  Anything should

11    be removed that is not verifiable, so if that's the

12    case, then yes, per Wikipedia guidelines.

13        Q.    Still, your answer is not an answer,

14    Mr. Moradian.

15              Are you -- it's a very simple yes-or-no

16    question.  I'm not asking you about guidelines, I'm not

17    asking you about how you did it, I'm not even asking you

18    yet why you did it.

19              My question is simply, yes or no, and so I

20    think this is now my sixth time asking this question:

21    Were you the one who removed Fred Hayes' name from the

22    PTK Wikipedia page?

23        A.    Thank you, sir.  I'm gonna answer it with the

24    context appropriate to answer.

25              The answer is per Wikipedia guidelines of
```

Page 13

```
 1   neutrality, verifiability, and objectivity, yes.
 2        Q.   So the answer to my question is yes, you were
 3   the one who did it?
 4             I can't tell from your answer whether you're
 5   answering me yes or no.
 6             Are you the one who did it?  Eighth time.
 7        A.   I've already answered this question, and I'm
 8   just gonna repeat the same answer.  My answer has your
 9   yes-or-no answer in it and that is the answer.  Period.
10        Q.   Okay.  So to confirm and clarify for me, so I'm
11   clear, are you the one who removed Fred Hayes' name from
12   the PTK Wikipedia page for -- yeah, for PTK?
13        A.   Per Wikipedia standards of verifiability, yes,
14   I am the one.
15        Q.   Thank you.
16             Are you the one who removed Wes Moore's name
17   from the PTK Wikipedia page?
18        A.   Sir, I don't know who these people are.
19        Q.   Are you the one who removed his name?
20        A.   I'm going to need more context.  I can't answer
21   with just this amount of information.
22        Q.   Why is it that you removed names of former
23   members -- I'm sorry, names of members of Phi Theta
24   Kappa identified on the PTK Wikipedia page?
25        A.   That's a great question.  It's, again, per the
```

Page 14

 1    standards of Wikipedia of verifiability, there is no

 2    citation on any of the members that were removed and,

 3    therefore, it is not in my hands as an individual

 4    whether they should be there or should not be there.

 5    It's the terms of service of Wikipedia.

 6         And I do note that, you know, PTK in their new

 7    rollout of design and, you know, obfuscating, you know,

 8    the false advertising issues aside, did add the people

 9    on their site and I commend them for putting a place on

10    the internet where these people finally exist because

11    Wikipedia cannot have floating objects with no

12    verifiable resource or verification on the internet.

13         So to the extent that, you know, Phi Theta

14    Kappa has now given them a citation and I -- and I do

15    notice that, you know, it looks like PTK has added them

16    both on their website and on their Wikipedia, then, you

17    know, there's a basis for them being there, but prior to

18    that, objectively, neutrally speaking, per the terms of

19    Wikipedia and to none of my interest or disinterest,

20    those members should not be there if they cannot be

21    verified.

22    Q.   Mr. Moradian, you just said that I notice.  Do

23    you have PTK's Wikipedia page up in front of you on the

24    screen?

25    A.   Sir, when I say I notice --

Page 15

1        Q.    Yes-or-no question, Mr. Moradian.  I will not

2    let you interfere with my examination by having a bunch

3    of documents up on your screen that are going to give

4    you answers to questions.  You are to use the documents

5    and information that I give you here today unless I tell

6    you otherwise.

7            Do you understand?

8            MR. LINKE:  Objection as to form.

9            THE WITNESS:  Sir, my screen consists of a

10   large photo of myself, a small photo of you, a small

11   photo of Katie Langgle, I hope I pronounced that

12   correctly, a small photo of Derek Linke, Videographer B

13   and Nader Moradian, which is misspelled, and a

14   Dakota Stephens as well as -- and that's all.  There's a

15   Zoom window and there's a Microsoft task bar at the

16   bottom and that's all I can see.  I hope that provides

17   context.

18   BY MR. POLAK:

19       Q.    I'm going to show you what has been marked as

20   Exhibit 378.

21            Do you have your Exhibit Share folder up?

22       A.    No, sir.  Do you give me authorization to

23   change my window into that format?

24       Q.    Yes, I do.

25            (Exhibit 378 marked for identification.)

```
                                              Page 16
  1          THE WITNESS:  I am in Veritext Exhibit Share
  2     and I -- where should I see this document?
  3     BY MR. POLAK:
  4       Q.   I don't know, it probably populates differently
  5     on different people, but when you go into the marked
  6     exhibits, you will see there is a Exhibit 378 HS
  7     30(b)(6) notice.
  8       A.   So in my folder, I only see recent files dating
  9     back from an August deposition, if someone could assist
 10     me, I --
 11       Q.   Well, here, I'll just share my screen and show
 12     it to you.  Probably easier this way.
 13          This is Exhibit 378.  And do you see the
 14     exhibit number down there at the bottom right-hand
 15     corner?
 16          This is titled "Phi Theta Kappa Honor Society's
 17     Amended Notice of First Rule 30(b)(6) Deposition to
 18     HonorSociety.org."
 19          And I'll scroll through it here for you.
 20          It has some definitions under Schedule A, and
 21     then under Schedule B, there is some topics.
 22          Do you recognize that document?
 23       A.   Yes, I do.
 24       Q.   Okay.  You understand that you are here as a
 25     representative of Honor Society to testify on behalf of
```

Page 17

1    that company for information that company has responsive

2    to those topics, right?

3        A.    Yes, sir.

4        Q.    What did you do to prepare for this deposition?

5        A.    I reviewed that notice.  I reviewed my

6    declaration.  I reviewed Dr. Lynn Tincher-Ladner's

7    declaration, and I reviewed Wikipedia.

8        Q.    Which declaration is it that you reviewed that

9    was -- you said you reviewed your declaration.  Which

10   one was it?

11       A.    I believe it would be the one referencing

12   Wikipedia.

13       Q.    There were two that you submitted.  One said

14   that the only reference to Wikipedia was that you had

15   not made edits for some time and then there was a second

16   subsequent one that identified more of those as I

17   recall.

18            I might have those two backwards, but there was

19   one more that was more substantive in terms of the

20   explanation about the edits made by you to the Wikipedia

21   site.  Is the more substantive one the one that you

22   reviewed?

23       A.    I'm not sure.

24       Q.    But your recollection is you only reviewed one?

25       A.    I believe so.

                                                    Page 18

1      Q.   You said that you reviewed Wikipedia.  What

2   does that mean?

3      A.   Well, I looked at the article, I looked at the

4   history, and I reviewed Wikipedia as a platform, as a

5   whole.

6      Q.   Okay.  You said you looked at an article.  What

7   article are you talking about?

8      A.   I believe that would be the one that we're here

9   to discuss, which would be the Phi Theta Kappa page.

10     Q.   When is it that you looked at the Phi Theta

11  Kappa page to prepare yourself for today?

12     A.   I'm sorry, did you say Theta Kappa or

13  Beta Kaplan?

14     Q.   I think you heard me, Phi Theta Kappa, the one

15  that we're talking about.  When is it that you reviewed

16  that page?

17     A.   Well, I reviewed it last night.

18     Q.   Any other times to prepare for today?

19     A.   I don't believe so.

20     Q.   You said that you looked at what you described

21  as history in connection with Wikipedia.  What are you

22  talking about there?

23     A.   Sure.

24          So every page has a history and you can click a

25  button called "view history" and the result is you'll

Page 19

1    review the history of the page.

2        Q.   How often or how many times did you look at the

3    history for PTK's Wikipedia page?

4            MR. LINKE:  Objection as to form.

5    BY MR. POLAK:

6        Q.   To prepare for today?

7        A.   Last night and briefly when we were discussing

8    scheduling this meeting.

9        Q.   You also said you looked at Wikipedia as a

10   platform.  What did you mean by that?

11       A.   So just reviewing the information on the site,

12   researching and rereading their pillars, for example,

13   which discuss the importance of notability,

14   verifiability, objectivity; just, you know, the things

15   that you would be familiar with to understand Wikipedia.

16       Q.   Was that the first time that you ever looked at

17   those?

18       A.   No, sir.

19       Q.   When you looked at the PTK Wikipedia page to

20   prepare for today, were you looking for anything

21   specific?

22       A.   Well, per the notice that you showed me, I was

23   looking to understand to make sure that I was informed

24   to be able to testify and answer those three questions.

25       Q.   Same question as to when you looked at the

```
 1    history that you described for the PTK Wikipedia page,
 2    were you looking for anything specific?
 3         A.   To have the ability to answer those three
 4    questions I'm here to testify about.
 5         Q.   When you reviewed your declaration, were you
 6    looking for anything specific?
 7         A.   To have the ability to answer the three
 8    questions I'm here to answer on behalf of the 30(b)(6).
 9         Q.   Did you see anything new -- well, let me
10    rephrase that question.
11              When you reread your declaration, was there
12    anything that you read that you didn't recall?
13              MR. LINKE:  Objection as to form.
14    BY MR. POLAK:
15         Q.   Sometimes when you read things even though you
16    signed it weeks before or you've picked it up weeks
17    before you read it and you go, oh, yeah, I remember that
18    now, that's kind of what I'm talking about here,
19    Mr. Moradian.
20              When you read the declaration, was there
21    anything that you saw that was kind of like that?
22         A.   I don't believe so.
23         Q.   Same thing with the PTK Wikipedia page?
24         A.   Can you please repeat the core question.
25         Q.   Was there anything that struck you when you
```

Page 21

1   were looking at it, you're like, oh, yeah, now I

2   remember that, I wasn't thinking about it, but now I

3   remember?

4       A.   I'm not sure how to answer that.  I'll try to

5   the best of my ability and I believe, you know,

6   something that jumped out to me is that, as I said, that

7   I had noticed that, oh, you know, Phi Theta Kappa has

8   decided to, you know, acknowledge their member base on

9   their website.  That wasn't there before when you click

10  on the verifiability, that was something new, it didn't

11  exist before.  And so, you know, I'm happy for them that

12  they were able to bridge that gap between, you know,

13  just putting unsubstantive things on Wikipedia and

14  substantive things.  So to that effect, I was surprised

15  and, you know, happy for them that, you know, they

16  looked to at least try to verify what they were claiming

17  on Wikipedia.

18      Q.   When you reviewed the Wikipedia as a platform

19  to prepare for today's deposition, did you learn

20  anything new that you didn't know before?

21      A.   I don't believe so.

22      Q.   So you said that you reviewed the notice, you

23  reviewed your declaration, you reviewed

24  Dr. Tincher-Ladner's declaration, and you reviewed these

25  various things on Wikipedia to prepare for today.

Page 22

1             Did you do anything else to prepare for today?

2        A.    I don't believe so.

3        Q.    Did you have discussions with anyone that works

4    for Honor Society to see what information they have

5    relative to these topics?

6        A.    To my knowledge, there is no basis for anybody

7    to have any knowledge on the topics.

8             MR. POLAK:  Objection.  Nonresponsive.

9    BY MR. POLAK:

10        Q.    My question was not what you knew what other

11    people did.

12             My question was whether you had discussions

13    with anyone at Honor Society about whether they had

14    knowledge of information responsive to these topics?

15        A.    I had informed the members of the team that I

16    will be in this deposition and opened the forum to have

17    discussion about this deposition.  I was not imparted

18    any knowledge from any other party.

19        Q.    When was that?

20        A.    I believe that was yesterday and perhaps a

21    meeting before that as well.

22        Q.    Who was at the meeting?

23        A.    Dave Asari, who is a contractor, and

24    Michael Calvert.

25        Q.    Tell me about that meeting.

Page 23

1      A.    Sure.

2            So it's just a brief conversation where

3      everyone discusses the week ahead.  This is a part of my

4      week ahead, so I informed the team and, you know, we

5      took it from there, talked about the week ahead and that

6      was the extent of the conversation.

7      Q.    What did you tell them about today?

8      A.    I informed them I have the pleasure of sitting

9      with you today and that I look forward to speaking with

10     you like always and engaging in friendly dialogue hoping

11     to, first and foremost, protect students and, you know,

12     protect objectivity and truth.

13     Q.    Did you tell them anything else?

14     A.    I believe that's all.  I informed them of the

15     deposition and opened up a forum for anybody to ask

16     questions or comments and mentioned that I'm looking

17     forward to speaking with you today and came here to

18     answer your questions to the best of HonorSociety.org's

19     collective ability.

20     Q.    What do you mean by you "opened up a forum"?

21     A.    As I said, I -- I said we're having this

22     meeting tomorrow and paused and waited to see if anybody

23     had anything to add or say.

24     Q.    Did you share with them the deposition notice

25     that we just looked at?

Page 24

1       A.    I don't believe so.

2       Q.    Did you mention the specifics of the three

3    topics?

4       A.    I don't believe so.

5       Q.    Did you ask them if they made any revisions to

6    PTK's Wikipedia page?

7       A.    Nobody on our team, and I have had

8    conversations to this effect, uses Wikipedia in an

9    editor capacity.  We've discussed that in depth and

10   nobody on our team uses Wikipedia, so that was already

11   an established fact.

12      Q.    When?

13      A.    Since -- numerous times since the initial

14   Wikipedia escalation, or whatever term you would prefer

15   to use, that Dr. Tincher-Ladner and you put forward.

16   You know, it's been a conversation and nobody's from the

17   layer of Wikipedia, nobody's made edits to Wikipedia of

18   any page.  That was discussed again.  And so I have that

19   understanding that I have explicitly asked whether

20   people have used Wikipedia, and the answer has been no

21   every time.

22      Q.    Okay.  So let's go back to make sure I

23   understand what timing you're talking about.

24            Dr. Tincher-Ladner filed her supplemental

25   declaration on July 24th of this year.  So when you say

Page 25

1    that you had a conversation with your team about their

2    use of Wikipedia, was it before she filed her

3    supplemental declaration about Wikipedia edits or after?

4             MR. LINKE:  Objection as to form.

5             THE WITNESS:  I would say that since filing

6    to -- you know, we've discussed Wikipedia and people's

7    activity from that date up until our last meeting and so

8    I have an understanding both from that July 24th date

9    before and then, secondly, from yesterday and before.

10   BY MR. POLAK:

11      Q.   So are you telling me, Mr. Moradian, that you

12   directly asked David Asari whether he was responsible

13   for any edits to PTK's Wikipedia page?

14      A.   I have asked that before, yes.

15      Q.   When is it that you asked him?  After July 24th

16   of this year?

17      A.   Yes.

18      Q.   What was that?

19      A.   Yes, sir.

20      Q.   Are you telling me that you had a direct

21   conversation with Michael Calvert about whether he made

22   any edits to PTK's Wikipedia page?

23      A.   Yes, sir, that's correct.

24      Q.   And what did he tell you?

25      A.   Both of them individually confirmed that they

Page 26

```
 1    have never edited the Phi Theta Kappa page nor pages
 2    generally.
 3         Q.    Did you have any conversations with
 4    Tina Murtagh over whether she has made any edits to
 5    PTK's Wikipedia page?
 6         A.    Yes, I have.
 7         Q.    And what did she tell you?
 8         A.    The same thing.
 9         Q.    Which is what?
10         A.    She has not edited the Wikipedia page of
11    Phi Theta Kappa before ever.
12         Q.    I think you have someone who works with you in
13    some capacity named Ryan.  Do you know who I'm referring
14    to?
15         A.    I believe so, yes.
16         Q.    What is that person's full name?
17         A.    The account you're referring to is an alias
18    account that is used to answer questions, the full name
19    is Ryan Evans.
20         Q.    Is Ryan Evans not a real person?
21         A.    It's an alias.
22         Q.    Of who?
23         A.    Of the company.
24         Q.    Who has control over that alias?
25         A.    David Asari and, secondly, I do.
```

1      Q.   So you read Lynn's -- or Dr. Tincher-Ladner's

2  declaration in preparation for this deposition, right?

3      A.   Yes, sir.

4      Q.   You saw and read her allegations made in that

5  declaration about the edits that were made to PTK's

6  website, correct?  PTK's Wikipedia page, right?

7      A.   Would you mind repeating that again?

8      Q.   You read what had she wrote about her

9  observations of the changes that were made to PTK's

10  Wikipedia pages, right?

11      A.   I did read it, yes.

12      Q.   And she claimed in that declaration that

13  someone under the name "WikiObjectivity" was responsible

14  for the changes that she was concerned about, right?

15      A.   That's my understanding, yes.

16      Q.   Do you deny making any of the changes that she

17  identified in her declaration as being of concern?

18           MR. LINKE:  Objection as to form.

19           THE WITNESS:  Would you mind repeating that,

20  please?

21  BY MR. POLAK:

22      Q.   Do you deny making any of the changes that

23  Dr. Tincher-Ladner identified in her declaration as

24  being of concern?

25           MR. LINKE:  Objection as to form.

Page 28

1          THE WITNESS:  To the extent that there was

2      objectivity, verifiability, and reliability added per

3      Wikipedia guidelines, I do acknowledge, yes.

4      BY MR. POLAK:

5          Q.   So the answer to my question is yes, you're the

6      one that did those?

7          A.   I -- yes, I imparted neutrality and truth.

8          Q.   It's a straightforward question, I didn't ask

9      you why you did it, we'll get to that.  I didn't ask you

10     how you did it, we'll get to that.

11          I just want to make sure we're clear on the

12     record that you were the one who made those edits that

13     she identified in her declaration as being of concern.

14     Right?

15          MR. LINKE:  Objection as to form.

16          THE WITNESS:  Yes, sir, per the Wikipedia

17     guidelines, I did make those changes.

18     BY MR. POLAK:

19         Q.   Did you make those in your capacity as an

20     executive for Honor Society?

21          MR. LINKE:  Objection as to form.

22          THE WITNESS:  I -- no, sir, I don't believe

23     Wikipedia works like that.

24     BY MR. POLAK:

25         Q.   So you were not doing that on behalf of

Page 29

1    Honor Society?

2            MR. LINKE:  Objection as to form.

3            THE WITNESS:  I was adding the context and

4    knowledge base that I, as an individual and as a curator

5    of the Honor Society museum, which is the largest

6    Honor Society museum and had the ability to curate,

7    learn about, and impart.

8            I think part of Wikipedia's guidelines as for

9    the cultural sector and specifically calls out museum

10   curators and librarians to help impart the cultural

11   sector.  And to that effect, book librarians and museum

12   curators have been involved in the Phi Theta Kappa page.

13   BY MR. POLAK:

14      Q.   Sir, are you telling me that you personally and

15   individually accept responsibility for any damage those

16   edits may have caused to PTK?

17           MR. LINKE:  Objection as to form.

18           THE WITNESS:  Sir, as I just said, I was

19   working on behalf of being a museum curator and not as

20   an individual, so I was working upon it with the

21   Honor Society museum.

22   BY MR. POLAK:

23      Q.   The Honor Society museum is part of the

24   Honor Society Foundation?

25      A.   That is correct.

Page 30

```
 1      Q.   And the Honor Society Foundation is associated
 2   with the HonorSociety.org organization?
 3      A.   I believe so.
 4      Q.   I think the last time or one of the last times
 5   that we've spoken, you told me that you were the
 6   executive director for the Honor Society Foundation.
 7   Are you still holding that office for the foundation?
 8      A.   Yes, sir.
 9      Q.   You have employees other than Mr. Asari or
10   Mr. Calvert that work at College Budget, right?
11           MR. LINKE:  Objection as to form.  It's outside
12   the scope of the noticed topics.
13   BY MR. POLAK:
14      Q.   You can answer the question.
15      A.   I don't know.
16      Q.   You don't know?  What do you mean you don't
17   know?
18      A.   I didn't prepare for that today.
19      Q.   Aren't you the president of College Budget?
20   Don't you own that company?
21           MR. LINKE:  Objection as to form.  This is
22   outside the scope of noticed topics.
23   BY MR. POLAK:
24      Q.   Don't you own that company, Mr. Moradian?
25           MR. LINKE:  Same objection.
```

Page 31

```
 1          THE WITNESS:  I'm here to answer the three

 2     questions that you asked me to testify for for this

 3     30(b)(6), and I will be happy to answer those questions.

 4     BY MR. POLAK:

 5        Q.   Mr. Moradian, you don't get to play lawyer

 6     today.  Your lawyer can play lawyer, you don't get to.

 7          Please answer my question and I promise you it

 8     is relevant to the three topics that I will connect the

 9     dot here in a second.

10          My question for you is, do you -- are you

11     seriously telling me you don't know who works for you at

12     College Budget?

13          I'm not asking for a list, I'm just asking for

14     a yes or no.

15          MR. LINKE:  Mr. Polak, in line with

16     Judge Meyers' discussion with the parties about this

17     deposition being strictly limited to 30(b)(6) topics, I

18     would request that you make a proffer about how this is

19     going to be relevant so we can consider it in good faith

20     because I do want this to proceed smoothly.

21          MR. POLAK:  It's in violation of the agreement

22     that we have, Derek.  You can object to your question.

23     BY MR. POLAK:

24        Q.   Mr. Moradian, I'm just trying to find out -- my

25     next question to you is going to be whether you had
```

Page 32

```
 1    discussions with anyone at College Budget to find out if
 2    anyone there made edits to PTK's Wikipedia page.
 3           But my question right now is, do you even know
 4    who works for you over there?
 5    A.    To my knowledge, the only employee other than
 6    myself at College Budget is David Asari.
 7    Q.    I'll ask you about Campus Buddy.  Do you
 8    presently have any employees over there?
 9    A.    Campus Buddy and College Budget are the same
10    organization.
11    Q.    So are you telling me that you didn't -- I'm
12    sorry.
13           Did you have any conversations other than with
14    Mr. Asari with anyone associated with College Budget or
15    Campus Buddy about whether they made edits to PTK's
16    Wikipedia site?
17    A.    You previously asked about employed and now
18    you're using the word "associated," so I just want
19    clarity to what you mean.
20    Q.    In any way associated with those organizations,
21    did you have any conversations with anyone over there
22    about whether they made any edits to PTK's Wikipedia
23    page?
24    A.    Yes.
25    Q.    Who?
```

1          A.   I talked to and confirmed with Gerard Trinidad

2     and Maria Alcante to confirm that they have not made any

3     editing.

4          Q.   When did that happen?

5          A.   In the last week and at the time of -- of this

6     mischaracterization/escalation of Phi Theta Kappa's

7     Wikipedia page.

8          Q.   Was this at the same meeting you were

9     describing before involving Mr. Asari and Mr. Calvert

10    where you were, I think, preparing for the week?

11         A.   No, this was on a customer service call or a

12    call with the team that does customer service that I sit

13    in on from time to time.

14         Q.   When was this?

15         A.   I believe it was last week, the last time it

16    occurred.

17         Q.   Who else was present?

18         A.   David Asari.

19         Q.   Anybody else?

20         A.   The said individuals.

21         Q.   Anybody else?

22         A.   No, sir.

23         Q.   So what did Mr. Trinidad tell you?

24         A.   Mr. Trinidad and Maria don't have much

25    knowledge about PTK in general.  They never heard about

Page 34

```
 1   it prior to the litigation and they assured me that they

 2   have not done anything outside of their scope.

 3        Q.   Do you have anybody else working in your

 4   customer service area other than Mr. Trinidad and

 5   Ms. Alcante?

 6        A.   I'm not sure how this ties into the three

 7   questions that we prepared for for today.

 8        Q.   You can still answer the question, though,

 9   Mr. Moradian.

10             I'm trying to figure out who all you talked to

11   since you're testifying on behalf of the company, but I

12   shouldn't have to explain myself to you.

13             The way this works, as you know, because this

14   is, I think, your fourth deposition, maybe fifth, I ask

15   the questions, you give the answers, and if your lawyer

16   has an issue, he'll say his peace, but -- so my

17   question, please answer it.

18             MR. LINKE:  Objection as to form.

19             THE WITNESS:  Would you mind repeating the

20   question, please?

21   BY MR. POLAK:

22        Q.   Who else works for you in any capacity in

23   connection with that customer service function other

24   than Mr. Trinidad and Ms. Alcante?

25             MR. LINKE:  Objection as to form.
```

Page 35

1          THE WITNESS:  I believe just David Asari as

2    well.

3    BY MR. POLAK:

4      Q.    Did you have conversations with anyone else

5    associated with any organization that you were

6    affiliated with about whether they provided edits or

7    made edits to PTK's Wikipedia page?

8      A.    Yes.

9      Q.    Who?

10     A.    I also discussed with Nader Moradian and

11   confirmed that he has not used Wikipedia in editor

12   fashion.

13     Q.    Anybody else other than Nader and the other

14   people that we've spoken about?

15     A.    I have confirmed with Burjiss Pavri since I

16   last spoke to him about a week ago and post Wikipedia

17   mischaracterization and escalation and -- I believe

18   that's everybody.

19     Q.    Is there anybody affiliated or associated with

20   your family of companies that you did not speak with

21   about whether they made edits to the Wikipedia page for

22   PTK?

23     A.    I don't believe so.

24     Q.    Okay.  I'm going to ask you some questions

25   about communications that were had with your lawyers.

Page 36

 1    These are going to be very simple yes-or-no questions,

 2    and they are going to be the types of questions that ask

 3    for information that would be on what we lawyers call a

 4    privilege log, so it's going to be the identities of the

 5    people involved in the conversation, a general subject

 6    of the conversation without disclosing the privileged

 7    underlying communications, and the dates that those

 8    conversations occurred, okay?

 9              Your lawyer, I'm sure, is going to be objecting

10    here from time to time or at least giving you some

11    guidance to make sure you don't step on the

12    communications that you had, but I wanted to give you

13    that preface so you understand what I'm getting at.  I'm

14    not asking you for the substance of what you discussed,

15    like the advice that you received, like do this, don't

16    do that, I'm not asking for that.  I'm just going to be

17    asking you for the who, a general subject of the what,

18    and the when.  Okay?

19              So my question for you is this --

20       A.    Sir, I think we've been going about an hour.

21    Would you mind if I take a restroom break and a water

22    break?

23       Q.    Let me ask you this question first and then we

24    will.

25              With respect to -- I understand the first edits

1    that you made were in April of 2024 being the first

2    edits that you made to the PTK Wikipedia page.

3            Did you have any conversations with any lawyers

4    prior to that date concerning editing Wikipedia pages?

5    It's a simple yes or no.

6            MR. LINKE:  I instruct the witness not to

7    answer the question to the extent it requires disclosing

8    attorney-client privileged communications.  And

9    objection as to form.

10   BY MR. POLAK:

11       Q.   You can answer, Mr. Moradian.

12       A.   I don't believe that there was consultation

13   with lawyers at that time.

14           MR. POLAK:  Okay.  We can take that break now.

15           It's presently 11:30 your time, so why don't we

16   come back at 11:40 your time, Pacific.

17           VIDEOGRAPHER:  Okay.  Stand by.

18           This marks the end of Media No. 1.  Going off

19   the record at 11:30 a.m. Pacific.  Thank you.

20           (Off the record at 11:30 a.m.)

21           (Back on the record at 11:45 a.m.)

22           VIDEOGRAPHER:  We are back on the record at

23   11:45 a.m. Pacific.  And this marks the beginning of

24   Media No. 2, deposition of Michael Moradian.

25           Please proceed, Counsel.

1    BY MR. POLAK:

2        Q.    All right.   Mr. Moradian, I want to ask you

3    some questions generally about your familiarity with

4    Wikipedia.

5              First of all, when did you first become aware

6    of the Wikipedia website?

7        A.    To the best of my knowledge, it would be near

8    the time that it was founded.

9        Q.    When was that?

10       A.    I don't recollect specifically, I believe it

11    was in the early 2000s.

12       Q.    Why would you use it in your life?

13       A.    Well --

14             MR. LINKE:   Objection to form.

15             THE WITNESS:   I mean, Wikipedia is the largest

16    collection of neutral, verifiable, objective information

17    that has ever existed.   And so it's important -- you

18    know, people rely on Wikipedia to seek absolute truth,

19    to seek verifiability, to look at a platform that is not

20    biased and to help them understand the world around

21    themselves, so it's an incredibly important platform and

22    one where if -- you know, should not be used to bias and

23    trick people.   Should not be -- the user should

24    disclose -- it's -- you know, you're not allowed to edit

25    on behalf of your own company, that's a strict conflict

Page 39

1    of interest and the result is this beautiful creation

2    where the world can access information that is, again,

3    objective, neutral, and verifiable.

4            And so in my life as a curator of a museum, as

5    a student, as a learner, you know, I have used it almost

6    daily and I think many people around the world have.

7    And I believe that -- it's a very powerful, important

8    tool and it needs to be, you know, truthful to protect

9    the users.  To protect people that use the platform,

10   that rely on it, and so -- yeah, I love Wikipedia and I

11   think it's a very important tool for educators and for

12   individuals to view objectively.

13   BY MR. POLAK:

14      Q.   Would it be a conflict of interest for someone

15   who's involved in a lawsuit with somebody else to go and

16   edit their opponent's Wikipedia page to put forth the

17   narrative or legal theory they're relying on in the

18   lawsuit; would that be a conflict of interest?

19           MR. LINKE:  Objection as to form.

20           THE WITNESS:  An interesting statement.

21   However, per Wikipedia guidelines, the guidelines say

22   that an owner or an employee of the company must not

23   edit their own page and it simply refers to specifically

24   within litigation as a lesser should not.

25           And so when you're dealing with the must not,

Page 40

1    this is the lesser of two, and so, you know, while I

2    ordinarily would not edit a page and in this context you

3    have to look at the severity of the violation.  And when

4    you're looking at, you know, false advertising, gross

5    mischaracterization and -- and to be clear, I have

6    nothing against PTK and I have nothing against

7    Dr. Tincher-Ladner.  I think they both have tremendous

8    potential.

9         I believe in them, in their ability to reform

10   themselves, acknowledge truths, and be the best they can

11   be, but it is important that we acknowledge objective,

12   neutral, and verifiable facts.  And I think that that

13   has been something that has been an issue in this case

14   is, you know, mischaracterizing truth, hiding truth.

15   You know, these are major, major issues.

16        I don't control Wikipedia and I don't own

17   Wikipedia and so to the extent that any contribution is

18   on the site, it would be by third-party administrators

19   who are qualified librarians, historians that view the

20   information and I don't have, you know, anything other

21   than a contributor role and that's all.

22        MR. POLAK:  Move to strike, nonresponsive.

23   BY MR. POLAK:

24        Q.   My question to you was whether it was a

25   conflict of interest for that to happen, simple yes or

Page 41

1   no.

2       A.    As I described in depth, it is a lesser

3   conflict in interest than what was presented on

4   Wikipedia in terms of an owner or leader of a page

5   editing their own page.

6       Q.    Is a lesser conflict of interest still a

7   conflict of interest?

8               MR. LINKE:  Objection as to form.

9               THE WITNESS:  Again, it's -- it's a lesser of

10  the two and so it's actually resolving conflict.

11  BY MR. POLAK:

12      Q.    How is the creation of a conflict of interest a

13  resolution of a conflict of interest in that

14  circumstance?  I'm not following.

15              MR. LINKE:  Objection as to form.

16              THE WITNESS:  I think you do understand that --

17  BY MR. POLAK:

18      Q.    I don't.  I wouldn't have asked the question if

19  I did.

20              I'm trying to understand how a conflict of

21  interest under those circumstances can actually resolve

22  a conflict of interest.  If somebody who is involved in

23  a lawsuit with the opposing party goes and makes edits

24  to that opposing party's PTK page consistent with that

25  person's litigation narrative, how does that resolve the

Page 42

1    conflict of interest?

2            MR. LINKE:  Objection as to form.

3            THE WITNESS:  I'm happy to answer that.  When

4    there are perpetuated objective lies, false advertising,

5    misstatements, placed by a leader, an owner or employee

6    of an organization on their Wikipedia page, then whoever

7    corrects that, whoever brings that in line is bringing

8    the page closer to compliance.

9    BY MR. POLAK:

10       Q.   So in your mind, it's not okay for PTK to edit

11   its page, but it is just fine for you, as an adversary

12   in litigation, to go make whatever changes you think are

13   appropriate or necessary to their page.  And you're not

14   conflicted at all in doing that; is that your position?

15           MR. LINKE:  Objection as to form.

16           THE WITNESS:  Sir, I think you're trying to put

17   words in my mouth.

18           But what I did say is that Wikipedia is an

19   objective, neutral platform that encourages

20   verifiability and objectivity.

21           And to the extent of the pages brought more in

22   line and out of noncompliance due to gross

23   mischaracterizations of owner, leader of a page, yes,

24   that is an improvement and that's why it's accepted by

25   Wikipedia and it's as simple as that.

1    BY MR. POLAK:

2        Q.    When -- well, why don't you tell me, what was

3    your very first edit ever to a Wikipedia page?

4            MR. LINKE:  Objection as to form.  Outside the

5    scope of the noticed topics.

6            THE WITNESS:  I believe my first edit ever,

7    which is, I believe, what you're asking; is that right?

8    BY MR. POLAK:

9        Q.    That's correct.

10       A.    Would have been in the early 2000s.  Likely

11   about UCLA when I was attending UCLA as a student.

12       Q.    Since that first edit, did you make any other

13   edits to Wikipedia pages up until the time that you made

14   the first edit to PTK's page?

15           MR. LINKE:  Objection as to form.  Outside the

16   scope of the noticed topics.

17           THE WITNESS:  I can't remember every edit.

18   BY MR. POLAK:

19       Q.    Did you make --

20       A.    I didn't prepare for this.

21       Q.    And did you make any edits between the first

22   edit that you claimed to have made in 2000 to the first

23   edit you made to the PTK Wikipedia page?

24           MR. LINKE:  Objection as to form.  Objection,

25   outside the scope of the noticed topics.

Page 44

1          THE WITNESS:  I'm not sure, I didn't prepare

2     for this.

3     BY MR. POLAK:

4          Q.    So is the answer I don't know?  Or do you know

5     and you just don't want to tell me?

6          A.    Of course not, Mr. Polak.

7          Q.    No one --

8          A.    You know --

9          Q.    Mr. Moradian -- okay.  We can't talk over each

10    other.

11           I'm just telling you, if you know the answer to

12    the question, just answer the question.

13          A.    Sure.

14          Q.    It's a simple yes or no, did you make any edits

15    to Wikipedia between the time you made the first one

16    back in 2000-ish to 2024 when you made the edits to

17    PTK's Wikipedia page?

18          MR. LINKE:  Objection as to form.  Objection as

19    being outside the scope of the noticed topics.

20          THE WITNESS:  Just to give some context of what

21    I do remember, and I don't remember everything, but I

22    would say that I did used to use Wikipedia a lot and was

23    a regular user and editor in the early 2000s.

24    BY MR. POLAK:

25          Q.    So since the early 2000s to April of 2024, it

Page 45

1    doesn't sound like you made any other edits, or at least

2    you don't recall making any other edits to anyone's

3    Wikipedia pages; is that right?

4          MR. LINKE:  Objection as to form.  Objection,

5    outside the scope of the noticed topics.

6          THE WITNESS:  Yeah, I don't have any -- I

7    didn't prepare for that.  I'm not sure how to answer

8    that.

9    BY MR. POLAK:

10   Q.   Well, I'm not asking you whether you prepared,

11   and I'm not asking -- if you don't -- if you're not sure

12   on how to answer my question, is there something

13   confusing about my questions to you?  The words that I

14   used?  Or do you understand it and you just don't want

15   to give me the answer that's in your head?

16   A.   Well, I'm trying my best to answer your

17   questions and I'm trying to give you the best answer I

18   can.

19   Q.   Well, the answer to my question could either be

20   yes, I did make edits, no, I didn't make any edits, or I

21   don't know.  Which is it?

22   A.   So I believe the answer, as I've said before,

23   is that I don't know.

24   Q.   Okay.  So you admitted in your declaration that

25   you have used the handle "WikiObjectivity" to make edits

Page 46

1    to PTK's Wikipedia page, right?

2        A.    I believe so, yes.

3        Q.    Have you ever used any other handle to make

4    edits on Wikipedia?

5            MR. LINKE:  Objection as to form.  Outside the

6    scope of the noticed topics.

7            THE WITNESS:  I don't remember.

8    BY MR. POLAK:

9        Q.    Have you used any handle other than

10   "WikiObjectivity" since April of this year to make edits

11   to Wikipedia pages?

12       A.    No, sir.

13       Q.    What about this year generally in 2024?

14       A.    I don't believe so.

15       Q.    What about in the last five years -- actually

16   since -- since COVID started in 2020, have you used any

17   other handle to make edits to Wikipedia pages?

18           MR. LINKE:  Objection as to form.  Objection as

19   being outside the scope of the noticed deposition

20   topics.

21           THE WITNESS:  Yeah, I really can't say.  I

22   don't remember every moment of every day.  And as I

23   said, I use Wikipedia a lot, so I'm trying to answer to

24   the best of my ability.  It's a very broad question.

25

Page 47

1    BY MR. POLAK:

2        Q.    If I wanted you to go on Wikipedia and identify

3    or find every handle you've ever used to make edits to

4    Wikipedia pages, where would you go?

5        A.    So I don't believe that there is a repository

6    of anybody making edits anywhere because you don't have

7    to be logged in.  And to that extent, you know, I'm not

8    a regular editor and I don't know what other accounts

9    and when I've used it, but if you ask me more specific

10   questions, I'd be happy to answer them.

11       Q.    What type of more specific question would I

12   need to ask you to get the information?

13       A.    Well, it would be something on those three

14   points that I prepared for today.  I'd be most able to

15   answer those.

16       Q.    Did you use any handle other than

17   "WikiObjectivity" to make edits to PTK's pages?

18       A.    No, sir.

19       Q.    You said that you could make edits to a

20   Wikipedia page without logging in.  Does that mean that

21   you wouldn't -- that any changes that you would make

22   would not be associated with a handle?

23       A.    I think to my knowledge, and I don't know that

24   I've ever done that, but to my knowledge, it would be

25   associated with an IP address and it's -- yeah, so it is

Page 48

1    associated with something.

2        Q.   Okay.  So I take from your answer, then, that

3    all of the changes that you made or edits that you made

4    to PTK's Wikipedia page were made under the handle

5    "WikiObjectivity" and not under any other handle or

6    anonymously through an IP address?

7            MR. LINKE:  Objection as to form.

8            THE WITNESS:  Yes, sir, that's correct.

9    BY MR. POLAK:

10       Q.   So I'd like you to walk me through the process

11   of making a change to a Wikipedia page.  What do you

12   have to do in order to -- to do that?

13       A.   I don't know that I can speak to the Wikipedia

14   experience for everybody, so I don't know what the

15   answer to your question would be as phrased.

16       Q.   Well, let's talk about how you do it.

17           If you want to make a change to a web -- I'm

18   sorry, I keep saying web page and that's not accurate.

19           If you want to make a change or an edit to an

20   existing Wikipedia page, how do you go about doing it?

21   Walk me through the process.

22       A.   My understanding, you would log into an

23   account, you would identify what needs to be changed.

24   You would make sure that you comply with Wikipedia's

25   pillars.  You would verify and find third-party

1    resources since this is an encyclopedia to verify the

2    edit.  You would explain the edit so that anybody can

3    understand it and you would submit it.  And that's my

4    understanding.

5        Q.    Are your edits that you make to a Wikipedia

6    page supposed to be biased or unbiased?

7            MR. LINKE:  Objection as to form.

8            THE WITNESS:  Well, I think, to the best of my

9    abilities, you know, it's been very important to try to

10   strive to be as unbiased as possible and also to trust

11   the editor process and the administrator process to

12   fact-check, make sure things are objective and to

13   streamline.

14           And to -- that's the backbone and the success

15   of Wikipedia is that it doesn't rely on any contributor,

16   it's, instead, a community.  And a community that is

17   knowledgable, that understands the community and that

18   contributes accordingly to the community and

19   self-monitors.

20           So I think that's, to my understanding, how

21   Wikipedia works, and that's why, you know, I strove to

22   give the most neutral edits that I could and accept any

23   edits that editors objectively made, and I think that's

24   why our -- my edits were largely thanked and awarded and

25   Dr. Tincher-Ladner's were banned, frankly, because

Page 50

1    they're in direct violation.

2    BY MR. POLAK:

3        Q.   Did you say that you won an award for your

4    edits to PTK's page?

5        A.   I believe that the award referenced was to

6    another page.

7        Q.   So if a jury or the Court read what you said a

8    second ago, that that is why you were awarded for your

9    work, you're not talking about an award that you got for

10   PTK's edits, right?

11       A.   Well, actually, in a way I was awarded for my

12   edits to the Wikipedia -- PTK Wikipedia and others

13   because I was asked to join the Wikipedia fraternities

14   and sororities editor group, which is a very exclusive

15   group.  There's only about 30 people in it, to my

16   knowledge.  And to be admitted into that circle is

17   recognition of the knowledge, authority, and objectivity

18   of the work that I'm doing.  So I would say that I was

19   awarded for my work.

20       Q.   I've heard you use the following words to

21   describe your efforts to edit PTK's Wikipedia page.

22   I've heard you say that you were "unbiased."  Is that

23   your understanding, that you were unbiased in your

24   edits?

25            MR. LINKE:  Objection as to form.

Page 51

```
 1          THE WITNESS:  So I wouldn't use the word
 2     "unbiased," but I would -- and Wikipedia explains that
 3     bias doesn't just occur, you know, from being a party,
 4     but it's in how you utilize it.  And by being a curator
 5     of a museum, by having probably the most subject
 6     knowledge of anybody in the general honor society space,
 7     I was able to contribute my knowledge to objectively
 8     enhance and verify information on the PTK page, but also
 9     numerous other pages.
10     BY MR. POLAK:
11          Q.   So you're saying you were biased, then?
12               I thought you said before that you were
13     unbiased, but now you said that you wouldn't use the
14     word "biased" or "unbiased," so which is it?  Were you
15     biased or were you unbiased?
16               MR. LINKE:  Objection as to form.
17               THE WITNESS:  So I'm very familiar with the way
18     you operate.  And you know, the way I answer that
19     question will be -- set up to be used against me either
20     way and, you know, this is just the way that you frame
21     your arguments.  But I think you can be both.  I
22     don't -- and Wikipedia allows you to contribute and, you
23     know, to add value and so I would say that the answer is
24     that I was less biased than any other resource that was
25     currently contributing.
```

Page 52

1    BY MR. POLAK:

2        Q.    So in your view, it is perfectly acceptable to

3    have some level of bias in making edits to Wikipedia

4    pages?

5        A.    I would say that we strive for the least amount

6    of bias as possible, and to that effect, I was working

7    towards that.

8            MR. POLAK:  Objection.  Nonresponsive.

9            Could you read the question back, please?

10            THE COURT REPORTER:  Yes.

11            (The question was read back.)

12            THE WITNESS:  Again, there's a relativism to

13    all statements.  Nobody is a zero in unbiased.

14    Everybody, whether you're a member of PTK or not invited

15    to PTK, whether you went to community college or didn't

16    go to community college, you have some level of bias.

17    And so lowering it from the 100 standard of the most

18    biased owner/operator of an organization is an

19    improvement.

20            And so to the extent possible, the job is

21    objectivity, that's the aim and the goal of Wikipedia,

22    and that's precisely and only what was done.

23            MR. POLAK:  Objection.  Nonresponsive.

24    BY MR. POLAK:

25        Q.    My question for you, Michael, was not that

Page 53

1    complicated.

2         I'm just asking you whether or not you believe

3    that it is consistent with Wikipedia's policy to make

4    edits even though those edits are, at some level,

5    biased?

6         MR. LINKE:  Objection as to form.

7         THE WITNESS:  We all have a duty to protect the

8    public, to protect students, and, you know, if my edits

9    are less biased, again, then it is in terms -- it is

10   within Wikipedia's terms, it's the difference of you

11   must not do something and you should not.  And we

12   changed a must not, which is Dr. Tincher-Ladner editing

13   the page in conjunction with her wife, to a should not,

14   which is a museum curator who has subject knowledge that

15   can help enhance the page's objectivity to add

16   verifiable and credible sources.

17        So I believe that's why I'm -- I was awarded

18   and recognized for our contribute -- my contributions to

19   Wikipedia within the honor society space.

20        MR. POLAK:  Objection.  Nonresponsive again.

21        Could you read the question back, Ms. Langgle?

22        THE COURT REPORTER:  Yes.

23         (The last question was read back.)

24        MR. LINKE:  Same objection.

25        THE WITNESS:  Yes, it is consistent with our

Page 54

1  policies as per their policies regarding conflict of

2  interest.

3  BY MR. POLAK:

4      Q.   And I think what you told me in a previous

5  answer was that you were just fine being biased in your

6  edits so long as it protects what your view is of what

7  is needed to protect children and students?

8          MR. LINKE:   Objection.

9  BY MR. POLAK:

10     Q.   In other words, the ends justifies the means;

11 is that what you're telling me?

12         MR. LINKE:   Objection as to form.

13         THE WITNESS:   I'm not really sure what you're

14 saying.  All I understand is that Wikipedia's meant to

15 be a neutral, objective platform and contributions I can

16 help verify that and make it a more trusted place and a

17 more objective place is the main goal.  And to that

18 extent, I pride myself on being able to be a contributor

19 and to help, you know, create an objective platform for

20 people to understand.

21 BY MR. POLAK:

22     Q.   Was it your intention to be neutral in the

23 edits that you made to PTK's Wikipedia page?

24         MR. LINKE:   Objection as to form.

25         THE WITNESS:   I think so.

Page 55

1  BY MR. POLAK:

2      Q.   You've also used another word saying that there

3  must be "objectivity" in the edits.  Do you recall that?

4      A.   I do.

5      Q.   Was it your expectation to be objective in the

6  edits that you made to PTK's Wikipedia site?

7      A.   I think --

8           MR. LINKE:  Objection as to form.

9           THE WITNESS:  Ultimately, Wikipedia and its

10  standards and its objectivity are determined by neutral

11  third parties.  And so to the extent possible, I would

12  like to contribute to that and I have no way of

13  contributing more than that.  And I think that Wikipedia

14  and their resulting treatment -- I mean, we're talking

15  about educated librarians and professionals viewing this

16  information, so it's not random people.  These are the

17  most knowledgeable -- subject knowledge people and they

18  accept what is objective.

19           If they feel it's not objective, they rewrite

20  it.  And if they feel that something is point-of-view

21  washing or vandalism, they remove it.

22           And so it's really not in my hands as much as

23  they like to be framed that way, I have no control over

24  Wikipedia and I just simply contribute and add and

25  people, administrators, decide.

Page 56

1    BY MR. POLAK:

2        Q.   So you don't try to be objective with your

3    edits?

4            MR. LINKE:  Objection as to form.

5            THE WITNESS:  I do aim to be objective.

6    BY MR. POLAK:

7        Q.   Okay.  So the answer to my question before,

8    beyond what else that you said in that answer, is that

9    you do try to be objective in your edits to PTK's

10   Wikipedia page.  That was the standard that you held

11   yourself to?

12       A.   The standard that I held myself to was to

13   contribute to the page and to allow the administrators

14   to do their job to determine objectivity.

15       Q.   So you didn't try to be objective?

16       A.   To the best of my ability.

17       Q.   What email account did you use to sign up for

18   "WikiObjectivity" as a handle?

19       A.   I believe it was a account that I had

20   previously.

21       Q.   Which was?

22       A.   It's a TomBradyFan email that I have, and I

23   used it for setting up the account.

24       Q.   So you used a personal email to sign up for

25   that account, not an Honor Society email?

Page 57

1          MR. LINKE:  Objection as to form.

2          THE WITNESS:  Wikipedia doesn't require email

3    addresses to begin with.

4    BY MR. POLAK:

5       Q.   Michael, this goes so much easier if you just

6    listen to the question I'm asking and you answer it the

7    way I've asked.  Okay?

8          I didn't ask you what Wikipedia requires, you

9    know that I didn't ask you what Wikipedia requires, so

10   I'm going to move to strike your answer because it

11   doesn't answer the question.  So now I'm going to ask it

12   again.

13         MR. POLAK:  Ms. Langgle, could you read the

14   question back, please?

15         THE COURT REPORTER:  Yes.

16         (The last question was read back.)

17         THE WITNESS:  I don't know if I'm qualified to

18   judge whether it's a personal email or not personal

19   email.  It's an email that I used.

20   BY MR. POLAK:

21      Q.   Okay.  Is that because you do use, from time to

22   time, that TomBrady email that you're referring to for

23   Honor Society business?

24      A.   Well, it's used for Wikipedia edits in the

25   honor society space.

Page 58

1      Q.   So the answer is yes, you do use it for
2   Honor Society business?
3           MR. LINKE:  Objection as to form.
4           THE WITNESS:  I don't know if that would be
5   qualified as Honor Society business.
6   BY MR. POLAK:
7      Q.   Okay.  Well, you told me before you were unable
8   to distinguish what was Honor Society business versus
9   your personal use in connection with that email and
10  that's what I'm trying to get at.
11          So is that an email that you use for
12  Honor Society business or is it not an email that you
13  use for Honor Society business?
14          MR. LINKE:  Objection as to form.
15          THE WITNESS:  The only use case that it was
16  used for was for Wikipedia and so I don't know how to
17  answer more than that.
18  BY MR. POLAK:
19     Q.   You have used some other terms that I want to
20  ask about in terms of Wikipedia.
21          One is the word "administrator."  What do you
22  mean when you say that?
23     A.   So my knowledge, there are administrators that
24  kind of have power over the pages and the users, and so
25  my understanding is they're administrators in place such

Page 59

1   as Rublamb, who is a 35-year-old -- 35-year history of

2   being a librarian and historian, he or she seems to be

3   the administrator.  I don't know who they are other than

4   just clicking their about page and they would have the

5   absolute discretion, to my knowledge, on the page.

6        Q.   "Rublamb" is a handle just like

7   "WikiObjectivity" is a handle?

8        A.   That is correct.

9        Q.   And I think we've seen Rublamb on -- on the

10  history page for PTK's Wikipedia page, right?

11       A.   I believe so.

12       Q.   Have you had any -- well, do you communicate

13  with this person who goes by the handle "Rublamb"?

14       A.   So to the best of my knowledge, that individual

15  awarded me the original barnstar -- barnstar award and I

16  thanked that person for recognizing my contributions and

17  that individual invited me to join the group of Wiki

18  fraternity and sorority editors acknowledging my work

19  and the value of my work and I thanked that individual

20  for recognizing me there as well and that's the extent

21  to which I engaged with this individual.

22       Q.   So the answer to my question of whether you

23  communicate with them is yes?

24       A.   I just gave you the most specific answer I

25  possibly could.

1      Q.   Not really.  But I just want to make sure the

2   record is clear.

3           Is the answer to my question, yes?

4      A.   The answer is when Rublamb gave me an original

5   barnstar award, I thanked the individual.  When they

6   added me to the Wikipedia fraternity and sorority

7   exclusive page, I also thank you'd the individual and

8   accepted my invitation, and that's the extent to which I

9   have spoken to this individual.

10      Q.   So you've actually spoken with Rublamb?

11      A.   That's the extent to which I have spoken on

12   Wikipedia in typing format to the said person.

13      Q.   Have you ever spoken orally to Rublamb using

14   words coming out of your mouth?

15      A.   No, sir.

16      Q.   Have you ever emailed this Rublamb person?

17      A.   I believe that Wikipedia does email the

18   individual when you write to them, so --

19      Q.   How is it -- how is it that you write to them

20   through Wikipedia?

21      A.   It would be on -- commenting on their --

22   whatever they wrote to me.

23      Q.   If I went on the Wikipedia, would I be able to

24   see all of those communications?

25           MR. LINKE:  Objection as to form.

Page 61

1            THE WITNESS:  I believe so.  I'm not sure.  I

2      would have to check for you.

3      BY MR. POLAK:

4         Q.   Are there any communications you've had with

5      Rublamb that are not publicly available?

6            MR. LINKE:  Objection as to form.

7            THE WITNESS:  I would have to check on that as

8      well.  I don't know of any.

9            MR. POLAK:  And Madam Court Reporter, Rublamb

10     is R-o-b-l-a-m.

11            Is that right?

12            MR. LINKE:  It's R-u-b-l-a-m-b.

13            MR. POLAK:  Rublamb, R-u-b-l-a-m-b, okay.

14     BY MR. POLAK:

15        Q.   How do you know this person has been a 35-year

16     librarian?

17        A.   Again, as I mentioned, it's simply based on

18     their Wikipedia profile as well as the immense number of

19     awards from Wikipedia that this person has won.  So I

20     have not investigated Rublamb.  I do know that when you

21     click on their page, they have a myriad of awards and

22     are a highly decorated Wikipedia administrator and

23     that's verifiable publicly and so that's the only extent

24     which I know who or what Rublamb is.

25        Q.   Do you have a phone number for this Rublamb?

Page 62

1      A.    No, sir.

2      Q.    Do you have a name?

3      A.    I don't believe I've seen a name, sir, it's

4  just what's on their Wikipedia page.

5      Q.    Have you ever texted him or her?

6      A.    I have no idea who Rublamb is.

7      Q.    Are you familiar with someone that goes by the

8  handle "Anomi"- -- I'm sorry, "Anomiebot,"

9  A-n-o-m-i-e-b-o-t?

10     A.    Well, to my knowledge, the term "bot" would

11  imply that it's an automated feature.  I don't have any

12  more knowledge than that and I've not communicated with

13  him.

14     Q.    So the answer to my question is you haven't had

15  any -- you don't know who that person is?  You haven't

16  had any communications?

17     A.    That's correct.

18     Q.    Do you know anything about a greenC, space,

19  bot, green, capital letter C, bot?

20     A.    No, sir, nothing that wouldn't be publicly

21  viewable to all of us.

22     Q.    You ever had any communications with that

23  person?

24     A.    I don't believe so, no, sir.

25     Q.    Another user by the name of Jax MN, J-a-x M-N,

Page 63

```
 1   like the abbreviation for Minnesota.

 2          Have you had any communications with that

 3   person?

 4      A.   I don't believe so.  I've just read their

 5   Wikipedia page.

 6      Q.   You've looked at their Wikipedia page?

 7      A.   That is right.

 8      Q.   What do you know about their Wikipedia page?

 9      A.   I believe that they have won some award and

10   they're located in Minnesota.  Or actually, I'm not even

11   sure they're located in Minnesota.  I do know that they

12   acknowledge having some tie to Minnesota at some time,

13   that's my recollection.

14      Q.   Are you aware of any edits they made to PTK's

15   Wikipedia page?

16      A.   Not specifically.

17      Q.   Same question for greenC bot?

18      A.   No, not specifically.

19      Q.   Same question for Anomiebot?

20      A.   No, not specifically.

21      Q.   Are you familiar with a handle or a person that

22   goes by the handle "DaveMCK," D-a-v-e-M-C-K, all one

23   word?

24      A.   I'm not sure, but I believe I saw that account

25   last night for the first time if I remember correctly,
```

Page 64

1  so that's the only subject knowledge I have there.

2      Q.   Are you aware of any edits that person made to

3  PTK's Wikipedia page?

4      A.   I'm not sure that I remember the edits, but I

5  believe, I believe, that -- and this is my best guess --

6  that that is the individual who added -- just added on

7  September 26th, 27th, and 28th, so in the past five

8  days, some verifiability to help verify some claims made

9  by PTK such as the notable members which didn't exist

10  before.

11      Q.   Another user name -- well, I'm sorry, going

12  back to DaveMCK, have you had any communications with

13  that person?

14      A.   No, sir.

15      Q.   Another user name, "Headbomb," H-e-a-d-b-o-m-b.

16  Are you aware of any edits that person made to the PTK's

17  Wikipedia page?

18      A.   I'm not.

19      Q.   Have you had any communications with that

20  person?

21      A.   No, sir.

22      Q.   Another user name, "Citation Bot,"

23  C-i-t-a-t-i-o-n Bot.  Are you familiar with any edits

24  that person made to the PTK Wikipedia page?

25      A.   I would only be speculating, but I believe the

Page 65

1    Citation Bot is a bot that is meant to improve or edit
2    citations.  And I believe I saw that, but that's all
3    that I know.
4        Q.   Any of these people that I've just listed here,
5    do you know whether they are administrators for
6    Wikipedia?
7             MR. LINKE:  Objection as to form.
8             THE WITNESS:  I don't have any knowledge to
9    that.
10   BY MR. POLAK:
11       Q.   Are you an administrator?
12       A.   No, sir.
13       Q.   Other than Rublamb, are you aware of any other
14   administrator with responsibility for the PTK Wikipedia
15   page?
16       A.   Well, it seems like View Mom Viking who had to
17   deal with the vandalism of PTK, both Coralreef78 which
18   seems to be Courtney Lane's account, which is
19   Lynn Tincher-Ladner's wife, followed by --
20             THE COURT REPORTER:  I'm sorry, by whose wife?
21             THE WITNESS:  Dr. Lynn Tincher-Ladner.
22             THE COURT REPORTER:  Okay.
23             THE WITNESS:  Followed by "MakeMyDay1918,"
24   which admittedly is the account -- self-admittedly of
25   Dr. Tincher-Ladner.

Page 66

1          I understand that View Mom Viking may be an

2     administrator as well because they made their

3     independent decision to deal with the issues and what

4     they characterize, I believe, as point-of-view washing

5     and vandalism, and so I believe, to my understanding,

6     that person may be an administrator as well.

7     BY MR. POLAK:

8          Q.   How do you know that Coralreef is associated

9     with Courtney Lange?

10         A.   I would say that it's upon belief, and

11    discovery will answer that definitively, but it's my

12    understanding and belief that she's born in 1978 and

13    that would highly tie to her being Coralreef78.

14         Q.   Any other basis?

15         A.   I think discovery will show that.  I don't know

16    the rest.

17         Q.   So you have no other basis other than the fact

18    it has 78 in the name?

19         A.   Well, also Dr. Lynn referring to her employees,

20    one of which is her own wife, which is a conflict of

21    interest of a public charity, but nevertheless, we're

22    not here to discuss that and I'm trying stay on topic

23    here, that is my basis.  Yes.

24              MR. POLAK:  Move to strike.

25              Could you read the question back, please?

Page 67

```
 1              THE COURT REPORTER:  Yes.

 2                 (The last question was read back.)

 3              THE WITNESS:  That, and the fact that

 4    Courtney Lange is an employee of PTK, which

 5    Dr. Tincher-Ladner admitted that an employee made those

 6    edits are the main basis of my claim.

 7    BY MR. POLAK:

 8         Q.    Do you have any secondary bases?

 9         A.    At this time, those are my bases.

10         Q.    Have you had any communications with Wikipedia

11    over who owns the Coralreef handle?

12         A.    I don't believe so, no, sir.

13         Q.    How do you know MakeMyDay1918 is

14    Dr. Tincher-Ladner's account?

15         A.    Well, that's -- if I were to take her

16    declaration as truthful, then that's how I would make

17    that basis, based on her declaration.

18         Q.    You used the term "washing."  What does that

19    mean?

20         A.    It's a term that a Wikipedia administrator used

21    to describe the changes by PTK.  Whether it's a PTK

22    employee, whoever it may be, it's essentially, you know,

23    understood as point-of-view washing.  So that would mean

24    pushing a one-sided agenda that could also knowingly be

25    false or misguided.  And that's -- again, that's the
```

Page 68

1    term that a Wikipedia administrator used themselves.

2          I -- I don't have anything wrong with PTK or

3    Dr. Lynn Tincher-Ladner.  I just want peace and

4    protection for students, and I think we can go a long

5    way by talking.  You know, we haven't had a chance to

6    speak in two-and-a-half years and that is, you know,

7    something that I seek, to open up dialogue, and I'm

8    always available for a conversation and, you know, I --

9    I -- I think that's the best way to, you know, handle

10   and bring this to an end.

11         MR. POLAK:  Objection.  Nonresponsive as to

12   nearly all of that.  I can't remember when it started,

13   but -- but the bulk of that answer was nonresponsive.

14   BY MR. POLAK:

15      Q.   And Michael, again, I've got a lot to go

16   through with you here today.  You can try to shove

17   whatever you want to try to shove at these answers that

18   aren't responsive to my questions, but I will go get

19   more time if I need to, okay?  I just want to make you

20   aware.

21      A.   Yes, sir.

22      Q.   Okay.  This isn't the time to be talking about

23   settling.

24         Did we lose you?

25      A.   There we go.

Page 69

1      Q.   You used -- well, this definition of "washing"

2   that you gave me.  Is that -- can that definition be

3   found somewhere at Wikipedia?

4           I'm not asking you to go find it, I'm just

5   asking you whether it can be found.

6      A.   I'm not the original user of that term, and I

7   don't know where that person got that term from.

8      Q.   Is it your understanding that engaging in

9   washing, as you've defined it on Wikipedia, is

10  inappropriate or appropriate under Wikipedia's rules?

11     A.   Well, to my understanding, that administrator

12  found the actions of Coralreef78, MakeMyDay1918, to be

13  that term, point-of-view washing, and that's all I know

14  about that.

15     Q.   Have you ever disclosed to any moderator for

16  the PTK Wikipedia site that you are the executive

17  director for Honor Society?

18     A.   Well, I think my page describes that I'm here

19  to help mitigate offering bias in the honor society

20  space and does opine on those values.  I would be happy

21  to disclose that and -- yeah.

22           MR. POLAK:  Objection.  Nonresponsive.

23           Can you read the question back, please,

24  Ms. Langgle?

25           THE COURT REPORTER:  Yes.

1          (The last question was read back.)

2          THE WITNESS:  I would be happy to.  I don't

3     believe that I have yet and I don't believe that I've

4     been asked to.

5     BY MR. POLAK:

6        Q.   But you definitely never volunteered it, have

7     you?

8        A.   Well, I volunteered a mission statement for the

9     page that was very similar to the mission of

10    Honor Society.

11         MR. POLAK:  Objection.  Nonresponsive.

12         Can you read the question back, please,

13    Ms. Langgle?

14         THE COURT REPORTER:  Yes.

15         MR. POLAK:  We're going to do this all day,

16    Michael.

17          (The last question was read back.)

18         THE WITNESS:  I volunteered a statement that

19    was similar to the values of Honor Society, and that's

20    the extent to which I volunteered any information.

21         MR. POLAK:  Objection.  Nonresponsive.

22         Please ask -- please read the question to him a

23    third time.  Hopefully he'll answer it this time.

24         THE COURT REPORTER:  Okay.

25          (The last question was read back.)

Page 71

1          THE WITNESS:  My answer is the same as the last

2     two answers, they responded to that question.

3          MR. POLAK:  Objection.  Nonresponsive.

4     BY MR. POLAK:

5        Q.    My question is whether you ever volunteered

6     that you were the executive director for Honor Society

7     to any moderator for the Wikipedia PTK page?

8        A.    I volunteered that statement.

9        Q.    That's not what I asked you, Michael.

10          MR. POLAK:  So objection.  Move to strike.

11     BY MR. POLAK:

12        Q.    Did you ever volunteer to any moderator that

13     you were the executive director of Honor Society?

14        A.    I'm going to use the restroom soon, so I don't

15     know --

16        Q.    Answer the question, Michael.

17        A.    I simply volunteered the statement on the about

18     page as to my background.

19          MR. POLAK:  Objection.  Nonresponsive.

20     BY MR. POLAK:

21        Q.    I'll ask it now, I think, a seventh time, might

22     be sixth, I'm losing count.

23          Did you ever volunteer to any moderator of the

24     PTK Wikipedia page that you were the executive director

25     of Honor Society?

Page 72

1    A.   Sir, to the best of my ability, I've answered

2 that question and I'll answer it again that I have only

3 volunteered what was on that page and that is what I

4 volunteered.

5    Q.   So is the answer no, you have never volunteered

6 to any moderator that you were the executive director of

7 Honor Society?

8    A.   I haven't volunteered that I'm the curator of

9 the Honor Society museum, nor the executive director of

10 Honor Society nor any of these.

11         Although, you know, being in the cultural

12 sector, I would find that to be relevant and I would

13 disclose that.  I don't have an issue with that.

14         MR. POLAK:  Object to the last half of that

15 answer as being nonresponsive.

16         THE WITNESS:  Okay.

17         MR. POLAK:  Do you need to take a break,

18 Mr. Moradian?

19         THE WITNESS:  Yes.

20         MR. POLAK:  Okay.  We'll take a 10 minute

21 break.

22         VIDEOGRAPHER:  Okay.  Stand by.

23         This marks the end of Media No. 2.  Going off

24 the record at 12:42 p.m. Pacific.

25         (Off the record at 12:42 p.m.)

Page 73

1          (Back on the record at 1:06 p.m.)

2          VIDEOGRAPHER:  We are back on the record at

3     1:06 p.m. Pacific, and this marks the beginning of

4     Media No. 3, deposition of Michael Moradian.

5          Please proceed, Counsel.

6     BY MR. POLAK:

7     Q.    You created the Wikipedia -- "WikiObjectivity."

8     Let me scratch that question, make sure it's clean.

9          You created the "WikiObjectivity" user name

10    specifically with the intention of editing PTK's

11    Wikipedia page under that handle, right?

12    A.    Well -- no, I wouldn't say that's a correct

13    characterization.  And I -- I think that, you know,

14    we -- the page had a description of what it does and it,

15    you know, contributes to editing and creating five new

16    Wikipedia pages, I believe, and editing about 60 of

17    them, and so PTK, to that extent, is just, you know, one

18    of probably 60 pages that this account touched.

19    Q.    The first edit, though, that was made with the

20    "WikiObjectivity" user name was PTK's Wikipedia page,

21    right?

22    A.    I believe that was just a cursory mark of this

23    may contain advertising, it is a rather standard

24    designation that people give articles.

25    Q.    You created the "WikiObjectivity" user name on

Page 74

1    April 16, 2024, right?

2        A.    Yes, I believe that's right.

3        Q.    How soon after April 16, 2024, did you make any

4    edits to any Wikipedia page other than PTK's?

5        A.    Well, I believe it was pretty quickly, so --

6        Q.    Which one --

7        A.    Excuse me?

8        Q.    Which one was it?

9        A.    I think the creation of the Bouchet Graduate

10   Honor Society, which is a tremendous inclusive honor

11   society, came around that time.  That's one that got the

12   original barnstar award.

13          There was the Honor Society caucus page that

14   didn't exist, but, you know, was a big part of honor

15   society space history.  There was the page on the

16   Ku Klux Klan Honor Society, and I think all of those

17   kind of came in conjunction.

18          It's basically about, you know, identifying an

19   issue and contributing towards the partying facts,

20   objective, truths, verifiable analysis to those fields.

21       Q.    But you've been using Wikipedia and making

22   edits to Wikipedia since the early 2000s.  Why did you

23   wait until April 16 of 2024 to create this

24   "WikiObjectivity" user name?

25       A.    Sure, I think that's a good question.

1          I think that, you know, I'm running an

2    organization, I'm very busy in my own duties, I have a

3    family.  I'm not a Wikipedia editor by trade and, you

4    know, it -- I like to live by the philosophy of live and

5    let live, and that's how we've largely viewed Phi Theta

6    Kappa, you know.  I never had an issue with Don nor

7    Dr. Lynn Tincher-Ladner, so I never really had a reason

8    to look into or edit or fact-check Wikipedia.

9          But, at the same time, when you're, you know,

10   dragged into a lawsuit and not that that's the main

11   contributor, but it does open your eyes to look at

12   things.  You know, if -- I wouldn't, for example,

13   research you as an individual, I would have no reason

14   to, but, you know, now that we've become best buds and

15   we're talking on the regular, I would say that I've

16   googled your name and -- to learn more about it.

17          Now, if you had said something that was

18   egregiously false on Wikipedia, then it would be the

19   duty -- I didn't know you or it before, but once I

20   become aware of it, it is our duty, once you're aware,

21   to add context, add information to help make the page

22   more objective.

23   Q.   Well, let's talk about the other things that

24   were happening around that time.

25          In late February, early March, you and your

Page 76

1    organization issued a survey called the Community

2    College Survey, right?

3        A.    Community College Honor Society Survey, that's

4    correct.

5        Q.    And that survey continued to be used up through

6    mid-March, correct?

7        A.    Through and beyond, yes.

8        Q.    Is that same survey in some -- a reduced

9    portion of that survey continues to be in effect now,

10   right?

11       A.    That is right.

12       Q.    So with respect to the survey as it existed

13   back in March of this year, you recall that we had to go

14   to court to get an injunction against your use of that

15   survey, right?

16       A.    I recall reading the injunction, and I don't

17   believe that it was against using surveys.  It was

18   specifically on a couple of questions narrowly tailored

19   to that point and we complied to the T.

20       Q.    And one of those questions that the Court

21   enjoined you from using related to a question concerning

22   Rod Risley and the sexual harassment allegations, right?

23            MR. LINKE:  Objection as to form.

24            THE WITNESS:  I believe one of the questions

25   did involve that, that's right.

Page 77

1    BY MR. POLAK:

2        Q.    And another one of the questions that the Court

3    enjoined you from doing was -- it involved a

4    embezzlement claim at Itawamba College, right?

5            MR. LINKE:  Objection as to form.

6            THE WITNESS:  Injunction narrowly referred to

7    that survey question, that is correct.

8    BY MR. POLAK:

9        Q.    And you do recall that the Court found those

10   questions in combination with other questions that were

11   the subject of the injunction to be, in the Court's

12   word, "malicious"?

13       A.    Can you repeat that?

14       Q.    You do recall that Judge Reeves found those

15   questions concerning Itawamba College and Rod Risley and

16   some of the other questions to be malicious against PTK?

17       A.    I believe you're conflating things, but yes,

18   the survey questions, narrowly tailored, were -- may

19   have contained that language.

20       Q.    Well, I didn't ask you that, we already

21   established that the questions contained those topics.

22            My question to you is that you do recall that

23   Judge Reeves called your use of those questions in the

24   survey to be malicious?

25       A.    I didn't study that in preparation for today

Page 78

1    and these three topics, so I'm just trying to answer to

2    the best of my ability.

3        Q.   Have you forgotten that Judge Reeves identified

4    your conduct in connection with this survey to be

5    malicious?

6        A.   I -- I don't understand why you're talking like

7    that.  I think you can talk in normal tone and I will

8    get the question.

9        Q.   You can just answer my question, Mr. Moradian.

10            Have you forgotten that Judge Reeves found your

11   conduct as to this survey to be malicious?

12            MR. LINKE:  Objection as to form.

13            THE WITNESS:  I highly respect Judge Reeves and

14   the court and respect what they wrote, and I have read

15   it and I acknowledge that I have read it and to --

16   BY MR. POLAK:

17       Q.   Not my question.  Not my question.  So I'll ask

18   it, I guess, a third time now, Mr. Moradian.

19            Have you forgotten that Judge Reeves called

20   your conduct in connection with this survey and those

21   questions in particular to be malicious?

22            MR. LINKE:  Objection as to form.

23            THE WITNESS:  Sir, I have not forgotten what

24   Judge Reeves said and I hold those close to me.

25

Page 79

1    BY MR. POLAK:

2         Q.    So you have not forgotten that Judge Reeves

3    called your conduct malicious in connection with this

4    survey?

5              MR. LINKE:  Objection as to form.

6              THE WITNESS:  I would have to read that

7    characterization or the quote again to confirm what

8    you're saying.  I'm just doing the best I can given what

9    I know.

10   BY MR. POLAK:

11        Q.    So apparently you have forgotten.

12             If he used that term, you have forgotten that

13   he used that term in connection with this order?

14             MR. LINKE:  Objection as to form.

15             THE WITNESS:  Well, you're asking, you know,

16   very broad things and then very narrow things and

17   switching around, but I'm trying to give you the best

18   and most truthful answer that I can.

19   BY MR. POLAK:

20        Q.    And I would appreciate a truthful answer in

21   response to my question, so I'll ask it again.

22             It sounds to me that sitting here today you

23   cannot recall whether Judge Reeves used the word

24   "malicious" to describe your conduct with regard to that

25   survey.

Page 80

1          MR. LINKE:  Objection as to form.

2          THE WITNESS:  No, sir, I have not forgotten

3    what Judge Reeves said.

4    BY MR. POLAK:

5       Q.   So you do remember him calling your conduct

6    malicious in connection with the survey?

7          MR. LINKE:  Objection as to form.

8          THE WITNESS:  I believe so.

9    BY MR. POLAK:

10      Q.   And that order was entered on March 28, right?

11      A.   I will take your statement as truth.

12      Q.   Okay.  So you also filed your counterclaims

13   against PTK on -- or amended counterclaims against PTK

14   where you asserted these new claims concerning false

15   advertising, defamation, tortious interference,

16   antitrust on April 10th, 2024, right?

17      A.   I will take your statement as true.

18      Q.   Okay.  So I just -- I'm trying to put in

19   context here so I understand the timing of your creation

20   of the "WikiObjectivity" user name.

21          That was done on April 16, we've already

22   established that, right?

23      A.   Yes, sir, I believe so.

24      Q.   And within the four-week period before that,

25   you issued a malicious survey, you got caught issuing a

Page 81

1     malicious survey, the judge enjoined you from sending

2     the malicious survey, and you amended counterclaims to

3     greatly broaden the scope of claims in this suit, right?

4                MR. LINKE:  Objection as to form.

5                THE WITNESS:  I'm not a lawyer and I haven't

6     reviewed the whole docket in preparation of this, but I

7     will take your statements at face value.

8     BY MR. POLAK:

9        Q.    So it's in that context that you want

10    Judge Reeves to believe that you created the

11    "WikiObjectivity" user name because at that point in

12    time you were just ready to start commenting to the

13    world on your knowledge about Honor Society?

14       A.    Well, this is important.  You can litigate or

15    you can lie, but to litigate and lie at the same time,

16    it becomes problematic.  And what we're seeing from PTK

17    is, on one hand, aggressively litigate, don't even speak

18    to a party; on the other hand, boldface lie.

19                Now, I don't run Wikipedia, I don't own

20    Wikipedia.  Wikipedia is a nonprofit and runs itself

21    accordingly, so to the -- I am not -- you know, there's

22    nothing I can add to Wikipedia that if its -- if its

23    authorities, if its administrators found nontruthful

24    would be removed immediately and I would be banned, but

25    you cannot sit here and say that at the same time PTK is

Page 82

```
1    entitled to litigate and lie, you know?

2           And that's essentially what you're saying, that

3    you -- that you -- you know, PTK deserves that license

4    to lie.

5           MR. POLAK:  Objection.  Nonresponsive.

6           Ms. Langgle, could you reread the question for

7    the witness so he may understand it and answer it?

8           THE COURT REPORTER:  Yes.

9             (The last question was read back.)

10          THE WITNESS:  What part of my answer did -- did

11   you --

12   BY MR. POLAK:

13      Q.   Mr. Moradian, just answer the question.  You

14   didn't answer it.

15          I gave you the context of the weeks leading up

16   to April 16 when you created "WikiObjectivity" and my

17   understanding is your testimony here today is that you

18   intended to create "WikiObjectivity" so that you could

19   impart upon the world your vast knowledge to the world

20   about honor societies.

21          Is that what you want Judge Reeves to believe,

22   is that that was your purpose even though in the weeks

23   preceding, you had issued a malicious survey, you had

24   been caught issuing a malicious survey, Judge Reeves

25   enjoined you from issuing that malicious survey further
```

Page 83

1    and you asserted broad counterclaims just a week prior

2    in this lawsuit?

3        A.    I'm not sure that's a question, I'm just

4    hearing a statement.

5        Q.    I'm not going to argue with you, it is a

6    question.  Let's -- let's step back.

7            It is true, isn't it, that you want

8    Judge Reeves to believe that you created the

9    "WikiObjectivity" user name solely so that you could

10   impart upon the world your knowledge of honor societies?

11       A.    I would want to be conveyed that you can only

12   impact -- you can only make change to something that you

13   know about.  If you don't know about it, you can't say

14   something about it, and so the circumstances that cause

15   you to learn or know about something is independent of

16   what you've learned.  Once you've learned it, you have a

17   duty to deal with it.

18           And I would say to Judge Reeves or any

19   interested party that leaders can come from anywhere.

20   Heros can come from anywhere.  Just because you're

21   litigated does not mean you cannot stand up for the

22   rights of students and for the general public.  Facts

23   are facts and Wikipedia arbitrates and determines that

24   and these are their determinations, not mine.

25       Q.    When is it that you first learned of

Page 84

1    Rod Risley's allegations against him?

2            MR. LINKE:  Objection as to form.

3            THE WITNESS:  Well, considering that I was

4    executive director of Honor Society when that happened,

5    I believe I heard about it as it happened.

6    BY MR. POLAK:

7        Q.   And that happened back in what?  What year?

8        A.   2015.

9        Q.   So you had 2015, 2016, 2017, 2018, 2019, 2020,

10   2021, 2022, 2023, and the first three months of 2024 to

11   create edits to PTK's page, correct?

12           Simple yes-or-no question, Mr. Moradian.

13           You had the opportunity to make edits to PTK's

14   Wikipedia page in those years, correct?

15       A.   Look, victims of sexual abuse can come out at

16   any time and speak out at any time.  There is no, you

17   know, it has to be --

18       Q.   Mr. Moradian, you are not a victim of sexual

19   abuse or harassment.  These are not your claims.  That

20   is nowhere near responsive to the question I asked you,

21   so I would ask you to please, please, listen to the

22   question I'm asking you and answer the question.

23           I gave a broad range of years, going all the

24   way back to 2015, so I'm going to ask it again.

25           You had the opportunity because you had the

Page 85

 1    knowledge of these allegations to make edits to PTK's

 2    page all the way back since 2015, but you chose not to

 3    do so, right?

 4         A.   Again --

 5              MR. LINKE:  Objection as to form.

 6              THE WITNESS:  -- this is important and I want

 7    to be heard.

 8              If a victim of sexual abuse comes out a decade

 9    later and speaks to you, you can be an ally of that

10    victim.  This is not, you know, a granular thing here.

11    People from 30, 40, 50 years ago are getting their

12    moments today and the fact that you can't acknowledge

13    these women's pain and what they've gone through as a

14    result of PTK and its leadership is indicative of the

15    issue.  This is the issue that we're dealing with.

16              It's a broad-based coverup and you are the main

17    proponent of that.

18    BY MR. POLAK:

19         Q.   How can it be a coverup if the articles that

20    you cited to the edits that you made to the PTK page

21    existed from 2015 and 2016?

22         A.   Well --

23              MR. LINKE:  Objection as to form.

24              THE WITNESS:  -- the fact that you're using the

25    legal system to quash discourse of known, truthful, and

1   verifiable facts, and you're stepping on freedom of

2   speech, expression, that is exactly the issue here.

3          You know, I didn't make these articles, I had

4   nothing to do with them, but they should be weighed as

5   appropriate, you know, to any argument or discussion.

6          You know, Golden Key Honor Society has a

7   section exactly like this, and I didn't deal with that,

8   but that's their halo, and this is PTK's, and so --

9   BY MR. POLAK:

10     Q.   Let's go back -- let's go back to my question.

11          If you knew about these sexual harassment

12   allegations in 2015, why didn't you edit PTK's page

13   then?

14          MR. LINKE:  Objection as to form.

15          THE WITNESS:  I didn't know these individuals

16   personally at that time, I didn't know their stories.

17   And this is just one story upon, you know -- one day, so

18   I wouldn't necessarily, you know -- I think what you're

19   missing is that we're a friendly organization and we're

20   not looking to hurt anybody.  You know, this is not

21   about -- I wouldn't go around saying ill about anybody,

22   that's just not my nature.

23   BY MR. POLAK:

24     Q.   When is it -- when is it that these women

25   approached you to tell you their story?

Page 87

1          I'm sorry, that's not correct.

2          When is it that these women were approached by

3    you to tell their story?

4          MR. LINKE:  Objection as to form.

5          THE WITNESS:  I think we've discussed this in

6    depth in earlier depositions, but it was within the

7    course of the last two years.

8    BY MR. POLAK:

9       Q.   All right.  So you knew about it in 2022, but

10   you made no edits, right?

11      A.   Sir, are you --

12          MR. LINKE:  Objection as to form.

13   BY MR. POLAK:

14      Q.   Just answer the questions, Mr. Moradian.

15      A.   I'm not allowed to discuss a woman's sexual

16   misconduct when she discusses it, is that what you're

17   saying?

18      Q.   Mr. Moradian, this goes so much better when

19   you'd just answer the questions that I'm asking.  Rather

20   than trying to argue with me at every turn or not answer

21   the question at all.  So I'm going to ask it again.

22          It is true, isn't it, that you knew -- you had

23   already contacted these women in 2022, but you made no

24   edits to PTK's page at that time?

25          MR. LINKE:  Objection as to form.

Page 88

```
 1              THE WITNESS:  That is true.
 2   BY MR. POLAK:
 3      Q.   Okay.  I didn't ask you why.  I didn't ask you
 4   why.  I just asked you whether it was true.
 5              So you also knew in 2023 and you made no edits
 6   to PTK's Wikipedia page, right?
 7              MR. LINKE:  Objection as to form.
 8              THE WITNESS:  This litigation is not my whole
 9   life.  I don't sit around thinking about this every day,
10   so I don't think that, you know, I -- that is relevant.
11              MR. POLAK:  Object.  Nonresponsive.  Ask the
12   question again.
13   BY MR. POLAK:
14      Q.   You knew about it in 2023, Mr. Moradian, and
15   you didn't make any edits to PTK's page then either, did
16   you?
17              MR. LINKE:  Objection as to form.
18              THE WITNESS:  I don't believe so.
19   BY MR. POLAK:
20      Q.   Okay.  You waited until the judge found you to
21   have engaged in a malicious effort to tortiously
22   interfere in PTK's activities through this survey and
23   after you made these broad-based counterclaims to go and
24   mess with PTK's Wikipedia page, right?
25              MR. LINKE:  Objection as to form.
```

Page 89

1              THE WITNESS:  May you please repeat that?

2              MR. POLAK:  You can read it back, Ms. Langgle.

3              THE COURT REPORTER:  Okay.

4              (The last question was read back.)

5              THE WITNESS:  There's a lot to unpack there.

6              Firstly, I dispute the characterization of

7     "mess."  I wouldn't -- I wouldn't use that word "mess,"

8     but to the extent that, you know, we added objective

9     information or enhanced the page, I wouldn't say there's

10    any relation to -- you know -- I mean, you're drawing

11    lines to places that I've never even heard or thought

12    about.

13             The preliminary injunction was about a survey,

14    and that was well established.  You know, these facts

15    are on the internet.  They're there.  I didn't make this

16    up.

17             And Wikipedia is a forum for that, for notable,

18    verifiable, objective information.  So I don't really,

19    you know, follow the implications that you're trying to,

20    you know, cast on me.  I think it's extremely a stretch.

21             MR. POLAK:  Objection.  Nonresponsive.

22    BY MR. POLAK:

23        Q.   You used the word "administrator" before for

24    Wikipedia.  Are you familiar with the term "moderator"?

25        A.   I believe I've heard that word before.

Page 90

```
 1       Q.   Is a moderator different than an administrator

 2   on Wikipedia?

 3       A.   I believe there are slight differences, but I'm

 4   not an expert and I couldn't advise you on the

 5   differences.

 6       Q.   Are you a novice editor?

 7       A.   Well --

 8       Q.   Okay.  Let me -- let me ask this differently.

 9            Are you aware that there are different levels

10   of editors for content on Wikipedia?

11       A.   I believe so.

12       Q.   One of these is called a Novice Editor, capital

13   N, capital E, right?

14       A.   I'm not sure.

15       Q.   Do you know whether you are considered a

16   Novice Editor?

17       A.   I have no idea what the Wikipedia

18   classifications are.

19       Q.   I'm going to read to you some of these other

20   classifications, and I'm going to ask you whether you

21   have achieved a status of these levels.

22            The first one is Apprentice Editor.

23       A.   I have no idea.

24       Q.   Journeyman Editor?

25       A.   Same answer.
```

Page 91

1      Q.    Yeoman Editor?

2      A.    Same answer.

3      Q.    Experienced Editor?

4      A.    Same answer.

5      Q.    Senior Editor 1?

6      A.    Same answer.

7      Q.    And Senior Editor 2?

8      A.    Same answer.

9      Q.    Senior Editor 3?

10     A.    Same answer.

11     Q.    Master Editor 1?

12     A.    Same answer.

13     Q.    Master Editor 2?

14     A.    Same.

15     Q.    Master Editor 3?

16     A.    Same.

17     Q.    Grand Master Editor?

18     A.    Same.

19     Q.    Ultimate Editor?

20     A.    Same answer.

21     Q.    Do you know if Rublamb has reached any of those

22  levels?

23     A.    In preparation for today's deposition, I

24  didn't -- was not aware that I needed to study the

25  gameified level of Rublamb.  I would be happy to, but --

1    Q.   No, you can just answer that question I don't

2    know.  That's all you gotta tell me.

3         But you use a lot of words in responses to the

4    questions that I ask you that are meaningless, not

5    relevant, and not responsive.

6         MR. POLAK:  So objection.  Nonresponsive.

7    BY MR. POLAK:

8    Q.   Please answer my question, do you know whether

9    or not Rublamb has achieved any of those statuses that I

10   just identified for you?

11        MR. LINKE:  Objection as to form.

12        THE WITNESS:  I believe he has achieved some of

13   those qualifications.  I can -- I'm not qualified to

14   list them right now.

15   BY MR. POLAK:

16   Q.   Are you aware that there are award levels at

17   Wikipedia?

18   A.   I know that I've received the original barnstar

19   award, and that's, as a result, an award that I'm

20   familiar.

21   Q.   What do you have to do to achieve a barnstar

22   award?

23   A.   To my knowledge, it's basically to

24   contribute -- make a contribution that a editor or

25   moderator finds deserving of that award.

Page 93

1           And yeah, I was very proud and happy, I believe

2    it was the Bouchet Graduate Honor Society and their, you

3    know, take on inclusive excellence that got me that

4    award and I'm proud of that.

5       Q.   Is it this Rublamb person that gave you the

6    award?

7       A.   I believe it is.

8       Q.   Do you know whether he had to get permission

9    from anyone to give you that award?

10           I'm sorry, I don't know if it's a he or she.

11           Do you know whether Rublamb had to get

12   permission from anyone to give you that award?

13      A.   I have no idea.

14      Q.   Do you know anything about the process that

15   Rublamb has to go through to get permission to give you

16   an award?

17      A.   I think it's just based on the value that you

18   add.  And I know that Wikipedia prides itself on not

19   being a bureaucracy, so I can't speak to the

20   processes -- I just have no idea about how Wikipedia

21   works or determines such things.

22      Q.   And you don't know anything about Rublamb other

23   than what Rublamb has posted on Wikipedia?

24      A.   Well --

25           MR. LINKE:  Objection as to form.

Page 94

1          THE WITNESS:  -- I know about his awards, his
2     contributions are public.
3          You can view his -- his or her history to learn
4     more and I think Wikipedia's self-contained like that
5     where you kind of build a reputation within the
6     community.
7     BY MR. POLAK:
8        Q.  But as far as you know, Rublamb could be a
9     person working at a library or it could also just be
10    some guy living in his mother's basement eating pizza
11    while they're on the internet.  You don't know?
12          MR. LINKE:  Objection as to form.
13          THE WITNESS:  I mean, it could be both.  I
14    mean, a librarian could be eating pizza in the basement,
15    too, you know, I can't really speak to that.
16          MR. POLAK:  All right.  I'm going to show you
17    what's been marked as Exhibit 379, and I will go ahead
18    and share my screen with you.
19          (Exhibit 379 marked for identification.)
20          THE WITNESS:  Which document?  I want to pull
21    it up on this Veritext.
22    BY MR. POLAK:
23        Q.  379, but if you look at your screen, I'll show
24    it to you.
25          You had talked about the five pillars.  I found

1    this on the Wikipedia website and it is a Wikipedia page

2    for the Wikimedia Foundation universal code of conduct.

3           Do you see that?  Have you seen this page

4    before?

5        A.   Yes, I'm looking at it right now.

6        Q.   Okay.  You've seen it before?

7        A.   I believe I have in preparation for today.

8        Q.   Yeah.

9           And they go through and they talk about this

10   universal code of conduct.  Is that universal code of

11   conduct the five pillars that you were referring to

12   before?

13       A.   I need a moment to refresh -- to look at this

14   document to be able to make that statement.

15          So I don't believe that these are the pillars.

16   I do see that there's talk about, you know, content

17   vandalism and abuse of power and privilege, which seem

18   to be relevant in this case, but I think that there's a

19   pillar that talk about, you know, the standards of

20   verifiability, notability, objectivity, reliability.  I

21   believe that's the pillars.  I don't see the pillars

22   listed here.

23       Q.   Okay.  You do recognize that this is a code of

24   conduct that applies to Wikipedia edits, right?

25       A.   I believe so, looking at it right now, yes.

1      Q.   Okay.  And is this a code of conduct that you

2    hold yourself accountable to when making edits to

3    Wikipedia pages?

4           MR. LINKE:  Objection as to form.

5           THE WITNESS:  Probably more so than

6    Dr. Tincher-Ladner.

7           MR. POLAK:  Objection.  Nonresponsive.

8           Can you read the question back, please,

9    Ms. Langgle?

10          THE COURT REPORTER:  Yes.

11          (The last question was read back.)

12          MR. LINKE:  Same objection.

13          THE WITNESS:  To the best of my ability and

14   relative to the situation and the other parties, yes.

15   BY MR. POLAK:

16     Q.   Is this the code of conduct that you would

17   expect the Court to hold you accountable for in

18   evaluating your actions in editing PTK's Wikipedia page?

19     A.   I would expect them to hold everybody

20   accountable to a similar standard.

21     Q.   So the answer is yes, you would expect the

22   Court to hold you accountable to this standard?

23     A.   I'm not sure -- again, I'm not an attorney and

24   I think you know that.  I don't know what the standard

25   for the court system is.  I don't even know if this is a

Page 97

1   terms of service for Wikipedia.  So I don't know what --

2   you know, again, you're asking me to make lawyerly

3   statements here.  I can't.

4        I don't know if this is in the purview of the

5   court system, I don't even know if it's in the purview

6   of the Wikipedia system.  I just know that I would

7   expect anybody who's looking at it to consider the role

8   of all of the players equally.

9        Q.   Is this a standard that you hold yourself to?

10       A.   I don't know.  It's the same standard we all

11  look at when dealing with Wikipedia.

12       Q.   What do you mean you don't know whether you

13  would hold yourself to the standard?

14            MR. LINKE:  Objection as to form.

15            THE WITNESS:  I believe I withhold myself to

16  the standard in accordance with how others hold their --

17  even closer enjoined to this topic hold themselves.

18  BY MR. POLAK:

19       Q.   Okay.  So let's go down here to a section

20  called "Unacceptable Behavior."

21            Do you see this, where I'm showing you here,

22  "Unacceptable Behavior"?

23       A.   Okay.

24       Q.   And the 3.3, "Content Vandalism and Abuse of

25  the Projects," do you see that?

Page 98

1      A.    I see that.

2      Q.    Okay.  Here Wikipedia says in this universal

3  code of conduct that it would be a violation if you are,

4  quote, deliberately introducing biased, false,

5  inaccurate, or inappropriate content, or hindering,

6  impeding, or otherwise hampering the creation and/or

7  maintenance of content.

8            Did I read that correctly?

9      A.    I believe you read that correctly.

10     Q.    So here is that word again that you said didn't

11  apply to you, "biased."

12           Do you -- are you going to change your mind

13  now, now that you've read this, and say that introducing

14  biased information onto a page would be something that

15  you shouldn't do?

16           MR. LINKE:  Objection as to form.

17           THE WITNESS:  If you would like to show me a

18  statement, I can speak to that statement, but I can't,

19  you know, speak in generalities, I don't even know what

20  you're talking about, what you're referring to.

21  BY MR. POLAK:

22     Q.    You told me before when I asked you whether or

23  not you would believe that your edit should be unbiased,

24  you said I don't know that I would use the word "biased"

25  or "unbiased."

Page 99

```
 1          Here we see the word "biased" in the code of
 2   conduct.  So are you willing to hold yourself now to the
 3   standard for your edits to not deliberately introduce
 4   biased content?
 5       A.   I hold myself to a higher standard than
 6   Dr. Lynn Tincher-Ladner and that's essentially what
 7   matters in this instance.
 8          MR. POLAK:  Objection.  Nonresponsive.
 9   BY MR. POLAK:
10       Q.   My question to you had nothing to do about
11   Dr. Tincher-Ladner.
12       A.   It --
13       Q.   My question to you, Mr. Moradian, had to do
14   with whether or not you are now willing to concede that
15   deliberately introducing biased content to edits to a
16   Wikipedia page violates the universal code of conduct?
17       A.   Well, I don't believe that my edits were
18   biased.  Nobody cited them as being biased.  If there
19   are corrections needed, that corrections were made and
20   undisputed, and so to the best of my ability, we
21   imparted -- I imparted objective information for
22   Wikipedia to consider.
23          I didn't fight with them.  I didn't try to POV
24   wash them.  I certainly didn't vandalize the page.
25          So I've done the best of my ability to create a
```

1    truthful -- to contribute to a truthful, notable, and

2    verifiable environment, and that's all I can do.

3              MR. POLAK:  Objection.  Nonresponsive.

4              THE WITNESS:  Also --

5    BY MR. POLAK:

6        Q.   Mr. Moradian, my question to you, Mr. Moradian,

7    is whether you concede that deliberately introducing

8    biased content in edits to a Wikipedia page violates the

9    universal code of conduct for Wikipedia?

10             MR. LINKE:  Objection as to form.

11             THE WITNESS:  Can we have lunch soon?  It is

12   almost 2:00 p.m. here and I'm losing track of these

13   long-winded and loaded questions, but --

14             MR. POLAK:  Move to strike the sidebar and the

15   comment and the answer.

16   BY MR. POLAK:

17       Q.   Mr. Moradian, answer my question, please.

18            Do you concede --

19             MR. LINKE:  Objection --

20   BY MR. POLAK:

21       Q.   Do you concede that the -- that deliberately

22   introducing biased content into edits on a Wikipedia

23   page violates the universal code of conduct for

24   Wikipedia?

25             MR. LINKE:  Objection as to form.

                                                    Page 101

1          THE WITNESS:  Well, actually, let's read this

2    together.  You know, because you're asking me to answer

3    something.

4          Deliberately introducing biased, comma, false,

5    comma, inaccurate or inappropriate content together,

6    comma, or hindering.  That would imply that it has to

7    follow all of those to create that effect.  And we know

8    that the entries were not false, inaccurate,

9    inappropriate or hindering so I don't concede that they

10   were biased, but to the extent that they were, they

11   certainly still were within the purview of being

12   acceptable contributions.

13   BY MR. POLAK:

14       Q.   Do you know the difference between the word

15   "or" and "and"?

16       A.   Well, it looks like they're modifying what's

17   within the commas, inaccurate or inappropriate

18   conduct -- content.

19       Q.   So it's your understanding that you can be as

20   biased as you want, you can be as false as you want, you

21   can be as inaccurate or inappropriate as you want with

22   respect to content so long as you do not also hinder,

23   impede, or otherwise hamper the creation of content;

24   that's your interpretation of this provision?

25       A.   Sir, I don't know why you're doing this.  We

Page 102

1    are both educated people.  We understand what's going

2    on.  I contribute to the article and it left my hands.

3    Wikipedia deemed those to be truthful and valuable

4    editions and I was awarded for making such editions to

5    Wikipedia.

6          On the other hand, your client did things that

7    were viewed as vandalism and washing and was banned.

8          So I don't know where the conversation is.  I

9    don't know what point you're trying to make, but you are

10   mischaracterizing and grossly abusing the system.

11         MR. POLAK:  Objection.  Nonresponsive.

12         Ms. Langgle, could you reread the question for

13   the witness so he may try to answer it?

14         THE COURT REPORTER:  Yes.

15         (The last question was read back.)

16         THE WITNESS:  The first rule of Wikipedia is

17   that there are no rules to Wikipedia.  It's about -- and

18   you can look that up.  It's about making valuable

19   contributions and people seeing it as valuable and so

20   that supersedes this statement.  And I know you're

21   trying to find one word and drive home a point, but I

22   vehemently disagree with the way you're conducting

23   yourself and I've answered this question five times.

24   BY MR. POLAK:

25         Q.   I don't understand, Mr. Moradian, why you are

Page 103

1    so reluctant to concede that deliberately introducing

2    biased information through edits violates the universal

3    code of conduct.  Why can you not agree with that basic

4    statement?

5            MR. LINKE:  Objection as to form.

6            THE WITNESS:  Sir, whatever point you're trying

7    to drive home, you're -- you're purposely leaving out

8    the context of the fact that the page itself was

9    vandalized, it was not compliant to begin with, and it

10   was just the duty of anybody to bring that to attention.

11   Biased or not biased, Wikipedia took over and did its

12   job.  That's not my job and just pointing that out is

13   not problematic.

14   BY MR. POLAK:

15       Q.   One of the things it says that shouldn't be

16   done is systematically manipulating content to favor

17   specific interpretations of facts or points of view.

18            Do you agree that that's a standard that, as an

19   editor of a Wikipedia page, you should abide by?

20       A.   Yeah, I did.

21            MR. LINKE:  Objection as to form.

22   BY MR. POLAK:

23       Q.   What was your answer, Mr. Moradian?

24       A.   I spoke about Ms. Mosal and her contributions

25   to PTK.  That has no benefit to anybody but PTK.

Page 104

1          I spoke about Rod Risley and his contributions

2     to PTK as well as his hall-of-fame recognition with the

3     AACC and that helps nobody but PTK.

4          These -- there was no systemic manipulation.

5     This is about adding context to a page.  And so I would

6     say -- and the record shows that there were many, many

7     favorable editions to the PTK page and it's just about

8     context.  And you know that, I don't need to explain

9     this to you, you viewed that.

10          MR. POLAK:  Mr. Moradian -- objection,

11    nonresponsive.

12    BY MR. POLAK:

13         Q.    I didn't ask you about anything that you did.

14         A.    You did, though.

15         Q.    I'm only asking you whether or not you agree

16    that this standard applies to your edits.  That is, the

17    standard is that it would be inappropriate and violative

18    of universal code of conduct for Wikipedia to, quote,

19    systematically manipulate content to favor specific

20    interpretations of facts or points of view.  Can you

21    just agree with me on that?

22          MR. LINKE:  Objection as to form.

23          THE WITNESS:  All right.  We're gonna read the

24    context, why we have a universal code of conduct.

25          We believe in empowering as many people as

Page 105

1    possible to actively participate in Wikimedia products

2    and spaces to reach our vision of a world in which

3    everyone can share in the sum of all human knowledge.

4    We believe our communities of contributors should be as

5    diverse, inclusive, and accessible as possible.

6            So that is the -- the basis, the background on

7    which these code of conduct exists.  And yeah, to that

8    extent, we have abided by the spirit of the code of

9    conduct.

10           MR. POLAK:  Objection.  Nonresponsive.

11           I'll tell you, Mr. Moradian, and I'll tell you,

12   Derek, I'm about ready to get the judge on the phone so

13   he can sit in here and listen to this nonsense where I

14   have to keep asking the same gosh-darn question every

15   time, over and over and over again.

16   BY MR. POLAK:

17      Q.  My question for you, Mr. Moradian, was very

18   simple so I'm going to ask it one more time and if need

19   be, multiple more times until I get an answer and then

20   we can take a break.

21           My question for you is simply this:  Do you

22   agree that this standard identified here on the page

23   that we're looking for -- looking at applies to the

24   edits that -- that you would perform to Wikipedia pages;

25   that is, that it is a violation of the universal code of

Page 106

1    conduct for Wikipedia to, quote, systematically

2    manipulate content to favor specific interpretations of

3    facts or points of view?

4              MR. LINKE:  Objection as to form.

5              THE WITNESS:  Yes, I believe it applies to me

6    and all contributors equally, yes.

7              MR. POLAK:  Thank you.  We can take that break

8    now.

9              THE WITNESS:  Thank you.

10             VIDEOGRAPHER:  Okay.  Stand by everyone.

11             This marks the end of Media No. 3, going off

12   the record at 1:57 p.m. Pacific.

13             (Off the record at 1:57 p.m.)

14             (Back on the record at 2:46 p.m.)

15             VIDEOGRAPHER:  We are back on the record at

16   2:46 p.m. Pacific.  And this marks the beginning of

17   Media No. 4, deposition of Michael Moradian.

18             Please proceed, Counsel.

19             MR. POLAK:  All right.

20             I'm marking Exhibit 380.

21             (Exhibit 380 marked for identification.)

22   BY MR. POLAK:

23       Q.   And what I'm -- I'll represent to you that this

24   is Exhibit E-3 of Dr. Tincher-Ladner's declaration that

25   you were referring to before, but, as you can see, the

Page 107

1    first page is marked E-3.  You can see that it was filed

2    on July 24th, 2024.

3            And you'll recall seeing this as an exhibit

4    since you told us that you reviewed Dr. Tincher-Ladner's

5    declaration in preparation for this, but I'll tell you

6    that this is a document that she tendered to the Court

7    that's titled "Phi Theta Kappa Difference Between

8    Revisions," and it shows the differences between what

9    PTK's Wikipedia page looked like as of April 8th, 2024,

10   and the revisions that were made on April 16th, 2024.

11           Do you see that where I'm making reference

12   there?  There's a pink box and a green box right next to

13   each other there.  Those are the -- those are the date

14   references.  Do you see that?

15           MR. LINKE:  Objection as to form.

16           THE WITNESS:  The date, are you talking about

17   this April 16, 2024?

18   BY MR. POLAK:

19       Q.   Yeah.  So Wikipedia gives you the ability to go

20   look at -- to compare what Wikipedia pages look like on

21   one date versus another date, right?

22       A.   I believe so, yes.

23       Q.   Okay.  And I'll just tell you that's what

24   Dr. Tincher-Ladner was showing here in this document is

25   a comparison of what we see in the red box, the date is

Page 108

1    April 8th of 2024 against how this Wikipedia page looked

2    on April 16th of 2024.  Do you see that?

3        A.    Yes.

4        Q.    Okay.  So when we look at this, the very first

5    edit that was made here is right here in this box that's

6    below it in green and it says, "This article contains

7    content that is written like an advertisement.  Please

8    help improve it by removing promotional content and

9    inappropriate external links, and by adding encyclopedic

10   content written from a neutral point of view."

11           Do you see where that's written?

12       A.    Yes, I do.

13       Q.    Are you the person that posted that statement

14   on the PTK page?

15       A.    Yes, "WikiObjectivity" posted that and it's the

16   most purest form of discussion for a page.

17       Q.    Okay.  But I didn't really ask you about -- to

18   comment on it.

19           I'm just asking you, you yourself are the one

20   that posted that, right, under the user name

21   "WikiObjectivity"?

22       A.    Sure, it's a call for objectivity, yes.

23       Q.    Okay.  So people can go put those types of

24   statements on Wikipedia pages and it is like a big siren

25   going out to people who are on Wikipedia asking them to

```
 1   come and comment on a particular page?

 2           MR. LINKE:  Objection as to form.

 3   BY MR. POLAK:

 4       Q.   Is that your understanding?

 5           MR. LINKE:  Same objection.

 6           THE WITNESS:  I wouldn't characterize it as a

 7   siren.  I think it's a call for an objectivity for

 8   content and revision.  It's a standard procedure.

 9   BY MR. POLAK:

10       Q.   Okay.  But at minimum, the purpose of this for

11   you was to get other people to come and look at PTK's

12   website and make edits -- PTK's Wikipedia page, not

13   website, PTK's Wikipedia page and make edits?

14       A.   Well, I mean, can you -- sorry, can you repeat

15   that?  I just want to make sure I answer that as well as

16   I can.

17       Q.   It was your intention in posting this to cause

18   other people to come to PTK's Wikipedia page and make

19   edits?

20       A.   I don't think necessarily so.  I think it's

21   just a chance for people to come, anybody, and to look

22   at the, again, notability, verifiability, and

23   reliability of the content and make their own judgments,

24   and it -- I think a certain percentage of Wikipedia

25   pages have this so it is not an uncommon statement.
```

1    Q.   Have you made that type of notice on any other

2   Wikipedia page?

3    A.   I believe in the history of my life, I may

4   have.  I don't remember the early 2000s, but, you

5   know, anybody has a duty to step up and ask for pages to

6   conform to Wikipedia guidelines.  That's the whole point

7   of the community.

8    Q.   So is the answer no, you haven't put that

9   notice on any other website --

10   A.   I believe --

11   Q.   -- in the early 2000s?

12       MR. LINKE:  Objection as to form.

13       THE WITNESS:  I believe I have.

14       I believe the answer is yes, I think I have,

15  but not in the last recent period.  I haven't been

16  active in Wikipedia as much as I used to be.

17  BY MR. POLAK:

18   Q.   And the time period that you recall making or

19  possibly making that type of edit was back in the early

20  2000s?

21   A.   That's right.

22   Q.   And not at any time since then?

23   A.   Not in the last -- in the period in question.

24  I don't know when the last day was, but I would say not

25   in the period in question.

Page 111

1    Q.    How are you defining "the period in question"?

2    A.    Based on your discovery request period.

3    Q.    Since 2016?

4    A.    I believe, yes, it was April 2016.

5    Q.    So you think you made -- okay.  I just want to

6    be clear here, so the record's clear.

7          You don't recall putting this statement that we

8    see here about how the article contains content that is

9    written like an advertisement on any Wikipedia page

10   other than PTK's since January 1 of 2016?

11   A.    Well, actually, there are banners like this

12   that were placed on and I helped contribute to on my own

13   inclusive excellence page on the Honor Society Caucus

14   page, so, you know, I actively contributed these

15   messages to those pages and helped edit and create it.

16         So, yeah, even the pages that I created have

17   had these messages in the time period and so they have

18   existed on those pages as well.

19   Q.    But that was after April 16th of 2024, right?

20   A.    I believe so, yes.

21   Q.    Okay.  So from January 1 of 2016 to April 15 of

22   2024, you had not placed this statement that we're

23   talking about on any Wikipedia page?

24   A.    Well, I wasn't using Wikipedia to the same

25   extent.  I was building a great business that I'm proud

Page 112

 1    of, getting married, having children, it just was not my

 2    priority.

 3        Q.   Didn't ask you why, just need to know, yes or

 4    no.

 5            MR. POLAK:  So I would object to that as

 6    nonresponsive.

 7            Please just answer the question.

 8            And Ms. Langgle, if you could please repeat the

 9    question.

10            THE COURT REPORTER:  Yes.

11             (The last question was read back.)

12            THE WITNESS:  I don't believe so.

13    BY MR. POLAK:

14        Q.   What does it mean to you that content is

15    written like an advertisement?

16        A.   Well, I think point-of-view washing would fall

17    under that category.  One-sided, propaganda, false

18    statements, things that are unnecessarily or incorrectly

19    ambulatory towards an entity or self-praising, things

20    that, you know, one would view as differently if one

21    were to say about themselves other than a neutral site,

22    like Wikipedia is intended to be.

23        Q.   Let's look at this first paragraph here that

24    I'm highlighting for you.

25            Is there anything in that paragraph that you

Page 113

1    think contains content that is written like an

2    advertisement?

3        A.    Well, I don't know that I can answer every line

4    item.  I think to --

5        Q.    Actually, you are here to do exactly that, so I

6    want to make it very clear.  You are here to do exactly

7    that, so please answer my question.

8              What, in that paragraph, constitutes language

9    that is written like an advertisement?

10             MR. LINKE:  Objection as to form.

11             THE WITNESS:  Sure.  Well, I'll try my best.

12             This really wasn't my intention, and I had no

13   intent to -- you know, I never reviewed our changes

14   section, but I would say that Phi Theta Kappa is the

15   name of the entity.  You know, putting "honor society"

16   and the name in bold is implicitly endorsing this as

17   honor society, which I think is hotly contested.  I

18   don't -- I think that is inherently a problem here.

19             Calling it international when community

20   colleges is only an American concept, which

21   Dr. Tincher-Ladner testified to.  Sure, maybe there's a

22   base in Guam, there's one in Bermuda, but these are

23   extensions of American products.  Calling it

24   international and making it seem bigger in scope some

25   would say is misleading.

Page 114

1        You know, students seeking bachelor's degrees,

2    that's not true to our understanding, so I think that's

3    misleading.

4        And yeah, generally you don't jump straight

5    into your millions of members and 1300 chapter in 10

6    nations in your one-line description of Wikipedia.  I

7    mean, that's just not standard practice.

8        You can look at other honor societies, so I

9    would say that that's creating an advertorial-type tone

10   to this article, but that's -- you know, you asked me

11   and I'm answering to the best of my abilities.

12   BY MR. POLAK:

13      Q.   Next paragraph under "Mission," is there

14   anything in that paragraph that is an advertisement in

15   your words?

16      A.   Well --

17           MR. LINKE:  Objection as to form.

18           THE WITNESS:  -- since you're asking me, it's

19   become apparent, you know, in the scope of discovery and

20   the scope of our conversations that Phi Theta Kappa

21   doesn't recognize high academic achievement.

22        In many cases, it's an average society or

23   below-average society, you know, reaching students in

24   the 50th percentile, 60th percentile, so I don't

25   know if that's -- just, again, you're asking me and I'm

Page 115

```
1    giving, you know, you what you're asking for.  I
2    wouldn't certainly -- you know, I'm just here to provide
3    you what you're asking, but I don't know if I would
4    classify this as a society to recognize high academic
5    achievement when they're, you know, recognizing students
6    in the 85th percentile or bottom 15 percent of some
7    schools, but that's okay.
8            To provide opportunities to help them grow as
9    scholars and leaders.  Maybe that's -- maybe that's
10   okay, I'm really not in the position to judge that.
11   BY MR. POLAK:
12      Q.   So -- so you're not really in a position to say
13   whether there's advertising language in this paragraph?
14           MR. LINKE:  Objection as to form.
15           THE WITNESS:  Well, I didn't flag anything or
16   bring any notice to it, so I -- I don't think that's in
17   contest.  I don't -- you know, my job -- and you know, I
18   use that term as an individual or a person contributing
19   to Wikipedia -- is just to see if something is notable,
20   verifiable, and reliable.  And you know, to that extent,
21   you're bringing up very good points that these could be
22   questionable, I just -- it's not my intent to question
23   every single thing of Phi Theta Kappa.  I -- I believe
24   they can have a tremendous impact, but they need to be
25   transparent and that's it.
```

Page 116

1    BY MR. POLAK:

2        Q.    Next paragraph here, "History, Name, Origin and

3    Usage."  Starting with the origin and then -- and ending

4    with "was born," is there any language in here that

5    reads like an advertisement?

6            MR. LINKE:  Objection as to form.

7            THE WITNESS:  Well, I would say that this

8    statement conflicts with a lot of PTK's own history and

9    own statements, so I would be worried on their behalf

10   looking at it objectively because they commonly praise

11   themselves as being the first honor society for

12   community colleges.  And that is a statement that's been

13   made over and over again.

14           Here, they're actually, seems like, stepping on

15   that notion with the existence of Kappa Phi Omicron and

16   the fact that many honor societies sprang up into

17   existence prior to the existence of Phi Theta Kappa, so

18   it's just not reliable.  That's the problem, either this

19   is a misstatement or PTK's other advertisements are a

20   misstatement, but to --

21   BY MR. POLAK:

22       Q.    Are you saying it is untrue that Phi Theta

23   Kappa could be traced back to Kappa Omicron?

24           MR. LINKE:  Objection as to form.

25           THE WITNESS:  I'm not saying that.  I'm saying

Page 117

1    that it's not verifiable here.

2    BY MR. POLAK:

3        Q.    Because it doesn't have a footnote?

4        A.    Well, that's the basis of Wikipedia.

5        Q.    Okay.  But that doesn't make it an

6    advertisement either, does it?

7        A.    Well --

8            MR. LINKE:  Objection as to form.

9            THE WITNESS:  Let's just look at the very last

10   words, "Phi Theta Kappa was born."  You know, the tone

11   there is not an objective encyclopedic tone and somebody

12   could, you know, take exception to an encyclopedia, you

13   know, claiming, you know, this is the birth of Venus

14   here.  This is just -- this is not an appropriate tone

15   for Wikipedia.

16           Again, that's for the community.  I'm not here

17   to --

18   BY MR. POLAK:

19       Q.    Yep.  Let's look at the -- these paragraphs

20   here.

21       A.    Okay.  Let's start with this paragraph.

22       Q.    Tell me what, in your view, reads like it is

23   content of an advertisement.

24           MR. LINKE:  Objection as to form.

25           THE WITNESS:  So we're looking at, you know, a

Page 118

```
 1   halo effect here where, you know, PTK is trying to use
 2   the halo of Phi Beta Kappa, which has been verified
 3   multiple times on multiple different verified sources
 4   that there's never been a connection, they're not sister
 5   societies and, in fact, in the 200 years of Phi Beta
 6   Kappa, they call the name "Phi Theta Kappa" a downright
 7   travesty.
 8          So I mean, to -- to say that it was modeled
 9   after it and modeled after this prestigious society when
10   it was literally copy and pasted or -- as you would call
11   it, a fake Rolex, you know, a fake Rolex example, a
12   knockoff.
13          And, again, I'm not saying these to hurt
14   anybody's feelings, I respect Dr. Lynn and PTK, but
15   we're just trying to look at history.  This is just the
16   fact.  I didn't make this up and I'm certainly not
17   propounding it, I'm just telling you what I know to be
18   the fact.
19   BY MR. POLAK:
20      Q.   My question, Mr. Moradian, I'll let you finish
21   your answer, but you're not answering my question and so
22   my question to you was, what about this is -- is written
23   like the content of an advertisement?
24          But if you want to finish your answer to that
25   question, you can, but I have a different one for you
```

Page 119

1    that might short-circuit this.  Do you want to hear my

2    next question?

3         A.   Let me answer, you know, I like to give full

4    answers.  I don't want to cut you off or me off.

5              But -- I mean, we're talking about modeled

6    after aspects of a prestigious senior college honor

7    society.  This gives the commercial impression, to my

8    knowledge, that there's some sort of either

9    relationship, some -- something from this prestigious

10   organization wears on to PTK.

11             Now, there's no relationship between the two.

12   There's a 1965 book on PTK which makes that clear, the

13   200 years of Phi Beta Kappa makes that clear, the book.

14   And, you know, Marlo calling them sister societies or

15   some third-party websites call them sister societies is

16   just false, but sorry, let me get back to the point

17   here.

18             So using the word "modeled," "prestigious" and

19   "international" is conveying a sense of authority and

20   legacy and, like, foundation, that just doesn't

21   organically exist so -- so that -- that could be argued

22   that it is creating an advertorial tone.

23        Q.   So is your view that what's wrong -- what was

24   wrong with the PTK Wikipedia page as of April 16th,

25   2024, that made it written like an advertisement was

1    that it contained information that was factually untrue

2    in your view?

3        A.    Well, to --

4            MR. LINKE:  Objection as to form.

5            THE WITNESS:  So there is some factually

6    untruths, there is some exaggerations, and there is just

7    some advertorial diction in detail, and I'm just here

8    helping you as much as I can explain, you know -- you

9    can ask a English professor, they'd be more qualified

10   and an expert in diction and detail, but just based on

11   my knowledge, yeah, there are some issues there.

12   BY MR. POLAK:

13       Q.    Okay.  But you're the one who put the note on

14   the Wikipedia page saying, hey, come make edits, this

15   looks like an advertisement.

16            So I'm asking you to identify for me the things

17   that read like an advertisement as opposed to just being

18   factually wrong, unless you think those two things are

19   the same.

20       A.    I mean, sure.  Would you like me to go through

21   the whole document?

22       Q.    Well, that's what we were doing, we're going

23   paragraph by paragraph on it for you to tell me, but it

24   sounds to me as if, in this first paragraph up here, you

25   don't have any facts to show that the origin of

Page 121

1    Phi Theta Kappa can be traced back to Kappa Phi Omicron

2    as being a false statement, right?

3              MR. LINKE:  Objection as to form.

4              THE WITNESS:  Well, even the statement as

5    written here does not credibly lend itself to saying

6    that these are the same organizations.  And all of the

7    documentation that I've viewed, you know, doesn't tie

8    them back directly, and if it were the case, I'm sure

9    the screen name "MakeMyDay1910" would be more accurate

10   than "MakeMyDay1918."  So -- I mean, even by implication

11   of the dates chosen, there -- there is a difference.

12   There's a reason why PTK goes to 1918.

13   BY MR. POLAK:

14       Q.   Do you know who wrote the first PTK Wikipedia

15   page?

16       A.   I believe it was written in early, like, 2009,

17   or approximately then, so I can't tell you.

18       Q.   So are you assuming that PTK is responsible for

19   the content that is on PTK's Wikipedia page?

20       A.   Well, they have admitted being responsible for

21   the content, so it only -- you know -- they have already

22   acknowledged that.  It's not even a --

23       Q.   Where?

24       A.   In Lynn's declaration.

25       Q.   You think she said that?

Page 122

1      A.    She did say that.

2      Q.    Okay.  So -- all right.  Let's go down here to

3   notable members.

4      A.    Wait.  I'd like to finish my previous comment.

5      Q.    You were done.  You were done, Mr. Moradian.

6   So if Mr. Linke wants to ask you to follow up on an

7   answer you gave, he can do that later on.

8            Let's go down to notable members.  We see here

9   a list of about 20 to 30 people who are identified as

10  notable members of PTK, right?

11     A.    I haven't counted them.

12     Q.    Well, it's -- it's not the number that matters,

13  but it's people -- it's a fairly long list of people who

14  are former members of Honor Society -- I'm sorry, former

15  members of PTK.

16     A.    Looks like there are 23 by my count.

17     Q.    Okay.  So I was right, it was between 20 and

18  30.

19            You see where I'm talking about here on the

20  page, Mr. Moradian, right?

21     A.    Right under the advertorial for Geico,

22  Enterprise, Lenovo, Dell, Hurst, Review Services,

23  Bank of America and Bartleby; is that where you're

24  referring to?

25     Q.    No.  It's on the screen, Mr. Moradian.  Do you

Page 123

1    see "Notable Members" there?

2         A.    Under the advertorial content, yes, I do.

3         Q.    Okay.  And the very first name here is

4    Carol Browner, who is a former United States

5    Environmental Protection Agency administrator who

6    attended Miami-Dade College.

7              Do you see that?

8         A.    I see that.

9         Q.    You took her name off this list, didn't you?

10        A.    I don't see a reference or any attempt to

11   verify her belonging on this page.

12        Q.    Is that a yes-or-no question to my answer?  I

13   will move to strike your answer because it was not

14   responsive.

15        A.    Yes, per Wikipedia guidelines of verifiability

16   and reliability, I removed it.

17        Q.    Okay.  Now, because this is blue, that means

18   what?  It's a link, right?

19        A.    I believe so, yes.

20        Q.    So you can click on that page and go learn more

21   about Ms. Browner?

22        A.    I believe so, yes.

23        Q.    But rather than letting the people who come to

24   the page to learn more about Ms. Browner, you just

25   deleted her from existence off of this page?

Page 124

1          MR. LINKE:  Objection as to form.

2          THE WITNESS:  Ms. Browner has to have a

3    reference to being a member of PTK, which is notable,

4    verifiable, and objective.  If there is no reference to

5    that, then there's no sense of belonging to this page.

6    It's what's called an orphan.  You can't just throw

7    orphan links on pages.

8          People have -- I mean, the whole point of

9    Wikipedia is objectivity, verifiability, and

10   reliability.  There is no way that me and you could sit

11   here and prove on what was on the internet that day that

12   she was a member.  And if -- if it were there, I would

13   have added the reference and -- if I had found it and

14   let it be.

15   BY MR. POLAK:

16     Q.   And so every single person listed on this

17   "Notable Members" portion of the website that did not

18   have a note like that, that I'm showing you, a number 13

19   for Evan Edinger, you deleted it?

20          MR. LINKE:  Objection as to form.

21          THE WITNESS:  It's inappropriate Wikipedia

22   content to be there until it is verifiable.  And so

23   based on Wikipedia guidelines, I noted that and removed

24   it per guidelines.

25

Page 125

1   BY MR. POLAK:

2       Q.   So the answer to my question is yes, you

3   removed it because it didn't have a footnote on it?

4           MR. LINKE:  Objection as to form.

5           THE WITNESS:  I just answered that question.

6   Would you like me to answer it again?

7   BY MR. POLAK:

8       Q.   I would like you to just answer the question.

9           So it's true, isn't it, that you deleted every

10  name of every person under this "Notable Members"

11  section that did not have a footnote, yes or no?

12          MR. LINKE:  Objection as to form.

13          THE WITNESS:  Per Wikipedia guidelines, it

14  should never have been listed on this page.  They have

15  to be verified and reliably verified.  And that's the

16  strength of the community of Wikipedia.

17          If something doesn't belong there, it's

18  supposed to be removed.  That's the duty of anybody

19  viewing the page.

20          MR. POLAK:  Objection.  Nonresponsive.

21          Ms. Langgle, could you please read the question

22  for Mr. Moradian to answer?

23          THE COURT REPORTER:  Yes.

24           (The last question was read back.)

25          MR. LINKE:  Same objection.

1          THE WITNESS:  Yes, per the guidelines of

2     Wikipedia, notability, verifiability, and reliability,

3     they should be removed and were removed.

4     BY MR. POLAK:

5          Q.   Did you make any effort to determine whether or

6     not there are documents out there that would evidence

7     Carol Browner's membership in PTK?

8          MR. LINKE:  Objection as to form.

9          THE WITNESS:  In fact, I did.

10    BY MR. POLAK:

11         Q.   You searched for that?

12         A.   Yes.

13         Q.   You didn't find any?

14         A.   At that time, on the internet, there were no

15    sources.  It has come to my attention they have been

16    added since, but the time spectrum doesn't work like

17    that.  At that moment, there was no verifiable point on

18    the internet.

19         Q.   How did you search for that?

20         A.   I typed in Carol M. Browner, Phi Theta Kappa,

21    as well as Phi Theta -- basically copy/pasted this into

22    Google with the term Phi Theta Kappa and PTK to see if

23    anything can come up that will point me in that

24    direction.

25         Q.   Did you keep any record of those searches?

Page 127

1    A.   I mean, I don't know if a Google search is

2   something that's documented, so I don't know if that

3   record exists.

4    Q.   Did you engage in internet research on all of

5   these other names that you deleted to determine if there

6   was a reference to these people as being a member of

7   Phi Theta Kappa?

8         MR. LINKE:  Objection as to form.

9         THE WITNESS:  I believe -- I believe I did, I

10  believe I looked at every page of theirs on Wikipedia

11  and googled them, but I have to be clear that there's no

12  requirement or need to do that.  The lack of a footnote

13  is really all that's required.

14  BY MR. POLAK:

15   Q.   Would you say that you made a comprehensive

16  search for data that existed on the internet that would

17  show that these people who you deleted had a

18  relationship with Phi Theta Kappa?

19        MR. LINKE:  Objection as to form.

20        THE WITNESS:  I think the word "comprehensive"

21  is vague, but I will say I put an effort to try to

22  confirm who I could and the people that were verified

23  were untouched because they followed the Wikipedia

24  guidelines of verifiability and notability and

25  reliability.

Page 128

1          To the ones that I could not determine that,

2     you know, the -- again, the whole existence of Wikipedia

3     is built on this concept and so it would be

4     inappropriate to have all of these people listed with no

5     links.

6     BY MR. POLAK:

7          Q.   How much time did you spend editing these

8     notable members at PTK on -- the first time, the first

9     time that you removed them?

10              MR. LINKE:  Objection as to form.

11              THE WITNESS:  I can't remember the exact amount

12     of time.  I can tell you that I familiarized myself with

13     what's acceptable in Wikipedia and I clicked on all of

14     the individuals, I looked for references.  The ones that

15     had references were compliant with the terms and I let

16     them be.  And the ones that weren't compliant, I noted

17     as such in the modification in part to ask for

18     verification.

19              I mean, that's the whole point of flagging,

20     flagging an issue is that it gives a call to action,

21     hey, if you see something that I'm missing, please step

22     in and add it.  And you know, to her credit, Dr. Lynn

23     Tincher-Ladner has realized that come to her knowledge

24     and put on the Phi Theta Kappa page, but it didn't --

25     simply didn't exist back then.

Page 129

1           And even that, you know, just to be clear,

2    would be problematic because that's a first-party

3    footnote.  It would be what you would call a conflict of

4    interest, but -- and bias, of course, but it's better

5    than nothing, you know, the fact that there's nothing --

6    I mean, we could be talking about dinosaurs being

7    members of PTK.  We could be talking about

8    Michael Jackson and that wouldn't do any good for the

9    general public.

10           The general public needs to know that what's in

11   an encyclopedia is reliable and verifiable.

12           MR. POLAK:  Objection.  Nonresponsive.

13           Ms. Langgle, could you please read the question

14   back so Mr. Moradian can answer it.

15           THE COURT REPORTER:  Yes.

16           (The last question was read back.)

17           THE WITNESS:  I didn't remove them the first

18   time that I saw them not being compliant.  That was the

19   whole point, we put out a message and I didn't make any

20   changes.  I probably spent 20 minutes or so researching

21   these individuals and I didn't do anything.

22   BY MR. POLAK:

23       Q.  Well, ultimately you did remove their names,

24   right?

25           MR. LINKE:  Objection as to form.

Page 130

1          THE WITNESS:  Well, because they're not

2    compliant with Wikipedia terms.

3    BY MR. POLAK:

4       Q.   So the answer is yes, eventually you did remove

5    their names?

6          MR. LINKE:  Objection as to form.

7          THE WITNESS:  As I've stated, yes, because

8    they're not compliant with Wikipedia terms of service.

9    BY MR. POLAK:

10      Q.   So when you did that, did you spend any extra

11   time researching their names?

12         MR. LINKE:  Objection as to form.

13         THE WITNESS:  I spent -- yeah, a considerable

14   amount of time, frankly, because I was shocked,

15   confused, and flabbergasted, you know, how a society

16   like this -- I used to think PTK was legitimate, you

17   know, so -- so I guess I was equally duped as everybody

18   else, but -- but that was my understanding at the time.

19         And so I didn't really seek to change or

20   dismantle anything, but as time goes by and more and

21   more minutes were spent on each person and hours are

22   spent viewing this page and hours were spent, I mean, it

23   became apparent that it's just simply not an

24   encyclopedic objective article.

25         MR. POLAK:  Objection.  Nonresponsive.

```
                                                    Page 131
 1          Ms. Langgle, would you please read the question

 2     for Mr. Moradian so that he may try to answer the

 3     question.

 4              THE COURT REPORTER:  Yes.

 5              (The last question was read back.)

 6              THE WITNESS:  Yes.

 7     BY MR. POLAK:

 8        Q.   How much more time over the original 20 minutes

 9     did you spend researching their names?

10              MR. LINKE:  Objection as to form.

11              THE WITNESS:  Probably another 45 minutes.

12     BY MR. POLAK:

13        Q.   How confident are you of that number?

14        A.   It's my best estimate.

15        Q.   And that investigation was Google searches; is

16     that right?

17        A.   To the best of my knowledge, yes.  As well as

18     searches of the PTK website which used to have a search

19     box, so I did search PTK website as well, but that

20     search box doesn't exist anymore so it would actually be

21     harder now, but those are the two steps I took.

22        Q.   You eventually added a name to the PTK notable

23     members, right?

24        A.   I believe so, yes.

25        Q.   Who was that?
```

Page 132

```
 1      A.    Thomas Matthew Crooks.

 2      Q.    What is he famous for?

 3      A.    Well, for being a PTK member.

 4      Q.    You think he's famous for being a PTK member?

 5  Really?

 6      A.    Well, again, notability, this is about a

 7  notable member section, so he's notable for what's in --

 8  put in the topic there, which was attempted Donald Trump

 9  assassin, but he is a notable member.  There's no two

10  ways about that.  I mean, there are -- national

11  large-scale articles that covered it.

12      Q.    What relevance did his PTK membership have to

13  his fame?

14      A.    Well, the same thing could be asked about

15  Carol Browner.

16          MR. POLAK:  Mr. Moradian, objection.

17  Nonresponsive.

18          Please answer my question.

19          Ms. Langgle, would you please read the question

20  back for the witness.

21          THE COURT REPORTER:  Yes.

22           (The last question was read back.)

23          THE WITNESS:  Sure.  He is a -- he was a

24  community college student at the time.  And the

25  prevailing sentiment of studying him was his community
```

1    college associations, one of which was Phi Theta Kappa,

2    it was viewed notable, reliable, and relevant by media

3    sources, and that's how it got its coverage and

4    notability.

5    BY MR. POLAK:

6        Q.   You think his PTK membership was populated into

7    media sources?

8        A.   Well, if you look at the footnotes, which I

9    assume you have, you would see that it was.

10       Q.   Did you think it was funny to attach

11   Mr. Crooks' name to the PTK Wikipedia page while you

12   were deleting famous astronauts, notable government

13   officials, scientists, people of importance, did you

14   think that was funny?

15           MR. LINKE:  Objection as to form.

16           THE WITNESS:  Not at all.  And I think we

17   covered how Wikipedia works.  It's simply, again, about

18   verifiability, reliability, and notability.  And you

19   know, we don't get to choose who has those attributes

20   and who doesn't.  It's up to the general public to reach

21   that consensus and to protect the integrity of

22   Wikipedia.

23           And so I don't -- I think it's disturbing that,

24   you know, you're putting forth such an -- you know, dark

25   image as to, you know, how Wikipedia works.  I mean,

Page 134

1    this is just the nature of objectivity, notability, and

2    verifiability.

3    BY MR. POLAK:

4        Q.   Did you go out and do any searching for notable

5    members of PTK that were not listed on the page

6    originally?  Other than -- other than Mr. Crooks, of

7    course, who you did add.

8              MR. LINKE:  Objection as to form.

9              THE WITNESS:  Yes.

10   BY MR. POLAK:

11       Q.   You did?

12       A.   Yes.

13       Q.   Did you find any?

14       A.   Yes.

15       Q.   Who?

16       A.   Dr. Margaret Mosal, who was the original

17   executive director and founder made the page due to my

18   studies and research.

19              Further, Dr. Rod Risley who, you know, deserves

20   a lot of credit for taking PTK from a small

21   back-of-a-hardware-store organization into what it is

22   today, or what it was, is notable and, you know, he made

23   the page.  And those are just two examples of people

24   that objectively deserve to be in the history of

25   Phi Theta Kappa.  They are the history of Phi Theta

Page 135

```
 1    Kappa.  They were researched and cited and added and
 2    that's to the credit of Phi Theta Kappa and their
 3    history.
 4         Q.   Who else?
 5         A.   Well, those are some of the main ones.
 6         Q.   Well, that's two, that's two.  That's not some,
 7    that's two, that's a couple.
 8         A.   That's a lot.
 9         Q.   Did you identify in your research any other
10    notable members of PTK?
11         A.   Sir, I'm not aware any notable members of PTK
12    other than Rod Risley, Margaret Mosal, and those are the
13    ones that I added.  If it were to come to my attention,
14    which we haven't -- just simply haven't seen, then I
15    would add them if that were the task in front of me.
16         Q.   But, Mr. Moradian, you told me that you
17    searched for other notable members and those are two
18    that you added, so I'm asking you in the search that you
19    did, did you identify any other notable members of PTK?
20         A.   No, sir, I'm not aware of any other notable
21    members.
22         Q.   So this -- this search that you did only
23    uncovered two notable members of PTK?
24              MR. LINKE:  Objection as to form.
25              THE WITNESS:  Well, there was only three or
```

1    four that were confirmed notable so it's a 50 percent

2    addition, so I think that is a large addition to what

3    was already verified for PTK.  So I think that's a lot,

4    50 percent addition of --

5    BY MR. POLAK:

6        Q.   Well, it's 50 percent addition only because you

7    deleted the other 20.

8        A.   Again, it's not because I deleted them, it's

9    because they weren't up to Wikipedia guidelines to be

10   there.

11       Q.   So how long -- well, were you looking for these

12   other notable members of PTK during the 40-, 45 minutes

13   or so that you identified before when you were

14   researching these existing people?

15       A.   No.

16            MR. LINKE:  Objection as to form.

17   BY MR. POLAK:

18       Q.   What's that?

19       A.   Negative.

20       Q.   How much time did you spend looking for other

21   notable members of PTK?

22       A.   Probably between a hundred to a thousand hours.

23       Q.   A hundred to a thousand hours?

24       A.   Yes.

25       Q.   Well, was it closer to a hundred or was it

1    closer to a thousand?

2        A.    Closer to a thousand.

3        Q.    Okay.  When did you start that process?

4        A.    Predominantly in the last two years.

5        Q.    Okay.  So this was not a part of your efforts

6    in April of 2024, it predated it?

7        A.    That's right.

8        Q.    Why have you been engaging in that research of

9    all of those other notable members of PTK?

10       A.    To try and understand what PTK really is.

11       Q.    Or were you trying to find people like

12   Mr. Crooks who tried to kill the president?  And you

13   could --

14            MR. LINKE:  Objection.

15   BY MR. POLAK:

16       Q.    -- put in things and use them in this

17   litigation to malign PTK; wasn't that really what your

18   intention was?

19            MR. LINKE:  Objection as to form.

20            THE WITNESS:  Sir, I have -- I vehemently

21   disagree with that assessment, and I find it insulting

22   to say that I would do that.

23            That was a top-of-the-world article that PTK

24   was in, in the subject line at that time that it

25   occurred live, and to say that there was something other

1    than reporting the facts, the notable, verifiable,

2    reliable truth is just misrepresentation.

3    BY MR. POLAK:

4        Q.    I'm going to show you Matthew Crooks' -- you

5    know, we're live on the internet right now on this and I

6    went to Matthew Crooks' Wikipedia page.

7            Have you ever been to Matthew Crooks' Wikipedia

8    page?

9        A.    Yes, I have.

10       Q.    Now, down here it talks about his early life

11   and education.  And because you've read his Wikipedia

12   page, you already know that there is no reference at all

13   to Phi Theta Kappa here, right?

14       A.    Well, there is a reference to the National

15   Technical Honor Society that is notable there.  You see

16   that as plain as I do, and you'll also note that this

17   page is blocked from editing so a lot of people can --

18   no, not that one, National Technical Honors.

19       Q.    This one right here, the National Technical --

20   why is that important to you?

21       A.    It's the same context which PTK is involved and

22   covered.  And to an extent, PTK's involvement in his

23   early life and education could be argued to be higher

24   than NTHS.  So, you know --

25       Q.    What do you know about the National Technical

Page 139

1    Honor Society?

2              MR. LINKE:  Objection as to form.

3              THE WITNESS:  Well, it's the National -- it's

4    called the National Technical Honor Society.  They serve

5    two-year students since the 1980s, mostly at technical

6    colleges.  They have lax standards of admissions similar

7    to PTK.  They're not members of the ACHS similar to PTK.

8    Their colors are purple and white.

9              Thomas Matthew Crooks was also a member of

10   National Technical Honor Society.

11   BY MR. POLAK:

12      Q.   Okay.  You seem to know quite a bit about the

13   organization.

14      A.   Off the top of my head, though --

15      Q.   Have you -- let's just jump to that.

16           Here is their Wikipedia page.  Have you ever

17   made any edits to this, this page?

18      A.   Yes, I have.

19      Q.   What edits did you make?

20      A.   We also -- I also added a notable coverage of

21   Mr. Crooks.

22      Q.   Really?  Because I go down here to

23   "Notable Members," he's nowhere to be seen.

24      A.   Well, why don't we click "view history"

25   together.

1      Q.   Up here?

2           Is this the change you're making here?  I only

3      see you here as "WikiObjectivity" right here.

4           What button do I need to press to see what

5      change you made?

6           Mr. Moradian, what button do I need to press in

7      order to see what change you made here at this -- this

8      one?

9      A.   This part of Wikipedia, I'm not representing

10     myself, but I think if you click --

11     Q.   This is where you told me to go.

12          MR. LINKE:  Objection as to form.

13     BY MR. POLAK:

14     Q.   Well, let's look here, let's look at the

15     previous.  Actually, no, let's look at contribs, I think

16     this will tell us, won't it?  No, that's not right.

17     Let's look at this.

18          I don't see anything in here, let's go back,

19     let's go down here.  Well, Mr. Crooks, are you sure you

20     added Mr. Crooks to this web -- this Wikipedia page?

21     A.   Yeah, why don't we go back --

22          MR. LINKE:  Objection -- objection as to form.

23          THE WITNESS:  Yeah, let's go down.  What dates,

24     if you remember offhand, since we're on the topic of

25     Mr. Crooks, what date did that incident occur?

Page 141

1    BY MR. POLAK:

2        Q.    The incident occurred where he tried to kill

3    the former president?

4        A.    Can you please remind us off that?

5        Q.    I do not remember the date off the top of my

6    head, but I believe it was probably in June or July of

7    this year.

8              There is only one change that is identified

9    here from WikiObjectivity.

10       A.    Why don't you click on the time and date to the

11   left, yeah.  And there's Mr. Crooks.

12       Q.    So are you the one -- you claim to be the one

13   that put that there?

14       A.    Well, we just reviewed it together.  It's

15   objective, it's reliable, it's verifiable and --

16       Q.    No, this doesn't tell me that you're the one

17   that did it, this just tells me that it was there.

18       A.    If you would like, we can take a break and you

19   can investigate and confirm that, but I'm telling you

20   right now that's what happened.

21       Q.    Okay.  Well, you've never gone back to put him

22   back on here, have you?

23            MR. LINKE:  Objection as to form.

24            THE WITNESS:  I'm not -- listen, I'm not the

25   policeman of Wikipedia.  This is not my job.  You know,

1    I'm just here trying to add what I can, where I can,

2    however I can to make Wikipedia a more notable,

3    verifiable and reliable place.  And --

4    BY MR. POLAK:

5        Q.    Well, let's talk about that then, Mr. Moradian.

6    Because with respect to the names that you deleted, it's

7    true, isn't it, that PTK tried to put them back up,

8    right?

9        A.    Without verification and notability.

10       Q.    So the answer is yes, you knew PTK tried to put

11   them back up, right?  It's just a yes-or-no question,

12   Mr. Moradian.  You knew that PTK tried to put them back

13   up after you deleted them?

14           MR. LINKE:  Objection as to form.

15           THE WITNESS:  Please don't ask loaded questions

16   and then just say yes or no --

17   BY MR. POLAK:

18       Q.    It is not loaded, Mr. Moradian.  It is a simple

19   yes-or-no question.  You knew that PTK tried to put

20   those names back up after you deleted them, right?

21           MR. LINKE:  Objection as to form.

22           THE WITNESS:  I -- what I know, to answer your

23   question, is that when they were added back, they did

24   not have any notability, verifiability or reliability

25   added to them.  And somebody, I believe it was Viewmont

Page 143

1   Viking, or somebody else, took exception to that as

2   well.  So to answer your question, yes, to the extent

3   that it did not comply with the Wikipedia guidelines.

4   BY MR. POLAK:

5       Q.   So this back and forth that happened in

6   connection with these names, when you took them down and

7   PTK tried to put them back up, did you have any role to

8   play with those names being re-removed from the

9   Wikipedia page?

10          MR. LINKE:  Objection as to form.

11          THE WITNESS:  To the best of my knowledge, I

12  believe the response is they were added multiple times

13  back by PTK without verification.  I believe -- which

14  the -- the record speaks for itself, by the way, so

15  there is no need to ask me this question, but the record

16  shows, I believe, that one time I did assist and the

17  rest of the times I did not.

18  BY MR. POLAK:

19      Q.   What is it that you did to assist?

20      A.   Essentially when there is, you know, in order

21  to protect Wikipedia, if there is an undue change,

22  you're allowed to click the undue button to protect it

23  from vandalism and POV washing, among other things.

24      Q.   When you click the undue button, what

25  disappeared that PTK had put up?

Page 144

1      A.   Well, it would be whatever in that context that

2   was added that was not compliant with Wikipedia.

3      Q.   So if they added all the names back, you're the

4   one that deleted them all the way off again, right?

5           MR. LINKE:   Objection as to form.

6           THE WITNESS:   That's not right.

7   BY MR. POLAK:

8      Q.   Tell me where I'm wrong.

9      A.   I believe ultimately Viewmont Viking, or a user

10  to that name, did that.

11     Q.   I'm not talking about that instance, I'm

12  talking about the instance that you've already

13  identified for me where you were the one who hit undo

14  for what PTK did.

15     A.   Sir, as clearly as I can possibly state, I have

16  explained it.  I said, yes, one time where the answer

17  was not appropriate or not in compliance with Wikipedia

18  I did click it.  And the rest of the times it was the

19  Wikipedia community at large that did it.  That's --

20     Q.   Which you -- which you invited to the page when

21  you put that post on there about how the page was an

22  advertisement?

23     A.   Well, firstly --

24           MR. LINKE:   Objection.  Objection.  Objection

25  as to form.

Page 145

1          THE WITNESS:  I don't believe that that was on

2     the page any longer, firstly.  So that alert that you're

3     misattributing, you know, the time continuum here, there

4     was no banner as you called it, it was just -- there was

5     nothing of that affect.

6          The Wikipedia community is a self-monitoring

7     and self-policing community that stands for

8     verifiability, reliability and notability.  And they --

9     they remove things that are not compliant and they

10    sometimes incorporate and edit things that could be

11    compliant.  And so to that effect, it's all in their

12    hands, it's all in the hands of Wikipedia foundation and

13    their administrators, moderators and contributors.

14    BY MR. POLAK:

15    Q.   So you don't dispute that you were part of the

16    back and forth that was going on after your initial set

17    of changes, where PTK was trying to put content back on

18    to the Wikipedia page that you had deleted, right?

19          MR. LINKE:  Objection as to form.

20          THE WITNESS:  As I've stated, and the record

21    itself shows, I was involved in protecting the Wikipedia

22    community.  And to that extent, as I stated, I was

23    involved once and not involved other times.

24    BY MR. POLAK:

25    Q.   Isn't it true you really were just trying to

Page 146

1    make a point in this case, in this lawsuit?

2              MR. LINKE:  Objection as to form.

3              THE WITNESS:  Absolutely not.  I think, if

4    anything, just the opposite.  You know, I'm trying to

5    bring us together, to bring out the truth and to show

6    what's -- what's real and what's good in people.

7              You know, Margaret Mosal dedicated her life to

8    PTK and she was just removed.  Rod Risley dedicated his

9    life to PTK and built it into what it is today.  He's

10   the one that got them the Mississippi land grant and

11   this colonial style manor that Lynn resides in work wise

12   today.  It wasn't Lynn's doing.  And Rod Risley deserves

13   the credit of the work that he put in.

14             And, you know, you -- you're throwing the baby

15   out with the bath water here.  And I'm trying to uplift

16   the truth, uplift the reliable facts, the notable facts

17   and verify.  Things have to be verified, that's the way

18   that the world works.  That's the way that Wikipedia

19   works.  And I would like to believe that, you know, the

20   court system works that way too, you know, I had -- so

21   that -- I mean, truth is truth.

22   BY MR. POLAK:

23        Q.   Why is it you weren't interested in the truth

24   from 2016 to 2023?

25        A.   I'm --

Page 147

1          MR. LINKE:  Objection.  Objection.  Objection

2     as to form.

3          THE WITNESS:  So part of my -- sorry, can you

4     repeat the question?

5     BY MR. POLAK:

6      Q.   Why is it you weren't interested in the truth

7     from 2016 to 2023?  You waited until after you got hit

8     with an injunction, the judge called you malicious, the

9     survey got enjoined, you filed all these extraordinarily

10    broad counter claims.  You do all that, and you don't

11    start making changes to anything until after that

12    happens.  Why were you not interested in the truth in

13    the eight years before?

14          MR. LINKE:  Objection as to form.

15          THE WITNESS:  That's just categorical

16    mischaracterization here.  HonorSociety.org was founded

17    to bring forth the truth.  It was founded to bring forth

18    a correct and remediate all these issues in the honor

19    society space.  The Honor Society museum was founded to

20    preserve and enhance the legacy of honor societies for

21    good and for worse.  You know, there -- there are many

22    great things that honor societies have done and there

23    are many black eyes.

24          You know, there -- there's been systemic

25    inequities, structural racism, sexual indecency in the

Page 148

1    case of PTK.  And we're just talking facts here.  And,

2    you know, there's been a lot of abuse, you know, both

3    from embezzlement, some would say private inurement,

4    misusing nonprofit status.  I mean, these are just

5    things off the top of my head, but the point is our

6    existence set out to correct these things.  We have been

7    advocates from the beginning.  Wikipedia is not the only

8    place to advocate for truth.

9    BY MR. POLAK:

10       Q.   All right.  I'm going to show you what's been

11   marked as Exhibit E-7 -- I'm sorry, it's not

12   Exhibit E-7, it is Exhibit 381.  This is also

13   Exhibit E-7 to Dr. Tincher-Ladner's declaration that was

14   submitted with the court.

15           (Exhibit 381 marked for identification.)

16           THE WITNESS:  Are we going to have a bathroom

17   break soon?  Would you like to take it now?  I can go

18   five minutes, however you feel.

19           MR. POLAK:  Brandon, what time did we start

20   this session?

21           VIDEOGRAPHER:  2:46 p.m. Pacific.  2:46.

22           MR. POLAK:  Yeah, we can do that.

23           THE WITNESS:  Thank you.

24           VIDEOGRAPHER:  So right now, correct?

25           MR. POLAK:  Yeah, sorry.  We can go off the

Page 149

1    record?

2            VIDEOGRAPHER:  This marks the end of Media

3    No. 4.  Going off the record at 3:51 Pacific.

4            (Off the record at 3:51 p.m.)

5            (Back on the record at 4:06 p.m.)

6            VIDEOGRAPHER:  We are back on the record at

7    4:06 p.m. Pacific.  This marks the beginning of Media

8    No. 5, deposition of Mr. Michael Moradian.

9            Please proceed, Counsel.

10   BY MR. POLAK:

11       Q.   I'm going to put Exhibit 381 up on the screen

12   for you.  And there is an exhibit sticker.  Again, this

13   is Exhibit E-7 to Dr. Tincher-Ladner's declaration,

14   which you said you reviewed prior to today in

15   preparation for the deposition.

16           This document was -- basically it was a capture

17   of an internet site on Wednesday, July 24.  And the

18   internet site was PTK's Wikipedia page, so just to give

19   you a frame of reference of what this document is.

20           I want to go down to this section that became a

21   matter of controversy, I think, between you and PTK and

22   your changes.  And I'm going to start here, and it is

23   titled controversies and misconduct.

24           Do you see that?

25       A.   I see that.

Page 150

1    Q.   Do you recall making edits to PTK's Wikipedia

2    page in this section called controversies and

3    misconduct?

4    A.   Well, I see about 20 references in this section

5    of notable, verifiable third party resources.  I do

6    think that I contributed to some of this section, namely

7    in the verifiable and notable linkage.

8    Q.   Okay.  So this first sentence, in 2024, the Phi

9    Theta Kappa entered into two lawsuits over false

10   advertising, attempted monopoly, and trade dress.  Is

11   that your language?

12   A.   I can't sit here and say definitively that I

13   know, but I believe it's -- it's a true statement

14   however you read it.  And I know that this page was

15   updated by Wikipedia within the hour or two of when this

16   screenshot was taken to conform to their policies,

17   namely Rublamb and the moderators and administrators

18   promptly wrote it as they see fit.

19   Q.   Okay.  So you're here to testify about the

20   changes that you made to this web page.  And you can't

21   tell me whether this is your language?

22        MR. LINKE:  Objection as to form.

23        THE WITNESS:  Well, if you want me to go and

24   look at the history or the history which you have in

25   front of you, we could definitively tell that.  But

Page 151

1    you're asking based on my memory and I don't want to

2    guess.

3    BY MR. POLAK:

4        Q.   Okay.  Here we go.  Where do you want -- where

5    do you want to look?

6        A.   Please click view history.  And I can't

7    instruct exactly, but you can find -- highlight the

8    section of who -- when that appeared.

9        Q.   I don't -- well, I don't know when it appeared.

10   I'm asking you whether it was your language or not?

11       A.   Well, I think we all know when it appeared

12   because it's in the record here.  So I could either

13   refer you to view the record or we can sit and audit it

14   together.  Let's see --

15       Q.   I -- you're here to tell me what edits it is

16   that you made and when.  Are you telling me you're not

17   prepared to tell me what edits you made and when?

18            MR. LINKE:  Objection as to form.

19            THE WITNESS:  That's not correct.  I am here

20   and I am prepared.

21   BY MR. POLAK:

22       Q.   Okay, so tell me, when did you make -- is that

23   language yours that we looked at?

24            MR. LINKE:  Objection as to form.

25            THE WITNESS:  Can I use my web browser to

Page 152

1  confirm that?

2  BY MR. POLAK:

3      Q.   What do you need to do to confirm -- to look

4  at, to confirm?

5      A.   I need to click on the WikiObjectivity links,

6  the dates or -- I guess the contribs section to see

7  which one has that in -- in green.

8      Q.   Okay.  Revision history here.

9      A.   Okay.  On the PTK page, so if you -- yeah.

10     Q.   Okay.  You want to go to contribs, this button?

11     A.   Yes, please.

12          These are the contributions to all of the

13  different pages, so you can see there's quite a bit, but

14  I didn't mean to bring you here.  Let's see, let's go

15  back and look at PTK --

16     Q.   What is this green -- what is this green

17  number?

18     A.   I believe -- my understanding it's the number

19  of characters that were either added or subtracted from

20  the page.

21     Q.   Okay.  So this one right here, does this show

22  something that you wrote?  You undid the revision of

23  that number by this user, Makemyday1918 for POV washing

24  and vandalism.  And you say that they're circumventing

25  the Wiki ban.  And you also say that Makemyday1918 is a

Page 153

1    company representative.  Is that your language?

2        A.   So from the term POV washing until subvert the

3    page to an advert is my language.  The parts before that

4    and after that are just Wikipedia conventions.

5        Q.   Okay.  So we were looking before at what you

6    needed to look at to be able to tell me what was your

7    language or not on that -- in that section.  What is it

8    that we need to go look at in order to determine that?

9        A.   We can do that together by simply -- I'm not

10   sure which link to click, but you can see on the PTK

11   view history, where that page shows up, that line shows

12   up as green, green meaning that it was an addition.

13       Q.   Where do I need to look at to get that?

14       A.   Up to the PTK Wikipedia page.  Now click view

15   history, please.  Now let's go down to find

16   WikiObjectivity.  I wouldn't -- I wouldn't suggest this

17   one because we've established that was simply an undue,

18   a reversion, so let's look for a different copy.

19            That only has 36 characters, so it's also

20   unlikely.  That's another reversion by Coralreef, so

21   it's probably not that, so we'd have to -- I'm trying my

22   best to help you here.  It looks like -- these are all

23   newer changes, right?  So you're looking at -- yeah.

24   Well, it looks like if you click on the current for one

25   of these ones that referenced lawsuit, it may have

Page 154

1    something.

2        Q.    What do I got to do now to help you remember

3    what the edits that you made?

4            MR. LINKE:    Objection as to form.

5            THE WITNESS:    Well, it looks like there was a

6    reversion of community being capitalized or not

7    capitalizing.    Let's keep going down, please.

8    BY MR. POLAK:

9        Q.    We were talking about that section at the

10   bottom of the page.    These are notable members.

11       A.    No, I think it's here somewhere.

12       Q.    Okay.    This is in February 2024 -- okay, in --

13   this is the language we were looking at before, in 2024,

14   Phi Theta Kappa entered into two lawsuits, right?    So we

15   were looking at this here.    In 2024, Phi Theta Kappa

16   entered into two lawsuits, right?    So we see here that

17   language.

18       A.    And the links to the notable coverage,

19   including PTK's own coverage, that's correct.

20       Q.    Does this refresh your memory as to whether you

21   are responsible for this language being here as of

22   July 24, 2024?

23       A.    Yes, I believe it does help refresh my memory.

24       Q.    Okay.    And what do you believe to be the case?

25   Are you the person that wrote this language that we're

Page 155

```
 1    looking at here, starting within 2024?

 2        A.    Narrowly referring to that line, I believe I

 3    did write it and I believe I sourced two --

 4        Q.    Okay.

 5        A.    -- verifiable resources to confirm what was

 6    written.

 7        Q.    Okay.  So let's go through this real quick.  In

 8    2024, did this lawsuit start in 2024?

 9        A.    Well, the lawsuit --

10        Q.    It's just a yes-or-no question, Mr. Moradian.

11    Did the lawsuit start in 2024?

12            MR. LINKE:  Objection as to form.

13            THE WITNESS:  The answer is in part yes and in

14    part no.

15    BY MR. POLAK:

16        Q.    Does your language here talk about it being in

17    part correct in 2024 and in part no, not in 2024?

18            MR. LINKE:  Objection as to form.

19    BY MR. POLAK:

20        Q.    Yes or no.

21        A.    This is my contribution.  I believe it was

22    updated to meet Wikipedia standards, but at this point,

23    no, it only referred to 2024 as we're both reading.

24        Q.    Right.  So this lawsuit started in 2022, and so

25    your statement that PTK entered into two lawsuits in
```

Page 156

1    2024 is false, right?

2        A.    I don't think it's false.

3        Q.    Well, what is true about this?  The lawsuit

4    didn't start in 2024 and there is only one lawsuit here,

5    so what is true about this statement?

6            MR. LINKE:  Objection as to form.

7            THE WITNESS:  To my knowledge, the amended --

8    the second amended complaint to PTK was last amended in

9    2024, that's a lawsuit.  And our countersuit of

10   attempted monopoly is also a lawsuit.  And those are two

11   that were entered into or formally brought to the court

12   in 2024.

13           So while, you know, it's -- it's hard to be

14   perfect, we all strive for it.  And I wish I could be

15   perfect or more perfect, but this is the best of ability

16   and I think it accurately describes the fact that in

17   2024 there were two amended complaints and two lawsuits

18   filed and it accurately explains that and links to

19   sources to confirm that.

20   BY MR. POLAK:

21       Q.    So you think every time somebody amends a

22   complaint, it's a new lawsuit?

23           MR. LINKE:  Objection as to form.

24           THE WITNESS:  I'm not a lawyer, so I can't

25   really speak to that, I don't know.

Page 157

1   BY MR. POLAK:

2       Q.   I'm not asking you whether it's right or not.

3   I'm asking you what you think.

4            MR. LINKE:   Objection as to form.

5            THE WITNESS:   My understanding is that, and

6   this is just my understanding because you're asking me.

7   Whenever new claims are added or brought forth to a

8   party, it could be interpreted as a new lawsuit.

9   BY MR. POLAK:

10      Q.   I'm going to show you what's been marked as

11  Exhibit 382, this is Judge Reeves order on the second

12  injunction against you and your company.  See here,

13  order on second motion for preliminary injunction?

14          (Exhibit 382 marked for identification.)

15           THE WITNESS:   Yes.

16  BY MR. POLAK:

17      Q.   Let's go to page -- did you read this order

18  when it came down?

19      A.   Yes, I did.

20      Q.   And this order came down on August 22, so a

21  little over a month ago, right?

22      A.   I believe that's what the document says, yes.

23      Q.   Did you read it once or did you read it

24  multiple times?

25      A.   I have read it many times.

Page 158

1      Q.    Okay.  Do you feel like you know what's in it?

2    You feel --

3            MR. LINKE:  Objection.

4    BY MR. POLAK:

5      Q.    You feel like you know what Judge Reeves was

6    telling you in his order?

7            MR. LINKE:  Objection as to form.

8            THE WITNESS:  I -- I believe -- I believe so.

9    BY MR. POLAK:

10     Q.    Let's go down here to page 13.  It says here

11   that Honor Society mis -- this is Judge Reeves, Honor

12   Society misleads again when it frames itself as the

13   plaintiff in this litigation.  This lawsuit, of course,

14   was filed by PTK.  Honor Society knows this.  Do you see

15   that?

16     A.    Yes, I see that right now.

17     Q.    And so do you disagree with Judge Reeves when

18   he says that there was no justification to say that

19   Honor Society was the plaintiff here?

20           MR. LINKE:  Objection as to form.  Objection.

21   It's outside the scope of the noticed 30(b)(6)

22   deposition topics.

23           THE WITNESS:  I'm sorry, I'm just trying my

24   best to help you here, but what I would say is, like a

25   broken record, you're bending the space time continuum

Page 159

1    and you're -- you're referring to a document that

2    occurred on 8/22 to discuss what should have been known

3    or somehow I should have known and that occurred in

4    July, so to my -- to my knowledge, there is no way I

5    would know something that would happen in the future.

6    BY MR. POLAK:

7        Q.    I'm not asking you about something that

8    happened in the future, Mr. Moradian.  Simply we were

9    talking about the language that was on -- that we were

10   looking at there in -- on the page.  And you told me

11   that you thought there were two lawsuits regardless,

12   that's why we're talking about it Mr. Moradian.

13          So let's look here at what else you wrote.

14   Honor Society sued PTK claiming it misrepresents its

15   membership criteria and potentially deceiving students

16   under false premises -- pretenses.  Do you see that?

17       A.    I see that.

18       Q.    Okay.  Is there any reference here -- you go on

19   to say that PTK filed a lawsuit against Honor Society

20   alleging trademark infringement.  That's the second

21   sentence, right?

22       A.    Yes, I see that.

23       Q.    Now, you do understand that Judge Reeves told

24   you later on that there was only one lawsuit and PTK was

25   the one that filed it, right?

Page 160

1          MR. LINKE:  Objection as to form.

2          THE WITNESS:  I'm not sure that's what

3     Judge Reeves said in that statement.  And I'm not sure

4     how that applies retroactively to a month beforehand.

5     BY MR. POLAK:

6          Q.   The question here for you, Mr. Moradian, is

7     this statement here that Phi Theta Kappa entered into

8     two lawsuits, one filed by Honor Society and the other

9     filed by PTK is just simply untrue, if you're to believe

10    what Judge Reeves wrote in his order, right?

11         MR. LINKE:  Objection as to form.

12         THE WITNESS:  Well, I'd like to take a moment

13    for us to unpack this because it is very important to me

14    that we are verifiable, reliable and objective, so can

15    you please respectfully bring Judge Reeves --

16    BY MR. POLAK:

17         Q.   I need you to answer the question,

18    Mr. Moradian.  I don't need you to preach to me.  I

19    don't need you to accuse me of misconduct.  And I don't

20    need to hear any funky words like chicanery, okay?  I

21    just need you to answer the questions.  So I will object

22    to your answer as being nonresponsive.

23         Please answer the question.

24         A.   I'm trying my best, sir.

25         Q.   I don't think you are.

Page 161

1        A.    I really am.

2        Q.    I think you're trying to play games with me to

3    do exactly what I warned Judge Meyers what you were

4    going to do, which is run out the clock.

5        A.    Sir, I'm trying my best to answer your

6    questions.  And I will answer any question you put

7    before me to the best of my ability.

8            To my knowledge, this is three questions,

9    topics for a 30(b)(6) and you're spending what looks to

10   be seven hours on three questions.  I don't think that

11   was the spirit of this, but, you know, you're entitled

12   to it and I'm here to help you, so please, please work

13   with me so I can do my best to help you, sir.

14           MR. POLAK:  Objection.  Nonresponsive.

15   BY MR. POLAK:

16       Q.    Please, Mr. Moradian, please answer my

17   question.

18           Ms. Langgle, could you please read the

19   question?

20           THE COURT REPORTER:  Yes.

21            (The last question was read back.)

22   BY MR. POLAK:

23       Q.    Mr. Moradian, we've been waiting about a minute

24   for you to answer the question.  Could you please just

25   answer the question?

Page 162

1      A.   Can you please point me to the statement in

2   Exhibit 382 that you're referring to prior?  Just I want

3   to make sure my answer is as accurate and fully

4   responsive as possible.

5      Q.   Mr. Moradian, my question was very clear.

6   We've been talking about this section this entire time.

7   And here you're saying that Honor Society sued PTK in

8   2024 and there was a separate lawsuit filed by PTK

9   against Honor Society.  Those two things are just not

10   true, are they?

11           MR. LINKE:  Objection as to form.

12   BY MR. POLAK:

13      Q.   The lawsuit started in 2022, right?

14           MR. LINKE:  Objection as to form.

15           THE WITNESS:  Yes, that is my understanding of

16   the initial lawsuit.

17   BY MR. POLAK:

18      Q.   And at the time that you made this edit, you

19   knew that the lawsuit started in 2022?

20           MR. LINKE:  Objection as to form.

21           THE WITNESS:  Well, in reading the disclaimer

22   here, as well as looking for, it talks about that, you

23   know, we were sued in federal court by PTK on April 20,

24   2022, for designation of trade dress and infringement of

25   unfair competition.  Then it says Honor Society Michael

Page 163

1    Moradian countersued and are presently

2    defendants/counter-plaintiffs in this litigation.

3            And so based on Judge Reeves' words, it becomes

4    clear to me countersued to my knowledge does mean that

5    there was another lawsuit or suit back and that both of

6    these were occurring in 2024.  And so I believe to my

7    understanding that that statement was wholly true.  I

8    think I would have, you know, polished it up a little

9    bit more, but needless to say, Wikipedia is a community

10   and people stepped up and did that to my knowledge.

11           MR. POLAK:  Objection.  Nonresponsive.

12           Ms. Langgle, could you read the question back

13   again?

14           THE COURT REPORTER:  Yes.

15            (The last question was read back.)

16           MR. LINKE:  Objection as to form.

17           THE WITNESS:  Yes, I am aware, and I was aware

18   that the lawsuit originally started in 2022, but had

19   updates in 2024.

20   BY MR. POLAK:

21     Q.   I'm going to switch over to the existing --

22   sharing my screen with you.  This is existing Phi Theta

23   Kappa page.  We scroll down here to controversies and

24   members misconduct, we see the same sentence still here,

25   now October 1 of 2024.  So the remainder of July, all of

Page 164

1    August, all of September, all of October -- I'm sorry,

2    and the first day of October, this language is still

3    here that you wrote, in 2024, Phi Theta Kappa entered

4    into two lawsuits, right?

5              MR. LINKE:  Objection as to form.

6    BY MR. POLAK:

7        Q.   That's what it still says, right?

8              MR. LINKE:  Objection as to form.

9              THE WITNESS:  I don't own or operate Wikipedia

10   nor this page.  Yes, it does still say that.  And that's

11   part of the issue with Wikipedia, is that, you know,

12   anybody can write anything and, you know, it is an

13   issue.  It is something that Wikipedia deals with and I

14   don't believe -- well, I believe I answered your

15   question, so I don't want to overstep.

16   BY MR. POLAK:

17       Q.   You have the ability to make edits to this,

18   right?

19       A.   No.

20              MR. LINKE:  Objection as to form.

21   BY MR. POLAK:

22       Q.   What, Mr. Moradian?

23       A.   I currently do not have the ability.

24       Q.   When did you lose the ability to make edits to

25   this?

Page 165

1      A.    I believe when the preliminary injunction was

2    issued, I lost my ability or -- in order to comply with

3    the injunction more accurately, I -- that's part of the

4    injunction, so I would not be at liberty to edit this

5    page at all.

6      Q.    Would you agree with me that this first

7    sentence is that you wrote back in July is not

8    completely factually true?

9            MR. LINKE:  Objection as to form.

10           THE WITNESS:  I would dispute that.

11   BY MR. POLAK:

12     Q.    Why?

13     A.    To my knowledge, PTK entered two lawsuits in

14   2024 as both a plaintiff and counter-plaintiff regarding

15   those topics of trade dress and attempted monopoly.  And

16   so the statement itself, while not a perfect statement

17   or perfectly worded, is accurate.

18     Q.    I'm going to show you what's been marked as

19   Exhibit 383, Exhibit E-1 to Dr. Tincher-Ladner's

20   declaration is what this exhibit originally was, but

21   we're going to call it Exhibit 383.  And this is a

22   comparison of revisions, just like we looked at before,

23   between July 22, 2024, and later that day July 22, 2024.

24   Do you see that?

25           (Exhibit 383 marked for identification.)

Page 166

1          THE WITNESS:  Yes, I see that.

2    BY MR. POLAK:

3        Q.   Okay.  And you are the source of these

4    revisions, right?  That's why it says your name right

5    here?

6        A.   Yes, I believe that's the case.

7        Q.   Okay.  Very first paragraph here on,

8    November 19, 1929, Phi Theta Kappa petitioned the

9    American association of junior colleges.  Do you see

10   that paragraph?

11       A.   Yes, I believe I see it.

12       Q.   And then the second sentence is:  While not

13   historically accurate, is in green, Phi Theta Kappa now

14   celebrates its Founder's Day on November 19.  Are you

15   the one that wrote that, while not historically

16   accurate?

17       A.   Well, yes, I believe based on this picture, I

18   believe that is true.  And that is written by

19   WikiObjectivity.

20       Q.   Okay, meaning written by you, don't use your

21   alias, it was written by you, Michael Moradian, right?

22       A.   Yes.

23       Q.   Okay.  Did you footnote that?

24       A.   The whole section --

25       Q.   Did you footnote that change, Mr. Moradian?

Page 167

1          A.    Sir, the way footnotes works --

2          Q.    It's a yes-or-no question, Mr. Moradian.

3     Really, I'm cutting you off because I'm tired of hearing

4     you not give me answers to my questions.

5               Did you footnote that change, yes or no?

6               MR. LINKE:  Objection as to form.

7               THE WITNESS:  I'm sorry, you feel that way.

8     And I'm really genuinely trying my hardest here to help

9     you.  It doesn't hurt us if you cut me off and try to

10    put words in my mouth, but what I'm saying is no, there

11    is not a footnote to that specific section.  No, there

12    is not a footnote to any of this changes, and no, it's

13    not necessary.

14    BY MR. POLAK:

15         Q.    You told me before that you were entitled to

16    delete 22 names of people who are notable former members

17    of PTK because there was no footnote.  Yet, you put this

18    on here and did not footnote it yourself.  Do I

19    understand that correctly?

20              MR. LINKE:  Objection as to form.

21              THE WITNESS:  Again, there is a difference

22    between notability, right?  So there is a section called

23    notable members because people need to be notable.

24    That's the whole point of the section.

25              But the way Wikipedia works, and, you know, I

1    actually try to use PTK's exact wording, which you've

2    seen, but that -- even that is against Wikipedia

3    regulations.  So you have to summarize, you know, and so

4    this is not in itself a notable contribution, it's just

5    a summary of a statement of fact.

6    BY MR. POLAK:

7        Q.   Wait.  You're saying here that what was on --

8    that Phi Theta Kappa is inaccurately celebrating its

9    Founder's Day on November 19.  You're the one that put

10   that language in there, that it was not historically

11   accurate, but you're just fine with not documenting that

12   with some source?

13       A.   Well, but you --

14            MR. LINKE:  Objection.  Objection as to form.

15            THE WITNESS:  Both you and I sitting here today

16   can acknowledge that that statement is truthful and

17   correct.  There is no dispute to that.

18   BY MR. POLAK:

19       Q.   That's not my point, Mr. Moradian.  My point is

20   that in the one instance with respect to the members,

21   you were just fine deleting everything because they did

22   not have footnotes with sources, but here you

23   interjected something and there is no footnote, there is

24   no source.  And I'm trying to understand why it is okay

25   in one instance, but not okay in the other?

Page 169

1      A.   Sure, and I'll do --

2           MR. LINKE:  Objection.  Objection as to form.

3           THE WITNESS:  I'll do my best to explain your

4    question so that you can fully understand it.  A section

5    that has notable members by definition requires

6    notability for each member.  So these members have to be

7    verified, reliable and notable.  That's the definition

8    of the section.

9           A commentary on a statement that is untrue and

10   recognized as such and a truthful statement is put in

11   does not require the same notability standard.  It just

12   doesn't.  It's not a section called notable members.  It

13   is not a claim of notability.  It is just a truthful

14   statement, so I think both you and I agree on that.

15   BY MR. POLAK:

16      Q.   Why is that statement not historically

17   accurate?

18      A.   Well --

19      Q.   Actually, let me withdraw that question.

20           Where did you get your information from on

21   which you based this insertion that it is, quote, not

22   historically accurate?

23      A.   I got it from video and text from Phi Theta

24   Kappa and Dr. Lynn Tincher-Ladner.

25      Q.   What specifically from Dr. Tincher-Ladner?

1      A.   Well, it's explicitly stated, we received our

2  November 19, 1929, our petition from AAJC to be

3  recognized as unofficial Honor Society.  And then we

4  decided, you know, we acknowledged -- basically says

5  that's not our founding day, but it -- we chose to

6  recognize that day as our founding date.  And that's

7  very proudly reverberating through PTK materials.

8          And so by their own admission, if they just

9  chose a date, that wasn't the date of their founding, I

10  think you and I can agree that that wouldn't be a

11  historically accurate date.

12     Q.   So you have a source that you could have done,

13  but you didn't?

14     A.   Sir, I --

15          MR. LINKE:  Objection as to form.

16  BY MR. POLAK:

17     Q.   Do you have an answer to that question,

18  Mr. Moradian?

19     A.   Yeah, I -- I have added many sections like

20  that, such as the section below that talks about the

21  history in a positive light for PTK.

22          And another thing to -- to make clear here is

23  these edits occur back-to-back-to-back.  And so one edit

24  could be to add the text and the next edit could be to

25  add the citation.  So just because one green copy

1    doesn't include it, doesn't mean that within moments or

2    less than minutes a citation would have been added to

3    these, so I'd have to look at all of the edits at this

4    time, but I do believe -- well, we know, we agree that

5    it is not historically accurate, so that one is not in

6    contest in its truthfulness.

7         And then this second section is just very

8    positive content about PTK.  And I think it is important

9    to celebrate, you know, history, legacy, these are all

10   the things that PTK purports to have, right?  So we

11   should celebrate the whole story.

12        And, you know, to my knowledge this isn't the

13   Lynn Tincher-Ladner society, it is the Phi Theta Kappa

14   society.  And they had history that predates her and

15   that -- that's a part of the history, that should be

16   celebrated.  So that's up to, you know, the public,

17   Wikipedia, everybody, but that is part of the story and

18   these were youthful contributions.  And I try my best to

19   impart objectivity and neutrality and notability and

20   verifiability.

21        MR. POLAK:  Objection.  Nonresponsive.  That

22   question really didn't require a -- what was amounted to

23   about a three to five minute answer.

24   BY MR. POLAK:

25        Q.   All right.  So I think what you have told me

Page 172

1    previously is that -- well, okay regardless.  Let's go

2    down here, look at what you wrote earlier.  You wrote

3    Phi Theta Kappa is currently in a lawsuit over false

4    advertising, attempted monopoly and trade dress.  Do you

5    see that?  You wrote that, right?

6         A.   It looks like that, yes.

7         Q.   Okay.  PTK allegedly misrepresents its

8    membership criteria false asserting -- falsely asserting

9    that it is limited to the top 10 percent of students,

10   thus potentially deceiving students into joining under

11   false pretenses.  That's your litigation position in

12   this case, right?

13             MR. LINKE:  Objection as to form.

14             THE WITNESS:  That is a small portion of it; to

15   my knowledge.

16   BY MR. POLAK:

17        Q.   But it's part of your litigation position in

18   this case, right?

19             MR. LINKE:  Objection as to form.

20   BY MR. POLAK:

21        Q.   Are you going to answer my question?

22        A.   Would you mind repeating it?  I was distracted

23   by that raised hand by Dr. Tincher-Ladner.

24             MR. POLAK:  Ms. Langgle, would you read the

25   question, please?

1           THE COURT REPORTER:  Yes.

2               (The last question was read back.)

3           THE WITNESS:  To an extent, yes.  And it's

4    neutrally written statement about the circumstances.

5    BY MR. POLAK:

6       Q.   Do you identify PTK's position in what you

7    wrote?

8       A.   Yes, I believe the next line --

9       Q.   Let me be clear.  Do you identify PTK's

10   position as to the validity of that claim concerning

11   misrepresentation?

12      A.   Yes, I believe by adding the terms allegedly,

13   potentially.  And it is helping create a more neutral

14   circumstance.  This is a contribution.  The next line

15   talks in-depth about PTK and the moderators and

16   administrators took this up themselves, brought it into

17   compliance within hours, and they stood as such.  So

18   I -- I think Wikipedia in general does a great job to

19   make sure the statements are handled under their terms.

20           MR. POLAK:  Objection.  Nonresponsive.

21           Can you read the question back, Ms. Langgle?

22           THE COURT REPORTER:  Yes.

23               (The last question was read back.)

24           THE WITNESS:  Yes.

25

Page 174

1    BY MR. POLAK:

2        Q.    Where?  Where do you identify -- well, we'll

3    start with, do you say PTK denies the claims?  Just yes

4    or no, do you state that they deny the claims?

5        A.    No, nor is it my job to do that.

6        Q.    That would be improper for you to add more

7    language around what PTK has -- has -- is claiming to

8    defend itself against those claims, right?

9              MR. LINKE:  Objection as to form.

10             THE WITNESS:  I don't understand the question.

11   BY MR. POLAK:

12       Q.    You don't feel like you would need to explain

13   what PTK's position is?  For example, that it denies

14   misrepresenting that top 10 percent number?

15             MR. LINKE:  Objection as to form.

16             THE WITNESS:  I think allegedly and potentially

17   implicate implied that.  However, we have already seen

18   that those are true misrepresentations and, you know,

19   but for this legal situation, we -- we wouldn't even be

20   sitting here saying allegedly.  They did deceive

21   students.  Like, there is no -- that's not in question.

22   Or maybe it is in question, but we neutralized, I

23   neutralized it.  And to be fair, and to help get closer

24   to compliance with Wikipedia by adding in those words,

25   so yes, the answer is yes, I did.

Page 175

1    BY MR. POLAK:

2        Q.    Well, let's look at what you wrote about your

3    own -- about PTK's claims against the Honor Society.  It

4    says PTK filed a lawsuit against Honor Society alleging

5    trademark infringement and the use of visual elements

6    and marketing materials, namely blue and gold colors,

7    gold stoles and the usage of wreaths, right?  Did I read

8    that correctly?

9        A.    Yes, you did.

10       Q.    Okay.  And again, you -- you put, just like you

11   put up here allegedly, you use the word alleging

12   trademark infringement, right?

13       A.    Yes.

14       Q.    That's not all you wrote here.  You also wrote

15   this occurred despite the prevalence of blue and gold

16   colors and stoles in honor societies such as Phi Beta

17   Kappa, Phi Kappa Phi, Golden Key International, Honor

18   Society and many others, right?  That's your litigation

19   position in this case, isn't it?

20       A.    Well, I appreciate --

21            MR. LINKE:  Objection.  Objection as to form.

22            THE WITNESS:  I appreciate that you highlighted

23   the fact that I did treat both sides fairly, so I

24   appreciate you highlighting that, both sides were

25   equally described.  And then the next statement is a

Page 176

1    truth.

2            MR. POLAK:  That's your -- okay.  Objection.

3    Nonresponsive in the entirety of that answer.

4            Ms. Langgle, would you please read the question

5    back so Mr. Moradian can answer the question?

6            THE COURT REPORTER:  Yes.

7              (The last question was read back.)

8            THE WITNESS:  It looks like that was a compound

9    question, but I further believe there was a question

10   before this in the line of questioning.

11   BY MR. POLAK:

12      Q.   Mr. Moradian, I asked you simply, that is your

13   litigation position in this case, isn't it?

14           MR. LINKE:  Objection as to form.

15           THE WITNESS:  My litigation position is that

16   PTK is acting like a monopolist and using litigation and

17   forced to eliminate competition.  That's my litigation

18   position.

19   BY MR. POLAK:

20      Q.   Mr. Moradian, objection, nonresponsive.

21           My question for you, Mr. Moradian, is isn't it

22   true that this statement here about the prevalence of

23   blue and gold colors and other honor societies is part

24   of your litigation position in this case?  Yes or no.

25           MR. LINKE:  Objection as to form.

Page 177

1           THE WITNESS:  In part.

2      BY MR. POLAK:

3           Q.   And it is a defense that you are asserting in

4      response to PTK's claims alleging trademark infringement

5      and the use of similar visual elements and marketing

6      materials, namely blue and gold colors, right?

7           MR. LINKE:  Objection as to form.

8      BY MR. POLAK:

9           Q.   What's that, Mr. Moradian?

10          A.   To the extent that truth is a defense, yes.

11          Q.   Okay.  So here we see that you have provided

12     language in what you edited this with that states your

13     litigation position, but you did not give PTK the same

14     courtesy up above where you were talking about the

15     claims that you're making against PTK, right?

16          MR. LINKE:  Objection as to form.

17          THE WITNESS:  Wikipedia gives them that

18     courtesy as well, yes.

19     BY MR. POLAK:

20          Q.   Gives who?  I thought you told me PTK can't go

21     change its own Wikipedia page.  That in your view,

22     that's improper?

23          A.   So a third party, like Rublamb, can and did do

24     that.

25          Q.   But you didn't and you're the one who wrote it,

1   right?

2       A.   Sir, yes, I did write it.  And no, I am not

3   responsible for the -- what Wikipedia chooses to accept

4   and deny.

5       Q.   You're responsible for what you wrote, though,

6   aren't you?

7       A.   Yes.  I only wrote truthful and as neutral as

8   possible as I could write and yes.

9       Q.   And you think it is neutral writing to talk

10  about your defenses in this case, but leave out PTK's

11  defenses in this case?  That's your definition of

12  neutrality?

13          MR. LINKE:  Objection as to form.

14          THE WITNESS:  So it seems like you're

15  conflating truth with a defense position, but truth

16  supersedes all of that.  And so truth stands on its own

17  two feet.

18  BY MR. POLAK:

19      Q.   So the answer is yes, that's your definition of

20  neutrality?  You can leave out facts that are not

21  helpful to you, but you can include facts that are

22  helpful to you, that's neutral?

23          MR. LINKE:  Objection as to form.

24          THE WITNESS:  Sir, it's really disconcerting

25  that you're taking my answers and twisting them and

1    maligning them.  I've answered this many times.  And the

2    fact that I wrote that PTK filed a lawsuit and all of

3    its claims makes it clear that I did a good faith effort

4    to describe PTK's efforts as well.  And that should be

5    applauded, so yes, I did represent both sides to the

6    best of my abilities.

7    BY MR. POLAK:

8        Q.   You also continued to write here:

9    Additionally, wreaths have been a symbol of achievement

10   dating back to ancient Greece.  That is also one of your

11   litigation positions in this case, right?

12           MR. LINKE:  Objection as to form.

13           THE WITNESS:  Truth supersedes litigation and

14   it supersedes the Wikipedia standards.  Truth is truth

15   and the absolute truth is what Wikipedia seeks.  And so

16   to answer your question, yes, it is a part of

17   Wikipedia's standards that could be argued that it is a

18   part of it.  And yes, it is a part of a defense, but it

19   is also just absolute truth.

20   BY MR. POLAK:

21       Q.   Because you say so?

22           MR. LINKE:  Objection as to form.

23           THE WITNESS:  No, I see a citation there.

24   BY MR. POLAK:

25       Q.   It's true that it is a defense of yours?

Page 180

```
 1              MR. LINKE:  Objection as to form.

 2              THE WITNESS:  Yes, truth is my defense, in

 3     part.

 4     BY MR. POLAK:

 5         Q.   You wrote content about Rod Risley on the PTK

 6     Wikipedia pages too, right?

 7              MR. LINKE:  Objection as to form.

 8              THE WITNESS:  Yes, I believe so.

 9     BY MR. POLAK:

10         Q.   Let's take a look at -- well, first of all,

11     what was the purpose of you editing PTK's Wikipedia page

12     to make reference to Rod Risley?

13              MR. LINKE:  Objection as to form.

14              THE WITNESS:  So Wikipedia has standards that

15     rely on notability, verifiability and reliability.  If

16     anything breaches those standards, then it should be

17     included in the page.  It is part of the history and it

18     is a noted part of the history.  And so there would be

19     no reason other than making sure that there is a

20     comprehensive, neutral, reliable statement on Phi Theta

21     Kappa.

22     BY MR. POLAK:

23         Q.   You made statements in the survey that was

24     issued in late February, early March concerning

25     Mr. Risley, right?
```

Page 181

1      A.   I'm not prepared to talk about that today.   I

2   prepared for my 30(b)(6) to answer the three questions

3   pending before me.

4      Q.   You can still answer the question though.

5           You don't remember whether you made any

6   references to sexual harassment allegations of PTK and

7   your honor society survey back in March?

8           MR. LINKE:  Objection as to form.

9           THE WITNESS:  Broadly I do remember, yes.

10  BY MR. POLAK:

11     Q.   And the Court found that that question, as well

12  as several other questions were malicious.  We've

13  already talked about that, right?

14          MR. LINKE:  Objection as to form.

15          THE WITNESS:  I believe we have talked about

16  that.

17  BY MR. POLAK:

18     Q.   Yet you're making changes to PTK's Wikipedia

19  page within weeks after the injunction order comes down

20  telling you that those survey questions about the sexual

21  harassment were malicious.  You're making changes to the

22  PTK Wikipedia page about the very same issue, right?

23          MR. LINKE:  Objection as to form.

24          THE WITNESS:  I'm really sorry.  I'm trying my

25  best to answer your questions.  And I'm trying my best

Page 182

1    to be as truthful and accurate as possible.  And I'm

2    sorry if, you know, the answers are not what you are

3    seeking, but what I will say is that your statement was

4    about the survey questions, which I acknowledge.  There

5    was nothing in there about Wikipedia, so I -- I don't --

6    I just don't see -- yeah, I don't see where your --

7    you're tying in the spirit facts here.

8    BY MR. LINKE:

9        Q.   So you didn't see any problem in going and

10   editing in a public way PTK's Wikipedia page to talk

11   about these sexual harassment allegations when the judge

12   had already told you not to send around survey questions

13   in a public way about the same subject matter?

14            MR. LINKE:  Objection as to form.

15            THE WITNESS:  To answer your question, the

16   survey questions are the survey questions, and I

17   respected that fully.  There is no mention of Wikipedia.

18   The articles in question were from Inside Higher Ed,

19   Chronicles of Higher Education, And Then She Spoke Up,

20   The Clarion Ledger and a few other notable sources.  And

21   I didn't write those articles and I -- I'm confident

22   that you know that, so I -- I actually didn't do

23   anything other than handle truth.  And again, I -- I'm

24   sorry, but truth is truth.

25

Page 183

1    BY MR. POLAK:

2        Q.   Let's look at what you wrote here.  This is on

3    Exhibit 381, this is as the PTK Wikipedia web page

4    looked on July 24.  And we looked before, this

5    controversies and misconduct, we already went over this

6    first paragraph.  And we determined you were the one who

7    wrote all of that.

8             You're also the one that wrote this paragraph,

9    right?  In 2015, National PTK president Rod Risley took

10   a paid leave of absence following claims of sexual

11   harassment, intimidation and unprofessional behavior

12   from two former student international officers.  These

13   allegations prompted the Phi Theta Kappa board of

14   directors to initiate an investigation.  Rod Risley

15   announced his retirement, leading to the termination of

16   the inquiry and his receipt of a multimillion dollar

17   retirement package.

18             You wrote that, right?

19       A.   I'm not sure that I did.  We'd have to look at

20   the audit logs to find that specific section.

21       Q.   All right.  We're looking back at the page that

22   we looked at before.  We see all of the language that I

23   just read.  Does that refresh your memory as to whether

24   you're the one who wrote that?

25       A.    It looks like it.  It looks like there is eight

Page 184

1    sources in there.

2        Q.   I didn't ask you about sources.  I'm just

3    asking you, sir, whether or not you're the one who wrote

4    it.

5            Can you please just confirm on the record that

6    you are the one who wrote it?

7            MR. LINKE:  Objection as to form.

8            MR. POLAK:  I would object to that last answer

9    as being nonresponsive, so please, answer the question,

10   Mr. Moradian.  Confirm on the record that you are the

11   one that wrote this content here.  I'm sorry --

12           MR. LINKE:  Objection as to form.

13           MR. POLAK:  This one, that we were looking at

14   before.

15           THE WITNESS:  Is there a question outstanding?

16   BY MR. POLAK:

17       Q.   Yeah, there is, Mr. Moradian.

18           You are here to testify about the changes that

19   you made to this website, okay?  And I've been waiting

20   for answers from you for extended periods of time.  I've

21   had to go back and rebuild for you the changes that you

22   made to show you where it is.  That was your homework to

23   do coming here today, not mine, but I'll do it, but I'm

24   going to ask you now I think the fourth, maybe the fifth

25   time, are you the one who put this language on the

Page 185

1    Wikipedia page that we're looking at here in this

2    exhibit, 381, starting with in 2015 and ending with

3    package?

4              MR. LINKE:  Objection as to form.

5              THE WITNESS:  Firstly, please don't yell at me,

6    I'm trying my best here to answer your questions as

7    thoughtfully as possible.  And I don't appreciate that

8    tone.

9    BY MR. POLAK:

10        Q.  You were not trying to answer questions

11   thoughtfully or responsively, Mr. Moradian.  Don't throw

12   that at me because I don't believe it for a minute, and

13   I'm not here to argue with you about it.  What I am here

14   is to get an answer from you.  And I'm not yelling at

15   you.

16             I will say that I'm very frustrated with the

17   pace of the deposition, the responsiveness of your

18   answers, the fact that I've had to go back, I think

19   probably around 50 times asking the court reporter to

20   read the question back is not the way this process is

21   supposed to work, but look, I'm going to ask you now for

22   the seventh time I think, sixth or seventh time, are you

23   the one who is responsible for the words that we see

24   here on document, Exhibit 381, starting with in 2015 to

25   package?

Page 186

1          MR. LINKE:  Objection as to form.

2          THE WITNESS:  I believe so.

3   BY MR. POLAK:

4      Q.   Thank you.

5          Nowhere in here is there any statement that

6   Mr. Risley or PTK denied the allegations, is there?

7          MR. LINKE:  Objection as to form.

8          THE WITNESS:  I'm not sure that it's verfiable

9   and reliably on the internet that that occurred.

10  BY MR. POLAK:

11     Q.   Did you read these -- did you read these

12  articles that you posted?

13     A.   Yes, I did.

14     Q.   Did you read them front to back?

15     A.   Yes, I did.

16     Q.   Did you read them carefully?

17     A.   Yes.

18     Q.   And it is your recollection that none of those

19  articles state that Mr. Risley denied the allegations?

20     A.   I don't believe those were the take aways from

21  the articles.

22     Q.   I'm not asking you what the take aways were, so

23  objection.  Nonresponsive.

24          Can you read the question back, Ms. Langgle?

25          THE COURT REPORTER:  Yes.

Page 187

1              (The last question was read back.)

2              THE WITNESS:  Look, whether or not he denies it

3    does not again change truth.  I think, you know, you may

4    not have a solid understanding of what truth means.  And

5    to that effect, maybe that's why we're in this

6    litigation to begin with, you know.  I think there --

7    you know, there is a fundamental understanding of

8    objectivity and analysis that seems to be lacking here,

9    but I will say that I'm trying my best to answer your

10   questions completely.  And it's -- if you don't get an

11   answer that you don't like -- if you got an answer that

12   you don't like, you just simply say nonresponsive and

13   you don't allow for a proper ask and answer style

14   scenario here.  This is worse than a military

15   interrogation, in terms of asking something and then

16   punishing if you don't get the answer that you desire,

17   so I'm trying my best here.

18             MR. POLAK:  Objection.  Nonresponsive.

19             Ms. Langgle, will you reread the question

20   again, please.  Hopefully we'll get an answer this time.

21             THE COURT REPORTER:  Yes.

22              (The last question was read back.)

23             THE WITNESS:  I don't recollect that, no.

24   BY MR. POLAK:

25        Q.   Do you recall whether any of those articles

Page 188

1    made reference to the two young women demanding money to

2    compensate them to settle the case, to settle their

3    claims?

4         A.    Well, as Judge Reeves described, the Tony Morex

5    declaration added further context to the scenario, which

6    is part of the record now.  And those clarified those

7    points that to my understanding, based on the girls'

8    statements, they did not seek any money, that was their

9    lawyers asking for it.  And it is being used and

10   conflated to obscure the truth, so yes, that's my

11   understanding.

12        Q.    Well, I'm totally confused by your answer.  Is

13   it your understanding that the articles that you refer

14   to here in the article -- in this, make reference to

15   demands for financial compensation for these claims of

16   sexual harassment?

17             MR. LINKE:  Objection as to form.

18             THE WITNESS:  I believe that one or two of them

19   may have referenced that, but there is also information

20   available to us that refutes that as well.

21   BY MR. POLAK:

22        Q.    Okay.  You didn't put any of that in your

23   Wikiedits here, did you?

24        A.    Sir, I'm -- I'm not Wikipedia, I'm just a

25   contributor.

Page 189

1     Q.   You're the one who wrote this, you are the one

2   that made the conscious decision to not put that in what

3   you wrote, right?

4           MR. LINKE:  Objection as to form.

5           THE WITNESS:  Well, there is a lot of room in

6   terms of what is, you know -- that -- anybody can

7   interpret and write what they believe is the main, you

8   know, portion of the link.  I don't believe that one

9   sentence from a lawyer represents the full spirit and

10  scope of what happened regarding the sexual misconduct

11  towards these girls.  So, you know, I invite anybody --

12  BY MR. POLAK:

13    Q.   I thought it was alleged sexual misconduct,

14  Mr. Moradian?

15    A.   Well, we're here in deposition and you're

16  asking me what I know.  We've spoken to the women

17  themselves.  And to that extent, it is alleged, but

18  we've heard from sources that are credible that do

19  allege them, so yes, it is --

20    Q.   We're talking about what you wrote here on the

21  Wikipedia page.  Not what you happened to have learned

22  during the course of this lawsuit, okay?  So with

23  respect to what you wrote here, can you point me to

24  anything here that says Rod Risley's point of view in

25  connection with these claims?

```
                                          Page 190
 1              MR. LINKE:  Objection as to form.
 2              THE WITNESS:  The more pertinent rhetorical
 3    question is can you?  Or anybody?
 4              MR. POLAK:  Objection.  Nonresponsive.
 5    BY MR. POLAK:
 6       Q.   Mr. Moradian, is there anything here that
 7    states Rod Risley's point of view in connection with
 8    these claims?
 9              MR. LINKE:  Objection as to form.
10              THE WITNESS:  No, and I don't believe there
11    needs to be.
12    BY MR. POLAK:
13       Q.   Okay.  Is there anything here that states Phi
14    Theta Kappa's view of these claims?
15              MR. LINKE:  Objection as to form.
16              THE WITNESS:  There could be if PTK did not
17    delete their blog post and their statements on this.
18    BY MR. POLAK:
19       Q.   You're saying that the articles that you cite
20    here do not contain any statements of position or point
21    of view by Phi Theta Kappa?
22              MR. LINKE:  Objection as to form.
23              THE WITNESS:  Well, the -- the primary sources
24    were deleted that -- of Phi Theta Kappa statements.
25    That's not in my control.
```

1    BY MR. POLAK:

2        Q.   We're not talking about primary sources,

3    Mr. Moradian, I'm talking about any sources.  And

4    specifically I'm talking about the articles that you

5    yourself cited.  And are you telling me that there are

6    no references in those articles to Phi Theta Kappa's

7    point of view concerning these allegations?

8            MR. LINKE:  Objection as to form.

9            THE WITNESS:  My understanding, those were not

10   the thematic messages of the posts.

11   BY MR. POLAK:

12       Q.   So that's where you draw the line is whether

13   the posts have thematic importance as opposed to actual

14   facts?

15           MR. LINKE:  Objection as to form.

16           THE WITNESS:  I don't know if I'm qualified to

17   answer that.  I'm just one person contributing to

18   Wikipedia.  I'm not a Wikipediaian.

19   BY MR. POLAK:

20       Q.   At the end of the day, though, you could have

21   identified Rod Risley's denial of these allegations, Phi

22   Theta Kappa's investigation into the allegations and the

23   results of that investigation, the first one.  And

24   otherwise the points of view stated in these articles,

25   by either Mr. Risley or Phi Theta Kappa, but you chose

Page 192

1    not to, didn't you?

2            MR. LINKE:  Objection as to form.

3            THE WITNESS:  I dispute that characterization.

4    BY MR. POLAK:

5        Q.   Why is it that you didn't include any point of

6    view of either Dr. Risley or Phi Theta Kappa in the text

7    that your fingers wrote?

8            MR. LINKE:  Objection as to form.

9            THE WITNESS:  Well, it looks like I did.  It

10   looks like I wrote these allegations prompted the PTK

11   board of directors to initiate an investigation.  That's

12   a positive statement about the steps that PTK took and

13   those were cited, so it shows that it was a good faith

14   effort to provide fair and balanced response.

15   BY MR. POLAK:

16       Q.   All right.  But these articles state so much

17   more in terms of Phi Theta Kappa's position and point of

18   view, don't they, than just --

19           MR. LINKE:  Objection.

20   BY MR. POLAK:

21       Q.   -- created a -- they initiated an

22   investigation?

23           MR. LINKE:  Objection as to form.

24           THE WITNESS:  I would disagree, but I would be

25   happy to look at the articles and, you know, have a

Page 193

1    friendly debate about what they say.

2    BY MR. POLAK:

3        Q.   Well, it's a little late for that since you're

4    the one who immediately after finding -- or having an

5    order against you and your company, enjoining a survey

6    that is on this very topic and you turn around and you

7    modify the Wikipedia page to include the very same

8    references.  And those references have now been up for

9    months, it's a little late, isn't it?

10       A.   No.

11            MR. LINKE:  Objection as to form.

12            THE WITNESS:  No.

13   BY MR. POLAK:

14       Q.   Just so I'm clear, do you consider this

15   paragraph starting with in 2015 and ending with package,

16   to comply with the neutrality requirements of the

17   universal code of conduct for Wikipedia?

18       A.   I'm not a lawyer, nor an administrator or

19   moderator of Wikipedia, so it would be hard for me to

20   make that distinguishment.  But I would say that they do

21   capture a summation of what's presented in those

22   articles that are linked to.

23       Q.   They just happen to not include in that

24   summation the point of view of Dr. Risley or Phi Theta

25   Kappa of the allegations?

Page 194

1          MR. LINKE:  Objection as to form.

2          THE WITNESS:  No, that's untrue, it does.  It

3    says that it prompted the PTK board to initiate

4    investigation, that's pretty pro PTK.

5    BY MR. POLAK:

6        Q.   You don't think that that makes it sound as if

7    Dr. Risley did something wrong?  That it was worthy of

8    being investigated?

9          MR. LINKE:  Objection as to form.

10         THE WITNESS:  I really don't know what you want

11   me to tell you there.  I didn't write the articles about

12   this sexual misconduct.  I was not involved in the

13   sexual misconduct.  I did not, you know -- I was not

14   privy to, you know, I was not a first party witness of

15   this.

16         So these are reported facts on a notable,

17   verifiable and reliable websites, like inside Higher Ed.

18   and Chronicles of Higher Education.  And Wikipedia is a

19   compilation of verifiable sources, and so the best that

20   you can really ask for is to try and convey the gist of

21   that and then to link back to where people can

22   investigate that on their own.  And that was done.

23   BY MR. POLAK:

24       Q.   And do you know whose choice -- whose choice it

25   was for Dr. Risley to take the paid leave of absence?

Page 195

1      A.   Well, my understanding is that Larry Horn found

2  an indecent photo of Rod Risley at the behest of Lynn

3  Tincher-Ladner.  And Lynn Tincher-Ladner took that to

4  the board and basically utilized that to help get

5  Dr. Rod Risley terminated and proceed to get her into

6  the position, so that is what I do know.

7           MR. POLAK:  Objection.  Nonresponsive.

8           Ms. Langgle, could you please reread the

9  question, so hopefully Mr. Moradian can answer it?

10           THE COURT REPORTER:  Yes.

11            (The last question was read back.)

12           THE WITNESS:  This sounds like a memory test

13  right now.  So to my memory, I can't say definitively,

14  but I would presume it would either be the board or

15  Dr. Risley himself.

16  BY MR. POLAK:

17      Q.   You don't -- I'll tell you that the articles

18  that you cite state that Dr. Risley was the one who made

19  the choice to take the paid leave of absence to avoid

20  being a distraction.  You don't say that here, do you?

21      A.   Well, actually --

22           MR. LINKE:  Objection.  Objection as to form.

23           THE WITNESS:  Actually, it does -- I do say

24  that.  It says President Rod Risley took a leave of

25  absence.  And the took is an action step that modifies

Page 196

1    the words before it, so Rod Risley took a paid leave of

2    absence.  It --

3    BY MR. POLAK:

4        Q.    You think that's clear?  You think that's clear

5    from what you wrote?

6            MR. LINKE:  Objection as to form.

7            THE WITNESS:  It's accurate.

8    BY MR. POLAK:

9        Q.    All right.  And here, Risley announced his

10   retirement, leading to the termination of the inquiry

11   and his -- the receipt of a multimillion dollar

12   retirement package.

13           You sat in Dr. Tincher-Ladner's deposition and

14   you heard her explain that that retirement had nothing

15   to do with these allegations, right?

16           MR. LINKE:  Objection as to form.

17           THE WITNESS:  I heard what Dr. Tincher-Ladner

18   said.

19   BY MR. POLAK:

20       Q.    That deposition was on February 28, about

21   two months maybe prior to when it is that you made these

22   edits.  Why would you put in this edit on Wikipedia

23   something that you know to be false or misleading?

24           MR. LINKE:  Objection as to form.

25           THE WITNESS:  I know this statement to be true.

Page 197

1  BY MR. POLAK:

2      Q.   It's not what Judge Reeves said.  He told you,

3  in connection with the survey that you did, that had a

4  question on this very subject, that it -- that you

5  needed to be enjoined from restating that false and

6  misleading statement to the public because it wasn't

7  true.

8          MR. LINKE:  Objection as to form.

9          THE WITNESS:  Sir, that's a gross

10  mischaracterization and bordering on chicanery again.

11  Because what Judge Reeves said was very clear that the

12  six questions in their exact form were to not be asked

13  in that exact form, but they may even be asked in

14  another form, okay?  And so that was the enjoined

15  statement.  This is not that statement.  And further, it

16  did remediate any of the terms that were not

17  satisfactory within that survey.

18  BY MR. POLAK:

19      Q.   So you felt when you wrote, this very

20  comfortable in repeating the false and misleading

21  statement that Dr. Risley had received a multimillion

22  dollar retirement package as a part of his resolution of

23  this sexual harassment claim?

24          MR. LINKE:  Objection as to form.

25          THE WITNESS:  There is nothing false or

Page 198

1    misleading about that statement.  That's a whole truth

2    based on the 990 and based on the statements made.

3    BY MR. POLAK:

4        Q.   It was his retirement that he had been saving

5    up for years.  You don't say that here, do you?

6            MR. LINKE:  Objection as to form.

7            THE WITNESS:  It does say that he received a

8    retirement package.

9    BY MR. POLAK:

10       Q.   He received a retirement package.  That's not

11   what he received.  He had been investing his own money

12   in a retirement plan for years.  That is different,

13   right, Mr. Moradian?

14           MR. LINKE:  Objection as to form.

15           THE WITNESS:  Again, mischaracterization.

16   Deferred revenue is not his own money, it is deferred

17   revenue of his salary from PTK.  And whether, you know,

18   that was invested in something, that's still a

19   retirement package.  My definition is more truthful than

20   yours here.

21           And the fact that, you know, he was under

22   investigation, and then under investigation generally

23   means let's take a pause here.  We're investigating.  It

24   doesn't mean you just walk out, it's a get out of jail

25   free card.  An investigation generally goes until the

Page 199

1    investigation is over.  To just say let's close the

2    investigation and I'll take $4 million, that's a quid

3    pro quo of you close the investigation, I don't have to

4    jeopardize my $4 million.  And I'll take my $4 million

5    and hand over the reigns to Dr. Boggs and

6    Dr. Tincher-Ladner to start their -- their hegemonic

7    empire, I don't know, taking their steps to, you know,

8    build -- again, I like -- I like -- I don't hold

9    anything against PTK or Lynn, I understand being a

10   leader.  Being a leader is showing restraint at times

11   too.

12           And, you know, I call for us to have a

13   conversation.  We don't have to do this all publicly.

14   We don't have to do it on the record.  I don't want to

15   sit and talk to Wikipedia, but to the extent that truth

16   is being talked, you know, it is important that we feel

17   comfortable understanding and discussing truth, period.

18           MR. POLAK:  Objection.  Nonresponsive.

19   BY MR. POLAK:

20       Q.   All right.  So let's look at Exhibit 383 --

21       A.   Would it be --

22       Q.   We've looked at this document before.  This is

23   Exhibit E-1 to Dr. Tincher-Ladner's declaration.  And

24   this was -- this tract some of your revisions that you

25   made on the -- July 22, all right?  Which is just a few

Page 200

1    days before the revisions that we were looking at

2    before.

3           And we go down and we scroll down to leadership

4    misconduct, and let's see what you wrote about

5    Dr. Risley here.  Here you wrote:  Rod Risley's tenure

6    as national president was overshadowed by serious

7    allegations and further controversy regarding his

8    retirement compensation.

9           Do you think that is neutrally worded?  A

10   simple yes or no will suffice.

11          MR. LINKE:  Objection as to form.

12          THE WITNESS:  Yes, I believe so.

13   BY MR. POLAK:

14     Q.   You don't think the language calling it serious

15   allegations, further controversy, overshadowed are

16   inflammatory and nonneutral?

17          MR. LINKE:  Objection as to form.

18          THE WITNESS:  I think in my opinion they would

19   be best categorized as truthful.

20   BY MR. POLAK:

21     Q.   Much of this language is the same and only

22   slightly different, but even when you wrote this, his --

23   there is no point of view from Dr. Risley, is there?

24   Such as Dr. Risley denied the allegations?

25          MR. LINKE:  Objection as to form.

1          THE WITNESS:  Well, it does pretty neutrally

2     describe the situation.  It talks about the board

3     initiating an investigation.  And it talks about Risley

4     announcing his retirement, so those are neutral terms.

5     BY MR. POLAK:

6          Q.  But you don't talk about how Dr. Risley denied

7     the allegations, right?

8          A.  Well, I think --

9          MR. LINKE:  Objection as to form.

10    BY MR. POLAK:

11         Q.  It's just a yes-or-no question, Michael.  You

12    don't need to give me everything else that happens to be

13    in your head.  It has nothing to do with the question

14    that I asked.  I just need you to admit that there is

15    nothing here that says Dr. Risley denied the

16    allegations, right?

17         MR. LINKE:  Objection as to form.

18         THE WITNESS:  To my knowledge, those references

19    were deleted by PTK.  If they existed on the web, it

20    would be easier to verify, but however PTK decided to

21    delete the most notable portions of that, so I, you

22    know, I try my best, but I can't control what PTK

23    believes.

24    BY MR. POLAK:

25         Q.  Well, we're not really talking about that,

Page 202

1    we're talking maybe the articles -- well, we've already

2    been over this in terms of what the articles say.

3            You then write starting with additionally,

4    additionally his abrupt retirement was marked by a

5    multimillion dollar compensation package, which cast

6    further doubt on the legitimacy and governance practices

7    of Phi Theta Kappa.

8            Do you consider that language to be neutral?

9            MR. LINKE:  Objection as to form.

10           THE WITNESS:  I do, but I'm not the arbiter of

11   this page and the moderators made it neutral.

12   BY MR. POLAK:

13       Q.   This decision left the allegations unresolved

14   and raised significant concerns about accountability and

15   transparency within Phi Theta Kappa.

16           Is it your testimony under oath that you

17   believe that to be a neutral statement?

18           MR. LINKE:  Objection as to form.

19           THE WITNESS:  Yes, I do believe that to be

20   neutral, but ultimately it is left in the hands of

21   PTK -- of Wikipedia, and they resolved accordingly.

22   BY MR. POLAK:

23       Q.   And you didn't provide any source to support

24   your statement about raised significant concerns about

25   accountability and transparency within Phi Theta Kappa?

Page 203

1            MR. LINKE:  Objection as to form.

2            THE WITNESS:  Is that a statement or a

3    question?

4    BY MR. POLAK:

5        Q.    It's a question, Mr. Moradian.  There is no

6    citation here.  You didn't provide any footnote --

7        A.    Well --

8        Q.    -- to support that statement?

9            MR. LINKE:  Objection as to form.

10            THE WITNESS:  There are many places that would

11    support that statement, including --

12    BY MR. POLAK:

13        Q.    That's not what I asked you.  I didn't ask you

14    if there were other places.  I just asked you whether or

15    not you provided a footnote.  And the truth is you did

16    not, did you?

17            MR. LINKE:  Objection as to form.

18            THE WITNESS:  I did not intend for my edits to

19    be an authoritative take on PTK.  It is instead an

20    opportunity to --

21            THE COURT REPORTER:  I'm sorry, can you start

22    over again?

23            THE WITNESS:  I did not attempt for my entry to

24    be an authoritative viewpoint on PTK.  I instead added

25    information that would be left in the hands of the

Page 204

1    moderators and administrators to make their decision,

2    which they did.

3    BY MR. POLAK:

4        Q.    Your edits to the PTK Wikipedia page also

5    involved words related to the Itawamba situation,

6    correct?

7        A.    To an extent, yes.

8              VIDEOGRAPHER:    Counsel, in a few minutes, can I

9    take a break to change the media?

10             MR. POLAK:    Let's do that now.

11             VIDEOGRAPHER:    Thank you.

12             This marks the end of Media No. 5.    Going off

13   the record at 5:36 p.m. Pacific.

14             (Off the record at 5:36 p.m.)

15             (Back on the record at 5:48 p.m.)

16             VIDEOGRAPHER:    We're back on the record at

17   5:49 p.m. Pacific.    And this marks the beginning of

18   Media No. 6, deposition of Michael Moradian.

19             Please proceed, Counsel.

20   BY MR. POLAK:

21       Q.    All right, so we're going to go back to

22   Exhibit 381.    And this again is Dr. Tincher-Ladner's

23   declaration.    This is the PTK Wikipedia page as it

24   existed on July 24, 2024.    And we're going to go down

25   here and we're going to look at the Itawamba paragraph

Page 205

1   that you have.

2          Starting with, in February 2024, all the way

3   through May 2023, are these your words?

4      A.   I believe so.

5      Q.   And this relates to the embezzlement

6   allegations concerning a Robin Lowe who worked over at

7   Itawamba Community College, right?

8      A.   Yes, I believe --

9          MR. LINKE:  Objection as to form.

10         THE WITNESS:  Yes, I believe so.

11  BY MR. POLAK:

12     Q.   Now, at the time that you made these edits, you

13  knew that Dr. Tincher-Ladner had already testified that

14  PTK advisers are not PTK employees, right?

15         THE COURT REPORTER:  I'm sorry, did someone

16  speak?  I didn't hear it.

17         MR. POLAK:  I think Mr. Linke objected to form.

18         MR. LINKE:  That's correct.

19         MR. POLAK:  But the witness has not yet

20  answered.

21         THE COURT REPORTER:  Thank you.

22         MR. LINKE:  Objection as to form.

23         THE WITNESS:  Can you please repeat the

24  question?

25         MR. POLAK:  Ms. Langgle, could you read that

Page 206

1    for Mr. Moradian.

2              THE COURT REPORTER:  Yes.

3              (The last question was read back.)

4              MR. LINKE:  Objection as to form.

5              THE WITNESS:  Yes, I am aware that

6    Dr. Tincher-Ladner testified to that.

7    BY MR. POLAK:

8         Q.   That was done at her deposition on February 28

9    of this year, correct?

10        A.   I believe so.

11        Q.   And you're not aware of any evidence that

12   contradicts that testimony, right?

13             MR. LINKE:  Objection as to form.

14             THE WITNESS:  I'm just unclear on what you're

15   asking because I don't see the relevance.

16             MR. POLAK:  Ms. Langgle, could you please

17   reread the question again?

18             THE COURT REPORTER:  Yes.

19              (The last question was read back.)

20             MR. LINKE:  Same objection.

21             THE WITNESS:  To be clear, this article states

22   that she's an advisor.  Nowhere does it reference being

23   an employee.

24             MR. POLAK:  Objection.  Nonresponsive.

25             Ms. Langgle, could you reread the question for

Page 207

1      the witness?  Maybe he'll answer it this time.

2                  THE COURT REPORTER:  Yes.

3                    (The last question was read back.)

4                  MR. LINKE:  Objection as to form.

5                  THE WITNESS:  I'm here to answer three

6      questions based on the 30(b)(6) request.  And that's

7      what I'm here to answer, that's what I prepared for.  I

8      don't see this within the scope of that.

9      BY MR. POLAK:

10          Q.   Are you refusing to answer my question,

11     Mr. Moradian?

12                 MR. LINKE:  Objection as to form.

13                 THE WITNESS:  No.

14     BY MR. POLAK:

15          Q.   Then answer it, please.

16                 If you need it read back a third or fourth time

17     now, we can have it read back for you.

18          A.   Please.

19                 MR. POLAK:  Okay.  Ms. Langgle, would you

20     please reread the third or fourth time that same

21     question?

22                 THE COURT REPORTER:  Yes.

23                   (The last question was read back.)

24                 MR. LINKE:  Objection as to form.

25                 THE WITNESS:  Can you please clarify what

Page 208

1    testimony you're referring to?

2    BY MR. POLAK:

3        Q.    Testimony that we just got done talking about

4    that you said you were aware of, that Dr. Tincher-Ladner

5    testified that PTK advisers are not PTK employees.

6        A.    What was the question?

7        Q.    Good lord.  Mr. Moradian, answer the question.

8    Do you really want her to have to read it again, a

9    fourth or fifth time?

10       A.    Sir, I'm trying to the best of my ability to

11   answer your questions.  And you're asking compound

12   questions about a subject that I wasn't instructed to

13   prepare for, so I'm trying my best to answer.  And I

14   appreciate you working with me so that I can give the

15   best answer possible.

16       Q.    I don't think the question was compound.  In

17   fact, I think it was subject verb direct object, to be

18   honest, but I will ask it again.  You are aware of no

19   evidence that contradicts Dr. Tincher-Ladner's testimony

20   that PTK advisers are not PTK employees?

21            MR. LINKE:  Objection as to form.

22            THE WITNESS:  I don't believe so and I don't

23   believe that's a question.

24   BY MR. POLAK:

25       Q.    Are you aware that PTK exercises no control

Page 209

1    over the PTK advisers?

2            MR. LINKE:  Objection as to form.

3            THE WITNESS:  I don't believe that to be a true

4    statement.

5    BY MR. POLAK:

6        Q.    Why not?

7        A.    By definition, they can't exert no control,

8    their PTK advisers.  They're operating under the

9    auspices of PTK.

10       Q.    How do you define auspices?

11       A.    Control.

12       Q.    So what evidence do you have that PTK controls

13   the chapter advisers?

14           MR. LINKE:  Objection.  Outside the scope of

15   the 30(b)(6) deposition notice.  Objection as to form.

16           THE WITNESS:  I haven't prepared for this, so

17   I'll try to answer it to the best of my knowledge, but

18   if PTK designates who is an advisor or there is a

19   designation of PTK and there is some level of control of

20   who gets to be that advisor, whether by the college or

21   by PTK itself, there is a level of control because the

22   title has been conferred on that individual.  And so

23   just by the behest of the title, there is some level of

24   control.

25

Page 210

1    BY MR. POLAK:

2        Q.    Nowhere in what you wrote in this section that

3    I've highlighted is there any statement by you that PTK

4    exercised no employer/employee control over Ms. Lowe; is

5    that right?

6            MR. LINKE:  Objection as to form.

7            THE WITNESS:  There wouldn't need to be such a

8    disclosure, especially because it doesn't say that.

9    And --

10           THE COURT REPORTER:  I'm sorry, I couldn't --

11   you said there wouldn't need to be a disclosure

12   especially because it doesn't say that, and I didn't get

13   the rest of it.

14           THE WITNESS:  It specifically states that she

15   is in an advisor role.

16   BY MR. POLAK:

17       Q.    But the point you're making here in this edit

18   is that Robin Lowe engaged in this misconduct in her

19   capacity as some affiliation with PTK, right?

20           MR. LINKE:  Objection as to form.

21           THE WITNESS:  Would you mind -- well, I didn't

22   get the question.  I'm sorry for that, can you please

23   quickly repeat it?

24           MR. POLAK:  Could you repeat the question for

25   the witness, Ms. Langgle?

1          THE COURT REPORTER:  Yes.

2            (The last question was read back.)

3          MR. LINKE:  Objection as to form.

4          THE WITNESS:  That's admittedly a hard train of

5     thought to follow.

6     BY MR. POLAK:

7        Q.   Let me ask it a different way.  Would it be

8     accurate or inaccurate for you to write here that PTK

9     experienced the embezzlement?

10          MR. LINKE:  Objection as to form.  Outside the

11     scope of the 30(b)(6) deposition notice.

12          THE WITNESS:  That's not what it says here, so

13     that would be a hypothetical.

14     BY MR. POLAK:

15        Q.   I'm just asking you if you had written it,

16     would that be accurate or inaccurate?

17          MR. LINKE:  Objection as to form.  Objection as

18     being beyond the scope of the 30(b)(6) deposition

19     notice.

20          THE WITNESS:  I would have to speculate, and I

21     don't feel comfortable speculating.

22     BY MR. POLAK:

23        Q.   What is it about that that causes you to have

24     to speculate?

25        A.   Well --

1      Q.   Well, let me ask it a different way.  Would you

2   ever write that the society experienced the

3   embezzlement?  Is that your point here when you wrote

4   this, that the society experienced the embezzlement?

5            MR. LINKE:  Objection as to form.

6            THE WITNESS:  Sir, I'm working to aid you as

7   much as I can.  And so I'll just blanket statement to

8   save you time, and I don't feel comfortable speculating.

9   So if you ask me speculative questions, I don't feel

10  comfortable, but if you ask me questions that are

11  substantive on the elements here, I will be happy to

12  answer them as best I can.

13           MR. POLAK:  Object as nonresponsive.

14  BY MR. POLAK:

15     Q.   I'm not asking you to speculate.  I'm asking

16  you whether or not it would be appropriate -- well, let

17  me ask it a different way for you.

18           Is the point that you're trying to make with

19  this language here that I've highlighted that PTK

20  experienced the embezzlement?

21           MR. LINKE:  Objection as to form.

22           THE WITNESS:  I'm not trying to make any point.

23  There are 10 articles that I counted there, 10

24  individual notable news reported articles, including the

25  Mississippi Department of Justice I believe that was the

Page 213

1   basis for these statements, so I'm just working with the

2   notable, verifiable and reliable sources.

3   BY MR. POLAK:

4        Q.   Did you want, when you wrote this, for some

5   reader to think that PTK was responsible for the

6   embezzlement?

7             MR. LINKE:  Objection as to form.

8             THE WITNESS:  Definitely not, no.

9   BY MR. POLAK:

10       Q.   Why not?

11       A.   I don't want PTK to have issues.  I like the

12  idea of PTK.  I like the idea of Dr. Lynn

13  Tincher-Ladner, but what is here again is a matter of

14  truthfulness, objectivity and reportability here.  I

15  didn't write these statements, I didn't make the 10

16  sources.  And simply a contribution that was -- I was

17  asked to contribute into this whole category of

18  Wikipedia, I'm just doing the best that I can to help

19  people get a more objective viewpoint.  And I don't

20  wish -- I don't wish that this was true.  I wish that it

21  wasn't true, but I -- the 10 sources that we listed here

22  tell the story, and that's where you should be looking.

23       Q.   But in the language that you write here, you

24  don't state anything about how PTK had nothing to do

25  with the embezzlement, do you?

Page 214

1              MR. LINKE:  Objection as to form.

2              THE WITNESS:  Would you mind, for context,

3      clicking, going up and clicking on the top link, up to

4      the top of the page?  Oh, this is -- yeah, let's go to

5      the live version.

6      BY MR. POLAK:

7          Q.   Here?

8          A.   Yes, please.  Let's please go down.  Okay.

9      Right here.

10             The last statement there, member and chapter

11     misconduct is a standard section for articles that fall

12     under Wikipedia fraternities and sororities.  Misconduct

13     does not have to be national to be included.  In fact,

14     it is rarely national, but does require independent

15     sources.

16             Some instances do not rise to the level of

17     being notable to be included.  Because this incident has

18     coverage, resulting in criminal charges and happened

19     this year, it does seem to be worthy of inclusion for

20     now.  Signed off by Rublamb.

21             And so I think that again will save us time and

22     save you time because that's the interpretation and the

23     validation of independent third party moderator of

24     Wikipedia.  And I didn't write that, I have nothing to

25     do with that, but that is the understanding.  And I

Page 215

1    think it is important that we all understand that.

2        Q.   Do you remember Judge Reeves addressing this

3    issue of misleading statements your organization has

4    made concerning the Itawamba embezzlement allegations?

5            MR. LINKE:  Objection as to form.

6            THE WITNESS:  Are you referring to the

7    August 22 statement?

8    BY MR. POLAK:

9        Q.   I am.

10       A.   Yes, I'm familiar with those.

11       Q.   What do you recall Judge Reeves saying?

12       A.   Well, August 22 is beyond the time horizon of

13   Wikipedia, so this is a space time continuum issue

14   again, but I wouldn't have been aware of what was --

15   what I'm about to say at the time of Wikipedia because

16   it didn't exist at that time.

17           But what I can tell you now, to answer your

18   question, is that I'm aware that, you know, he wrote

19   about it and asked for a disclaimer and that the

20   disclaimer be added to articles and that Wikipedia not

21   be edited.  And that we have -- I have honored and

22   complied with that to the fullest of my ability.

23       Q.   Do you believe that the language that we looked

24   at that you wrote, concerning these Itawamba

25   circumstances, was misleading in any way?

Page 216

1          MR. LINKE:  Objection as to form.

2          THE WITNESS:  No, sir, I don't believe so.

3     BY MR. POLAK:

4     Q.   Well, let's look at what Judge Reeves had to

5     say about that.  This is the order, go ahead and show

6     you the top here.  This is Exhibit -- well, we've looked

7     at that already, haven't we?  Yeah, sorry.  Exhibit 382.

8     And I'm going to take you to page 12 where Judge Reeves

9     is telling you:  One post created without right or

10    justifiable cause was Honor Society's article about

11    Robin Lowe, a PTK chapter advisor at Itawamba Community

12    College who was arrested for allegedly embezzling funds.

13         Honor Society's post makes Lowe appear as a PTK

14    employee, when in fact PTK campus advisers are employees

15    of community colleges.  The advisor role is an unpaid

16    volunteer.  Dr. Tincher-Ladner testified to this in her

17    February deposition.  Moradian was present when she

18    explained it.  There is no factual basis for Honor

19    Society's claim.

20         Do you agree or disagree with Judge Reeves

21    finding there?

22         MR. LINKE:  Objection as to form.

23         THE WITNESS:  Sir, it is important to note that

24    your question started with did you realize, which

25    implies at the moment in time it was written did I

Page 217

1    realize.  That occurred in July, and now your reading

2    statements in August 22 and you're asking me if I now

3    realize in July something that occurred in the future.

4    And unless you know something about the time space

5    continuum, that's physically impossible.  There is no

6    way in July, when Wikipedia was at issue, I would have

7    known what was going to be written five to six weeks

8    later.

9            So you're conflating two things and I'm trying

10   my best here, but it's just not fair to -- to take a

11   question in one moment of time, did I realize what I'm

12   writing.  And then now read something that occurred five

13   weeks in the future and say, look, you didn't

14   acknowledge that.  I can't acknowledge things that don't

15   exist in the present moment, so I'm trying my best here.

16           MR. POLAK:  Objection.  Nonresponsive.

17           Ms. Langgle, could you please read the question

18   for Mr. Moradian?

19           THE COURT REPORTER:  Yes.

20            (The last question was read back.)

21           MR. LINKE:  Objection as to form.

22           THE WITNESS:  This is outside of the scope of

23   what I prepared for for this 30(b)(6).  I -- I prepared

24   to answer three questions and I'm fully prepared to

25   answer those, but this is just outside of that.

Page 218

1    BY MR. POLAK:

2        Q.    Are you refusing to answer the question,

3    Mr. Moradian?

4            MR. LINKE:  Objection as to form.

5            THE WITNESS:  No, sir, but you're striking my

6    answers as nonresponsive.

7            MR. POLAK:  Well, I haven't stricken that

8    answer yet because you haven't given me one.  You just

9    told me you don't want to answer it.  So are you going

10   to answer my question?  Which is, do you agree with

11   Judge Reeves findings there in that paragraph?

12           MR. LINKE:  Objection as to form.  Objection as

13   being outside the scope of the noticed 30(b)(6)

14   deposition topics.

15           THE WITNESS:  I have complied with it fully.

16   BY MR. POLAK:

17       Q.    I'm not asking you whether you complied with

18   it.  I'm just asking you whether there is anything in it

19   that you disagree with?

20           MR. LINKE:  Objection as to form.  Objection as

21   being outside the scope of the noticed 30(b)(6)

22   deposition topics.

23           THE WITNESS:  I'm really not in a position to

24   answer that.

25

Page 219

1    BY MR. POLAK:

2        Q.   What prevents you from answering my question as

3    to whether you agree or disagree with anything in that

4    paragraph?

5             MR. LINKE:   Objection as to form.   Objection as

6    to being outside the scope of the noticed 30(b)(6)

7    deposition topics.

8             THE WITNESS:   I prepared today for the 30(b)(6)

9    to answer the three questions that you required my

10   testimony.   The issues that you're touching on here

11   reached to other parts of the litigation, which are at

12   play right now.   And I don't feel comfortable stepping

13   outside of my preparation to answer questions not

14   related to what I prepared for today.

15   BY MR. POLAK:

16       Q.   Mr. Moradian, part of the reason why we're here

17   is because Judge Reeves himself asked us to take your

18   deposition to find out your intent when you made these

19   changes to the Wikipedia pages.   That includes looking

20   at not only your intentions, but what was in your head

21   at the time that you made them.

22            We're also entitled to look at whether or not

23   you have an understanding as to whether or not the

24   statements that you made were misleading or false

25   because that goes to the issue of malice.   I shouldn't

Page 220

```
 1   have to explain that because I don't have to explain it
 2   to you, but I'm stating it for you here so you
 3   understand the reasons why I'm asking you these
 4   questions.
 5             And absolutely yes, you need to be able to
 6   answer the question as to whether or not you see
 7   anything incorrect in Judge Reeves paragraph there.  So
 8   I'm going to ask you one more time:  Do you see anything
 9   in that paragraph that is untrue?
10             MR. LINKE:  Objection as to form.  And
11   objection as being outside the scope of the noticed
12   30(b)(6) deposition topics.
13   BY MR. POLAK:
14      Q.   Are you going to answer my question,
15   Mr. Moradian?
16      A.   I'm trying my best to answer it.
17      Q.   Well, I've been sitting here for about 30
18   seconds waiting for an answer, notwithstanding the other
19   five minutes that I've been trying to get an answer from
20   you and I still don't have one.
21      A.   I'm just simply not prepared to answer things
22   outside of what I prepared for.  And, you know, you're
23   asking me now about a statement that was not in
24   existence when the Wikipedia issue happened, so it's
25   really hard -- I mean, this is a hypothetical.  You're
```

Page 221

1  now asking something about six or eight weeks later and

2  trying to use this to show my intent of something that

3  occurred six or eight weeks earlier.  And it's just

4  impossible to draw the line like -- direct connection to

5  this statement to what was going on in Wikipedia, it's

6  just not appropriate.

7      Q.  You can make your legal argument, you can have

8  your lawyer make your legal argument, but the question

9  is do you have an answer to my question?  Is there

10  anything in this paragraph that is untrue factually?

11          MR. LINKE:  Objection as to form.  Objection as

12  to being outside the scope of the noticed 30(b)(6)

13  deposition topics.

14          THE WITNESS:  I don't know.

15  BY MR. POLAK:

16      Q.  Okay.  Part of what Judge Reeves is telling you

17  here, is that the post that was at issue here was made

18  without right or justifiable cause.  Quote -- quote,

19  without right or without justifiable cause, end quote.

20          And he goes on to say that Honor Society's post

21  makes Lowe appear as a PTK employee, when in fact PTK

22  campus advisers are employees of community colleges.

23          Do you disagree that the post at issue there

24  made it appear as if Lowe was a PTK employee, not an

25  employee of the community college that she worked for?

1          MR. LINKE:  Objection as to form.  And

2   objection as being beyond the scope of the 30(b)(6)

3   deposition topics.

4          Mr. Polak, this is getting past the border of

5   harassment.  And I'm getting close to instructing the

6   witness not to answer.  This question isn't even about

7   the Wikipedia pages, it is about something else

8   entirely.  I've been very patient.  This has nothing to

9   do with the 30(b)(6) topics.

10         MR. POLAK:  You can answer -- I've already

11  explained it.

12  BY MR. POLAK:

13     Q.   You can explain it, Mr. Moradian.

14         THE WITNESS:  May you please repeat the

15  question?

16         MR. POLAK:  Okay.  We will have a conversation

17  with Judge Meyers about this at some point, I promise

18  you.  If you don't want to answer my question, you don't

19  want to point out or explain the answers to my

20  questions, I'm going to mark that as non -- as an answer

21  that you refused to answer as a question you refused to

22  answer because you're not answering it.

23         So will you at least agree with me that

24  Judge Reeves is sitting here telling you in this order

25  that it is without right or justifiable cause to make

Page 223

1    any implication that -- that PTK employs the PTK

2    advisers as opposed to the community colleges?

3            MR. LINKE:  Objection as to form.  Objection as

4    being outside the scope of the 30(b)(6) deposition

5    topic.

6            Jonathan, I'm going to instruct the witness not

7    to answer this.  Judge Meyers directed the parties, and

8    you personally, on behalf of PTK, agreed to limit this

9    deposition strictly to the subjects of the 30(b)(6)

10   deposition topic and Judge Reeves' instructions as to

11   discovery.  This has nothing to do with the Wikipedia

12   page.  We've been extremely patient.  Please ask about

13   the Wikipedia page or the issues related to that during

14   the deposition notice.

15           MR. POLAK:  Derek, you are violating the

16   agreement.  If you want to instruct him not to answer,

17   just simply instruct him not to answer.

18   BY MR. POLAK:

19      Q.   Mr. Moradian, are you going to take your

20   lawyer's advice and not answer my question?

21      A.   Yes.

22      Q.   Okay.  I'm going to show you the next page of

23   Judge Reeves' order, starting with the conclusion is

24   simple.  And he writes:  The conclusion is simple, Honor

25   Society chose to describe an Itawamba Community College

Page 224

1  employee who allegedly took public funds and made it

2  look as though a PTK employee took money from PTK

3  members, all to further Honor Society's scheme to injure

4  PTK.  Do you see where I read that?

5       A.   I see where you read that.

6       Q.   All right.  Is it your view that the changes

7  that you made to the Wikipedia page for PTK did not do

8  exactly what it is that Judge Reeves says that you did

9  on the websites that you created?

10          MR. LINKE:  Objection as to form.

11          THE WITNESS:  Whatever is written or described

12  here would not reflect upon the July 2024 Mike Moradian

13  because he had not read this statement at that time, so

14  it would be impossible for me to comment on -- at that

15  time continuum that this was a statement that crossed my

16  mind.

17  BY MR. POLAK:

18       Q.   You told me that -- first of all, that's not

19  what I asked, I didn't ask you whether this statement

20  crossed your mind, so I object to that as nonresponsive.

21          You told me, Mr. Moradian, that you saw nothing

22  wrong with the language that we looked at on -- on what

23  was Exhibit E-7 of Dr. Tincher-Ladner's declaration,

24  right?  Those words that we looked at, you saw nothing

25  wrong about them.  You saw nothing misleading about

Page 225

1    them, right?

2            MR. LINKE:  Objection as to form.

3            THE WITNESS:  You're just referring to those

4    words.  I don't know what "those words" is referring to.

5    BY MR. POLAK:

6        Q.   The words about -- I'll read them to you.  In

7    February 2024, Robin Lowe, a former advisor for the PTK

8    chapter at Itawamba Community College, was charged with

9    embezzlement of public funds meant to benefit the PTK

10   chapter.  Lowe was the chapter advisor for Phi Theta

11   Kappa for 15 years, from 2008 to May of 2023.  That's

12   the language I'm talking about.  So what's the answer to

13   my question?

14       A.   Sir, I have no idea what your question is.

15       Q.   Well, I'm glad we waited 20 seconds for you to

16   tell me that, but you can delay it as long as you want

17   and keep playing that delay game.  And the fact that you

18   did not answer the question for, pretty much guarantees

19   that we're gonna be taking this up with Judge Meyers.  I

20   cannot wait to share with him this transcript, it's like

21   nothing I've ever seen.

22            So, Ms. Langgle, could you please read for the

23   witness the question before the last question?

24            THE COURT REPORTER:  Yes.

25            (The last question was read back.)

Page 226

1          MR. LINKE:  Objection as to form.

2          THE WITNESS:  I try my best here, but I -- can

3    you put on display where you're talking about?  That --

4    I have no context again what -- what are we even talking

5    about?  Those words could be anything.  Can you show me

6    the same you're referring to and ask me a question while

7    referring -- using that statement.

8    BY MR. POLAK:

9      Q.    Well, I read it to you, but we'll put up here

10   on the screen.

11     A.    Is there an outstanding question?

12     Q.    Judge Reeves wrote:  The conclusion is simple.

13   Honor Society chose to describe an Itawamba Community

14   College employee who allegedly took public funds and

15   made it look as though a PTK employee took money from

16   PTK members all to further Honor Society's scheme to

17   injure PTK.

18          Isn't that what you did here with these

19   Wikipedia edits?

20          MR. LINKE:  Objection as to form.

21          THE WITNESS:  I don't know how much more clear

22   I can be, and I'm really trying my best here, but there

23   is no way that that statement, August 22, is what I was

24   trying to do here because it didn't exist at this time.

25   So to ask me isn't that saying what this is, the answer

Page 227

1    is no, because it didn't -- that statement didn't exist

2    at this time.  It's as simple as that.

3          And no, the intent was not that.  And I respect

4    Judge Reeves fully.  There is no -- since he hadn't said

5    what he said for five more weeks, there is no way that

6    could play a role into writing or crafting this message.

7    BY MR. POLAK:

8      Q.   Do you agree with me at the time that you made

9    this post -- I'm sorry, these edits to the Wikipedia

10   page, you knew that Ms. Lowe was an employee of Itawamba

11   Community College and not --

12         MR. LINKE:  Objection.  Objection as to form.

13         THE WITNESS:  My general understanding, and I

14   believe it's the public's understanding to my knowledge,

15   is that when we talk about an advisor of a PTK chapter

16   at Itawamba Community College, that is self-explanatory

17   that it is an advisor that works at Itawamba Community

18   College and was an advisor for PTK chapter.  And so the

19   statement in and of itself is true and representative,

20   so...

21         MR. POLAK:  Objection.  Nonresponsive.

22         Ms. Langgle, could you reread the question,

23   please?

24         THE COURT REPORTER:  Yes.

25         (The last question was read back.)

1          THE WITNESS:  Yes, I did know that.  And yes,

2     it was explicitly stated as such in the edit.

3     BY MR. POLAK:

4          Q.   Where does it say that in this edit that

5     Ms. Lowe is an employee of Itawamba Community College

6     and not an employee of PTK?

7          A.   Well, the general understanding, a chapter is

8     that it is a registered student organization.  It is not

9     an -- it is not a part of the Itawamba Community

10    College.  And the advisers are employees of all

11    registered student organizations of the community

12    college they serve.  That -- I mean, that's just the

13    general understanding of the verbatim text.  And I --

14    and, you know, that -- it doesn't -- it doesn't read to

15    the counter of what the general understanding of those

16    words would be.

17         Q.   We're going to look at Exhibit 383, which is

18    Exhibit E-1 to Dr. Tincher-Ladner's declaration.  And

19    these revisions -- we've looked at this document

20    already, revisions that existed as of July 22, just two

21    days before what we were looking at before, right?  And

22    we scroll down and we look at what you wrote this time

23    that was visible for a period of time.  You wrote the

24    society has experienced embezzlement.  You wrote that,

25    didn't you?

1      A.   Based on them -- it being green within this

2    passage, I would -- I believe I would agree with that.

3      Q.   It is an untrue statement that the society

4    experienced embezzlement because it was the community

5    college that experienced the embezzlement, right?

6           MR. LINKE:  Objection as to form.

7           THE WITNESS:  Well, according to Chad White, I

8    believe his name is, of the Mississippi Department of

9    Justice I believe, which is linked to in this article, I

10   would love to pull that up and read what he wrote.  This

11   is the government official who is notable, reliable and

12   verifiable.  And to my understanding, he described it

13   similar to that.  And further, Rublamb also made clear

14   his third party take as the authority in this space of

15   how that ties into a general society issue.

16           MR. POLAK:  Objection.  Nonresponsive.

17           Can you read the question back, please,

18   Ms. Langgle?

19           THE COURT REPORTER:  Yes.

20            (The last question was read back.)

21           MR. LINKE:  Objection as to form.

22           THE WITNESS:  I don't believe so.

23   BY MR. POLAK:

24      Q.   You don't believe that that statement, the

25   society has experienced embezzlement is untrue?

Page 230

1      A.    I don't.

2            MR. LINKE:  Objection as to form.

3   BY MR. POLAK:

4      Q.    What is it that -- what is it that makes that

5   statement, true?

6      A.    The fact that it is a PTK chapter and it

7   explicitly discusses PTK funds, that the Mississippi

8   Chad White specifically called it out and is verifiable,

9   it is notable and it is objective.  So therefore, that's

10  the basis of my belief that -- of that -- in that

11  statement.

12     Q.    And so what you were trying to convey with the

13  other edit that we looked at just a second ago, the

14  later version, was to convey that the society had

15  experienced embezzlement, right?

16           MR. LINKE:  Objection as to form.

17           THE WITNESS:  In one way or another, the

18  society has experienced embezzlement.

19  BY MR. POLAK:

20     Q.    Now, we talked before about the back and forth

21  that was going on through these edits between what you

22  were doing versus what Phi Theta Kappa was doing, right?

23     A.    I believe so.

24     Q.    And you were aware that when you would make a

25  change, Phi Theta Kappa would then go and make a change

1    and then you said at least on one occasion you made an

2    additional change, right?

3        A.   I believe what you're referring to is undoing

4    revision.  And yes, I believe that would be a correct

5    statement.

6        Q.   What I'm going to show you is again live on the

7    Wikipedia revision history.  And it is your

8    understanding that Coralreef was PTK related?

9        A.   Her -- Dr. Lynn Tincher-Ladner's declaration,

10   yes.

11       Q.   Okay.  And we don't see Coralreef down here in

12   April 2024, May 2024, June 2024, early July of 2024, all

13   of those changes are being made to PTK's Wikipedia page

14   and PTK isn't attempting any changes, right?

15             MR. LINKE:  Objection as to form.

16             THE WITNESS:  I can't speak to PTK's activities

17   or inactivities.

18   BY MR. POLAK:

19       Q.   Okay.  Well, we can look at these things.

20   You're making -- you made a change here on April 16,

21   let's just keep scrolling up here, right?  You can see

22   my cursor.  Objectivity, objectivity, objectivity, then

23   we get CanonNi, do you know who -- do you think that's

24   associated with PTK?

25       A.   It could be.  I have no basis one way or

Page 232

1   another.

2       Q.   If Dr. Tincher-Ladner says it is not her or

3   anyone at Honor Society -- I'm sorry, at PTK, you

4   wouldn't have any reason to dispute that, would you?

5            MR. LINKE:  Objection as to form.

6   BY MR. POLAK:

7       Q.   I'm just asking you, do you have any reason to

8   dispute that if that's what she said?

9       A.   Objection as to form.

10           THE WITNESS:  Well, considering that -- I'm

11  sorry if this comes across wrong, or I don't intend this

12  to be hurtful, I'm speaking out of a place of respect

13  and truthfulness, but considering that she's made a

14  multitude of false statements, it doesn't necessarily,

15  just her saying something alone would not move me one

16  way or another.

17  BY MR. POLAK:

18      Q.   Okay.  So we're looking here at your other

19  changes in April.  We see Rublamb come up, we see you

20  again, we see these others.  But we don't see Coralreef

21  emerge until July 22.  And Coralreef made changes at

22  9:37 p.m., again at 9:41 p.m.  And then fairly quickly

23  you made a bunch of changes as well, just not an hour to

24  an hour-and-a-half later, right?

25      A.   It looks like about two hours later, that's

1    correct.

2        Q.   When somebody does something to changes that

3    you make on Wikipedia, do you get some sort of email or

4    notice or message?

5        A.   Can you rephrase that question?

6        Q.   No.

7        A.   I'll answer to the best of my ability.

8        Q.   I would hope so.  Please do.

9        A.   When you say do you, I'm not clear as to

10   whether you're referring to me individually or the

11   general you.

12       Q.   You, you, Mr. Moradian, Mr. WikiObjectivity, do

13   you get a message or an email or some type of

14   communication letting you know that someone has done

15   something with respect to something that you've changed

16   on Wikipedia?

17           MR. LINKE:  Objection as to form.

18           THE WITNESS:  My knowledge, the WikiObjectivity

19   logged in page would get a notification similar to a

20   Facebook notification or an Instagram notification,

21   prompting that there is one pending change.  And that's

22   the only knowledge I would have of it.

23   BY MR. POLAK:

24       Q.   Okay.  And so it's likely then that you got

25   some sort of notification of Coralreef's changes and you

Page 234

1    went back online that night and made four additional

2    changes; is that right?

3              MR. LINKE:  Objection as to form.

4    BY MR. POLAK:

5         Q.   Three additional changes.  Thank you.

6              MR. LINKE:  Objection as to form.

7              THE WITNESS:  I don't know what all those

8    changes are, but I do know that there is one undoing the

9    revision by Coralreef, which looks like it occurred

10   two hours later, which is in contrast to Coralreef

11   above, where Viewmont Viking undo of the revision

12   one minute later.  So I wouldn't say I was as diligent

13   as Viewmont Viking.  I don't know if two hours is slow

14   or fast, I have no basis.  The only basis I have is

15   one minute response time versus two-hour response time.

16   BY MR. POLAK:

17        Q.   I don't know that I was commenting on the

18   speed.  I was really just kind of noting the amount of

19   time that transpired between when Coralreef made the

20   change to when you've made changes to undue those.

21             Then Coralreef goes back in and the next -- I

22   guess later that night -- no, later, later the next day,

23   goes and tries to undo those changes that you undid of

24   hers, right?  So there is back and forth here, right?

25        A.   Is the question there's back and forth here?

1      Q.    Sure.

2      A.    Yes, to my knowledge there is back and forth.

3   I believe if you click on Coralreef78, there will be

4   further explanation.

5      Q.    Okay.  And then this Viewmont Viking gets

6   involved.  Have you had any communications with Viewmont

7   Viking about the edits that were being made here?

8      A.    I believe the only communication would be

9   what's on this chain, so --

10      Q.    Is Viewmont Viking a moderator or an

11   administrator for Wikipedia?

12      A.    I'm not sure the exact status.  I don't know

13   who this individual is.

14      Q.    Have you had any interaction with Viewmont

15   Viking other than what is in connection with the PTK

16   Wikipedia page?

17      A.    No.

18      Q.    Do you know whether these posts that were on

19   July 23 by Viewmont Viking were the first?  We can

20   scroll down here to see.  I don't see Viewmont Viking

21   going back into 2021 or any of that, so do you know

22   whether Viewmont Viking had ever previously taken an

23   interest in PTK's page?

24      A.    I would have to look at the entire history to

25   be able to fully answer that, but I do believe, based on

1    my memory, that Viewmont Viking belongs to the editor

2    group of Wiki fraternities and sororities, and so it is

3    involved with the general category.

4        Q.    They're the ones that invited you to join them?

5        A.    Rublamb is the leader, to my knowledge, and

6    he's the one that invited me to join it because of my

7    valuable contributions.  I don't know whether or not, I

8    can't confirm whether or not Viewmont Viking was

9    involved with that, knew about it or contributed to it

10    in any way.

11        Q.    Okay.  So there are these interactions here

12    between Coralreef and Viewmont Viking, this -- from

13    JohnFromPickney gets involved, Makemyday1918 gets

14    involved, but then you get back involved again.  And we

15    look at this, which we've already talked about, where

16    you are accusing Makemyday1918 of point view washing and

17    vandalism; is that right?

18        A.    Would you mind scrolling down a little bit,

19    please?  A little bit more, please?  Would you mind

20    scrolling a little bit up?  I'm sorry.  Okay.  July 23,

21    1416 Viewmont Viking used the term POV pushing.  And

22    that was the basis for -- I think washing is a little

23    less forceful actually than pushing, but I -- so I

24    didn't originate that claim, it was -- the claim was

25    originally made by an independent third party Viewmont

Page 237

1   Viking, and I simply corroborated that.

2           MR. POLAK:  Objection.  Nonresponsive.

3   BY MR. POLAK:

4       Q.  So you have this back and forth down here,

5   Viewmont Viking gets involved, but then you pop back up

6   on July 24 and you make the statement that you did here

7   about PTK.  Why didn't you just let that go?

8           MR. LINKE:  Objection as to form.

9           THE WITNESS:  Sir, have you not listened to

10  anything that I've been talking about for the last

11  six hours?  The whole point of Wikipedia is about

12  neutrality, verifiability and reliability.  And to --

13          THE COURT REPORTER:  I'm sorry, the point of

14  Wikipedia is?

15          THE WITNESS:  Verifiability, reliability and

16  notability and to take a blanket advertisement and throw

17  that as a Wikipedia page op is in violation of the FTC

18  Act of 1914.  It was a -- and to that extent, I believe

19  you and Dr. Tincher-Ladner should be thanking me, to the

20  extent that I'm helping prevent them from, you know, a

21  serious violation of FTC Act of 1914, so yeah, you're

22  welcome.

23  BY MR. POLAK:

24      Q.  So you didn't let it go because you were trying

25  to protect PTK from violating some Act from over

Page 238

1    100 years ago?

2         MR. LINKE:  Objection as to form.  Objection as

3    to form.

4         THE WITNESS:  Sir, that is not some Act from

5    100 years ago.  That's the basis of advertising.  That's

6    the basis of false advertising, false statements.  And

7    for me to go out of my way to remove statements that are

8    unambiguously in violation of that is a huge favor and a

9    huge benefit to both PTK and Dr. Tincher-Ladner.

10   BY MR. POLAK:

11        Q.   What other organizations have you in 2024

12   identified false advertising by them in any way, other

13   than PTK?

14        A.   Well, I think to some extent, 42 societies were

15   marked as using blue and gold as their primary colors,

16   42 honor societies.  So, you know, I'll go ahead and,

17   you know, to that effect, I was protecting the

18   distinctiveness you could argue from your perspective of

19   these 41 other societies that were falsely using the

20   distinctive trade dress by your definition of PTK.

21        But other than that, there was also the usage

22   of wreaths that I -- over 20 honor societies were using,

23   but by your definition, again, those would be 19 engaged

24   in false origination of source.  So I believe those --

25   those were called out.  I believe that the Ku Klux Klan

Page 239

1    Honor Society had issues that were brought up and

2    brought to light.  The Honor Society caucus demonstrated

3    issues that were discussed and analyzed.  The

4    Association of College Honors Societies to some extent

5    faced the same issues.  The general Honor Society page,

6    you know, had similar issues.

7         We added information, I, about the Bouchet

8    Graduate Honor Society, which was in order to help

9    clarify the space and prevent false issues.  So I would

10   just generally say that this has been highly active

11   across the space and not at all, you know, targeted one

12   way or another.  This is purely a truthful exercise in

13   order to create objectivity, neutrality, verifiability

14   and reliability.

15        Q.   Are you familiar with the honor society, not

16   your organization, but the name for the type of

17   organization Honor Society Wikipedia page?

18        A.   I believe I just referenced that as a page,

19   yes.

20        Q.   Did you make any changes to that page?

21        A.   I believe so, yes.

22        Q.   What changes do you recall making to that one?

23        A.   Well, I believe -- I haven't looked at that

24   page recently, so I don't know what their current status

25   is, but to my recollection there was contact around the

Page 240

1    inclusive nature of the Bouchet Graduate Honor Society

2    by Yale and Howard that was added to the page.  There

3    was context surrounding the Ku Klux Klan Honor Society,

4    as well as systemic bias and structural racism that has

5    played a role in traditional honor societies that may be

6    referenced there.

7           I believe there might have been clarifications

8    around the voluntary nature of ACHS and how the Honor

9    Society caucus exists outside of the ACHS and outside of

10   the purview of that.  I don't know if I wrote about how

11   Sigma Xi, which is X-i, does not require any GPA

12   requirements.  I believe we touched on the colors,

13   perhaps, of societies that were listed on that page to,

14   you know, make sure that they correctly delineate the

15   colors of the organizations, dozens of which included

16   blue and gold as their primary colors.

17       Q.   Do you know whether your organization is

18   identified as an Honor Society on that page?

19       A.   Well --

20           MR. LINKE:  Objection as to form.  Objection as

21   being outside the scope of the 30(b)(6) deposition

22   topics.

23           THE WITNESS:  I wouldn't write about my

24   organization because we know that's a conflict of

25   interest and we respect that, so I know that I haven't

Page 241

1    written about it on that page, but --

2    BY MR. POLAK:

3        Q.   But didn't you write about your own

4    organization when you talked about the lawsuit that

5    exists with PTK?

6        A.   I didn't make a Wikipedia page about my own

7    company.

8        Q.   It's not my question, though, that I asked you

9    before.  What I asked you is why haven't you made any

10   edits to have your organization included on the Honor

11   Society page that we're talking about?

12           MR. LINKE:  Objection as to form.  Objection as

13   being outside the scope of the 30(b)(6) deposition

14   topics.

15           THE WITNESS:  I'm not sure I understand the

16   question.

17   BY MR. POLAK:

18       Q.   We've already established that your

19   organization is not identified as an honor society on

20   the Honor Society Wikipedia page, right?

21           MR. LINKE:  Objection as to form.  Objection as

22   being outside the scope of the 30(b)(6) deposition

23   topics.

24   BY MR. POLAK:

25       Q.   Here, I'm going to show you.  This is the Honor

Page 242

1    Society Wikipedia page.  Down here there is a list of

2    collegiate honor societies.  And you know your

3    organization is not identified here, right?

4            MR. LINKE:  Objection as to form.  Objection as

5    being outside the scope of the 30(b)(6) deposition

6    topics.

7    BY MR. POLAK:

8        Q.    Right?

9        A.    I mean, this is -- nowhere does it represent

10   this to be a comprehensive list of honors societies

11   and --

12       Q.    That's not my point, Mr. Moradian.  I didn't

13   ask you whether it was intended to be a comprehensive

14   list.  I just asked you whether your organization is

15   identified here and it is not, is it?

16           MR. LINKE:  Objection as to form.  Objection as

17   being outside the scope of the Rule 30(b)(6) deposition

18   topics.

19           THE WITNESS:  I don't know why you're asking me

20   about it.  You seem to have answered it yourself.

21   BY MR. POLAK:

22       Q.    Mr. Moradian, answer my question.  You know

23   that your organization is not listed on this Wikipedia

24   page, right?  Just yes or no.

25           MR. LINKE:  Objection as to form.  Objection as

Page 243

1    being outside the scope of the Rule 30(b)(6) deposition

2    topics.

3            THE WITNESS:  Yes, and we're fine with that.

4    BY MR. POLAK:

5        Q.   Why have you not tried to add honor society to

6    this page?  You made all these edits about PTK on PTK's

7    page.  Why have you not tried to edit this to include

8    your organization?

9            MR. LINKE:  Objection as to form.  Objection as

10   being outside the scope of the Rule 30(b)(6) deposition

11   topics.

12           THE WITNESS:  Why would we?

13   BY MR. POLAK:

14       Q.   Is that your only answer?  Why did you create

15   the Ku Klux Klan Honor Society Wiki?

16           MR. LINKE:  Objection as to form.  Objection as

17   being outside the scope of the 30(b)(6) deposition

18   notice.

19           THE WITNESS:  That is outside for what I

20   prepared for today to testify on the three subjects.

21   BY MR. POLAK:

22       Q.   Mr. Moradian, you have mentioned it no less

23   than 10 times today.  You're the one who brought it up,

24   I didn't.  So I'm asking you, why did you create the Ku

25   Klux Klan Honor Society Wiki?

Page 244

1           MR. LINKE:  Objection as to form.  Objection as

2     being outside the scope of the Rule 30(b)(6) deposition

3     topics.

4           THE WITNESS:  Because you're asking me, I will

5     answer.  The answer is simply because it is a

6     verifiable, reliable and notable piece of traditional

7     honor society history.  This occurred far before my

8     parents were born.  This -- and no less, this is truth

9     and this is history.

10          There is no way that I or anybody that I knew

11    had a role in this truthfulness, you know, part of

12    history, but it -- it is disingenuous to sit here and

13    say that what was going on in the south or at that time

14    period, did not have a role in honor societies and

15    traditional honor societies.

16          The fact that PDK did not allow

17    African-Americans or women or Jews or other minorities

18    to join.  The fact that PTK did not allow men to join,

19    this is all a sign of the times.  I'm not blaming it on

20    the societies, but it is true and it is a fact, and it

21    is a fact that you need to acknowledge -- people need to

22    acknowledge, in order to understand the past, in order

23    to understand where we are today and in order to move

24    forward.  And so that is critical piece of analysis that

25    you are trying to reject, and thus hurting the

Page 245

1    truthfulness, verifiability and reliability of history.

2    BY MR. POLAK:

3        Q.   Has your Ku Klux Klan Honor Society Wiki talk

4    about PTK?

5            MR. LINKE:  Objection as to form.  Objection as

6    being outside the scope of the Rule 30(b)(6) deposition

7    topics.

8            THE WITNESS:  I haven't prepared for that.  It

9    is outside the scope of these questions.

10   BY MR. POLAK:

11       Q.   You just got through telling me all sorts of

12   information about it and you mentioned it a bunch of

13   times in this deposition.  Apparently, in response to

14   some questions that I've already asked, you must think

15   it is relevant.

16           Do you recall whether there is any mention of

17   PTK on the Ku Klux Klan Honor Society Wikipedia?

18           MR. LINKE:  Objection as to form.  Objection as

19   being outside the scope of the Rule 30(b)(6) deposition

20   topics.

21           THE WITNESS:  I don't recall, but if you have

22   something that would imply otherwise or show otherwise,

23   I would be happy to discuss it, but I don't recall and I

24   don't believe so.

25           THE COURT REPORTER:  Counsel, if we're going to

Page 246

1    go to another subject, can I take a five, please?

2            MR. POLAK:  Absolutely.

3            VIDEOGRAPHER:  Standby.  This marks the end of

4    Unit No. 6.  Going off the record at 7:02 p.m. Pacific.

5            (Off the record at 7:02 p.m.)

6            (Back on the record at 7:15 p.m.)

7            VIDEOGRAPHER:  We are back on the record at

8    7:15 p.m. Pacific.  And this marks the beginning of

9    Media No. 7, deposition of Michael Moradian.

10           Please proceed, Counsel.

11   BY MR. POLAK:

12      Q.   Mr. Moradian, you've mentioned previously that

13   you have attempted to create a blue and gold Honor

14   Society Wikipedia page.  What were you referring to?

15      A.   It's not a Wikipedia page, it's a category.

16      Q.   What does that mean?  How is a category

17   different than a page?

18      A.   So category is a term used to -- I hate

19   defining a word with itself, but to categorize certain

20   items.  And so, you know, you may look at a category,

21   you know, born in the year 2000.  And celebrities that

22   are born in the year 2000 would all fit that category.

23   Or nonprofits in Mississippi, you know, that could be a

24   category.

25           And, you know, to that effect, blue and gold

Page 247

1    honor societies may be considered a category.  I'm not

2    the expert or the judge of that, but there were 42 that

3    were categorized as such and that Wikipedia basically,

4    you know, determined that it was not a unique enough

5    descriptor, it was a generic descriptor from what I

6    understand.  And so they wouldn't base a category on

7    something so generic.

8        Q.   Why is it that you don't like to define

9    something with the word that it is?

10            MR. LINKE:  Objection as to form.

11            THE WITNESS:  That's a nice question.  I think

12   it's important to distinguish what I meant by that.  I

13   wouldn't, you know, it's -- it's important to clarify,

14   you know, the English lexicon and to use terms that

15   would most adequately help define something.  And so I

16   was just trying to be helpful to your response.

17   BY MR. POLAK:

18       Q.   Yeah, but why is it a problem to define a word

19   with the word?

20            MR. LINKE:  Objection as to form.

21            THE WITNESS:  I don't believe that it is a

22   problem.

23   BY MR. POLAK:

24       Q.   You just said that it was.  Are you changing

25   your testimony?

Page 248

1          A.    No.

2                MR. LINKE:  Objection as to form.

3     BY MR. POLAK:

4          Q.    Which is it, is it a problem or is it not a

5     problem to define a word with a word?  Actually, I think

6     what you just said is that you do not like to define a

7     word with the word, I think that was your testimony.  So

8     why is it that you don't like to define a word with the

9     word?

10         A.    I'd be happy to answer that for you.  The

11    English lexicon is filled with ample opportunities to be

12    descriptive and categorize things as needed.  And so in

13    that example, I was trying to be as descriptive as

14    possible and it's -- it's as simple as that.

15                It was -- in order to help provide you a

16    cleaner response to your question.  Also, I did just do

17    it, so it is an acceptable way of communicating.

18         Q.    Do you agree with me it would be confusing

19    sometimes to define a word with a word, in terms of

20    trying to figure out what the word actually means?

21                MR. LINKE:  Objection as to form.  Objection as

22    being beyond the scope of the Rule 30(b)(6) deposition

23    topic.

24                MR. POLAK:  He brought it up, Derek.

25                MR. LINKE:  Well, I'm not instructing him not

1    to answer.  I'm making my objection for the record as

2    concisely as possible.  If you would like me to justify

3    it now, I can.  Otherwise, you can keep going.

4    BY MR. POLAK:

5        Q.   Mr. Moradian, you can answer the question.

6        A.   Can you please repeat the question?

7             MR. POLAK:  Ms. Langgle, could you repeat the

8    question?  Read it for him?

9             THE COURT REPORTER:  Yes.

10            (The last question was read back.)

11            MR. LINKE:  Objection as to form.  Objection as

12   being outside the scope of the Rule 30(b)(6) deposition

13   topics.

14            THE WITNESS:  No, I don't.  I think it's

15   beautiful.  I think it's part of the English lexicon.

16   And I think when a word is self-descriptive in and of

17   itself, it provides ample context and that's what's so

18   beautiful about it.

19   BY MR. POLAK:

20       Q.   Have you made any online statements about PTK

21   on any Wikipedia page we haven't discussed?

22       A.   Well, I know we didn't discuss them on

23   inclusive excellence because they don't believe that

24   inclusive excellence is valid, even though the most

25   colleges and universities propound that and push it.  So

Page 250

1    I don't believe that, you know, PTK would have a place

2    in the inclusive excellence page.

3         I know that we didn't talk about them on the

4    Honor Society caucus page because they were never

5    members of the Honors Society caucus.  To my knowledge,

6    I have never discussed them on the ACHS page because

7    while they were members for about 18 months out of 100

8    plus year history, I know it was a tumultuous era that

9    ultimately led to antitrust concerns, coming from the

10   ACHS about the behaviors of Phi Theta Kappa, where they

11   had to consult antitrust attorneys.  And in regard to

12   the way PTK was behaving, I believe that was in 2000 --

13   2007, so I wouldn't write about that.

14        Let's see, the Ku Klux Klan Honor Society, I

15   don't believe there would be any reason to tie the two

16   together.  It would -- wouldn't affect the scope of

17   objectivity, neutrality, verifiability, so I don't

18   believe so.

19        So I think, you know, if PTK were to be written

20   in other pages, it would most appropriately be placed in

21   a counterfeiting article or confusing brand perceptions

22   article perhaps, but I have not been involved in any of

23   those articles.

24        So to my knowledge, the only place that the Phi

25   Theta Kappa page has been referenced would be neatly

1  contained within your advertorial section that was

2  existed and now updated to meet Wikipedia standards to

3  achieve objectivity, neutrality and verifiability and

4  reliability, and that would be the only goal.

5          MR. POLAK:  Objection as nonresponsive with the

6  exception of the last sentence there about where you

7  actually did make reference to PTK, which was what my

8  question was about.  Not about all of the places where

9  you could have, but didn't.

10  BY MR. POLAK:

11     Q.   Have you -- have you made any online statements

12  about PTK in the last 30 days, other than Wikipedia

13  pages?

14          MR. LINKE:  Objection as to form.  And

15  objection as being outside the scope of the

16  Rule 30(b)(6) deposition topics.

17          THE WITNESS:  I'm thinking because I haven't

18  prepared for this because it is not within the scope of

19  the three things that I was asked to prepare for, but

20  I -- I will do my best to answer the question, so please

21  allow me a moment to think and make sure that I can give

22  you the best answer.

23          To the best of my knowledge, the last 30 days

24  have entailed me taking down articles, Twitter pages and

25  I'm -- I'm not aware of a single instance at this moment

Page 252

1    of anything being added, other than a disclaimer, which

2    I was asked to add.

3    BY MR. POLAK:

4        Q.    When did you create the inclusive excellence

5    Wikipedia page?

6            MR. LINKE:  Objection as to form.  And

7    objection as being beyond the scope of the Rule 30(b)(6)

8    deposition topics.

9            THE WITNESS:  I haven't prepared for that, but

10   I can try to give you my best answer.

11   BY MR. POLAK:

12       Q.    Please do.

13       A.    To my knowledge, it would have been some time

14   between April 16, 2024, and August 22, 2024.  It's

15   easily verifiable as it's a public record on Wikipedia.

16       Q.    Are you aware of how often Wikipedia is

17   visited?

18           MR. LINKE:  Objection as to form.  Objection as

19   being outside the scope for the Rule 30(b)(6) deposition

20   topics.

21           THE WITNESS:  Aware can mean a lot of things,

22   so...

23   BY MR. POLAK:

24       Q.    Do you know?

25           MR. LINKE:  Objection as to form.  Objection as

Page 253

1    to being outside the scope of the Rule 30(b)(6)

2    deposition topics.

3              THE WITNESS:  Can you ask the question again,

4    please?

5    BY MR. POLAK:

6        Q.  Isn't it the number one website in the world in

7    terms of visits?

8              MR. LINKE:  Objection as to form.  And

9    objection as being outside the scope of the

10   Rule 30(b)(6) deposition topics.

11             THE WITNESS:  To my knowledge, Google is the

12   number one.

13   BY MR. POLAK:

14       Q.  Where do you think Wikipedia ranks in terms of

15   the number of website hits or web traffic?

16             MR. LINKE:  Objection as to form.  Objection as

17   being outside the scope of the Rule 30(b)(6) deposition

18   topics.

19             THE WITNESS:  I can't -- I didn't prepare for

20   that in conjunction with this testimony about the

21   30(b)(6) and the three categories, so it would only be a

22   guess.  I don't feel comfortable guessing.

23   BY MR. POLAK:

24       Q.  Do you have any understanding as to who the

25   typical users are of Wikipedia in terms of demographics?

1          MR. LINKE:  Objection as to of form.  And

2     objection as being outside the scope of the noticed

3     Rule 30(b)(6) deposition topics.

4          THE WITNESS:  I have some idea.

5     BY MR. POLAK:

6          Q.    What is it?

7          A.    Well, based on Wikipedia's entry, which I read

8     last night, the users are generally hobbyists who are

9     engaged in the sector, professionals, men in their 20s

10    and in their retirement ages are disproportionately --

11         THE COURT REPORTER:  I'm sorry, are what?

12         THE WITNESS:  Disproportionately represented in

13    the Wikipedia population.  And so that's my

14    understanding based on Wikipedia's own, you know,

15    reading what Wikipedia said.

16    BY MR. POLAK:

17         Q.    Do you have any information on -- to what

18    extent students review Wikipedia pages?

19         MR. LINKE:  Objection as to form.  Objection as

20    being outside the scope of the Notice Rule 30(b)(6)

21    deposition topics.

22         THE WITNESS:  I don't believe I do.

23    BY MR. POLAK:

24         Q.    Have you contacted any media or news

25    organizations about PTK or Dr. Tincher-Ladner in the

1    last 60 days?

2             MR. LINKE:  Objection as to form.  And

3    objection as being outside the Rule 30(b)(6) deposition

4    topics.

5             Mr. Polak, this is so far beyond being strictly

6    limited to the Rule 30(b)(6) deposition topics.  If you

7    have questions about that, he's here, he's been here.

8    You can ask those of the questions of the Wikipedia

9    page.

10            MR. POLAK:  It goes to malice.  You can

11   answer --

12            MR. LINKE:  That's not within the scope -- it's

13   not within the scope of the deposition notice.  It's not

14   within the scope of what the Court asked for as far as

15   discovery.

16   BY MR. POLAK:

17       Q.   You can answer the question, Mr. Moradian.

18       A.   Can you please repeat the question?

19       Q.   Have you been in contact or in communication

20   with any news or media organizations about PTK or

21   Dr. Tincher-Ladner in the last 60 to 90 days?

22            MR. LINKE:  Objection as to form.  Objection as

23   being outside the scope of the Rule 30(b)(6) deposition

24   topics.  I instruct the witness not to answer the

25   question, except to the extent it relates to the

Page 256

1   Wikipedia pages, which is the subject of this deposition

2   and the subject of the discovery that Judge Reeves

3   indicated Honor Society needed to subject itself to,

4   which it has been doing all day.

5   BY MR. POLAK:

6       Q.   Are you going to refuse to answer my question,

7   Mr. Moradian?  I've already told you it goes to malice.

8       A.   I'm going to follow the advice of my counsel.

9       Q.   So you're going to refuse to answer my

10  question?

11          MR. LINKE:  Objection as to form.

12  BY MR. POLAK:

13      Q.   It's just a yes-or-no question.  Have you been

14  in contact with any news or media organizations about

15  PTK or Dr. Tincher-Ladner in the last 60 to 90 days?

16          MR. LINKE:  Same objections as to form.

17  Outside the scope of the Rule 30(b)(6) deposition

18  notice.

19          Same instruction.  If it relates to the

20  Wikipedia page that is the subject of the discovery at

21  issue, to which this deposition was required to be

22  strictly limited, or to the deposition topics in the

23  notice, then he should answer.  Otherwise, I'm

24  instructing him not to answer.

25

Page 257

1    BY MR. POLAK:

2        Q.    What's the answer, Mr. Moradian?

3        A.    The answer is that I will follow the advice of

4    my counsel.

5        Q.    So you are refusing to answer my question?

6            MR. LINKE:   Objection as to form.

7            THE WITNESS:   Yes, I am following the advice of

8    my counsel.

9    BY MR. POLAK:

10       Q.    Are you a petulant cyber bully?

11           MR. LINKE:   Objection as to form.   Objection

12    based on the scope of the 30(b)(6) rule -- Rule 30(b)(6)

13    deposition notices, which this question is clearly

14    outside of.

15           THE WITNESS:   There is no basis for that claim

16    and the argument would most be cleanly the opposite.

17    BY MR. POLAK:

18       Q.    So there is no basis -- you're saying there is

19    no basis for when Judge Reeves called you a petulant

20    cyber bully?

21           MR. LINKE:   Objection as to form.   Objection as

22    to being beyond the scope the Rule 30(b)(6) deposition

23    notice.

24           THE WITNESS:   I'm prepared to answer questions

25    and to testify on behalf of the three questions that

1    you're here to ask me, and I am prepared to answer

2    those.  And I'm doing the best I can.

3    BY MR. POLAK:

4        Q.    Can you answer my question then, please?

5        A.    Can you please restate your question?

6            MR. POLAK:  Ms. Langgle, could you please

7    reread the question for the witness?

8            THE COURT REPORTER:  Yes.

9             (The last question was read back.)

10            MR. LINKE:  Objection as to form.  Objection as

11    being outside the scope of the Rule 30(b)(6) deposition

12    notice.

13            THE WITNESS:  I will be happy to answer that if

14    I had a direct quote and context to that statement.

15    BY MR. POLAK:

16        Q.    I'm going to show you the very last page of his

17    order.  Mike Tyson -- I'm going to quote.  Mike Tyson

18    once said everyone has a plan until they get punched in

19    the mouth, and he gives a citation.  He goes on to say,

20    quote, it appears that Honor Society wants to punch PTK

21    in the mouth at every opportunity, but the totality of

22    its online behavior paints a picture of a petulant cyber

23    bully fixated on destroying a competitor rather than a

24    boxer abiding by the rules of his sport.

25            So is it your view, Mr. Moradian, that

Page 259

1    Judge Reeves got it wrong when he called you a petulant

2    cyber bully?

3            MR. LINKE:  Objection as to form.  And

4    objection as being beyond the scope the Rule 30(b)(6)

5    deposition topics.

6            THE WITNESS:  I have no context to answer that

7    question.

8    BY MR. POLAK:

9        Q.   What do you mean by that?  You have a whole

10   27-page order here, where he walked through in

11   painstaking detail, including the Wikipedia pages, where

12   he came to the conclusion that you were a petulant cyber

13   bully.  You said you read the order, right?  Isn't that

14   right?

15           MR. LINKE:  Objection as to form.

16   BY MR. POLAK:

17       Q.   You told me before that you had read the order

18   and in fact had read it many times, right?

19           MR. LINKE:  Objection as to form.  Objection as

20   being outside the scope of the Rule 30(b)(6) deposition

21   topics.

22           THE WITNESS:  Yes, I have read this statement,

23   this document many times.

24   BY MR. POLAK:

25       Q.   Okay.  So are you disagreeing with

Page 260

1    Judge Reeves' characterization of your online behavior

2    as painting a picture of a petulant cyber bully?

3                MR. LINKE:  Objection as to form.  Objection as

4    being outside the scope of the Rule 30(b)(6) deposition

5    topics.

6                THE WITNESS:  I didn't prepare for this

7    question because it's outside of the three things that I

8    was asked to prepare for in order to answer this.

9    BY MR. POLAK:

10       Q.    You still need to answer it, Mr. Moradian.

11       A.    You cut me off.

12       Q.    Hopefully you're getting to the answer.

13             Go ahead.

14       A.    So I believe that the people who know me, the

15    people who have dealt with me and anybody that you talk

16    to who knows me, knows who I am, what I stand for and

17    what I believe in.  I -- and so based on that, I -- and

18    to your original question, I don't consider myself to be

19    that.

20             And I -- I believe that I have been a force for

21    good, that I've been recognized on Wikipedia for being a

22    valid and contributor.  I've been recognized by Business

23    Magazine, Business Week Magazine for being one of

24    America's best young entrepreneurs.  I was recognized by

25    the US Department of State for my entrepreneurial

Page 261

1    efforts that was published in a publication around the

2    world.

3         And so I believe my record speaks for itself

4    that I have values, I believe in inclusivity and

5    furthering opportunities for everybody and for being

6    there for the people who need me the most.  And so I'm

7    proud to hang my hat, knowing that that's who I am and

8    what I stand for.

9    Q.   If you have such a great reputation and take

10   such pride in it, why are you putting it all at risk by

11   cyber bullying PTK in the way that you have, including

12   these Wikipedia edits?

13        MR. LINKE:  Objection as to form.

14        THE WITNESS:  Well, the statement that you

15   made, as you and I both know, is a gross

16   mischaracterization.  And I have been open to

17   conversation for two-and-a-half years.  I have been

18   reaching out and asking to have a conversation.  And I

19   believe that open doors and communications is the best

20   way.  It's -- the world operates through understanding,

21   through sharing mutual commonalities and through

22   discussion.

23        And so I have made myself available to call me

24   at any time.  Dr. Tincher-Ladner has my phone number, as

25   I've seen her having my business card.  You have my

Page 262

1    phone number.  I'll make it easier and give the whole

2    public my phone number, it is ▮▮▮▮▮▮▮▮▮  And

3    anybody can call me at any time and I'm willing to talk

4    about this in order to open doors.  And so I -- I have

5    done exactly the opposite.

6              And to the extent that I wouldn't say I'm

7    risking it all.  You know, the first statement of our

8    press release, which you mischaracterized as well, says

9    in defense of students and the society -- general honor

10   society -- community College space.  The first word, the

11   first substantive word was defense.  And I'm here

12   defending what I believe in, defending the families and

13   the employees who have sacrificed to create an inclusive

14   honor society for the thousands of students who are

15   loyal members and who enjoy our benefits and tools.

16             And for the fact of the brand that we have

17   built over the last decade, I am -- but nevertheless I

18   am here to speak and, you know, talking about this case

19   is -- I would prefer to not be in this case.  And, you

20   know, this -- this is not the preferred route because

21   the only winner here, sir, is you.  You're making

22   millions of dollars off of the back of a nonprofit.  And

23   this nonprofit is seeking information through you.

24             I would surmise that it would be best for them

25   to take third party consultations, including their own

Page 263

1    lawyer, Maury Nunez, to get his opinion on what he

2    believes is the best.  Because you, sir, are giving, you

3    know, as established in the heckler case that you were

4    involved in, misrepresentations to your -- to your --

5    your own party and they're detrimentally relying on it.

6         So I am trying my best here to open the doors

7    to Dr. Lynn Tincher-Ladner to help her and to help all

8    of us move forward and focus on creating value for

9    students on spending our money, helping the individuals

10    we are aimed to help and not enriching Jonathan Polak.

11         MR. POLAK:  Objection.  Nonresponsive.

12         MR. LINKE:  Brandon, are we at seven hours now?

13    I believe we're a minute over.

14         VIDEOGRAPHER:  Yes, about 7:01, it's 7 hours

15    and 1 minute.

16         MR. POLAK:  I've probably got about another

17    five minutes or so.  I think he has taken up plenty of

18    my time.

19         VIDEOGRAPHER:  Mr. Moradian, this is on the

20    record, just to let you know.

21         MR. POLAK:  You can come back, Michael.

22         Okay.

23         MR. LINKE:  So Mr. Polak, you're saying with

24    five more minutes, you'll be finished with the

25    examination?

Page 264

1          MR. POLAK:  Well, five minutes of my questions.

2     Whether I get five minutes of answers or not is a whole

3     other thing.  But look, I mean, the -- again, I've never

4     been in a deposition of this nature before.  And

5     Mr. Asari, I thought, was at the far end of deposition

6     misconduct, but we've reached new lows today.

7          I mean, look, I've got more questions and I

8     think I'm entitled to continue asking them.  If you want

9     to call it, call it, and I'll take it up with

10    Judge Meyers.

11         MR. LINKE:  Well, I tell you what, there's been

12    so much questioning today that was clearly outside the

13    scope of the Rule 30(b)(6).  We let you do it.  And if

14    you are willing to say your deposition will be concluded

15    with five more minutes of testimony, we'll do it.

16    Otherwise, I don't see that being productive for the

17    parties and we should end it now.

18         MR. POLAK:  Well, I'm going to keep going until

19    you tell me I'm going to stop.

20         MR. LINKE:  Okay.  So then we should probably

21    stop for the night and that's the end of the deposition.

22         MR. POLAK:  Okay.  Well, I've got more

23    questions and he did impede my ability to get this

24    deposition done.  There's no reason this should have

25    taken seven hours of testimony or more.  There is no

Page 265

1  reason.

2            I'm fully prepared to go send not only

3  Judge Meyers the transcript, but the video because the

4  video is pretty telling.

5            MR. LINKE:  I agree.  And I think the

6  questioning was the primary cause of that.

7            MR. POLAK:  Okay.

8            MR. LINKE:  And I share your view on what the

9  transcript and the video will demonstrate.  So my offer

10 was five minutes, if you can use it to conclude, so that

11 we can put this behind ourselves.  Otherwise, I don't

12 see any reason to continue and we believe this

13 deposition is completed other than that.

14           MR. POLAK:  I would like to think that I can

15 get this done in the next five minutes.  But again, I

16 can't promise you that will be the case when

17 Mr. Moradian seems to think running out the clock is a

18 reasonable way to do it.  I'm prepared to keep asking

19 some questions.  And then if you think it's gone too

20 long after that, you just let me know and we'll stop.

21           MR. LINKE:  Can we take a three minute sidebar

22 off the record, so I can consult with my client?

23           MR. POLAK:  Yes.

24           VIDEOGRAPHER:  Okay, this marks the end of

25 Media No. 7.  Going off the record at 7:49 p.m. Pacific.

Page 266

1           (Off the record at 7:49 p.m.)

2           (Back on the record at 8:00 p.m.)

3           VIDEOGRAPHER:  Okay.  We're back on the record

4      at 8:00 p.m. Pacific, and this marks the beginning of

5      Media No. 8, deposition of Michael Moradian.

6           Please proceed, Counsel.

7           MR. POLAK:  All right, sorry.  Thank you.

8           We had a chance to go off the record and talk

9      about where we are.  I think where we are right now is

10     that I went back and looked at my notes, I've got more

11     than just a limited amount of questions for

12     Mr. Moradian.

13          And I think Derek and I have a disagreement

14     over whether or not more time is necessary.  I'm not

15     going to rehash the reasons why I think it is and Derek,

16     I'd ask you not to rehash the reasons why you think we

17     should finish.  But suffice to say, you think we should

18     be done, I disagree.  We'll take it up at a later date.

19          And as far as I'm concerned we'll keep the

20     deposition subject to being resumed at a later point.

21     And Derek, I think you look at it differently.

22          MR. LINKE:  Yes, and I appreciate your

23     invitation that we not rehash the positions that we

24     previously stated.  I only note that we object to not

25     concluding the deposition.  And you said that we think

Page 267

1    it should be done.  I would just like to clarify that

2    our position is that it is done, but with that, we can

3    end.

4              MR. POLAK:  If that's what I said, that's not

5    what I intended.  So you're correct, we are in

6    disagreement about that.

7              I guess with that, we'll go ahead and end the

8    deposition.

9              VIDEOGRAPHER:  Okay.  Thank you.  Standby,

10   please.

11             Is there anything from the court reporter

12   before I conclude the record only, or counsel?

13             THE COURT REPORTER:  Mr. Linke, did you want a

14   copy of the transcript?

15             MR. LINKE:  Yes, and I would like to place it

16   on the same delivery schedule as Mr. Polak's client

17   does.

18             MR. POLAK:  And we will need a copy of the

19   transcript, and we will need it fairly quickly.  And I

20   think we'll also need a copy of the video.

21             THE COURT REPORTER:  Thank you.

22             VIDEOGRAPHER:  Thank you.  I'm going to

23   conclude for today.

24             This ends today's deposition of Michael

25   Moradian.  Total number of media used is 8.  Going off

Page 268

1    the record at 8:02 p.m. Pacific Daylight Time.

2                 (Off the record at 8:02 p.m.)

3                          -0o0-

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 269

1                          CERTIFICATE

2

3

4          I, Katie Langgle, a California Certified

5   Shorthand Reporter, do hereby certify:

6              That prior to being examined, the witness in

7   the foregoing proceedings was by me duly sworn to

8   testify to the truth, the whole truth, and nothing but

9   the truth;

10             That said proceedings were taken before me at

11  the time and place therein set forth and were taken down

12  by me in shorthand and thereafter transcribed into

13  typewriting under my direction and supervision;

14             I further certify that I am neither counsel

15  for, nor related to, any party to said proceedings, nor

16  in any way interested in the outcome thereof.

17

18             In witness whereof, I have hereunto subscribed

19  my name at Laughlin, Nevada, this 3rd day of October,

20  2024.

21

22

23

                         Katie L. Langgle

24                       CSR No. 8637

25

```
                                                          Page 270
1                        Veritext Legal Solutions
                            1100 Superior Ave
2                              Suite 1820
                          Cleveland, Ohio 44114
3                         Phone: 216-523-1313
4

     October 7, 2024
5

     To: Mr. Linke
6

     Case Name: Phi Theta Kappa Honor Society v. Honorsociety.Org Inc Et Al
7

     Veritext Reference Number: 6946296
8

     Witness:  Michael Moradian       Deposition Date:  10/1/2024
9

10   Dear Sir/Madam:

11
     Enclosed please find a deposition transcript.  Please have the witness
12
     review the transcript and note any changes or corrections on the
13
     included errata sheet, indicating the page, line number, change, and
14
     the reason for the change.  Have the witness' signature notarized and
15
     forward the completed page(s) back to us at the Production address
16   shown
17   above, or email to production-midwest@veritext.com.
18
     If the errata is not returned within thirty days of your receipt of
19
     this letter, the reading and signing will be deemed waived.
20
21   Sincerely,
22   Production Department
23

24
25   NO NOTARY REQUIRED IN CA
```

```
                                                    Page 271
 1                   DEPOSITION REVIEW
                   CERTIFICATION OF WITNESS
 2
           ASSIGNMENT REFERENCE NO: 6946296
 3         CASE NAME: Phi Theta Kappa Honor Society v. Honorsociety.Org
    Inc Et Al
           DATE OF DEPOSITION: 10/1/2024
 4         WITNESS' NAME: Michael Moradian
 5         In accordance with the Rules of Civil
    Procedure, I have read the entire transcript of
 6  my testimony or it has been read to me.
 7         I have made no changes to the testimony
    as transcribed by the court reporter.
 8

    _____        _____
 9  Date                    Michael Moradian
10         Sworn to and subscribed before me, a
    Notary Public in and for the State and County,
11  the referenced witness did personally appear
    and acknowledge that:
12
           They have read the transcript;
13         They signed the foregoing Sworn
                Statement; and
14         Their execution of this Statement is of
                their free act and deed.
15
           I have affixed my name and official seal
16
    this _____ day of_____, 20_____.
17
                   _____
18                 Notary Public
19                 _____
                   Commission Expiration Date
20
21
22
23
24
25
```

Page 272

```
 1              DEPOSITION REVIEW
              CERTIFICATION OF WITNESS
 2
         ASSIGNMENT REFERENCE NO: 6946296
 3       CASE NAME: Phi Theta Kappa Honor Society v. Honorsociety.Org
    Inc Et Al
         DATE OF DEPOSITION: 10/1/2024
 4       WITNESS' NAME: Michael Moradian
 5       In accordance with the Rules of Civil
    Procedure, I have read the entire transcript of
 6  my testimony or it has been read to me.
 7       I have listed my changes on the attached
    Errata Sheet, listing page and line numbers as
 8  well as the reason(s) for the change(s).
 9       I request that these changes be entered
    as part of the record of my testimony.
10
         I have executed the Errata Sheet, as well
11  as this Certificate, and request and authorize
    that both be appended to the transcript of my
12  testimony and be incorporated therein.
13  _____        _____
    Date                    Michael Moradian
14
         Sworn to and subscribed before me, a
15  Notary Public in and for the State and County,
    the referenced witness did personally appear
16  and acknowledge that:
17       They have read the transcript;
         They have listed all of their corrections
18           in the appended Errata Sheet;
         They signed the foregoing Sworn
19           Statement; and
         Their execution of this Statement is of
20           their free act and deed.
21       I have affixed my name and official seal
22  this _____ day of_____, 20_____.
23           _____
             Notary Public
24
             _____
25           Commission Expiration Date
```

Page 273

1                           ERRATA SHEET
                    VERITEXT LEGAL SOLUTIONS MIDWEST
2                       ASSIGNMENT NO: 6946296
3        PAGE/LINE(S) /          CHANGE          /REASON
4        _____
5        _____
6        _____
7        _____
8        _____
9        _____
10       _____
11       _____
12       _____
13       _____
14       _____
15       _____
16       _____
17       _____
18       _____
19

         _____      _____
20       Date                   Michael Moradian
21       SUBSCRIBED AND SWORN TO BEFORE ME THIS _____
22       DAY OF _____, 20_____ .
23                              _____
                                Notary Public
24

25                              _____
                                Commission Expiration Date

[& - 22]

Page 1

| & | | | |
|---|---|---|---|
| **&**  3:9,13 7:12 | **1300**  114:5 | 136:7 150:4 | **2023**  84:10 |
| **0** | **1416**  236:21 | 162:23 225:15 | 88:5,14 146:24 |
| **00208**  1:7 6:21 | **148**  5:12 | 238:22 271:16 | 147:7 205:3 |
| **0o0**  6:4 268:3 | **15**  5:7 111:21 | 272:22 273:22 | 225:11 |

| | | | |
|---|---|---|---|
| **1** | 115:6 225:11 | **200**  118:5 | **2024**  1:22 3:3 |
| **1**  1:22,25 3:3 | **157**  5:13 | 119:13 | 6:2,7 37:1 |
| 6:2,15 37:18 | **16**  74:1,3,23 | **2000**  43:22 | 44:16,25 46:13 |
| 91:5,11 111:10 | 80:21 82:16 | 44:16 246:21 | 74:1,3,23 |
| 111:21 163:25 | 107:17 231:20 | 246:22 250:12 | 80:16 84:10 |
| 165:19 199:23 | 252:14 | **2000s**  38:11 | 107:2,9,10,17 |
| 228:18 263:15 | **165**  5:15 | 43:10 44:23,25 | 108:1,2 111:19 |
| **10**  72:20 114:5 | **16th**  107:10 | 74:22 110:4,11 | 111:22 119:25 |
| 172:9 174:14 | 108:2 111:19 | 110:20 | 137:6 150:8 |
| 212:23,23 | 119:24 | **2007**  250:13 | 154:12,13,15 |
| 213:15,21 | **18**  250:7 | **2008**  225:11 | 154:22 155:1,8 |
| 243:23 | **1820**  270:2 | **2009**  121:16 | 155:8,11,17,17 |
| **10/1/2024** | **19**  166:8,14 | **2015**  84:8,9,24 | 155:23 156:1,4 |
| 270:8 271:3 | 168:9 170:2 | 85:2,21 86:12 | 156:9,12,17 |
| 272:3 | 238:23 | 183:9 185:2,24 | 162:8 163:6,19 |
| **100**  3:22 52:17 | **1914**  10:2 | 193:15 | 163:25 164:3 |
| 238:1,5 250:7 | 237:18,21 | **2016**  84:9 | 165:14,23,23 |
| **106**  5:10 | **1918**  121:12 | 85:21 111:3,4 | 204:24 205:2 |
| **10:39**  3:3 6:3,6 | **1929**  166:8 | 111:10,21 | 224:12 225:7 |
| **10th**  80:16 | 170:2 | 146:24 147:7 | 231:12,12,12 |
| **1100**  270:1 | **1965**  119:12 | **2017**  84:9 | 231:12 238:11 |
| **11:30**  37:15,19 | **1978**  66:12 | **2018**  84:9 | 252:14,14 |
| 37:20 | **1980s**  139:5 | **2019**  84:9 | 269:20 270:4 |
| **11:40**  37:16 | **1:06**  73:1,3 | **2020**  46:16 | **206.274.2800** |
| **11:45**  37:21,23 | **1:57**  106:12,13 | 84:9 | 3:23 |
| **12**  216:8 | **1st**  6:7 | **2021**  84:10 | **20s**  254:9 |
| **12:42**  72:24,25 | | 235:21 | **216-523-1313** |
| **13**  124:18 | **2** | **2022**  84:10 | 270:3 |
| 158:10 | **2**  37:24 72:23 | 87:9,23 155:24 | **22**  6:21 157:20 |
| | 91:7,13 | 162:13,19,24 | 165:23,23 |
| | **20**  122:9,17 | 163:18 | 167:16 199:25 |
| | 129:20 131:8 | | |

[22 - 601.968.5500]                                                    Page 2

215:7,12 217:2
226:23 228:20
232:21 252:14
**23** 122:16
235:19 236:20
**24** 5:12 149:17
154:22 183:4
204:24 237:6
**24th** 24:25 25:8
25:15 107:2
**26th** 64:7
**27** 259:10
**270** 1:25
**27th** 64:7
**28** 80:10
196:20 206:8
**28th** 64:7
**29901** 269:23
**2:00** 100:12
**2:46** 106:14,16
148:21,21

**3**

**3** 6:21 73:4
91:9,15 106:11
106:24 107:1
**3.3** 97:24
**30** 16:7,17 20:8
31:3,17 50:15
85:11 122:9,18
158:21 161:9
181:2 207:6
209:15 211:11
211:18 217:23
218:13,21
219:6,8 220:12

220:17 221:12
222:2,9 223:4
223:9 240:21
241:13,22
242:5,17 243:1
243:10,17
244:2 245:6,19
248:22 249:12
251:12,16,23
252:7,19 253:1
253:10,17,21
254:3,20 255:3
255:6,23
256:17 257:12
257:12,22
258:11 259:4
259:20 260:4
264:13
**300** 4:2
**3100** 4:2
**317.713.3500**
3:12
**35** 59:1,1 61:15
**3500** 3:10
**36** 153:19
**368-3686** 262:2
**378** 5:7 15:20
15:25 16:6,13
**379** 5:8 94:17
94:19,23
**380** 5:10
106:20,21
**381** 5:12
148:12,15
149:11 183:3

185:2,24
204:22
**382** 5:13
157:11,14
162:2 216:7
**383** 5:15
165:19,21,25
199:20 228:17
**39205** 3:15
**39216** 4:3
**3:22** 1:7
**3:51** 149:3,4
**3rd** 269:19

**4**

**4** 106:17 149:3
199:2,4,4
**40** 85:11
136:12
**41** 238:19
**42** 238:14,16
247:2
**44114** 270:2
**45** 131:11
136:12
**46204-2023**
3:11
**4:06** 149:5,7

**5**

**5** 149:8 204:12
**50** 85:11 136:1
136:4,6 185:19
**50th** 114:24
**5:36** 204:13,14

**5:48** 204:15
**5:49** 204:17

**6**

**6** 16:7,17 20:8
31:3,17 158:21
161:9 181:2
204:18 207:6
209:15 211:11
211:18 217:23
218:13,21
219:6,8 220:12
221:12 222:2,9
223:4,9 240:21
241:13,22
242:5,17 243:1
243:10,17
244:2 245:6,19
246:4 248:22
249:12 251:16
252:7,19 253:1
253:10,17,21
254:3,20 255:3
255:6,23
256:17 257:12
257:12,22
258:11 259:4
259:20 260:4
264:13
**60** 73:16,18
255:1,21
256:15
**601.949.4720**
4:4
**601.968.5500**
3:16

**[60th - acknowledge]**

**60th** 114:24
**651** 3:14
**6946296** 2:1
  270:7 271:2
  272:2 273:2

**7**

**7** 148:11,12,13
  149:13 224:23
  246:9 263:14
  265:25 270:4
**700** 3:22
**78** 66:18
**7:01** 263:14
**7:02** 246:4,5
**7:15** 246:6,8
**7:49** 265:25
  266:1

**8**

**8** 5:4 266:5
  267:25
**8/22** 159:2
**805** 262:2
**85th** 115:6
**8637** 1:23 3:4
  269:24
**8:00** 266:2,4
**8:02** 268:1,2
**8th** 107:9 108:1

**9**

**90** 255:21
  256:15
**90401-3602**
  3:22

**94** 5:8
**990** 198:2
**993** 1:23 3:4
**9:37** 232:22
**9:41** 232:22

**a**

**a.m.** 3:3 6:3,6
  37:19,20,21,23
**aacc** 104:3
**aajc** 170:2
**abbreviation**
  63:1
**abide** 103:19
**abided** 105:8
**abiding** 258:24
**abilities** 49:9
  114:11 179:6
**ability** 20:3,7
  21:5 23:19
  29:6 40:9
  46:24 56:16
  72:1 78:2
  96:13 99:20,25
  107:19 156:15
  161:7 164:17
  164:23,24
  165:2 208:10
  215:22 233:7
  264:23
**able** 19:24
  21:12 47:14
  51:7 54:18
  60:23 95:14
  153:6 220:5
  235:25

**above** 177:14
  234:11 270:17
**abrupt** 202:4
**absence** 183:10
  194:25 195:19
  195:25 196:2
**absolute** 38:18
  59:5 179:15,19
**absolutely**
  146:3 220:5
  246:2
**abuse** 84:15,19
  85:8 95:17
  97:24 148:2
**abusing** 102:10
**academic**
  114:21 115:4
**accept** 29:15
  49:22 55:18
  178:3
**acceptable** 52:2
  101:12 128:13
  248:17
**accepted** 42:24
  60:8
**access** 39:2
**accessible**
  105:5
**accordance**
  97:16 271:5
  272:5
**account** 26:17
  26:18 48:23
  56:17,19,23,25
  63:24 65:18,24

**above** 67:14 73:18
**accountability**
  202:14,25
**accountable**
  96:2,17,20,22
**accounts** 47:8
**accurate** 48:18
  121:9 162:3
  165:17 166:13
  166:16 168:11
  169:17,22
  170:11 171:5
  182:1 196:7
  211:8,16
**accurately**
  156:16,18
  165:3
**accuse** 160:19
**accusing**
  236:16
**achieve** 92:21
  251:3
**achieved** 90:21
  92:9,12
**achievement**
  114:21 115:5
  179:9
**achs** 139:7
  240:8,9 250:6
  250:10
**acknowledge**
  21:8 28:3
  40:10,11 63:12
  78:15 85:12
  168:16 182:4

[acknowledge - advocate]                                    Page 4

217:14,14
244:21,22
271:11 272:16
**acknowledged**
121:22 170:4
**acknowledging**
59:18
**act** 10:1 237:18
237:21,25
238:4 271:14
272:20
**acting** 176:16
**action** 6:21 7:3
128:20 195:25
**actions** 69:12
96:18
**active** 110:16
239:10
**actively** 105:1
111:14
**activities** 88:22
231:16
**activity** 25:7
**actual** 191:13
**actually** 10:17
41:10,21 46:15
50:11 60:10
63:10 101:1
111:11 113:5
116:14 131:20
140:15 168:1
169:19 182:22
195:21,23
236:23 248:5
248:20 251:7

**add** 14:8 23:23
51:23 53:15
55:24 75:21,21
81:22 93:18
128:22 134:7
135:15 142:1
170:24,25
174:6 243:5
252:2
**added** 14:15
28:2 60:6 64:6
64:6 89:8
124:13 126:16
131:22 135:1
135:13,18
139:20 140:20
142:23,25
143:12 144:2,3
152:19 157:7
170:19 171:2
188:5 203:24
215:20 239:7
240:2 252:1
**adding** 29:3
104:5 108:9
173:12 174:24
**addition** 136:2
136:2,4,6
153:12
**additional**
231:2 234:1,5
**additionally**
179:9 202:3,4
**address** 47:25
48:6 270:15

**addresses** 57:3
**addressing**
215:2
**adequately**
247:15
**administrator**
49:11 58:21
59:3 61:22
65:11,14 66:2
66:6 67:20
68:1 69:11
89:23 90:1
123:5 193:18
235:11
**administrators**
40:18 55:25
56:13 58:23,25
65:5 81:23
145:13 150:17
173:16 204:1
**admission**
170:8
**admissions**
139:6
**admit** 201:14
**admitted** 45:24
50:16 67:5
121:20
**admittedly**
65:24,24 211:4
**adversary**
42:11
**advert** 153:3
**advertisement**
108:7 111:9

112:15 113:2,9
114:14 116:5
117:6,23
118:23 119:25
120:15,17
144:22 237:16
**advertisements**
10:2 116:19
**advertising**
14:8 40:4 42:4
73:23 80:15
115:13 150:10
172:4 238:5,6
238:12
**advertorial**
114:9 119:22
120:7 122:21
123:2 251:1
**advice** 36:15
223:20 256:8
257:3,7
**advise** 90:4
**advisers** 205:14
208:5,20 209:1
209:8,13
216:14 221:22
223:2 228:10
**advisor** 206:22
209:18,20
210:15 216:11
216:15 225:7
225:10 227:15
227:17,18
**advocate** 148:8

**advocates**
148:7
**affect** 145:5
250:16
**affiliated** 35:6
35:19
**affiliation**
210:19
**affiliations** 7:8
**affirmed** 8:9
**affixed** 271:15
272:21
**african** 244:17
**agency** 123:5
**agenda** 67:24
**agendas** 9:24
**ages** 254:10
**aggressively**
81:17
**ago** 35:16 50:8
85:11 157:21
230:13 238:1,5
**agree** 6:14
10:22 103:3,18
104:15,21
105:22 165:6
169:14 170:10
171:4 216:20
218:10 219:3
222:23 227:8
229:2 248:18
265:5
**agreed** 223:8
**agreement**
31:21 223:16

**ahead** 23:3,4,5
94:17 216:5
238:16 260:13
267:7
**aid** 212:6
**aim** 52:21 56:5
**aimed** 263:10
**al** 6:18 270:6
271:3 272:3
**alcante** 33:2
34:5,24
**alert** 145:2
**alias** 26:17,21
26:24 166:21
**allegations**
27:4 76:22
84:1 85:1
86:12 181:6
182:11 183:13
186:6,19 191:7
191:21,22
192:10 193:25
196:15 200:7
200:15,24
201:7,16
202:13 205:6
215:4
**allege** 189:19
**alleged** 189:13
189:17
**allegedly** 172:7
173:12 174:16
174:20 175:11
216:12 224:1
226:14

**alleging** 159:20
175:4,11 177:4
**allow** 56:13
187:13 244:16
244:18 251:21
**allowed** 38:24
87:15 143:22
**allows** 51:22
**ally** 85:9
**ambulatory**
112:19
**amended** 16:17
80:13 81:2
156:7,8,8,17
**amends** 156:21
**america** 122:23
**america's**
260:24
**american**
113:20,23
166:9
**americans**
244:17
**amount** 13:21
52:5 128:11
130:14 234:18
266:11
**amounted**
171:22
**ample** 248:11
249:17
**analysis** 74:20
187:8 244:24
**analyzed** 239:3

**ancient** 179:10
**announced**
183:15 196:9
**announcing**
201:4
**anomi** 62:8
**anomiebot** 62:8
63:19
**anonymously**
48:6
**answer** 12:6,13
12:13,23,24,25
13:2,4,8,8,9,9
13:20 19:24
20:3,7,8 21:4
23:18 24:20
26:18 28:5
30:14 31:1,3,7
34:8,17 37:7
37:11 42:3
44:4,11,12
45:7,12,15,16
45:17,19,22
46:23 47:10,15
48:2,15 51:18
51:23 54:5
56:7,8 57:6,10
57:11 58:1,17
59:22,24 60:3
60:4 62:14
66:11 68:13
70:23 71:1,16
72:2,5,15 78:1
78:9 79:18,20
82:7,10,13,14

84:22 87:14,19
87:20 90:25
91:2,4,6,8,10
91:12,20 92:1
92:8 96:21
100:15,17
101:2 102:13
103:23 105:19
109:15 110:8
110:14 112:7
113:3,7 118:21
118:24 119:3
122:7 123:12
123:13 125:2,6
125:8,22
129:14 130:4
131:2 132:18
142:10,22
143:2 144:16
155:13 160:17
160:21,22,23
161:5,6,16,24
161:25 162:3
170:17 171:23
172:21 174:25
176:3,5 178:19
179:16 181:2,4
181:25 182:15
184:8,9 185:6
185:10,14
187:9,11,11,13
187:16,20
188:12 191:17
195:9 207:1,5
207:7,10,15

208:7,11,13,15
209:17 212:12
215:17 217:24
217:25 218:2,8
218:9,10,24
219:9,13 220:6
220:14,16,18
220:19,21
221:9 222:6,10
222:18,20,21
222:22 223:7
223:16,17,20
225:12,18
226:25 233:7
235:25 242:22
243:14 244:5,5
248:10 249:1,5
251:20,22
252:10 255:11
255:17,24
256:6,9,23,24
257:2,3,5,24
258:1,4,13
259:6 260:8,10
260:12
**answered**   12:5
13:7 72:1
102:23 125:5
164:14 179:1
205:20 242:20
**answering**   13:5
114:11 118:21
219:2 222:22
**answers**   15:4
34:15 68:17

71:2 119:4
167:4 178:25
182:2 184:20
185:18 218:6
222:19 264:2
**antitrust**   80:16
250:9,11
**anybody**   22:6
23:15,22 33:19
33:21 34:3
35:13,19 47:6
49:2 51:6
86:20,21 97:7
103:10,25
109:21 110:5
125:18 164:12
189:6,11 190:3
244:10 260:15
262:3
**anybody's**
118:14
**anymore**
131:20
**anyone's**   10:17
45:2
**apparent**
114:19 130:23
**apparently**
79:11 245:13
**appear**   216:13
221:21,24
271:11 272:15
**appearance**   7:6
**appearances**
7:8

**appeared**   151:8
151:9,11
**appears**   258:20
**appended**
272:11,18
**applauded**
179:5
**applies**   95:24
104:16 105:23
106:5 160:4
**apply**   98:11
**appreciate**
79:20 175:20
175:22,24
185:7 208:14
266:22
**apprentice**
90:22
**approached**
86:25 87:2
**appropriate**
9:12 12:24
42:13 69:10
86:5 117:14
144:17 212:16
221:6
**appropriately**
250:20
**approximately**
121:17
**april**   37:1
44:25 46:10
74:1,3,23
80:16,21 82:16
107:9,10,17

108:1,2 111:4
111:19,21
119:24 137:6
162:23 231:12
231:20 232:19
252:14
**arbiter** 202:10
**arbitrates**
83:23
**area** 34:4
**argue** 83:5
87:20 185:13
238:18
**argued** 119:21
138:23 179:17
**argument** 86:5
221:7,8 257:16
**arguments**
51:21
**arrested**
216:12
**article** 18:3,6,7
102:2 108:6
111:8 114:10
130:24 137:23
188:14 206:21
216:10 229:9
250:21,22
**articles** 73:24
85:19 86:3
132:11 182:18
182:21 186:12
186:19,21
187:25 188:13
190:19 191:4,6

191:24 192:16
192:25 193:22
194:11 195:17
202:1,2 212:23
212:24 214:11
215:20 250:23
251:24
**asari** 22:23
25:12 26:25
30:9 32:6,14
33:9,18 35:1
264:5
**aside** 14:8
**asked** 12:5
24:19 25:12,14
25:15 31:2
32:17 41:18
50:13 57:7
70:4 71:9
84:20 88:4
98:22 114:10
132:14 176:12
197:12,13
201:14 203:13
203:14 213:17
215:19 219:17
224:19 241:8,9
242:14 245:14
251:19 252:2
255:14 260:8
**asking** 11:9
12:16,17,17,20
31:13,13 36:14
36:16,17 43:7
45:10,11 53:2

57:6 69:4,5
79:15 84:22
87:19 97:2
101:2 104:15
105:14 108:19
108:25 114:18
114:25 115:1,3
120:16 135:18
151:1,10 157:2
157:3,6 159:7
184:3 185:19
186:22 187:15
188:9 189:16
206:15 208:11
211:15 212:15
212:15 217:2
218:17,18
220:3,23 221:1
232:7 242:19
243:24 244:4
261:18 264:8
265:18
**aspects** 119:6
**assassin** 132:9
**asserted** 80:14
83:1
**asserting** 172:8
172:8 177:3
**assessment**
137:21
**assignment**
271:2 272:2
273:2
**assist** 16:9
143:16,19

**associated** 30:1
32:14,18,20
35:5,19 47:22
47:25 48:1
66:8 231:24
**association**
166:9 239:4
**associations**
133:1
**assume** 133:9
**assuming**
121:18
**assured** 34:1
**astronauts**
133:12
**attach** 133:10
**attached** 272:7
**attack** 9:8
**attempt** 123:10
203:23
**attempted**
132:8 150:10
156:10 165:15
172:4 246:13
**attempting**
231:14
**attended** 123:6
**attending**
43:11
**attention**
103:10 126:15
135:13
**attorney** 7:9
37:8 96:23

**attorneys**
  250:11
**attributes**
  133:19
**audio**  6:13
**audit**  151:13
  183:20
**august**  16:9
  157:20 164:1
  215:7,12 217:2
  226:23 252:14
**auspices**  209:9
  209:10
**authoritative**
  203:19,24
**authorities**
  81:23
**authority**  50:17
  119:19 229:14
**authorization**
  15:22
**authorize**
  272:11
**automated**
  62:11
**available**  61:5
  68:8 188:20
  261:23
**ave**  270:1
**average**  114:22
  114:23
**avoid**  195:19
**award**  50:3,5,9
  59:15 60:5
  63:9 74:12

92:16,19,19,22
92:25 93:4,6,9
93:12,16
**awarded**  49:24
50:8,11,19
53:17 59:15
102:4
**awards**  61:19
61:21 94:1
**aware**  38:5
63:14 64:2,16
65:13 68:20
75:20,20 90:9
91:24 92:16
135:11,20
163:17,17
206:5,11 208:4
208:18,25
215:14,18
230:24 251:25
252:16,21
**aways**  186:20
186:22

**b**

**b**  5:5 15:12
16:7,17,21
20:8 31:3,17
61:10,12,12,13
61:13 62:9
64:15,15
158:21 161:9
181:2 207:6
209:15 211:11
211:18 217:23
218:13,21

219:6,8 220:12
221:12 222:2,9
223:4,9 240:21
241:13,22
242:5,17 243:1
243:10,17
244:2 245:6,19
248:22 249:12
251:16 252:7
252:19 253:1
253:10,17,21
254:3,20 255:3
255:6,23
256:17 257:12
257:12,22
258:11 259:4
259:20 260:4
264:13
**baby**  146:14
**bachelor's**
  114:1
**back**  11:18
16:9 24:22
37:16,21,22
44:16 52:9,11
53:21,23 57:14
57:16 64:12
66:25 67:2
69:23 70:1,12
70:17,25 73:1
73:2 76:13
82:9 83:6 84:7
84:24 85:2
86:10,10 89:2
89:4 96:8,11

102:15 106:14
106:15 110:19
112:11 116:23
119:16 121:1,8
125:24 128:25
129:14,16
131:5 132:20
132:22 134:21
140:18,21
141:21,22
142:7,11,12,20
142:23 143:5,7
143:13 144:3
145:16,17
149:5,6 152:15
161:21 163:5
163:12,15
165:7 170:23
170:23,23
173:2,21,23
176:5,7 179:10
181:7 183:21
184:21 185:18
185:20 186:14
186:24 187:1
187:22 194:21
195:11 204:15
204:16,21
206:3,19 207:3
207:16,17,23
211:2 217:20
225:25 227:25
229:17,20
230:20 234:1
234:21,24,25

235:2,21
236:14 237:4,5
246:6,7 249:10
258:9 262:22
263:21 266:2,3
266:10 270:15
**backbone**
49:14
**background**
71:18 105:6
**backwards**
17:18
**balance** 9:19
**balanced**
192:14
**ban** 152:25
**bank** 122:23
**banned** 49:25
81:24 102:7
**banner** 145:4
**banners** 111:11
**bar** 15:15
**barnstar** 59:15
59:15 60:5
74:12 92:18,21
**bartleby**
122:23
**base** 21:8 29:4
113:22 247:6
**based** 61:17
67:17 85:16
88:23 93:17
111:2 120:10
124:23 151:1
163:3 166:17

169:21 188:7
198:2,2 207:6
229:1 235:25
254:7,14
257:12 260:17
**basement**
94:10,14
**bases** 67:8,9
**basic** 103:3
**basically** 74:18
92:23 126:21
149:16 170:4
195:4 247:3
**basis** 14:17
22:6 66:14,17
66:23 67:6,17
105:6 117:4
213:1 216:18
230:10 231:25
234:14,14
236:22 238:5,6
257:15,18,19
**bath** 146:15
**bathroom**
148:16
**beautiful** 39:1
249:15,18
**beginning** 7:9
37:23 73:3
106:16 148:7
149:7 204:17
246:8 266:4
**behalf** 3:2
16:25 20:8
28:25 29:19

34:11 38:25
116:9 223:8
257:25
**behaving**
250:12
**behavior** 97:20
97:22 183:11
258:22 260:1
**behaviors**
250:10
**behest** 195:2
209:23
**belief** 66:10,12
230:10
**believe** 9:17
10:21 17:11,25
18:8,19 20:22
21:5,21 22:2
22:20 23:14
24:1,4 26:15
28:22 30:3
33:15 35:1,17
35:23 37:12
38:10 39:7
40:9 43:6,7
45:22 46:2,14
47:5 50:5 53:2
53:17 56:19
59:11 60:17
61:1 62:3,24
63:4,9,24 64:5
64:5,25 65:2
66:4,5 67:12
70:3,3 73:16
73:22 74:2,5

76:17,24 77:17
80:8,23 81:10
82:21 83:8
84:5 88:18
89:25 90:3,11
92:12 93:1,7
95:7,15,21,25
97:15 98:9,23
99:17 104:25
105:4 106:5
107:22 110:3
110:10,13,14
111:4,20
112:12 115:23
121:16 123:19
123:22 127:9,9
127:10 131:24
141:6 142:25
143:12,13,16
144:9 145:1
146:19 150:13
152:18 154:23
154:24 155:2,3
155:21 157:22
158:8,8 160:9
163:6 164:14
164:14 165:1
166:6,11,17,18
171:4 173:8,12
176:9 180:8
181:15 185:12
186:2,20
188:18 189:7,8
190:10 200:12
202:17,19

205:4,8,10
206:10 208:22
208:23 209:3
212:25 215:23
216:2 227:14
229:2,8,9,22,24
230:23 231:3,4
235:3,8,25
237:18 238:24
238:25 239:18
239:21,23
240:7,12
245:24 247:21
249:23 250:1
250:12,15,18
254:22 260:14
260:17,20
261:3,4,19
262:12 263:13
265:12
**believes** 201:23
263:2
**belong** 125:17
**belonging**
123:11 124:5
**belongs** 236:1
**bending** 158:25
**benefit** 103:25
225:9 238:9
**benefits** 262:15
**bermuda**
113:22
**best** 21:5 23:18
38:7 40:10
45:16,17 46:24

49:8 56:16
59:14 64:5
68:9 72:1
75:14 78:2
79:8,17 96:13
99:20,25
113:11 114:11
131:14,17
143:11 153:22
156:15 158:24
160:24 161:5,7
161:13 169:3
171:18 179:6
181:25,25
185:6 187:9,17
194:19 200:19
201:22 208:10
208:13,15
209:17 212:12
213:18 217:10
217:15 220:16
226:2,22 233:7
251:20,22,23
252:10 258:2
260:24 261:19
262:24 263:2,6
**beta** 18:13
118:2,5 119:13
175:16
**better** 87:18
129:4
**beyond** 56:8
76:7 211:18
215:12 222:2
248:22 252:7

255:5 257:22
259:4
**bias** 38:22 51:3
52:3,6,16
69:19 129:4
240:4
**biased** 38:20
49:6 51:11,14
51:15,24 52:18
53:5,9 54:5
98:4,11,14,24
99:1,4,15,18,18
100:8,22 101:4
101:10,20
103:2,11,11
**big** 74:14
108:24
**bigger** 113:24
**birth** 117:13
**bit** 139:12
152:13 163:9
236:18,19,20
**black** 147:23
**blaming** 244:19
**blanket** 212:7
237:16
**blocked** 138:17
**blog** 190:17
**blue** 123:17
175:6,15
176:23 177:6
238:15 240:16
246:13,25
**board** 183:13
192:11 194:3

195:4,14 201:2
**boggs** 199:5
**bold** 113:16
**boldface** 81:18
**book** 29:11
119:12,13
**border** 222:4
**bordering**
197:10
**born** 66:12
116:4 117:10
244:8 246:21
246:22
**bot** 62:10,19,19
63:17 64:22,23
65:1,1
**bothers** 9:1
**bottom** 15:16
16:14 115:6
154:10
**bouchet** 74:9
93:2 239:7
240:1
**boulevard** 3:22
**box** 3:14
107:12,12,25
108:5 131:19
131:20
**boxer** 258:24
**brand** 250:21
262:16
**brandon** 4:6
6:24 148:19
263:12

**breaches**
180:16
**break** 36:21,22
37:14 72:17,21
105:20 106:7
141:18 148:17
204:9
**bridge** 21:12
**brief** 23:2
**briefly** 19:7
**bring** 68:10
103:10 115:16
146:5,5 147:17
147:17 152:14
160:15
**bringing** 42:7
115:21
**brings** 42:7
**broad** 46:24
79:16 83:1
84:23 85:16
88:23 147:10
**broaden** 81:3
**broadly** 181:9
**broken** 158:25
**brought** 42:21
156:11 157:7
173:16 239:1,2
243:23 248:24
**browner** 123:4
123:21,24
124:2 126:20
132:15
**browner's**
126:7

**browser** 151:25
**buddy** 32:7,9
32:15
**budget** 30:10
30:19 31:12
32:1,6,9,14
**buds** 75:14
**build** 94:5
199:8
**building**
111:25
**built** 128:3
146:9 262:17
**bulk** 68:13
**bully** 257:10,20
258:23 259:2
259:13 260:2
**bullying** 261:11
**bunch** 15:2
232:23 245:12
**bureaucracy**
93:19
**burjiss** 35:15
**business** 57:23
58:2,5,8,12,13
111:25 260:22
260:23 261:25
**busy** 75:2
**button** 18:25
140:4,6 143:22
143:24 152:10

**c**

**c** 3:6 62:19
63:22 64:23

**ca** 270:25
**california** 3:22
269:4
**call** 33:11,12
36:3 108:22
109:7 118:6,10
119:15 128:20
129:3 165:21
199:12 261:23
262:3 264:9,9
**called** 18:25
76:1 77:23
78:19 79:3
90:12 97:20
124:6 139:4
145:4 147:8
150:2 167:22
169:12 230:8
238:25 257:19
259:1
**calling** 80:5
113:19,23
119:14 200:14
**calls** 29:9
**calvert** 22:24
25:21 30:10
33:9
**camera** 6:10
**campus** 32:7,9
32:15 216:14
221:22
**canonni** 231:23
**capacity** 24:9
26:13 28:19
34:22 210:19

**capital** 62:19
90:12,13
**capitalized**
154:6
**capitalizing**
154:7
**capture** 5:12
149:16 193:21
**caraway** 3:13
**card** 198:25
261:25
**carefully**
186:16
**carol** 123:4
126:7,20
132:15
**carter** 3:13
7:16
**case** 1:7 7:22
8:3 12:12
40:13 58:15
95:18 121:8
146:1 148:1
154:24 166:6
172:12,18
175:19 176:13
176:24 178:10
178:11 179:11
188:2 262:18
262:19 263:3
265:16 270:6
271:3 272:3
**cases** 114:22
**cast** 89:20
202:5

**categorical**
147:15
**categories**
253:21
**categorize**
246:19 248:12
**categorized**
200:19 247:3
**category**
112:17 213:17
236:3 246:15
246:16,18,20
246:22,24
247:1,6
**caucus** 74:13
111:13 239:2
240:9 250:4,5
**caught** 80:25
82:24
**cause** 83:14
109:17 216:10
221:18,19
222:25 265:6
**caused** 29:16
**causes** 211:23
**ccr** 1:23 3:4
**cec** 3:15
**celebrate** 171:9
171:11
**celebrated**
171:16
**celebrates**
166:14
**celebrating**
168:8

**celebrities**
246:21
**certain** 109:24
246:19
**certainly** 99:24
101:11 115:2
118:16
**certificate**
269:1 272:11
**certification**
271:1 272:1
**certified** 269:4
**certify** 269:5,14
**chad** 229:7
230:8
**chain** 235:9
**chance** 68:5
109:21 266:8
**change** 15:23
48:11,17,19
83:12 98:12
130:19 140:2,5
140:7 141:8
143:21 166:25
167:5 177:21
187:3 204:9
230:25,25
231:2,20
233:21 234:20
270:13,14
272:8 273:3
**changed** 48:23
53:12 233:15
**changes** 27:9
27:14,16,22

28:17 42:12
47:21 48:3
67:21 113:13
129:20 145:17
147:11 149:22
150:20 153:23
167:12 181:18
181:21 184:18
184:21 219:19
224:6 231:13
231:14 232:19
232:21,23
233:2,25 234:2
234:5,8,20,23
239:20,22
270:12 271:7
272:7,9
**changing**
247:24
**chapter** 114:5
209:13 214:10
216:11 225:8
225:10,10
227:15,18
228:7 230:6
**characterizati...**
73:13 79:7
89:6 192:3
260:1
**characterize**
8:24 9:6 66:4
109:6
**characters**
152:19 153:19

**charged** 225:8
**charges** 214:18
**charity** 66:21
**charles** 3:14
7:16
**check** 49:12
61:2,7 75:8
**chicanery** 9:6
160:20 197:10
**child** 3:13
**children** 54:7
112:1
**choice** 194:24
194:24 195:19
**choose** 133:19
**chooses** 178:3
**chose** 85:2
170:5,9 191:25
223:25 226:13
**chosen** 121:11
**chronicles**
182:19 194:18
**circle** 50:16
**circuit** 119:1
**circumstance**
41:14 173:14
**circumstances**
41:21 83:14
173:4 215:25
**circumventing**
152:24
**citation** 14:2,14
64:22 65:1
170:25 171:2
179:23 203:6

**[citation - comma]**

258:19
**citations** 10:22
65:2
**cite** 190:19
195:18
**cited** 10:16
85:20 99:18
135:1 191:5
192:13
**civil** 6:21 271:5
272:5
**claim** 67:6 77:4
141:12 169:13
173:10 197:23
216:19 236:24
236:24 257:15
**claimed** 27:12
43:22
**claiming** 21:16
117:13 159:14
174:7
**claims** 64:8
80:14 81:3
84:19 147:10
157:7 174:3,4
174:8 175:3
177:4,15 179:3
183:10 188:3
188:15 189:25
190:8,14
**clarifications**
240:7
**clarified** 188:6
**clarify** 8:20
13:10 207:25

239:9 247:13
267:1
**clarion** 182:20
**clarity** 32:19
**classifications**
90:18,20
**classify** 115:4
**clean** 73:8
**cleaner** 248:16
**cleanly** 257:16
**clear** 13:11
28:11 40:5
60:2 111:6,6
113:6 119:12
119:13 127:11
129:1 162:5
163:4 170:22
173:9 179:3
193:14 196:4,4
197:11 206:21
226:21 229:13
233:9
**clearly** 144:15
257:13 264:12
**cleveland** 270:2
**click** 18:24 21:9
61:21 123:20
139:24 140:10
141:10 143:22
143:24 144:18
151:6 152:5
153:10,14,24
235:3
**clicked** 128:13

**clicking** 59:4
214:3,3
**client** 8:1 37:8
102:6 265:22
267:16
**clock** 161:4
265:17
**close** 78:24
199:1,3 222:5
**closer** 42:8
97:17 136:25
137:1,2 174:23
**code** 5:9 95:2
95:10,10,23
96:1,16 98:3
99:1,16 100:9
100:23 103:3
104:18,24
105:7,8,25
193:17
**collection**
38:16
**collective** 23:19
**college** 30:10
30:19 31:12
32:1,6,9,14
52:15,16 76:2
76:3 77:4,15
119:6 123:6
132:24 133:1
205:7 209:20
216:12 221:25
223:25 225:8
226:14 227:11
227:16,18

228:5,10,12
229:5 239:4
262:10
**colleges** 113:20
116:12 139:6
166:9 216:15
221:22 223:2
249:25
**collegiate** 242:2
**colonial** 146:11
**colors** 139:8
175:6,16
176:23 177:6
238:15 240:12
240:15,16
**combination**
77:10
**come** 37:16
83:19,20 84:15
109:1,11,18,21
120:14 123:23
126:15,23
128:23 135:13
232:19 263:21
**comes** 85:8
181:19 232:11
**comfortable**
197:20 199:17
211:21 212:8
212:10 219:12
253:22
**coming** 60:14
184:23 250:9
**comma** 101:4,5
101:6

[commas - conclude]    Page 14

**commas** 101:17
**commencing**
  3:3
**commend** 14:9
**comment**
  100:15 108:18
  109:1 122:4
  224:14
**commentary**
  169:9
**commenting**
  60:21 81:12
  234:17
**comments**
  23:16
**commercial**
  119:7
**commission**
  271:19 272:25
  273:25
**commonalities**
  261:21
**commonly**
  116:10
**communicate**
  59:12,23
**communicated**
  62:12
**communicating**
  248:17
**communication**
  233:14 235:8
  255:19
**communicati...**
  35:25 36:7,12

37:8 60:24
61:4 62:16,22
63:2 64:12,19
67:10 235:6
261:19
**communities**
  105:4
**community**
  49:16,16,17,18
  52:15,16 76:1
  76:3 94:6
  110:7 113:19
  116:12 117:16
  125:16 132:24
  132:25 144:19
  145:6,7,22
  154:6 163:9
  205:7 216:11
  216:15 221:22
  221:25 223:2
  223:25 225:8
  226:13 227:11
  227:16,17
  228:5,9,11
  229:4 262:10
**companies**
  35:20
**company** 17:1
  17:1 26:23
  30:20,24 34:11
  38:25 39:22
  153:1 157:12
  193:5 241:7
**compare**
  107:20

**comparison**
  5:15 107:25
  165:22
**compensate**
  188:2
**compensation**
  188:15 200:8
  202:5
**competition**
  162:25 176:17
**competitor**
  258:23
**compilation**
  194:19
**complaint**
  156:8,22
**complaints**
  156:17
**completed**
  265:13 270:15
**completely**
  165:8 187:10
**compliance**
  42:8 144:17
  173:17 174:24
**compliant**
  103:9 128:15
  128:16 129:18
  130:2,8 144:2
  145:9,11
**complicated**
  53:1
**complied** 76:19
  215:22 218:15
  218:17

**comply** 48:24
  143:3 165:2
  193:16
**compound**
  176:8 208:11
  208:16
**comprehensive**
  127:15,20
  180:20 242:10
  242:13
**computer**
  11:16
**concede** 99:14
  100:7,18,21
  101:9 103:1
**concept** 113:20
  128:3
**concern** 27:17
  27:24 28:13
**concerned**
  27:14 266:19
**concerning**
  37:4 76:21
  77:15 80:14
  173:10 180:24
  191:7 205:6
  215:4,24
**concerns**
  202:14,24
  250:9
**concisely** 249:2
**conclude**
  265:10 267:12
  267:23

**[concluded - continue]**                                      Page 15

concluded
  264:14
concluding
  266:25
conclusion
  223:23,24
  226:12 259:12
conduct   5:9
  78:4,11,20
  79:3,24 80:5
  95:2,10,11,24
  96:1,16 98:3
  99:2,16 100:9
  100:23 101:18
  103:3 104:18
  104:24 105:7,9
  106:1 193:17
conducted   6:9
  6:22
conducting
  102:22
conferred
  209:22
confident
  131:13 182:21
confirm   13:10
  33:2 79:7
  127:22 141:19
  152:1,3,4
  155:5 156:19
  184:5,10 236:8
confirmed
  25:25 33:1
  35:11,15 136:1

conflated
  188:10
conflating
  77:17 178:15
  217:9
conflict   38:25
  39:14,18 40:25
  41:3,6,7,10,12
  41:13,20,22
  42:1 54:1
  66:20 129:3
  240:24
conflicted
  42:14
conflicts   116:8
conform   110:6
  150:16
confused
  130:15 188:12
confusing
  45:13 248:18
  250:21
conjunction
  53:13 74:17
  253:20
connect   31:8
connection
  6:10 18:21
  34:23 58:9
  78:4,20 79:3
  79:13 80:6
  118:4 143:6
  189:25 190:7
  197:3 221:4
  235:15

conscious
  189:2
consensus
  133:21
consider   31:19
  97:7 99:22
  193:14 202:8
  260:18
considerable
  130:13
considered
  90:15 247:1
considering
  84:3 232:10,13
consistent
  41:24 53:3,25
consists   15:9
constitutes
  113:8
consult   250:11
  265:22
consultation
  37:12
consultations
  262:25
contact   239:25
  255:19 256:14
contacted
  87:23 254:24
contain   73:23
  190:20
contained
  77:19,21 94:4
  120:1 251:1

contains   108:6
  111:8 113:1
content   90:10
  95:16 97:24
  98:5,7 99:4,15
  100:8,22 101:5
  101:18,22,23
  103:16 104:19
  106:2 108:7,8
  108:10 109:8
  109:23 111:8
  112:14 113:1
  117:23 118:23
  121:19,21
  123:2 124:22
  145:17 171:8
  180:5 184:11
contest   115:17
  171:6
contested
  113:17
context   12:24
  13:20 15:17
  29:3 40:2
  44:20 75:21
  80:19 81:9
  82:15 103:8
  104:5,8,24
  138:21 144:1
  188:5 214:2
  226:4 240:3
  249:17 258:14
  259:6
continue   6:13
  264:8 265:12

[continued - counter]    Page 16

continued 76:5
179:8
continues 76:9
continuum
145:3 158:25
215:13 217:5
224:15
contractor
22:23
contradicts
206:12 208:19
contrast 234:10
contribs 140:15
152:6,10
contribute 9:13
51:7,22 53:18
55:12,24 56:13
92:24 100:1
102:2 111:12
213:17
contributed
9:15 111:14
150:6 236:9
contributes
49:18 73:15
contributing
51:25 55:13
74:19 115:18
191:17
contribution
40:17 92:24
155:21 168:4
173:14 213:16
contributions
10:4 53:18

54:15 59:16
94:2 101:12
102:19 103:24
104:1 152:12
171:18 236:7
contributor
40:21 49:15
54:18 75:11
188:25 260:22
contributors
105:4 106:6
145:13
control 10:17
10:18 26:24
40:16 55:23
190:25 201:22
208:25 209:7
209:11,19,21
209:24 210:4
controls 209:12
controversies
149:23 150:2
163:23 183:5
controversy
149:21 200:7
200:15
conventions
153:4
conversation
23:2,6 24:16
25:1,21 36:5,6
68:8 102:8
199:13 222:16
261:17,18

conversations
24:8 26:3
32:13,21 35:4
36:8 37:3
114:20
convey 9:22
194:20 230:12
230:14
conveyed 83:11
conveying
119:19
copy 118:10
126:21 153:18
170:25 267:14
267:18,20
coralreef 66:8
67:11 153:20
231:8,11
232:20,21
234:9,10,19,21
236:12
coralreef's
233:25
coralreef78
65:17 66:13
69:12 235:3
core 20:24
corner 16:15
corporate 7:19
correct 25:23
27:6 29:25
43:9 48:8 59:8
62:17 73:12
76:4,6 77:7
84:11,14 87:1

147:18 148:6
148:24 151:19
154:19 155:17
168:17 204:6
205:18 206:9
231:4 233:1
267:5
corrections
99:19,19
270:12 272:17
correctly 15:12
63:25 98:8,9
167:19 175:8
240:14
corrects 42:7
corroborated
237:1
counsel 6:16
7:7 8:2 37:25
73:5 106:18
149:9 204:8,19
245:25 246:10
256:8 257:4,8
266:6 267:12
269:14
count 71:22
122:16
counted 122:11
212:23
counter 1:6,10
1:15 3:8,19
7:14 147:10
163:2 165:14
228:15

**counterclaims**
80:12,13 81:2
83:1 88:23
**counterfeiting**
250:21
**countersued**
163:1,4
**countersuit**
156:9
**county** 271:10
272:15
**couple** 76:18
135:7
**course** 44:6
87:7 129:4
134:7 158:13
189:22
**court** 1:1 6:19
7:1 8:5,13 50:7
52:10 53:22
57:15 61:9
65:20,22 67:1
69:25 70:14,24
76:14,20 77:2
77:9 78:14
82:8 89:3
96:10,17,22,25
97:5 102:14
107:6 112:10
125:23 129:15
131:4 132:21
146:20 148:14
156:11 161:20
162:23 163:14
173:1,22 176:6

181:11 185:19
186:25 187:21
195:10 203:21
205:15,21
206:2,18 207:2
207:22 210:10
211:1 217:19
225:24 227:24
229:19 237:13
245:25 249:9
254:11 255:14
258:8 267:11
267:13,21
271:7
**court's** 77:11
**courtesy**
177:14,18
**courtney** 65:18
66:9 67:4
**coverage** 133:3
139:20 154:18
154:19 214:18
**covered** 132:11
133:17 138:22
**coverup** 85:16
85:19
**covid** 46:16
**cowan** 3:14
7:16
**crafting** 227:6
**create** 54:19
74:23 82:18
84:11 99:25
101:7 111:15
173:13 239:13

243:14,24
246:13 252:4
262:13
**created** 73:7,9
73:25 81:10
82:16 83:8
111:16 192:21
216:9 224:9
**creating** 73:15
114:9 119:22
263:8
**creation** 39:1
41:12 74:9
80:19 98:6
101:23
**credible** 53:16
189:18
**credibly** 121:5
**credit** 128:22
134:20 135:2
146:13
**criminal**
214:18
**criteria** 159:15
172:8
**critical** 244:24
**crooks** 132:1
133:11 134:6
137:12 138:4,6
138:7 139:9,21
140:19,20,25
141:11
**crossed** 224:15
224:20

**crr** 1:23
**csr** 1:23 3:4
269:24
**cultural** 29:9
29:10 72:11
**curate** 29:6
**curator** 29:4,19
39:4 51:4
53:14 72:8
**curators** 29:10
29:12
**current** 153:24
239:24
**currently** 51:25
164:23 172:3
**cursor** 231:22
**cursory** 73:22
**customer** 33:11
33:12 34:4,23
**cut** 119:4 167:9
260:11
**cutting** 167:3
**cv** 1:7 6:21
**cwr** 1:8 6:21
**cyber** 257:10
257:20 258:22
259:2,12 260:2
261:11

**d**

**d** 5:1 63:22
64:15
**dade** 123:6
**daily** 39:6
**dakota** 4:2 8:3
15:14

**damage** 29:15
**dark** 133:24
**darn** 105:14
**data** 127:16
**date** 25:7,8
  37:4 107:13,16
  107:21,21,25
  140:25 141:5
  141:10 170:6,9
  170:9,11
  266:18 270:8
  271:3,9,19
  272:3,13,25
  273:20,25
**dates** 36:7
  121:11 140:23
  152:6
**dating** 16:8
  179:10
**dave** 22:23
**davemck** 63:22
  64:12
**david** 25:12
  26:25 32:6
  33:18 35:1
**day** 46:22
  70:15 86:17
  88:9 110:24
  124:11 164:2
  165:23 166:14
  168:9 170:5,6
  191:20 234:22
  256:4 269:19
  271:16 272:22
  273:22

**daylight** 6:6
  268:1
**days** 64:8 200:1
  228:21 251:12
  251:23 255:1
  255:21 256:15
  270:18
**deal** 65:17 66:3
  83:17 86:7
**dealing** 39:25
  85:15 97:11
**deals** 164:13
**dealt** 260:15
**dear** 270:10
**debate** 193:1
**decade** 85:8
  262:17
**deceive** 174:20
**deceiving**
  159:15 172:10
**decide** 55:25
**decided** 21:8
  170:4 201:20
**decision** 66:3
  189:2 202:13
  204:1
**declaration**
  17:6,7,8,9 20:5
  20:11,20 21:23
  21:24 24:25
  25:3 27:2,5,12
  27:17,23 28:13
  45:24 67:16,17
  106:24 107:5
  121:24 148:13

  149:13 165:20
  188:5 199:23
  204:23 224:23
  228:18 231:9
**decorated**
  61:22
**dedicated**
  146:7,8
**deed** 271:14
  272:20
**deemed** 102:3
  270:19
**defamation**
  80:15
**defend** 174:8
**defendant** 1:6
  1:10,12,15,19
  3:8,19 7:14
**defendants**
  7:22 163:2
**defending**
  262:12,12
**defense** 177:3
  177:10 178:15
  179:18,25
  180:2 262:9,11
**defenses**
  178:10,11
**deferred**
  198:16,16
**define** 209:10
  247:8,15,18
  248:5,6,8,19
**defined** 69:9

**defining** 111:1
  246:19
**definitely** 70:6
  213:8
**definition** 69:1
  69:2 169:5,7
  178:11,19
  198:19 209:7
  238:20,23
**definitions**
  16:20
**definitively**
  66:11 150:12
  150:25 195:13
**degrees** 114:1
**delay** 225:16
  225:17
**delete** 167:16
  190:17 201:21
**deleted** 123:25
  124:19 125:9
  127:5,17 136:7
  136:8 142:6,13
  142:20 144:4
  145:18 190:24
  201:19
**deleting** 133:12
  168:21
**deliberately**
  98:4 99:3,15
  100:7,21 101:4
  103:1
**delineate**
  240:14

**[delivery - different]** Page 19

| | | | |
|---|---|---|---|
| **delivery** 267:16 | 185:17 189:15 | **depth** 24:9 41:2 | **designation** |
| **dell** 122:22 | 196:13,20 | 87:6 173:15 | 73:24 162:24 |
| **demanding** | 204:18 206:8 | **derek** 3:21 7:21 | 209:19 |
| 188:1 | 209:15 211:11 | 15:12 31:22 | **desire** 187:16 |
| **demands** | 211:18 216:17 | 105:12 223:15 | **desk** 11:16 |
| 188:15 | 218:14,22 | 248:24 266:13 | **despite** 175:15 |
| **demographics** | 219:7,18 | 266:15,21 | **destroying** |
| 253:25 | 220:12 221:13 | **describe** 50:21 | 258:23 |
| **demonstrate** | 222:3 223:4,9 | 67:21 79:24 | **detail** 120:7,10 |
| 265:9 | 223:10,14 | 179:4 201:2 | 259:11 |
| **demonstrated** | 240:21 241:13 | 223:25 226:13 | **determinations** |
| 239:2 | 241:22 242:5 | **described** | 83:24 |
| **denial** 191:21 | 242:17 243:1 | 18:20 20:1 | **determine** |
| **denied** 186:6 | 243:10,17 | 41:2 175:25 | 56:14 126:5 |
| 186:19 200:24 | 244:2 245:6,13 | 188:4 224:11 | 127:5 128:1 |
| 201:6,15 | 245:19 246:9 | 229:12 | 153:8 |
| **denies** 174:3,13 | 248:22 249:12 | **describes** 69:18 | **determined** |
| 187:2 | 251:16 252:8 | 156:16 | 55:10 183:6 |
| **deny** 27:16,22 | 252:19 253:2 | **describing** 33:9 | 247:4 |
| 174:4 178:4 | 253:10,17 | **description** 5:6 | **determines** |
| **department** | 254:3,21 255:3 | 73:14 114:6 | 83:23 93:21 |
| 212:25 229:8 | 255:6,13,23 | **descriptive** | **detrimentally** |
| 260:25 270:22 | 256:1,17,21,22 | 248:12,13 | 263:5 |
| **depends** 6:9 | 257:13,22 | 249:16 | **dialogue** 23:10 |
| **deposition** 1:21 | 258:11 259:5 | **descriptor** | 68:7 |
| 3:1 5:7 6:8,16 | 259:20 260:4 | 247:5,5 | **diction** 120:7 |
| 6:22 16:9,17 | 264:4,5,14,21 | **deserve** 134:24 | 120:10 |
| 17:4 21:19 | 264:24 265:13 | **deserves** 82:3 | **difference** 5:10 |
| 22:16,17 23:15 | 266:5,20,25 | 134:19 146:12 | 53:10 101:14 |
| 23:24 27:2 | 267:8,24 270:8 | **deserving** | 107:7 121:11 |
| 31:17 34:14 | 270:11 271:1,3 | 92:25 | 167:21 |
| 37:24 46:19 | 272:1,3 | **design** 14:7 | **differences** |
| 73:4 91:23 | **depositions** | **designates** | 90:3,5 107:8 |
| 106:17 149:8 | 87:6 | 209:18 | **different** 16:5 |
| 149:15 158:22 | | | 90:1,9 118:3 |

118:25 152:13
153:18 198:12
200:22 211:7
212:1,17
246:17
**differently**  16:4
90:8 112:20
266:21
**diligent**  234:12
**dinosaurs**
129:6
**direct**  25:20
50:1 208:17
221:4 258:14
**directed**  223:7
**direction**
126:24 269:13
**directly**  25:12
121:8
**director**  30:6
69:17 71:6,13
71:24 72:6,9
84:4 134:17
**directors**
183:14 192:11
**disagree**
102:22 137:21
158:17 192:24
216:20 218:19
219:3 221:23
266:18
**disagreeing**
259:25
**disagreement**
266:13 267:6

**disappeared**
143:25
**disclaimer**
162:21 215:19
215:20 252:1
**disclose**  38:24
69:21 72:13
**disclosed**  69:15
**disclosing**  36:6
37:7
**disclosure**
210:8,11
**disconcerting**
178:24
**discourse**  85:25
**discovery**
66:11,15 111:2
114:19 223:11
255:15 256:2
256:20
**discretion**  59:5
**discuss**  18:9
19:13 66:22
87:15 159:2
245:23 249:22
**discussed**  24:9
24:18 25:6
35:10 36:14
87:5 239:3
249:21 250:6
**discusses**  23:3
87:16 230:7
**discussing**  19:7
199:17

**discussion**
22:17 31:16
86:5 108:16
261:22
**discussions**
22:3,12 32:1
**disingenuous**
244:12
**disinterest**
14:19
**dismantle**
130:20
**display**  226:3
**disproportion...**
254:10,12
**dispute**  89:6
145:15 165:10
168:17 192:3
232:4,8
**distinctive**
238:20
**distinctiveness**
238:18
**distinguish**
58:8 247:12
**distinguishm...**
193:20
**distracted**
172:22
**distraction**
195:20
**district**  1:1,2
6:19,19
**disturbing**
133:23

**diverse**  105:5
**division**  1:3
6:20
**docket**  81:6
**document**  16:2
16:22 94:20
95:14 107:6,24
120:21 149:16
149:19 157:22
159:1 185:24
199:22 228:19
259:23
**documentation**
121:7
**documented**
127:2
**documenting**
168:11
**documents**
11:14 15:3,4
126:6
**doing**  28:25
42:14 48:20
50:18 77:3
79:8 101:25
120:22 146:12
213:18 230:22
230:22 256:4
258:2
**dollar**  183:16
196:11 197:22
202:5
**dollars**  262:22
**don**  75:6

donald   132:8
doors   261:19
  262:4 263:6
dot   31:9
doubt   202:6
downright
  118:6
dozens   240:15
dr   1:18 7:14,19
  7:20 17:6
  21:24 24:15,24
  27:1,23 40:7
  49:25 53:12
  65:21,25 66:19
  67:5,14 68:3
  75:7 96:6 99:6
  99:11 106:24
  107:4,24
  113:21 118:14
  128:22 134:16
  134:19 148:13
  149:13 165:19
  169:24,25
  172:23 192:6
  193:24 194:7
  194:25 195:5
  195:15,18
  196:13,17
  197:21 199:5,6
  199:23 200:5
  200:23,24
  201:6,15
  204:22 205:13
  206:6 208:4,19
  213:12 216:16

224:23 228:18
231:9 232:2
237:19 238:9
254:25 255:21
256:15 261:24
263:7
dragged   75:10
draw   191:12
  221:4
drawing   89:10
dress   150:10
  162:24 165:15
  172:4 238:20
drive   102:21
  103:7
dstephens   4:3
due   42:22
  134:17
duly   8:9 269:7
duped   130:17
duties   75:2
duty   10:18 53:7
  75:19,20 83:17
  103:10 110:5
  125:18

e

e   3:6,6,14 5:1,2
  5:5 62:9 63:22
  64:15 90:13
  106:24 107:1
  148:11,12,13
  149:13 165:19
  199:23 224:23
  228:18

earlier   87:6
  172:2 221:3
early   38:11
  43:10 44:23,25
  74:22 75:25
  110:4,11,19
  121:16 138:10
  138:23 180:24
  231:12
easier   16:12
  57:5 201:20
  262:1
easily   252:15
eating   94:10,14
ed   182:18
  194:17
edinger   124:19
edit   38:24
  39:16,23 40:2
  42:10 43:3,6
  43:12,14,17,22
  43:23 48:19
  49:2,2 50:21
  65:1 73:19
  75:8 86:12
  98:23 108:5
  110:19 111:15
  145:10 162:18
  165:4 170:23
  170:24 196:22
  210:17 228:2,4
  230:13 243:7
edited   26:1,10
  177:12 215:21

editing   33:3
  37:4 41:5
  53:12 73:10,15
  73:16 96:18
  128:7 138:17
  180:11 182:10
editions   102:4
  102:4 104:7
editor   10:18
  24:9 35:11
  44:23 47:8
  49:11 50:14
  75:3 90:6,12
  90:16,22,24
  91:1,3,5,7,9,11
  91:13,15,17,19
  92:24 103:19
  236:1
editors   49:23
  59:18 90:10
edits   17:15,20
  24:17 25:3,13
  25:22 26:4
  27:5 28:12
  29:16 32:2,15
  32:22 35:6,7
  35:21 36:25
  37:2 41:23
  43:13,21 44:14
  44:16 45:1,2
  45:20,20,25
  46:4,10,17
  47:3,6,17,19
  48:3 49:5,22
  49:23,24 50:4

**[edits - enriching]**                                                     Page 22

50:10,12,24
52:3 53:4,4,8
54:6,23 55:3,6
56:3,9 57:24
63:14 64:2,4
64:16,23 67:6
74:4,22 84:11
84:13 85:1,20
87:10,24 88:5
88:15 95:24
96:2 99:3,15
99:17 100:8,22
103:2 104:16
105:24 109:12
109:13,19
120:14 139:17
139:19 150:1
151:15,17
154:3 164:17
164:24 170:23
171:3 196:22
203:18 204:4
205:12 226:19
227:9 230:21
235:7 241:10
243:6 261:12
**educated** 55:15
102:1
**education**
138:11,23
182:19 194:18
**educators**
39:11
**effect** 9:22 10:3
21:14 24:8

29:11 52:6
76:9 101:7
118:1 145:11
187:5 238:17
246:25
**effort** 88:21
126:5 127:21
179:3 192:14
**efforts** 50:21
137:5 179:4
261:1
**egregiously**
75:18
**eight** 147:13
183:25 221:1,3
**eighth** 13:6
**either** 45:19
51:19 88:15
116:18 117:6
119:8 151:12
152:19 191:25
192:6 195:14
**elements** 175:5
177:5 212:11
**eliminate**
176:17
**email** 56:17,22
56:24,25 57:2
57:18,19,19,22
58:9,11,12
60:17 233:3,13
270:17
**emailed** 60:16
**embezzlement**
77:4 148:3

205:5 211:9
212:3,4,20
213:6,25 215:4
225:9 228:24
229:4,5,25
230:15,18
**embezzling**
216:12
**emerge** 232:21
**empire** 199:7
**employed**
32:17
**employee** 32:5
39:22 42:5
67:4,5,22
206:23 210:4
216:14 221:21
221:24,25
224:1,2 226:14
226:15 227:10
228:5,6
**employees** 30:9
32:8 66:19
205:14 208:5
208:20 216:14
221:22 228:10
262:13
**employer** 210:4
**employs** 223:1
**empowering**
104:25
**enclosed**
270:11
**encourages**
42:19

**encyclopedia**
49:1 117:12
129:11
**encyclopedic**
108:9 117:11
130:24
**endorsing**
113:16
**ends** 54:10
267:24
**engage** 127:4
**engaged** 59:21
88:21 210:18
238:23 254:9
**engaging** 23:10
69:8 137:8
**english** 120:9
247:14 248:11
249:15
**enhance** 9:13
51:8 53:15
147:20
**enhanced** 9:16
10:3 89:9
**enhancement**
10:6
**enjoined** 76:21
77:3 81:1
82:25 97:17
147:9 197:5,14
**enjoining** 193:5
**enjoy** 262:15
**enriching**
263:10

entailed  251:24

entered  80:10
150:9 154:14
154:16 155:25
156:11 160:7
164:3 165:13
272:9

enterprise
122:22

entire  162:6
235:24 271:5
272:5

entirely  222:8

entirety  176:3

entitled  82:1
161:11 167:15
219:22 264:8

entity  112:19
113:15

entrepreneurial
260:25

entrepreneurs
260:24

entries  101:8

entry  203:23
254:7

environment
100:2

environmental
123:5

equally  97:8
106:6 130:17
175:25

era  250:8

errata  270:13
270:18 272:7
272:10,18
273:1

escalation
24:14 33:6
35:17

especially
210:8,12

esq  3:9,10,14
3:21 4:2

essentially
67:22 82:2
99:6 143:20

established
24:11 77:21
80:22 89:14
153:17 241:18
263:3

estimate
131:14

et  6:18 270:6
271:3 272:3

evaluating
96:18

evan  124:19

evans  26:19,20

eventually
130:4 131:22

everybody
35:18 48:14
52:14 96:19
130:17 171:17
261:5

evidence  126:6
206:11 208:19
209:12

exact  128:11
168:1 197:12
197:13 235:12

exactly  86:2,7
113:5,6 151:7
161:3 224:8
262:5

exaggerations
120:6

examination
8:15 15:2
263:25

examined  8:9
269:6

example  19:12
75:12 118:11
174:13 248:13

examples
134:23

excellence  93:3
111:13 249:23
249:24 250:2
252:4

except  255:25

exception
117:12 143:1
251:6

exclusive  50:14
60:7

excuse  74:7

executed
272:10

execution
271:14 272:19

executive  28:20
30:6 69:16
71:6,13,24
72:6,9 84:4
134:17

exercise  239:12

exercised  210:4

exercises
208:25

exert  209:7

exhibit  5:6,7,8
5:10,12,13,15
15:20,21,25
16:1,6,13,14
94:17,19
106:20,21,24
107:3 148:11
148:12,12,13
148:15 149:11
149:12,13
157:11,14
162:2 165:19
165:19,20,21
165:25 183:3
185:2,24
199:20,23
204:22 216:6,7
224:23 228:17
228:18

exhibits  16:6

exist  14:10
21:11 64:9
74:14 119:21

128:25 131:20
215:16 217:15
226:24 227:1
**existed** 10:21
38:17 76:12
85:21 111:18
127:16 201:19
204:24 228:20
251:2
**existence**
116:15,17,17
123:25 128:2
148:6 220:24
**existing** 48:20
136:14 163:21
163:22
**exists** 105:7
127:3 240:9
241:5
**expect** 96:17,19
96:21 97:7
**expectation**
55:5
**experience**
48:14
**experienced**
91:3 211:9
212:2,4,20
228:24 229:4,5
229:25 230:15
230:18
**expert** 90:4
120:10 247:2
**expiration**
271:19 272:25

273:25
**explain** 34:12
49:2 104:8
120:8 169:3
174:12 196:14
220:1,1 222:13
222:19
**explained**
144:16 216:18
222:11
**explains** 51:2
156:18
**explanation**
17:20 235:4
**explanatory**
227:16
**explicitly** 24:19
170:1 228:2
230:7
**expression** 86:2
**extended**
184:20
**extensions**
113:23
**extent** 10:16,21
11:23 14:13
23:6 28:1 37:7
40:17 42:21
47:7 52:20
54:18 55:11
59:20 60:8,11
61:23 70:20
73:17 89:8
101:10 105:8
111:25 115:20

138:22 143:2
145:22 173:3
177:10 189:17
199:15 204:7
237:18,20
238:14 239:4
254:18 255:25
262:6
**external** 108:9
**extra** 130:10
**extraordinarily**
147:9
**extremely**
89:20 223:12
**eyes** 75:11
147:23

**f**

**face** 81:7
**facebook**
233:20
**faced** 239:5
**fact** 24:11
49:12 66:17
67:3 75:8
85:12,24 103:8
116:16 118:5
118:16,18
126:9 129:5
156:16 168:5
175:23 179:2
185:18 198:21
208:17 214:13
216:14 221:21
225:17 230:6
244:16,18,20

244:21 259:18
262:16
**facts** 10:23
40:12 74:19
83:22,23 86:1
89:14 103:17
104:20 106:3
120:25 138:1
146:16,16
148:1 178:20
178:21 182:7
191:14 194:16
**factual** 216:18
**factually** 120:1
120:5,18 165:8
221:10
**fair** 174:23
192:14 217:10
**fairly** 122:13
175:23 232:22
267:19
**faith** 31:19
179:3 192:13
**fake** 118:11,11
**fall** 112:16
214:11
**false** 14:8 40:4
42:4 67:25
75:18 80:14
98:4 101:4,8
101:20 112:17
119:16 121:2
150:9 156:1,2
159:16 172:3,8
172:11 196:23

197:5,20,25
219:24 232:14
238:6,6,12,24
239:9
**falsely** 172:8
238:19
**fame** 104:2
132:13
**familiar** 19:15
51:17 62:7
63:21 64:23
89:24 92:20
215:10 239:15
**familiarity**
38:3
**familiarized**
128:12
**families** 262:12
**family** 35:20
75:3
**famous** 132:2,4
133:12
**far** 94:8 244:7
255:5,14 264:5
266:19
**fashion** 35:12
**fast** 234:14
**favor** 103:16
104:19 106:2
238:8
**favorable**
104:7
**feature** 62:11
**february** 75:25
154:12 180:24

196:20 205:2
206:8 216:17
225:7
**federal** 162:23
**feel** 55:19,20
148:18 158:1,2
158:5 167:7
174:12 199:16
211:21 212:8,9
219:12 253:22
**feelings** 118:14
**feet** 178:17
**felt** 197:19
**fields** 74:20
**fifth** 12:7 34:14
184:24 208:9
**fight** 99:23
**figure** 34:10
248:20
**filed** 6:18 24:24
25:2 80:12
107:1 147:9
156:18 158:14
159:19,25
160:8,9 162:8
175:4 179:2
**files** 16:8
**filing** 25:5
**filled** 248:11
**finally** 14:10
**financial**
188:15
**find** 31:24 32:1
47:3 48:25
69:4 72:12

102:21 126:13
134:13 137:11
137:21 151:7
153:15 183:20
219:18 270:11
**finding** 193:4
216:21
**findings** 218:11
**finds** 92:25
**fine** 42:11 54:5
168:11,21
243:3
**fingers** 192:7
**finish** 118:20
118:24 122:4
266:17
**finished** 263:24
**firm** 7:2,17 8:3
**first** 16:17
19:16 23:11
36:23,25 37:1
38:5,5 43:3,6
43:12,14,21,22
44:15 63:25
73:19 83:25
84:10 90:22
102:16 107:1
108:4 112:23
116:11 120:24
121:14 123:3
128:8,8 129:2
129:17 150:8
164:2 165:6
166:7 180:10
183:6 191:23

194:14 224:18
235:19 262:7
262:10,11
**firstly** 89:6
144:23 145:2
185:5
**fit** 150:18
246:22
**five** 46:15 64:7
73:15 94:25
95:11 102:23
148:18 171:23
217:7,12
220:19 227:5
246:1 263:17
263:24 264:1,2
264:15 265:10
265:15
**fixated** 258:23
**flabbergasted**
130:15
**flag** 115:15
**flagging** 128:19
128:20
**floating** 14:11
**focus** 263:8
**folder** 15:21
16:8
**follow** 89:19
101:7 122:6
211:5 256:8
257:3
**followed** 65:19
65:23 127:23

[following - form]                                             Page 26

| | | | |
|---|---|---|---|
| **following** 41:14 | 45:4 46:5,18 | 140:22 141:23 | 197:8,12,13,14 |
| 50:20 183:10 | 48:7 49:7 | 142:14,21 | 197:24 198:6 |
| 257:7 | 50:25 51:16 | 143:10 144:5 | 198:14 200:11 |
| **follows** 8:10 | 53:6 54:12,24 | 144:25 145:19 | 200:17,25 |
| **footnote** 117:3 | 55:8 56:4 57:1 | 146:2 147:2,14 | 201:9,17 202:9 |
| 125:3,11 | 58:3,14 60:25 | 150:22 151:18 | 202:18 203:1,9 |
| 127:12 129:3 | 61:6 65:7 | 151:24 154:4 | 203:17 205:9 |
| 166:23,25 | 76:23 77:5 | 155:12,18 | 205:17,22 |
| 167:5,11,12,17 | 78:12,22 79:5 | 156:6,23 157:4 | 206:4,13 207:4 |
| 167:18 168:23 | 79:14 80:1,7 | 158:7,20 160:1 | 207:12,24 |
| 203:6,15 | 81:4 84:2 85:5 | 160:11 162:11 | 208:21 209:2 |
| **footnotes** 133:8 | 85:23 86:14 | 162:14,20 | 209:15 210:6 |
| 167:1 168:22 | 87:4,12,25 | 163:16 164:5,8 | 210:20 211:3 |
| **force** 260:20 | 88:7,17,25 | 164:20 165:9 | 211:10,17 |
| **forced** 176:17 | 92:11 93:25 | 167:6,20 | 212:5,21 213:7 |
| **forceful** 236:23 | 94:12 96:4 | 168:14 169:2 | 214:1 215:5 |
| **foregoing** | 97:14 98:16 | 170:15 172:13 | 216:1,22 |
| 269:7 271:13 | 100:10,25 | 172:19 174:9 | 217:21 218:4 |
| 272:18 | 103:5,21 | 174:15 175:21 | 218:12,20 |
| **foremost** 23:11 | 104:22 106:4 | 176:14,25 | 219:5 220:10 |
| **forgotten** 78:3 | 107:15 108:16 | 177:7,16 | 221:11 222:1 |
| 78:10,19,23 | 109:2 110:12 | 178:13,23 | 223:3 224:10 |
| 79:2,11,12 | 113:10 114:17 | 179:12,22 | 225:2 226:1,20 |
| 80:2 | 115:14 116:6 | 180:1,7,13 | 227:12 229:6 |
| **form** 8:19 9:11 | 116:24 117:8 | 181:8,14,23 | 229:21 230:2 |
| 10:7 11:4 15:8 | 117:24 120:4 | 182:14 184:7 | 230:16 231:15 |
| 19:4 20:13 | 121:3 124:1,20 | 184:12 185:4 | 232:5,9 233:17 |
| 25:4 27:18,25 | 125:4,12 126:8 | 186:1,7 188:17 | 234:3,6 237:8 |
| 28:15,21 29:2 | 127:8,19 | 189:4 190:1,9 | 238:2,3 240:20 |
| 29:17 30:11,21 | 128:10 129:25 | 190:15,22 | 241:12,21 |
| 34:18,25 37:9 | 130:6,12 | 191:8,15 192:2 | 242:4,16,25 |
| 38:14 39:19 | 131:10 133:15 | 192:8,23 | 243:9,16 244:1 |
| 41:8,15 42:2 | 134:8 135:24 | 193:11 194:1,9 | 245:5,18 |
| 42:15 43:4,15 | 136:16 137:19 | 195:22 196:6 | 247:10,20 |
| 43:24 44:18 | 139:2 140:12 | 196:16,24 | 248:2,21 |

[form - getting]                                                    Page 27

249:11 251:14
252:6,18,25
253:8,16 254:1
254:19 255:2
255:22 256:11
256:16 257:6
257:11,21
258:10 259:3
259:15,19
260:3 261:13
**formally**
156:11
**format** 15:23
60:12
**former** 13:22
122:14,14
123:4 141:3
167:16 183:12
225:7
**forth** 39:16
133:24 143:5
145:16 147:17
147:17 157:7
230:20 234:24
234:25 235:2
237:4 269:11
**forum** 9:21
22:16 23:15,20
89:17
**forward** 23:9
23:17 24:15
244:24 263:8
270:15
**found** 69:3,5,12
77:9,14 78:10

81:23 88:20
94:25 124:13
181:11 195:1
**foundation**
1:11 5:8 7:23
29:24 30:1,6,7
95:2 119:20
145:12
**founded** 38:8
147:16,17,19
**founder** 134:17
**founder's**
166:14 168:9
**founding** 170:5
170:6,9
**four** 80:24
136:1 234:1
**fourth** 12:2
34:14 184:24
207:16,20
208:9
**frame** 51:20
149:19
**framed** 55:23
**frames** 158:12
**frankly** 49:25
130:14
**fraternities**
50:13 214:12
236:2
**fraternity**
59:18 60:6
**fred** 10:5,8
11:2,20 12:3,8
12:21 13:11

**free** 198:25
271:14 272:20
**freedom** 86:1
**friendly** 23:10
86:19 193:1
**front** 14:23
135:15 150:25
186:14
**frustrated**
185:16
**ftc** 10:1 237:17
237:21
**full** 26:16,18
119:3 189:9
**fullest** 215:22
**fully** 162:3
169:4 182:17
217:24 218:15
227:4 235:25
265:2
**function** 34:23
**fundamental**
187:7
**funds** 216:12
224:1 225:9
226:14 230:7
**funky** 160:20
**funny** 133:10
133:14
**further** 82:25
134:19 176:9
188:5 197:15
200:7,15 202:6
224:3 226:16
229:13 235:4

269:14
**furthering**
261:5
**future** 159:5,8
217:3,13

**g**

**g** 3:9
**game** 225:17
**gameified**
91:25
**games** 161:2
**gap** 21:12
**geico** 122:21
**general** 33:25
36:5,17 51:6
83:22 129:9,10
133:20 173:18
227:13 228:7
228:13,15
229:15 233:11
236:3 239:5
262:9
**generalities**
98:19
**generally** 26:2
38:3 46:13
114:4 198:22
198:25 239:10
254:8
**generic** 247:5,7
**genuinely**
167:8
**gerard** 33:1
**getting** 36:13
85:11 112:1

222:4,5 260:12
**girls** 188:7
189:11
**gist** 194:20
**give** 11:14 15:3
15:5,22 34:15
36:12 44:20
45:15,17 49:22
73:24 79:17
93:9,12,15
119:3 149:18
167:4 177:13
201:12 208:14
251:21 252:10
262:1
**given** 14:14
79:8 218:8
**gives** 107:19
119:7 128:20
177:17,20
258:19
**giving** 36:10
115:1 263:2
**glad** 225:15
**go** 6:14 16:5
20:17 24:22
39:15 42:12
47:2,4 48:20
52:16 68:4,15
68:18,25 69:4
76:13 86:10,10
86:21 88:23
93:15 94:17
95:9 97:19
107:19 108:23

120:20 122:2,8
123:20 134:4
139:22 140:11
140:18,19,21
140:23 148:17
148:25 149:20
150:23 151:4
152:10,14
153:8,15 155:7
157:17 158:10
159:18 172:1
177:20 184:21
185:18 200:3
204:21,24
214:4,8 216:5
230:25 237:7
237:24 238:7
238:16 246:1
260:13 265:2
266:8 267:7
**goal** 52:21
54:17 251:4
**goes** 41:23 57:5
59:13 62:7
63:22 87:18
121:12 130:20
198:25 219:25
221:20 234:21
234:23 255:10
256:7 258:19
**going** 6:5 11:11
13:20 15:3,19
31:19,25 35:24
36:1,2,4,9,16
36:20 37:18

57:10,11 64:11
70:15 71:14
72:23 83:5
84:23,24 87:21
90:19,20 94:16
98:12 102:1
105:18 106:11
108:25 120:22
138:4 145:16
148:10,16
149:3,11,22
154:7 157:10
161:4 163:21
165:18,21
172:21 182:9
184:24 185:21
204:12,21,24
204:25 214:3
216:8 217:7
218:9 220:8,14
221:5 222:20
223:6,19,22
228:17 230:21
231:6 235:21
241:25 244:13
245:25 246:4
249:3 256:6,8
256:9 258:16
258:17 264:18
264:18,19
265:25 266:15
267:22,25
**gold** 175:6,7,15
176:23 177:6
238:15 240:16

246:13,25
**golden** 86:6
175:17
**gonna** 12:23
13:8 104:23
225:19
**good** 6:5 31:19
74:25 115:21
129:8 146:6
147:21 179:3
192:13 208:7
260:21
**google** 126:22
127:1 131:15
253:11
**googled** 75:16
127:11
**gosh** 105:14
**gotta** 92:2
**governance**
202:6
**government**
133:12 229:11
**gpa** 240:11
**graduate** 74:9
93:2 239:8
240:1
**grand** 91:17
**grandstand**
9:24
**grant** 146:10
**granular** 85:10
**great** 13:25
111:25 147:22
173:18 261:9

**greatly** 81:3
**greece** 179:10
**green** 62:19
  107:12 108:6
  152:7,16,16
  153:12,12
  166:13 170:25
  229:1
**greenc** 62:18
  63:17
**gross** 40:4
  42:22 197:9
  261:15
**grossly** 102:10
**group** 50:14,15
  59:17 236:2
**grow** 115:8
**guam** 113:22
**guarantees**
  225:18
**guess** 64:5
  78:18 130:17
  151:2 152:6
  234:22 253:22
  267:7
**guessing**
  253:22
**guidance** 36:11
**guidelines**
  12:10,12,16,25
  28:3,17 29:8
  39:21,21 110:6
  123:15 124:23
  124:24 125:13
  126:1 127:24

136:9 143:3
**guy** 94:10

**h**

**h** 5:5 64:15
**habit** 9:5
**hac** 3:9
**half** 68:6 72:14
  232:24 261:17
**hall** 104:2
**halo** 86:8 118:1
  118:2
**hamper** 101:23
**hampering**
  98:6
**hand** 8:6 16:14
  81:17,18 102:6
  172:23 199:5
**handle** 45:25
  46:3,9,17 47:3
  47:16,22 48:4
  48:5 56:18
  59:6,7,13 62:8
  63:21,22 67:11
  68:9 73:11
  182:23
**handled** 173:19
**hands** 14:3
  55:22 102:2
  145:12,12
  202:20 203:25
**hang** 261:7
**happen** 33:4
  40:25 159:5
  193:23

**happened** 84:4
  84:5,7 141:20
  143:5 159:8
  189:10,21
  214:18 220:24
**happening**
  75:24
**happens**
  147:12 201:12
**happy** 21:11,15
  31:3 42:3
  47:10 69:20
  70:2 91:25
  93:1 192:25
  212:11 245:23
  248:10 258:13
**harassment**
  76:22 84:19
  86:11 181:6,21
  182:11 183:11
  188:16 197:23
  222:5
**hard** 156:13
  193:19 211:4
  220:25
**harder** 131:21
**hardest** 167:8
**hardware**
  134:21
**hat** 261:7
**hate** 246:18
**hayes** 10:5,8
  11:2,20 12:3,8
  12:21 13:11

**he'll** 34:16
  70:23 207:1
**head** 45:15
  139:14 141:6
  148:5 201:13
  219:20
**headbomb**
  64:15
**hear** 119:1
  160:20 205:16
**heard** 6:11
  18:14 33:25
  50:20,22 84:5
  85:7 89:11,25
  189:18 196:14
  196:17
**hearing** 83:4
  167:3
**heckler** 263:3
**hegemonic**
  199:6
**held** 56:10,12
**help** 29:10
  38:20 53:15
  54:16,19 64:8
  69:19 75:21
  108:8 115:8
  153:22 154:2
  154:23 158:24
  161:12,13
  167:8 174:23
  195:4 213:18
  239:8 247:15
  248:15 263:7,7
  263:10

[helped - hope]                                                    Page 30

| | | | |
|---|---|---|---|
| **helped**  111:12 | **historically** | **home**  102:21 | 176:23 181:7 |
| 111:15 | 166:13,15 | 103:7 | 216:10,13,18 |
| **helpful**  178:21 | 168:10 169:16 | **homework** | 221:20 223:24 |
| 178:22 247:16 | 169:22 170:11 | 184:22 | 224:3 226:13 |
| **helping**  120:8 | 171:5 | **honest**  208:18 | 226:16 232:3 |
| 173:13 237:20 | **history**  18:4,21 | **honor**  1:4,11 | 238:16,22 |
| 263:9 | 18:24,25 19:1 | 6:17 7:23 8:1 | 239:1,2,5,8,15 |
| **helps**  104:3 | 19:3 20:1 59:1 | 16:16,25 22:4 | 239:17 240:1,3 |
| **hereunto** | 59:10 74:15 | 22:13 28:20 | 240:5,8,18 |
| 269:18 | 94:3 110:3 | 29:1,5,6,21,23 | 241:10,19,20 |
| **heros**  83:20 | 116:2,8 118:15 | 29:24 30:1,6 | 241:25 242:2 |
| **hey**  120:14 | 134:24,25 | 51:6 53:19 | 243:5,15,25 |
| 128:21 | 135:3 139:24 | 56:25 57:23,25 | 244:7,14,15 |
| **hiding**  40:14 | 150:24,24 | 58:2,5,8,12,13 | 245:3,17 |
| **high**  114:21 | 151:6 152:8 | 69:17,19 70:10 | 246:13 247:1 |
| 115:4 | 153:11,15 | 70:19 71:6,13 | 250:4,14 256:3 |
| **higher**  99:5 | 170:21 171:9 | 71:25 72:7,9 | 258:20 262:9 |
| 138:23 182:18 | 171:14,15 | 72:10 74:10,10 | 262:14 270:6 |
| 182:19 194:17 | 180:17,18 | 74:13,14,16 | 271:3 272:3 |
| 194:18 | 231:7 235:24 | 76:3 81:13 | **honored** |
| **highlight**  151:7 | 244:7,9,12 | 82:20 83:10 | 215:21 |
| **highlighted** | 245:1 250:8 | 84:4 86:6 93:2 | **honors**  138:18 |
| 175:22 210:3 | **hit**  144:13 | 111:13 113:15 | 239:4 242:10 |
| 212:19 | 147:7 | 113:17 114:8 | 250:5 |
| **highlighting** | **hits**  253:15 | 116:11,16 | **honorsociety....** |
| 112:24 175:24 | **hobbyists** | 119:6 122:14 | 1:8,14 6:18 |
| **highly**  61:22 | 254:8 | 138:15 139:1,4 | 7:22 30:2 |
| 66:13 78:13 | **hold**  78:24 96:2 | 139:10 147:18 | 147:16 270:6 |
| 239:10 | 96:17,19,22 | 147:19,20,22 | 271:3 272:3 |
| **hinder**  101:22 | 97:9,13,16,17 | 158:11,11,14 | **honorsociety....** |
| **hindering**  98:5 | 99:2,5 199:8 | 158:19 159:14 | 23:18 |
| 101:6,9 | **holding**  30:7 | 159:19 160:8 | **honorsociety....** |
| **historian**  59:2 | **hollister**  3:9 | 162:7,9,25 | 16:18 |
| **historians** | 7:13 | 170:3 175:3,4 | **hope**  15:11,16 |
| 40:19 | | 175:16,17 | 233:8 |

**hopefully** 70:23
187:20 195:9
260:12
**hoping** 23:10
**horizon** 215:12
**horn** 195:1
**hotly** 113:17
**hour** 36:20
150:15 232:23
232:24 234:15
**hours** 130:21
130:22 136:22
136:23 161:10
173:17 232:25
234:10,13
237:11 263:12
263:14 264:25
**howard** 240:2
**hs** 16:6
**huge** 238:8,9
**human** 105:3
**hundred**
136:22,23,25
**hurst** 122:22
**hurt** 86:20
118:13 167:9
**hurtful** 232:12
**hurting** 244:25
**hypothetical**
211:13 220:25

**i**

**idea** 62:6 90:17
90:23 93:13,20
213:12,12
225:14 254:4

**identification**
15:25 94:19
106:21 148:15
157:14 165:25
**identified**
13:24 17:16
27:17,23 28:13
78:3 92:10
105:22 122:9
136:13 141:8
144:13 191:21
238:12 240:18
241:19 242:3
242:15
**identify** 47:2
48:23 120:16
135:9,19 173:6
173:9 174:2
**identifying**
74:18
**identities** 36:4
**image** 133:25
**immediately**
81:24 193:4
**immense** 61:18
**impact** 83:12
115:24
**impart** 29:7,10
82:19 83:10
171:19
**imparted** 9:17
9:18,18 22:17
28:7 99:21,21
**impede** 101:23
264:23

**impeding** 98:6
**implicate**
174:17
**implication** 9:2
9:3,4,8 121:10
223:1
**implications**
89:19
**implicitly**
113:16
**implied** 174:17
**implies** 216:25
**imply** 62:11
101:6 245:22
**importance**
19:13 133:13
191:13
**important** 9:23
38:17,21 39:7
39:11 40:11
49:9 81:14
85:6 138:20
160:13 171:8
199:16 215:1
216:23 247:12
247:13
**impossible**
217:5 221:4
224:14
**impression**
119:7
**improper** 174:6
177:22
**improve** 65:1
108:8

**improvement**
42:24 52:19
**inaccurate** 9:9
98:5 101:5,8
101:17,21
211:8,16
**inaccurately**
168:8
**inactivities**
231:17
**inappropriate**
69:10 98:5
101:5,9,17,21
104:17 108:9
124:21 128:4
**incident** 140:25
141:2 214:17
**include** 171:1
178:21 192:5
193:7,23 243:7
**included**
180:17 214:13
214:17 240:15
241:10 270:13
**includes** 219:19
**including** 7:7
154:19 203:11
212:24 259:11
261:11 262:25
**inclusion**
214:19
**inclusive** 74:10
93:3 105:5
111:13 240:1
249:23,24

250:2 252:4
262:13
**inclusivity**
261:4
**incorporate**
145:10
**incorporated**
6:18 272:12
**incorrect** 220:7
**incorrectly**
112:18
**incredibly**
38:21
**indecency**
147:25
**indecent** 195:2
**independent**
66:3 83:15
214:14,23
236:25
**indiana** 3:10,11
**indianapolis**
3:11
**indicated** 256:3
**indicating**
270:13
**indicative**
85:14
**individual** 14:3
29:4,20 59:14
59:17,19,21
60:5,7,9,18
64:6 75:13
115:18 209:22
212:24 235:13

**individually**
25:25 29:15
233:10
**individuals**
33:20 39:12
86:15 128:14
129:21 263:9
**inequities**
147:25
**inflammatory**
200:16
**information**
13:21 15:5
17:1 19:11
22:4,14 36:3
38:16 39:2
40:20 47:12
51:8 55:16
70:20 75:21
89:9,18 98:14
99:21 103:2
120:1 169:20
188:19 203:25
239:7 245:12
254:17 262:23
**informed** 19:23
22:15 23:4,8
23:14
**infringement**
159:20 162:24
175:5,12 177:4
**inherently**
113:18
**initial** 24:13
145:16 162:16

**initiate** 183:14
192:11 194:3
**initiated**
192:21
**initiating** 201:3
**injunction** 5:14
76:14,16 77:6
77:11 89:13
147:8 157:12
157:13 165:1,3
165:4 181:19
**injure** 224:3
226:17
**inquiry** 183:16
196:10
**insertion**
169:21
**inside** 182:18
194:17
**instagram**
233:20
**instance** 99:7
144:11,12
168:20,25
251:25
**instances**
214:16
**instruct** 37:6
151:7 223:6,16
223:17 255:24
**instructed**
208:12
**instructing**
222:5 248:25
256:24

**instruction**
256:19
**instructions**
223:10
**insulting**
137:21
**integrity**
133:21
**intend** 203:18
232:11
**intended** 82:18
112:22 242:13
267:5
**intent** 113:13
115:22 219:18
221:2 227:3
**intention** 54:22
73:10 109:17
113:12 137:18
**intentions**
219:20
**interaction**
235:14
**interactions**
236:11
**interest** 14:19
39:1,14,18
40:25 41:3,6,7
41:12,13,21,22
42:1 54:2
66:21 129:4
235:23 240:25
**interested** 7:4
83:19 146:23
147:6,12

**[interested - joneswalker.com]**                                        Page 33

269:16
**interesting**
39:20
**interfere** 15:2
88:22
**interference**
80:15
**interjected**
168:23
**international**
113:19,24
119:19 175:17
183:12
**internet** 5:12
6:10 10:20
14:10,12 89:15
94:11 124:11
126:14,18
127:4,16 138:5
149:17,18
186:9
**interpret** 189:7
**interpretation**
101:24 214:22
**interpretations**
103:17 104:20
106:2
**interpreted**
157:8
**interrogation**
187:15
**intimidation**
183:11
**introduce** 99:3

**introducing**
98:4,13 99:15
100:7,22 101:4
103:1
**inurement**
148:3
**invested** 198:18
**investigate**
141:19 194:22
**investigated**
61:20 194:8
**investigating**
198:23
**investigation**
131:15 183:14
191:22,23
192:11,22
194:4 198:22
198:22,25
199:1,2,3
201:3
**investing**
198:11
**invitation** 60:8
266:23
**invite** 189:11
**invited** 52:14
59:17 144:20
236:4,6
**involve** 76:25
**involved** 29:12
36:5 39:15
41:22 77:3
138:21 145:21
145:23,23

194:12 204:5
235:6 236:3,9
236:13,14,14
237:5 250:22
263:4
**involvement**
138:22
**involving** 33:9
**ip** 47:25 48:6
**ish** 44:16
**issue** 34:16
40:13 72:13
74:19 75:6
85:15,15 86:2
128:20 164:11
164:13 181:22
215:3,13 217:6
219:25 220:24
221:17,23
229:15 256:21
**issued** 76:1
80:25 82:23
165:2 180:24
**issues** 14:8
40:15 66:3
120:11 147:18
213:11 219:10
223:13 239:1,3
239:5,6,9
**issuing** 80:25
82:24,25
**itawamba** 77:4
77:15 204:5,25
205:7 215:4,24
216:11 223:25

225:8 226:13
227:10,16,17
228:5,9
**item** 113:4
**items** 246:20

**j**

**j** 4:2 62:25
**jackson** 3:15
4:1,3 129:8
**jail** 198:24
**january** 111:10
111:21
**jax** 62:25
**jeopardize**
199:4
**jews** 244:17
**job** 2:1 52:20
56:14 103:12
103:12 115:17
141:25 173:18
174:5
**johnfrompick...**
236:13
**join** 50:13
59:17 236:4,6
244:18,18
**joined** 7:15,18
8:1
**joining** 172:10
**jonathan** 3:9
7:12 223:6
263:10
**jones** 4:1 8:4
**joneswalker....**
4:3

**[journeyman - know]** Page 34

**journeyman**
    90:24
**jpolak**  3:11
**judge**  31:16
    57:18 77:14,23
    78:3,10,13,19
    78:24 79:2,23
    80:3 81:1,10
    82:21,24 83:8
    83:18 88:20
    105:12 115:10
    147:8 157:11
    158:5,11,17
    159:23 160:3
    160:10,15
    161:3 163:3
    182:11 188:4
    197:2,11 215:2
    215:11 216:4,8
    216:20 218:11
    219:17 220:7
    221:16 222:17
    222:24 223:7
    223:10,23
    224:8 225:19
    226:12 227:4
    247:2 256:2
    257:19 259:1
    260:1 264:10
    265:3
**judgments**
    109:23
**july**  5:12 24:25
    25:8,15 107:2
    141:6 149:17

154:22 159:4
163:25 165:7
165:23,23
183:4 199:25
204:24 217:1,3
217:6 224:12
228:20 231:12
232:21 235:19
236:20 237:6
**jump**  114:4
    139:15
**jumped**  21:6
**june**  141:6
    231:12
**junior**  166:9
**jury**  50:7
**justice**  212:25
    229:9
**justifiable**
    216:10 221:18
    221:19 222:25
**justification**
    158:18
**justifies**  54:10
**justify**  249:2

**k**

**k**  63:22
**kaplan**  18:13
**kappa**  1:4 5:10
    6:17 7:13
    13:24 14:14
    16:16 18:9,11
    18:12,14 21:7
    26:1,11 29:12
    75:6 107:7

113:14 114:20
115:23 116:15
116:17,23,23
117:10 118:2,6
118:6 119:13
121:1,1 126:20
126:22 127:7
127:18 128:24
133:1 134:25
135:1,2 138:13
150:9 154:14
154:15 160:7
163:23 164:3
166:8,13 168:8
169:24 171:13
172:3 175:17
175:17 180:21
183:13 190:21
190:24 191:25
192:6 193:25
202:7,15,25
225:11 230:22
230:25 250:10
250:25 270:6
271:3 272:3
**kappa's**  7:18
    33:6 190:14
    191:6,22
    192:17
**katie**  1:23 3:4
    7:1 15:11
    269:4,23
**keep**  48:18
    105:14 126:25
    154:7 225:17

231:21 249:3
264:18 265:18
266:19
**key**  86:6 175:17
**kill**  137:12
    141:2
**kind**  20:18,21
    58:24 74:17
    94:5 234:18
**klan**  74:16
    238:25 240:3
    243:15,25
    245:3,17
    250:14
**klux**  74:16
    238:25 240:3
    243:15,25
    245:3,17
    250:14
**knew**  22:10
    86:11 87:9,22
    88:5,14 142:10
    142:12,19
    162:19 205:13
    227:10 236:9
    244:10
**knockoff**
    118:12
**know**  9:19,23
    10:1,3 13:18
    14:6,7,7,13,15
    14:17 16:4
    19:14 21:5,7,8
    21:11,12,15,15
    21:20 23:4,11

| | | | |
|---|---|---|---|
| 24:16 25:6 | 93:8,10,11,14 | 148:2,2 150:13 | 246:21,23,25 |
| 26:13 30:15,16 | 93:18,22 94:1 | 150:14 151:9 | 247:4,13,14 |
| 30:17 31:11 | 94:8,11,15 | 151:11 156:13 | 249:22 250:1,3 |
| 32:3 34:13 | 95:16,19 96:24 | 156:25 158:1,5 | 250:8,19 |
| 38:18,22,24 | 96:24,25 97:1 | 159:5 161:11 | 252:24 254:14 |
| 39:5,8 40:1,4 | 97:2,4,5,6,10 | 162:23 163:8 | 260:14 261:15 |
| 40:14,15,20 | 97:12 98:19,19 | 164:11,12 | 262:7,18,20 |
| 44:4,4,8,11 | 98:24 101:2,7 | 167:25 168:3 | 263:3,20 |
| 45:21,23 47:7 | 101:14,25 | 170:4 171:4,9 | 265:20 |
| 47:8,23 48:13 | 102:8,9,20 | 171:12,16 | **knowing** 261:7 |
| 48:14 49:9,21 | 104:8 110:5,24 | 174:18 182:2 | **knowingly** |
| 51:3,18,20,23 | 111:14 112:3 | 182:22 187:3,6 | 67:24 |
| 53:8 54:19 | 112:20 113:3 | 187:7 189:6,8 | **knowledgable** |
| 57:9,17 58:4 | 113:13,15 | 189:11,16 | 49:17 |
| 58:16 59:3 | 114:1,10,19,23 | 191:16 192:25 | **knowledge** |
| 61:8,15,20,24 | 114:25 115:1,2 | 194:10,13,14 | 22:6,7,14,18 |
| 62:15,18 63:8 | 115:3,5,17,17 | 194:24 195:6 | 29:4 32:5 |
| 63:11 65:3,5 | 115:20 117:10 | 196:23,25 | 33:25 38:7 |
| 66:8,15 67:13 | 117:12,13,13 | 198:17,21 | 47:23,24 50:16 |
| 67:22 68:5,6,8 | 117:25 118:1 | 199:7,7,12,16 | 50:17 51:6,7 |
| 68:9 69:7,13 | 118:11,17 | 201:22 215:18 | 53:14 55:17 |
| 71:15 72:11 | 119:3,14 120:8 | 217:4 220:22 | 58:23 59:5,14 |
| 73:13,15,17 | 121:7,14,21 | 221:14 225:4 | 62:10,12 64:1 |
| 74:14,18 75:1 | 127:1,2 128:2 | 226:21 228:1 | 65:8 81:13 |
| 75:4,6,9,12,14 | 128:22 129:1,5 | 228:14 231:23 | 82:19 83:10 |
| 75:19 79:9,15 | 129:10 130:15 | 233:14 234:7,8 | 85:1 92:23 |
| 81:21 82:1,3 | 130:17 133:19 | 234:13,17 | 105:3 119:8 |
| 83:13,13,15 | 133:24,24,25 | 235:12,18,21 | 120:11 128:23 |
| 84:17 85:10 | 134:19,22 | 236:7 237:20 | 131:17 143:11 |
| 86:3,5,6,15,16 | 138:5,12,24,25 | 238:16,17 | 156:7 159:4 |
| 86:17,18,20 | 139:12 141:25 | 239:6,11,24 | 161:8 163:4,10 |
| 88:10 89:8,10 | 142:22 143:20 | 240:10,14,17 | 165:13 171:12 |
| 89:14,19,20 | 145:3 146:4,7 | 240:24,25 | 172:15 201:18 |
| 90:15 91:21 | 146:14,19,20 | 242:2,19,22 | 209:17 227:14 |
| 92:2,8,18 93:3 | 147:21,24 | 244:11 246:20 | 233:18,22 |

**[knowledge - learn]**                                                    Page 36

235:2 236:5
250:5,24
251:23 252:13
253:11
**knowledgeable**
55:17
**known** 85:25
159:2,3 217:7
**knows** 158:14
260:16,16
**ku** 74:16
238:25 240:3
243:15,24
245:3,17
250:14

**l**

**l** 1:23 3:4 61:10
61:12,13
269:23
**lack** 127:12
**lacking** 187:8
**ladner** 1:18 4:6
7:14,19,20
24:15,24 27:23
40:7 53:12
65:21,25 67:5
68:3 75:7 96:6
99:6,11 107:24
113:21 128:23
169:24,25
171:13 172:23
195:3,3 196:17
199:6 205:13
206:6 208:4
213:13 216:16

232:2 237:19
238:9 254:25
255:21 256:15
261:24 263:7
**ladner's** 17:6
21:24 27:1
49:25 65:19
67:14 106:24
107:4 148:13
149:13 165:19
196:13 199:23
204:22 208:19
224:23 228:18
231:9
**land** 146:10
**lane's** 65:18
**lange** 66:9 67:4
**langgle** 1:23
3:4 7:1 15:11
53:21 57:13
69:24 70:13
82:6 89:2 96:9
102:12 112:8
125:21 129:13
131:1 132:19
161:18 163:12
172:24 173:21
176:4 186:24
187:19 195:8
205:25 206:16
206:25 207:19
210:25 217:17
225:22 227:22
229:18 249:7
258:6 269:4,23

**language** 77:19
113:8 115:13
116:4 150:11
150:21 151:10
151:23 153:1,3
153:7 154:13
154:17,21,25
155:16 159:9
164:2 168:10
174:7 177:12
183:22 184:25
200:14,21
202:8 212:19
213:23 215:23
224:22 225:12
**large** 15:10
132:11 136:2
144:19
**largely** 49:24
75:5
**largest** 29:5
38:15
**larry** 195:1
**late** 75:25
180:24 193:3,9
**laughlin** 269:19
**law** 7:17
**lawsuit** 39:15
39:18 41:23
75:10 83:2
146:1 153:25
155:8,9,11,24
156:3,4,9,10,22
157:8 158:13
159:19,24

162:8,13,16,19
163:5,18 172:3
175:4 179:2
189:22 241:4
**lawsuits** 150:9
154:14,16
155:25 156:17
159:11 160:8
164:4 165:13
**lawyer** 31:5,6,6
34:15 36:9
81:5 156:24
189:9 193:18
221:8 263:1
**lawyer's**
223:20
**lawyerly** 97:2
**lawyers** 35:25
36:3 37:3,13
188:9
**lax** 139:6
**layer** 24:17
**leader** 41:4
42:5,23 199:10
199:10 236:5
**leaders** 83:19
115:9
**leadership**
85:14 200:3
**leading** 82:15
183:15 196:10
**learn** 21:19
29:7 75:16
83:15 94:3
123:20,24

learned  83:16
  83:16,25
  189:21
learner  39:5
leave  178:10,20
  183:10 194:25
  195:19,24
  196:1
leaving  103:7
led  250:9
ledger  182:20
left  102:2
  141:11 202:13
  202:20 203:25
legacy  119:20
  147:20 171:9
legal  6:25 7:2
  9:5 39:17
  85:25 174:19
  221:7,8 270:1
  273:1
legitimacy
  202:6
legitimate
  130:16
lend  121:5
lenovo  122:22
lesser  39:24
  40:1 41:2,6,9
letter  62:19
  270:19
letting  123:23
  233:14
level  52:3,16
  53:4 91:25

209:19,21,23
  214:16
levels  90:9,21
  91:22 92:16
lexicon  247:14
  248:11 249:15
liberty  165:4
librarian  59:2
  61:16 94:14
librarians
  29:10,11 40:19
  55:15
library  94:9
license  82:3
lie  81:15,15,18
  82:1,4
lies  42:4
life  38:12 39:4
  88:9 110:3
  138:10,23
  146:7,9
light  170:21
  239:2
likely  43:10
  233:24
limit  223:8
limited  31:17
  172:9 255:6
  256:22 266:11
line  31:15 42:7
  42:22 113:3
  114:6 137:24
  153:11 155:2
  173:8,14
  176:10 191:12

221:4 270:13
  272:7 273:3
lines  89:11
link  123:18
  153:10 189:8
  194:21 214:3
linkage  150:7
linke  3:21,23
  7:21,21 8:19
  9:11 10:7 11:4
  15:8,12 19:4
  20:13 25:4
  27:18,25 28:15
  28:21 29:2,17
  30:11,21,25
  31:15 34:18,25
  37:6 38:14
  39:19 41:8,15
  42:2,15 43:4
  43:15,24 44:18
  45:4 46:5,18
  48:7 49:7
  50:25 51:16
  53:6,24 54:8
  54:12,24 55:8
  56:4 57:1 58:3
  58:14 60:25
  61:6,12 65:7
  76:23 77:5
  78:12,22 79:5
  79:14 80:1,7
  81:4 84:2 85:5
  85:23 86:14
  87:4,12,25
  88:7,17,25

92:11 93:25
  94:12 96:4,12
  97:14 98:16
  100:10,19,25
  103:5,21
  104:22 106:4
  107:15 109:2,5
  110:12 113:10
  114:17 115:14
  116:6,24 117:8
  117:24 120:4
  121:3 122:6
  124:1,20 125:4
  125:12,25
  126:8 127:8,19
  128:10 129:25
  130:6,12
  131:10 133:15
  134:8 135:24
  136:16 137:14
  137:19 139:2
  140:12,22
  141:23 142:14
  142:21 143:10
  144:5,24
  145:19 146:2
  147:1,14
  150:22 151:18
  151:24 154:4
  155:12,18
  156:6,23 157:4
  158:3,7,20
  160:1,11
  162:11,14,20
  163:16 164:5,8

| | | | |
|---|---|---|---|
| 164:20 165:9 | 212:5,21 213:7 | 267:15 270:5 | 219:11 |
| 167:6,20 | 214:1 215:5 | **linked** 193:22 | **little** 157:21 |
| 168:14 169:2 | 216:1,22 | 229:9 | 163:8 193:3,9 |
| 170:15 172:13 | 217:21 218:4 | **links** 108:9 | 236:18,19,20 |
| 172:19 174:9 | 218:12,20 | 124:7 128:5 | 236:22 |
| 174:15 175:21 | 219:5 220:10 | 152:5 154:18 | **live** 75:4,4,5 |
| 176:14,25 | 221:11 222:1 | 156:18 | 137:25 138:5 |
| 177:7,16 | 223:3 224:10 | **list** 31:13 92:14 | 214:5 231:6 |
| 178:13,23 | 225:2 226:1,20 | 122:9,13 123:9 | **living** 94:10 |
| 179:12,22 | 227:12 229:6 | 242:1,10,14 | **llp** 3:9,20 4:1 |
| 180:1,7,13 | 229:21 230:2 | **listed** 65:4 | 7:21 8:4 |
| 181:8,14,23 | 230:16 231:15 | 95:22 124:16 | **loaded** 9:2 |
| 182:8,14 184:7 | 232:5 233:17 | 125:14 128:4 | 100:13 142:15 |
| 184:12 185:4 | 234:3,6 237:8 | 134:5 213:21 | 142:18 |
| 186:1,7 188:17 | 238:2 240:20 | 240:13 242:23 | **located** 63:10 |
| 189:4 190:1,9 | 241:12,21 | 272:7,17 | 63:11 |
| 190:15,22 | 242:4,16,25 | **listen** 57:6 | **log** 36:4 48:22 |
| 191:8,15 192:2 | 243:9,16 244:1 | 84:21 105:13 | **logged** 47:7 |
| 192:8,19,23 | 245:5,18 | 141:24 | 233:19 |
| 193:11 194:1,9 | 247:10,20 | **listened** 237:9 | **logging** 47:20 |
| 195:22 196:6 | 248:2,21,25 | **listing** 272:7 | **logs** 183:20 |
| 196:16,24 | 249:11 251:14 | **literally** 118:10 | **long** 54:6 68:4 |
| 197:8,24 198:6 | 252:6,18,25 | **litigate** 81:14 | 100:13 101:22 |
| 198:14 200:11 | 253:8,16 254:1 | 81:15,17 82:1 | 122:13 136:11 |
| 200:17,25 | 254:19 255:2 | **litigated** 83:21 | 225:16 265:20 |
| 201:9,17 202:9 | 255:12,22 | **litigation** 34:1 | **longer** 145:2 |
| 202:18 203:1,9 | 256:11,16 | 39:24 41:25 | **look** 19:2 23:9 |
| 203:17 205:9 | 257:6,11,21 | 42:12 88:8 | 38:19 40:3 |
| 205:17,18,22 | 258:10 259:3 | 137:17 158:13 | 75:8,11 84:15 |
| 206:4,13,20 | 259:15,19 | 163:2 172:11 | 94:23 95:13 |
| 207:4,12,24 | 260:3 261:13 | 172:17 175:18 | 97:11 102:18 |
| 208:21 209:2 | 263:12,23 | 176:13,15,16 | 107:20,20 |
| 209:14 210:6 | 264:11,20 | 176:17,24 | 108:4 109:11 |
| 210:20 211:3 | 265:5,8,21 | 177:13 179:11 | 109:21 112:23 |
| 211:10,17 | 266:22 267:13 | 179:13 187:6 | 114:8 117:9,19 |

**[look - made]**    Page 39

118:15 133:8
140:14,14,15
140:17 150:24
151:5 152:3,15
153:6,8,13,18
159:13 171:3
172:2 175:2
180:10 183:2
183:19 185:21
187:2 192:25
199:20 204:25
216:4 217:13
219:22 224:2
226:15 228:17
228:22 231:19
235:24 236:15
246:20 264:3,7
266:21
**looked**  18:3,3,6
18:10,20 19:9
19:16,19,25
21:16 23:25
63:6 107:9
108:1 127:10
128:14 151:23
165:22 183:4,4
183:22 199:22
215:23 216:6
224:22,24
228:19 230:13
239:23 266:10
**looking**  11:8,9
19:20,23 20:2
20:6 21:1
23:16 40:4

86:20 95:5,25
97:7 105:23,23
116:10 117:25
136:11,20
153:5,23
154:13,15
155:1 159:10
162:22 183:21
184:13 185:1
200:1 213:22
219:19 228:21
232:18
**looks**  14:15
101:16 120:15
122:16 153:22
153:24 154:5
161:9 172:6
176:8 183:25
183:25 192:9
192:10 232:25
234:9
**lord**  208:7
**lose**  68:24
164:24
**losing**  71:22
100:12
**lost**  165:2
**lot**  44:22 46:23
68:15 89:5
92:3 116:8
134:20 135:8
136:3 138:17
148:2 189:5
252:21

**love**  39:10
229:10
**lowe**  205:6
210:4,18
216:11,13
221:21,24
225:7,10
227:10 228:5
**lowering**  52:17
**lows**  264:6
**loyal**  262:15
**lunch**  100:11
**lynn**  1:18 4:6
7:14 17:6
65:19,21 66:19
68:3 75:7 99:6
118:14 128:22
146:11 169:24
171:13 195:2,3
199:9 213:12
231:9 263:7
**lynn's**  27:1
121:24 146:12

**m**

**m**  5:2 61:10,12
61:13 62:9,25
63:22 64:15
126:20
**madam**  61:9
270:10
**made**  17:15,20
24:5,17 25:21
26:4 27:4,5,9
28:12 32:2,15
32:22 33:2

35:7,21 37:1,2
43:13,22,23
44:15,16 45:1
48:3,3,4 49:23
54:23 55:6
63:14 64:2,8
64:16,24 66:2
67:5 73:19
85:20 87:10,23
88:5,23 99:19
107:10 108:5
110:1 111:5
116:13 119:25
127:15 134:17
134:22 139:17
140:5,7 150:20
151:16,17
154:3 162:18
180:23 181:5
184:19,22
188:1 189:2
195:18 196:21
198:2 199:25
202:11 205:12
215:4 219:18
219:21,24
221:17,24
224:1,7 226:15
227:8 229:13
231:1,13,20
232:13,21,23
234:1,19,20
235:7 236:25
241:9 243:6
249:20 251:11

**[made - mean]** Page 40

| | | | |
|---|---|---|---|
| 261:15,23 | 129:19 139:19 | 180:19 181:18 | 94:17,19 |
| 271:7 | 142:2 146:1 | 181:21 210:17 | 106:21 107:1 |
| **magazine** | 151:22 162:3 | 231:20 239:22 | 148:11,15 |
| 260:23,23 | 164:17,24 | 249:1 262:21 | 157:10,14 |
| **main** 54:17 | 170:22 173:19 | **malice** 219:25 | 165:18,25 |
| 67:6 75:10 | 180:12 188:14 | 255:10 256:7 | 202:4 238:15 |
| 85:16 135:5 | 193:20 204:1 | **malicious** | **marketing** |
| 189:7 | 212:18,22 | 77:12,16,24 | 175:6 177:5 |
| **maintenance** | 213:15 221:7,8 | 78:5,11,21 | **marking** |
| 98:7 | 222:25 230:24 | 79:3,24 80:6 | 106:20 |
| **major** 40:15,15 | 230:25 233:3 | 80:25 81:1,2 | **marks** 37:18,23 |
| **make** 19:23 | 237:6 239:20 | 82:23,24,25 | 72:23 73:3 |
| 24:22 28:11,17 | 240:14 241:6 | 88:21 147:8 | 106:11,16 |
| 28:19 31:18 | 251:7,21 262:1 | 181:12,21 | 149:2,7 204:12 |
| 36:11 42:12 | **makemyday1...** | **malign** 137:17 | 204:17 246:3,8 |
| 43:12,19,21 | 121:9 | **maligning** | 265:24 266:4 |
| 44:14 45:20,20 | **makemyday1...** | 179:1 | **marlo** 119:14 |
| 45:25 46:3,10 | 65:23 67:13 | **manipulate** | **married** 112:1 |
| 46:17 47:3,17 | 69:12 121:10 | 104:19 106:2 | **master** 91:11 |
| 47:19,21 48:17 | 152:23,25 | **manipulating** | 91:13,15,17 |
| 48:19,24 49:5 | 236:13,16 | 103:16 | **materials** 170:7 |
| 49:12 53:3 | **makes** 41:23 | **manipulation** | 175:6 177:6 |
| 54:16 60:1 | 119:12,13 | 104:4 | **matter** 6:17 |
| 67:16 68:19 | 179:3 194:6 | **manor** 146:11 | 149:21 182:13 |
| 73:8 74:3 | 216:13 221:21 | **march** 75:25 | 213:13 |
| 75:21 83:12 | 230:4 | 76:6,13 80:10 | **matters** 99:7 |
| 84:13 85:1 | **making** 27:16 | 180:24 181:7 | 122:12 |
| 86:3 88:15 | 27:22 45:2 | **margaret** | **matthew** 132:1 |
| 89:15 92:24 | 47:6 48:11 | 134:16 135:12 | 138:4,6,7 |
| 95:14 97:2 | 52:3 74:21 | 146:7 | 139:9 |
| 102:9 109:12 | 96:2 102:4,18 | **maria** 33:2,24 | **maury** 263:1 |
| 109:13,15,18 | 107:11 110:18 | **mark** 73:22 | **mean** 8:20 18:2 |
| 109:23 113:6 | 110:19 113:24 | 222:20 | 19:10 23:20 |
| 117:5 118:16 | 140:2 147:11 | **marked** 15:19 | 30:16 32:19 |
| 120:14 126:5 | 150:1 177:15 | 15:25 16:5 | 38:15 47:20 |

**[mean - minute]**

55:14 58:22
67:19,23 83:21
89:10 94:13,14
97:12 109:14
112:14 114:7
118:8 119:5
120:20 121:10
124:8 127:1
128:19 129:6
130:22 132:10
133:25 146:21
148:4 152:14
163:4 171:1
198:24 220:25
228:12 242:9
246:16 252:21
259:9 264:3,7
**meaning**
153:12 166:20
**meaningless**
92:4
**means** 54:10
123:17 187:4
198:23 248:20
**meant** 9:21
54:14 65:1
225:9 247:12
**media** 6:15
37:18,24 72:23
73:4 106:11,17
133:2,7 149:2
149:7 204:9,12
204:18 246:9
254:24 255:20
256:14 265:25

266:5 267:25
**meet** 8:17
155:22 251:2
**meeting** 19:8
22:21,22,25
23:22 25:7
33:8
**member** 21:8
52:14 124:3,12
127:6 132:3,4
132:7,9 139:9
169:6 214:10
**members** 13:23
13:23 14:2,20
22:15 64:9
114:5 122:3,8
122:10,14,15
123:1 124:17
125:10 128:8
129:7 131:23
134:5 135:10
135:11,17,19
135:21,23
136:12,21
137:9 139:7,23
154:10 163:24
167:16,23
168:20 169:5,6
169:12 224:3
226:16 250:5,7
262:15
**membership**
126:7 132:12
133:6 159:15
172:8

**memory** 151:1
154:20,23
183:23 195:12
195:13 236:1
**men** 244:18
254:9
**mention** 24:2
182:17 245:16
**mentioned**
23:16 61:17
243:22 245:12
246:12
**mess** 8:18,21
8:23,25 9:1,7
88:24 89:7,7
**message** 129:19
227:6 233:4,13
**messages**
111:15,17
191:10
**meyers** 31:16
161:3 222:17
223:7 225:19
264:10 265:3
**miami** 123:6
**michael** 1:21
3:1 5:3 6:16
7:25 8:8 22:24
25:21 37:24
52:25 57:5
68:15 70:16
71:9,16 73:4
106:17 129:8
149:8 162:25
166:21 201:11

204:18 246:9
263:21 266:5
267:24 270:8
271:4,9 272:4
272:13 273:20
**microsoft**
15:15
**mid** 76:6
**midwest**
270:17 273:1
**mike** 224:12
258:17,17
**military** 187:14
**miller** 4:6 6:24
**million** 199:2,4
199:4
**millions** 114:5
262:22
**mind** 27:7,19
34:19 36:21
42:10 98:12
172:22 210:21
214:2 224:16
224:20 236:18
236:19
**mine** 83:24
184:23
**minimum**
109:10
**minnesota** 63:1
63:10,11,12
**minorities**
244:17
**minute** 72:20
161:23 171:23

185:12 234:12
234:15 263:13
263:15 265:21
**minutes** 129:20
130:21 131:8
131:11 136:12
148:18 171:2
204:8 220:19
263:17,24
264:1,2,15
265:10,15
**mis** 158:11
**misattributing**
145:3
**mischaracteri...**
9:4 33:6 35:17
40:5 147:16
197:10 198:15
261:16
**mischaracteri...**
42:23
**mischaracteri...**
262:8
**mischaracteri...**
40:14 102:10
**misconduct**
87:16 149:23
150:3 160:19
163:24 183:5
189:10,13
194:12,13
200:4 210:18
214:11,12
264:6

**misguided**
67:25
**misleading**
113:25 114:3
196:23 197:6
197:20 198:1
215:3,25
219:24 224:25
**misleads**
158:12
**misrepresent...**
138:2 173:11
**misrepresent...**
174:18 263:4
**misrepresenti...**
174:14
**misrepresents**
159:14 172:7
**missing** 86:19
128:21
**mission** 70:8,9
114:13
**mississippi** 1:2
3:15 4:3 6:20
146:10 212:25
229:8 230:7
246:23
**misspelled**
15:13
**misstatement**
116:19,20
**misstatements**
42:5
**misusing** 148:4

**mitigate** 69:19
**mn** 62:25
**modeled** 118:8
118:9 119:5,18
**moderator**
69:15 71:7,12
71:23 72:6
89:24 90:1
92:25 193:19
214:23 235:10
**moderators**
145:13 150:17
173:15 202:11
204:1
**modification**
128:17
**modifies**
195:25
**modify** 193:7
**modifying**
101:16
**mom** 65:16
66:1
**moment** 11:5
46:22 95:13
126:17 160:12
216:25 217:11
217:15 251:21
251:25
**moments** 85:12
171:1
**money** 188:1,8
198:11,16
224:2 226:15
263:9

**monica** 3:22
**monitoring**
145:6
**monitors** 49:19
**monopolist**
176:16
**monopoly**
150:10 156:10
165:15 172:4
**month** 157:21
160:4
**months** 84:10
193:9 196:21
250:7
**moore's** 13:16
**moradian** 1:21
3:1 4:6 5:3
6:16 7:25 8:2,8
8:17 11:14,19
12:2,14 14:22
15:1,13 20:19
25:11 30:24
31:5,24 34:9
35:10 37:11,24
38:2 44:9
72:18 73:4
78:9,18 82:13
84:12,18 87:14
87:18 88:14
99:13 100:6,6
100:17 102:25
103:23 104:10
105:11,17
106:17 118:20
122:5,20,25

| | | **n** | **narrative** 39:17 |
|---|---|---|---|
| 125:22 129:14 | 273:20 | | 41:25 |
| 131:2 132:16 | **morex** 188:4 | **n** 3:6 5:1,2,2 | **narratives** 9:24 |
| 135:16 140:6 | **morning** 6:5 | 62:9,25 64:23 | **narrow** 79:16 |
| 142:5,12,18 | **mosal** 103:24 | 90:13 | **narrowly** 76:18 |
| 149:8 155:10 | 134:16 135:12 | **nader** 4:6 8:2 | 77:6,18 155:2 |
| 159:8,12 160:6 | 146:7 | 15:13 35:10,13 | **national** 132:10 |
| 160:18 161:16 | **mother's** 94:10 | **name** 6:24 10:5 | 138:14,18,19 |
| 161:23 162:5 | **motion** 157:13 | 10:10 11:2,20 | 138:25 139:3,4 |
| 163:1 164:22 | **mouth** 42:17 | 12:3,8,21 | 139:10 183:9 |
| 166:21,25 | 60:14 167:10 | 13:11,16,19 | 200:6 214:13 |
| 167:2 168:19 | 258:19,21 | 26:16,18 27:13 | 214:14 |
| 170:18 176:5 | **move** 40:22 | 62:2,3,25 | **nations** 114:6 |
| 176:12,20,21 | 57:10 66:24 | 64:11,15,22 | **natively** 10:2 |
| 177:9 184:10 | 71:10 100:14 | 66:18 73:9,20 | **nature** 9:13 |
| 184:17 185:11 | 123:13 232:15 | 73:25 74:24 | 86:22 134:1 |
| 189:14 190:6 | 244:23 263:8 | 75:16 80:20 | 240:1,8 264:4 |
| 191:3 195:9 | **multimillion** | 81:11 83:9 | **near** 38:7 84:20 |
| 198:13 203:5 | 183:16 196:11 | 108:20 113:15 | **nearly** 68:12 |
| 204:18 206:1 | 197:21 202:5 | 113:16 116:2 | **neatly** 250:25 |
| 207:11 208:7 | **multiple** | 118:6 121:9 | **necessarily** |
| 216:17 217:18 | 105:19 118:3,3 | 123:3,9 125:10 | 86:18 109:20 |
| 218:3 219:16 | 143:12 157:24 | 131:22 133:11 | 232:14 |
| 220:15 222:13 | **multitude** | 144:10 166:4 | **necessary** |
| 223:19 224:12 | 232:14 | 229:8 239:16 | 42:13 167:13 |
| 224:21 233:12 | **murtagh** 26:4 | 269:19 270:6 | 266:14 |
| 242:12,22 | **museum** 29:5,6 | 271:3,4,15 | **need** 13:20 |
| 243:22 246:9 | 29:9,11,19,21 | 272:3,4,21 | 47:12 68:19 |
| 246:12 249:5 | 29:23 39:4 | **named** 26:13 | 72:17 95:13 |
| 255:17 256:7 | 51:5 53:14 | **names** 13:22,23 | 104:8 105:18 |
| 257:2 258:25 | 72:9 147:19 | 127:5 129:23 | 112:3 115:24 |
| 260:10 263:19 | **mutual** 261:21 | 130:5,11 131:9 | 127:12 140:4,6 |
| 265:17 266:5 | **mw** 2:1 | 142:6,20 143:6 | 143:15 152:3,5 |
| 266:12 267:25 | **myriad** 61:21 | 143:8 144:3 | 153:8,13 |
| 270:8 271:4,9 | | 167:16 | 160:17,18,19 |
| 272:4,13 | | | |

**[need - notable]**                                      Page 44

160:20,21
167:23 174:12
201:12,14
207:16 210:7
210:11 220:5
244:21,21
260:10 261:6
267:18,19,20
**needed** 54:7
91:24 99:19
153:6 197:5
248:12 256:3
**needless** 163:9
**needs** 39:8
48:23 129:10
190:11
**negative**
136:19
**neither** 269:14
**neutral** 38:16
39:3 40:12
42:19 49:22
54:15,22 55:10
108:10 112:21
173:13 178:7,9
178:22 180:20
201:4 202:8,11
202:17,20
**neutrality** 9:18
13:1 28:7
171:19 178:12
178:20 193:16
237:12 239:13
250:17 251:3

**neutralized**
174:22,23
**neutrally** 14:18
173:4 200:9
201:1
**nevada** 269:19
**never** 26:1
33:25 70:6
72:5 75:6,7
89:11 113:13
118:4 125:14
141:21 250:4,6
264:3
**nevertheless**
66:21 262:17
**new** 14:6 20:9
21:10,20 73:15
80:14 156:22
157:7,8 264:6
**newer** 153:23
**newman** 3:20
7:21
**newmanlaw....**
3:23
**news** 212:24
254:24 255:20
256:14
**nice** 247:11
**night** 18:17
19:7 63:25
234:1,22 254:8
264:21
**nobody's** 24:16
24:17

**non** 222:20
**noncompliance**
42:22
**nonneutral**
200:16
**nonprofit**
81:20 148:4
262:22,23
**nonprofits**
246:23
**nonresponsive**
10:24 11:25
22:8 40:22
52:8,23 53:20
68:11,13 69:22
70:11,21 71:3
71:19 72:15
82:5 88:11
89:21 92:6
96:7 99:8
100:3 102:11
104:11 105:10
112:6 125:20
129:12 130:25
132:17 160:22
161:14 163:11
171:21 173:20
176:3,20 184:9
186:23 187:12
187:18 190:4
195:7 199:18
206:24 212:13
217:16 218:6
224:20 227:21
229:16 237:2

251:5 263:11
**nonsense**
105:13
**nontruthful**
81:23
**normal** 78:7
**north** 4:2
**northern** 1:3
6:20
**notability**
19:13 95:20
109:22 126:2
127:24 132:6
133:4,18 134:1
142:9,24 145:8
167:22 169:6
169:11,13
171:19 180:15
237:16
**notable** 11:23
64:9 89:17
100:1 115:19
122:3,8,10
123:1 124:3,17
125:10 128:8
131:22 132:7,7
132:9 133:2,12
134:4,22
135:10,11,17
135:19,20,23
136:1,12,21
137:9 138:1,15
139:20,23
142:2 146:16
150:5,7 154:10

**[notable - objection]**                                                    Page 45

154:18 167:16
167:23,23
168:4 169:5,7
169:12 182:20
194:16 201:21
212:24 213:2
214:17 229:11
230:9 244:6
**notarized**
270:14
**notary** 270:25
271:10,18
272:15,23
273:23
**note** 6:8 14:6
120:13 124:18
138:16 216:23
266:24 270:12
**noted** 124:23
128:16 180:18
**notes** 266:10
**notice** 5:7
14:15,22,25
16:7,17 17:5
19:22 21:22
23:24 110:1,9
115:16 209:15
211:11,19
223:14 233:4
243:18 254:20
255:13 256:18
256:23 257:23
258:12
**noticed** 21:7
30:12,22 43:5

43:16,25 44:19
45:5 46:6,19
158:21 218:13
218:21 219:6
220:11 221:12
254:2
**notices** 257:13
**noticing** 7:9
**notification**
233:19,20,20
233:25
**noting** 234:18
**notion** 116:15
**notwithstandi...**
220:18
**november**
166:8,14 168:9
170:2
**novice** 90:6,12
90:16
**nths** 138:24
**number** 16:14
61:18,25
122:12 124:18
131:13 152:17
152:18,23
174:14 253:6
253:12,15
261:24 262:1,2
267:25 270:7
270:13
**numbers** 272:7
**numerous**
24:13 51:9

**nunez** 263:1

**o**

**o** 5:2 61:10
62:9,9 64:15
64:23
**oath** 202:16
**obfuscating**
14:7
**object** 31:22
72:14 88:11
112:5 160:21
184:8 208:17
212:13 224:20
266:24
**objected**
205:17
**objecting** 36:9
**objection** 8:19
9:11 10:7,24
11:4,25 15:8
19:4 20:13
22:8 25:4
27:18,25 28:15
28:21 29:2,17
30:11,21,25
34:18,25 37:9
38:14 39:19
41:8,15 42:2
42:15 43:4,15
43:24,24 44:18
44:18 45:4,4
46:5,18,18
48:7 49:7
50:25 51:16
52:8,23 53:6

53:20,24 54:8
54:12,24 55:8
56:4 57:1 58:3
58:14 60:25
61:6 65:7
68:11 69:22
70:11,21 71:3
71:10,19 76:23
77:5 78:12,22
79:5,14 80:1,7
81:4 82:5 84:2
85:5,23 86:14
87:4,12,25
88:7,17,25
89:21 92:6,11
93:25 94:12
96:4,7,12
97:14 98:16
99:8 100:3,10
100:19,25
102:11 103:5
103:21 104:10
104:22 105:10
106:4 107:15
109:2,5 110:12
113:10 114:17
115:14 116:6
116:24 117:8
117:24 120:4
121:3 124:1,20
125:4,12,20,25
126:8 127:8,19
128:10 129:12
129:25 130:6
130:12,25

| | | | |
|---|---|---|---|
| 131:10 132:16 | 184:12 185:4 | 229:6,16,21 | 54:19 55:5,18 |
| 133:15 134:8 | 186:1,7,23 | 230:2,16 | 55:19 56:2,5,9 |
| 135:24 136:16 | 187:18 188:17 | 231:15 232:5,9 | 56:15 74:20 |
| 137:14,19 | 189:4 190:1,4 | 233:17 234:3,6 | 75:22 89:8,18 |
| 139:2 140:12 | 190:9,15,22 | 237:2,8 238:2 | 99:21 117:11 |
| 140:22,22 | 191:8,15 192:2 | 238:2 240:20 | 124:4 130:24 |
| 141:23 142:14 | 192:8,19,23 | 240:20 241:12 | 141:15 160:14 |
| 142:21 143:10 | 193:11 194:1,9 | 241:12,21,21 | 213:19 230:9 |
| 144:5,24,24,24 | 195:7,22,22 | 242:4,4,16,16 | **objectively** |
| 145:19 146:2 | 196:6,16,24 | 242:25,25 | 9:17 14:18 |
| 147:1,1,1,14 | 197:8,24 198:6 | 243:9,9,16,16 | 39:12 49:23 |
| 150:22 151:18 | 198:14 199:18 | 244:1,1 245:5 | 51:7 116:10 |
| 151:24 154:4 | 200:11,17,25 | 245:5,18,18 | 134:24 |
| 155:12,18 | 201:9,17 202:9 | 247:10,20 | **objectivity**   9:18 |
| 156:6,23 157:4 | 202:18 203:1,9 | 248:2,21,21 | 13:1 19:14 |
| 158:3,7,20,20 | 203:17 205:9 | 249:1,11,11 | 23:12 28:2 |
| 160:1,11 | 205:22 206:4 | 251:5,14,15 | 42:20 50:17 |
| 161:14 162:11 | 206:13,20,24 | 252:6,7,18,18 | 52:21 53:15 |
| 162:14,20 | 207:4,12,24 | 252:25,25 | 55:3,10 56:14 |
| 163:11,16 | 208:21 209:2 | 253:8,9,16,16 | 95:20 108:22 |
| 164:5,8,20 | 209:14,15 | 254:1,2,19,19 | 109:7 124:9 |
| 165:9 167:6,20 | 210:6,20 211:3 | 255:2,3,22,22 | 134:1 171:19 |
| 168:14,14 | 211:10,17,17 | 256:11 257:6 | 187:8 213:14 |
| 169:2,2 170:15 | 212:5,21 213:7 | 257:11,11,21 | 231:22,22,22 |
| 171:21 172:13 | 214:1 215:5 | 257:21 258:10 | 239:13 250:17 |
| 172:19 173:20 | 216:1,22 | 258:10 259:3,4 | 251:3 |
| 174:9,15 | 217:16,21 | 259:15,19,19 | **objects**   14:11 |
| 175:21,21 | 218:4,12,12,20 | 260:3,3 261:13 | **obscure**   188:10 |
| 176:2,14,20,25 | 218:20 219:5,5 | 263:11 | **observations** |
| 177:7,16 | 220:10,11 | **objections**   7:5 | 27:9 |
| 178:13,23 | 221:11,11 | 256:16 | **occasion**   231:1 |
| 179:12,22 | 222:1,2 223:3 | **objective**   9:19 | **occur**   51:3 |
| 180:1,7,13 | 223:3 224:10 | 38:16 39:3 | 140:25 170:23 |
| 181:8,14,23 | 225:2 226:1,20 | 40:11 42:4,19 | **occurred**   33:16 |
| 182:14 184:7 | 227:12,12,21 | 49:12 54:15,17 | 36:8 137:25 |

141:2 159:2,3
175:15 186:9
217:1,3,12
221:3 234:9
244:7
**occurring**
163:6
**october**   1:22
3:3 6:2,7
163:25 164:1,2
269:19 270:4
**offer**   265:9
**offering**   69:19
**offhand**   140:24
**office**   3:14 7:16
30:7
**officers**   183:12
**official**   229:11
271:15 272:21
**officials**   133:13
**oh**   20:17 21:1,7
214:4
**ohio**   270:2
**okay**   9:15
11:18 12:6
13:10 16:24
18:6 24:22
35:24 36:8,18
37:14,17 42:10
44:9 45:24
48:2 56:7 57:7
57:21 58:7
61:13 65:22
68:19,22 70:24
72:16,20,22

80:12,18 88:3
88:20 89:3
90:8 95:6,23
96:1 97:19,23
98:2 106:10
107:23 108:4
108:17,23
109:10 111:5
111:21 115:7
115:10 117:5
117:21 120:13
122:2,17 123:3
123:17 137:3,5
139:12 141:21
150:8,19 151:4
151:22 152:8,9
152:10,21
153:5 154:12
154:12,24
155:4,7 158:1
159:18 160:20
166:3,7,20,23
168:24,25
172:1,7 175:10
176:2 177:11
184:19 188:22
189:22 190:13
197:14 207:19
214:8 221:16
222:16 223:22
231:11,19
232:18 233:24
235:5 236:11
236:20 259:25
263:22 264:20

264:22 265:7
265:24 266:3
267:9
**old**   59:1
**omicron**
116:15,23
121:1
**once**   75:19,20
83:16 145:23
157:23 258:18
**ones**   128:1,14
128:16 135:5
135:13 153:25
236:4
**online**   234:1
249:20 251:11
258:22 260:1
**op**   237:17
**open**   9:21 68:7
75:11 261:16
261:19 262:4
263:6
**opened**   11:16
22:16 23:15,20
**operate**   51:18
164:9
**operates**
261:20
**operating**
209:8
**operator**   52:18
**opine**   69:20
**opinion**   200:18
263:1

**opponent's**
39:16
**opportunities**
115:8 248:11
261:5
**opportunity**
84:13,25
203:20 258:21
**opposed**   120:17
191:13 223:2
**opposing**   41:23
41:24
**opposite**   146:4
257:16 262:5
**orally**   60:13
**order**   5:13
48:12 79:13
80:10 140:7
143:20 153:8
157:11,13,17
157:20 158:6
160:10 165:2
181:19 193:5
216:5 222:24
223:23 239:8
239:13 244:22
244:22,23
248:15 258:17
259:10,13,17
260:8 262:4
**ordinarily**   40:2
**organically**
119:21
**organization**
30:2 32:10

[organization - page]                                    Page 48

35:5 42:6
52:18 75:2
76:1 86:19
119:10 134:21
139:13 215:3
228:8 239:16
239:17 240:17
240:24 241:4
241:10,19
242:3,14,23
243:8
**organizations**
32:20 121:6
228:11 238:11
240:15 254:25
255:20 256:14
**origin**   116:2,3
120:25
**original**   59:15
60:4 69:6
74:12 92:18
131:8 134:16
260:18
**originally**
134:6 163:18
165:20 236:25
**originate**
236:24
**origination**
238:24
**orphan**   124:6,7
**outcome**   7:4
269:16
**outside**   30:11
30:22 34:2

43:4,15,25
44:19 45:5
46:5,19 158:21
209:14 211:10
217:22,25
218:13,21
219:6,13
220:11,22
221:12 223:4
240:9,9,21
241:13,22
242:5,17 243:1
243:10,17,19
244:2 245:6,9
245:19 249:12
251:15 252:19
253:1,9,17
254:2,20 255:3
255:23 256:17
257:14 258:11
259:20 260:4,7
264:12
**outstanding**
184:15 226:11
**overshadowed**
200:6,15
**overstep**
164:15
**own**   30:20,24
38:25 39:23
40:16 41:5
66:20 75:2
81:19 109:23
111:12 116:8,9
154:19 164:9

170:8 175:3
177:21 178:16
194:22 198:11
198:16 241:3,6
254:14 262:25
263:5
**owner**   39:22
41:4 42:5,23
52:18
**owns**   67:11

**p**

**p**   3:6,6
**p.a.**   3:13
**p.m.**   72:24,25
73:1,3 100:12
106:12,13,14
106:16 148:21
149:4,5,7
204:13,14,15
204:17 232:22
232:22 246:4,5
246:6,8 265:25
266:1,2,4
268:1,2
**pace**   185:17
**pacific**   6:6
37:16,19,23
72:24 73:3
106:12,16
148:21 149:3,7
204:13,17
246:4,8 265:25
266:4 268:1
**package**   183:17
185:3,25

193:15 196:12
197:22 198:8
198:10,19
202:5
**page**   5:3,6,9
8:18 9:16 10:3
10:6,10 11:3
11:20 12:4,9
12:22 13:12,17
13:24 14:23
18:9,11,16,24
19:1,3,19 20:1
20:23 24:6,18
25:13,22 26:1
26:5,10 27:6
29:12 32:2,23
33:7 35:7,21
37:2 39:16,23
40:2 41:4,5,24
42:6,8,11,13,23
43:3,14,23
44:17 46:1
47:20 48:4,11
48:18,20 49:6
50:4,6,21 51:8
53:13 54:23
56:10,13 59:4
59:5,10,10
60:7 61:21
62:4 63:5,6,8
63:15 64:3,17
64:24 65:15
69:18 70:9
71:7,18,24
72:3 73:11,14

| | | | |
|---|---|---|---|
| 73:20 74:4,13 | 163:23 164:10 | 73:16,18 96:3 | 82:10 128:17 |
| 74:15 75:21 | 165:5 177:21 | 105:24 107:20 | 137:5 140:9 |
| 84:11,14 85:2 | 180:11,17 | 108:24 109:25 | 145:15 147:3 |
| 85:20 86:12 | 181:19,22 | 110:5 111:15 | 155:13,14,17 |
| 87:24 88:6,15 | 182:10 183:3 | 111:16,18 | 155:17 164:11 |
| 88:24 89:9 | 183:21 185:1 | 124:7 152:13 | 165:3 171:15 |
| 95:1,3 96:18 | 189:21 193:7 | 180:6 219:19 | 171:17 172:17 |
| 98:14 99:16,24 | 202:11 204:4 | 222:7 250:20 | 176:23 177:1 |
| 100:8,23 103:8 | 204:23 214:4 | 251:13,24 | 179:16,18,18 |
| 103:19 104:5,7 | 216:8 223:12 | 254:18 256:1 | 180:3,17,18 |
| 105:22 107:1,9 | 223:13,22 | 259:11 | 188:6 197:22 |
| 108:1,14,16 | 224:7 227:10 | **paid** 183:10 | 219:16 221:16 |
| 109:1,12,13,18 | 231:13 233:19 | 194:25 195:19 | 228:9 244:11 |
| 110:2 111:9,13 | 235:16,23 | 196:1 | 249:15 272:9 |
| 111:14,23 | 237:17 239:5 | **pain** 85:13 | **participants** |
| 119:24 120:14 | 239:17,18,20 | **painstaking** | 6:11 |
| 121:15,19 | 239:24 240:2 | 259:11 | **participate** |
| 122:20 123:11 | 240:13,18 | **painting** 260:2 | 105:1 |
| 123:20,24,25 | 241:1,6,11,20 | **paints** 258:22 | **particular** |
| 124:5 125:14 | 242:1,24 243:6 | **paragraph** | 78:21 109:1 |
| 125:19 127:10 | 243:7 246:14 | 112:23,25 | **parties** 6:14 |
| 128:24 130:22 | 246:15,17 | 113:8 114:13 | 31:16 55:11 |
| 133:11 134:5 | 249:21 250:2,4 | 114:14 115:13 | 96:14 223:7 |
| 134:17,23 | 250:6,25 252:5 | 116:2 117:21 | 264:17 |
| 138:6,8,12,17 | 255:9 256:20 | 120:23,23,24 | **parts** 153:3 |
| 139:16,17 | 258:16 259:10 | 166:7,10 183:6 | 219:11 |
| 140:20 143:9 | 270:13,15 | 183:8 193:15 | **party** 1:10,16 |
| 144:20,21 | 272:7 273:3 | 204:25 218:11 | 1:19 3:19 7:3 |
| 145:2,18 | **page's** 53:15 | 219:4 220:7,9 | 11:22 22:18 |
| 149:18 150:2 | **pages** 1:25 26:1 | 221:10 | 40:18 41:23 |
| 150:14,20 | 27:10 37:4 | **paragraphs** | 48:25 51:3 |
| 152:9,20 153:3 | 42:21 43:13 | 117:19 | 81:18 83:19 |
| 153:11,14 | 45:3 46:11,17 | **parents** 244:8 | 119:15 129:2 |
| 154:10 157:17 | 47:4,17 51:9 | **part** 23:3 29:8 | 150:5 157:8 |
| 158:10 159:10 | 52:4 58:24 | 29:23 74:14 | 177:23 194:14 |

| | | | |
|---|---|---|---|
| 214:23 229:14 | 127:6,17,22 | **perpetual** 9:5 | **phi** 1:4 5:10 |
| 236:25 262:25 | 128:4 133:13 | **perpetuate** | 6:17 7:13,18 |
| 263:5 269:15 | 134:23 136:14 | 9:24 | 13:23 14:13 |
| **party's** 41:24 | 137:11 138:17 | **perpetuated** | 16:16 18:9,10 |
| **partying** 74:19 | 146:6 163:10 | 42:4 | 18:14 21:7 |
| **passage** 229:2 | 167:16,23 | **person** 26:20 | 26:1,11 29:12 |
| **past** 64:7 222:4 | 194:21 213:19 | 59:13,16 60:12 | 33:6 75:5 |
| 244:22 | 244:21 260:14 | 60:16 61:15,19 | 107:7 113:14 |
| **pasted** 118:10 | 260:15 261:6 | 62:15,23 63:3 | 114:20 115:23 |
| 126:21 | **people's** 25:6 | 63:21 64:2,13 | 116:15,17,22 |
| **patient** 222:8 | **percent** 115:6 | 64:16,20,24 | 117:10 118:2,5 |
| 223:12 | 136:1,4,6 | 66:6 69:7 93:5 | 118:6 119:13 |
| **pause** 198:23 | 172:9 174:14 | 94:9 108:13 | 121:1,1 126:20 |
| **paused** 23:22 | **percentage** | 115:18 124:16 | 126:21,22 |
| **pavri** 35:15 | 109:24 | 125:10 130:21 | 127:7,18 |
| **pdk** 244:16 | **percentile** | 154:25 191:17 | 128:24 133:1 |
| **peace** 34:16 | 114:24,24 | **person's** 26:16 | 134:25,25 |
| 68:3 | 115:6 | 41:25 | 135:2 138:13 |
| **pending** 181:3 | **perceptions** | **personal** 56:24 | 150:8 154:14 |
| 233:21 | 250:21 | 57:18,18 58:9 | 154:15 160:7 |
| **people** 13:18 | **perfect** 156:14 | **personally** | 163:22 164:3 |
| 14:8,10 16:5 | 156:15,15 | 29:14 86:16 | 166:8,13 168:8 |
| 22:11 24:20 | 165:16 | 223:8 271:11 | 169:23 171:13 |
| 35:14 36:5 | **perfectly** 52:2 | 272:15 | 172:3 175:16 |
| 38:18,23 39:6 | 165:17 | **perspective** | 175:17,17 |
| 39:9 50:15 | **perform** 105:24 | 238:18 | 180:20 183:13 |
| 54:20 55:16,17 | **period** 13:9 | **pertinent** 190:2 | 190:13,21,24 |
| 55:25 65:4 | 80:24 110:15 | **petition** 170:2 | 191:6,21,25 |
| 73:24 85:11 | 110:18,23,25 | **petitioned** | 192:6,17 |
| 102:1,19 | 111:1,2,17 | 166:8 | 193:24 202:7 |
| 104:25 108:23 | 199:17 228:23 | **petulant** | 202:15,25 |
| 108:25 109:11 | 244:14 | 257:10,19 | 225:10 230:22 |
| 109:18,21 | **periods** 184:20 | 258:22 259:1 | 230:25 250:10 |
| 122:9,13,13 | **permission** | 259:12 260:2 | 250:24 270:6 |
| 123:23 124:8 | 93:8,12,15 | | 271:3 272:3 |

**philosophy**
75:4
**phone** 61:25
105:12 261:24
262:1,2 270:3
**photo** 15:10,10
15:11,12 195:2
**phrased** 48:15
**physically**
217:5
**picked** 20:16
**picture** 166:17
258:22 260:2
**piece** 244:6,24
**pillar** 95:19
**pillars** 19:12
48:25 94:25
95:11,15,21,21
**pink** 107:12
**pizza** 94:10,14
**place** 6:14 9:21
14:9 54:16,17
58:25 142:3
148:8 232:12
250:1,24
267:15 269:11
**placed** 10:19
42:5 111:12,22
250:20
**places** 89:11
203:10,14
251:8
**placing** 10:2
**plain** 138:16

**plaintiff** 1:6,10
1:10,15,16 3:2
3:8,19,19 6:17
7:13 158:13,19
165:14,14
**plaintiffs** 163:2
**plan** 198:12
258:18
**platform** 18:4
19:10 21:18
38:19,21 39:9
42:19 54:15,19
**play** 31:5,6
143:8 161:2
219:12 227:6
**played** 240:5
**players** 97:8
**playing** 225:17
**please** 6:8 7:5
8:5 11:15,16
12:6 20:24
27:20 31:7
34:17,20 37:25
52:9 57:14
66:25 69:23
70:12,22,22
73:5 84:21,21
89:1 92:8 96:8
100:17 106:18
108:7 112:7,8
113:7 125:21
128:21 129:13
131:1 132:18
132:19 141:4
142:15 149:9

151:6 152:11
153:15 154:7
160:15,23
161:12,12,16
161:16,18,24
162:1 172:25
176:4 184:5,9
185:5 187:20
195:8 204:19
205:23 206:16
207:15,18,20
207:25 210:22
214:8,8 217:17
222:14 223:12
225:22 227:23
229:17 233:8
236:19,19
246:1,10 249:6
251:20 252:12
253:4 255:18
258:4,5,6
266:6 267:10
270:11,11
**pleasure** 23:8
**plenty** 263:17
**plus** 250:8
**point** 55:20
66:4 67:23
69:13 76:19
81:11 102:9,21
103:6 108:10
110:6 112:16
119:16 124:8
126:17,23
128:19 129:19

146:1 148:5
155:22 162:1
167:24 168:19
168:19 189:23
189:24 190:7
190:20 191:7
192:5,17
193:24 200:23
210:17 212:3
212:18,22
222:17,19
236:16 237:11
237:13 242:12
266:20
**pointing**
103:12
**points** 47:14
103:17 104:20
106:3 115:21
188:7 191:24
**polak** 3:9 5:4
7:12,12 8:16
8:22 9:14 10:9
10:24 11:1,7
11:25 12:1
15:18 16:3
19:5 20:14
22:8,9 25:10
27:21 28:4,18
28:24 29:13,22
30:13,23 31:4
31:15,21,23
34:21 35:3
37:10,14 38:1
39:13 40:22,23

[polak - polak]                                                    Page 52

| | | | |
|---|---|---|---|
| 41:11,17 42:9 | 105:10,16 | 164:6,16,21 | 205:25 206:7 |
| 43:1,8,18 44:3 | 106:7,19,22 | 165:11 166:2 | 206:16,24 |
| 44:6,24 45:9 | 107:18 109:3,9 | 167:14 168:6 | 207:9,14,19 |
| 46:8 47:1 48:9 | 110:17 112:5 | 168:18 169:15 | 208:2,24 209:5 |
| 50:2 51:10 | 112:13 114:12 | 170:16 171:21 | 210:1,16,24 |
| 52:1,8,23,24 | 115:11 116:1 | 171:24 172:16 | 211:6,14,22 |
| 53:20 54:3,9 | 116:21 117:2 | 172:20,24 | 212:13,14 |
| 54:21 55:1 | 117:18 118:19 | 173:5,20 174:1 | 213:3,9 214:6 |
| 56:1,6 57:4,13 | 120:12 121:13 | 174:11 175:1 | 215:8 216:3 |
| 57:20 58:6,18 | 124:15 125:1,7 | 176:2,11,19 | 217:16 218:1,7 |
| 61:3,9,13,14 | 125:20 126:4 | 177:2,8,19 | 218:16 219:1 |
| 65:10 66:7,24 | 126:10 127:14 | 178:18 179:7 | 219:15 220:13 |
| 67:7 68:11,14 | 128:6 129:12 | 179:20,24 | 221:15 222:4 |
| 69:22 70:5,11 | 129:22 130:3,9 | 180:4,9,22 | 222:10,12,16 |
| 70:15,21 71:3 | 130:25 131:7 | 181:10,17 | 223:15,18 |
| 71:4,10,11,19 | 131:12 132:16 | 183:1 184:8,13 | 224:17 225:5 |
| 71:20 72:14,17 | 133:5 134:3,10 | 184:16 185:9 | 226:8 227:7,21 |
| 72:20 73:6 | 136:5,17 | 186:3,10 | 228:3 229:16 |
| 77:1,8 78:16 | 137:15 138:3 | 187:18,24 | 229:23 230:3 |
| 79:1,10,19 | 139:11 140:13 | 188:21 189:12 | 230:19 231:18 |
| 80:4,9 81:8 | 141:1 142:4,17 | 190:4,5,12,18 | 232:6,17 |
| 82:5,12 84:6 | 143:4,18 144:7 | 191:1,11,19 | 233:23 234:4 |
| 85:18 86:9,23 | 145:14,24 | 192:4,15,20 | 234:16 237:2,3 |
| 87:8,13 88:2 | 146:22 147:5 | 193:2,13 194:5 | 237:23 238:10 |
| 88:11,13,19 | 148:9,19,22,25 | 194:23 195:7 | 241:2,17,24 |
| 89:2,21,22 | 149:10 151:3 | 195:16 196:3,8 | 242:7,21 243:4 |
| 92:6,7,15 94:7 | 151:21 152:2 | 196:19 197:1 | 243:13,21 |
| 94:16,22 96:7 | 154:8 155:15 | 197:18 198:3,9 | 245:2,10 246:2 |
| 96:15 97:18 | 155:19 156:20 | 199:18,19 | 246:11 247:17 |
| 98:21 99:8,9 | 157:1,9,16 | 200:13,20 | 247:23 248:3 |
| 100:3,5,14,16 | 158:4,9 159:6 | 201:5,10,24 | 248:24 249:4,7 |
| 100:20 101:13 | 160:5,16 | 202:12,22 | 249:19 251:5 |
| 102:11,24 | 161:14,15,22 | 203:4,12 204:3 | 251:10 252:3 |
| 103:14,22 | 162:12,17 | 204:10,20 | 252:11,23 |
| 104:10,12 | 163:11,20 | 205:11,17,19 | 253:5,13,23 |

254:5,16,23
255:5,10,16
256:5,12 257:1
257:9,17 258:3
258:6,15 259:8
259:16,24
260:9 263:10
263:11,16,21
263:23 264:1
264:18,22
265:7,14,23
266:7 267:4,18
**polak's** 267:16
**policeman**
141:25
**policies** 54:1,1
150:16
**policing** 145:7
**policy** 53:3
**polished** 163:8
**pop** 237:5
**populated**
133:6
**populates** 16:4
**population**
254:13
**portion** 76:9
124:17 172:14
189:8
**portions**
201:21
**position** 42:14
115:10,12
172:11,17
173:6,10

174:13 175:19
176:13,15,18
176:24 177:13
178:15 190:20
192:17 195:6
218:23 267:2
**positions**
179:11 266:23
**positive** 170:21
171:8 192:12
**possible** 49:10
52:6,20 55:11
105:1,5 162:4
178:8 182:1
185:7 208:15
248:14 249:2
**possibly** 59:25
110:19 144:15
**post** 3:14 35:16
144:21 190:17
216:9,13
221:17,20,23
227:9
**posted** 93:23
108:13,15,20
186:12
**posting** 109:17
**posts** 191:10,13
235:18
**potential** 40:8
**potentially**
159:15 172:10
173:13 174:16
**pov** 99:23
143:23 152:23

153:2 236:21
**power** 58:24
95:17
**powerful** 39:7
**practice** 114:7
**practices** 202:6
**praise** 116:10
**praising** 112:19
**preach** 160:18
**preceding**
82:23
**precisely** 52:22
**predated** 137:6
**predates**
171:14
**predominantly**
137:4
**preface** 36:13
**prefer** 24:14
262:19
**preferred**
262:20
**preliminary**
89:13 157:13
165:1
**premises**
159:16
**preparation**
27:2 77:25
81:6 91:23
95:7 107:5
149:15 219:13
**prepare** 17:4
18:11,18 19:6
19:20 21:19,25

22:1 30:18
43:20 44:1
45:7 208:13
251:19 253:19
260:6,8
**prepared** 34:7
45:10 47:14
151:17,20
181:1,2 207:7
209:16 217:23
217:23,24
219:8,14
220:21,22
243:20 245:8
251:18 252:9
257:24 258:1
265:2,18
**preparing**
33:10
**present** 4:6 7:7
33:17 216:17
217:15
**presented** 41:3
193:21
**presently** 32:8
37:15 163:1
**preserve**
147:20
**president** 30:19
137:12 141:3
183:9 195:24
200:6
**press** 140:4,6
262:8

**prestigious**
118:9 119:6,9
119:18
**presume**
195:14
**pretenses**
159:16 172:11
**pretty** 74:5
194:4 201:1
225:18 265:4
**prevailing**
132:25
**prevalence**
175:15 176:22
**prevent** 237:20
239:9
**prevents** 219:2
**previous** 54:4
122:4 140:15
**previously**
32:17 56:20
172:1 235:22
246:12 266:24
**pride** 54:18
261:10
**prides** 93:18
**primary**
190:23 191:2
238:15 240:16
265:6
**prior** 14:17
34:1 37:4 83:1
116:17 149:14
162:2 196:21
269:6

**priority** 112:2
**private** 148:3
**privilege** 36:4
95:17
**privileged** 36:6
37:8
**privy** 194:14
**pro** 3:9 194:4
199:3
**probably** 16:4
16:12 51:5
73:18 96:5
129:20 131:11
136:22 141:6
153:21 185:19
263:16 264:20
**problem**
113:18 116:18
182:9 247:18
247:22 248:4,5
**problematic**
81:16 103:13
129:2
**procedure**
109:8 271:5
272:5
**proceed** 31:20
37:25 73:5
106:18 149:9
195:5 204:19
246:10 266:6
**proceeding** 7:5
**proceedings**
269:7,10,15

**process** 48:10
48:21 49:11,11
93:14 137:3
185:20
**processes** 93:20
**production**
270:15,17,22
**productive**
264:16
**products** 105:1
113:23
**professionals**
55:15 254:9
**professor** 120:9
**proffer** 31:18
**profile** 61:18
**projects** 97:25
**promise** 31:7
222:17 265:16
**promotional**
108:8
**prompted**
183:13 192:10
194:3
**prompting**
233:21
**promptly**
150:18
**pronounced**
15:11
**propaganda**
112:17
**proper** 187:13
**proponent**
85:17

**propound**
249:25
**propounding**
118:17
**protect** 23:11
23:12 39:8,9
53:7,8 54:7
133:21 143:21
143:22 237:25
**protecting**
145:21 238:17
**protection** 68:4
123:5
**protects** 54:6
**proud** 93:1,4
111:25 261:7
**proudly** 170:7
**prove** 124:11
**provide** 115:2,8
192:14 202:23
203:6 248:15
**provided** 35:6
177:11 203:15
**provides** 15:16
249:17
**provision**
101:24
**ptk** 9:10,16
10:5,11 11:3
12:4,9,22
13:12,12,17,24
14:6,15 19:19
20:1,23 29:16
33:25 35:22
37:2 40:6

| | | | |
|---|---|---|---|
| 41:24 42:10 | 153:14 155:25 | 228:6 230:6,7 | 149:18 150:1 |
| 43:23 50:12 | 156:8 158:14 | 231:8,14,24 | 154:19 168:1 |
| 51:8 52:14,15 | 159:14,19,24 | 232:3 235:15 | 173:6,9 174:13 |
| 64:9,24 65:14 | 160:9 162:7,8 | 237:7,25 238:9 | 175:3 177:4 |
| 65:17 67:4,21 | 162:23 165:13 | 238:13,20 | 178:10 179:4 |
| 67:21 68:2 | 167:17 170:7 | 241:5 243:6 | 180:11 181:18 |
| 69:16 71:7,24 | 170:21 171:8 | 244:18 245:4 | 182:10 231:13 |
| 73:17 77:16 | 171:10 172:7 | 245:17 249:20 | 231:16 235:23 |
| 80:13,13 81:16 | 173:15 174:3,7 | 250:1,12,19 | 243:6 |
| 81:25 82:3 | 175:4 176:16 | 251:7,12 | **public**  53:8 |
| 85:14,20 | 177:13,15,20 | 254:25 255:20 | 66:21 83:22 |
| 103:25,25 | 179:2 180:5 | 256:15 258:20 | 94:2 129:9,10 |
| 104:2,3,7 | 181:6,22 183:3 | 261:11 | 133:20 171:16 |
| 108:14 118:1 | 183:9 186:6 | **ptk's**  8:18 | 182:10,13 |
| 118:14 119:10 | 190:16 192:10 | 11:20 14:23 | 197:6 224:1 |
| 119:12,24 | 192:12 194:3,4 | 19:3 24:6 | 225:9 226:14 |
| 121:12,14,18 | 198:17 199:9 | 25:13,22 26:5 | 252:15 262:2 |
| 122:10,15 | 201:19,20,22 | 27:5,6,9 32:2 | 271:10,18 |
| 124:3 126:7,22 | 202:21 203:19 | 32:15,22 35:7 | 272:15,23 |
| 128:8 129:7 | 203:24 204:4 | 43:14 44:17 | 273:23 |
| 130:16 131:18 | 204:23 205:14 | 46:1 47:17 | **public's**  227:14 |
| 131:19,22 | 205:14 208:5,5 | 48:4 50:4,10 | **publication** |
| 132:3,4,12 | 208:20,20,25 | 50:21 54:23 | 261:1 |
| 133:6,11 134:5 | 209:1,8,9,12,18 | 55:6 56:9 | **publicly**  61:5 |
| 134:20 135:10 | 209:19,21 | 59:10 63:14 | 61:23 62:20 |
| 135:11,19,23 | 210:3,19 211:8 | 64:3,16 73:10 | 199:13 |
| 136:3,12,21 | 212:19 213:5 | 73:20 74:4 | **published** |
| 137:9,10,17,23 | 213:11,12,24 | 84:11,13 85:1 | 261:1 |
| 138:21 139:7,7 | 216:11,13,14 | 86:8,12 87:24 | **pull**  94:20 |
| 142:7,10,12,19 | 221:21,21,24 | 88:6,15,22,24 | 229:10 |
| 143:7,13,25 | 223:1,1,8 | 96:18 107:9 | **punch**  258:20 |
| 144:14 145:17 | 224:2,2,4,7 | 109:11,12,13 | **punched** |
| 146:8,9 148:1 | 225:7,9 226:15 | 109:18 111:10 | 258:18 |
| 149:21 152:9 | 226:16,17 | 116:8,19 | **punishing** |
| 152:15 153:10 | 227:15,18 | 121:19 138:22 | 187:16 |

| | | | |
|---|---|---|---|
| **purely** 239:12 | 261:10 | 76:21 77:7,22 | 176:4,5,7,9,9 |
| **purest** 108:16 | **q** | 78:8,9,17,17 | 176:21 179:16 |
| **purple** 139:8 | **qualifications** | 79:21 82:6,9 | 181:4,11 |
| **purports** | 92:13 | 82:13 83:3,6 | 182:15,18 |
| 171:10 | **qualified** 40:19 | 84:12,20,22,22 | 184:9,15 |
| **purpose** 82:22 | 57:17 58:5 | 86:10 87:21 | 185:20 186:24 |
| 109:10 180:11 | 92:13 120:9 | 88:12 89:4 | 187:1,19,22 |
| **purposely** | 191:16 | 92:1,8 96:8,11 | 190:3 195:9,11 |
| 103:7 | **quality** 6:9,10 | 99:10,13 100:6 | 197:4 201:11 |
| **purview** 97:4,5 | **quash** 85:25 | 100:17 102:12 | 201:13 203:3,5 |
| 101:11 240:10 | **question** 10:13 | 102:15,23 | 205:24 206:3 |
| **push** 249:25 | 11:18 12:16,19 | 105:14,17,21 | 206:17,19,25 |
| **pushing** 67:24 | 12:20 13:2,7 | 110:23,25 | 207:3,10,21,23 |
| 236:21,23 | 13:25 15:1 | 111:1 112:7,9 | 208:6,7,16,23 |
| **put** 24:15 39:16 | 19:25 20:10,24 | 112:11 113:7 | 210:22,24 |
| 42:16 80:18 | 22:10,12 28:5 | 115:22 118:20 | 211:2 215:18 |
| 108:23 110:8 | 28:8 30:14 | 118:21,22,25 | 216:24 217:11 |
| 120:13 127:21 | 31:7,10,22,25 | 119:2 123:12 | 217:17,20 |
| 128:24 129:19 | 32:3 34:8,17 | 125:2,5,8,21,24 | 218:2,10 219:2 |
| 132:8 137:16 | 34:20 36:19,23 | 129:13,16 | 220:6,14 221:8 |
| 141:13,21 | 37:7 40:24 | 131:1,3,5 | 221:9 222:6,15 |
| 142:7,10,12,19 | 41:18 44:12,12 | 132:18,19,22 | 222:18,21 |
| 143:7,25 | 45:12,19 46:24 | 142:11,19,23 | 223:20 225:13 |
| 144:21 145:17 | 47:11 48:15 | 143:2,15 147:4 | 225:14,18,23 |
| 146:13 149:11 | 51:19 52:9,11 | 155:10 160:6 | 225:23,25 |
| 161:6 167:10 | 52:25 53:21,23 | 160:17,23 | 226:6,11 |
| 167:17 168:9 | 56:7 57:6,11 | 161:6,17,19,21 | 227:22,25 |
| 169:10 175:10 | 57:14,16 59:22 | 161:24,25 | 229:17,20 |
| 175:11 184:25 | 60:3 62:14 | 162:5 163:12 | 233:5 234:25 |
| 188:22 189:2 | 63:17,19 66:25 | 163:15 164:15 | 241:8,16 |
| 196:22 226:3,9 | 67:2 69:23 | 167:2 169:4,19 | 242:22 247:11 |
| 265:11 | 70:1,12,17,22 | 170:17 171:22 | 248:16 249:5,6 |
| **putting** 14:9 | 70:25 71:2,5 | 172:21,25 | 249:8,10 251:8 |
| 21:13 111:7 | 71:16 72:2 | 173:2,21,23 | 251:20 253:3 |
| 113:15 133:24 | 73:8 74:25 | 174:10,21,22 | 255:17,18,25 |

256:6,10,13
257:5,13 258:4
258:5,7,9
259:7 260:7,18
**questionable**
115:22
**questioning**
176:10 264:12
265:6
**questions** 15:4
19:24 20:4,8
23:16,18 26:18
31:2,3 34:7,15
35:24 36:1,2
38:3 45:13,17
47:10 68:18
76:18,20,24
77:2,10,10,15
77:16,18,21,23
78:21 87:14,19
92:4 100:13
142:15 160:21
161:6,8,10
167:4 181:2,12
181:20,25
182:4,12,16,16
185:6,10
187:10 197:12
207:6 208:11
208:12 212:9
212:10 217:24
219:9,13 220:4
222:20 245:9
245:14 255:7,8
257:24,25

264:1,7,23
265:19 266:11
**quick** 155:7
**quickly** 74:5
210:23 232:22
267:19
**quid** 199:2
**quite** 139:12
152:13
**quo** 199:3
**quote** 79:7 98:4
104:18 106:1
169:21 221:18
221:18,19
258:14,17,20

**r**

**r** 3:6 61:10,12
61:13
**rachel** 3:10
7:15
**racism** 147:25
240:4
**raise** 8:5
**raised** 172:23
202:14,24
**random** 55:16
**range** 84:23
**ranks** 253:14
**rarely** 214:14
**rather** 73:23
87:19 123:23
258:23
**reach** 105:2
133:20

**reached** 91:21
219:11 264:6
**reaching**
114:23 261:18
**read** 20:12,15
20:17,20 27:1
27:4,8,11 50:7
52:9,11 53:21
53:23 57:13,16
63:4 66:25
67:2 69:23
70:1,12,17,22
70:25 78:14,15
79:6 82:9 89:2
89:4 90:19
96:8,11 98:8,9
98:13 101:1
102:15 104:23
112:11 120:17
125:21,24
129:13,16
131:1,5 132:19
132:22 138:11
150:14 157:17
157:23,23,25
161:18,21
163:12,15
172:24 173:2
173:21,23
175:7 176:4,7
183:23 185:20
186:11,11,14
186:16,24
187:1,22
195:11 205:25

206:3,19 207:3
207:16,17,23
208:8 211:2
217:12,17,20
224:4,5,13
225:6,22,25
226:9 227:25
228:14 229:10
229:17,20
249:8,10 254:7
258:9 259:13
259:17,18,22
271:5,6,12
272:5,6,17
**reader** 213:5
**reading** 76:16
155:23 162:21
217:1 254:15
270:19
**reads** 116:5
117:22
**ready** 81:12
105:12
**real** 26:20
146:6 155:7
**realize** 216:24
217:1,3,11
**realized** 128:23
**really** 46:21
54:13 55:22
60:1 75:7
89:18 94:15
108:17 113:12
115:10,12
127:13 130:19

**[really - referring]**

132:5 137:10
137:17 139:22
145:25 156:25
161:1 167:3,8
171:22 178:24
181:24 194:10
194:20 201:25
208:8 218:23
220:25 226:22
234:18
**reason** 75:7,13
121:12 180:19
219:16 232:4,7
250:15 264:24
265:1,12
270:14 272:8
273:3
**reasonable**
265:18
**reasons** 220:3
266:15,16
**rebuild** 184:21
**recall** 17:17
20:12 45:2
55:3 76:13,16
77:9,14,22
79:23 107:3
110:18 111:7
150:1 187:25
215:11 239:22
245:16,21,23
**receipt** 183:16
196:11 270:18
**received** 36:15
92:18 170:1

197:21 198:7
198:10,11
**recent** 16:8
110:15
**recently** 239:24
**recognition**
50:17 104:2
**recognize**
16:22 95:23
114:21 115:4
170:6
**recognized**
53:18 169:10
170:3 260:21
260:22,24
**recognizing**
59:16,20 115:5
**recollect** 38:10
187:23
**recollection**
17:24 63:13
186:18 239:25
**record** 6:6,14
7:9 28:12
37:19,20,21,22
60:2 72:24,25
73:1,2 104:6
106:12,13,14
106:15 126:25
127:3 143:14
143:15 145:20
149:1,3,4,5,6
151:12,13
158:25 184:5
184:10 188:6

199:14 204:13
204:14,15,16
246:4,5,6,7
249:1 252:15
261:3 263:20
265:22,25
266:1,2,3,8
267:12 268:1,2
272:9
**record's** 111:6
**recorded** 6:12
6:15
**recording** 6:9
6:13
**red** 107:25
**reduced** 76:8
**reeves** 77:14,23
78:3,10,13,19
78:24 79:2,23
80:3 81:10
82:21,24 83:8
83:18 157:11
158:5,11,17
159:23 160:3
160:10,15
163:3 188:4
197:2,11 215:2
215:11 216:4,8
216:20 218:11
219:17 220:7
221:16 222:24
223:10,23
224:8 226:12
227:4 256:2
257:19 259:1

260:1
**refer** 151:13
188:13
**reference** 17:14
107:11 123:10
124:3,4,13
127:6 138:12
138:14 149:19
159:18 180:12
188:1,14
206:22 251:7
270:7 271:2
272:2
**referenced** 50:5
153:25 188:19
239:18 240:6
250:25 271:11
272:15
**references**
107:14 128:14
128:15 150:4
181:6 191:6
193:8,8 201:18
**referencing**
17:11
**referred** 77:6
155:23
**referring** 26:13
26:17 57:22
66:19 95:11
98:20 106:25
122:24 155:2
159:1 162:2
208:1 215:6
225:3,4 226:6

226:7 231:3
233:10 246:14
**refers** 39:23
**reflect** 224:12
**reform** 40:9
**refresh** 95:13
154:20,23
183:23
**refuse** 256:6,9
**refused** 222:21
222:21
**refusing** 207:10
218:2 257:5
**refutes** 188:20
**regard** 79:24
250:11
**regarding** 54:1
165:14 189:10
200:7
**regardless**
159:11 172:1
**registered**
228:8,11
**regular** 44:23
47:8 75:15
**regulations**
168:3
**rehash** 266:15
266:16,23
**reigns** 199:5
**reject** 244:25
**related** 7:3
76:21 204:5
219:14 223:13
231:8 269:15

**relates** 205:5
255:25 256:19
**relation** 89:10
**relationship**
119:9,11
127:18
**relative** 22:5
96:14
**relativism**
52:12
**release** 262:8
**relevance**
132:12 206:15
**relevant** 31:8
31:19 72:12
88:10 92:5
95:18 133:2
245:15
**reliability** 28:2
95:20 109:23
123:16 124:10
126:2 127:25
133:18 142:24
145:8 180:15
237:12,15
239:14 245:1
251:4
**reliable** 9:22
10:16 115:20
116:18 129:11
133:2 138:2
141:15 142:3
146:16 160:14
169:7 180:20
194:17 213:2

229:11 244:6
**reliably** 10:19
125:15 186:9
**reluctant** 103:1
**rely** 38:18
39:10 49:15
180:15
**relying** 39:17
263:5
**remainder**
163:25
**remediate**
147:18 197:16
**remember**
20:17 21:2,3
43:17 44:21,21
46:7,22 63:25
64:4 68:12
80:5 110:4
128:11 140:24
141:5 154:2
181:5,9 215:2
**remind** 141:4
**remote** 1:21
**remotely** 6:22
7:7
**remove** 10:10
10:14,18 11:2
11:20 55:21
129:17,23
130:4 145:9
238:7
**removed** 11:23
11:24 12:3,8
12:11,21 13:11

13:16,19,22
14:2 81:24
123:16 124:23
125:3,18 126:3
126:3 128:9
143:8 146:8
**removing** 10:5
108:8
**repeat** 13:8
20:24 77:13
89:1 109:14
112:8 147:4
205:23 210:23
210:24 222:14
249:6,7 255:18
**repeating** 27:7
27:19 34:19
172:22 197:20
**rephrase** 20:10
233:5
**reportability**
213:14
**reported** 1:23
194:16 212:24
**reporter** 7:1
8:5,13 52:10
53:22 57:15
61:9 65:20,22
67:1 69:25
70:14,24 82:8
89:3 96:10
102:14 112:10
125:23 129:15
131:4 132:21
161:20 163:14

[reporter - returned]                                                    Page 60

173:1,22 176:6
185:19 186:25
187:21 195:10
203:21 205:15
205:21 206:2
206:18 207:2
207:22 210:10
211:1 217:19
225:24 227:24
229:19 237:13
245:25 249:9
254:11 258:8
267:11,13,21
269:5 271:7
**reporting**
138:1
**repository** 47:5
**represent** 7:13
7:22,24 106:23
179:5 242:9
**representative**
7:19 8:2 16:25
153:1 227:19
**represented**
254:12
**representing**
6:24 140:9
**represents**
189:9
**reputation** 94:5
261:9
**request** 31:18
111:2 207:6
272:9,11

**require** 57:2
169:11 171:22
214:14 240:11
**required**
127:13 219:9
256:21 270:25
**requirement**
127:12
**requirements**
193:16 240:12
**requires** 37:7
57:8,9 169:5
**reread** 20:11
82:6 102:12
187:19 195:8
206:17,25
207:20 227:22
258:7
**rereading**
19:12
**research** 75:13
127:4 134:18
135:9 137:8
**researched**
135:1
**researching**
19:12 129:20
130:11 131:9
136:14
**resides** 146:11
**resolution**
41:13 197:22
**resolve** 41:21
41:25

**resolved**
202:21
**resolving** 41:10
**resource** 14:12
51:24
**resources** 49:1
150:5 155:5
**respect** 9:9
36:25 76:12
78:13,14
101:22 118:14
142:6 168:20
189:23 227:3
232:12 233:15
240:25
**respected**
182:17
**respectfully**
160:15
**responded** 71:2
**response** 79:21
143:12 177:4
192:14 234:15
234:15 245:13
247:16 248:16
**responses** 92:3
**responsibility**
29:15 65:14
**responsible**
25:12 27:13
121:18,20
154:21 178:3,5
185:23 213:5
**responsive** 17:1
22:14 68:18

84:20 92:5
123:14 162:4
**responsively**
185:11
**responsiveness**
185:17
**rest** 66:16
143:17 144:18
210:13
**restate** 258:5
**restating** 197:5
**restraint**
199:10
**restroom** 36:21
71:14
**result** 18:25
39:1 85:14
92:19
**resulting** 55:14
214:18
**results** 191:23
**resumed**
266:20
**retirement**
183:15,17
196:10,12,14
197:22 198:4,8
198:10,12,19
200:8 201:4
202:4 254:10
**retroactively**
160:4
**returned**
270:18

**revenue** 198:16
198:17
**reverberating**
170:7
**reversion**
153:18,20
154:6
**review** 19:1
122:22 254:18
270:12 271:1
272:1
**reviewed** 17:5
17:5,6,7,8,9,22
17:24 18:1,4
18:15,17 20:5
21:18,22,23,23
21:24 81:6
107:4 113:13
141:14 149:14
**reviewing**
11:13 19:11
**revision** 109:8
152:8,22 231:4
231:7 234:9,11
**revisions** 5:11
5:15 24:5
107:8,10
165:22 166:4
199:24 200:1
228:19,20
**rewrite** 55:19
**rhetorical**
190:2
**right** 8:5,17
9:16 16:14

17:2 27:2,6,10
27:14 28:14
30:10 32:3
38:2 43:7 45:3
46:1 50:10
59:10 61:11
63:7 73:11,21
74:1,2 76:2,10
76:11,15,22,25
77:4 80:10,16
80:22 81:3
85:3 87:9,10
88:6,24 90:13
92:14 94:16
95:5,24,25
104:23 106:19
107:12,21
108:5,20
110:21 111:19
121:2 122:2,10
122:17,20,21
123:18 129:24
131:16,23
137:7 138:5,13
138:19 140:3
140:16 141:20
142:8,11,20
144:4,6 145:18
148:10,24
152:21 153:23
154:14,16
155:24 156:1
157:2,21
158:16 159:21
159:25 160:10

162:13 164:4,7
164:18 166:4,4
166:21 167:22
171:10,25
172:5,12,18
174:8 175:7,12
175:18 177:6
177:15 178:1
179:11 180:6
180:25 181:13
181:22 183:9
183:18,21
189:3 192:16
195:13 196:9
196:15 198:13
199:20,25
201:7,16
204:21 205:7
205:14 206:12
210:5,19 214:9
216:9 219:12
221:18,19
222:25 224:6
224:24 225:1
228:21 229:5
230:15,22
231:2,14,21
232:24 234:2
234:24,24
236:17 241:20
242:3,8,24
259:13,14,18
266:7,9
**rights** 83:22

**rise** 214:16
**risk** 261:10
**risking** 262:7
**risley** 76:22
77:15 104:1
134:19 135:12
146:8,12 180:5
180:12,25
183:9,14 186:6
186:19 191:25
192:6 193:24
194:7,25 195:2
195:5,15,18,24
196:1,9 197:21
200:5,23,24
201:3,6,15
**risley's** 84:1
189:24 190:7
191:21 200:5
**robin** 205:6
210:18 216:11
225:7
**rod** 76:22
77:15 84:1
104:1 134:19
135:12 146:8
146:12 180:5
180:12 183:9
183:14 189:24
190:7 191:21
195:2,5,24
196:1 200:5
**role** 40:21 97:7
143:7 210:15
216:15 227:6

240:5 244:11
244:14
**rolex** 118:11,11
**rollout** 14:7
**room** 189:5
**route** 262:20
**rpm** 1:8 6:21
**rublamb** 59:1,6
59:9,13 60:4
60:10,13,16
61:5,9,13,20,24
61:25 62:6
65:13 91:21,25
92:9 93:5,11
93:15,22,23
94:8 150:17
177:23 214:20
229:13 232:19
236:5
**rule** 16:17
102:16 242:17
243:1,10 244:2
245:6,19
248:22 249:12
251:16 252:7
252:19 253:1
253:10,17
254:3,20 255:3
255:6,23
256:17 257:12
257:12,22
258:11 259:4
259:20 260:4
264:13

**rules** 9:25
69:10 102:17
258:24 271:5
272:5
**run** 81:19
161:4
**running** 75:1
265:17
**runs** 81:20
**ryan** 26:13,19
26:20

**s**

**s** 3:6 5:2,5
270:15 272:8,8
273:3
**sacrificed**
262:13
**salary** 198:17
**santa** 3:22
**sat** 196:13
**satisfactory**
197:17
**save** 212:8
214:21,22
**saving** 198:4
**saw** 20:21 27:4
63:24 65:2
129:18 224:21
224:24,25
**saying** 48:18
51:11 54:14
55:2 79:8 82:2
86:21 87:17
116:22,25,25
118:13 120:14

121:5 162:7
167:10 168:7
174:20 190:19
215:11 226:25
232:15 257:18
263:23
**says** 98:2
103:15 108:6
157:22 158:10
158:18 162:25
164:7 166:4
170:4 175:4
189:24 194:3
195:24 201:15
211:12 224:8
232:2 262:8
**scale** 132:11
**scenario**
187:14 188:5
**schedule** 16:20
16:21 267:16
**scheduling**
19:8
**scheme** 224:3
226:16
**scholars** 115:9
**schools** 115:7
**scientists**
133:13
**scope** 30:12,22
34:2 43:5,16
43:25 44:19
45:5 46:6,19
81:3 113:24
114:19,20

158:21 189:10
207:8 209:14
211:11,18
217:22 218:13
218:21 219:6
220:11 221:12
222:2 223:4
240:21 241:13
241:22 242:5
242:17 243:1
243:10,17
244:2 245:6,9
245:19 248:22
249:12 250:16
251:15,18
252:7,19 253:1
253:9,17 254:2
254:20 255:12
255:13,14,23
256:17 257:12
257:22 258:11
259:4,20 260:4
264:13
**scratch** 73:8
**screen** 6:12
14:24 15:3,9
16:11 94:18,23
121:9 122:25
149:11 163:22
226:10
**screenshot**
150:16
**scroll** 16:19
163:23 200:3
228:22 235:20

**scrolling**
231:21 236:18
236:20
**seal** 271:15
272:21
**search** 126:19
127:1,16
131:18,19,20
135:18,22
**searched**
126:11 135:17
**searches**
126:25 131:15
131:18
**searching**
134:4
**second** 5:13
17:15 31:9
50:8 156:8
157:11,13
159:20 166:12
171:7 230:13
**secondary** 67:8
**secondly** 25:9
26:25
**seconds** 220:18
225:15
**section** 86:7
97:19 113:14
125:11 132:7
149:20 150:2,4
150:6 151:8
152:6 153:7
154:9 162:6
166:24 167:11

167:22,24
169:4,8,12
170:20 171:7
183:20 210:2
214:11 251:1
**sections** 170:19
**sector** 29:9,11
72:12 254:9
**see** 15:16 16:2
16:6,8,13 20:9
22:4 23:22
60:24 95:3,16
95:21 97:21,25
98:1 99:1
106:25 107:1
107:11,14,25
108:2,11 111:8
115:19 122:8
122:19 123:1,7
123:8,10
126:22 128:21
133:9 138:15
140:3,4,7,18
149:24,25
150:4,18
151:14 152:6
152:13,14
153:10 154:16
157:12 158:14
158:16 159:16
159:17,22
163:24 165:24
166:1,9,11
172:5 177:11
179:23 182:6,6

182:9 183:22
185:23 200:4
206:15 207:8
220:6,8 224:4
224:5 231:11
231:21 232:19
232:19,20,20
235:20,20
250:14 264:16
265:12
**seeing** 81:16
102:19 107:3
**seek** 38:18,19
68:7 130:19
188:8
**seeking** 114:1
182:3 262:23
**seeks** 179:15
**seem** 95:17
113:24 139:12
214:19 242:20
**seems** 59:2
65:16,18
116:14 178:14
187:8 265:17
**seen** 6:11 59:9
62:3 95:3,6
135:14 139:23
168:2 174:17
225:21 261:25
**self** 49:19 65:24
94:4 112:19
145:6,7 227:16
249:16

**send** 182:12
265:2
**sending** 81:1
**senior** 91:5,7,9
119:6
**sense** 9:19
119:19 124:5
**sentence** 150:8
159:21 163:24
165:7 166:12
189:9 251:6
**sentiment**
132:25
**separate** 162:8
**september** 64:7
164:1
**serious** 200:6
200:14 237:21
**seriously** 31:11
**serve** 139:4
228:12
**service** 14:5
33:11,12 34:4
34:23 97:1
130:8
**services** 122:22
**session** 148:20
**set** 51:19
145:16 148:6
269:11
**setting** 56:23
**settle** 188:2,2
**settling** 68:23
**seven** 161:10
263:12 264:25

**seventh** 71:21
185:22,22
**several** 181:12
**severity** 40:3
**sexual** 76:22
84:15,18 85:8
86:11 87:15
147:25 181:6
181:20 182:11
183:10 188:16
189:10,13
194:12,13
197:23
**share** 15:21
16:1,11 23:24
94:18 105:3
225:20 265:8
**sharing** 163:22
261:21
**sheet** 270:13
272:7,10,18
273:1
**shocked** 130:14
**short** 119:1
**shorthand**
269:5,12
**shove** 68:16,17
**show** 15:19
16:11 66:15
94:16,23 98:17
120:25 127:17
138:4 146:5
148:10 152:21
157:10 165:18
184:22 216:5

221:2 223:22
226:5 231:6
241:25 245:22
258:16
**showed** 19:22
**showing** 97:21
107:24 124:18
199:10
**shown** 270:16
**shows** 104:6
107:8 143:16
145:21 153:11
153:11 192:13
**shut** 11:16
**sidebar** 100:14
265:21
**sided** 67:24
112:17
**sides** 175:23,24
179:5
**sigma** 240:11
**sign** 56:17,24
244:19
**signature**
269:23 270:14
**signed** 20:16
214:20 271:13
272:18
**significant**
202:14,24
**signing** 270:19
**similar** 70:9,19
96:20 139:6,7
177:5 229:13
233:19 239:6

**simple** 10:13
12:15 36:1
37:5 40:25
42:25 44:14
84:12 105:18
142:18 200:10
223:24,24
226:12 227:2
248:14
**simply** 12:19
39:23 55:24
61:17 71:17
105:21 128:25
130:23 133:17
135:14 153:9
153:17 159:8
160:9 176:12
187:12 213:16
220:21 223:17
237:1 244:5
**sincerely**
270:21
**single** 115:23
124:16 251:25
**sir** 11:8,17
12:23 13:18
14:25 15:9,22
17:3 19:18
25:19,23 27:3
28:16,22 29:14
29:18 30:8
33:22 36:20
42:16 46:12
47:18 48:8
60:15 62:1,3

62:20,24 64:14
64:21 65:12
67:12 68:21
72:1 78:23
80:2,23 87:11
101:25 103:6
135:11,20
137:20 144:15
160:24 161:5
161:13 167:1
170:14 178:2
178:24 184:3
188:24 197:9
208:10 212:6
216:2,23 218:5
225:14 237:9
238:4 262:21
263:2 270:10
**siren** 108:24
109:7
**sister** 118:4
119:14,15
**sit** 33:12 81:25
88:9 105:13
124:10 150:12
151:13 199:15
244:12
**site** 5:12 9:10
14:9 17:21
19:11 32:16
40:18 55:6
69:16 112:21
149:17,18
**sitting** 23:8
79:22 168:15

**[sitting - southern]**

174:20 220:17
222:24
**situation**  96:14
174:19 201:2
204:5
**six**  197:12
217:7 221:1,3
237:11
**sixth**  12:20
71:22 185:22
**slight**  90:3
**slightly**  200:22
**slow**  234:13
**small**  15:10,10
15:12 134:20
172:14
**smoot**  3:10
7:15
**smoothly**  31:20
**societies**  82:20
83:10 114:8
116:16 118:5
119:14,15
147:20,22
175:16 176:23
238:14,16,19
238:22 239:4
240:5,13 242:2
242:10 244:14
244:15,20
247:1
**society**  1:5,11
6:17 7:23 8:1
16:25 22:4,13
28:20 29:1,5,6

29:21,23,24
30:1,6 51:6
53:19 56:25
57:23,25 58:2
58:5,8,12,13
69:17,19 70:10
70:19 71:6,13
71:25 72:7,9
72:10 74:10,11
74:13,15,16
76:3 81:13
84:4 86:6 93:2
111:13 113:15
113:17 114:22
114:23 115:4
116:11 118:9
119:7 122:14
130:15 138:15
139:1,4,10
147:19,19
158:11,12,14
158:19 159:14
159:19 160:8
162:7,9,25
170:3 171:13
171:14 175:3,4
175:18 181:7
212:2,4 223:25
226:13 228:24
229:3,15,25
230:14,18
232:3 239:1,2
239:5,8,15,17
240:1,3,9,18
241:11,19,20

242:1 243:5,15
243:25 244:7
245:3,17
246:14 250:4,5
250:14 256:3
258:20 262:9
262:10,14
270:6 271:3
272:3
**society's**  16:16
216:10,13,19
221:20 224:3
226:16
**solely**  83:9
**solid**  187:4
**solutions**  6:25
7:2 270:1
273:1
**somebody**
39:15 41:22
117:11 142:25
143:1 156:21
233:2
**soon**  71:14 74:3
100:11 148:17
**sororities**  50:14
214:12 236:2
**sorority**  59:18
60:6
**sorry**  13:23
18:12 32:12
48:18 62:8
64:11 65:20
87:1 93:10
109:14 119:16

122:14 147:3
148:11,25
158:23 164:1
167:7 181:24
182:2,24
184:11 203:21
205:15 210:10
210:22 216:7
227:9 232:3,11
236:20 237:13
254:11 266:7
**sort**  119:8
233:3,25
**sorts**  245:11
**sound**  45:1
194:6
**sounds**  79:22
120:24 195:12
**source**  166:3
168:12,24
170:12 202:23
238:24
**sourced**  155:3
**sources**  11:22
53:16 118:3
126:15 133:3,7
156:19 168:22
182:20 184:1,2
189:18 190:23
191:2,3 194:19
213:2,16,21
214:15
**south**  244:13
**southern**  1:2
6:19

**[space - statement]**

**space** 51:6
53:19 57:25
62:18 69:20
74:15 147:19
158:25 215:13
217:4 229:14
239:9,11
262:10
**spaces** 105:2
**speak** 10:23
35:20 48:13
68:6 81:17
84:16 93:19
94:15 98:18,19
156:25 205:16
231:16 262:18
**speaking** 14:18
23:9,17 232:12
**speaks** 85:9
143:14 261:3
**specific** 19:21
20:2,6 47:9,11
59:24 103:17
104:19 106:2
167:11 183:20
**specifically**
29:9 38:10
39:23 63:16,18
63:20 73:10
76:18 169:25
191:4 210:14
230:8
**specifics** 24:2
**spectrum**
126:16

**speculate**
211:20,24
212:15
**speculating**
64:25 211:21
212:8
**speculative**
212:9
**speech** 86:2
**speed** 234:18
**spend** 128:7
130:10 131:9
136:20
**spending** 161:9
263:9
**spent** 129:20
130:13,21,22
130:22
**spirit** 105:8
161:11 182:7
189:9
**spoke** 35:16
103:24 104:1
182:19
**spoken** 30:5
35:14 60:9,10
60:11,13
189:16
**sport** 258:24
**sprang** 116:16
**square** 3:10
**stand** 37:17
72:22 83:21
106:10 260:16
261:8

**standard** 52:17
56:10,12 73:23
96:20,22,24
97:9,10,13,16
99:3,5 103:18
104:16,17
105:22 109:8
114:7 169:11
214:11
**standards**
11:21,24 13:13
14:1 55:10
95:19 139:6
155:22 179:14
179:17 180:14
180:16 251:2
**standby** 246:3
267:9
**stands** 145:7
178:16
**start** 81:12
117:21 137:3
147:11 148:19
149:22 155:8
155:11 156:4
174:3 199:6
203:21
**started** 46:16
68:12 155:24
162:13,19
163:18 216:24
**starting** 116:3
155:1 185:2,24
193:15 202:3
205:2 223:23

**state** 4:2 7:6,8
144:15 174:4
186:19 192:16
195:18 213:24
260:25 271:10
272:15
**stated** 130:7
145:20,22
170:1 191:24
228:2 266:24
**statement**
39:20 70:8,18
71:8,17 80:11
80:17 83:4
95:14 98:18,18
102:20 103:4
108:13 109:25
111:7,22 116:8
116:12 121:2,4
150:13 155:25
156:5 160:3,7
162:1 163:7
165:16,16
168:5,16 169:9
169:10,14,16
173:4 175:25
176:22 180:20
182:3 186:5
192:12 196:25
197:6,15,15,21
198:1 202:17
202:24 203:2,8
203:11 209:4
210:3 212:7
214:10 215:7

220:23 221:5
224:13,15,19
226:7,23 227:1
227:19 229:3
229:24 230:5
230:11 231:5
237:6 258:14
259:22 261:14
262:7 271:13
271:14 272:19
272:19
**statements**
52:13 81:7
97:3 108:24
112:18 116:9
173:19 180:23
188:8 190:17
190:20,24
198:2 213:1,15
215:3 217:2
219:24 232:14
238:6,7 249:20
251:11
**states** 1:1 6:19
123:4 177:12
190:7,13
206:21 210:14
**stating** 220:2
**status** 90:21
148:4 235:12
239:24
**statuses** 92:9
**stay** 66:22
**stenographic...**
1:23

**step** 36:11 83:6
110:5 128:21
195:25
**stephens** 4:2
8:3 15:14
**stepped** 163:10
**stepping** 86:1
116:14 219:12
**steps** 131:21
192:12 199:7
**stettinius** 3:9
7:12
**sticker** 149:12
**stoles** 175:7,16
**stood** 173:17
**stop** 264:19,21
265:20
**store** 134:21
**stories** 86:16
**story** 86:17,25
87:3 171:11,17
213:22
**straight** 114:4
**straightforward**
28:8
**streamline**
49:13
**street** 4:2
**strength**
125:16
**stretch** 89:20
**stricken** 218:7
**strict** 38:25
**strictly** 31:17
223:9 255:5

256:22
**strike** 40:22
57:10 66:24
71:10 100:14
123:13
**striking** 218:5
**strive** 49:10
52:5 156:14
**strove** 49:21
**struck** 20:25
**structural**
147:25 240:4
**student** 39:5
43:11 132:24
183:12 228:8
228:11
**students** 23:11
53:8 54:7 68:4
83:22 114:1,23
115:5 139:5
159:15 172:9
172:10 174:21
254:18 262:9
262:14 263:9
**studies** 134:18
**study** 77:25
91:24
**studying**
132:25
**style** 9:5 146:11
187:13
**subject** 36:5,17
51:5 53:14
55:17 64:1
77:11 137:24

182:13 197:4
208:12,17
246:1 256:1,2
256:3,20
266:20
**subjects** 223:9
243:20
**submit** 49:3
**submitted**
17:13 148:14
**subscribed**
269:18 271:10
272:14 273:21
**subsequent**
17:16
**substance**
36:14
**substantive**
17:19,21 21:14
212:11 262:11
**subtracted**
152:19
**subvert** 153:2
**success** 49:14
**sued** 159:14
162:7,23
**suffice** 200:10
266:17
**suggest** 153:16
**suit** 81:3 163:5
**suite** 3:10,22
4:2 270:2
**sum** 105:3
**summarize**
168:3

**summary** 168:5
**summation**
193:21,24
**superior** 270:1
**supersedes**
102:20 178:16
179:13,14
**supervision**
269:13
**supplemental**
24:24 25:3
**support** 202:23
203:8,11
**supposed** 11:13
49:6 125:18
185:21
**sure** 10:20
17:23 18:23
19:23 21:4
23:1 24:22
28:11 34:6
36:9,11 44:1
44:13 45:7,11
48:24 49:12
54:13 60:1
61:1 63:11,24
64:4 73:8
74:25 83:3
90:14 96:23
108:22 109:15
113:11,21
120:20 121:8
132:23 140:19
153:10 160:2,3
162:3 169:1

173:19 180:19
183:19 186:8
235:1,12
240:14 241:15
251:21
**surmise** 262:24
**surprised**
21:14
**surrounding**
240:3
**survey** 76:1,2,3
76:5,8,9,12,15
77:7,18,24
78:4,11,20
79:4,25 80:6
80:25 81:1,2
82:23,24,25
88:22 89:13
147:9 180:23
181:7,20 182:4
182:12,16,16
193:5 197:3,17
**surveys** 76:17
**switch** 163:21
**switching**
79:17
**sworn** 7:10 8:6
8:9 269:7
271:10,13
272:14,18
273:21
**symbol** 179:9
**system** 85:25
96:25 97:5,6
102:10 146:20

**systematically**
103:16 104:19
106:1
**systemic** 104:4
147:24 240:4

**t**

**t** 5:2,5 62:9
64:23,23 76:19
**taft** 3:9 7:12
**taftlaw.com**
3:11
**tailored** 76:18
77:18
**take** 6:13 36:21
37:14 48:2
67:15 72:17,20
80:11,17 81:7
93:3 105:20
106:7 117:12
141:18 148:17
160:12 180:10
186:20,22
194:25 195:19
198:23 199:2,4
203:19 204:9
216:8 217:10
219:17 223:19
229:14 237:16
246:1 261:9
262:25 264:9
265:21 266:18
**taken** 3:1 6:16
150:16 235:22
263:17 264:25
269:10,11

**talk** 44:9 48:16
75:23 78:7
95:9,16,19
142:5 155:16
178:9 181:1
182:10 199:15
201:6 227:15
245:3 250:3
260:15 262:3
266:8
**talked** 23:5
33:1 34:10
94:25 181:13
181:15 199:16
230:20 236:15
241:4
**talking** 18:7,15
18:22 20:18
24:23 50:9
55:14 68:5,22
75:15 78:6
98:20 107:16
111:23 119:5
122:19 129:6,7
144:11,12
148:1 154:9
159:9,12 162:6
177:14 189:20
191:2,3,4
201:25 202:1
208:3 225:12
226:3,4 237:10
241:11 262:18
**talks** 138:10
162:22 170:20

173:15 201:2,3
**targeted**
239:11
**task** 15:15
135:15
**team** 22:15
23:4 24:7,10
25:1 33:12
**technical**
138:15,18,19
138:25 139:4,5
139:10
**technology** 3:2
6:23
**tell** 13:4 15:5
22:25 23:7,13
25:24 26:7
33:23 43:2
44:5 86:25
87:3 92:2
105:11,11
107:5,23
117:22 120:23
121:17 128:12
140:16 141:16
144:8 150:21
150:25 151:15
151:17,22
153:6 194:11
195:17 213:22
215:17 225:16
264:11,19
**telling** 25:11,20
29:14 31:11
32:11 44:11

54:11 118:17
141:19 151:16
158:6 181:20
191:5 216:9
221:16 222:24
245:11 265:4
**tells** 141:17
**tendered** 107:6
**tenure** 200:5
**term** 8:24
24:14 62:10
67:18,20 68:1
69:6,7,13
79:12,13 89:24
115:18 126:22
153:2 236:21
246:18
**terminated**
195:5
**termination**
183:15 196:10
**terms** 14:5,18
17:19 41:4
53:9,10 58:19
58:20 97:1
128:15 130:2,8
173:12,19
187:15 189:6
192:17 197:16
201:4 202:2
247:14 248:19
253:7,14,25
**test** 195:12
**testified** 8:10
113:21 205:13

206:6 208:5
216:16
**testify** 16:25
19:24 20:4
31:2 150:19
184:18 243:20
257:25 269:8
**testifying** 34:11
**testimony**
82:17 202:16
206:12 208:1,3
208:19 219:10
247:25 248:7
253:20 264:15
264:25 271:6,7
272:6,9,12
**text** 169:23
170:24 192:6
228:13
**texted** 62:5
**thank** 7:11 8:13
12:23 13:15
37:19 60:7
106:7,9 148:23
186:4 204:11
205:21 234:5
266:7 267:9,21
267:22
**thanked** 49:24
59:16,19 60:5
**thanking**
237:19
**theirs** 127:10
**thematic**
191:10,13

**theory** 39:17
**thereof** 269:16
**theta** 1:4 5:10
6:17 7:13,18
13:23 14:13
16:16 18:9,10
18:12,14 21:7
26:1,11 29:12
33:6 75:5
107:7 113:14
114:20 115:23
116:17,22
117:10 118:6
121:1 126:20
126:21,22
127:7,18
128:24 133:1
134:25,25
135:2 138:13
150:9 154:14
154:15 160:7
163:22 164:3
166:8,13 168:8
169:23 171:13
172:3 180:20
183:13 190:14
190:21,24
191:6,22,25
192:6,17
193:24 202:7
202:15,25
225:10 230:22
230:25 250:10
250:25 270:6
271:3 272:3

**[thing - time]**

Page 70

| | | | |
|---|---|---|---|
| **thing** 20:23 | 73:13 74:9,16 | 236:22 238:14 | **thousands** |
| 26:8 85:10 | 74:25 75:1 | 245:14 247:11 | 262:14 |
| 115:23 132:14 | 78:7 86:18 | 248:5,7 249:14 | **three** 19:24 |
| 170:22 264:3 | 87:5 88:10 | 249:15,16 | 20:3,7 24:2 |
| **things** 10:18 | 89:20 93:17 | 250:19 251:21 | 31:1,8 34:6 |
| 11:15 19:14 | 94:4 95:18 | 253:14 263:17 | 47:13 78:1 |
| 20:15 21:13,14 | 96:24 109:7,20 | 264:8 265:5,14 | 84:10 135:25 |
| 21:25 49:12 | 109:20,24 | 265:17,19 | 161:8,10 |
| 75:12,23 77:17 | 110:14 111:5 | 266:9,13,15,16 | 171:23 181:2 |
| 79:16,16 93:21 | 112:16 113:1,4 | 266:17,21,25 | 207:5 217:24 |
| 102:6 103:15 | 113:17,18 | 267:20 | 219:9 234:5 |
| 112:18,19 | 114:2 115:16 | **thinking** 21:2 | 243:20 251:19 |
| 120:16,18 | 120:18 121:25 | 88:9 251:17 | 253:21 257:25 |
| 137:16 143:23 | 127:20 130:16 | **third** 1:10,16 | 260:7 265:21 |
| 145:9,10 | 132:4 133:6,10 | 1:19 3:19 | **throw** 124:6 |
| 146:17 147:22 | 133:14,16,23 | 11:19,22 40:18 | 185:11 237:16 |
| 148:5,6 162:9 | 136:2,3 140:10 | 48:25 55:11 | **throwing** |
| 171:10 217:9 | 140:15 146:3 | 70:23 78:18 | 146:14 |
| 217:14 220:21 | 149:21 150:6 | 119:15 150:5 | **tie** 63:12 66:13 |
| 231:19 248:12 | 151:11 154:11 | 177:23 207:16 | 121:7 250:15 |
| 251:19 252:21 | 156:2,16,21 | 207:20 214:23 | **ties** 34:6 229:15 |
| 260:7 | 157:3 160:25 | 229:14 236:25 | **time** 6:6 7:6 |
| **think** 9:12,15 | 161:2,10 163:8 | 262:25 | 11:19 12:2,7 |
| 12:20 18:14 | 169:14 170:10 | **thirty** 270:18 | 12:20 13:6 |
| 26:12 29:8 | 171:8,25 | **thomas** 132:1 | 17:15 19:16 |
| 30:4 33:10 | 173:18 174:16 | 139:9 | 24:21 30:4 |
| 34:14 36:20 | 178:9 184:24 | **thought** 51:12 | 33:5,13,13,15 |
| 39:6,11 40:7 | 185:18,22 | 89:11 159:11 | 36:10,10 37:13 |
| 40:12 41:16 | 187:3,6 194:6 | 177:20 189:13 | 37:15,16 38:8 |
| 42:12,16 47:23 | 196:4,4 200:9 | 211:5 264:5 | 43:13 44:15 |
| 49:8,20,23 | 200:14,18 | **thoughtfully** | 57:21,22 63:12 |
| 51:21 54:4,25 | 201:8 205:17 | 185:7,11 | 63:25 67:9 |
| 55:7,13 59:9 | 208:16,17 | **thousand** | 68:19,22 70:23 |
| 66:15 68:4,9 | 213:5 214:21 | 136:22,23 | 70:23 71:21 |
| 69:18 71:21 | 215:1 231:23 | 137:1,2 | 74:11 75:9,24 |

| | | | |
|---|---|---|---|
| 78:18 81:12,15 | **times** 18:18 | 224:23 228:18 | **told** 30:5 54:4 |
| 81:25 84:16,16 | 19:2 24:13 | 231:9 232:2 | 58:7 98:22 |
| 86:16 87:24 | 30:4 102:23 | 237:19 238:9 | 107:4 135:16 |
| 105:15,18 | 105:19 118:3 | 254:25 255:21 | 140:11 159:10 |
| 110:18,22 | 143:12,17 | 256:15 261:24 | 159:23 167:15 |
| 111:17 126:14 | 144:18 145:23 | 263:7 | 171:25 177:20 |
| 126:16 128:7,8 | 157:24,25 | **tired** 167:3 | 182:12 197:2 |
| 128:9,12 | 179:1 185:19 | **title** 209:22,23 | 218:9 224:18 |
| 129:18 130:11 | 199:10 243:23 | **titled** 16:16 | 224:21 256:7 |
| 130:14,18,20 | 244:19 245:13 | 107:7 149:23 | 259:17 |
| 131:8 132:24 | 259:18,23 | **today** 7:24 15:5 | **tombrady** |
| 136:20 137:24 | **timing** 24:23 | 18:11,18 19:6 | 57:22 |
| 141:10 143:16 | 80:19 | 19:20 21:25 | **tombradyfan** |
| 144:16 145:3 | **tina** 26:4 | 22:1 23:7,9,17 | 56:22 |
| 148:19 156:21 | **tincher** 1:18 | 30:18 31:6 | **tomorrow** |
| 158:25 162:6 | 4:6 7:14,19,20 | 34:7 47:14 | 23:22 |
| 162:18 171:4 | 17:6 21:24 | 68:16 77:25 | **tone** 78:7 114:9 |
| 184:20,25 | 24:15,24 27:1 | 79:22 82:17 | 117:10,11,14 |
| 185:22,22 | 27:23 40:7 | 85:12 95:7 | 119:22 185:8 |
| 187:20 205:12 | 49:25 53:12 | 134:22 146:9 | **tony** 188:4 |
| 207:1,16,20 | 65:19,21,25 | 146:12 149:14 | **took** 23:5 |
| 208:9 212:8 | 67:5,14 68:3 | 168:15 181:1 | 103:11 123:9 |
| 214:21,22 | 75:7 96:6 99:6 | 184:23 219:8 | 131:21 143:1,6 |
| 215:12,13,15 | 99:11 106:24 | 219:14 243:20 | 173:16 183:9 |
| 215:16 216:25 | 107:4,24 | 243:23 244:23 | 192:12 195:3 |
| 217:4,11 | 113:21 128:23 | 264:6,12 | 195:24,25 |
| 219:21 220:8 | 148:13 149:13 | 267:23 | 196:1 224:1,2 |
| 224:13,15 | 165:19 169:24 | **today's** 21:19 | 226:14,15 |
| 226:24 227:2,8 | 169:25 171:13 | 91:23 267:24 | **tool** 39:8,11 |
| 228:22,23 | 172:23 195:3,3 | **together** 101:2 | **tools** 262:15 |
| 234:15,15,19 | 196:13,17 | 101:5 139:25 | **top** 137:23 |
| 244:13 252:13 | 199:6,23 | 141:14 146:5 | 139:14 141:5 |
| 261:24 262:3 | 204:22 205:13 | 151:14 153:9 | 148:5 172:9 |
| 263:18 266:14 | 206:6 208:4,19 | 250:16 | 174:14 214:3,4 |
| 268:1 269:11 | 213:13 216:16 | | 216:6 |

**topic** 66:22
97:17 132:8
140:24 193:6
223:5,10
248:23
**topics** 16:21
17:2 22:5,7,14
24:3 30:12,22
31:8,17 43:5
43:16,25 44:19
45:5 46:6,20
77:21 78:1
158:22 161:9
165:15 218:14
218:22 219:7
220:12 221:13
222:3,9 240:22
241:14,23
242:6,18 243:2
243:11 244:3
245:7,20
249:13 251:16
252:8,20 253:2
253:10,18
254:3,21 255:4
255:6,24
256:22 259:5
259:21 260:5
**tortious** 80:15
**tortiously**
88:21
**total** 267:25
**totality** 258:21
**totally** 188:12

**touched** 73:18
240:12
**touching**
219:10
**towards** 52:7
74:19 112:19
189:11
**traced** 116:23
121:1
**track** 100:12
**tract** 199:24
**trade** 75:3
150:10 162:24
165:15 172:4
238:20
**trademark**
159:20 175:5
175:12 177:4
**traditional**
240:5 244:6,15
**traffic** 253:15
**train** 211:4
**transcribed**
269:12 271:7
**transcript**
225:20 265:3,9
267:14,19
270:11,12
271:5,12 272:5
272:11,17
**transparency**
202:15,25
**transparent**
115:25

**transpired**
234:19
**travesty** 118:7
**treat** 175:23
**treatment**
55:14
**tremendous**
40:7 74:10
115:24
**trick** 38:23
**tried** 137:12
141:2 142:7,10
142:12,19
143:7 243:5,7
**tries** 234:23
**trinidad** 33:1
33:23,24 34:4
34:24
**true** 80:17 83:7
87:22 88:1,4
114:2 125:9
142:7 145:25
150:13 156:3,5
162:10 163:7
165:8 166:18
174:18 176:22
179:25 196:25
197:7 209:3
213:20,21
227:19 230:5
244:20
**trump** 132:8
**trust** 49:10
**trusted** 54:16

**truth** 9:17,22
23:12 28:7
38:18 40:14,14
80:11 138:2
146:5,16,21,21
146:23 147:6
147:12,17
148:8 176:1
177:10 178:15
178:15,16
179:13,14,14
179:15,19
180:2 182:23
182:24,24
187:3,4 188:10
198:1 199:15
199:17 203:15
244:8 269:8,8
269:9
**truthful** 39:8
67:16 79:18,20
85:25 100:1,1
102:3 168:16
169:10,13
178:7 182:1
198:19 200:19
239:12
**truthfulness**
171:6 213:14
232:13 244:11
245:1
**truths** 40:10
74:20
**try** 21:4,16
49:9 56:2,9,15

**[try - understanding]**                                            Page 73

68:16,17 99:23
102:13 113:11
127:21 131:2
137:10 167:9
168:1 171:18
194:20 201:22
209:17 226:2
252:10
**trying** 31:24
34:10 41:20
42:16 45:16,17
46:23 58:10
66:22 78:1
79:17 80:18
87:20 89:19
102:9,21 103:6
118:1,15
137:11 142:1
145:17,25
146:4,15
153:21 158:23
160:24 161:2,5
167:8 168:24
181:24,25
185:6,10 187:9
187:17 208:10
208:13 212:18
212:22 217:9
217:15 220:16
220:19 221:2
226:22,24
230:12 237:24
244:25 247:16
248:13,20
263:6

**tuesday** 1:22
6:2
**tumultuous**
250:8
**turn** 87:20
193:6
**twisting** 178:25
**twitter** 251:24
**two** 17:13,18
40:1 41:10
68:6 71:2 87:7
119:11 120:18
131:21 132:9
134:23 135:6,6
135:7,17,23
137:4 139:5
150:9,15
154:14,16
155:3,25
156:10,17,17
159:11 160:8
162:9 164:4
165:13 178:17
183:12 188:1
188:18 196:21
217:9 228:20
232:25 234:10
234:13,15
250:15 261:17
**tying** 182:7
**type** 47:11
110:1,19 114:9
233:13 239:16
**typed** 126:20

**types** 36:2
108:23
**typewriting**
269:13
**typical** 253:25
**typing** 60:12
**tyson** 258:17
258:17

**u**

**u** 61:12,13
**ucla** 43:11,11
**ultimate** 91:19
**ultimately** 55:9
129:23 144:9
202:20 250:9
**unable** 58:7
**unacceptable**
97:20,22
**unambiguously**
238:8
**unbiased** 49:6
49:10 50:22,23
51:2,13,14,15
52:13 98:23,25
**unclear** 206:14
**uncommon**
109:25
**uncovered**
135:23
**under** 16:20,21
27:13 41:21
48:4,5 69:10
73:11 108:20
112:17 114:13
122:21 123:2

125:10 159:16
172:10 173:19
198:21,22
202:16 209:8
214:12 269:13
**underlying**
36:7
**understand**
15:7 16:24
19:15,23 24:23
36:13,25 38:20
41:16,20 45:14
49:3 54:14,20
66:1 78:6
80:19 82:7
102:1,25
137:10 159:23
167:19 168:24
169:4 174:10
199:9 215:1
220:3 241:15
244:22,23
247:6
**understanding**
24:19 25:8
27:15 48:22
49:4,20 50:23
58:25 66:5,12
69:8,11 82:17
101:19 109:4
114:2 130:18
152:18 157:5,6
162:15 163:7
187:4,7 188:7
188:11,13

191:9 195:1
199:17 214:25
219:23 227:13
227:14 228:7
228:13,15
229:12 231:8
253:24 254:14
261:20
**understands**
49:17
**understood**
67:23
**undid** 152:22
234:23
**undisputed**
99:20
**undo** 144:13
234:11,23
**undoing** 231:3
234:8
**undue** 143:21
143:22,24
153:17 234:20
**unfair** 162:25
**unique** 247:4
**unit** 6:15 246:4
**united** 1:1 6:19
123:4
**universal** 5:9
95:2,10,10
98:2 99:16
100:9,23 103:2
104:18,24
105:25 193:17

**universities**
249:25
**unnecessarily**
112:18
**unofficial**
170:3
**unpack** 89:5
160:13
**unpaid** 216:15
**unprofessional**
183:11
**unresolved**
202:13
**unsubstantive**
21:13
**untouched**
127:23
**untrue** 116:22
120:1 160:9
169:9 194:2
220:9 221:10
229:3,25
**untruths** 120:6
**updated** 150:15
155:22 251:2
**updates** 163:19
**uplift** 146:15
146:16
**usage** 116:3
175:7 238:21
**use** 11:11 15:4
24:15 25:2
38:12 39:9
44:22 46:23
47:16 50:20

51:1,13 56:17
57:21 58:1,9
58:11,13,15
71:14 76:14
77:23 89:7
92:3 98:24
115:18 118:1
137:16 151:25
166:20 168:1
175:5,11 177:5
221:2 247:14
265:10
**used** 9:23 24:20
26:18 35:11
38:22 39:5
44:22 45:14,25
46:3,9,16 47:3
47:9 51:19
55:2 56:23,24
57:19,24 58:16
58:19 67:18,20
68:1 69:1 76:5
79:12,13,23
89:23 110:16
130:16 131:18
188:9 236:21
246:18 267:25
**user** 38:23
44:23 62:25
64:11,15,22
69:6 73:9,20
73:25 74:24
80:20 81:11
83:9 108:20
144:9 152:23

**users** 39:9
58:24 253:25
254:8
**uses** 24:8,10
**using** 3:2 6:23
32:18 60:13
74:21 76:17,21
85:24 111:24
119:18 176:16
226:7 238:15
238:19,22
**utilize** 51:4
**utilized** 195:4

**v**

**v** 1:17 63:22
270:6 271:3
272:3
**vague** 127:21
**valid** 249:24
260:22
**validation**
214:23
**validity** 173:10
**valuable** 102:3
102:18,19
236:7
**value** 51:23
59:19 81:7
93:17 263:8
**values** 69:20
70:19 261:4
**vandalism**
55:21 65:17
66:5 95:17
97:24 102:7

143:23 152:24
236:17
**vandalize**
99:24
**vandalized**
103:9
**various** 21:25
**vast** 82:19
**vehemently**
102:22 137:20
**venus** 117:13
**verb** 208:17
**verbatim**
228:13
**verfiable** 186:8
**verifiability**
13:1,13 14:1
19:14 21:10
28:2 38:19
42:20 64:8
95:20 109:22
123:15 124:9
126:2 127:24
133:18 134:2
142:24 145:8
171:20 180:15
237:12,15
239:13 245:1
250:17 251:3
**verifiable** 9:22
10:15,19 11:22
12:11 14:12
38:16 39:3
40:12 53:16
61:23 74:20

86:1 89:18
100:2 115:20
117:1 124:4,22
126:17 129:11
138:1 141:15
142:3 150:5,7
155:5 160:14
194:17,19
213:2 229:12
230:8 244:6
252:15
**verification**
14:12 128:18
142:9 143:13
**verified** 14:21
118:2,3 125:15
125:15 127:22
136:3 146:17
169:7
**verify** 11:5,11
21:16 48:25
49:1 51:8
54:16 64:8
123:11 146:17
201:20
**veritext** 6:24
7:2 16:1 94:21
270:1,7 273:1
**veritext.com.**
270:17
**version** 214:5
230:14
**versus** 6:18
58:8 107:21
230:22 234:15

**vice** 3:9
**victim** 84:18
85:8,10
**victims** 84:15
**video** 6:13,15
169:23 265:3,4
265:9 267:20
**videoconfere...**
6:1
**videographer**
4:6 6:5,25
15:12 37:17,22
72:22 73:2
106:10,15
148:21,24
149:2,6 204:8
204:11,16
246:3,7 263:14
263:19 265:24
266:3 267:9,22
**videotaped**
1:21
**view** 18:25
39:12 40:19
52:2 54:6
55:20 65:16
66:1,4 67:23
69:13 94:3
103:17 104:20
106:3 108:10
112:16,20
117:22 119:23
120:2 139:24
151:6,13
153:11,14

177:21 189:24
190:7,14,21
191:7,24 192:6
192:18 193:24
200:23 224:6
236:16 258:25
265:8
**viewable** 62:21
**viewed** 75:5
102:7 104:9
121:7 133:2
**viewing** 55:15
125:19 130:22
**viewmont**
142:25 144:9
234:11,13
235:5,6,10,14
235:19,20,22
236:1,8,12,21
236:25 237:5
**viewpoint**
203:24 213:19
**viking** 65:16
66:1 143:1
144:9 234:11
234:13 235:5,7
235:10,15,19
235:20,22
236:1,8,12,21
237:1,5
**violates** 99:16
100:8,23 103:2
**violating**
223:15 237:25

**violation** 31:21 40:3 50:1 98:3 105:25 237:17 237:21 238:8

**violative** 104:17

**virtual** 3:2 6:23

**virtually** 6:9

**visible** 228:23

**vision** 105:2

**visited** 252:17

**visits** 253:7

**visual** 175:5 177:5

**voluntary** 240:8

**volunteer** 71:12,23 216:16

**volunteered** 70:6,8,18,20 71:5,8,17 72:3 72:4,5,8

**vs** 1:7

**w**

**wait** 74:23 122:4 168:7 225:20

**waited** 23:22 88:20 147:7 225:15

**waiting** 161:23 184:19 220:18

**waived** 270:19

**walk** 48:10,21 198:24

**walked** 259:10

**walker** 4:1 8:4

**want** 28:11 31:20 32:18 38:2 44:5 45:14 48:17,19 58:19 60:1 68:3,17,19 81:9 82:21 83:7,11 85:6 94:20 101:20 101:20,21 109:15 111:5 113:6 118:24 119:1,4 149:20 150:23 151:1,4 151:5 152:10 162:2 164:15 194:10 199:14 208:8 213:4,11 218:9 222:18 222:19 223:16 225:16 264:8 267:13

**wanted** 36:12 47:2

**wants** 122:6 258:20

**warned** 161:3

**wash** 99:24

**washing** 55:21 66:4 67:18,23 69:1,9,13

102:7 112:16 143:23 152:23 153:2 236:16 236:22

**water** 36:21 146:15

**way** 16:12 32:20 34:13 50:11 51:17,18 51:20,20 55:12 55:23 57:7 68:5,9 84:24 85:2 102:22 124:10 143:14 144:4 146:17 146:18,20 159:4 167:1,7 167:25 182:10 182:13 185:20 205:2 211:7 212:1,17 215:25 217:6 226:23 227:5 230:17 231:25 232:16 236:10 238:7,12 239:12 244:10 248:17 250:12 261:11,20 265:18 269:16

**ways** 132:10

**we've** 24:9 25:6 30:5 35:14 36:20 59:9 75:5,14 80:21

87:5 153:17 161:23 162:6 181:12 189:16 189:18 199:22 202:1 216:6 223:12 228:19 236:15 241:18 264:6

**wears** 119:10

**web** 48:17,18 140:20 150:20 151:25 183:3 201:19 253:15

**website** 14:16 21:9 27:6 38:6 95:1 109:12,13 110:9 124:17 131:18,19 184:19 253:6 253:15

**websites** 119:15 194:17 224:9

**wednesday** 5:12 149:17

**week** 23:3,4,5 33:5,10,15 35:16 80:24 83:1 260:23

**weeks** 20:16,16 82:15,22 181:19 217:7 217:13 221:1,3 227:5

[weighed - wikipedia]                                                         Page 77

| | | | |
|---|---|---|---|
| **weighed** 86:4 | **wikipedia** 8:18 | 50:12,12,13,21 | 108:24,25 |
| **welcome** | 9:10,16,20,21 | 51:2,22 52:3 | 109:12,13,18 |
| 237:22 | 9:25 10:6,10 | 52:21 53:19 | 109:24 110:2,6 |
| **went** 52:15 | 10:15 11:3,12 | 54:23 55:6,9 | 110:16 111:9 |
| 60:23 138:6 | 11:20,21,24 | 55:13,24 56:10 | 111:23,24 |
| 183:5 234:1 | 12:4,9,10,12,22 | 57:2,8,9,24 | 112:22 114:6 |
| 266:10 | 12:25 13:12,13 | 58:16,20 59:10 | 115:19 117:4 |
| **wes** 13:16 | 13:17,24 14:1 | 60:6,12,17,20 | 117:15 119:24 |
| **whereof** 269:18 | 14:5,11,16,19 | 60:23 61:18,19 | 120:14 121:14 |
| **white** 139:8 | 14:23 17:7,12 | 61:22 62:4 | 121:19 123:15 |
| 229:7 230:8 | 17:14,20 18:1 | 63:5,6,8,15 | 124:9,21,23 |
| **wholly** 163:7 | 18:4,21 19:3,9 | 64:3,17,24 | 125:13,16 |
| **wife** 53:13 | 19:15,19 20:1 | 65:6,14 67:10 | 126:2 127:10 |
| 65:19,20 66:20 | 20:23 21:13,17 | 67:20 68:1 | 127:23 128:2 |
| **wiki** 59:17 | 21:18,25 24:6 | 69:3,9,16 71:7 | 128:13 130:2,8 |
| 152:25 236:2 | 24:8,10,14,17 | 71:24 73:7,11 | 133:11,17,22 |
| 243:15,25 | 24:17,20 25:2 | 73:16,20 74:4 | 133:25 136:9 |
| 245:3 | 25:3,6,13,22 | 74:21,22 75:3 | 138:6,7,11 |
| **wikiedits** | 26:5,10 27:6 | 75:8,18 81:19 | 139:16 140:9 |
| 188:23 | 27:10 28:3,16 | 81:20,20,22 | 140:20 141:25 |
| **wikimedia** 5:8 | 28:23 32:2,16 | 83:23 84:14 | 142:2 143:3,9 |
| 95:2 105:1 | 32:22 33:7 | 88:6,24 89:17 | 143:21 144:2 |
| **wikiobjectivity** | 35:7,11,16,21 | 89:24 90:2,10 | 144:17,19 |
| 27:13 45:25 | 37:2,4 38:4,6 | 90:17 92:17 | 145:6,12,18,21 |
| 46:10 47:17 | 38:15,18 39:10 | 93:18,20,23 | 146:18 148:7 |
| 48:5 56:18 | 39:16,21 40:16 | 95:1,1,24 96:3 | 149:18 150:1 |
| 59:7 73:7,9,20 | 40:17 41:4 | 96:18 97:1,6 | 150:15 153:4 |
| 73:25 74:24 | 42:6,18,25 | 97:11 98:2 | 153:14 155:22 |
| 80:20 81:11 | 43:3,13,23 | 99:16,22 100:8 | 163:9 164:9,11 |
| 82:16,18 83:9 | 44:15,17,22 | 100:9,22,24 | 164:13 167:25 |
| 108:15,21 | 45:3 46:1,4,11 | 102:3,5,16,17 | 168:2 171:17 |
| 140:3 141:9 | 46:17,23 47:2 | 103:11,19 | 173:18 174:24 |
| 152:5 153:16 | 47:4,20 48:4 | 104:18 105:24 | 177:17,21 |
| 166:19 233:12 | 48:11,13,20 | 106:1 107:9,19 | 178:3 179:14 |
| 233:18 | 49:5,15,21 | 107:20 108:1 | 179:15 180:6 |

**[wikipedia - witness]**

| | | | |
|---|---|---|---|
| 180:11,14 | **wikipedia's** | 44:1,20 45:6 | 131:6,11 |
| 181:18,22 | 29:8 48:24 | 46:7,21 48:8 | 132:20,23 |
| 182:5,10,17 | 53:3,10 54:14 | 49:8 51:1,17 | 133:16 134:9 |
| 183:3 185:1 | 69:10 94:4 | 52:12 53:7,25 | 135:25 137:20 |
| 188:24 189:21 | 179:17 254:7 | 54:13,25 55:9 | 139:3 140:23 |
| 191:18 193:7 | 254:14 | 56:5 57:2,17 | 141:24 142:15 |
| 193:17,19 | **wikipediaian** | 58:4,15 61:1,7 | 142:22 143:11 |
| 194:18 196:22 | 191:18 | 65:8,21,23 | 144:6 145:1,20 |
| 199:15 202:21 | **willing**  99:2,14 | 67:3 70:2,18 | 146:3 147:3,15 |
| 204:4,23 | 262:3 264:14 | 71:1 72:16,19 | 148:16,23 |
| 213:18 214:12 | **wilshire**  3:22 | 76:24 77:6 | 150:23 151:19 |
| 214:24 215:13 | **winded**  100:13 | 78:13,23 79:6 | 151:25 154:5 |
| 215:15,20 | **window**  15:15 | 79:15 80:2,8 | 155:13 156:7 |
| 217:6 219:19 | 15:23 | 81:5 82:7,10 | 156:24 157:5 |
| 220:24 221:5 | **winner**  262:21 | 84:3 85:6,24 | 157:15 158:8 |
| 222:7 223:11 | **wise**  3:13 7:16 | 86:15 87:5 | 158:23 160:2 |
| 223:13 224:7 | 146:11 | 88:1,8,18 89:1 | 160:12 162:15 |
| 226:19 227:9 | **wisecarter.com** | 89:5 92:12 | 162:21 163:17 |
| 231:7,13 233:3 | 3:15 | 94:1,13,20 | 164:9 165:10 |
| 233:16 235:11 | **wish**  156:14 | 96:5,13 97:15 | 166:1 167:7,21 |
| 235:16 237:11 | 213:20,20,20 | 98:17 100:4,11 | 168:15 169:3 |
| 237:14,17 | **withdraw** | 101:1 102:13 | 172:14 173:3 |
| 239:17 241:6 | 169:19 | 102:16 103:6 | 173:24 174:10 |
| 241:20 242:1 | **withhold**  97:15 | 104:23 106:5,9 | 174:16 175:22 |
| 242:23 245:17 | **witness**  6:11 | 107:16 109:6 | 176:8,15 177:1 |
| 246:14,15 | 7:9,24 8:12,20 | 110:13 112:12 | 177:17 178:14 |
| 247:3 249:21 | 9:12 10:8 11:5 | 113:11 114:18 | 178:24 179:13 |
| 251:2,12 252:5 | 15:9 16:1 25:5 | 115:15 116:7 | 179:23 180:2,8 |
| 252:15,16 | 27:19 28:1,16 | 116:25 117:9 | 180:14 181:9 |
| 253:14,25 | 28:22 29:3,18 | 117:25 120:5 | 181:15,24 |
| 254:13,15,18 | 31:1 34:19 | 121:4 124:2,21 | 182:15 184:15 |
| 255:8 256:1,20 | 35:1 37:6 | 125:5,13 126:1 | 185:5 186:2,8 |
| 259:11 260:21 | 38:15 39:20 | 126:9 127:9,20 | 187:2,23 |
| 261:12 | 41:9,16 42:3 | 128:11 129:17 | 188:18 189:5 |
| | 42:16 43:6,17 | 130:1,7,13 | 190:2,10,16,23 |

191:9,16 192:3
192:9,24
193:12 194:2
194:10,14
195:12,23
196:7,17,25
197:9,25 198:7
198:15 200:12
200:18 201:1
201:18 202:10
202:19 203:2
203:10,18,23
205:10,19,23
206:5,14,21
207:1,5,13,25
208:22 209:3
209:16 210:7
210:14,21,25
211:4,12,20
212:6,22 213:8
214:2 215:6
216:2,23
217:22 218:5
218:15,23
219:8 221:14
222:6,14 223:6
224:11 225:3
225:23 226:2
226:21 227:13
228:1 229:7,22
230:17 231:16
232:10 233:18
234:7 237:9,15
238:4 240:23
241:15 242:19

243:3,12,19
244:4 245:8,21
247:11,21
249:14 251:17
252:9,21 253:3
253:11,19
254:4,12,22
255:24 257:7
257:15,24
258:7,13 259:6
259:22 260:6
261:14 269:6
269:18 270:8
270:11 271:1,4
271:11 272:1,4
272:15
**witness'** 270:14
**woman's** 87:15
**women** 86:24
　87:2,23 188:1
　189:16 244:17
**women's** 85:13
**won** 50:3 61:19
　63:9
**word** 9:1,9
　32:18 51:1,14
　55:2 58:21
　63:23 77:12
　79:23 89:7,23
　89:25 98:10,24
　99:1 101:14
　102:21 119:18
　127:20 175:11
　246:19 247:9
　247:18,19

248:5,5,7,7,8,9
248:19,19,20
249:16 262:10
262:11
**worded** 165:17
　200:9
**wording** 168:1
**words** 9:12,13
　42:17 45:13
　50:20 54:10
　60:14 92:3
　114:15 117:10
　160:20 163:3
　167:10 174:24
　185:23 196:1
　204:5 205:3
　224:24 225:4,4
　225:6 226:5
　228:16
**work** 30:10
　50:9,18,19
　59:18,19
　126:16 146:11
　146:13 161:12
　185:21
**worked** 205:6
　221:25
**working** 29:19
　29:20 34:3
　52:6 94:9
　208:14 212:6
　213:1
**works** 22:3
　26:12 28:23
　31:11 32:4

34:13,22 49:21
93:21 133:17
133:25 146:18
146:19,20
167:1,25
227:17
**world** 38:20
　39:2,6 81:13
　82:19,19 83:10
　105:2 137:23
　146:18 253:6
　261:2,20
**worried** 116:9
**worse** 147:21
　187:14
**worthy** 194:7
　214:19
**wreaths** 175:7
　179:9 238:22
**write** 60:18,19
　155:3 164:12
　178:2,8 179:8
　182:21 189:7
　194:11 202:3
　211:8 212:2
　213:15,23
　214:24 240:23
　241:3 250:13
**writes** 223:24
**writing** 178:9
　217:12 227:6
**written** 108:7
　108:10,11
　111:9 112:15
　113:1,9 118:22

**[written - zoom]**

119:25 121:5
121:16 155:6
166:18,20,21
173:4 211:15
216:25 217:7
224:11 241:1
250:19
**wrong** 68:2
119:23,24
120:18 144:8
194:7 224:22
224:25 232:11
259:1
**wrote** 27:8
60:22 78:14
121:14 150:18
152:22 154:25
159:13 160:10
164:3 165:7
166:15 172:2,2
172:5 173:7
175:2,14,14
177:25 178:5,7
179:2 180:5
183:2,7,8,18,24
184:3,6,11
189:1,3,20,23
192:7,10 196:5
197:19 200:4,5
200:22 210:2
212:3 213:4
215:18,24
226:12 228:22
228:23,24
229:10 240:10

**x**

**x**  5:1,2,5 62:25
240:11
**xi**  240:11

**y**

**yale**  240:2
**yeah**  13:12
20:17 21:1
39:10 45:6
46:21 47:25
69:21 93:1
95:8 103:20
105:7 107:19
111:16 114:4
120:11 130:13
140:21,23
141:11 148:22
148:25 152:9
153:23 170:19
182:6 184:17
214:4 216:7
237:21 247:18
**year**  24:25
25:16 46:10,13
59:1,1 61:15
76:13 84:7
139:5 141:7
206:9 214:19
246:21,22
250:8
**years**  46:15
68:6 84:14,23
85:11 87:7
118:5 119:13
137:4 147:13

198:5,12
225:11 238:1,5
261:17
**yell**  185:5
**yelling**  185:14
**yeoman**  91:1
**yep**  117:19
**yesterday**
22:20 25:9
**young**  188:1
260:24
**youthful**
171:18

**z**

**zero**  52:13
**zoom**  15:15

Mississippi Rules of Civil Procedure

Rule 30

Depositions Upon Oral Examination

(e) Submission to Witness; Changes; Signing.
When the testimony is taken by stenographic means,
or is recorded by other than stenographic means as
provided in subsection (b)(4) of this rule, and if
the transcription or recording thereof is to be
used at any proceeding in the action, such
transcription or recording shall be submitted to
the witness for examination, unless such
examination is waived by the witness and by the
parties. Any changes in form or substance which the
witness desires to make shall be entered upon the
transcription or stated in a writing to accompany
the recording, together with a statement of the
reasons given by the witness for making them.
Notice of such changes and reasons shall promptly
be served upon all parties by the party taking the
deposition. The transcription or recording shall
then be affirmed in writing as correct by the
witness, unless the parties by stipulation waive
the affirmation. If the transcription or recording
is not affirmed as correct by the witness within

thirty days of its submission to him, the reasons for the refusal shall be stated under penalty of perjury on the transcription or in a writing to accompany the recording by the party desiring to use such transcription or recording. The transcription or recording may then be used fully as though affirmed in writing by the witness, unless on a motion to suppress under Rule 32(d)(4) the court holds that the reasons given for the refusal to affirm require rejection of the deposition in whole or in part.

DISCLAIMER: THE FOREGOING CIVIL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE STATE RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the

foregoing transcript is a true, correct and complete

transcript of the colloquies, questions and answers

as submitted by the court reporter. Veritext Legal

Solutions further represents that the attached

exhibits, if any, are true, correct and complete

documents as submitted by the court reporter and/or

attorneys in relation to this deposition and that

the documents were processed in accordance with

our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining

the confidentiality of client and witness information,

in accordance with the regulations promulgated under

the Health Insurance Portability and Accountability

Act (HIPAA), as amended with respect to protected

health information and the Gramm-Leach-Bliley Act, as

amended, with respect to Personally Identifiable

Information (PII). Physical transcripts and exhibits

are managed under strict facility and personnel access

controls. Electronic files of documents are stored

in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.

# EXHIBIT A-12

<u>MUTUAL RECIPROCAL TRADEMARKS LICENSING AGREEMENT</u>

THIS AGREEMENT is made by and between THE PHI BETA KAPPA SOCIETY (hereinafter, "Beta") and PHI THETA KAPPA (hereinafter, "Theta") each of Beta and Theta being a "Party" and together the "Parties" to this Agreement as follows:

WHEREAS, Beta is a not-for-profit association, established in 1776, which, as an honor society, promotes liberal scholarship in four year undergraduate colleges and universities throughout the United States; and

WHEREAS, Theta is a not-for-profit corporation, established in 1918, which, as an honor society, promotes scholarship in two year junior colleges throughout the United States; and

WHEREAS, Beta is the owner of its registered trademarks which include its name in various forms, as detailed hereinbelow; and

WHEREAS, Theta is the owner of its own separate registered trademarks which include its name in various forms, as detailed hereinbelow; and

WHEREAS, Beta and Theta have had an oral understanding and cooperative arrangement between them as to their identities; and

WHEREAS, Beta and Theta each and both wish to now memorialize that said understanding and cooperative arrangement;

NOW, THEREFORE, they do agree:

1. *TRADEMARKS*: The Trademarks which are the subject of this Agreement are the following:

    1.01 Owned by Beta:

| Mark | Registr. # |
| --- | --- |
| ΦBK (as to Greek letters only; not remainder of Mark) | 591,140 |
| ΦBK (as to Greek letters only; not remainder of Mark) | 731,963 |
| Phi Beta Kappa | 734,333 |

    1.02 Owned by Theta:

| Mark | Registr. # |
| --- | --- |
| ΦΘK | 1,837,832 |
| Phi Theta Kappa | 1,844,370 |

    1.03 The Parties agree and acknowledge that the foregoing Trademarks are not all of the Trademarks owned by each.

    2. *ACKNOWLEDGEMENTS:* Each Party has acknowledged and hereby again acknowledges that:

        2.01 The Parties have similar (but not identical) eleemosynary goals and purposes which do not conflict in promoting scholarship and education.

        2.02 The names of the Parties bear a certain similarity in appearance and sound, whether in the form of Greek letters or when spelled in their respective phonetic English equivalents.

PTK0132046

---*MUTUAL RECIPROCAL TRADEMARKS LICENSING AGREEMENT*

2.03 The appearance and sound of each of the respective trademarks of the Parties constitute essential elements of the registered marks.

2.04 The Parties serve distinctly separate segments of the educational community.

2.05 Each Party's name is a "Famous Mark" within the meaning of 15 U.S.C. §1125(c).

2.06 Beta's said trademarks are owned exclusively by Beta as are all of Beta's trademarks.

2.07 Theta's said trademarks are owned exclusively by Theta as are all of Theta's trademarks.

3. *LIMITED RECIPROCAL LICENSES:* The Parties hereby agree to the following licenses to be in effect for the term of this Agreement and to be effective retroactively to

3.01 Beta hereby grants unto Theta the limited power and authority for the term of this Agreement (including all extensions and renewals) to utilize Beta's name and aforesaid trademarks, which necessarily include but not are not specifically limited to the appearance and sound of said marks, only to the limited and minimal extent that the same may be found to be subsumed in Theta's name, and for no other purpose without the written agreement of Beta.

3.02 Theta hereby grants unto Beta the limited power and authority for the term of this Agreement (including all extensions and renewals) to utilize Theta's name and aforesaid trademarks, which necessarily include but not are not specifically limited to the appearance and sound of said marks,  only to the limited and minimal extent that the same may be found to be subsumed in Beta's name, and for no other purpose without the written agreement of Theta.

3.03 Nothing herein shall be construed to grant to Theta the right to use Beta's name in any way other than as subsumed in Theta's use of Theta's own name.

3.04 Nothing herein shall be construed to grant to Beta the right to use Theta's name in any way other than as subsumed in Beta's use of Beta's own name.

3.05 Each of said licenses is applicable to and exercisable in all media and forms of human apprehension, and is not geographically limited in any way.

3.06 Neither license granted hereunder is exclusive.

3.07 Neither Party has the right to sublicense or assign any right or license granted in this Agreement without the prior written consent of the Party granting such license, but the same shall not be construed to prevent any use or license by Beta of Beta's own name and trademarks, or prevent any use or license by Theta of Theta's own name and trademarks.

3.08 As neither Party is hereby authorized to utilize the other's trademarks apart from subsumption as aforesaid, no credit to or acknowledgement of the Party granting the license is to be given or made at any time in any way, unless agreed otherwise in writing by the such granting Party.

4. *CONSIDERATION:* The Parties agree that the mutual promises herein contained and the reciprocal licenses herein granted are adequate and fair consideration had and received by each.

5. *TERM:* This Agreement and the licenses granted hereunder shall continue in full force and effect until terminated in accord with provisions of this Agreement.

2

Confidential Subject to Protective Order

PTK0132047

---MUTUAL RECIPROCAL TRADEMARKS LICENSING AGREEMENT

6. *TERMINATION:* Each Party has the right to terminate this Agreement on thirty (30) days written notice at any time.

7. *WARRANTIES:* No other warranties are hereby made except that:

7.01 Beta warrants that Beta's said trademarks are owned exclusively by Beta as are all of Beta's trademarks.

2.06 Theta warrants that Theta's said trademarks are owned exclusively by Theta as are all of Theta's trademarks.

8. *INFRINGEMENT NOTIFICATION:* If a licensed Party shall learn of or discover any actual, apparent, intentional or suspected infringement of a trademark of the licensing Party, the licensed Party shall have the duty to promptly notify the licensing Party thereof. Each Party shall otherwise be wholly and solely responsible for the policing of its own trademarks and the enforcement of its own rights.

9. *BREACH:* Each Party shall indemnify and save harmless the other Party in and from all costs, damages, detriments, losses and expenses for any breach of this Agreement by such breaching Party, whether intentional or unintentional.

9.01 No enforcement action shall be taken against a Party until at least five (5) business days written notice of breach has been provided to the Party against whom such action is contemplated.

9.02 In addition to all other rights and remedies allowed by and under law, each Party shall have the right to enjoin the other from any actual or threatened breach, without the same constituting an election of remedies.

9.03 All costs of enforcement or defense, including but not limited to reasonable attorney fees shall be recoverable by the prevailing party in any enforcement action.

10. *RELATIONSHIP:* The relationship between the Parties is that of independently contracting entities.

10.1 No joint venture, partnership, agency or other relationship is formed hereby or to be construed hereunder.

10.2 Neither Party has any right or authority to act on behalf or hold itself out as agent for or as a part of the other Party.

11. *COUNSEL:* The Parties each acknowledge that this Agreement has been drafted by one Counsel at the mutual request of both Parties.

11.1 Each Party acknowledges having entered into written waiver of conflicts of interest of such single Counsel with regard to this Agreement, after explanation and discussion of the same with such Counsel.

11.2 Each Party acknowledges that Counsel disclosed the right of each party to employ separate Counsel in connection herewith.

12. MISCELLANEOUS: The following Miscellaneous provisions apply:

Confidential Subject to Protective Order

PTK0132048

*---MUTUAL RECIPROCAL TRADEMARKS LICENSING AGREEMENT*

12.1 This Agreement is the entire agreement between the Parties as to the subject matter hereof, superseding and replacing all other prior agreements and contracts of every kind and character between the Parties, all of which are merged herein, and may not be modified except in writing signed by all Parties.

12.2 If any portion hereof is declared invalid by rule of court or operation of law, the same shall not invalidate the entire Agreement which shall continue in effect as if the invalid portion had not been a part hereof.

12.3 This Agreement is and shall be binding upon and inure to the benefit of each and every successor-in-interest of every kind and character of each of the respective Parties.

12.4 This Agreement is not assignable by any Party without the written consent of all Parties, and no sublicensing, relicensing, transfer or alienation hereof is permitted or allowed.

12.5 Each Party shall provide such further assurances, sign such additional documents and take such additional actions as may be reasonable and necessary to effectuate and fulfill all the terms of this instrument.

12.6 This Agreement is and shall be fully binding upon all the respective successors of every kind and character of each of the Parties.

12.7 This Contract is and shall be governed by and construed under the laws of the District of Columbia.

The Phi Beta Kappa Society

by: _____

Date: _____8/21/00_____

Phi Theta Kappa

by: _____

Date: _____

PBK&PTK.doc

4

Confidential Subject to Protective Order

PTK0132049

# MORRIS A. NUNES, ATTY., P.C.
### 7247 LEE HIGHWAY
### FALLS CHURCH, VIRGINIA 22046

### (703) 241-4917
### FAX: (703) 241-4935

MORRIS A. NUNES
ADM. VA. & D.C.

JOY ELIZABETH MATAK, ESQ.
ADM. VA.

Aug. 15, 2000

Dr. Douglas Foard
The Phi Beta Kappa Society
4th Floor
1785 Mass. Ave. NW
Washington, D.C. 20036

Re: PBK/PTK

Dear Doug:

Per our e-mails and conversations, here are three original hard copies for signature of the Waiver of Conflicts document. Please forward all three to Rod once you've signed all three.

By copy hereof, I'm asking Rod to then sign all three, keep one, return one to you and one to me.

I'm hoping we can have this out of the way quickly so we can move on to the substantive matter itself.

Please let me know if there is any question.

Many thanks to you and Rod for your understanding and cooperation.

Cordially,
Morris A. Nunes, Atty., P.C.

Morris A. Nunes, Esq.

cc: Rod Risley
Encl.
MAN/tsh

Confidential Subject to Protective Order

## WAIVER OF CONFLICTS OF INTEREST

THIS WAIVER is made by and among The Phi Beta Kappa Society ("Beta") and Phi Theta Kappa ("Theta") (hereinafter, all together, "Client Parties") and Morris A. Nunes, Esq. ("MAN") an attorney in Fairfax County, Virginia, together with his Virginia professional corporation, Morris A. Nunes, Atty., P.C. ("MANAPC") (hereinafter, MAN and MANAPC together, "Lawyer Parties") all agreeing as follows:

1. BACKGROUND: A. Beta and Theta have both separately been clients of the Lawyer Parties, for a variety of matters stretching over several years.

B. The Client Parties desire to enter into a reciprocal agreement for the purpose of protecting their separate trademarks and names.

2. CONFLICT: Beta and Theta have jointly agreed the Lawyer Parties to draft the said proposed agreement, which representation does or could present a conflict of interest between the Client Parties, in that advantages to one of the Client Parties in the particular language of such agreement could be disadvantageous to another, or that matters on which advice is sought by one party may require advice which could potentially be disadvantageous to the other party.

3. WAIVER: A. After explanation and upon due consideration, *including but not limited to the opportunity to consult with other counsel and advisors*, the undersigned, among whom it is acknowledged that said conflicts of interest may exist or do exist or both, do each and all waive such conflicts as to MAN and as to MANAPC and all associates, employees, staff, officers and directors thereof, so that the same may represent Beta in drafting such an agreement, for which Beta and Theta will each pay one-half of the attorney fees to the Lawyer Parties.

B. It is further intended and understood among the Parties that such agreement is designed to memorialize the terms of a pre-existing oral agreement originally made by the Parties without the assistance of any counsel as Beta and Theta have negotiated. The Parties may further negotiate, and the representation by the Lawyer Parties is not intended to create any advantage or disadvantage for one or the other of Beta and Theta, even though both Beta and Theta acknowledge and understand that each could seek and continue to be free to seek other legal counsel to try to obtain representation for such purposes.

C. Nothing in this Waiver shall be construed to prevent any party from terminating representation in any matter in accord with any agreement of representation.

4. BINDING: This waiver is binding upon all of the heirs, successors and assigns, jointly and severally, of each and all of the parties hereto.

5. WAIVER EFFECTIVE: This Waiver shall not be effective until signed by all of the parties and shall then be effective on the date last signed.  Further, signature hereon by any party in the absence of all signatures shall not be binding upon any party nor constitute an admission or evidence as to, for or against any party.

1

Confidential Subject to Protective Order

*--- WAIVER OF CONFLICTS OF INTEREST*

*6. LATER* RECUSAL: Notwithstanding anything herein to the contrary, the parties hereto all agree that if it shall appear that additional matters of conflict shall arise or that any existing matters may or appear to prevent the Lawyer Parties from fulfilling all ethical duties despite this Waiver, any of the client parties may request that Maury and MANAPC later recuse themselves from further involvement in such transaction or Maury and MANAPC may voluntarily recuse themselves.

*Client Parties:*
The Phi Beta Kappa Society                    Phi Theta Kappa

by: _____        _____
   Authorized Signatory                   Authorized Signatory

Date: _____8/16/00_____, 2000    Date: _____, 2000

*Lawyer Parties:*
MANAPC: Morris A. Nunes, Atty., P.C.      MAN:

by: _____        _____
   Authorized Signatory                   Morris A. Nunes

Date: _____Aug. 15_____, 2000      Date: _____Aug. 15_____, 2000

2

Confidential Subject to Protective Order                    PTK0132052

## MUTUAL RECIPROCAL TRADEMARKS LICENSING AGREEMENT

THIS AGREEMENT is made by and between THE PHI BETA KAPPA SOCIETY (hereinafter, "Beta") and PHI THETA KAPPA (hereinafter, "Theta") each of Beta and Theta being a "Party" and together the "Parties" to this Agreement as follows:

WHEREAS, Beta is a not-for-profit association, established in 1776, which, as an honor society, promotes liberal scholarship in four year undergraduate colleges and universities throughout the United States; and

WHEREAS, Theta is a not-for-profit corporation, established in 1918, which, as an honor society, promotes scholarship in two year junior colleges throughout the United States; and

WHEREAS, Beta is the owner of its registered trademarks which include its name in various forms, as detailed hereinbelow; and

WHEREAS, Theta is the owner of its own separate registered trademarks which include its name in various forms, as detailed hereinbelow; and

WHEREAS, Beta and Theta have had an oral understanding and cooperative arrangement between them as to their identities; and

WHEREAS, Beta and Theta each and both wish to now memorialize that said understanding and cooperative arrangement;

NOW, THEREFORE, they do agree:

1. *TRADEMARKS*: The Trademarks which are the subject of this Agreement are the following:

   1.01 Owned by Beta:

   | Mark | Registr. # |
   | --- | --- |
   | ΦBK (as to Greek letters only; not remainder of Mark) | 591,140 |
   | ΦBK (as to Greek letters only; not remainder of Mark) | 731,963 |
   | Phi Beta Kappa | 734,333 |

   1.02 Owned by Theta:

   | Mark | Registr. # |
   | --- | --- |
   | ΦΘK | 1,837,832 |
   | Phi Theta Kappa | 1,844,370 |

   1.03 The Parties agree and acknowledge that the foregoing Trademarks are not all of the Trademarks owned by each.

2. *ACKNOWLEDGEMENTS:* Each Party has acknowledged and hereby again acknowledges that:

   2.01 The Parties have similar (but not identical) eleemosynary goals and purposes which do not conflict in promoting scholarship and education.

   2.02 The names of the Parties bear a certain similarity in appearance and sound, whether in the form of Greek letters or when spelled in their respective phonetic English equivalents.

Confidential Subject to Protective Order

2.03 The appearance and sound of each of the respective trademarks of the Parties constitute essential elements of the registered marks.

2.04 The Parties serve distinctly separate segments of the educational community.

2.05 Each Party's name is a "Famous Mark" within the meaning of 15 U.S.C. §1125(c).

2.06 Beta's said trademarks are owned exclusively by Beta as are all of Beta's trademarks.

2.07 Theta's said trademarks are owned exclusively by Theta as are all of Theta's trademarks.

3. *LIMITED RECIPROCAL LICENSES:* The Parties hereby agree to the following licenses to be in effect for the term of this Agreement and to be effective retroactively to

3.01 Beta hereby grants unto Theta the limited power and authority for the term of this Agreement (including all extensions and renewals) to utilize Beta's name and aforesaid trademarks, which necessarily include but not are not specifically limited to the appearance and sound of said marks, only to the limited and minimal extent that the same may be found to be subsumed in Theta's name, and for no other purpose without the written agreement of Beta.

3.02 Theta hereby grants unto Beta the limited power and authority for the term of this Agreement (including all extensions and renewals) to utilize Theta's name and aforesaid trademarks, which necessarily include but not are not specifically limited to the appearance and sound of said marks, only to the limited and minimal extent that the same may be found to be subsumed in Beta's name, and for no other purpose without the written agreement of Theta.

3.03 Nothing herein shall be construed to grant to Theta the right to use Beta's name in any way other than as subsumed in Theta's use of Theta's own name.

3.04 Nothing herein shall be construed to grant to Beta the right to use Theta's name in any way other than as subsumed in Beta's use of Beta's own name.

3.05 Each of said licenses is applicable to and exercisable in all media and forms of human apprehension, and is not geographically limited in any way.

3.06 Neither license granted hereunder is exclusive.

3.07 Neither Party has the right to sublicense or assign any right or license granted in this Agreement without the prior written consent of the Party granting such license, but the same shall not be construed to prevent any use or license by Beta of Beta's own name and trademarks, or prevent any use or license by Theta of Theta's own name and trademarks.

3.08 As neither Party is hereby authorized to utilize the other's trademarks apart from subsumption as aforesaid, no credit to or acknowledgement of the Party granting the license is to be given or made at any time in any way, unless agreed otherwise in writing by the such granting Party.

4. *CONSIDERATION:* The Parties agree that the mutual promises herein contained and the reciprocal licenses herein granted are adequate and fair consideration had and received by each.

5. *TERM:* This Agreement and the licenses granted hereunder shall continue in full force and effect until terminated in accord with provisions of this Agreement.

2

Confidential Subject to Protective Order

PTK0132054

*---MUTUAL RECIPROCAL TRADEMARKS LICENSING AGREEMENT*

6. *TERMINATION:* Each Party has the right to terminate this Agreement on thirty (30) days written notice at any time.

7. *WARRANTIES:* No other warranties are hereby made except that:

7.01 Beta warrants that Beta's said trademarks are owned exclusively by Beta as are all of Beta's trademarks.

2.06 Theta warrants that Theta's said trademarks are owned exclusively by Theta as are all of Theta's trademarks.

8. *INFRINGEMENT NOTIFICATION:* If a licensed Party shall learn of or discover any actual, apparent, intentional or suspected infringement of a trademark of the licensing Party, the licensed Party shall have the duty to promptly notify the licensing Party thereof. Each Party shall otherwise be wholly and solely responsible for the policing of its own trademarks and the enforcement of its own rights.

9. *BREACH:* Each Party shall indemnify and save harmless the other Party in and from all costs, damages, detriments, losses and expenses for any breach of this Agreement by such breaching Party, whether intentional or unintentional.

9.01 No enforcement action shall be taken against a Party until at least five (5) business days written notice of breach has been provided to the Party against whom such action is contemplated.

9.02 In addition to all other rights and remedies allowed by and under law, each Party shall have the right to enjoin the other from any actual or threatened breach, without the same constituting an election of remedies.

9.03 All costs of enforcement or defense, including but not limited to reasonable attorney fees shall be recoverable by the prevailing party in any enforcement action.

10. *RELATIONSHIP:* The relationship between the Parties is that of independently contracting entities.

10.1 No joint venture, partnership, agency or other relationship is formed hereby or to be construed hereunder.

10.2 Neither Party has any right or authority to act on behalf or hold itself out as agent for or as a part of the other Party.

11. *COUNSEL:* The Parties each acknowledge that this Agreement has been drafted by one Counsel at the mutual request of both Parties.

11.1 Each Party acknowledges having entered into written waiver of conflicts of interest of such single Counsel with regard to this Agreement, after explanation and discussion of the same with such Counsel.

11.2 Each Party acknowledges that Counsel disclosed the right of each party to employ separate Counsel in connection herewith.

12. MISCELLANEOUS: The following Miscellaneous provisions apply:

3

Confidential Subject to Protective Order

PTK0132055

---*MUTUAL RECIPROCAL TRADEMARKS LICENSING AGREEMENT*

12.1 This Agreement is the entire agreement between the Parties as to the subject matter hereof, superseding and replacing all other prior agreements and contracts of every kind and character between the Parties, all of which are merged herein, and may not be modified except in writing signed by all Parties.

12.2 If any portion hereof is declared invalid by rule of court or operation of law, the same shall not invalidate the entire Agreement which shall continue in effect as if the invalid portion had not been a part hereof.

12.3 This Agreement is and shall be binding upon and inure to the benefit of each and every successor-in-interest of every kind and character of each of the respective Parties.

12.4 This Agreement is not assignable by any Party without the written consent of all Parties, and no sublicensing, relicensing, transfer or alienation hereof is permitted or allowed.

12.5 Each Party shall provide such further assurances, sign such additional documents and take such additional actions as may be reasonable and necessary to effectuate and fulfill all the terms of this instrument.

12.6 This Agreement is and shall be fully binding upon all the respective successors of every kind and character of each of the Parties.

12.7 This Contract is and shall be governed by and construed under the laws of the District of Columbia.

The Phi Beta Kappa Society

by: _Douglas W. Foard_

Date: _5/21/00_

Phi Theta Kappa

by: _____

Date: _10/3/00_

PBK&PTK.doc

4

Confidential Subject to Protective Order

PTK0132056

# MORRIS A. NUNES, ATTY., P.C.

7247 LEE HIGHWAY
FALLS CHURCH, VIRGINIA 22046

(703) 241-4917
FAX: (703) 241-4935

MORRIS A. NUNES
ADM. VA. & D.C.

JOY ELIZABETH MATAK, ESQ
ADM. VA.

*AUG 1 8 2000*

Aug. 15, 2000

Dr. Douglas Foard
The Phi Beta Kappa Society
4th Floor
1785 Mass. Ave. NW
Washington, D.C. 20036

Re: PBK/PTK

Dear Doug:

Per our e-mails and conversations, here are three original hard copies for signature of the Waiver of Conflicts document. Please forward all three to Rod once you've signed all three.

By copy hereof, I'm asking Rod to then sign all three, keep one, return one to you and one to me.

I'm hoping we can have this out of the way quickly so we can move on to the substantive matter itself.

Please let me know if there is any question.

Many thanks to you and Rod for your understanding and cooperation.

Cordially,
Morris A. Nunes, Atty., P.C.

Morris A. Nunes, Esq.

cc: Rod Risley
Encl.
MAN/tsh

Confidential Subject to Protective Order

PTK0132057

# WAIVER OF CONFLICTS OF INTEREST

THIS WAIVER is made by and among The Phi Beta Kappa Society ("Beta") and Phi Theta Kappa ("Theta") (hereinafter, all together, "Client Parties") and Morris A. Nunes, Esq. ("MAN") an attorney in Fairfax County, Virginia, together with his Virginia professional corporation, Morris A. Nunes, Atty., P.C. ("MANAPC") (hereinafter, MAN and MANAPC together, "Lawyer Parties") all agreeing as follows:

1. BACKGROUND: A. Beta and Theta have both separately been clients of the Lawyer Parties, for a variety of matters stretching over several years.

B. The Client Parties desire to enter into a reciprocal agreement for the purpose of protecting their separate trademarks and names.

2. CONFLICT: Beta and Theta have jointly agreed the Lawyer Parties to draft the said proposed agreement, which representation does or could present a conflict of interest between the Client Parties, in that advantages to one of the Client Parties in the particular language of such agreement could be disadvantageous to another, or that matters on which advice is sought by one party may require advice which could potentially be disadvantageous to the other party.

3. WAIVER: A. After explanation and upon due consideration, *including but not limited to the opportunity to consult with other counsel and advisors*, the undersigned, among whom it is acknowledged that said conflicts of interest may exist or do exist or both, do each and all waive such conflicts as to MAN and as to MANAPC and all associates, employees, staff, officers and directors thereof, so that the same may represent Beta in drafting such an agreement, for which Beta will pay the attorney fees to the Lawyer Parties.

B. It is further intended and understood among the Parties that such agreement is designed to memorialize the terms of a pre-existing oral agreement originally made by the Parties without the assistance of any counsel as Beta and Theta have negotiated. The Parties may further negotiate, and the representation by the Lawyer Parties is not intended to create any advantage or disadvantage for one or the other of Beta and Theta, even though both Beta and Theta acknowledge and understand that each could seek and continue to be free to seek other legal counsel to try to obtain representation for such purposes.

C. Nothing in this Waiver shall be construed to prevent any party from terminating representation in any matter in accord with any agreement of representation.

4. BINDING: This waiver is binding upon all of the heirs, successors and assigns, jointly and severally, of each and all of the parties hereto.

5. WAIVER EFFECTIVE: This Waiver shall not be effective until signed by all of the parties and shall then be effective on the date last signed.  Further, signature hereon by any party in the absence of all signatures shall not be binding upon any party nor constitute an admission or evidence as to, for or against any party.

1

PTK0132058

## --- WAIVER OF CONFLICTS OF INTEREST

     6. LATER RECUSAL: Notwithstanding anything herein to the contrary, the parties hereto all agree that if it shall appear that additional matters of conflict shall arise or that any existing matters may or appear to prevent the Lawyer Parties from fulfilling all ethical duties despite this Waiver, any of the client parties may request that Maury and MANAPC later recuse themselves from further involvement in such transaction or Maury and MANAPC may voluntarily recuse themselves.

*Client Parties:*
The Phi Beta Kappa Society             Phi Theta Kappa

by:_____      _____
    Authorized Signatory               Authorized Signatory

Date: _____, 2000      Date: _____, 2000

*Lawyer Parties:*
MANAPC: Morris A. Nunes, Atty., P.C.     MAN:

by:_____      _____
    Authorized Signatory               Morris A. Nunes

Date: _____, 2000      Date: _____, 2000

2

Confidential Subject to Protective Order

PTK0132059

# EXHIBIT A-13

**Page Vault**

| | |
|---|---|
| Document title: | Wikipedia:Conflict of interest - Wikipedia |
| Capture URL: | https://en.wikipedia.org/wiki/Wikipedia:Conflict_of_interest |
| Page loaded at (UTC): | Thu, 10 Oct 2024 20:54:20 GMT |
| Capture timestamp (UTC): | Thu, 10 Oct 2024 20:58:05 GMT |
| Capture tool: | 10.51.0 |
| Collection server IP: | 54.145.42.72 |
| Browser engine: | Mozilla/5.0 (X11; Linux x86_64) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/126.0.6478.234 Safari/537.36 |
| Operating system: | Linux (Node 20.17.0) |
| PDF length: | 16 |
| Capture ID: | 2A7zGjLFHBj45ex8eapjcm |
| Display Name: | dcassady |



**WIKIPEDIA**
The Free Encyclopedia

Photograph a historic site, help Wikipedia, and win a prize. Participate in the world's largest photography competition this month!
**Learn more**



# Wikipedia:Conflict of interest

文A **58 languages** ∨

Project page    Talk                                                    Read    Edit    View history    Tools ∨

From Wikipedia, the free encyclopedia

> *If you want to report a problematic conflict of interest editor, see* Wikipedia:Conflict of interest/Noticeboard.
> *For practical advice for editors who might have a conflict of interest, see* Wikipedia:Plain and simple conflict of interest guide
> *"Wikipedia:Conflict" redirects here. For other uses, see* Wikipedia:Conflict (disambiguation).

---

✔ **This page documents an English Wikipedia behavioral guideline.** Editors should generally follow it, though exceptions may apply. Substantive edits to this page should reflect consensus. When in doubt, discuss first on this guideline's talk page.

> Shortcuts
> **WP:COI**
> **WP:CONFLICT**

🥔 **This page in a nutshell:** Do not edit Wikipedia in your own interests, nor in the interests of your external relationships.

---

**Conflict of interest (COI)** editing involves contributing to Wikipedia about yourself, family, friends, clients, employers, or your financial and other relationships. Any external relationship can trigger a conflict of interest. Someone having a conflict of interest is a description of a *situation*, not a judgment about that person's opinions, integrity, or good faith.

COI editing is strongly discouraged on Wikipedia. It undermines public confidence and risks causing public embarrassment to the individuals and companies being promoted. Editors with a COI are sometimes unaware of whether or how much it has influenced their editing. If COI editing causes disruption, an administrator may opt to place blocks on the involved accounts.

Editors with a COI, including paid editors, are expected to disclose it whenever they seek to change an affected article's content. Anyone editing for pay must disclose who is paying them, who the client is, and any other relevant affiliation; this is a requirement of the Wikimedia Foundation. COI editors are strongly discouraged from editing affected articles directly, and can propose changes on article talk pages instead. However, our policy on matters relating to living people allows very obvious errors to be fixed quickly, including by the subject.

When investigating COI editing, *do not reveal the identity* of editors against their wishes. Wikipedia's

| Wikipedia guidelines |
|---|
| Guidelines list · Policies list |
| **Behavioral** |
| Assume good faith · **Conflict of interest** · Courtesy vanishing · Disruptive editing · Don't bite the newcomers · Don't disrupt to make a point · Etiquette · Gaming the system · User pages · Other behavioral guidelines · WMF friendly space policy |
| **Discussions** |
| Talk page guidelines · Signatures |
| **Content** |
| Citing sources · External links · Reliable sources (medicine) · Fringe theories · Non-free content · Offensive material · Don't copy long texts · Don't create hoaxes · Patent nonsense · Other content guidelines |
| **Editing** |
| Article size · Be bold · Understandability · Other editing guidelines |
| **Categorization** |
| Categories, lists, templates · Categorization · Disambiguation |
| **Style** |
| Manual of Style (contents · lists · tables) |

## Contents [hide]

(Top)
Wikipedia's position
How to disclose a COI
What is conflict of interest?
Dealing with edit requests from COI or paid editors
Copyright of paid contributions
Covert advertising
Other categories of COI
Miscellaneous
How to handle conflicts of interest
See also
Further reading

## Appearance [hide]

Text
○ Small
● Standard
○ Large

Width
● Standard
○ Wide

Color (beta)
○ Automatic
● Light
○ Dark

Document title: Wikipedia:Conflict of interest - Wikipedia
Capture URL: https://en.wikipedia.org/wiki/Wikipedia:Conflict_of_interest
Capture timestamp (UTC): Thu, 10 Oct 2024 20:58:05 GMT

Content

(Top)

> Wikipedia's position

> How to disclose a COI

> What is conflict of interest?

> Dealing with edit requests from COI or paid editors

  Copyright of paid contributions

> Covert advertising

> Other categories of COI

> Miscellaneous

> How to handle conflicts of interest

  See also

  Further reading

articles directly, and can propose changes on article talk pages. Moreover, our [real-time peer review] relating to living people allows very obvious errors to be fixed quickly, including by the subject.

When investigating COI editing, *do not* reveal the identity of editors against their wishes. Wikipedia's policy against harassment, and in particular the prohibition against disclosing personal information, **takes precedence** over this guideline. To report COI editing, follow the advice at How to handle conflicts of interest, below. Editors making or discussing changes to this guideline or related guidance shall disclose whether they have been paid to edit Wikipedia.

## Wikipedia's position   [ edit ]

### Purpose of Wikipedia   [ edit ]

> *Further information: Wikipedia:What Wikipedia is not*

As an encyclopedia, Wikipedia's mission is to provide the public with articles that summarize accepted knowledge, written neutrally and sourced reliably. Readers expect to find neutral articles written independently of their subject, not corporate or personal webpages, or platforms for advertising and self-promotion. Articles should contain only material that complies with Wikipedia's content policies and best practices, and Wikipedians must place the interests of the encyclopedia and its readers above personal concerns.

### COI editing   [ edit ]

> *See also: Wikipedia:Plain and simple conflict of interest guide*

Editors with a COI should follow Wikipedia policies and best practices scrupulously:

Shortcut
**WP:COIEDIT**

- you should **disclose** **your COI** when involved with affected articles;
- you are **strongly discouraged** from editing affected articles directly;
- you may **propose changes** on talk pages (by using the `{{edit COI}}` template), so that they can be peer-reviewed;
- you should put new articles through the Articles for Creation (AfC) process instead of creating them directly;
- you should **not act as a reviewer** of affected article(s) at AfC, new pages patrol or elsewhere;
- you should **respect other editors** by keeping discussions concise.

Note that no one on Wikipedia controls articles. If Wikipedia hosts an article about you or your organization, others may add information that would otherwise remain little known. They may also decide to delete the article or decide to keep it should you later request deletion. The media has several times drawn attention to companies that engage in COI editing on Wikipedia (see Conflict-of-interest editing on Wikipedia), which has led to embarrassment for the organizations concerned.

### Paid editing   [ edit ]

Being paid to contribute to Wikipedia is one form of financial COI; it places the paid editor in a conflict between their employer's goals and Wikipedia's goals. The kind of paid editing of most concern to the community involves using Wikipedia for public relations and marketing purposes. Sometimes called "paid advocacy," this is problematic because it invariably reflects the interests of the client or employer.

Shortcuts
**WP:PE**
**WP:PAY**
**WP:NOPR**
**WP:NOPAY**
**WP:FCOI**

Other editing guidelines

Categories, lists, templates ·
Categorization · Disambiguation

**Style**
Manual of Style (contents · lists ·
tables)

**Deletion**
Deletion process · Speedy keep ·
Deletion guidelines for administrators

**Project content**
Project pages (WikiProjects) · Templates
· User pages (User boxes) · Shortcuts ·
Subpages

**Other**
Naming conventions · Notability

**Search**

Search for a guideline

V · T · E

Contents   (Top)

&gt; **Wikipedia's position**

&gt; How to disclose a COI

&gt; What is conflict of interest?

&gt; Dealing with edit requests from COI or paid editors

   Copyright of paid contributions

&gt; Covert advertising

&gt; Other categories of COI

&gt; Miscellaneous

&gt; How to handle conflicts of interest

   See also

   Further reading

Being paid to contribute to Wikipedia is one form of financial COI; it places the interests of an external employer ahead of the interests of the community. The kind of paid editing of most concern to the community involves using Wikipedia for public relations and marketing purposes. Sometimes called "paid advocacy," this is problematic because it invariably reflects the interests of the client or employer.

Shortcuts
**WP:PAY**
**WP:NOPR**
**WP:NOPAY**
**WP:FCOI**

More generally, an editor has a financial conflict of interest whenever they write about a topic with which they have a close financial relationship. This includes being an owner, employee, contractor, investor or other stakeholder.

The Wikimedia Foundation requires that all paid editing be disclosed. Additionally, global policy requires that (if applicable) you **must** provide links on your user-page to **all** active accounts on external websites through which you advertise, solicit or obtain paid editing. If you receive or expect to receive compensation (money, goods or services) for your contributions to Wikipedia, the policy on the English Wikipedia is:

- you must **disclose** who is paying you, on whose behalf the edits are made, and any other relevant affiliation;
- you should make the disclosure on your user page, **on affected talk pages**, and whenever you discuss the topic;
- you are **strongly discouraged** from editing affected articles directly;
- you may **propose changes** on talk pages by using the `{{edit COI}}` template, so that they can be peer-reviewed;
- you should put new articles through the Articles for Creation (AfC) process instead of creating them directly;
- you must **not act as a reviewer** of affected article(s) at AfC, new pages patrol or elsewhere;
- you should **respect volunteers** by keeping discussions concise (see WP:PAYTALK).

Requested edits are subject to the same standards as any other, and editors may decline to act on them. The guide to effective COI edit requests provides guidance in this area. To find an article's talk page, click the "talk" button at the top of the article. See WP:TEAHOUSE if you have questions about these things. If you are an administrator, you must not use administrative tools for any paid-editing activity (except when related to work as a Wikipedian-in-residence, or as someone paid by the Wikimedia Foundation or an affiliate).

### Wikimedia Foundation terms of use   [ edit ]

   *Further information: Wikipedia:Paid-contribution disclosure*

The Wikimedia Foundation's terms of use require that editors who are being paid for their contributions disclose their *employer* (the person or organization who is paying for the edits); the *client* (the person or organization on whose behalf the edits are made); and any other relevant *affiliation*. This is the policy of the English Wikipedia.

## How to disclose a COI   [ edit ]

### General COI   [ edit ]

If you become involved in an article where you have any COI, you should always let other editors know about it, whenever and wherever you discuss the topic. There are three venues to do this.

Shortcuts
**WP:DISCLOSE**
**WP:DCOI**

1. If you want to use a template to do this, place `{{connected contributor}}` **at the top of the affected talk page**, fill it in as follows, and save:

| Connected contributor template | [show] |
| --- | --- |

Note that someone else may add this for you.

2. You can also make a statement in the edit summary of any COI contribution.

3. If you want to note the COI **on your user page**, you can use the `{{UserboxCOI}}`

Appearance   hide

**Text**

◯ Small
● Standard
◯ Large

**Width**

● Standard
◯ Wide

**Color (beta)**

◯ Automatic
● Light
◯ Dark

(Top)

› Wikipedia's position

› **How to disclose a COI**

› What is conflict of
  interest?

› Dealing with edit
  requests from COI or
  paid editors

  Copyright of paid
  contributions

› Covert advertising

› Other categories of
  COI

› Miscellaneous

› How to handle conflicts
  of interest

  See also

  Further reading

Note that someone else may add this for you.

2. You can also make a statement in the edit summary of any COI contribution.

3. If you want to note the COI on **your user page**, you can use the `{{UserboxCOI}}`
template:

| UserboxCOI template | [show] |
|---|---|

Also, if you propose significant or potentially controversial
changes to an affected article, you can use the `{{edit COI}}`
template. Place this at the bottom of the talk page and state
your suggestion beneath it (be sure to sign it with four tildes,
~~~~). If the proposal is verifiable and appropriate, it will
usually be accepted. If it is declined, the editor declining the
request will usually add an explanation below your entry.

> **Example**
> For a COI disclosure, see
> **Talk:Steve Jobs**
> In this edit, one editor added
> a COI declaration for
> another editor.

### Paid editors  [ edit ]

> *Further information: Wikipedia:Paid-contribution disclosure*
> "WP:UPE" redirects here. Not to be confused with Wikipedia:Use
> plain English.

> Shortcuts
> **WP:COIPAYDISCLOSE**
> **WP:COIDISCLOSEPAY**
> **WP:UPE**

If you are being paid for your contributions to Wikipedia, you must
declare who is paying you, who the client is, and any other relevant role or relationship. You
may do this on your user page, on the talk page of affected articles, or in your edit
summaries. As you have a conflict of interest, you must ensure everyone with whom you
interact is aware of your paid status, in all discussions on Wikipedia pages within any
namespace. If you want to use a template to disclose your COI on a talk page, place
`{{connected contributor (paid)}}` at the top of the page, fill it in as follows, and save:

| Connected contributor (paid) template | [show] |
|---|---|

The *employer* is whoever is paying you to be involved in the article (such as a PR company).
The *client* is on whose behalf the payment is made (usually the subject of the article). If the
employer and client are the same entity—that is, if Acme Corporation is paying you to write
about Acme Corporation—the client parameter may be left empty. See `{{connected
contributor (paid)}}` for more information. Note that other editors may add this template
for you. Paid editing without such a declaration is called *undisclosed paid editing* (**UPE**).

You are expected to maintain a clearly visible list on your user page of your paid
contributions. If you advertise, solicit or obtain paid editing work via an account on any
external website, you must provide links on your user-page to all such accounts.

If you propose changes to an affected article, you can use the `{{edit COI}}` template. Post
it on the talk page and make your suggestion underneath it.

The use of administrative tools as part of any paid editing activity, except as a Wikipedian-in-
Residence, or when the payment is made by the Wikimedia Foundation or an affiliate of the
WMF, is considered a serious misuse and likely to result in sanctions or their removal.

## What is conflict of interest?  [ edit ]

### External roles and relationships  [ edit ]

> Shortcut
> **WP:EXTERNALREL**

While editing Wikipedia, an editor's primary role is to further the
interests of the encyclopedia. When an external role or relationship
could reasonably be said to undermine that primary role, the editor has
a conflict of interest similar to how a judge's primary role as an impartial adjudicator would
be undermined if they were married to one of the parties.

## External roles and relationships   [edit]

While editing Wikipedia, an editor's primary role is to further the interests of the encyclopedia. When an external role or relationship could reasonably be said to undermine that primary role, the editor has a conflict of interest similar to how a judge's primary role as an impartial adjudicator would be undermined if they were married to one of the parties.

Shortcut
**WP:EXTERNALREL**

Any external relationship—personal, religious, political, academic, legal, or financial (including holding a cryptocurrency)—can trigger a COI. How close the relationship needs to be before it becomes a concern on Wikipedia is governed by common sense. For example, an article about a band should not be written by the band's manager, and a biography should not be an autobiography or written by the subject's spouse. There can be a COI when writing on behalf of a competitor or opponent of the page subject, just as there is when writing on behalf of the page subject.

Subject-matter experts (SMEs) are welcome on Wikipedia within their areas of expertise, subject to the guidance below on financial conflict of interest and on citing your work. SMEs are expected to make sure that their external roles and relationships in their field of expertise do not interfere with their primary role on Wikipedia.

### COI is not simply bias   [edit]

*Further information: WP:ADVOCACY*

Determining that someone has a COI is a **description of a situation**. It is not a judgment about that person's state of mind or integrity. A COI can exist in the absence of bias, and bias regularly exists in the absence of a COI. Beliefs and desires may lead to biased editing, but they do not constitute a COI. COI emerges from an editor's roles and relationships, and the *tendency to bias* that we assume exists when those roles and relationships conflict.

Shortcut
**WP:COINOTBIAS**

### Why is conflict of interest a problem?   [edit]

On Wikipedia, editors with a conflict of interest who unilaterally add material tend to violate Wikipedia's content and behavioral policies and guidelines. The content they add is typically unsourced or poorly sourced and often violates the neutral point of view policy by being promotional and omitting negative information. They may edit war to retain content that serves their external interest. They may overuse primary sources or non-independent sources, and they may give too much weight to certain ideas.

### Actual, potential and apparent COI   [edit]

An **actual COI** exists when an editor has a COI with respect to a certain judgment *and* is in a position where the judgment must be exercised.

Shortcuts
**WP:ACTUALCOI**
**WP:POTENTIALCOI**
**WP:APPARENTCOI**

Example: A business owner has an actual COI if they edit articles and engage in discussions about that business.

A **potential COI** exists when an editor has a COI with respect to a certain judgment *but is not* in a position where the judgment must be exercised.

Example: A business owner has a potential COI with respect to articles and discussions about that business, but they have no actual COI if they stay away from those pages.

An **apparent COI** exists when there is reason to believe that an editor has a COI.

Example: Editors have an apparent COI if they edit an article about a business, and for some reason they appear to be the business owner or in communication with the business owner, although they may actually have no such connection. Apparent COI raises concern within the community and should be resolved through discussion whenever possible.

## Dealing with edit requests from COI or paid editors   [edit]

*Further information: Wikipedia:Edit requests*

Content

(Top)
> Wikipedia's position
> How to disclose a COI
> **What is conflict of interest?**
> Dealing with edit requests from COI or paid editors
  Copyright of paid contributions
> Covert advertising
> Other categories of COI
> Miscellaneous
> How to handle conflicts of interest
  See also
  Further reading

Appearance   hide

Text

○ Small
● Standard
○ Large

Width

● Standard
○ Wide

Color (beta)

○ Automatic
● Light
○ Dark

Contents    hide

(Top)

> Wikipedia's position

> How to disclose a COI

> **What is conflict of interest?**

> Dealing with edit requests from COI or paid editors

   Copyright of paid contributions

> Covert advertising

> Other categories of COI

> Miscellaneous

> How to handle conflicts of interest

   See also

   Further reading

some reason they appear to be the business owner or in communication with the business owner, although then they may actually have no such connection. Apparent COI raises concern within the community and should be resolved through discussion whenever possible.

## Dealing with edit requests from COI or paid editors  [ edit ]

*Further information: Wikipedia:Edit requests*

### Responding to requests  [ edit ]

Editors responding to edit requests from COI or paid editors are expected to do so carefully, particularly when commercial interests are involved. When large amounts of text are added to an article on behalf of the article subject, the article has, in effect, been ghostwritten by the subject without the readers' knowledge. Responding volunteers should therefore carefully check the proposed text and sources. That an article has been expanded does not mean that it is better.

Shortcut
WP:COIRESPONSE

- Make sure the proposed paid text complies with WP:WEIGHT.
- Look for unnecessary detail that may have been added to overwhelm something negative.
- Make sure nothing important is missing. Responding editors should do their own search for independent sources. **Do not rely on the sources offered by the paid editor.**
- Look for non-neutral language and unsourced or poorly sourced content.
- Be cautious about accepting content based on self-published sources such as a personal website, or primary sources such as a company website or press release.

If the paid text is added to the article, the edit summary should include full attribution.

### Attribution in edit summaries  [ edit ]

*Further information: Wikipedia:Copying within Wikipedia and Wikipedia:Copying text from other sources*

If editors choose to add material to an article on behalf of a COI or paid editor, they must provide attribution for the text in the edit summary. The edit summary should include the name of the COI or paid editor, a link to the draft or edit request, and that the edit contains a COI or paid contribution. For example:

Shortcuts
WP:COIATTRIBUTE
WP:PAIDATTRIBUTE

```
Text inserted on behalf of paid editor User:X; copied from [[Draft:Paid
draft]].
```

or you can also use the following format, from text requested in a talk page,

```
Edit made due to [[WP:COI]] edit request by User:SVeatch; copied or adapted
from "Revisions to Infobox, Introduction and History" at
[[Special:Permalink/1213729307]]
```

The permalink helps avoid broken links when sections are archived.

This transparency helps editors and readers to determine the extent of COI influence on the article. It also complies with copyright requirements.

### Paid editors on talk pages  [ edit ]

Paid editors must respect the volunteer nature of the project and keep discussions concise. When proposing changes to an article, they should describe the suggested modifications and explain why the changes should be made. Any changes that may be contentious, such as removal of negative text, should be highlighted.

Shortcuts
WP:COITALK
WP:PAYTALK

Before being drawn into long exchanges with paid editors, volunteers should be aware that paid editors may be submitting evidence of their talk-page posts to justify their salaries or fees. No editor should be expected to engage in long or repetitive discussions with someone who is being paid to argue with them.

Document title: Wikipedia:Conflict of interest - Wikipedia
Capture URL: https://en.wikipedia.org/wiki/Wikipedia:Conflict_of_interest
Capture timestamp (UTC): Thu, 10 Oct 2024 20:58:05 GMT

Text
○ Small
● Standard
○ Large

Width
● Standard
○ Wide

Color (beta)
○ Automatic
● Light
○ Dark

describe the suggested modifications and explain why the changes should be made. Any changes that may be contentious, such as removal of negative text, should be highlighted.

Before being drawn into long exchanges with paid editors, volunteers should be aware that paid editors may be submitting evidence of their talk-page posts to justify their salaries or fees. No editor should be expected to engage in long or repetitive discussions with someone who is being paid to argue with them.

Editors who refuse to accept a consensus by arguing *ad nauseam* may find themselves in violation of the guideline against disruptive editing.

## Copyright of paid contributions  [ edit ]

See also: *Work for hire*

Editors are reminded that any text they contribute to Wikipedia, assuming they own the copyright, is irrevocably licensed under a Creative Commons-Attribution-Sharealike license and the GNU Free Documentation License. Content on Wikipedia, including article drafts and talk-page comments, can be freely copied and modified by third parties for commercial and non-commercial use, with the sole requirement that it be attributed to Wikipedia contributors.

| Shortcuts |
| --- |
| **WP:COICOPYRIGHT** |
| **WP:PAIDCOPYRIGHT** |

Paid editors must ensure that they own the copyright of text they have been paid to add to Wikipedia; otherwise, they are unable to release it. A text's author is normally assumed to be the copyright holder. Companies sometimes provide paid editors with text written by someone else. Alternatively, a paid editor might write text for Wikipedia within the scope of their employment (a "work for hire"), in which case copyright resides with the employer.

Where there is doubt that the paid editor owns the copyright, they (or the employer or author) are advised to forward a release from the copyright holder to the Volunteer Response Team (`permissions-en@wikimedia.org`). See WP:PERMISSION for how to do this and Wikipedia:Declaration of consent for all enquiries for a sample letter.

If editors choose to add material to an article on behalf of a paid editor, they must provide attribution for the text in the edit summary. See WP:COIATTRIBUTE for how to do this.

## Covert advertising  [edit]

See also: *Wikipedia:Reliable sources § Sponsored content*

| | This section in a nutshell: Avoid hidden advertising. | Shortcuts |
| --- | --- | --- |
| | | **WP:COVERT** |
| | | **WP:NOHIDDENADS** |

### US: Federal Trade Commission, state law, and native advertising  [ edit ]

See also: *Native advertising*, *Consumer protection*, and *Direct-to-consumer advertising*

All editors are expected to follow United States law on undisclosed advertising, which is described by the Federal Trade Commission (FTC) at *Endorsement Guidelines* and *Dot Com Disclosures*. The FTC regards advertising as deceptive if it mimics a content format, such as a news report, that appears to come from an independent, impartial source:



> Marketers and publishers are using innovative methods to create, format, and deliver digital advertising. One form is "native advertising", content that bears a similarity to the news, feature articles, product reviews, entertainment, and other material that surrounds it online. ...
>
> In digital media, native ads often resemble the design, style, and functionality of the media in which they are disseminated. ... The more a native ad is similar in format and topic to content on the publisher's site, the more likely that a disclosure will be necessary to prevent deception. —Federal Trade Commission, 2015

(Top)

> Wikipedia's position

> How to disclose a COI

> What is conflict of interest?

> Dealing with edit requests from COI or paid editors

Copyright of paid contributions

**Covert advertising**

> Other categories of COI

> Miscellaneous

> How to handle conflicts of interest

See also

Further reading

content that bears a similarity to the news, feature articles, product

In digital media, native ads often resemble the design, style, and functionality of the media in which they are disseminated. ... The more a native ad is similar in format and topic to content on the publisher's site, the more likely that a disclosure will be necessary to prevent deception. —Federal Trade Commission, 2015

To judge whether an ad is deceptive under the Federal Trade Commission Act of 1914, the FTC considers "both what the ad says and the format it uses to convey that information ... Advertisements or promotional messages are deceptive if they convey to consumers expressly or by implication that they're independent, impartial, or from a source other than the sponsoring advertiser ...".

State law may have similar prohibitions. While the FTC law may apply only to interstate and foreign commerce, state law applies to intrastate commerce and must be obeyed. At least one state court case found liability for an ad disguised as editorial content.[*citation needed*]

### European fair-trading law  [ edit ]

> *See also: Unfair Commercial Practices Directive*

In 2012 the Munich Oberlandesgericht court ruled that if a company or its agents edit Wikipedia with the aim of influencing customers, the edits constitute covert advertising, and as such are a violation of European fair-trading law. The ruling stated that readers cannot be expected to seek out user and talk pages to find editors' disclosures about their corporate affiliation.

### UK Advertising Standards Authority  [ edit ]

The Advertising Standards Authority (ASA) in the UK found in 2012 that the content of tweets from two footballers had been "agreed with the help of a member of the Nike marketing team". The tweets were not clearly identified as Nike marketing communications and were therefore in breach of the ASA's code.

### Advertising Standards Canada  [ edit ]

The Canadian Code of Advertising Standards, administered by Advertising Standards Canada, states: "No advertisement shall be presented in a format or style that conceals the fact that it is an advertisement."

## Other categories of COI  [ edit ]

### Legal and other disputes  [ edit ]

> *Further information: WP:BLPCOI*

The biographies of living persons policy says: "[A]n editor who is involved in a significant controversy or dispute with another individual – whether on- or off-wiki – or who is an avowed rival of that individual, should not edit that person's biography or other material about that person, given the potential conflict of interest."

| Shortcuts |
| --- |
| **WP:COIBLP** |
| **WP:COILEGAL** |

Similarly, editors should not write about court cases in which they or those close to them have been involved, nor about parties or law firms associated with the cases.

### Campaigning, political  [ edit ]

> *See also: WP:ADVOCACY*

| Shortcuts |
| --- |
| **WP:COICAMPAIGN** |
| **WP:COIPOLITICAL** |

Activities regarded by insiders as simply "getting the word out" may appear promotional or propagandistic to the outside world. If you edit articles while involved with campaigns in the same area, you may have a conflict of interest. Political candidates and their staff should not edit articles about themselves, their supporters, or their opponents. Government employees should not edit articles about their agencies, government, political party, political opponents, or controversial political topics.

### Text

○ Small

● Standard

○ Large

### Width

● Standard

○ Wide

### Color (beta)

○ Automatic

● Light

○ Dark

Content (Top)

> Wikipedia's position
> How to disclose a COI
> What is conflict of interest?
> Dealing with edit requests from COI or paid editors
  Copyright of paid contributions
> Covert advertising
> **Other categories of COI**
> Miscellaneous
> How to handle conflicts of interest
  See also
  Further reading

appear promotional or propagandistic to the outside world. If you edit articles while involved with campaigns in the same area, you may have a conflict of interest. Political candidates and their staff should not edit articles about themselves, their supporters, or their opponents. Government employees should not edit articles about their agencies, government, political party, political opponents, or controversial political topics.

Shortcuts
WP:COIPOLITICAL

## Writing about yourself, family, friends  [ edit ]

*"WP:COS" redirects here. For the "credible claim of significance" essay, see Wikipedia:Credible claim of significance.*
*Further information: Wikipedia:Autobiography and WP:BLPCOI*

You should generally refrain from creating articles about yourself, or anyone you know, living or dead, unless through the Articles for Creation process. If you have a personal connection to a topic or person with an existing article, you are advised to refrain from editing that article directly and to provide full disclosure of the connection if you comment about the article on talk pages or in other discussions. Requests for updates on an article about yourself or someone with whom you have a personal connection can be made on the article's talk page by following the instructions at WP:COIREQ.

Shortcuts
WP:COISELF
WP:SELFPROMOTE

An exception to not editing an article about yourself or someone you know is made if the article contains defamation or a serious error that needs to be corrected quickly. If you do make such an edit, please follow it up with an email to WP:VRT, Wikipedia's volunteer response team, or ask for help on WP:BLPN, our noticeboard for articles about living persons, or the talk page of the article in question.

## Citing yourself  [ edit ]

*"WP:SELFCITE" redirects here. For Wikipedia citing itself, see WP:CIRCULAR.*
*See also: WP:MEDCOI*

Shortcut
WP:SELFCITE

Using material you have written or published is allowed within reason, but only if it is relevant, conforms to the content policies, including WP:SELFPUB, and is not excessive. Citations should be in the third person and should not place undue emphasis on your work. You will be permanently identified in the page history as the person who added the citation to your own work. When in doubt, defer to the community's opinion: propose the edit on the article's talk page and allow others to review it. However, adding numerous references to work published by yourself and none by other researchers is considered to be a form of spamming.

## Cultural sector  [ edit ]

*"WP:CURATOR" redirects here. For the tool used by Wikipedia:New pages patrol, see Wikipedia:Page Curation.*
*Further information: Wikipedia:GLAM, Wikipedia:Advice for the cultural sector, and Wikipedia:The Wikipedia Library/Cultural Professionals*

Shortcut
WP:CURATOR

Museum curators, librarians, archivists, and similar are encouraged to help improve Wikipedia, or to share their information in the form of links to their resources. If a link cannot be used as a reliable source, it may be placed under further reading or external links if it complies with the external links guideline. Bear in mind that Wikipedia is not a mirror or a repository of links, images, or media files.

See also WP:Expert editors.

## Wikipedians in residence  [ edit ]

There are forms of paid editing that the Wikimedia community regards as acceptable. These include Wikipedians in residence (WiRs)—Wikipedians who may be paid to collaborate with mission-aligned organizations, such as galleries, libraries, archives, and museums. WiRs must not engage in public relations or

Shortcut
WP:WIRCOI

(Top)

Wikipedia's position

How to disclose a COI

What is conflict of interest?

Dealing with edit requests from COI or paid editors

Copyright of paid contributions

Covert advertising

Other categories of COI

Miscellaneous

How to handle conflicts of interest

See also

Further reading

### Wikipedians in residence  [ edit ]

There are forms of paid editing that the Wikimedia community regards as acceptable. These include Wikipedians in residence (WiRs)—Wikipedians who may be paid to collaborate with mission-aligned organizations, such as galleries, libraries, archives, and museums. WiRs must not engage in public relations or marketing for their organization in Wikipedia, and they should operate within the bounds defined by Core characteristics of a Wikipedian in Residence at Wikimedia Outreach. They must work closely with a Wikipedia project or the general Wikipedia community, and are required to identify their WiR status on their user page and on talk pages related to their organization when they post there.

Shortcut
**WP:WIRCOI**

### Reward board  [ edit ]

Another example of acceptable paid editing is the reward board, where editors can post incentives, usually to raise articles to featured-article or good-article status. If you participate in this, transparency and neutrality are key.

## Miscellaneous  [ edit ]

### Solicitations by paid editors  [ edit ]

In any solicitation sent to a prospective client, paid editors should disclose the following information:

- Paid editors do not represent the Wikimedia Foundation nor the Wikipedia editing community, and they have no authority beyond that of any volunteer editor.
- Paid editors must disclose their employer, client, and affiliations on Wikipedia. There is no confidentiality for the client.
- Paid edits may be reviewed and revised in the normal course of work on Wikipedia. Neither the client nor the paid editor own the article.
- Paid editors cannot guarantee any outcome for an article on Wikipedia. It can be revised or deleted by other editors at any time.

Providing a client with a link to this section is appropriate disclosure if it is done in a neutral and non-deceptive manner.

- Paid editors must also provide a link to their user page which includes a declaration of their paid editing status. If an external website claims that a particular Wikipedia editor works for them, but that editor's user page has no such declaration, this is likely to indicate that the website is impersonating that editor.

If you received a solicitation from a paid editor that does not include this information, we recommend that you not do business with them. They are not following our policies and guidelines.

### Beware of scams  [ edit ]

*Further information: Wikipedia:Articles for creation/Scam warning*

Shortcut
**WP:BEWARESCAM**

Some solicitations from paid editors have been linked to fraud; see for example Operation Orangemoody. A large number of businesses claim to offer editing services, but some of these are scams. If someone claims that experienced editors work for them, ask them for the user names of those editors and check the corresponding editor user pages for a paid-contribution disclosure; its absence likely indicates that the claim is false. Offers to guarantee that a page will be saved from deletion, in return for significant sums of money, are always fraudulent, as are offers to use special privileges on Wikipedia.

If you think you've received a fraudulent solicitation, please forward it to paid-en-wp@wikipedia.org for investigation.

### Law of unintended consequences  [ edit ]

*Further information: Wikipedia:Wikipedia is in the real world*

**Content**

(Top)

› Wikipedia's position

› How to disclose a COI

› What is conflict of interest?

› Dealing with edit requests from COI or paid editors

Copyright of paid contributions

› Covert advertising

› Other categories of COI

› **Miscellaneous**

› How to handle conflicts of interest

See also

Further reading

If you think you've received a fraudulent solicitation, please forward it to paid-en-wp@wikipedia.org for investigation.

## Law of unintended consequences  [ edit ]

*Further information: Wikipedia:Wikipedia is in the real world*

Once an article is created about yourself, your group, or your company, you have no right to control its content, or to delete it outside the normal channels. If there is anything publicly available on a topic that you would *not* want to have included in an article, it will probably find its way there eventually.

> Shortcut
> **WP:LUC**

## No shared accounts, no company accounts  [ edit ]

*Further information: WP:NOSHARE and WP:ORGNAME*

Do not create a shared organizational account, or use the name of an organization as the account name. The account is yours, not your employer's.

## Making uncontroversial edits  [ edit ]

Editors who have a general conflict of interest may make unambiguously uncontroversial edits (but see WP:FINANCIALCOI). They may:



> Shortcuts
> **WP:COIADVICE**
> **WP:COIU**

1. remove spam and unambiguous vandalism,
2. remove unambiguous violations of the biography of living persons policy,
3. fix spelling, grammatical, or markup errors,
4. repair broken links,
5. remove their own COI edits, and
6. add independent reliable sources when another editor has requested them, although it is better to supply them on the talk page for others to add.

If another editor objects for any reason, it is not an uncontroversial edit. Edits not covered by the above should be discussed on the article's talk page. If an article has few uninvolved editors, ask at the talk page of a related WikiProject or at the COI noticeboard. See also WP:COITALK.

## Supplying photographs and media files  [ edit ]

Editors with a COI are encouraged to upload high-quality media files that are appropriately licensed for Wikipedia and that improve our coverage of a subject. For more information, follow the instructions at Commons. In some cases, the addition of media files to an article may be an uncontroversial edit that editors with a COI can make directly, but editors should exercise discretion and rely on talk pages when images may be controversial or promotional. If the addition of an image is challenged by another editor, it is controversial.

The use of non-free contents are restricted. Generally, using press photos or images provided by client who wish to feature them in the article but unwilling to irrevocably release the copyright under Creative Commons is unacceptable. Editors may not upload images provided by client for "Wikipedia article purpose only" and falsely claim they're licensed under CC BY-SA, as such photos are fundamentally incompatible with free content principles. Only the copyright owner or their authorized representatives may grant permission to use a work under a Creative Commons license, not the photographed subject or their public relations agent. If the same image is found copyrighted elsewhere prior to the upload date, it may be removed as a copyright violation. If you are the copyright owner and want to release content to Creative Commons for use on Wikipedia, see Commons:Volunteer Response Team § Licensing images: when do I contact VRT?.

## How to handle conflicts of interest  [ edit ]

### Advocacy, noticeboards  [ edit ]

*Main pages: Wikipedia:Neutral point of view/Noticeboard and Wikipedia:Reliable sources/Noticeboard*

**Appearance**  hide

Text

○ Small

● Standard

○ Large

Width

● Standard

○ Wide

Color (beta)

○ Automatic

● Light

○ Dark

(Top)

> Wikipedia's position

> How to disclose a COI

> What is conflict of interest?

> Dealing with edit requests from COI or paid editors

   Copyright of paid contributions

> Covert advertising

> Other categories of COI

> Miscellaneous

> **How to handle conflicts of interest**

   See also

   Further reading

How to handle conflicts of interest   [ edit ]

## Advocacy, noticeboards   [ edit ]

*Main pages: Wikipedia:Neutral point of view/Noticeboard and Wikipedia:Reliable sources/Noticeboard*

If a user's edits lead you to believe that they might have a COI (that is, if they have an "apparent COI"), and there has been no COI disclosure, consider first whether the issue may be simple advocacy. Most advocacy does not involve COI. Whether an editor is engaged in advocacy should first be addressed at the user's talk page, then at WP:NPOVN, the neutral-point-of-view noticeboard. The appropriate forum for concerns about sources is WP:RSN, the reliable-sources noticeboard. If there are concerns about sockpuppets or meatpuppets, please bring that concern to WP:SPI.

## Reporting to the conflict of interest noticeboard   [ edit ]

*Main page: Wikipedia:Conflict of interest/Noticeboard*

If you believe an editor has an undisclosed COI and is editing in violation of this guideline, raise the issue in a civil manner on the editor's talk page, which is the first step in resolving user-conduct issues, per the dispute resolution policy, citing this guideline. If that fails to resolve the issue, such as when an editor has repeatedly added problematic material over an extended period, then open a discussion at the conflict of interest noticeboard (COIN). This also applies to a disclosed COI that is causing a problem: for example, an acknowledged BLP subject who is editing their own BLP.

| Shortcut |
| --- |
| **WP:COICOIN** |

During the COIN discussion, avoid making disparaging remarks about the user in question, their motives or the subject of the article(s).

Post whatever public evidence you have to support that there is a COI, or that it is causing a problem, in the form of edits by that user or information the user has posted about themselves. Do not post private information; see WP:OUTING, which is policy, and the section below, "Avoid outing".

If private information must be shared to resolve a COI issue, it may be emailed to *paid-en-wp@wikipedia.org*. Follow the advice in WP:OUTING: "Only the minimum information necessary should be conveyed and the minimum number of people contacted." The priority should be to avoid unnecessary privacy violations.

## Avoid outing   [ edit ]

*Further information: Wikipedia:Harassment § Posting of personal information, and Wikipedia:Wikimedia Foundation statement on paid editing and outing*

| Shortcut |
| --- |
| **WP:AVOIDOUTING** |

When investigating COI editing, the policy against harassment takes precedence. It requires that Wikipedians not reveal the identity of editors against their wishes. Examine editors' behavior instead and seek advice by email if necessary. Do not ask a user if they *are* somebody; instead one can ask if they have an undisclosed connection to that person. If revealing private information is needed to resolve COI editing, and if the issue is serious enough to warrant it, editors can **email** *paid-en-wp@wikipedia.org*. Also see the section "Reporting to the conflict of interest noticeboard" above.

## Dealing with single-purpose accounts   [ edit ]

*Further information: Wikipedia:Blocking policy § Disruption-only, and Wikipedia:Single-purpose account*

Accounts that appear to be single-purpose, existing for the sole or primary purpose of promotion or denigration of a person, company, product, service, website, organization, etc., and whose postings are in apparent violation of this guideline, should be made aware of this guideline and warned not to continue their problematic editing. If the same pattern of editing

(Top)

Wikipedia's position

How to disclose a COI

What is conflict of interest?

Dealing with edit requests from COI or paid editors

Copyright of paid contributions

Covert advertising

Other categories of COI

Miscellaneous

How to handle conflicts of interest

See also

Further reading

*Further information: Wikipedia:Blocking policy § Disruption only, and Wikipedia:Single-purpose account*

Accounts that appear to be single-purpose, existing for the sole or primary purpose of promotion or denigration of a person, company, product, service, website, organization, etc., and whose postings are in apparent violation of this guideline, should be made aware of this guideline and warned not to continue their problematic editing. If the same pattern of editing continues after the warning, the account may be blocked.

## Templates  [ edit ]

Relevant article talk pages may be tagged with `{{connected contributor}}` or `{{connected contributor (paid)}}`. The article itself may be tagged with `{{COI}}`. A section of an article can be tagged with `{{COI|section}}`.

Other templates include:

- `{{uw-coi}}` (to be placed on user Talk pages to warn editors that they may have a conflict of interest)
- `{{uw-coi-username}}` (another Talk page warning, this one for editors whose username appears to violate the WP:Usernames policy)
- `{{COI editnotice}}` (this template goes on article talk pages and gives instructions to COI editors on how to submit edit requests to the article)
- `{{UserboxCOI}}` (for users to self-declare on their own Userpages those articles with which they have a conflict of interest, one such template per article)

## See also  [ edit ]

**Wikimedia Foundation**

- Terms of Use#4. Refraining from Certain Activities
- Sue Gardner, "Press releases/Sue Gardner statement paid advocacy editing" ⧉, Wikimedia Foundation, 21 October 2013.

**Contact us**

- Wikipedia:Contact us/Article subjects

**Article**

- Conflict of interest editing on Wikipedia

**Policies**

- Wikipedia:Paid-contribution disclosure
- Wikipedia:Username policy
- Wikipedia:What Wikipedia is not

**Wikiprojects**

- Wikipedia:WikiProject Integrity

**Miscellaneous**

- Wikipedia:About you
- Wikipedia:The Wikipedia Library/Cultural Professionals
- Category:Wikipedia conflict of interest edit requests (lists edits for review where proposer has a conflict of interest)
- Category:Wikipedia articles with possible conflicts of interest
- Wikipedia:Reward board
- Wikipedia:FAQ/Article subjects
- User:COIBot
- Users creating autobiographies ⧉ (an edit filter)
- Statement on Wikipedia from participating communications firms, June 2014

**Essays**

Document title: Wikipedia:Conflict of interest - Wikipedia
Capture URL: https://en.wikipedia.org/wiki/Wikipedia:Conflict_of_interest
Capture timestamp (UTC): Thu, 10 Oct 2024 20:58:05 GMT

(Top)

› Wikipedia's position

› How to disclose a COI

› What is conflict of interest?

› Dealing with edit requests from COI or paid editors

Copyright of paid contributions

› Covert advertising

› Other categories of COI

› Miscellaneous

› How to handle conflicts of interest

**See also**

Further reading

- Wikipedia:Reward board
- Wikipedia:FAQ/Article subjects
- User:COIBot
- Users creating autobiographies 🔗 (an edit filter)
- Statement on Wikipedia from participating communications firms, June 2014

**Essays**

- Wikipedia:Best practices for editors with close associations
- Wikipedia:Conflicts of interest (medicine)
- Wikipedia:Deceptive advertising
- Wikipedia:Don't cry COI
- Wikipedia:For publicists publicizing a client's work
- Wikipedia:Ghostwriting
- Wikipedia:Help available for editors with conflicts of interest
- Wikipedia:Independent sources
- Wikipedia:Paid editing (essay)
- Wikipedia:Plain and simple conflict of interest guide
- Wikipedia:Public relations (essay)
- Wikipedia:Search engine optimization
- Wikipedia:Wikipedia is in the real world

**Historical**

- Wikipedia:WikiProject Cooperation (defunct)
- Wikipedia community discussion on paid editing, 2009, sparked by discovery that admin/crat/OTRS editor was editing for pay
- Wikipedia community discussion on conflict of interest, 2012.
- Wikipedia:COI+ (failed proposal, 21 February 2013)
- Commercial editing (failed policy proposal turned into an essay, November 2013)
- No paid advocacy (failed policy proposal, November 2013)
- Paid editing policy proposal (failed policy proposal, November 2013)
- Conflict of interest limit (failed policy proposal, December 2013)

## Further reading [ edit ]

*(chronological)*



Wikimedia Commons has media related to **Conflict-of-interest editing on Wikipedia**.

- Davis, Michael (1982). "Conflict of Interest" 🔗, *Business and Professional Ethics Journal*, 1(4), pp. 17–27 (influential). doi:10.5840/bpej1982149 🔗
- Luebke, Neil R. (1987). "Conflict of Interest as a Moral Category," *Business & Professional Ethics Journal*, 6, pp. 66–81. JSTOR 27799930 🔗 (influential)
- Davis, Michael (Winter 1993). "Conflict of Interest Revisited," *Business & Professional Ethics Journal*, 12(4), pp. 21–41. JSTOR 27800924 🔗
- Stark, Andrew (2003). *Conflict of Interest in American Public Life* 🔗, Harvard University Press.
- Carson, Thomas L. (January 2004). "Conflicts of Interest and Self-Dealing in the Professions: A Review Essay," *Business Ethics Quarterly*, 14(1), pp. 161–182. JSTOR 3857777 🔗
- Krimsky, Sheldon (2006). "The Ethical and Legal Foundations of Scientific 'Conflict of Interest'" 🔗, in Trudo Lemmings and Duff R. Waring (eds.), *Law and Ethics in Biomedical Research: Regulation, Conflict of Interest, and Liability*, University of Toronto Press.
- McDonald, Michael (23 April 2006). "Ethics and Conflict of Interest" 🔗, The W. Maurice Young Center for Applied Ethics, University of British Columbia.



| V · T · E | **Wikipedia key policies and guidelines (?)** | | [show] |
|---|---|---|---|
| V · T · E | **Conflict of interest** | | [hide] |
| **Issues** | Chinese wall · Conflict of interest in the healthcare industry · Conflicts of interest on Wikipedia · Funding bias · Insider trading · Judicial disqualification · Nepotism · Regulatory capture · Self-dealing · Self-regulation · State capture · Shill | | |
| **Related** | AllTrials · Arm's length principle · Bias · Business ethics · Cochrane · Corruption · *Cui bono* · Follow the money · Legal ethics · Lobbying · Medical ethics (cases) · Medical ghostwriter · Moral hazard · Pharmaceutical marketing · Pharmaceutical sales representative · Pharmacovigilance · Political ethics · Political bias · Revolving door · | | |

- Wikipedia:WikiProject Cooperation (defunct)
- Wikipedia community discussion on paid editing, 2009, sparked by discovery that admin/crat/OTRS editor was editing for pay
- Wikipedia community discussion on conflict of interest, 2012.
- Wikipedia:COI+ (failed proposal, 21 February 2013)
- Commercial editing (failed policy proposal turned into an essay, November 2013)
- No paid advocacy (failed policy proposal, November 2013)
- Paid editing policy proposal (failed policy proposal, November 2013)
- Conflict of interest limit (failed policy proposal, December 2013)

## Further reading  [ edit ]

*(chronological)*

- Davis, Michael (1982). "Conflict of Interest" 🔗, *Business and Professional Ethics Journal*, 1(4), pp. 17–27 (influential). doi:10.5840/bpej1982149 🔗



Wikimedia Commons has media related to *Conflict-of-interest editing on Wikipedia*.

- Luebke, Neil R. (1987). "Conflict of Interest as a Moral Category," *Business & Professional Ethics Journal*, 6, pp. 66–81. JSTOR 27799930 🔗 (influential)
- Davis, Michael (Winter 1993). "Conflict of Interest Revisited," *Business & Professional Ethics Journal*, 12(4), pp. 21–41. JSTOR 27800924 🔗
- Stark, Andrew (2003). *Conflict of Interest in American Public Life* 🔗, Harvard University Press.
- Carson, Thomas L. (January 2004). "Conflicts of Interest and Self-Dealing in the Professions: A Review Essay," *Business Ethics Quarterly*, 14(1), pp. 161–182. JSTOR 3857777 🔗
- Krimsky, Sheldon (2006). "The Ethical and Legal Foundations of Scientific 'Conflict of Interest'" 🔗, in Trudo Lemmings and Duff R. Waring (eds.), *Law and Ethics in Biomedical Research: Regulation, Conflict of Interest, and Liability*, University of Toronto Press.
- McDonald, Michael (23 April 2006). "Ethics and Conflict of Interest" 🔗, The W. Maurice Young Center for Applied Ethics, University of British Columbia.



| | **Wikipedia key policies and guidelines (?)** | [show] |
|---|---|---|

| v · t · e | **Conflict of interest** | [hide] |
|---|---|---|
| **Issues** | Chinese wall · Conflict of interest in the healthcare industry · Conflicts of interest on Wikipedia · Funding bias · Insider trading · Judicial disqualification · Nepotism · Regulatory capture · Self-dealing · Self-regulation · State capture · Shill | |
| **Related** | AllTrials · Arm's length principle · Bias · Business ethics · Cochrane · Corruption · *Cui bono* · Follow the money · Legal ethics · Lobbying · Medical ethics (cases) · Medical ghostwriter · Moral hazard · Pharmaceutical marketing · Pharmaceutical sales representative · Pharmacovigilance · Political ethics · Political bias · Revolving door · Sponsorship of continuing medical education | |
| **Law** | *Nemo iudex in causa sua* · *R v Bow Street Metropolitan Stipendiary Magistrate, ex parte Pinochet (No 2)* · *R v Neil* · *R v Sussex Justices, ex parte McCarthy* | |
| **Media** | *Bad Pharma* · *Big Pharma* · *Inside Job* · *Side Effects* · *Who Killed the Electric Car?* · *Taken for a Ride* | |
| | 🔘 Conflict of interest (category) · 🔘 Conflicts of interest on Wikipedia (category) | |

| Categories: Wikipedia behavioral guidelines · Wikipedia notability |
|---|
| Wikipedia conflict of interest guidelines |

---

This page was last edited on 23 September 2024, at 10:56 (UTC).

Text is available under the Creative Commons Attribution-ShareAlike License 4.0; additional terms may apply. By using this site, you agree to the Terms of Use and Privacy Policy. Wikipedia® is a registered trademark of the Wikimedia Foundation, Inc., a non-profit organization.

Privacy policy    About Wikipedia    Disclaimers    Contact Wikipedia    Code of Conduct    Developers    Statistics    Cookie statement    Mobile view




Document title: Wikipedia:Conflict of interest - Wikipedia
Capture URL: https://en.wikipedia.org/wiki/Wikipedia:Conflict_of_interest
Capture timestamp (UTC): Thu, 10 Oct 2024 20:58:05 GMT

# EXHIBIT A-14

Page 1

```
 1                UNITED STATES DISTRICT COURT
 2               SOUTHERN DISTRICT OF MISSISSIPPI
 3                      NORTHERN DIVISION
 4
 5   PHI THETA KAPPA HONOR SOCIETY,      )
                                         )
 6        Plaintiff/Counter-Defendant    )   Civil Action No.
                                         )   3:22-cv-00208-CWR-
 7   v.                                  )   RPM
                                         )
 8   HONORSOCIETY.ORG, INC.,             )
                                         )
 9        Defendant/Counter-Plaintiff    )
          /Third-Party Plaintiff         )
10                                       )
     HONOR SOCIETY FOUNDATION, INC.,     )
11                                       )
          Defendant                      )
12   _____)
                                         )
13   And Related Cross-Action.           )
     _____)
14
15
16                  VIDEOTAPED DEPOSITION OF
17                         DAVID ASARI
18                   SHERMAN OAKS, CALIFORNIA
19                        MAY 2, 2024
20
21
22
23
24   REPORTED BY:      ELIZABETH TORSTENBO, CSR NO. 9048, RPR
25   FILE NO.:         6679279
```

Page 2

```
 1              UNITED STATES DISTRICT COURT
 2            SOUTHERN DISTRICT OF MISSISSIPPI
 3                  NORTHERN DIVISION
 4
 5   PHI THETA KAPPA HONOR SOCIETY,      )
                                         )
 6        Plaintiff/Counter-Defendant )   Civil Action No.
                                         )   3:22-cv-00208-CWR-
 7   v.                                  )   RPM
                                         )
 8   HONORSOCIETY.ORG, INC.,             )
                                         )
 9        Defendant/Counter-Plaintiff )
          /Third-Party Plaintiff         )
10                                       )
     HONOR SOCIETY FOUNDATION, INC.,     )
11                                       )
          Defendant                      )
12   _____)
                                         )
13   And Related Cross-Action.           )
     _____)
14
15
16        Deposition of DAVID ASARI, taken on behalf of
17   Plaintiff, at 15260 Ventura Boulevard, 20th Floor,
18   Sherman Oaks, California, commencing at 9:05 a.m.,
19   Thursday, May 2, 2024, before Elizabeth Torstenbo, CSR
20   No. 9048, RPR.
21
22
23
24
25
```

Page 227

1    evidence.

2    BY MR. POLAK:

3         Q.    Well, I'll just ask you more generally,

4    then.  What do you recall Mr. Moradian saying about the

5    records request that you were discussing?

6         A.    I think we were talking, generally

7    speaking, and we -- we both were talking about what --

8    what information we'd like to get.  We'd like to do a

9    public records request because I have experience doing

10   that.  And we thought getting GPA statistics would be a

11   good idea from -- from their -- from schools.  And

12   then, also, generally, what's -- what we would be

13   asking for in terms of the requests directly with PTK.

14        Q.    Why would it be a good idea to get this

15   information from schools, the GPA statistics, at that

16   time?

17        A.    I think we -- we wanted to get an idea of

18   what the GPA statistics were.

19        Q.    But why?  You hadn't ever sent a similar

20   request out asking for this level of detail of GPA

21   statistics before, had you?

22        A.    Not this exact request.

23        Q.    Yeah.  So why?  Why then, in March of

24   2024?  You'd never done it before.  Why then?

25        A.    We were concerned that -- that, possibly,

Page 228

1    the GPA -- we just wanted -- I think we just wanted to

2    make sure that --

3         Q.    You were going to start -- finish the

4    sentence there.  You were concerned the GPA what?

5         A.    Well, we wanted to get an idea of if

6    PTK's claims of 10 percent were -- being in the top

7    10 percent were correct.  So that would be --

8         Q.    And that's something that you and

9    Mr. Moradian were talking about there at your son's

10   party was this litigation and the claims that PTK had

11   made in advertising; right?

12        A.    We weren't really talking about the

13   litigation.  We were just talking about if those claims

14   were correct.

15        Q.    Okay.  And so this GPA statistics request

16   emerged from that conversation; right?

17        A.    That's right.

18        Q.    Okay.  Let's look at the -- well, did you

19   talk about any other types of information that you

20   would want to get when you were having this

21   conversation with Mr. Moradian at your son's birthday

22   party?

23        A.    Not specifically.  We wanted to -- I think

24   the other part of the request is just communication

25   between the schools.  There was no real --

Page 328

1              THE VIDEOGRAPHER:  We are off the record at

2    6:39 p.m.

3

4              (TIME NOTED:  6:39 p.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 329

1          I, the undersigned, a Certified Shorthand

2    Reporter of the State of California, do hereby certify:

3          That the foregoing proceedings were taken

4    before me at the time and place herein set forth; that

5    any witnesses in the foregoing proceedings, prior to

6    testifying, were administered an oath; that a record of

7    the proceedings was made by me using machine shorthand

8    which was thereafter transcribed under my direction;

9    that the foregoing transcript is an true record of the

10   testimony given.

11          Further, that if the foregoing pertains to

12   the original transcript of a deposition in a Federal

13   Case, before completion of the proceedings, review of

14   the transcript [ ] was [ ] was not requested.

15          I further certify I am neither financially

16   interested in the action nor a relative or employee of

17   any attorney or any party to this action.

18          IN WITNESS WHEREOF, I have this date

19   subscribed my name.

20

21   DATED:  7th day of May, 2024.

22

23                    *Elizabeth Torstenbo*

                      ELIZABETH TORSTENBO, RPR

24                    CSR No. 9048

25

# EXHIBIT A-15

**Cost Report**

Phi Theta Kappa Society / Trademark Infringement

| Date | Description | Attorney | Orig Amt | Rev Amt | Vendor | Voucher | Check No. | Invoice | Narrative |
|------|-------------|----------|----------|---------|--------|---------|-----------|---------|-----------|
| 03/13/2024 | Westlaw search - in contract | 1079 | 25.00 | 0.00 | | 0 | 0 | 6304101 | WESTLAW CHARGES MARCH, 2024 |
| 03/13/2024 | Westlaw search - in contract | 2973 | 100.00 | 0.00 | | 0 | 0 | 6304101 | WESTLAW CHARGES MARCH, 2024 |
| 03/13/2024 | Westlaw search - in contract | 0983 | 89.23 | 0.00 | | 0 | 0 | 6304101 | WESTLAW CHARGES MARCH, 2024 |
| 03/17/2024 | Westlaw search - in contract | 0983 | 25.00 | 0.00 | | 0 | 0 | 6304101 | WESTLAW CHARGES MARCH, 2024 |
| 03/18/2024 | Westlaw search - in contract | 0983 | 267.68 | 0.00 | | 0 | 0 | 6304101 | WESTLAW CHARGES MARCH, 2024 |
| 03/19/2024 | Westlaw search - in contract | 0983 | 178.46 | 0.00 | | 0 | 0 | 6304101 | WESTLAW CHARGES MARCH, 2024 |
| 03/20/2024 | Westlaw search - in contract | 2973 | 150.00 | 0.00 | | 0 | 0 | 6304101 | WESTLAW CHARGES MARCH, 2024 |
| 03/21/2024 | Travel | JGPO | 400.00 | 400.00 | Jonathan G. Polak | 2861589 | 999105764 | 6304101 | Travel, Jonathan G. Polak, J. Polak receipt for flight for 3/27/2024 Evidentiary Hearing. |
| 03/21/2024 | Westlaw search - in contract | 2973 | 350.00 | 0.00 | | 0 | 0 | 6304101 | WESTLAW CHARGES MARCH, 2024 |
| 03/23/2024 | Westlaw search - in contract | 0983 | 25.00 | 0.00 | | 0 | 0 | 6304101 | WESTLAW CHARGES MARCH, 2024 |
| 03/24/2024 | Westlaw search - in contract | 0983 | 25.00 | 0.00 | | 0 | 0 | 6304101 | WESTLAW CHARGES MARCH, 2024 |
| 03/25/2024 | Westlaw search - in contract | 1079 | 1,175.00 | 0.00 | | 0 | 0 | 6304101 | WESTLAW CHARGES MARCH, 2024 |
| 03/26/2024 | Westlaw search - in contract | 1079 | 150.00 | 0.00 | | 0 | 0 | 6304101 | WESTLAW CHARGES MARCH, 2024 |
| 03/27/2024 | Deposition/transcript | JGPO | 829.25 | 829.25 | Candice Simmons Crane | 2867921 | 30351 | 6304101 | Deposition/transcript, Candice Simmons Crane, Payment for transcript of March 27, 2024 hearing. |
| 03/28/2024 | Travel | JGPO | 1,969.48 | 1,969.48 | Jonathan G. Polak | 2864219 | 999106142 | 6304101 | Travel, Jonathan G. Polak, J. Polak reimbursement for Westin Hotel stay March 25-28, 2024 for March 27, 2024 hearing. |
| 03/28/2024 | Travel | JGPO | 25.18 | 25.18 | Jonathan G. Polak | 2864220 | 999106142 | 6304101 | Travel, Jonathan G. Polak, J. Polak reimbursement for uber on March 28, 2024 from hotel to airport. |
| 04/01/2024 | Travel | 0960 | 1,610.68 | 0.00 | William Michael Etienne | 2864215 | 999106186 | 6330424 | [Delete] Travel, William Michael Etienne, Attorney Reimbursement for Travel Expense 25Mar2024 |
| 06/12/2024 | Westlaw search - in contract | 0983 | 50.00 | 0.00 | | 0 | 0 | 6376040 | WESTLAW CHARGES JUNE, 2024 |
| 07/06/2024 | Westlaw search - in contract | 0983 | 75.00 | 0.00 | | 0 | 0 | 6402281 | WESTLAW CHARGES JULY, 2024 |
| 07/11/2024 | Westlaw search - in contract | 0983 | 75.00 | 0.00 | | 0 | 0 | 6402281 | WESTLAW CHARGES JULY, 2024 |

| Date | Description | | Amount | Amount | | | | Notes |
|------|-------------|------|--------|--------|------|------|------|-------|
| 7/10/2024 | Travel | JGPO | 400.00 | 400.00 | Jonathan G. Polak | | | Airfare, Jonathan G. Polak, Reimbursement for flight from Indianapolis to Jackson, 7-12-24 Evidentiary Hearing |
| 7/12/2024 | Uber | JGPO | 67.31 | 67.31 | Jonathan G. Polak | | | Uber charges, Jonathan G. Polak, July Evidentiary Hearings |
| 7/12/2024 | Travel | JGPO | 548.97 | 548.97 | Jonathan G. Polak | | | Airfare, Jonathan G. Polak, Reimbursement for flight from Jackson to Indianapolis, 7-12-24 Evidentiary Hearing |
| 7/13/2024 | Travel | JGPO | 950.12 | 950.12 | Jonathan G. Polak | | | Travel, Jonathan G. Polak, Hotel Charge for 7-12-24 Evidentiary Hearing |
| 07/13/2024 | Deposition/transcript | JGPO | 286.20 | 286.20 | Teri Barker Norton, RMR, FCRR, RDR | 2901111 | 34821 | 6431362 | Deposition/transcript, Teri Barker Norton, RMR, FCRR, RDR, Evidentiary Hearing transcript, V. 1 (7/12/24) |
| 07/17/2024 | Federal Express | 9911 | 102.07 | 102.07 | Federal Express Corp | 2895327 | 8112575 | 6402281 | Federal Express Sent: 07/09/2024 FROM Taft Service Center, TO Mike Wallace, Airbill#: 777303067784 |
| 07/17/2024 | Federal Express | 9911 | 229.63 | 229.63 | Federal Express Corp | 2895327 | 8112575 | 6402281 | Federal Express Sent: 07/10/2024 FROM DeeAnn Cassady, TO Kelly S. Hatter, Airbill#: 777322449417 |
| 07/18/2024 | Deposition/transcript | JGPO | 1,452.00 | 1,452.00 | Teri Barker Norton, RMR, FCRR, RDR | 2901112 | 34821 | 6431362 | Deposition/transcript, Teri Barker Norton, RMR, FCRR, RDR, Evidentiary Hearing transcript, V. 2 (7/12/24) |
| 07/18/2024 | Travel | JGPO | 771.15 | 771.15 | Jonathan G. Polak | 2902373 | 999115046 | 6431362 | Travel, Jonathan G. Polak, Hotel Charge for 7-17-24 Evidentiary Hearing |
| 7/18/2024 | Airfare | JGPO | 400.00 | 400.00 | Jonathan G. Polak | | | | Airfare, Jonathan G. Polak, Reimbursement for flight from Jackson to Indianapolis, 7-17-27 Evidentiary Hearing |
| 07/19/2024 | Airfare | 0960 | 1,718.92 | 1,718.92 | William Michael Etienne | 2896072 | 999113446 | 6402281 | Airfare, William Michael Etienne, Attorney Travel Reimbursement for Wm Michael Etienne; Travel date July 11-13 and 16-19, 2024, arrival Jackson, MS.; TRO Hearing. |
| 07/19/2024 | Travel | 0960 | 1,406.78 | 1,406.78 | William Michael Etienne | 2896072 | 999113446 | 6402281 | Travel, William Michael Etienne, Hotel stays |
| 07/22/2024 | Westlaw search - out of contract | DRW | 5.39 | 0.00 | | 0 | 0 | 6402281 | WESTLAW CHARGES JULY, 2024 |
| 08/05/2024 | Westlaw search - in contract | 0983 | 1,004.10 | 0.00 | | 0 | 0 | 6431362 | WESTLAW CHARGES August, 2024 |
| 08/31/2024 | Westlaw search - in contract | DRW | 50.00 | 0.00 | | 0 | 0 | 6431362 | WESTLAW CHARGES August, 2024 |
| 09/09/2024 | Westlaw search - in contract | 0983 | 893.45 | 893.45 | | 0 | 0 | 0 | WESTLAW CHARGES September, 2024 |
| 09/10/2024 | Westlaw search - in contract | 0983 | 1,473.03 | 1,473.03 | | 0 | 0 | 0 | WESTLAW CHARGES September, 2024 |
| 09/11/2024 | Westlaw search - in contract | 0983 | 89.23 | 89.23 | | 0 | 0 | 0 | WESTLAW CHARGES September, 2024 |
| 09/16/2024 | Westlaw search - in contract | 1079 | 25.00 | 25.00 | | 0 | 0 | 0 | WESTLAW CHARGES September, 2024 |
| 09/17/2024 | Westlaw search - in contract | 1079 | 75.00 | 75.00 | | 0 | 0 | 0 | WESTLAW CHARGES September, 2024 |

| Date | Description | | Amount | Amount | Vendor | Ref | | | Notes |
|------|-------------|------|--------|--------|--------|------|------|------|-------|
| 09/17/2024 | Westlaw search - in contract | 0983 | 50.00 | 50.00 | | 0 | 0 | 0 | WESTLAW CHARGES September, 2024 |
| 09/18/2024 | Professional services | JGPO | 3,265.00 | 3,265.00 | Page Vault, Inc. | 2908116 | 0 | 0 | Professional services, Page Vault, Inc., preservation of Honor Society Foundation May and June blog posts with affidavit |
| 09/23/2024 | Westlaw search - in contract | 2369 | 175.00 | 175.00 | | 0 | 0 | 0 | WESTLAW CHARGES September, 2024 |
| | | | **23,033.31** | **17,602.77** | | | | | |

# EXHIBIT A-16

## Veritext, LLC - Midwest Region
Tel. 800-554-3376 Email: billing-midwest@veritext.com
Fed. Tax ID: 20-3132569



| | |
|---|---|
| Bill To: | Jonathan G. Polak<br>Taft Stettinius & Hollister LLP<br>One Indiana Square<br>Suite 3500<br>Indianapolis, IN, 46204 |

| | |
|---|---|
| **Invoice #:** | **7771876** |
| **Invoice Date:** | **10/10/2024** |
| **Balance Due:** | **$4,613.57** |

| **Case: Phi Theta Kappa Honor Society v. Honorsociety.Org Inc Et Al (3:22-cv-00309-cwr-rpm)** | **Proceeding Type: Depositions** |
|---|---|

Job #: 6946296    |    Job Date: 10/1/2024    |    Delivery: Expedited

| | |
|---|---|
| Location: | Los Angeles, CA |
| Billing Atty: | Jonathan G. Polak |
| Scheduling Atty: | Jonathan G. Polak | Taft Stettinius & Hollister LLP |

| Witness: Michael Moradian | Amount |
|---|---|
| Transcript Services | $1,731.45 |
| Transcript Services - Priority Request | $1,038.87 |
| Rough Draft | $589.05 |
| Professional Attendance | $715.00 |
| Exhibits | $25.20 |
| Logistics, Processing & Electronic Files | $25.00 |
| Virtual Services | $390.00 |
| Smart Summary - Over 100 Transcript Pages | $99.00 |

| Notes: | **Invoice Total:** | **$4,613.57** |
|---|---|---|
| | **Payment:** | **$0.00** |
| | **Credit:** | **$0.00** |
| | **Interest:** | **$0.00** |
| | **Balance Due:** | **$4,613.57** |

TERMS:  Payable upon receipt.  Accounts 30 days past due will bear a finance charge of 1.5% per month. Accounts unpaid after 90 days agree to pay all collection costs, including reasonable attorney's fees. Contact us to correct payment errors.  No adjustments will be made after 90 days. For more information on charges related to our services please consult http://www.veritext.com/services/all-services/services-information

---

| **Remit to:**<br>Veritext<br>P.O. Box 71303<br>Chicago IL 60694-1303<br>Fed. Tax ID: 20-3132569 | **Pay By ACH (Include invoice numbers):**<br>**A/C Name:** Veritext<br>**Bank Name:** BMO Harris Bank<br>**Account No:** 4353454 **ABA:** 071000288<br>**Swift:** HATRUS44 | **Invoice #:  7771876**<br><br>**Invoice Date:   10/10/2024**<br><br>**Balance Due:  $4,613.57** |
|---|---|---|

Pay by Credit Card: www.veritext.com