UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

| | |
|---|---|
| PHI THETA KAPPA HONOR SOCIETY, <br><br> Plaintiff/Counter-Defendant, <br><br> v. <br><br> HONORSOCIETY.ORG INC., <br><br> Defendant/Counter-Plaintiff <br><br> HONOR SOCIETY FOUNDATION, INC., <br><br> Defendant. | Civil Action No. 3:22-cv-00208-CWR-RPM |
| HONORSOCIETY.ORG INC., <br><br> Defendant/Counter-Plaintiff/Third-Party Plaintiff <br><br> v. <br><br> LYNN TINCHER-LADNER, <br><br> Third-Party Defendant. | |

**DECLARATION OF MICHAEL MORADIAN**

1

I, Michael Moradian, hereby declare, under 28 U.S.C. § 1746, as follows:

1. I am over 18 years of age, competent to testify to the matters stated herein, and make this declaration on the basis of personal knowledge.

2. I am the founder, President, Treasurer, and executive director of defendant HonorSociety.org Inc. as well as the President and Treasurer of defendant Honor Society Foundation, Inc. (together, "HonorSociety").

3. This declaration is filed in support of HonorSociety's response to Phi Theta Kappa Honor Society's Motion to Dismiss Pursuant to Rule 41(b) filed in this action at Docket No. 375 and 376.

4. On May 13, 2024, a former PTK employee, Wendy Flores, contacted HonorSociety by email. I did not initiate contact with Ms. Flores. She reached out on her own. Ms. Flores' email, a copy of which was produced by HonorSociety in discovery also appears as Exhibit A to Ms. Flores' declaration dated January 27, 2025 which was filed in support of HonorSociety's response to PTK's motion.

5. That same day I spoke with Ms. Flores for about an hour. We discussed the issues raised in her email relating to her views on the hostile work environment she and others experienced at PTK, including in particular what she described as abusive treatment by Dr. Lynn Tincher-Ladner, PTK's CEO. We also discussed the lawsuit between PTK and HonorSociety.

6. Ms. Flores, as with other former PTK employees I've spoken with, told me about Dr. Tincher-Ladner's abusive treatment of employees, including treatment relating to their departure from PTK. For example, Ms. Flores brought up former PTK CFO Steve Mulhollen who, according to Ms. Flores, Dr. Tincher-Ladner had derided and abused in connection with his departure from PTK. I heard similar accounts of Dr. Tincher-Ladner's treatment of Mr. Mulhollen from others as well.

7. During that call, Ms. Flores told me that she expected PTK, in particular Dr. Tincher-Ladner, to retaliate against former employees who came forward with information related to this lawsuit. I told her that it would be best for former employees concerned about

retaliation to obtain independent counsel of their choice so they could protect their own interests and not be silenced or intimidated by PTK or its litigation counsel.

8. But because I was also concerned about the burden of paying for an attorney should a former employee become involved in the case as a witness, I told Ms. Flores that HonorSociety would consider paying for the attorney fees if she or another former employee needed to do so to protect themselves.

9. At no point did I ever offer to pay or provide anything of value to Ms. Flores or any other former PTK employee. Nor did I ever indicate that whether HonorSociety would consider covering attorney fees was conditioned on the selection of an attorney, what testimony would be provided, or whether the person took any particular actions. Under no circumstances would I attempt to influence someone in that way and I have not done so at any point.

10. Following the May 13 call, I did not speak with Ms. Flores again until December 2024 when she was subpoenaed by PTK and decided to hire an attorney.

11. I understand that sometime after my May call with Ms. Flores she wrote to former PTK employee Christin Grissom in a text message that I was "determined to get" Dr. Tincher-Ladner "removed from office." I never told Ms. Flores that at any time. Nor did I ask her to tell Ms. Grissom that was my or HonorSociety's goal. Ms. Flores contacted Ms. Grissom on her own and I did not see that text message until it was produced by Ms. Grissom in discovery in December 2024.

12. Similarly, I understand that in November 2024 Ms. Flores sent a text message to another former PTK employee, Paige Rakestraw, in which Ms. Flores wrote that "This CEO, Mike, is out to destroy Lynn and remove her from her position". I never told Ms. Flores that I am out to "destroy" Dr. Tincher-Ladner or to "remove her from her position" or anything along those lines. That is not my goal and is not HonorSociety's goal. I did not ask Ms. Flores to tell that to Ms. Rakestraw and I did not see that text message until PTK filed its motion and supporting materials.

13. On June 14, 2024, HonorSociety received another email from a former PTK employee. Neither I nor anyone else at HonorSociety initiated this contact. This former employee used the pseudonym "Mr. Smiley" in an effort to remain anonymous and I will refer to her by that here as well, although I understand PTK knows her identity. A copy of that email is included in my email exchange with this person produced in discovery by HonorSociety and is Ex. A-7 to the Smoot Declaration. Similar to Ms. Flores, this person raised concerns about an abusive workplace and deceptive practices at PTK and suggested certain other former PTK employees that I should consider contacting for information about PTK's deceptive practices. I provided Mr. Smiley with my phone number and suggested a call.

14. On June 14, Mr. Smiley initiated a text message discussion with me. My text messages with Mr. Smiley have been produced in discovery, including the ones attached to the Smoot Declaration as Ex. 21 and Ex. 22.

15. In that exchange, I shared my view that PTK's lawsuit against HonorSociety was "Just Lynn [Tincher-Ladner] power tripping and spending nonprofit's money to fight her ego trip. No merit whatsoever." Mr. Smiley responded, "I hope your team is able to get Lynn out of her position." To which I responded "We can and must together! For the sake of students and PTK itself," thus indicating agreement with Mr. Smiley's view on the impact of Dr. Tincher-Ladner's handling of the lawsuit on PTK and its students. I never told Mr. Smiley that I wanted Dr. Tincher-Ladner to be terminated or removed from her position.

16. I did reach out to several of the people based on the recommendations of Ms. Flores and Mr. Smiley, noting that I had been referred to them by a former PTK employee. Some of them either declined my request or did not respond at all, as shown in Exhibits A-12, A-13, A-15, A-16, A-17, A-18, A-19, A-20 to the Smoot Declaration, all of which HonorSociety produced in discovery.

17. However, multiple other former PTK employees reached out to me. They were all afraid of retaliation by PTK and Dr. Tincher-Ladner. They all expressed to me that they have endured abusive treatment at PTK and felt that they had no recourse.

4

18. PTK's motion accuses me of improperly attempting to influence former employees Kate Santhuff and Monica Marlowe. The only communications I've ever had with either of them are shown in their entirety at Smoot Declaration Ex. A-9, which is a brief LinkedIn exchange between me and Ms. Santhuff, and Ex. A-11, which are two text messages I sent to Ms. Marlowe. In both cases, I believe those communications clearly show that I never offered either of them anything and never asked for anything other than a conversation. I certainly did not ask either of them for testimony or anything else along those lines.

19. In November 2024, I reached out to former PTK CFO Mr. Mulhollen by text message to request a call. A copy of this message, which HonorSociety produced in discovery, is attached to the Smoot Declaration as Ex. A-2.

20. My message to Mr. Mulhollen noted that "I'd prefer to ask you directly rather than having to take your deposition for a full day. Could we just chat a few minutes at your convenience?" PTK's motion accuses me of threatening Mr. Mulhollen with a deposition if he didn't cooperate with my request. It was not my intention to threaten him. I certainly didn't see it that way. There have been so many depositions in this case and somehow nearly all of them have lasted all day, or at least felt that way. I was the one who was trying to avoid another full day deposition if possible.

21. My message also noted that "Lynn [Tincher-Ladner] derided you on your way out."

22. That was a reference to what I had heard about Dr. Tincher-Ladner's treatment of Mr. Mulhollen from Ms. Flores and others. It was not, as PTK's motion speculates, a reference to any documents that PTK produced in this case with confidentiality designations under the protective order. I have not and would not intentionally disclose PTK's designated confidential information inconsistent with the requirements of the protective order and did not do so in my message to Mr. Mulhollen.

23. Mr. Mulhollen never responded to my messages. I have never spoken with him or had further communications with him.

24. At no point have I ever sought to misrepresent myself in communications with any former PTK employee. I used my real name and in the few occasions where I did have a call with someone, made sure they understood my role with HonorSociety and involvement in this lawsuit. And for the communications via LinkedIn messages, I used my personal LinkedIn profile, which lists not only my current affiliation with HonorSociety, but also my entire professional history.

25. I have never bribed, threatened, or intimidated any witness, including without limitation any of the former PTK employees I have communicated with or that are referenced in PTK's motion and supporting materials.

26. PTK's motion also accuses me of threatening its chairman, Dr. George Boggs, after his deposition on April 5, 2024. I did not threaten him in any way. Rather, after the deposition was over, I approached him for a brief discussion. At this point, there were multiple other attorneys in the room right nearby us, including PTK's lead counsel Jonathan Polak as well as HonorSociety's counsel. And there were multiple other attorneys for both sides still connected by Zoom as well as the court reporter and videographer.

27. In all, my interaction with Dr. Boggs was only a minute or so. We shook hands and I said it was a pleasure meeting him in person. I shared my condolences with him about a personal issue that he had brought up earlier during the day. I told him that HonorSociety didn't want to continue in litigation with PTK and asked him whether, as the Chair of PTK's board, he was fully aware of everything going on in the case and the issues that had come up. I mentioned a few examples of issues that had arisen during the deposition that, to me, it seemed he had not been aware of. One of those was around PTK's PPP loan. I encouraged him to look into those issues.

28. At no point did I tell Dr. Boggs that I or HonorSociety planned to submit a complaint to the federal government related to PTK's PPP loan. Nor did I suggest that I or HonorSociety would do so—or take any other action against PTK—should PTK continue with its lawsuit.

29. We ended the discussion by again shaking hands and were both smiling. I came away thinking that we had a brief but pleasant interaction.

6

30. I absolutely did not threaten Dr. Boggs or intend to come across that way, either with respect to PTK's PPP loan or anything else. Nor have I or HonorSociety taken any steps to submit a complaint to any government agency about PTK, whether about its PPP loan or anything else.

I declare under the penalty of perjury under the laws of the United States of America that, to the best of my knowledge, the foregoing is true and correct.

Executed January 28, 2025

DocuSigned by:

*Mike Moradian*

Michael Moradian