# Exhibit 1

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF MISSISSIPPI
## NORTHERN DIVISION

| | |
|---|---|
| PHI THETA KAPPA HONOR SOCIETY, | Civil Action No. 3:22-cv-00208-CWR-RPM |
|     Plaintiff/Counter-Defendant, | |
| v. | |
| HONORSOCIETY.ORG INC., | |
|     Defendant/Counter-Plaintiff | |
| HONOR SOCIETY FOUNDATION, INC., | |
|     Defendant. | |
| HONORSOCIETY.ORG INC., | |
|     Defendant/Counter-Plaintiff/Third-Party Plaintiff | |
| v. | |
| LYNN TINCHER-LADNER, | |
|     Third-Party Defendant. | |

**HONORSOCIETY.ORG INC. AND HONOR SOCIETY FOUNDATION, INC.'S MEMORANDUM IN RESPONSE TO PHI THETA KAPPA'S MOTION TO DISMISS PURSUANT TO RULE 41(b)**

## Table of Contents

Introduction ................................................................................................................ 1

Facts ......................................................................................................................... 1

    A.    HonorSociety was contacted by multiple former PTK employees eager to share information about the abusive environment they and others endured while at PTK. ................................................................................................................ 1

    B.    Mr. Moradian did not commit perjury or otherwise misrepresent his views on Dr. Tincher-Ladner to the Court or in deposition. .......................................... 2

    C.    Mr. Moradian did not offer anyone anything in exchange for testimony, much less false testimony. ................................................................................. 4

    D.    Mr. Moradian did not "misrepresent himself" in communications. ............. 5

    E.    Mr. Moradian did not disclose confidential information. ............................. 5

    F.    Mr. Moradian did not threaten witnesses. ................................................... 6

    G.    No one "conspired to conceal" documents. .................................................. 7

Argument ................................................................................................................ 8

    A.    Standard for Rule 41 Sanctions and Dismissal ............................................ 8

    B.    There was no perjury. .................................................................................... 9

    C.    The Court cannot rely on hearsay excerpts of third-party opinion to prove Mr. Moradian's intent. ................................................................................... 10

    D.    Mr. Moradian's only direct statements do not prove he committed perjury. ............. 10

    E.    There was no bribery. ................................................................................. 11

    F.    There was no intimidation. ......................................................................... 13

    G.    There were no violations of the Protective Order. ...................................... 13

    H.    Evidence was not intentionally concealed and PTK has all the information it seeks.14

    I.    Claims that Mr. Moradian "misrepresented" himself are both false and not a basis for sanctions even if true. ................................................................... 16

    J.    There is no basis for sanctions but even if there were terminating sanctions are inappropriate. ........................................................................................... 16

Conclusion ............................................................................................................ 17

## Table of Authorities

### Cases

*Brown v. Oil States Skagit Smatco*,
  664 F.3d 71 (5th Cir. 2011) .................................................................................. 16, 17

*Dyll v. Adams*,
  No. 3:91-CV-2734-D, 1997 U.S. Dist. LEXIS 24694 (N.D. Tex. Apr. 28, 1997) ..................... 13

*Gonzalez v. Trinity Marine Grp., Inc.*,
  117 F.3d 894 (5th Cir. 1997) ................................................................................... 16

*Graves v. Standard Ins. Co.*,
  No. 3:14-CV-558-DJH, 2015 WL 13714166 (W.D. Ky. May 22, 2015) .................................. 13

*Harlan v. Lewis*,
  982 F.2d 1255 (8th Cir. 1993) .................................................................................. 13

*Ill. Cent. Gulf R.R. Co. v. McLain*,
  174 So.3d 1279 (Miss. 2015) ................................................................................... 12

*In re Intercontinental Terminals Co. LLC*,
  No. 4:19-cv-1460, 2022 U.S. Dist. LEXIS 119172 (S.D. Tex. June 24, 2022) ...................... 9

*In re Prof'l Hockey Antitrust Litig.*,
  63 F.R.D. 641 (E.D. Pa. 1974) .................................................................................. 15

*Koch v. Puckett*,
  907 F.2d 524 (5th Cir. 1990) .................................................................................... 9

*McNeal v. Papasan*,
  842 F.2d 787 (5th Cir. 1988) ................................................................................. 8, 9

*Montegut Props., LLC v. Lloyds of London*,
  No. 07-3134, 2009 U.S. Dist. LEXIS 90703 (E.D. La. Sep. 3, 2009) .............................. 14

*Nat'l Hockey League v. Metro. Hockey Club, Inc.*,
  427 U.S. 639 (1976) ....................................................................................... 14, 15

*Neeley v. State*,
  202 Miss. 736 (1947) ........................................................................................... 11

*Positive Software Sols., Inc. v. New Century Mortg. Corp.*,
  619 F.3d 458 (5th Cir. 2010) .................................................................................... 8

*Ramirez v. T&H Lemond, Inc.*,
  845 F.3d 772 (7th Cir. 2016) ................................................................................... 12

*Rimkus Consulting Grp., Inc. v. Cammarata*,
   688 F. Supp. 2d 598 (S.D. Tex. 2010) ................................................. 9

*Rogers v. Kroger Co.*,
   669 F.2d 317 (5th Cir. 1982) ................................................. 9, 12, 17

*Rucker v. Pelicia Hall MDOC Comm'r*,
   No. 1:19-CV-00901-RHWR, 2022 U.S. Dist. LEXIS 73702 (S.D. Miss. Apr. 22, 2022) ......... 9

*Snider v. L-3 Commc'ns Vertex Aerospace, L.L.C.*,
   946 F.3d 660 (5th Cir. 2019) ................................................. 8, 15

*Snider v. L-3 Commc'ns Vertex Aerospace, LLC*,
   No. 3:09-cv-704-HTW-LRA, 2016 U.S. Dist. LEXIS 188697 (S.D. Miss. Mar. 15, 2016) ..... 15

*State v. Booker*,
   84 Miss. 187 (1904) ................................................. 11

*Sturgeon v. Airborne Freight Corp.*,
   778 F.2d 1154 (5th Cir. 1985) ................................................. 8

*Topalian v. Ehrman*,
   3 F.3d 931 (5th Cir. 1993) ................................................. 16

*Torah Soft Ltd. v. Drosnin*,
   No. 00 Civ. 0676 (JCF), 2003 U.S. Dist. LEXIS 16273 (S.D.N.Y. Aug. 28, 2003) .............. 12

*United States v. Dunnigan*,
   507 U.S. 87, 94 (1993) ................................................. 9

*Wilson v. Rentway, Inc.*,
   No. 4:03-CV-0636-A, 2004 U.S. Dist. LEXIS 2086 (N.D. Tex. Feb. 11, 2004) .............. 14, 15

*Woodson v. Surgitek, Inc.*,
   57 F.3d 1406 (5th Cir. 1995) ................................................. 16

*Young v. Office of U.S. Senate Sergeant at Arms*,
   217 F.R.D. 61 (D.D.C. 2003) ................................................. 12

**Statutes and Rules**

Fed. R. Civ. P. 37 ................................................. 14

Fed. R. Civ. P. 41 ................................................. 9, 14

Fed. R. Civ. P. 41(b) ................................................. 9

Fed. R. Evid. 701 ................................................. 10

Fed. R. Evid. 802 ................................................. 10

Miss. Code Ann. § 97-9-65 ........................................................................................................11

## Introduction

PTK's motion to dismiss seeks extraordinary terminating sanctions based on bold statements that HonorSociety's founder Michael Moradian lied, bribed and threatened witnesses, and violated the protective order. But none of the scant factual support PTK cites indicates that such extraordinary relief is appropriate. PTK's motion relies primarily on PTK's hyperbolic characterizations of Mr. Moradian's communications. The communications themselves are tame. Most of them are no more than Mr. Moradian reaching out to introduce himself to request a call, with either a response declining his request or no response at all. PTK has not identified any witness who was unduly influenced, much less any prejudice it has suffered as a result of Mr. Moradian's communications. Nor did it demonstrate that Mr. Moradian perjured himself or violated the protective order. PTK's motion should be denied in its entirety.

## Facts

### A.    HonorSociety was contacted by multiple former PTK employees eager to share information about the abusive environment they and others endured while at PTK.

On May 13, 2024, a former PTK employee, Wendy Flores, reached out by email to HonorSociety to share her observations and concerns about PTKs operations and marketing. Declaration of Wendy Flores ("Flores Decl.") ¶ 3; Declaration of Michael Moradian ("Moradian Decl.") ¶ 4. Ms. Flores was motivated "by a desire to shed light on systemic issues within PTK's operations and leadership." Flores Decl. ¶ 4. Her email highlighted a pattern of abusive conduct by Dr. Tincher-Ladner affecting numerous employees and that the PTK board appeared ineffective in addressing the issues. *Id.* ¶ 4, Ex. A. Flores' email noted she was aware of several former PTK employees who could help HonorSociety "prove your stance" with respect to this lawsuit, and offered to share their contact information. *Id.*, Ex. A. That same day, Ms. Flores and Mr. Moradian spoke about the issues raised in her email and PTK's lawsuit against HonorSociety. *Id.* ¶ 7.

On June 14, another former PTK employee initiated contact with HonorSociety, listing a dozen former employees to contact about "abusive workplace" and "deceptive practices" at

PTK. December 31, 2024 Declaration of Rachel Smoot ("Smoot Decl."), Ex. A-7 (HS_1019258). That former employee expressed concern about Dr. Tincher-Ladner, noting "workplace harassment from Lynn-Tincher-Ladner. On several occasions, she has cussed and harassed employees" and warning that "[t]here is so much information Dr. Ladner doesn't want to get out." *Id.*

The former employee also mentioned the incident involving former PTK advisor "Robin Lowe, who embezzled thousands of dollars from the chapter. I'm sure that's not the only one." *Id.* The former employee further noted that "Phi Theta Kappa does not monitor advisors as they should….Students [sic] money for membership isn't even being looked over or watched to be sure it's used for PTK purposes." *Id.*

Mr. Moradian reached out to several of the people that the former employees had recommended contacting, noting that he had been referred to them by a former PTK employee, but some of them either declined his request or did not respond at all. *See id.*, Ex. A-12, A-13, A-15, A-16, A-17, A-18, A-19, A-20; Moradian Decl. ¶ 16.

**B.     Mr. Moradian did not commit perjury or otherwise misrepresent his views on Dr. Tincher-Ladner to the Court or in deposition.**

PTK identifies a series of out-of-context statements as perjury during Mr. Moradian's deposition in which he made various statements about Dr. Tincher-Ladner to the general effect of him not having anything against her or PTK's leadership. *See* Mot. at 5. PTK also claims Mr. Moradian committed perjury by stating during a hearing about webpages HonorSociety created criticizing Dr. Tincher-Ladner that it was not his intention and had never been his intention to get Dr. Tincher-Ladner fired from PTK. *See id.* at 4.

PTK claims that those statements were false based on comments from Ms. Flores to two former PTK employees. First, a June 2024 text message from Ms. Flores to Christin Grissom in which Flores stated her belief that Mr. Moradian was "determined to get [Dr. Tincher-Ladner] removed from office." Smoot Decl., Ex. A-26; Flores Decl. ¶ 11. This message was not authored by Mr. Moradian and does not purport to quote him. Similarly, on November 13, 2024, Ms.

Flores sent a text message to another former PTK employee, Paige Rakestraw. *See* December 31, 2024 Declaration of Lynn Tincher-Ladner at Ex. B-1. Ms. Flores told Ms. Rakestraw about the lawsuit and that she might be deposed and then opined that "This CEO, Mike, is out to destroy Lynn and remove her from her position as (sic) try to PTK to what it used to be." *Id.* Neither Mr. Moradian nor Dr. Tincher-Ladner are included on the message thread nor is there any evidence that the communication is anything more than Ms. Flores's view.

And, in fact, that is exactly the case. At the time of Ms. Flores' messages to Ms. Grissom and Ms. Rakestraw, Ms. Flores had only even spoken with Mr. Moradian on one occasion, back in May 2024. *See* Flores Decl. ¶¶ 7–8. According to Ms. Flores, "Mr. Moradian did not tell me, then or ever, that he sought to have Dr. Tincher-Ladner removed as PTK's CEO" or that it was his goal to see a leadership change at PTK at all. *Id.* ¶¶ 13–15. Nor did he ever tell Ms. Flores that he was out "to destroy Dr. Tincher-Ladner or to somehow have her removed from her position." *Id.* ¶ 19. Ms. Flores' comments to Ms. Grissom and Ms. Rakestraw reflect her own desire for a leadership change at PTK, not Mr. Moradian's objectives or anything he said to her. *See id.* ¶¶ 13–14, 18–20.

PTK also relies on messages between Mr. Moradian and a former PTK employee who contacted him under the pseudonym Mr. Smiley. Mr. Moradian told the contact: "PTK is aggressive and willing to lie. We are going to win this by everyone telling the truth together. So you (sic) help means the world to overcoming Lynn, PTK and their injustices." Smoot Decl. ¶ 14, Ex. A-21. Further along in that exchange, Mr. Moradian commented that PTK's lawsuit against HonorSociety was "Just Lynn power tripping and spending nonprofit's money to fight her ego trip. No merit whatsoever." *Id.* ¶ 14, Ex. A-22. Mr. Smiley responded, "I hope your team is able to get Lynn out of her position." *Id.* Moradian responded "We can and must together! For the sake of students and PTK itself." *Id.* Mr. Moradian never told Mr. Smiley that he wanted Dr. Tincher-Ladner to be terminated or removed from her position, but agreed with Mr. Smiley's view on the impact of Dr. Tincher-Ladner's handling of the lawsuit on PTK and its students. Moradian Decl. ¶ 15.

**C.    Mr. Moradian did not offer anyone anything in exchange for testimony, much less false testimony.**

PTK complains that Mr. Moradian offered to pay the attorney's fees of former employees. In a few cases where the third party was concerned about retaliation from PTK or its counsel, Mr. Moradian encouraged the third party to obtain independent counsel of their choice so they could protect their own interests. *Id.* ¶ 7. For example, he told Ms. Flores that HonorSociety "might consider paying attorney fees for former PTK employees willing to come forward with information related to the lawsuit" because of his view that "PTK's lawyers were very aggressive and was concerned that they might seek to intimidate or silence former employees." Flores Decl. ¶ 15.

He also told Ms. Flores of his concern about the burden of paying for an attorney should a former employee become involved in the case as a witness. *Id.* So he told Ms. Flores that HonorSociety "might be willing to cover attorney fees for a former employee who found themselves in that position and needed to obtain counsel to protect their own interests." *Id.* ¶ 15. According to Ms. Flores, "at no point" did Mr. Moradian "ever suggest to me that his willingness to pay for counsel would be conditioned on providing favorable testimony, allowing him to have a say in which attorney I retained, or anything else." *Id.* ¶ 15; *see also* Moradian Decl. ¶ 9. Nor did Mr. Moradian ever offer anyone else anything of value in exchange for anything. Moradian Decl. ¶ 9; *see also* Flores Decl. ¶ 16 ("Moreover, at no point did Mr. Moradian ever offer me anything of value in exchange for anything, including testimony or any other form of participation or involvement in this case.").

PTK also points to two statements where Mr. Moradian offered to help unemployed former PTK employees find jobs or help them in an unspecified way in the future. Mot. at 7-8 (citing Smoot Decl. Exs. A-9, A-11). Neither of these establish a quid pro quo for anything, much less false testimony. And in both cases, Mr. Moradian never spoke with the person and never had any further communication with them other than what is reflected on the communications HonorSociety produced. Moradian Decl. ¶ 18.

**D.    Mr. Moradian did not "misrepresent himself" in communications.**

PTK claims that Mr. Moradian "repeatedly misrepresented himself" because he did not expressly state that he was an interested party in communications to former employees, expressly state that HonorSociety was a counterclaimant rather than using the shorthand "suing PTK" and stated that he was seeking to protect employees and students from abuse. Mot. at 8-10. Rather than identify any harm these alleged actions caused, PTK merely concludes that "Clearly Moradian's efforts were not altruistic – his intention was to use this dirt to 'destroy' Dr. Tincher-Ladner and get her employment terminated." Mot. at 10.

Mr. Moradian used his real name in every communication. *See, e.g.*, Smoot Decl. Ex. A-11; *see also* Moradian Decl. ¶ 24. He identified himself as being with HonorSociety and involvement in the lawsuit when communications got past an initial outreach. Moradian Decl. ¶ 24. Many of the communications were from his LinkedIn profile, which lists not only his current affiliation but also his entire professional history. *Id.*

**E.    Mr. Moradian did not disclose confidential information.**

Former PTK employees repeatedly told Mr. Moradian about Dr. Tincher-Ladner's abusive treatment of employees, including in particular relating to their departures from PTK. For example, when Ms. Flores spoke with Mr. Moradian in May 2024, among other things, she mentioned to him about Dr. Tincher-Ladner's treatment of former CFO Steve Mulhollen upon his departure. Flores Decl. ¶ 17; Moradian Decl. ¶ 6. Mr. Moradian heard about Dr. Tincher-Ladner's treatment of Mr. Mulhollen from others as well. Moradian Decl. ¶ 6.

In November 2024, when Mr. Moradian reached out to Mr. Mulhollen by text message, he commented that "Lynn [Tincher-Ladner] derided you on your way out." *See* Smoot Decl. ¶ A-2. PTK's motion claims that Mr. Moradian was actually referring to an email produced in this lawsuit, which PTK designated for confidential handling under the Protective Order, in which Dr. Tincher-Ladner referred to Mr. Mulhollen as an "asswipe." He was not. Moradian Decl. ¶ 22. Rather, this was a reference to what Mr. Moradian had heard from Ms. Flores and others about Dr. Tincher-Ladner's treatment of Mr. Mulhollen. *Id.* As Mr. Moradian's exchange with Mr.

Mulhollen shows, he never mentioned "asswipe" or otherwise divulged content from any materials PTK may have designated under the protective order. *Id.*

**F.    Mr. Moradian did not threaten witnesses.**

PTK complains that Mr. Moradian sent a message to a former employee that PTK alleges "threatened" the employee with a deposition if he didn't cooperate. Mot. at 8. On November 20, 2024, Mr. Moradian sent three short text messages to former PTK CFO Steve Mulhollen asking about his availability for a short call, which read in their entirety

> Hi Steve, my name's Mike Moradian. You were named as a witness in a litigation I just have a couple friendly questions about your time at PTK. Are you available to talk?

> I'd prefer to ask you directly rather than having to take your deposition for a full day. Could we just chat a few minutes at your convenience?

> Lynn derided you on your way out. I just have one innocuous question to ask you. Can I please call you and ask, and we go on our ways?

*See* Smoot Ex. A-2. Mr. Mulhollen never responded, never spoke with Mr. Moradian, and Mr. Moradian had no further communications with him. Moradian Decl. ¶ 23.

Citing a declaration from PTK's board member George Boggs, PTK next claims that on April 5, 2024 at Dr. Boggs's deposition, Mr. Moradian "told Dr. Boggs that unless PTK settled with HonorSociety, Moradian would pursue a Paycheck Protection Program ('PPP') fraud investigation into PTK's PPP loans." Motion at 8 (citing Declaration of Dr. George Boggs ("Boggs Decl.") at ¶ 3). This simply is not true and not even supported by the Boggs declaration PTK relies on.

Mr. Moradian interacted with Mr. Boggs after the conclusion of Dr. Boggs' deposition when counsel for both sides were present, along with the court reporter and videographer. Moradian Decl. ¶ 26. Mr. Moradian mentioned a few issues that had arisen in the deposition which it had seemed Dr. Boggs had not previously been aware of, despite being the Chair of PTK's board. *Id.* ¶ 27. One of those issues was around PTK's PPP loan. *Id.* Mr. Moradian encouraged Dr. Boggs to look into those issues in general since he seemed to not have been aware

of them. *Id.* At no point did Mr. Moradian tell Dr. Boggs that he or HonorSociety planned to submit a complaint with the federal government against PTK related to its PPP loan or that it would do so if PTK continued with its lawsuit. *Id.* ¶ 28. Mr. Moradian did not make any kind of threat to Dr. Boggs and did not intend to come across that way. *Id.* ¶ 30. Nor has Mr. Moradian or HonorSociety taken any steps to submit a complaint about PTK to any government agency, whether about its PPP loan or anything else. *Id.* Moreover, Dr. Boggs' declaration doesn't even identify the alleged threat. It merely states that Mr. Moradian "gave a veiled threat". *See* Boggs Decl. ¶ 3.

**G.    No one "conspired to conceal" documents.**

PTK alleges that Mr. Moradian "conspired to conceal" communications he obtained from former employees. Mot. at 11–12. That is not the case. On November 26, 2024, PTK contacted HonorSociety and asked that all communications between Mr. Moradian and former or current PTK employees be produced no later than December 2, 2024. Linke Decl. ¶ 4, Ex. 1. HonorSociety's counsel responded the next day—the Wednesday before Thanksgiving—and indicated that it would confer with HonorSociety about the request. *See id.* ¶ 5, Ex. 2. On Monday, December 2, after the holiday weekend, PTK asked for an update and demanded that the documents be produced the next day. *Id.* Early the next morning, PTK contacted Magistrate Judge Myers about its demand for the documents. *Id.* ¶ 6, Ex. 3. HonorSociety responded on the same day that it would produce the communications. *Id.* PTK agreed to a production by December 10. *Id.* ¶ 7, Ex. 4. On December 10, HonorSociety produced the communications. *See id.* ¶ 8, Ex. 5. PTK identifies no prejudice from the timing of the production.

Nor did Mr. Moradian "conspire" with anyone to conceal anything as PTK alleges. PTK claims that Mr. Moradian "repeatedly promised these individuals to keep his communications with them a secret and that he would 'respect confidentiality' of the communications." Mot. at 12 (citing Smoot Decl. ¶ 16). But those supposed "repeated promises" are a single instance on May 14, 2024 in which Mr. Moradian text messaged Ms. Flores that "We can always respect confidentiality." *See* Smoot Decl. Ex. A-23. And he did keep that promise—HonorSociety

designated Mr. Moradian's communications for confidential handling under the protective order when they were produced to PTK. *See* Linke Decl. ¶ 8, Ex. 5.

In contrast, PTK did not respect confidentiality. Because many of the third parties feared retaliation from Dr. Tincher-Ladner personally, HonorSociety designated Mr. Moradian's communications for Attorneys' Eyes Only handling under the Protective Order. *Id.* ¶ 8, Ex. 5; *see also* Moradian Decl. ¶ 17. PTK's counsel emailed to request that they be immediately lowered to the Confidential designation specifically because it was urgent for Dr. Tincher-Ladner to personally review them all. Linke Decl. ¶ 9, Ex. 5. HonorSociety agreed to re-designate almost all of the documents to Confidential, but noted that the remaining 14 would remain Attorneys' Eyes Only. *Id.* ¶ 10, Ex. 5. This was because certain of the third parties had expressed particular concerns about retaliation from Dr. Tincher-Ladner, personally. *See* Moradian Decl. ¶ 7. HonorSociety's efforts to respect their confidentiality was for naught, as PTK's counsel immediately forwarded all of the Attorneys' Eyes Only communications directly to Dr. Tincher-Ladner who promptly reviewed them. Linke Decl. ¶ 11, Ex. 6.

## Argument

### A.    Standard for Rule 41 Sanctions and Dismissal

This Court has confirmed that bad faith "sanctions are only available in two narrow circumstances: when the offending party's conduct was (1) before the court, or (2) 'in direct defiance of its orders.'" Dkt. No. 366, p. 8 n. 4 (citing Dkt. No. 288 at 5 (citing *Positive Software Sols., Inc. v. New Century Mortg. Corp.*, 619 F.3d 458, 462 (5th Cir. 2010) ("impos[ing] sanctions for the direct violation of its order"))). Dismissal with prejudice is an "extreme sanction that deprives a litigant of the opportunity to pursue his claim." *Snider v. L-3 Commc'n. Vertex Aerospace, L.L.C.*, 946 F.3d 660, 679 (5th Cir. 2019). The strict and heightened standard for dismissal with prejudice is only met if there is "a clear record of delay or contumacious conduct by the plaintiff" and "lesser sanctions would not serve the best interests of justice." *Id.*; *see also McNeal v. Papasan*, 842 F.2d 787, 790 (5th Cir. 1988) ("[W]e have consistently refused to permit a court to impose this sanction …") (citing *Sturgeon v. Airborne Freight Corp.*, 778 F.2d 1154, 1159

(5th Cir. 1985)). Mere negligence, "regardless of how careless, inconsiderate, or understandably exasperating," is not "contumacious conduct." *McNeal*, 842 F.2d at 792 (quotation marks and citation omitted). The movant bears the burden of proof to show that dismissal is appropriate. *See e.g.*, *In re Intercontinental Terminals Co. LLC*, No. 4:19-cv-1460, 2022 U.S. Dist. LEXIS 119172, at *55 (S.D. Tex. June 24, 2022).

Although Rule 41 of the Federal Rules of Civil Procedure permits a defendant to "move to dismiss the action or any claim against it" "[i]f the plaintiff fails to … to comply with … a court order," Fed. R. Civ. P. 41(b), dismissal is often inappropriate even in cases of noncompliance. *Rucker v. Pelicia Hall MDOC Comm'r*, No. 1:19-CV-00901-RHWR, 2022 U.S. Dist. LEXIS 73702, at *4 (S.D. Miss. Apr. 22, 2022) ("Plaintiff did not comply with the Court's Order [] Dismissal under Rule 41(b) is nevertheless inappropriate, and Defendants' Motion to Dismiss under Rule 41(b) is denied").

Thus, in addition to non-compliance, courts in this circuit further require the existence of aggravating factors, such as "the extent to which the plaintiff, as distinguished from his counsel, was personally responsible for the delay, the degree of actual prejudice to the defendant, and whether the [harm] was the result of intentional conduct." *Rogers v. Kroger Co.*, 669 F.2d 317, 320 (5th Cir. 1982). Sanctions are generally inappropriate where the movant "offered no evidence that it has suffered actual prejudice," or that the conduct was "intentional or purposeful." *Id.* at 322–23.

## B.    There was no perjury.

Perjury is the "willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory." *United States v. Dunnigan*, 507 U.S. 87, 94 (1993). Perjury is not established by "mere contradictory testimony from witnesses or inconsistencies in a witness's testimony." *Rimkus Consulting Grp., Inc. v. Cammarata*, 688 F. Supp. 2d 598, 648 (S.D. Tex. 2010) (citing *Koch v. Puckett*, 907 F.2d 524, 531 (5th Cir. 1990) ("[C]ontradictory trial testimony, however, merely establishes a credibility question for the jury.")).

PTK manufactures an illusion of contradiction by selectively pulling fragments from Mr. Moradian's testimony out of context. PTK wants the Court to believe that Mr. Moradian is on one hand praising PTK to the skies while on the other scheming to destroy Dr. Tincher-Ladner personally. Neither is true. For example, PTK misleadingly edits Mr. Moradian's testimony to claim that he said "I like the idea of PTK. I like the idea of Dr. Lynn Tincher-Ladner." But instead, in the context of discussing why he edited Wikipedia's page on PTK to add unflattering facts, he responded, "I don't want PTK to have issues. I like the idea of PTK. I like the idea of Dr. Lynn Tincher-Ladner, but what is here again is a matter of truthfulness, objectivity and reportability here." In context, he was criticizing Dr. Tincher-Ladner and PTK's actions and dishonesty while making it clear it wasn't personal. Read in context and in full, all of the statements PTK identifies as "lies" are instead truthful statements that Mr. Moradian is engaged in litigation, wants to win, but has nothing personal against Dr. Tincher-Ladner.

## C. The Court cannot rely on hearsay excerpts of third-party opinion to prove Mr. Moradian's intent.

Neither hearsay nor lay opinion are admissible in a motion. Fed. R. Evid. 701; Fed. R. Evid. 802. PTK offers a series of emails from third parties that include statements like "this CEO, Mike, is out to destroy Lynn and remove her from her position." The statement is offered for the truth of the matter asserted—that Mr. Moradian is out to remove Dr. Tincher-Ladner from her position—and none of the hearsay exceptions apply. Further, it is lay opinion: The statement does not relay a statement made by Mr. Moradian nor any facts at all, simply the conclusion as to Mr. Moradian's desire and intent. PTK should be precluded from introducing inadmissible hearsay and lay opinion.

## D. Mr. Moradian's only direct statements do not prove he committed perjury.

PTK relies heavily on Mr. Moradian's statement that "PTK is aggressive and willing to lie. We are going to win this by everyone telling the truth together. So you (sic) help means the world to overcoming Lynn, PTK and their injustices" to aid in its argument that his other statements are "lies." The context of that statement is a conversation with a former employee about potential

testimony in this case. *See* Smoot Decl. ¶ 14, Ex. A. PTK has repeatedly reminded the Court that it was PTK who started this out-of-control litigation and that HonorSociety merely added counterclaims. PTK has aggressively litigated this matter, including repeatedly accusing Mr. Moradian of misconduct. Dr. Tincher-Ladner is a defendant and the principal behind PTK's actions. It should be unsurprising that Mr. Moradian wants to overcome her, PTK, and what HonorSociety sees as injustices and lies. That Mr. Moradian wants to overcome Dr. Tincher-Ladner in the litigation does not make his statement that he doesn't want her fired perjury.

Likewise, Mr. Moradian's other statement about PTK taken in context is, at worst, unwisely-chosen words. In response to a statement by Ms. Chaney upset about PTK and Dr. Tincher-Ladner that "I hope your team is able to get Lynn out of her position" Mr. Moradian empathized that "We can and must together! For the sake of students and PTK itself." Smoot Decl. at Ex. A-22. In context, this statement is nothing more than Mr. Moradian's oft-repeated statements that Dr. Tincher-Ladner's dishonesty was harming PTK and the industry itself and she needed to stop.

### E.   There was no bribery.

PTK relies on Mississippi's prohibition against bribery to induce perjury which provides:

> Every person who shall, by the offer of any valuable consideration, attempt, unlawfully and corruptly, to procure any other person to commit wilful and corrupt perjury as a witness in any cause, matter, or proceeding in or concerning which such other person might by law be examined as a witness.

Miss. Code Ann. § 97-9-65. It is an "essential element of the offense… that the accused knows that the testimony which he wants the witness to give is false, and that the witness, as well as himself, is aware of the falsity thereof." *Neeley v. State*, 202 Miss. 736, 740 (1947). Further, any testimony must be material to the case. *State v. Booker*, 84 Miss. 187, 188 (1904).

PTK claims that although "Moradian has not offered straight cash" he has nonetheless committed bribery by offering to pay attorney's fees and to assist former PTK employees finding work. Although PTK blusters much, claiming that "Moradian should not be able to buy negative

testimony" against PTK, PTK fails to meet the elements because it does not claim that Moradian ever sought false testimony, only testimony that is "negative" to PTK's case. The communications PTK provides demonstrate that no false testimony was sought. Mr. Moradian has asked for information but never even suggested that facts should be made up or altered. *See, e.g.*, Smoot Decl., Exs. A-9, A-11.

PTK's other authority does not support its argument that Mr. Moradian committed bribery.  PTK relies on *Ramirez v. T&H Lemond, Inc.*, 845 F.3d 772, 779-82 (7th Cir. 2016). But in *Ramirez*, the plaintiff offered money to lie about observing discrimination, worked out what the false testimony would be with the witness, and the witness falsely testified. Likewise, in *Illinois Central Gulf Railroad Co. v. McLain*, 174 So.3d 1279, 1286 (Miss. 2015), the plaintiff asked a witness to lie about key facts. Finally, PTK's reliance on *Young v. Office of U.S. Senate Sergeant at Arms*, 217 F.R.D. 61, 68-69, 71 (D.D.C. 2003), is likewise misplaced. In *Young*, the plaintiff paid a witness $50,000 for material false testimony about sexual misconduct in the Senate. None of that happened here. Mr. Moradian never asked a witness to provide any particular testimony, much less false testimony for which the witness would be compensated.

PTK makes much of Mr. Moradian's purported offer to pay the attorney's fee expenses of certain third parties who might be drawn into this lawsuit. But there is nothing inappropriate about offering to cover attorney's fees. Fact witnesses can be compensated for reasonable expenses incurred through testifying. Paying for an independent attorney to defend a witness's own interests during a deposition is neither improper nor a bribe, particularly where, as here, the opposing party is aggressive and vindictive. *See, e.g.*, *Torah Soft Ltd. v. Drosnin*, No. 00 Civ. 0676 (JCF), 2003 U.S. Dist. LEXIS 16273, at *5-6 (S.D.N.Y. Aug. 28, 2003). The offer is not a bribe because the witness does not receive anything of value other than the protection of their own interests because they have been compelled to testify, and as long as the attorney representing them speaks for only the witness's interest there is neither conflict nor impropriety.

Further, even if there was an improper payment—which there was not—the appropriate response for any "tainted" testimony is to either exclude the testimony or to give the opposing

party access to the terms of the agreement between the paying party and the compensated witness and allow them to introduce it at trial. *Dyll v. Adams*, No. 3:91-CV-2734-D, 1997 U.S. Dist. LEXIS 24694, at *8 (N.D. Tex. Apr. 28, 1997). There is no justification for imposing terminating sanctions for offering to cover a third-party's independent attorney's fees.

## F.    There was no intimidation.

PTK claims that asking a witness on a single occasion in text message if he would speak informally rather than be deposed is sanctionable conduct. But there is no support for the idea that merely offering a material witness a choice between an interview and a deposition is intimidation. PTK relies on *Graves v. Standard Insurance Co.*, No. 3:14-CV-558-DJH, 2015 WL 13714166, at *3, 11 (W.D. Ky. May 22, 2015), but in *Graves*, a doctor was threatened with a lawsuit and a possible report of unauthorized practice of medicine unless he changed his testimony, not a deposition where he would be asked to tell the truth. And in *Harlan v. Lewis*, 982 F.2d 1255, 1259 (8th Cir. 1993), the court imposed modest monetary sanctions after counsel attempted to influence expert witnesses not to testify by threatening they would be sued, too, if they did so.

PTK also claims that a threat to report it to the federal government unless the lawsuit was withdrawn justifies dismissal. That threat was not made. Given how rapidly PTK dashes to the Court at any perceived misdeed, it is highly improbable that, if this story were true, PTK would have waited nine months to make an issue of it.

Further, PTK did not withdraw the lawsuit and HonorSociety did not report any PPP violations. There was no threat, but if there had been, it was demonstrably ineffective. The lack of a report is further support that no threat was made and also means PTK suffered no harm.

## G.    There were no violations of the Protective Order.

PTK speculates that Mr. Moradian disclosed confidential information because he texted a former employee noting that Dr. Tincher-Ladner derided the employee when he left employment. Mot. at 11. PTK speculates that Mr. Moradian's information must have come from a deposition Mr. Moradian attended where the email—marked confidential but not itself shown or admitted as a deposition exhibit—was discussed. But Dr. Tincher-Ladner called Mr.

Mulhollen an "asswipe" in an intra-office communication. News of CEO crudity and bullying travels fast and Mr. Moradian learned that information from multiple third parties. PTK has no evidence whatsoever to the contrary, relying only on the same speculation that pervades the motion.

PTK next quotes the Court out of context from an already exhaustively litigated issue regarding the source of information for surveys HonorSociety sent out. Motion at 11. PTK misrepresents the Court's statement as a conclusion that HonorSociety improperly used confidential information crafting the surveys. In truth, the Court was trying to determine the date surveys were sent out and used Dr. Tincher-Ladner's deposition as a time marker. (Dkt. No. 135 at 100:4-21.)  The only mention of testimony at Dr. Tincher-Ladner's deposition being used came from HonorSociety's attorney Derek Newman, who noted that HonorSociety might have used non-confidential information learned there. Dkt. No. 135 at 100: 10-12.

**H.    Evidence was not intentionally concealed and PTK has all the information it seeks.**

PTK identifies an alleged discovery violation as the basis for the Court to dismiss HonorSociety's counterclaims. Specifically, PTK argues that "Moradian's intentional concealment of evidence further evidences contempt for this Court's rules and orders." Motion, p. 20. But there was no intentional concealment, and even if there was, there was no violation of a Court order. That is the precise distinction that a magistrate judge for the Eastern District of Louisiana relied on in *Montegut Properties, LLC v. Lloyds of London* when concluding that "[t]he record does not reveal a pattern of contumacious conduct … or a failure to comply with a Court Order that would justify involuntary dismissal for failure to comply with a discovery order." No. 07-3134, 2009 U.S. Dist. LEXIS 90703, at *14 (E.D. La. Sep. 3, 2009). In doing so, the court distinguished *Wilson v. Rentway, Inc.*, No. 4:03-CV-0636-A, 2004 U.S. Dist. LEXIS 2086, at *1 (N.D. Tex. Feb. 11, 2004), where "the plaintiff was ordered to produce documents and respond to requests" but failed to do so. *Montegut Props.*, 2009 U.S. Dist. LEXIS 90703, at *14.

PTK also cites *National Hockey League v. Metropolitan Hockey Club, Inc.*, which involved a dismissal pursuant to Rule 37, not Rule 41, and which is therefore inapposite. 427 U.S. 639, 640-

41 (1976). Moreover, in that case, "crucial interrogatories remained substantially unanswered despite numerous extensions granted at the eleventh hour and … and notwithstanding several admonitions by the Court and promises and commitments by the plaintiffs." *Id.* at 640; *see also In re Prof'l Hockey Antitrust Litig.*, 63 F.R.D. 641, 648 (E.D. Pa. 1974) ("Dates mean something to me as a trial judge… I just hope that it will not happen again because you are at the precipice."). Thus, like *Wilson* and unlike here, *National Hockey League* involved a non-movant who refused to provide discovery in violation of a court order.

Nevertheless, for its proposition that HonorSociety's purported "discovery concealment rises to the level of contumacious conduct," PTK relies on a case where, unlike here: (1) concealed documents were never produced; and (2) the perpetrators of the concealment were attorneys, who owed the court greater candor. Specifically, PTK relies on *Snider*, 946 F.3d 660, where outside counsel for L-3 conspired with in-house counsel to bring a sex discrimination case against L-3. When L-3 questioned in-house counsel regarding some emails suggesting this inappropriate relationship, in-house counsel/plaintiff "testified that she had produced all of the electronic information on her home computer and that no emails had been deleted." *Snider v. L-3 Commc'ns Vertex Aerospace, LLC*, No. 3:09-cv-704-HTW-LRA, 2016 U.S. Dist. LEXIS 188697, at *10 (S.D. Miss. Mar. 15, 2016). L-3 did not believe her and served subpoenas on outside counsel's law firm, which yielded thousands of unproduced emails that "revealed a time frame of collusion between the two attorneys against their mutual client spanning three years[.]" *Id.* at 10–11.

Here, PTK makes much of HonorSociety's December 10, 2024 production. But most of the documents at issue were from less than a month before. And those few that were not—like a single text message string—were either not searched for because the search parameters did not include them, were either produced and are in the mass of documents or were simply overlooked. Further, PTK doesn't identify any prejudice. There is no contumacious conduct and PTK opted not to pursue a discovery motion, leaving no remedy now.

In keeping with its theme of slinging as much irrelevant mud as it can find, PTK feels the need to remind the Court about the Navex subpoena ruling, where the Court ruled that private complaints could not be subpoenaed. Mot. at 12. That has no bearing here; HonorSociety was not subpoenaing information, was not seeking only private complaints, and even if it had been that is not a basis for sanctions and PTK does not argue otherwise.

## I. Claims that Mr. Moradian "misrepresented" himself are both false and not a basis for sanctions even if true.

PTK complains that Mr. Moradian didn't choose the right words when first introducing himself to various third parties. Mot. at 8-10. But these complaints do not appear to form part of PTK's argument that HonorSociety's claims must be dismissed. The complaints appear only in the facts section and not the argument. *Compare id.* pp. 8-10 *with* 13-25. This appears to just be more mudslinging, and in truth there is no obligation for Mr. Moradian to describe himself as an "interested party and a counter-claimant" when introducing himself. Mr. Moradian never concealed his identity or said anything false.

PTK also complains because Mr. Moradian said he wanted to right wrongs at PTK as part of the litigation. Those statements are true; he wants to do so out of a sense of justice, but also because, as PTK has so often-repeated, the entire industry can be tarnished by CEOs calling people "asswipes" and engaging in spam marketing. Everyone benefits if PTK stops its misdeeds.

## J. There is no basis for sanctions but even if there were terminating sanctions are inappropriate.

Dismissal with prejudice "is an extreme sanction that deprives a litigant of the opportunity to pursue his claim." *Woodson v. Surgitek, Inc.*, 57 F.3d 1406, 1418 (5th Cir. 1995). As such, it should only be applied in extreme circumstances where no lesser sanction would serve. *Brown v. Oil States Skagit Smatco*, 664 F.3d 71, 77 (5th Cir. 2011). This Court must use "the least onerous sanction which will address the offensive conduct." *Gonzalez v. Trinity Marine Grp., Inc.*, 117 F.3d 894, 899 (5th Cir. 1997); *see also Topalian v. Ehrman*, 3 F.3d 931, 937 (5th Cir. 1993) (holding that district courts must show that "sanctions are not vindictive or overly harsh reactions to

- 16 -

objectionable conduct, and that the amount and type of sanction was necessary to carry out the purpose of the sanctioning provision") Dismissal of an action with prejudice is appropriate only if its deterrent value cannot be substantially achieved by use of less drastic sanctions. *Brown*, 664 F.3d at 78. The Court must identify its reasons for not choosing lesser sanctions in the record. *Id.*

Lesser sanctions can include:

> Assessments of fines, costs, or damages against the plaintiff or his counsel, attorney disciplinary measures, conditional dismissal, dismissal without prejudice, and explicit warnings are preliminary means or less severe sanctions that may be used to safeguard a court's undoubted right to control its docket.

*Rogers*, 669 F.2d at 321–22. For example, in *Brown*, the Fifth Circuit upheld terminating sanctions where a plaintiff testified in one lawsuit that he left employment solely because of back pain and then in a second that he left solely because of racial harassment. 664 F.3d at 78. The court considered and rejected lesser sanctions because the plaintiff could not afford to pay a monetary sanction and rejected dismissing only one claim because that claim was already effectively dead.

To the extent they exist at all, PTK's complaints are picayune. PTK claims Mr. Moradian "perjured" himself by identifying third-party opinion and at best ambiguous statements from Mr. Moradian himself. PTK can cross-examine Mr. Moradian on that allegedly contradictory testimony, and it is for a jury to decide the truth. PTK objects to "bribery" and threats but identifies no quid pro quo nor any prejudice. To the extent the Court finds Mr. Moradian's conduct improper, a monetary sanction will result. Likewise, PTK hollers loudly about alleged discovery violations, but accepted a December 10 production date without identifying prejudice or seeking sanctions. No sanction is appropriate, but if one were to be, it should be of the type normally imposed for minor discovery violations—PTK's reasonable fees in pursuing the documents.

## Conclusion

PTK has manufactured misdeeds by omitting material portions of evidence, asking the Court to accept hearsay lay opinion, and claiming that offering to help find an unemployed person

a job without any quid pro quo is the crime of bribery. This is not mountains out of molehills:
There isn't even a mole. PTK's motion should be denied in its entirety.

Dated: January 28, 2025                     Respectfully Submitted,

                                            s/ Derek Linke
                                            Derek A. Newman (pro hac vice)
                                            Derek Linke (pro hac vice)
                                            Keith P. Scully (pro hac vice)
                                            Gregory M. Scialabba (pro hac vice)
                                            NEWMAN LLP
                                            100 Wilshire Blvd, Suite 700
                                            Santa Monica, CA 90401
                                            Tel: (310) 359-8200
                                            dn@newmanlaw.com
                                            linke@newmanlaw.com
                                            keith@newmanlaw.com
                                            gs@newmanlaw.com

                                            s/ Dakota J. Stephens
                                            W. Whitaker Rayner (MS Bar # 4666)
                                            Dakota J. Stephens (MS Bar # 106695)
                                            Hugh A. Warren, V (MS Bar # 106711)
                                            JONES WALKER LLP
                                            190 E. Capitol St., Suite 800
                                            Jackson, Mississippi 39201
                                            Tel: (601) 949-4724
                                            wrayner@joneswalker.com
                                            dstephens@joneswalker.com
                                            hwarren@joneswalker.com

                                            Attorneys for Defendant, Counter-Claimant, and
                                            Third-Party Plaintiff HonorSociety.org, Inc. and
                                            Defendant Honor Society Foundation, Inc.

**Certificate of Service**

I hereby certify that on January 28, 2025, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system. Participants in the case are registered CM/ECF users and service will be accomplished by the CM/ECF system.

Executed this 28th day of January, 2025      s/ Derek Linke
                                                Derek Linke