### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF MISSISSIPPI
### NORTHERN DIVISION

| | | |
|---|---|---|
| PHI THETA KAPPA HONOR SOCIETY, | ) | |
| | ) | |
| Plaintiff/Counter-Defendant | ) | Civil Action No.  3:22-cv-00208-CWR-RPM |
| | ) | |
| v. | ) | |
| | ) | |
| HONORSOCIETY.ORG, INC., | ) | |
| | ) | |
| Defendant/Counter-Plaintiff | ) | |
| /Third-Party-Plaintiff | ) | |
| | ) | |
| HONOR SOCIETY FOUNDATION, INC., | ) | |
| | ) | |
| Defendant | ) | |
| | ) | |
| ------------------------------------------------------ | ) | |
| | ) | |
| HONORSOCIETY.ORG, INC., | ) | |
| | ) | |
| Defendant/Counter-Plaintiff | ) | |
| /Third-Party-Plaintiff | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| DR. LYNN TINCHER-LADNER, | ) | |
| | ) | |
| Third-Party Defendant | ) | |

## <u>MEMORANDUM IN SUPPORT OF MOTION TO DISMISS</u>

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ........................................................................................ 1

II. MORADIAN'S SANCTIONABLE CONDUCT. ........................................... 3

    A. Moradian Perjured Himself to the Court ............................................. 4

    B. Moradian Attempted to Improperly Influence Witnesses ...................... 7

        1. Moradian suggested bribes to witnesses to induce their cooperation ........ 7

        2. Moradian threatened witnesses for their cooperation ............................. 8

    C. Moradian Misrepresented Himself and His Motivations in the
Communications .............................................................................. 8

    D. Moradian (Again) Disclosed Information Designated by PTK as
"CONFIDENTIAL", To Improperly Influence Witnesses .................... 10

    E. Moradian Conspired to Intentionally Conceal Production of Relevant
Documents in Discovery .................................................................. 11

III. DEFENDANTS' PERJURY AND INTENTIONAL DISREGARD FOR THIS
COURT'S ORDERS MERITS "DEATH PENALTY" SANCTIONS. .......... 13

    A. Standard for Dismissal Under Rule 41(b ........................................... 13

    B. Moradian's Repeated Perjury Warrants Dismissal of Honor Society's
Entire Case .................................................................................... 14

    C. Moradian's Other Conduct Rises to Contumacious Conduct and Also
Warrants Dismissal of Honor Society's Entire Case ........................... 17

        1. Suggesting bribes to PTK's witnesses is contumacious conduct ............. 18

        2. Suggesting threats to PTK's witnesses is contumacious conduct ............. 19

        3. Moradian has repeatedly violated the Protective Order, which
amounts to sanctionable conduct ........................................................ 19

        4. Moradian's intentional concealment of evidence further evidences
contempt for this Court's rules and orders ........................................... 20

    D. Lesser Sanctions Would Not Be Enough of a Deterrence .................... 21

IV. CONCLUSION. ........................................................................................ 26

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Brown v. Oil States Skagit Smatco*,
664 F.3d 71 (5th Cir. 2011) ...............................................................13, 14, 15, 17, 22

*Callip v. Harris Cnty. Child Welfare Dep't.*,
757 F.2d 1513 (5th Cir. 1985) ..................................................................................14

*Chambers v. NASCO, Inc.*,
501 U.S. 45 (1991) ) ..................................................................................................13

*Chase v. Dietrich*,
2017 WL 4400018 (S.D. Miss. Sept. 30, 2017)..............................................13, 14, 23

*Domingue v. Jantran, Inc.*,
2020 WL 5632964 (N.D. Miss. Sept. 21, 2020).........................................................22

*Farris v. Ben E. Keith Co.*,
2018 WL 354762 (E.D. Tex. Jan. 10, 2018)..............................................................15

*Garcia v. Berkshire Life Ins. Co. of Am.*,
569 F.3d 1174 (10th Cir. 2009) ................................................................................15

*Graves v. Standard Ins. Co.*,
2015 WL 13714166 (W.D. Ky. May 22, 2015).........................................................19

*Harlan v. Lewis*,
982 F.2d 1255 (8th Cir.), *cert. denied*, 510 U.S. 828 (1993)...................................19

*Hillman v. Weatherly*,
14 So.3d 721 (Miss. 2009).........................................................................................18

*Ill. Cent. Gulf R. Co. v. McLain*,
174 So.3d 1279 (Miss. 2015).....................................................................................18

*In re Taxotere (Docetaxel) Prods. Liab. Litig.*,
966 F.3d 351 (5th Cir. 2020) ....................................................................................22

*Jackson v. Murphy*,
468 F. App'x 616 (7th Cir. 2012) .............................................................................14

*Marroco v. Gen. Motors Corp.*,
966 F.2d 220 (7th Cir. 1992) ........................................................................20, 22, 25

*McNeal v. Papasan*,
842 F.2d 787 (5th Cir. 1988) ..............................................................................14

*Monsanto Co. v. Ralph*,
382 F.3d 1374 (Fed. Cir. 2004)............................................................................15

*Nat'l Hockey League v. Metro. Hockey Club, Inc.*,
427 U.S. 639 (1976).............................................................................................1

*Pressey v. Patterson*,
898 F.2d 1018 (5th Cir.1990) ..............................................................................13

*Ramirez v. T&H Lemont, Inc.*,
845 F.3d 772 (7th Cir. 2016) ...............................................................................18

*Sarco Creek Ranch v. Greeson*,
167 F.Supp.3d 835 (S.D. Tex. 2016) ............................................................13, 15

*Snider v. L-3 Commc'ns Vertex Aerospace, LLC*,
2016 WL 3648281 (S.D. Miss. Mar. 15, 2016) ........................................21, 22, 26

*Taylor v. Consol. Pipe & Supply Co., Inc.*,
2017 WL 3090317 (S.D. Miss. July 20, 2017) (J. Reeves) ............................ *passim*

*Tesco Corp. v. Weatherford Int'l, Inc.*,
2014 WL 4244215 (S.D. Tex. Aug. 25, 2014) ......................................................15

*Wagner v. Boh Bros. Const. Co., LLC.*,
2012 WL 3637392 (E.D. La. Aug. 22, 2012) ..................................................15, 23

*Woodson v. Surgitek*,
57 F.3d 1406 (5th Cir. 1995) ...............................................................................13

*Young v. Office of U.S. Senate Sergeant at Arms*,
217 F.R.D. 61 (D.D.C. 2003)...........................................................18, 22, 24

**Statutes**

Miss. Code Ann. § 97-9-65...................................................................................18

# I.    INTRODUCTION

PTK and Dr. Tincher-Ladner acknowledge and respect that neither this Court, nor any other, is a forum for petty disputes. The sheer number of entries on the docket tells the history of this case and how the dispute has evolved. But PTK would be remiss in refraining from filing this motion that seeks "death penalty" sanctions due to Defendants' contumacious conduct, and in particular that of their principal, Michael Moradian. PTK has recently discovered that Moradian has perjured himself at the hearing on July 17 and also at deposition and also has engaged in witness tampering, bribery and other misconduct, severely prejudicing PTK's and Dr. Tincher-Ladner's ability to litigate this case fairly. PTK and Dr. Tincher-Ladner have no other choice but to bring Moradian's contumacious conduct to the Court's attention and ask for relief.

At the July 17 Evidentiary Hearing, PTK asked Michael Moradian directly if he wanted Dr. Tincher-Ladner "fired." Moradian swore to the Court: "That is not my intention. It's never been my intention." Due to recently discovered evidence, PTK now knows that was a lie. Moradian has been engaging *since May of this year* in a high volume of secret communications with current and former PTK employees to "destroy" Dr. Tincher-Ladner and see her terminated from her position. This lie was significant. Moradian offered that testimony to persuade this Court that he had no malice towards either PTK or Dr. Tincher-Ladner in using artificial intelligence to create 5,000+ websites promulgating his false advertising and antitrust theories, and to otherwise support his view that he was doing the community college space a service in his disparagement of PTK and Dr. Tincher-Ladner on those sites. He has even relied on that and related false testimony in making his appeal of the second injunction order to the Fifth Circuit.[1]

---

[1] This is not the first time the Court has had to address Moradian's deception and Honor Society's clear lack of candor in these proceedings. These sanctionable activities have been ongoing and continuous since the spring of this year. The Court will recall that during the March 27, 2024 Hearing on PTK's First Motion for Preliminary Injunction, the Court questioned the timing of Honor Society's issuance of a malicious

His recently-discovered (and by his own hand, concealed) efforts have been purposeful and widespread. This time his pattern of bribery and thinly veiled threats intimidate not only PTK but also its witnesses in this case. These communications also evidence Moradian's improper concealment of otherwise discoverable information (he states expressly to third parties that he would keep these communications "secret") as well as the improper disclosure by him of confidential information in violation of the Protective Order (e.g., disclosing confidential information learned during Dr. Tincher-Ladner's deposition). Honor Society has been following a mission apart from this case with a single goal in mind: using this lawsuit to destroy Dr. Tincher-Ladner and PTK.

Litigants that repeatedly lie and ignore court orders have no place in the civil justice system. A party cannot use the court system on one hand to prosecute claims against another, while on the other hand abuse the court system's procedures in an effort to secretly and deceptively "destroy" its adversary and later lie about that to the Court. At its core, justice requires litigants to come to court with at least some modicum of integrity. It also requires the parties to play by the rules. Moradian's conduct demonstrates none of that, and instead reflects nothing more than contumacious disrespect for this Court, its authority over him, and its procedures. It is well within

---

survey, which used confidential information obtained during Dr. Tincher-Ladner's deposition the week before. (Dkt. 135, 3/27/24 Hearing Tr. at 99:18-101:10.) And in the Court's First Preliminary Injunction Order, the Court determined Honor Society had issued a survey with "malicious intent to harm PTK's lawful business" and that Honor Society's agent David Asari had "laundered his public records requests through his personal email account." (Dkt. 130 at 4-5.) Of course, just a few months later, the Court entered a Second Preliminary Injunction Order related in part to Honor Society's publication of over 5,000 webpages and articles deriding PTK and Dr. Tincher-Ladner and the nefarious revisions Honor Society made to PTK's Wikipedia article. And in that Order, this Court also questioned Honor Society's attorneys' candor in representations made during the proceedings and Moradian's outright efforts to circumvent the Court's first injunction order. This Court most recently found Honor Society to be in contempt of its Second Preliminary Injunction Order, awarding PTK its attorney's fees and costs incurred in connection with its Motion for Contempt. (Dkt. 366 at 17.) But despite these two injunctions already in place, Moradian has continued to act with impunity and without any deference to this Court, set on a singular mission to destroy Dr. Tincher-Ladner and to get her terminated from PTK.

the Court's inherent power to sanction Moradian for this behavior. Given the malice behind Moradian's efforts, and considering his now-discovered perjury, intentional concealment of evidence, violation of other court orders, and clear efforts at witness tampering, the ultimate sanction is warranted: dismissal with prejudice of Honor Society's counterclaims and third-party claims. Grounds also exist for the default of Honor Society and Honor Society Foundation as to all claims against them by PTK. Moradian's actions here are so egregious, they merit such relief, considering the already mounting evidence of improper conduct here, including other instances of contempt of this Court's orders.

## II.    MORADIAN'S SANCTIONABLE CONDUCT.

PTK first learned of Moradian's *ex parte* contact with ex-employees or affiliates of PTK in or around April 2024. (Tincher-Ladner Decl. ¶ 5.) Dr. Tincher-Ladner received messages from several ex-PTK employees out of concern, that Moradian was reaching out by phone, text message, or social media to ask prying questions about PTK while accusing PTK of abuse. (*Id.* ¶ 6.) At the time, none of these messages was overly concerning, since these persons were not responding, and the messages did not seem voluminous or on their face pernicious. (*Id.*)

But on or around November 15, PTK became aware that these messages were far more nefarious than they originally seemed. (*Id.* ¶ 8.) Paige Rakestraw, a PTK former employee, informed PTK that she had received a message from Wendy Flores, another former employee of PTK. (*Id.*) In this message, Flores claimed that she was "asked to reach out to" her and that "[t]his CEO, Mike, is out to *destroy* Lynn and remove her from her position . . . ." (*Id.*) (emphasis added) This was concerning to PTK for reasons beyond the obvious potential impact on PTK's charitable business – it evidenced a deception by Moradian on this Court in his July 17 testimony. PTK immediately contacted Honor Society to request copies of all third-party communications Moradian had with current former PTK employees, officers, and other affiliates. (Smoot Decl. ¶

6.) At first resisting, Honor Society reluctantly agreed to produce this information after PTK contacted Magistrate Judge Myers. (*Id.* ¶¶ 6-7.) So it was only for the first time on December 10 that PTK began to understand how many people Moradian has improperly contacted during the preceding six months. (*Id.* ¶ 7.) Then, through subpoenas issued to some of those persons Moradian had contacted, the entire ugly picture developed.

### A. Moradian Perjured Himself to the Court.

What is now clear from these otherwise concealed communications is that Moradian lied to this Court at the July 17 hearing. As this Court is aware, PTK was required to file not one but two Motions for Preliminary Injunction related to Honor Society's malicious activity directed at PTK and Dr. Tincher-Ladner. (Dkts. 116, 220.) Specifically with respect to the July Motion for Preliminary Injunction, and at Honor Society's insistence, the parties appeared before the Court on July 12 and 17 for a two-day evidentiary hearing. (Dkts. 228, 229.) At issue was Moradian's use of generative artificial intelligence to create 5,000+ websites all designed to disparage PTK and its CEO, Dr. Tincher-Ladner.[2] Included in the malicious content were websites with titles suggesting that Dr. Tincher-Ladner was the "mastermind" of PTK's allegedly deceptive conduct, and others associating Dr. Tincher-Ladner with racist east Asian tropes. (ECF No. 230 at 4, 15, 18.). The material focus in that proceeding was Moradian's intent in launching that effort, and whether he had created these sites with malice. For that reason, at the hearing, PTK's counsel asked the question directly:

> Q:    *Do you want Dr. Tincher-Ladner fired?*
>
> A:    *That is not my intention. It's never been my intention . . .*

---

[2] At the time, and on appeal, Honor Society has argued that these publications were "to counteract PTK's disinformation" rather than made with any malicious intent. *See* Defs' Appeal Brief, Case No. 24-60452, Dkt. 52 at 17.

(Dkt. 229, July 17, 2024 Hearing Tr. at 64, l. 11-12 (emphasis added)).

Nearly three months later, PTK deposed Moradian as Honor Society's designated Rule 30(b)(6) witness in relation to the revisions made to PTK's Wikipedia page. There, Moradian repeated this lie on multiple occasions, stating "I have nothing against PTK and I have nothing against Dr. Tincher-Ladner. I think they both have tremendous potential." (Smoot Decl. ¶ 3, Ex. A-1, 10/1/24 Dep. Tr. at 40:5-8. *See also id.* at 75:6-7 ("I never had an issue with Don [sic] nor Dr. Lynn-Tincher-Ladner."); 118:13-14 ("And, again, I'm not saying these to hurry anybody's feelings, I respect Dr. Lynn and PTK . . . .").) Moradian later stated "I don't hold anything against PTK or Lynn. I understand being a leader." (*Id.* at 199:8-11.) He even testified "I like the idea of PTK. I like the idea of Dr. Lynn-Tincher-Ladner . . . ." (*Id.* at 213:11-13.) Moradian concluded "I am trying my best here to open the doors to Dr. Lynn Tincher-Ladner to help her and to help all of us move forward and focus on creating value for students on spending our money . . ." (*Id.* at 263:6-10.)

But now PTK has learned that the only door Moradian has wanted open since May of this year is one for Dr. Tincher-Ladner to use as her exit from PTK. The following are text messages from former PTK employees discussing Moradian's intent or messages from Moradian himself demonstrating such (importantly, several were before his testimony on July 17 to the Court):

- 11/13/24 Message from Wendy Flores[3] to Paige Rakestraw[4]: "This CEO, *Mike, is out to destroy Lynn and remove her from her position* . . . ." (Tincher-Ladner Decl. ¶ 9, Ex. B-2 (emphasis added));

---

[3] Flores, previously named Wendy Giammarco, was employed by PTK from 1997 to 2022. At the time of her departure, her primarily responsibilities were over events and scholarships.

[4] Paige Rakestraw, previously named Paige Still, was employed by PTK from 2012 to 2024. Her primary responsibilities related to membership and customer service support.

- 6/14/24 Message from Moradian to J. Cameron Chaney[5]: "PTK is aggressive and willing to lie. We are going to win this by everyone telling the truth together. So you help means the world *to overcoming Lynn*, PTK and their injustices." (Smoot Decl. ¶ 14, Ex. A-21 (emphasis added));

- 6/27/2024 Message from Flores to Christin Grissom[6]: "This guy is on a mission! He said he tried to settle with her and said he'd stay out of the community college area and she refused. So he's digging up stuff from Rod days to current day, looking into Courtney Lange and her Prima Donna position in the Foundation department, he's talked to old IO officers, old staff like Luke and Dawneen and It seems the students that filed that lawsuit against Rod feel like they were dismissed by PTK and Lynn and want justice. *He's determined to get her removed from office.* He's willing to pay for attorneys fees for any previous staff who has information or documentation to support the toxic behavior." (*Id.* ¶ 18 Ex. A-26 (emphasis added));

- (undated but by context likely also in June, 2024)[7] Message from Cameron-Chaney to Moradian: "I hope your team is able *to get Lynn out of her position*." (*Id.* ¶ 14, Ex. A-22.) Moradian responds "*We can and must together*!" (*Id.* (emphasis added)).

These messages clearly show that Moradian lied to the Court in July and at deposition in October. His testimony in July that he did not intend to have Dr. Tincher-Ladner terminated from her employment was clearly after his June communications with these former employees where he stated the contrary. His conduct in November was just more of the same, demonstrating that same ill-intent and malice towards Dr. Tincher-Ladner and his deceptive statements to the Court.

---

[5] Cameron-Chaney was employed by PTK from 2021 to 2024. At the time of her departure, her primary responsibilities related to membership and customer service support. According to another document Honor Society produced, Cameron-Chaney emailed Moradian and wished to stay anonymous, requesting the use of a pseudonym "Mr. Smiley." (Smoot Decl. ¶ 16, Ex. A-7.)

[6] Grissom was employed by PTK from 2007 to 2021. Her responsibilities over time related to scholarships and membership.

[7] In the same text thread, Moradian notes "a few of these songbirds can and should be deposed as early as mid summer." (Smoot Decl. ¶ 14, Ex. A-22.) But by the time of the July 17 hearing, mid-summer was already here; so it can be reasonably implied these communications occurred in June 2024.

### B. *Moradian Attempted to Improperly Influence Witnesses.*

The text and other communications obtained from Moradian and these former employees demonstrate more than just his perjury. They also evidence his offering of improper incentives to influence witnesses in this matter.

#### 1. *Moradian suggested bribes to witnesses to induce their cooperation.*

PTK has uncovered previously hidden evidence that Moradian offered witnesses *quid pro quo* exchanges for information. He offered to "*pay for attorneys fees* for any previous staff who has information or documentation to support the toxic behavior." (Smoot Decl. ¶ 18, Ex. A-26.) Moradian also offered employment to former PTK employees while seeking their favorable testimony in this matter. He contacted Kathryn Johnson Santhuff, a former PTK employee, via LinkedIn message on September 19, claiming "I heard about what happened to you at PTK and sorry to learn of your experience. I'd like to connect with you to learn more and see if I can help in any way either with the past *or helping find you new work.*" (*Id.* ¶ 10, Ex. A-9 (emphasis added).)

Similarly, just days after Dr. Monica Marlowe left the Phi Theta Kappa Foundation, she received a message from Moradian, who told her "From what I can tell, you are a great person and deserve the best. That's what *I'd like to make sure you get.*" (Smoot Decl. ¶ 11, Ex. A-11 (emphasis added).) Implying that Marlowe left on bad terms, Moradian offered to assist Marlowe either financially or in her efforts to find a new position – another thinly veiled bribe for information.

Because of Moradian's efforts to keep these and other communications a secret (as described more fully below), it is likely that these offers of value to witnesses in exchange for favorable testimony and cooperation occurred with other witnesses – but the communications were only oral. In all, PTK has discovered that Moradian contacted as many as 24 former and current PTK employees since May 2024 – all of which were concealed by Defendants until December 10.

(Smoot Decl. ¶ 7.) Based on his written communications with Santhuff and Marlowe, and memorializations by Flores, there is little doubt Moradian offered the same if not more to those he communicated with orally.

### 2. Moradian threatened witnesses for their cooperation.

Just as Moradian offered the "carrot" of financial and other rewards for cooperation, he also threatened the "stick" to others. To coerce individuals to talk to him, Moradian resorted to threatening expense associated with participating in formal discovery. For example, on November 20, Moradian texted Steve Mulhollen, PTK's former Chief Financial Officer, "You were named as a witness in a litigation" when no parties have disclosed him as such. (Smoot Decl. ¶ 5, Ex. A-2.) When Moradian didn't receive a response from Mulhollen, Moradian stated "*I'd prefer to ask you directly rather than having to take your deposition for a full day.* Could we just chat a few minutes at your convenience." (*Id.* (emphasis added).)

This is consistent with his other activities known to date. Just days after this Court entered its First Preliminary Injunction Order, Moradian threatened PTK board member Dr. George Boggs at the conclusion of his deposition (Boggs Decl. ¶ 3.) There, Moradian told Dr. Boggs that unless PTK settled with Honor Society, Moradian would pursue a Paycheck Protection Program ("PPP") fraud investigation into PTK's PPP loans. (*Id.* ) Moradian sat in throughout most of Dr. Boggs deposition and was present when Dr. Boggs confirmed that in his position as a member of the Board of Directors, he not only has influence over PTK's ability to settle the litigation but also Dr. Tincher-Ladner's employment. (*Id.* ¶ 5.)

### C. Moradian Misrepresented Himself and His Motivations in the Communications.

When contacting PTK's employees and officers, Moradian repeatedly misrepresented himself and the lawsuit, just as he made those same misrepresentations in connection with the 5,000+ websites (and at a time when he knew of the scope and basis of the Court's Second

Preliminary Injunction). Rather than himself as an interested party, Moradian claimed he "had some questions about" a person's time at PTK and "just wanted to connect." (*See, e.g.*, Smoot Decl. ¶ 12.) Moradian also misrepresented Honor Society as the aggrieved/crusading party, deliberately omitting that PTK initiated the lawsuit based on Honor Society's bad actions, which the Court found to be misleading in its Second Preliminary Injunction Order. (*see, e.g., id.*, Ex. A-19, Ex. A-20.) Some examples are as follows:

- To Larry Horn[8]: "I was referred to contact you about PTK by ex-employees, and could really use your help. We're working to protect students, employees and others from potential abuses at PTK. Can we have a quick call at your convenience?" (*Id.* ¶ 12, Ex. A-13.)

- To Kierra Handy[9]: "I was referred to contact you by an ex-PTK employee. I'm the president of Honor Society and we're in a lawsuit with PTK in order to protect students, employees and the general public from the leadership abuse at PTK, and I'd like to hear your story. Can we connect soon?" (*Id.* ¶ 13, Ex. A-19.)

- To Steve Mulhollen: "I was referred to contact you by an ex-PTK employee. We're suing PTK in order to protect students, employees and the general public from the leadership abuse at PTK, and I'd like to hear your story.  Can we connect sometime soon? (*Id.*, Ex. A-20.)

- To "Luke"[10]: "I was referred to contact you about PTK by ex-employees and ex-IO's, and could really use your help. We're working to protect students, employees and others from potential abuses at PTK." (*Id.* ¶ 17, Ex. A-15.)

- To Nancy Sanchez[11]: "We need to protect students and employees of PTK from abuse and I'd appreciate your time for a quick call." (*Id.*, Ex. A-16.)

---

[8] Larry Horn was employed with PTK from 2001 to 2019. His responsibilities were primarily related to PTK's IT systems.

[9] Kierra Handy was employed with PTK as a Social Media Coordinator from 2018 to 2020. Her responsibilities included creating content, scheduling posts, engaging with followers and monitoring analytics for PTK's social media accounts.

[10] "Luke" is believed to be Lucas Davis, former PTK Associate Director of Chapter Relations, employed from 2009 to 2013. In that position, his responsibilities involved management of programs and membership for chapters in the eastern United States.

[11] Nancy Sanchez was employed with PTK as its Chief Opportunity Officer from 2022 to 2023.

- To "Stacy"[12]: "I'd like to learn more about your experiences with PTK and Lynn, in an effort to protect students and employees from abuse." (*Id.* ¶ 17, Ex. A-18, ) and a month later "I need your help to protect students and employees hurt by her." (*Id.*).

Much like his colleague David Asari, Moradian is laundering his role in this lawsuit in these communications – there is no mention of Moradian's personal and vested interest in this case. These misrepresentations that Honor Society is the party suing PTK without mentioning the original claim from PTK are the same misrepresentations the Court found to be false in its Second Preliminary Injunction Order. (Dkt. 230 at 13 ("Honor Society misleads again when it frames itself as the plaintiff in this litigation. . . . This lawsuit was, of course, filed by PTK. Honor Society knows this. There is no justification for this conduct.").) But these misrepresentations go one step further, claiming Honor Society is seeking to protect "employees" from purported abuse, yet Honor Society has asserted no such claim and these efforts were just more malingering and malicious disparagement of PTK and Dr. Tincher-Ladner. Clearly Moradian's efforts were not altruistic – his intention was to use this dirt to "destroy" Dr. Tincher-Ladner and get her employment terminated.

### D. Moradian (Again) Disclosed Information Designated by PTK as "CONFIDENTIAL", To Improperly Influence Witnesses.

Moradian's improper communications also reveal his disclosure of confidential information obtained during deposition testimony and through PTK's document production. (Smoot Decl. ¶ 5.) Moradian texted Mulhollen, PTK's former Chief Financial Officer, "Lynn derided you on your way out" and requested a call or Mr. Mulhollen would otherwise have to appear for a deposition. (*Id.*, Ex. A-2.) But the "derision" noted in this text message was based on a confidential email PTK produced during the litigation, which Honor Society questioned PTK's

---

[12] "Stacy" is believed to be Stacy Nelson, employed by PTK from 2007 to 2021 as a PTK Store Associate. Her responsibilities included shipping and receiving store goods and customer service of store patrons.

Chief Financial Officer about at her March 18 deposition. (*Id.*, Ex. A-3, 3/18/24 Chandler Dep. Tr. at 24:6-9; *id.*, Ex. A-29) Such disclosure follows a pattern of disregard Moradian has engaged in throughout this case. Moradian denied that his statement was based on that deposition testimony, claiming instead he learned it from other former employees. (*Id.* ¶ 6, Ex. A-4, 12/2/2024 Email from D. Newman ("[Moradian] repeated something he heard from third parties.").) This is doubtful, and there is no basis to believe anything Moradian says based on his track record of deceit to date. Also, there are no references in any of the communications between Moradian and these prior employees about Mulhollen. (*Id.* ¶ 5.)

The Court is already aware of other uses by Moradian of confidential information. He admitted to relying on Dr. Tincher-Ladner's testimony provided at that same confidential deposition in creating the malicious March survey, and that the survey contained information he learned at that deposition. The Court recognized that improper reliance during the March 27 Evidentiary Hearing. (Dkt. 135 at 100:17-21 (Court: "Some of the [survey] information there, it appears to me from reading the papers, probably came at the time that Dr. Tincher-Ladner's deposition was taken, and I think we've already agreed or been told that deposition was sometime in February."):

### E. *Moradian Conspired to Intentionally Conceal Production of Relevant Documents in Discovery.*

Over the last six months, Moradian secretly communicated with former (and purportedly current)[13] employees of PTK, seeking information he wants to use in this litigation, or at minimum were otherwise responsive to a request for production. Never were these communications

---

[13] Documents produced in response to PTK's third-party subpoenas implicate that at least at one point, a current employee of PTK was actively working with Moradian, including providing Moradian with PTK-documents that were not produced based on PTK's prior objections to written discovery requests. (Smoot Decl. ¶ 17, Ex. A-30.) These documents include private student communications to PTK that otherwise would have been produced HIGHLY CONFIDENTIAL – ATTORNEYS EYES ONLY. (*Id.*)

identified to PTK, nor where they produced in discovery despite an obligation to do so under Rule 34.

Honor Society has already informed the Court that it believes the negative information about PTK from its employees is relevant to its affirmative defenses to PTK's Lanham Act claims. (Dkt. 91 at 8.) Honor Society previously issued a subpoena to NAVEX, a third-party contractor who handled complaints related to PTK's Code of Conduct. PTK moved to quash the subpoena, and in its Opposition to PTK's Motion, Honor Society informed the Court that the information sought would be relevant to its defense that it would not trade off an organization with a poor reputation. (*Id.*) Magistrate Judge Ball granted PTK's motion, finding that any private complaints (including those by PTK employees) has no bearing on PTK's public reputation. (Dkt. 95 at 4.) Honor Society has made other attempts to secure this information through discovery, including its Second Motion to Compel, which is pending. (Dkt. 300). Nevertheless, it appears Moradian has persisted with trying to obtain this discovery through his improper communications with current and former PTK employees.

Further, Moradian's communications with these former and then current employees are clearly responsive to PTK Request No. 7 (served on April 12, 2023):

> 7.    Documents, including Communications, other than Communications with Your attorneys or Documents from Your attorneys, relating to or referencing Plaintiff, PTK, any employee, former or present, of PTK, Lynn Tincher-Ladner, PTK EDGE, CAREER EDGE and/or the above-captioned litigation, whether created before or after the date of filing this Lawsuit.

(Smoot Decl. ¶ 7.) The failure to identify is a discovery violation, but active concealment and conspiracy to do so is another matter. Yet that is what these communications clearly show. Moradian repeatedly promised these individuals to keep his communications with them a secret and that he would "respect confidentiality" of the communications. (*See, e.g.*, *id.* ¶ 16.) Moradian

even told one former employee that their conversations "are all off the record convos and I won't be quoting you or sharing things you said." (*Id.*)

After learning of these communications, PTK made multiple requests to Honor Society to supplement its production with all responsive information. (Smoot Decl. ¶ 6.) Honor Society did not do so until December 10 and only after PTK was forced to notify Magistrate Judge Myers of the deficiency. (*Id.* ¶ 7.)

## III. DEFENDANTS' PERJURY AND INTENTIONAL DISREGARD FOR THIS COURT'S ORDERS MERITS "DEATH PENALTY" SANCTIONS.

### A. Standard for Dismissal Under Rule 41(b).

Under Rule 41(b), a federal district court is authorized to "dismiss an action or claim of a party that fails to prosecute, to comply with the Federal Rules, or to obey an order of the court." *Chase v. Dietrich*, 2017 WL 4400018, at *1 (S.D. Miss. Sept. 30, 2017) (citing *Chambers v. NASCO, Inc.*, 501 U.S. 45, 62 (1991)). This inherent power applies equally to a dismissal ("when the plaintiff has engaged in sanctionable conduct") as well as default judgment ("when the defendant has engaged in sanctionable conduct"). *Sarco Creek Ranch v. Greeson*, 167 F.Supp.3d 835, 845 (S.D. Tex. 2016) (citing *Woodson v. Surgitek*, 57 F.3d 1406, 1417 (5th Cir. 1995)). *See also Pressey v. Patterson*, 898 F.2d 1018, 1021 n. 2 (5th Cir.1990) (stating that sanctions of default judgment and dismissal with prejudice are viewed "interchangeably" in this circuit).

"[D]ismissal with prejudice is an extreme sanction" appropriate 'only if: (1) there is a clear record of delay or contumacious conduct by the plaintiff, and (2) lesser sanctions would not serve the best interests of justice.'" *Taylor v. Consol. Pipe & Supply Co., Inc.*, 2017 WL 3090317, at *2 (S.D. Miss. July 20, 2017) (J. Reeves) (citing *Brown v. Oil States Skagit Smatco*, 664 F.3d 71, 77 (5th Cir. 2011)). "[I]t is not a party's negligence—regardless of how careless, inconsiderate, or understandably exasperating—that makes conduct contumacious; instead, it is "the stubborn

resistance to authority" which justifies a dismissal with prejudice." *Id.* (citing *McNeal v. Papasan*, 842 F.2d 787 (5th Cir. 1988)).

In *Brown*, the Fifth Circuit recognized perjury as contumacious conduct. 664 F.3d at 77-78. An oath to tell the truth "is not trivial. The proper administration of justice depends on people testifying truthfully under oath." *Id.* at 77 (citation omitted). Providing deceitful conflicting testimony to further a party's own interest in a lawsuit "undermine[s] the integrity of the judicial process" and amounts to "fraud upon the court." *Id.* at 78. *See also Taylor*, 2017 WL 3090317, at *2 ("At the beginning of a deposition, the witness solemnly swears to tell the truth, the whole truth, and nothing but the truth, under penalty of perjury. The oath 'is not trivial.' It has power and force. It means something.") (citation omitted). But generally, this Court has defined "contumacious conduct" as "a lack of respect for the Court or the Rules governing the judicial process and procedure." *Chase*, 2017 WL 4400018, at *2.

This Court has wide discretion in granting the relief requested by PTK. *Id.* ("The Fifth Circuit will only reverse this Court's decision if it finds an abuse of discretion." Such discretion is guided by the existence of certain "aggravating factors" as identified by the Fifth Circuit:

> In affirming these cases, the Fifth Circuit has dismissed many cases with prejudice that have involved the presence of one or more of three "aggravating factors": (1) the delay or failure to comply is attributable directly to the plaintiff, rather than his attorney; (2) actual prejudice to the defendant; and (3) the delay or failure to comply is caused by intentional conduct.

*Id.* (citing *Callip v. Harris Cnty. Child Welfare Dep't.*, 757 F.2d 1513, 1519 (5th Cir. 1985)).

### B. Moradian's Repeated Perjury Warrants Dismissal of Honor Society's Entire Case.

Moradian's perjury alone is sufficient to warrant a sanction of dismissal of Honor Society's entire case. Federal courts routinely dismiss claims as sanctions for perjured testimony. *See, e.g.*, *Jackson v. Murphy*, 468 F. App'x 616, 620 (7th Cir. 2012) (affirming dismissal of plaintiff's claim

14

based on his proffer of perjured testimony and forged documents); *Garcia v. Berkshire Life Ins. Co. of Am.*, 569 F.3d 1174, 1180 (10th Cir. 2009) (affirming dismissal following plaintiff's affirmative fabrication of evidence relevant to her claims); *Monsanto Co. v. Ralph*, 382 F.3d 1374, 1381 (Fed. Cir. 2004) (affirming striking of defendant's pleadings due to defendant's perjured testimony and failure to voluntarily provide discovery that he was otherwise obligated to provide).

The Fifth Circuit is no different than other circuits in its treatment of perjured testimony and doctored evidence. *See Brown*, 664 F.3d at 77 (affirming dismissal with prejudice as plaintiff's perjured testimony "effectively killed" his claim); *Greeson*, 167 F.Supp.3d at 846 (acknowledging the concern of imposing "extreme sanction of dismissal . . . is not present" when a party has "directly engaged in the alleged misconduct as is the case with perjury"); *Tesco Corp. v. Weatherford Int'l, Inc.*, 2014 WL 4244215, at *6–7 (S.D. Tex. Aug. 25, 2014) (imposing death penalty sanctions under the court's inherent power when a lawyer lied to the court about a witness's out-of-court testimony in order to gain an unfair advantage during litigation); *Farris v. Ben E. Keith Co.*, 2018 WL 354762, at *1 (E.D. Tex. Jan. 10, 2018) (dismissing plaintiff's claim with prejudice following his "offering both perjured testimony and forged documents in an attempt to advance his claims"); *Wagner v. Boh Bros. Const. Co., LLC.*, 2012 WL 3637392, at *10-11 (E.D. La. Aug. 22, 2012) (finding "[t]he factual circumstances and holdings of *Brown* are directly on point with the instant case" and dismissing plaintiff's case with prejudice).

In *Taylor*, this Court recounted plaintiff's false testimony and misrepresentations she made in her deposition, interrogatory responses, and "self-serving affidavit." 2017 WL 3090317, at *2-3. Because the "misrepresentations came from the client herself[, t]he consequences should be imposed upon her." *Id.* at *3. Specifically, the Court found that plaintiff "deceitfully provided conflicting testimony in order to further [her] own pecuniary interests . . . and, in doing so,

undermined the integrity of the judicial process. Through [her] perjured testimony, [Taylor] committed fraud upon the court, and this blatant misconduct constitutes contumacious conduct." *Id.* at *4 (citation omitted). As a result, the Court could not find "a less onerous sanction that would address [plaintiff's] pattern of conduct, achieve deterrence, and preserve the integrity of the judiciary." *Id.* Just like in *Taylor*, Moradian's repeated perjured testimony "serves no purpose" except to benefit Defendants' pecuniary interests and prevents the proper administration of justice such that the harshest sanction should be imposed. *Taylor*, 2017 WL 3090317, at *4 (citing *Brown*, 664 F.3d at 77.)

Moradian's perjured testimony gets to the core of the malice element at issue in the injunction motion. His answer was intentionally designed to cause this Court to believe he had created the websites based on altruism not malice. These websites parroted Honor Society's claims that PTK has engaged in false advertising, defamation, tortious interference and anti-competitive activities. As such, Moradian's perjury extends to his assertion of these claims as well. And his efforts to see Dr. Tincher-Ladner terminated, while doing so secretly, also speak to Defendants' defenses to PTK's affirmative claims, since Dr. Tincher-Ladner is in a position of authority on settlement and continued prosecution of the claims by PTK against Honor Society. Considering the scope of not only the substance of his perjured testimony but also his efforts to actively conceal the truth, the effect speaks to all claims at issue in this lawsuit. His perjury permeates everything.

Moradian has no defense either that he may have "changed his mind" at some point after the hearing on whether to target Dr. Tincher-Ladner's employment. Many of Moradian's communications with former employees were dated well before the July 12 and 17 evidentiary hearings, even though they continued long after. (Smoot Decl. ¶ 8.)

Thus, Moradian's perjured testimony was material to his July 17 in-court testimony and

the claims asserted in this matter by all parties. He "deceitfully provided conflicting testimony in order to further [his] own pecuniary interests . . . and, in doing so, undermined the integrity of the judicial process." *Taylor*, 2017 WL 3090317, at *4 (citing *Brown*, 664 F.3d at 78). Through his perjured testimony, Moradian committed fraud upon the court, and this blatant misconduct constitutes "contumacious conduct." This Court, like all other courts, treats the act of perjury as singularly determinative of whether to impose sanctions, because of the harm such act have on justice itself and the need to deter future similar misconduct by other litigants:

> The proper administration of justice depends on people testifying truthfully under oath. Courts have a duty to protect the public and safeguard the judicial process. As the Supreme Court explained more than 70 years ago, "tampering with the administration of justice . . . is a wrong against the institutions set up to protect and safeguard the public, institutions in which fraud cannot complacently be tolerated consistently with the good order of society." *But here, as in other areas of the law, the most severe in the spectrum of sanctions provided by statute or rule must be available to the district court in appropriate cases, not merely to penalize those whose conduct may be deemed to warrant such a sanction, but to deter those who might be tempted to such conduct in the absence of such a deterrent.*

*Id.* (citations omitted) (emphasis added).

### C. Moradian's Other Conduct Rises to Contumacious Conduct and Also Warrants Dismissal of Honor Society's Entire Case.

Moradian's perjury on material issues is alone sufficient to warrant Rule 41(b) relief. But Moradian's continued resistance to this Court's authority extends well beyond that act of dishonesty, including illegal influencing or attempts to influence witnesses, contempt of the Second Preliminary Injunction, and violations of the Protective Order, all of which compounds the strong case demonstrating his contumacious conduct. *See Brown*, 664 F.3d at 77 (citation omitted) ("[I]t is not a party's negligence—regardless of how careless, inconsiderate, or understandably exasperating—that makes conduct contumacious; instead, it is 'the stubborn resistance to authority' which justifies a dismissal with prejudice."). Each of these actions alone has been found to be sanctionable in this Court or others, further affirming that Moradian will not be deterred

17

absent the sanctions sought by PTK.

### 1. Suggesting bribes to PTK's witnesses is contumacious conduct.

Attempting to influence and bribe a witness is sanctionable pursuant to a court's inherent authority. In *Ramirez v. T&H Lemond, Inc.*, the Seventh Circuit affirmed the sanction of dismissal of the case under the court's inherent authority where the plaintiff engaged in witness tampering through bribery. 845 F.3d 772, 779-82 (7th Cir. 2016). Likewise, the Supreme Court of Mississippi has held that in instances where a party attempts to influence material witness testimony, such conduct is sanctionable and grounds for dismissal (even without the defendant's other misconduct). *Ill. Cent. Gulf R. Co. v. McLain*, 174 So.3d 1279, 1286 (Miss. 2015).[14] *Accord Young v. Office of U.S. Senate Sergeant at Arms*, 217 F.R.D. 61, 68-69, 71 (D.D.C. 2003) (finding third-party monetary offer on behalf of plaintiff to witness was an attempt to "influence the testimony of two witnesses in bad faith" and subjecting plaintiff's claim to dismissal). Mississippi law defines "bribery to induce perjury" as:

> Every person who shall, by the offer of any valuable consideration, attempt, unlawfully and corruptly, to procure any other person to commit wilful and corrupt perjury as a witness in any cause, matter, or proceeding in or concerning which such other person might by law be examined as a witness, shall, upon conviction, be punished by imprisonment in the penitentiary not exceeding five years.

Miss. Code Ann. § 97-9-65.

Although Moradian has not offered straight cash (to PTK's knowledge anyway) he has apparently offered money in the form of attorney's fees and assisting former PTK employees to find "new work." (Smoot Decl. ¶¶ 10, 11, 18.) Such offers are inducements that amount to bribery under the Mississippi statute and a sanctionable attempt to influence witnesses in this case. Moradian should not be permitted to buy negative testimony in exchange for information Honor

---

[14] Mississippi courts have "adopted the standard promulgated by the Fifth Circuit for review of dismissals" pursuant to their respective Rules 41(b). *Hillman v. Weatherly*, 14 So.3d 721, 725-26 (Miss. 2009).

Society purportedly planned to use in support of its defenses against PTK's claims. Such conduct calls for dismissal of Honor Society's and Honor Society Foundation's entire case.

### 2. Suggesting threats to PTK's witnesses is contumacious conduct.

PTK's recent discovery of Moradian's threats of multiple material witnesses also calls for sanctions. Courts regularly find that threatening a witness with litigation to interfere with their participation in a suit is sanctionable. *See, e.g.*, *Graves v. Standard Ins. Co.*, 2015 WL 13714166, at *3, 11 (W.D. Ky. May 22, 2015) (issuing sanctions under the court's inherent authority when counsel attempted to "improperly coerce" a witness to withdraw his adverse opinion "by suggesting the possibility of litigation"); *Harlan v. Lewis*, 982 F.2d 1255, 1259 (8th Cir.), *cert. denied*, 510 U.S. 828 (1993) (imposing sanctions under the court's inherent authority where counsel attempted to influence expert witnesses not to testify because they also might be sued by the plaintiff, and could avoid potential liability by refusing to testify).

As PTK learned in Honor Society's December 10 production, Moradian threatened Steve Mulhollen, PTK's former Chief Financial Officer, with a deposition if he declined to speak with Moradian directly. (Smoot Decl. ¶ 5.) This veiled threat of burdensome litigation conduct mirrors the threat Moradian made to Dr. Boggs on April 5, following his deposition. (Boggs Decl. ¶¶ 2-3.) Then, knowing of Dr. Boggs role in potentially settling the case, Moradian claimed he would initiate a PPP fraud investigation of PTK if PTK did not settle. (*Id.* ¶ 3.) To PTK's knowledge, Honor Society has yet to file any such PPP fraud claim, further evidencing the baseless nature of the threat to Dr. Boggs. (*Id.* ¶ 4.)

### 3. Moradian has repeatedly violated the Protective Order, which amounts to sanctionable conduct.

This Court has already recognized Moradian's improper use of provisionally sealed confidential information obtained during Dr. Tincher-Ladner's deposition to launch a malicious

survey about PTK that the Court subsequently enjoined. (Dkt. 135 at 100:17-21.) And now, Moradian has made such improper disclosures again in violation of the Court's Protective Order in his communications with Steve Mulhollen that referenced Paige Chandler's testimony (i.e., "Lynn derided you on your way out . . ."). (Smoot Decl. ¶ 5.) "Wilful [sic] and unexcused violations of the protective order . . . certainly qualify as 'contumacious conduct'" that gives rise to dismissal. *Marroco v. Gen. Motors Corp.*, 966 F.2d 220, 224 (7th Cir. 1992). In *Marroco*, the defendant claimed that only a showing of intent to violate the protective order would support sanctions. *Id.* The Seventh Circuit disagreed, finding that "gross negligence" was all that was required. *Id.* at 224-25. Certainly, Moradian's misconduct here was intentional, exceeding the otherwise lesser "gross negligence" standard.

### 4. Moradian's intentional concealment of evidence further evidences contempt for this Court's rules and orders.

Moradian and Honor Society's active concealment of these secret communications with PTK's former employees is particularly egregious. It was intentional, and the texts themselves show that Moradian knew they were discoverable but instead chose to conceal them from PTK. These communications were specifically requested through a Rule 34 request for production served in April 2023. (Smoot Decl. ¶ 7.) Never were these communications produced until December 10, 2024. (*Id.* ¶¶ 7-8.) PTK does not point to this failure as evidence of abuse of either Rule 26 or 34. Typically, such a failure would be addressed by an order to produce the documents. But here, the issue is not just a lack of production but the refusal to play by the rules at all – in the larger context of the perjury, the witness intimidation and bribery, etc. There is no mistake that Moradian knew at the time he was keeping these communications secret that he was flouting his discovery obligations. That was the whole point of him telling these persons that it was "best" to keep these communications not in writing so they would need to be produced. (*Id.* ¶ 16.) But

inherent in such a statement is that to the extent they *were* in writing, they *should be* produced.

In *Snider v. L-3 Commc'ns Vertex Aerospace, LLC*, this Court was asked to reconsider its dismissal of plaintiff's case as a sanction for similar concealment of evidence. 2016 WL 3648281, at *1 (S.D. Miss. Mar. 15, 2016). In denying the motion for reconsideration, the Court found that L-3 had "propounded to Snider interrogatories and requests for production which if answered truthfully would have revealed Edwards' [L-3's outside counsel] role in Snider's EEOC investigation and Title VII complaint. Yet, Snider concealed the voluminous emails, documents, and factual matters that would have revealed the assistance Edwards provided." *Id.* at *14. Snider and Edwards continued their collusion to further another party's own claims against L-3. *Id.* This conduct contradicted Snider's prior deposition testimony, and the Court found that Snider's "discovery concealment rises to the level of contumacious conduct" appropriate for a dismissal. *Id.* at *14-15.

Honor Society has actively concealed Moradian's communications with former PTK employees since Moradian's first communication since at least May of this year, and certainly before the July 17 hearing when Moradian testified. It is no coincidence that these secret text messages and other communications prove Moradian's deception at the court hearing as to his true intent vis-à-vis Dr. Tincher-Ladner. The connection is undeniable. Honor Society's "discovery concealment rises to the level of contumacious conduct" this Court has already found to warrant dismissal. *Snider*, 2016 WL 3648281, at *14. *See also Nat'l Hockey League v. Metro. Hockey Club, Inc.*, 427 U.S. 639, 640-41 (1976) (affirming district court's sanction of dismissal based on plaintiffs' "callous disregard of responsibilities counsel owe to the Court and their opponents.").

### D. Lesser Sanctions Would Not Be Enough of a Deterrence.

Moradian has perjured himself before this Court and in depositions. He has attempted to bribe and threaten witnesses he believes have information material to Honor Society's defenses.

He has also repeatedly disclosed information in violation of the Protective Order. Each of these actions alone has been found to be contumacious conduct warranting dismissal. *See, e.g.*, *Taylor*, 2017 WL 3090317, at *4 (dismissing action based on plaintiff's perjury); *Young*, 217 F.R.D. at 71 (finding third-party monetary offer on behalf of plaintiff to witness was an attempt to "influence the testimony of two witnesses in bad faith" and subjecting plaintiff's claim to dismissal); *Marroco*, 966 F.2d at 224 (holding violation of protective order amounts to contumacious conduct giving rise to dismissal); *Snider*, 2016 WL 3648281, at *14 (concluding plaintiff's active concealment of "voluminous emails, documents, and factual matters . . . rises to the level of contumacious conduct."). Together, any lesser sanction other than default of Defendants on PTK's claims and dismissal of their entire case would not deter Moradian from his contumacious conduct.

Under Fifth Circuit precedent, "the district court [is required to] use 'the least onerous sanction which will address the offensive conduct." *Brown*, 664 F.3d at 78 (citation omitted). "A district court's dismissal of an action with prejudice is 'appropriate only if its deterrent value cannot be substantially achieved by use of less drastic sanctions.'" *Id.* (citation omitted). "Lesser sanctions include assessments of fines, costs, or damages against the plaintiff, conditional dismissal, dismissal without prejudice, and explicit warnings." *Domingue v. Jantran, Inc.*, 2020 WL 5632964, at *6 (N.D. Miss. Sept. 21, 2020) (citing *In re Taxotere (Docetaxel) Prods. Liab. Litig.*, 966 F.3d 351, 360 (5th Cir. 2020)). "While the best interests of justice include consideration of the impact on the instant case, . . . a court may also consider the need to deter similar conduct in future cases." *Id.* (citation omitted).

In *Taylor*, in dealing with the appropriate sanction for perjury, this Court considered ordering plaintiff to pay fees, "or simply allowing defendants to re-depose her." 2017 WL 3090317, at *3. But ultimately, the Court found "[t]hree facts counsel against those options": (1)

plaintiff's "perjury was so overwhelming that it reaches almost every kind of physical and emotional injury she claims the accident caused"; (2) plaintiff "misrepresented her situation to the defendants [and] failed to disclose her medical history to her post-accident treating physicians"; and (3) "simply allowing her to be re-deposed at this juncture would alter the scales by allowing Taylor to correct and clarify her tainted testimony." *Id.* In looking at these three facts, the Court found "Taylor's conduct should not be so easily excused." *Id. See also Wagner*, 2012 WL 3637392, at *10 (declining lesser sanctions short of dismissal in part because "[a]n order precluding plaintiff from testifying at trial would probably harm defendant more than plaintiff, given his demonstrated disdain for the oath and the likely effect that would have on defendant's credibility choice defense at trial"); *Chase*, 2017 WL 400018, at *9 (determining "Court, as a gatekeeper for the integrity of trials" should not permit the lawsuit to "go forward with a Plaintiff who has shown so little respect for his obligation to answer questions truthfully.").

This record is replete with Moradian's disregard for the Court and its authority, and like the plaintiff in *Taylor*, Moradian's conduct should not be excused. Moradian's repeated lies to the Court go to the very claims and defenses Honor Society and Honor Society Foundation have advanced in this case. For example, his perjury was intended to circumvent PTK's claims for tortious interference. His false testimony was intentionally crafted to mislead this Court as to his true intent (malice). The perjury was also to defend his conduct in spreading claims (through the 5,000+ websites) made concerning alleged false advertising, defamation and anti-competitive activity by PTK – all counterclaims asserted by Honor Society in this litigation. Again, the nexus between Moradian's testimony and those claims is clear. Moreover, his effort to gather evidence to get Dr. Tincher-Ladner terminated from her role as CEO of PTK, and to mislead this Court as to his true intentions, all demonstrate a goal of eliminating one of the principal decision-makers

on settlement of this matter – an effort that cuts at everything related to this litigation. It is not difficult then to conclude that because the perjury related to all claims, then the sanction for dismissal should also extend to all claims.

Likewise, lesser sanctions related to Moradian's witness tampering would also not serve the necessary deterrence contemplated by district courts. *See Young*, 217 F.R.D. at 70 (determining lesser sanctions of attorneys fees and expenses would not sufficiently deter plaintiff following her attempts to bribe witnesses for favorable testimony). Witness tampering cannot be cured by any monetary sanctions alone or even a protective order. *See id.* (finding a protective order would be an inadequate remedy is it would be "extremely unlikely that plaintiff would obey a protective order prohibiting her from any further contacts with SAA employees" and a protective order "does not punish her for the misconduct in which she already has engaged"). Because Moradian is specifically using bribes and veiled threats to garner testimony that Honor Society has told the Court is relevant to its affirmative defenses, issuing related sanctions would be appropriate. *Id.* Simply telling Defendants to "not do that again" does not undo the prejudice to PTK and the Court's administration of justice, especially considering the track record established here. Moradian was told not to publicly disseminate the "malicious" survey through the first injunction, yet he then just re-populated the same material in his 5,000+ websites. He was then told to make changes to those websites to correct deceptive and misleading statements in them, and he instead manipulated the text of the websites to undermine the effect of the Court's order. (Dkt. 366 at 13-15.) At every turn, Moradian has directed his efforts to avoid, not comply with, this Court's orders. There is no reason to think that his improper contacting of witnesses, and offers of value or threats to them, will cease because the Court so instructs. He is far more likely to parse this Court's words, looking for loopholes regardless of whether they actually exist. His own conduct in this litigation

24

shows his true disregard for the Court.

Further, Moradian's repeated violations of the protective order, in combination with all the other evidence of contumacious conduct, supports dismissal of Honor Society's claims against PTK. *See Marroco*, 966 F.2d 224 (holding violation of protective order amounts to contumacious conduct giving rise to dismissal). Moradian has violated the Protective Order at least twice and done so knowingly.

As the Fifth Circuit has routinely found – the courtroom has no place or tolerance for liars. Nor is there any room for party who attempts to tamper with material witnesses to obtain (and conceal) extrajudicial discovery admittedly material to the party's claims. It stands then that a default of Honor Society and Honor Society Foundation as to PTK's claims is also warranted here. The penalty for perjury should be that severe for all the reasons this Court identified in *Taylor*. And when considered in combination with the witness intimidation, the bribery, the intentional disclosure of otherwise confidential information, and intentional concealment of evidence, the record supports such a severe result. It is not as if these acts are not also relevant to the claims asserted by PTK against Defendants. PTK's claims of intentional interference are firmly rooted in the malice shown by Moradian in issuing the "malicious" survey and the creation of the 5,000+ websites. His deception goes directly to that claim. But the effect does not end there. Moradian's multiple deceptions and active concealment of evidence calls into question his entire participation in this proceeding. A proven liar, Moradian's companies should not continue to profit from his abuse of this proceeding, including in defending against PTK's claims of trademark infringement, false advertising and unfair competition. Therefore, "[d]ismissal with prejudice is the only proper response, especially considering that every aspect of" Honor Society's and Honor Society Foundation's "claims now is tainted by" Moradian's "abusive and contumacious conduct." *Snider*,

2016 WL 3648281, at *16.

## IV.    CONCLUSION.

For all these reasons, PTK asks the Court to dismiss Honor Society's Counterclaims with prejudice and find Honor Society and Honor Society Foundation in default of Plaintiff's claims. From Moradian's continued contumacious conduct, no lesser sanction would serve as a deterrent for his perjury, witness tampering, and violations of the Protective Order. PTK further requests an award of its reasonable attorney's fees and costs in connection with this motion.

Dated this 31st of December, 2024.

Respectfully submitted,

*/s/ Jonathan G. Polak*
Jonathan G. Polak (Pro Hac Vice)
W. Michael Etienne (Pro Hac Vice)
TAFT STETTINIUS & HOLLISTER LLP
One Indiana Square, Suite 3500
Indianapolis, IN 46204-2023
(317) 713-3500 – phone
(317) 713-3699 – fax
jpolak@taftlaw.com
metienne@taftlaw.com

Rachel Smoot (Pro Hac Vice)
TAFT STETTINIUS & HOLLISTER LLP
41 S. High Street, Suite 1800
Columbus, OH 43215
(614) 221-2838 – phone
(614) 221-2007 – fax
rsmoot@taftlaw.com

Daniel R. Warncke (Pro Hac Vice)
TAFT STETTINIUS & HOLLISTER LLP
425 Walnut Street, Suite 1800
Cincinnati, OH 45202
(513) 357-9397 – phone
dwarncke@taftlaw.com

Philip R. Bautista (Pro Hac Vice)
TAFT STETTINIUS & HOLLISTER LLP
200 Public Square, Suite 3500

26

Cleveland, OH 44114-2302
(216) 706-3686 — phone
pbautista@taftlaw.com

*/s/ Michael B. Wallace*
Michael B. Wallace, MSB # 6904
Charles E. Cowan, MSB #104478
Beau M. Bettiga, MSB #105905
Jack F. Hall, MSB #106842
WISE CARTER CHILD & CARAWAY, P.A.
Post Office Box 651
Jackson, Mississippi 39205
Phone 601-968-5500

*Counsel for Phi Theta Kappa Honor Society and
Dr. Lynn Tincher-Ladner*

**<u>CERTIFICATE OF SERVICE</u>**

I, Jonathan Polak, do hereby certify that I have this day electronically filed the foregoing pleading or other paper with the Clerk of the Court using the ECF system which sent notification to all counsel of record.

Dated: December 31, 2024

*/s/ Jonathan G. Polak*
Jonathan G. Polak

28