**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF MISSISSIPPI**
**NORTHERN DIVISION**

| | |
|---|---|
| PHI THETA KAPPA HONOR SOCIETY, | Civil Action No. 3:22-cv-00208-CWR-RPM |
|     Plaintiff/Counter-Defendant, | |
| v. | |
| HONORSOCIETY.ORG INC., | |
|     Defendant/Counter-Plaintiff | |
| HONOR SOCIETY FOUNDATION, INC., | |
|     Defendant. | |
| HONORSOCIETY.ORG INC., | |
|     Defendant/Counter-Plaintiff/Third-Party Plaintiff | |
| v. | |
| LYNN TINCHER-LADNER, | |
|     Third-Party Defendant. | |

**HONORSOCIETY.ORG INC.'S MEMORANDUM IN SUPPORT OF MOTION TO EXCLUDE TESTIMONY OF DAVID FRANKLYN**

# Table of Contents

Introduction .................................................................................................................. 1

Facts 2

    A.   The likelihood of confusion survey. ........................................................... 2

    B.   The secondary-meaning survey. ................................................................ 3

    C.   The false-advertising survey. .................................................................... 4

Argument ..................................................................................................................... 5

    A.   Likelihood of confusion survey. ............................................................... 6

          1.    The likelihood-of-confusion survey did not test PTK's actual trade dress ......... 6

          2.    The likelihood of confusion survey created an artificial market by placing the products in close proximity and presenting respondents with stimuli they would never see in real life. ........................................................... 6

          3.    The controls artificially directed respondents to the stole and cords—items only purchased after joining and when graduating—in determining if potential members were confused by branding. ............................................ 9

          4.    The survey presents no valid information on likelihood of confusion because it required survey respondents to answer questions by referencing website pages directly rather than testing their impressions of them. ........................................................................................... 10

          5.    Quality controls were inadequate and Mr. Franklyn's margin of error calculation relied on an inapposite method.................................................... 10

          6.    The combined errors mean the likelihood of confusion survey should be excluded. ........................................................................................... 12

    B.   Secondary-meaning survey.................................................................... 12

          1.    The secondary-meaning survey didn't test PTK's actual trade dress. .............. 12

          2.    Only four respondents who were not already PTK members associated the trade dress with PTK. ............................................................................. 13

          3.    The control overstated secondary meaning by changing aspects of the image that are not claimed as protected trade dress. ...................................... 14

          4.    The target population is overbroad because it includes persons who are not eligible for PTK membership.......................................................... 16

5.   Mr. Franklyn failed to include information necessary to evaluate his survey. ...................................................................................................16

6.   Mr. Franklyn's secondary-meaning survey analysis failed to implement adequate quality controls, and his analysis includes respondents whose answers may not accurately represent the perceptions and understanding of the secondary meaning of the asserted trade dress. ..........18

7.   The combined errors mean the secondary meaning survey should be excluded. ...................................................................................................18

C.   False-advertising study ...........................................................................18

1.   Mr. Franklyn's false-advertising survey must be excluded because it is based on improper leading questions..............................................................18

2.   Mr. Franklyn's survey failed to include a control. ..............................................19

3.   Mr. Franklyn's false-advertising survey is unreliable because it introduced acquiescence bias into his survey through the use of the repetitive yes/no questions........................................................................................................21

4.   The survey fails to replicate the market by selecting only small portions of HonorSociety's website.......................................................................................21

5.   Franklyn's false-advertising survey does not determine what messages respondents took from the advertising because he let them answer questions while reading from the images. ........................................................23

6.   Mr. Franklyn's sample size was too small and included persons who never would have seen the advertising on the website..............................................24

7.   Franklyn's false-advertising survey analysis failed to implement adequate quality controls. ..............................................................................................25

8.   The combined errors mean the false advertising survey should be excluded. ...................................................................................................25

Conclusion ..........................................................................................................26

**Table of Authorities**

## Cases

*American Auto. Ass'n v. AAA Ins. Agency*,
618 F. Supp. 787 (W.D. Tex. 1985) ........................................................... 10

*Amstar Corp. v. Domino's Pizza, Inc.*,
615 F.2d 252 (5th Cir. 1980) ...........................................................13, 17, 25

*AutoZone, Inc. v. Tandy Corp.*,
373 F.3d 786 (6th Cir. 2004) ........................................................... 14, 25

*Baumholser v. Amax Coal Co.*,
630 F.2d 550 (7th Cir. 1980) ........................................................... 17

*Bd. of Regents v. KST Elec., Ltd.*,
550 F. Supp. 2d 657 (W.D. Tex. 2008) ........................................................... 20, 23

*Capri Sun GmbH v. Am. Bev. Corp.*,
595 F. Supp. 3d 83 (S.D.N.Y. 2022) ........................................................... 8

*Casa Tradicion S.A. de C.V. v. Casa Azul Spirits, LLC*,
No. H-22-2972,
2023 U.S. Dist. LEXIS 197610 (S.D. Tex. Nov. 3, 2023) ........................................................... 7

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
509 U.S. 579 (1993) ...........................................................5, 11, 27

*Elvis Presley Enters. v. Capece*,
141 F.3d 188 (5th Cir. 1998) ........................................................... 10

*Exxon Corp. v. Tex. Motor Exch. of Hous., Inc.*,
628 F.2d 500 (5th Cir. 1980) ........................................................... 6, 10

*Harolds Stores, Inc. v. Dillard Dept. Stores, Inc.*,
82 F.3d 1533 (10th Cir. 1996) ........................................................... 14

*IDV N. Am. v. S & M Brands*,
26 F. Supp. 2d 815 (E.D. Va. 1998) ........................................................... 19

*Ill. Tool Works Inc. v. Rust-Oleum Corp.*,
Civil Action No. H-17-2084,
2018 U.S. Dist. LEXIS 191925 (S.D. Tex. June 21, 2018) ........................................................... 22, 24

*Johnson v. Big Lots Stores, Inc.*,
Nos. 04-3201, 05-6627,
2008 U.S. Dist. LEXIS 35316 (E.D. La. Apr. 29, 2008) ........................................................... 14

*Joules Ltd. v. Macy's Merch. Grp. Inc.*,
No. 15-CV-3645,
2016 U.S. Dist. LEXIS 101151 (S.D.N.Y Aug. 2, 2016), *aff'd*, 695 F. App'x 633 (2d Cir. 2017)............. 8

*Keith v. Volpe*,
858 F.2d 467 (9th Cir. 1988) ....................................................................................................... 17

*Kinetic Concepts, Inc. v, BlueSky Med. Corp.*,
2006 U.S. Dist. LEXIS 60187 (W.D. Tex. Aug. 11, 2006)..........................................12, 14, 20, 21

*Kis v. Foto Fantasy*,
204 F. Supp. 2d 968 (N.D. Tex. 2001)........................................................................................... 25

*Knight v. Kirby Inland Marine Inc.*,
482 F.3d 347 (5th Cir. 2007) ....................................................................................................... 10

*Luckenbach Tex., Inc. v. Engel*,
No. A-19-CV-00567-DH,
2022 U.S. Dist. LEXIS 205809 (W.D. Tex. Oct. 12, 2022) .................................................... 7, 15

*Mini Melts, Inc. v. Reckitt Benckiser, Inc.*,
No. 4:07-cv-271,
2009 U.S. Dist. LEXIS 148588 (E.D. Tex. Feb. 26, 2009) ...................................................... 14

*Moore v. Ashland Chem. Inc.*,
151 F.3d 269 (5th Cir. 1998) ......................................................................................................... 5

*Munoz v. Orr*,
200 F.3d 291 (5th Cir. 2000) .................................................................................................. 6, 12

*Namer v. Broad. Bd. of Governors*,
No. 12-2232,
2014 U.S. Dist. LEXIS 156876 (E.D. La. Nov. 5, 2014)......................................................... 7, 8

*New Century Fin., Inc. v. New Century Fin. Corp.*,
Civil Action No. C-04-437,
2005 U.S. Dist. LEXIS 45960 (S.D. Tex. Nov. 29, 2005) .......................................................... 12

*Novartis Consumer Health, Inc. v. Johnson & Johnson Merck Consumer Pharms Co.*,
129 F. Supp. 2d 351 (D.N.J. 2000) ............................................................................................... 15

*Pharmacia Corp. v. GlaxoSmithKline Consumer Healthcare, L.P.*,
292 F. Supp. 2d 594 (D.N.J. 2003) ............................................................................................... 14

*Pittsburgh Press Club v. United States*,
579 F.2d 751 (3d Cir. 1978) ......................................................................................................... 17

*Pizza Hut, Inc. v. Papa John's Int'l*,
227 F.3d 489 (5th Cir. 2000) ................................................................................................. 15, 20

*Powerhouse Marks LLC v. Chi Hsin Impex, Inc.*,
  No. 04-73923,
  2006 U.S. Dist. LEXIS 16454 (E.D. Mich. Apr. 5, 2006) .................................................... 14, 25

*Reich v. So. Md. Hosp., Inc.*,
  43 F.3d 949 (4th Cir. 1995) ................................................................................................. 14

*Riviana Foods, Inc. v. Societe Des Produits Nestle S.A.*,
  No. H-93-2176,
  1994 U.S. Dist. LEXIS 20267 (S.D. Tex. Dec. 20, 1994) ......................................................... 20

*Scott Fetzer Co. v. House of Vacuums Inc.*,
  381 F.3d 477 (5th Cir. 2004) .........................................................................................6, 16, 17

*Scotts v. United Indus. Corp.*,
  315 F.3d 264 (4th Cir. 2002) ............................................................................................... 22

*Shell Trademark Mgmt. B.V. v. Warren Unilube, Inc.*,
  765 F. Supp. 2d 884 (S.D. Tex. 2011) .................................................................................. 14

*Squirtco v. Seven-Up Co.*,
  628 F.2d 1086 (8th Cir. 1980) ............................................................................................... 7

*Strumlauf v. Starbucks Corp.*,
  No. 16-cv-01306-YGR,
  2018 U.S. Dist. LEXIS 2409 (N.D. Cal. Jan. 5, 2018) .............................................................. 24

*THOIP v. Walt Disney Co.*,
  690 F. Supp. 2d 218 (S.D.N.Y. 2010) .......................................................................8, 20, 22, 24

*Water Pik, Inc. v. Med-Systems, Inc.*,
  726 F.3d 1136 (10th Cir. 2013) .............................................................................................. 8

*Waterloo Sparkling Water Corp. v. Treaty Oak Brewing & Distilling Co.*, LLC,
  No. 1:21-CV-161-RP,
  2021 U.S. Dist. LEXIS 227700 (W.D. Tex. Nov. 24, 2021) ......................................................... 8

*Wells Fargo & Co. v. WhenU.com, Inc.*,
  293 F. Supp. 2d 734 (E.D. Mich. 2003) ................................................................................. 24

**Other Authorities**

APOR Report on Online Panels. Report of the AAPOR Task Force on Online Panels. Retrieved
  from https://www.aapor.org/AAPOR_Main/media/MainSiteFiles/AAPOROnlinePanels
  TFReportFinalRevised1.pdf) .................................................................................................. 12

Barber, William G. and Giulio E. Yaquinto. *"The Universe." Trademark and Deceptive Advertising
  Surveys: Law, Science, and Design*. Edited by Shari Seidman Diamond and Jerre B. Swann.
  ABA Section of Intellectual Property Law. American Bar Association, Second Edition 2022  26

Bernstein, David H. and Bruce P. Keller. *"Survey Evidence in False Advertising Cases." Trademark and Deceptive Advertising Surveys: Law, Science, and Design*. Edited by Shari Seidman Diamond and Jerre B. Swann; ABA Section of Intellectual Property Law. American Bar Association, Second Edition 2022 ................................................................................. 20, 21

Diamond, Shari Seidman, Reference Guide on Survey Research., *Reference Manual on Scientific Evidenc*e, 3rd Edition, Federal Judicial Center, The National Academies Press, Washington, D.C., 2011........................................................................................................................... 18

Dupont, Thomas D., Use of Surveys and Survey Experts in Trademark Litigation, in Practical Tips on Trademark Litigation 187 (A.B.A., Sec. Intell. Prop. L., 2001)........................................... 25

Edwards, G. Kip and J. David Mayberry. "The Daubert Revolution and Lanham Act Surveys." *Trademark and Deceptive Advertising Surveys: Law, Science, and Design*. Edited by Shari Seidman Diamond and Jerre B. Swann, ABA Section of Intellectual Property Law. American Bar Association, Second Edition 2022.................................................................................... 25

J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition, (6th ed.) ........... 18, 21

Ostberg, Henry D. *"Response to the Article Entitled, a Reading Test or a Memory Test: Which Survey Methodology Is Correct."* Trademark Reporter. 95 (2005)................................... 10, 24

Peng, Chao-Ying Joanne and Ziskin, Mary B. "Control Group", *Encyclopedia of Survey Research Methods*, Paul J. Lavrakas, Editor, SAGE Publications, Inc., Thousand Oaks, CA, 2008 ......... 21

Rivera, Artemio. "Testing the Admissibility of Trademark Surveys After Daubert." Journal of the Patent and Trademark Office Society. September 2002 ...................................................... 25

Shari Seidman Diamond, *Reference Guide on Survey Research*, in REFERENCE MANUAL ON SCIENTIFIC EVIDENCE 229 (West 2000) ............................................................................... 12

Swann, Jerre B. *"A ReadingTest or a Memory Test: Which Survey Methodology Is Correct."* Trademark Reporter. 95 (2005)....................................................................................... 11, 24

## Rules

Fed. R. Evid. 702 ............................................................................................................... 5, 7

**Introduction**

PTK engaged David Franklyn to conduct three separate surveys. The Court should exclude his opinion because each of the surveys are deeply flawed. He committed 17 different material errors, each of which is based on improper and unreliable methodology.

His opinion on likelihood of confusion should be excluded for five reasons. First, the purpose of a likelihood-of-confusion survey is to measure whether consumers would be confused between two trademarks. PTK identified in discovery what its trademark—a trade dress—is comprised of. But Franklyn did not test that trade dress. He tested components of it. Second, the survey created an artificial market by placing the products in close proximity and presenting respondents with stimuli they would never see in real life. That type of survey is always unreliable. Third, the controls artificially directed respondents to products they would only see if they were already members of PTK or HonorSociety. Fourth, the survey presents no valid information on likelihood of confusion because it required survey respondents to answer questions by referencing website pages directly rather than testing their impressions of them. Fifth, Franklyn used inadequate quality controls and his margin-of-error calculation relied on an inapposite method.

Franklyn's secondary-meaning opinion should be excluded for five reasons. First, Franklyn again test for secondary meaning in a trademark that was some components of PTK's trade dress, but not the actual trade dress that it claims. Second, he only tested four respondents who weren't already PTK members when he should have tested only people who weren't PTK members. Third, the control overstated secondary meaning by changing aspects of the image that are not claimed as protected trade dress. Fourth, the target population is overbroad because it includes persons who are not eligible for PTK membership. Fifth, he failed to include information necessary to evaluate his survey.

Franklyn's false-advertising opinion should be excluded for seven reasons. First, it is based on improper leading questions of statements that he created that cannot be found in HonorSociety's advertising. Second, he failed to include a control. Third, the survey introduced

acquiescence bias into his survey through the use of the repetitive yes/no questions. Fourth, the survey fails to replicate the market by selecting only small portions of Honor Society's website. Fifth, does not determine what messages respondents took from the advertising because he let them answer questions while reading from the images. Sixth, Mr. Franklyn's sample size was too small and included persons who never would have seen the advertising on the website. Finally, he failed to implement adequate quality controls.

Each of these 17 errors in proper methodology is enough to confuse and mislead a jury. The combination of all these unreliable methods requires that a jury never hear his misguided opinions. The Court should exclude Franklyn's opinion.

<div align="center">**Facts**</div>

**A.    The likelihood of confusion survey.**

To assess "consumer perceptions relevant to likelihood of confusion in this case," PTK's expert David Franklyn drew a pool of respondents from a third-party survey company who answered yes to a variety of qualifying questions, including that they all were "individuals who have been enrolled in a 2-year college at any point during the past 5 years or who intend to enroll in a 2-year college at some point during the next 12 months, and who have joined an honor society or have been or will be interested in joining an honor society." (*See* Declaration of Gregory Scialabba ("Scialabba Decl.") ¶ 4, Ex. 1 at p. 15.)

Mr. Franklyn then presented survey respondents with images of graduation regalia from Phi Theta Kappa's current website and an Instagram post from PTK. (*Id*. ¶ 5, Ex. 2.)  He next showed respondents images of graduation regalia from HonorSociety and other honor societies' websites and Instagram posts and asked respondents to answer questions about whether they believed a variety of things, including whether the items were from the same or a different honor society. (*Id.* ¶¶5-6, Exs. 2-3). He allowed respondents to review the second set of images (from HonorSociety or another honor society) for an indefinite amount of time and allowed them to access PTK's images via a link contained on the same page as each question so respondents could toggle back and forth between the two:



(*Id.* ¶ 7, Ex. 4.)

He concluded that his "confusion survey indicates a net aggregate confusion rate of 22.58% between Phi Theta Kappa and HonorSociety," and that "the results of the confusion survey [establishes a] significant likelihood of confusion between HonorSociety and Phi Theta Kappa." (*Id.* Ex. 1 at 7.)

**B.    The secondary-meaning survey.**

To test for the "existence of secondary meaning in Phi Theta Kappa's colors and logo," Mr. Franklyn conducted a survey in which he "showed respondents images of the regalia stole and rope that Phi Theta Kappa members wear at graduation." (*Id.* Ex.1 at 44.) Respondents were then asked a series of questions, including whether they associated the regalia with one honor society or more than one honor society. (*Id.* ¶ 8, Ex. 5). He then showed respondents a completely black stole and cords with no insignia and asked the same questions:



(*Id.* Ex. 5.)

Mr. Franklyn's secondary-meaning survey concludes that "Phi Theta Kappa's claimed trade dress has a 39.93% net association among the current consumer universe, as well as a 31.91% net association across the total universe of current and prospective consumers," and that these "results indicate that Phi Theta Kappa's trade dress carries substantial secondary meaning both among two-year college students and members of Phi Theta Kappa." (*Id.* Ex. 1 at 7.)

**C.      The false-advertising survey.**

To assess "false advertising in Phi Theta Kappa's promotional material," Mr. Franklyn conducted a false advertising study which "showed respondents images of HonorSociety webpages advertising their various qualifications, benefits, and accolades." (*Id.* Ex. 1 at 65.) He selected sections of text and images from a variety of HonorSociety's past and current webpages. He did not display the entirety of any webpage nor did he place any image he showed in the context it was actually displayed. He then asked a series of leading questions and allowed respondents to click a button to review each image again when selecting answers. (*Id.* ¶ 9, Ex. 6.) The questions included whether respondents believed that "the referenced organization is considered a merit-based honor society by institutions of higher education," and

"has been ranked as one of the top honor societies in the United States by a qualified ranking organization." For one question, respondents were able to view an image that stated "How HonorSociety Puts Inclusion Over Exclusion: No GPA Requirements." (*Id.* Ex. 6 at 11.) They were then asked "Based on the images you have just viewed, is it your belief that the referenced organization requires a minimum GPA to join as a member?" (*Id.* Ex. 6 at 21.) An astonishing 48% answered yes. (*See id.* ¶ 11, Ex. 8 at 81; Ex. 7)

Mr. Franklyn concludes that a "supermajority of respondents exceeding 80% indicated that the falsity of any of the messages would materially decrease their interest in joining HonorSociety." (*Id.* Ex. 1 at 7–8.)

### Argument

The admission of expert testimony is governed by Federal Rule of Evidence 702 and the Supreme Court's decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). Rule 702 establishes that expert testimony is admissible only if: (1) the testimony will help the finder of fact understand the evidence or determine a fact in issue; (2) the testimony is based on sufficient facts or data; (3) the testimony is the product of reliable principles and methods; and (d) the principles and methods have been reliably applied to the facts of the case. Fed. R. Evid. 702. The proponent of expert testimony bears the burden of establishing the admissibility of the testimony. *See Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 276 (5th Cir. 1998) (en banc).

Evaluating the validity of surveys under Daubert involves two criteria: (1) "the adequacy of the [survey] universe," and (2) "the format of the questioning." *Exxon Corp. v. Tex. Motor Exch. of Hous., Inc.*, 628 F.2d 500, 506–07 (5th Cir. 1980). If a survey suffers from nothing more than minor methodological flaws, the survey will survive *Daubert*. *Scott Fetzer Co. v. House of Vacuums Inc.*, 381 F.3d 477, 488 (5th Cir. 2004). But if "serious flaws in a survey will make any reliance on that survey unreasonable and no reasonable jury could view the proffered survey as evidence of confusion among relevant consumers," then that survey is inadmissible. *Id.*

This Court can rely on cumulative flaws within each report rather than evaluating each flaw in isolation. For example, in *Munoz v. Orr*, 200 F.3d 291, 301 (5th Cir. 2000), the court

properly excluded a report where the expert had totals not meeting 100% in a table, started with an improper assumption, failed to consider some variables, and relied on the plaintiff's compilation of data. *Id.* The Fifth Circuit held "[t]aken cumulatively, the problems with Dr. Benz' expert evidence indicate that his expert testimony could be unreliable" and upheld exclusion under the court's gatekeeper function. *Id.* at 302.

A.    **Likelihood of confusion survey.**

1.    **The likelihood-of-confusion survey did not test PTK's actual trade dress**

PTK previously claimed that the following elements make up its purported unregistered trade dress:

- A palette comprising predominantly navy blue and gold;

- Branding and marketing featuring a wreath of leaves;

- Regalia, including stoles comprising a gold material with emblematic imagery at the bottom in navy blue.

(Scialabba Decl. ¶ 4, Ex. 1 at 3; *see also* Dkt. No. 136 ¶ 35.)

As recently as its 30(b)(6) deposition just over two weeks ago, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. (Scialabba Decl. ¶14, Ex. 11 at 52:5–20.)

David Franklyn's likelihood-of-confusion survey tested images of graduation regalia from Phi Theta Kappa's current website and an Instagram post from PTK. Those images did not contain all the elements of the trade dress, and so he did not test PTK's actual trade dress. They did not include the wreath of leaves or the key logo. He instead tested certain components of it. By failing to test the actual trade dress, his survey is meaningless and would just confuse the jury.

2.    **The likelihood of confusion survey created an artificial market by placing the products in close proximity and presenting respondents with stimuli they would never see in real life.**

Testimony must be the product of reliable principles and methods. *See* FRE 702(c). Experts recognize two types of surveys to assess likelihood of confusion: the *Eveready* format and the

*Squirt* format. *See Namer v. Broad. Bd. of Governors,* No. 12-2232, 2014 U.S. Dist. LEXIS 156876, at *38 (E.D. La. Nov. 5, 2014) (approving of questions from *Eveready* survey format); *Luckenbach Tex., Inc. v. Engel*, No. A-19-CV-00567-DH, 2022 U.S. Dist. LEXIS 205809, at *6 (W.D. Tex. Oct. 12, 2022) (noting that courts are divided on admitting testimony based on the *Squirt* survey format) (citing *Squirtco v. Seven-Up Co.*, 628 F.2d 1086 (8th Cir. 1980)).

In a *Squirt* survey, consumers are first shown the plaintiff's product or mark, and later separately shown an array of other products or marks that includes the accused infringing one and then asked if they think anything from the array is associated with the first image that they saw. *Id.*; *see also Casa Tradicion S.A. de C.V. v. Casa Azul Spirits, LLC*, No. H-22-2972, 2023 U.S. Dist. LEXIS 197610, at *10–11 (S.D. Tex. Nov. 3, 2023) (citing *Luckenbach*, 2022 U.S. Dist. LEXIS 205809). A *Squirt* survey is only appropriate where the products are in physical proximity in the marketplace, so consumers are likely to see them together or near each other. *See id.* at *11. For example, in *Casa Tradicion*, the court questioned but allowed a *Squirt* survey where two alcohol bottles were likely to be sold in the same liquor stores, even if they were not placed immediately next to each other. *Id.*; *see also THOIP v. Walt Disney Co.*, 690 F. Supp. 2d 218, 236–37 (S.D.N.Y. 2010) (finding that sequential *Squirt*-like survey methodology was inadmissible where it did not sufficiently simulate marketplace conditions because plaintiff did not show a reasonable likelihood that consumers would have proximately encountered the specific pairs of shirts tested); *Water Pik, Inc. v. Med-Systems, Inc.*, 726 F.3d 1136, 1147 (10th Cir. 2013) (rejecting *Squirt*-type survey where expert cited no evidence that parties' products "were sold side-by-side in stores"). Courts have found that this sequential format is inappropriate where "the products at issue are not sold in the same stores or … on the same websites," because it "may over-estimate confusion by forcing consumers to consider the marks in close proximity in a way they would not in the marketplace." *Joules Ltd. v. Macy's Merch. Grp. Inc.*, No. 15-CV-3645, 2016 U.S. Dist. LEXIS 101151, at *24 (S.D.N.Y Aug. 2, 2016), *aff'd*, 695 F. App'x 633 (2d Cir. 2017)).

- 7 -

By contrast, an *Eveready* survey is appropriate where the senior user's mark is well-known but not necessarily marketed side-by-side. *See Namer*, 2014 U.S. Dist. LEXIS 156876, at *40 (noting that an *Eveready* survey exposed respondents "to a junior mark to see whether it is confused with a well-known senior mark"); *Capri Sun GmbH v. Am. Bev. Corp.*, 595 F. Supp. 3d 83, 121 (S.D.N.Y. 2022) (noting that an Eveready survey does not involve side-by-side comparison). For example, in *Waterloo Sparkling Water Corp. v. Treaty Oak Brewing & Distilling Co.*, LLC, No. 1:21-CV-161-RP, 2021 U.S. Dist. LEXIS 227700, at *22 n.6 (W.D. Tex. Nov. 24, 2021), Mr. Franklyn selected an *Eveready* format for two prepackaged drinks, where the senior user's mark was flavored and the junior user's was unflavored and contained alcohol.

This case requires a *Squirt* format because PTK's and HonorSociety's products are never side by side in the marketplace. This isn't a case where a bottle of water sits on a shelf next to another bottle of water. Rather, consumers are exposed to PTK's materials and HonorSociety's materials only if they happen upon them, or receive an invitation or advertisement from either. Those invitations and advertisements would be sent separately and never together. But Frankyn executed an *Eveready* format. This is plain error. An *Eveready* approach causes a bias because the consumer is exposed first to PTK's materials, and then after that exposure with it in mind mistakenly associates HonorSociety's materials. Whereas with the appropriate *Squirt* approach, the consumer would be biased by seeing PTK's materials first.

There is nothing more than speculation that any consumer would ever see the PTK and HonorSociety's two webpages side by side, let alone the pages displayed with a totally separate Instagram post at the same time as the competing page with its own totally separate Instagram post. Each page is contained deep within the website of each honor society, and a person would need to be searching for a stole and cords to purchase in order to see either page at all.

PTK's speculation to the contrary has no basis in fact. Although Dr. Franklyn notes that the two societies each send email and invitations and can be searched for via Google, the emails and invitations do not contain images of the stole and cords. A Google search results in the home page of each society, neither of which displays them. (Scialabba Decl. Ex. 8 at 28–29.)

Likewise, that students might see images of the respective stoles and cords on campus at events is pure speculation. And it is virtually impossible that the two would ever be displayed side-by-side like Mr. Franklyn did.

Thus, Franklyn's survey is invalid and should not be presented to the jury because it's based on unreliable methods and would confuse the jury.

### 3. The controls artificially directed respondents to the stole and cords—items only purchased after joining and when graduating—in determining if potential members were confused by branding.

The point of a likelihood-of-confusion survey is to determine whether consumers are likely to be confused by conditions in the marketplace when making a purchasing decision. For Mr. Franklyn's survey to be relevant and therefore admissible under *Daubert*, the underlying methodology must have been correctly applied to the case's particular facts. *Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 352 (5th Cir. 2007) (citing *Daubert*, 509 U.S. at 592–593). In other words, the survey should be aimed at determining whether a prospective honor-society member would likely be confused by the parties' marks.

Mr. Franklyn's test showed respondents an image of the HonorSociety web store selling the stole and cords along with an Instagram post showing a woman wearing those items. (Scialabba Decl. Ex. 4.) The stole and cords are only worn at graduation to show membership as part of graduation regalia. Only an existing PTK or HonorSociety member about to graduate would ever be interested in purchasing a stole and cords. Those items have no purpose other than at graduation, when it is too late to consider joining an honor society. But what Franklyn was testing for was not whether existing members would be confused by the other society's graduation regalia but rather whether *prospective* members might mistake one for the other. (*Id.* Ex. 1 at 5–6.)

By testing images that only an existing member would see, Franklyn's implemented unreliable and improper methodology that should be excluded.

4.  **The survey presents no valid information on likelihood of confusion because it required survey respondents to answer questions by referencing website pages directly rather than testing their impressions of them.**

A survey is only admissible if the format of the questioning follows accepted scientific principles. *Exxon*, 628 F.2d at 506–07 (evaluating format of the questioning). Consumer perceptions of advertising are only relevant if the advertising is as it is viewed in the marketplace. *Elvis Presley Enters. v. Capece*, 141 F.3d 188, 197 (5th Cir. 1998); *American Auto. Ass'n v. AAA Ins. Agency*, 618 F. Supp. 787, 792 (W.D. Tex. 1985) (the proper test is whether the average consumer, upon encountering the allegedly infringing mark in the isolated circumstances of the marketplace … would be likely to confuse or associate the defendant or his services with the plaintiff); (Scialabba Decl. Ex. 8 at 36-37, citing Ostberg, Henry D. *"Response to the Article Entitled, a Reading Test or a Memory Test: Which Survey Methodology Is Correct."* Trademark Reporter. 95 (2005): pp. 1446–1449; *see also* Swann, Jerre B. *"A ReadingTest or a Memory Test: Which Survey Methodology Is Correct."* Trademark Reporter. 95 (2005): 876-881 at 880.) Accordingly, it is an industry standard to show respondents two images and then remove them from view, asking the respondent then to answer questions about their impressions from having viewed the advertisements as they would in the real world—almost always for a few seconds or at most a minute. (*See id.*) Mr. Franklyn's survey allowed unrestricted access to both images and then allowed respondents to answer questions while still viewing the images.

By doing so, consumers' ability to interpret an image and answer questions is tested, rather than whether they retained confusion over certain elements in the two images after viewing them as they would in the marketplace. Franklyn again implemented improper methodology, and the Court should exclude his survey as a result.

5.  **Quality controls were inadequate and Mr. Franklyn's margin of error calculation relied on an inapposite method.**

One of the nonexclusive factors that courts consider when assessing the scientific validity or reliability of expert testimony under *Daubert* is the existence and maintenance of standards

and controls in the methodology. *Daubert*, 509 U.S. at 594. Although Mr. Franklyn claims quality control measures were in place during and after the survey, those measures were either not enforced or enforced incompletely, leading to statistically invalid data. (Scialabba Decl. Ex. 8 at 41-44.) For example, even though nonsensical answers were supposed to be removed, Franklyn counted nonsensical answers such as "great way" to a question about why the respondent believed a set of images were from the same honor society as another set. (*Id.*) Likewise, respondents who provided contradictory answers about whether they were confused were all counted as confused, and respondents who later corrected answers to indicate a lack of confusion were all counted as confused. All of these survey errors benefited PTK by artificially inflating confusion.

A survey should be excluded as unreliable if an error rate cannot be determined. *e.g. New Century Fin., Inc. v. New Century Fin. Corp.*, Civil Action No. C-04-437, 2005 U.S. Dist. LEXIS 45960, at *10 (S.D. Tex. Nov. 29, 2005). Mr. Franklyn provides a completely unsupported but authoritative-sounding margin of error: "a 95% confidence interval is +/- 6.9% for the test value and +/- 7.1% for the control value." (Scialabba Decl. Ex. 1 at 43.) But he does so only by applying completely inapposite methodology. Confidence intervals can be calculated for *probability* samples, where each member of the target population has a known probability of selection, and that probability can be used to calculate sampling error. (Scialabba Decl. Ex. 8 at 44, citing APOR Report on Online Panels. Report of the AAPOR Task Force on Online Panels. Retrieved from https://www.aapor.org/AAPOR_Main/media/MainSiteFiles/AAPOROnlinePanelsTFReportFinalRevised1.pdf, p. 772); *see Kinetic Concepts, Inc. v, BlueSky Med. Corp.*, 2006 U.S. Dist. LEXIS 60187, *12–13 (W.D. Tex. Aug. 11, 2006) (explaining that where nonprobability samples are used, "confidence intervals should not be computed") (*quoting* Shari Seidman Diamond, *Reference Guide on Survey Research*, in REFERENCE MANUAL ON SCIENTIFIC EVIDENCE 229, 259-60 (West 2000)).

For example, a sampling error could be calculated if a population of persons who purchased a particular product is 1,000 and 50 people were sampled about that purchase. But Mr. Franklyn doesn't know the total population of persons who are in or plan to be enrolled in a community college and who are interested in an honor society. Absent that key metric, sampling errors simply cannot be calculated using the method Franklyn applies.

### 6. The combined errors mean the likelihood of confusion survey should be excluded.

As the Fifth Circuit directed in *Munoz*, 200 F.3d at 301, this Court should exclude surveys where the cumulative errors make them unreliable and the possibility of prejudice and jury confusion is high. Those are exactly the circumstances with Mr. Franklyn's likelihood of confusion survey. Mr. Franklyn used the wrong type of survey because the advertising is never seen side-by-side, created an artificial market by so placing them, used graduation regalia that have nothing to do with whether a prospective member would select a particular honor society, gave respondents a comprehension test by leaving images up while asking questions about them, and performed inadequate quality controls. Sharing these results with a jury would do nothing more than confuse and mislead.

### B. Secondary-meaning survey.

### 1. The secondary-meaning survey didn't test PTK's actual trade dress.

The purpose of a secondary-meaning survey is to test whether a trademark—here trade dress—signifies a single source of goods or services to consumers. To properly test that, the survey requires presenting the actual trademark to the consumer. But here, Franklyn didn't present PTK's trade dress. Rather, he presented components of it. He did not include the wreath of leaves or the key logo. Franklyn could not test whether PTK's trade dress has secondary meaning without presenting the actual trade dress to consumers. Thus, the secondary-meaning survey is fatally flawed.

### 2. Only four respondents who were not already PTK members associated the trade dress with PTK.

Franklyn emphasized the ████████████████████████████████████████ ████████████████████████. (Scialabba Decl. ¶ 12, Ex. 9 at 129:3-130:5.) In conducting his secondary-meaning survey, he focused on ████████████████████████████████ █████████████████████████████████████████████████████████ ████████████████████████████████████████████. (*Id.*)

But such a group biased in favor of one result is not an appropriate survey audience, and surveys that only have those groups must be excluded. *See Amstar Corp. v. Domino's Pizza, Inc.*, 615 F.2d 252, 264 (5th Cir. 1980) (noting that the survey neglected completely defendants' primary customers: "young, single, male college students," and instead only polled "women found at home during six daylight hours who … would have been repeatedly exposed to plaintiff's mark [for sugar at grocery stores], but would have had little, if any, exposure to defendants' mark"); *Mini Melts, Inc. v. Reckitt Benckiser, Inc.*, No. 4:07-cv-271, 2009 U.S. Dist. LEXIS 148588, at *15 (E.D. Tex. Feb. 26, 2009) ("A survey should be excluded 'when the sample is clearly not representative of the universe it is intended to reflect.'") (*quoting Harolds Stores, Inc. v. Dillard Dept. Stores, Inc.*, 82 F.3d 1533, 1544 (10th Cir. 1996)); *Shell Trademark Mgmt. B.V. v. Warren Unilube, Inc.*, 765 F. Supp. 2d 884, 892 (S.D. Tex. 2011) (finding survey less reliable although admissible because "Shell has not demonstrated that the use of truck stops captured these other categories of heavy-duty motor oil consumers") (citation omitted); *Pharmacia Corp. v. GlaxoSmithKline Consumer Healthcare, L.P.*, 292 F. Supp. 2d 594, 605 (D.N.J. 2003) (failure to account for bias renders a survey unreliable).

Moreover, for the non-PTK cohort, he acknowledged ████████████████████ ████████████████████████. (Scialabba Decl. Ex. 9 at 130:9-132:8; 166:9-15.) A survey sample of four persons is insufficient to reach any scientifically valid conclusions and should be excluded. *See Johnson v. Big Lots Stores, Inc.*, Nos. 04-3201, 05-6627, 2008 U.S. Dist. LEXIS 35316, at *54 (E.D. La. Apr. 29, 2008) ("Bremer's opinion about the job duties of a position held

by approximately 4,000 persons is based on interviews of 70 respondents or 1.75 percent of the total population of ASMs … Courts have rejected the use of statements from such a low proportion of the overall population as representative evidence.") (*citing Reich v. So. Md. Hosp., Inc.*, 43 F.3d 949, 951 (4th Cir. 1995)); *AutoZone, Inc. v. Tandy Corp.*, 373 F.3d 786, 799 n.2 (6th Cir. 2004) ("[I]t is questionable whether the results are statistically significant given the small number of respondents."); *Powerhouse Marks LLC v. Chi Hsin Impex, Inc.*, No. 04-73923, 2006 U.S. Dist. LEXIS 16454, at *12 (E.D. Mich. Apr. 5, 2006) (questioning reliability of just one hundred and fifty respondents).

### 3. The control overstated secondary meaning by changing aspects of the image that are not claimed as protected trade dress.

A secondary-meaning survey that fails to use proper controls should be excluded. *Kinetic Concepts*, 2006 U.S. Dist. LEXIS 60187, at *19 ("The Fifth Circuit has recognized the unreliability of consumer surveys that do not utilize control groups[.]") (citing *Pizza Hut, Inc. v. Papa John's Int'l*, 227 F.3d 489, 503 (5th Cir. 2000) (finding a survey unreliable where it "failed to indicate whether the [consumer's] conclusions resulted from the advertisements at issue, or from personal [] experience, or from a combination of both").)

A properly-used control in a secondary meaning study removes factors that are different between the two products but are not asserted as protected trade dress. *See Novartis Consumer Health, Inc. v. Johnson & Johnson Merck Consumer Pharms Co.*, 129 F. Supp. 2d 351, 365 n. 10 (D.N.J. 2000); *Luckenbach*, 2022 U.S. Dist. LEXIS 205809, at *8 ("The purpose of the control group is to measure the level of background noise or guessing in a survey."). In other words, as with likelihood-of-confusion surveys, a proper control in a secondary-meaning survey removes only the characteristics that are being assessed for secondary meaning. *Id.*

For example, if two products are each sold in red aluminum cans and each is called "Fresh Cola" the control would have a different name than "Fresh Cola" but still be in otherwise identical packaging, to test whether the unprotected red color and can shape was the result of the confusion rather than the protected "Fresh Cola" name. An improper control, by contrast,

would create differences between the two that are unrelated to the "Fresh Cola" name, like changing the can shape and color so that fewer persons were confused by unprotected details.

Mr. Franklyn did exactly what should not be done to create a valid control. The protected items PTK asserts are the combined colors of blue and gold, a wreath of leaves, and a stole comprising a gold material with emblematic imagery at the bottom in navy blue. (Scialabba Decl. Ex. 1 at 4.) But rather than simply using different colors and changing the emblems, Franklyn made the "control" a monochromatic black with no emblem at all. (Scialabba Decl. ¶ 13 Ex. 10.)



(*Id.* ¶ 8, Ex. 5.)

Proper control would have been multicolored with different colors than used by PTK and had an emblem, but a different emblem than asserted by PTK. (*See* Scialabba Decl. Ex. 8 at 52-53.)

Mr. Franklyn admitted why he did this: He wanted to remove anything ████████████ ██████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████ ██████████████████████████████████████████. (*Id.* Ex. 9 at 95:6–96:14.) But "confusion" is not driven up "artificially" by having a proper control in a secondary meaning survey. Confusion isn't tested at all if the control has differences other than the protected characteristics, because there is no way of knowing whether respondents are reacting to the

protected characteristics or some other factor. Secondary meaning is only properly evaluated by presenting PTK's allegedly protected characteristics and then presenting a control image that is identical except the protected characteristics are changed.

### 4. The target population is overbroad because it includes persons who are not eligible for PTK membership.

The appropriate target population for a secondary-meaning survey is the consumers to whom the trade dress is directed. *Scott Fetzer*, 381 F.3d at 487; Stec at 54. In *Scott Fetzer Co.*, for example, the Fifth Circuit found the survey at issue was "suspiciously underinclusive" because it left out critical segments of the relevant population that should have been surveyed. *Scott Fetzer*, 381 F.3d at 488. And in *Amstar*, 615 F.2d at 254, the court reversed a trial court's entry of judgment in a dispute between a pizza chain and a sugar manufacturer because the survey in question improperly oversampled purchasers of sugar and undersampled pizza consumers.

The proper universe for PTK is persons eligible for membership. PTK isn't marketing to the populace as a whole nor is it marketing to every two-year college student. PTK's trade dress is directed at its potential members, who must meet mandatory criteria of being enrolled at an institution that has a PTK chapter, have completed a minimum amount of coursework, and have a minimum GPA. Franklyn's survey was directed instead at all "individuals who have been enrolled in a 2-year college at any point during the past 5 years or who intend to enroll in a 2-year college at some point during the next 12 months, and who have joined an honor society or have been or will be interested in joining an honor society." (Scialabba Decl. Ex. 1 at 45.) The survey doesn't indicate whether a single participant is enrolled at an institution that has a PTK chapter, have completed a minimum amount of coursework, and have a minimum GPA.

Because Franklyn measured the wrong population, the survey is fundamentally flawed and should be excluded.

### 5. Mr. Franklyn failed to include information necessary to evaluate his survey.

As the proponent of the survey, PTK bears the burden to show that "the survey was conducted in accordance with generally accepted survey principles and that the results were

used in a statistically correct manner," *Keith v. Volpe*, 858 F.2d 467, 480 (9th Cir. 1988) (citing *Baumholser v. Amax Coal Co.*, 630 F.2d 550, 552 (7th Cir. 1980)); *id.* ("The proponent of the survey bears the burden of establishing its admissibility.") (citing *Pittsburgh Press Club v. United States*, 579 F.2d 751, 758 (3d Cir. 1978)), and that "the sampling of the universe conforms with recognized statistical standards," J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition, (6th ed.) § 32:159. (*See also* Scialabba Decl. Ex. 8 at 52-53, citing Diamond, Shari Seidman, Reference Guide on Survey Research., *Reference Manual on Scientific Evidenc*e, 3rd Edition, Federal Judicial Center, The National Academies Press, Washington, D.C., 2011.)

PTK has not carried that burden. Mr. Franklyn sampled from two populations, one provided by a third-party survey company and another from an email list provided by PTK. However, Franklyn failed to include key information about either population or how he sampled from it, including the number of persons reached as opposed to those who were not reached or refused, sample sizes, and summaries of how the disposition of study-specific sample records so that response rates for probability samples and participation rates for non-probability samples can be computed. (Scialabba Decl. Ex. 8 at 55-56.) Without this information, the viability of his survey cannot be evaluated.

He also failed to determine how many panel members were also in the email list that he used, and further combined the results of each group to reach an average. (*Id.* Ex. 8 at 57.) This means that some respondents had multiple chances to be selected and also that there is no means of knowing how much of the sample was from respondents who were already PTK members. *Id.* As a result, there is no statistically rigorous, well-accepted way to generalize the survey results and they should be excluded. *Id.*

Without this material information, HonorSociety, the Court, and the jury cannot evaluate the survey. The Court should exclude it.

**6. Mr. Franklyn's secondary-meaning survey analysis failed to implement adequate quality controls, and his analysis includes respondents whose answers may not accurately represent the perceptions and understanding of the secondary meaning of the asserted trade dress.**

Although Franklyn claims to have conducted quality-control measures to remove respondents outside of the United States, respondents who provided nonsensical answers, and those who completed the survey too rapidly, numerous quality issues remained. Nonsensical answers abound. For example, in response to the question "Which scholastic achievement society do you associate with these images?" four respondents answered "." "3" "AVID" and "unique," respectively. (Scialabba Decl. Ex. 8 at 61-62 and Exhibit 11.0.) Each of these was counted as a valid response. Likewise, in response to the question "What in particular makes you say that?" at least one respondent failed to answer while another said only "cool". And numerous persons put in nonresponsive answers like "N/A" and "I don't know" in response to questions about which scholastic achievement societies they associated with the images and why they so believed. Yet, Franklin counted all these answers as valid. These answers put the whole survey into question and it should be excluded for improper methodology because Franklyn did not follow his own quality control measures.

**7. The combined errors mean the secondary meaning survey should be excluded.**

The secondary meaning survey showed a completely black control against PTK's brightly colored, multi-hued, and emblazoned graduation regalia. Despite this inadequate control, only four persons who aren't already PTK members associated the regalia with PTK. That alone is sufficient to exclude the secondary meaning survey. Compounded with an overbroad survey universe, a lack of information necessary to evaluate his methods, and inadequate quality controls, there is simply no reason a jury should be confused and distracted by admission.

**C.  False-advertising study**

**1. Mr. Franklyn's false-advertising survey must be excluded because it is based on improper leading questions.**

A leading question which asks survey participants whether they believe that there is a connection between the plaintiff's and defendant's goods and services should be "rejected as

an improper leading question which lacks probative value and which prejudices the reliability of the survey." *IDV N. Am. v. S & M Brands*, 26 F. Supp. 2d 815, 830 (E.D. Va. 1998) (applying to a likelihood of confusion survey); *see also Riviana Foods, Inc. v. Societe Des Produits Nestle S.A.*, No. H-93-2176, 1994 U.S. Dist. LEXIS 20267, at *10 (S.D. Tex. Dec. 20, 1994) (recognizing that survey used a leading question, "creating an association between the two products where none may have existed previously"); *Bd. of Regents v. KST Elec., Ltd.*, 550 F. Supp. 2d 657, 676 (W.D. Tex. 2008); Bernstein, David H. and Bruce P. Keller. *"Survey Evidence in False Advertising Cases." Trademark and Deceptive Advertising Surveys: Law, Science, and Design*. Edited by Shari Seidman Diamond and Jerre B. Swann; ABA Section of Intellectual Property Law. American Bar Association, Second Edition 2022. p. 209.

The Franklyn survey included a series of closed, leading questions asking respondents to confirm or deny summary statements that Mr. Franklyn wrote. For example, he asked respondents whether "The referenced organization is considered a merit-based honor society by institutions of higher education" and "Members of the referenced organization are more likely to feel satisfied with their college experience than non-members." (Scialabba Decl. Ex. 1 at 66-67.) Each statement was written by Franklyn and not found on HonorSociety's website. No information was gathered as to whether respondents noticed the allegedly false statements before they were led to form an opinion on them. Every question in the false advertising survey, other than screening questions like whether respondents could see images clearly, is a leading question, meaning the entire survey must be excluded as unreliable.

### 2.  Mr. Franklyn's survey failed to include a control.

Consumer surveys that do not utilize control groups are unreliable and courts exclude them for this deficiency. *Kinetic Concepts*, 2006 U.S. Dist. LEXIS 60187, at *19–21 (*citing Pizza Hut,* 227 F.3d at 503). A control is essential to measure the impact of the allegedly false statements. A control presents the same information, minus the statements, and then asks respondents the same questions. *See THOIP*, 690 F. Supp. 2d at 240 ("A control is designed to estimate the degree of background 'noise' or 'error' in the survey. Without a proper control,

there is no benchmark for determining whether a likelihood of confusion estimate is significant or merely reflects flaws in the survey methodology.") (citing J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition, § 32:187 at 32-397 to 32-400 (6th ed.). The degree to which consumers noticed and relied on the allegedly false statement—if any exists—can only be measured by comparing the control with the false advertising statements results. *See* Peng, Chao-Ying Joanne and Ziskin, Mary B. "Control Group", *Encyclopedia of Survey Research Methods*, Paul J. Lavrakas, Editor, SAGE Publications, Inc., Thousand Oaks, CA, 2008, pp. 146-147, and Bernstein, David H. and Bruce P. Keller. *"Survey Evidence in False Advertising Cases." Trademark and Deceptive Advertising Surveys: Law, Science, and Design*. The Franklyn survey included no control of this nature.

In the absence of a control group, a false-advertising survey can only be saved by the use of control questions—questions that screen pre-existing impressions that might have skewed the results. *BlueSky Med. Corp., supra, at * 21.* For example, in *Blue Sky,* the survey asked physicians and nurses if they believed advertisements claimed one product was less expensive than another. Although no control was included, the survey was admitted because it asked respondents a series of questions about their familiarity with the products at issue to identify any possible bias. Mr. Franklyn claimed during deposition that asking respondents "[b]ased on the images you have just viewed, is it your belief that the referenced organization provides pro bono legal services?" and "[b]ased on the image you have just viewed, is it your belief that members of the referenced organization receive a free subscription to Netflix?" were the controls in his survey. But a control question in a false-advertising survey tests for pre-existing factors that might influence the respondent's answers. *Blue Sky*, *supra*. The questions asked by Franklyn are attention-checking questions that are used to ensure that the respondent is paying attention. This is exactly how Mr. Franklyn used these questions, as he terminated any respondent that answered these questions wrong.

Because Franklyn failed to use any control, his survey is improper and should be excluded.

3.  **Mr. Franklyn's false-advertising survey is unreliable because it introduced acquiescence bias into his survey through the use of the repetitive yes/no questions.**

Acquiescence bias is the "tendency for survey respondents to agree with statements regardless of their content." (Scialabba Decl. Ex. 8 at 80-81.) Although this bias can occur with any survey question, acquiescence bias is especially prevalent with agree-or-disagree questions. (*Id.*) Mr. Franklyn's survey asked 23 consecutive agree-or-disagree questions followed by another possible 19 agree-or-disagree questions based on the first 23 responses. (*Id.*) Franklyn's survey compounds the impact of acquiescence bias by telling the respondents the statements are false, rather than asking them what they believe. (*Id.*)

Tellingly, one of Mr. Franklyn's questions demonstrates acquiescence bias in action. Under one set of stimuli, respondents were directly told that HonorSociety has no GPA requirements. (*Id.* Ex. 8 at 81.) But 48% of respondents answered the survey question to the contrary. (*Id.*) Coupled with the fact that every question is leading, it is unsurprising that respondents were lured into simply answering "yes" rather than providing their actual opinion.

Because Franklyn asked substantial yes/no questions introducing acquiescence bias, his survey is unreliable and should be excluded.

4.  **The survey fails to replicate the market by selecting only small portions of HonorSociety's website.**

False-advertising surveys should reflect the real world as much as possible to test consumer perception of the actual advertising at issue. *See Ill. Tool Works Inc. v. Rust-Oleum Corp.*, Civil Action No. H-17-2084, 2018 U.S. Dist. LEXIS 191925, at *10 (S.D. Tex. June 21, 2018) (noting that inadequacies "deprived the Survey respondents of context that could have affected their responses") (*citing Scotts v. United Indus. Corp.*, 315 F.3d 264, 280 (4th Cir. 2002)) ("[T]he relevant issue in a false advertising case is the consumer's reaction to the advertisement as a whole and in context."); *THOIP*, 690 F. Supp. 2d at 236–37 (rejecting survey methodology as "not reflect[ing] the realities of the marketplace" or "sufficiently approximat[ing] the manner in which consumers encountered the parties' products in the marketplace"— "THOIP has not shown a reasonable likelihood that consumers would have proximately encountered the specific

pairs of shirts tested"); *Bd. of Regents*, 550 F. Supp. 2d at 675–76 ("The evidence shows that Klein did not test the LSL in the burnt orange color in which  it almost invariably appears (apparently survey respondents were shown a 'whited out' version of the LSL)."). Rather than present consumers with HonorSociety's website as they would view it, Mr. Franklyn isolated small portions of a few pages from the website, including information on chapters and financial aid buried deep within the site:

 

(Scialabba Decl. Ex. 6 at 8; Ex. 8 at 82-85.)

Franklyn then compounded this erroneous focus on only portions he hand-selected by asking respondents leading, biased questions. In sum, the survey is unreliable and should be excluded.

**5. Franklyn's false-advertising survey does not determine what messages respondents took from the advertising because he let them answer questions while reading from the images.**

A valid false-advertising survey first presents the advertising as it appears in real life (*see THOIP*, 690 F. Supp. 2d at 236–37), then removes it, and then asks the respondent for impressions based on how a consumer perceived the advertising after it is no longer visible. Ostberg, Henry D. *"Response to the Article Entitled, a Reading Test or a Memory Test: Which Survey Methodology Is Correct."* Trademark Reporter. 95 (2005): pp. 1446–1449, and Swann, Jerre B. *"A Reading Test or a Memory Test: Which Survey Methodology Is Correct."* Trademark Reporter. 95 (2005): 876-881 at 880. By contrast, when questions are asked while the advertising is still before the respondent, this is nothing more than a reading test that measures nothing about false advertising. *See Strumlauf v. Starbucks Corp.*, No. 16-cv-01306-YGR, 2018 U.S. Dist. LEXIS 2409, at *18 (N.D. Cal. Jan. 5, 2018) ("This question elicits responses which are suggested by the question itself and ultimately tests reading comprehension and common sense rather than the likelihood of consumer confusion."). *See Ill. Tool*, 2018 U.S. Dist. LEXIS 191925, at *11 (finding that out of context statements from packaging "deprived the Survey respondents of context that could have affected their responses"); *Wells Fargo & Co. v. WhenU.com, Inc.*, 293 F. Supp. 2d 734, 767–768 (E.D. Mich. 2003) ("A survey is not reliable if it suggests to the respondents an answer that would not  [*768]  otherwise have occurred to them.")

Franklyn's false-advertising survey presented sections of text from HonorSociety's website—where PTK claims false advertising appeared—and placed a question below it. To answer the question, the respondent simply read the text and that allowed them to find the solution Franklyn wanted them to find. For example, Franklyn presented respondents with a page that said HonorSociety didn't require any particular GPA and then asked if HonorSociety did. This is just a reading test: The answer is right there. Unfortunately, 48% of respondents failed it, but that says nothing about whether HonorSociety is spreading falsehoods or if respondents rely on them.

- 23 -

Because Franklyn presented the advertising to the consumers as they answered questions, he conducted an invalid false-advertising survey that should be excluded.

**6. Mr. Franklyn's sample size was too small and included persons who never would have seen the advertising on the website.**

Survey reliability increases with the number of respondents and surveys with an inadequate number should be excluded. *See AutoZone*, 373 F.3d at 799 n.2 ("[I]t is questionable whether the results are statistically significant given the small number of respondents."); *Powerhouse*, 2006 U.S. Dist. LEXIS 16454, at *12 (questioning reliability of just one hundred and fifty respondents); Rivera, Artemio. "Testing the Admissibility of Trademark Surveys After Daubert." Journal of the Patent and Trademark Office Society. September 2002, p. 9 (citing Thomas D. Dupont, Use of Surveys and Survey Experts in Trademark Litigation, in Practical Tips on Trademark Litigation 187, 195 (A.B.A., Sec. Intell. Prop. L., 2001)); *see also*, Edwards, G. Kip and J. David Mayberry. "The Daubert Revolution and Lanham Act Surveys." *Trademark and Deceptive Advertising Surveys: Law, Science, and Design*. Edited by Shari Seidman Diamond and Jerre B. Swann, ABA Section of Intellectual Property Law. American Bar Association, Second Edition 2022. pp. 351–353. Generally, surveys employ at least between 200–300 responses in order to be considered viable, unless the total population is small or respondents are otherwise rare. (*Id.*)

The target population or "universe" should consist of persons who would have seen the alleged false statements and are potential consumers of the product described. *See Amstar*, 615 F.2d at 264 (explaining "one of the most important factors in assessing the validity of an opinion poll is the adequacy of the 'survey universe,' that is, the persons interviewed must adequately represent the opinions which are relevant to the litigation," and noting "the survey neglected completely defendants' primary customers"); *Kis v. Foto Fantasy*, 204 F. Supp. 2d 968, 971 (N.D. Tex. 2001) (giving survey less weight because "Dr. Howard did not utilize a proper survey universe; i.e., his pretest and survey participants did not mirror the actual consumers of Defendants' product"); Barber, William G. and Giulio E. Yaquinto. *"The Universe." Trademark*

*and Deceptive Advertising Surveys: Law, Science, and Design*. Edited by Shari Seidman Diamond and Jerre B. Swann. ABA Section of Intellectual Property Law. American Bar Association, Second Edition 2022. p. 36. Franklyn's survey directly asked respondents if they would have reviewed the website but failed to exclude the 57 who responded that they would not. (Scialabba Decl. Ex. 8 at 88-89; Ex. 1 at 73–74.) The samples were further reduced in size because Franklyn chose to test two different sets of stimuli from a current and a past version of HonorSociety's website. With the 57 persons removed, only 78 respondents remained for each target group. There is no reason the sample size could not have been far larger: The overall population of eligible college students numbers in the hundreds of thousands and Franklyn could have conducted his study over more than the four-day period he chose. Franklyn's decision to survey only 78 persons per target group means his study cannot reliably represent the experience of millions of actual consumers and should be excluded.

### 7. Franklyn's false-advertising survey analysis failed to implement adequate quality controls.

As with his other surveys, Franklyn's failure to conduct adequate quality controls call the false advertising survey's reliability into question. Despite the "attention check" questions, over 5% of respondents provided the same answer for each question, including one who stated "I don't know" to every question. (Scialabba Decl. Ex. 8 at 92-94, citing Ex. 7.) Further, two respondents were not shown or did not answer any of the follow-up questions relating to whether the statements influenced their perception of HonorSociety. (*Id.*) And even Mr. Franklyn's arbitrary 6 minute, 30 second minimum time to complete the survey was not enforced, with 16 persons completing the survey faster than that. Yet their answers were still counted. (*Id.*) Given the very small sample size, these quality-control errors further call into question the validity of Franklyn's results.

### 8. The combined errors mean the false advertising survey should be excluded.

Mr. Franklyn hand-selected a few small portions of HonorSociety's website and presented them completely out of context. He then asked a series of leading questions, ripe with

acquiescence bias, of a grand total of 78 persons for each target group while allowing them to view the statements in question, testing reading ability rather than falsity. The false advertising survey should be excluded.

## Conclusion

The Court must serve a gatekeeper function to keep unreliable survey methods from confusing and misleading a jury. The jury here would have to sort through 17 material errors and a medley of misinformation to evaluate Mr. Franklyn's three surveys. It should not have to do so, and the Court should apply *Daubert* as it was intended to keep the surveys out.

Dated: February 14, 2025                    Respectfully Submitted,

s/ Derek Linke
Derek A. Newman (pro hac vice)
Derek Linke (pro hac vice)
Keith P. Scully (pro hac vice)
Gregory M. Scialabba (pro hac vice)
Newman llp
100 Wilshire Blvd, Suite 700
Santa Monica, CA 90401
(310) 359-8200
dn@newmanlaw.com
linke@newmanlaw.com
keith@newmanlaw.com
gs@newmanlaw.com

s/ Dakota J Stephens
W. Whitaker Rayner (MS Bar # 4666)
Dakota J. Stephens (MS Bar # 106695)
Hugh A. Warren, V (MS Bar #106711)
Jones Walker llp
190 E. Capitol St., Suite 800
Jackson, Mississippi 39201
Tel: (601) 949-4724
wrayner@joneswalker.com
dstephens@joneswalker.com
hwarren@joneswalker.com

Attorneys for Defendant, Counter-Claimant, and
Third-Party Plaintiff HonorSociety.org Inc. and
Defendant HonorSociety Foundation, Inc.

**Certificate of Service**

I hereby certify that on February 14, 2025, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system. Participants in the case are registered CM/ECF users and service will be accomplished by the CM/ECF system.

Executed this 14th day of February, 2025.         s/ Derek Linke_____
                                                  Derek Linke