# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF MISSISSIPPI
### NORTHERN DIVISION

| | |
|---|---|
| PHI THETA KAPPA HONOR SOCIETY, | Civil Action No. 3:22-cv-00208-CWR-RPM |
|     Plaintiff/Counter-Defendant, | |
| v. | |
| HONORSOCIETY.ORG INC., | |
|     Defendant/Counter-Plaintiff | |
| HONOR SOCIETY FOUNDATION, INC., | |
|     Defendant. | |
| HONORSOCIETY.ORG INC., | |
|     Defendant/Counter-Plaintiff/Third-Party Plaintiff | |
| v. | |
| LYNN TINCHER-LADNER, | |
|     Third-Party Defendant. | |

**HONORSOCIETY.ORG INC. AND HONOR SOCIETY FOUNDATION, INC.'S MEMORANDUM IN RESPONSE TO PHI THETA KAPPA HONOR SOCIETY'S MOTION FOR SUMMARY JUDGMENT**

## Table of Contents

**Issues** ...................................................................................................................1

**Factual Background** ........................................................................................ 2

    A.    PTK's statements in advertising..............................................................2

    B.    PTK registered domain names containing the HONOR SOCIETY trademark because they were "related to HonorSociety.org" right before filing suit against HonorSociety. ........................................................................................6

    C.    PTK's officers, employees, and advisors told third parties that HonorSociety was a "scam," "fraudulent," or "illegitimate," and encouraged college representatives to block HonorSociety emails. ...............................................8

**Argument** ......................................................................................................... **9**

    A.    PTK is not entitled to summary judgment on HonorSociety's false-advertising claim because consumers withheld trade from HonorSociety as a result of PTK's statements, and PTK's advertising was false. .................................10

    B.    HonorSociety supplies evidence for each element of its ACPA claim.......................17

    C.    The Court should deny PTK's request to cancel the HONOR SOCIETY mark because it doesn't qualify for cancellation and PTK did not plead a cancellation claim.....................................................................................21

    D.    The Court should deny PTK's request to dismiss HonorSociety's defamation claim because HonorSociety has evidence that PTK published false statements about HonorSociety. ............................................................................ 22

    E.    HonorSociety has evidence that PTK caused HonorSociety to lose contracts and sales, creating issues of material fact on its tortious-interference claims. ........... 28

**Conclusion** ...................................................................................................**34**

# Table of Authorities

## Cases

*Ahders v. SEI Priv. Tr. Co.*,
  982 F.3d 312 (5th Cir. 2020) ................................................................................ 9

*Amazing Spaces, Inc. v. Metro Mini Storage*,
  608 F.3d 225 (5th Cir. 2010) ........................................................................ 18, 19

*Amy's Ice Creams, Inc. v. Amy's Kitchen, Inc.*,
  60 F. Supp. 3d 738 (W.D. Tex. 2014) ................................................................ 18

*Baugh v. Baugh*,
  512 So. 2d 1283 (Miss. 1987) ............................................................................ 23

*Boler v. Mosby*,
  352 So. 2d 1320 (Miss. 1977) ............................................................................ 23

*Brisco v. LeTourneau Techs., Inc.*,
  No. 07-cv-99, 2008 U.S. Dist. LEXIS 87789 (S.D. Miss. Oct. 27, 2008) ............................ 27

*Cenac v. Murry*,
  609 So. 2d 1257 (Miss. 1992) ............................................................................ 28

*DaimlerChrysler v. The Net Inc.*,
  388 F.3d 201 (6th Cir. 2004) ............................................................................ 21

*Deckers Outdoor Corp. v. Owner of ahnu.com*,
  No. 24-1698, 2024 U.S. Dist. LEXIS 228472 (E.D. La. Dec. 17, 2024) .................................. 17

*Decorative Ctr. of Houston v. Direct Response Publ'ns, Inc.*,
  264 F. Supp. 2d 535 (S.D. Tex. 2003) ................................................................ 16

*Deville v. Marcantel*,
  567 F.3d 156 (5th Cir. 2009) ............................................................................ 9

*Durham v. Ankura Consulting Grp., LLC*,
  No. 20-CV-112-KS-MTP, 2022 U.S. Dist. LEXIS 242741 (S.D. Miss. Dec. 12, 2022) ......... 30

*Eselin-Bullock & Assocs. Ins. Agency, Inc. v. Nat'l Gen. Ins. Co.*,
  604 So.2d 236 (Miss. 1992) ................................................................................ 23

*Goley v. Elwood Staffing, Inc.*,
  No. 15cv277-DPJ-FKB, 2017 U.S. Dist. LEXIS 217771 (S.D. Miss. Mar. 21, 2017) .............. 27

*Greater Houston Transp. Co. v. Uber Techs., Inc.*,
  155 F. Supp. 3d 670 (S.D. Tex. 2015) ................................................................ 14

*Hinkley v. Envoy Air, Inc.*,
    958 F.3d 544 (5th Cir. 2020) ............................................................................ 27

*Hubbard Chevrolet Co. v. Gen. Motors Corp.*,
    873 F.2d 873 (5th Cir. 1989) ............................................................................ 28

*Hubbard Chevrolet Co., v Gen. Motors Corp.*,
    682 F. Supp. 873 (S.D. Miss. 1987) .................................................................. 28

*In re Cordua Rests., Inc.*,
    823 F.3d 594 (Fed. Cir. 2016) ...........................................................................17

*IQ Prods. Co. v. Pennzoil Prods. Co.*,
    305 F.3d 368 (5th Cir. 2002) ............................................................................ 10

*Joan Cravens, Inc. v. Deas Constr. Inc.*,
    No. 15-CV-385-KS-MTP, 2016 U.S. Dist. LEXIS 165146 (S.D. Miss. Nov. 30, 2016) ...........13

*Lawrence v. Evans*,
    573 So. 2d 695 (Miss. 1990) ............................................................................. 23

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
    572 U.S. 118 (2014) ...........................................................................................11

*March Madness Athletic Ass'n LLC v. Netfire Inc.*,
    120 F. App'x 540 (5th Cir. 2005) ..................................................................... 21

*McFadden v. U.S. Fid. & Guar. Co.*,
    766 So. 2d 20 (Miss. App. 2000) ...................................................................... 23

*Milkovich v. Lorain Journal Co.*,
    497 U.S. 1 (1990) ............................................................................................... 26

*Molzan v. Bellagreen Holdings, L.L.C.*,
    112 F.4th 323 (5th Cir. 2024) ........................................................................... 10

*Muhler Co., Inc. v. Ply Gem Holdings, Inc.*,
    No. 11-cv-862-SB, 2015 U.S. Dist. LEXIS 184448 (D.S.C. July 13, 2015) ............................13

*Nichols v. Tri-State Brick & Tile Co.*,
    608 So. 2d 324 (Miss. 1992) ............................................................................. 28

*Perkins v. Littleton*,
    270 So. 3d 208 (Miss. App. 2018) .................................................................... 25

*Pizza Hut, Inc. v. Papa John's Int'l, Inc.*,
    227 F.3d 489 (5th Cir. 2000) .......................................................................10, 14

*Prime Publishers v. American-Republican, Inc.*,
    160 F. Supp. 2d 266 (D. Conn. 2001) .............................................................. 21

*Roussel v. Robbins*,
  688 So. 2d 714 (Miss. 1996) ................................................................. 26

*Southland Sod Farms v. Stover Seed Co.*,
  108 F.3d 1134 (9th Cir. 1997) ...............................................................14

*Speed v. Scott*,
  787 So. 2d 626 (Miss. 2001) ................................................................. 26

*Test Masters Educ. Servs., Inc. v. Singh*,
  428 F.3d 559 (5th Cir. 2005) ................................................................19

*Thomas v. Boyd Biloxi LLC*,
  360 So. 3d 204 (Miss. 2023) ................................................................. 32

*Turner v. Baylor Richardson Med. Ctr.*,
  476 F.3d 337 (5th Cir. 2007) ................................................................ 10

*U.S. Patent & Trademark Off. v. Booking.com*,
  591 U.S. 549 (2020) ............................................................................. 18

*Union Nat'l Bank v. Union Nat'l Bank*,
  909 F.2d 839 (5th Cir. 1990) ........................................................ 18, 22

*Viacom Int'l, Inc. v. IJR Cap. Invs., L.L.C.*,
  891 F.3d 178 (5th Cir. 2018) ................................................................19

*Wal-Mart Stores, Inc. v. Samara Bros., Inc.*,
  529 U.S. 205 (2000) ..............................................................................19

## Statues & Rules

15 U.S.C. § 1064(3) ...................................................................................... 22

15 U.S.C. § 1125(d)(1)(A) .............................................................................17

Fed. R. Civ. P. 12(b) ..................................................................................... 27

Fed. R. Civ. P. 15(b)(1) ................................................................................ 27

Fed. R. Civ. P. 56(a) ...................................................................................... 9

Miss. R. Civ. P. 12(b)(6) .............................................................................. 27

## Issues

PTK's motion for summary judgment presents the following issues:

1. **Standing/Injury for False Advertising.** In a false-advertising case, for standing and injury, the plaintiff must suffer economic or reputational injury from the defendant's advertising. Here, HonorSociety has evidence from consumers that they canceled HonorSociety memberships based on false statements in PTK's advertising. Does HonorSociety have evidence of standing and injury?

2. **Literal Falsity in False Advertising.** In a false-advertising case, deception is presumed if a statement in advertising is literally false. Here, PTK advertised that it only accepts students in the top 10% of their schools when evidence shows it accepts over 50% at many schools. It advertised that the average *student receives* $2,500 in scholarships when in truth the average *scholarship* is $2,500, but the average student does not receive that much. Is deception presumed in this case?

3. **Deception in False Advertising.** If a plaintiff lacks evidence that the defendant's statements in advertising are literally false, it must provide evidence of deception. Here, students testified that they joined PTK because they believed the false scholarships claims that it advertised, and evidence shows students signed up for PTK because they believed the top-10% claim. Does HonorSociety have evidence of deception?

4. **Distinctive Trademark.** A trademark is generic, and not distinctive, if consumers associate it as identifying the entire class of services set forth in the trademark-registration certificate. A mark is suggestive, and thus distinctive, if it requires imagination to associate it with the services in the registration certificate. Here, the HONOR SOCIETY trademark is registered—not for honor societies but—for membership clubs. Is the HONOR SOCIETY trademark distinctive for membership clubs?

5. **Bad Faith for Cybersquatting.** A cybersquatting plaintiff must show that the defendant registered a domain name, confusingly similar to the plaintiff's trademark, with the bad-faith intent to profit. Here, PTK's CEO and other employees wrote that they registered a

series of "HonorSociety" domain names because they "related to HonorSociety.org" and then pointed the domain names at PTK's own website, advertising PTK's services. Does HonorSociety have evidence of PTK's bad faith in registering the domain names?

6. **Defamatory Statements.** Mississippi courts recognize that false statements indicating that the plaintiff has committed a crime or runs a scam are defamatory. PTK employees and agents published that HonorSociety is a scam, was "stealing money from college students," and was operating as a "fraudulent organization." Does HonorSociety have evidence of PTK's defamatory statements?

7. **Tortious-Interference Lost Sales.** To succeed on tortious-interference claims, a plaintiff must show lost sales caused by the defendant's wrongful interference. Here, HonorSociety previously generated sales from students who received HonorSociety's email invitations. But PTK worked with schools "to block emails from HonorSociety.org" and then HonorSociety stopped generating sales from students at those schools. Does HonorSociety have evidence of lost sales caused by PTK's interference?

## Factual Background

### A.    PTK's statements in advertising.

PTK repeatedly made three statements in its advertising:

- PTK is the only and/or official honor society for community colleges;

- PTK members have access to hundreds of millions of dollars in "exclusive" transfer scholarships awarded to students transferring to a four-year college or university, and members receive an average of $2,500 per member in transfer scholarships; and

- PTK members are in the top 10% of community college students.

*Id.* ¶¶ 75–108, 184–187.

### 1.    PTK advertises that its members are in the "top 10%" of community-college students, but evidence shows most are not.

PTK uses variations of the statement that a student is "in the top 10%" of students at their college in advertising, including when it extends invitations to join PTK. Linke Decl. ¶ 18, Ex. 15

at 79 (email to PTK invitee offering 20% off on graduation regalia and stating, "You're already in the top 10% of students at your college, why not stand out on graduation day with our exclusive stoles, cords, medals, and more?!"); *id.* ¶ 17, Ex. 14 at 505 (PTK invitation stating that PTK "only recognize[s] the top 10% of students"); *id.* ¶ 20, Ex. 17 at PTK0019820 (███████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████); *see also id.* ¶ 19, Ex. 16; *id.* ¶ 21, Ex. 18; *id.* ¶ 22, Ex. 19; *id.* ¶ 23, Ex. 20 at PTK0001650.

PTK's CEO testified that "[s]tudents join PTK because they want their academic achievements recognized. And so they join because they got invited to join, and the college is saying, you are the top, you are in the top of the top." *Id.* ¶ 13, Ex. 10 (Evid. Hr'g Tr., July 12, 2024) at 160:20–25. After receiving a PTK invitation, one student shared a tearful video on social media in which she said: "I just got an email from Phi Theta Kappa … telling me that I'm in the top 10% of community college students. And I'm so proud of myself. I dropped out of high school when I was 16 and I never thought I was that smart." *Id.* ¶ 14, Ex. 11.

Data from community colleges shows that the percentage of students meeting the GPA requirements for PTK eligibility usually exceeds 10%. For example, from January 2019 through summer 2024:

- ████████████████████████████████████████████ (*id.* ¶ 72, Ex. 69; *id.* ¶ 78, Ex. 75);

- ████████████████████████████████████████████ (*id.* ¶ 71, Ex. 68);

- ████████████████████████████████████████████ (*id.* ¶ 72, Ex. 69; *id.* ¶ 78, Ex. 75);

- ████████████████████████████████████████████ (*id.* ¶ 73, Ex. 70);

- ███████████████████████████████████████████████████ (*id.* ¶ 74, Ex. 71);

- ███████████████████████████████████████████████████ (*id.* ¶ 75, Ex. 72); and

- 52% of students at the College of Western Idaho met its chapter's 3.25 GPA requirement (*id.* ¶ 76, Ex. 73; *id.* ¶ 77, Ex. 74 at CWI000006).[1]

When asked how PTK determines that a student is in the "top 10%," PTK CEO Tincher-Ladner testified ██████████████████████████████████████



██████████████████████ *Id.* ¶ 24, Ex. 21 (Feb. 28, 2024 Tincher-Ladner Dep.) at 45:22–46:17. PTK can only do this calculation for ██████████████████████ ████████████████ *Id.* at 46:4–17. Tincher-Ladner also stated ██████████████ ████████████████████████████████████████████████ ████████████████████████████ *Id.* at 210:6–13. Even according to PTK's calculations—which were prepared only in the context of litigation—███████████ ████████████████████████████████████████████████ ██████████████████ *Id.* ¶ 25, Ex. 22 (Dec. 16, 2024 Tincher-Ladner Dep., AEO volume) at 265:15–267:18; *id.* ¶ 15, Ex. 12.

      **2.**   **PTK advertises that its members have exclusive access to millions of dollars in transfer scholarships and that the average member receives $2,500 per year in transfer scholarships, but PTK admits that is inaccurate.**

PTK's advertising also states that the average PTK member receives $2,500 in transfer scholarships per year. *Id.* ¶ 28, Ex. 25 (PTK invitation stating that "the average member gets $2,500 a year [in transfer scholarships]"); *id.*, Ex. 19 at PTK0130730 (████); *id.* ¶ 27, Ex. 24 (PTK flier stating ████████████████████████████████████████████

---

[1] Data for the College of Western Idaho is from the Fall 2020 through Summer 2024 semesters. *Id.* ¶ 76, Ex. 73.



███████████ ”). Often in the same marketing materials, PTK claims that its members have access to $37 or $246 million in member-only transfer scholarships. *See id.*, Ex. 25 (PTK invitation stating that "$37 million in transfer scholarships [are] available exclusively for Phi Theta Kappans"); *id.*, Ex. 19 at PTK0130730 (████████████████████████ ████████████████████"); *see also id.* ¶ 29, Ex. 26 at PTK0028889. ██████████

Tincher-Ladner testified that █████████████████████████████████████ █████████████████████████████████████████████. Ex. 22 at 157:5–15. Not all PTK members receive transfer scholarships. *See id.* at 118:10–25.

3. **PTK advertises that it is "the official honor society" for community colleges but only has a recognition, from over a century ago, that it is "an" official honor society.**

PTK's advertising also claims that it is "the official" or "the only" honor society of community colleges. *See id.*, Ex. 16 (PTK invitation stating it is "the official honor society of community colleges.") This refers to an action ██████████████████ ██████████████████████████████████████████████ ██████████████████████. *See id.* ¶ 31, Ex. 28. ████████████ ██████████████████████████████████████████ ██████████████. *Id.* ¶ 32, Ex. 29 at AACC_000976 (emphasis added). The AACC had a policy of approving "honorary scholarship societies other than Phi Theta Kappa," *id.* ¶ 33, Ex. 30 at AACC_002015, and according to ██████████████████ ██████████████████████████. *Id.* ¶ 34, Ex. 31 at AACC_000913.

4. **Existing HonorSociety members cancelled their memberships citing reasons mirroring PTK's false statements, and sometimes directly quoting PTK's advertising.**

HonorSociety produced records of requests from students to cancel their HonorSociety memberships or receive refunds for membership payments. Students compared HonorSociety to PTK. For example, some expressed the opinion ███████████████████████████████ ████████████ *Id.* ¶ 9, Ex. 6 at row 449 (claiming ██████████████████ t"); *id.* ¶ 8,

Ex. 5 at row 8531. Others stated that █████████████████████████████████

████████████████████." *Id.* ¶ 10, Ex. 7 at rows 1222 and 1252; *id.* ¶ 11, Ex. 8; *id.* Ex. 5 at

row 13499. And at least a few of the students said they received emails from PTK advisors at

their schools that prompted them to cancel their HonorSociety memberships. One email, sent to

students ███████████████████████████████████████████████████

████████████████████████████████████████████████████ *Id.*,

Ex. 5 at row 9912. Other emails claimed that ███████████████████████████

███████████ *Id.* at rows 267 and 445.

**B.    PTK registered domain names containing the HONOR SOCIETY trademark because they were "related to HonorSociety.org" right before filing suit against HonorSociety.**

**1.    HonorSociety owns and has widely used its HONOR SOCIETY trademark since 2013.**

HonorSociety is the owner of the registered HONOR SOCIETY trademark, a word mark

registered in Class 35, Membership Clubs. The certificate of registration provides that the class

of goods is:

> Membership club services providing benefits to members, namely providing discounts for the goods and services of others; Membership club services providing benefits to members, namely, providing discounts for restaurants, insurance services, credit cards, banking services, and travel services; Membership club services providing benefits to members, namely, mail order services featuring honor cords for graduation; Membership club services providing benefits to members, namely, providing job listings and career information.

Linke Decl., ¶ 46, Ex. 43 (Reg. No. 4,662,343). Honor Society has used the mark continuously in

interstate commerce since at least May 1, 2013, and registered it with the United States

Trademark Office on December 30, 2014. *Id.* HonorSociety is a ████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

█████████████████████████████" *Id.* ¶ 53, Ex. 50 (Evid. Hr'g Tr., July 17,

2024) at 82:3–22.

HonorSociety has used the honorsociety.org domain for over a decade and

HonorSociety.org is part of HonorSociety's official corporate name. HonorSociety.org records

███████████████████████████████████████████████████████████████████████

████████████████████████████████. *Id.* ¶ 4, Ex. 1 (Jan. 3, 2024 Moradian Dep) at

204:16–206:10; *see also id.* ¶ 54, Ex. 51 (████████████████████████████████

████). HonorSociety markets itself in written materials using the HONOR SOCIETY mark and

has ██████████████████████████████████████████████████. *Id.*, Ex. 1 at

310:14–311:20. ███████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████. *Id.* ¶ 57, Ex. 44.

**2.    PTK's CEO directed it to register five domain names containing "honorsociety" because they were "related to honorsociety.org."**

In March 2022, immediately before PTK filed this lawsuit, ███████████████████████

████████████████████████████████████████████████████████████

█████████ Specifically, ████████████████████████████████████████████

██████████████████████████████████████████████

████████████████ *Id.* ¶ 52, Ex. 49. A few weeks later, █████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████ *Id.*, Ex. 22 at 253:1–23; *id.* ¶ 58, Ex. 55 (Dec. 16, 2024

Tincher-Ladner Dep. Ex. 488); *id.*, Ex. 23 at 159:5–12; *id.* ¶ 5, Ex. 2 (Jan. 29, 2025 Tincher-

Ladner Dep. Ex. 536); *id.* ¶ 6, Ex. 3 (Dec. 16, 2024 Tincher-Ladner Dep. Ex. 487). ██████

████████████████████████████████████████████████████. *Id.*, Ex. 55; *id.*

¶ 59, Ex. 56; *id.* ¶ 60, Ex. 57; *id.* ¶ 61, Ex. 58.

PTK subsequently used the registered domain names to redirect users to its own website, ptk.org. *Id.* ¶ 62, Ex. 59 (Jan. 27, 2025 Moradian Dep.) at 119:12–121:19; *id.* ¶ 63, Ex. 60; *id.* ¶ 64, Ex. 61; *id.* ¶ 65, Ex. 62; *id.* ¶ 66, Ex. 63; *id.* ¶ 67, Ex. 64; *id.* ¶ 68, Ex. 65; *id.* ¶ 69, Ex. 66; *id.* ¶ 70, Ex. 67.

**C.    PTK's officers, employees, and advisors told third parties that HonorSociety was a "scam," "fraudulent," or "illegitimate," and encouraged college representatives to block HonorSociety emails.**

PTK representatives have published to students, college representatives, and other organizations in the community-college space that HonorSociety engages in theft and fraud. For example, in an email



.￵" *Id.* ¶ 36, Ex. 33.

*Id.* ¶ 42, Ex. 45. In yet another email,

" *Id.* ¶ 38, Ex. 35.

In an email

*Id.* ¶ 37, Ex. 34.

*Id.* ¶ 41, Ex. 38 at PTK0132290.

*Id.* ¶ 39, Ex. 36.

*Id.* ¶ 40, Ex. 37.



*Id.*

*Id.*, Ex. 33.

*Id.*, Ex. 42.

*Id.* ¶ 51, Ex. 48 at PTK0123726.

*Id.*

*Id.* ¶ 50, Ex. 47; *see also id.* ¶ 47, Ex. 44

).

## Argument

To prevail on a summary-judgment motion, a movant must show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A genuine dispute of material fact exists 'if the evidence is sufficient for a reasonable jury to return a verdict for the nonmoving party.'" *Ahders v. SEI Priv. Tr. Co.*, 982 F.3d 312, 315 (5th Cir. 2020) (citation omitted). When considering a summary-judgment motion, "the court must view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in its favor." *Deville v. Marcantel*, 567 F.3d 156, 163–64 (5th Cir. 2009). At this stage, the court must also "refrain from making credibility determinations or weighing the

evidence." *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007) (citation omitted). Faithfully applying these standards to this record, the Court should deny PTK's motion for summary judgment.

**A.    PTK is not entitled to summary judgment on HonorSociety's false-advertising claim because consumers withheld trade from HonorSociety as a result of PTK's statements, and PTK's advertising was false.**

For a Lanham Act false-advertising claim, a plaintiff must show five elements: "(1) A false or misleading statement of fact about a product; (2) Such statement either deceived or had the capacity to deceive a substantial segment of potential consumers; (3) The deception was material, in that it is likely to influence the consumer's purchasing decision; (4) The product is in interstate commerce; and (5) The plaintiff has been or is likely to be injured as a result of the statement at issue." *Molzan v. Bellagreen Holdings, L.L.C.*, 112 F.4th 323, 334 (5th Cir. 2024) (quoting *IQ Prods. Co. v. Pennzoil Prods. Co.*, 305 F.3d 368, 375 (5th Cir. 2002)).

PTK argues that HonorSociety must demonstrate that a student joined PTK instead of HonorSociety, or else HonorSociety lacks standing and injury. But the law requires no such thing. Instead, all HonorSociety must show is that PTK's false advertising caused someone to "withhold trade from" HonorSociety—*not* that they then give that business to PTK. And HonorSociety has evidence that PTK's advertising caused consumers to withhold trade from HonorSociety.

PTK also argues that HonorSociety cannot show consumers were deceived by PTK's false advertising. But deception is presumed when the statements at issue are literally false. *Pizza Hut, Inc. v. Papa John's Int'l*, 227 F.3d 489, 497 (5th Cir. 2000). Here, genuine questions of fact exist as to the literal falsity of PTK's statements, and HonorSociety also has evidence that consumers were deceived.

**1.    HonorSociety was proximately harmed because potential and existing customers withheld trade from HonorSociety due to PTK's false advertising.**

To show proximate cause, HonorSociety need only show a genuine dispute of material fact that it suffered economic or reputational injury from PTK's advertising. *See Lexmark Int'l, Inc. v.*

- 10 -

*Static Control Components, Inc.*, 572 U.S. 118, 133 (2014). Economic or reputational injury "occurs when deception of consumers causes them to withhold trade from the plaintiff." *Id.* PTK attempts to raise the bar for standing and injury, asserting that if HonorSociety cannot show that an individual joined PTK rather than HonorSociety, then HonorSociety lacks standing and injury. It cites no authority in support of that proposition.

HonorSociety has produced voluminous records of refund requests from students indicating that they cancelled because of PTK's false advertising. For example, ███████████ ██████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ███████████████████████████████████████ *See* Linke Decl., Ex. 5 at rows 267, 445, 9912. ████████████████████████████████████████████████████████████ ████████████████████████████████████ *Id.*, Ex. 5 at row 9912. Other emails parroted PTK's claim to be "the only honors society for two year colleges." *Id.* at rows 267 and 445. These emails from PTK advisors contain nearly verbatim one of the statements HonorSociety complains of—namely, that PTK is the only or official honor society for community colleges. Also related to the "official honor society" ███████████████ █████████████████████████████████████████████████████████████████████████ ██████████ *Id.*, Ex. 6 at row 449; *see also id.*, Ex. 5 at row 8531 (████████████████ ████████), and row 109532 (████████████████ was "associated with their school," *id.*, Ex. 7 at rows 1222 and 1252; *id.*, Ex. 8, █████████████████████████████ *Id.*, Ex. 5 at row 13499.

In relation to PTK's claim that its members have access to hundreds of millions of dollars in "exclusive" transfer scholarships and receive an average of $2,500 in transfer scholarships per year, ██████████████████████████████████████████████████ ██████████████ *Id.*, Ex. 21 at 75:6–10. ██████████████████████████ ██████████████████████████ *id.* ¶ 12, Ex. 9 (Hall Dep. Tr.) 24:22–25. On the basis of

this evidence, a reasonable jury could find that PTK's scholarship-related statements caused these students to cancel their HonorSociety memberships, thereby injuring HonorSociety.

PTK asserts that HonorSociety hasn't produced "evidence indicating its members sought refunds or terminations of their memberships due to PTK's advertising." Dkt. No. 426 at 8–9 (citing Dkt. No. 425-2 ¶ 5). This conclusion ignores the evidence just discussed and not supported by PTK's citation, a declaration by its counsel describing and characterizing her search of just a few spreadsheets. *See* Dkt. No. 425-2 ¶ 5. PTK also suggests that when asked about persons "who joined PTK over Honor Society because of PTK," HonorSociety's Rule 30(b)(6) witness testified ███████████████████████████████████████. Dkt. No. 426 at 8 (citing Linke Decl., Ex. 59 at 126:25–127:17). But in the testimony PTK cites, ██ ████████████████████████████████████████████. Linke Decl., Ex. 59 at 127:3–5 ██ ████████████████████████████████████████████████████ ████████). Thus, contrary to PTK's conclusory statement, the record shows at least a genuine dispute that students joined PTK in lieu of HonorSociety due to PTK's false advertising.

A jury could also reasonably find that HonorSociety would be harmed by PTK's false statements that students are in the "top 10%" of their class, or of community-college students. PTK's CEO testified that students join PTK because of PTK's claim that its members are at the top of their class: "Students join PTK because they want their academic achievements recognized. And so they join because they got invited to join, and the college is saying, you are the top, you are in the top of the top." *Id.*, Ex. 10 at 160:20–25. And one PTK invitee tearfully shared her reaction to a PTK invitation: "I just got an email from Phi Theta Kappa … telling me that I'm in the top 10% of community college students. And I'm so proud of myself. I dropped out of high school when I was 16 and I never thought I was that smart." *Id.*, Ex. 11. The fact that this student was so moved by PTK's invitation shows that the "top 10%" claim can have an enormous impact on students and their choices.

This evidence establishes a genuine question of fact as to whether PTK's false statements caused consumers to withhold trade from HonorSociety, which is all that is required to survive summary judgment.

The cases PTK cites are inapposite. In *Joan Cravens, Inc. v. Deas Construction Inc.*, 15-CV-385-KS-MTP, 2016 U.S. Dist. LEXIS 165146, at *18–19 (S.D. Miss. Nov. 30, 2016), the plaintiffs' false-advertising claim was dismissed because the plaintiffs showed that the defendant made an allegedly deceptive statement to the plaintiffs themselves, but could not show that the defendant made any deceptive statement to the plaintiffs' potential consumers. But here, HonorSociety has ample evidence that PTK made false statements to the relevant consumers. *See* Linke Decl., Ex. 15 at HS_237979 (email advertisement to PTK invitee for graduation regalia containing "top 10%" statement); *id.*, Ex. 14 at CCSNH000505 (PTK invitation containing "top 10%" statement); *id.*, Ex. 19 at PTK0130730 (███████████████████ ████████; *id.*, Ex. 16 (PTK invitation containing "the official honor society" statement).) Because PTK made the statements to HonorSociety's customers and potential customers, *Joan Cravens* does not apply. *See* Linke Decl., Ex. 15 at HS_237979 (email to PTK invitee advertising graduation regalia containing "top 10%" statement); *id.*, Ex. 14 at CCSNH000505 (PTK invitation containing "top 10%" statement); *id.*, Ex. 19 at PTK0130730 ██████████ ███████████████████████); *id.*, Ex. 16 (PTK invitation containing "the official honor society" statement).

In *Muhler Co., Inc. v. Ply Gem Holdings, Inc.*, No. 11-cv-862-SB, 2015 U.S. Dist. LEXIS 184448 (D.S.C. July 13, 2015), an unreported decision from an out-of-circuit district court, the court was not considering a Lanham Act false-advertising claim. Instead, the question was "whether the Defendants [were] entitled to summary judgment on the Plaintiff's [South Carolina Unfair Trade Practices Act] and common law unfair competition claims." *Id.* The court concluded that the affidavits the plaintiff pointed to as evidence may have shown that the individuals were deceived, but not that they withheld business from the plaintiff sufficient to establish a common-law unfair competition claim. *Id.* at *10–12. On this record, however,

HonorSociety can show that consumers withheld business by cancelling their HonorSociety memberships.

And in *Berg v. Symons*, the court found that the plaintiff did not prove the injury element of his false advertising claim because the letters from customers expressing confusion actually showed that those customers wanted to continue to do business with him. 393 F. Supp. 2d at 559–60. Unlike the *Berg* plaintiff, HonorSociety presents evidence showing that consumers ceased doing business with HonorSociety due to PTK's statements.

**2.    PTK's materiality argument doesn't apply because PTK's advertising is literally false, and HonorSociety has evidence of PTK's deception.**

PTK argues that it is entitled to summary judgment because there is "no evidence" that customers were deceived by PTK's advertising. But as PTK acknowledges, evidence of the statement's impact on consumers—or "materiality"—is only called for if the advertising is merely misleading rather than literally false. *See Pizza Hut*, 227 F.3d at 495. When advertising is literally false, "the court will assume that the statements actually misled consumers." *Id.* at 497. Whether a statement was literally false is a jury question. *See, e.g.*, *Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1146 (9th Cir. 1997) (reversing summary judgment where a reasonable juror could conclude advertisements were literally false); *Greater Houston Transp. Co. v. Uber Techs., Inc.*, 155 F. Supp. 3d 670, 701–02 (S.D. Tex. 2015) (denying summary judgment where plaintiff failed to present evidence of materiality because they presented evidence challenging the accuracy of defendant's statements).

In its August 22, 2024 order, the Court found that as to "whether invited students constitute the top 10% of students at their colleges or the top 10% nationally, the Court is no clearer as to which side has the accurate claim." Dkt. No. 230 at 22. Thus, the Court already found a material issue of disputed fact about whether the statement is literally false, and so HonorSociety need not present evidence of materiality at this stage.

Responses to subpoenas and public-records requests from community colleges establish that PTK's top-10% claim is false. Just by way of example, ██████████████████████

███████████████████████████████████████ t (Linke Decl. ¶ 72, Ex. 69; *id.* ¶ 78, Ex. 75); ██

█████████████████████████████████████████████ (*id.* ¶ 71, Ex. 68); ██

█████████████████████████████████████████████ (*id.* ¶ 72, Ex. 69; *id.*

¶ 78, Ex. 75); ██████████████████████████████████████████████ (*id.* ¶ 73,

Ex. 70); ████████████████████████████████████████████ t (*id.* ¶ 74,

Ex. 71); █████████████████████████████████████████████

(*id.* ¶ 75, Ex. 72); and 52% of students at the College of Western Idaho met its chapter's 3.25

GPA requirement (*id.* ¶ 76, Ex. 73; *id.* ¶ 77, Ex. 74 at CWI000006). It seems that often over 50%

of the student body is in PTK's top 10% because its claim in advertising is false.

PTK admits the statement is false. ████████████████████████████████

█████████████████████████████ *Id.*, Ex. 22 at 265:15–267:18; *id.*, Ex. 12. ██████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████. *See id.*, Ex. 23 at 15:25–18:11; *id.*, Ex. 13. Thus, other

students with higher GPAs than those invited to PTK may not be eligible for PTK membership.

Likewise, PTK's statement that the "average member" receives $2,500 in transfer

scholarships per year is false. ██████████████████████████████████████

██████████████████████████████████████████████. *Id.*,

Ex. 22 at 157:5–15. Thus, the statement is literally false. And like the top-10% claim where there's

a disputed issue of material fact as to falsity, the Court already found the "same goes for the

dispute over the average dollar amount that PTK members receive in scholarships." Dkt. No.

230 at 22. So evidence of materiality isn't required.

Even if the evidence didn't show the statements were false, the evidence shows they

deceived consumers by impacting their purchasing decisions. ██████████████████

████████████████████████████████████████████████████

████████████████ *Id.*, Ex. 21 at 75:6–10. ████████████████████████████

██████████████████████████████." *Id.*, Ex. 9 at 24:22–25. The testimony is further

████████████████████████████████████████████████████

██████████████████ *See id.*, Ex. 5 at rows 993, 2048, 24706, 52308, 89901. That

evidence shows the statements about scholarships are material.

Finally, PTK's advertising that it is "the official" or "the only" honor society of

community colleges is false. *See id.*, Ex. 16 (PTK invitation stating that PTK is "the official honor

society of community colleges.").█████████████████████████████

████████████████████████████████████████████████████

*See id.*, Ex. 28. But documents from AACC do not support the claim that PTK is "*the* official"

honor society for community colleges, only that AACC endorsed PTK as *an* official honor

society. For example, ████████████████████████████████████████

██████████████████████████████ *Id.*, Ex. 29 at

AACC_000976. Other Board meeting minutes indicate that ████████████████

██████████████████████ *Id.*, Ex. 31 at AACC_000913; *id.*, Ex. 30 at

AACC_002015. These records create a genuine fact issue as to whether PTK's statements are

literally false and preclude summary judgment.

Even if the Court found that the statement that PTK is "the only" or "the official" honor

society for community colleges is misleading rather than literally false, there is evidence that

many students were misled by that statement. ████████████████████████

████████████████████████████████████████████████████

████████████████████████ ip. *Id.*, Ex. 5 at rows 267, 445, 9912.

████████████████████████ . *Id.*, Ex. 6 at row 449; *id.*, Ex. 5 at HS_365631 at row

8531, 109532, 13499; *id.*, Ex. 7 at rows 1222 and 1252; *id.*, Ex. 8.

In light of this evidence, PTK's reliance on *Decorative Center of Houston v. Direct Response

Publications, Inc.*, 264 F. Supp. 2d 535 (S.D. Tex. 2003) is misplaced. That court granted

summary judgment to the defendant because the plaintiff produced no evidence that the

deception influenced purchasing decisions. Whereas here, evidence establishes that PTK's

statements in fact caused students to cancel their HonorSociety memberships or request and

receive refunds because they relied on PTK's statements. Thus, PTK's deception influenced their purchasing decisions.

Because the evidence on this issue shows a genuine dispute of material fact regarding literal falsity, or at least regarding actual consumer deception, the Court should deny PTK's summary-judgment motion.

**B.    HonorSociety supplies evidence for each element of its ACPA claim.**

To prove a claim under the Anticybersquatting Consumer Protection Act (ACPA), a plaintiff must show: (1) its mark is famous or distinctive; (2) the domain names registered by the defendant are identical or confusingly similar to the mark; and (3) that the defendant had a bad faith intent to profit from the domain names when it registered, trafficked in, or used them. *Deckers Outdoor Corp. v. Owner of ahnu.com*, No. 24-1698, 2024 U.S. Dist. LEXIS 228472, at *4 (E.D. La. Dec. 17, 2024) (citing 15 U.S.C. § 1125(d)(1)(A)).

**1.    HonorSociety's mark is distinctive and not generic.**

PTK claims that HonorSociety cannot enforce its ACPA rights because HONOR SOCIETY is generic. A mark is generic if consumers associate the mark as identifying the entire class of goods set forth in the registration certificate. *In re Cordua Rests., Inc.*, 823 F.3d 594, 602 (Fed. Cir. 2016) (holding that a "proper genericness inquiry focuses on the description of services set forth in the certificate of registration.").

HONOR SOCIETY is registered for membership clubs, including a broad range of clubs that provide a broad range of services, including "discounts for restaurants, insurance services, credit cards, banking services, and travel services." Linke Decl., Ex. 43. ████████████ ████████████  *Id.*, Ex. 50 at 82:1–2. ████████████████ ████████████████████████████████████ ████████████████████████████████████ ████████████████████████████ Id. at 82:3–22.

PTK has no evidence that the mark is generic for the membership-club category of goods set forth in the registration.

Trademarks are classified in categories of increasing distinctiveness: (1) generic;
(2) descriptive; (3) suggestive; (4) arbitrary; or (5) fanciful. *Amazing Spaces, Inc. v. Metro Mini Storage*, 608 F.3d 225, 240 (5th Cir. 2010). The latter three categories of marks are deemed inherently distinctive and are entitled to protection, while descriptive marks are only protectable with secondary meaning. *Id.* A descriptive term is one that "identifies a characteristic or quality of the article or service." *Union Nat'l Bank v. Union Nat'l Bank*, 909 F.2d 839, 845 (5th Cir. 1990). They are often adjectives such as "speedy," "friendly," "green," "menthol," or "reliable." *Id.*

A suggestive term is one which "suggests rather than describes, some particular characteristic of the goods or services to which it applies and requires the consumer to exercise the imagination in order to draw a conclusion as to the nature of goods and services." *Id.* For example, "penguin" is suggestive as to refrigerators—because penguins represent cold, which suggests refrigerators keep things cold. *Id.*

Courts should rarely determine the strength of a mark at summary judgment rather than on a full factual record. *Id.* at 845. In other words, whether a mark is inherently distinctive or has acquired secondary meaning are issues of fact. *Amazing Spaces*, 608 F.3d at 234; *Amy's Ice Creams, Inc. v. Amy's Kitchen, Inc.*, 60 F. Supp. 3d 738, 747 (W.D. Tex. 2014). Because its trademark is registered, HonorSociety is entitled to a presumption that HONOR SOCIETY is valid, and PTK has the burden to rebut that presumption. *U.S. Patent & Trademark Off. v. Booking.com*, 591 U.S. 549, 552 (2020).

HONOR SOCIETY is not descriptive because the words "honor society" do not describe a membership club. Rather, the words may suggest one of many characteristics of HonorSociety's club, such as that students are recognized for certain academic achievements. But overall, HONOR SOCIETY does not describe the panoply of benefits or inform the consumer that HonorSociety is a membership club. As PTK has so loudly proclaimed, HonorSociety is not the same type of organization as PTK: "PTK is a genuine honor society that applies standards in its invitation of members. Honor Society … is not." Dkt. No. 150 at 6; *see*

*also* Dkt. No. 136 ¶ 51 (by "calling itself 'Honor Society,' its entire existence is built upon the premise that it is something that it is not. As evidenced by its trademark registrations, it is a 'membership club' designed to do nothing more than to extract money from college students on the misleading representation that membership in the organization means something when it does not and that the members receive benefits when they do not.") HonorSociety is a membership club. And the trademark registration is for that category of services—not honor societies. Thus, the mark is suggestive, which makes it inherently distinctive.

"Even if a mark is not inherently distinctive, it can acquire distinctiveness if it has developed secondary meaning." *Viacom Int'l, Inc. v. IJR Cap. Invs., L.L.C.*, 891 F.3d 178, 189 (5th Cir. 2018) (quoting *Wal-Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205, 210–11 (2000)). "A mark develops secondary meaning 'when, in the minds of the public, the primary significance of a [mark] is to identify the source of the product rather than the product itself.'" *Id.* (quoting *Test Masters Educ. Servs., Inc. v. Robin Singh Educ. Servs., Inc.*, 799 F.3d 437, 445 (5th Cir. 2015)).

Courts look to seven factors in evaluating secondary meaning: (1) length and manner of use of the mark or trade dress, (2) volume of sales, (3) amount and manner of advertising, (4) nature of use of the mark or trade dress in newspapers and magazines, (5) consumer-survey evidence, (6) direct consumer testimony, and (7) the defendant's intent in copying the trade dress. *Amazing Spaces*, 608 F.3d at 248. Survey evidence is not required to establish secondary meaning. *Viacom*, 891 F.3d at 191.



. *Id.*, Ex. 1 at 310:14–311:20. ██████████████████████████████ ███████████████████████████████████████████ *See id.*, Ex. 1 at 269:10–12 (██████████████████); *id.*, Ex. 52 at 186:11–17 (███████████████████); *id.*, Ex. 53 ████████████████████. PTK's own actions demonstrate that the HONOR

SOCIETY mark is associated with HonorSociety in the minds of consumers. PTK registered the domain names with the intent of having them point to PTK's website rather than HonorSociety's. The only business reason to do that is if the domains are associated with HonorSociety and PTK could benefit from diverting traffic to its own operation.

**2.    PTK's domain names are identical or confusingly similar to the HONOR SOCIETY trademark.**

The second element is whether PTK's domain names are identical or confusingly similar to HonorSociety's mark. They are: the words "honor society" appear in each domain name: honorsociety.foundation, honorsociety.shop, joinhonorsociety.info, joinhonorsociety.net, and joinhonorsociety.us.

**3.    PTK acted in bad faith in registering domain names containing the HONOR SOCIETY mark.**

████████████████████████████████████████████████████████████

████████████████████████████ Linke Decl., Ex. 49. ████████████

███████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████ *Id.*, Ex. 22 at 253:1-23; *id.*, Ex. 55; *id.*, Ex. 23 at 159:5–12; *id.*, Ex. 2; *id.*, Ex. 3. The fact that PTK's CEO expressly requested to purchase domain names "related to HonorSociety.org" shows that PTK was targeting HonorSociety directly for commercial gain.

████████████████████████████████████████████████

███████████████████████. *See id.*, Ex. 59 at 119:12–121:19 (████████████████

████████████████████████; *id.*, Exs. 60–67. Consumers seeking to visit the HonorSociety Foundation might click on a link to PTK's honorsociety.foundation domain name and be directed instead to PTK's website. Likewise, a consumer seeking to shop at HonorSociety's online store might click PTK's honorsociety.shop domain. And consumers

seeking to join HonorSociety might click PTK's joinhonorsociety.info, joinhonorsociety.net, or joinhonorsociety.us and be diverted from doing business with HonorSociety.

The email with instruction to register the domain names with particular reference to HonorSociety is by definition bad faith. And that PTK registered these domain names within a month of filing its lawsuit against HonorSociety indicates that PTK registered them as part of its campaign to punish HonorSociety.

PTK attempts to avoid liability by asserting that it never verified "with 100 percent certainty" that it successfully pointed the disputed domains to ptk.org. Linke Decl., Ex. 23 at 160:14. That's irrelevant to the inquiry. The test is PTK's intent, not its success or lack thereof. *See, e.g., March Madness Athletic Ass'n LLC v. Netfire Inc.*, 120 F. App'x 540, 545 (5th Cir. 2005) ("Whether they profited or not, [defendants] acted with the bad faith intent to profit as required by [ACPA]"); *Prime Publishers v. American-Republican, Inc.*, 160 F. Supp. 2d 266, 280-81 (D. Conn. 2001) (noting that defendant could benefit from its "warehousing" of domains even if it did not actively use those domains); *See also DaimlerChrysler v. The Net Inc.*, 388 F.3d 201, 207 (6th Cir. 2004) (affirming finding of bad faith where ACPA defendant "never actually used the site.")

The Court should deny summary judgment as to the cybersquatting claim.

## C. The Court should deny PTK's request to cancel the HONOR SOCIETY mark because it doesn't qualify for cancellation and PTK did not plead a cancellation claim.

PTK argues in a single paragraph that the HONOR SOCIETY mark should be cancelled. Dkt. No. 426 at 20–21. But under 15 U.S.C. § 1065, a mark that has been "registered and used in commerce for over five years" becomes incontestable. *Perry v. H.J. Heinz Co. Brands, L.L.C.*, 994 F.3d 466, 471 (5th Cir. 2021). "Once a mark becomes incontestable, its federal registration constitutes *conclusive* evidence of its validity" with only a few exceptions that PTK did not raise. *Id.* (emphasis in original). Because HonorSociety's mark registered in 2014, PTK's opportunity to challenge it expired in 2019.

- 21 -

PTK relies on 15 U.S.C. § 1064(3), which provides that a mark may be challenged at any time if it has "become the generic name for the goods or services, or a portion thereof, for which it is registered." Again, this only applies for the goods "for which it is registered"—in this case, membership clubs. PTK doesn't claim the mark is generic for membership clubs. And the provision only applies when a mark is originally protectable but later becomes generic by widespread use. *Union Nat'l Bank*, 909 F.2d at 845 n.15. In that narrow circumstance, consumers no longer associate the mark as designating a single source, but instead as designating an entire class of goods or services. *Id.* Examples of former trademarks that became generic for an entire class of goods include "thermos," "trampoline," "aspirin," and "yo-yo." *Id.* That is not the case here. PTK argues that HONOR SOCIETY is generic and has always been so, not that it has become generic with use.

Separately, PTK's Second Amended Complaint does not include a cause of action for cancellation of the HONOR SOCIETY mark, nor does PTK seek cancellation of the HONOR SOCIETY mark in its Prayer for Relief. *See* Dkt. No. 136 at 43–46. And nothing within the ACPA authorizes cancellation of a trademark.

Because the five-year window to petition for cancellation has expired, and PTK did not plead cancellation, the Court should not cancel it.

**D.    The Court should deny PTK's request to dismiss HonorSociety's defamation claim because HonorSociety has evidence that PTK published false statements about HonorSociety.**

In its argument on defamation, PTK mischaracterizes the law, ignores more than a century of precedent recognizing that labels like "scam" and "thief" constitute defamation per se when they impugn business integrity, and omits key distinguishing facts from the cases it cites. It also fails to address evidence showing that PTK representatives systematically referred to HonorSociety as a "scam" as part of a coordinated campaign to delegitimize HonorSociety in the eyes of students and educational institutions.

1.    **PTK published numerous false statements impugning HonorSociety's business integrity.**

A "communication is defamatory if it tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." *Eselin-Bullock & Assocs. Ins. Agency, Inc. v. Nat'l Gen. Ins. Co.*, 604 So. 2d 236, 241 (Miss. 1992). For over a century, Mississippi courts have recognized that false statements impugning business integrity—including characterizations equivalent to "scam", "thief", or "illegitimate"—are actionable as defamation. For example, in *McFadden v. U.S. Fid. & Guar. Co.*, 766 So. 2d 20, 21 (Miss. App. 2000), the insurance adjuster for the defendant insurance company referred to the plaintiff doctor as a "crackpot" and "quack" when discussing his suitability as a treating physician for an insured's injuries. The Mississippi Court of Appeals reversed in part a directed verdict for the defendants, finding that, in this context, a jury could find that the terms "crackpot" and "quack" were defamation because they were intended to disparage the plaintiff doctor's professional abilities. *Id*. at 24. In doing so, the court noted that "quack" is defined as "an untrained person who pretends to be a physician"—in other words, a "scam" or a "fraud." *Id*.; *see also Valley Dry Goods Co. v. Buford*, 114 Miss. 414, 75 So. 252, 254 (Miss. 1917) (finding the word "thief" actionable per se where plaintiff was accused of stealing $100 from a cash register where she worked); *Boler v. Mosby*, 352 So. 2d 1320, 1323 (Miss. 1977) ("accusing a person of being a thief is actionable per se."); *Baugh v. Baugh*, 512 So. 2d 1283, 1285 (Miss. 1987) ("Without doubt, an utterance falsely imputing a crime or accusing one of being a thief is actionable per se."); *Lawrence v. Evans*, 573 So. 2d 695, 698 (Miss. 1990) ("a single charge of lying or dishonesty, if it otherwise meets the test of defamation, may be actionable.").

Here, PTK carefully orchestrated a campaign involving all levels of PTK's organization, to brand HonorSociety as a "scam" and systematically undermine its ability to operate. PTK made ongoing explicit accusations of theft and fraud. For example, a ███████████████████ ████████████████████████████████████████████████████████████ aware of [HonorSociety], we have no affiliation with them, and we believe they are a scam."

Linke Decl., Ex. 33. ██████████████████████████████

██████████████████████████████████s. *Id.* ████████████████

████████████████████████████████████████████████████████

█████████████████ *Id.*, Ex. 34. █████████████████████████

████████████████████████ *Id.*, Ex. 35.

The defamatory statements came from the highest levels of PTK. For example, PTK

employee ████████████████████████████████████████████████

██████████████████████████████ *Id.*, Ex. 38.██████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████████ *Id.*, Ex.

36.█████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████ *Id.*, Ex. 37. ██████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████. *Id.*

PTK also leveraged its institutional relationships to amplify these defamatory messages.

The organization used its Presidential Advisory Board (PAB), composed of community-college

presidents, to spread false messaging about HonorSociety. █████████████████████

████████████████████████████████████████████████████████

███████████████████████. *Id.*, Ex. 40 at 55–59, 61–62, 71; *id.*, Ex. 41.

Further, when college advisors or students would characterize HonorSociety as a "scam,"

PTK representatives consistently reinforced and amplified these characterizations rather than

correct them. ██████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████ *Id.*, Ex. 42.

This evidence belies PTK's claims that it "has never referred to Honor Society as a 'scam,'" Dkt. No. 426 at 26, that HonorSociety has never identified any evidence that "PTK conveyed those messages to the community college leadership," or that PTK was the source of these communications. *Id.* at 22. To the contrary, it demonstrates that PTK officers and employees of all levels made numerous statements—to PTK advisors, college officials, and other collegiate organizations—calling into question HonorSociety's legitimacy.

PTK consistently characterized HonorSociety's business practices as fraudulent, deceptive, and predatory. In this context, and especially given that PTK and HonorSociety are direct competitors in the community-college market, there is ample evidence from which a jury could find that PTK defamed HonorSociety.

PTK created a narrative that went beyond mere criticism of a competitor to accusations of serious criminal conduct. And the impact of this coordinated campaign was severe and measurable: hundreds, if not thousands, of Honor Society members cancelled their memberships and requested refunds, specifically citing these "scam" allegations that originated with PTK.



████████████ Linke Decl., Exs. 5–8. ██████████████████

████████████████████████████████████████

██████████. *See id.*, Ex. 5 at row 9912 ████████████████████

████████████████████████████████ *see also id.*, Ex. 5–8. Thus, the record demonstrates a systematic, organization-wide effort to damage HonorSociety's reputation and business relationships through false and defamatory statements.

The cases PTK relies on are distinguishable. In *Perkins v. Littleton*, 270 So. 3d 208 (Miss. App. 2018), the alleged defamation was informing a newspaper about how the plaintiff, a politician, had been sued by his family for forging deeds. The court found that was not inherently

unethical or defamatory because political candidates and their supporters commonly engage in "opposition research." *Id.* at 217. The court also found that, "on its face" the statement neither "accuse[s] Perkins of any criminal activity" nor "clearly or unmistakably impl[ies] that Perkins committed a crime." *Id.* In contrast, PTK's allegations of fraud and theft here "on their face" accuse HonorSociety of criminal activity and "clearly and unmistakably" imply that HonorSociety committed a crime.

And in *Speed v. Scott*, 787 So. 2d 626 (Miss. 2001), Harold Speed, a volunteer fire-department chief, called Robert Scott, a volunteer firefighter, a "liar and thief" for stealing documents that Scott himself had drafted. *Id.* at 627. Although Scott conceded that his reputation was undamaged, and that no one believed Speed's accusations, he argued that "thief" is slander per se. *Id.* at 633. But the court determined that the allegations did not rise to the level of a crime involving "moral turpitude" or "infamous punishment" because the supposed theft involved documents of no intrinsic monetary value, and there was no possibility Scott would face meaningful criminal liability. *Id.* at 634.

By contrast, PTK's statements about HonorSociety go far beyond the limited personal accusations in *Speed*. PTK engaged in a systematic, years' long campaign. It repeatedly branded HonorSociety a "scam" and a "fraudulent organization." PTK accused HonorSociety of stealing money from students, and claimed it deliberately targeted vulnerable populations. Unlike Speed's accusation about notebook pages with no intrinsic value, PTK alleges theft of significant monetary value in the aggregate. It claimed HonorSociety was "stealing money from college students" and "charges $50 every 6 months" fraudulently. Unlike in *Speed*, where the court found no possibility of meaningful criminal liability, the accusations against HonorSociety, if true, could certainly subject it to criminal liability and punishment for widespread fraud and theft.

Finally, PTK's reliance on *Milkovich v. Lorain Journal Co.*, 497 U.S. 1 (1990), is misplaced. As the Mississippi Supreme Court explained in *Roussel v. Robbins*, 688 So. 2d 714, 723 (Miss. 1996), "after *Milkovich*, whether a statement is characterized as a 'fact' or 'opinion' is no longer a relevant inquiry in determining whether it may be constitutionally privileged. Rather, the

relevant inquiry is whether the statement could be reasonably understood as declaring or implying a provable assertion of fact." Here, PTK's allegations of theft and fraud directly accuse HonorSociety of specific criminal conduct that is objectively verifiable and provable as true or false.

Because the evidence shows that PTK made statements to third parties claiming that HonorSociety was a scam, fraud, or illegitimate, the Court should deny PTK's motion for summary judgment.

### 2. PTK's motion to dismiss under state procedural law is improper because federal procedure governs, and the motion is barred because PTK already responded to HonorSociety's pleading.

PTK's contention that HonorSociety's defamation claims should be dismissed for failure to state a claim is procedurally improper.

PTK seeks dismissal of the claim under Mississippi Rules of Civil Procedure Rule 12(b)(6), arguing that the claim can be dismissed under Mississippi procedural law "at any stage." But federal courts adjudicating state-law claims apply *federal* procedural law, not state procedural law. *Hinkley v. Envoy Air, Inc.*, 958 F.3d 544, 552 (5th Cir. 2020). And neither of the federal cases PTK cites supports its Mississippi Rule 12(b)(6) argument because neither dismissed a claim under Rule 12(b)(6). *See Goley v. Elwood Staffing, Inc.*, No. 15cv277-DPJ-FKB, 2017 U.S. Dist. LEXIS 217771, *22 (S.D. Miss. Mar. 21, 2017); *Briscoe v. LeTourneau Techs., Inc.*, No. 07-cv-99(DCB)(JMR), 2008 U.S. Dist. LEXIS 87789, *19 (S.D. Miss. Oct. 27, 2008).

Also, a motion asserting any of the Rule 12(b) defenses "must be made before pleading if a responsive pleading is allowed." Fed. R. Civ. P. 12(b). HonorSociety filed its Second Amended Counterclaim on April 10, 2024 and PTK responded on April 24. Dkt. Nos. 138, 152. Thus, its motion to dismiss is now barred.

Separately, Rule 15(b)(1) provides that "if, at trial, a party objects that evidence is not within the issues raised in the pleadings, the court may permit the pleadings to be amended." If

the Court believes the pleading is insufficient, and if PTK objects at trial, the Court should allow HonorSociety to amend to conform its pleading to the evidence.

**E.    HonorSociety has evidence that PTK caused HonorSociety to lose contracts and sales, creating issues of material fact on its tortious-interference claims.**

A claim for tortious interference with contract "ordinarily lies when 'a party maliciously interferes with a valid and enforceable contract[,] causing one party not to perform and resulting in injury to the other contracting party.'" *Nichols v. Tri-State Brick & Tile Co.*, 608 So. 2d 324, 328 (Miss. 1992). And for a claim for tortious interference with prospective business advantage, the plaintiff must prove the existence of a "prospective relationship" marked by a "reasonable likelihood that the relationship would come into existence." *Hubbard Chevrolet Co. v. Gen. Motors Corp.*, 682 F. Supp. 873, 878 (S.D. Miss. 1987), *judgment aff'd*, 873 F.2d 873 (5th Cir. 1989).

**1.    HonorSociety has identified thousands of lost contracts and sales arising directly from PTK's systematic campaign to interfere with HonorSociety's contracts and business relationships.**

As the Supreme Court of Mississippi has observed, defamation can constitute tortious interference with business relations. *See Cenac v. Murry*, 609 So. 2d 1257, 1270 (Miss. 1992) (listing "defamation, injurious falsehood or other fraud," as acts that can result in liability for tortious interference) (citation omitted). The same systematic campaign of defamatory statements that forms the basis of HonorSociety's defamation claim also directly establishes the elements of tortious interference.

PTK argues that "Honor Society has not identified a single contract or business relation with which PTK has interfered." But substantial documentary evidence shows that thousands of HonorSociety members canceled their memberships citing reasons that directly mirror PTK's defamatory statements, and others never signed up because PTK caused schools to block HonorSociety's invitations to join.

████████████████████████████████████████████████████████████

████████████████████ Linke Decl., Ex. 32. █████████████████████████

██████████████████ *Id.*; *see also, e.g.*, *id.*, Exs. 33, 48. ████████████



*Id.*, Ex. 47.

*Id.*, Ex. 33.

*Id.*, Ex. 44. This "suggestion" was clearly encouraging interference.

*Id.*, Ex. 42,

*Id.*, Ex. 48.

Because HonorSociety generates a significant number of members from its email campaigns, the jury can infer that HonorSociety lost a significant number of potential members when PTK caused schools to block HonorSociety emails from going through. The jury can hear HonorSociety's testimony about how many members generally sign up after an email campaign from each school, and can infer that HonorSociety lost that many members after PTK caused its email to be blocked at those schools.

HonorSociety also lost existing members who failed to perform existing contracts after being exposed to PTK's defamatory statements about HonorSociety. For example, when seeking a refund, one student reported:

██████████████████████████████████████████ statement directly mirrors PTK's campaign to cause school advisor to tell students that HonorSociety isn't recognized at schools. The jury can draw an inference that those students terminated their existing contracts with HonorSociety because PTK's defamatory statements led to colleges telling students that HonorSociety wasn't recognized.

The consistent appearance of PTK's specific talking points in student cancellation for years shows the lasting damage that PTK caused. The jury can reasonably credit each one of those cancellations as being caused by PTK. To be clear, what makes these cancellations particularly compelling as evidence is not just their volume and temporal proximity to PTK's statements, but the striking similarity between the language used by students and the specific defamatory claims intentionally propagated by PTK. When students report being told by advisors that HonorSociety is a "scam," when they mention confusion with PTK, when they cite concerns about recurring charges, they are repeating information that originated with PTK's defamatory campaign.

The evidence tells a clear story: PTK engaged in a systematic effort to disparage HonorSociety through multiple channels, and students responded by canceling their memberships, often using language that directly echoed PTK's defamatory statements. This causal connection between PTK's words and HonorSociety's lost memberships is not just correlation. It is causation demonstrated through years of consistent evidence.

**2. HonorSociety has evidence that PTK caused HonorSociety's harm by maliciously interfering with HonorSociety's existing and potential customers.**

PTK relies primarily on *Durham v. Ankura Consulting Grp., LLC*, No. 20-CV-112-KS-MTP, 2022 U.S. Dist. LEXIS 242741 (S.D. Miss. Dec. 12, 2022), to challenge HonorSociety's showing of causation. The case is distinguishable. In *Ankura*, Dr. Durham sued Ankura Consulting Group for tortious interference with contract and business relations. Ankura had conducted audits of Dr. Durham's services on behalf certain trusts. The audits indicated that Dr. Durham performed poorly. Upon seeing the audit results, the trusts sent notification letters to

Durham's customers about the audit, and then the customers stopped using Dr. Durham's services. *Id.*

The court in *Ankura* found that Dr. Durham failed to establish causation because he lacked evidence that Ankura directly told the customers to stop using Dr. Durham's services. *Id.* at *11. The court emphasized that Ankura was merely an agent for the trusts, who were the actual decision makers. *Id.* Ankura's input was "twice removed"—Ankura reported audit results to an Audit Committee, which made recommendations to the trusts, who ultimately decided that Durham was unreliable. *Id.* at *13.

But here, unlike Ankura, PTK representatives directly advised colleges to block HonorSociety's communications. ███████████████████████████████████████ ██████████████████████████████████████████████████████ Linke Decl., Ex. 47. █████████████████████████████████████████████████ ████████████████████████████████████████ ███████████████████████████████████████ *Id.*, Ex. 48, that demonstrated the direct causal connection missing in *Ankura*.

While Ankura was merely an agent carrying out audits on behalf of the trusts, PTK acted independently to harm a competitor. ██████████████████████████████ █████████████████████████████████████████████████████ ██████████████████ *Id.*, Ex. 32—demonstrating a clear competitive motivation for their actions. This stands in stark contrast to *Ankura*, where the court found insufficient evidence of malicious intent to harm Dr. Durham.

The documentary evidence also contradicts PTK's claim that HonorSociety cannot show any "actual damage or loss due to PTK's purported conduct." ██████████████████ █████████████████████████████████████████████████████ █████████████████████████████████████████████████████ █████████████████████████████ Linke Decl., ¶ 48, Ex. 45, HonorSociety's First Am. Resp. to Interrog. No. 7, p. 3.

Given that HonorSociety memberships constitute recurring revenue with a 90% renewal rate every six months, the impact of PTK's actions continues to compound over time. ███

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████

Similarly unpersuasive is PTK's trumpeting of the fact that that only one student specifically referenced the PTK advisor email in refund requests. Mississippi courts recognize that, in tort cases, causation can be established through circumstantial evidence and reasonable inferences. *Thomas v. Boyd Biloxi LLC*, 360 So. 3d 204, 214–15 (Miss. 2023) (explaining that a plaintiff "may establish causation through the use of circumstantial evidence"). Although it is true that the circumstantial evidence "must be sufficient to make [the] asserted theory reasonably probable, not merely possible, and more probable than any other theory based on such evidence, . . . [i]t is generally for the trier of fact to say whether circumstantial evidence meets this test." *Id.* And "only in rare and exceptional cases [should] a civil case depending upon circumstantial evidence be taken from the jury." *Id.* Here, the relationship between PTK's defamatory campaign and the surge in cancellations, as well as numerous cancelation records mirroring PTK's defamatory statements, creates a genuine factual dispute regarding causation that must be resolved at trial. The one email that PTK cites is just the tip of the iceberg, and that one email alone would be enough to establish causation.

PTK claims it should not be responsible for causing HonorSociety's lost contracts and sales because its advisors—and not employees—committed the wrongdoing. This is a distinction without a difference. ████████████████████████████████████████

████████████████████████████████████████████████████

Linke Decl., ¶ 49, Ex. 46, and encouraged them to disseminate this information to students. PTK should not be permitted to distance itself from the foreseeable consequences of arming its representatives with defamatory statements while acknowledging internally that these statements were intended to impact HonorSociety's membership numbers.

Mississippi courts have consistently rejected summary-judgment motions in tortious-interference cases involving evidence similar to what HonorSociety has presented. In *Gasparrini*, for example, a psychologist sued individuals for tortious interference after they encouraged a third party, Major Rogers, to send disparaging letters about Gasparrini. 802 So. 2d at 1064. The Mississippi Court of Appeals reversed the trial court's grant of summary judgment on the tortious interference claim, finding genuine issues of material fact existed as to all four elements of the tort. *Id.* at 1067.

First, regarding intentional and willful acts, the court found that the defendants' encouragement of Major Rogers to send disparaging letters created a factual issue for trial. *Id.* Similarly, PTK representatives' communications calling HonorSociety a "scam" and encouraging schools to block HonorSociety emails raise genuine questions about intentional interference that a jury should resolve. Second, on whether the acts were calculated to damage business, the court recognized that letters sent to Gasparrini's employers insinuating unethical behavior were intended to damage his business relationships. *Id.* Similarly, PTK's communications to colleges alleging HonorSociety acted unethically was intended to damage its business relationships. Third, concerning justification, the court noted a jury could reasonably conclude the defendants had "little reason, at least justifiable reason" for their campaign, being motivated by "desire for retribution." *Id.* at 1068. Similarly, a jury could determine that PTK had no justifiable reason for its defamatory campaign—other than unfair competition with malicious intent to damage HonorSociety. Fourth, regarding actual damages, the court noted Gasparrini's clear demonstration of lost contracts and decreased revenue from $800,000 to $600,000 after the letter campaign. HonorSociety similarly demonstrates lost business opportunities resulting from PTK's actions. *Id.*

Most importantly, the *Gasparrini* court emphasized that when the evidence shows targeted communications caused business losses, determining "the exact cause and the extent of damage is for the finder of fact to determine after a trial on the merits." This principle directly applies to

this case. The evidence shows PTK's targeted communications about HonorSociety being a "scam" and the subsequent business losses create factual issues a jury must resolve.

The overwhelming evidence in this case demonstrates that PTK's campaign was not merely disparaging but specifically designed to interfere with HonorSociety's contracts and business relationships. From encouraging colleges to block communications (Linke Decl., Exs. 33, 42, 44) to directly telling students ███████████████████████ (*id.*, Ex. 34), PTK's actions satisfy all elements required for tortious-interference claims under Mississippi law. This creates genuine issues of material fact regarding PTK's interference with HonorSociety's business relationships and the resulting damages. Thus, the Court should deny summary judgment on HonorSociety's tortious-interference claims.

## Conclusion

PTK's summary-judgment motion asserts that HonorSociety lacks evidence to support its claims. But on its false-advertising claim, HonorSociety has evidence that consumers canceled memberships because they saw PTK's literally false statements in advertising. On its cybersquatting claim, HonorSociety has evidence that PTK registered domain names confusingly similar to HonorSociety's trademark, which is distinctive because HONOR SOCIETY does not mean "membership club." HonorSociety also has evidence of PTK's bad faith as PTK wrote that it registered the domain names because they "related to HonorSociety.org" On its defamation claim, HonorSociety has evidence that PTK published that HonorSociety is a scam, stole money, and is a fraudulent organization when none of that is true. And on its tortious-interference claims, HonorSociety has evidence that it lost business to students who never received its invitations because PTK caused schools to block the students from receiving them.

Genuine disputes of material fact exist because HonorSociety has plenty of evidence sufficient for a reasonable jury to return a verdict for HonorSociety on all its claims. The Court should deny PTK's summary-judgment motion.

Dated: March 7, 2025                    Respectfully Submitted,

s/ Derek Linke
Derek A. Newman (pro hac vice)
Derek Linke (pro hac vice)
Keith P. Scully (pro hac vice)
Gregory M. Scialabba (pro hac vice)
Newman LLP
100 Wilshire Blvd, Suite 700
Santa Monica, CA 90401
Telephone: 310-359-8200
dn@newmanlaw.com
linke@newmanlaw.com
keith@newmanlaw.com
gs@newmanlaw.com

s/ Robert L. Gibbs
Robert L. Gibbs, MSB No. 4816
Gibbs Travis PLLC
210 East Capital Street, Suite 1801
Jackson, Mississippi 39201
Telephone: 601-487-2631
Facsimile: 601-366-4295
rgibbs@gibbstravis.com

Attorneys for Defendant, Counter-Claimant,
and Third-Party Plaintiff HonorSociety.org Inc.
and Defendant Honor Society Foundation, Inc.

**Certificate of Service**

I hereby certify that on March 7, 2025, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system. Participants in the case are registered CM/ECF users and service will be accomplished by the CM/ECF system.

Executed this 7th day of March 2025.          s/ Derek Linke
                                                Derek Linke