**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF MISSISSIPPI**
**NORTHERN DIVISION**

| | | |
|---|---|---|
| PHI THETA KAPPA HONOR SOCIETY, | ) | |
| | ) | |
| Plaintiff/Counter-Defendant | ) | Civil Action No.  3:22-cv-00208-CWR-RPM |
| | ) | |
| v. | ) | |
| | ) | |
| HONORSOCIETY.ORG, INC., | ) | |
| | ) | |
| Defendant/Counter-Plaintiff | ) | |
| /Third-Party-Plaintiff | ) | |
| | ) | |
| HONOR SOCIETY FOUNDATION, INC., | ) | |
| | ) | |
| Defendant | ) | |
| | ) | |
| ---------------------------------------------------- | ) | |
| | ) | |
| HONORSOCIETY.ORG, INC., | ) | |
| | ) | |
| Defendant/Counter-Plaintiff | ) | |
| /Third-Party-Plaintiff | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| DR. LYNN TINCHER-LADNER, | ) | |
| | ) | |
| Third-Party Defendant | ) | |

**DECLARATION OF JONATHAN G. POLAK**

I, Jonathan G. Polak, declare as follows:

1.      I am over the age of eighteen and competent to testify to the matters in this Declaration. I have personal knowledge and access to information regarding the matters discussed in this Declaration, as counsel of record for the Plaintiff/Counter-Defendant Phi Theta Kappa Honor Society ("PTK") and Third-Party Defendant Dr. Lynn Tincher-Ladner in this lawsuit. My

Declaration is based on my personal knowledge and investigation into the information and documents discussed in this Declaration.

2.      Throughout the litigation, PTK has attempted to discover the percentage of community college students in Honor Society's membership mix, yet Honor Society could not (or chose not to) provide any reliable or consistent representation to that end. For example, Honor Society and its principal, Michael Moradian provided several, inconsistent representations on this issue, including at Moradian's depositions on January 3, 2024 and May 3, 2024 and in various interrogatory responses and supporting documents, which are provided with this Declaration. **Exhibit A-1** attached hereto is a true and accurate copy of excerpts from Moradian's January 3, 2024 deposition transcript. **Exhibit A-2** attached hereto is a true and accurate copy of excerpts from Moradian's May 3, 2024 deposition transcript. **Exhibit A-3** attached hereto is a true and accurate copy of excerpts from Honor Society's Fourth Supplemental Responses to Dr. Tincher-Ladner's Second Set of Interrogatories, which includes LTL's INT No. 33. **Exhibit A-4** attached hereto is a true and accurate copy of excerpts from Honor Society's Responses to Dr. Tincher-Ladner's Third Set of Interrogatories, which includes LTL's INT No. 37. **Exhibit A-5** is a true and accurate copy of HS_221507, which was produced by Honor Society to PTK and cited in Honor Society's supplemental responses provided in Exhibits A-3 and A-4. At no time did Moradian or Honor Society ever provide a consistent, reliable answer as to the percentage of community college students in Honor Society's membership mix. At present, we stand no closer to knowing the percentage of community college students in Honor Society's membership than we did at the beginning of this litigation, despite asking on multiple occasions, in multiple discovery devices, that question.

3.     Moradian's deposition testimony (included in Exhibit A-1 and Exhibit A-**2**) is relevant to other issues described in PTK's Memorandum in Support of its Motion in Limine as well. For example, PTK seeks to exclude from trial his testimony that PTK practices "modern day Jim Crowism" and his comments regarding Dr. Tincher-Ladner's spouse. Moradian also mentioned Dr. Tincher-Ladner's spouse in Honor Society's 30(b)(6) deposition in connection with edits to PTK's Wikipedia page. **Exhibit A-6** attached hereto is a true and accurate copy of excerpts from Honor Society's October 1, 2024, 30(b)(6) deposition transcript. Toni Marek, who has published online content parroting Moradian's online content, has also alleged "nepotism concerns" regarding "Tincher-Ladner's spouse." **Exhibit A-7** and **Exhibit A-8** attached hereto are true and accurate copies of Marek's online publications.

4.     PTK's Motion in Limine also seeks to exclude documents Honor Society obtained in response to its public records requests. Honor Society's counsel, Mr. Newman, told this Court in connection with the First Preliminary Injunction Hearing that those records requests are not discovery devices and do not relate to "Rule 26 or the federal rules." **Exhibit A-9** attached hereto is a true and accurate copy of excepts of the First Preliminary Hearing held on March 27, 2024. Despite Mr. Newman's representations to the Court, David Asari, Honor Society's employee, agent, or contractor, testified at deposition that the records requests were used "to get an idea of if PTK's claims of . . . being in the top 10 percent were correct." **Exhibit A-10** is a true and accurate copy of excepts from Asari's May 2, 2024 deposition transcript.

5.     PTK's Motion in Limine also seeks to exclude documents Honor Society obtained in response to its public records requests on the basis that they constitute hearsay and are unauthenticated, which is an objection PTK's counsel raised (and the Court expressed its opinion on) in the Secondary Preliminary Injunction Hearing.

6.      PTK's Motion in Limine seeks to exclude certain evidence referenced in expert reports served by Honor Society. To that end, **Exhibit A-11** attached hereto is a true and accurate copy of the expert report of Charles Kush. And **Exhibit A-12** attached hereto is a true and accurate copy of the expert report of Craig Schulman.

7.      PTK's Motion in Limine also references the deposition testimony of Dr. Tincher-Ladner in multiple instances (e.g., where she is questioned about PTK's alleged competition and confusion with honor societies other than Honor Society and where she makes clear that PTK advisors are employees of the community colleges, not PTK). **Exhibit A-13** is a true and accurate copy of excepts from Dr. Tincher-Ladner's February 28, 2024 deposition transcript. **Exhibit A-14** is a true and accurate copy of excepts from Dr. Tincher-Ladner's December 16, 2024 deposition transcript.

8.      PTK's Motion in Limine also references results of its expert's, David Franklyn, likelihood of confusion survey. To that end, **Exhibit A-15** attached hereto is a true and accurate copy of the expert report of David Franklyn.

9.

I declare under penalty of perjury that the foregoing is true and correct. 28 U.S.C. § 1746.

Executed on: April 11, 2025

*/s/ Jonathan G. Polak*
Jonathan G. Polak

# EXHIBIT A-1

FILED UNDER SEAL

# EXHIBIT A-2

FILED UNDER SEAL

# EXHIBIT A-3

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF MISSISSIPPI
### NORTHERN DIVISION

| | |
|---|---|
| PHI THETA KAPPA HONOR SOCIETY, | Civil Action No. 3:22-cv-00208-CWR-RPM |
|     Plaintiff/Counter-Defendant, | |
| v. | |
| HONORSOCIETY.ORG INC., | |
|     Defendant/Counter-Plaintiff | |
| HONOR SOCIETY FOUNDATION, INC., | |
|     Defendant. | |
| HONORSOCIETY.ORG INC., | |
|     Defendant/Counter-Plaintiff/Third-Party Plaintiff | |
| v. | |
| LYNN TINCHER-LADNER, | |
|     Third-Party Defendant. | |

## HONORSOCIETY.ORG INC.'S FOURTH SUPPLEMENTAL RESPONSES TO THIRD-PARTY DEFENDANT LYNN TINCHER-LADNER'S SECOND SET OF INTERROGATORIES

HonorSociety.org Inc. hereby supplements its responses to Interrogatory Nos. 20, 23, 27, 29, 30, and 33 from Lynn Tincher-Ladner's Second Set of Interrogatories.

### Preliminary Statement

1.      These objections and responses are made solely for the purpose of this action, and are made without waiving: (a) the right to object (on the grounds of competency, admissibility, privilege, proprietary information, relevancy, materiality, or any other proper grounds) to the use of these responses for any purpose, in whole or in part, in any subsequent step or proceeding in

- 1 -

Many of the HonorSociety members who received emails from their community colleges warning that HonorSociety was a "scam"(after PTK had told the colleges to send those emails) cancelled their memberships, citing the "scam" warning emails.

**SECOND SUPPLEMENTAL RESPONSE:**

Subject to and without waiving the objections in HonorSociety's previous responses, HonorSociety responds as follows:

HonorSociety supplements its response by referring Tincher-Ladner to the following documents: BOLDR0000337; HS_365631; HS_367781; HS_367774; HS_367777; HS_367779; HS_367780; HS_367781.

**INTERROGATORY NO. 33:**

Identify the Document(s) that You contend describe the overall mix of two-year program students, community college students, junior college students and technical schools students in Your membership, by year, from 2016 to present.

**RESPONSE:**

HonorSociety objects to this Interrogatory because it is overbroad, unduly burdensome, and seeks to impose a requirement on HonorSociety to marshal its evidence in the form of an interrogatory response. HonorSociety also objects to this interrogatory to the extent it seeks expert information, the production of which is governed by the Federal Rules of Civil Procedure. HonorSociety objects to the phrase "describe the overall mix" because it is vague, ambiguous, and seeks irrelevant information. HonorSociety will provide a response to this interrogatory to the best of its ability following further explanation from Tincher-Ladner as to what it means or what information is sought.

**SUPPLEMENTAL RESPONSE:**

Subject to and without waiving the objections in HonorSociety's prior response, HonorSociety supplements its response as follows:

Following a diligent search, HonorSociety has not located any document or documents in its possession, custody, or control, that "describe the overall mix" of its membership based on attendance at a particular level of educational institution, whether on a yearly basis, or otherwise.

**SECOND SUPPLEMENTAL RESPONSE:**

Subject to and without waiving the objections in HonorSociety's prior response, HonorSociety supplements its response as follows: HS_221507

Dated: December 16, 2024                        Newman llp

                                                s/ Derek Linke
                                                _____
                                                Derek A. Newman (pro hac vice)
                                                Derek Linke (pro hac vice)
                                                Keith P. Scully (pro hac vice)
                                                Gregory M. Scialabba (pro hac vice)
                                                100 Wilshire Blvd, Suite 700
                                                Santa Monica, CA 90401
                                                Tel: (310) 359-8200
                                                dn@newmanlaw.com
                                                linke@newmanlaw.com
                                                keith@newmanlaw.com
                                                gs@newmanlaw.com

                                                Attorneys for Defendant, Counter-Claimant,
                                                and Third-Party Plaintiff HonorSociety.org, Inc.

## Verification

I, Michael Moradian, am the Executive Director of HonorSociety.org Inc. In that capacity, I either have personal knowledge or have been provided the personal knowledge of others that is responsive to the interrogatories above (subject to the objections stated). Where documents are identified herein that have been marked ATTORNEYS' EYES ONLY by PTK, I have not reviewed those and only know of their relevance from my attorneys. For those facts set forth here, and based on that personal knowledge so described, they are true and correct to the best of my belief.

Executed this 16th day of December 2024.

DocuSigned by:

*Mike Moradian*

2879F22B88B441E...

Michael Moradian

**Certificate of Service**

I hereby certify that on December 16, 2024, a copy of the foregoing was served via email upon the following counsel.

Michael B. Wallace, MSB # 6904
Charles E. Cowan, MSB #104478
Beau M. Bettiga, MSB #105905
Jack F. Hall, MSB #106482
WISE CARTER CHILD & CARAWAY
401 East Capitol Street, Suite 600
P. O. Box 651 (39205-0651)
Jackson, MS 39201
(601) 968-5500 - phone
mbw@wisecarter.com
cec@wisecarter.com
ksh@wisecarter.com
bmb@wisecarter.com

Jonathan G. Polak (Pro Hac Vice)
William M. Etienne (Pro Hac Vice)
Daniel R. Warncke (Pro Hac Vice)
TAFT STETTINIUS & HOLLISTER LLP
One Indiana Square, Suite 3500 Indianapolis,
IN 46204-2023
(317) 713-3500 – phone
(317) 713-3699 – fax
jpolak@taftlaw.com
metienne@taftlaw.com
warncke@taftlaw.com

Rachel Smoot (Pro Hac Vice)
TAFT STETTINIUS & HOLLISTER LLP
41 S. High Street, Suite 1800
Columbus, OH 43215
(614) 221-2838 – phone
(614) 221-2007 – fax
rsmoot@taftlaw.com

Philip R. Bautista (Pro Hac Vice)
TAFT STETTINIUS & HOLLISTER LLP
200 Public Square, Suite 3500
Cleveland, OH 44114
(216) 241-2838 – phone
(216) 241-3707 – fax
pbautista@taftlaw.com

Counsel for Plaintiff and Counter-Defendant Phi Theta Kappa Honor Society, and Third-Party Defendant Dr. Lynn Tincher-Ladner.

I hereby certify under the penalty of perjury that the foregoing is true and correct.

Executed on December 16, 2024 at Mercer Island, Washington.

s/ Derek Linke
Derek Linke

# EXHIBIT A-4

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF MISSISSIPPI**
**NORTHERN DIVISION**

| | |
|---|---|
| PHI THETA KAPPA HONOR SOCIETY, | Civil Action No. 3:22-cv-00208-CWR-RPM |
|     Plaintiff/Counter-Defendant, | |
| v. | |
| HONORSOCIETY.ORG INC., | |
|     Defendant/Counter-Plaintiff | |
| HONOR SOCIETY FOUNDATION, INC., | |
|     Defendant. | |
| HONORSOCIETY.ORG INC., | |
|     Defendant/Counter-Plaintiff/Third-Party Plaintiff | |
| v. | |
| LYNN TINCHER-LADNER, | |
|     Third-Party Defendant. | |

**HONORSOCIETY.ORG INC.'S RESPONSES TO LYNN TINCHER-LADNER'S**
**THIRD SET OF INTERROGATORIES**

    HonorSociety.org Inc. responds to Lynn Tincher-Ladner's Third Set of Interrogatories as follows:

**Preliminary Statement**

    1.    These objections and responses are made solely for the purpose of this action, and are made without waiving: (a) the right to object (on the grounds of competency, admissibility, privilege, proprietary information, relevancy, materiality, or any other proper grounds) to the use of these responses for any purpose, in whole or in part, in any subsequent step or proceeding in this action; (b) the right to object on any and all grounds, at any time, to interrogatories, other

interrogatory response. HonorSociety also objects to this Interrogatory to the extent it seeks information protected by the attorney-client privilege and/or work product doctrine.

Subject to and without waiving these objections, HonorSociety responds as follows: HS_220898; HS_220936; HS_354940; HS_355138; HS_355260; HS_355633; HS_363510.

**INTERROGATORY NO. 37:**

Identify by Bates number the documents evidencing community college membership as portion of Honor Society's overall membership.

**RESPONSE:**

HonorSociety objects to this Interrogatory as it is overbroad, unduly burdensome, and seeks to impose a requirement on HonorSociety to marshal its evidence in the form of an interrogatory response. HonorSociety also objects to this Interrogatory to the extent it seeks information protected by the attorney-client privilege and/or work product doctrine. HonorSociety further objects because the phrase "community college membership as portion of Honor Society's overall membership" is vague and ambiguous.

Subject to and without waiving these objections, and while fact discovery is ongoing, HonorSociety responds as follows: HS_221507.

**INTERROGATORY NO. 38:**

Identify by Bates number the documents evidencing the approximate 880 membership cancellation requests You stated in Paragraph 41 of your Amended Third-Party Complaint (Dkt. 62) and Paragraph 151 in Your Second Amended Counterclaims (Dkt. 153).

**RESPONSE:**

HonorSociety objects to this Interrogatory as it is overbroad, unduly burdensome, and seeks to impose a requirement on HonorSociety to marshal its evidence in the form of an interrogatory response. HonorSociety also objects to this Interrogatory to the extent it seeks information protected by the attorney-client privilege and/or work product doctrine.

Subject to and without waiving these objections, and while fact discovery is ongoing, HonorSociety responds as follows: HS_365631 contains refund requests, of which approximately 879 are from Ivy Tech students. Many of these 879 refund requests referenced communications from Ivy Tech that mirrored the language PTK used in "warning" colleges about HonorSociety, including that it is a "scam", not "a legitimate honor society", a "fake website and not to sign up". Specifically, the Ivy Tech students requesting a refund referred to an email received by the PTK Chapter Advisor at Ivy Tech which stated that HonorSociety "is not a legitimate honor society", its email to students is "bogus", and that "Phi Theta Kappa is your legitimate and official Honor Society for two-year colleges and only requires a one-time fee." These 879 requests are a portion of those refund requests HonorSociety has received as a result of PTK and Tincher-Ladner's conduct.

Dated: November 18, 2024

Newman llp

s/ Derek Linke
Derek A. Newman (pro hac vice)
Derek Linke (pro hac vice)
Keith P. Scully (pro hac vice)
Gregory M. Scialabba (pro hac vice)
100 Wilshire Blvd, Suite 700
Santa Monica, CA 90401
Tel: (310) 359-8200
dn@newmanlaw.com
linke@newmanlaw.com
keith@newmanlaw.com
gs@newmanlaw.com

Attorneys for Defendant, Counter-Claimant, and Third-Party Plaintiff HonorSociety.org, Inc.

## Verification

I, Michael Moradian, am the Executive Director of HonorSociety.org Inc. In that capacity, I either have personal knowledge or have been provided the personal knowledge of others that is responsive to the interrogatories above (subject to the objections stated). For those facts set forth here, and based on that personal knowledge so described, they are true and correct to the best of my belief.

Executed this 18th day of November, 2024.

<DocuSigned by:>
*Mike Moradian*
2B79F22B8BA41E...

Michael Moradian

**Certificate of Service**

I hereby certify that on November 18, 2024, a copy of the foregoing was served via email upon the following counsel.

Jonathan G. Polak (Pro Hac Vice)
William M. Etienne (Pro Hac Vice)
TAFT STETTINIUS & HOLLISTER LLP
One Indiana Square, Suite 3500
Indianapolis, IN 46204-2023
(317) 713-3500 – phone
(317) 713-3699 – fax
jpolak@taftlaw.com
metienne@taftlaw.com

Rachel Smoot (Pro Hac Vice)
TAFT STETTINIUS & HOLLISTER LLP
41 S. High Street, Suite 1800
Columbus, OH 43215
(614) 221-2838 – phone
(614) 221-2007 – fax
rsmoot@taftlaw.com

Michael B. Wallace, MSB # 6904
Charles E. Cowan, MSB #104478
Beau M. Bettiga, MSB #105905
Jack F. Hall, MSB #106482
WISE CARTER CHILD & CARAWAY
401 East Capitol Street, Suite 600
P. O. Box 651 (39205-0651)
Jackson, MS 39201
(601) 968-5500 - phone
mbw@wisecarter.com
cec@wisecarter.com
ksh@wisecarter.com
bmb@wisecarter.com

Counsel for Plaintiff and Counter-Defendant Phi Theta Kappa Honor Society, and Third-Party Defendant Dr. Lynn Tincher-Ladner.

I hereby certify under the penalty of perjury that the foregoing is true and correct.

Executed on November 18, 2024 at Mercer Island, Washington.


s/ Derek Linke
Derek Linke

# EXHIBIT A-5

FILED UNDER SEAL

# EXHIBIT A-6

Page 1

1              UNITED STATES DISTRICT COURT
2            SOUTHERN DISTRICT OF MISSISSIPPI
3                  NORTHERN DIVISION
4
   PHI THETA KAPPA HONOR            )
5  SOCIETY,                         )
                                    )
6                                   )
   Plaintiff/Counter-Defendant,     )
7                                   ) CASE NO.
   vs.                              ) 3:22-CV-00208-
8                                   ) CWR-RPM
   HONORSOCIETY.ORG, INC.,          )
9                                   )
                                    )
10 Defendant/Counter-Plaintiff.     )
   /Third-Party-Plaintiff           )
11                                  )
   HONOR SOCIETY FOUNDATION, INC.,  )
12                                  )
   Defendant.                       )
13                                  )
   ------------------------------   )
14                                  )
   HONORSOCIETY.ORG, INC.,          )
15                                  )
   Defendant/Counter-Plaintiff      )
16 /Third-Party-Plaintiff           )
                                    )
17 v.                               )
                                    )
18 DR. LYNN TINCHER-LADNER,         )
                                    )
19 Third-Party Defendant.           )
   _____ )
20
21    VIDEOTAPED REMOTE DEPOSITION OF MICHAEL MORADIAN
22              TUESDAY, OCTOBER 1, 2024
23          Stenographically Reported by:
      Katie L. Langgle, CSR No. 8637, CRR; CCR NO. 993
24
25 Pages 1 through 270

Page 65

1   Citation Bot is a bot that is meant to improve or edit

2   citations.  And I believe I saw that, but that's all

3   that I know.

4        Q.   Any of these people that I've just listed here,

5   do you know whether they are administrators for

6   Wikipedia?

7             MR. LINKE:  Objection as to form.

8             THE WITNESS:  I don't have any knowledge to

9   that.

10  BY MR. POLAK:

11       Q.   Are you an administrator?

12       A.   No, sir.

13       Q.   Other than Rublamb, are you aware of any other

14  administrator with responsibility for the PTK Wikipedia

15  page?

16       A.   Well, it seems like View Mom Viking who had to

17  deal with the vandalism of PTK, both Coralreef78 which

18  seems to be Courtney Lane's account, which is

19  Lynn Tincher-Ladner's wife, followed by --

20            THE COURT REPORTER:  I'm sorry, by whose wife?

21            THE WITNESS:  Dr. Lynn Tincher-Ladner.

22            THE COURT REPORTER:  Okay.

23            THE WITNESS:  Followed by "MakeMyDay1918,"

24  which admittedly is the account -- self-admittedly of

25  Dr. Tincher-Ladner.

1           I understand that View Mom Viking may be an

2    administrator as well because they made their

3    independent decision to deal with the issues and what

4    they characterize, I believe, as point-of-view washing

5    and vandalism, and so I believe, to my understanding,

6    that person may be an administrator as well.

7    BY MR. POLAK:

8        Q.    How do you know that Coralreef is associated

9    with Courtney Lange?

10       A.    I would say that it's upon belief, and

11   discovery will answer that definitively, but it's my

12   understanding and belief that she's born in 1978 and

13   that would highly tie to her being Coralreef78.

14       Q.    Any other basis?

15       A.    I think discovery will show that.  I don't know

16   the rest.

17       Q.    So you have no other basis other than the fact

18   it has 78 in the name?

19       A.    Well, also Dr. Lynn referring to her employees,

20   one of which is her own wife, which is a conflict of

21   interest of a public charity, but nevertheless, we're

22   not here to discuss that and I'm trying stay on topic

23   here, that is my basis.  Yes.

24           MR. POLAK:  Move to strike.

25           Could you read the question back, please?

Page 269

                            CERTIFICATE

1

2

3

4          I, Katie Langgle, a California Certified

5    Shorthand Reporter, do hereby certify:

6          That prior to being examined, the witness in

7    the foregoing proceedings was by me duly sworn to

8    testify to the truth, the whole truth, and nothing but

9    the truth;

10         That said proceedings were taken before me at

11   the time and place therein set forth and were taken down

12   by me in shorthand and thereafter transcribed into

13   typewriting under my direction and supervision;

14         I further certify that I am neither counsel

15   for, nor related to, any party to said proceedings, nor

16   in any way interested in the outcome thereof.

17

18         In witness whereof, I have hereunto subscribed

19   my name at Laughlin, Nevada, this 3rd day of October,

20   2024.

21

22

23

                    Katie L. Langgle

24                  CSR No. 8637

25

# EXHIBIT A-7

Page Vault

| | |
|---|---|
| Document title: | Petition · Stand Up for Students! Stop Misleading Students & Toxic Bullying by Phi Theta Kappa HQ - United States · Change.org |
| Capture URL: | https://www.change.org/p/stand-up-for-students-stop-misleading-students-toxic-bullying-by-phi-theta-kappa-hq |
| Page loaded at (UTC): | Thu, 20 Mar 2025 19:05:10 GMT |
| Capture timestamp (UTC): | Thu, 20 Mar 2025 19:38:12 GMT |
| Capture tool: | 10.55.0 |
| Collection server IP: | 54.145.42.72 |
| Browser engine: | Mozilla/5.0 (X11; Linux x86_64) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/126.0.6478.234 Safari/537.36 |
| Operating system: | Linux (Node 20.17.0) |
| PDF length: | 7 |
| Capture ID: | aJYPAVNQffSxgweJHrFfAr |
| Display Name: | arose |

change.org    Back to petition    ⊙ Search    Start a petition    Log in

# Stand Up for Students! Stop Misleading Students & Toxic Bullying by Phi Theta Kappa HQ



**Recent signers**

jodie sheridan • 4 hours ago    Geraldine Gonzaga • 4 hours ago    Ana lourine benlot • 7 hours ago    Sofia Va...


Decision Makers: Brenna Bird +29

## The Issue

Phi Theta Kappa (PTK), under CEO Lynn Tincher-Ladner, faces **serious allegations of deceptive marketing, misleading scholarship benefits,** and a **toxic workplace.** Multiple former employees describe bullying, broken promises, and a culture that—at least in their view—favors revenue and personal gain over student welfare.

This petition calls for a complete overhaul of PTK leadership, demanding transparency, accountability, and a renewed commitment to recognizing genuine academic excellence rather than perpetuating questionable practices. We don't seek to destroy PTK—only to ***save PTK from these issues*** and restore its core mission of truly serving students.

*Join us in demanding transparency, accountability, and the reform PTK HQ needs. Sign the petition today!*

~~~~ Further Explanation & Evidence ~~~~

🚨 *Toxic Bullying Concerns by ex-PTK Employees and ex-Student Officers*

**Watch this news story** to learn more about me and my emotionally scarring experience with PTK.

*I am a victim of Phi Theta Kappa, and I need your help to make a lasting difference.*



**16,922** ✔
Verified signatures ⌄

### Sign this petition

First name

Last name

Email

City

Country

United States    ▾

State
▾

Zip code

☑ Display my name and comment on this petition

✎ Sign petition

By signing, you accept Change.org's **Terms of Service** and **Privacy Policy**, and agree to receive occasional emails about campaigns on Change.org. You can unsubscribe at any time.

Document title: Petition · Stand Up for Students! Stop Misleading Students &amp; Toxic Bullying by Phi Theta Kappa HQ - United States · Change.org
Capture URL: https://www.change.org/p/stand-up-for-students-stop-misleading-students-toxic-bullying-by-phi-theta-kappa-hq
Capture timestamp (UTC): Thu, 20 Mar 2025 19:38:12 GMT
Page 1 of 6

🚨 *Toxic Bullying Concerns by ex-PTK Employees and ex-Student Officers*

**Watch this news story** to learn more about me and my emotionally scarring experience with PTK.

*I am a victim of Phi Theta Kappa, and I need your help to make a lasting difference.*

Numerous whistleblowers and former PTK employees describe a culture of fear, broken promises, and leadership prioritizing money and status over PTK's actual mission to serve students. Here's what some report:

- **Jessie (PTK Member & Former Employee):** Promised a scholarship that never came through; claims PTK leadership only cares about boosting numbers and revenue. Saw CEO's salary skyrocket, CEO's spouse hired, and believes in her opinion that both members and employees are mistreated by leadership's alleged greed.

- **Wendy (25-Year Employee):** Describes a toxic work environment with cursing, humiliation, and retaliation, ultimately leaving her with PTSD. Feels the mission is overshadowed by self-promotion and urges employees and others to speak out.

- **Rebekah (PTK Member & Former Employee):** Calls Tincher-Ladner a root cause of PTK's problems, in her opinion. She believes the "Top 10%" promise was deceptive, and staff promises (raises, remote work) were repeatedly broken. Believes fear and favoritism define the current culture.

- *Many others are afraid to put their name in public for fear of retaliation.*

We need to hold PTK leadership accountable for their actions to prevent more students and employees from experiencing what we have had to endure. By signing this petition, you support the stance that it's time to say no more to misleading practices and bullying in PTK and stand up for the rights of all students and employees. *Please, sign this petition.*

🚨 *Here's why else you should care and demand accountability:*

1️⃣ **The "Top 10%" Lie Concerns**

- PTK claims to recognize the "Top 10%" of students, but public records clearly suggest this isn't true—often over 30%, sometimes over 60+% of students on campus are invited. These misleading claims encourage students to pay for a distinction that doesn't exist, costing students and their families millions annually.

- See the evidence for yourself directly from the colleges: The "Top 10%" of students includes **62.5% at Miramar College**, **39% Grayson College**, **38.9% at Jackson College**.

2️⃣ **Misleading Scholarship Claims**

- PTK promises **"$246 million in member-only scholarships"** and that **"the average member gets $2,500 a year."** Many of these scholarships are publicly available to all students, and the true "average member" median exclusive PTK scholarship benefit is perhaps closer to zero, leaving students and families disappointed and misled.

3️⃣ **Gross Financial Mismanagement**

- PTK's net income *plummeted by $5.6 million* from 2021 to 2023, dropping from a $4.7 million surplus to a $900,000 deficit. 2024 was likely much worse. Financial instability like this can threaten the very programs students rely on. Who ultimately pays the price when finances are mismanaged?

4️⃣ **Ballooning CEO Salary and Nepotism Concerns**

- During this financial decline, **CEO Lynn Tincher-Ladner's salary skyrocketed by 49% over two years**, from $259,674 in 2021 to $386,564 in 2023. No other key employee received a

surplus to a $800,000 deficit. BBB was likely much worse. Financial instability like this can
threaten the very programs students rely on. Who ultimately pays the price when finances
are mismanaged?

🔷 **Ballooning CEO Salary and Nepotism Concerns**

- During this financial decline, *CEO Lynn Tincher-Ladner's salary skyrocketed by 49% over two
  years*, from $259,674 in 2021 to $386,564 in 2023. No other key employee received a
  substantial raise during this period. Today, in 2025, Tincher-Ladner's salary is likely still
  larger.

- Tincher-Ladner's spouse holds a senior position within PTK Foundation (though paid by PTK),
  creating a perception of conflicts of interest and raising genuine questions about resource
  allocation, governance and private inurement.

Phi Thea Kappa board members hold a fiduciary responsibility not only to the public good but crucially also
to the students attending the colleges that employ them. *Where is the PTK Board?*


*See the Deceptive Advertising Issue for Yourself*

In our view, **social media videos like this one** illustrate the emotional manipulation caused by PTK's false
narratives. Watch the video to see firsthand how PTK's misleading claims may exploit emotions and break
trust.

*Public Records Expose the Truth*

Public records from Miramar College, where *PTK Board Member Michael Odu* works, reveal that **62.5% of
students** at the campus were deemed eligible for PTK membership under the claim that they were in the
"Top 10%."

*Quotes from a Misleading PTK Invitation to Join:*

- **"You're in the top 10% of students on your campus,"**

- **"$246 million in member-only transfer scholarships,"**

- **"The average member gets $2,500 a year"**

It's time for PTK to face the facts, overhaul the leadership immediately and restore integrity to its mission.
*Current leadership must be held accountable for misleading millions of students over the past few years.
Please...Sign this petition now.*


We encourage anyone who believes they have been misled by this company to contact **their state attorney
general's office** or the **Better Business Bureau**.

*The evidence and findings here should be judged on their own merits, irrespective of PTK attempts to discredit
those raising concerns.*

Disclaimer: *This petition reflects the good faith opinions of the petitioner and contributors, and is not endorsed by
Phi Theta Kappa headquarters. The views and experiences shared are those of the petitioner and contributors,
aimed at fostering transparency, accountability, and reform.*

⚑ Report a policy violation

---



**Toni Marek**
Petition Starter

| Media inquiries |
| --- |

**Media inquiries**

---

## The Decision Makers



**Brenna Bird**
Iowa Attorney General

☹ No response (notified 8 days ago)

**Email decision maker**



**Todd Rokita**
Indiana Attorney General

☹ No response (notified 8 days ago)

**Email decision maker**



**Shad White**
Mississippi Auditor

☹ No response (notified 15 days ago)

**Email decision maker**

**View 27 more**

---

## The Supporters

### Featured Comments



**Jessie**, Florence
2 months ago

*"As a former member and employee of PTK, I've seen first hand how the leadership and management of this organization has taken from students. I was promised a scholarship that was taken from me, without any explanation or confirmation. I simply waited for a scholarship I never received. When I emailed the person who promised the scholarship (along with their department & Lynn Tincher-Ladner herself), I never received a response. 2 weeks later, I got a call and was told the person who promised the scholarship was conveniently no longer employed and I would not be receiving my scholarship, despite needing that money*

**Show full text**

♡ 20 likes   ·   ⚐ Report

*person who promised the scholarship (along with their department & Lynn Tincher-Ladner herself), I never received a response. 3 weeks later, I got a call and was told the person who promised the scholarship was conveniently no longer employed and I would no longer be receiving my scholarship, despite needing that money*

**Show full text**

♡ 20 likes  ·  ⚑ Report



**Wendy**, Ocala
2 months ago

*"As a former Phi Theta Kappa employee for over 25 years, I support this movement to save PTK from itself because the organization I once cared deeply about has been overshadowed by serious leadership issues. During my time at PTK I witnessed a toxic workplace environment. In my opinion, the organization's toxic leadership has fostered a culture of bullying and unprofessional behavior. Employees were cursed at, publicly humiliated and retaliated against, leaving many, including myself with PTSD years later. I walked away without notice because I could no longer endure the abusive environment. The current leadership's*

**Show full text**

♡ 17 likes  ·  ⚑ Report



**Rebekah**, Pearl
2 months ago

*"As a former employee, I can say without hesitation that Lynn Tincher-Ladner is a problem at Phi Theta Kappa. Her leadership has turned what could be an incredible organization into a frustrating, broken system that prioritizes her own interests over PTK's mission of academic excellence. I first encountered PTK as a member at a local Community College, where I was told I was in the "Top 10%" of my class. At the time, I was proud of that distinction, but looking back, I realize I likely wasn't in the Top 10% at all. It feels incredibly deceiving to have been misled like that, especially when I thought I was being genuinely*

**Show full text**

♡ 14 likes  ·  ⚑ Report

[ View all comments ]

### Featured Videos

   

[ View all supporter voices ]

### Support Change — **Become a Member Today**

Not beholden to politics or power brokers, Change.org is free for people everywhere to make change. Every day there are real victories for issues you care about, only possible because we are 100% funded by everyday people like you.

| $4 | $6 | $11 |

| $21 | Other |

**Support Change.org**



Support Change — **Become a Member Today**

Not beholden to politics or power brokers, Change.org is free for people everywhere to make change. Every day there are real victories for issues you care about, only possible because we are 100% funded by everyday people like you.

**Will you stand with us to protect the power of everyday people to make a difference?**

| $4 | $6 | $11 |

| $21 | Other |

**Support Change.org**

Pay with credit card or PayPal

## Petition updates



## Share this petition



Share this petition in person or use the QR code for your own material.

**Download QR Code**

|  Share on Facebook |

|  Send via WhatsApp |

|  Post on X |

|  Copy link |

|  Send via email |

Petition created on January 9, 2025

Change.org  ›  fraud  ›
**Stand Up for Students! Stop Misleading Students & Toxic Bullying by Phi Theta Kappa HQ**

## Trending petitions



## Victorious Petitions



# EXHIBIT A-8

Page Vault

| | |
|---|---|
| Document title: | Petition · Demand Investigation of Phi Theta Kappa: Reports of Abuse, Toxic Bullying & Deceptive Ads - United States · Change.org |
| Capture URL: | https://www.change.org/p/demand-investigation-of-phi-theta-kappa-reports-of-abuse-toxic-bullying-deceptive-ads |
| Page loaded at (UTC): | Thu, 20 Mar 2025 19:39:02 GMT |
| Capture timestamp (UTC): | Thu, 20 Mar 2025 19:39:31 GMT |
| Capture tool: | 10.55.0 |
| Collection server IP: | 54.145.42.72 |
| Browser engine: | Mozilla/5.0 (X11; Linux x86_64) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/126.0.6478.234 Safari/537.36 |
| Operating system: | Linux (Node 20.17.0) |
| PDF length: | 7 |
| Capture ID: | jGwhNGfcenvrQ3gDmN9jCp |
| Display Name: | arose |

PDF REFERENCE #:          9goJdwVqybTE9eK2tgFNaB

# Demand Investigation of Phi Theta Kappa: Reports of Abuse, Toxic Bullying & Deceptive Ads



## The Issue

Phi Theta Kappa (PTK) – the nation's largest community college honor society – is **under fire for serious allegations that it betrays the very students and values it claims to champion.** Under CEO Lynn Tincher-Ladner, insiders and public records point to:

- **The "Top 10%" Lie:**

Although PTK has boasted for years that it recognizes only the "Top 10%" of students, college data indicate that 30%, 40%, or even over 60% of the student body can receive invitations. At Miramar College, 62.5% of students got "Top 10%" invites—contradicting the exclusivity promise and potentially costing students millions in membership fees they believe signified true academic distinction.

- $246 Million "Exclusive" Scholarships?

PTK markets "$246 million in member-only scholarships" with an average award of "$2,500" per member. Critics and former insiders say many of these scholarships are widely available to all students, meaning the real exclusive benefit to PTK members is negligible or close to zero. This dupes students and donors who trust the sales pitch, often paying $60–$100+ in membership fees under false expectations.

- Financial Turmoil Amid CEO Pay Hikes & Nepotism:

Despite a reported plunge from a $4.7 million surplus to a $900,000 deficit (and possibly worse in 2024), Tincher-Ladner allegedly took a 49% salary increase over two years—no other senior staff saw anything similar. Even more troubling: Tincher-Ladner's spouse now holds a senior director role at the PTK Foundation, raising conflict-of-interest and nepotism concerns. While students' fees fund PTK, leadership appears to be benefiting handsomely.

- Toxic Leadership & Bullying:

Multiple former employees and whistleblowers detail a toxic workplace, marked by bullying, retaliation, broken promises, and leadership that allegedly prioritizes revenue and personal gain over student welfare. Some reports claim staff are intimidated into silence, further undermining PTK's stated mission to honor academic excellence.

### Sign this petition

**6** ✔
Verified signatures ⌄

First name

Last name

Email

City

Country
United States ▾

State
▾

Zip code

☑ Display my name and comment on this petition

✎ **Sign petition**

By signing, you accept Change.org's **Terms of Service** and **Privacy Policy**, and agree to receive occasional emails about campaigns on Change.org. You can unsubscribe at any time.

- Toxic Leadership & Bullying:

Multiple former employees and whistleblowers detail a toxic workplace, marked by bullying, retaliation, broken promises, and leadership that allegedly prioritizes revenue and personal gain over student welfare. Some reports claim staff are intimidated into silence, further undermining PTK's stated mission to honor academic excellence.

- Lavish Spending Over Student Needs (Michelin-Star Example):

In some accounts, PTK board gatherings and executive dinners have occurred at 3-star Michelin restaurants, costing upwards of $1,000 per person, even as the nonprofit's finances teeter. Observers argue such extravagance only heightens the perception of self-enrichment at the expense of trusting students and donors.

**Why This Matters Now**

- Graduation season is upon us. Each year, over a million prospective members are exposed to PTK's bold claims, risking thousands more students falling prey to unclear or exaggerated promises.
- Financial integrity is at stake. Millions of dollars in membership fees, donor contributions, and scholarship funds may be misused if these allegations hold true.
- Students and donors deserve the truth. The integrity of academic honors—and the futures of countless community college students—rely on honest leadership that invests in them, not executive perks.

**Call to Action: Demand Urgent Accountability & Reform**

- Sign the Petition:
  Show regulators, college presidents, and accreditation bodies that we refuse to let misleading practices and potential financial mismanagement slide. Your signature strengthens the demand for an immediate, independent investigation into PTK.
- Spread the Word:
  Share this petition across social media, campus forums, and with any journalists or influencers who care about educational integrity. The more people aware of these allegations, the harder it is for them to be ignored.
- Urge Oversight:
  We call on state attorneys general, nonprofits regulators, and college administrators to thoroughly review PTK's membership tactics, financial allocations, and workplace environment—before another generation of students is led astray.

***We Don't Want to Destroy PTK—We Want to Save It***
Phi Theta Kappa has a proud legacy of honoring community college students—but recent evidence and whistleblower accounts suggest an organization sliding into false advertising, questionable spending, and intimidation. We seek transparency, accountability, and a restored commitment to the society's core mission: serving students and recognizing true academic excellence.

*Disclaimer:* All points derive from public data, firsthand whistleblower testimony, and media reports. PTK leadership is welcome to release transparent financial statements and membership data if these allegations are inaccurate. Our only aim is to protect students, uphold academic integrity, and ensure that any nonprofit claiming to champion honor truly lives up to its mission.

Sign today and stand with students, families, and donors who demand the truth—and an end to what many see as systemic abuses under PTK's current leadership. The time to act is now.

⚑ <u>Report a policy violation</u>



**<u>Toni, Community College Advocate</u>**
Petition Starter

sign today and stand with students, families, and donors who demand the truth—and an end to what many
see as systemic abuses under PTK's current leadership. The time to act is now.

⚑ Report a policy violation



**Toni, Community College Advocate**
Petition Starter

**Media inquiries**

Support Change — **Become a Member Today**

Not beholden to politics or power brokers, Change.org is free for people everywhere to make change. Every day there are real victories for issues you care about, only possible because we are 100% funded by everyday people like you.

**Will you stand with us to protect the power of everyday people to make a difference?**

$4      $6      $11

$21      Other

**Support Change.org**

Pay with credit card or **PayPal**

## Petition updates



## Share this petition



Share this petition in person or use the QR code for your own material.

**Download QR Code**

　⬡　**Share on Facebook**

　⬡　**Send via WhatsApp**

　✕　**Post on X**

　🔗　**Copy link**

　✉　**Send via email**

Petition created on February 26, 2025

## Trending petitions



## Petitions promoted by other Change.org users



Promoted by 4,674 supporters

**Stop the USAID Stop Work Order – Protect Jobs, Security, and America's...**

✍ 90,554 signatures

[ **Sign this petition** ]



Promoted by 3,786 supporters

**Save Taiwan: A 911 Call for Defending Dr. Ko's Justice**

✍ 73,967 signatures

[ **Sign this petition** ]



Promoted by 16 supporters

**Carl Drew Blind Justice- A Fight Against Lies, Manipulation and...**

✍ 3,569 signatures

[ **Sign this petition** ]



Promoted by 114 supporters

**A SECOND CHANCE AT A LIFE FOR MARTIN "ANTHONY" VILLALON JR**

✍ 2,368 signatures

[ **Sign this petition** ]



Promoted by 1 supporter

**Implement Regulations for Drilling, National Weather Service, and FEMA Aid**

✍ 2 signatures

[ **Sign this petition** ]



Promoted by 1 supporter

**Urge the NFL to Vote on Mandating Bengals' Owner to Sell the Team**

✍ 2 signatures

[ **Sign this petition** ]



Promoted by 1 supporter

**Demand Justice for Unjust Treatment Resulting in Personal Damages**

✍ 3 signatures

[ **Sign this petition** ]



Promoted by 1 supporter

**Protect Children and Pass Nationwide Family Vlogging Laws!**

✍ 31 signatures

[ **Sign this petition** ]



Promoted by 1 supporter

**Reinstate NFL 2K to Challenge Madden's Exclusive License**

✍ 11 signatures

[ **Sign this petition** ]



Promoted by 52 supporters

**SAVE FISHERMAN'S LANDING AND CAMPGROUND,...**

Muskegon, MI, USA

✍ 1,194 signatures

[ **Sign this petition** ]



Promoted by 20 supporters

**Advocate for the Commutation of Juvenile Lifer Jean Cintron**

✍ 153 signatures

[ **Sign this petition** ]



Promoted by 72 supporters

**Preserve King's Point**

King's Point, Panama City, FL, USA

✍ 521 signatures

[ **Sign this petition** ]







Document title: Petition · Demand Investigation of Phi Theta Kappa: Reports of Abuse, Toxic Bullying &amp; Deceptive Ads - United States · Change.org
Capture URL: https://www.change.org/p/demand-investigation-of-phi-theta-kappa-reports-of-abuse-toxic-bullying-deceptive-ads
Capture timestamp (UTC): Thu, 20 Mar 2025 19:39:31 GMT                                                                 Page 4 of 6

Sign this petition    Sign this petition    Sign this petition    Sign this petition



Promoted by 60 supporters

**Reasons Why SC Felony DUI Offenders Should Be Taken Off The Violent...**

✍ **946 signatures**

Sign this petition



Promoted by 1 supporter

**Stop Family Separation and Deal Effectively with Inflation under President...**

✍ **9 signatures**

Sign this petition



Promoted by 141 supporters

**WE BELIEVE HER: Justice for an Innocent Child**

✍ **3,128 signatures**

Sign this petition



Promoted by 1 supporter

**Implement Radars on All Highways for Speed Monitoring and Fine...**

Florida, USA

✍ **5 signatures**

Sign this petition



Promoted by 5 supporters

**INHUMANE TREATMENT AT MADISON COUNTY JAIL (JACKSON, TN)**

✍ **186 signatures**

Sign this petition



Promoted by 13 supporters

**Stop Drilling in American National Parks, Monuments, and Wildlife...**

✍ **281 signatures**

Sign this petition

## Victorious Petitions



Victory!

**Fix the NYC Schools Calendar: No School on...**

My name is Isaac and I'm a 7th grader in Brooklyn, New York. I love to think about calendars and I noticed a problem:...

Read more

👤 Isaac Regnier    👥 23,015



Victory!

**FDA, Approve Life-Saving Nasal Epinephrine for...**

As a food allergy advocate and concerned parent of a child with severe food allergies, I am writing this petition...

Read more

👤 Dave Bloom    👥 40,560



Victory!

**Get Amazon to Offer Plastic-Free Packaging Options**

Thousands of the products on Amazon are shipped with plastic wrapping and cushioning materials unnecessarily. W...

Read more

👤 Nicole Delma    👥 784,676

Sign this petition

Sign this petition

## Victorious Petitions



**Victory!**

### Fix the NYC Schools Calendar: No School on...

My name is Isaac and I'm a 7th grader in Brooklyn, New York. I love to think about calendars and I noticed a problem:...

**Read more**

Isaac Regnier          23,015



**Victory!**

### FDA, Approve Life-Saving Nasal Epinephrine for...

As a food allergy advocate and concerned parent of a child with severe food allergies, I am writing this petition...

**Read more**

Dave Bloom          40,560



**Victory!**

### Get Amazon to Offer Plastic-Free Packaging Options

Thousands of the products on Amazon are shipped with plastic wrapping and cushioning materials unnecessarily. W...

**Read more**

Nicole Delma          784,676

## Newly created petitions



### Reinstate Kings Island Field Trip for the 8th Grade...

I am an 8th grader at Ankeny Middle School and I had been eagerly looking forward to our field trip to Kings Island....

**Read more**

... ...          7



### REVERSE ALAMO DRAFTHOUSE'S FASCIST LAT...

We petition that Alamo Drafthouse allow customers into the theater without watching their Alamo Advertisements....

**Read more**

Anson Call          7



### Require Outdoor Education as a Mandatory Componen...

We, a group of future educators preparing for our careers, hold a deep commitment to the value of outdoor...

**Read more**

Rachel Picard          22

**Company**

About

Impact

Careers

Team

**Community**

Blog

Press

Community Guidelines

**Support**

Help

Privacy

Terms

Cookie Policy

Manage Cookies

**Connect**

X

Facebook

Instagram

**Guides**

How To Write A Petition

Do Petitions Work

What is the Right To Petition

How to Start a School Petition

© 2025, Change.org, PBC

This site is protected by reCAPTCHA and the Google Privacy Policy and Terms of Service apply.

English (United States)

Document title: Petition · Demand Investigation of Phi Theta Kappa: Reports of Abuse, Toxic Bullying &amp; Deceptive Ads - United States · Change.org
Capture URL: https://www.change.org/p/demand-investigation-of-phi-theta-kappa-reports-of-abuse-toxic-bullying-deceptive-ads
Capture timestamp (UTC): Thu, 20 Mar 2025 19:39:31 GMT

Page 6 of 6

# EXHIBIT A-9

1          IN THE UNITED STATES DISTRICT COURT
        FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
2                   NORTHERN DIVISION

3

4   PHI THETA KAPPA HONOR SOCIETY                    PLAINTIFF

5   VERSUS              CIVIL ACTION NO. 3:22-CV-00208-CWR-RPM

6   HONORSOCIETY.ORG, INC., ET AL.                  DEFENDANTS

7

8

                      EVIDENTIARY HEARING
9          BEFORE THE HONORABLE CARLTON W. REEVES,
             UNITED STATES DISTRICT COURT JUDGE,
10                    MARCH 27, 2024,
                    JACKSON, MISSISSIPPI

11

12

13

14   APPEARANCES:

15   FOR THE PLAINTIFF:    MICHAEL B. WALLACE, ESQ.
                          JONATHAN G. POLAK, ESQ.
16
     FOR THE DEFENDANTS:   W. WHITAKER RAYNER, ESQ.
17                        DEREK NEWMAN, ESQ.

18

19

20

21

     REPORTED BY:
22
        CANDICE S. CRANE, RPR, RCR, CCR #1781
23      OFFICIAL COURT REPORTER
        501 E. Court Street, Suite 2.500
24      Jackson, Mississippi  39201
        Telephone:  (601)608-4187
25      E-mail:  Candice_Crane@mssd.uscourts.gov

1   public records request sent in this litigation?

2      MR. NEWMAN:  Honor Society has been sending public

3   records requests since its first day in business years ago,

4   ten years ago.  Regularly sends public records requests and

5   is very familiar with the way of doing that.

6      THE COURT:  Did you find that the responses

7   received -- because presumably then since it does it all

8   the time, during this litigation, then, they were doing it

9   for the last two years.  Was the -- did you find that the

10   responses received from the various institutions were

11   responsive to existing discovery that had been propounded

12   by Phi Theta Kappa?

13      MR. NEWMAN:  Your Honor, two responses.  First, I

14   would like to take a step back and note that Honor Society

15   sends out public records requests not for discovery in this

16   case, but for competitive reasons.  And so those would not

17   all relate to discovery in this matter.

18      And then the second response to Your Honor's

19   question about whether they overlap with discovery

20   responses is just frankly I don't know.  And the reason I

21   don't know is because my client is engaging in what it has

22   a right to do, send out public records requests, as it has

23   done for 12 years for competitive purposes.  I'm not

24   involved in that process, and I don't expect my client to

25   report to me about everything they do in their business.

1          MR. NEWMAN:  And because of that, they would never

2    serve -- we would never serve a subpoena on PTK asking for

3    this information, because it's not relevant to this

4    litigation.

5          THE COURT:  No, you would not have to serve a

6    subpoena.  All you'd have to do is serve discovery on PTK;

7    right?

8          MR. NEWMAN:  Correct, Your Honor.  So we would never

9    serve a request for production of documents on PTK asking

10   for information that's overbroad for purposes of the

11   litigation.  That's not why Honor Society sends out public

12   records requests.  They've been doing it forever, and it's

13   to gain a competitive advantage freely under their right

14   under the law.

15         And so it just strikes me as disingenuous for PTK to

16   say we could have gotten it in discovery.  We could not

17   have gotten it in discovery.  When I say "we," I shouldn't

18   say "we," I should say my client, because I'm not involved

19   in that.  My client is not entitled to information in

20   discovery for competitive purposes that don't relate to the

21   lawsuit.  For that, my client turns to public records

22   requests, which it has every right to send.

23         THE COURT:  But your client is entitled to certain

24   information under the rules of discovery.

25         MR. NEWMAN:  Yes, Your Honor.

the Federal Rules of Civil Procedure.  The records requests
and surveys are not discovery devices.  They're done for
competitive reasons, to gain intelligence, to provide
better services, to understand the market, and so they
don't relate to Rule 26 or the federal rules.

       But to the extent that there's a discovery request
and it's valid, Honor Society will comply.  To the extent
we get an informal request, we may comply, as we did last
night, and PTK will get all the information that it needs.

       So I'd like to move to my next point, which is
another compelling reason why this Court should deny the
motion for TRO, and that is Honor Society had the absolute
right to conduct public records requests and send surveys.

       Now, what was striking to me is that the federal
government in every state has these public records request
laws, and we cite four -- four Fifth Circuit Court of
Appeals binding cases that held that a party has the
absolute right to send public records requests even when
it's in litigation.

       So that's the issue before the Court, one of many,
but does Honor Society have the right to send these records
requests?  If so, PTK can't succeed on the merits of its
claims.

       And then the other side is, is it appropriate to
issue a TRO?  And I'll cite the Fifth Circuit cases.

1                    **CERTIFICATE OF COURT REPORTER**

2

3          I, Candice S. Crane, Official Court Reporter for

4     the United States District Court for the Southern District

5     of Mississippi, do hereby certify that the above and

6     foregoing pages contain a full, true, and correct

7     transcript of the proceedings had in the forenamed case at

8     the time and place indicated, which proceedings were

9     stenographically recorded by me to the best of my skill and

10    ability.

11         I further certify that the transcript fees and

12    format comply with those prescribed by the Court and

13    Judicial Conference of the United States.

14         THIS, the 2nd day of April, 2024.

15

16                        /s/ Candice S. Crane, RPR, RCR, CCR

17                        Candice S. Crane, RPR, RCR, CCR #1781
                          Official Court Reporter
18                        United States District Court
                          Candice_Crane@mssd.uscourts.gov
19

20

21

22

23

24

25

# EXHIBIT A-10

FILED UNDER SEAL

# EXHIBIT A-11

# Rebuttal Expert Report of Charles Kush

Phi Theta Kappa Honor Society v. HonorSociety.org, Inc.

September 30, 2024

# I.    Expert Information

## A. Name and Organization

Charles A. Kush III
GLG
60 East 42nd St 3rd Fl
New York, NY 10165

## B. Qualifications

I am a Network Member of GLG (Gerson Lehrman Group), whose activities include performing expert analyses in connection with litigation matters. I have previously been retained as an expert for the plaintiff in one litigation (Spotlight Ticket Management, Inc. v. StubHub, Inc. in Los Angeles County Superior Court, 20VECV00691) and have consulted with hundreds of clients regarding a variety of matters, with particular expertise in digital marketing and branding, ecommerce, omnichannel retail, affiliate marketing, information technology, internet solutions, and engineering.

My digital marketing and branding expertise includes experience as an ecommerce executive, digital marketer, entrepreneur, and owner/operator of CREATIVE PRODUCTS Business Services, a digital agency that performs a multitude of services for businesses, including business strategy consulting, brand creation, website development, search engine marketing (SEM), search engine optimization (SEO), social media advertising, ecommerce services, affiliate marketing, and email marketing. I have led digital marketing efforts for multiple brands as Chief Operating Officer of eFashionSolutions, a leading outsourced ecommerce solution provider that focused on the fashion and apparel industry. I have also built and marketed brands for my own businesses in different industries as an entrepreneur, as well as for various Small and Medium Sized Businesses (SMB) digital agency clients.

As a strategic business advisor and technology executive, I have over 35 years of professional work experience, including over 20 years of digital marketing and branding experience. I have held a variety of board member, C-suite, and executive-level positions related to digital transformation, ecommerce, and IT with a variety of businesses, including Fortune-ranked companies. I hold a Bachelor of Science degree in Mechanical and Aerospace Engineering from Rutgers University School of Engineering. My resume is attached hereto as Appendix A.

I am being compensated for my work through GLG at $600 per hour for prep work, $900 per hour for deposition and testimony, and $300 per hour for non-working travel. My compensation is not affected by the outcome of this case.

# II.  Case and Assignment

This report concerns Phi Theta Kappa Honor Society (hereafter referred to as "PTK") v. HonorSociety.org Inc. and Honor Society Foundation, Inc. (hereafter referred to as "HonorSociety") in the United States District Court for the Southern District of Mississippi, Northern Division, Civil Action No. 3:22-cv-00208-CWR-RPM.

PTK has submitted the "Expert Report of Jeffrey D. Parkhurst" ("Parkhurst Report") dated August 30, 2024 in support of its alleged infringement and false advertisement damages. In his report, Mr. Parkhurst states PTK retained him to "opine the corrective action that is required to restore the Phi Theta Kappa brand from the damages done to it by Honor Society's confusing, false, and misleading activities and advertising."[1] I was asked by counsel for HonorSociety to review the Parkhurst Report, up to the corrective advertising section, and respond to Mr. Parkhurst's opinions as they related to brand confusion, brand damage, and misimpressions allegedly suffered by PTK.

In preparing this report, I reviewed and analyzed the documents listed in Appendix C.

# III.  Expert Opinions and Supporting Rationale

## A. Claims that False Advertising by HonorSociety caused Misimpressions for PTK

Mr. Parkhurst claims in his report that each "consumer who looked at Honor Society online" constituted a "misimpression" of PTK due to HonorSociety's "false or misleading advertising."[2] Mr. Parkhurst claims these "misimpressions aris[e] from" HonorSociety (1) "falsely calling itself an 'honor society' when it is not", (2) using "PTK's colors (navy blue/gold) in combination but also in Honor Society's false advertisements around the benefits it offers", and (3) stating it "is 'loved' by higher education, etc., and 'ranked' as a top honor society by a respected organization, when neither is supported by fact."[3] Based on my experience and review of the evidence, none of these actions by HonorSociety have caused, or could cause, misimpressions of PTK.

At the outset, Mr. Parkhurst states that misimpressions "can be defined as those instances where customers have seen Honor Society webpages, email, location listings in business directories, in

---

[1] Parkhurst Report, ¶ 19.
[2] Parkhurst Report, ¶¶ 7, 10.
[3] Parkhurst Report, ¶ 7.

search engine results pages, and on Honor Society social media profiles."[4] However, he does not explain why somebody viewing any of these pages "experienced 'misimpressions' of Phi Theta Kappa"; rather, he just assumes they do. To the extent Mr. Parkhurst is claiming that any consumer who views "Honor Society webpages," etc., experienced a misimpression of PTK because they confused HonorSociety with PTK, as explained below, (a) there is no evidence of actual confusion beyond *de minimis* confusion which can be expected between competitors in any industry, and (b) there is not a likelihood of confusion between HonorSociety and PTK due to their colors and logos as Parkhurst contends. Accordingly, I disagree that anybody who viewed HonorSociety's materials, online or offline, experienced a misimpression of PTK for which corrective advertising is needed to remedy.

### 1.  Claim that HonorSociety is not an Honor Society

Mr. Parkhurst states in his report that HonorSociety is "Falsely calling itself an 'honor society' when it is not."[5] Based on my professional advertising and marketing experience, HonorSociety calling itself an "honor society" does not cause "misimpressions" of PTK, or the honor society market as a whole, for which corrective advertising would be needed to remedy.

Mr. Parkhurst provides no explanation or justification for his proposition that HonorSociety is not an honor society. When asked his definition of an honor society during his deposition, Mr. Parkhurst stated it was outside of the scope of his opinion.[6] Later in his deposition, when questioned by PTK's counsel on his understanding of what constitutes an honor society, Mr. Parkhurst stated:

> Yeah if I go back to when I first got involved with this the idea of what is an Honor Society, to me, it related, you know, to -- typically it's performance the kids who get good grades they get honored with that that's why they go forward that was a basic tenant I had seen growing up I agreed to that, that is a component of it.  But there's other things going on that are modern like with the Honor Society where they are trying different things, but I still hold the line on performance and grade is a key driver or a component of it.[7]

Mr. Parkhurst testified that this "understanding" that "grades" are a "key driver or a component" of what constitutes an honor society was the basis for his opinions that HonorSociety calling itself an "honor society" caused misimpressions.

There are, however, numerous honor societies in addition to HonorSociety that do not have a grade requirement for membership. Some of these honor societies include:

---

[4] Parkhurst Report, ¶ 9.
[5] Parkhurst Report, ¶ 7.
[6] Parkhurst Deposition Transcript, 110:12-16.
[7] Parkhurst Deposition Transcript, 237:19-238:8.

a.  **National Adult Education Honor Society (NAEHS)**:

   o  **Founded**: 1991

   o  **Focus**: Recognizes adult learners who demonstrate dependable attendance, a cooperative attitude, and a strong work ethic.

   o  **Membership Criteria**: No GPA requirement; based on personal qualities and commitment to education.

   o  **Website**: http://naehs.org

b.  **Phi Rho Pi Forensic Honor Society**:

   o  **Founded**: 1927

   o  **Focus**: Honors students participating in forensic (speech and debate) activities.

   o  **Membership Criteria**: No GPA requirement; based on participation and achievement in forensic competitions.

   o  **Website**: http://www.phirhopi.org

c.  **Order of the Arrow Honor Society**:

   o  **Founded**: 1915

   o  **Focus**: Recognizes Scouts and Scouters who exemplify the Scout Oath and Law in their daily lives.

   o  **Membership Criteria**: No GPA requirement; based on service, leadership, and camping skills within the Boy Scouts of America.

   o  **Website**: https://oa-bsa.org

d.  **Pershing Rifles Honor Society**:

   o  **Founded**: 1894

   o  **Focus**: Military-oriented honor society that promotes leadership, military drill, and service.

   o  **Membership Criteria**: No GPA requirement; based on military drill performance and leadership qualities.

   o  **Website**: https://pershingriflessociety.org

e.  **QEBH Honor Society**:

   o  **Founded**: 1898

- o **Focus**: Senior honor society at the University of Missouri that recognizes leadership, service, and character.

- o **Membership Criteria**: No GPA requirement; based on leadership and service contributions.

- o **Website**: https://en.wikipedia.org/wiki/QEBH

f. **Ellis Island Honors Society**:

- o **Founded**: 1986

- o **Focus**: Honors individuals who have made significant contributions to society and their communities.

- o **Membership Criteria**: No GPA requirement; based on contributions to the community and society.

- o **Website**: https://www.eihonors.org

In addition, Phi Beta Kappa, the oldest honor society in the United States (founded in 1776), did not have a grade requirement for membership for almost 75 years. As detailed in "Phi Beta Kappa in American Life: The First Two Hundred Years" by Richard Nelson Current, Phi Beta Kappa "'existed more than half a century -- nearly 75 years in fact -- without ever taking marks into consideration.' Indeed, there were no marks to be taken into consideration in those early years."[8]

The fact that (a) Phi Beta Kappa, the oldest honor society in the United States, existed for so long without a grade requirement for membership, and (b) numerous honor societies today still do not have a "grade" or GPA requirement, certainly indicates that reputable honor societies can exist without having grade requirements for membership. While Mr. Parkhurst cites to the Association of Collegiate Honor Societies (ACHS) for the prospect that "certain foundational elements are required for any honor society, including scholastic requirements…", he admits that PTK is not recognized by the ACHS either.[9]

HonorSociety is an inclusive academic and professional achievement society, welcoming students who have accomplished academic success, as well as those who aspire to do so. It does not limit its membership based on GPA.

Given the existence of other honor societies without grade requirements for membership and the fact that Phi Beta Kappa (the oldest honor society in the United States) existed for almost 75 years without any grade requirements for membership, it is my opinion that HonorSociety calling

---

[8] Phi Beta Kappa in American Life: The First Two Hundred Years" by Richard Nelson Current, pg. 160-161 (attached as Appendix B).
[9] Parkhurst Report, ¶ 72.

itself an honor society would not mislead or confuse consumers. Therefore, HonorSociety calling itself an honor society would not result in any misimpressions for PTK or the honor society market in general.

## 2. HonorSociety's Use of Navy Blue and Gold Colors

Mr. Parkhurst further states that HonorSociety's "Use of PTK's colors (navy blue/gold) in combination but also in Honor Society's false advertisements around the benefits it offers" has resulted in misimpressions of PTK.[10] Mr. Parkhurst also specifically calls out HonorSociety's use of gold stoles as creating misimpressions of PTK.[11]

Although both PTK and HonorSociety use blue and gold in their branding, they are not the only honor societies to do so. Numerous other prominent honor societies use blue and gold in their branding. Some of them include the following:

a. **Phi Beta Kappa**

  o **Focus**: Liberal arts and sciences

  o **Market**: Four-year universities

  o **Website**: https://www.pbk.org

b. **Phi Kappa Phi**

  o **Focus**: All academic disciplines

  o **Market**: Four-year universities

  o **Website**: https://www.phikappaphi.org

c. **Golden Key International Honour Society**

  o **Focus**: Academic excellence, leadership, and service

  o **Market**: Four-year universities

  o **Website**: https://www.goldenkey.org

d. **National Honor Society (NHS)**

  o **Focus**: Scholarship, leadership, service, and character

  o **Market**: High schools

  o **Website**: https://www.nhs.us

---

[10] Parkhurst Report, ¶ 7.
[11] Parkhurst Report, ¶ 53.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

e. **Omicron Delta Kappa**

- o **Focus**: Leadership across various fields including academics, athletics, service, communications, and arts
- o **Market**: Four-year universities
- o **Website**: https://odk.org

f. **Sigma Xi**

- o **Focus**: Scientific research and engineering
- o **Market**: Four-year universities and research institutions
- o **Website**: https://www.sigmaxi.org

g. **Alpha Phi Sigma**

- o **Focus**: Criminal Justice
- o **Market**: Four-year universities
- o **Website**: https://alphaphisigma.org

h. **Beta Gamma Sigma**

- o **Focus**: Business
- o **Market**: Four-year universities (business schools)
- o **Website**: https://www.betagammasigma.org

i. **Beta Kappa Chi**

- o **Focus**: Natural Sciences and Math
- o **Market**: Four-year universities
- o **Website**: https://www.betakappachi.org

j. **Epsilon Pi Tau**

- o **Focus**: Technology
- o **Market**: Four-year universities and technical institutions
- o **Website**: https://epsilonpitau.org

k. **The Society for Collegiate Leadership & Achievement (SCLA)**

- o **Focus**: Leadership and academic achievement across various disciplines

- o **Market**: Four-year universities and community colleges

- o **Website**: https://www.thescla.org

In addition to PTK and HonorSociety, numerous other honor societies also use gold stoles. Some of them include:

a. **Mu Kappa Tau**: This marketing honor society uses gold stoles to signify academic excellence and membership. The gold stoles are often worn during graduation ceremonies to highlight the achievements of its members.

b. **Gamma Theta Upsilon**: As an international honor society in geography, Gamma Theta Upsilon members wear gold stoles to represent their commitment to the field and their academic accomplishments.

c. **National Society of Collegiate Scholars (NSCS)**: NSCS members wear gold stoles to symbolize their dedication to scholarship, leadership, and service. The gold stoles are a part of their graduation regalia.

d. **Omicron Delta Epsilon**: This economics honor society uses blue and gold stoles. The gold represents excellence and achievement in the field of economics.

e. **Phi Alpha**: Members of this social work honor society wear blue and gold stoles. The gold color signifies the high standards and achievements of its members in the field of social work.

f. **Phi Sigma**: As a biology honor society, Phi Sigma members wear gold stoles to denote their academic excellence and contributions to the biological sciences.

g. **Psi Beta**: This psychology honor society for two-year colleges uses gold stoles to recognize the academic achievements and dedication of its members in the field of psychology.

Given that numerous honor societies across the industry use blue and gold as their colors, consumers are not likely to confuse HonorSociety for PTK because they both use blue and gold. Rather, consumers know that blue and gold are commonly used by honor societies and as academic colors, generally (e.g., Notre Dame, UCLA, etc.). Given the prevalence of gold stoles amongst many honor societies, consumers are unlikely to confuse HonorSociety's gold stoles with PTK's, especially because of the clearly differentiated logos of HonorSociety and PTK clearly visible on both stoles.

The logos of PTK and HonorSociety are sufficiently different as to avoid any confusion between the two. PTK's logo features a golden key with the Greek letters ΦΘΚ (Phi Theta Kappa), and is adorned by oak leaves and laurel, with the head of Athena at the top.[12] HonorSociety's logo

---

[12] https://www.ptk.org/about-ptk/

features a shield containing a burning torch surrounded by branches of knowledge.[13] By way of contrast, it is apparent that the PTK logo is much more similar to that of Phi Beta Kappa than to that of HonorSociety.[14]

Given that numerous honor societies in the industry use the blue and gold colors, combined with the distinct differentiation between the PTK and HonorSociety logos, HonorSociety's use of blue and gold colors does not cause confusion between it and PTK, and therefore would not cause "misimpressions" of PTK.

### 3. Statements on HonorSociety's Website that it is "loved by higher education" and "ranked as a top honor society"

Mr. Parkhurst states that HonorSociety's past statements on its website of being "'loved' by higher education, etc., and 'ranked' as a top honor society by a respected organization" are not supported by fact, and thus caused misimpressions of PTK and the honor society market.[15]

Mr. Parkhurst misquotes HonorSociety's website by representing that HonorSociety stated it "is 'loved' by higher education, etc."[16] In reality, honorsociety.org previously had a section titled "Higher education loves Honor Society!"[17] Mr. Michael Moradian of HonorSociety testified that this section heading previously on the HonorSociety website was driven by positive verbal discussions with college administrators and students regarding HonorSociety.[18]

As far as the "ranked as a top honor society by a respected organization" statement previously on the HonorSociety website, this was driven by the College Magazine article titled "5 Honor Societies You Should Join – Phi Beta Kappa, HonorSociety.org and More" and posted at https://www.collegemagazine.com/5-honor-societies-join-phi-beta-kappa-honorsociety-org/.[19] Mr. Parkhurst again misquotes HonorSociety's website. The actual quote appearing on honorsociety.org was that "Honor Society was ranked as one of the top 'Honor Societies You Should Join' by College Magazine…"[20] Given that HonorSociety was indeed included in an article of "5 Honor Societies You Should Join," HonorSociety's statement that it was ranked as a top honor society you should join is not misleading. Mr. Parkhurst appears to quibble with the term "ranked" as being inaccurate because there was "no visible methodology" and disparages the College Magazine author because she also wrote articles about drinking and meeting guys at parties.[21] HonorSociety's inclusion in this article, however, indicates the author believed HonorSociety stood out as an "honor society you should join" above other honor societies. The

---

[13] https://www.honorsociety.org/
[14] https://www.ptk.org/about-ptk/ ; https://www.pbk.org/about.
[15] Parkhurst Report, ¶ 7.
[16] Parkhurst Report, ¶ 7.
[17] HS_221259.
[18] Moradian Deposition Transcript, 166:15-172:14.
[19] Parkhurst Report, ¶ 77 and fn 78.
[20] HS_221259.
[21] Parkhurst Report, ¶ 77.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY    9

author also writing articles about mundane college experiences like meeting guys and going to parties does not make HonorSociety's statement on its website that it was included in the "5 Honor Societies You Should Join" article misleading.

Based on HonorSociety's representations, it is my opinion that these two statements were not misleading and would not have resulted in misimpressions of PTK or the honor society market. They certainly would not have caused any confusion with PTK, since they are general statements that don't have any connection to PTK.

Moreover, according to Moradian's testimony, these two statements appeared on honorsociety.org only for two years[22] out of the four-and-a-half-year period (i.e. 44% of the period) Mr. Parkhurst used to estimate the number of consumers who visited honorsociety.org in calculating the total number of "misimpressions" PTK suffered (10,574,785, per Figure 1. in Mr. Parkhurst's report). Therefore, even if one or both of these two statements were "false" or "misleading", Mr. Parkhurst overstated the resulting misimpressions by a factor of 2.25 (4.5 / 2 = 2.25).

## B. Claim that PTK and all honor societies were perceived as a scam because of HonorSociety

Mr. Parkhurst claims that HonorSociety caused PTK to be perceived as a "scam":

> Phi Theta Kappa has inherited a halo of unwanted perception from honorsociety.org that all honor societies are scams. Specifically, Phi Theta Kappa issued a 2021 survey to students that declined membership with the following selections: I'm too busy, This feels like a scam, Too many emails, Just not interested. Of the 569 people who opened the email, 137 (or approximately 24%) responded that they believed PTK feels like a scam.[23]

Mr. Parkhurst, however, fails to provide any proof whatsoever throughout his report that any actions by HonorSociety caused a "scam" perception of PTK or other honor societies in the market.

On the contrary, there is clear evidence in Mr. Parkhurst's report that the "scam" perception and reputation problem of honor societies has existed to some extent for nearly a hundred years. As described in Mr. Parkhurst's report, The Association of College Honor Societies (ACHS) is "…an organization founded in 1925 to preserve the integrity of honor societies from less reputable organizations."[24]

Mr. Parkhurst goes on to say "[i]nterestingly, a 2017 story from USA Today 92 years later addresses the same reputation problem." The story to which he is referring is posted at

---

[22] Moradian Deposition Transcript 164:13-166:16.
[23] Parkhurst Report, ¶ 8.
[24] Parkhurst Report, ¶ 72.

https://www.usatoday.com/story/college/2017/03/07/how-to-tell-sketchy-honor-societies-from-legitimate-ones/37428417/. Thus, from the formation of ACHS in 1925 to the USA story in 2017, there clearly has been a long-standing reputation problem for honor societies.

Mr. Parkhurst's report provides no evidence that any action by HonorSociety caused PTK to be considered a scam, yet ample evidence suggests that honor societies as a whole have had a "halo of unwanted perception" that they are illegitimate organizations for almost 100 years. Based on the information in his report, the survey that Mr. Parkhurst cites in paragraph 8 does nothing to try and determine why some respondents stated that PTK "feels like a scam," much less demonstrate a link to HonorSociety.

Therefore, Mr. Parkhurst blaming HonorSociety for a perception that PTK or honor societies are perceived as a scam is both unfounded and unreasonable. These reputation problems occurred long before HonorSociety's existence began in 2014, and the 2019 – 2023 time period over which Mr. Parkhurst calculates misimpressions.

## C. Claims that HonorSociety caused confusion

### 1. Claim that PTK was confused with HonorSociety

Mr. Parkhurst claims that HonorSociety caused consumers to confuse it with PTK:

> We see it in refund requests at Honor Society. Phi Theta Kappa has also received at its national office at least 135 tracked complaints including actual confusion. Forty three stated they 'joined HS.org thinking it was PTK'. [25]

Mr. Parkhurst states that PTK has "…approximately 250,000 active members in the nation's community colleges and other two year degree programs…"[26]

In analyzing the HonorSociety refund requests shown in HS_136621 and HS_203039, I counted 14 requests that suggested students joined HonorSociety thinking they were joining PTK. Per Mr. Parkhurst's report, "Honor Society added 210,650 paid membership units from 2019 through June 30, 2023."[27] Therefore, the 14 counts of potential confusion out of a total population of 210,650 members calculates to be 0.0066% of HonorSociety members who indicated confusion in joining HonorSociety thinking it was PTK.

In analyzing the PTK reports of confusion, if we conservatively assume that these 43 counts of confusion are out of a minimum population of 250,000 active members, this calculates to be 0.0172% of PTK members who indicated confusion in joining HonorSociety thinking it was PTK.

---

[25] Parkhurst Report, ¶ 6.
[26] Parkhurst Report, ¶ 1.
[27] Parkhurst Report, ¶ 16.

If we add up the 43 PTK complaints and the 14 HonorSociety requests, we get 57 total consumers that indicated confusion between HonorSociety and PTK. Dividing 57 by the total population of 210,650 HonorSociety members, we get 0.027% of HonorSociety members who indicated confusion between HonorSociety and PTK.

Even if we conservatively assume <u>all</u> of PTK's "135 tracked complaints" demonstrated actual confusion between HonorSociety and PTK, adding the 14 HonorSociety requests, we get 149 total consumers that indicated confusion between HonorSociety and PTK. Dividing 149 by the total population of 210,650 HonorSociety members, we get 0.0707% of HonorSociety members who indicated confusion between HonorSociety and PTK.

In my opinion, these very small percentages of confusion are negligible and can be expected of competitors serving the same market in any industry. Since HonorSociety serves the same market as PTK, I see no statistically significant evidence that consumers confused PTK and HonorSociety, let alone that HonorSociety's actions caused any statistically significant confusion between it and PTK. Therefore, these minimal amounts of "actual confusion" do not evidence any misimpressions or "likelihood of confusion."[28]

## 2. Claim that HonorSociety's directory of Honor Society Pages caused confusion

Mr. Parkhurst also opines that a directory on honorsociety.org created confusion and misimpressions of PTK:

> [a]s we detail below in the section below, honorsociety.org shows a directory of 56 honor societies. twenty nine [sic] are for brands that use 'Honor Society' in their names on their own websites. At honorsociety.org, Honor Society has stripped out the words 'honor society' for these 29 brands. Honor Society lists the name (often Greek) but excludes 'honor society'. We are left with 'Honor Society' in one place, and that is Honor Society. It is creating confusion at the category level. Actual confusion offers strong evidence of a likelihood of confusion because the actual confusion is evident, and you can see it.[29]

In my opinion, it is very clear to the viewer that this page is a directory of individual honor societies that are in no way connected to HonorSociety. In fact, the page is titled "Honor Societies", is subtitled "Honor Society Pages" and clearly states "[t]his directory is for informational purposes only. The organizations listed are independent and separate from Honor Society, whose website you are viewing. For more information, please visit the website of the third party organization listed below."

---

[28] Contra Parkhurst Report, ¶ 6.
[29] Parkhurst Report, ¶ 56 and fn 50; https://www.honorsociety.org/HonorSocieties.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY                12

I disagree with Mr. Parkhurst's implication that the removal of the words "honor society" from 29 of the listed honor societies causes confusion. It is clearly stated on the page that all of these organizations are honor societies, and repeating these words for every organization would be redundant and verbose, making the page less appealing and harder to read.

In addition, Mr. Parkhurst states "[i]nterestingly the honorsociety.org webpage with over 56 honor societies fits in well as a house of brands for Honor Society.", implying that HonorSociety is using a house of brands brand architecture strategy with their directory of Honor Society Pages.[30]

A house of brands is a brand architecture strategy where a company owns and manages multiple distinct brands, each with its own unique identity, target market, and marketing strategy. HonorSociety, however, makes no claim of ownership of any of the honor societies it lists on the directory page. In fact, HonorSociety clearly states on the page "The organizations listed are independent and separate from Honor Society, whose website you are viewing. For more information, please visit the website of the third party organization listed below."

It is my opinion that these clear statements would prevent any confusion by the consumer into thinking that HonorSociety owned the honor societies listed on the page. I disagree with Mr. Parkhurst's implication that HonorSociety is using a house of brands brand architecture strategy with their directory of Honor Society Pages.

Mentioning competitors on a website like HonorSociety with its "Honor Societies" page is sometimes done by website owners to both help educate their readers, and for SEO (Search Engine Optimization) purposes. The reason that this may be helpful for SEO is that when someone searches for a competitor and finds them listed on your website, it can drive additional traffic to your site. This is because your website becomes a relevant result for the search query.

Moreover, as Mr. Parkhurst notes, Phi Theta Kappa is not present on this directory.[31] Therefore, a consumer viewing this page would not be a misimpression for PTK. Given the clear page title of "Honor Societies", subtitle of "Honor Society Pages", and clear disclaimer that the listed organizations "are independent and separate from Honor Society", a consumer viewing this page would not be a misimpression for the honor society market, either.

## D. Summary of Conclusions

Mr. Parkhurst claims in his expert report that HonorSociety made false advertising, causing confusion between itself and PTK and causing a perception in the market that honor societies are a scam, and that this caused misimpressions in the market that require corrective advertising to repair damage to PTK's brand.

---

[30] Parkhurst Report, ¶ 67-68.
[31] Parkhurst Report, ¶ 68.

I have reviewed and disputed each of these claims in this report. There is no meaningful evidence of confusion between HonorSociety and PTK, no evidence that HonorSociety caused any negative impressions of honor societies in the market or perceptions that honor societies are a scam, and no evidence presented of any damages caused by HonorSociety to the PTK brand. It is therefore my expert opinion that no meaningful misimpressions were made by HonorSociety and thus, no corrective advertising is justified.

## Disclaimer

My opinions expressed herein are based on the information provided to me by Phi Theta Kappa Honor Society and HonorSociety.org, Inc. through and by Newman LLP, and my professional knowledge and experience.

I make no warranties, expressed or implied, with respect to the accuracy or completeness of the information provided by others. The opinions and conclusions contained in this report are based on the information available to me at the time of this report's preparation. I reserve the right to revise or modify these opinions and conclusions should additional information become available.

This report is intended for the sole use of the parties to this legal matter and their attorneys. It should not be relied upon by any other party for any purpose.

*Charles A. Kush III*
_____
Charles A. Kush III

September 30, 2024
_____
Date

# Appendix A

Resume for Charles A. Kush III

# CHARLES A. KUSH III

## EXECUTIVE SUMMARY

A results-oriented and innovative executive with a proven record of driving growth, profitability, and turnaround success across diverse industries and roles. Demonstrated expertise in digital marketing, ecommerce, omnichannel retail, IT, AI, and Internet solutions, coupled with strong leadership, strategic planning, and operational excellence skills. Possesses a unique blend of technical aptitude, business acumen, and integrity, with a focus on maximizing value for stakeholders.

## CORE STRENGTHS

Digital Transformation Leadership | Ecommerce Strategy & Execution | Operational Excellence & Cost Reduction | P&L Management & Revenue Growth | Multi-Channel Marketing & Partnerships | Business Turnaround & Acquisitions | Technology Solutions & Integration | Consulting Services | Executive Coaching & Team Leadership | Board Experience

## KEY ACCOMPLISHMENTS

- **Led the turnaround of multiple businesses:** Achieved record growth (200%), revenue ($215M annual ecommerce sales), and increased profitability & cost reduction ($54M annually) through strategic initiatives.
- **Built and scaled successful ventures:** Grew a B2C ecommerce business by 194% 5-year revenue CAGR, launched a new affiliate program with over 1,000 partners, and expanded into a full-service B2B digital agency.
- **Turned around a struggling business unit of a large enterprise:** Improved efficiency and profitability.
- **Led development of a nationwide executive dashboard:** Enhanced service performance tracking and received company-wide acclaim.
- **Built and led a professional services practice:** Secured $7M in annual sales and paved the way for acquisition.
- **Proven advisor and consultant:** Sought-after expert for acquisitions, investments, and turnarounds, advising hundreds of clients across various industries.
- **Award-winning leader:** Recognized for superior performance, exemplary service, and innovative contributions throughout career.

## PROFESSIONAL EXPERIENCE

### Board Advisor, RKTech (2023- Present)

Provide strategic guidance and insights to assist the company in capturing new customers, identifying potential M&A opportunities, and defining growth goals. Play a key role in shaping business strategies and driving the company's expansion, leveraging extensive industry knowledge and expertise.

### Director, Board of Directors, Better Business Bureau Serving New Jersey (2019- Present)

Direct, advise, govern, and oversee policies of the BBB Serving New Jersey, ensuring ethical business practices and marketplace trust. Exercise control over affairs, finances, funds, and property. Contribute to strategic direction, leadership, and decision-making. Monitor compliance, drive operational improvements, and enhance financial performance. Foster stakeholder relationships, represent the BBB, and promote its mission.

### Vice President of IT, Ecommerce, The Children's Place (2012- 2013)

Recruited to lead ecommerce technology function for billion-dollar children's apparel retailer, engaging teams in development and implementation of strategic projects to improve ecommerce functionality and interoperability within the enterprise.

- Headed rebuild of IT ecommerce organization, advising on infrastructure design, application development, project management, quality assurance, and 24x7 production support to elevate profit potential.
- Developed and implemented innovative ecommerce platform, enabling record sales for the company, doubling previous record for ecommerce revenue generated in a single day for key holiday season.
- Partnered with marketing and operations teams to boost ecommerce sales by 22% within the first year of tenure, taking upgraded ecommerce site to generate $215M of company's $1.8B in net sales.

### Chief Operating Officer (COO) and Chief Information Officer (CIO), eFashionSolutions (2011- 2012)

Sought out to direct and oversee business and technology operations for leading supplier of ecommerce solutions in fashion and apparel industry. Directed daily operations while guiding execution of strategic initiatives for creative/interaction design, photography studio, merchandising, marketing, ecommerce, IT, warehouse management, fulfillment, and customer service solutions.

- Credited with turning around trend of fiscal underperformance, restoring profitability through impressive $5.4M total cost reduction via improved P&L management and shift to prioritize profitable client relationships.
- Spurred 200% growth in revenues for top clients within 12-month period, capturing record holiday sales and creating potential for sustained business relationships.

### Executive Management Consultant | Business Advisor | Network Member, GLG, Guidepoint (2003- Present)

Provide strategic consulting services to PE, VC, institutional investment, and law firm clients. Provide thought leadership to analyze businesses, explain technologies, discuss competitive dynamics, provide market outlook, and make recommendations to maximize business growth and profitability.

- Advised hundreds of clients on acquisitions, investments, and turnarounds, specializing in ecommerce, omnichannel retail, digital marketing, information technology, artificial intelligence, and Internet solutions.

### Founder, President, Chief Executive Officer (CEO), Chief Digital Officer (CDO), Creative Products (2000- Present)

Founded and continue to foster year-over-year growth of B2C/B2B ecommerce and digital marketing retail business. Steer development of short- and long-range business plans impacting sales, marketing, and operations to capitalize on existing and emerging market opportunities. Cultivate relationships with vendors, suppliers, clients, and marketing partners.

- Led organization to achieve substantial year-over-year growth, with revenues seeing increases of up to 194% in compound annual growth rate over five years.
- Navigated business expansion to include launch of in-house digital agency offering full-service digital marketing solutions for clients, inclusive of ecommerce, SEO/SEM, web design, social media, and marketing automation services.

### Additional Experience:

**Program Director, Northeast Region, Beechwood | Capgemini:** Established and led 100+ person teams to sell, develop, implement, and support custom technology solutions, leading to acquisition of Beechwood by Capgemini.

**Various Management Roles, AT&T:** Led teams of project managers in planning and executing strategic initiatives, including software development, complex service provisioning, and customer service, receiving numerous awards.

**Manufacturing Project Engineer | Production Engineer, ITT Avionics:** Coordinated transition of advanced military radar jammers from design phase to production, keeping the U.S. Military safe in the skies and earning two Presidential Citations.

## EDUCATION

Rutgers University School of Engineering, Bachelor of Science, Mechanical and Aerospace Engineering

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

# Appendix B

Pages 160 and 161 of "Phi Beta Kappa in American Life: The First Two Hundred Years" by Richard Nelson Current



There was, meanwhile, a tendency for chapters to decrease the proportion of the class elected. In the revised United Chapters constitution of 1937, the maximum was reduced from 25 to 15 percent. Many of the chapters already limited the number to less than 15 percent in their bylaws and did not reach their own maximums in actual practice. But wide variations in bylaws and in practices continued.[11]

Though such inconsistencies gave rise to some concern, this was nothing in comparison with the controversy that raged over the selection of members on the basis of grades. The practice seemed deplorable to at least a few ΦBK faculty, such as the Johns Hopkins professor who in 1927 refused to contribute to the endowment fund because he did not believe in "rewards of merit" but only in "activities that make more keen the interest in the intellectual life for its own sake." When Voorhees asked him for suggestions, the professor elaborated:

The intangible "prize" in the form of honor recognition of success in scholarship as indicated by grades seems to me on the whole undignified and unworthy and . . . it persuades a considerable number of students capable of better things to work in part at least with unworthy ideals, stimulated not wholly by genuine interest in the subjects studied but in part by selfish considerations of personal prestige. . . .

I believe that Phi Beta Kappa should recast her methods and reform her ideals, getting away wholly from the "prize" idea and endeavoring rather to stimulate true scholarly interest. At present she is something of a menace to real scholarship. She should be a definite aid, standing for the real thing rather than the empty honor.

I speak not without some first-hand knowledge for I have been one of the founders of three chapters, Johns Hopkins University, Goucher College, and Oberlin College and have attended one of the tri-annual conventions. I have watched with a good bit of interest the effect of Phi Beta Kappa in Goucher and in Oberlin. I think at Hopkins it has had very little influence. I have deplored some features of its influence in Goucher and at Oberlin.[12]

Taking much the same view, a few students declined election to the society. Two of them made news in the *New York Times* during the 1920s. The first Vassar student ever to reject the key did so because she never had "believed in rewarding high or low marks to students." The first at Dartmouth said he "did not consider it an honor." He explained that "the present system of marks in college does not show the true ability of a student."

The *New York Herald-Tribune*, in an editorial on February 22, 1928, commended the Dartmouth student. Seniors may well hold Phi Beta Kappa memberships in "contempt," the editorial writer said, since "boys become members or not automatically as a result of scholastic standing mathematically established by the faculty." Voorhees wrote a letter to the paper in reply. "There is no requirement that all those who receive high rank must be automatically elected," he declared. "Any chapter that



applies the automatic rule is untrue to the tradition of the fraternity, for it existed more than half a century—nearly seventy-five years in fact—without ever taking marks into consideration." Indeed, there were no marks to be taken into consideration in those early years. "That Phi Beta Kappa elections are not held in 'contempt,'" Voorhees added, "is evident from the fact that, while over 2,500 memberships are offered each year, the number of declensions during my quarter-century of service average less than one a year." But he did not succeed in putting an end to the controversy.

Some Phi Beta Kappa leaders themselves were quite critical in the 1930s. The society has done nothing to "enrich the intellectual life of the college world," charged Edward Ellery, acting president of Union College and former president of the New York State Association of Phi Beta Kappa. It merely "seconds the motion" of professors who have graded the student, he said, and it makes no distinction between easy and difficult courses. He contended that the society ought to "blacklist" courses that "require little or no intellectual effort."

"About half of the chapters have insisted on grades as the sole basis, for, they say, any other criteria would be subjective and open to wire-pulling," Shimer informed the *New York Times* in 1934. "Other chapters, fortunately, are willing to take a certain amount of hot water in order to distinguish more accurately the truly liberal scholar from the grind, the faithful lesson learner, and the follower of snap courses." Some of these other chapters were basing elections not only on grades but also on "one or more of the following considerations: general promise, character of courses, cultural qualities, breadth of interest, extracurricular activities, leadership, personality, interest in the welfare of the university."[13]

Here and there a college or university tried to do something about the discrepancy in grading between individual professors and between entire departments. Oberlin experimented from 1930 to 1934 with a ranking system, which required easy as well as difficult graders to list their students in order from best to worst instead of giving most of them A's and B's (or D's and F's). The University of Chicago introduced comprehensive exams to be graded by readers other than the persons teaching the courses. Under the old system, the Chicago dean reported, "not a few" students were elected to Phi Beta Kappa because they had taken "pipe" courses. Under the new system the initiates proved to be "more worthy members."

Harvard had begun as early as 1916 to give special emphasis to independent work and to base honors at graduation not only on course grades but also on the results of broad written examinations, an oral exam, and an honors thesis. Until 1934, however, the Harvard chapter persisted in electing largely on the basis of course grades. As a result, some students were elected to Phi Beta Kappa but failed to win honors, while others graduated with honors but failed to make Phi Beta Kappa. The reform of 1934 increased the number elected at the end of the

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

# Appendix C

Case Documents Reviewed and Analyzed

- PTK v. HonorSociety Civil Action No. 3:22-cv-00208-CWR-RPM SECOND AMENDED COMPLAINT Document 136 filed on 04/09/24.
- PTK v. HonorSociety Civil Action No. 3:22-cv-00208-CWR-RPM HONORSOCIETY.ORG, INC.'S SECOND-AMENDED COUNTERCLAIMS AND SECOND-AMENDED THIRD-PARTY COMPLAINT Document 138 filed on 04/10/24.
- Expert Report of Jeffrey D. Parkhurst dated August 30, 2024.
- Draft September 23, 2024 deposition transcript of Jeffrey Parkhurst.
- https://www.honorsociety.org/
- https://www.ptk.org/
- https://www.collegemagazine.com/5-honor-societies-join-phi-beta-kappa-honorsociety-org/
- https://www.achshonor.org/
- https://www.usatoday.com/story/college/2017/03/07/how-to-tell-sketchy-honor-societies-from-legitimate-ones/37428417/
- https://www.honorsociety.org/HonorSocieties
- Deposition Transcript of Michael Moradian pages 164-172; 179-180.
- About PTK _ Phi Theta Kappa.pdf
- HonorSociety Grad Pack.pdf
- HonorSociety.org Grad Pack - HonorSociety.org Store.pdf
- HS Directory.pdf
- PBK - About Phi Beta Kappa.pdf
- PTK - Stole_ Cords_ Medallion - Phi Theta Kappa Honor Society Shop.pdf
- SCLA Graduation Stole – The SCLA.pdf
- SCLA Honor Cords – The SCLA.pdf
- HS_129481.pdf
- HS_136621.pdf
- HS_136621.xlsx
- HS_203039.pdf
- HS_203039.xlsx
- HS_220988.pdf
- HS_221258.pdf
- HS_284248.pdf
- HS_367782.pdf
- HS_368188.pdf
- HS_600581.pdf

- PTK0000108.pdf
- PTK0000149.pdf
- PTK0000639.pdf
- PTK0000773.pdf
- PTK0000844.pdf
- PTK0000846.pdf
- PTK0000881.pdf
- PTK0081120.pdf
- PTK0081378.pdf
- PTK0081379.pdf
- PTK0130705.pdf
- PTK0132095.pdf
- PTK0133189.pdf
- PTK0133207.pdf
- PTK0133208.pdf
- PTK0133209.pdf
- PTK0133230.pdf
- PTK0133284.pdf
- PTK0136424.pdf
- PTK0136453.pdf
- PTK0136464.pdf
- PTK0143339.pdf
- PTK0183497.pdf

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

# EXHIBIT A-12

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION**

| | |
|---|---|
| PHI THETA KAPPA HONOR SOCIETY, | |
|     Plaintiff/Counter Defendant, | |
| v. | |
| HONORSOCIETY.ORG INC., | |
|     Defendant/Counter-Plaintiff | Civil Action No. 3:22-cv-00208-CWR-RPM |
| HONOR SOCIETY FOUNDATION, INC. | |
|     Defendant. | |
| HONORSOCIETY.ORG INC., | |
|     Defendant/Counter-Plaintiff/Third-Party Plaintiff | |
| v. | |
| LYNN TINCHER-LADNER, | |
|     Third-Party Defendant. | |

**EXPERT REPORT OF CRAIG T. SCHULMAN, PH.D.**

August 30, 2024

8/30/2024

Date

Craig T. Schulman, Ph.D.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

## TABLE OF CONTENTS

■    Introduction..................................................................................... 1

   A.  Qualifications ............................................................................. 1

   B.  Assignment ................................................................................ 3

   C.  Materials Considered.................................................................. 4

   D.  Compensation............................................................................. 5

■    Background Information on Honor Societies ...................................... 5

   A.  General versus Specialized Honor Societies............................... 5

   B.  PTK............................................................................................ 8

   C.  HonorSociety ............................................................................ 10

   D.  Other General Honor Societies .................................................. 11

■    PTK's Alleged Anticompetitive Acts ............................................... 13

■    Analyzing Antitrust Allegations in this Case ................................... 15

■    Market Definition............................................................................ 18

   A.  Background on the Definition of a Relevant Market .................. 18

   B.  Market Definition for Honor Societies....................................... 23

      1.  The Relevant Product is Membership Sales to Students at Community Colleges....24

      2.  PTK and HonorSociety Are Direct Competitors .................. 25

      3.  Competition From HonorSociety Impacted PTK.................. 28

      4.  Other Honor Societies That Compete With PTK.................. 29

      5.  The Relevant Product Market .............................................. 34

      6.  The Relevant Geographic Market ........................................ 36

■    PTK Possesses Market Power and Is the Dominant Firm in the Relevant Market ......... 36

■    PTK's Relationship With AACC Helps Maintain Its Dominant Position ..................... 38

■    PTK and Community College Officials Have Engaged in Coordinated Behavior to Maintain PTK's Dominant Position and Exclude Competitors .................................. 43

■    Harm to Competition........................................................................ 50

■    Antitrust Injury ............................................................................... 51

■    Antitrust Damages............................................................................ 56

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

■    **INTRODUCTION**

**A.    Qualifications**

1.    My name is Craig T. Schulman. I am a Director in the College Station, Texas office of Berkeley Research Group, LLC ("BRG") and Associate Professor of the Practice in the Department of Economics at Texas A&M University.[1] BRG is a leading global expert services and consulting firm that provides independent expert testimony, litigation and regulatory support, authoritative studies, strategic advice, and data analytics to major law firms, Fortune 500 corporations, government agencies, and regulatory bodies around the world. My business address is 2700 Earl Rudder Freeway South, Suite 4800, College Station, TX, 77845.

2.    I received my Ph.D. in Economics from Texas A&M University in 1990. My fields of specialization include industrial organization, antitrust economics, international economics, and econometrics. Industrial organization is the branch of economics that studies competition and regulation in individual markets, including the analysis of pricing, market entry, and business strategy. I started my professional career as an assistant professor in the Department of Economics at the University of Arkansas. During the 1995-1996 academic year, I served as the senior international economist in the Applied Economics Division of the U.S. International Trade Commission. From January 1998 to August 1999, I served as director of the Center for Business and Economic Research at the University of Arkansas Sam M. Walton School of Business. I also served as a member of the Arkansas Governor's Council of Economic Advisors from January 1998 to July 2001.

---

[1] I was promoted to the rank of Professor of the Practice effective September 1, 2024.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

Prior to joining BRG, I spent 10 years as a Managing Economist and Principal with the economic consulting firm LECG in College Station, Texas.

3. At Texas A&M, I currently teach undergraduate and graduate courses in economic data analytics. These courses include topical coverage of basic and advanced statistical and econometric methodology along with strategies for analyzing large, complex datasets. In the past I have taught courses in antitrust economics (undergraduate and masters levels) econometrics (undergraduate, masters and Ph.D. levels) economic forecasting (undergraduate and masters levels) and international economics (undergraduate and masters levels).

4. I have been engaged as a testifying expert and consultant in large-scale litigation in the areas of antitrust, intellectual property, international trade and general litigation. These engagements have occurred in a variety of industries, including crude-oil and natural gas leasehold markets, crude-oil markets, natural gas markets, petrochemicals, petroleum refining, petroleum product markets, heavy manufacturing, chemicals, pharmaceuticals, insurance, financial services, real estate services, consumer products, health care, and computer hardware and software. My engagements have included cases in state and federal courts, international arbitration, as well as the U.S. Federal Trade Commission ("FTC") and the U.S. International Trade Commission.

5. My curriculum vitae is attached hereto as **Attachment 1** and includes a list of the matters where I have offered expert testimony in the past four years.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

### B.    Assignment

6.    I have been retained by Counsel for Counter-Plaintiff HonorSociety.Org, Inc. (hereafter, "HonorSociety") as an independent expert witness to address the antitrust allegations put forward in HonorSociety's Second-Amended Counterclaims and Second-Amended Third-Party Complaint against Phi Theta Kappa Honor Society (hereafter, "PTK") and Third-Party Defendant Dr. Lynn Tincher-Ladner, President and CEO of PTK.

7.    I have been asked to analyze whether PTK has engaged in attempted monopolization (or will likely achieve monopoly power) regarding general honor societies serving community college students in the United States, and whether PTK's alleged anticompetitive actions serve to enhance or facilitate the exercise of any such monopoly power. I also have been asked to consider and quantify any antitrust damages suffered by HonorSociety due to PTK's alleged anticompetitive acts.

8.    HonorSociety has made a series of antitrust allegations relating to monopolization and other anticompetitive acts by PTK "intended to harm HonorSociety and drive it from the market."[2] Noting that "PTK has long been the dominant provider of honors-societies services in the relevant market,"[3] HonorSociety states, "PTK has actively engaged in a course of anticompetitive conduct designed to prevent other potential market entrants from providing services to community-college students."[4] As a result of PTK's challenged conduct, "HonorSociety has experienced a very significant decrease in its membership and

---

[2] HonorSociety.Org, Inc.'s Second-Amended Counterclaims and Second-Amended Third-Party Complaint, April 10, 2024 (hereafter, "Complaint"), ¶ 7.

[3] Complaint, ¶ 66.

[4] Complaint, ¶ 8.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

product sales,"[5] and "has lost members that would have joined HonorSociety had PTK not engaged in predatory and deceptive conduct designed to interfere with competition."[6]

9.      This report summarizes my opinions and the bases for these opinions relevant to my assessment of these issues. In conducting my investigation and forming my opinions, I have used principles, methods, facts and data commonly accepted in the fields of industrial organization and antitrust economics. My consideration of these matters is on-going. I expect to review any reports, exhibits and testimony that may arise after the filing of this report. Accordingly, my opinions are subject to revision based upon the work I may conduct or supervise in the future. I respectfully reserve the right to supplement this report based upon any such additional work and to provide additional materials that summarize, support, or explain my opinions.

## C.      Materials Considered

10.     My opinions and conclusions detailed in this report are based on the pleadings and interrogatory responses submitted in this matter; the discovery record in this matter that I have reviewed to date, including deposition transcripts and exhibits; public source materials; and my background and knowledge of industrial organization, antitrust economics and econometrics. I have been provided access to the database containing all discovery documents provided by the parties in this matter. The facts and data that I have considered are of the type reasonably relied upon by experts in my fields of industrial

---

[5] Complaint, ¶ 150.

[6] Complaint, ¶ 174.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

organization, antitrust economics, and econometrics. The documents considered in performing my analysis in this case are referenced herein and/or listed in **Attachment 2**.

### D.    Compensation

11.    BRG receives $840 per hour for my time spent working on this matter. My compensation does not depend on the outcome of this matter.

■    **BACKGROUND INFORMATION ON HONOR SOCIETIES**

12.    The Association of College Honor Societies ("ACHS") states, "An honor society is an association of primarily collegiate chapters whose purposes are to recognize and encourage high scholarship and/or leadership achievement in some broad or specialized field of study."[7] General academic honor societies accept student members regardless of academic discipline whereas specialized honor societies offer membership for specific fields of study, student characteristics or other factors.

### A.    General versus Specialized Honor Societies

13.    General honor societies are organizations accepting student members from colleges and universities not limited to a specific academic discipline or student characteristic. The ACHS[8] classifies "General Honor Societies" as those that "receive into membership from

---

[7] "Membership," Association of College Honor Societies (ACHS), https://www.achshonor.org/membership#:~:text=Classification%20of%20Honor%20Societies,as%20the%20society %20has%20established.

[8] The ACHS "was established nearly a hundred years ago to set standards for academic honor societies and serve as a certifying body to review members who petition to become members, to determine whether or not they met a set of standards which were agreed upon by honor societies." It is the only certifying body for academic honor societies. (Deposition of Curt Gomulinski, April 30, 2024, pp. 12, 16.) Mr. Gomulinski is the current President of ACHS. He also stated, "ACHS divides honor societies into upper division, for junior and seniors, and lower division, for freshman, sophomores, or community colleges, and there's a dividing between that. So honor societies are either for a lower division or upper division, not both." (p. 90).

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

a broad field of study in one or all schools and colleges of an institution who have achieved high scholarship and who fulfill such additional requirements of leadership as the society has established."[9] Dr. George Boggs, the Chair of PTK Board of Directors, stated that a general honor society "would be a society that would be open to membership regardless of your major as long as you met the requirements -- the academic requirements to become a member."[10] For example, Phi Beta Kappa, the oldest academic general honor society in the United States founded in 1776, states that its membership is open to "exemplary juniors and seniors who excelled in a rigorous arts and sciences education."[11] The Alpha Kappa Mu National Honor Society, founded in 1937, is "open to junior and senior men and women in all academic areas."[12] The Alpha Chi National College Honor Society, founded in 1922, recognizes achievements in general scholarship whose "[m]embership is limited to the top 10% of juniors, seniors, and graduate students at colleges and universities…."[13] Other general honor societies, like HonorSociety and PTK, offer membership to two-year, community college students.

14.    The ACHS classifies "Specialized Honor Societies" as those that "receive into membership persons who have demonstrated high scholarship within a specialized or given field of study of a school, college, or larger unit of a university or within a field of study of a two-

---

[9] "Membership," Association of College Honor Societies (ACHS), https://www.achshonor.org/membership#:~:text=Classification%20of%20Honor%20Societies,as%20the%20society%20has%20established.

[10] Deposition of George Boggs, April 5, 2024, p. 123.

[11] "Phi Beta Kappa Chapters," The Phi Beta Kappa Society, https://www.pbk.org/chapters-associations/about-chapters.

[12] "About AKM – Questions and Answers," Alpha Kappa Mu Honor Society, https://www.alphakappamu.org/about.html.

[13] "Frequently Asked Questions," Alpha Chi National College Honor Society, https://alphachihonor.org/member-faq.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

year college." [14] Unlike general honor societies, specialized honor societies limit membership to a specific field of study, student characteristic, type of institution or geographic location. For example, Omicron Delta Epsilon is solely for students studying economics. [15] SALUTE Veterans National Honor Society is only open to "Military Active Duty, or Honorably Discharged Veterans, who attend college at a 2-year or 4-year institution, with a 3.0+ GPA…."[16] The Alpha Beta Kappa National Honor Society is a U.S. honor society for students who attend private certificate, vocational, and trade schools. [17] Alpha Gamma Sigma is the honor society serving only California's Community Colleges system. [18]

15.    Other examples of specialized honor societies are mentioned in the record for this matter. Alpha Beta Gamma "is an National Honor Society established in 1970 to recognize and encourage scholarship among students enrolled in Business and Professional curricula at two-year degree granting institutions."[19] Psi Beta, founded in 1982, "is a national honor society for students attending two-year colleges, inviting students who plan to major or minor in psychology, as well as students who simply have an interest in psychology."[20]

---

[14] "Membership," Association of College Honor Societies (ACHS),
https://www.achshonor.org/membership#:~:text=Classification%20of%20Honor%20Societies,as%20the%20society%20has%20established.

[15] "Honoring Achievement in Economics Worldwide," Omicron Delta Epsilon: The International Honor Society for Economics, https://www.omicrondeltaepsilon.org/index.html.

[16] "Join: Individual and Chapter Memberships," SALUTE Veterans National Honor Society,
https://salute.colostate.edu/join/.

[17] The Alpha Beta Kappa National Honor Society, https://www.abkhs.org/.

[18] The California Community College Scholastic Honor Society, https://www.agshonor.org/.  *See* also, Deposition of George Boggs, April 5, 2024, pp. 120-123.

[19] "General Information," Alpha Beta Gamma, https://abg.org/general-information/; Complaint, ¶ 40.

[20] "Psi Beta: Community College National Honor Society in Psychology," Psi Beta, https://psibeta.org/; Complaint, ¶ 41.

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

Sigma Chi Eta ("SCH") "is the official community college honor society of the National Communication Association (NCA). Since 2000, SCH has fostered growth in the Communication discipline among two-year colleges and universities."[21] Sigma Kappa Delta, founded in 1996, "is the English Honor Society for Two-Year Colleges."[22] Delta Alpha Pi, founded in 2004, "is an academic honor society founded to recognize high-achieving students with disabilities who are attending colleges (including community colleges) and universities as undergraduate or graduate students."[23] Tau Beta Pi is the engineering honor society that "recognizes students who achieve distinction in their engineering studies, who are in the top ranks of their class, and demonstrate exemplary character."[24] PTK cites to three examples of specialized honor societies for community college students for nursing, business, and speech and debate.[25]

### B.    PTK

16.    PTK, an academic honor society founded in 1918, is an invitation-only honor society that recognizes students in the areas of academic excellence and leadership.[26] PTK's website

---

[21] "Sigma Chi Eta," National Communication Association, https://www.natcom.org/student-and-early-career/sigma-chi-eta; Complaint, ¶ 42. Lambda Pi Eta (LPH) also focuses on students studying communications, stating that it "is the National Communication Association's official honor society at four-year colleges and universities. LPH has more than 500 active chapters at four-year colleges and universities nationwide." ("Lambda Pi Eta," National Communication Association, https://www.natcom.org/lambda-pi-eta).

[22] "About SKD," Sigma Kappa Delta: The National English Honor Society for Two-Year Colleges, https://www.english2.org/about_skd.php; Complaint, ¶ 43.

[23] "Home," Delta Alpha Pi International Honor Society: Working for an aDAPtable World, https://deltaalphapihonorsociety.org/; Complaint, ¶ 45.

[24] Deposition of Curt Gomulinski, April 30, 2024, pp. 8-9.

[25] Deposition of George Boggs, April 5, 2024, pp. 120-123.

[26] "About PTK," PTK, https://www.ptk.org/about-ptk/; "FAQS," Phi Theta Kappa Honor Society, https://www.ptk.org/join/faqs/. According to the Complaint, ¶¶ 66-67, "PTK has long been the dominant provider of honors-societies services in the relevant market. It is over 100 years old and has members at hundreds of community colleges in the United States. PTK has long marketed itself as an elite society consisting of only the top-performing community college students."

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

states, "The American Association of Community Colleges (AACC) recognized Phi Theta Kappa as the official honor society for two-year colleges in 1929."[27] PTK believes that it is the only official honor society of two-year/community colleges,[28] and that "almost all the community colleges have a PTK chapter."[29] PTK states, "We are the most prestigious and oldest honor society serving students enrolled at associate degree granting colleges and universities."[30] PTK's services are only available to students at community colleges and it does not market to students at four-year universities.[31] Membership dues are a one-time $60 international fee, a one-time regional fee, and a one-time chapter fee based on location.[32] For example, the PTK chapter at Berkeley City College in California charges a one-time membership fee of $105 that includes the local, regional and international fees.[33]

---

[27] "FAQS," Phi Theta Kappa Honor Society, https://www.ptk.org/join/faqs/.

[28] Deposition of Lynn Tincher-Ladner, February 28, 2024, pp. 131-132; Deposition of George Boggs, April 5, 2024, pp. 113-114; and Deposition of Daniel J. Phelan, April 4, 2024, p. 132. Dr. Tincher-Ladner stated that PTK is "the largest and most prestigious honor society serving community colleges around the world." (p. 198). Upon further questioning, Dr. Tincher-Ladner clarified that when saying "serving [community] colleges around the world" she apparently meant serving colleges in the United States and U.S. territories. (pp. 198-199). She stated, "Community colleges are an American concept. It's – they're American institutions. When you get outside the United States, you don't hear the word 'community college.' There are none. We have them all in the United States." (p. 198).

[29] Deposition of Lynn Tincher-Ladner, February 28, 2024, p. 199. PTK also believes it is the official honor society for community colleges that are not members of AACC. (Deposition of George Boggs, April 5, 2024, p. 114; Deposition of Daniel J. Phelan, April 4, 2024, p. 173.) Community colleges are not required to have PTK as an honor society. (Deposition of Daniel J. Phelan, April 4, 2024, p. 98.)

[30] PTK0141249.

[31] Deposition of George Boggs, April 5, 2024, pp. 25-28. Dr. Phelan agrees that PTK engages in marketing efforts to students at community colleges. (Deposition of Daniel J. Phelan, April 4, 2024, p. 131.) Dr. Monica Marlowe stated that PTK "targets students who are enrolled at a two-year college" and does not target students at four-year colleges. (Deposition of Monica Marlowe, March 20, 2024, p. 75.) According to PTK's website eligible members are described as follows: "Students who are associate degree-seeking; 1-year certificate/diploma-seeking; bachelor's degree-seeking; part-time; workforce; transfer only (not earning an associate degree or certificate); previously earned another degree; international; dual enrolled with high school and college, etc. are eligible for membership if they meet the membership criteria stated in the local chapter's bylaws." Harmon, Chasity, "What types of students are eligible?" Phi Theta Kappa Honor Society, September 1, 2020, https://support.ptk.org/hc/en-us/articles/360036805373-What-types-of-students-are-eligible.

[32] "FAQS," Phi Theta Kappa Honor Society, https://www.ptk.org/join/faqs/. In her February 28, 2024, deposition, Dr. Tincher-Ladner stated, "We have 1280 chapters…" and "We have 4.3 million members." (pp. 29, 196).

[33] "Phi Theta Kappa Honor Society," Berkeley City College, https://www.berkeleycitycollege.edu/ptk/.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

Similarly the PTK chapter at College of Southern Nevada charges a one-time $100 fee that includes local, regional and international fees.[34] According to PTK, it offers a number of benefits to members, including scholarships, networking opportunities, career training, and discounts.[35]

## C.    HonorSociety

17.    HonorSociety, founded in 2014, "is an inclusive academic and professional achievement society."[36] It "is a new entrant to the market, launched just over a decade ago, [and] [i]n contrast with PTK's focus on exclusivity, HonorSociety markets itself both to students that have achieved academic success as well as those who aspire to do so."[37] It offers a six-month membership for $65 with higher tier membership available.[38] HonorSociety offers a number of benefits included with membership as well as scholarships.[39] HonorSociety's website states, "Our members come from all walks of life. Honor Society® is a membership club, and proud to be the most inclusive academic and professional society in the nation."[40] Mr. Michael Moradian (HonorSociety's founder and CEO) stated, "We market ourselves as an honor society, and we are much more than that and market more than that. …

---

[34] "CSN-Phi Theta Kappa (PTK)," College of Southern Nevada, https://www.csn.edu/phi-theta-kappa.

[35] "Member Benefits," Phi Theta Kappa Honor Society, https://www.ptk.org/benefits/.

[36] Complaint, ¶ 48.

[37] Complaint, ¶ 6.

[38] "How Much are the Dues to be an Honor Society Member?" HonorSociety, https://www.honorsociety.org/memberdues ;"Honor Society Tiers," HonorSociety, https://www.honorsociety.org/membership-tiers.

[39] "Scholarships Platform For All," HonorSociety, https://www.honorsociety.org/scholarships.

[40] HonorSociety, https://www.honorsociety.org. "Because HonorSociety is inclusive, welcoming students who have accomplished academic success as well as those who aspire to do so, it does not claim to limit its membership based on arbitrary criteria such as GPA. Everyone who cares about academic success is welcome to join HonorSociety and has equal access to HonorSociety's scholarship platform, benefits, and other services." (Complaint, ¶ 52.)

10

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

[HonorSociety is] "an inclusive academic and professional society."[41] The purpose of HonorSociety "was to create a platform to give all students and interested members of the general public a place to recognize their achievements, to empower them, to maximize their individual success."[42] HonorSociety "is available to, and has members in, each of the distinctive higher education markets including students in four-year universities and those in two-year community colleges, as well as alumni and others associated with higher education."[43] HonorSociety has different grade point average ("GPA") thresholds for different levels of academic recognition: "Highest Honors": 3.8 – 4.0 GPA; "High Honors": 3.5 – 3.79 GPA; "Honors": 3.2 – 3.49 GPA; and "Strength & Honor": No specified GPA.[44] After the Covid pandemic, HonorSociety has become an entirely online platform covering all schools and members.[45]

### D.    Other General Honor Societies

18.    The record in this matter specifically references other general honor societies that offer membership to college students. These are: the National Society of Leadership & Succes ("NSLS"), the National Society of Collegiate Scholars ("NSCS"), the Alpha Beta Kappa

---

[41] Deposition of Michael Moradian, January 3, 2024, pp. 99-100.

[42] Deposition of Michael Moradian, February 1, 2023, p. 95.

[43] Complaint, ¶ 51. Michael Moradian stated, "We never focused on community colleges specifically" though HonorSociety "solicit[s] invitations to students who attend two-year colleges and university programs." (Deposition of Michael Moradian, January 3, 2024, pp. 170, 292.)

[44] "HonorSociety.org Requirements & Recognition Levels," HonorSociety, https://www.honorsociety.org/requirements.

[45] Deposition of Michael Moradian, January 3, 2024, pp. 88-89.

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

Honor Society ("ABKHS"), Phi Sigma Pi and the Society for Collegiate Leadership & Achievement ("SCLA").[46]

19.    The NSLS, founded in 2001, advertises itself as "The Nation's Largest Leadership Honor Society" with 839 chapters and 2,067,590 members nationwide.[47] The NSLS states that, "We are the only accredited honor society in the nation."[48] NSLS members pay a one-time fee of $95 when applying to join the organization.[49] The NSCS, founded in 1994, advertises itself as "The #1 Most Valuable Honor Society in the U.S."[50] with "nearly 300 chapters and over a million and a half lifetime members."[51] The "NSCS Classic Membership is $97. There are no additional chapter nor annual dues."[52] The ABKHS, founded in 1977, advertises itself as "the 'premier national honor society' for America's private postsecondary schools, institutes, colleges and universities."[53] It has chapters in

---

[46] Complaint, ¶ 36. Dr. Tincher-Ladner recognizes that in addition to HonorSociety, NSLS and NSCS are also active in the community college honor society business. She also references an additional honor society serving two-year college students, "There's an honor society that serves students in California that -- Alpha Gamma Sigma or something like that." (Deposition of Lynn Tincher-Ladner, February 28, 2024, pp. 125, 131, 168-169.) Alpha Gamma Sigma, founded in 1926, is the honor society of the California Community Colleges system (The California Community College Scholastic Honor Society, https://www.agshonor.org/). Mr. Moradian, when asked to identify other inclusive honor societies, specifically identified NSLS (National Society of Leadership & Success) and SCLA (Society for Collegiate Leadership & Achievement). (Deposition of Michael Moradian, January 3, 2024, pp. 97, 329-330.)

[47] "About the National Society of Leadership and Success," NSLS, https://www.nsls.org/about.

[48] "How the NSLS Can Boost Your Resume," NSLS, https://www.nsls.org/blog/list-honor-society-on-resume#:~:text=We%20are%20the%20only%20accredited,hire%20members%20of%20the%20NSLS.

[49] "How Much is Membership to the NSLS," NSLS, https://www.nsls.org/faq#:~:text=HOW%20MUCH%20IS%20MEMBERSHIP%20TO,not%20expire%20or%20need%20renewal. NSLS is described as "an organization that provides a life-changing leadership program that helps students achieve personal growth, career success, and empowers them to have a positive impact in their community." ("About the National Society of Leadership and Success," NSLS, https://www.nsls.org/about.)

[50] "The #1 Most Valuable Honor Society in the U.S.," The National Society of Collegiate Scholars, https://nscs.org/.

[51] "How Many Chapters are There?" NSCS FAQ, https://nscs.org/faq/.

[52] "What is the Membership Fee?" NSCS FAQ, https://nscs.org/faq/.

[53] "Benefits & Privileges," Alpha Beta Kappa Honor Society, https://www.abkhs.org/Honor-Society-Contact-Ocean-View-DE.html.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

over 500 institutions including campus-based and online.[54] The ABKHS fee "for each individual membership is $50 (fees may vary for honor cords and shipping). There are no annual dues for institutions or members."[55] Phi Sigma Pi, founded in 1916, characterizes itself as "an active professional organization both locally and nationally."[56] It is "based on 120+ campuses and geographical locations throughout the United States" with "over 55,000 inducted Members."[57] Phi Sigma Pi states, "When joining directly through the National Office the membership fee is $299."[58] The Society for Collegiate Leadership & Achievement ("SCLA") "is a multi-disciplinary honor society with 100,000+ members at 600+ colleges nationwide"[59] Their lifetime membership fee is $95 with no other recurring fees.[60]

### ■ PTK'S ALLEGED ANTICOMPETITIVE ACTS

20.    HonorSociety has made a series of antitrust allegations relating to monopolization and other anticompetitive acts by PTK. HonorSociety brings a count against PTK under Section 2 of the Sherman Act, claiming "PTK has engaged in illegal attempted monopolization of

---

[54] "About US," Alpha Beta Kappa Honor Society, https://www.abkhs.org/aboutus.html.

[55] "Join US," Alpha Beta Kappa Honor Society, https://www.abkhs.org/joinus.html.

[56] "Memberships FAQs," CORE, Phi Sigma Pi National Honor Fraternity, https://core.phisigmapi.org/member/resources/member-faqs.

[57] "Memberships FAQs," CORE, Phi Sigma Pi National Honor Fraternity, https://core.phisigmapi.org/member/resources/member-faqs.

[58] "Memberships FAQs," CORE, Phi Sigma Pi National Honor Fraternity, https://core.phisigmapi.org/member/resources/member-faqs.

[59] "Frequently Asked Questions," The Society for Collegiate Leadership & Achievement, https://www.thescla.org/faq. HonorSociety mentions SCLA and NSLS as other "inclusive honor societies" (Deposition of Michael Moradian, January 3, 2024, pp. 97, 330.)

[60] "Frequently Asked Questions," The Society for Collegiate Leadership & Achievement, https://www.thescla.org/faq.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

the market for general honors societies for community-college students in the United States."[61] Specific exclusionary and anticompetitive acts alleged by HonorSociety include:

- False claims by PTK that it is "the only legitimate honors society for community-college students."[62] HonorSociety states, "PTK's claims about being the only official honor society have caused consumers in the relevant market to purchase PTK's membership services to the exclusion of competition. Those consumers would have otherwise purchased services from one of PTK's competitors in the relevant market had PTK not repeatedly published that false claim."[63]

- "PTK's anticompetitive efforts to maintain or retain dominance in the relevant market also include its use of a combination of false or misleading marketing claims designed to eliminate any competition." [64] In particular, "PTK engages in deceptive and malicious conduct designed to eliminate competition in the relevant market, including without limitation PTK's years-long efforts to make false accusations to community colleges about HonorSociety and other potential competitors in the relevant market."[65] This interference with HonorSociety's ability to communicate with community-college

---

[61] Complaint, ¶160.

[62] Complaint, ¶162. In particular, HonorSociety states, "[R]elying solely on a recognition in 1929 by an industry association that PTK was **an** official honor society for community colleges—PTK now markets itself as the '**only** official' honor society for community colleges. This implies that all community colleges exclusively recognize PTK as legitimate to the exclusion of all others. PTK's claim is false." Complaint, ¶10 (emphasis in original).

[63] Complaint, ¶11. HonorSociety states, "But secondly and importantly, there is nothing -- and I mean nothing -- to unqualified backup the statement that PTK is the officially recognized honor society serving students of associate degrees. … And so inherently, by promoting that you're the official, it implies everybody else, including any other invitation, is illegitimate. And that's a false statement. That – it's – it's anti-competitive." (Deposition of Michael Moradian, January 3, 2024, pp. 327-328, 330.)

[64] Complaint, ¶9.

[65] Complaint, ¶165.

14

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

students was done by PTK "for the purpose of excluding competition,"[66] causing "substantial damages to HonorSociety and its reputation and have deterred prospective members of HonorSociety from becoming members or caused HonorSociety's actual members to cancel their memberships and seek refunds."[67]

## ◼   ANALYZING ANTITRUST ALLEGATIONS IN THIS CASE

21.    In addition to the anticompetitive exclusionary conduct alleged above, HonorSociety has put forth claims of attempted monopolization under § 2 of the Sherman Act. The FTC describes § 2 of the Sherman Act:

> "Section 2 of the Sherman Act makes it unlawful for a company to 'monopolize, or attempt to monopolize,' trade or commerce. … The law is violated only if the company tries to maintain or acquire a monopoly through unreasonable methods. For the courts, a key factor in determining what is unreasonable is whether the practice has a legitimate business justification."[68]

22.    A monopolization inquiry typically begins by investigating whether the firm under study already possesses market (or monopoly) power which might be sustained by anticompetitive exclusionary acts or commercial practices. Baker (2013) states: "The most obvious anticompetitive exclusionary strategies directly constrain rivals by imposing costs or reducing rivals' access to customers."[69] Fumagalli, et al. (2018) state:

> "Exclusionary practices are contracts, pricing strategies and more generally actions taken by dominant firms to deter new competitors from entering an industry, to oblige rivals to exit, to confine them to market niches, or to

---

[66] Complaint, ¶165.

[67] Complaint, ¶128.

[68] "Single Firm Conduct," Federal Trade Commission, https://www.ftc.gov/advice-guidance/competition-guidance/guide-antitrust-laws/single-firm-conduct.

[69] Baker, Jonathan B. "Exclusion as a Core Competition Concern," *Antitrust Law Journal*, vol. 78, 2013, pp. 527-89, at p. 539.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

prevent them from expanding, and which ultimately causes consumer harm."[70]

An FTC Working Paper stated,

"Section 2 applies to all types of unilateral conduct by firms, and thus covers a vast range of activities. It is primarily aimed at preventing injury to competition accomplished through exclusion of rivals."[71]

23.    PTK has engaged in such exclusionary conduct to reduce the competitive influence of HonorSociety and others. In this instance, PTK has been able to leverage its dominance in the relevant market as well as relationships to college administrators in an attempt to exclude rivals, including HonorSociety, from the market.

24.    The framework for analyzing these claims from an economic perspective includes determining whether PTK has, or has attempted to acquire, durable market power in a properly defined market.[72] The next step includes analyzing whether PTK's alleged

---

[70] Fumagalli, Chiara, Massimo Motta and Claudio Calcagno, Exclusionary Practices: The Economics of Monopolisation and Abuse of Dominance, Cambridge University Press, 2018, p. 1. Francis (2022) states that exclusion is "a restraint on rivals' ability or incentive to compete ... [that] need not be complete: material burden is sufficient." Francis, Daniel, "Making Sense of Monopolization," Vol. 84, 2022, *Antitrust Law Journal*, pp. 779-839, at p. 804.

[71] Adkinson, Jr., William F.,Karen L. Grimm, and Christopher N. Bryan, "ENFORCEMENT OF SECTION 2 OF THE SHERMAN ACT: THEORY AND PRACTICE," Working Paper, November 3, 2008, p. 3, https://www.ftc.gov/system/files/documents/public_events/section-2-sherman-act-hearings-single-firm-conduct-related-competition/section2overview.pdf.

[72] In discussing "durable market power," the U.S. Department of Justice and the Federal Trade Commission state, "the persistence of market power can indicate that entry barriers exist, that further entrenchment may tend to create a monopoly, and that there would be substantial benefits from the emergence of new competitive constraints or disruptions." (Merger Guidelines, U.S. Department of Justice and the Federal Trade Commission, December 18, 2023 ("Merger Guidelines"), p. 18.). The FTC states: "The antitrust laws prohibit conduct by a single firm that unreasonably restrains competition by creating or maintaining monopoly power. Most Section 2 claims involve the conduct of a firm with a leading market position … Courts do not require a literal monopoly before applying rules for single firm conduct; that term is used as shorthand for a firm with significant and durable market power — that is, the long term ability to raise price or exclude competitors." ("Monopolization Defined," Federal Trade Commission, https://www.ftc.gov/advice-guidance/competition-guidance/guide-antitrust-laws/single-firm-conduct/monopolization-defined)

16

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

anticompetitive conduct has efficiency or procompetitive benefits, and whether there are any real or potential adverse effects on competition.[73]

25.     In addition, one must consider whether HonorSociety has been injured as a result of PTK's alleged anticompetitive behavior, and whether that injury flows from that which makes the acts anticompetitive. Finally, there must be some economic detriment to HonorSociety (e.g., its ability to attract and keep members, a negative financial impact) caused by the anticompetitive acts. Whether there is harm to any particular competitor in the market is irrelevant, unless that harm stems from conduct that also harms the competitive process generally. This is because, as is commonly stated in the antitrust literature, antitrust laws are designed to protect competition, not competitors.[74] To economists, this means that the analysis is focused on market outcomes from the customers' perspective, in this case actual or potential members of general honors societies for community-college students.

26.     The focus on customer welfare is important in antitrust analysis.[75] A business's competitive strategy need not benefit the business's rivals. Indeed, competitive moves by

---

[73] *See*, for example, "US Monopolisation Cases," *Global Competition Review*, January 28, 2021(citations omitted) ("On one hand, courts have repeatedly found no Section 2 violation based on vigorous, 'rough' competition, and have held that even driving a competitor from the market is not necessarily enough to support a claim. On the other hand, if there is no legitimate or procompetitive reason for the conduct, that is, it is done for the sole purpose of harming competition, that is most likely to be found to be 'exclusionary'.")

[74] *See*, for example, *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 483 (1977) ("The antitrust laws, however, were enacted for 'the protection of competition, not competitors.'") (quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 82 S. Ct. 1502, 320 (1962)); and *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 224 (1993) ("It is axiomatic that the antitrust laws were passed for the protection of competition, not competitors.") (citations omitted).

[75] Consumer welfare (and the closely related concept of "consumer surplus") is an economic concept that captures the benefits that consumers derive from consumption of a good or service. It is basically the economic value gained by consumers from a good/service in excess of the price they pay for it. The consumer welfare standard guides antitrust enforcers (and courts) when evaluating the competitive effects of a firm's commercial practice or the effects of a merger, and economic analysis can be used to investigate if the conduct under study will raise prices, reduce output, or stifle innovation. All else equal, any negative impact on the consumer as measured by these metrics (which underpin the consumer welfare standard) likely run afoul of antitrust laws. See, for example, Mungan, Murat C. and John M.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

one firm are typically detrimental to rivals. It is for this reason that a careful examination of the effects of conduct on competition and customers is essential for the economic analysis of antitrust allegations and claims. In general, this requires a well-defined, economically sound definition of the relevant market, in which to assess the competitive effects and market power that is challenged. This report next focuses on market definition, and subsequently analyzes the existence of market power and harm to competition in the relevant market.

■ MARKET DEFINITION

## A. Background on the Definition of a Relevant Market

27. Markets are defined to place the analysis of antitrust issues in an economically meaningful context – properly defined markets can be subject to the exercise of market or monopoly power. Antitrust markets are defined in terms of both the product/service at issue and the geographic area over which competition takes place. For antitrust purposes, the market definition task seeks to delineate an area of close competition relevant to the firms, products, and conduct at issue. Relevant markets are defined in antitrust economics so that the competitive analysis is able to discern if market power could be exercised within it.[76]

---

Yun (2023), "A Reputational View of Antitrust's Consumer Welfare Standard," *George Mason University Law & Economics Research Paper Series*, 23-05 ("The consumer welfare standard has guided antitrust agencies and courts for the past 50 years …Specifically, many antitrust decisions boiled down to a simple question: what happens to the welfare of consumers with and without the conduct at issue?"). This article was also published in the *Houston Law Review*, Vol. 61, pp. 569-611, 2024.

[76] Market power is the ability to profitably raise prices above a competitive level for a significant period of time. It may be exercised by a firm acting on its own or by a group of firms acting together. See Baker, Jonathan and Timothy Bresnahan, "Economic Evidence in Antitrust: Defining Markets and Measuring Market Power," John M. Olin Program in Law and Economics, Stanford Law School, Working Paper No. 328, September 2006. Courts have held that a firm possesses monopoly power when it has "the power to control prices or exclude competition." *United States v. E. I. du Pont de Nemours Co.,351 U. S. 377, 351 U. S. 391 (1956).*

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

As such, market definition seeks to identify the relevant competitive constraints on the firm(s) and conduct at issue.[77]

28.    It is close substitutes that one seeks to identify when defining a relevant product market, because it is close substitutes that will impose competitive discipline on the firm and conduct at issue.[78] If products or services are sufficiently close substitutes for one another, then competition among their suppliers constrains their ability to increase prices or behave anticompetitively toward its customers. Thus, at a minimum, relevant product markets include products and services that directly and actively compete with each other. Moreover, to analyze the potential for an exercise of market power, relevant product markets also include goods and services from firms that may not be current competitors, but would be competitors in response to, say, a price increase or a removal/lowering of an entry barrier or restrictive practice. That is, it may be appropriate to include potential suppliers in the relevant product market along with actual suppliers.

29.    However, as stated by Baker (2007), "[M]arket definition may not be required when market power or anticompetitive effect can be demonstrated directly through means other than inference from the number, size distribution, and other characteristics of firms."[79] Richards (2012) states,

> "[I]n retrospective analysis of the effects of past conduct, direct evidence of the actual effects of such conduct is often more probative than

---

[77] See, for example, Baker, Jonathan B., "Market Definition: An Analytical Overview," *Antitrust Law Journal*, Vol. 74, No. 1, 2007, p. 129. ("Market definition is often the most critical step in evaluating market power and determining whether business conduct has or likely will have anticompetitive effects.")

[78] *See*, for example, Motta, Massimo, *Competition Policy: Theory and Practice*, Cambridge University Press, 2009, pp. 102-103; and Baker, Jonathan B., "Market Definition: An Analytical Overview," *Antitrust Law Journal*, vol. 74, 2007.

[79] See, for example, Baker, Jonathan B., "Market Definition: An Analytical Overview," *Antitrust Law Journal,* Vol. 74, No. 1, 2007, p. 131.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

comparatively confusing and misleading market definition and market share analysis. … In the context of monopolization claims under Section 2, courts have reached a similar conclusion [that direct evidence of adverse effects on competition can show that the challenged conduct is anticompetitive] even more readily in view of the classic definition of 'monopoly power' under Section 2 as 'the power to control prices or exclude competition.' When a competitor can be shown to have acquired actual power to control price as a consequence of the challenged conduct, multiple courts of appeals have squarely held that market definition is not necessary to a Section 2 claim. Leading commentators have largely agreed."[80]

30. Similarly, the relevant geographic market is the territory in which firms that sell the relevant product are considered to be close substitutes by buyers. If a sufficient number of purchases by customers in a given geographic area would substitute to suppliers located outside that area in response to a price increase (or some other anticompetitive practice), then the price increase (or anticompetitive practice) would not be profitable and the geographic market would be defined too narrowly. Thus, the relevant geographic market includes current supply options or locations for buyers of the relevant product as well as potential substitute supplies from other locations.

31. What has become a standard analytical framework for defining relevant antitrust markets is discussed in the U.S. Department of Justice ("DOJ") and FTC Merger Guidelines ("Guidelines").[81] The Guidelines discuss several approaches that are used to identify relevant antitrust markets.

---

[80] See also, Richards, J. Douglas, "Is Market Definition Necessary in Sherman Act Cases When Anticompetitive Effects Can Be Shown with Direct Evidence," *Antitrust*, Vol. 26, 2012, pp. 53, 57, (citations omitted).

[81] "Merger Guidelines," U.S. Department of Justice and Federal Trade Commission, December 18, 2023, available at https://www.justice.gov/d9/2023-12/2023%20Merger%20Guidelines.pdf. See also, ABA Section of Antitrust Law, Market Definition in Antitrust: Theory and Case Studies, 2012, p. 19. "While these guidelines are not binding on the courts, courts have repeatedly acknowledged that the *Merger Guidelines* 'are helpful in providing an analytical framework for evaluating an acquisition.'" (citing *New York v. Kraft General Foods*, 926 F. Supp. 321, 359, n.9 (1995)).

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

"A. Direct evidence of substantial competition between the merging parties can demonstrate that a relevant market exists in which the merger may substantially lessen competition and can be sufficient to identify the line of commerce and section of the country affected by a merger, even if the metes and bounds of the market are only broadly characterized.

B. Direct evidence of the exercise of market power can demonstrate the existence of a relevant market in which that power exists. This evidence can be valuable when assessing the risk that a dominant position may be entrenched, maintained, or extended, since the same evidence identifies market power and can be sufficient to identify the line of commerce and section of the country affected by a merger, even if the metes and bounds of the market are only broadly characterized.

C. A relevant market can be identified from evidence on observed market characteristics ("practical indicia"), such as industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors.[82] Various practical indicia may identify a relevant market in different settings.

D. Another common method employed by courts and the Agencies is the hypothetical monopolist test.[83] This test examines whether a proposed market is too narrow by asking whether a hypothetical monopolist over this market could profitably worsen terms significantly, for example, by raising price."[84]

32.     The "hypothetical monopolist test" seeks to define the relevant antitrust market such that a hypothetical monopolist controlling that market would find it profitable to impose a small but significant and non-transitory increase in price (a "SSNIP").[85] If the imposition of a

---

[82] *Brown Shoe*, 370 U.S. at 325, *quoted in United States v. U.S. Sugar Corp.*, 73 F.4th 197, 204-07 (3d Cir. 2023) (affirming district court's application of *Brown Shoe* practical indicia to evaluate relevant product market that included, based on the unique facts of the industry, those distributors who "could counteract monopolistic restrictions by releasing their own supplies"). (citation in original)

[83] See *FTC v. Penn State Hershey Med. Center*, 838 F.3d 327, 338 (3d Cir. 2016). While these guidelines focus on applying the hypothetical monopolist test in analyzing mergers, the test can be adapted for similar purposes in cases involving alleged monopolization or other conduct. See, for example, *McWane, Inc. v. FTC*, 783 F.3d 814, 829-30 (11th Cir. 2015). (citation in original)

[84] Guidelines, pp. 40-41.

[85] Guidelines, Section 4.3.A ("The Hypothetical Monopolist Test").

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

SSNIP in a candidate market definition would induce enough consumers to turn to alternative products (either within the candidate geographic area or to the candidate product(s) in a different geographic area) such that the SSNIP would prove to be unprofitable, the candidate market is too narrow and must be enlarged. In this sense, antitrust market definition seeks to identify all viable substitutes – in both the product space and the geographic space – to which consumers could turn in the event of a SSNIP.

> "The purpose of defining a relevant market is to identify its participants: the group of firms which impose competitive constraints upon a particular firm or combination of firms. Thus a market's participants should include all those competitors that are positioned to discipline or constrain a monopolistic price increase, while excluding those firms that do not have that ability."[86]

33.    Customers' ability and willingness to switch among products or among suppliers in response to an increase in price, or perhaps the removal/lowering of an entry barrier or restrictive practice, is the central issue in market definition.[87] There is a broad consensus among economists and antitrust practitioners that the analytical framework for market definition in the Guidelines can be of considerable assistance in many circumstances for assessing competition issues, and provides useful methodological tools for evaluating market boundaries.[88] As stated in the Guidelines, "While these guidelines

---

[86] ABA Section of Antitrust Law, Market Power Handbook, 2005, p. 54 (citations omitted).

[87] Customer switching behavior between products in response to changes in prices is what economists call "cross-price elasticity of demand." The cross-price elasticity of demand for a product is the percentage change in the quantity of one product demanded in response to a small (e.g., one percent) change in the price of another product. If the cross-price elasticity of demand for a product outside of a proposed relevant market is large, then a hypothetical monopolist's price increase over products within a proposed relevant market is less likely to be profitable because significant customer demand will shift to outside of the proposed market in response to the hypothetical monopolist's price increase. If this were the case, then the candidate relevant market needs to be expanded to include this "outside" product.

[88] See also, Demperio, Stephanie and Jennifer Cascone Fauver, "Defining the Relevant Market in Pharmaceutical Antitrust Cases," Antitrust Healthcare Chronicle, Vol. 32, No. 1, Antitrust Section of the American Bar Association,

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

focus on applying the hypothetical monopolist test in analyzing mergers, the test can be adapted for similar purposes in cases involving alleged monopolization or other conduct."[89]

### B.    Market Definition for Honor Societies

34.    The market definition analysis that follows applies the hypothetical monopolist test in a qualitative sense, with a focus on direct evidence of substantial competition among various honor societies and the exercise of market power, to define the relevant market for this matter.[90] This hypothetical monopolist test attempts to provide a more precise framework for analyzing substitutability among potentially competing products/services. I conduct my analysis by considering businesses that are honor societies, their product offerings and geographic area(s) of supply. In particular, the candidate market of PTK as the sole supplier

---

November 2017, p. 2 ("[T]he SSNIP test for market definition is a standard tool used in antitrust matters…"); and Coate, Malcolm B. and Jeffrey H. Fischer, "A Practical Guide to the Hypothetical Monopolist Test for Market Definition," *Journal of Competition Law & Economics*, Vol. 4, No. 4, 2007, p. 1031 ("The Department of Justice (DOJ) hypothetical monopolist test is now well established as the test for market definition at the United States (US) enforcement agencies, the federal courts, and many international antitrust regimes.") (citation omitted).

[89] Guidelines, p. 41, fn. 81.

[90] Economic principles show that a monopolist (or dominant firm) charging profit-maximizing prices will face a relatively elastic demand and will find it unprofitable to further increase its price. Consequently, in attempted monopolization cases, it is inappropriate to use the hypothetical monopolist test using a SSNIP-type framework because it will lead to the incorrect conclusion that the firm faces many substitutes, that the relevant market is broad, and that dominance does not exist when, in fact, it does. In antitrust economics, this is the well-known *Cellophane* fallacy. *See*, for example, Guidelines, pp. 42-43; and Church, Jeffrey and Roger Ware, Industrial Organization: A Strategic Approach, McGraw Hill, 2000, p. 619. PTK stated, "Increasing fees to membership creates decline in enrollment. In general, 1% increase in prices leads to a 2.62% decrease in membership." (PTK0208948-PTK0208954 at PTK0208953). According to this information, PTK's estimated price elasticity of demand is -2.62. This relatively elastic demand for PTK's membership sales indicates that if it were to raise its price (all else equal), it would collect lower membership revenue as prospective PTK members would either seek membership from competing honor societies or chose not to purchase at all. However, as the *Cellophane fallacy* cautions, even if PTK were facing such a relatively elastic demand (indicating the presence of economic substitutes), this does not mean that PTK lacks market power or is not the dominant firm in the relevant market.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

of general honor society memberships for two-year community colleges is gradually expanded to encompass all potential sources of close substitution.

1. **The Relevant Product is Membership Sales to Students at Community Colleges**

35.    PTK does not compete with general honor societies who only seek memberships from students attending four-year institutions. Its services are only available to students at community colleges and it does not market to students at four-year universities.[91] Put another way, community college students interested in purchasing honor society services do not have the option to acquire those services from organizations limited to students at four year institutions – such services are not a *substitute* for the services offered by PTK. PTK's constitution restricts its focus to community college students,[92] and it does not have chapters at four-year colleges or universities or at professional schools like medical schools or law schools.[93] PTK "has [not] expanded into the baccalaureate market," and has never considered expanding its services to students other than those at community colleges.[94] Dr. Tincher-Ladner considers PTK the only official honor society serving community colleges.[95] When asked if there has ever been any confusion between Phi Theta Kappa and Phi Beta Kappa, Dr. Boggs responded, "No, because Phi Beta Kappa's exclusively in the four-year institution space and Phi Theta Kappa's in the two-year community college

---

[91] Deposition of George Boggs, April 5, 2024, pp. 25-28. Dr. Marlowe stated that PTK "targets students who are enrolled at a two-year college" and does not target students at four-year colleges. (Deposition of Monica Marlowe, March 20, 2024, p. 75.)

[92] Deposition of George Boggs, April 5, 2024, p. 26.

[93] Deposition of George Boggs, April 5, 2024, pp. 25-26. Dr, Boggs states, "I would doubt that they would -- that PTK would be involved in anything above an associate degree-granting institution … PTK's services are only available to students at community colleges." (p. 27)

[94] Deposition of George Boggs, April 5, 2024, p. 27.

[95] Deposition of Lynn Tincher-Ladner, February 28, 2024, p. 269.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

space."[96] As an example of how honor societies differ between two- and four-year schools, the National Communication Association ("NCA") has two "official" honor societies for students studying communications: Lambda Pi Eta "is the National Communication Association's official honor society at *four-year* colleges and universities"; and Sigma Chi Eta which "is the official *community college* honor society of the National Communication Association (NCA)."[97]

36.    General honor societies like PTK and HonorSociety do not compete with, though may be complementary to, specialized honor societies. For example, Dr. Boggs provided three examples of specialized honor societies for community college students limited to three specific academic disciplines – nursing, business, and speech and debate.[98] When asked if PTK considered the honor society for nursing community college students to be a competitor, he responded, "No, I don't believe PTK considers any of the specific subject matter honor societies to compete with Phi Theta Kappa … Because it's not a general honor society, and students are free to join PTK and one of the specific subject matter societies."[99]

## 2.    PTK and HonorSociety Are Direct Competitors

37.    Tracee Walker, PTK's Director of Marketing and Communications, stated in an internal email dated January 17, 2018, "This is a brief comparison of PTK, HonorSociety.org and NSCS (National Society of Collegiate Scholars). I asked if she was aware of any others

---

[96] Deposition of George Boggs, April 5, 2024, p. 257.

[97] "Sigma Chi Eta," National Communication Association, https://www.natcom.org/student-and-early-career/sigma-chi-eta; "Lambda Pi Eta," National Communication Association, https://www.natcom.org/lambda-pi-eta (emphasis added).

[98] Deposition of George Boggs, April 5, 2024, pp. 122-123.

[99] Deposition of George Boggs, April 5, 2024, p. 123.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

that advisors encounter, and she said in her experience those were the two that gave us the most head-to-head competition."[100]

38.    Dr. Phelan testified that he is not aware of any organizations or companies, other than HonorSociety, that PTK has identified as being a competitor in providing services to students at community colleges.[101] Dr. Tincher-Ladner testified that she learned about HonorSociety in 2017 when "they were sending invitations to some of our students … When I say 'our,' I mean community colleges."[102] On March 11, 2017, Dr. Tincher-Ladner stated, "This is an email from the competition" in reference to a correspondence she forwarded to several of her colleagues containing a student's HonorSociety Acceptance Letter.[103] An internal PTK email dated October 17, 2018 stated, "We keep hearing from Membership Services that honorsociety.org is a major threat."[104] When asked if PTK currently has any competition in the honor society space, Dr. Tincher-Ladner responded, "Yeah, we have an unfair competitor, unfair competition with … honorsociety.org."[105] When asked whether there are any other honor societies, other than PTK, that are available to community college students and a competitor to PTK, Dr. Phelan mentioned "Honor Society."[106]

---

[100] PTK0014031.

[101] Deposition of Daniel J. Phelan, April 4, 2024, pp. 190.

[102] Deposition of Lynn Tincher-Ladner, February 28, 2024, p. 143.

[103] Deposition of Lynn Tincher-Ladner, February 28, 2024, Exhibit 135. "Q. Well, I mean, as we saw in Exhibit 135, Honor Society was on your radar screen in 2017, right? They were the competition. A. Yeah, which I forwarded them to deal with, like 'check this out' . … Q. Did you consider what Honor Society was doing by sending this invitation in 2017 to be fair competition? A. In 2017? Q. Yeah. A. I don't know." (pp. 167, 185).

[104] PTK0132161 (email from Tracee M. Walker, PTK's Director of Marketing and Communications).

[105] Deposition of Lynn Tincher-Ladner, February 28, 2024, p. 168.

[106] Deposition of Daniel J. Phelan, April 4, 2024, pp. 141-142, 254.

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

39.     PTK and HonorSociety recognized each other as competitors for honor society memberships for students at community colleges. For example, an email from Monica Marlow and Fredrica Tyes, stated, "████████████████████████████████████ ████████████████████████████████████"[107] When asked about HonorSociety's product bundles, Dr. Tincher-Ladner stated, "███████████████████ ████████████████████████████████████████████ ██████████████████████"[108] When asked why she and Ms. Tyes were looking at the honorsociety.org website around June 2022, Dr. Tincher-Ladner stated, "During this time we were looking at everything …Every little thing, yeah. Trying to figure out things and research and – yeah."[109] Mr. Moradian mentioned "Phi Theta Kappa" (and three other honor societies) in discussing Exhibit 37 (a text from Mr. Moradian dated July 24, 2020) to his deposition wherein he wrote, "list all their prices, and we'll align near them. … our operations team wanted to understand pricing."[110] An HonorSociety email which contained the question "Who are your direct and indirect business competitors' websites?" lists "https://www.ptk.org/" (among other websites).[111]

40.     PTK's former Director of Scholarship, Christin Grissom, received an invitation to join HonorSociety.[112] In January 2018, she was instructed by PTK's Tracee Walker, PTK's Director of Marketing and Communications, "████████████████████████████████

---

[107] PTK0047106-PTK0047107. This is Exhibit 146 to Lynn Tincher-Ladner's February 28, 2024 deposition. *See* also p. 245 of this deposition.

[108] Deposition of Lynn Tincher-Ladner, February 28, 2024, p. 244.

[109] Deposition of Lynn Tincher-Ladner, February 28, 2024, pp. 245-246.

[110] Deposition of Michael Moradian, February 1, 2023, pp. 255-256. Mr. Moradian believed that the pricing reference referred to pens.

[111] Deposition of Michael Moradian, January 3, 2024, Exhibit 30 and p. 216.

[112] PTK0143370 - PTK0143371.

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**



"[113] Ms. Walker also stated:

"[114]

### 3. Competition From HonorSociety Impacted PTK

41.     PTK and HonorSociety directly compete for membership from students enrolled at two-year community colleges, and membership gains by HonorSociety have had a detrimental effect on PTK.[115] According to Dr. Tincher-Ladner, HonorSociety was having an impact on PTK's membership numbers starting in 2020, and in "2020, 2021, 2022, my, you know, concerns grew through that time in regard to that."[116] When asked what was the financial impact for PTK of students being confused in joining HonorSociety rather than PTK, Paige Chandler (PTK's Chief Financial Officer) responded, "our membership revenue has seen a consistent decline" since 2015.[117] Dr. Boggs stated, "Well, we -- we sometimes have

---

[113] PTK0143370.

[114] PTK0143370 - PTK0143371 (emphasis added).

[115] While HonorSociety's annual percentage change in gross revenue was +28.9% and +37.0% in 2017 and 2018, respectively, PTK's membership revenue fell by -1.0% and -4.9% in those same periods. (HS_129481; PTK0072078; PTK0007501; PTK0003962; and BRG calculations.)

[116] Deposition of Lynn Tincher-Ladner, February 28, 2024, p. 144.

[117] Deposition of Paige Chandler, March 18, 2024, p. 43. When asked if she had any discussions with anyone regarding the cause of declines in membership since 2016, she stated, "Sure. … Well, of course I'm aware that there has been confusion among our students between us and HonorSociety.org. There -- I do know that community college enrollment has been down." (p. 45).

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

losses in membership, so that can cause a decrease in revenue."[118] When asked what might cause a loss in PTK membership, he responded, "Well, I think one cause, of course, is the enrollment changes in the colleges themselves. Another, we believe, is confusion about the Honor Society versus Phi Theta Kappa, that students are being misled into joining the Honor Society."[119] Dr. Boggs described a discussion between him and another PTK Board member, Mary Linder, concerning HonorSociety's impact on PTK's revenues and membership. He stated, "So that is a significant -- in her opinion, is a significant factor in the loss of potential membership for PTK."[120]

42.     An October 1, 2017 email from Heather Yush, PTK's Director of Member Services, stated:

> "We are growing increasingly concerned about the negative impact that 'competitors' are having on our membership numbers. Namely, HonorSociety.org and National Society for Leadership & Success (AKA Sigma Alpha Pi). … Also, we've heard of an uptick in activity with NSLS (AKA Sigma Alpha Phi)."[121]

### 4.     Other Honor Societies That Compete With PTK

43.     The record indicates that PTK competes with several other general honor societies in addition to HonorSociety. Dr. Tincher-Ladner stated that in addition to HonorSociety, the NSLS, NSCS, as well as the California-focused Alpha Sigma Gamma, compete with PTK for community-college honor society members. She testified:

---

[118] Deposition of George Boggs, April 5, 2024, p. 51.

[119] Deposition of George Boggs, April 5, 2024, p. 51.

[120] Deposition of George Boggs, April 5, 2024, pp. 137-138.

[121] PTK0050209; PTK0050210.

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

"Q. Are you aware of any other competitors -- are you aware of PTK ever having any competitors other than Honor Society in the community college Honor Society space?

A.  And then I would describe Honor Society currently as the unfair competitor among all of those folks.

Q. Do you consider those other folks to be fair competitors?

A. I have not -- I don't look at them as -- I would say yeah, compared to honorsociety.org, I would consider them fair competitor -- competition."[122]

44.    PTK emails and documents primarily discuss NSLS, NSCS, HonorSociety and Golden Key National Honor Society and their competitive significance/offerings relative to PTK. For example:

- A PTK informational document compares ███████████████████ ████████████████████████████████████████████ ████████████████████████████████████████[123]

- A PTK email dated January 30, 2018 requests ████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████          ████████████████

---

[122] Deposition of Lynn Tincher-Ladner, February 28, 2024, pp. 168-169. Other than Honor Society, Dr. Phelan is not aware of any organizations or companies that PTK has identified as being a competitor in providing services to students at community colleges. (Deposition of Daniel J. Phelan, April 4, 2024, pp. 190, 254-255.)

[123] PTK0091540-PTK0091553 at PTK0091549.

[124] "Debbra Esparza," LinkedIn, https://www.linkedin.com/in/webdebb/; "Esparza to Receive Phi Theta Kappa Alumni Achievement Award," Phi Theta Kappa Honor Society,

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**



---

https://web.archive.org/web/20240522073337/https://www.ptk.org/2018/02/13/esparza-to-receive-phi-theta-kappa-alumni-achievement-award/.

[125] PTK0182311.

[126] PTK0060316 (October 18, 2017, email from Phylliss Duvall to Lynn Tincher-Ladner).

[127] PTK0013634 (September 6, 2019, email from Kierra Handy).

[128] PTK0143183 (August 9, 2019, email from Tracee Walker).

[129] PTK0208948-PTK0208953 at PTK0208953.

[130] PTK0141513 (February 24, 2016, email from Melissa Meyer to Nancy Rieves).

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**



---

[131] PTK0142648 (December 20, 2018, email from Lynn Tincher-Ladner).

[132] PTK0182405 (December 6, 2016, email from Heather Yush, PTK Director of Member Services).

[133] PTK0183867 - PTK0183868.

[134] PTK0142332 (February 9, 2016, email from Heather Johnson to Lynn Tincher-Ladner).

[135] PTK0142721 (February 9, 2016, email from Lynn Tincher-Ladner to Clay Meyer).

[136] PTK0182313 (October 5, 2017, email from Katherine Scanlon).

[137] "Alpha Pi Theta (PTK)," Brookdale Community College, https://www.brookdalecc.edu/alpha-pi-theta-ptk/.

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**



”138

- “ ”139

- ”140

- ”141

-

---

138 PTK0141549.

139 PTK0142414 (April 15, 2019, email from Tracee Walker to Katherine Scanlon), (emphasis in original).

140 PTK0183825. While this email refers to NSCS as "NCSC", the link to the article being discussed pertains to NSCS.

141 PTK0142706-PTK0142707.

142 PTK0142941.

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**



[REDACTED]"[144]

45.    Golden Key National Honor Society is explicitly referenced by PTK and HonorSociety.

[REDACTED]

[REDACTED]"[147] Mr. Moradian also referenced Golden Key National Honor Society.[148]

### 5.    The Relevant Product Market

46.    As discussed in **Section II**, HonorSociety, NSLS, NSCS and Golden Key National Honor Society are general honor societies that compete with PTK for community college student memberships. Sigma Kappa Delta is also mentioned in one PTK document that I reviewed.

---

[143] PTK0142941.

[144] PTK0142941.

[145] PTK0141513 (February 24, 2016, email from Nancy Rieves to Melissa Meyer). See also PTK0182311.

[146] Deposition of Curt Gomulinski, April 30, 2024, p. 89.

[147] "Apply for Membership," Golden Key International Honour Society, https://www.goldenkey.org/golden-key-eligibility/.

[148] Deposition of Michael Moradian, January 3, 2024, pp. 95, 178.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

However, since this organization describes itself as "the National English Honor Society for Two-Year Colleges,"[149] I consider it a specialized, and not general, honor society.[150]

47.    A relevant product market is defined to be "any grouping of sales whose sellers, if unified by a hypothetical cartel or merger, could profitably raise prices significantly above the competitive level."[151] That is, if a bundle of sales could be profitably priced higher if sold by a monopolist rather than competitive firms, the products in that set form a relevant market. As discussed in **Section V.A**, the assessment for whether this condition is satisfied is known as the "hypothetical monopolist test." The hypothetical monopolist test in this matter informs what would happen in the event of a hypothetical merger involving PTK, HonorSociety, NSLS, NSCS and Golden Key. Because there are no other comparable general-honor-society products available in the marketplace to which community college students could substitute other than those offered by these firms, their (hypothetical) merger would have formed a hypothetical monopolist capable of exercising monopoly power.

48.    The record evidence indicates that the product offerings from PTK, NSLS, NSCS, HonorSociety and Golden Key are sufficiently close substitutes to be placed in the same relevant product market. Moreover, the "qualitative" hypothetical monopolist test supports that the bundle of services offered by these general honor societies to two-year college

---

[149] "Sigma Kappa Delta", Sigma Kappa Delta, https://www.english2.org.

[150] Dr. Tincher-Ladner stated that she had never heard of SCLA when Dr. Phelan asked her about them (Deposition of Daniel J. Phelan, April 4, 2024, p. 255; PTK0132371). Both Alpha Beta Kappa and Phi Sigma Pi appear to be less significant honor societies in that while they may seek student memberships from community colleges, they do so in a minor way. While these three honor societies may be in the relevant market to some minor degree, their inclusion or exclusion in it does not alter any of my opinions or conclusions.

[151] Areeda, Philip E. and Herbert Hovenkamp, <u>Antitrust Law: An Analysis of Antitrust Principles and Their Application</u>, Aspen Publishers, 2024, ¶ 533b.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

students is a relevant product market for evaluating the antitrust/competition claims in this matter.

### 6.    The Relevant Geographic Market

49.    Given the commercial realities of honor societies that serve U.S. community college students, the relevant product market defined above is associated with a geographic market that encompasses the United States (including its territories).[152] Dr. Tincher-Ladner stated:

> "Community colleges are an American concept. It's – they're American institutions. When you get outside the United States, you don't hear the word 'community college.' There are none. We have them all in the United States."[153]

50.    Though PTK may have chapters outside the contiguous United States,[154] non-U.S. honor societies are not substitutes for those located in the United States for U.S. community college students seeking honor society membership.

■    **PTK POSSESSES MARKET POWER AND IS THE DOMINANT FIRM IN THE RELEVANT MARKET**

51.    PTK is the dominant incumbent honor society in the relevant market. In 1997, PTK was described as follows: "Established by Missouri college presidents in 1918, Phi Theta Kappa is recognized as the largest honor society in higher education with more than one million

---

[152] Deposition of Lynn Tincher-Ladner, February 28, 2024, p. 199. See also, "Geographic Market Definition," Note by the United States, OECD Working Party No. 3 on Co-operation and Enforcement, November 8, 2016, p. 2 ("In *Brown Shoe, Inc. v. United States*, the U.S. Supreme Court instructed that the geographic market employed in a given case must 'both correspond to the commercial realities of the industry and be economically significant,' requiring a 'pragmatic, factual approach' to market definition, rather than a formalistic one."). Citation omitted.

[153] Deposition of Lynn Tincher-Ladner, February 28, 2024, p. 198.

[154] Deposition of George Boggs, April 5, 2024, p. 21. When asked if schools outside the U.S. are PTK members, Dr. Boggs stated, "There are. For example, the British Virgin Islands, Guam, which I think is a U.S. territory. So there are -- there are a few international members. Probably Canadians. Probably some Canadians."

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

members and 1,200 chapters located in all fifty states…"[155] As I discussed above, PTK currently states that it is the most prestigious and oldest honor society serving U.S. community college students, and that virtually all U.S. community colleges have a PTK chapter. This dominance has allowed PTK to act to exclude or limit competitors in the manner described below in **Sections VII, VIII and X**. The power to exclude or limit competition is symptomatic – and allows for the maintenance – of PTK's durable market power.[156]

52.    In discussing "durable market power," the U.S. antitrust agencies state "the persistence of market power can indicate that entry barriers exist, that further entrenchment may tend to create a monopoly, and that there would be substantial benefits from the emergence of new competitive constraints or disruptions."[157] The FTC states,

> "The antitrust laws prohibit conduct by a single firm that unreasonably restrains competition by creating or maintaining monopoly power. Most Section 2 claims involve the conduct of a firm with a leading market position … Courts do not require a literal monopoly before applying rules for single firm conduct; that term is used as shorthand for a firm with significant and durable market power — that is, the long term ability to raise price or exclude competitors."[158]

Church and Ware (2000) state:

---

[155] Berry, David A., Emma Jo Marshall and Dane U. Eisenberg, Community Conversations: Toward Shared Understandings of American Identity, Phi Theta Kappa International Honor Society and the Community College Humanities Association, 1997, p. 61.

[156] Kaplow and Shapiro (2007) states, "…[O]ne may be able to infer the presence of market power from the challenged conduct itself. If we observe a firm engaging in a practice that could not be profitable unless it enhanced the firm's market power to some certain degree, we may then infer that market power would indeed increase to that degree." (Kaplow, Louis and Carl Shapiro, "Antitrust," Chapter 15, Handbook of Law and Economics. Vol. 2, 2007, A. Mitchell Polinsky and Steven Shavell (eds.), p. 1094.)

[157] Merger Guidelines, U.S. Department of Justice and the Federal Trade Commission, December 18, 2023, p. 18.

[158] "Monopolization Defined," Federal Trade Commission, https://www.ftc.gov/advice-guidance/competition-guidance/guide-antitrust-laws/single-firm-conduct/monopolization-defined.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

Maintenance of market power requires barriers that prohibit or restrict entry of new firms. .... From the perspective of firms, entry barriers are required to protect an incumbent's market power. ... [I]ncumbent firms can make strategic investments and engage in other behavior that magnifies the effect of, or creates, structural entry barriers and shelters both their market power and monopoly profits."[159]

■ **PTK'S RELATIONSHIP WITH AACC HELPS MAINTAIN ITS DOMINANT POSITION**

53.     PTK's President & CEO Dr. Tincher-Ladner maintains a close relationship with The American Association of Community Colleges ("AACC'), "the primary advocacy organization for the nation's community colleges … represent[ing] more than 1,000 2-year, associate degree-granting institutions and nearly 12 million students."[160] PTK is listed by AACC as an Affiliated Council,[161] and Dr. Tincher-Ladner was appointed to serve on AACC's Board starting July 1, 2022.[162] PTK advertises that, "PTK is recognized as the official honor society for associate degree-granting colleges by the American Association of Community Colleges (AACC)."[163] When asked if PTK is the only official honor society for community colleges, Dr. Boggs, the current chair of PTK's Board of Directors testified as follows:

        "Yes, that's correct.

---

[159] Church, Jeffrey and Roger Ware, <u>Industrial Organization: A Strategic Approach</u>, McGraw Hill, 2000, pp. 113, 115.

[160] "About Us," American Association of Community Colleges, https://www.aacc.nche.edu/about-us/. Dr. Phelan describes the AACC as "the lead national voice for community colleges. … By its charter, the American Association of Community Colleges is focused on two-year institutions." (Deposition of Daniel J. Phelan, April 4, 2024, pp. 22, 27.)

[161] "List of Affiliated Councils," American Association of Community Colleges, https://www.aacc.nche.edu/about-us/affiliated-councils/list-of-affiliated-councils/.

[162] "Tincher-Ladner to Serve on American Association of Community Colleges' Board of Directors," Phi Theta Kappa Honor Society, https://web.archive.org/web/20240522074532/https://www.ptk.org/2022/05/23/tincher-ladner-to-serve-on-aacc-board-of-directors/.

[163] "Community Colleges Provide a Smart Start," Phi Theta Kappa Honor Society, https://web.archive.org/web/20240520131553/https://www.ptk.org/by-dr-lynn-tincher-ladner/.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

Q. What is that understanding based on?

A. Based on the action of the AACC board back in 1929 and the close relationship that I mentioned earlier, that the presidents of AACC have served on the Phi Theta Kappa board and there's -- there were two joint conventions. PTK plays a pretty significant role in the annual convention of AACC. And I would bet if you ask any community college president what the official honor society is, they would tell you PTK."[164]

"Well, if you ask any community college president what the international honor society for their students is, they would identify Phi Theta Kappa. So I believe you have the records that Phi Theta Kappa was recognized by AACC as the official honor society for community colleges, I think it was in 1929, and Phi Theta Kappa and AACC have been pretty integrally involved with each other. They've had two joint conventions over the years; I mentioned the last four presidents of AACC have served on the board. … So -- so there seems to be a continuing understanding that Phi Theta Kappa is the legitimate honor society for community college students."[165]

54.    When asked about the basis for his understanding that since 1929 PTK has been the official honor society of community colleges, Dr. Phelan, a current member of PTK's Board of Directors stated:

"That's always been my understanding. Literature that I read in the past; the fact that Walter Bumphus [current AACC President and CEO] himself served on this board; that Lynn Tincher-Ladner, president and CEO of Phi Theta Kappa, currently sits on the AACC board; the fact that AACC has space on its agenda in the conference for Phi Theta Kappa recognitions for students and advisers, donors. … The basis for me is -- the basis of my understanding is historical and seeing it in publications and the fact that I see the interrelationship regularly, every year."[166]

---

[164] Deposition of George Boggs, April 5, 2024, pp. 113-114.

[165] Deposition of George Boggs, April 5, 2024, pp. 109-110.

[166] Deposition of Daniel J. Phelan, April 4, 2024, pp. 133, 134.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

55.    PTK's interaction with AACC (other than having Dr. Tincher-Ladner serve on its Board) is documented on AACC's website.[167] PTK is also involved with AACC through PTK's Presidential Advisory Board ("PAB"), "a group of community college presidents that represents states across the country. That group meets a couple of times a year."[168] When asked about the PAB meetings, Dr. Boggs stated that "they're usually held in conjunction with other conferences that would – presidents would come to, such as the PTK convention or [the] AACC [annual convention]."[169] He continued, "Dr. Tincher-Ladner usually calls the meeting to order and has an agenda for the meeting. Usually it's an update on PTK activities."[170] When asked when PTK's PAB started, Dr. Boggs replied, "It started after Dr. Tincher-Ladner became CEO -- president and CEO, so, you know, I would guess maybe 2018, somewhere around there."[171] Dr. Boggs stated that the first time he ever heard of Honor Society "was at one of those Presidential Advisory Board meetings,"[172] and "a frequent topic the presidents bring up" that "has come up repeatedly" at PAB meetings concern losses in PTK membership that were attributable to confusion about

---

[167] See, for example, "In DC, on **February 8** [2017]**,** Phi Theta Kappa President and CEO Dr. Lynn Tincher-Ladner visited the AACC offices to provide me [Dr. Walter G. Bumphus, current President and CEO, AACC] with an update on the new PTK strategic plan." ("Where's Walter Archive," American Association of Community Colleges, https://www.aacc.nche.edu/publications-news/ceo-to-ceo/wheres-walter-archive/), (emphasis in original); and "On June 30 [2020], I [Dr. Walter G. Bumphus. President and CEO, AACC] participated in a call of The Six. Dr. Lynn Tincher-Ladner, president and CEO of Phi Theta Kappa, along with two of her student officers: Lavada Burse, PTK International President from Grayson College in Texas, and Elena Wong, PTK International Vice President for Division III from Oakland Community College in Michigan. They discussed several PTK initiatives and how students are adapting in the COVID-19 environment." ("Where's Walter Archive," American Association of Community Colleges, https://www.aacc.nche.edu/publications-news/ceo-to-ceo/wheres-walter-archive/).

[168] Deposition of George Boggs, April 5, 2024, p. 55. Dr. Boggs initially referred to the Presidential Advisory Board as the Presidential Advisory Council but later corrected this in his deposition (p. 61).

[169] Deposition of George Boggs, April 5, 2024, pp. 56, 62.

[170] Deposition of George Boggs, April 5, 2024, p. 57.

[171] Deposition of George Boggs, April 5, 2024, p. 59.

[172] Deposition of George Boggs, April 5, 2024, p. 71.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

HonorSociety.[173] He listed four community college officials who were on PTK's PAB,[174] two of which are also listed as AACC "Advisory Board Members" – Mary Graham (President, Mississippi Gulf Coast Community College) and Joe May (Chancellor, Dallas County Community College District).[175] Dr. Boggs remembered talking about the issue of confusion between HonorSociety and PTK at PAB meetings with Mary Graham, which has "come up regularly."[176]

56.    Dr. Monica Marlowe, the executive director of the Phi Theta Kappa Foundation and PTK's Chief of Staff,[177] describes PTK's PAB as a board of presidents from community colleges across the country "who meet in an advisory capacity … [that more than once] have expressed concern about other Honor Societies … that students were confused about thinking they were joining PTK and it not being Phi Theta Kappa."[178] The PAB Meeting Minutes dated October 17, 2019 stated, "Dr. Tincher-Ladner discussed at the last PAB Meeting students join other honor societies by mistake - honorsociety.org is one of the worst. Need assistance of PAB to help communicate problem."[179]

---

[173] Deposition of George Boggs, April 5, 2024, p. 55.

[174] Deposition of George Boggs, April 5, 2024, p. 57.

[175] "Advisory Board Members," American Association of Community Colleges, https://www.aacc.nche.edu/programs/workforce-economic-development/expanding-community-college-apprenticeships/advisory-board-members/.

[176] Deposition of George Boggs, April 5, 2024, pp. 57-59.

[177] PTK0047106- PTK0047107.

[178] Deposition of Monica Marlowe, March 20, 2024, pp. 58-59, 61, 62.

[179] PTK0064023. The PAB Meeting Minutes, October 17, 2019, are Exhibit 177 to Dr. Marlowe's deposition. PTK also used the PAB to address the presence of other honor societies. For example, when Dr. Phelan asked Dr. Tincher-Ladner about her knowledge of SCLA and how PTK should respond to them, she stated, "I have never heard of them" and replied, "I am going to get some support from the PAB and the BOD – some recommendations at the next meeting. Maybe you and I can have coffee at AACC and go over any final plans. Then, it is on." (PTK0132371 – PTK0132373 at PTK0132371, PTK0132373.)

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

57.    PTK uses its relationships with AACC to help maintain PTK's dominant position as the "official" honor society for community college students. In addition to Dr. Tincher-Ladner being on AACC's Board and the PTK PAB's relationship with AACC, Dr. Boggs, a former President and CEO Emeritus of AACC, has been the chair of PTK's Board of Directors since 2016, and served as its vice chair starting in 2006 during his tenure as AACC's President/CEO from 2000 to 2010.[180] Dr. Daniel J. Phelan, a member of PTK's board since 2016, when asked how he came to be on PTK's Board responded, "Actually, I was serving on the American Association of Community Colleges' board at the time."[181]

58.    Moreover, the PTK PAB:

> "consists of college presidents who provide input into the Society's strategic plan, priorities, and direction. Specific duties include advocating for Phi Theta Kappa, its members, and its mission; serving as a liaison between Phi Theta Kappa Headquarters and the college leaders in the president's state."[182]

59.    Dr. Tincher-Ladner, in letters to two community college administrators expressing her concern about other honor societies opening chapters, stated:

> "It is also the responsibility of college presidents to appoint chapter advisors. This partnership represents a strong and long-standing commitment to student success, and I believe that Phi Theta Kappa's

---

[180] Deposition of George Boggs, April 5, 2024, p. 111. *See* also, "Boggs, Karpinski Elected to Lead Phi Theta Kappa Board of Directors," Phi Theta Kappa Honor Society, https://web.archive.org/web/20240520114741/https://www.ptk.org/2021/02/04/boggs-karpinski-elected-to-lead-phi-theta-kappa-board-of-directors/.

[181] Deposition of Daniel J. Phelan, April 4, 2024, pp. 11-12, 13.

[182] "Presidential Advisory Board," Phi Theta Kappa Honor Society, https://www.ptk.org/leadership/presidential-advisory-board/.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

sustainability is largely a result of strong partnerships with college leaders on each campus."[183]

███ **PTK AND COMMUNITY COLLEGE OFFICIALS HAVE ENGAGED IN COORDINATED BEHAVIOR TO MAINTAIN PTK'S DOMINANT POSITION AND EXCLUDE COMPETITORS**

60.     A firm engages in monopolization (or attempted monopolization) when it engages in exclusionary acts that create, strengthen, or preserve a monopoly (or dominant) position in a relevant antitrust market, other than simply winning business on the merits of its products compared to those of its competitors. PTK and community college officials have engaged in coordinated behavior to maintain PTK's dominant position and exclude competitors. In particular, community college officials alerted PTK when other honor societies attempted to open a chapter on their campuses. For example, an email from Josephine Fritts (Ozarks Technical Community College, Special Academics Program Instructor and PTK Regional Coordinator) to Dr. Tincher-Ladner and Blake Ellis stated, "█████████████ ████████████████████████████████████████████████ ████████████████████████████"[184] In this email chain that contained a St. Louis Community College student's acceptance letter into NSLS, Ms. Church stated, "████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████"[185]

---

[183] PTK0142791-PTK0142792 at PTK0142791 (letter to Dr. Higdon, Chancellor, Ozarks Technical Community College, October 15, 2017); PTK0093777-PTK0093778 at PTK0093777 (letter to Mario K. Castillo, Vice Chancellor and General Counsel, Lone Star College, June 28, 2017).

[184] PTK0182985-PTK0182989 at PTK0182985. Stephanie Church is the "Coordinator Campus Life & College Transition at St. Louis Community College Wildwood at Saint Louis Community College." ("Stephanie Church," LinkedIn, https://www.linkedin.com/in/stephanieachurch/.)

[185] PTK0182985-PTK0182989.

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

61. ███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████[186]██
███████████████████████████████████████████
███████████████████████████████████████████
████████████████████████[187]

62. ███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
██████████████████████████████ ███████████
███████████████████████████████████████████
███ ██ ████████████████████████████████████
███████████████████████████████████████████
█████████████████████████████████████████



---

[186] PTK0142739.

[187] PTK0142739.

[188] PTK0142198.

[189] PTK0142198.

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**



---

[190] PTK0005269.

[191] PTK0005269.

[192] PTK0142785.

[193] "Chancellor's Bio," Ozarks Technical Community College, https://about.otc.edu/chancellor/chancellor-bio/.

[194] "Presidential Advisory Board," Phi Theta Kappa Honor Society, https://www.ptk.org/leadership/presidential-advisory-board/; PTK0064023.

[195] PTK0142785.

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**



65.

66.

67.

[196] PTK0142791-PTK0142792 at PTK0142791.

[197] PTK0142785.

[198] PTK0142785.

[199] "Mario Castillo, J.D. Bio," Lone Star College, https://www.lonestar.edu/candidate-mario-castillo.htm.

[200] PTK0142699.

[201] PTK0093777-PTK0093778 at PTK0093777. Note that this language is identical to that used by Dr. Tincher-Ladner in her letter to Dr. Higdon at OTC.

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**



68.

69.     PTK either advised or encouraged community colleges or the PTK on-campus chapter advisor (who typically is a faculty member) to have their college IT department block HonorSociety emails from reaching students. The following are some examples of PTK and community college officials engaging in coordinated behavior to block, or attempt to block, HonorSociety's access to community college students.

---

[202] PTK0142699.

[203] PTK0142699.

[204] PTK0183610.

[205] PTK0182980.

[206] PTK0182980.

[207] PTK0182980.

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

- ████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████ █████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████

- ████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████

- ████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
██████████████████████████████████

- ████████████████████████████████████████████
████████████████████████████

████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████

---

[208] PTK0050209.

[209] PTK0050209.

[210] PTK0070576.

[211] PTK0070599.

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**



---

[212] PTK0123549.

[213] Paige Still, a PTK Membership Services Senior Specialist, and Paige Rakestraw, a PTK Membership Services Senior Specialist are assumed to be the same person. Both are listed as PTK's "Division III" membership services specialist and sometime between February 2020 (see PTK0132443) and March 2021 (see PTK0123724), Paige Still became Paige Rakestraw. According to Paige Rakestraw's LinkedIn profile (Paige Rakestraw, LinkedIn, https://www.linkedin.com/in/paige-rakestraw-9aaa39190/), she's been a PTK Membership Services Senior Specialist since 2012. There is no LinkedIn profile for a Paige Still.

[214] PTK0123724 - PTK0123727 at PTK0123726.

[215] PTK0123724 - PTK0123727 at PTK0123725.

[216] PTK0123724 - PTK0123727 at PTK0123724.

[217] PTK0123724 - PTK0123727 at PTK0123724.

[218] PTK0124125.

[219] PTK0132444.

[220] PTK0132443.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

- 

70.     These explicit actions by PTK to impede HonorSociety (and other PTK competitors), as well as PTK's coordinating with community college officials and its close working relationship with AACC, represent explicit concerted action to exclude competitors, and in particular, HonorSociety. As such, these episodes provide direct evidence of PTK's power to exclude competitors from the relevant market.

### ■ HARM TO COMPETITION

71.     PTK's conduct reduced HonorSociety's and others' ability to compete, and "injury to competition [is] accomplished through exclusion of rivals." [223] When a dominant incumbent such as PTK faces the prospect of competition from HonorSociety (and others) and, in response, engages in anticompetitive conduct which succeeds at reducing that rival's (and others) ability to compete and to execute its business plan, then as a matter of economics, competition has been harmed. If market access by competitors is impeded, then consumers will not realize the full benefits of competition. Moreover,

> "'[a] successful campaign of disparagement may also jeopardize and threaten other [requisite] conditions necessary for competition to thrive' to

---

[221] PTK0132455-PTK0132457.

[222] PTK0132455.

[223] Adkinson, Jr., William F., Karen L. Grimm, and Christopher N. Bryan, "ENFORCEMENT OF SECTION 2 OF THE SHERMAN ACT: THEORY AND PRACTICE," Working Paper, November 3, 2008, p. 3, https://www.ftc.gov/system/files/documents/public_events/section-2-sherman-act-hearings-single-firm-conduct-related-competition/section2overview.pdf.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

the extent that disparagement creates entry barriers and/or leads to oligopoly and/or monopoly. To the extent that a firm adopts a campaign to falsely disparage 'its competitors and their respective products for the purpose of forcing them to exit the market,' or through creating a barrier to the firm's competitors' entry or re-entry, and such a campaign proves to be successful, it will result in an injury to competition."[224]

72.    PTK's actions reduced HonorSociety's and others' ability to compete, leading to harm to competition and consumers (i.e., community college students seeking membership in general honor societies). The conduct at issue in this case is not competition on the merits from an economic perspective. Consequently, PTK's actions – while perhaps beneficial to PTK in that competition has been muted – lacked any cognizable procompetitive benefits such as increased efficiency, reduced marginal costs, or improved quality products/services.

### ■    ANTITRUST INJURY

73.    Antitrust injury focuses on the effect that the challenged conduct has on competition by identifying the market in which competition (not merely a competitor) has or will likely be harmed and the mechanism by which the challenged conduct does so. That is, from an economic perspective, there must be antitrust injury of the type protected by the Sherman Act such that injury flows from the alleged antitrust violation.[225]

74.    As I discussed above, PTK engaged in conduct to exclude or limit the ability of HonorSociety (and other PTK rivals) from accessing potential student members at

---

[224] Marshall, Kevin S., The Economics of Antitrust Injury and Firm-Specific Damages, Lawyers & Judges Publishing Company, Inc., 2008, Kindle Edition. Citations omitted.

[225] See, Baker, Jonathan and Timothy Bresnahan, "Economic Evidence in Antitrust: Defining Markets and Measuring Market Power," John M. Olin Program in Law and Economics, Stanford Law School, Working Paper No. 328, September 2006, p. 3.

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

community colleges. This included PTK engaging in coordinated behavior with community college officials to prevent entry and/or expansion by competing honor societies. Specific exclusionary conduct by PTK against HonorSociety includes the following:

*PTK's Systematic Effort to Have the IT Departments at Community Colleges Block HonorSociety's Emails to Students*

75.     PTK encouraged community colleges (or the PTK on-campus chapter advisor) to have their college IT department block HonorSociety emails from reaching students. This is a particularly harmful act to HonorSociety because their business model relied heavily (now solely) on online access to students rather than having physical chapters on campus like PTK. HonorSociety became a completely online platform during and after Covid.

*PTK's Involvement with AACC Through PTK's PAB*

76.     HonorSociety was "a frequent topic the [community college] presidents bring up" which "has come up repeatedly" at PAB meetings concerning losses in PTK membership due to HonorSociety. For example, the PAB Meeting Minutes, October 17, 2019, stated, "Dr. Tincher-Ladner discussed at the last PAB Meeting students join other honor societies by mistake - honorsociety.org is one of the worst. Need assistance of PAB to help communicate problem." [226] Since PAB members consist of community college and technical college presidents from across the country whose "[s]pecific duties include advocating for Phi Theta Kappa, its members, and its mission; serving as a liaison between

---

[226] PTK0064023.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

Phi Theta Kappa Headquarters and the college leaders in the president's state,"[227] negative information about HonorSociety was widely known and dispersed throughout the country.[228]

### *PTK's Repeated and Widespread Claim That It Is the Only Official Honor Society of Community Colleges*

77.    PTK portrays itself as "the official national honor society for junior colleges."[229] A sample of community college websites finds that schools in 46 states repeat this information. See **Appendix 1**. While the veracity of PTK's assertion about being the official honor society for community colleges is at issue in this litigation, such a wide-spread claim about PTK implies that competing honor societies including HonorSociety are "unofficial" and should not be recognized or condoned by community colleges, and that their students are ill-advised to join any "unofficial" honor society.

### *PTK's Alleged Campaign of Disparagement*

78.     HonorSociety has alleged that PTK engaged in a campaign of disparagement against HonorSociety with the aim of limiting HonorSociety's ability to recruit new members.[230] "To the extent that a firm adopts a campaign to falsely disparage 'its competitors and their

---

[227] "Presidential Advisory Board," PTK, https://www.ptk.org/foundation/presidential-advisory-board/. There are 24 college presidents on PTK's PAB from schools located in Alabama, Alaska, Arkansas, Colorado, Delaware, Florida, Guam, Iowa, Kansas, Louisiana, Maryland, Massachusetts, Minnesota, Mississippi, Missouri, Montana, New Jersey, North Carolina, North Dakota, Pennsylvania, Tennessee, Virginia, Washington and Wyoming.

[228] For example, PTK's press release dated January 30, 2018 welcomed Dr. Tonjau Williams (President of St. Petersburg College, Florida), to its Presidential Advisory Board, and stated, "She joins 40 other college presidents **from across the nation** on the board and will provide input into the organization's strategic plan, priorities, and direction." ("PTK Appoints Williams to Presidential Advisory Board," PTK, https://www.ptk.org/ptk-appoints-williams-to-presidential-advisory-board/, (emphasis added)).

[229] "About PTK," PTK, https://www.ptk.org/about-ptk/.

[230] *See*, for example, Complaint, ¶¶ 2, 7, 9, 69, 70, 128-151.

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

respective products for the purpose of forcing them to exit the market'… and such a campaign proves to be successful, it will result in an injury to competition."[231] To the extent the fact finder determines that PTK falsely and/or inappropriately disparaged HonorSociety, then given PTK's dominant market position, that disparagement had an anticompetitive impact. The following are some examples of PTK's campaign of disparagement against HonorSociety.

- ██████████████████████████████████████
  ██████████████████████████████████████
  ██████████████████████████████████████
  ██████████████████████████████████████
  ██████████████████████████████████████
  ████████████████████████████

- ██████████████████████████████████████
  ██████████████████████████████████████
  ██████████████████████████████████████
  ██████████████████████████████████████
  ████████████████████

- ██████████████████████████████████████
  ██████████████████████████████████████
  ██████████████████████████████████████

---

[231] Marshall, Kevin S., The Economics of Antitrust Injury and Firm-Specific Damages, Lawyers & Judges Publishing Company, Inc., 2008, Kindle Edition, (citations omitted).

[232] PTK0031936.

[233] PTK0044854.

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

---

[234] PTK0060308; PTK0060310; PTK0060311; PTK0060312; PTK0060313.

[235] PTK0132301.

[236] PTK0132512.

[237] PTK0070576; PTK0132443; PTK0132455.

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

79.     These actions by PTK to exclude or limit HonorSociety's ability to compete for membership sales to students is the type of conduct that antitrust laws are designed to prevent, as "injury to competition [is] accomplished through exclusion of rivals."[238]

■    **ANTITRUST DAMAGES**

80.     My damages methodology employs the "before and after" framework, a well-accepted method of analyzing anticompetitive harm and damages in antitrust cases.[239] This approach compares the patterns of relevant economic variables prior to the initiation of anticompetitive conduct with the patterns during the period of anticompetitive conduct. Korenblit (2012) states:

> "Under the before-and-after method, the plaintiff estimates damages using its performance before or after the antitrust violation to infer how it would have performed during the damage period. … In foreclosure cases, the plaintiff estimates its profits 'but for' the illegal practices by using its own economic condition before or after the antitrust violation."[240]

81.     A key concept in assessing economic damages is that of the "but-for" market. The but-for market estimates the economic value (e.g., revenues, profits) that would have prevailed "but-for" the challenged conduct and is the basis for calculating damages. Any excess of these "but-for" values (e.g., revenues, profits) above those achieved by the plaintiff during

---

[238] Adkinson, Jr., William F., Karen L. Grimm, and Christopher N. Bryan, "ENFORCEMENT OF SECTION 2 OF THE SHERMAN ACT: THEORY AND PRACTICE," Working Paper, November 3, 2008, p. 3, https://www.ftc.gov/system/files/documents/public_events/section-2-sherman-act-hearings-single-firm-conduct-related-competition/section2overview.pdf.

[239] *See*, McCrary, Justin and Daniel L Rubinfeld, "Measuring Benchmark Damages in Antitrust Litigation," *Journal of Econometric Methods* Vol. 3, No. 1, 2014, pp. 63-74; and Proving Antitrust Damages – Legal and Economic Issues, Third Edition, ABA Section of Antitrust Law, 2017, pp. 92-93. Although this approach is often described generically as "before and after," similar approaches are called "before and during," "during and after," and "before, during and after."

[240] Korenblit, Claire M., "Quantifying Antitrust Damages - Convergence of Methods Recognized by U.S. Courts and the European Commission," *CPI Antitrust Chronicle*, March 2012, pp. 4-5. (citation omitted).

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

the challenged conduct represents damages.[241] That is, in estimating economic damages, the analysis considers the difference between the plaintiff's economic position if the challenged conduct had not occurred and the plaintiff's actual economic position.[242]

82.    To assess the extent of harm to HonorSociety, I requested data sufficient to estimate trends in HonorSociety membership.[243] **Figure 1** show average new HonorSociety members per year for the periods 2013-2018 and 2019-2023. Average new HonorSociety members per year fell from 56,331 in 2013-2018 to 49,589 in 2019-2023 – a 12.0% decrease.

---

[241] van Dijk and Verboven (2008) state, "The concept underlying most economic damages assessments is that of the 'but-for' world. … The difference between this counterfactual world and the actual world provides the measurement of damages." (van Dijk, Theon and Frank Verboven, "Quantification of Damages," in ISSUES IN COMPETITION LAW AND POLICY, ABA Section of Antitrust Law, 2008, pp. 2331-2348 at p. 2332.)

[242] The Reference Manual on Scientific Evidence states, "Damages measurement then determines the plaintiff's hypothetical value in the but-for scenario, [and] [e]conomic damages are the difference between that value and the actual value that the plaintiff achieved." (Allen, Mark A., Robert E. Hall, and Victoria A. Lazear, "Reference Guide on Estimation of Economic Damages," Reference Manual on Scientific Evidence, Third Edition, Federal Judicial Center, 2011, p. 432.)

[243] HonorSociety's normal course membership data does not systematically track members' academic affiliation. Given this limitation, it was not possible to develop a sufficiently reliable breakdown of HonorSociety's membership sales to 2-year college students versus others over the 2013-2023 period.

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

**Figure 1**

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**Figure 2**
**HonorSociety New Memberships**



*Source*: HonorSociety Membership Transaction Database.

84.    HonorSociety initially experienced robust growth in memberships with an average annual trend increase of 12.1% per year over 2013-2018. This was followed by a steep drop-off in 2019 (a 32% decrease from the previous year) and an average annual decline of 2.4% per year over 2019-2023. This same type of pattern is evident in HonorSociety's financial performance as shown in **Figure 3** – robust growth in gross profits averaging 28.9% per year over the 2016-2018 period followed by a drop-off in 2019 and much more modest growth thereafter, averaging 4.7%.

59

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

**Figure 3**
**HonorSociety Gross Profits**



*Sources*: HS_220988; HS_221030; HS_129481.

85.     As noted above, efforts by PTK to exclude HonorSociety began as early as 2017 and 2018. Also, as can be seen in **Figure 2**, HonorSociety experienced a drop off in new memberships in 2018 compared to 2017. However, given the trend in HonorSociety's financial performance, I am using the average annual increase in HonorSociety memberships over the 2013-2018 period as the "before" period to estimate how HonorSociety would have performed but-for PTK's exclusionary conduct over the period from 2019 forward – the "after" period.

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

86.    As is clear from the record, honor society memberships closely follow college enrollment trends.[244] Data from the National Student Clearing House Research Center, shown in **Figure 4**, indicate that over the period 2013-2018, U.S. college enrollment decreased by an average of 0.9% per year. In estimating damages to HonorSociety, I adjust its but-for growth rate by the annual percentage change in college enrollment over 2019-2023 relative to the average annual changes over 2013-2018. Thus, for example, since HonorSociety experienced 12.1% growth in membership per year over 2013-2018 in the presence of a 0.9% per decrease in college enrollment over the same period, my estimate for HonorSociety's 2019 but-for growth rate is 12.1% – 0.3% + 0.9% = 12.9%.

---

[244] *See*, for example, Deposition of Paige Chandler, March 18, 2024, p. 45; Deposition of George Boggs, April 5, 2024, pp. 51, 146; PTK0141640-PTK0141646; PTK0208948-PTK0208954; PTK0118660- PTK0118707 at PTK0118678; PTK0116272- PTK0116295 at PTK0116281; PTK0120182.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**Figure 4**
**Annual College Enrollment**
**2013 – 2023**



*Sources*: National Student Clearinghouse Research Center, Current Term Enrollment Estimates Reports (Data Appendix Spring 2024; Data Appendix Fall 2023; Data Appendix Fall 2022; Report Spring 2020, p. 4; Report Spring 2019, p. 3; Report Fall 2018, p. 3; Report Spring 2018, p. 4; Report Fall 2017, p. 3; Report Spring 2017, p. 4; Report Fall 2016, p. 3; Report Spring 2016, p. 4; Report Fall 2015, p. 3; Report Spring 2015, p. 4).

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

87.  My estimate of HonorSociety's antitrust damages is presented in **Table 1**. Given PTK's exclusionary conduct and campaign of disparagement against HonorSociety as described above, and the ubiquitousness of social media, it is not unreasonable to conclude that PTK's actions affected HonorSociety's overall business. Moreover, PTK interacts with four-year colleges through its "PTK Connect" and "University Partner Scholarships" programs which allows for a wider dissemination of information by PTK beyond just community colleges.[245] If the fact finder determines this to be the case, antitrust damages to HonorSociety over the period 2019-2024 total $16.9 million, as shown in **Table 1**. To the extent that the fact finder determines that harm to HonorSociety was limited to 2-year colleges, I provide an estimate of damages to HonorSociety based on the proportion of 2-year college enrollment to total college enrollment, totaling $4.4 million.[246]

---

[245] "Phi Theta Kappa is proud to partner with over 800 four-year colleges and universities to offer hundreds of millions of dollars in member-exclusive transfer scholarships for PTK students seeking a bachelor's degree. … Log into PTK Connect to get the information on who to contact and how to apply for our partner scholarships." ("University Partnership Scholarships," PTK, https://www.ptk.org/scholarships/how-our-scholarships-work/university-partner-scholarships/.) In describing the types of scholarships available to PTK members, Dr. Tincher-Ladner stated, "And one is our transfer scholarships, and those are about students matriculating to a four-year college or a university with a particular partner. … A four-year college has their own eligibility requirements for transfer scholarships. So we have about 820 partners, hopefully, more right now." (Deposition of Lynn Tincher-Ladner, February 28, 2024, pp. 56, 60.)

[246] These damages figures reflect nominal dollars that are not adjusted for inflation or the time value of money.

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

**Table 1**
**HonorSociety Antitrust Damages**



*Notes*: 1. Gross Profit Margin for 2024 is average of 2018-2023. 2. Enrollment Trend Adjustment for 2024 based on average annual percentage change over 2019-2023. 3. Actual Gross Profits for 2024 are assumed to grow at 2023 rate.

*Sources*: HS_220988; HS_221030; HS_129481; HonorSociety Membership Transaction Database; National Student Clearinghouse Research Center, Current Term Enrollment Estimates Reports (Data Appendix Spring 2024; Data Appendix Fall 2023; Data Appendix Fall 2022; Report Spring 2020, p. 4; Report Spring 2019, p. 3; Report Fall 2018, p. 3; Report Spring 2018, p. 4; Report Fall 2017, p. 3; Report Spring 2017, p. 4; Report Fall 2016, p. 3; Report Spring 2016, p. 4; Report Fall 2015, p. 3; Report Spring 2015, p. 4).

# Appendix 1

HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY

**Appendix 1**

**Examples of PTK Chapter Officiality Claims by State**

| State | School | Location | Quote Regarding PTK | Source |
|---|---|---|---|---|
| Alabama | Calhoun Community College | Huntsville, AL | "Phi Theta Kappa is the official academic honor society for community colleges." | https://calhoun.edu/student-activities-clubs/student-clubs-organizations/phi-theta-kappa/ |
| Alaska | Kenai Peninsula College | Soldotna, Alaska | "Phi Theta Kappa is the International Honor Society for the two-year college" | https://kpc.alaska.edu/student-life/student-activities/phi-theta-kappa.cshtml |
| Arizona | Arizona Western College | Yuma, Arizona | "Phi Theta Kappa is the only national honor society for students of two-year (junior and community) colleges." | https://www.azwestern.edu/student-life/honors/phi-theta-kappa |
| Arkansas | Arkansas State University - Beebe | Beebe, Arkansas | "The American Association of Community Colleges (AACC) recognized Phi Theta Kappa as the official honor society for two-year colleges in 1929." | https://www.asub.edu/honors-program/ |
| California | College of the Canyons | Santa Clarita, California | "The American Association of Community Colleges (AACC) recognized Phi Theta Kappa as the official honor society for two-year colleges in 1929." | https://www.canyons.edu/academics/honors/honorssociety/index.php |
| Colorado | Colorado Northwestern Community College | Rangely, Colorado | "The American Association of Community Colleges (AACC) recognized PTK as the official honor society for two-year colleges in 1929." | https://cncc.edu/campus-life/clubs-organizations |
| Connecticut | CT State Community College Quinebaug Valley | Danielson, CT | "Phi Theta Kappa (PTK) is recognized as the official honor society for community colleges by the American Association of Community Colleges." | https://qvcc.edu/student-resources/ptk/ |
| Florida | Florida Southwestern State Community College | Punta Gorda, Florida | "Phi Theta Kappa is recognized as the official Honor Society for community colleges by the American Association of Community Colleges." | https://www.fsw.edu/ptk |
| Georgia | South Georgia State College | Douglas, Georgia | "The American Association of Community Colleges (AACC) recognized Phi Theta Kappa as the official honor society for two-year colleges in 1929." | https://www.sgsc.edu/life-at-sgsc/ptk |
| Hawaii | Kapiʻolani Community College | Honolulu, Hawaii | "Founded in 1918, the Phi Theta Kappa Honor Society is the officially-recognized international honor society of two-year colleges and academic programs." | https://www.kapiolani.hawaii.edu/support-and-campus-life/honors-societies/ |
| Idaho | College of Eastern Idaho | Idaho Falls, Idaho | "The American Association of Community Colleges (AACC) recognized Phi Theta Kappa as the official honor society for two-year colleges in 1929." | https://cei.edu/honor-society |

**HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY**

| State | School | Location | Quote Regarding PTK | Source |
|-------|--------|----------|---------------------|--------|
| Illinois | Black Hawk College | Moline, Illinois | "Phi Theta Kappa is recognized as the official honor society for community colleges by the American Association of Community Colleges." | https://www.bhc.edu/news/2023/06/qc-campus-students-join-phi-theta-kappa-honor-society-spring-2023/ |
| Indiana | Ivy Tech Community College | Indianapolis, Indiana | "Phi Theta Kappa is the International Honor society of community Colleges." | https://ivylife.ivytech.edu/organization/phi-theta-kappa-honor-society-indianapolis |
| Iowa | Des Moines Area Community College | Caroll, Iowa | "The American Association of Junior Colleges (now known as the American Association of Community Colleges or AACC) recognized Phi Theta Kappa as the official honor society for two-year colleges in 1929." | https://internal.dmacc.edu/carroll/Pages/PhiThetaKappa.aspx |
| Kansas | Barton Community College | Great Bend, Kansas | "With more than two million members and 1,250 chapters located in all 50 of the United States and eight international countries, Phi Theta Kappa is recognized as the official honor society for community colleges by the American Association of Community Colleges." | https://bartonccc.edu/studentlife/clubs |
| Kentucky | Sullivan University | Lexington, Kentucky | "In 1929, the American Association of Community Colleges recognized Phi Theta Kappa as the official honor society for two-year colleges." | https://www.sullivan.edu/news/lexington-campus-inducts-new-members-of-phi-theta-kappa |
| Louisiana | Baton Rouge Community College | Baton Rouge, Louisiana | "It is the official honor society for community colleges by the American Association of Community Colleges." | https://www.mybrcc.edu/student-life/clubsorgs/ptk.php |
| Maine | Kennebec Valley Community College | Fairfield, Maine | "Phi Theta Kappa is recognized as the official honor society for community colleges by the American Association of Community Colleges." | https://www.kvcc.me.edu/life-at-kvcc/clubs-organizations/ |
| Maryland | Baltimore City Community College | Baltimore, Maryland | "The society is recognized by the American Association of Community Colleges as the official international honor society for two-year colleges." | https://www.bccc.edu/domain/2130 |
| Massachusetts | Bristol Community College, Fall River Campus | Fall River, Massachusetts | "Phi Theta Kappa is the only officially recognized international honor society for two-year colleges in the United States and abroad." | https://bristolcc.edu/learnatbristol/academicresources/phithetakappa.html |
| Michigan | Delta College | University Center, Michigan | "The American Association of Community Colleges recognizes Phi Theta Kappa as the official honor society for two-year colleges." | https://www.delta.edu/students/engage/ptk.html |

**HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY**

| State | School | Location | Quote Regarding PTK | Source |
|---|---|---|---|---|
| Minnesota | Century College | White Bear Lake, Minnesota | "PTK has been recognized as the official honor society of community colleges by the American Association of Community Colleges (AACC) since 1929." | https://www.century.edu/phi-theta-kappa/ |
| Mississippi | Holmes Community College | Goodman, Mississippi | "Phi Theta Kappa is the official academic honor society for community colleges." | https://holmescc.edu/student-life/phi-theta-kappa/ |
| Missouri | Jefferson College | Hillsboro, Missouri | "In 1929, the American Association of Community colleges recognized Phi Theta Kappa as the official honor society for two-year colleges." | https://www.jeffco.edu/ptk-honor-society |
| Montana | Dawson Community College | Glendive, Montana | "International Honor Society of the Two-Year College, is recognized by the American Association of Community Colleges as the official honor society for two-year colleges." | https://www.dawson.edu/current-students/student-success/student-life.html |
| Nebraska | Nebraska College of Technical Agriculture in Curtis | Curtis, Nebraska | "Phi Theta Kappa is recognized as the official honor society for two-year colleges." | https://ncta.unl.edu/activities/phi-theta-kappa |
| Nevada | College of Southern Nevada | Las Vegas, Nevada | "The American Association of Community Colleges (AACC) recognized Phi Theta Kappa as the official honor society for two-year colleges in 1929." | https://www.csn.edu/phi-theta-kappa |
| New Hampshire | NHTI Concord's Community College | Concord, New Hampshire | "The American Association of Community Colleges (AACC) recognized Phi Theta Kappa as the official honor society for two-year colleges in 1929." | https://www.nhti.edu/nhti-raises-scholarship-funds-for-high-achieving-students/ |
| New Jersey | Bergen Community College | Paramus, New Jersey | "Phi Theta Kappa is the official honor society for two-year colleges." | https://bergen.edu/honors/phi-theta-kappa-ptk/ |
| New Mexico | Central New Mexico Community College | Albuquerque, New Mexico | "Phi Theta Kappa is the official international honor society for two-year colleges." | https://www.cnm.edu/depts/trio/scholarships-and-internships |
| New York | Borough of Manhattan Community College | New York, New York | "Phi Theta Kappa is the official honor society for two-year colleges, as recognized by the American Association of Community Colleges." | https://www.bmcc.cuny.edu/academics/ptk/ |
| North Carolina | Edgecombe Community College | Rocky Mount, North Carolina | "In 1929, the American Association of Community Colleges recognized Phi Theta Kappa as the official honor society for two-year colleges." | https://edgecombe.edu/current-students/student-clubs-and-organizations/phi-theta-kappa/ |
| North Dakota | Dakota College at Bottineau | Bottineau, North Dakota | "Join the DCB chapter of Phi Theta Kappa, the official honor society for two-year colleges." | https://www.dakotacollege.edu/student-life/clubs-and-organizations |

3

**HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY**

| State | School | Location | Quote Regarding PTK | Source |
|-------|--------|----------|---------------------|--------|
| Ohio | Clark State College | Springfield, Ohio | "In 1929, the American Association of Community Colleges recognized Phi Theta Kappa as the official honor society for two-year colleges." | https://www.clarkstate.edu/community/news/clark-state-to-hold-ptk-induction-ceremony/ |
| Oklahoma | Eastern Oklahoma State College | Wilburton, Oklahoma | "Phi Theta Kappa is recognized as the official honor society of associate-level institutions and programs." | https://www.eosc.edu/student-life/student-activities/phi-theta-kappa |
| Oregon | Columbia Gorge Community College | The Dalles, Oregon | "Phi Theta Kappa is the official international honor society of the two-year college that promotes scholarship, leadership, service, and fellowship." | https://www.cgcc.edu/PTK |
| Pennsylvania | Westmoreland County Community College | Youngwood, Pennsylvania | "PTK is the only nationally acclaimed honor society serving America's two-year colleges and associate degree-granting institutions." | https://westmoreland.edu/student_life/student-organizations/honor-societies.html |
| South Carolina | Central Carolina Technical College | Sumter, South Carolina | "PTK, the international honor society of the two-year college, conducts this program each year to honor outstanding students from technical, junior and community colleges nationwide." | https://www.cctech.edu/news/three-central-carolina-technical-college-honor-society-students-named-to-south-carolina-academic-team/ |
| Tennessee | Chattanooga State Community College | Chattanooga, Tennessee | "Phi Theta Kappa (PTK) is the international academic honor society of all two-year colleges." | https://www.chattanoogastate.edu/phi-theta-kappa |
| Texas | Alvin Community College | Alvin, Texas | "Phi Theta Kappa is the official honor society of Alvin Community College." | https://www.alvincollege.edu/phithetakappa/ |
| Vermont | Community College of Vermont | Montpelier, Vermont | "PTK is recognized as the official honor society for two-year colleges by the American Association of Community Colleges." | https://ccv.edu/phi-theta-kappa-at-ccv/ |
| Virginia | Laurel Ridge Community College | Warrenton, Virginia | "Phi Theta Kappa is the only national honor society for students of community, technical and junior colleges." | https://laurelridge.edu/clubs-organizations/phi-theta-kappa/ |
| Washington | Centralia College | Centralia, Washington | "PTK was established in 1918 and deemed the official honor society for two-year colleges by the American Association of Community Colleges (ASCC) in 1929." | https://www.centralia.edu/resources/student-life/ptk.aspx |
| West Virginia | New River Community & Technical College | Lewisburg, West Virginia | "Phi Theta Kappa is the international honor society of two-year colleges and academic programs." | https://www.newriver.edu/phi-theta-kappa/ |
| Wisconsin | Gateway Technical College | Kenosha, Wisconsin | "Phi Theta Kappa has been recognized by the American Association of Community and Junior College as the official honor fraternity of two-year colleges since 1929." | https://www.gtc.edu/campus-life/student-involvement/phi-theta-kappa |
| Wyoming | Eastern Wyoming College | Torrington, Wyoming | "Phi Theta Kappa is the recognized academic honor society for community colleges." | https://ewc.wy.edu/student-resources/get-involved/ |

# Attachment 1



**CRAIG SCHULMAN, PH.D.**
BERKELEY RESEARCH GROUP
2700 Earl Rudder Freeway South, Suite 4800
College Station, TX 77845

Direct: 979.599.9229
Cell: 979.324.5988
cschulman@thinkbrg.com

## SUMMARY

Craig T. Schulman is a Professor of the Practice in the Department of Economics at Texas A&M University. Dr. Schulman has been engaged as a testifying expert and consultant in large-scale litigation in the areas of antitrust, intellectual property, class certification, international trade, and general litigation.

Dr. Schulman's engagements have occurred in a variety of industries, including petrochemicals, petroleum refining, petroleum product markets, crude-oil markets, heavy manufacturing, chemicals, pharmaceuticals, healthcare, insurance, financial services, consumer products, and computer hardware. These engagements have included settings in state and federal courts, in international arbitration, and with the Federal Trade Commission and the U.S. International Trade Commission. In addition, Dr. Schulman has provided support and analysis for presentation to the Federal Trade Commission and Department of Justice during their merger review process.

Dr. Schulman currently serves on the faculty in the Department of Economics at Texas A&M. His research and teaching interests include international trade policy, econometrics, industrial organization and financial economics. He has published articles in *Energy Economics*, *Journal of International Economics*, *National Tax Journal*, *Annales D'Economie et de Statistique*, and *Review of International Economics*, among others.

Before joining Berkeley Research Group, Dr. Schulman served as an associate professor of economics at the University of Arkansas. He joined the faculty of the University of Arkansas as an assistant professor of economics in 1990. During the 1995–1996 academic year, Dr. Schulman served as the senior economist for the Applied Economics Division of the U.S. International Trade Commission, including service as a special advisor on trade policy to the government of Russia. After returning to the university in 1996, Dr. Schulman was promoted to associate professor of economics in 1997. From January 1998 to August 1999, Dr. Schulman served as the director of the Center for Business and Economic Research in the university's Sam M. Walton College of Business. He also served as a member of the Arkansas Governor's Council of Economic Advisors from January 1998 to July 2001.



**EDUCATION**

Ph.D., Economics, Texas A&M University, 1990
Dissertation: *The Optimal Choice of Trade Policy in Oligopolistic Industries.*
Fields of specialization: Industrial Organization, Antitrust, International Economics and Econometrics.
B.S., Economics, Texas A&M University, 1985

**PRESENT POSITIONS**

Berkeley Research Group, College Station, TX
Director
- Testify in deposition and trial
- Develop economic analysis for complex litigation, including antitrust matters, international trade law and contract and business damages
- Prepare white papers, consulting reports, expert witness reports, and affidavits
- Engagements have included industries such as petrochemicals, petroleum refining, oil, heavy manufacturing, chemicals, insurance, healthcare, financial services, consumer products, and computer hardware
- Work has included a number of cases for parties investigated by the FTC

Texas A&M University
Professor of the Practice, 2024–present
Associate Professor of the Practice, 2015–2024
Visiting associate professor of Economics, 2002–2015
Adjunct associate professor of Economics, 2001–present
- Teach International Trade Policy, Development Economics, Econometrics, Economic Forecasting, and Data Analytics.

**PROFESSIONAL EXPERIENCE**

LECG, College Station, TX
Principal 2004–2010
Managing economist 2001–2004

University of Arkansas
Associate professor, 1997–2001
Director, Center for Business and Economic Research, 1998–1999
Assistant professor, 1990–1997
- Researched and published papers in various fields of economics, including Industrial Organization and International Trade
- Taught courses at undergraduate, masters, and Ph.D. levels, including Antitrust Economics, International Trade and Econometrics
- Led effort to completely restructure MBA curriculum



- Led a strategic planning exercise to reshape and refocus the mission of the Center for Business and Economic Research
- Helped develop a new major in International Business and Economics

Arkansas Governor's Council of Economic Advisors
Member, 1998–2001
- Reviewed and advised the Office of Finance and Administration regarding quarterly tax revenue forecasts
- Prepared white papers on economic development strategy for the Office of the Governor

U.S. International Trade Commission
Senior International economist, Applied Economics Division, 1995–1996
- Provided technical support and advice regarding modeling of economic damages in anti-dumping and countervailing duty cases
- Prepared economic damages reports for anti-dumping and countervailing duty cases
- Helped prepare white paper reports on the economic effects changes in U.S. international trade law

## SELECTED CASEWORK AND CONSULTING PROJECTS

- For a logistics company: Estimated demand systems for consumer products for use in inventory management systems.
- For a major consumer products company: Analyzed the relevant geographic and product market in a merger involving consumer products.
- For a wastewater treatment company: Analyzed the relevant geographic and product market, assessed extent of market power and economic damages in an antitrust claim of monopolization.
- For a commercial real estate firm: Assessed economic damages from a breach of contract.
- For a petrochemical firm: Assessed economic damages from a breach of contract.
- For a major petroleum services firm: Developed methodology for assessing economic damages from a breach of confidentiality.
- For an insurance firm: Analyzed the relevant geographic and product market in a merger involving medical insurance firms.
- For petroleum products firm: Analyzed the economic impact of alleged fraud.
- For a major consumer products company: Analyzed the relevant geographic and product market, assessed extent of market power and economic damages in an antitrust claim of monopolization.
- For a major financial services firm: Developed a simulation model of world oil market.
- For a major oil company: Modeled the world oil market and provided strategic advice regarding production and pricing.



- For a major pharmaceutical products firm: Analyzed issues relating to class certification and damages in nation-wide and state level actions involving allegations of fraud.
- For a major computer technology firm: Analyzed the relevant geographic and technology markets, assessed extent of market power and economic damages in an antitrust counterclaim to a claim for patent infringement.
- For a major integrated petroleum products firm: Analyzed retail market structure and pricing to address allegations of predatory pricing of gasoline.
- For a major consumer products company: Assessed economic damages for a breach of contract.
- For a major consumer products company: Analyzed market structure in the context of allegations of monopsony.
- For an insurance firm: Analyzed the price determinants of petrochemical products in the context of a business interruption claim.
- For a major petroleum products firm: Analyzed crude oil quality differentials and assessed economic damages associated with a breach of contract.
- For a major petroleum products firm: Analyzed market structure and assessed economic damages associated with allegations of commodity price manipulation.
- For a major petroleum products firm: Developed price forecasts and analyzed crude oil price differentials owing to crude quality for an international arbitration related to expropriated assets.
- For a regional equipment manufacturer: Analyzed market structure and assessed economic damages associated with allegations of monopolization and breach of contract.
- For an equipment rental company: Assessed economic damages associated with allegations of breach of fiduciary duty and theft of intellectual property.
- For a regional petroleum products company: Analyzed market structure and the extent of entry barriers associated with allegations of breach of fiduciary duty.
- For an international equipment manufacturer: Assessed economic damages associated with allegations of breach of contract.
- For a major petroleum products firm: Analyzed market structure and assessed economic causation and damages associated with allegations of price discrimination in wholesale petroleum products markets.
- For a major oil and gas exploration and production firm: Analyzed issues related to class certification associated with allegations of underpayment of royalties related to natural gas liquids.

## ACADEMIC HONORS AND AWARDS

- The Lynde and Harry Bradley Foundation Fellowship, 1989–1990

- Texas A&M University College of Liberal Arts, Association of Former Students Distinguished Achievement Award for Teaching, 2021

**BRG**
**Berkeley Research Group**

**COURSES TAUGHT**

       Econometric Theory and Applications, Ph.D., M.A., and Undergraduate
       International Trade Theory and Policy, Ph.D., M.A., and Undergraduate
       Economic Forecasting, M.A. and Undergraduate
       Economic Data Analytics/Statistics, M.A. and Undergraduate
       Applied Microeconomics, M.A.
       Antitrust Economics, M.A.
       Principles of Economics, Undergraduate

**GRANTS AND SPONSORED RESEARCH**

- "Setting Transformer Efficiency Standards: Potential Unintended Consequences," with James Griffin, AK Steel Corporation and Allegheny Technologies Incorporated, 2012, co-principal investigator
- "Scientific Games: Cooperative Services," with William Hamm and David Najvar, Scientific Games Corporation, 2012, co-principal investigator
- "Aramco Production Strategies: Their Implications for World Oil Prices and Saudi Wealth Maximization," with James Griffin, Aramco Services Company, 2003, co-principal investigator
- "World Oil Supply and Demand," with James Griffin, UBS Global Asset Management, 2002, co-principal investigator
- "The Efficacy of Classroom Experiments in Teaching Introductory Economics," with Thomas McKinnon and Yvonne Durham, National Science Foundation, $221,000, 1999–2004, principal investigator and project director
- "Priming the Pump: Research as a Catalyst for Economic Growth," University of Arkansas Center for Business and Economic Research, $7,500, 2000, co-principal investigator
- *Alternatives for Expanded School Bus Liability Insurance Coverage*, Arkansas State Board of Education, $5000, 1998, principal investigator
- *Over the Road Transportation Forecast*, University of Arkansas Supply Chain Management Research Center, $5,000, 1998, principal investigator
- "Corporate Tax Integration and the Interaction Between Dividend Policy and Capital Gains," with Keith Sellers and Deborah Thomas, Ernst & Young Foundation, 1994 Tax Research Grant Program, $30,000, co-principal investigator

**PROFESSIONAL ACTIVITY**

- Ad-hoc referee – *Journal of International Economics, International Economic Review, Economica, Review of International Economics, Social Science Quarterly, Canadian Journal of Economics, National Tax Journal, Economic Inquiry, Energy Journal.*
- Texas Advanced Research/Advanced Technology Programs – Social and Behavioral Sciences Review Panelist, August 1999.

BRG
Berkeley Research Group

- National Science Foundation, Division of Undergraduate Education – Course, Curriculum and Laboratory Improvement Program Review Panelist, July 2000.
- National Science Foundation, Division of Undergraduate Education – Undergraduate Assessment Program Workshop (July, 2000). Invited participant in workshop to define objectives for a new NSF program supporting assessment of undergraduate programs in science, mathematics, engineering, and technology.
- American Economic Association, Member.
- American Bar Association, Member.

## *PUBLICATIONS*

**Refereed**

(1)  "Strategic Non-intervention and the Choice of Trade Policy for International Oligopoly," with Hae-Shin Hwang, *Journal of International Economics* 34, 1993, 73–93.

(2)  *Effects of Tax Policy on Corporate Financing Decision: Integration and Capital Gains*, with Keith Sellers and Deborah Thomas, The Tax Foundation and Ernst & Young, Washington, DC, October 1994, 33 pp.

(3)  "Estimation of SUR Model with Non-nested Missing Observations," with Hae-shin Hwang, *Annales D'Économie et de Statistique* 44, 1996, 21 pp.

(4)  "Effects of Tax Integration and Capital Gains Tax on Corporate Leverage," with Deborah Thomas, Keith Sellers, and Duane Kennedy, *National Tax Journal* 49:1, 1996, 31–54.

(5)  "Performance Pay as a Screening Devise," with Marc Chopin, *Studies in Economics and Finance* 18:2, 1997, 94–108.

(6)  "Free Entry, Quasi Free Trade and Strategic Trade Policy," *Review of International Economics* 5:1, 1997, 83–100.

(7)  "Active Management, Fund Size, and Bond Mutual Fund Returns," with James Philpot, Douglas Hearth, and James Rimbey, *Financial Review* 33, 1998, 115–125.

(8)  "The Effect of the Tax Reform Act of 1986 and Over-Built Markets on Commercial Office Property Values," with Stanley Smith and Larry Woodward, *Journal of Real Estate Research* 19:3, 2000, 301–320.

(9)  "The Weekend Effect, 'Reverse' Weekend Effect and Firm Size," with Jorge Brusa and Pu Liu, *Journal of Business Finance and Accounting* 27:5-6, June 2000, 863–890.

(10)  "Are Treasury Securities Free of Default?" with Srinivas Nippani and Pu Liu, *Journal of Finance and Quantitative Analysis* 36:2, June 2001.

(11)  "An Analysis of the Effect of Management Participation in Director Selection on the Long-Term Performance of the Firm," with William Callahan and James Millar, *Journal of Corporate Finance* 9, 2003.

(12)  "The Weekend Effect and 'Reverse' Weekend Effect: An Analysis by Month of the Year, Week of the Month and Industry," with Jorge Brusa and Pu Liu, *Journal of Business Finance and Accounting* 30:5–6, June 2003.

(13)  "The 'Reverse' Weekend Effect: The U.S. Market vs. International Markets," with Jorge Brusa and Pu Liu, *International Journal of Financial Analysis* 12:3, 3rd Quarter 2003.

(14) "An International Investigation of the Influence of Dividend Taxation on Research and Development Tax Credits," with Tracy S. Manly and Deborah Thomas, *Journal of the American Taxation Association* 25:2, Fall 2003.

(15) "Price Asymmetry in Energy Demand Models: A Proxy for Energy Saving Technical Change?" with James M. Griffin, *Energy Journal* 26:2, Spring 2005.

(16) "Weekend Effect, 'Reverse' Weekend Effect, and Investor Trading Activities," with Jorge Brusa and Pu Liu, *Journal of Business Finance and Accounting* 32:7–8, Spring 2005.

(17) "Tax Incentives for Economic Growth: Capital Investment or Research," with Tracy S. Manly and Deborah Thomas, *Advances in Taxation* 17, 2007.

(18) "Classroom Experiments: Not Just Fun and Games," with Yvonne Durham and Thomas McKinnon, *Economic Inquiry* 45:1, January 2007.

**Refereed Proceedings**

- "Tax Integration and Corporate Dividend Policy - The Canadian Experience," with Deborah Thomas and Keith Sellers, *Eighth Asian-Pacific Conference on International Accounting Issues*, 1996. Awarded outstanding paper of the Conference by the CGAA of Canada.

- "The Relative Impact of Capital Inputs and Retail Structure on Labor Productivity in Retailing: A Longitudinal Analysis in Japan," with Robert Stassen, in *Enhancing Knowledge Development in Marketing*, American Marketing Association, 1995, 274.

- "Tax Policy and Corporate Leverage in Australia and New Zealand," with Keith Sellers, Deborah Thomas, Charles Robnett, and Patty Huff, *Fifth Asian-Pacific Conference on International Accounting Issues*, 1993.

- "An Examination of Factors Affecting Productivity in Japanese Retailing, 1976–1988," with Robert Stassen and Mayuresh Kelkar, in *Enhancing Knowledge Development in Marketing*, American Marketing Association, 1992, 310.

**Technical Reports**

(1) "Priming the Pump: Research as a Catalyst for Economic Growth," University of Arkansas Center for Business and Economic Research, 2000.

(2) "Arkansas Public School Performance: How Does Your District Rank?" *Arkansas Business and Economic Review* 32:1, Spring 1999, 7–15.

(3) *Alternatives for Expanded School Bus Liability Insurance Coverage*, Report to the Arkansas State Board of Education, Center for Business and Economic Research, University of Arkansas, 1998.

(4) *Over the Road Transportation Forecast*, University of Arkansas Center for Business and Economic Research, 1998.

(5) *Survey of the Labor Market for New Ph.D.s in Economics: 1999–2000*, with William P. Curington, University of Arkansas Center for Business and Economic Research, 1998.

(6) *Large Newspaper Printing Presses and Components Thereof, Whether Assembled or Unassembled, from Germany and Japan*, Staff report to the Commission on Investigations Nos. 731-TA-736 and 737 (Preliminary), U.S. International Trade Commission, August 1995. (Pricing section of report)

**TESTIMONY: 2019 - 2024**

- USIC, LLC et al vs. Brent Coffield, et al, Marion Superior Court, Marion County, Indiana, Report:  January 2019, Deposition:  August 2019.

- Segundo Navarro Drilling Ltd. and Lewis Petro Properties, Inc. vs. Gates Mineral Company, Ltd., District Court of Webb County, Texas, Expert Designation, March 2019.

- Theodore Kirkpatrick et al. vs. HomeAway.com, Inc., et al., U.S. District Court for the Western District of Texas, Declaration: August 2019, Deposition:  September 2019.

- BMC Software, Inc. vs. International Business Machines Corporation, U.S. District Court for the Southern District of Texas, Report: December 2019, Deposition: February 2020.

- Scott and Rhonda Burnett, et al. vs. The National Association of Realtors, et al., U.S. District Court for the Western District of Missouri, Report: May 2021, Deposition: July 2021, Declaration: December 2021, Report: January 2022, Hearing Testimony:  April 2022, Report: May 2022, Deposition: July 2022. Report: August 2022, Deposition: August 2022, Trial testimony: October 2023.

- Anita C. Deselms, et al. vs. Occidental Petroleum Corporation, et al., District Court for the District of Wyoming, Declaration: October 2021, Depositions: January 2022, April 2024.

- Converge Midstream, LLC vs. Magellan Crude Oil Pipeline Company, L.P. and Magellan Midstream Partners, L.P., District Court of Harris County, Texas, Expert Designation: October 2023, Deposition: January 2024.

# Attachment 2

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

## Attachment 2
## Materials Considered

| Legal |
|---|
| Amended Initial Disclosures of Defendant, Counter-Claimant, and Third-Party Plaintiff HonorSociety.org, Phi Theta Kappa Honor Society v. HonorSociety.org, Inc. v. Dr. Lynn Ticher-Ladner, US District Court, Southern District of Mississippi, Jackson Division, Civil Action No. 3:22-cv-00208-CWR-FKB, May 22, 2023 |
| Brooke Group Ltd. v. Brown & Williamson Tobacco Corp., 509 U.S. 209, 224 (1993) |
| Brown Shoe Co. v. United States, 370 U.S. 294, 82 S. Ct. 1502, 320 (1962) |
| Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 483 (1977) |
| Defendant HonorSociety.org, Inc.'s First Amended Response to Plaintiff's First Set of Interrogatories, Phi Theta Kappa Honor Society v. HonorSociety.org, Inc., US District Court, Southern District of Mississippi, Jackson Division, Civil Action No. 3:22-cv-00208-CWR-FKB, August 17, 2023 |
| Defendant HonorSociety.org, Inc.'s First Amended Response to Plaintiff's First Set of Requests for Production of Documents, Phi Theta Kappa Honor Society v. HonorSociety.org, Inc., US District Court, Southern District of Mississippi, Jackson Division, Civil Action No. 3:22-cv-00208-CWR-FKB, August 17, 2023 |
| Defendant HonorSociety.org, Inc.'s Response to Plaintiff's First Set of Interrogatories, Phi Theta Kappa Honor Society v. HonorSociety.org, Inc., US District Court, Southern District of Mississippi, Jackson Division, Civil Action No. 3:22-cv-00208-CWR-FKB, June 2, 2023 |
| Defendant HonorSociety.org, Inc.'s Response to Plaintiff's First Set of Requests for Production of Documents, Phi Theta Kappa Honor Society v. HonorSociety.org, Inc., US District Court, Southern District of Mississippi, Jackson Division, Civil Action No. 3:22-cv-00208-CWR-FKB, May 12, 2023 |
| Defendant HonorSociety.org, Inc.'s Second Amended Response to Plaintiff's First Set of Interrogatories, Phi Theta Kappa Honor Society v. HonorSociety.org, Inc., US District Court, Southern District of Mississippi, Jackson Division, Civil Action No. 3:22-cv-00208-CWR-FKB, November 16, 2023 |
| Defendant HonorSociety.org, Inc.'s Second Amended Response to Plaintiff's First Set of Requests for Production of Documents, Phi Theta Kappa Honor Society v. HonorSociety.org, Inc., US District Court, Southern District of Mississippi, Jackson Division, Civil Action No. 3:22-cv-00208-CWR-FKB, November 20, 2023 |
| Dr. Lynn Tincher Ladner's Rule 26(a) Initial Disclosures, Phi Theta Kappa Honor Society v. HonorSociety.org, Inc. v. Dr. Lynn Ticher-Ladner, US District Court, Southern District of Mississippi, Jackson Division, Civil Action No. 3:22-cv-00208-CWR-FKB, May 15, 2023 |
| FTC v. Penn State Hershey Med. Center, 838 F.3d 327, 338 (3d Cir. 2016) |
| HonorSociety.Org, Inc. Second-Amended Counterclaims and Second-Amended Third-Party Complaint, Phi Theta Kappa Honor Society v. HonorSociety.org, Inc. v. Dr. Lynn Ticher-Ladner, US District Court, Southern District of Mississippi, Jackson Division, Civil Action No. 3:22-cv-00208-CWR-FKB, April 10, 2024 |
| Theta Kappa Honor Society v. HonorSociety.org, Inc. v. Dr. Lynn Ticher-Ladner, US District Court, Southern District of Mississippi, Jackson Division, Civil Action No. 3:22-cv-00208-CWR-FKB, May 15, 2023 |

| |
|---|
| Interrogatories (Set One), From HonorSociety.org, Inc. to Phi Theta Kappa Honor Society, Phi Theta Kappa Honor Society v. HonorSociety.org, Inc. v. Dr. Lynn Ticher-Ladner, US District Court, Southern District of Mississippi, Jackson Division, Civil Action No. 3:22-cv-00208-CWR-FKB, June 14, 2023 |
| Interrogatories (Set Two), From HonorSociety.org, Inc. to Phi Theta Kappa Honor Society, Phi Theta Kappa Honor Society v. HonorSociety.org, Inc. v. Dr. Lynn Ticher-Ladner, US District Court, Southern District of Mississippi, Jackson Division, Civil Action No. 3:22-cv-00208-CWR-FKB, November 29, 2023 |
| McWane, Inc. v. FTC, 783 F.3d 814, 829-30 (11th Cir. 2015) |
| New York v. Kraft General Foods, 926 F. Supp. 321, 359, n.9 (1995) |
| Phi Theta Kappa Honor Society and Lynn Tincher-Ladner's First Amended Rule 26(A) Initial Disclosures, Phi Theta Kappa Honor Society v. HonorSociety.org, Inc. v. Dr. Lynn Ticher-Ladner, US District Court, Southern District of Mississippi, Jackson Division, Civil Action No. 3:22-cv-00208-CWR-FKB, April 22, 2024 |
| Phi Theta Kappa Honor Society and Lynn Tincher-Ladner's Supplemental Rule 26(A) Initial Disclosures, Phi Theta Kappa Honor Society v. HonorSociety.org, Inc. v. Dr. Lynn Ticher-Ladner, US District Court, Southern District of Mississippi, Jackson Division, Civil Action No. 3:22-cv-00208-CWR-FKB, December 6, 2023 |
| Phi Theta Kappa Honor Society's Amended Responses to HonorSociety.Org, Inc.'s Requests for Admissions (Set One), Phi Theta Kappa Honor Society v. HonorSociety.org, Inc. v. Dr. Lynn Ticher-Ladner, US District Court, Southern District of Mississippi, Jackson Division, Civil Action No. 3:22-cv-00208-CWR-FKB, October 2, 2023 |
| Phi Theta Kappa Honor Society's Responses to HonorSociety.org, Inc.'s Interrogatories (Set One), Phi Theta Kappa Honor Society v. HonorSociety.org, Inc. v. Dr. Lynn Ticher-Ladner, US District Court, Southern District of Mississippi, Jackson Division, Civil Action No. 3:22-cv-00208-CWR-FKB, July 14, 2023 |
| Phi Theta Kappa Honor Society's Responses to HonorSociety.org, Inc.'s Interrogatories (Set Two), Phi Theta Kappa Honor Society v. HonorSociety.org, Inc. v. Dr. Lynn Ticher-Ladner, US District Court, Southern District of Mississippi, Jackson Division, Civil Action No. 3:22-cv-00208-CWR-FKB, December 29, 2023 |
| Phi Theta Kappa Honor Society's Responses to HonorSociety.org, Inc.'s Requests for Admissions (Set One), Phi Theta Kappa Honor Society v. HonorSociety.org, Inc. v. Dr. Lynn Ticher-Ladner, US District Court, Southern District of Mississippi, Jackson Division, Civil Action No. 3:22-cv-00208-CWR-FKB, July 14, 2023 |
| Phi Theta Kappa Honor Society's Responses to HonorSociety.org, Inc.'s Requests for Admissions (Set Two), Phi Theta Kappa Honor Society v. HonorSociety.org, Inc. v. Dr. Lynn Ticher-Ladner, US District Court, Southern District of Mississippi, Jackson Division, Civil Action No. 3:22-cv-00208-CWR-FKB, December 29, 2023 |
| Phi Theta Kappa Honor Society's Responses to HonorSociety.org, Inc.'s Requests for Production of Documents (Set Two), Phi Theta Kappa Honor Society v. HonorSociety.org, Inc. v. Dr. Lynn Ticher-Ladner, US District Court, Southern District of Mississippi, Jackson Division, Civil Action No. 3:22-cv-00208-CWR-FKB, December 29, 2023 |

| |
|---|
| Phi Theta Kappa Honor Society's Rule 26(a) Initial Disclosures, Phi Theta Kappa Honor Society v. HonorSociety.org, Inc. v. Dr. Lynn Ticher-Ladner, US District Court, Southern District of Mississippi, Jackson Division, Civil Action No. 3:22-cv-00208-CWR-FKB, May 15, 2023 |
| Phi Theta Kappa Honor Society's Supplemental Responses to HonorSociety.org, Inc.'s Interrogatories (Set One), Phi Theta Kappa Honor Society v. HonorSociety.org, Inc. v. Dr. Lynn Ticher-Ladner, US District Court, Southern District of Mississippi, Jackson Division, Civil Action No. 3:22-cv-00208-CWR-FKB, September 29, 2023 |
| Plaintiff's First Set of Interrogatories to HonorSociety.org, Inc., Phi Theta Kappa Honor Society v. HonorSociety.org, Inc., US District Court, Southern District of Mississippi, Jackson Division, Civil Action No. 3:22-cv-00208-CWR-FKB, April 12, 2023 |
| Plaintiff's First Set of Requests for Production of Documents to HonorSociety.org, Inc., Phi Theta Kappa Honor Society v. HonorSociety.org, Inc., US District Court, Southern District of Mississippi, Jackson Division, Civil Action No. 3:22-cv-00208-CWR-FKB, April 12, 2023 |
| Requests for Admissions (Set One), From HonorSociety.org, Inc. to Phi Theta Kappa Honor Society, Phi Theta Kappa Honor Society v. HonorSociety.org, Inc. v. Dr. Lynn Ticher-Ladner, US District Court, Southern District of Mississippi, Jackson Division, Civil Action No. 3:22-cv-00208-CWR-FKB, June 14, 2023 |
| Requests for Admissions (Set Two), From HonorSociety.org, Inc. to Phi Theta Kappa Honor Society, Phi Theta Kappa Honor Society v. HonorSociety.org, Inc. v. Dr. Lynn Ticher-Ladner, US District Court, Southern District of Mississippi, Jackson Division, Civil Action No. 3:22-cv-00208-CWR-FKB, November 29, 2023 |
| Requests for Production of Documents (Set One), From HonorSociety.org, Inc. to Phi Theta Kappa Honor Society, Phi Theta Kappa Honor Society v. HonorSociety.org, Inc. v. Dr. Lynn Ticher-Ladner, US District Court, Southern District of Mississippi, Jackson Division, Civil Action No. 3:22-cv-00208-CWR-FKB, June 14, 2023 |
| Requests for Production of Documents (Set Two), From HonorSociety.org, Inc. to Phi Theta Kappa Honor Society, Phi Theta Kappa Honor Society v. HonorSociety.org, Inc. v. Dr. Lynn Ticher-Ladner, US District Court, Southern District of Mississippi, Jackson Division, Civil Action No. 3:22-cv-00208-CWR-FKB, November 29, 2023 |
| United States v. E. I. du Pont de Nemours Co.,351 U. S. 377, 351 U. S. 391 (1956) |
| United States v. U.S. Sugar Corp., 73 F.4th 197, 204-07 (3d Cir. 2023) |
| **Depositions** |
| Deposition of Curt Gomulinski, April 30, 2024 and Exhibits |
| Deposition of Daniel J. Phelan, April 4, 2024 and Exhibits |
| Deposition of David Asari, May 2, 2024 and Exhibits |
| Deposition of George Boggs, April 5, 2024 and Exhibits |
| Deposition of Heather Yush, February 27, 2024 and Exhibits |
| Deposition of Lynn Tincher-Ladner, February 28, 2024 and Exhibits |
| Deposition of Michael Moradian, February 1, 2023 and Exhibits |
| Deposition of Michael Moradian, January 3, 2024 and Exhibits |
| Deposition of Michael Moradian, May 3, 2024 and Exhibits |
| Deposition of Mikal Calvert, January 5, 2024 and Exhibits |

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

| |
|---|
| Deposition of Monica Marlowe, March 20, 2024 and Exhibits |
| Deposition of Nader Moradian, January 4, 2024 and Exhibits |
| Deposition of Paige Chandler, March 18, 2024 and Exhibits |
| **Bates** |
| HS_129481 |
| HS_2201033 |
| HS_2201034 |
| HS_2201035 |
| HS_220986 |
| HS_220987 |
| HS_220988 |
| HS_220989 |
| HS_220990 |
| HS_220991 |
| HS_220992 |
| HS_220993 |
| HS_221005 |
| HS_221017 |
| HS_221029 |
| HS_221030 |
| HS_221031 |
| HS_221032 |
| PTK0001682 |
| PTK0001683 |
| PTK0001690 |
| PTK0002999 |
| PTK0003198 |
| PTK0003307 |
| PTK0003366 |
| PTK0003390 |
| PTK0003443 |
| PTK0003477 |
| PTK0003962 |
| PTK0004202 |
| PTK0004453 |
| PTK0004454 |
| PTK0005269 |
| PTK0005270 |
| PTK0005271 |
| PTK0006177 |
| PTK0006178 |
| PTK0006351 |

| |
|---|
| PTK0007170 |
| PTK0007253 |
| PTK0007501 |
| PTK0009501 |
| PTK0013287 |
| PTK0013621 |
| PTK0013626 |
| PTK0013634 |
| PTK0013635 |
| PTK0013974 |
| PTK0013976 |
| PTK0014031 |
| PTK0014033 |
| PTK0017677 |
| PTK0026600 |
| PTK0026601 |
| PTK0026693 |
| PTK0028705 |
| PTK0030454 |
| PTK0031898 |
| PTK0031900 |
| PTK0031901 |
| PTK0031936 |
| PTK0038269 |
| PTK0044798 |
| PTK0044817 |
| PTK0044854 |
| PTK0047106 |
| PTK0047107 |
| PTK0048863 |
| PTK0048866 |
| PTK0050209 |
| PTK0050210 |
| PTK0058993 |
| PTK0060308 |
| PTK0060310 |
| PTK0060311 |
| PTK0060312 |
| PTK0060313 |
| PTK0060316 |
| PTK0060318 |
| PTK0060753 |

| |
|---|
| PTK0061006 |
| PTK0061007 |
| PTK0062449 |
| PTK0063162 |
| PTK0064023 |
| PTK0064090 |
| PTK0064091 |
| PTK0070173 |
| PTK0070351 |
| PTK0070352 |
| PTK0070576 |
| PTK0070599 |
| PTK0070947 |
| PTK0070949 |
| PTK0071908 |
| PTK0072078 |
| PTK0072113 |
| PTK0072550 |
| PTK0072583 |
| PTK0072950 |
| PTK0073706 |
| PTK0075012 |
| PTK0075184 |
| PTK0075554 |
| PTK0081430 |
| PTK0086975 |
| PTK0087469 |
| PTK0091540 |
| PTK0093777 |
| PTK0093909 |
| PTK0093938 |
| PTK0104864 |
| PTK0104865 |
| PTK0111042 |
| PTK0111043 |
| PTK0116270 |
| PTK0116272 |
| PTK0116410 |
| PTK0117017 |
| PTK0117023 |
| PTK0117036 |
| PTK0118659 |

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

| |
|---|
| PTK0118660 |
| PTK0118678 |
| PTK0119085 |
| PTK0119776 |
| PTK0120182 |
| PTK0120904 |
| PTK0122574 |
| PTK0123549 |
| PTK0123724 |
| PTK0123725 |
| PTK0123726 |
| PTK0123776 |
| PTK0123779 |
| PTK0123780 |
| PTK0123784 |
| PTK0123786 |
| PTK0123791 |
| PTK0123793 |
| PTK0123799 |
| PTK0123801 |
| PTK0123810 |
| PTK0123816 |
| PTK0123818 |
| PTK0123826 |
| PTK0123842 |
| PTK0124115 |
| PTK0124125 |
| PTK0128829 |
| PTK0132161 |
| PTK0132301 |
| PTK0132371 |
| PTK0132373 |
| PTK0132443 |
| PTK0132444 |
| PTK0132455 |
| PTK0132512 |
| PTK0136341 |
| PTK0136342 |
| PTK0136584 |
| PTK0136606 |
| PTK0140325 |
| PTK0140326 |

| |
|---|
| PTK0140327 |
| PTK0140341 |
| PTK0140342 |
| PTK0140377 |
| PTK0140793 |
| PTK0141246 |
| PTK0141249 |
| PTK0141502 |
| PTK0141513 |
| PTK0141521 |
| PTK0141549 |
| PTK0141612 |
| PTK0141639 |
| PTK0141640 |
| PTK0142168 |
| PTK0142198 |
| PTK0142199 |
| PTK0142332 |
| PTK0142414 |
| PTK0142449 |
| PTK0142457 |
| PTK0142459 |
| PTK0142460 |
| PTK0142476 |
| PTK0142485 |
| PTK0142501 |
| PTK0142648 |
| PTK0142651 |
| PTK0142686 |
| PTK0142697 |
| PTK0142699 |
| PTK0142700 |
| PTK0142706 |
| PTK0142721 |
| PTK0142739 |
| PTK0142743 |
| PTK0142785 |
| PTK0142788 |
| PTK0142791 |
| PTK0142797 |
| PTK0142800 |
| PTK0142803 |

| |
|---|
| PTK0142804 |
| PTK0142807 |
| PTK0142810 |
| PTK0142825 |
| PTK0142835 |
| PTK0142941 |
| PTK0142942 |
| PTK0142945 |
| PTK0142979 |
| PTK0143013 |
| PTK0143183 |
| PTK0143346 |
| PTK0143350 |
| PTK0143363 |
| PTK0143364 |
| PTK0143370 |
| PTK0143417 |
| PTK0143425 |
| PTK0182103 |
| PTK0182173 |
| PTK0182223 |
| PTK0182225 |
| PTK0182311 |
| PTK0182313 |
| PTK0182315 |
| PTK0182318 |
| PTK0182321 |
| PTK0182324 |
| PTK0182352 |
| PTK0182353 |
| PTK0182358 |
| PTK0182405 |
| PTK0182406 |
| PTK0182407 |
| PTK0182454 |
| PTK0182980 |
| PTK0182980 |
| PTK0182981 |
| PTK0182985 |
| PTK0183154 |
| PTK0183163 |
| PTK0183174 |

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

| |
|---|
| PTK0183183 |
| PTK0183610 |
| PTK0183754 |
| PTK0183809 |
| PTK0183825 |
| PTK0183826 |
| PTK0183867 |
| PTK0198945 |
| PTK0207140 |
| PTK0207394 |
| PTK0208948 |
| PTK0208950 |
| PTK0208953 |
| PTK0212529 |
| PTK0215549 |
| PTK0215550 |
| **Third Party** |
| "HonorSociety.org Requirements & Recognition Levels," HonorSociety, https://www.honorsociety.org/requirements |
| "Presidential Advisory Board," PTK, https://www.ptk.org/foundation/presidential-advisory-board/ |
| "Sigma Kappa Delta", Sigma Kappa Delta, https://www.english2.org |
| "About AKM – Questions and Answers," Alpha Kappa Mu Honor Society, https://www.alphakappamu.org/about.html |
| "About PTK," Phi Theta Kappa Honor Society, https://www.ptk.org/about-ptk/ |
| "About SKD," Sigma Kappa Delta: The National English Honor Society for Two-Year Colleges, https://www.english2.org/about_skd.php |
| "About the National Society of Leadership and Success," NSLS, https://www.nsls.org/about. |
| "About US," Alpha Beta Kappa Honor Society, https://www.abkhs.org/aboutus.html |
| "About Us," American Association of Community Colleges, https://www.aacc.nche.edu/about-us/ |
| "Advisory Board Members," American Association of Community Colleges, https://www.aacc.nche.edu/programs/workforce-economic-development/expanding-community-college-apprenticeships/advisory-board-members/ |
| "Alpha Pi Theta (PTK)," Brookdale Community College, https://www.brookdalecc.edu/alpha-pi-theta-ptk/ |
| "Apply for Membership," Golden Key International Honour Society, https://www.goldenkey.org/golden-key-eligibility/ |
| "Benefits & Privileges," Alpha Beta Kappa Honor Society, https://www.abkhs.org/Honor-Society-Contact-Ocean-View-DE.html |
| "Boggs, Karpinski Elected to Lead Phi Theta Kappa Board of Directors," Phi Theta Kappa Honor Society, https://web.archive.org/web/20240520114741/https://www.ptk.org/2021/02/04/boggs-karpinski-elected-to-lead-phi-theta-kappa-board-of-directors/ |

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

| |
|---|
| "Chancellor's Bio," Ozarks Technical Community College, https://about.otc.edu/chancellor/chancellor-bio/ |
| "Community Colleges Provide a Smart Start," Phi Theta Kappa Honor Society, https://web.archive.org/web/20240520131553/https://www.ptk.org/by-dr-lynn-tincher-ladner/ |
| "CSN_Phi Theta Kappa (PTK)," College of Southern Nevada, https://www.csn.edu/phi-theta-kappa |
| "Debbra Esparza," LinkedIn, https://www.linkedin.com/in/webdebb/ |
| "Esparza to Receive Phi Theta Kappa Alumni Achievement Award," Phi Theta Kappa Honor Society, https://web.archive.org/web/20240522073337/https://www.ptk.org/2018/02/13/esparza-to-receive-phi-theta-kappa-alumni-achievement-award/ |
| "FAQS," Phi Theta Kappa Honor Society, https://www.ptk.org/join/faqs/ |
| "Frequently Asked Questions," Alpha Chi National College Honor Society, https://alphachihonor.org/member-faq |
| "Frequently Asked Questions," The Society for Collegiate Leadership & Achievement, https://www.thescla.org/faq |
| "General Information," Alpha Beta Gamma, https://abg.org/general-information/ |
| "Geographic Market Definition," Note by the United States, OECD Working Party No. 3 on Co-operation and Enforcement, November 8, 2016 |
| "Home," Delta Alpha Pi International Honor Society: Working for an aDAPtable World, https://deltaalphapihonorsociety.org/ |
| "Honor Society Tiers," HonorSociety, https://www.honorsociety.org/membership-tiers |
| "Honoring Achievement in Economics Worldwide," Omicron Delta Epsilon: The International Honor Society for Economics, https://www.omicrondeltaepsilon.org/index.html |
| "How Many Chapters are There?" NSCS FAQ, https://nscs.org/faq/ |
| "How Much are the Dues to be an Honor Society Member?" HonorSociety, https://www.honorsociety.org/memberdues |
| "How Much is Membership to the NSLS," NSLS, https://www.nsls.org/faq#:~:text=HOW%20MUCH%20IS%20MEMBERSHIP%20TO,not%20expire%20or%20need%20renewal |
| "How the NSLS Can Boost Your Resume," NSLS, https://www.nsls.org/blog/list-honor-society-on-resume#:~:text=We%20are%20the%20only%20accredited,hire%20members%20of%20the%20NSLS |
| "Join US," Alpha Beta Kappa Honor Society, https://www.abkhs.org/joinus.html |
| "Join: Individual and Chapter Memberships," SALUTE Veterans National Honor Society, https://salute.colostate.edu/join/ |
| "Lambda Pi Eta," National Communication Association, https://www.natcom.org/lambda-pi-eta |
| "List of Affiliated Councils," American Association of Community Colleges, https://www.aacc.nche.edu/about-us/affiliated-councils/list-of-affiliated-councils/ |
| "Mario Castillo, J.D. Bio," Lone Star College, https://www.lonestar.edu/candidate-mario-castillo.htm |
| "Member Benefits," Phi Theta Kappa Honor Society, https://www.ptk.org/benefits/ |
| "Membership," Association of College Honor Societies (ACHS), https://www.achshonor.org/membership#:~:text=Classification%20of%20Honor%20Societies,as%20the%20society%20has%20established |

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

| |
|---|
| "Memberships FAQs," CORE, Phi Sigma Pi National Honor Fraternity, https://core.phisigmapi.org/member/resources/member-faqs |
| "Merger Guidelines," U.S. Department of Justice and Federal Trade Commission, December 18, 2023, available at https://www.justice.gov/d9/2023-12/2023%20Merger%20Guidelines.pdf |
| "Monopolization Defined," Federal Trade Commission, https://www.ftc.gov/advice-guidance/competition-guidance/guide-antitrust-laws/single-firm-conduct/monopolization-defined |
| "Phi Beta Kappa Chapters," The Phi Beta Kappa Society, https://www.pbk.org/chapters-associations/about-chapters |
| "Phi Theta Kappa Honor Society," Berkeley City College, https://www.berkeleycitycollege.edu/ptk/ |
| "Presidential Advisory Board," Phi Theta Kappa Honor Society, https://www.ptk.org/leadership/presidential-advisory-board/ |
| "Psi Beta: Community College National Honor Society in Psychology," Psi Beta, https://psibeta.org/ |
| "PTK Appoints Williams to Presidential Advisory Board," PTK, https://www.ptk.org/ptk-appoints-williams-to-presidential-advisory-board/ |
| "Scholarships Platform For All," HonorSociety, https://www.honorsociety.org/scholarships |
| "Sigma Chi Eta," National Communication Association, https://www.natcom.org/student-and-early-career/sigma-chi-eta |
| "Single Firm Conduct," Federal Trade Commission, https://www.ftc.gov/advice-guidance/competition-guidance/guide-antitrust-laws/single-firm-conduct |
| "Stephanie Church," LinkedIn, https://www.linkedin.com/in/stephanieachurch/ |
| "The #1 Most Valuable Honor Society in the U.S.," The National Society of Collegiate Scholars, https://nscs.org/ |
| "Tincher-Ladner to Serve on American Association of Community Colleges' Board of Directors," Phi Theta Kappa Honor Society, https://web.archive.org/web/20240522074532/https://www.ptk.org/2022/05/23/tincher-ladner-to-serve-on-aacc-board-of-directors/ |
| "University Partnership Scholarships," PTK, https://www.ptk.org/scholarships/how-our-scholarships-work/university-partner-scholarships/ |
| "US Monopolisation Cases," Global Competition Review, January 28, 2021 |
| "What is the Membership Fee?" NSCS FAQ, https://nscs.org/faq/ |
| "Where's Walter Archive," American Association of Community Colleges, https://www.aacc.nche.edu/publications-news/ceo-to-ceo/wheres-walter-archive/ |
| ABA Section of Antitrust Law, Market Definition in Antitrust: Theory and Case Studies, 2012 |
| ABA Section of Antitrust Law, Market Power Handbook¸ 2005 |
| Adkinson, Jr., William F.,  Karen L. Grimm, and Christopher N. Bryan, "ENFORCEMENT OF SECTION 2 OF THE SHERMAN ACT: THEORY AND PRACTICE," Working Paper, November 3, 2008, https://www.ftc.gov/system/files/documents/public_events/section-2-sherman-act-hearings-single-firm-conduct-related-competition/section2overview.pdf |
| Adkinson, Jr., William F., Karen L. Grimm, and Christopher N. Bryan, "ENFORCEMENT OF SECTION 2 OF THE SHERMAN ACT: THEORY AND PRACTICE," Working Paper, November 3, 2008, https://www.ftc.gov/system/files/documents/public_events/section-2-sherman-act-hearings-single-firm-conduct-related-competition/section2overview.pdf |

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

Allen, Mark A., Robert E. Hall, and Victoria A. Lazear, "Reference Guide on Estimation of Economic Damages," Reference Manual on Scientific Evidence, Third Edition, Federal Judicial Center, 2011

Berry, David A., Emma Jo Marshall and Dane U. Eisenberg, Community Conversations: Toward Shared Understandings of American Identity. Community College Humanities Association, 1997

Church, Jeffrey and Roger Ware, Industrial Organization: A Strategic Approach, McGraw Hill, 2000

Demperio, Stephanie and Jennifer Cascone Fauver, "Defining the Relevant Market in Pharmaceutical Antitrust Cases," Antitrust Healthcare Chronicle, Vol. 32, No. 1, Antitrust Section of the American Bar Association, November 2017

Fumagalli, Chiara, Massimo Motta and Claudio Calcagno, Exclusionary Practices: The Economics of Monopolisation and Abuse of Dominance, Cambridge University Press, 2018

Harmon, Chasity, "What types of students are eligible?" Phi Theta Kappa Honor Society, September 1, 2020, https://support.ptk.org/hc/en-us/articles/360036805373-What-types-of-students-are-eligible

HonorSociety, https://www.honorsociety.org

https://bartonccc.edu/studentlife/clubs

https://bergen.edu/honors/phi-theta-kappa-ptk/

https://bristolcc.edu/learnatbristol/academicresources/phithetakappa.html

https://calhoun.edu/student-activities-clubs/student-clubs-organizations/phi-theta-kappa/

https://ccv.edu/phi-theta-kappa-at-ccv/

https://cei.edu/honor-society

https://cncc.edu/campus-life/clubs-organizations

https://edgecombe.edu/current-students/student-clubs-and-organizations/phi-theta-kappa/

https://ewc.wy.edu/student-resources/get-involved/

https://holmescc.edu/student-life/phi-theta-kappa/

https://internal.dmacc.edu/carroll/Pages/PhiThetaKappa.aspx

https://ivylife.ivytech.edu/organization/phi-theta-kappa-honor-society-indianapolis

https://kpc.alaska.edu/student-life/student-activities/phi-theta-kappa.cshtml

https://laurelridge.edu/clubs-organizations/phi-theta-kappa/

https://ncta.unl.edu/activities/phi-theta-kappa

https://qvcc.edu/student-resources/ptk/

https://westmoreland.edu/student_life/student-organizations/honor-societies.html

https://www.alvincollege.edu/phithetakappa/

https://www.asub.edu/honors-program/

https://www.azwestern.edu/student-life/honors/phi-theta-kappa

https://www.bccc.edu/domain/2130

https://www.bhc.edu/news/2023/06/qc-campus-students-join-phi-theta-kappa-honor-society-spring-2023/

https://www.bmcc.cuny.edu/academics/ptk/

https://www.canyons.edu/academics/honors/honorssociety/index.php

https://www.cctech.edu/news/three-central-carolina-technical-college-honor-society-students-named-to-south-carolina-academic-team/

https://www.centralia.edu/resources/student-life/ptk.aspx

https://www.century.edu/phi-theta-kappa/

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

| |
|---|
| https://www.cgcc.edu/PTK |
| https://www.chattanoogastate.edu/phi-theta-kappa |
| https://www.clarkstate.edu/community/news/clark-state-to-hold-ptk-induction-ceremony/ |
| https://www.cnm.edu/depts/trio/scholarships-and-internships |
| https://www.csn.edu/phi-theta-kappa |
| https://www.dakotacollege.edu/student-life/clubs-and-organizations |
| https://www.dawson.edu/current-students/student-success/student-life.html |
| https://www.delta.edu/students/engage/ptk.html |
| https://www.eosc.edu/student-life/student-activities/phi-theta-kappa |
| https://www.fsw.edu/ptk |
| https://www.gtc.edu/campus-life/student-involvement/phi-theta-kappa |
| https://www.jeffco.edu/ptk-honor-society |
| https://www.kapiolani.hawaii.edu/support-and-campus-life/honors-societies/ |
| https://www.kvcc.me.edu/life-at-kvcc/clubs-organizations/ |
| https://www.mybrcc.edu/student-life/clubsorgs/ptk.php |
| https://www.newriver.edu/phi-theta-kappa/ |
| https://www.nhti.edu/nhti-raises-scholarship-funds-for-high-achieving-students/ |
| https://www.sgsc.edu/life-at-sgsc/ptk |
| https://www.sullivan.edu/news/lexington-campus-inducts-new-members-of-phi-theta-kappa |
| https://www.uvu.edu/catalog/current/courses/search.html?query=UVST+ |
| Iken, Alexander, et al., "Non-Price Competition: EU Merger Control Framework and Case Practice," European Commission Competition Policy Brief, Issue 1, April 2024, https://competition-policy.ec.europa.eu/document/download/b0042baf-a258-4c31-b31a-6331cb8d54a2_en?filename=kdak24001enn_competition_policy_brief_non-price_merger-control.pdf |
| Kaplow, Louis and Carl Shapiro, "Antitrust," Chapter 15, Handbook of Law and Economics. Vol. 2, 2007, Edited by A. Mitchell Polinsky and Steven Shavell |
| Marshall, Kevin S., The Economics of Antitrust Injury and Firm-Specific Damages. Lawyers & Judges Publishing Company, Inc., 2008, pp. 23-24. Kindle Edition |
| Motta, Massimo, Competition Policy: Theory and Practice, Cambridge University Press, 2009 |
| National Student Clearinghouse Research Center, Current Term Enrollment Estimates Report Data Appendix Fall 2022 |
| National Student Clearinghouse Research Center, Current Term Enrollment Estimates Report Data Appendix Fall 2023 |
| National Student Clearinghouse Research Center, Current Term Enrollment Estimates Report Data Appendix Spring 2024 |
| National Student Clearinghouse Research Center, Current Term Enrollment Estimates Report Fall 2015 |
| National Student Clearinghouse Research Center, Current Term Enrollment Estimates Report Fall 2016 |
| National Student Clearinghouse Research Center, Current Term Enrollment Estimates Report Fall 2017 |
| National Student Clearinghouse Research Center, Current Term Enrollment Estimates Report Fall 2018 |
| National Student Clearinghouse Research Center, Current Term Enrollment Estimates Report Spring 2015 |

| |
|---|
| National Student Clearinghouse Research Center, Current Term Enrollment Estimates Report Spring 2016 |
| National Student Clearinghouse Research Center, Current Term Enrollment Estimates Report Spring 2017 |
| National Student Clearinghouse Research Center, Current Term Enrollment Estimates Report Spring 2018 |
| National Student Clearinghouse Research Center, Current Term Enrollment Estimates Report Spring 2019 |
| National Student Clearinghouse Research Center, Current Term Enrollment Estimates Report Spring 2020 |
| Paige Rakestraw, LinkedIn, https://www.linkedin.com/in/paige-rakestraw-9aaa39190/ |
| Phillip E. Areeda and Herbert Hovenkamp, Antitrust Law: An Analysis of Antitrust Principles and Their Application, New York: Aspen Publishers, 2024 |
| Proving Antitrust Damages – Legal and Economic Issues, Third Edition, ABA Section of Antitrust Law, 2017 |
| The Alpha Beta Kappa National Honor Society, https://www.abkhs.org/ |
| The California Community College Scholastic Honor Society, https://www.agshonor.org/ |
| van Dijk, Theon and Frank Verboven, "Quantification of Damages," in ISSUES IN COMPETITION LAW AND POLICY, ABA Section of Antitrust Law, 2008 |
| **Academic** |
| Baker, Jonathan and Timothy Bresnahan, "Economic Evidence in Antitrust: Defining Markets and Measuring Market Power," John M. Olin Program in Law and Economics, Stanford Law School, Working Paper No. 328, September 2006 |
| Baker, Jonathan B. "Exclusion as a Core Competition Concern," *Antitrust Law Journal*, vol. 78, 2013 |
| Baker, Jonathan B., "Market Definition: An Analytical Overview," *Antitrust Law Journal*, Vol. 74, No. 1, 2007 |
| Coate, Malcolm B. and Jeffrey H. Fischer, "A Practical Guide to the Hypothetical Monopolist Test for Market Definition," *Journal of Competition Law & Economics*, Vol. 4, No. 4, 2007 |
| Francis, Daniel, "Making Sense of Monopolization," vol. 84, 2022, *Antitrust Law Journal* |
| Korenblit, Claire M., "Quantifying Antitrust Damages - Convergence of Methods Recognized by U.S. Courts and the European Commission," *CPI Antitrust Chronicle*, March 2012 |
| McCrary, Justin and Daniel L Rubinfeld, "Measuring benchmark damages in antitrust litigation," *Journal of Econometric Methods* Vol. 3, No. 1, 2014 |
| Mungan, Murat C. and John M. Yun (2023), "A Reputational View of Antitrust's Consumer Welfare Standard," George Mason University Law & Economics Research Paper Series, 23-05. This article was also published in the *Houston Law Review*, vol. 61, pp. 569-611, 2024 |
| Richards, J. Douglas, "Is Market Definition Necessary in Sherman Act Cases When Anticompetitive Effects Can Be Shown with Direct Evidence," *Antitrust*, Vol. 26, 2012 |
| **Data** |
| HonorSociety Membership Transaction Database |

# EXHIBIT A-13

# Phi Theta Kappa Honor Society v. honorsociety.org, Inc.

**\*CONFIDENTIAL\* AEO -REDACTED  Lynn Tincher-Ladner**
**February 28, 2024**

All depositions & exhibits are available for downloading at
<www.brookscourtreporting.com>
Please call or e-mail depo@brookscourtreporting.com if you need  a
**Username** and **Password.**



**Mississippi - Louisiana - Tennessee - New York**
**1-800-245-3376**

*CONFIDENTIAL* AEO -REDACTED   Lynn Tincher-Ladner 2/28/2024

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
JACKSON DIVISION

PHI THETA KAPPA HONOR SOCIETY

                                        PLAINTIFF

V.              CIVIL ACTION NO. 3:22-CV-208-CWR-FKB

HONORSOCIETY.ORG, INC.

                                        DEFENDANT

_____

HONORSOCIETY.ORG, INC.

                                  COUNTER-CLAIMANT

V.

PHI THETA KAPPA HONOR SOCIETY

                                  COUNTER-DEFENDANT

_____

HONORSOCIETY.ORG, INC.

                             THIRD-PARTY PLAINTIFF

V.

DR. LYNN TINCHER-LADNER

                             THIRD-PARTY DEFENDANT

_____

REDACTED TRANSCRIPT - CONFIDENTIAL
(AEO DESIGNATIONS REDACTED)
DEPOSITION OF DR. LYNN TINCHER-LADNER

Taken at the instance of the Defendant at
Wise, Carter, Child & Caraway, 401 E Capitol,
Suite 600, Jackson, Mississippi, on Wednesday,
February 28, 2024,
beginning at 9:15 a.m.

REPORTED BY:
GINGER H. BROOKS, CCR #1165
CRR, RPR, CRC, CCR, CLR, RSA

*CONFIDENTIAL* AEO -REDACTED   Lynn Tincher-Ladner 2/28/2024

```
 1          You may have a different understanding of
 2      what's public.
 3              Do you mean like published in a
 4      newspaper?
 5              MR. ROZANSKY:  That you're aware is
 6      known beyond the confines of PTK?
 7              MR. POLAK:  I don't know that that's
 8      public.
 9              MR. ROZANSKY:  Sure.  Let's go with that
10      you know has --
11      Q.   (By Mr. Rozansky)  Let me ask it this
12  way:  Are you aware of any chapter advisors
13  engaging in dishonest behavior where that behavior
14  became the subject of any articles or news
15  coverage?
16              MR. POLAK:  That's just a yes-or-no
17      question.
18              THE WITNESS:  Yes, from a -- yes.
19      Q.   (By Mr. Rozansky)  Okay.  What conduct?
20      A.   Don't know, because chapter advisors are
21  employees of their college, and we have never been
22  involved at PTK in any sort of investigation.  If
23  they're -- if they are having some misconduct as
24  an employee, they have all this stuff on their end
25  to take care of that.
```

 1                 It's not in our purview to deal with
 2     that.  They're college employees.
 3         Q.   I'm asking you a different question,
 4     though, which is whether you're aware of any
 5     chapter advisors that have been publicly accused
 6     of engaging in misconduct?
 7                 MR. POLAK:  Asked and answered.
 8                 THE WITNESS:  I said "yes" to that.
 9         Q.   (By Mr. Rozansky)  Okay.  And I'm asking
10     you who?
11                 MR. POLAK:  Okay.  That's a different
12             question than you asked before.
13                 MR. ROZANSKY:  Yeah, I'm asking a
14             different question.
15         Q.   (By Mr. Rozansky)  Who?
16         A.   Very recently, there was an article that
17     came out about a college employee who is also a
18     PTK advisor, and that's the only one I know of.
19         Q.   What was that PTK advisor accused of?
20         A.   It looks like, from reading the article,
21     which --
22                 MR. POLAK:  Objection to form.  That is
23             vague, ambiguous, and mischaracterizes the
24             prior testimony.  She didn't say that this
25             person was just a chapter advisor.

*CONFIDENTIAL* AEO -REDACTED   Lynn Tincher-Ladner 2/28/2024

1               CERTIFICATE OF COURT REPORTER

2               I, Ginger H. Brooks, Court Reporter and

3    Notary Public, in and for the State of

4    Mississippi, hereby certify that the foregoing

5    contains a true and correct transcript of the

6    testimony of DR. LYNN TINCHER-LADNER, as taken by

7    me in the aforementioned matter at the time and

8    place heretofore stated, as taken by stenotype and

9    later reduced to typewritten form under my

10   supervision by means of computer-aided

11   transcription.

12               I further certify that under the

13   authority vested in me by the State of Mississippi

14   that the witness was placed under oath by me to

15   truthfully answer all questions in the matter.

16               I further certify that, to the best of

17   my knowledge, I am not in the employ of or related

18   to any party in this matter and have no interest,

19   monetary or otherwise, in the final outcome of

20   this matter.

21               Witness my signature and seal this the

22   6th day of March, 2024.

23

24                         GINGER H. BROOKS, #1165
                           CRR, RPR, CCR

25   My Commission Expires:

# EXHIBIT A-14

FILED UNDER SEAL

# EXHIBIT A-15

---

**EXPERT REPORT OF DAVID FRANKLYN IN THE MATTER OF PHI THETA KAPPA HONOR SOCIETY V. HONORSOCIETY.ORG, INC.**

---

PREPARED BY:
David Franklyn
5602 E Via Buena Vista
Paradise Valley, AZ 85253

August 30, 2024

# *TABLE OF CONTENTS*

Page #

**TABLE OF CONTENTS** **1**
**I. ASSIGNMENT AND BACKGROUND** **2**
**II. STUDY AUTHORSHIP AND QUALIFICATIONS** **6**
**III. SUMMARY OF OPINIONS** **7**
**IV. GENERAL SURVEY METHODOLOGY** **8**
    Double-Blind Interviewing 9
    Interviewing Procedures and Data Processing 9
    Quality Control 9
**V. DETAILED ANALYSIS OF CONFUSION SURVEY RESULTS** **12**
    OVERVIEW OF STUDY 12
    SUMMARY OF KEY FINDINGS 14
    SURVEY METHODOLOGY 14
        The Relevant Universe of Interest 15
        Experimental Design 19
        Sampling Plan 37
        Interviewing Period 37
        Quality Control 37
    CONFUSION SURVEY RESULTS AND DISCUSSION 38
**VI. ADDITIONAL EVIDENCE OF CONSUMER CONFUSION** **43**
**VII. DETAILED ANALYSIS OF SECONDARY MEANING SURVEY RESULTS** **44**
    OVERVIEW OF STUDY 44
    SUMMARY OF KEY FINDINGS 45
    SURVEY METHODOLOGY 45
        The Relevant Universe of Interest 46
        Experimental Design 50
        Sampling Plans 58
        Interviewing Period 61
        Quality Control 61
    SECONDARY MEANING SURVEY RESULTS AND DISCUSSION 61
**VIII. DETAILED ANALYSIS OF FALSE ADVERTISING SURVEY RESULTS** **65**
    OVERVIEW OF STUDY 65
    SUMMARY OF KEY FINDINGS 67
    SURVEY METHODOLOGY 68
        The Relevant Universe of Interest 68
        Experimental Design - Message Portion 74
        Experimental Design - Materiality Portion 87

Sampling Plan                                                                 89
Interviewing Period                                                           89
Quality Control                                                              89
FALSE ADVERTISING SURVEY RESULTS AND DISCUSSION                              90
**IX. ADDITIONAL EVIDENCE OF FALSE ADVERTISING**                          **95**
**X. CONCLUSION**                                                          **98**

**APPENDIX A:     CURRICULUM VITAE OF STUDY'S AUTHOR**
**APPENDIX B:     SURVEY QUESTIONNAIRES**
          B1: CONFUSION SURVEY QUESTIONNAIRE
          B2: SECONDARY MEANING SURVEY QUESTIONNAIRE
          B3: FALSE ADVERTISING SURVEY QUESTIONNAIRE
**APPENDIX C:     SURVEY STIMULI**
          C1: CONFUSION SURVEY STIMULI
          C2: SECONDARY MEANING SURVEY STIMULI
          C3: FALSE ADVERTISING SURVEY STIMULI
**APPENDIX D:     SURVEY SCREENSHOTS**
          D1: CONFUSION SURVEY SCREENSHOTS
          D2: SECONDARY MEANING SURVEY SCREENSHOTS
          D3: FALSE ADVERTISING SURVEY SCREENSHOTS
**APPENDIX E:     SURVEY DATA**
          E1: CONFUSION SURVEY DATA
          E2: SECONDARY MEANING SURVEY DATA
          E3: FALSE ADVERTISING SURVEY DATA
**APPENDIX F:     MATERIALS CONSIDERED**
**APPENDIX G:     LIST OF OTHER COLLEGE REGALIA**
**APPENDIX H:     ADDENDA TO ADDITIONAL EVIDENCE OF**
          **CONFUSION AND FALSE ADVERTISING**

# I.    ASSIGNMENT AND BACKGROUND

---

Founded in 1918, Phi Theta Kappa Honor Society ("Phi Theta Kappa") is the oldest two-year university scholastic achievement society in the country.[1] As far as I am

---

[1] Plaintiff's Second Amended Complaint at p. 4, para. 17.

aware, it is widely recognized as the most established and prestigious scholastic achievement society among community colleges, being the only honor society that is formally affiliated with and endorsed by the American Association of Community Colleges.[2] Given that Phi Theta Kappa is a two-year college (or elsewise defined as community college, junior college, or technical school) scholastic achievement society, a market which Phi Theta Kappa alleges Honor Society to be unfairly and dishonestly appropriating, two year colleges are the relevant universe for analysis.

Phi Theta Kappa alleges several elements of trade dress that it claims have been in continuous use since 1924, and which are unique to it as a scholastic achievement society. The elements that I am analyzing, claimed independently and in combination are:

    a. A palette comprising predominantly navy blue and gold;

    b. Branding and marketing featuring a wreath of leaves;

    c. Regalia including stoles comprising a gold material with emblematic imagery at the bottom in navy blue.[3]





[4]

---

[2] Plaintiff's Second Amended Complaint at p. 4,, para. 19.
[3] Plaintiff's Second Amended Complaint at p. 9, para. 35.
[4] See: https://www.ptk.org/wp-content/uploads/2021/09/Phithetakappa_Logo_Stacked_Notag_Color_CMYK_300ppi.png.

3



5

Honor Society is purportedly infringing on Phi Theta Kappa's signature trade dress by utilizing the same common elements in its advertising and regalia:







6

---

4



7

As far as I have been able to discern through online research, navy blue and gold are not commonly used in the trade dress of two-year college scholastic achievement societies. I have attached a list of two-year college scholastic achievement societies and their respective regalia which share blue- and gold-adjacent color palettes.[8] Although some may be reasonably described as "blue and gold": (1) none use a darker or <u>navy</u> blue and gold in combination as do Phi Theta Kappa and Honor Society; and (2) those which do recognizably use blue and gold specialize in particular student sub-demographics (Delta Psi Omega: theater students; Psi Beta: psychology students; Delta Alpha Pi: disabled students).

I have been retained by counsel for Plaintiff Phi Theta Kappa Honor Society ("Phi Theta Kappa") to provide analysis as to whether the trade dress claimed by Phi Theta Kappa in its Second Amended Complaint holds secondary meaning, and whether

---

[7] See: https://cdn.shopify.com/s/files/1/0091/2048/1331/products/3810808_1024x1024.jpg?v=1562591443.
[8] See Appendix G attached.

5

Defendant HonorSociety.Org, Inc.'s ("Honor Society") branding creates a likelihood of confusion or actual confusion with Phi Theta Kappa's trade dress. Additionally, I have been retained to determine whether Honor Society is falsely advertising the nature of its organization and whether such representations materially affect relevant consumers' impressions of Honor Society.

## II.    STUDY AUTHORSHIP AND QUALIFICATIONS

I am currently a law professor at Arizona State University, with an appointment in the Sandra Day O'Connor College of Law.  I am also the Executive Director of the McCarthy Institute at ASU Law, which is focused on scholarship and research in intellectual property law, with particular emphasis in the areas of trademark law, branding and consumer perceptions related to brands. I have published extensively on issues relating to intellectual property law and am editor-in-chief and co-author of McCarthy's Desk Encyclopedia of Intellectual Property Law.

Formerly, between 2018 and 2021, I held a joint appointment in both the law school and Ageno School of Business at Golden Gate University in San Francisco. Between 2000 and 2018, I was a law professor and Executive Director of the McCarthy Institute for Intellectual Property and Technology Law at the University of San Francisco and Director of the Center for the Empirical Study of Trademark Law (CEST).

I have consulted and/or qualified as an expert witness on behalf of clients in numerous cases involving consumer perception and behavior issues, including in matters in the United States (federal and state courts), Asia, the European Union, the Middle East, and South America. I have personally designed and executed numerous consumer perception surveys that have been accepted into evidence by state and federal courts.

In addition to my survey research experience, I hold a J.D. from University of Michigan Law School. Additional biographical material, including lists of testimony and publications, is provided in Appendix A.

For my engagement in this matter, I am being compensated a flat fee of $130,000 for the preparation and fielding of these surveys through the completion of the expert report, plus approximately $20,000 to cover sample costs incurred by our survey vendor. For my continued engagement in this matter past the completion of the report, I will be compensated at my standard rate of $675 per hour. My compensation is not dependent upon the outcome of this proceeding.

## III.    SUMMARY OF OPINIONS

1. The results of the confusion survey indicate a net aggregate confusion rate of 22.58% between Phi Theta Kappa and Honor Society. Based on the results of the confusion survey, there is significant likelihood of confusion between Honor Society and Phi Theta Kappa.

2. The results of the secondary meaning survey indicate Phi Theta Kappa's claimed trade dress has a 39.93% net association among the current consumer universe, as well as a 31.91% net association across the total universe of current and prospective consumers. These results indicate that Phi Theta Kappa's trade dress carries substantial secondary meaning both among two-year college students and members of Phi Theta Kappa.

3. Honor Society's reputation among the relevant consumer universe, as would be consistent with scholastic achievement societies, overwhelmingly depends on the veracity of its many messages claiming prestige and associated benefits of membership. A supermajority of respondents exceeding 80% indicated that the

7

falsity of any of the messages would materially decrease their interest in joining Honor Society.

## IV.    *GENERAL SURVEY METHODOLOGY*

I conducted three surveys designed to test for (1) the likelihood of confusion between Phi Theta Kappa and Honor Society; (2) the secondary meaning in Phi Theta Kappa's trade dress; and (3) false advertising by Honor Society. Methodological features common to each of these surveys are denoted below. Further methodological elements specific to each of these surveys are discussed in their respective analysis sections.

The sample of survey respondents was recruited using a randomized selection of survey respondents who participate in online survey panels. Surveys conducted on the internet are well-accepted in both academic and market research, and are viewed by courts as standard and reliable methodological approaches to survey research. Indeed, online surveys are now the most common method of conducting market research among consumers.  Companies and other entities regularly make decisions of importance based on data they collect through online surveys. Numerous U.S. District Courts have expressly endorsed and accepted into evidence online surveys in trademark cases.

I have designed, fielded, and reported on numerous internet surveys that have been accepted by state and federal courts.

The sample of panelists used in the surveys was provided by Dynata, a leading supplier of online samples for surveys.[9]  Dynata is highly regarded as a reputable source of consumers for online surveys within the field of market research.  Dynata

---

[9] Excepting the Group 2 portion of the Secondary Meaning Survey, which is explained in the corresponding section of this report.

utilizes appropriate industry procedures for ensuring the integrity and quality of its panels.  Dynata ensures data integrity through their continued review of their panelists' behavior on a variety of metrics.

## Double-Blind Interviewing

These studies were administered under "double-blind" conditions. Consumers were uninformed as to the  purpose and sponsorship of the study. The survey is also, by definition, "blind" in that there is no person administering the surveys that can do anything to influence the results (unlike, for instance, a survey where someone asks a respondent questions in person or over  the phone).

## Interviewing Procedures and Data Processing

The online survey questionnaires were constructed, programmed, and hosted under my direction. My staff and I thoroughly tested the programmed surveys prior to any potential consumers receiving the invitations to participate in the surveys. Data was collected through the Qualtrics survey platform. The data sets showing each respondent's answers to all questions are provided in electronic form in Appendices E1, E2, and E3.

## Quality Control

Several quality control metrics were employed to ensure the validity of responses. Respondents in all three surveys were required to complete the following quality checks, in addition to data cleaning and other quality assurance measures specific to each of the surveys, which are discussed in the individual survey sections of this report.

All respondents were asked a quality assurance question in which they were

9

given a set of standard rating options and were asked to instead type the word "north" in the blank next to the "other" option. The aim of this question was to ensure that respondents were actively paying attention to the survey and fully reading the question text.



Respondents who clicked any of the first five options or who entered text that did not include "north" (regardless of capitalization) were immediately terminated (*i.e.*, not allowed to proceed further in the survey).

All respondents were also asked whether they typically wear eyeglasses or contact lenses when they read or shop.

10



If they answered "yes" to the question, they were asked if they would be wearing their eyeglasses or contact lenses during the survey. The intent of this question is to make sure that respondents were viewing the stimuli in the same way as they would in their typical day-to-day reading and shopping.

Respondents who indicated that they typically wear eyeglasses or contact lenses, but that they did not plan to for the remainder of the survey, were terminated.

Respondents were also provided with a detailed list of instructions and were asked to agree to these instructions in order to participate in the survey.

11

You have qualified to take this survey. Before continuing, please carefully read these instructions:

* Please take the survey in one session without interruption.
* Please keep your browser maximized for the entire survey.
* While taking the survey, please do not consult any other websites or other electronic or written materials.
* Please answer all questions on your own without consulting any other person.
* Please do not guess. If for any question you don't know the answer, please write "don't know" or "not sure" in the answer box provided.

I understand and agree to the above instructions

I do not understand or do not agree to the above instructions

Continue

Consumers who indicated that they did not understand or agree to the instructions were terminated from the survey.

## V. *DETAILED ANALYSIS OF CONFUSION SURVEY RESULTS*

---

**OVERVIEW OF STUDY**

To assess consumer perceptions relevant to likelihood of confusion in this case, I utilized a sequential lineup survey design (*e.g.,* a two-room *Squirt*). I determined this was the appropriate methodology for a confusion survey in this case for the following reasons. Generally, a *Squirt* survey is advisable when the parties sell or advertise their goods or services in physical or virtual proximity to each other. After reviewing Plaintiff's Second Amended Complaint  as well as additional information in the marketplace and provided by the parties in this litigation, I believe it is highly likely

12

that consumers could encounter these brands in physical and/or temporal proximity. These reasons include, but are not limited to:

- Consumers are sent recruitment emails by Honor Society, often to their private student email addresses, when they are expecting recruitment emails from Phi Theta Kappa or other school-sanctioned organizations.[10]
- Consumers can encounter both brands on a single Google search results page, when searching "honor society".[11]
- Consumers can encounter both brands on campuses where Honor Society holds events.[12]

Given this proximity, the sequential lineup survey is appropriate to assess consumer confusion.[13]

In the survey I designed and conducted for this matter, I first showed survey respondents (who were past or prospective members of a 2-year college honor society or who had previously considered joining a 2-year college honor society) the current presentation of the Phi Theta Kappa website page from which members can order its stole and rope graduation regalia, as well as a post from Phi Theta Kappa's Instagram account showing a member wearing the graduation regalia.

After seeing several "distracter" questions, consumers were then shown four different image pairs from honor societies in random order. As with the Phi Theta Kappa pages, each image pair consisted of a regalia sales page for the honor society and a social media post from the honor society's Facebook or Instagram account showing a

---

[10] *See* documents HS_136621 and HS_203039
[11] *See* documents HS_136621 and HS_203039
[12] HS_002834.pdf
[13] "[A]two-room lineup 'is an attempt to replicate the marketplace process of advertising exposure to a brand or trade dress, followed by being confronted in the market with both similar and differing brands or trade dresses.'" Jerre B. Swann, *Likelihood-of-Confusion Surveys*, Trademark and Deceptive Advertising Surveys, 66-67(Shari Seidman Diamond and Jerre B. Swann, 2nd ed. 2022) (citing McCarthy, *supra* note 5, § 32:177.

person wearing its regalia.

Survey respondents were randomly assigned to either the "test" cell or the "control" cell. Within the test cell, consumers saw the website pages and social media posts for Honor Society, The National Society of Leadership and Success, Alpha Sigma Lambda Honor Society, and National Technical Honor Society. For each set of website images, consumers were asked questions regarding the source, sponsorship, and affiliation, if any, between this scholastic achievement society and the scholastic achievement society from the first section of the survey (the Phi Theta Kappa image set). If consumers indicated they believed there was such a relationship, they were asked to provide a rationale for their thinking.

Within the control cell, everything was identical to the above, with the exception that all references to "Honor Society" in the Honor Society image set had been digitally altered to "Merit Society", the blue and gold coloring was digitally altered to salmon pink and gray, and the wreath logo was removed.

## SUMMARY OF KEY FINDINGS

After viewing the Phi Theta Kappa and Honor Society websites and social media posts, a significant percentage of survey respondents indicated that they mistakenly believed that the two organizations were related. Respondents' verbatim, written responses further indicated that the confusion was specifically driven by the name "Honor Society", the logo, and the colors navy blue and gold. After controlling for noise, these name, logo, and color associations were responsible for the majority of confusion among survey respondents.

## SURVEY METHODOLOGY

The screenshots shown are reduced in size in order to fit on the pages of this

14

report. Survey images appeared larger on respondents' screens, and respondents had the ability to increase the size of the text or images using the zoom-in feature on their browser. A full set of screenshots for this survey can be found in Appendix D1.

## The Relevant Universe of Interest

The interested universe of this study was individuals who have been enrolled in a 2-year college at any point during the past 5 years or who intend to enroll in a 2-year college at some point during the next 12 months, and who have joined an honor society or have been or will be interested in joining an honor society.

Consumers were first asked about their age.



Respondents who selected "Under 18" were terminated from (*i.e.*, not allowed to proceed further in) the survey.

15

Next, respondents were asked their gender. Options for "Female" and "Male" were randomized.



Respondents were then asked in which state they currently reside and were provided with a drop-down menu of options.

Those selecting "I do not live in the United States" were terminated.

Respondents were then asked if they or anyone in their household work in certain industries. Options other than "None of the Above" were randomized.

16



Respondents were terminated if they selected "honor society or organization".

Respondents were then asked whether they have been enrolled in a 2-year college at any point within the past 5 years. The order of the options "Yes" and "No" was randomized.



In the next screen, they were asked whether they intend to be enrolled in a 2-year college at some point in the next 12 months. As before, the order of the options "Yes"

and "No" was randomized.

> Do you plan to enroll in a two-year college at any point during the next 12 months?
>
> Yes
>
> No
>
> Don't know/unsure
>
> Continue

     Respondents who did not answer "yes" to either of the above two questions were terminated.

     If respondents answered "yes" to either of the above questions, they were asked if while enrolled in a 2-year college, they had joined an honor society or had been or will be interested in joining an honor society. The first three options were randomized.

In a previous question, you mentioned that you have been enrolled in a 2-year college at some point during the last 5 years or plan to be enrolled in a 2-year college at some point during the next 12 months.

While enrolled in a 2-year college, have you been or will you be interested in joining an honor society?

No, I have not been and will not be interested in joining an honor society

Yes, I have already joined an honor society

Yes, I have been or will be interested in joining an honor society

Don't know/prefer not to say

Continue

Only respondents who selected either "Yes, I have already joined an honor society" or "Yes, I have been or will be interested in joining an honor society" were allowed to continue in the survey.

### Experimental Design

After passing screening criteria and qualifying for the survey, in the first section of the survey respondents were asked to review an image of the Phi Theta Kappa website and an image from its social media account, as shown below in a screenshot of the survey. A copy of the entire survey's questionnaire is included in Appendix B1.

19

Please review the following images as if you are planning to join or have been a member of this scholastic achievement society. Please take as long as you need to view the images. You will be able to proceed once you see the 'Continue' button, which will appear momentarily.

*Use the zoom-in feature on the device you are using if you would like to enlarge any of the images.*



Were you able to view the images clearly?

Yes

No

Continue

While this and subsequent images are reduced in size to fit on these pages, the images appeared larger to consumers responding to the survey. Further, respondents were advised that they could adjust the size of the image using the standard zooming feature on their device. Respondents were also asked to state whether they could clearly see the images. Those indicating they could not see the images were terminated and not allowed to proceed further in the survey. Larger screenshots are provided within Appendix D1 of this report.

Respondents were instructed to "review the following images as if you are planning to join or have been a member of this scholastic achievement society." To ensure review of the images, a 5-second minimum wait was required before respondents were allowed to continue to the next screen of the survey.

Respondents were then required to indicate that they understood that if, later in the survey, the survey refers to the organization from the first section, that it is referring to the organization previously seen on the last screen. Respondents were advised that on subsequent pages containing survey questions, a yellow button would be present that would allow respondents to re-view the images from the first section.

This concludes the **first section** of the survey. If later in the survey you are asked about the scholastic achievement society you were shown in the first section of the survey, we are referring to the organization that you just saw on the last screen. At any point in the survey, you can return to view the images from the first section of the survey by clicking the yellow button.

I understand

I do not understand

Continue

The second section of the survey consisted of "distracter" questions, just as a respondent might have a pause or break, or think of something else, between viewing websites. These questions also functioned to mask the intent of the survey. Respondents were asked how many hours per week they exercise.

22



Then respondents were asked how many hours per week they watch television.



In the third section of the survey, respondents were told that they would be shown several images, and after viewing each image that they would be asked a series of questions. Respondents were also instructed not to guess with their answers, and to instead write "don't know" or "not sure" in the answer box if they did not know the answers.

For the **third section** of the survey, you will be shown several images. After viewing each image, you will be asked a series of questions.

Please do not guess. If for any question you don't know the answer, please write "don't know" or "not sure" in the answer box provided.

Continue

This survey utilized a test and control design. The only difference between the test and control cell was the stimuli shown for the Honor Society website and social media page.

Within the test cell, respondents saw (among other organizations' websites and social media pages) a page from the Honor Society website from which people can order graduation regalia and a page from their social media showing a person wearing the regalia. Both images included the name "Honor Society", the logo with the wreath, and the blue and gold colors of Honor Society.

24



Within the control cell, consumers saw an altered website in which all instances of the word "Honor Society" were changed to "Merit Society", the wreath emblems

were removed, and the blue and gold colors were changed to salmon pink and gray.



All other content and stimuli were identical across the test and control cells.

Respondents were shown the images and were asked to review them as if they were planning to join or have been a member of this scholastic achievement society.

To ensure review of the images, a 5-second minimum wait was required before respondents were allowed to continue to the next screen of the survey. After that, respondents were asked a series of questions to assess confusion, beginning with whether they believed the scholastic achievement society shown in the images was owned and operated by the same scholastic achievement society shown in the first section of the survey or by a different scholastic achievement society. The order of the first and second answer choices was randomized.

Below is the same set of images as previously shown. Please answer the question at the bottom of the page.

If at any time you would like to see the images from the **first section** of the survey, please click on the yellow button.

View images from first section



Do you believe that the scholastic achievement society represented in the above images

| | |
|---|---|
| **Is owned and operated by the same scholastic achievement society** that you were shown in the **first section** of the survey | |
| **Is owned and operated by a different scholastic achievement society** than you were shown in the **first section** of the survey | |
| I do not know or have no opinion | |
| I was unable to view the image clearly | |

Continue

28

Consumers who indicated that they believe that the scholastic achievement society shown in the images is owned or operated by the same scholastic achievement society they were shown in the first section of the survey were then asked, "why do you say that?"



29

Next, respondents were asked to indicate whether they believe that the scholastic achievement society shown in the images is or is not sponsored or approved by the scholastic achievement society shown in the first section of the survey. The order of the first and second answer choices was randomized.



Respondents who indicated that they believe that the scholastic achievement society shown in the images is sponsored or approved by the same scholastic achievement society they were shown in the first section of the survey were then asked, "why do you say that?"



Next, respondents were asked to indicate whether they believe that the scholastic achievement society shown in the images has a business affiliation or connection with the scholastic achievement society they were shown in the first section of the survey. The order of the first and second answer choices was randomized.



Respondents who indicated that the scholastic achievement society shown in the images does have a business affiliation or connection with the scholastic achievement society they were shown in the first section of the survey were then asked, "why do you say that?"



All respondents, across both the test and control cells, saw the same set of questions for three other scholastic achievement societies, named The National Society of Leadership and Success, Alpha Sigma Lambda Honor Society, and National Technical Honor Society. Each of the four sets of images were shown in random order, such that the Honor Society images could be the first, second, third, or fourth image sets shown. Images of how the other three image sets appeared in the survey are included below and within Appendices C1 and D1.





On each of the question pages, there was a yellow button with the words "View images from first section" on it. The respondents were advised earlier in the survey that they could click on that button and view the images from the first section. If respondents chose to click on the yellow button, the images from the first section were displayed below it, and they could click on the "x" button to close those first section images. Below is an example of what the survey page looked like after the yellow button was clicked.



Full images of stimuli and screenshots are included in Appendices C1 and D1 to this report.

**Sampling Plan**

To ensure applicability of the research findings, rough quotas were set up in line with census distributions for geographical region. Census-based quotas were not used for age or gender, because the population who has been recently enrolled in 2-year colleges skews young and female. Our sample was 60% female, which is consistent with data showing that 59% of 2-year college students are female.[14]

**Interviewing Period**

Interviewing was conducted January 3rd, 2024 and January 4th, 2024.

**Quality Control**

Respondents in this survey were required to complete the standard set of quality control questions described earlier in this report.

The dataset was also reviewed in detail and "cleaned" prior to analysis. Data cleaning includes the removal of any respondents whose geographic coordinates or IP address were located outside of the United States, respondents who entered gibberish or nonsensical answers into open-ended responses, and respondents who took the survey in an inordinately short amount of time, among other considerations. For this survey, my analysis showed that the minimum amount of time in which a respondent could take the survey while fully examining the images and reading the questions was 3 minutes and 45 seconds (225 seconds). Therefore, survey responses were removed for any respondents who took the survey in less than 225 seconds. The full dataset is

---

[14]https://www.statista.com/statistics/421305/percentage-of-students-in-community-colleges-by -gender/#:~:text=U.S.%20community%20colleges%3A%20share%20of%20for,credit%20students%202021 %2C%20by%20gender&text=In%202021%2C%20around%2059%20percent,the%20United%20States%20w ere%20female.

available in Appendix E1, and the responses excluded from analysis during data cleaning are included as a separate tab within the data file.

## CONFUSION SURVEY RESULTS AND DISCUSSION

As more fully explained in the Experimental Design section, this survey consisted of showing an interested universe a sequential lineup of stimuli to compare confusion between Phi Theta Kappa's trade dress and Honor Society's trade dress, as demonstrated in their websites and regalia. The test group was shown images of Honor Society website and regalia. The control group was shown modified images with the name changed to "Merit Society", logo removed, and colors changed to salmon pink and gray. A total of 372 respondents took the survey,[15] with 186 respondents in the test cell and 186 respondents in the control cell.

1. **After viewing images from the website regalia store and social media of Phi Theta Kappa and Honor Society, a significant percentage of respondents were confused as to the relationship between the organizations.**

As detailed in the Experimental Design section, respondents were randomly assigned to either the test or control cell and, in the third section of the survey, were shown images sets from four scholastic achievement societies in random order.

After indicating that they could clearly see the images, consumers were asked questions regarding the source, sponsorship, and affiliation between the scholastic achievement society shown on the current page and the scholastic achievement society that was shown in the first section of the survey (Phi Theta Kappa) for each image set.

---

[15] Total usable N, after data cleaning.

**Source Confusion**

Of the consumers who saw the Honor Society website and social media page, 38.71% indicated they believed that Honor Society is owned or operated by Phi Theta Kappa.

As more thoroughly discussed in the Experimental Design section of my report, the "Merit Society" cell serves as a control. The purpose of a control cell is to account for "noise" within the data. Of the respondents who saw the Merit Society website and social media page, 20.43% indicated they believed that Merit Society is owned or operated by Phi Theta Kappa.

After controlling for noise, the net level of source confusion between Phi Theta Kappa and Honor Society is 18.28% (38.71%-20.43%).

Respondents who indicated a source relationship between Honor Society and Phi Theta Kappa were asked to provide a rationale (i.e., "Why do you say that?"). Below is a subset of these verbatim responses. In my review, a significant percentage of consumers made the connection as a result of the name "Honor Society", the blue and gold colors, and the logo.

- "Because of the colors and the way they look"
- "The colors looked similar"
- "It's the same name"
- "Same color scheme"
- "They both have the torch displayed"
- "Same colors and logo"
- "Similar colors"
- "They appear to look the same/similar thus possibly being made by the same company"

39

- "I say that because they both have the same design and theme"
- "The logo looks similar to the first image's logo"
- "They have the same colors and emblem"
- "Colors are the same as the first images I was shown"

All individual responses are available in electronic form in Appendix E1.

**Sponsorship or Approval Confusion**

Of the consumers who were shown Honor Society images, 43.01% believed that the scholastic achievement society shown in the images is sponsored or approved by the scholastic achievement society shown in the first section of the survey (Phi Theta Kappa).

Within the control cell, 24.19% believed that the scholastic achievement society shown is sponsored or approved by the scholastic achievement society shown in the first section of the survey (Phi Theta Kappa).

After controlling for noise, the net level of sponsorship or approval confusion between Phi Theta Kappa and Honor Society is 18.82% (43.01%-24.19%).

Respondents exhibiting confusion as to sponsorship or approval offered similar responses when asked to provide a rationale (*i.e.*, "Why do you say that?") as those indicating source confusion. Below is a subset of these verbatim responses. In my review, a significant percentage of consumers made the connection as a result of the name "Honor Society", the blue and gold colors, and the logo.

- "The items in the image look the same"
- "It has the same name"
- "Same colors and similar logo"

40

- "They look so similar"
- "Says honor society and shows the same logo"
- "They look very similar and seem to have the same logos on them"
- "It's completely the same"
- "An Honor Society website, with a name as vague as that, most likely has connection with other Honor Societies"
- "Same colors, same design, same everything"
- "They have the same emblem just without the words"

All individual responses are available in electronic form in Appendix E1.

**Affiliation or Connection Confusion**

Of the consumers who saw the Honor Society images, 45.16% believed that the scholastic achievement society shown in the images has a business affiliation or connection with the scholastic achievement society shown in the first section of the survey (Phi Theta Kappa).

Within the control cell, 25.81% believed that the scholastic achievement society shown on the website has a business affiliation or connection with the scholastic achievement society shown in the first section of the survey (Phi Theta Kappa).

After controlling for noise, the net level of business affiliation or connection confusion between Phi Theta Kappa and Honor Society is 19.35% (45.16%-25.81%).

Respondents exhibiting confusion as to affiliation and connection offered similar responses when asked to provide a rationale (*i.e.*, "Why do you say that?") as with the previous two types of confusion. Below is a subset of these verbatim responses. In my review, a significant percentage of consumers made the connection as a result of the name "Honor Society", the blue and gold colors, and the logo.

41

- "They have the same colors"
- "They do look a lot a like so I would assume they are connected somehow"
- "Same names and image"
- "Looks same"
- "They look very similar and are advertised the same way"
- "I say that because they are both very similar"
- "All the imagery is close"
- "Design looks similar to each other"
- "The same color schemes and theme"
- "I feel like the Phi Theta Kappa Honor Society is connected to the Honor Society website since it is a specific honor society"
- "Both have the same name"
- "Same colors"

All individual responses are available in electronic form in Appendix E1.

## Overall Confusion

In order to arrive at an overall level of confusion, I aggregated the responses. To qualify for the aggregated confusion metrics, respondents had to indicate that they believed there was source confusion, sponsorship/approval confusion, *or* affiliation/connection confusion.

If a respondent indicated that they believed there were multiple types of confusion, they were only counted once.

When aggregating across source, sponsorship, and affiliation confusion, 64.52% of respondents in the test cell indicated at least one type of confusion. Within the control cell, 41.94% of respondents indicated at least one type of confusion. This creates a net

aggregate confusion of **22.58%** (64.52%-41.94%).[16]

The results are summarized in table form below.

|  | N | Source confusion | Sponsorship/ approval confusion | Business affiliation/ connection confusion | **Aggregated confusion (deduped)** |
|---|---|---|---|---|---|
| Test | 186 | 38.71% | 43.01% | 45.16% | **64.52%** |
| Control | 186 | 20.43% | 24.19% | 25.81% | **41.94%** |
| Net |  | 18.28% | 18.82% | 19.35% | **22.58%** |

## VI.    ADDITIONAL EVIDENCE OF CONSUMER CONFUSION

Plaintiff Phi Theta Kappa and Defendant Honor Society have each provided logs of member and prospective member complaints. These logs contain many comments demonstrating confusion between Honor Society and Phi Theta Kappa.

Plaintiff Phi Theta Kappa keeps records of member and potential member complaints and comments. I have been provided with and have reviewed a log of such comments in Document PTK0183497. As I note in Appendix H, there are many instances from this log in which members or prospective members appear to be confused about the relationship between Phi Theta Kappa and Honor Society. Some entries explicitly state "Joined HS.org thinking it was PTK." Defendant Honor Society

---

[16] Margin of error for a 95% confidence interval is +/- 6.9% for the test value and +/- 7.1% for the control value.

has also provided partial logs of membership cancellations, from which I have also noted several examples of confusion between Phi Theta Kappa and Honor Society.

Many of the substantive comments in Document HS_203039, Honor Society's internal membership cancellation logs, suggest confusion of Honor Society with other organizations. Search queries for specific terms shows that there are  a total of ██ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████ The high occurrence of these terms in consumer-provided comments support the likelihood of additional instances of confusion between Honor Society and Phi Theta Kappa.

## VII.  *DETAILED ANALYSIS OF SECONDARY MEANING SURVEY RESULTS*

<u>**OVERVIEW OF STUDY**</u>

In order to test for the existence of secondary meaning in Phi Theta Kappa's colors and logo, I showed respondents images of the regalia stole and rope that Phi Theta Kappa members wear at graduation. These images of Phi Theta Kappa's regalia contain the alleged trade dress colors and logo, and the name "Phi Theta Kappa" was digitally removed from the stole. After I showed respondents the images, I asked them whether they associate the displayed products with one scholastic achievement society, more than one scholastic achievement society, or no scholastic achievement society at all. The study included a separate control cell in which respondents were shown modified versions of the images with the alleged trade dress elements removed. The control cell respondents were shown images of the same stole and regalia that were digitally altered to change the color to black and to remove the logo, and they were then asked the same set of questions. This study design follows standard and generally

accepted statistical and consumer market survey methods for the assessment of secondary meaning in an alleged product trade dress.

For purposes of this study, the relevant universe was the same as that of the confusion survey. Respondents were filtered to only include adults (individuals 18 years of age or older) in the United States who have either attended a 2 year college during the last 5 years or plan to attend a 2 year college in the next 12 months, and who have already joined, have been interested in joining, or will be interested in joining an honor society or similar organization.

## SUMMARY OF KEY FINDINGS

After viewing the Phi Theta Kappa regalia stole and rope, a significant percentage of respondents constituting current, past, and prospective consumers indicated that they believe that the items are associated with a single source (i.e. only one honor society). Many respondents specifically identified PTK as the source. Respondents' verbatim, written responses further indicated that the secondary meaning association was prompted specifically by the colors navy blue and gold and the logo.

## SURVEY METHODOLOGY

The screenshots shown are reduced in size in order to fit on the pages of this report. Survey images appeared larger on respondents' screens, and respondents had the ability to increase the size of the text or images using the zoom-in feature on their browser. A full set of screenshots for this survey can be found in Appendix D2.

45

## The Relevant Universe of Interest

The interested universe of this study was individuals who have been enrolled in a 2-year college at any point during the past 5 years or who intend to enroll in a 2-year college at some point during the next 12 months, and who have joined an honor society or have been or will be interested in joining an honor society.

Consumers were first asked about their age.



Respondents who selected "Under 18" were  terminated from (*i.e.,* not allowed to proceed further in) the survey.

Next, respondents were asked their gender. Options for "Female" and "Male" were randomized.

46



Respondents were then asked in which state they currently reside and were provided with a drop-down menu of options.



Those selecting "I do not live in the United States" were terminated.

Respondents were then asked if they or anyone in their household work in certain industries. Options other than "None of the Above" were randomized.



Respondents were terminated if they selected "honor society or organization".

Respondents were then asked whether they have been enrolled in a 2-year college at any point within the past 5 years. The order of the options "Yes" and "No" was randomized.



In the next screen, they were asked whether they intend to be enrolled in a 2-year college at some point in the next 12 months. As before, the order of the options "Yes" and "No" was randomized.

Do you plan to enroll in a two-year college at any point during the next 12 months?

| |
|---|
| Yes |
| No |
| Don't know/unsure |

Continue

Respondents who did not answer "yes" to either of the above two questions were terminated.

If respondents answered "yes" to either of the above questions, they were asked if, while enrolled in a 2-year college, they had joined an honor society or had been or will be interested in joining an honor society. The first three options were randomized.

In a previous question, you mentioned that you have been enrolled in a 2-year college at some point during the last 5 years or plan to be enrolled in a 2-year college at some point during the next 12 months.

While enrolled in a 2-year college, have you been or will you be interested in joining an honor society?

No, I have not been and will not be interested in joining an honor society

Yes, I have already joined an honor society

Yes, I have been or will be interested in joining an honor society

Don't know/prefer not to say

Continue

Only respondents who selected either "Yes, I have already joined an honor society" or "Yes, I have been or will be interested in joining an honor society" were allowed to continue in the survey.

**<u>Experimental Design</u>**

After the initial screening/classification portion of the survey, respondents were told they had qualified to take the survey, shown instructions, and asked to verify their understanding/agreement of the instructions. Next, they were shown the images showing the regalia.

Respondents were first shown an introductory page with instructions, in which they were told to take as much time as they need to view each image and that they were

required to spend a minimum of 5 seconds viewing each image before progressing to the next screen. A copy of the entire survey's questionnaire is included in Appendix B2.

The following images are from a scholastic achievement society. Please review these images as if you were considering joining this achievement society.

Please take as much time as you need to view each image. After 5 seconds, you will have the option to move to the next page.

If for any question you do not know the answer, please type "don't know" or "not sure" in the answer box provided.

→

Respondents were then presented with the images one at a time and on separate pages, with the stole image presented first and the rope image presented second. On each page, respondents were instructed to use the zoom feature on their device if they would like to zoom in on the image and asked whether they could see the image clearly. Respondents who indicated that they could not view an image clearly were terminated. To ensure that respondents viewed each image for the minimum of 5 seconds, the blue forward arrow button did not appear until 5 seconds had elapsed.

An example of what each page looked like is shown below.

51

*Use the zoom-in feature on the device you are using if you would like to enlarge the image.*



Were you able to see the image clearly?

Yes

No

→

Below are pictures of the stimuli used in the test cell of the study.

Test Cell:

Stole



Rope



Using the test images as a template, I modified the appearance of the regalia for the control group images by changing the colors and removing the logo. Below are pictures of stimuli used as controls in the control cell:

Control Cell:

Stole



Rope



Respondents were randomly assigned to either the test cell or the control cell. Respondents in the test cell were shown the two test images, and respondents in the control cell were shown the two control images. Each respondent was shown two images total.

After viewing the images, respondents were asked whether they associated the regalia shown in the images with one scholastic achievement society, more than one scholastic achievement society, or no particular scholastic achievement society, with those three answer choices presented in randomized order. Respondents were also able to indicate that they had no opinion or did not know.

Below is the same set images that you just viewed. Please answer the question at the bottom of the page.



Do you associate the regalia shown in these images with one scholastic achievement society, more than one scholastic achievement society, or no particular scholastic achievement society?

| No particular scholastic achievement society |
| One scholastic achievement society |
| More than one scholastic achievement society |
| Don't know or have no opinion |

→

Respondents who selected "no particular scholastic achievement society" or "don't know" were not asked any more questions. Respondents who answered "one scholastic achievement society" were asked which scholastic achievement society they associated with the images and given an open text box in which to type their response. Respondents who answered "more than one scholastic achievement society" were shown the same page as those who answered "one scholastic achievement society" except with the wording changed to plural "societies", in order to correspond with their answer.

56

Below is the same set of images that you just viewed. Please answer the question at the bottom of the page.



Which scholastic achievement society do you associate with these images?

[                                                            ]

[ → ]

Respondents were then asked what in particular made them say that, with another open text box in which to type their answer.

What in particular makes you say that?

[                                                            ]

[ → ]

These images and screenshots were reduced in size in order to fit the pages of this report, and they appeared larger to respondents. Full images of stimuli and screenshots are included in Appendices C2 and D2 to this report.

## **Sampling Plans**

A total of 865 qualified respondents participated in this survey. After successfully completing screening criteria and data quality control questions, respondents were randomly assigned to either the test cell or the control cell. A total of 428 participants were in the test cell, while a total of 437 participants were in the control cell.

This survey was fielded in two parts, which will be referred to as Group 1 and Group 2. For Group 1, the survey was fielded to consumers who were part of an online panel. For Group 2, the survey was fielded to individuals who had joined Phi Theta Kappa within the last 5 years. The two surveys were identical in all respects except the sampling plan.[17]

### *Group 1*

The sample of panelists used in the survey was provided by Dynata, a leading supplier of online samples for surveys. Dynata is highly regarded as a reputable source of consumers for online surveys within the field of  market research, and it utilizes appropriate industry procedures for  ensuring the integrity and quality of its panels.

To ensure applicability of the research findings, rough quotas were set up in line

---

[17] Our universe includes respondents who are both members of Phi Theta Kappa as well as those consumer who are interested in joining scholastic achievement societies. The analysis of both universes follows generally accepted principles for a secondary meaning survey. *See* Susan Schwartz McDonald, *Secondary Meaning Surveys*, Trademark and Deceptive Advertising Surveys, 79, 88-89 (Shari Seidman Diamond and Jerre B. Swann, 2nd ed. 2022) (finding the use of both current consumers and prospective consumers for a secondary meaning

with census distributions for geographical regions. Census-based quotas were not used for age or gender, because the population who has been enrolled in 2-year colleges skews young and female. Our sample was 63% female, which is consistent with data showing that 59% of 2-year college students are female.[18]

A total of 423 qualified respondents participated in Group 1. After successfully completing screening criteria and data quality control questions, respondents were randomly assigned to either the test or the control cell. A total of 210 participants were in the test cell, while a total of 213 participants were in the control cell.

*Group 2*

The sampling plan for Group 2 involved respondents who joined Phi Theta Kappa within the last 5 years. Phi Theta Kappa provided a list of the email addresses of members who had joined in the last 5 years, and emails were sent out to a random subset of those members.

The emails were sent from the Qualtrics platform and contained the same survey link as was sent out to the Group 1 respondents. The solicitation email, shown below, was sent out directly from Qualtrics and described the survey as being "about collegiate merchandise". To avoid priming respondents, at no point did it disclose that the respondents were invited to respond based on their Phi Theta Kappa membership or their participation in honor societies generally. Respondents were compensated for their participation with a $10 Amazon gift card, which is consistent with the survey-taking rewards given to online panel samples.

---

[18]https://www.statista.com/statistics/421305/percentage-of-students-in-community-colleges-by -gender/#:~:text=U.S.%20community%20colleges%3A%20share%20of%20for,credit%20students%202021 %2C%20by%20gender&text=In%202021%2C%20around%2059%20percent,the%20United%20States%20w ere%20female.

**Get a gift card for taking a survey about collegiate merchandise**    

    **Research Services <noreply@qemailserver.com>**
To:

Please take this survey about collegiate merchandise. We would love to get your opinion.

The survey should take no more than 5 minutes, and upon completion you will get a $10 Amazon gift card.

**Follow this link to the Survey:**
Take the Survey

Or copy and paste the URL below into your internet browser:
https://qualtricsxmg2rn3v6hk.qualtrics.com/jfe/preview/previewId/1c403299-b120-4b04-8140-6ebff900302f/SV_1Agwj3xSNyNRnHE?Q_CHL=preview

Follow the link to opt out of future emails:
Click here to unsubscribe

Respondents in Group 2 answered the same screening questionnaire as those in Group 1 and had the same qualification requirements. All respondents solicited for Group 2 passed the qualification questionnaire, which makes sense because the solicitation email was sent only to individuals who had attended a 2-year college and joined an honor society within the past 5 years.

Because Group 2 involved only individuals who had joined Phi Theta Kappa within the past 5 years, no age or gender quotas were used.

A total of 442 qualified respondents participated in Group 2. After successfully completing screening criteria and data quality control questions, respondents were randomly assigned to either the test or the control cell. A total of 218 participants were in the test cell, while a total of 224 participants were in the control cell.

60

**Interviewing Period**

Interviewing for Group 1 was conducted December 5, 2023-December 7, 2023. Interviewing for Group 2 was conducted December 18, 2023-December 21, 2023.

**Quality Control**

Respondents in this survey were required to complete the standard set of quality control questions described earlier in this report.

The dataset was also reviewed in detail and "cleaned" prior to analysis. Data cleaning includes the removal of any respondents whose geographic coordinates or IP address were located outside of the United States, respondents who entered gibberish or nonsensical answers into open-ended responses, and respondents who took the survey in an inordinately short amount of time,[19] among other considerations. A total of 3 respondents were removed from the dataset during data cleaning, all of which were removed due to entering gibberish or nonsensical verbatim answers. The full dataset is available in Appendix E2, and the responses excluded from analysis during data cleaning are included as a separate tab within the data file.

**SECONDARY MEANING SURVEY RESULTS AND DISCUSSION**

As more fully explained in the Experimental Design section, this survey consisted of showing an interested universe of respondents two images of honor society regalia. Respondents in the test cell were shown images of the Phi Theta Kappa regalia, with the words "Phi Theta Kappa" digitally removed. Respondents in the control cell

---

[19] My analysis for this survey showed that the minimum amount of time in which a respondent could take the survey while fully examining the images and reading the questions was 1 minute 15 seconds (75 seconds). However, as the fastest respondent completed the survey in 76 seconds, no respondents were excluded from the dataset because of speeding.

were shown modified images with the entire logo removed and all of the colors changed to black.

1. ***A significant majority of respondents associated the trade dress with only one scholastic achievement society.***

After viewing the images of the regalia, respondents were asked if they associated the regalia in the images with one scholastic achievement society, more than one scholastic achievement society, no particular scholastic achievement society, or if they didn't know/had no opinion.

**Table 1 – Source Association, Group 1**

| Group 1 | Test<br>N = 210 | Control<br>N = 213 | Net |
|---|---|---|---|
| One scholastic achievement society | 40.95% | 17.37% | 23.58% |
| More than one scholastic achievement society | 39.52% | 42.25% | |
| No particular scholastic achievement society | 14.29% | 28.17% | |
| Don't know/no opinion | 5.24% | 12.21% | |

**Table 2 – Source Association, Group 2**

| Group 2 | Test<br>N = 218 | Control<br>N = 224 | Net |
|---|---|---|---|
| One scholastic achievement society | 57.34% | 17.41% | 39.93% |
| More than one scholastic achievement society | 17.43% | 20.54% | |
| No particular scholastic achievement society | 17.89% | 49.11% | |
| Don't know/no opinion | 7.34% | 12.95% | |

**Table 3 – Source Association, Both Group 1 & Group 2 combined**

| Groups 1 & 2 combined | Test<br>N = 428 | Control<br>N = 437 | Net |
|---|---|---|---|
| One scholastic achievement society | 49.30% | 17.39% | 31.91% |
| More than one scholastic achievement society | 28.27% | 31.12% | |
| No particular scholastic achievement society | 16.12% | 38.90% | |
| Don't know/no opinion | 6.31% | 12.59% | |

A total of 49.30% of the test group associated the images with one scholastic achievement society, compared to 17.39% in the control group, for a net association of 31.91% (49.20%-17.39%). Net association was somewhat higher among members of Phi Theta Kappa (39.93%), but, notably, substantial net association was still found among the broader online panel designed to incorporate prospective consumers (23.58%).

2. ***Many respondents specifically identified Phi Theta Kappa as the source of the trade dress elements.***

In Group 1, which consisted of respondents with no known prior knowledge of Phi Theta Kappa, 4 respondents in the test cell (1.90%) and 0 respondents in the control cell specifically cited Phi Theta Kappa as the single source of the trade dress. In Group 2, for which the respondents were already Phi Theta Kappa members, 93 respondents in the test cell (42.66%) specifically identified Phi Theta Kappa in their verbatim answers, along with 11 respondents (4.91%) in the control cell.

3. ***Many respondents identified elements of the trade dress, such as logo and colors, as the reason for which they recognized the regalia.***

After being asked which scholastic achievement society/societies they associated the regalia with, respondents were asked "What in particular makes you say that?". Many respondents specifically identified the colors and logo as the reason for their association.

Below are examples of answers to this question ("What in particular makes you say that?") from respondents in the test cell in Group 1 who selected one honor society.
- "The colors and ropes"
- "The gold and blue"
- "The colors and shaping"
- "Just the distinctive matching colors show it is one society"
- "The logo and color"
- "Gold and blue colors"
- "It's the colors I think"
- "The certain colors and symbol"

Below are examples of answers to this question ("What in particular makes you say that?") for respondents in the test cell in Group 1 who selected one honor society AND specified Phi Theta Kappa.
- "The simbol [sic] on the tie and the colors"
- "The embroited [sic] emblem I recognize it"
- "I recognize these items from the society's store"
- "The look of the honor items"

Below are examples of answers to this question ("What in particular makes you say that?") for respondents in the test cell in Group 2 who selected one honor society AND specified Phi Theta Kappa.
- "Colors"
- "The color scheme (goldish-orange and blue) and the emblem."
- "The colors and images"

64

- "Yellow color"

- "The color"

- "Colors"

- "The logo and color"

- "The blue and gold colors"

- "Colors and logo"

- "The colors and emblem"

- "The colors and insignia look like the phi theta kappa regalia"

- "Those look like the regalia from Phi Theta Kappa's kit"

- "Colors and image on stoll [sic]"

- "The gold and blue color scheme, as well as the logo on the first image looks similar to Phi Theta Kappa logo"

- "The gold and the symbol"

- "Color and symbol"

All individual responses are available in electronic form in Appendix E2.

## VIII.  *DETAILED ANALYSIS OF FALSE ADVERTISING SURVEY RESULTS*

### OVERVIEW OF STUDY

In order to test for false advertising in Phi Theta Kappa's promotional material, I showed respondents images of Honor Society webpages advertising their various qualifications, benefits, and accolades. Two cells of stimuli were used. The first cell showed respondents images from Defendant's current website. The second cell showed respondents images from Defendants website prior to June 17, 2023. Respondents were

asked a series of questions regarding the message conveyed by the images, i.e. whether based on the image viewed they believed a particular statement to be true. If respondents responded affirmatively to interpreting a specific message from the stimuli, they were asked follow-up questions regarding the materiality of the images, i.e. whether their interest in Honor Society would increase or decrease if the statement were false. This study design follows standard and generally accepted statistical and consumer market survey methods for false advertising surveys.

The statements put to respondents are as follows:

- The referenced organization requires a minimum GPA to join as a member (Q103, Q203).
- The referenced organization has any academic requirement to join as a member (Q104, Q204).
- The referenced organization is considered a merit-based honor society by institutions of higher education (Q105, Q205).
- Members of the referenced organization are likely to receive better grades than non-members (Q106, Q206).
- Members of the referenced organization are more likely to be successful in their academic programs than non-members (Q107, Q207).
- Members of the referenced organization are more likely to stay in school and graduate on time than non-members (Q108, Q208).
- Members of the referenced organization are more likely to feel satisfied with their college experience than non-members (Q109, Q209).
- Members of the referenced organization are more marketable when job searching and applying to graduate school than non-members (Q110, Q210).
- Members of the referenced organization are more likely to develop valuable leadership and interpersonal skills than non-members (Q111, Q211).
- Members of the referenced organization are likely to connect better with collegiate peers, faculty, and staff members than non-members (Q112, Q212).

- The referenced organization has been ranked as one of the top honor societies in the United States by a qualified ranking organization (Q113, Q213).
- The referenced organization is the largest honor society in the United States (Q114, Q214).
- The referenced organization has active on-campus chapters that meet regularly (Q115, Q215).
- The referenced organization has campus chapters that are officially recognized by universities (Q116, Q216).
- The referenced organization is affiliated with physical campus chapters at multiple universities (Q117, Q217).
- The referenced organization is a non-profit entity (Q118, 218).
- The use of "honorsociety.org" as a domain name refers to a non-profit entity (Q119, Q219).
- The referenced organization is respected and held in high esteem by administrators, instructors and professors in higher education (Q120, Q220).
- Members of the referenced organization received 10% off Student Financial Aid preparation and advisory services from FAFSA.com (Q121, Q221).

## **SUMMARY OF KEY FINDINGS**

When shown a series of statements asserting prestige and benefits of membership with Honor Society, a supermajority of respondents indicated that they would be far less interested in joining Honor Society if even one statement were false. The attributes respondents considered most important included: (1) that the organization is respected and held in high esteem by administrators, instructors, and professors in higher education; (2) that the Honor Society has campus chapters officially recognized by universities; and (3) that members of Honor Society gain certain benefits over non-members.

## SURVEY METHODOLOGY

The screenshots shown are reduced in size in order to fit on the pages of this report. Survey images appeared larger on respondents' screens, and respondents had the ability to increase the size of the text or images using the zoom-in feature on their browser. A full set of screenshots for this survey can be found in Appendix D3.

## The Relevant Universe of Interest

The interested universe of this study was individuals who have been enrolled in a 2-year college at any point during the past 5 years or who intend to enroll in a 2-year college at some point during the next 12 months, and who have joined an honor society or have been or will be interested in joining an honor society.

Consumers were first asked about their age.

What is your age?

- ○ Under 18
- ○ 18-24
- ○ 25-35
- ○ 36-45
- ○ 46-55
- ○ 56-65
- ○ 66+
- ○ Prefer not to answer

Continue

Respondents who selected "Under 18" were terminated from (*i.e.*, not allowed to proceed further in) the survey.

Next, respondents were asked their gender. Options for "Female" and "Male" were randomized.



Respondents were then asked in which state they currently reside and were provided with a drop-down menu of options.

Those selecting "I do not live in the United States" were terminated.

Respondents were then asked if they or anyone in their household work in certain industries. Options were randomized.



Do you or does anyone in your household work in the following industries? Select all that apply.

- ☐ Manufacture or distribution of kitchen appliances
- ☐ Honor society or similar organization
- ☐ Personal training/physical therapy
- ☐ Health insurance
- ☐ None of the Above

Continue

Respondents were terminated if they selected "honor society or similar organization".

Respondents were then asked whether they have been enrolled in a two-year college at any point within the last 60 months (5 years).



In the next screen, they were asked whether they intend to be enrolled in a two-year college at some point in the next 12 months.

If respondents did not answer "yes" to either of the above questions, they were terminated from the survey.

If respondents answered "yes" to either of the above questions, they were asked if while enrolled in a 2-year college, they had joined an honor society or had been or

will be interested in joining an honor society.

In a previous question, you mentioned that you have been enrolled in a 2-year college at some point during the last 5 years or plan to be enrolled in a 2-year college at some point during the next 12 months.

While enrolled in a 2-year college, have you been or will you be interested in joining an honor society?

○ No, I have not been and will not be interested in joining an honor society

○ Yes, I have been or will be interested in joining an honor society

○ Yes, I have already joined an honor society

○ Don't know/prefer not to say

**Continue**

Only respondents who selected either "Yes, I have already joined an honor society" or "Yes, I have been or will be interested in joining an honor society" were allowed to continue in the survey.

An additional screener question was implemented in determining the relevant universe of interest for the false advertising survey, as compared to the confusion and secondary meaning surveys.

Depending upon whether the respondent indicated they had joined an honor society or that they would be interested in joining an honor society, respondents were asked what resources they have reviewed or they would review in researching the honor society.

72

In a previous question, you mentioned that you have joined an honor society while enrolled in a 2-year college.

What resources have you referenced in connection with your membership in an honor society? Select all that apply

- ☐ Physical mail
- ☐ Email
- ☐ Online advertisement
- ☐ Social media
- ☐ Communication with representative of the local campus chapter of the honor society
- ☐ Physical advertisement
- ☐ The honor society's website
- ☐ Other
- ☐ I don't know

In a previous question, you mentioned that you have been or would be interested in joining an honor society while enrolled in a 2-year college.

What resources would you reference in researching an honor society? Select all that apply.

- ☐ Email
- ☐ Social media
- ☐ Online advertisement
- ☐ Physical advertisement
- ☐ Communication with representative of the local campus chapter of the honor society
- ☐ The honor society's website
- ☐ Physical mail
- ☐ Other

73

I established a quota that a minimum of 60% of respondents needed to indicate that they would review or had reviewed the honor society's website. In the final respondent pool, over 73% of respondents indicated that they would or had done so.

Other than the additional quota put above, the relevant universe was the same as that of the confusion and secondary meanings surveys. Respondents were filtered to only include adults (individuals 18 years of age or older) in the United States who have either attended a 2 year college during the last 5 years or plan to attend a 2 year college in the next 12 months, and who have joined, have been interested in joining, or will be interested in joining an honor society or similar organization.

## **Experimental Design - Message Portion**

After the initial screening portion of the survey, respondents were shown one of two sets of images, depending on the cell to which they were randomly assigned.

Please review the following images as if you are planning to join or have been a member of this organization and then answer the questions that follow. Please take as long as you need to view the images. You will be able to proceed once you see the "Continue" button.

You can review the previously displayed images by clicking the "View Images" button that will appear throughout the survey.

Please click "Continue" to see these images.

Continue

Respondents who were assigned to Cell 1, the "current" cell, were shown 8 images of the defendant's website and an email solicitation, including the defendant's updated home page,[20] defendant's ranking and alleged benefits as it appears on their homepage,[21] their alleged campus chapters on their "Campus Chapters" webpage,[22] their purported discount for FAFSA.com,[23] their email solicitation, and an FAQ page entitled "How Honor Society Puts Inclusion Over Exclusion: No GPA Requirements."[24] The home page and other webpages were current as of the date the survey was fielded.



[20]Honor Society, https://www.honorsociety.org/

[21]*Id.*

[22]Honor Society, *Chapters*, https://www.honorsociety.org/chapters

[23]Honor Society, *FAFSA.com - Student Financial Aid Services*, https://www.honorsociety.org/benefits-coupons/fafsacom-student-financial-aid-services

[24]Honor Society Member Services, *How Honor Society Puts Inclusion Over Exclusion: No GPA Requirements*, https://support.honorsociety.org/hc/en-us/articles/16483494621837-How-Honor-Society-Puts-Inclusion-Over-Exclusion-No-GPA-Requirements











Respondents who were assigned to Cell 2, the "past" cell, were shown 8 images of the defendant's website and email solicitation, including the defendant's prior home page[25], defendant's ranking and alleged benefits as it appears on their homepage, their alleged campus chapters on their "Campus Chapters" webpage, their purported discount for FAFSA.com, and their email solicitation. These images were similar to, and in some cases the same as, the images shown in Cell 1, but they depict variations in the Honor Society website that existed before July 2023.

---

[25]Based on our research, defendant's changed the homepage of their website after June 17, 2023. One of the changes was on their homepage from "We're also the largest." to "We're also the largest, based on web traffic."See Internet Archive, *honorsociety.org (June 17, 2023)*, https://web.archive.org/web/20230801000000*/honorsociety.org.







Student - Honor Society Membership Acceptance Form



**Dear student,**

Congratulations! You are invited to join the *Honor Society*. Accepting this distinction connects you with like-minded high achievers from your region and across the nation, both in person and through our society's web portal.

Honor Society is the preeminent organization dedicated to recognition of academic and professional success. Our society empowers members to achieve through scholarship, recognition, exclusive privileges, job opportunities and much more. Honor Society recognizes your achievements to date, and builds a framework for future success.

Activate your membership now to become a member today!

**Student:**

**Activate your Honor Society Membership**



After viewing each image, respondents were asked whether they were able to view the image clearly. Respondents who indicated that they could not view the images clearly were terminated.



Respondents were informed that they may review the set of images they have previously viewed by clicking the "View Images" button at any point during the survey. The yellow "View images" button appeared at the top left of each subsequent question. If the respondent chose to click on it, the set of images was displayed below the button, as shown in the following screenshot.

84



Next, respondents were asked one of the several message questions. Every respondent was shown every question, and questions were displayed to respondents one at a time in a randomized order. In the example screenshot below, respondents were asked if it was their belief the referenced organization is considered a merit based honor society by institutions of higher education. For every question, respondents had the option to indicate "Yes", "No" or "I don't know," and the order of the answer options "Yes" and "No" were randomized.

The same format was used throughout the message portion of the survey to gauge whether the relevant consumer believed the stimuli supported each stated claim. A copy of the entire survey's questionnaire is included in Appendix B3.

As quality controls, two additional questions were included which asked the respondents if the advertisements purported to convey the message that the organization offers pro bono legal services or if members of the organization receive a free Netflix subscription. The purpose of these control questions was to ask about something that was clearly not indicated by the stimuli (none of the stimuli reference

Netflix or pro bono legal services in any way). Therefore, all respondents who are paying attention to the images and questions will accurately answer "No". Respondents who answered "Yes" to either of the above control questions were terminated from the survey.[26] Because the questions were shown in randomized order, the control questions could appear at any point during the series of message questions.

<div align="center">

**<u>Experimental Design - Materiality Portion</u>**

</div>

For each question within the Message portion of the survey (except for the control statements), there are related pairs of Materiality questions. After having completed all Message questions, respondents were shown the Materiality questions. Each respondent was only shown the Materiality questions that correspond to the Message questions for which they had previously answered "Yes". For any Message question for which they had answered "No" or "I don't know", respondents were not asked the corresponding Materiality questions.

For example, respondents who indicated that the organization referenced in the images above does require a minimum GPA to join as a member in the Message portion were asked whether their decision of whether or not to join the organization would be influenced if the organization did not require a minimum GPA. As before, respondents had the option to indicate "Yes", "No" or "I don't know," and the answer choices "Yes" and "No" were randomized.

---

[26] The use of control statements (also known as internal controls) is a generally accepted control in a false advertising survey. *See* E. Deborah Jay, *Ten Truths of False Advertising Surveys*, 103 Trademark Rep. 1116, 1143-45 (2013).



If the respondent indicated "Yes," they were asked whether it would increase, decrease or have no effect on their interest in joining the organization.



The same format was used throughout the Materiality portion of the survey to gauge whether, were each claim to be false, it would have a material impact upon the relevant consumer's decision to join the honor society. Full images of stimuli and screenshots are included in Appendices C3 and D3 to this report.

## Sampling Plan

A total of 213 qualified respondents participated in this survey. After successfully completing screening criteria and data quality control questions, respondents were randomly assigned to one of two cells, which I internally labeled "current" and "past". A total of 102 participants were in the "current" cell, while a total of 111 participants were in the "past" cell. Participants were not told which cell to which they had been assigned, and the only difference between the two cells was the version of the stimuli used. The "current" cell used images from the Honor Society website as it appeared at the time of data collection in January 2024, and the "past" cell used the equivalent images from the website as they appeared before July 2023.

## Interviewing Period

Interviewing was conducted from January 11, 2024 to January 14, 2024.

## Quality Control

Respondents in this survey were required to complete the standard set of quality control questions described earlier in this report.

The dataset was also reviewed in detail and "cleaned" prior to  analysis. Data cleaning includes the removal of any respondents whose geographic coordinates or IP address were located outside of the United States and respondents who took the survey

in an inordinately short amount of time, among other considerations. For this survey, my analysis showed that the minimum amount of time in which a respondent could take the survey while fully examining the images and reading the questions was 6 minutes and 30 seconds (390 seconds). Therefore, survey responses were removed for any respondents who took the survey in less than 390 seconds. The full dataset is available in Appendix E3, and the responses excluded from analysis during data cleaning are included as a separate tab within the data file.

### FALSE ADVERTISING SURVEY RESULTS AND DISCUSSION

As more fully explained in the Experimental Design section, this survey consisted of showing the relevant universe images from Honor Society's website containing various claims about the organization and benefits of membership. Respondents were then asked about the message (whether they believed each stated claim based upon their review of the stimuli) and materiality (whether the falsity of each stated claim affected their interest in Honor Society) as relating to their perception of each claim.

1. ***An overwhelming supermajority of respondents indicated that if 1 or more of the statements were false, that it would materially decrease their interest***

**81.22%** of respondents indicated that if 1 or more of the statements on Honor Society's website were false, that it would materially decrease their interest in joining the organization. Of the statements, consumers indicated that if the following statements were false, they would materially decrease their interest in joining the organization:

> a. "Higher Education Loves Honor Society"
> b. Honor Society's advertisement of campus chapters that are officially recognized by universities

90

    c.   Members of Honor Society are more likely to develop valuable leadership and interpersonal skills

    d.   Members of Honor Society are more likely to feel satisfied with their college experience than non members

    e.   Members of Honor Society are more likely to stay in school and graduate on time than non-members

    f.   Members of Honor Society are more likely to be more successful in in their academic programs

2. ***A substantial number of respondents indicated that Honor Society's website indicated they are considered a merit-based honor society by institutions of higher education, and that such representation would have a material impact on their decision to join the organization.***

In total, **76.88%** of respondents indicated that Honor Society's website represented that they are considered a merit-based honor society by institutions of higher education. This is likely attributable to Honor Society's name and overall branding. Additionally, **26.88%** of respondents in both cells indicated that, if Honor Society is not considered a merit-based honor society by institutions of higher education, then it would materially decrease their interest in joining the organization.

3. ***A substantial number of respondents indicated that Honor Society's website indicated they are respected and held in high esteem by administrator, instructors and professors in higher education, and that such representation would have a material impact on their decision to join the organization.***

In total, **89.38%** of the total respondents indicated that Honor Society's website represented that they are respected and held in high esteem by administrators, instructors and professors in higher education. This is likely attributable to Honor

91

Society's advertisement on their homepage that "Higher Education Loves Honor Society."

Additionally, **43.19%** of respondents in both cells indicated that, if Honor Society is not respected and not held in high esteem by administrators, instructors and professors in higher education, then it would materially decrease their interest in joining the organization.

### 4. *A substantial number of respondents indicated that Honor Society's advertisement of campus chapters officially recognized by universities would have a material impact on their decision to join the organization.*

In total, **88.13%** of the total respondents indicated that Honor Society's website conveyed the message that they have campus chapters that are officially recognized by universities.

Subsequently, in the related follow up questions, **26.76%** of respondents indicated that if they did not have campus chapters that are officially recognized by universities, that it would materially decrease their interest in joining the organization.

### 5. *A significant number of respondents indicated that Honor Society's advertisement of several benefits for members would have a material impact on their decision to join the organization.*

Honor Society advertises several benefits on their homepage alleging that members receive better grades, are more successful in their academic program, are more likely to stay in school and graduate on time, feel more satisfied with their college experience, are more marketable when job searching and applying to graduate school, develop valuable leadership and interpersonal skills, and connect better with peers, faculty, and staff members as compared to non-members.

Indeed, respondents indicated that these statements conveyed the message that members do in fact receive these benefits. Respondents found these messages were not only conveyed by the statements, but they would have a material impact on their decision of whether or not to join the organization:

### a. Better grades

**75.63%** of total respondents indicated that Honor Society statement's conveyed the message that their members receive better grades than non-members. **24.88%** of total respondents indicated that if members did not receive better grades than non-members, that it would materially decrease their interest in joining the organization.

### b. Likelihood of academic success

**87.50%** of total respondents indicated that Honor Society statement's conveyed the message that their member's are more likely to be successful in their academic programs than non-members. **34.27%** of total respondents indicated that if members are not more likely to be more successful in their academic programs than non-members, that it would materially decrease their interest in joining the organization.

### c. Likelihood to graduate on time

**88.75%** of total respondents indicated that Honor Society statement's conveyed the message that their members are more likely to stay in school and graduate on time than non-members. **32.86%** of total respondents indicated that if members are not more likely to stay in school and graduate on time than non-members,, that it would materially decrease their interest in joining the organization.

### d. Likelihood of satisfaction

**88.13%** of total respondents indicated that Honor Society statement's conveyed the message that their members are more likely to feel satisfied with their college experience than non-members. **30.99%** of total respondents indicated that if members are not more likely to feel satisfied with their college experience than non-members, that it would materially decrease their interest in joining the organization.

### e. Job and graduate school marketability

**90.00%** of total respondents indicated that Honor Society statement's conveyed the message that their members are more marketable when job searching and applying to graduate school than non-members. **30.99%** of total respondents indicated that if members are not more marketable when job searching and applying to graduate school than non-members, that it would materially decrease their interest in joining the organization.

### f. Likelihood of developing leadership and interpersonal skills

**88.75%** of total respondents indicated that Honor Society statement's conveyed the message that their members are more likely to develop valuable leadership and interpersonal skills than non-members; **36.15%** of total respondents indicated that if members are not more likely to develop valuable leadership and interpersonal skills than non-members, that it would materially decrease their interest in joining the organization.

### g. Likelihood of connecting with peers, faculty, and staff

**81.88%** of total respondents indicated that Honor Society statement's conveyed the message that their members are likely to connect better with collegiate peers, faculty,

94

and staff members than non-members. **21.60%** of total respondents indicated that if members are not more likely to connect better with collegiate peers, faculty and staff members than non-members, that it would materially decrease their interest in joining the organization.

On average, **<u>29.63%</u>** indicated that if the aforementioned statements concerning membership benefits were false, that it would materially decrease their interest in joining the organization.

6. *On average, a significant number of respondents indicated that Honor Society's statements would have a material impact on their decision to join the organization.*

Across all statements on Honor Society's website, respondents indicated that their interest in joining the organization would decrease by **<u>23.47%</u>** if these statements were, indeed, false. This average treats each statement with equal weight; if certain statements that were clearly less important to respondents, such as a claim that Honor Society is the "largest honor society in the United States" (a decrease of only 5.0% interest), an average which weighted or excluded less material statements would be even higher.

## IX.   *ADDITIONAL EVIDENCE OF FALSE ADVERTISING*

The membership cancellation logs provided by Honor Society in documents HS_203029 and HS_136621 further contain evidence of dissatisfaction and allegations of false advertising. HS_203039 contains ▮▮▮▮ entries, collected from June 2, 2017,

through February 6, 2018.[27] Many substantive comments in HS_203039 suggest the following potential reasons for discontinuing membership, with more substantial comments often incorporating multiple reasons.[28] Specific examples of comments in these categories can be found in the Addendum to this section located in Appendix H to this Report.

- As previously observed in Section VI, *supra* pp. 44-45, the student misunderstood which organization they had signed up with, or mistook the organization for their school's honors society.



---

[27] Although there are 15,204 entries, many membership cancellation requests were not accompanied by explanation. Approximately 2,112 entries are blank, 1,264 entries state "no reason" or variants, and 1,031 entries contain "n/a" or variants.

[28] The common reasons for requesting cancellation membership are listed based on my qualitative review of the comments. Keyword counts are provided as rough, overview illustrations of the frequency these reasons appeared in the data to support my qualitative observations.

[29] The search term "affiliat" was used in order to encompass both "affiliate" and "affiliation".



Additionally, Mikal Clavert, Chief Marketing officer of Honor Society, testified that Honor Society regularly markets to children as young as 13 years old, and there is no requirement that a person even be enrolled in any school or academic program to join its membership.[30]

On the whole, there are many indications in the Honor Society internal document HS_203039 suggesting that Honor Society may be materially misrepresenting a number of things which the relevant universe of consumers would materially rely upon. Deposition Exhibit 48 contains an advertisement which had been displayed on the Honor Society website, claiming *inter alia* that members receive better grades, are more marketable when job searching and applying to graduate school, and connect better with peers, faculty, and staff members. After reviewing the students' comments in document HS_203039, it does not seem that their experience has aligned with the advertised benefits. Indeed, the same advertisement touts "Higher education loves Honor Society!" and that "Honor Society was ranked as one of the top 'Honor Societies You Should Join'" by College Magazine, the article of which is included as Deposition Exhibit 49, and appears to have been freelance written by a college student with no qualifications, Deposition Exhibit 50. Further, Deposition Exhibit 48 contains an advertisement that Honor Society was ranked "a worthwhile dues based organizations

---

[30] Calvert Dep. Tr. at 244:21-245:17, 276:19-277:11, 325:1-5.

[sic] in a survey of our members." But again, HS_203039 does not seem to align with this statement.

Although consumer complaints are not uncommon in consumer-facing business, the preponderance and nature of complaints implicate Honor Society as misrepresenting: (1) affiliation or approval from colleges where it had none; (2) the reoccurring charging of membership fees; and (3) the purported benefits of membership. Furthermore, there are complaints which suggest that Honor Society may not maintain particular academic standards for admitting member students, nor indeed take efforts to avoid advertising to and admitting members who are not even attending a college. Finally, on its face, the the name "Honor Society" connotes that the organization is in fact an organization that would recognize established and measured academic success; that it does not require academic success to join its membership renders the organization's name misleading.

## X.    CONCLUSION

Based on the surveys conducted and described in this report, it is clear that relevant consumers are clearly influenced by Honor Society's promotional and trademark strategies to confuse the organization with Phi Theta Kappa.

After reviewing website and regalia stimuli, a net aggregate of 22.58% of respondents reported confusion between Phi Theta Kappa and Honor Society. This exceeds most standards set by courts to indicate a likelihood of confusion.[31] A

---

[31] *McCarthy on Trademarks and Unfair Competition* § 32:326-327 (5th ed.) "Generally, figures in the range of 25 percent to 50 percent have been viewed as solid support for a finding of likelihood of confusion.  The Ninth Circuit has said that a survey showing a 27.7% level of confusion is alone sufficient evidence to prevent a summary judgment that there is no likelihood of confusion....the Second Court found that a 15-20 percent rate corroborates a finding of likely confusion."

likelihood of confusion finding would be consistent with the evidence suggesting actual confusion summarized in pp. 46-47 of this report.

PTK's alleged trade dress, i.e. its navy and gold color scheme, combined with its wreath of leaves logo, was tested in a survey for single-source identification significance. The survey was administered to two different groups. Group 1 was a cohort fielded from an online panel provider, and Group 2 was a random subset of individuals on a mailing list of PTK members who had joined in the previous 5 years. For Group 1, in the test cell, 40.95% of respondents indicated that PTK's trade dress was associated with a single source. For Group 2, in the test cell, 57.34% of respondents indicated that PTK's trade dress was associated with a single source. Several respondents in both cohorts identified that source as PTK. After controlling for noise, and taking into account respondents in the control cells, we found a net secondary meaning of 23.58% and 39.93% per each group, respectively. When viewed in context, it is my opinion that PTK has established substantial source identification significance in its asserted trade dress.

After reviewing Honor Society webpages advertising various statements about the organization and benefits of membership, 81.22% of respondents indicated a decrease in interest in the organization if any one of the statements surveyed were false. The unweighted average of the rate of respondents indicating a decrease in interest per each statement is 23.47%. Although this survey does not address the truth value of the statements surveyed, it does indicate that their veracity is highly material to relevant consumers and their interest in the organization. Given the evidence suggesting actual false advertising summarized in pp. 101-103, the results of this survey could demonstrate that relevant consumers' reliance on any false statements materially affects their decisions when choosing to apply for scholastic organization memberships.

If called in this case to testify as an expert at trial I expect to prepare exhibits to aid my testimony. I also reserve the right to supplement and/or amend my opinions if additional information or evidence is provided to me.

Respectfully submitted this 30th day of August, 2024

_David J. Franklyn_

_____

David J. Franklyn